# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DRFP L.L.C., d/b/a SKYE   :
VENTURES,
           :  **Case No. 2:04-cv-793**
   **Plaintiff,**
           :  **Judge Holschuh**
 **v.**
           :  **Magistrate Judge Kemp**
THE REPUBLICA BOLIVARIANA
DE VENEZUELA, et al.,   :

   **Defendants.**    :

## MEMORANDUM OPINION AND ORDER

This action for default on promissory notes brought by DRFP L.L.C., d/b/a Skye Ventures ("Plaintiff") against The Republica Bolivariana de Venezuela ("Venezuela") and the Venezuelan Ministry of Finance ("the Ministry") (collectively, "Defendants") is before the Court pursuant to Magistrate Judge Kemp's Order of May 27, 2008 (doc. # 135). That Order amended the discovery schedule in this case to allow the Court to resolve the issues of subject matter jurisdiction and *forum non conveniens*, originally raised in Defendants' Motion to Dismiss (doc. # 13), before requiring the parties to engage in potentially lengthy discovery regarding the validity of the promissory notes at issue. For the following reasons the Court concludes that, assuming the promissory notes in question are valid, Defendants are not immune from this Court's jurisdiction under Foreign Sovereign Immunities Act. Additionally, the Court concludes that the doctrine of *forum non conveniens* does not require dismissal of the case. Defendants' Motion to Dismiss (doc. # 13) on the grounds of subject matter jurisdiction and *forum non conveniens* is thus **DENIED**.

## I.  Relevant Background

On December 7, 1981, the Banco de Desarrollo Agropecuario SA ("Bandagro"), a state-

owned agricultural assistance bank in Venezuela that is now defunct, issued a series of no coupon

bearer promissory notes.[1]  The notes state that they are payable to holder 10 years and 1 day after

the date of issue (December 8, 1991), and also state: "The terms and conditions of this Promissory

Note will be governed by and construed in accordance with the laws of Switzerland and additional

thereto by the regulations of the International Chamber of Commerce in Paris and the United States

Council of the International Chamber of Commerce Brochure '322' last revised edition."  (Compl.

ex. 1A, 1B, doc. # 1.)  Additionally, the notes state that the Minister of Hacienda (the precursor to

the Ministry) guarantees payment of the notes, and that the notes are backed by Venezuela.

The notes were initially acquired by Gruppo Triad-FCC SPA ("Gruppo"), a Panamanian

corporation.  Although the notes state on their face that their maturity date would be December 8,

1991, in early December 1991 the Ministry extended the notes' maturity date until December 1999.

Gruppo demanded payment on the notes in 2001, and in March 2003 the Ministry began an

investigation into Gruppo's demands, part of which included the Ministry sending a representative

to inspect the notes which were then being held in Miami, Florida.  This investigation led to an

opinion by the Venezuelan Attorney General, issued in October 2003, that the notes were valid and

that Venezuela was obligated to pay the notes.  Relying on this opinion, Plaintiff acquired two notes

from Gruppo in 2004, numbers 7/12 and 8/12, each in the amount of $50 million U.S. dollars (the

"Notes").  Plaintiff subsequently from Columbus, Ohio made a demand for payment on the Notes.

---

[1] Defendants vigorously contest the validity of these notes, and argue that they are
forgeries and were never issued by Bandagro.  For the purposes of resolving the threshold issue
of jurisdiction, however, the Court and the parties assume that the notes are valid, which will
allow the Court to focus only on the legal issues involved.  (See Order, May 27, 2008, doc. #
135; Def. Supp. Br. p. 6, 26, doc. # 136 (arguing that even if notes are valid Plaintiff cannot
establish jurisdiction); Pl. Supp. Br. p. 8, doc. # 137 (noting that the Court assumes the notes are
valid for the purpose of resolving the jurisdictional issue).)

Defendants, however, had since conducted a further investigation into the notes and had now concluded that the Notes Plaintiff holds are forgeries, were invalid and consequently revoked the Attorney General's opinion. Defendants refused Plaintiff's demand for payment, and Plaintiff brought this action on August 23, 2004.

Defendants filed a Motion to Dismiss the Complaint on January 31, 2005 (doc. # 13) and raised several grounds that allegedly support dismissal, including lack of subject matter jurisdiction due to sovereign immunity and *forum non conveniens*. After a lengthy period of motion practice before two magistrate judges addressing the proper sequencing and scope of the discovery necessary to resolve Defendants' Motion to Dismiss, on July 16, 2007 Magistrate Judge Kemp ordered the parties to continue their already-begun discovery related to the validity of the Notes, and denied Defendants' request for a stay of that discovery and their suggestion that the Court should address subject matter jurisdiction issues and the doctrine of *forum non conveniens*. (Doc. # 117.)

On July 24, 2007, however, Defendants informed the Court that the Venezuelan Supreme Court had recently issued a decision addressing the issues in this case, and objected to Magistrate Judge Kemp's July 16, 2007 order on the ground that the recent Venezuelan Supreme Court opinion indicated that the best course of action would be to stay discovery and address subject matter jurisdiction and *forum non conveniens*. (Docs. # 118, 119, 120.) This Court then overruled Defendants' objections because Magistrate Judge Kemp's order was not clearly erroneous, but referred the issue back to Magistrate Judge Kemp to determine if the new Venezuelan Supreme Court opinion constituted good cause to modify the previous pretrial order. (Doc. # 132.) Over Plaintiff's opposition, on May 27, 2008 Magistrate Judge Kemp decided that the Venezuelan Supreme Court opinion was indeed good cause to modify the July 16, 2007 order, and directed the

parties to file supplemental briefs addressing the issues of whether, assuming the Notes are valid, subject matter jurisdiction exists, and if subject matter jurisdiction exists, whether the case should be dismissed pursuant to the *forum non conveniens* doctrine. (Doc. # 135.) The parties have filed their supplemental briefs (docs. # 136-38, 141-42), and these issues are ripe for adjudication.

## II. Subject Matter Jurisdiction under the Foreign Sovereign Immunities Act

### A. Applicable Law

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, together with 28 U.S.C. § 1330, "grants federal district courts jurisdiction over civil actions against foreign states 'as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity.'" Republic of Austria v. Altmann, 541 U.S. 677, 685 (2004). The FSIA is the sole basis for establishing federal court jurisdiction over a foreign state. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-39 (1989). Once a defendant makes a *prima facie* showing that it is a foreign state or an agency or instrumentality of a foreign state, as those terms are defined by § 1603, § 1604 creates a presumption that the foreign state is immune from the jurisdiction of United States courts. See 28 U.S.C. § 1604; Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); Keller v. Central Bank of Nigeria, 277 F.3d 811, 815 (6th Cir. 2002). Plaintiff agrees that Venezuela is a foreign state, and that the Ministry is an agency or instrumentality of Venezuela (Compl. ¶¶ 4, 5, doc. # 1), and so Defendants are presumptively immune from this Court's jurisdiction. Plaintiff now bears a burden of production to show that an exception to FSIA immunity applies. Keller, 277 F.3d at 815. The ultimate burden of persuasion, however, rests at all times on the party claiming FSIA immunity: in this case, Defendants. Id.

Two exceptions to FSIA immunity are at issue, contained in the second and third clauses of

§ 1605(a)(2). Section 1605(a)(2) states, in relevant part:

> (a)　　A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case -
>
> * * *
>
> (2)　　in which the action is based . . .; [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [3] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).[2] Section 1605(a)(2) as a whole is known as the "commercial activity

exception," see Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992), because all the

---

[2] In its supplemental brief following Magistrate Judge Kemp's May 27, 2008 order, Plaintiff argued that both of these exceptions apply. Defendants argue that the Court should address only jurisdiction under the third clause of § 1605(a)(2) because jurisdiction under the second clause is not within the scope of the issues Magistrate Judge Kemp's order allowed the parties to brief (p. 2, doc. # 138), but the Court does not agree. In its initial brief in response to Defendants' Motion to Dismiss, Plaintiff clearly stated that it believed that the exception contained in the second clause of § 1605(a)(2) applied in this case. (P. 19-20, doc. # 20). Although the majority of the parties' subsequent briefs have focused on the exception in the third clause of § 1605(a)(2), the issue of whether the second clause creates FSIA jurisdiction was properly raised and is still at issue. Magistrate Judge Kemp's May 27, 2008 order is not to the contrary; it does, at times, specifically reference only the third clause of § 1605(a)(2) and does not mention the second clause, but at other times speaks broadly of the Court addressing "subject matter jurisdiction" with no qualifiers. Finally, Defendants have submitted a second supplemental brief addressing Plaintiff's arguments with respect to the second clause of § 1605(a)(2) and the Court **GRANTS** Defendants' Motion for Leave to file this supplemental brief (doc. # 138). Therefore, Defendants will be heard on this issue and Plaintiff will suffer no prejudice by having the Court consider and rule on the issue of whether the second clause of § 1605(a)(2) creates subject matter jurisdiction.

In its supplemental brief, however, Plaintiff also argued that Defendants have implicitly waived their FSIA immunity. (Pl Supp. Br. p. 28-34, doc. # 137.) Defendants also objected to Plaintiff raising this new issue, and in this case the Court agrees with Defendants. Unlike the second clause of § 1605(a)(2), this is the first time that Plaintiff has raised the issue of waiver, and it is not within the scope of the issues that Magistrate Judge Kemp ordered the parties to brief. Plaintiff acknowledges that this argument went beyond Magistrate Judge Kemp's May 27, 2008 order (p. 4, doc. # 141), and has offered to strike that portion of its supplemental brief. Plaintiff's suggestion is appropriate, and the Court will not address Plaintiff's newly-raised waiver argument.

exceptions set forth in the section are rooted in the idea that when a foreign state engages in purely private commercial transactions, as opposed to sovereign acts, immunity is not appropriate. See id. at 613-14. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act[,]" 28 U.S.C. § 1603(d), and in Weltover the Supreme Court clarified that the terms "commercial conduct" or a "commercial act" mean actions by a foreign state that are in the nature of a private player participating in a market, as opposed to actions in the nature of a governmental actor regulating the market. Weltover, 504 U.S. at 614.

To establish that the exception in the second clause of § 1605(a)(2) applies, the action must 1) be "based upon" an act that was performed in the United States; and 2) the act in the United States must have been taken in connection with commercial activity by the foreign state outside the United States. 28 U.S.C. § 1605(a)(2). "Based upon" means that the act performed in the United States must establish one of the elements of the plaintiff's cause of action: "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Nelson, 507 U.S. at 357. The act in the United States upon which a plaintiff bases its claim need not itself be commercial, but it must have been taken "in connection with" the commercial activity conducted elsewhere: it must have some substantive connection or causal link to the commercial activity. See Adler v. Federal Republic of Nigeria, 107 F.3d 720, 726 (9th Cir. 1997).

To establish that the exception in the third clause of § 1605(a)(2) applies, the action must be "1) 'based . . . upon an act outside the territory of the United States'; 2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and 3) that 'cause[d] a direct effect in the United States.'" Weltover, 504 U.S. at 611 (quoting 28 U.S.C. §

6

1605(a)(2)).  The tests for the "based upon" and "in connection with" elements are the same under the third clause as they are under the second clause of § 1605(a)(2), but under the third clause the plaintiff must also show that the act outside of the United States had a "direct effect" in the United States.

The "direct effect" element does not "contain[] any unexpressed requirement of 'substantiality' or 'foreseeability'[,]" id. at 618, and the Sixth Circuit has rejected the "legally significant act" test, adopted by other circuits, that would require the plaintiff to show that "something legally significant actually happened in the U.S.[,]" Gregorian v. Izvestia, 871 F.2d 1515, 1527 (9th Cir. 1989), to establish FSIA jurisdiction under the third clause of § 1605(a)(2). Instead, the Supreme Court and the Sixth Circuit both state that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" Keller, 277 F.3d at 817 (quoting Weltover, 504 U.S. at 618).  "Of course the generally applicable principle de minimus non curat lex[3] ensures that jurisdiction may not be predicated on purely trivial effects in the United States[,]" American Telecom Co., L.L.C. v. Republic of Lebanon, 501 F.3d 534, 539 (6th Cir. 2007) (quoting Weltover, 504 U.S. at 618).  To establish a direct effect under the third clause of § 1605(a)(2), therefore, a plaintiff must show that the effect was not a trivial effect and that it was the immediate consequence of a foreign state's activity.

B.     Analysis

1.     The Second Clause of § 1605(a)(2)

Plaintiff argues that the exception in the second clause of § 1605(a)(2) applies because the

_____

[3] "The law does not care for, or take notice of, very small or trifling matters."  BLACK'S LAW DICTIONARY 224 (Abridge. 5th ed. 1983).

Ministry's investigation into Gruppo's demands for payment included inspecting the Notes in Miami, Florida; Plaintiff argues that this is an "act performed in the United States" taken in connection with Defendants' commercial activity of issuing and guaranteeing the Notes in Venezuela. (Pl. Supp. Br. p. 26, doc. # 137.) Plaintiff further argues that its case is "based upon" the Ministry's investigation in Miami because Plaintiff relied on the investigation and the Attorney General's opinion that the Notes were valid when it purchased the Notes from Gruppo and, from Columbus, made demand for payment: "Venezuela's investigation of the Notes in the United States began an unbroken chain of events beginning with the [Attorney General's] investigation, which enticed Plaintiff to purchase the Notes, and ending with Venezuela's failure to remit payment in Columbus, Ohio." (Id. p. 27-28.) Defendants respond by arguing that Plaintiff's claim is not "based upon" the Ministry investigation in Miami because establishing that the investigation occurred does not prove any of the elements of Plaintiff's claim. (Def. Supp. Br. p. 3-7, doc. # 138.)

Bandagro's issuance of the Notes, and Defendants' guarantee of them, were certainly "commercial activity" under § 1603(d) and Weltover, because Defendants were acting in the nature of a private player participating in a market by issuing and guaranteeing such "garden variety debt instruments," see Weltover, 504 U.S. at 614, and the noncommercial act of inspecting the Notes was taken "in connection with" that commercial activity. This satisfies the second requirement for establishing that the exception in the second clause of § 1605(a)(2) applies, but the question is whether Plaintiff's action is "based upon" an act performed in the United States: the primary, fundamental requirement for the application of the second clause of § 1605(a)(2).

As noted above, in Saudi Arabia v. Nelson the Supreme Court interpreted the "based upon" requirement to mean that an action is based upon the "elements of a claim that, if proven, would

entitle a plaintiff to relief under his theory of the case." 507 U.S. at 357. What, then, are the elements of Plaintiff's claim for default on these Notes?

Defendants state that "[t]he elements [of Plaintiff's claim] are Plaintiff's ownership of the (allegedly genuine) notes and the refusal of the Venezuelan government to pay." (2d Supp. Br. p. 4, doc. # 138.). Ohio law includes these same elements - in Ohio, the elements of an action for default on a promissory note are: (1) the defendant must have signed the note; (2) the plaintiff must be the holder of or be entitled to enforce the note; and (3) the note must be due and unpaid. OHIO REV. CODE ANN. §§ 1303.36(A), (B), 1303.41 (LexisNexis 2002); 71 OH. JUR. 3D *Negotiable Instruments and Other Commercial Paper* § 342 (2008).

Furthermore, the Bandagro Notes specifically state that the obligations of the bank and Defendants will be governed by "the laws of Switzerland and additional thereto by the regulations of the International Chamber of Commerce Brochure '322' last revised edition." As discussed in section II.B.2 *infra*, these provisions allow the holder of the Notes to designate the place where the bank would remit payment, and in this case Plaintiff designated Columbus, Ohio.

Having thus determined what the elements of Plaintiff's cause of action are, the Court now asks whether Plaintiff's action is "based upon" Defendant's act of investigating and examining the Notes in Miami. The Court concludes that it is not. Evidence that a Ministry representative traveled to Miami to inspect the Notes, and that the results of this inspection helped to support the Attorney General's initial opinion that the Notes were valid, would certainly be *evidence* that the Notes were valid, *i.e.* that Defendants signed the Notes and that they are genuine, which is the first element of Plaintiff's claim. However, that does not mean that the act of inspecting the Notes in Miami conclusively *established* the first element of Plaintiff's claim, as <u>Nelson</u> requires. <u>See</u> 507 U.S. at

357. Under Plaintiff's theory of the case, the act that conclusively established the validity of the Notes and the act upon which Plaintiff relied in purchasing the Notes was the Attorney General's October 2003 opinion concluding that the Notes were valid debt obligations. That act occurred in Venezuela, not the United States.

Plaintiff's "chain of events" argument is unpersuasive, because Nelson and the second clause of § 1605(a)(2) require that a specific act occurring in the United States must actually establish one of the elements of the plaintiff's claim, not that an act in the United States leads to or supports the establishment of an element of the claim. Under Plaintiff's theory of the case, see id., proving that the Ministry representative inspected the Notes in Miami does not entitle the Plaintiff to relief on its cause of action for default on the Notes, because Plaintiff has consistently argued that the Attorney General's October opinion is what actually established the Notes' validity. The inspection in Miami certainly supported and formed a basis for the Attorney General's decision, but it did not conclusively establish that Defendants signed the Notes, because the Miami inspection was just a facet of a larger and broader investigation that ultimately culminated in an opinion rendered in Venezuela, not the United States.

Plaintiff has not satisfied its burden of production to demonstrate that the exception to FSIA immunity in the second clause of § 1605(a)(2) applies, and Plaintiff's claim is not "based . . . upon an act performed in the United States." This Court does not have subject matter jurisdiction pursuant to the second clause of § 1605(a)(2)'s commercial activity exception.

### 2. The Third Clause of § 1605(a)(2)

Plaintiff also argues that the exception contained in the third clause of § 1605(a)(2) applies in this case. Plaintiff's claim is "based upon" an act outside of the United States, as all of

Defendants' commercial activity took place outside the United States.  Assuming for the purposes of this ruling that the Notes are valid, the parties agree that Defendants engaged in commercial activity, see Weltover, 504 U.S. at 614 (issuing debt instruments that a private entity could issue is commercial activity), and all of Defendants' actions had a substantial connection to that commercial activity.  The basic issue, therefore, is whether Defendants' failure to pay on the Notes had a direct effect in the United States.

Plaintiff argues that Defendants' refusal to pay on the Notes had a direct effect in the United States because Plaintiff had validly designated a bank in Columbus, Ohio as the place of payment.  Once Plaintiff did so, Plaintiff argues that Defendants had a contractual obligation to pay on the Notes in Columbus.  Plaintiff argues that when Defendants refused to pay, money that should have been coming to Columbus did not arrive, causing a direct effect in the United States.  (Pl. Supp. Br. p. 12, doc. # 137.)  Plaintiff primarily relies on Weltover for this argument.  Defendants respond by arguing that Plaintiff's unilateral acts of holding the Notes in the United States, demanding payment in Columbus, and designating Columbus as the place of payment do not create a direct effect in the United States because the Notes did not specifically designate the United States as the place of payment.  (Def. Supp. Br. p. 25-33, doc. # 136.)  Defendants rely primarily on circuit and district court opinions applying Weltover for their argument.

To determine if a foreign sovereign's commercial act had a direct effect in the United States, courts frequently ask whether the foreign sovereign had a contractual obligation to pay money in the United States pursuant to a designation of the United States as the place of payment.  See, e.g., Weltover, 504 U.S. at 619; Keller, 277 F.3d at 818; Global Index, Inc. v. Mkapa, 290 F.Supp.2d 108, 113 (D.D.C. 2003) (stating that relevant case law does not "specifically require[] express designation

of the United States as the place of payment[,]" but "[a]s a factual matter, however, in almost every case . . . involving the direct effect exception, the existence or absence of an expressly designated place of payment has been decisive").

Such a designated place of payment was decisive for the Supreme Court in <u>Weltover</u>, which involved Argentina's issuance of government-backed bonds. The bonds stated that they were payable in United States dollars and allowed the holder to elect to demand payment through either the London, Frankfurt, Zurich, or New York markets. 504 U.S. at 610. When the bonds matured the holders designated New York as the place of payment, and after Argentina attempted to reschedule the debts and then defaulted on the bonds, the holders sued in federal court. The Supreme Court, affirming both the district court's and the Second Circuit's finding that the exception in the third clause of § 1605(a)(2) applied, held that "[b]ecause New York [pursuant to the holders' designation] was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." <u>Id.</u> at 619.

The Sixth Circuit has also relied on a foreign sovereign's contractual obligation to pay at a designated location in the United States to find that the third clause of § 1605(a)(2) created an exception to FSIA immunity. In <u>Keller</u> the plaintiff, a Michigan businessman, entered into a contract with defendants, representatives of the Nigerian government, to distribute prefabricated hospital and emergency care facilities in Nigeria. 277 F.3d at 814. Plaintiff and defendants agreed in the contract that defendants would transfer funds to plaintiff's bank account in Cleveland, Ohio as payment for the facilities, but when no funds were transferred plaintiff filed suit. <u>Id.</u> The Sixth

Circuit, after surveying decisions from other circuits finding "a direct effect when a defendant agrees to pay funds to an account in the United States and then fails to do so[,]" id. at 818, found that defendants' actions had a direct effect in the United States because "defendants agreed to pay but failed to transmit the promised funds." Id. Other circuits have relied on similar reasoning, even when the debt instrument in question does not specifically indicate any one place of payment but rather allows the holder to designate a place of payment. See, e.g., Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127, 132 (2d Cir. 1998) (where letter of credit allowed plaintiff to designate any place of payment and plaintiff designated a New York bank account, defendant's failure to pay on the letter of credit resulted in direct effect in United States); Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887 (5th Cir. 1998) (where plaintiff designated Houston bank account as place of payment on a letter of credit that allowed plaintiff to designate any place of payment, defendant's failure to remit funds to Houston bank had direct effect in the United States).

The question, then, is whether the Notes allowed Plaintiff to validly designate Columbus as the place of payment, and thus imposed upon Defendants a contractual obligation to pay on the Notes in the United States. Although Defendants argue to the contrary, the Court finds that Plaintiff has demonstrated that the Notes allowed Plaintiff to designate Columbus as the place of payment pursuant to Defendants' specified contractual obligations in the Notes.

As noted *supra* in § I, the Notes state: "The terms and conditions of [these] Promissory Note[s] will be governed by and construed in accordance with the laws of Switzerland and additional thereto by the regulations of the International Chamber of Commerce in Paris and the United States Council of the International Chamber of Commerce Brochure '322' last revised edition." (Compl. ex. 1A, 1B, doc. # 1.) While the Notes themselves do not specifically state that their holder can

demand payment in the United States, the Notes clearly include the United States as a place of payment because of Bandagro's agreement that its obligations under the Notes, which would include the obligation to make payment, will be governed and construed in accorance with the laws of Switzerland and by the regulations of the International Chamber of Commerce ("ICC"). Plaintiff has produced the unrebutted affidavit of Marco Villa, an expert in Swiss law who specializes in banking and commerce, who states that Swiss law, as applied to the Notes, would allow a demand for payment and suit to obtain payment on the Notes in any jurisdiction, including the United States. (Aff. of Marco Villa ¶¶ 2, 5, Pl. Br. re: Disc. ex. 3, doc. # 20.)

Plaintiff has also produced the unrebutted affidavit of Gary M. Post, an expert in financial matters and the ICC's regulations in its Rules on Collection, which he states "allow the holder of a debt instrument, such as promissory notes, to demand payment essentially anywhere in the world." (Aff. of Gary M. Post ¶ 2, Pl. Supp. Br. ex. 3, doc. # 137 ("Post Aff.").) The reason for this broad payment provision is that it benefits both the creditor and the purchaser of promissory notes. Post states that the Notes could not have been sold in the international market unless payment could be demanded outside of Venezuela: "If buyers were required to either go to Venezuela to collect the notes or were subject to the Venezuelan legal system to collect the notes, such notes could not have been sold." (Id. ¶ 9.) Furthermore, Post states that it was foreseeable and intended by Bandagro that payment on the Notes would be demanded in the United States because: the Notes are bearer notes and are freely transferable, they are written in English, and the amount is listed in United States dollars. (Id. ¶¶ 3, 10.) He also states that "[i]t is common knowledge that Venezuela has made regular use of the United States [m]arkets to place and settle debt instruments." (Id. ¶ 11.) Post unequivocally concludes that demand for payment from Columbus, Ohio was proper under the ICC

regulations, and that Plaintiff validly designated a bank in Columbus, Ohio as the place of payment. (Id. ¶ 8.)

Defendants do not refute Post's Affidavit, and instead argue that the ICC regulations are irrelevant to this case because they are voluntary guidelines. (Def. 2d Supp. Br. p. 21-22, doc. # 138.) The fact that Defendants may consider the ICC regulations to be voluntary guidelines, however, does nothing to detract from the undisputed fact that Bandagro voluntarily and contractually agreed when issuing the Notes that their terms and conditions would be governed by Swiss law and the ICC regulations.[4] The reason for doing so is obvious; according to Post's Affidavit, Bandagro could not have sold the Notes if it had not included this contractual obligation in the Notes.

To establish that an exception to FSIA immunity applies, Plaintiff has a burden of production only, not a burden of ultimate persuasion (which falls on the entity claiming immunity), see Keller, 277 F.3d at 815, and this unrefuted affidavit testimony is sufficient to establish that under the negotiated terms of the Notes, including the ICC regulations and Swiss law, Plaintiff was entitled to designate any place of payment it desired, including Columbus. And once Plaintiff designated Columbus as the place of payment, Defendants had a contractual obligation to pay on the Notes in Columbus. Their failure to do so caused a direct effect in the United States, because "[m]oney that was supposed to have been delivered to a [Columbus] bank for deposit was not forthcoming." Weltover, 504 U.S. at 619; see also Keller, 227 F.3d at 818.

Defendants argue that Weltover and Keller are distinguishable because in those cases the

---

[4] Again, assuming for the purposes of this Opinion that the Notes are not forgeries and were in fact issued by Bandagro.

bonds and contracts at issue specifically designated a United States place of performance, unlike the Notes at issue in this case. That fact, however, is not determinative. The Court finds the Second Circuit's rejection of a similar argument to be persuasive:

> Although the letter of credit did not itself specify New York as the place of payment, it authorized the negotiating bank to designate the place of payment. In so doing, [defendant] consented to pay the relevant amount at a location chosen by plaintiff . . ., wherever that might be. Accordingly, when [plaintiff] specified New York in its correspondence, [defendant] had already impliedly agreed to New York as the place of payment. Moreover, the distinction defendant draws with Weltover is off-target because the bonds in Weltover did not specify New York as the sole place of payment, but rather listed New York as only one of four places that could be chosen by creditors for payment. See 504 U.S. at 609-10. The plaintiff creditors elected New York, which, rather than distinguishing Weltover from the facts of the case at hand, makes the two quite similar. Hence, we see no real factual difference between Weltover and the present case regarding the parties' agreement as to place of payment. Because [plaintiff] specified a New York bank account into which the funds were to be deposited - and because [defendant] had not eliminated New York as an option in the letter of credit it issued - its breach resulted in the failure of funds destined for New York to arrive there.

Hanil Bank, 148 F.3d at 132. Just so in the present case; the Notes themselves did not specify Columbus, Ohio as the place of payment, but by stating that the terms of the Notes - terms such as the place of payment - would be governed by Swiss law and the ICC regulations, the Notes authorized Plaintiff to designate a bank in Columbus, Ohio as the place of payment. As in Hanil Bank, the maker of the Notes in the present case "consented to pay the relevant amount at a location chosen by plaintiff, wherever that might be." Id. Defendants' failure to pay on the Notes thus "resulted in the failure of funds destined for [Columbus] to arrive there[,]" causing a direct effect in the United States. Id.

Defendants also rely on Global Index, 290 F.Supp.2d at 112-16 and Morris v. People's Republic of China, 478 F.Supp.2d 561 (S.D. N.Y. 2007), but those cases are distinguishable. Global Index involved promissory notes allegedly issued by a political subdivision of Tanzania.

The notes in that case contained no designated place of payment, but also contained no provision allowing the holder to designate a place of payment. 290 F.Supp.2d at 114-15. In finding that subject matter jurisdiction did not exist, the Global Index court relied on the fact that "[p]laintiff points to no evidence, or even potential evidence to be uncovered in discovery, that tends to show that the parties had even impliedly agreed on payment in the United States." Id. at 115. That is not the situation in this case, however, where Plaintiff has presented evidence demonstrating that the terms of the Notes specifically allowed the Plaintiff to designate a place of payment, including a place in the United States. Defendants point to the Global Index court's statement that "there is no direct effect if the creditor-plaintiff chooses, unilaterally, the U.S. as a place of payment without any prior agreement with the debtor[,]" id., but again that is not the case here. Defendants, when guaranteeing the Notes, agreed to the inclusion of Swiss law and the ICC regulations that allow a holder to designate its preferred place of payment, and thus agreed to pay on the Notes wherever the holder so designated. Global Index is clearly factually distinguishable.

Morris involved defaulted bonds, issued in 1913 by a predecessor Chinese government, that the plaintiff had acquired in 2000 and attempted to obtain payment on. 478 F.Supp.2d at 564. The terms of the bonds specifically excluded United States banks as places of payment on the bonds, a fact that the Morris court noted and relied upon in finding that default on the bonds could not have a direct effect in the United States, because the United States could never have been the designated place of payment. Id. at 570-71. This alone is sufficient to distinguish Morris from the Notes at issue here, which did not exclude any location, much less a United States location, as the place of payment. Defendants also argue that the Morris court relied on the fact that the bonds had been defaulted for 60 years before the plaintiff acquired them, which would attenuate any "direct

effect," and that Plaintiff in this case similarly acquired the Notes after the maturity date. In this case, however, Plaintiff acquired the Notes less than 5 years after the extended maturity date and soon after Defendants had themselves acknowledged in the Attorney General's opinion that the Notes were valid debt obligations. This is clearly distinguishable from the long-defaulted bonds at issue in Morris.

In sum, the Court finds that Defendants' failure to pay on the Notes caused a direct effect in the United States, because the Notes allowed Plaintiff to designate a place of payment in the United States and Defendants were contractually obligated under the terms of the Notes to pay at that location. Once Plaintiff designated Columbus, Ohio as the place of payment, Defendants' refusal to pay meant that funds that were supposed to arrive in Columbus failed to do so. Under Weltover, this is a direct effect in the United States for the purposes of the exception in the third clause of § 1605(a)(2). Plaintiff has satisfied its burden of production to establish that an exception to FSIA immunity applies, see Keller, 277 F.3d at 815; Defendants have failed to satisfy their burden of persuasion, and the Court finds that, assuming the Notes are valid, it has subject matter jurisdiction over this action pursuant to the exception in the third clause of 28 U.S.C. § 1605(a)(2). Defendants' Motion to Dismiss (doc. # 13) on the issue of subject matter jurisdiction is **DENIED**.

## III.  *Forum Non Conveniens*

### A.  **Applicable Law**

The doctrine of *forum non conveniens* allows a federal court to "dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 127 S. Ct. 1184, 1188 (U.S. 2007). A plaintiff's choice of forum, particularly when that plaintiff is a United States citizen

and has chosen its home forum, is entitled to a heightened degree of deference, see Duha v. Agrium, Inc., 448 F.3d 867, 873-74 (6th Cir. 2006), and "a plaintiff's choice of forum should rarely be disturbed." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981). If the defendant can show, however, that another forum has jurisdiction to hear the case and that retaining the case in the plaintiff's chosen forum would "'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." Id. (quoting Koster v. Am. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)).

The *forum non conveniens* analysis is thus a two-pronged inquiry: the defendant must establish 1) that an "available and adequate alternate forum" can hear the case, Duha, 448 F.3d at 873; and 2), "that the balance of private and public factors listed in Gulf Oil [Corp. v. Gilbert, 330 U.S. 501, 508-9 (1947)] reveals that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court." Duha, 448 F.3d at 873. A defendant must satisfy both prongs of the test to warrant a *forum non conveniens* dismissal, and "[t]he defendant bears the burden of proof on all elements of the *forum non conveniens* analysis." Stalinski v. Bakoczy, 41 F.Supp.2d 755, 758 (S.D. Ohio 1998) (Dlott, J.)

**B.     Analysis**

Although the parties spend much of their briefs addressing Venezuela's adequacy as a forum and the Gulf Oil public and private factors, the Court can resolve this issue by examining Venezuela's availability as a forum. See Stalinski, 41 F.Supp.2d at 759 (the first prong "is a two-part inquiry: availability and adequacy"); 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER &

EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3828.3 (3d ed. 2007) ("Although some courts conflate these issues, the availability and adequacy of the supposed alternative forum are better seen as raising independent issues that warrant separate consideration by the court").

Defendants argue that Venezuela is an available forum because they are amenable to service of process there, and because "the Venezuelan courts are open and available to review administrative actions" such as Plaintiff's. (Def. Supp. Br. p. 8-9, doc. # 136.) Plaintiff responds by arguing that Venezuela is not an available forum because the recent Venezuelan Supreme Court opinion has conclusively resolved in Venezuela the issue of the binding effect of the Attorney General's 2003 opinion, which in effect precludes Plaintiff from arguing in Venezuela that the Notes are valid obligations of the Defendants. (Pl. Supp. Br. p. 36-37, doc. # 137.)

Defendants are correct that an alternate forum is generally considered to be "available" when the defendants are amenable to service of process there. See Piper Aircraft, 454 U.S. at 254 n. 22. However, the Piper Aircraft Court also recognized that "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute," id., and the Court agrees with Plaintiff that, in light of the Venezuelan Supreme Court's recent opinion, the Venezuelan courts effectively would not permit litigation of one of the essential issues of Plaintiff's complaint. See also Norex Petroleum Ltd. v. Access Industries, Inc., 416 F.3d 146, 157 (2d Cir. 2005) (stating that an alternative forum is available if it permits litigation of the subject matter of the dispute and resolving the case on the ground that Russian courts would not permit the plaintiff to litigate disputed issues due to the preclusive effects of prior Russian court judgments).

The Venezuelan Supreme Court's recent opinion was rendered in response to a request filed by the current Venezuelan Attorney General, as well as the former Attorney General who gave the

October 2003 opinion upon which Plaintiff relies, asking the Venezuelan Supreme Court to interpret the constitutional and statutory powers of the Attorney General to issue opinions on the validity of Venezuela's debt obligations, as well as to interpret the binding nature of such opinions. (Translation of Venezuelan Supreme Court Opinion p. 16-17, Def. Emergency Mot. Vacate ex. B, doc. # 118.) The Venezuelan Supreme Court first noted that this request for interpretation specifically arose because of the former Attorney General's 2003 opinion that stated the Notes were valid debt obligations and because of Gruppo's demands for payment on the Notes, and then turned to the merits of the request for interpretation. After setting forth the relevant constitutional and statutory provisions and considering the evidence surrounding the former Attorney General's 2003 opinion, the Venezuelan Supreme Court concluded that the 2003 opinion was not rendered in the context of an administrative proceeding, and thus had absolutely no binding effect. The court further concluded that the 2003 opinion did not create any rights in favor of private individuals, and recognized that the Ministry and the former Attorney General later revoked the initial opinion and issued binding opinions rejecting the Notes' validity. (Id. p. 23.)

The Venezuelan Supreme Court's opinion finding that the Attorney General's initial 2003 opinion that the Notes were valid was illegal and the Venezuelan Supreme Court's further recognition of the subsequent rejection of that opinion and the later issuance of binding opinions by the Ministry and the new Attorney General finding the Notes to be invalid effectively decided the issue of the Notes' validity against the Plaintiff in the present case. Defendants argue that Venezuela is an available forum because "the decision reflects a process of considering various positions and acknowledging them in reaching a decision that is announced and explained" (Def. Supp. Br. p. 9, doc. # 136), but the problem is that this process has already finished and there is no

indication that the Venezuelan courts would allow it to begin again.  The Venezuelan courts have addressed the exact factual scenario presented by this case and have conclusively decided an issue central to Plaintiff's case adversely to Plaintiff's stated position.  This clearly shows that Venezuela is not available to Plaintiff as a forum in which to litigate its case.

The Second Circuit's opinion in <u>Norex</u> is instructive and persuasive.  In that case plaintiff Norex, a Cypriot corporation, was the majority shareholder of a Russian oil company, Yugraneft, and faced a takeover attempt from another company, TNK.  416 F.3d at 151.  As part of the takeover attempt, TNK filed lawsuits in Russia that sought to invalidate Norex's interest in Yugraneft.  The Russian courts, allegedly under TNK's control, entered default judgments against Norex and reduced its ownership share in Yugraneft to 20%.  These judgments prevented Norex from challenging the legality of TNK's takeover of Yugraneft in the Russian courts.  <u>Id.</u> at 152.  Thereafter, TNK stripped Yugraneft of its assets and Norex brought a RICO action based on fraud, extortion, and money laundering against numerous defendants, including TNK, in the Southern District of New York.

Reversing the district court's *forum non conveniens* dismissal, the Second Circuit recognized that Russian law provided for reasonable alternatives for a civil RICO claim, but found that

> these alternative actions are not practically available to [Norex] at present because the factual crux of any fraud or conspiracy claims that it would pursue in Russia would necessarily be based - like Norex's pending RICO action - on the illegality of defendants' actions in depriving Norex of its controlling equity interest in Yugraneft[,]

which issue Norex was precluded from litigating in Russia by the Russian court judgments.  <u>Id.</u> at 158.  The district court had recognized that Norex was precluded from litigating this issue in Russia

but reasoned that the absence of an available forum was excusable in light of the fact that Norex had not participated in the Russian litigation. The Second Circuit rejected that reasoning, however, and

> clarif[ied] that a case cannot be dismissed on grounds of *forum non conveniens* unless there is presently available to the plaintiff an alternative forum that will permit it to litigate the subject matter of its dispute. . . . [The available forum] analysis does not concern itself with the reason why an alternative forum is no longer available; its singular concern is the fact of present availability.

Id. at 159. The Norex court also noted that defendants bore the burden of demonstrating that Russia was an available forum, and that defendants had not satisfied their burden. Id.

In this case, Defendants have provided no evidence that would tend to show that Venezuelan courts would continue to entertain the issue of the validity of the Notes as set forth in the Attorney General's 2003 opinion. Similar to the situation in Norex, the "factual crux" of any claim Plaintiff might bring in Venezuela regarding the validity of the Notes would include its reliance on the Attorney General's 2003 opinion that the Notes are valid: an issue that the Venezuelan Supreme has already decided. Venezuela is thus not a currently available forum in which Plaintiff could completely litigate its claims, and a *forum non conveniens* dismissal would be inappropriate. Defendants' Motion to Dismiss (doc. # 13) on the issue of *forum non conveniens* is **DENIED**.[5]

## IV.    Conclusion

Defendants' Motion to Dismiss (doc. # 13) is **DENIED** as to the issues of subject matter

---

[5] This ruling should not be construed to conclusively resolve the issue of what binding effect the Venezuelan Supreme Court opinion may have on *this* Court. Norex again is instructive: "It may well be that a plaintiff that is precluded from litigating a matter in a foreign jurisdiction because of an adverse earlier judgment by [the foreign] courts will not be able to pursue the claim further in the United States, but the reason for dismissal in such circumstances is our recognition of the foreign judgment in the interest of international comity, not *forum non conveniens*." 416 F.3d at 159. Federal courts may, but are not required to, recognize and enforce the judgment of a foreign country due to comity considerations. See, e.g., Taveras v. Taveraz, 477 F.3d 767, 783 (6th Cir. 2007).

jurisdiction and *forum non conveniens*. The Court finds that the exception to a foreign sovereign's FSIA immunity contained in the second clause of 28 U.S.C. § 1605(a)(2) does not apply in this case, but assuming the Notes in question are valid the exception in the third clause does. The Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1605(a)(2) and 1330. Additionally, because the Court finds that Venezuela is not a currently available alternate forum, this case cannot be dismissed pursuant to the doctrine of *forum non conveniens*. This matter is referred back to Magistrate Judge Kemp for further proceedings in accordance with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.


Date: February 13, 2009                                         **/s/ John D. Holschuh**
                                                                John D. Holschuh, Judge
                                                                United States District Court