UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DRFP L.L.C., d/b/a Skye Ventures, | ) | Case No. 2:04-cv-0793 |
| Plaintiff, | ) | Judge Sargus |
| v. | ) | Magistrate Judge Kemp |
| República Bolivariana de Venezuela, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO COMPEL CRABBE, BROWN & JAMES TO PRODUCE ALLEGEDLY PRIVILEGED GRUPPO TRIAD DOCUMENTS IN ITS POSSESSION AND TO COMPEL GRUPPO TRIAD AND LARA PAVANELLI, THE PRESIDENT OF GRUPPO TRIAD, TO PRODUCE OTHER ALLEGEDLY PRIVILEGED GRUPPO TRIAD DOCUMENTS**

Pursuant to Federal Rules of Civil Procedure 34(c) and 45, Venezuela seeks an order compelling the law firm of Crabbe, Brown & James LLP ("CBJ") to produce allegedly privileged and work product protected documents relating to its representation of Gruppo Triad-FFC S.P.A. / S.A ("Gruppo Triad") that are responsive to the subpoena that Venezuela properly served upon CBJ.  Venezuela also asks the Court to issue a similar order directing Lara Pavanelli ("Ms. Pavanelli"), the current president of Gruppo Triad, and Gruppo Triad to produce any documents responsive to the subpoena served on Ms. Pavanelli that are being withheld under either the attorney-client privilege or work product doctrine.[1]

As demonstrated in the accompanying Memorandum, Gruppo Triad lost the right to assert the attorney client privilege and work product doctrine as a result of criminal and

---

[1] In addition to serving copies of this motion and the accompanying papers on Skye and CBJ, Venezuela has served copies of all the motion papers on Gruppo Triad and Ms. Pavanelli, through their attorney, so that they can respond on behalf of Gruppo Triad.

fraudulent misconduct by its principal, James Pavanelli ("Pavanelli"), and others associated with him. Courts in two different countries have already convicted Pavanelli for criminal schemes involving fake Bandagro notes owned by Gruppo Triad. Gruppo Triad's ensuing activities in the United States—including its entanglements with Skye Ventures and its engagement of CBJ—were a continuation of Pavanelli's and Gruppo Triad's criminal and fraudulent dealings in fake Bandagro notes. Gruppo Triad is not entitled to the protection of the attorney-client privilege or the work product doctrine.

Even in the remote event that Gruppo Triad's privilege is not vitiated under the crime-fraud exception, Gruppo Triad waived the protections of the attorney client privilege and work product doctrine by disclosing multiple legal opinions in connection with its transfer of the purported notes to Skye. Those opinions address numerous issues concerning Bandagro notes, including the subject matters of the documents subpoenaed from CBJ and Ms. Pavanelli.

CBJ, Gruppo Triad and Ms. Pavanelli have withheld responsive Gruppo Triad documents, asserting the attorney-client privilege and/or work product doctrine. On crime-fraud and waiver grounds, this Court should find that Gruppo Triad cannot shield documents related to Bandagro notes from discovery under the attorney client privilege or work product doctrine.

Respectfully submitted,

REPÚBLICA BOLIVARIANA DE VENEZUELA AND VENEZUELAN MINISTRY OF FINANCE

By its attorneys,

Albert J. Lucas (0007676)

Trial Attorney
Jason J. Blake (0087692)
CALFEE, HALTER & GRISWOLD LLP
1200 Huntington Center
41 South High Street
Columbus, OH 43215-4243
Telephone:  (614) 621-7002
Facsimile:  (614) 621-0010
alucas@calfee.com; jblake@calfee.com

Andrew Z. Schwartz, *pro hac vice*
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
Telephone:  (617) 832-1155
Facsimile:  (617) 832-7000
aschwartz@foleyhoag.com

Ronald E.M. Goodman, *pro hac vice*
Lawrence H. Martin, *pro hac vice*
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 232-1200
Facsimile:  (202) 785-6687
rgoodman@foleyhoag.com
lmartin@foleyhoag.com

Dated:  February 3, 2015

## CERTIFICATE OF SERVICE

A copy of the foregoing Motion to Compel, with the attached Memorandum in Support, Certification, Declaration and Exhibits, will be delivered to CBJ and counsel for Skye via hand delivery this 3d day of February, 2015.  A copy of the foregoing will also be delivered via overnight mail to counsel for Lara Pavanelli and Gruppo Triad this 3d day of February, 2015, at the following address:

Eddie M. Krenek
Krenek Law Offices
423 Mason Park Blvd.
Suite C
Katy, Texas 77450
281-578-7711 (p)
832-606-8585 (c)
edkrenek@kreneklaw.com

_____
One of the Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| DRFP L.L.C., d/b/a Skye Ventures, ) | |
| ) | Case No. 2:04-cv-0793 |
| Plaintiff, ) | |
| ) | Judge Sargus |
| v. ) | |
| ) | Magistrate Judge Kemp |
| República Bolivariana de Venezuela, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL CRABBE, BROWN & JAMES TO PRODUCE ALLEGEDLY PRIVILEGED GRUPPO TRIAD DOCUMENTS IN ITS POSSESSION AND TO COMPEL GRUPPO TRIAD AND LARA PAVANELLI, THE PRESIDENT OF GRUPPO TRIAD, TO PRODUCE OTHER ALLEGEDLY PRIVILEGED GRUPPO TRIAD DOCUMENTS**

## TABLE OF CONTENTS AND SUMMARY OF ARGUMENT

TABLE OF CONTENTS AND SUMMARY OF ARGUMENT ..................................................... i

I.      RELIEF REQUESTED ................................................................................. 1

II.     BACKGROUND ........................................................................................... 2

III.    STATEMENT OF FACTS ............................................................................ 7

        A.   The Dubious Origin Of The Gruppo Triad Notes (Including The Purported
             Notes At Issue In This Case). ..................................................................9

        B.   Pavanelli's Criminal Convictions For Dealing In Fake Bandagro Notes. ............10

        C.   Gruppo Triad And Pavanelli Use Bribes And Undue Influence To Further
             Their Criminal Schemes. ........................................................................13

        D.   Pavanelli Expands His Criminal Enterprise To The United States........................16

        E.   Richards Becomes Corna's Moneyman For Pavanelli And Gruppo Triad............19

        F.   Gruppo Triad And Skye Hatch A Plan To Try To Collect On Gruppo Triad's
             Bogus Bandagro Notes ...........................................................................24

        G.   Dissention In The Ranks...........................................................................32

        H.   Gruppo Triad Disclosed To Skye Its Legal Opinions Regarding the Validity
             And Enforceability Of The Bandagro Notes. ...........................................36

        I.   Gruppo Triad's Previous "Limited" Waiver Of Privilege .....................................37

IV.     ARGUMENT ................................................................................................ 38

        A.   Gruppo Triad Has Lost The Right To Assert The Attorney-Client Privilege
             Or Work Product Doctrine Under The Crime Fraud Exception Because Of
             Pavanelli's Criminal Activities Involving The Notes At Issue Here. ....................42

             1.   Under the crime fraud exception, where there is a prima facie
                  showing that a crime or fraud may have occurred, the attorney-client
                  privilege and work product doctrine are inapplicable to any
                  communication or documents relating to the prima facie violation. .........42

             2.   There is much more than a "reasonable basis" to suspect the
                  perpetration of a crime or fraud, given Pavanelli's criminal
                  convictions for dealing in fake Bandagro notes, Gruppo Triad's bribes
                  and illicit dealings in Venezuela, Gruppo Triad's sale of notes to Skye
                  that had been previously determined by an Italian court to be

counterfeit, and the numerous irregularities in Gruppo Triad's transaction with Skye. ................................................................44

    3.    Pavanelli and Gruppo Triad's activities in the United States in 2003–2004 were in furtherance of the criminal scheme to profit from bogus Bandagro notes, so any privilege or immunity from discovery relating to these activities has been lost. ...............................................47

   B.   Gruppo Triad Waived Any Privilege When It Voluntarily Shared Numerous Legal Opinions With Skye Concerning The Bandagro Notes. ............................49

    1.    A party may not selectively disclose self-serving privileged materials without waiving the privilege as to all communications on the same topic................................................................................49

    2.    Gruppo Triad's disclosure to Skye of allegedly privileged materials waived the privilege as to all communications concerning the purported Bandagro notes. ...................................................51

V.    CONCLUSION ........................................................................ 52

VI.   LOCAL RULE 37.2 CERTIFICATION ........................................ 54

## I.     RELIEF REQUESTED

Pursuant to Federal Rules of Civil Procedure 34(c) and 45, Venezuela seeks an order compelling the law firm of Crabbe, Brown & James LLP ("CBJ") to produce allegedly privileged and work product protected documents relating to CBJ's representation of Gruppo Triad-FFC S.P.A. / S.A ("Gruppo Triad") that are responsive to the subpoena that Venezuela properly served upon CBJ. *See* Exhibit 1.[1]  CBJ has withheld 53 documents on the basis of the attorney-client privilege or the work product doctrine. *See* Exhibits 2–4.

In addition, Venezuela seeks an order compelling Lara Pavanelli ("Ms. Pavanelli") and Gruppo Triad to produce other allegedly privileged documents that are responsive to the subpoena that Venezuela properly served on Ms. Pavanelli. *See* Exhibit 5.  She and Gruppo Triad have withheld approximately 87 documents on the basis of the attorney-client privilege. *See* Exhibit 6.

As demonstrated herein, Gruppo Triad lost the right to assert the attorney client privilege and work product doctrine as a result of criminal and fraudulent misconduct by its principal, James Pavanelli ("Pavanelli"), and others associated with him.  Courts in two different countries have already convicted Pavanelli for criminal schemes involving fake Bandagro notes owned by Gruppo Triad.  Gruppo Triad's ensuing activities in the United States—including its entanglements with Skye Ventures and its engagement of CBJ—were a continuation of Pavanelli's and Gruppo Triad's criminal and fraudulent dealings in fake Bandagro notes.  Gruppo Triad is not entitled to the protection of the attorney-client privilege or the work product doctrine.

---

[1] The exhibits cited in this memorandum are exhibits to the February 3, 2015 declaration of Andrew Z. Schwartz, filed herewith.

Even in the remote event that Gruppo Triad's privilege is not vitiated under the crime-fraud exception, Gruppo Triad waived the protections of the attorney-client privilege and work product doctrine by disclosing multiple legal opinions in connection with its transfer of the purported notes at issue to Skye. Those opinions address numerous issues concerning Bandagro notes including the subject matters of the documents subpoenaed from CBJ and Ms. Pavanelli.

On crime-fraud and waiver grounds, this Court should find that Gruppo Triad cannot shield documents related to Bandagro notes from discovery under the attorney-client privilege or work product doctrine. This Court should order CBJ to produce all documents that CBJ has withheld from production on privilege or work product grounds related to its representation of Gruppo Triad and the purported Bandagro notes, and order Ms. Pavanelli and Gruppo Triad to produce all documents concerning the purported Bandagro notes that they have withheld from production on privilege grounds.[2]

## II.    BACKGROUND

For almost 30 years, Gruppo Triad, a shadowy Panamanian entity, has perpetrated a worldwide fraud involving the use of more than one billion dollars of fake Bandagro notes to dupe lenders, investors, note purchasers, and now Venezuela and this Court. Gruppo Triad has preyed upon numerous unwitting victims, leading to the criminal conviction of Gruppo Triad officials and confederates in at least three different countries, and a pending criminal proceeding in a fourth country. Gruppo Triad's leader, Pavanelli, was convicted in the United Kingdom (in

---

[2] In addition to serving CBJ and Skye, Venezuela has served copies of its motion and the accompanying papers on Gruppo Triad and Ms. Pavanelli, through their attorney, so that they can respond on behalf of Gruppo Triad. As this Court is well aware, Gruppo Triad is a real party in interest given its agreements with Plaintiff Skye to share in proceeds of this litigation. As a result of Skye's control over Gruppo Triad's documents, this Court has ordered Skye to produce all of Gruppo Triad's documents in this case. D.E. 405. As discussed below, Skye has not produced a single Gruppo Triad document in response to this Court's order.

1989) and in Italy (in 2003) for crimes involving fake Bandagro notes. D.E. 120-4 & D.E. 120-5 through 120-9.[3] Pavanelli's co-conspirators in the United Kingdom included, among others, Alfredo Guillermo Aagaard Salazar ("Aagaard"), a prominent figure in Pavanelli's fictional history of the Bandagro notes, and Jon Piere Bon ("Bon"), an investor in Gruppo Triad. D.E. 120-4 at 4 (naming Pavanelli's co-conspirators); D.E. 415, Exhibit 21 (Tovar Decl.) ¶ 6 (identifying Aagaard as the source of a purported receipt allegedly showing payment for Bandagro notes); Exhibit 8, Deposition of Lara Pavanelli (L. Pavanelli Dep.") at 14:23–16:1 (identifying Bon as a Gruppo Triad investor). Another Gruppo Triad operative, and one of Skye's star affiants, Jose Nicolas Tovar Jimenez ("Tovar,"), was convicted in Venezuela for his involvement in Gruppo Triad's criminal activities and is currently under house arrest. D.E. 386. Even today, a criminal action related to Bandagro promissory notes is pending in Switzerland against Gruppo Triad's former attorney, Siro Schianchi. Exhibit 8, L. Pavanelli Dep. at 441:1–442:1. The Swiss criminal action was also brought against Pavanelli himself prior to his death. *Id.*

This litigation is the latest and most audacious phase of Gruppo Triad's criminal scheme—indeed it represents the culmination of the now-deceased Pavanelli's multi-decade, multi-continent scam to profit from counterfeit Bandagro notes. As described herein, Gruppo Triad's plot included a promised $100 million bribe and the use of fake documents to temporarily bamboozle the Venezuelan Ministry of Finance and the Venezuelan Attorney General into finding that Gruppo Triad's claim on the Bandagro notes should be paid. Shortly thereafter, following Venezuela's determination that the Gruppo Triad notes were fake and

---

[3] Venezuela has previously filed with this Court a certified translation of excerpts of the judgment of the Turin court that convicted Pavanelli (D.E. 120-5 through D.E. 120-9). D.E. 120-10. For the sake of completeness, Venezuela has provided a certified translation of the entire judgment as an exhibit to the February 3, 2015 declaration of Andrew Z. Schwartz, filed herewith. *See* Exhibit 7.

unenforceable, and following Venezuela's refusal to pay on the bogus notes, Gruppo Triad shifted its attention to the United States and sought to recruit a plaintiff who could be portrayed as unsullied by Gruppo Triad's misdeeds to be "upfront" in a lawsuit to collect payment on the notes. Enter Skye and with it, CBJ. Skye referred CBJ to Gruppo Triad, and CBJ represented Gruppo Triad in connection with the purported notes in 2004. Exhibit 9, Deposition of David J. Richards ("Richards Dep.") at 201:10–202:11; Exhibit 2.

In this action, Skye is seeking payment on two purported Bandagro promissory notes, allegedly having a combined face value of $100 million, that it purchased from Gruppo Triad sometime in the summer of 2004. D.E. 301; Exhibit 9, Richards Dep. at 25:15–21. As demonstrated below, there are many aspects of the sale that support the conclusion that the transaction was part of Gruppo Triad's ongoing crime spree, including the fact that the Gruppo Triad notes were sold to Skye for less than a penny on the dollar. What is particularly telling about the Gruppo Triad/Skye arrangement, for the purposes of this motion, is that the notes sold to Skye are among the very same notes found to be counterfeit by the Italian court that convicted Pavanelli approximately one year before the sale. *See* Exhibit 7.

That Gruppo Triad's documents are relevant and important to this action is beyond dispute. Gruppo Triad sold the purported notes to Skye in the summer of 2004, more than 20 years after the notes allegedly were issued, more than 10 years after their maturity date allegedly was extended, and more than four years after the allegedly extended maturity date occurred. As a result, Gruppo Triad, which supposedly held the notes from 1987 through 2004, is likely to have many of the documents most relevant to the issues before this Court. Gruppo Triad's documents could prove (again) that the purported notes are counterfeit. Gruppo Triad's documents could also show what Gruppo Triad disclosed in connection with the sale of the

purported notes to Skye, likely proving (if further proof is needed) that Skye is not an innocent purchaser and cannot distance itself from Gruppo Triad's criminal scheme.

Unfortunately, like most criminal enterprises, Gruppo Triad has attempted to thwart discovery of its documents. Venezuela first tried to obtain Gruppo Triad's documents through Skye, which has a contractual right to obtain documents from Gruppo Triad. D.E. 362. Skye resisted Venezuela's request. D.E. 370; D.E. 374. This Court, however, granted Venezuela's motion to compel and ordered Skye to gather and produce responsive Gruppo Triad documents. D.E. 405. Despite this Court's order, Skye has failed to obtain or produce a single Gruppo Triad document.

While Skye has failed to produce any Gruppo Triad documents, Venezuela has sought Gruppo Triad documents in the possession of other custodians. One such custodian is Gruppo Triad's former counsel, CBJ. Venezuela served a Rule 45 document subpoena on CBJ seeking, among other things, all documents in CBJ's possession relating to its representation of Gruppo Triad, including those documents dating back to 2004 when the purported notes were sold to Skye and this litigation was commenced. *See* Exhibit 1. CBJ has refused to produce various of the subpoenaed documents, identifying 53 documents that it is withholding on privilege and/or work product grounds. *See* Exhibits 2–4.

Venezuela next sought documents from Ms. Pavanelli—the current president of Gruppo Triad and daughter of the company's disgraced former leader, James Pavanelli. Ms. Pavanelli had initially told Skye in writing that all of Gruppo Triad's documents were destroyed, while this case was pending, in a mysterious 2010 house fire that reportedly killed her father, James Pavanelli. *See* Exhibit 11. This was a lie. Under oath at her recent deposition, Ms. Pavanelli admitted that many Gruppo Triad documents had actually been recovered from the fire and kept

in storage and then in a safe deposit box in Switzerland until very recently when Ms. Pavanelli's sister retrieved and sent some (but not all) of the documents from the safe deposit box to Ms. Pavanelli in response to Venezuela's subpoena.  Exhibit 8, L. Pavanelli Dep. at 374:24–383:3. Some, but not all of the documents Ms. Pavanelli recently obtained from her sister have been produced, while other of those documents have been withheld by Ms. Pavanelli on privilege grounds.  *Id.*; Exhibit 6.  Ms. Pavanelli has not yet produced (or logged as privileged or immune from discovery) any of the remaining documents from the safe deposit box that her sister failed to send her in the first instance.[4]

Gruppo Triad has also failed to preserve other potentially important documents.  Ms. Pavanelli testified that within the last year she deleted an email account that she had used for Gruppo Triad business since 2010 and no longer has any way to access those documents. Exhibit 8, L. Pavanelli Dep. at 93:14–96:9.  Venezuela has also recently learned that many additional Gruppo Triad documents were destroyed by Gruppo Triad's Venezuelan lawyer, Miguel Jacir ("Jacir"), when he closed his legal office in Venezuela sometime after 2007.  *See* Exhibit 12; D.E. 118-3 at 3.[5]

---

[4]  Skye also represented that it made some unsuccessful effort to obtain documents from Gruppo Triad's former counsel in Switzerland, Siro Schianchi ("Schianchi").  D.E. 370.  According to Skye, Schianchi claimed that Gruppo Triad's documents had been seized by a Swiss Public Attorney who still holds them.  D.E. 370 at 8.  Ms. Pavanelli maintains that Schianchi is lying.  Exhibit 8, L. Pavanelli Dep. at 294:17–24.  She testified at her deposition that a Gruppo Triad board member informed her that the documents had been returned to Schianchi some time ago.  *Id.*

[5]  Between the mysterious fire and the obstructive actions of seemingly every person affiliated with Gruppo Triad, it now appears unlikely that Skye will ever satisfy its court-ordered obligation to produce Gruppo Triad documents in this case.  Skye may claim that it diligently pursued the Gruppo Triad documents in response to the Court's November 26, 2014 order compelling it to do so (D.E. 405), but its belated efforts were far too little, far too late. Skye should have gathered these documents from Gruppo Triad and preserved them ten years ago when this case was filed.  Venezuela leaves for another day the issue of why Skye failed to obtain the Gruppo Triad documents back in 2004 when it obtained the contractual right to do so.  D.E. 358-1 at SKYE000894 at § 1.3; D.E. 405. Venezuela reserves all of its rights to seek a spoliation finding if and when this case nears or goes to trial, but in the instant motion, it seeks an order compelling production of specific documents that are known to exist and known to be relevant.

As demonstrated in this memorandum, any privilege that may have been applicable to Gruppo Triad's documents is vitiated under the crime fraud exception. Gruppo Triad has no right to invoke the attorney-client privilege or work product doctrine, given Pavanelli's criminal convictions based on the use of Gruppo Triad in schemes involving fake Bandagro Notes and Gruppo Triad's aborted attempt to use CBJ to further those schemes here. Additionally, Gruppo Triad waived any privilege that may have existed by disclosing multiple legal opinions in connection with its sale of the notes to Skye, which in turn produced the opinions to Venezuela to bolster its claims in this case. Gruppo Triad cannot hide behind the privilege to attempt to conceal its criminal or fraudulent activity or to prevent from disclosure documents that undermine Skye's theory of the case. The privilege is lost for both reasons and all responsive documents must be produced by CBJ, Ms. Pavanelli and Gruppo Triad.

### III. STATEMENT OF FACTS

Pavanelli and his puppet corporation, Gruppo Triad, are synonymous with fraud. The fraud at issue starts with the sketchy origin of the Gruppo Triad notes which, according to the testimony of the alleged signatories, contain forged signatures and other irregularities. *See* D.E. 256 at 24:18–38:10; D.E. 255 at 26:24–37:8; D.E. 257 at 44:1–53:20. The fraud continued with Pavanelli's criminal globetrotting, which resulted in a conviction of Pavanelli in the United Kingdom in 1989 for conspiracy to use false Bandagro notes "with the intention of inducing prospective purchasers thereof to accept them as genuine." D.E. 120-4 at 4. The fraud expanded further as Pavanelli was convicted in Italy in 2003 for using Gruppo Triad to deceive investors into making loans secured by fake Bandagro notes. *See* Exhibit 7. And finally, fresh off his conviction in Italy, Pavanelli took his criminal designs to the United States, bringing Skye into the scheme and hiring CBJ to, among other things, analyze the

potential to bring a lawsuit in Ohio to collect on Gruppo Triad's Bandagro notes. (As will be seen, it did not take CBJ long to fire Gruppo Triad as a client, but CBJ created and/or received relevant documents while, and after, representing Gruppo Triad.) Ultimately, the criminal plan in Ohio evolved into a deal to put Skye "upfront" in this litigation, with Gruppo Triad agreeing to a so-called "sale" to Skye of two Bandagro notes with a face value of $100 million, supposedly in exchange for several hundred thousand dollars that Skye had already loaned Gruppo Triad, with a promise of a multi-million dollar payout to Gruppo Triad if this litigation is successful.

The criminal purpose and fraudulent nature of this transaction is also apparent from the bewildering documentation of the transaction, which is so irregular that even today Skye cannot say when it bought the $100 million in notes from Gruppo Triad. If these machinations are not enough, it turns out that the notes sold to Skye are two of the very same notes found by the criminal court in Italy in 2003 to be counterfeit.

This litigation is thus a continuation of Gruppo Triad's criminal scheme, with Skye picking up where Pavanelli left off. The fraud by Gruppo Triad is ubiquitous. Among other consequences of this rampant misconduct, the crimes and fraud in which Gruppo Triad engaged deprive Gruppo Triad of the right to withhold from disclosure any documents or communications otherwise arguably protected by the attorney-client privilege or work product doctrine.[6]

---

[6] Venezuela assumes, without conceding, that the documents it seeks herein would be privileged or protected by the work product doctrine, but for the crime fraud exception being applicable. Venezuela reserves its rights to challenge the designation of any document sought herein as otherwise privileged or protected by the work product doctrine.

A. **The Dubious Origin Of The Gruppo Triad Notes (Including The Purported Notes At Issue In This Case).**

Skye brought this action on August 23, 2004, seeking to recover on the two purported promissory notes supposedly issued by a now defunct Venezuelan organization commonly referred to as "Bandagro." D.E. 1. Skye's Complaint was filed five days after Skye obtained the purported notes from Gruppo Triad through a tortured, multi-stage transaction. *See* D.E. 1; Exhibit 9, Richards Dep. at 38:5–12. The sale of these purported Bandagro notes to Skye was arranged by Pavanelli, Gruppo Triad's erstwhile leader, who had been convicted in Italy only a year earlier for dealing in fake Bandagro notes owned by Gruppo Triad. Exhibit 7 at 42–43.

Each of the purported notes sold to Skye has a stated issue date of December 7, 1981. D.E. 301-1 and D.E. 301-2. The alleged signatories have testified that they did not sign the purported notes and their signatures are forgeries. *See,* D.E. 256 at 24:18–38:10; D.E. 255 at 26:24–37:8; D.E. 257 at 44:1–53:20. Pavanelli claimed to have purchased the purported notes, along with many other Bandagro notes, in London in July 1987 from Aagaard. *See* Exhibit 13 at CBJ-27. That transaction, according to an e-mail from Pavanelli, allegedly involved a payment by Gruppo Triad of "much more" than $250 million. *Id.* Indicative of Pavanelli's inability to stick to a single version of his tale, Skye's principal, David Richards, testified that Pavanelli said he had paid $100 million or $200 million for the Bandagro notes. Exhibit 9, Richards Dep. at 220:24–221:14; Exhibit 10, Skye Dep. at 101:5–104:15. Pavanelli's daughter Lara, Gruppo Triad's current president, testified as its Rule 30(b)(6) designee that she heard Gruppo Triad purchased a "bundle" of Bandagro notes with an aggregate face value of $600 million by tendering some unknown combination of diamonds, German junk bonds and cash. Exhibit 14, Gruppo Triad 30(b)(6) deposition ("Gruppo Triad Dep.") at

- 9 -

38:24–39:6.  When a Swiss prosecutor asked Gruppo Triad's Swiss lawyer, Siro Schianchi, how Gruppo Triad acquired the notes, Schianchi responded, "At this point, no piece of the puzzle is repeated twice.  So there is no clear version worth repeating." D.E. 253-5 at 52–53. When asked what he thought, Schianchi said "At this point, I do not think anything.  I have been told too many versions by [James] Paolo Pavanelli." *Id.*

Pavanelli's description of the seller Aagaard does little to lend credibility to the supposed sale of the Bandagro notes to Gruppo Triad.  Aagaard is simply described by Pavanelli as "a venezuelan (sic) acting for and on behalf of some undisclosed businessmen." *See* Exhibit 17.  Pavanelli's daughter testified differently as to whom Aagaard was representing in the supposed sale.  As Gruppo Triad's Rule 30(b)(6) designee, Ms. Pavanelli claimed that Aagaard actually was a representative of Bandagro.  Exhibit 14, Gruppo Triad Dep. at 34:3–35:18.

### B.  Pavanelli's Criminal Convictions For Dealing In Fake Bandagro Notes.

Pavanelli's story about Gruppo Triad's purchase of the notes from Aagaard has not held up well over time.  Less than two years after Pavanelli claims Gruppo Triad purchased the Bandagro notes from the mysterious Aagaard, Pavanelli was convicted in the United Kingdom's Crown Court for conspiracy to use false instruments in the form of "a quantity of documents purporting to be promissory notes issued by the Banco de Desarrollo Agropecurario S.A. (Bandagro) of Venezuela which were and which they knew to be false[.]" D.E. 120-4 at 4, 8.  The Crown Court named Aagaard as a co-conspirator in Pavanelli's criminal scheme to use fake Bandagro notes.  *Id.*  Jean Piere Bon, an "investor" in Gruppo Triad who remains in contact with Lara Pavanelli some 25 years later, was also named as a co-conspirator.  *Id.*; Exhibit 8, L. Pavanelli Dep. at 14:23–16:1.

- 10 -

Two of the other named co-conspirators, Antonio Fusco and Jazmin Fusco, were a husband and wife team who had at least one other Bandagro-related encounter with the law. D.E. 120-4 at 4, 8. Mrs. Fusco was detained when she attempted to smuggle 18 purported Bandagro notes undeclared through customs in New York on May 1, 1987—months before any Pavanelli entity supposedly ever acquired such instruments. *See* D.E. 120-3. Significantly, the notes had blank maturity dates and among the papers Ms. Fusco was carrying was a document containing instructions for filling in blank notes and a letter from Pavanelli. *Id.* at 4. Pavanelli then wrote a letter to try to have the 18 notes released, explaining that Mrs. Fusco was carrying the notes from Caracas to Milan for Pavanelli's company and that she was flying via New York to meet up with her husband, who was in New York in connection with work he was doing for Pavanelli's company. *See* Exhibit 15 at VZ018528; Exhibit 14, Gruppo Triad Dep. at 60:15–62:11. Left unsaid was why Bandagro notes with blank maturity dates were being hand-delivered out of Venezuela in the first place.

Just four days after Ms. Fusco was detained carrying forms of Bandagro notes, Pavanelli sent a telex to Venezuela asking about Bandagro notes from 1981, saying that several investors had approached him about those notes. Exhibit 52 at LP0001004. Pavanelli asked Bandagro to confirm the positions held by the alleged signatories of the notes at the time when the notes were allegedly issued, and said that if an answer was not received in five days, Pavanelli would execute the transaction and deem the lack of response as approval from Bandagro. *Id.* Bandagro responded three days later, on May 8, 1987, denying the existence of the notes and warning Pavanelli that the notes were null and void. *Id.* Nevertheless, Pavanelli supposedly proceeded to buy the purported notes less than two months later. D.E. 415, Mem. at 24–25.

- 11 -

The Gruppo Triad criminal enterprise continued to expand from there.  Pavanelli was convicted on June 3, 2003, in Turin, Italy, again for crimes relating to the use of forged Bandagro notes owned by Gruppo Triad.  *See* Exhibit 7.  According to the Italian Court, Pavanelli concocted a scheme to swindle investors by taking on debt that "he could never back up and which he clearly sustained via promises to liquidate with non-existent bonds of the State of Venezuela."  *Id.* at 3.  Pavanelli refused to produce the Bandagro notes for inspection in his criminal trial (*id.* at 40–41) and, indeed, Pavanelli himself "tried to disappear completely in the attempt to get out of his responsibilities," (*id.* at 42), but the Italian court found that the evidence against Pavanelli—including a blank promissory note and draft letters found on Pavanelli's computer—"shows unequivocally that PAVANELLI produced not only the Bandagro bonds himself but also the documents certifying their genuineness and which he then gave as a guarantee to the investors."  *Id.* at 40–41.

Among the grounds for determining the "falsity of the Bandagro bonds" to have "been widely proved," the Italian court noted that Pavanelli's companies, including Gruppo Triad, had no assets, and thus that it defied belief that Gruppo Triad could have purchased notes with the face values claimed.  *Id.*  ("We have seen that the Panamanian compan[y] [GRUPPO] TRIAD . . . had no assets: how could they have been able to purchase such immense security assets as the Bandagro bonds?  Not surprisingly on this point PAVANELLI refuse[s] to answer.").[7]

---

[7] The Italian Court found that Pavanelli's companies were just "empty shells" with "no real estate, goods, plants, or commercial licenses, nor do they pay taxes."  Exhibit 7 at 31.  That appeared to continue to be the case for the remainder of Pavanelli's life.  His daughter, Lara Pavanelli testified that she has had great difficulty piecing together Gruppo Triad's affairs following Pavanelli's death in February 2010.  By way of example, she has been unable to locate any Gruppo Triad bank account.  Exhibit 8, L. Pavanelli Dep. at 87:18–88:3; 157:14–24.  James Pavanelli had never even informed his daughter that he had given her ownership shares in the company.  *Id.* at 67:1–8.  Ms. Pavanelli, Gruppo Triad's 30(b)(6) designee, is unaware of any business activity of Gruppo Triad other than attempting to collect on the purported notes since January 1, 2003.  Exhibit 14, Gruppo Triad Dep. at 69:6–70:6.

Importantly, the promissory notes that the Italian court found to be fraudulent in June 2003 include the *exact same purported notes* Gruppo Triad would sell to Skye one year later and which would become the basis for Skye's action against Venezuela.  The Italian court's recitation of the facts states that, in November 1993, Pavanelli "filed at the office of Notary Public Edy ALBISETTI in Chiasso 12 Venezuelan Bandagro promissory notes for USD 50 million each." *Id.* at 6.  The only purported Bandagro notes Gruppo Triad claims to have purchased with a $50 million face value are the twelve purported ICC-322 Series notes numbered 1/12 through 12/12.  *See* D.E. 415, Exhibit 21 (Tovar Declaration) at Exhibit A (translation of alleged Aagaard receipt for purchase of notes); *see also* Exhibit 17 at LP000188.  The two purported notes at issue in this case are among those twelve.  D.E. 415, Exhibit 21 ¶¶ 2, 3 & 6; Exhibit 17 at LP000188.

**C.  Gruppo Triad And Pavanelli Use Bribes And Undue Influence To Further Their Criminal Schemes.**

As part of its ongoing efforts to monetize the bogus Bandagro notes, Gruppo Triad attempted in 2002 and 2003 to convince the Venezuelan government to recognize the validity of numerous supposed Bandagro notes possessed by Gruppo Triad.  D.E. 415, Mem. at 47. By that time, Gruppo Triad's purported notes were well beyond the 1991 maturity date shown on their face and years beyond even the date in 1999 to which the maturity date allegedly had been "unilaterally extended."  Thus, Gruppo Triad shifted to a different method to try to profit from the notes:  hoping to get Venezuela itself to pay on them, rather than using the notes to steal money from lenders or investors.

Gruppo Triad initially was successful in its attempt to have Venezuela recognize the Bandagro notes.  Relying on documents (some false) supplied by Gruppo Triad and its politically connected Venezuelan lawyer, Miguel Jacir, the Venezuelan Ministry of Finance

- 13 -

(in August of 2003) and the Attorney General (in October 2003) initially determined that Gruppo Triad's claim for payment on the Bandagro notes was viable. *Id.*, Mem. at 33–35 (citing August 8, 2003 Ministry of Finance Report), Mem. at 36–37 (citing October 3, 2003 Attorney General Opinion). The story of how Gruppo Triad temporarily tricked Venezuela, not surprisingly, involves more nefarious activity.

Documents gathered by Venezuela in this litigation indicate that the initial determinations obtained by Gruppo Triad were the result of payoffs and undue influence. At the center of this corrupt effort to sway the government are Oscar Guzman Cova ("Guzman"), Carlos Delgado Morean ("Delgado"), and Delgado's father Carlos Román Delgado-Chalbaud (sometimes referred to in the documents as "Román" or "Delgado-Chalbaud").

Guzman was the Venezuelan official who investigated and authored a report on the validity or invalidity of the Gruppo Triad notes in 2003. *See* D.E. 415, Exhibit 42 (Jacir Declaration) ¶ 19 & Exhibit D. Guzman appointed Delgado to his Ministry of Finance team doing the investigation. *Id.* As a member of the Ministry of Finance team, Delgado travelled to Switzerland in the spring of 2003 to inspect some of the Gruppo Triad notes. *Id.* ¶ 20. Delgado viewed the notes and signed a statement as to their validity in March 2003, which was drafted by Schianchi, the Swiss attorney who served as Pavanelli's primary henchman. Exhibit 16. Then, on August 8, 2003, Guzman finished his report, finding that the Gruppo Triad claim should be paid.

Shortly after Gruppo Triad's apparent victory, which turned out to be short-lived, Pavanelli directed a payoff to Delgado. Pavanelli instructed the Swiss lawyer Schianchi, in writing, to tell Delgado that Gruppo Triad was about to sell $150 million worth of Bandagro

notes for $50 million, and once payment was received, Delgado (or others at his direction) would receive half of the payment.  D.E. 253-5 at 68–69, 70.  Schianchi was also ordered to tell Delgado that, in addition, he would also be given several Bandagro notes with a total face value of $75 million.  *Id.*  The only catch was that the payoffs to Delgado were conditioned on Pavanelli receiving the "original" October 3, 2003 Attorney General's opinion, within ten days of it being signed by the Venezuelan Attorney General.  *Id.*  Sure enough, a recently produced document from the files of Gruppo Triad listing the various purported Bandagro notes, with hand-written annotations indicating the individuals or entities to whom Gruppo Triad's notes had been transferred or promised, shows a significant number of notes earmarked for "Delgado."  Exhibit 17 at LP000188.

Gruppo Triad also appears to have paid for one of Delgado's hotel bills for a 10-day European stay over New Years in 2003–2004.  Exhibit 18 at LP00901–LP00902.  At about this same time, Pavanelli was arranging a meeting with Guzman and/or Delgado.  *See* Exhibit 19.  Thus, various documents show a close connection between Gruppo Triad and the Ministry of Finance officials (Guzman and Delgado) who had been involved in preparing the report in favor of Gruppo Triad.

Delgado's father, Delgado-Chalbaud, was also involved on behalf of Gruppo Triad in obtaining the initially favorable determinations in Venezuela.  Gruppo Triad's Venezuelan lawyer, Jacir, stated that Delgado-Chalbaud played a valuable and influential role behind the scenes in Gruppo Triad's efforts to collect on the Bandagro notes.  Exhibits 20–21.  Jacir told Pavanelli that "Román" had exerted an invaluable influence on Guzman Cova's preparation of the August 2003 report.  Exhibit 36 at CBJ-30–CBJ-31.

- 15 -

E-mails and letters written by Delgado-Chalbaud also reference a person cryptically referred to as "the Congressional Delegate" who was helping Gruppo Triad obtain a favorable result in Venezuela.  In a May 2004 e-mail, Delgado-Chalbaud warned Jacir that annoying "the Congressional Delegate" is "dangerous for everyone, because this man has driven all of the lobbying in the Attorney General's Office and Congress."  Exhibit 21.  Delgado-Chalbaud also reminded Pavanelli and Jacir "that there is someone who risked his career for this, and that we owe him a lot."  Exhibit 20 at JACIR-43-002.

Notwithstanding its initial apparent success, Gruppo Triad's plot was foiled in Venezuela.  Within several months of the initial decision, the Ministry of Finance fired Guzman (the author of the initial report), re-considered its earlier determination about the Gruppo Triad notes, reversed its initial report that the notes should be paid, and found that the Gruppo Triad notes were fake.  D.E. 415, Memo at 38–39; see also D.E. 120-18.  Then, in December of 2003, the Venezuelan Attorney General revoked her earlier October 2003 Opinion regarding the viability of the Gruppo Triad notes.  D.E. 22-2.  Faced with this changing landscape, Pavanelli turned his attention to the new frontier in Gruppo Triad's fraudulent scheme: the United States.

### D.  Pavanelli Expands His Criminal Enterprise To The United States.

Gruppo Triad's foray into the United States began with the collaboration of two convicted criminals, Pavanelli and Larry Corna ("Corna"), the latter of whom pled guilty in 2009 and was sentenced to prison in Ohio for a variety of crimes including forgery, theft and money laundering (Exhibit 9, Richards Dep. at 76:20–25 & 77:13–18; D.E. 414-2; D.E. 414-3).  In July 2003, Pavanelli contracted with Corna, through "Lawrence Corna Capital Markets," to "find[] and establish Capital Markets and/or Credit Facilities in U.S. dollars . . . for various blocks of the

GRUPPO TRIAD holdings in the BANDAGRO NOTES." Exhibit 22 at LP000468. The agreement identifies those notes as "BANCO DE DESARROLLO AGROPECUARIO SA. PROMISSORY NOTES Issued 12/01/1981 with a maturity date of 12/02/91" in the aggregate amount of $400 million. *Id.* Scheming to con prospective investors with counterfeit Bandagro notes was a common ploy for Pavanelli; his engagement of Corna was reminiscent of the circumstances that led to his convictions in the U.K. and Italy.

By August of 2003, Pavanelli was already anxious for Corna to raise money, using the counterfeit Bangagro notes as collateral. On August 12, 2003, Pavanelli wrote to Corna, "I would like to remind you the importance of this transaction and the outcome of the situation in Venezuela is of great importance to continue and finalize the deal." Exhibit 23 at LP000460. Pavanelli then added "I must get the '300G' this week and the 10G must be here today before the closing of the airline office at 5:00 p.m." *Id.* Pavanelli did not say why he needed the "300G" or the "10G," at least not in writing.

A few weeks later, things appeared to become even more desperate for Pavanelli. Pavanelli wrote Corna on September 5, 2003, telling him "[a]nother week has gone by and we have no positive results. This morning the 'Venezuelan' have [sic] gone back to Caracas. According to the latest info, we should have the 'ORDER TO PAY' from Ministry within 15/18 days maximum." Exhibit 24 at LP000452. Pavanelli then added, "We must be able to get funds not later than mid-next week to be able to speed up things. I must have you comment today and a timetable for funds. IF NOT, I MUST look into other direction now!" *Id.* Left unsaid was why Pavanelli would be so desperately in need of funds to "speed up things" when, according to his "latest info," an order to pay the hundreds of million dollars in Gruppo Triad notes was imminent.

Nearly two weeks later, Pavanelli wrote again to Corna, pleading for Corna to tell Pavanelli what was going on. Exhibit 25 at LP000907. Pavanelli wrote, "I had my partner from Venezuela here for a week awaiting [sic] for funds to come. I had to send him back to Caracas, has [sic] I cannot pay for his stay any longer. I must inform you that I cannot any longe[r] go on on [sic] this way." *Id.* Pavanelli then told Corna that the government would order payment on his notes between September 23 and September 26. *Id.* Once again, there was a disconnect between Pavanelli's increasingly desperate need for short-term funding and his stated expectation that the government would soon enter an order making him filthy rich.

While Corna was tasked with wrangling investors in the United States, he was also talking about contacting the Venezuela Ministry of Finance officials who were determining the validity of the Gruppo Triad notes. On August 28, 2003, Corna sent an e-mail to Pavanelli and indicated that he thought a telephone conference with himself, Pavanelli, a potential investor, and "Dr. Guzman (Mr. Delgatto [sic] also if possible)" was necessary, and had to be held that same day, in order to secure the investment. Exhibit 26 at LP000451. Corna further suggested conferring with Guzman and/or Delgado in advance "to predetermine the subject matter" for the call with the investor. *Id.*

In response, Pavanelli sent Guzman's office number at the Venezuelan Ministry of Finance and his cell phone number to Corna. *See* Exhibit 27 at LP000473. Several days later, Corna reported to Pavanelli that he was temporarily suspending communications with Guzman, thereby implying that contact with him had occurred. *See* Exhibit 28 at LP000472.

The timing and subject matter of these actual or proposed interactions between those acting on Gruppo Triad's behalf (including two convicted criminals), and certain officials at the Venezuelan Ministry of Finance charged with determining the validity of Gruppo Triad's notes,

- 18 -

raise yet further suspicions.  The evidence shows that Pavanelli and Corna needed money to move the process forward in Venezuela.  By late-summer 2003, Corna finally found a source of financing—Skye's David Richards.

### E.    Richards Becomes Corna's Moneyman For Pavanelli And Gruppo Triad

In the summer of 2003, months before the October 2003 Attorney General Opinion on which Skye claims it relied in purchasing the purported notes, Corna literally appeared on the doorstep of Skye's principal, David Richards, looking for money for Pavanelli and Gruppo Triad.  Richards had received a call from a business associate, David Corna, who asked Richards to speak with David's brother, Larry Corna, for five minutes.  Exhibit 9, Richards Dep. at 62:17–64:4.  Richards did not know Larry Corna, but agreed to speak with Larry as a favor to David. *Id.*  Within an hour, Larry Corna showed up on Richards' doorstep, sweating profusely, and asking Richards for a $5,000 loan. *Id.*  Despite being in the midst of a personal bankruptcy, Richards went into his house and wrote Larry Corna a check for $5,000. *Id.*  Larry Corna told Richards that, as part of the loan, Corna would give Richards an interest in a Venezuelan bond deal and pay him back. *Id.*  While the Cornas were a prominent family in Columbus in 2003, and at least some of Larry Corna's relatives were wealthy, Richards did not find it unusual that Larry Corna—a total stranger to Richards—was on Richards' doorstep begging for $5,000 rather than seeking the money from his own family. *Id.* at 70:19–71:19.

A week or so later, Larry Corna came back to Richards looking for another $5,000. *Id.* at 64:11–65:1.  At that time, Corna began to tell Richards more about the Bandagro notes. *Id.* Corna said the deal originated in Italy where Corna's family was from and had been passed along to Corna by someone named Marvin Cantor. *Id.*  Richards found the deal to be odd, even by Richards' standards.  As Richards testified in his deposition, "So we do a lot of odd things, I said

sounds pretty odd." *Id.* at 65:2–3. Richards became interested enough to give Corna the next $5,000 and then talk with Cantor. *Id.* at 65:2–66:10. The call with Cantor led Richards to speak with Antonio Usuelli, a resident of Switzerland. *Id.* Usuelli is another of Pavanelli's cronies, one of a growing list of foreign persons or entities who stand to benefit if Skye is successful in this litigation. *Id.* at 65:2–66:10 & 193:1–11. Usuelli continued to spin the Bandagro tale for Richards and explained who Pavanelli was and how he fit into the picture. *Id.* at 102:9–17.

By the end of September 2003—all before the Venezuelan Attorney General had issued her October 2003 opinion on which Skye says it relied—Richards had sent $10,000 to Gruppo Triad through Corna and Schianchi. In exchange for these $10,000 in payments, Richards received "deeds of trust," prepared by Schianchi, granting Richards and Skye a $100,000 interest (10:1) in the Bandagro notes held by Gruppo Triad. *Id.* at 95:6–96:14 & 98:1–10.

At or about this time, Richards engaged CBJ to assist Richards in checking out the opportunity to invest in, and later purchase, the notes from Gruppo Triad. *Id.* at 103:10–24. Richards relied extensively on Luis Alcalde of CBJ to perform this diligence because Alcalde, unlike Richards, speaks Spanish. *Id.* at 11:8–9 & 107:15–21; Exhibit 10, Skye Dep. at 206:20–211:16.

With $10,000 of Richards' money already in his pocket by the end of September 2003, Pavanelli ratcheted up his efforts to find more money after obtaining the (soon to be rescinded) October 2003 Attorney General opinion. A few weeks after Richards learned of the Attorney General's opinion, Richards spoke with Pavanelli for the first time. Exhibit 9, Richards Dep. at 102:18–106:1. Richards expected he was going to be paid the $100,000 return on his $10,000 investment. *Id.* at 103:10–15. Instead, Pavanelli asked Richards for another $50,000 in November 2003 to pay the fees of Gruppo Triad's lawyer, Jacir. *Id.* at 104:6–106:7. Even

- 20 -

Richards found this strange, causing him to wonder "why would he want money if he's going to get all this money?" *Id.* at 104:9–12. But, Richards also saw Pavanelli's desperate need for cash as an opportunity to "leverage a payment now to gain on a payment in the future." *Id.* at 104:13–18.

Richards sent Pavanelli, again through Schianchi, the $50,000 in November of 2003 and another $25,000 or $30,000 in December of 2003. *Id.* at 106:2–7 & 112:25–113:13. Even though the Venezuelan Attorney General had by that time issued her initial opinion in favor of the notes, which at least temporarily stood to make Pavanelli very rich, and Gruppo Triad and Skye insist they did not know the opinion had been revoked in December 2003, Pavanelli agreed to continue to give Richards the same exorbitant 10:1 ratio of interest in the bonds for every dollar invested. *Id.* at 95:18–23.

By the end of December, Usuelli began to become concerned with the deal Richards was shaping, complaining to Corna that the terms were "simply unacceptable" and that Usuelli refused "to be part of a negotiation which has the features of an extortion." Exhibit 29 at LP000937. A few days later, Usuelli again raised his concern about the terms with Corna, stating that "offering the notes around a penny for the dollar has the main result of scaring serious investors away, since it looks more like an attempted scam than an unusual but potentially very rewarding investment." Exhibit 30 at LP000938.

Pavanelli again reached out to Richards in January 2004, again desperate for money and asking this time that another $6,000 be sent to him by Western Union. Exhibit 9, Richards Dep. at 112:7–24. Pavanelli continued to contact Richards throughout the winter and early spring, seeking more money, always urgently needed. As Richards testified, "it was his modus operandi." *Id.* at 113:14–20 & 115:5–20.

- 21 -

During this early-January 2004 time period, the Corna/Pavanelli relationship reached its breaking point. Corna, true to his criminal nature, had skimmed money off the top before sending the rest of Richards' investment to Pavanelli. Richards testified that Corna had swiped approximately $1,000 of a $6,000 investment. *Id.* at 114:2–117:5. Contemporaneous documents suggest Corna took closer to $5,000 of a $20,000 investment. Exhibit 31 at LP000871. In any event, Pavanelli objected to Corna pocketing the money, leading to some tense communications among Pavanelli, Corna and Usuelli. *See, e.g., id.* (Pavanelli telling Corna he is upset "about the mess you have made of such a simple matter" and that Corna's illegal keeping of $4,150 had put Pavanelli "in a very difficult position with the venezuelan [sic] partners"); Exhibit 32 at LP000854 (Usuelli calling the situation "painfully surprising" and stating "clearly this matter can not remain in present tangled state").

Corna responded in writing to Pavanelli, telling him that "the $5,000 retained from Richards is a comedy" and that he had to investigate the transaction to "make sure my participation was legal" because "a person does not need even a remote possibility of going to prison at our age." Exhibit 33. These choice words proved to be a premonition, as before long Corna would indeed be incarcerated, albeit for other (though familiar sounding) financial crimes. Pavanelli and Richards eventually cut Corna out of the Bandagro transaction because he pilfered these funds. Exhibit 9, Richards Dep. at 114:2–117:5.

Although Pavanelli and Richards cut off Corna, Usuelli, whom Richards described as a friend (*id.* at 100:15–20), did not. Quite the contrary. While Corna was incarcerated for forgery, theft and money laundering (*id.* at 76:20–77:18), Usuelli continued to communicate with Corna and Corna's ex-wife, Maryellen Reash. This included sending emails to Ms. Reash's account, including an email expressly addressed to "Larry," with the intent that the email be brought or

read to him.  There were at least a dozen emails exchanged between Ms. Reash and Usuelli.  *See*

Exhibit 49.  Ms. Reash also corresponded with other players in this case, including David

DiBenedetto, a Skye investor, and Charles Cooper, Skye's counsel.  *Id.* at 14–17.  The clear

import of these emails is that the Cornas somehow retain an interest in the matter.

There are some graphic communications between Usuelli and the Cornas.  In a revealing

commentary on the criminal mindset of the Gruppo Triad gang, Usuelli repeatedly expressed

surprise at what he viewed as the harsh sentence given to Corna for his forgery, theft and money

laundering crimes, all of which Usuelli considered to be a misdemeanor.  *Id.* at 7, 10–11, 12–13.

This is not the only insight into the Gruppo dynamic afforded by recently unearthed

documents.  In perhaps the most sickening document in the case (at least among those produced

so far), in the wake of Pavanelli's death, Usuelli wrote to "Larry":

> Recently, the greatest piece of interest has been James's death.  He lived in a
> chalet in a swiss mountain resort where a short-circuit developed; since chalets
> are typically built in wood with interior panelling they burn like matches.  In fact,
> the poor guy died suffocated by smoke before being hit by flames.  It is uncertain
> whether he was playing an harp like Nero in the middle of Rome's fire, but like
> Nero he is not very much regretted.

*Id.* at 12–13 (all errors sic).  Four months later, Usuelli reported to Corna "I must say that since

James went up in smoke the whole matter had taken a much more professional turn and we

finally deal with lawyers, Courts and strategy rather than with the uretric [sic] tickle of James

and his mistresses."  *Id.* at 11.  These Brutus-like observations came from the suave operator

who was instrumental in persuading Richards to do business with Pavanelli in the first place.

Exhibit 9, Richards Dep. at 101:4–103:24.  Usuelli's depraved double-dealing with the

incarcerated Corna is a vivid illustration of the degree of criminality pervading the Gruppo Triad

camp.

- 23 -

F.    **Gruppo Triad And Skye Hatch A Plan To Try To Collect On Gruppo Triad's Bogus Bandagro Notes**

By early 2004, Gruppo Triad had a little wind in its U.S. sails with the backing of investors like Richards and John Kennedy, a partner at CBJ. As Corna had previously explained it to Pavanelli,

> We are now in a great position for me to quickly raise serious capital over a two week period. With the strong profiles of Mr. Kennedy and Mr. Richards I can accomplish many goals. I can even quickly establish other investment salesmen to offer it to their customers. We can run the documentation through Kennedy's law firm [CBJ] establishing more credibility. This is such a good allegiance we could not have planned it any better.

Exhibit 33 at LP000926.

All told, by the end of March 2004, Richards and his partners had sent Gruppo Triad more than a quarter million dollars without having ever met Pavanelli, Schianchi, Jacir, or anyone else involved in the Bandagro scheme (other than Corna) and without having ever seen the Bandagro notes in which he supposedly was being given an interest. Exhibit 10, Skye Dep. at 262:2–16.

Richards finally met Pavanelli in Como, Italy, in late-March or early-April of 2004. *Id.* The two apparently spent quality time together on April Fools' Day, appropriately enough, as Pavanelli romanced Richards. Exhibit 9, Richards Dep. at 158:13–15; *see also* Exhibit 34 at SKYE001181. Impressed by Pavanelli's apparent command over the wait staff at "the best hotel on Earth," Richards failed to detect that he was being seduced by a consummate con artist. Exhibit 9, Richards Dep. at 214:22–215:7. At his deposition over a decade later, Richards maintained that he still did not believe that Pavanelli conned him. *Id.* at 239:12–240:21.

Yet, it is clear that Richards himself grew suspicious of Pavanelli. As time went on, Richards required Gruppo Triad to include additional warranties and representations in various

- 24 -

iterations of the note purchase agreement.  In June of 2005, Skye had Gruppo Triad represent for the first time that it had "[f]iled [a] claim with Venezuela through its duly hired representative Jacir and did not engage in nor participate in nor cause any illegal, or fraudulent or dishonest activity during claim."  Exhibit 35 at SKYE005891 ¶ 3.10.  The representations demanded by Skye expanded over time, culminating with Gruppo Triad's representation in a January 1, 2010 agreement that it "did not engage in, participate in or cause any illegal, fraudulent or dishonest activity before, during or after the claim [for payment submitted to Venezuela], or in connection with the claim in any way."  Exhibit 36 at SKYE004474 at ¶ 5.10.

Upon first meeting Pavanelli in late-March or early-April 2004, Richards sensed there would be an opportunity to strike an even better than 10:1 deal for Skye as time went on and Pavanelli's need for cash grew.  Thus, as Pavanelli was playing Richards, Richards thought he could play Pavanelli.  As Richards explained,

> I could see that the guy really, from what he said, was running out of money and needed money.  And I was there.  And so I got the sense, like I've had in other deals, other distressed deals and when you're the guy there with cash, it gives you a tremendous opportunity to create a good deal for yourself and your investor group.

Exhibit 9, Richards Dep. at 238:5–11.  As Richards further explained, "my fund's opportunist, right, so we don't have any religion about the kind of thing that we do so we look for an opportunity, looked like it might be [an] opportunity."  *Id.* at 111:14–17.

During his stay in Como, Italy, Richards met with Pavanelli and his cohorts, including Schianchi, Usuelli, Bruno Fabbiani, and Pedro Wick.  *Id.* at 171:18–172:7.  On the first day of meetings, Pavanelli "basically recounted from beginning to end his entire story."  *Id.* at 218:23–219:1.  Richards was "impressed with the story," noting that "for such a strange deal it was a believable story.  Or had some credibility to it."  *Id.* at 219:4–7.  Richards returned from Como

- 25 -

with a suitcase full of papers given to him by Pavanelli. Richards estimates it was more than 1,000 pages. Exhibit 10, Skye Dep. at 14:11–15:23. Richards turned all of those documents over to CBJ. *Id.* at 15:4–9. Richards never again met with Pavanelli prior to purchasing the purported notes and bringing this litigation. Exhibit 9, Richards Dep. at 263:2–10.

Shortly after the Como meeting, in April 2004, Richards drafted and proposed an agreement for Skye to buy Bandagro notes from Gruppo Triad. *Id.* at 26:22–26. Richards was in "no way ready to do the deal in April," but Pavanelli signed the agreement right away because he wanted money. *Id.* at 27:1–29:3. Also, while Pavanelli was ready to do the deal in April, he was not willing to send Richards the notes at that time. *Id.* This was a deal-breaker for Richards. *Id.* at 202:3–11.

Richards and Pavanelli continued to talk through the spring and into the summer of 2004 concerning Skye's possible purchase of notes. Gruppo Triad's intractable refusal to send the notes to Skye caused Skye to suggest that Gruppo Triad work directly with Skye's counsel, CBJ, to bring a claim on Gruppo Triad's own behalf rather than selling the notes to Skye. *Id.* at 202:3–18.

Significantly for purposes of this motion, on April 23, 2004, Gruppo Triad hired CBJ to investigate and collect on Bandagro notes for Gruppo Triad. Exhibit 37 at CBJ-12. As part of its written agreement to represent Gruppo Triad, CBJ promised to undertake the following: (1) evaluate the Bandagro Notes, "including a review of the existing evidence, conference with the parties, research and a trip to Caracas Venezuela;" (2) prepare a legal opinion regarding the probabilities of a successful prosecution; and (3) the potential filing and prosecution of a lawsuit to pursue collection on Bandagro Notes owned by Gruppo Triad. *Id.*

Two months after Gruppo Triad engaged CBJ, an erratic Pavanelli apparently reconsidered his plan to bring his own claim and revived the plan to have Skye buy the notes and become the nominal plaintiff. Money seemed to be driving this change of heart. On June 18, 2004, Pavanelli wrote to Richards, copying Usuelli, in which he asked for money four different times in seven paragraphs. Pavanelli first said that "funds are URGENT AND VERY IMPORTANT" and listed a variety of uses of the money, including paying the expert (Fabbiani) and lawyer (Cajelli) in Pavanelli's criminal case in Italy. Exhibit 56 at SKYE006083 (emphasis in original). Pavanelli added that he was ready to send $100 million in notes to Alcalde, "but we need money." *Id.* Later in the same email, Pavanelli added "Also some funds are needed to take care of very sensitive matter to avoid further problems." *Id.* Pavanelli also told Richards that Pavanelli would try to get documents from his London criminal case but that he had to be careful not to wake "THE SLEEPING DOG." *Id.* (emphasis in original).

Five days later, on June 23, 2004, Skye executed an agreement with Gruppo Triad for Skye to purchase notes 3/12 and 4/12 from Gruppo Triad and then to bring a lawsuit, using CBJ, against Venezuela. Exhibit 38 at SKYE005870 ¶¶ 2.1–2.5. The June 23, 2004 agreement provided that CBJ would continue to work under its engagement letter with Gruppo Triad and that Skye would "become a beneficiary and party" to that agreement, with Skye and Gruppo Triad jointly directing CBJ. *Id.* Moreover, the agreement provided that, if the lawsuit failed, the notes "purchased by Skye" would simply be returned to Gruppo Triad. *Id.* at ¶ 3.3. If the lawsuit succeeded, Skye's $9.4 million in "deeds of trust" would be repaid, $20 million would go to CBJ, and $62.5 million would go to Gruppo Triad. *Id.* at SKYE005874 ¶ 2.1.

One day later, Luis Alcalde of CBJ, acting on behalf of Skye, sent a demand letter to the Venezuelan Ministry of Finance. Exhibit 10, Skye Dep. at 80:15–84:11. The letter asserted that

- 27 -

Skye had obtained two notes from Gruppo Triad and was the lawful bearer of notes 3/12 and 4/12. *Id.* This was blatantly false, as Skye had not obtained possession of notes 3/12 and 4/12. *Id.* at 202:10–11. In fact, Skye never obtained the phantom notes 3/12 and 4/12. *Id.* at 56:8–15.

CBJ made extensive efforts to get Pavanelli and Gruppo Triad to turn over the notes that Gruppo Triad had agreed to sell to Skye. This included an unsuccessful journey by CBJ to Italy. CBJ soon had enough of Pavanelli and Gruppo Triad. On July 30, 2004, CBJ wrote to Pavanelli and detailed the efforts it had made to be able to bring a lawsuit on the notes. Exhibit 39. CBJ informed Pavanelli that "The suit on behalf of Skye would also serve the interests of Gruppo and yourself personally." *Id.*[8]

According to CBJ's letter, however, Pavanelli was not cooperating with its efforts. CBJ wrote,

> For some time now you have promised to provide us with two Notes for Skye, as was agreed, so that a lawsuit could be commenced. In fact, two weeks ago we traveled to Lake Como, at great expense, in part to pick up the promised Notes. While in Lake Como, we provided you with all of the documents which were required of us and also all of the documents needed to effectuate the transfer of the Notes to CBJ. You refused to give us the two Notes. You then promised to send the two Notes by courier within a week but, to date, have failed to do so. Your recent actions convince us that you have other objectives which are inconsistent with pursuing the contemplated litigation.

*Id.* CBJ informed Pavanelli that his repeated refusals to turn over the notes demonstrated that he was not serious about the litigation. *Id.* By this letter, CBJ formally terminated its relationship with Gruppo Triad. *Id.*

---

[8] This representation from Skye's current counsel less than a month before the commencement of this action directly contradicts Richards' sworn statement nearly eight years later that "The only interest Skye represents in this litigation is its own." D.E. 258-2. It is also now abundantly clear that, in addition to serving the financial interests of Gruppo Triad, Skye is serving the interests of various other foreign persons and entities, including Jacir, Woodstrite Investments Limited ("Woodstrite") and Usuelli, all of whom stand to benefit if Skye prevails in this litigation. Exhibit 9, Richards Dep. at 249:11–250:3; Exhibit 10, Skye Dep. at 12:16–14:10. Then there are another 50 to 60 "investors" to whom Skye has syndicated a piece of the action. Exhibit 9, Richards Dep. at 45:21–46:5.

Six days after CBJ fired Gruppo Triad as a client, Pavanelli attempted to resurrect the relationship. He wrote to CBJ on August 5, 2004, stating that he had been informed that Alcalde no longer was a member of CBJ. Like much of what Pavavnelli said, this was not true; Alcalde has filed papers in this action as a CBJ attorney representing Skye at least through September 20, 2008. *See* D.E. 137 (Supplemental Memorandum filed by Alcalde). Pavanelli then wrote:

> Under present conditions, we Gruppo TRIAD-FFC, HAVE NO LONGER PROBLEM to work with you firm, and are ready to procede to make arrangements with Mr. SCHIANCHI of Chiasso Switzerland, to have the 2 promissory notes for the aggregate amount of US$ 100,000,000 (one hundred million US dollars) to be sent to you, but we still do not want out Mr. Richards and or SKYE VENTURE and other entity related to them out. So we will have to make arrangements to use another firm or company to be upfront in the lawsuit.

Exhibit 40 at CBJ-35 (emphasis in original) (all errors sic).[9]

Thus, although he did not elaborate, for some reason Pavanelli wanted to hide his relationship with Richards and Skye, at a time when both Gruppo Triad and Skye were dealing with CBJ. The ever "mercurial" Pavanelli, so described by Richards (Exhibit 9, Richards Dep. at 29:4–24), soon overcame his reservations about having Skye serve "upfront" in the litigation. Within a brief period of time, Skye and Gruppo Triad entered into the deal for the purchase of the purported notes upon which Skye has brought this lawsuit. Exhibit 10, Skye Dep. at 236:11– 238:9. Remarkably, Skye is unable to determine exactly when this happened; the most specific Richards could get was that the agreement to buy $100 million in face amount of notes was reached in late-July or early-August 2004. *Id.* at 88:12–90:7; Exhibit 9, Richards Dep. at 23:19–

---

[9] Skye wishfully refers to this document as a "poorly translated email that borders on unintelligible." D.E. 433 at 11 n.82. This email was produced from the files of CBJ, counsel to Skye in this action. CBJ has never suggested that it produced a translation, rather than the actual email from its files, or that this document is anything other than a true and accurate copy of the email it received from Pavanelli. If the document is "poorly translated," it was poorly translated by CBJ. Finally, there is nothing unintelligible about what Pavanelli is saying in the quoted paragraph. He was willing to move forward with the plan to transfer the notes to some nominal plaintiff for the purpose of bringing the lawsuit against Venezuela in the United States, but at the time he did not want Skye or Richards to be that nominal plaintiff serving "upfront" for Gruppo Triad.

26:20. The two notes Skye had agreed to buy in June (3/12 and 4/12) supposedly were determined to be encumbered, so Gruppo Triad had to find two other notes that it could sell to Skye. Exhibit 10, Skye Dep. at 41:20–43:4. Ultimately, Schianchi selected notes 7/12 and 8/12. *Id.* at 42:4–45:9 & 64:15–23. While the purchase agreement provided that these notes would be sold free and clear of all liens, Skye knew prior to buying the notes that other entities and individuals possessed a significant interest in them.[10]

Rather than update the June 23, 2004 agreement for notes 3/12 and 4/12 to reflect the specific notes Skye was purchasing, Skye and Gruppo Triad executed the original April 8, 2004 agreement, which made no reference to the specific notes Skye was buying or even the number of notes being purchased, and continued to represent an effective date of April 8, 2004, some four months prior to when the parties reached agreement.[11] D.E. 358-1. Richards could not explain why he did not either just update the references to the notes in the June 23, 2004 agreement or revise the April 8 agreement to include reference to the notes purchased and the actual date of the agreement, except Richards said that "I was comfortable with the agreement that I'd originally had. Or proposed." Exhibit 10, Skye Dep. at 86:14–24.

By the time Skye and Gruppo Triad entered into their purchase agreement in August 2004, Richards had already loaned Gruppo Triad $330,000 for interests in the purported Bandagro notes held by Gruppo Triad. *Id.* at 263:2–11. The money Richards had loaned Gruppo

---

[10] In fact, the purported notes were encumbered by an 8 percent lien held by Gruppo Triad's lawyer Miguel Jacir and a 25 percent lien held by the British Virgin Islands company Woodstrite. Skye now estimates that, due in part to interests held by others (mostly foreign persons or entities) in the notes, Skye's net recovery might be $10 million on the $100 million face value of the purported notes. Exhibit 10, Skye Dep. at 12:16–14:10. Yet, as late as the January 1, 2010 agreement between Skye and Gruppo Triad, Skye continued to have Gruppo Triad represent that the notes were transferred without liens or claims of any kind and they remained free of any liens or encumbrances. Exhibit 36 at SKYE004475 ¶ 5.11.

[11] Not only did Skye backdate the agreement but when Venezuela suggested that the notes had not been purchased in April 2004, Skye falsely told this Court that the purchase occurred in April 2004 and accused Venezuela of "distort[ing] the time frame." D.E. 319 at 5.

Triad was rolled into the stated purchase price.  Exhibit 9, Richards Dep. at 67:18–22.  There is no document rescinding or nullifying the deeds of trust Richards had received; nor does the "April 8" agreement executed in August 2004 make any reference to Skye's pre-existing interest via "deeds of trust" in the other purported Bandagro notes held by Gruppo Triad.  Exhibit 10, Skye Dep. at 90:18–91:22.  This $100 million transaction was not documented professionally; far from it.[12]

The note purchase agreement executed in August 2004, with an effective date of April 8, 2004, specifically required Skye to make a demand for payment on Venezuela and then to bring litigation in the United States for payment on the notes.  D.E. 358-1.  On August 11, 2004, CBJ's Alcalde wrote again to the Venezuelan Ministry of Finance, stating that the June 24, 2004 communication had misidentified Skye's notes and should have referred to notes 7/12 and 8/12. Exhibit 10, Skye Dep. at 84:15–85:8.  This second letter by Alcalde, like its predecessor, was again blatantly false, including insofar as it asserted that Skye was the bearer of notes 7/12 and 8/12, which Pavanelli still was clinging to as of that date (assuming the versions of these counterfeit notes he later sent to Skye even existed at that time).[13]

One week later, on August 18, 2004, Skye finally received the purported notes 7/12 and 8/12 from Gruppo Triad.  *Id.* at 70:17–73:5.  Pavanelli continued the con in exquisite fashion. The notes arrived in a briefcase handcuffed to a security guard with two different keys needed to

---

[12] Skye has not produced documents sufficient to determine the true amount of Skye's payments to Gruppo Triad and its interest in the purported Bandagro notes held by Gruppo Triad.  The June 23 agreement says that Skye had previously purchased $5.9 million in notes but also that Skye had nearly $9.5 million in deeds of trust.  Exhibit 38 at SKYE005869 & SKYE005874 ¶ 2.1.  Either amount would have represented a return of significantly more than 10:1 on the $330,000 Richards testified that he had paid as of August 2004.  Exhibit 10, Skye Dep. at 87:5–14.

[13] Skye has continually reiterated in this litigation the same false allegation that it was the bearer when it made its demands for payment.  *See* D.E. 1 ¶ 15; D.E. 147 ¶¶ 32, 35; D.E. 301 ¶¶ 32, 35; D.E. 304-1 ¶¶ 32, 35; D.E. 258-2 ¶ 22; D.E. 443-11 ¶ 12.  It absolutely was not.

unlock the handcuffs. *Id.* Richards had never before and has never since experienced such a scene. *Id.* Skye commenced this action five days later. *See* D.E. 1.

In connection with Skye's purchase of notes 7/12 and 8/12, Skye and Gruppo Triad agreed to share in any proceeds of the lawsuit that Skye was obligated to bring. Although the percentage of the recovery that Gruppo Triad was entitled to receive changed over time, the original distribution scheme (which has gone missing) was supposedly the same as what had been provided in the June 23 agreement. Exhibit 9, Richards Dep. at 207:9–15.[14]

### G.  Dissention In The Ranks

It is scarcely surprising that Skye tried so hard for so long to conceal from Venezuela and the Court the true nature of the dealings between Skye and Gruppo Triad. To say this was an unusual transaction, even before it morphed several times during this litigation (Exhibit 9, Richards Dep. at 279:13–281:20), would be an understatement of mammoth proportions. The transaction and its tangled history are themselves badges of the fraud that lies at the core of this action. The extent of the fraud is also evident from the behavior of the many rats on this ship. The main players behind this fraud have spent much of the past decade calling each other liars and accusing each other of criminal and fraudulent activity.

For example, in January 2005, Pavanelli wrote CBJ, then Skye's litigation counsel, and accused CBJ of being "associated with Skye Venture [sic] in a series of what we think to be

---

[14] Skye produced the "April 8" note purchase agreement in this case in 2006, but hid that portion of the agreement that revealed Gruppo Triad's interest in the outcome of this case. D.E. 358, Mem. at 2–3. When Skye finally produced the unredacted note purchase agreement many years later in September 2014, the distribution scheme included in the non-recourse promissory note attached to that agreement reflected neither the original agreement nor the agreement current at that time. Exhibit 9, Richards Dep. at 207:9–15 ("this was not the waterfall when we finalized the agreement in June – or, in July or August. This was the waterfall as it existed in December or January. And it's different today."). The waterfall originally agreed to by Skye and Gruppo Triad in August 2004 was supposedly the same as the waterfall contained in the executed June 23 agreement. *Id.* Richards had signed many different versions of the agreement between then and December 2004 or January 2005. *Id.* at 204:24–205:3.

illegal acts." Exhibit 50.[15]  Pavanelli continued, "We must inform you that over the past time we have accumulated a series of evidence of malpractice of some member of your law firm, to start with the 'Bonetti' affair, and of conspiracy with members of Skye Venture [sic] to damage our interests, and you have done nothing to protect us." *Id.*  Pavanelli then demanded that CBJ "dissociate totally from Skye Venture and Mr. David Richards immediately," and threatened "otherwise we will have no other solution but to report your law firm to the USA bar association, to the FBI under the RICO law, to the Italian criminal police, to the Swiss criminal police and to the international law police." *Id.*  Before closing his email, Pavanelli accused CBJ of "arrogance and malicious behavior" and alleged that Richards "has blackmailed us and have used all possible tricks to damage our interests." *Id.*

While Pavanelli lobbed allegations of corruption and criminality against Skye and Richards, Skye and Richards had a similar opinion of Pavanelli.  Richards, testifying as Skye's 30(b)(6) designee, explained the difficulty of dealing with the unreliable Pavanelli:

> Well, it's difficult to remember everything he said inaccurate, but he had become increasingly broke throughout this whole process, right.  He still was in need of money, if anything more so than at the beginning.  And so he would say—he got to the point where he was accusatory and he was calling Crabbe Brown and everybody liars and was just very contentious and that, I think that's perhaps one of the reasons that Crabbe Brown got rid of him.  And he would say things like you're not the owner of the notes, and then I would say of course we're owners of the notes.  We would get into arguments over that.  And just irrational things like that.  And he would just say something like you're not the owner of the notes and then he would say well, if you send me $25,000, I'll admit you're the owner of the notes, it would be an issue no more.

---

[15] This document—sent from Gruppo Triad's principal to a lawyer at CBJ, copying two Skye email addresses—came to light only in the last week, when produced by Skye's Los Angeles public relations firm in response to a document subpoena.  Skye did not produce it in response to document requests served on it or the Court's order for it to collect and produce Gruppo Triad documents.  Nor did CBJ produce the email in response to the subpoena served on it.  This apparent attempt to hide this document from Venezuela in utter disregard of discovery obligations, coupled with the loss or destruction of relevant documents during the pendency of this case, only heightens the importance of Venezuela's request for an order requiring the production of those Gruppo Triad documents that do exist.

Exhibit 10, Skye Dep. at 47:11–48:3.

The exchange of accusations and threats were not limited to just Pavanelli and Richards. Pavanelli characterized Woodstrite, an entity that Gruppo Triad gave a 25 percent interest in Gruppo Triad's notes, as a group of criminals. In a May 6, 2004 email to Richards and Jacir, copying Usuelli and others, Pavanelli claimed that "Bonetti [Woodstrite's principal] has been denounced in Switzerland and if him or any one of them come to Schianchi to claim the notes, Schianchi will call the Swiss police and they all will be arrested for attempted fraud, and other criminal charges." Exhibit 51.

Pavanelli's same May 6, 2004 email also casts aspersions on Jacir, Gruppo Triad's Venezuelan lawyer. In that email, Pavanelli told Richards that Richards does not "have to take any notice of what Jacir has told you concerning the Bonetti story." *Id.* Pavanelli goes on to say that Jacir had been trying to get ahold of all of the notes but "[f]ortunately I managed to get back 400 million dollars which he had in safe custody in Miami till last September." *Id.* Pavanelli then added, "This is the only negative part of Jacir. I was mad at him last September because I founf [sic] out that he was working on my back." *Id.*

Jacir, for his part, testified before the Venezuelan Office of the Prosecutor General on February 8, 2006, that he no longer represented Gruppo Triad and that he had returned Bandagro notes 1/12 to 8/12 from series 322 to Gruppo Triad through Jose Tovar. Exhibit 53 at FS1342. Jacir then testified that Tovar "lied about everything." *Id.* at FS1349. Tovar, of course, is under house arrest in Venezuela following a criminal conviction there and, like Jacir, is currently a key affiant on behalf of Skye. *See* D.E. 415, Exhibit 21. Jacir also told Pavanelli that Jacir and Pavanelli had both been deceived by Pavanelli's acquaintances. Exhibit 54 at CBJ-31–CBJ-32. Jacir also complained bitterly to Pavanelli about the copies of the notes provided to him by

Schianchi, writing that they "show a total lack of respect and are a mockery which I do not find acceptable." *Id.*

Schianchi, whom Pavanelli apparently trusted more than Jacir, does not seem to hold the same high opinion of Pavanelli. Schianchi told the Swiss prosecutor that Pavanelli had told him so many stories about how Pavanelli obtained the Bandagro notes that he did not know which one to believe. D.E. 253-5 at 52–53. Meanwhile, Lara Pavanelli, the current president of Gruppo Triad, testified that she does not trust Schianchi. She terminated Schianchi's representation of Gruppo Triad because she does not believe he was acting in Gruppo Triad's best interests, because he disclosed private Gruppo Triad documents to Skye, and because he was not cooperating with her after her father's death. Exhibit 8, L. Pavanelli Dep. at 75:20–78:10. And, as discussed above, Lara Pavanelli herself has lied to Skye about the existence of Gruppo Triad documents relevant to this litigation.

The lying and concealment inherent in this sordid transaction also made its way to the documentation. On or about October 19, 2004, as he was being cast adrift by Pavanelli and Richards, Corna signed an "Agreement And Release" by which Corna released Skye, Gruppo Triad, Richards and other individuals and entities in exchange for the transfer to Corna of certain interests in the purported notes held by Skye. Exhibit 55 at 9. Notably, the agreement, entered into after the commencement of this case, both gave Corna a financial interest in the Bandagro notes at issue in this case, and requires him to keep his interest "secret and confidential." *Id.* More specifically, the agreement requires Corna to lie and say he is no longer involved if asked about "the deal or related matters. *Id.*[16]

---

[16] This document, too, demonstrates Skye's utter disregard of its discovery obligations. The agreement was produced in response to a Rule 45 subpoena on Corna's ex-wife, Ms. Reash, a non-party. Skye has never identified or produced this document. Moreover, in response to Venezuela's request for "All documents concerning any agreements between Plaintiff and any other Person . . . granting them any potential benefits to be derived from this

Corna apparently needed the payment on the notes to satisfy other debts owed by him, including $33,000 he owed to David DiBenedetto. *Id.* at 16–17. DiBenedetto is another individual who stands to benefit from this litigation, as the January 1, 2010 waterfall produced by Skye shows that DiBenedetto stands to receive $1 million of Gruppo Triad's proceeds from this action. Exhibit 36 at 005961. DiBenedetto wrote Usuelli on Corna's behalf in December 2010, looking for information about the notes that he could pass on to Corna. Exhibit 55 at 8. Usuelli made a friendly response to DiBenedetto—his partner in the Gruppo Triad criminal venture—but then wrote to Corna's ex-wife to tell her, "I do not trust very much the guy, a little sharky to my taste, so please tell Larry to be careful with him." *Id.* Over the next year it became apparent which shark should have most concerned Corna. According to DiBenedetto's February 24, 2012 email, Richards had Corna sign a stack of papers that caused Corna to lose all of his interest in the notes to Richards. *Id.* Corna's interest (or a portion of it) was only returned after DiBenedetto paid a personal visit to Richards and told him that "if he wouldn't reimburse Larry his bonds, that he would never receive any money from the bonds for himself." *Id.*

## H. Gruppo Triad Disclosed To Skye Its Legal Opinions Regarding the Validity And Enforceability Of The Bandagro Notes.

During the course of Gruppo Triad's courting of Skye as a potential buyer for the purported notes, and in an effort to screen Pavanelli's fraud, Gruppo Triad supplied numerous legal opinions to Skye, touting the validity and enforceability of the purported notes. *See* Exhibits 41–46. The opinions are wide ranging and cover nearly every subject related to the Bandagro notes including: the history, validity, and enforceability of the Bandagro notes (Exhibit 41 at

---

Action," Skye objected to the breadth and relevancy of the request and then, subject to those objections, stated "that it has no documents responsive to this request." D.E. 372-2 at 18 (Request 36).

SKYE004097–4100, SKYE004103; Exhibit 42 at SKYE000984–986; Exhibit 43 at SKYE000945–946; Exhibit 44 at SKYE001141; Exhibit 45 at SKYE004330–4333); the alleged unilateral extension of the notes' maturity date (Exhibit 41 at SKYE004098), analysis of the Venezuelan Minister of Finance and Attorney General reports on the notes (*Id.* at SKYE004099– 4100; Exhibit 42 at SKYE000984; Exhibit 43 at SKYE000943–944); the possibility of litigation to enforce the notes, including litigation outside of Venezuela (Exhibit 41 at SKYE004101–4103, SKYE004110); and the chances of succeeding in litigation against Venezuela (*id.*). These legal opinions, absent crime or fraud, would typically be protected by the attorney-client privilege if kept confidential within Gruppo Triad. However, Gruppo Triad voluntarily and intentionally provided these opinions to Skye, and Skye in turn has provided such opinions to Venezuela in this litigation. Any privilege on the subject matters of these opinions has been waived.

## I. Gruppo Triad's Previous "Limited" Waiver Of Privilege

In 2006, two years after filing its complaint, Skye provided Venezuela with a document entitled "Plaintiff's Privilege Log" that identified 12 allegedly privileged documents that were withheld from production on the basis of the attorney-client privilege. D.E. 358-3. These documents, as described in the privilege log, primarily consisted of communications between, on the one hand, Gruppo Triad or its counsel, and on the other hand, Skye or its counsel. *Id.* Venezuela moved to compel those documents, arguing that, on their face, they were obviously not attorney-client communications, and if they contained attorney-client communications, the privilege had been waived by the disclosure of the documents outside of that relationship. D.E. 358. In opposition, Skye asserted that the Plaintiff's Privilege Log, despite the title given to it by Skye, was actually a log of documents in CBJ's possession that belonged to CBJ's former client, Gruppo Triad, as opposed to CBJ's current client, Skye. D.E. 361. After the motion was fully

briefed, the parties participated in a teleconference with Magistrate Judge Kemp, who proposed that CBJ produce the logged documents without the production amounting to a broad subject matter waiver. CBJ conferred with Ms. Pavanelli, Gruppo Triad's president, and apparently obtained Ms. Pavanelli's consent to produce the documents on this basis. Exhibit 46. After Venezuela, while otherwise reserving its rights, agreed not to argue that the production of these documents would amount to a broad subject matter waiver, CBJ produced the documents on November 6, 2014. *Id.*

Thereafter, on November 10, 2014, Venezuela served a document subpoena on CBJ. Exhibit 1. CBJ initially responded by letter dated November 28, 2014. Exhibit 2. CBJ provided a second letter on January 9, 2015, producing the personnel file of Luis Alcalde and providing a privilege log that identifies 53 withheld documents. Exhibits 2–3. The 2015 CBJ privilege log raises even more questions about the Gruppo Triad documents and the Plaintiff's Privilege Log produced in 2006. The CBJ log contains many more documents than were on the 2006 "Plaintiff's Privilege Log." If, as Skye now maintains, the 2006 privilege log represented the Gruppo Triad documents in CBJ's possession, it apparently was only a partial list.

## IV.    ARGUMENT

Gruppo Triad's documents and communications, in the possession, custody or control of CBJ, Gruppo Triad, Lara Pavanelli, or anyone else, are not worthy of attorney client privilege or work product protection. Pavanelli's two criminal convictions involving fake Bandagro notes provide more than a prima facie basis to conclude that Gruppo Triad's actions in the United States, including its brief engagement of CBJ, were in furtherance of an ongoing fraudulent scheme.

Even if the convictions were not prima facie evidence of crime or fraud (which they clearly are), there are more than ample facts in the record from which the Court could find prima facie evidence of crime and/or fraud, including:

- The three people whose names appear on the purported notes have testified that they never signed them.

- The story of how Gruppo Triad acquired the notes, from whom and for how much has changed so many times that even Gruppo Triad's long-time Swiss lawyer, Schianchi, does not know which story to believe.

- The wife of an employee of Pavanelli was detained trying to smuggle 18 Bandagro note forms through customs in New York for Pavanelli months before Pavanelli claimed his company bought the notes.

- The Bandagro note forms seized en route to Pavanelli had blank maturity dates and were accompanied by a set of instructions for filling out the notes.

- The individual who allegedly sold the notes to Pavanelli was named as a co-conspirator in the criminal case against Pavanelli in the United Kingdom.

- Gruppo Triad and the other Pavanelli companies affiliated with this fraud were nothing but shells with no real assets and no business activities other than to hold and collect on Bandagro notes.

- Gruppo Triad desperately begged for even small amounts of cash from potential investors, and gave away interests in the notes at bargain basement prices, even after the Ministry of Finance issued its initial report on Gruppo Triad's claim for payment.

- Gruppo Triad engaged the disreputable Larry Corna to try to place the notes with investors in the United States, and continued to pressure him to find investors even after the Ministry of Finance initially approved Gruppo Triad's claim.

- Gruppo Triad put Larry Corna in touch with the Ministry of Finance official examining Gruppo Triad's claim for payment, even though Corna had nothing to do with the alleged issuance of the purported notes or alleged extension of the maturity date and had nothing to contribute to the examination.

- Gruppo Triad demanded money from Corna to pay unnamed Venezuelans to accelerate the receipt of an order to pay Gruppo Triad's claim on the purported notes.

- Gruppo Triad offered a $25 million payment and $75 million in notes to Delgado, a Ministry of Finance employee who was involved in assessing Gruppo Triad's claim on the notes.

- Gruppo Triad repeatedly refused to hand over the notes to Skye and CBJ even after agreeing to sell the notes.

- Gruppo Triad could not keep straight which notes were encumbered and which were not when trying to find two notes to sell Skye.

- Gruppo Triad and Skye backdated their original agreement to make it look like the notes were sold months earlier than they had been sold.

- Gruppo Triad sold Skye two purported notes for less than a penny on the dollar.

- Gruppo Triad specifically told CBJ that it needed someone to be an "upfront" for this litigation.

- Pavanelli and other members of the extended Gruppo Triad family repeatedly alleged that other members of the family had engaged in crimes, fraud and other misconduct in connection with the Bandagro notes.

- There has been a widespread pattern of concealment of evidence by Gruppo Triad and Skye (and other destruction or loss of evidence by Gruppo Triad's former Venezuelan lawyer).

CBJ, Skye, and others are wrapped up in Gruppo Triad's fraudulent scheme to collect on bogus Bandagro notes, whether they intended to be, and whether they acknowledge it or not. While the fraud in this case did not originate with Skye, it has been perpetuated by Skye, in the spirit of its predecessor. The fraud is pervasive, stretching across decades and continents. In 1987, Bandagro notes with blank maturity dates (and instructions for filling them out) were seized in New York en route to Pavanelli. Two years later, Pavanelli was convicted in England for conspiracy to use Bandagro notes to defraud investors. The purported notes sold by Gruppo Triad to Skye (or other versions of those same fabricated notes) were among those found to be fraudulent by the Italian court as part of Pavanelli's 2003 criminal conviction. Gruppo Triad somehow lured Richards, sight unseen, to purchase the purported notes, despite Pavanelli's recent conviction involving the very same notes. Even after "selling" the notes to Skye, Pavanelli

- 40 -

refused to turn them over and, even after turning them over, would tell Skye it did not own them and accused CBJ of assisting Skye in criminal activity. The note purchase agreement, when it was eventually signed sometime in August 2004, was backdated to April 8, 2004. Why? No one seems to know. And Gruppo Triad sold these supposedly valid promissory notes for a pittance. D.E. 358-1 at SKYE000894. There is something very wrong with this picture.[17]

Skye also agreed to kick back tens of millions of dollars to Gruppo Triad and the convicted fraudster, Pavanelli, if the litigation to enforce the purported notes was successful. *Id.* at SKYE000899. Skye hid the terms of this arrangement from Venezuela and this Court for eight years, even falsely averring in an affidavit that Skye was not representing any interest other than its own in this litigation. D.E. 258-2 ¶ 24. Agreements syndicating the proceeds of this litigation to individuals and entities continue to roll in through third party discovery despite Skye being required to produce those agreements and insisting they do not exist. All of these circumstances speak loudly that Gruppo Triad's exploration of litigation in the United States and eventual sale of the purported notes to Skye were not legitimate business activities but instead represented the culmination of a deceptive and fraudulent scheme to defraud Venezuela and ultimately this Honorable Court. This epic fraud strips Gruppo Triad of any privilege or work product protections that it ever had.

---

[17] Lest there be any misunderstanding, Venezuela is not alleging that CBJ willfully acted in furtherance of Gruppo Triad's fraud; and the firm's firing of Gruppo Triad as a client shows that, unlike Skye, it was only willing to put up with so much of Pavanelli's nonsense. Nevertheless, CBJ represented Gruppo Triad during a critical, if brief, period in the evolution of the fraud, and uncloaked by any privilege, its dealings with Pavanelli and Gruppo Triad are likely to shed considerable light on Pavanelli's strategy and tactics as the note purchase agreement was being finalized and Skye, also represented by CBJ, was moving into the "upfront" position as the nominal plaintiff in this soon to be filed action. Complicating matters further for CBJ is that it took a security interest from Gruppo Triad in certain of the purported notes (Exhibit 47), and at least one of its partners, who remains counsel of record for Skye in the action, is also a Skye investor (Exhibit 9, Richards Dep. at 61:10–17). It also appears another CBJ partner, Larry James, was an investor in the Gruppo Triad notes. Exhibit 48.

Additionally, even if Gruppo Triad is somehow entitled to protection under the attorney-client or work product doctrines despite its criminal and fraudulent misconduct, Gruppo Triad has voluntarily waived any such privilege or immunity by sharing numerous of its legal opinions with Skye.  Gruppo Triad's waiver extends beyond those opinions to all other documents and communications related to the same subject matters.  The opinions are broad in scope and cover virtually every aspect of the scheme to enforce Bandagro notes.  Thus, Gruppo Triad can no longer claim a privilege or work product protection for any of its documents, including those identified on CBJ's and Lara Pavanelli's/Gruppo Triad's privilege logs.

Accordingly, this Court should find that Gruppo Triad is not entitled to assert the protections afforded by the attorney client or work product doctrines, and order that CBJ, Gruppo Triad and Ms. Pavanelli produce all documents that have been withheld on either or both of these grounds.  Any privilege or immunity that ever existed as to any of the documents identified in CBJ's or Lara Pavanelli's/Gruppo Triad's privilege logs is eviscerated by the crime fraud exception, or was waived when Gruppo Triad voluntarily provided numerous legal opinions to Skye.

A. **Gruppo Triad Has Lost The Right To Assert The Attorney-Client Privilege Or Work Product Doctrine Under The Crime Fraud Exception Because Of Pavanelli's Criminal Activities Involving The Notes At Issue Here.**

1. *Under the crime fraud exception, where there is a prima facie showing that a crime or fraud may have occurred, the attorney-client privilege and work product doctrine are inapplicable to any communication or documents relating to the prima facie violation.*

The crime fraud exception is well-established under Ohio law.  "[I]t is beyond contradiction that the [attorney-client] privilege does not attach in a situation where the advice sought by the client and conveyed by the attorney relates to some further unlawful or fraudulent transaction." *Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St. 3d

- 42 -

161, 167, 2010 Ohio 4469, 937 N.E.2d 533 (2010).  "Advice sought and rendered in this regard is not worthy of protection, and the principles upon which the attorney client privilege is founded do not dictate otherwise."  *Id.*

A two-part test is used to determine whether the crime fraud exception applies.  First, the party seeking disclosure must make "a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege . . . ."  *United States SEC v. Sierra Brokerage Servs.*, Case No. 2:03-cv-326, 2005 U.S. Dist. LEXIS 23866, at *12–13 (S.D. Ohio Oct. 18, 2005) (citing *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir. 1986)).  Second, there must be "some relationship between the communication at issue and the prima facie violation."  *Id.*

The crime fraud exception can be used to negate a claim of privilege in the context of a commercial transaction.  *See, e.g., id.* at *19 (finding that communications from an attorney used to perpetrate a fraud related to a merger were not privileged); *Miller v. Miller*, 247 B.R. 704, 711–12 (N.D. Ohio 2000) (finding crime fraud exception applies to communications which "could shed light" on the issue of intent related to a party's fraudulent conduct); *Royal Surplus Lines Ins. Co. v. Sofamor Danek Grp., Inc.*, 190 F.R.D. 505, 517 (W.D. Tenn. 1999) (holding fraudulent business proposal discoverable under crime fraud exception).

The prima facie showing is not a high standard.  It merely requires "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud."  *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997) (citing *In re Antitrust Grand Jury*, 805 F.2d 155, 166 (6th Cir. 1986)); *see also Squire, Sanders & Dempsey*, 127 Ohio St. 3d at 167 (citing *State ex rel. Nix v. Cleveland*, 83 Ohio St.3d 379, 384 (1998)) ("A party invoking the crime fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a crime or

fraud has been committed and that the communications were in furtherance of the crime or fraud.").

> 2. *There is much more than a "reasonable basis" to suspect the perpetration of a crime or fraud, given Pavanelli's criminal convictions for dealing in fake Bandagro notes, Gruppo Triad's bribes and illicit dealings in Venezuela, Gruppo Triad's sale of notes to Skye that had been previously determined by an Italian court to be counterfeit, and the numerous irregularities in Gruppo Triad's transaction with Skye.*

Pavanelli and Gruppo Triad's global scheme to illegally profit from forged Bandagro notes has spread from the United Kingdom, to Italy, Switzerland, and Venezuela, and now to the United States (more specifically to the Southern District of Ohio, the venue that Skye hand-picked to bring this litigation). By 2003, when Pavanelli's criminal enterprise reached the shores of the United States, Pavanelli had already been convicted in the United Kingdom and in Italy for crimes involving fake Bandagro notes. In the Italian conviction, the court also implicated Gruppo Triad—a shell company—in the fraud. *See* Exhibit 7. Venezuela had also determined that Gruppo Triad's notes were counterfeit, leading to, among other things, the conviction of at least one of Gruppo Triad's aforementioned operatives, Tovar. D.E. 386.

In most situations involving the crime fraud exception, a court must infer that a crime or fraud has occurred. Not here. In this case, there are already multiple criminal convictions and findings of counterfeit Bandagro notes possessed by Gruppo Triad. The judicial and administrative systems in the United Kingdom and Italy have done the heavy lifting. Pavanelli's convictions are conclusive proof that Gruppo Triad has participated in a crime or fraud involving fake Bandagro notes. These circumstances alone provide "a reasonable basis to suspect the perpetration of a crime or fraud" under the crime fraud exception.[18]

---

[18] In prior filings with this Court, Skye has attempted to collaterally attack Pavanelli's criminal convictions in the U.K. and Italy. *See, e.g.*, D.E. 361 at 4–5; D.E. 443, Mem. at 21. The law does not permit such a collateral attack on those convictions. *See, e.g.*, *Hirota v. MacArthur*, 338 U.S. 197, 198 (1948) (stating "courts of the United States

But there is so much more than those convictions.  Pavanelli's co-conspirator, Mrs. Fusco, was stopped trying to deliver to Pavanelli 18 Bandagro note forms with blank maturity dates and instructions for filling in the forms.  She was also carrying a letter from Pavanelli at the time.  There is no legitimate explanation for Pavanelli to be receiving those documents.  As detailed above, there is also documented proof that, as part of Gruppo Triad's efforts in Venezuela to have the Bandagro notes declared payable, Pavanelli promised a $100 million payoff to Delgado, a member of the Ministry of Finance team deciding the validity of the notes. DE 253-5 at 68–69, 70.  There is also evidence of numerous inappropriate contacts and secret meetings between Gruppo Triad and officials of the Venezuelan Ministry of Finance while the decision was being made on Gruppo Triad's notes.  These interactions, too, lack any innocent explanations.

When Gruppo Triad turned its attention to the United States, it enlisted the help of yet another unsavory character, Corna, who would later be convicted and imprisoned for his own fraudulent schemes.  *See* Exhibit 9, Richards Dep. at 76:20–25 & 77:13–18; D.E. 414-2; D.E. 414-3.  Pavanelli hired Corna to help Gruppo Triad obtain loans using alleged Bandagro notes as collateral.  Exhibit 22 at LP000468.  This is essentially the same scheme—using the exact same type of fake notes—that the court in Italy had found to be fraudulent just weeks before Pavanelli connected with Corna.  *See* Exhibit 7 at 3.  After Corna served his purpose by introducing Gruppo Triad and Skye, Richards and Pavanelli cut him out of the scheme, paying him some interest and requiring him to lie if asked about it.

have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed" by foreign military tribunal); *Neely v. Henkel*, 180 U.S. 109, 122 (1901) (holding that the powers and protections afforded by the U.S. Constitution "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country); *Lui-Dix v. Holder*, 528 F. App'x 595, 598 (7th Cir. 2013) (citing *Soetarto v. INS*, 516 F.2d 778, 780 (7th Cir. 1975) ("[A court's] function is not to try [] foreign crimes de novo.")); *Chiaramonte v. INS*, 626 F.2d 1093, 1098 (2d Cir. 1980) ("[N]either the INS nor the courts may entertain a challenge to the legitimacy of a criminal conviction duly obtained under the laws of a foreign country.").

If all of this were not enough, the numerous irregularities in the dealings between Gruppo Triad and Skye provide further evidence of Gruppo Triad's fraudulent designs. Skye purchased notes from Gruppo Triad with a face value of $100 million, yet the stated purchase price was less than a penny on the dollar, and there is no evidence that any money actually changed hands as part of the purchase. *See* D.E. 358-1 at SKYE000894–895. Even Gruppo Triad recognized that a deal on those terms would reek of fraud. Pavanelli's buddy, Usuelli, who helped convince Richards to deal with Pavanelli (Exhibit 9, Richards Dep. at 65:21–66:5; 101:4–102:17), warned Corna in January 2004 that "offering the notes around at a penny for a dollar has the main result of scaring serious investors away, since it looks more like an attempted scam than an unusual but potentially very rewarding investment." Exhibit 30.

On top of that, the note purchase agreement was backdated by over four months, for reasons which Skye is unwilling or unable to explain, and no one knows for sure when the agreement was actually reached. Exhibit 9, Richards Dep. at 23:19–26:10. Although the transaction purported to involve $100 million of notes, the agreement fails to identify the specific notes being acquired. *See* D.E. 358-1. CBJ's Alcalde made two demands for payment on Bandagro notes, one demand pertaining to notes that Skye never obtained, and another demand falsely asserting that Skye was the bearer of notes it did not then possess. The note purchase agreement also contemplated a multi-million dollar kickback to Gruppo Triad, but that arrangement was hidden from Venezuela and this Court for eight years. And within the last two months, taking the fraud to another level, the current president of Gruppo Triad, Ms. Pavanelli, falsely stated that Gruppo Triad's documents had burned up in the fire that killed her father. Exhibit 11. When faced with a subpoena, she admitted, eventually, that many documents had in fact been salvaged from the fire. *Compare* Exhibit 8, L. Pavanelli Dep. at 374:24–383:3 *with id.*

- 46 -

at 243:4–246:11. These documents, it turns out, are a treasure trove of relevant—and highly incriminating—evidence. The cache of documents recovered from the fire, which include many of the communications between Pavanelli and Corna, bring new meaning to the term "smoking guns."[19]

> 3. *Pavanelli and Gruppo Triad's activities in the United States in 2003–2004 were in furtherance of the criminal scheme to profit from bogus Bandagro notes, so any privilege or immunity from discovery relating to these activities has been lost.*

Not only does the evidence show that Gruppo Triad was involved in a continuing crime or fraud relating to bogus Bandagro notes, but the evidence is also clear that Gruppo Triad's activities in the United States, including in this judicial district, were integrally related to the criminal scheme to profit from bogus Bandagro notes.

In 2003, authorities in both Italy and Venezuela determined that the purported Bandagro notes held by Gruppo Triad were bogus. Gruppo Triad hoped to find a different forum where it could generate a different result.

Initially, the criminal scheme Gruppo Triad pursued in the United States was the exact same formula it had used previously in the United Kingdom, which led to the conviction there in 1989 and in Italy, which led to the criminal conviction there in 2003. In each country, the scheme was that bogus Bandagro notes, supposedly owned by Gruppo Triad, were used to generate liquidity from third parties, either by selling the notes or using the notes as collateral to secure loans for Pavanelli. *See* D.E. 120-4 at 4; Exhibit 7. Gruppo Triad used both schemes in

---

[19] The mystery surrounding the house fire was compounded by the fact that no will for Pavanelli has been located and he had no identifiable assets or liabilities at the time of his death, with the exception of his Gruppo Triad stock, and even there, the percentage of his and others' ownership of Gruppo Triad could not be determined. Exhibit 8, L. Pavanelli Dep. at 51:14–54:9; 58:4–59:4; 286:23–287:20. Moreover, the fire occurred just one month after the effective date of an agreement between Gruppo Triad and Skye engineered by Schianchi and Richards (Exhibit 36) that was so tilted in favor of Skye—virtually a hostile takeover of Gruppo Triad—that Ms. Pavanelli and Gruppo Triad are now disavowing the agreement. *Id.* at 157:14–158:23.

its dealings with Skye, first drawing money from Skye in exchange for a security interest in the notes, then selling two notes outright to Skye for the promise of funding and the possibility of a big payday if Skye succeeded in this litigation. Gruppo Triad's dealings with Skye show a clear "relationship" between Gruppo Triad's undertakings in the United States and its previous documented criminal activities. *In re Antitrust Grand Jury*, 805 F.2d at 164.

Gruppo Triad's fraud in the United States developed further to include a plan to enforce the counterfeit notes judicially. In April 2004, Gruppo Triad retained CBJ in Ohio to investigate Gruppo Triad's Bandagro notes, to write a legal opinion on their enforceability, and to institute a legal action in the United States to collect on the notes. Exhibit 37 at CBJ-12–CBJ-15. Gruppo Triad started down that path, but CBJ soon lost patience with Pavanelli's shenanigans, though not before generating or receiving the documents that are among the subjects of this motion. Exhibit 39. CBJ's termination of Gruppo Triad—and its statement that Pavanelli's "recent actions convince us that you have other objectives which are inconsistent with pursuing the contemplated litigation"—is further evidence of Gruppo Triad's fraud. *Id.*

After being fired by CBJ, Gruppo Triad altered its course. After some hesitation that further revealed its fraudulent intent, Gruppo Triad chose to use Skye, also represented by CBJ, as a proxy to be "upfront" in this litigation. Exhibit 40. And to facilitate the litigation, Gruppo Triad sold Skye two of the same purported notes that the Italian court had found to be fraudulent. *See* Exhibit 7 at 6; D.E. 415, Exhibit 21 (Tovar Declaration) ¶¶ 2, 3 & 6 and Exhibit A (translation of alleged Aagaard receipt for purchase of notes). Gruppo Triad's attempts to profit from the fake Bandagro notes in the United States, no matter the means, establish an additional "relationship" with its prior criminal activities. *In re Antitrust Grand Jury*, 805 F.2d at 164.

In sum, there is substantial evidence that Gruppo Triad's activities in the United States are in furtherance of Gruppo Triad's long-running criminal scheme to profit from fake Bandagro notes.  Under the crime fraud exception, all allegedly privileged and work product documents related to Gruppo Triad and the Bandagro notes must be produced.

### B. Gruppo Triad Waived Any Privilege When It Voluntarily Shared Numerous Legal Opinions With Skye Concerning The Bandagro Notes.

#### 1. *A party may not selectively disclose self-serving privileged materials without waiving the privilege as to all communications on the same topic.*

In the unlikely event that the Court finds that Gruppo Triad's prior trafficking in fraudulent Bandagro notes abroad, and its more recent use of Skye and CBJ in furtherance of its criminal and fraudulent schemes in the United States involving fake Bandagro notes, somehow does not vitiate Gruppo Triad's attorney client privilege and work product protections, then this Court should order the production of all of Gruppo Triad's documents withheld on privilege or work product grounds for the independent reason that Gruppo Triad waived any privilege when it voluntarily disclosed numerous legal opinions to Skye in connection with the sale of the purported notes to Skye in 2004.

The attorney client privilege is waived through the voluntary disclosure of otherwise privileged communications to third parties. *P & G, Co. v. Team Techs., Inc.*, 2013 U.S. Dist. LEXIS 100608, at *3 (S.D. Ohio July 17, 2013); R.C. 2317.02(A).  "Once a party has waived the attorney client privilege with respect to some items, that waiver extends beyond those items to all other communications relating to the same subject matter." *Id.*; *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005) ("The widely applied standard for determining the scope of a waiver of attorney client privilege is that the waiver applies to all other

communications relating to the same subject matter"); *See v. Haugh*, 2014 Ohio App. LEXIS 5129, at *1 (Ohio Ct. App. Nov. 26, 2014).

Subject matter waiver operates with equal force in the work product arena.  *See North Am. Rescue Prods. v. Bound Tree Med., LLC*, 2009 U.S. Dist. LEXIS 118316, at *25–26 (S.D. Ohio Nov. 19, 2009).  Indeed, in the work product context, subject matter waiver "will occur even if the party did not intend to waive the privilege through disclosure." *Id.*

The fact that the voluntary disclosure of privileged communications waives *all* communications relating to the same subject matter is justified by considerations of fairness.  As this Court has noted, "the waiver must extend beyond the document initially produced so that a party is prevented from disclosing communications that support its position, while concealing communications that do not support its position.  The waiving party cannot selectively produce only those documents it wishes to disclose to its opponent." *P & G*, 2013 U.S. Dist. LEXIS 100608 at *4–5 (internal quotations omitted); s*ee also In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 302–03 (6th Cir. 2002*)* (rejecting "any form of selective waiver" because such picking and choosing "transforms the attorney client privilege into merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage.").

The court's holding in *P & G* is instructive.  In *P & G*, plaintiffs moved to compel the production of opinions of counsel relating to the validity of defendants' patents. 2013 U.S. Dist. LEXIS 100608 at *2.  Because the defendants had voluntarily disseminated some of these legal opinions to their customers to solicit their business and later produced them to the plaintiffs, the court found that the defendants had broadly waived their attorney client privilege and that all the documents requested were discoverable. *Id.* at 9.  Moreover, the court went on to note that the

waiver "extends to all communications concerning whether that patent is valid, enforceable, and infringed by the accused products." *Id.* at 10.

> 2. *Gruppo Triad's disclosure to Skye of allegedly privileged materials waived the privilege as to all communications concerning the purported Bandagro notes.*

As part of the sale of the purported notes to Skye in 2004, Gruppo Triad provided Skye with at least five of the legal opinions prepared by Gruppo Triad's Venezuelan and Swiss attorneys. *See* Exhibits 41–45. In turn, Skye produced those opinions to Venezuela in this litigation. The subject matters discussed in those opinions are all encompassing, relating to virtually every aspect of the validity and enforceability of the Bandagro notes held by Gruppo Triad. The voluntary disclosures of these legal opinions by Gruppo Triad waive the privilege and work product doctrine for the subject matters addressed in these opinions. Thus, the Court should find that all interview notes, analyses, or legal opinions relating to Gruppo Triad and the Bandagro notes must be produced including those addressing, among other subjects:

- The history of the Gruppo Triad notes (*See* Exhibit 41, SKYE004097–4100; Exhibit 44, SKYE001141);

- The alleged validity and enforceability of the Gruppo Triad notes (*See* Exhibit 41, SKYE004097–4100, SKYE004103; Exhibit 42, SKYE000984–986; Exhibit 43, SKYE000945–946; Exhibit 44, SKYE001141; Exhibit 45, SKYE004330–4333);

- The purported unilateral extension of the Gruppo Triad notes' maturity date (*See* Exhibit 41, SKYE004098);

- The Venezuela Ministry of Finance and Attorney General reports on whether the Gruppo Triad notes should be paid (*See* Exhibit 41, SKYE004099–4100; Exhibit 42, SKYE000984; Exhibit 43, SKYE000943–944);

- The alleged binding legal effect of any report by the Ministry of Finance and Attorney General as to whether the Gruppo Triad notes should be paid (*See* Exhibit 44, SKYE001141);

- The possibility of filing litigation to collect on the Gruppo Triad notes, including the possibility of filing litigation outside of Venezuela (*See* Exhibit 41, SKYE004101–4103, SKYE004110); and

- The likelihood of success of any litigation against Venezeula to collect on the Gruppo Triad notes (*See id.*).

Given the breadth of the topics discussed in the legal opinions disclosed by Gruppo Triad, Gruppo Triad has effectively waived any privilege or work product protection it may have had with regard to the Bandagro notes.

Venezuela's subpoena to CBJ requires the production of documents related to CBJ's representation of Gruppo Triad. CBJ has refused to produce most of the responsive documents in its possession, claiming such documents are shielded from discovery under the attorney client privilege and work product doctrine. Exhibits 2–3. This Court should find that any privilege and work product protection that Gruppo Triad may have had regarding the subject matters detailed above has been waived, and CBJ should be ordered to produce all such documents to Venezuela. Similarly, Venezuela's subpoena to Lara Pavanelli calls for documents on many of the same subjects. Ms. Pavanelli, too, has withheld documents on privilege grounds, invoking Gruppo Triad's privilege. Exhibit 6. This Court should find that any privilege and work product protection that Gruppo Triad may have had in the subject matters detailed above has been waived, and Ms. Pavanelli and Gruppo Triad should be ordered to produce all such documents to Venezuela.

## V.    CONCLUSION

There is overwhelming evidence—much more than the required prima facie showing—that Gruppo Triad engaged in criminal and fraudulent conduct in connection with its scheme to collect on counterfeit Bandagro promissory notes, and to enlist others, most conspicuously Skye and CBJ, to attempt to carry out the scheme in the United States, in this judicial district. It is a rare civil case indeed that involves such extensive evidence of illicit activities.

This much is abundantly clear: Gruppo Triad was not a legitimate business enterprise.  It was instead a vehicle whose sole purpose was to perpetrate the crimes and frauds that have culminated in this action.  Whatever privilege or work product protection might otherwise have attached to any of the withheld communications from, to, or concerning Gruppo Triad has been vitiated under the crime-fraud exception.

It is of considerable importance, not just to Venezuela, but to the interests of justice and this Honorable Court, that an order is entered overriding Gruppo Triad's asserted privilege and work product protection.  This Court is being asked to enter a judgment in an astronomical amount that would posthumously bring Pavanelli's long-running fraudulent scheme to fruition.  Given the mountain of evidence already establishing that crimes and frauds have been committed in multiple countries, and given Gruppo Triad's stake in the outcome of this case, Gruppo Triad should not be permitted to shield any relevant evidence from the Court.  There has been enough evidence already lost, not preserved or concealed for long periods by Gruppo Triad, its Venezuelan attorney Jacir, and Skye.  As this matter draws nearer its conclusion, it is vital that the Court be able to render its decision in as fully informed a manner as possible.  Gruppo Triad has forfeited its right to claim the benefits of the attorney-client privilege and the work product doctrine; it should therefore not be permitted to hide any evidence of its communications with counsel, or any of its counsel's work product.  It is time for the truth to emerge.

For the reasons stated above, the Court should grant this motion and order the production of all documents responsive to Venezuela's subpoenas that have been withheld on attorney-client privilege and/or work product grounds.

## VI.     LOCAL RULE 37.2 CERTIFICATION

Counsel for Venezuela attempted to resolve this dispute without involvement of the Court via written correspondence and phone conferences with CBJ, and other communications with counsel to Lara Pavanelli and Gruppo Triad. However, counsel were unable to resolve their differences, necessitating the filing of this motion.

Respectfully submitted,

REPÚBLICA BOLIVARIANA DE VENEZUELA AND VENEZUELAN MINISTRY OF FINANCE

By its attorneys,

Albert J. Lucas (0007676)
Trial Attorney
Jason J. Blake (0087692)
CALFEE, HALTER & GRISWOLD LLP
1100 Fifth Third Center
21 East State Street
Columbus, OH 43215-4243
Telephone: (614) 621-7002
Facsimile: (614) 621-0010
alucas@calfee.com
jblake@calfee.com

Andrew Z. Schwartz, *pro hac vice*
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 832-1155
Facsimile: (617) 832-7000
aschwartz@foleyhoag.com

- 54 -

Ronald E.M. Goodman, *pro hac vice*
Lawrence H. Martin, *pro hac vice*
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 232-1200
Facsimile:  (202) 785-6687
rgoodman@foleyhoag.com
lmartin@foleyhoag.com

Dated:  February 3, 2015

### CERTIFICATE OF SERVICE

A copy of the foregoing will be delivered to CBJ and counsel for Skye via hand delivery this 3d day of February, 2015.  A copy of the foregoing will also be delivered via overnight mail to counsel for Lara Pavanelli and Gruppo Triad this 3d day of February, 2015, at the following address:

Eddie M. Krenek
Krenek Law Offices
423 Mason Park Blvd.
Suite C
Katy, Texas 77450
281-578-7711 (p)
832-606-8585 (c)
edkrenek@kreneklaw.com

_____
One of the Attorneys for Defendants