**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION
 3   DRFP L.L.C., d/b/a Skye      )
     Ventures,                    )
 4                                )
                                  )
 5            Plaintiff,          )
                                  )
 6   VS.                          )  CIVIL ACTION NUMBER:
                                  )  2:04-CV-0793
 7   Republica Bolivariana de     )
     Venezuela, et al.,           )
 8                                )
              Defendants.         )
 9
10   ***************************************************
11            ORAL/VIDEO DEPOSITION OF
12                 LARA PAVANELLI
13                   VOLUME 1
14                JANUARY 7, 2015
15
16   ***************************************************
17      ORAL DEPOSITION OF LARA PAVANELLI, produced as a
18   witness at the instance of the Defendant, was duly
19   sworn, was taken in the above-styled and numbered cause
20   on the JANUARY 7, 2015, from 9:02 a.m. to 4:25 p.m.,
21   before Chris Carpenter, CSR, in and for the State of
22   Texas, reported by machine shorthand, at the offices of
23   Reeves & Brightwell, LLP, Austin, Travis County, Texas,
24   pursuant to the Federal Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

**Page 2**

```
 1
 2
 3           A P P E A R A N C E S
 4   FOR THE PLAINTIFF:
 5       Charles "Chip" H. Cooper, Jr. (by telephone)
         Cooper & Elliott
 6       2175 Riverside Drive
         Columbus, OH 43221
 7       (614) 481-6000
         chipc@cooperelliott.com
 8
 9   FOR THE DEFENDANT(S):
10       Andrew Z. Schwartz
         Kevin J. Conroy
11       FOLEY & HOAG LLP
         155 Seaport Blvd.
12       Boston, MA  02210-2600
         (617) 832-1000
13       aschwartz@foleyhoag.com
14   FOR THE DEPONENT:
15       Eddie Krenek
         KRENEK LAW OFFICES
16       423 Mason Park Blvd., Suite C.
         Katy, TX  77450
17       (281) 578-7711
         edkrenek@kreneklaw.com
18
19   ALSO PRESENT:
20       Debra Austin, Videographer
21
22
23
24
25
```

**Page 3**

INDEX

Appearances.......................................2

LARA PAVANELLI
    Examination by Mr. Schwartz................4
Signature and Changes...........................186
Reporter's Certificate..........................187

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|-----|-------------|-------------|
| 1 | Subpoena to Produce Documents | 88 |
| 2 | Subpoena to Testify at a Deposition | 101 |
| 3 | E-Mail, Dec. 10, 2014 | 101 |
| 4 | Indictment and Conviction Documents | 127 |
| 5 | English Translation of Excerpts of Italian Court Document | 131 |
| 6 | Authorization Document Bates Stamped LP00003 | 134 |
| 7 | Revocation of Power of Attorney, Pages 19 Of 40 and 39 of 40 of Document 253-2 | 137 |
| 8 | Revocation of Power of Attorney, Aug. 8th, 2011 | 139 |
| 9 | Siro Schianchi Letter, June 9, 2011 | 142 |
| 10 | Amended Bandagro Notes Agreement | 161 |
| 11 | Amended Escrow Agreement | 162 |

LARA PAVANELLI                                                    1/7/2015

13

1    Q.  And what are their names?
2    A.  Jean Pierre Bon.  It's J-E-A-N, P-I-E-R-R-E,
3  B-O-N.  I've also exchanged e-mails with Adam Richards.
4    Q.  And who else?  I'm sorry.
5    A.  Adam Richards.  And that's all I can recall at
6  the moment.
7    Q.  All right.  How many e-mails have you exchanged
8  with Adam Richards using that e-mail address?
9    A.  I don't recall how many.
10   Q.  More than ten?
11   A.  I have no idea.  I would have to look at my
12 e-mail to give you a definitive answer.
13   Q.  Who is Sabina Fortin?
14   A.  She's a shareholder.
15   Q.  Of Gruppo Triad?
16   A.  Uh-huh.  Yes.
17   Q.  What percentage does she own of the shares?
18   A.  As far as I know, 5 percent.
19   Q.  Where does Sabina Fortin live?
20   A.  I believe she currently lives in Italy.
21   Q.  Where in Italy?
22   A.  I don't know the exact address.
23   Q.  Do you know what city, town or region she lives
24 in?
25   A.  No, I don't.  She's moved several times, so I

14

1  don't actually have her current address.
2    Q.  Who is Riccardo Rogina?
3    A.  Also a shareholder.
4    Q.  What percentage does he own?
5    A.  Six percent.
6    Q.  Where does he live?
7    A.  He lives in Torino.
8    Q.  Do you know his address in Torino?
9    A.  I -- not off the top of my head.
10   Q.  Do you have that information somewhere
11 available to you?
12   A.  I do in my notes, yes.
13   Q.  What notes?
14   A.  My personal notes.
15   Q.  What do you mean by personal notes?
16   A.  As in an address book with people's addresses.
17   Q.  Do you have a hard copy address book or you
18 looking -- talking about your phone?  What do you mean
19 by notes in this regard?
20   A.  Something that's written on a piece of paper.
21   Q.  Where is that piece of paper?
22   A.  In my house.
23   Q.  Who is Jean Pierre Bon?
24   A.  He is an investor.
25   Q.  Are you using investor as distinct from

15

1  shareholder?
2    A.  He's currently, as far as I know, he's not a
3  shareholder.
4    Q.  What kind of investor is he?
5    A.  I'm not sure I'm understanding the question.
6    Q.  You identified him as an investor.  I'm just
7  trying to understand what the nature of his investment
8  is.  Can you tell us?
9    A.  He's invested in the Gruppo Triad.
10   Q.  How?
11   A.  With money.  Again, not sure what you're asking
12 me.
13   Q.  How much money has Jean Pierre Bon invested in
14 Gruppo Triad?
15   A.  I'm not quite sure how much exactly at this
16 point.
17   Q.  What did he get in exchange for his monetary
18 investment?
19   A.  I believe he has documents showing that -- that
20 he will be repaid.
21   Q.  On what terms?
22   A.  I don't know.  I don't -- I don't have a formal
23 letter in my possession, so.
24   Q.  So, as you sit here today, you don't know how
25 much he invested and what return he may be entitled to?

16

1    A.  That's correct.
2    Q.  What have you communicated about by e-mail with
3  Adam Richards.
4    A.  I -- I don't recall the -- all the e-mails.
5    Q.  Do you recall the subject matter of any of
6  them?
7    A.  I can tell you his last e-mail, because I
8  remember that one, where he was asking me questions, but
9  I did not answer to the e-mail.  I referred him to my
10 attorney.
11   Q.  When did Adam Richards send you this last
12 e-mail?
13   A.  I think just a couple of days ago or maybe last
14 week.  I think last week actually.
15   Q.  As best you can recall this e-mail from last
16 week, what type of questions was he asking?
17   A.  Same questions similar to what you're asking me
18 now.
19   Q.  He was asking you about your use of the e-mail
20 account that is lpavanelli --
21   A.  No.  He was asking me about the shareholders
22 and investors.  I think he was trying to get ready for
23 this deposition as well.
24   Q.  How many questions did he ask?
25   A.  I don't know, half a dozen.

LARA PAVANELLI                                                1/7/2015

17

1    Q.  Can you remember any others?
2    **A.  Not at this time, no.**
3    Q.  You still have a copy of that e-mail in your
4  in-box?
5    **A.  I do.**
6    Q.  Can you recall any of the other e-mails that
7  Adam Richards has sent you?
8    **A.  Not in detail, no.**
9    Q.  Can you recall them in any matter, at any level
10  of detail?
11    **A.  It was usually very short e-mails.  Very brief**
12  **communications.**
13    Q.  Concerning what subjects?
14    **A.  I -- I don't recall.**
15    Q.  When did you first start receiving e-mails from
16  Adam Richards?
17    **A.  Fairly recently.**
18    Q.  Did you receive any of -- any e-mails from him
19  prior to 2014?
20    **A.  I don't believe so, no.**
21    Q.  Prior to 2014, did you ever speak with Adam
22  Richards?
23    **A.  Yes, I did.**
24    Q.  When did you first speak with him?
25    **A.  I believe it was 2010, after my father's death.**

LARA PAVANELLI                                              1/7/2015

51

so.

Q. Have you exchanged any e-mails with her concerning Gruppo Triad affairs since your father's death?

A. Very few.

Q. But some?

A. Yeah, but it's more like notices, similar to notices that I would send to other shareholders.

Q. What types of notices have you sent to Gruppo Triad shareholders after your father's death?

A. Notifying them that -- that we found a new lawyer. I mean, things like that, things of that nature.

Q. When your father, did he leave a Will or the equivalent of a Will in Italy?

A. We believe that there was one, but we haven't located it.

Q. When he died, he was in Switzerland, correct?

A. Correct.

Q. As far as you're aware, was he then residing full time in Switzerland?

A. As far as I know, yes.

Q. When did he first start to reside full time in Switzerland?

A. I couldn't tell you. I don't know.

50

A. She's in Italy.

Q. Where?

A. Perugia.

THE COURT REPORTER: How do you spell it?

THE WITNESS: P-E-R-U-G-I-A.

Q. (By Mr. Schwartz) How old is she now?

A. 41, 42, 41.

Q. What does she do in Perugia?

A. She is a stay-at-home mom.

Q. How many children does she have?

A. Three.

Q. Before becoming a stay-at-home mom, was she employed?

A. I believe she worked for a little while, yes.

Q. And in what industry or business?

A. If she worked for Fila, I believe. She was an admin assistant, something like that.

Q. Since your father's death, have you had any communications with your sister about Gruppo Triad?

A. Minimal.

Q. What has the nature of those minimal communications been?

A. I guess they've mostly been about me trying to inform her of things that are going on or things that need to be done, but she's not really very interested,

52

Q. Did he move directly there from the Como area in Italy?

A. I -- I don't know.

Q. Did you ever visit him in Switzerland?

A. I did.

Q. Where? The same location where he -- where he died?

A. Yes.

Q. Where was that?

A. A small town of -- I don't recall the name at this moment.

Q. When did you visit there?

A. When my son was two years old, so 2005. And before that, when I was pregnant, I think.

Q. Sometime in 2004?

A. 2003, we visited.

Q. Oh, I'm sorry, I did the math wrong.

A. And then 2005, I visited with my son.

Q. So 2003, when you were pregnant. 2005, after your son was two years old?

A. Yeah, he was little, uh-huh.

Q. When you visited in 2003, was it your understanding that your father was then residing full time in Switzerland?

A. No. He was going back and forth to Italy, I

LARA PAVANELLI                                          1/7/2015

53

1  believe.
2      Q.  Between the same place in Switzerland and --
3  and the Como area, as far as you know?
4      A.  I couldn't tell you.  I mean, our visits were
5  family visits, so, I was -- I don't know.  I don't
6  remember much of my pregnancy year either.
7      Q.  Fair enough.  So you said that you thought your
8  father left a Will but you couldn't find it?
9      A.  Correct.
10     Q.  What made you think that he left a Will?
11     A.  Because somebody said he had a Will.
12     Q.  Who said that?
13     A.  Schianchi.
14     Q.  When did Schianchi say that?
15     A.  At the meeting in 2010.
16     Q.  The Gruppo Triad shareholders meeting?
17     A.  Yes.
18     Q.  And that was roughly a month after your
19  father's death?
20     A.  Correct.
21     Q.  Prior to that time, did you have any
22  information one way or another as to whether your father
23  had left a Will?
24     A.  No, I didn't know.
25     Q.  What exactly did Schianchi say about there

54

1  having been a Will?
2      A.  That he had given -- that he had given him one
3  but then he had taken it back because he was going to
4  change it but Schianchi then never got the final Will.
5      Q.  And did Schianchi as far as you know have the
6  prior Will?
7      A.  He said he gave it back to him.
8      Q.  He didn't have a copy of it?
9      A.  Apparently not.  If he did, he didn't show me.
10     Q.  After you learned that your father died, did
11  you travel to Switzerland or Italy?
12     A.  Yes, I did.
13     Q.  Where did you go?
14     A.  I went to Perugia, and together with my sister,
15  we went up to Switzerland.
16        MR. COOPER:  I'm sorry.  I didn't hear the
17  last question.
18        MR. SCHWARTZ:  They went -- I'm -- and I'm
19  paraphrasing, Lara and Emma went to Perugia and from
20  there to Switzerland.
21     Q.  (By Mr. Schwartz) Right?
22     A.  Uh-huh.  Correct.
23     Q.  Was there a funeral?
24     A.  Yes.
25     Q.  Where?

55

1      A.  We did one in a local village where he was
2  residing.
3      Q.  In which country?
4      A.  In Switzerland.
5      Q.  Who was present?
6      A.  Besides my sister and I?
7      Q.  Yes.
8      A.  The Rogina family was there.  Mostly local
9  friends of his.
10     Q.  How many people total, as best you can
11  estimate?
12     A.  Maybe 20.
13     Q.  How old was your father when he died?
14     A.  63.
15     Q.  How long did you stay in Europe when you made
16  this trip for the funeral?
17     A.  About a month.
18     Q.  Why did you stay that long?
19     A.  Because it takes that long to take care of
20  business in Europe.
21     Q.  Did you stay in Switzerland for the entire
22  month?
23     A.  No.  We went back to Italy.
24     Q.  How long were you in Switzerland and how long
25  in Italy?

LARA PAVANELLI                                                1/7/2015

57

1  Q.  Are you suggesting that somebody did a test on
2  your sister to make sure that she was related to your
3  father or that the test was done on your father or the
4  remains?
5  **A.  Both.**
6  Q.  All right.  Other than attending to
7  the funeral, what other business did you attend to in
8  the aftermath of your father's death during the month
9  that you were in Europe?
10  **A.  We had a meeting at Schianchi's office.**
11  Q.  Who attended that?
12  **A.  Whichever shareholder could make it, or what**
13  **was believed at that time to be shareholders.  I don't**
14  **know.**
15  Q.  So are you -- when you said there was a meeting
16  at Schianchi's office, are you talking about the same
17  group of Triad shareholder meeting that you've testified
18  to a few minutes ago?
19  **A.  Correct.**
20  Q.  We'll get into that meeting later in the
21  deposition, but other than attending to the funeral and
22  going to that meeting at Schianchi's office, were there
23  any other business activities that you had to attend to
24  in the aftermath of your father's death?
25  **A.  No.**

58

1  Q.  Do I understand correctly that no Will has ever
2  been found?
3  **A.  Correct.**
4  Q.  Has there been any type of what we would call,
5  at least in some places in the United States, a probate
6  proceeding of any kind to deal with his assets or
7  liabilities that existed at the time of his death?
8  **A.  No.**
9  Q.  So any kind of legal proceeding at all in
10  Switzerland or Italy or any other place to deal with the
11  distribution of any assets he may have had to his heirs
12  or successors?
13  **A.  No.  Or at least not that I know of.**
14  Q.  What country was your father a citizen of at
15  the time of his death?
16  **A.  Italy.**
17  Q.  How do you know that?
18  **A.  He's only ever been Italian.**
19  Q.  When your father died, did he leave any assets?
20  Let me rephrase that question.
21    Did he have any assets?
22  **A.  Describe what you mean by assets.**
23  Q.  Cash, securities, real estate, personal
24  property, art, whatever somebody might own at the time
25  of death.

59

1  **A.  Not that I know of.**
2  Q.  Did he have any liabilities at the time of his
3  death?
4  **A.  Not that I know of.**
5  Q.  And I -- I'm sure these are not the simplest or
6  easiest questions to answer and I don't really mean to
7  be making this any more of a laborious exercise for you
8  than it has to be; but are you testifying, in essence,
9  that if your father had been asked to prepare a
10  financial statement listing assets and liabilities the
11  day before he died, he would have had literally no
12  assets to list and no liabilities as far as you know?
13  **A.  I don't know.  I mean, his whole life was**
14  **involved in his business, so my guess is whatever his**
15  **business dealings were.  But as far as I know, he did**
16  **not own a property and/or any other type of real estate.**
17  Q.  Did he have a bank account?
18  **A.  Oh.**
19    MR. COOPER:  Did he have a what?
20    MR. SCHWARTZ:  A bank account.
21  **A.  Well, I'm sure he did, but we're unaware of**
22  **where -- where it is, which one it is, we don't know.**
23  Q.  (By Mr. Schwartz) After he died, did you or any
24  other member of the family or anybody else, Schianchi,
25  or another lawyer, make any effort to locate any assets

60

1  or identify any liabilities?
2  **A.  We asked Schianchi to do so, but he said that**
3  **it was too difficult.  There were hundreds of thousands**
4  **of banks in Switzerland.**
5  Q.  So as far as you know, no effort was made?
6  **A.  Correct.**
7  Q.  And as far as you know, your father had no
8  safety deposit box or anything like that where
9  securities or financial instruments or precious items
10  might have been stored?
11  **A.  I don't know.**
12  Q.  In any event, as far as you know, nothing like
13  that has never been found?
14  **A.  As far as I know.**
15  Q.  Was any effort ever made to identify any
16  liabilities he may have had?
17  **A.  I would also have to say I don't know.**
18    MR. SCHWARTZ:  Bear with me for one
19  second.
20  Q.  (By Mr. Schwartz) What is your understanding of
21  how your father died?
22  **A.  He burned to death in a house fire.**
23  Q.  At the time, was he living in a single-family
24  house in Switzerland?
25  **A.  Yes.**

LARA PAVANELLI                                      1/7/2015

75

1   Q.  (By Mr. Schwartz) So, Ms. Pavanelli, without
2   divulging any communication that you have had with
3   Mr. Serra, can you tell me, as a general matter, what is
4   the purpose for which he has been hired?
5       **A.  To be our legal counsel.**
6   Q.  In what matter or matters?
7       **A.  Everything and anything in Switzerland.**
8   Q.  What legal proceedings are -- if any, are
9   ongoing in Switzerland for which Gruppo Triad needs
10  representation?
11      **A.  I actually don't know.  It's very unclear, so**
12  **that's why we've hired an attorney.**
13  Q.  Has Mr. Serra been hired to do anything having
14  to do with the lawsuit that has you sitting here today?
15      **A.  No.**
16  Q.  Has Mr. Serra been hired to do anything
17  concerning the relationship or dealings between Gruppo
18  Triad and Skye Ventures?
19      **A.  No.**
20  Q.  When you hired Mr. Serra a few months ago, did
21  you notify Mr. Schianchi that you were doing so?
22      **A.  He -- his -- I don't know how to phrase it.**
23  **His employment with us, I guess you should say, I don't**
24  **know -- he was terminated, to put it --**
25  Q.  Schianchi was terminated?

74

1   Q.  Gruppo Triad and you personally?
2       **A.  Not me personally, just the company has.**
3   Q.  Okay.  What has the company hired him to do?
4       **A.  Obtain --**
5       MR. KRENEK:  Hold on a second.
6       Let me lodge an objection.  That calls for
7   some privilege.
8       THE WITNESS:  Yeah.
9       MR. KRENEK:  To the extent that there's
10  conversations you've had with him, those are privileged,
11  so if you answer the question without getting into
12  privileged conversation, by all means, do so.  But don't
13  talk about privileged conversations.
14      MR. SCHWARTZ:  Let me -- I appreciate the
15  objection.  And let me sharpen the question a bit for
16  you to try to accommodate the objection.
17      Bearing in mind, just so the record is
18  clear, that my clients reserve their rights to seek to
19  override any privilege that's being asserted.  But since
20  that issue hasn't yet been litigated to conclusion
21  currently before any court, I understand why Mr. Krenek
22  is imposing that objection.  And subject to and without
23  waiver of my clients' rights, Mr. Krenek, I'm going to
24  reframe the question to try to accommodate the
25  objection.

76

1       **A.  -- bluntly.  Yes.**
2   Q.  Who terminated him?
3       **A.  I did.**
4   Q.  When?
5       **A.  A short while before we hired the other**
6   **attorney.**
7   Q.  Sometime in 2014?
8       **A.  Yes.**
9   Q.  How did you communicate this termination to
10  Schianchi?
11      **A.  By notarized letter.**
12  Q.  Do you still have a copy of that letter?
13      **A.  I'm sure I do, yeah.**
14  Q.  Is that among the documents that you have
15  produced pursuant to the subpoena in this case?
16      **A.  I believe so.  I'd have to look back.**
17  Q.  Okay.  Now, I want to go back to some of your
18  testimony from a few moments ago.  Actually, before I do
19  that, let me ask you this:  Why did you terminate
20  Schianchi?
21      **A.  Because I don't believe he's -- or -- or has**
22  **been acting in Triad's best interests.**
23  Q.  How has he not been doing that?
24      **A.  By providing private documents to other**
25  **parties.**

77

1    Q.  What other parties?
2    A.  I believe he disclosed our shareholder meeting
3  minutes to Skye Ventures.
4    Q.  Are there any other private documents he has
5  provided to other parties?
6    A.  I don't know.  That's the only one I'm aware
7  of.
8    Q.  When did he provide the shareholder meeting
9  minutes to Skye Ventures?
10   A.  I don't know when he provided them to them.
11   Q.  How did you learn that he had done so?
12   A.  I think when I -- I don't know.  I don't recall
13  when exactly I found out.
14   Q.  I'm asking you how did you find out?
15   A.  Oh.  I -- I don't recall.  It was -- I found
16  out through a third party, so...
17   Q.  What third party?
18   A.  I don't recall.
19   Q.  Why did you think that that was reason to
20  terminate him?
21   A.  Because he is violating attorney-client
22  privilege.
23   Q.  Is there anything else that Schianchi had done
24  or not done that caused you to terminate him in 2014?
25   A.  He was not cooperating.

79

1    Q.  Independent of what other shareholders may have
2  provided to you, have you found any other documents or
3  information concerning your father's business or Gruppo
4  Triad since your father died?
5    A.  Can you rephrase the beginning of the question?
6    Q.  Yeah.  You have testified now, to some extent,
7  about your efforts to get documents concerning Gruppo
8  Triad or your father's business from the other Gruppo
9  Triad shareholders, right?
10   A.  Uh-huh.
11   Q.  And let's just pause there.
12   A.  Yes.
13   Q.  And let me ask you:  Have you -- have you told
14  me everything that you can and that you remember about
15  your efforts to obtain documents from other
16  shareholders?
17   A.  I mean, it's an ongoing thing.  I am still at
18  the moment trying to locate more documents.
19   Q.  But so far as you've had success to date, have
20  you told me everything that you have achieved by asking
21  other shareholders to provide information?
22   A.  Yes.
23   Q.  Now, I think you also testified that you,
24  yourself, independently have made efforts to find
25  records of your father's or Gruppo Triad's business

78

1    Q.  How was he not cooperating?
2    A.  By not providing the information that I
3  requested.
4    Q.  What information?
5    A.  I had asked for all documents to be turned
6  over.
7    Q.  Which ones do you think he is withholding?
8    A.  I -- I can't say.  I don't know.
9    Q.  You just don't trust him at this point?
10   A.  Correct.
11   Q.  Now, I was going to go back, and I will now go
12  back to something you said a moment ago just to clarify
13  your testimony.
14        So you said that you had asked all the
15  other shareholders of Gruppo Triad, after your father
16  died, for documents they may have, and you received from
17  Sabrina Fortin at least one such document.  Has any
18  other shareholders of Gruppo Triad, as far as you can
19  recall, given any documents to you directly since your
20  father's death?
21   A.  No.
22   Q.  And if they've given anything to Schianchi,
23  other than maybe this Sabina Fortin document, you don't
24  know what it is?
25   A.  Correct.

LARA PAVANELLI                                          1/7/2015

87

1   Q.  How did that work out?
2   A.  It didn't.
3   Q.  Which companies did you contact?
4   A.  Hotmail, Yahoo.
5   Q.  So you contacted the Internet service provider
6   for those companies?
7   A.  Yes.
8   Q.  And what happened?
9   A.  They said I needed a court order.
10  Q.  Both Yahoo and Hotmail said that?
11  A.  Yes.
12  Q.  Did you make any effort to obtain a court
13  order?
14  A.  No.
15      THE COURT REPORTER:  Sorry?
16      THE WITNESS:  I said "No."
17  A.  Again, we've had very limited resources.
18  Q.  (By Mr. Schwartz) How much money does Gruppo
19  Triad have today?
20  A.  I am unaware of any bank accounts or funds.
21  I'm sure there are some somewhere; I just haven't to
22  this date been able to locate them.
23  Q.  Have you been trying to locate them?
24  A.  I did at the beginning.
25  Q.  And as you sit here today, you are unaware of

86

1   A.  Correct.
2   Q.  And you also said that you had a discussion
3   with Wick that went beyond Schoeni's resignation,
4   correct?
5   A.  Yeah.  We mostly talk about -- I mean, it's a
6   time we mostly talked about Schianchi and -- and what
7   needed to be done.
8   Q.  And what was said in that regard?
9   A.  That he could no longer represent us because we
10  don't feel he's representing us in -- in our best
11  interests.
12  Q.  And did Wick agree with that?
13  A.  He did, yes.
14  Q.  What did he say about that?
15  A.  Just that, that he agreed.
16  Q.  After your father died, was any effort made to
17  locate or secure any of his electronic records, whether
18  it was an e-mail account or any other form of electronic
19  data?
20  A.  Yes.
21  Q.  Okay.  What was done in that regard by whom?
22  A.  My sister and I.
23  Q.  What did you do?
24  A.  We contacted the companies where he had e-mails
25  and tried to get passwords.

88

1   any current Gruppo Triad bank account anywhere of any
2   nature?
3   A.  Correct.
4   Q.  Other than contacting Hotmail and Yahoo or the
5   owners of Hotmail or Yahoo, what else, if anything, have
6   you or your sister done to try to locate any of your
7   father's electronic or electronically-stored information
8   after his death?
9   A.  I asked Sabina Fortin if she was aware of any
10  passwords.  I asked Schianchi.  And none of them have
11  any of his passwords.
12  Q.  And other than those efforts, have either you
13  or your sister, as far as you know, done anything to
14  trip to recover your father's electronically-stored
15  information after his death?
16  A.  No.  I think if we had his computer, it would
17  have been helpful, but it was burnt, so...
18  Q.  Okay.  Now I'm going to shift gears, like I
19  said I was going to do before we took a break a while
20  ago.
21      MR. SCHWARTZ:  So let's mark this as
22  Pavanelli Exhibit 1.
23      (Exhibit 1 marked for identification.)
24      MR. SCHWARTZ:  I'm going to ask the court
25  reporter to actually write "Pavanelli" on the exhibit

LARA PAVANELLI                                    1/7/2015

89

1  sticker for each of these, because we are in the midst
2  of a case that's had multiple depositions, and we'll
3  have more, and it would be useful to have the exhibit
4  stickers reflect the deponent.
5       So if that's not too much of a burden,
6  Mr. Court Reporter, I'd ask as we mark this documents,
7  if you'd just put the name of the witness above the --
8  the number.  All right.  For the record, they're going
9  to be marked below the number.
10      And for the benefit of Mr. Cooper on the
11 phone, we will try to keep apprised of the flow of paper
12 here as best we can.
13      We are marking now as Pavanelli Exhibit 1
14 the subpoena for the production of documents by
15 Ms. Pavanelli.
16      Q.  (By Mr. Schwartz) All right.  So Ms. Pavanelli,
17 I have put before you a document marked as Deposition
18 Exhibit 1.  And directing your attention to the first
19 page, do you see this is the subpoena that was served on
20 you on December 17th of 2014, requiring you to produce
21 documents in this case?
22      **A.  Uh-huh, yes.**
23      Q.  All right.  And to the best of your knowledge,
24 you did, in fact, produce documents through Mr. Krenek
25 sometime within the past few days, correct?

92

1  withheld the e-mails while producing the attachments,
2  that's not a complete production and that needs to be
3  rectified.  So I'm just making that clear here on the
4  record.  If that's what she is testifying to, then the
5  production is not complete.  And I don't know how
6  quickly that can be rectified, but it needs to be
7  rectified.
8       MR. KRENEK:  I understand what you're
9  saying.  I wasn't aware that there were e-mails that
10 hadn't been produced.  But to the extent that there are
11 and to the extent that she is able to locate them and
12 get them produced, we don't have a problem turning those
13 over.
14      However, I will say since the 17th and the
15 day of the subpoena, she has simply not had much time to
16 get and locate and take care of all the document
17 production requests just because of the time frame
18 involved.  And I had mentioned that to you.  She did her
19 best.  We have done our best to have her here and
20 present and produce documents, to the extent she has
21 them.  But if there are others that are e-mails, I'll
22 visit with her to see how quickly those can be addressed
23 and produced.
24      MR. SCHWARTZ:  Thank you.  And I want to
25 make very clear that I'm not suggesting for a -- for an

LARA PAVANELLI                                              1/7/2015

---

93

1  instant that you, as Ms. Pavanelli's counsel, was aware
2  that there were e-mails.  Not for a second am I
3  intimating anything like that.  So we'll just need to
4  collectively revisit that, because those could be
5  important sources of information.
6      Q.  (By Mr. Schwartz) So I take it it's also true
7  that you didn't access any of the e-mails, or you at
8  least haven't produced any of the e-mails from the
9  account that you maintained and used for Gruppo Triad
10 purposes before you opened the new one, right?  Is that
11 question clear or is it too verbose?
12     A.  Restate the question.
13     Q.  Yeah.  I will.
14         Remind me, what e-mail address did you use
15 for Gruppo Triad business before
16 larapavanelli.Triad@gmail.com?
17     A.  LPavanelli@hotmail.com.
18     Q.  That's what I thought.  And in producing
19 documents or looking for documents to produce in
20 response to this subpoena, did you try to access that
21 Hotmail account?
22     A.  I did.
23     Q.  Okay.  And did you find any documents
24 concerning Gruppo Triad affairs in that Hotmail account?
25     A.  I'm unable to access the account.

---

94

1      Q.  Why can't you access it?
2      A.  Because it's been deleted.
3      Q.  The account has been deleted?
4      A.  Yeah.  I deleted that e-mail address.
5         MR. COOPER:  I'm sorry.  I couldn't hear
6  the answer.
7         MR. SCHWARTZ:  She said, "I deleted that
8  e-mail address."
9      Q.  (By Mr. Schwartz) When did you delete the
10 e-mail address?
11     A.  When I created the new one.
12     Q.  And is it your understanding that when you
13 deleted the address, you destroyed all of the e-mails
14 that had been sent or received through that account?
15     A.  I mean, it was an account that was not
16 specifically for Triad, so it was what my e-mail address
17 was for a long time.
18     Q.  But it's an account that you did use for Triad-
19 related business, correct, while it was an open account?
20     A.  Yes.
21     Q.  And you closed that account sometimes --
22 sometime in 2014, when you opened the
23 LPavanelli.Triad@gmail.com account, correct?
24     A.  Yes.
25     Q.  Do you remember when in 2014 you did that?

---

95

1      A.  No.
2      Q.  Was it early in the year?  Late in the year?
3      A.  Probably early in the year.
4      Q.  All right.  And tell me exactly what you did
5  after you got the subpoena to try to find e-mails from
6  the Hotmail account.
7      A.  I tried to get back into the account, but it --
8  they won't let me.
9      Q.  So you -- you entered your password?
10     A.  But -- but the attachments are what I printed,
11 so therefore, that came from that e-mail address, some
12 of the documents came from that.  But that's the reason
13 why I don't have the e-mails.
14     Q.  How is it possible you were able to find
15 attachments to e-mails in the Hotmail account, but you
16 can't find the e-mails themselves?
17     A.  No, I didn't find the attachments in the e-mail
18 now.  These are documents that I had printed at the time
19 when they were sent to me.  Since the account had been
20 closed, I already had hard copies, and that's the reason
21 why I deleted the account.
22     Q.  At the time you deleted the Hotmail account or
23 closed the Hotmail account --
24     A.  Uh-huh.
25     Q.  -- let's put it that way, did you print out the

---

96

1  -- every single attachment that you've received in an
2  e-mail that concerned Gruppo Triad?
3      A.  I believe so, yes.
4      Q.  So you think you have all the attachments, but
5  you don't have any of the e-mails concerning Gruppo
6  Triad business from the Hotmail --
7      A.  Right.
8      Q.  Is that right?
9      A.  Correct.
10     Q.  Other than looking at your hard copy file for
11 Gruppo Triad and producing attachments to e-mails from
12 the current LPavanelli.Triad@gmail.com account, did you
13 do anything else to find documents to produce in
14 response to this document subpoena that's marked as
15 Exhibit 1?
16     A.  No.
17     Q.  Did you ask anybody if they had documents?
18     A.  No.  The way that I understood the subpoena is,
19 you were asking me for what I had.  I mean, I have been
20 asking other people for documents all along.
21     Q.  And to the extent you have obtained them from
22 other people, you have produced them to us?
23     A.  Yes.
24     Q.  Did you withhold any of the documents from
25 production on the grounds that they were subject to the

---

LARA PAVANELLI                                             1/7/2015

97

1   attorney-client privilege or any other privilege or
2   protection from discovery?
3           MR. KRENEK: I'm going to say for the
4   record, she didn't withhold him, but I did withhold
5   those that were, I believed, attorney-client privileged.
6   I have not had an opportunity yet to make a privilege
7   log.
8           MR. SCHWARTZ: All right. Can you give us
9   some indication for the record the number of documents
10  that were withheld, to the best of your knowledge?
11          THE WITNESS: Are you asking me?
12          MR. SCHWARTZ: No, I'm actually asking
13  your counsel, unless you know.
14   Q.  (By Mr. Schwartz) I'll start with you. Do you
15  know?
16   A.  No, I don't know.
17   Q.  Okay. You have turned all the documents over
18  to Mr. Krenek, correct?
19   A.  Yes.
20   Q.  And then you let him do his job?
21   A.  Yes.
22   Q.  Okay.
23          MR. KRENEK: It may have been somewhere
24  between 60 or 80 pages.
25          MR. SCHWARTZ: All right.

LARA PAVANELLI                                    1/7/2015

156

1    Q. (By Mr. Schwartz) As far as you know, did
2  Antonio Usuelli ever serve as a lawyer for Gruppo Triad?
3    **A. I don't think so.**
4    Q. All right. So now let's get going.
5        As best you can recall, when he called you
6  several times after your father's death, what was on his
7  mind?
8    **A. I don't recall. That was a long time ago.**
9    Q. Do you remember what he said?
10   **A. No. I think he was initially trying to explain**
11 **all of this to me. That's all I recall from those --**
12 **from those days.**
13   Q. Did he indicate to you why he thought it was
14 his role to explain things to you?
15   **A. No.**
16   Q. Did he indicate to you in any way, shape, or
17 form that he had an interest in the outcome of the
18 lawsuit that Skye Ventures was bringing in Ohio?
19   **A. No.**
20   Q. As you sit here today, do you know whether he
21 has an interest in the outcome?
22   **A. I am not certain.**
23   Q. As you sit here today, do you know whether he
24 has any interest in whatever share of the litigation
25 proceeds Gruppo Triad may ever recover?

---

157

1    **A.  I don't know.**
2    Q.  Do you have any understanding of what will
3    happen with the proceeds of this litigation if Skye
4    Ventures prevails and collects on any judgment?
5    **A.  Restate the question, please.**
6    Q.  Do you have any idea what would happen with the
7    proceeds of this litigation if Sky Ventures were to
8    prevail and collect on a judgment?
9    **A.  I have some idea, yes.**
10   Q.  What's your idea?
11   **A.  I believe that some of the funds recovered will**
12   **go back to Triad, and I guess attorneys and legal fees**
13   **need to be paid.**
14   Q.  How much of the funds would go back to Gruppo
15   Triad?
16   **A.  That is not clear at this point.  Somewhere**
17   **between 30 and 60 percent.**
18   Q.  Why is it not clear?
19   **A.  Because I've seen several documents stating**
20   **different things, so...**
21   Q.  What type of documents?
22   **A.  Well, there's the 2010, some agreement that**
23   **Schianchi signed which is invalid.  So I am still**
24   **searching for original agreements.**
25   Q.  We may be able to show some agreements to you

---

158

1    in the course of today and tomorrow and have questions
2    for you about them.
3         But let me ask you about the 2010
4    agreement you're talking about.  Is that the one that
5    has an effective date of January 1st, 2010?
6    **A.  I don't know if it's January 1st, but it is**
7    **January, I believe, yeah.**
8    Q.  And you say that's invalid?
9    **A.  Yes, I believe so.**
10   Q.  Why is it invalid?
11   **A.  Because it was signed by Schianchi, who doesn't**
12   **speak English.  The agreement is in English.**
13   Q.  Is there any other reason why it's invalid?
14   **A.  Our position on that is that he was under the**
15   **impression that he had the right to sign such agreements**
16   **at that time.**
17   Q.  When you say our position, who are you
18   referring to?
19   **A.  Gruppo Triad.**
20   Q.  And is it Gruppo Triad's position that
21   Schianchi was not authorized to enter into that
22   agreement for Gruppo Triad?
23   **A.  That is correct.  And -- yeah, that is correct.**
24   Q.  Before you told that to me here today, have you
25   ever told that to anyone else?

---

159

1         MR. KRENEK:  Again, just to interject, to
2    the extent that calls for you to talk about any
3    conversations you've had with attorneys, including
4    myself, don't answer or disclose any attorney-client
5    privileges.  Otherwise, you may answer.
6    **A.  I have discussed it with Schianchi and other**
7    **attorneys.**
8    Q.  (By Mr. Schwartz) Other attorneys for Gruppo
9    Triad?
10   **A.  Yes.**
11   Q.  Okay.  Did you discuss it with Schianchi after
12   you had terminated his services starting in 2011?
13   **A.  I don't remember at what point I discussed it**
14   **with him.**
15   Q.  Have you ever communicated to Skye Ventures or
16   its lawyers that Gruppo Triad believes that the January
17   2010 agreement is not valid?
18   **A.  I don't remember.  And if I did say such a**
19   **thing, it was not in a formal manner.**
20   Q.  So Mr. Cooper is on the phone here from
21   Columbus, Ohio.  He represents Skye Ventures.  Is this
22   the first that any attorney for Skye Ventures has heard
23   you formally take the position here under oath today
24   that Gruppo Triad does not believe that the January 2010
25   agreement is valid?

---

160

1    **A.  You're asking me?**
2    Q.  I'm asking you.
3    **A.  Oh, I'm sorry.  Say the question again.**
4    Q.  You have Mr. Cooper here on the phone from
5    Columbus, Ohio, right?
6    **A.  Yes.**
7    Q.  You understand that he represents Skye
8    Ventures, correct?
9    **A.  Yes.**
10   Q.  Is he the first principal or lawyer for Skye
11   Ventures to learn of Gruppo Triad's formal position that
12   it does not believe the January 2010 agreement is valid?
13        MR. KRENEK: Objection, form.  Calls for
14   speculation.
15   Q.  (By Mr. Schwartz) As far as you know?  Have you
16   previously communicated that formal position that you're
17   now testifying to under oath here today to any
18   representative of Skye Ventures?
19   **A.  I don't believe I have, no.**
20   Q.  I just want to show you this January -- what I
21   believe is the agreement you're testifying to, just so
22   we're all on the same page here, and then we'll return
23   to Exhibit Number 9.
24        Okay.  So I'm going to show you now --
25   just bear with me one second.  So I'm going to have to

---

**189**

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3 DRFP L.L.C., d/b/a Skye     )
  Ventures,                   )
4                             )
          Plaintiff,          )
5                             )
  VS.                         )  CIVIL ACTION NUMBER:
6                             )  2:04-CV-0793
  Republica Bolivariana de    )
7 Venezuela, et al.,          )
                              )
8         Defendants.         )
9
10 *********************************************
11          ORAL/VIDEO DEPOSITION OF
12              LARA PAVANELLI
13                 VOLUME 2
14              JANUARY 8, 2015
15 *********************************************
16     ORAL DEPOSITION OF LARA PAVANELLI, produced as a
17 witness at the instance of the Defendant, was duly
18 sworn, was conitnued in the above-styled and numbered
19 cause on the JANUARY 8, 2015, from 9:16 a.m. to
20 3:10 p.m., before Chris Carpenter, CSR, in and for the
21 State of Texas, reported by machine shorthand, at the
22 offices of Reeves & Brightwell, LLP, Austin, Travis
23 County, Texas, pursuant to the Federal Rules of Civil
24 Procedure and the provisions stated on the record or
25 attached hereto.
```

---

**190**

```
1
2
3          A P P E A R A N C E S
4 FOR THE PLAINTIFF:
5    Charles "Chip" H. Cooper, Jr. (by telephone)
     Cooper & Elliott
6    2175 Riverside Drive
     Columbus, OH 43221
7    (614) 481-6000
     chipc@cooperelliott.com
8
9 FOR THE DEFENDANT(S):
10   Andrew Z. Schwartz
     Kevin J. Conroy
11   FOLEY & HOAG LLP
     155 Seaport Blvd.
12   Boston, MA  02210-2600
     (617) 832-1000
13   aschwartz@foleyhoag.com
14 FOR THE DEPONENT:
15   Eddie Krenek
     KRENEK LAW OFFICES
16   423 Mason Park Blvd., Suite C.
     Katy, TX  77450
17   (281) 578-7711
     edkrenek@kreneklaw.com
18
19 ALSO PRESENT:
20   Debra Austin, Videographer
21
22
23
24
25
```

---

**191**

```
1                      INDEX
2  Appearances......................190
3  LARA PAVANELLI
4     Examination by Mr. Schwartz.............194
5  Signature and Changes..........................343
6  Reporter's Certificate.........................344
7           EXHIBITS
8  NO. DESCRIPTION                  PAGE MARKED
9  12   Asset Protection Agreement, May 9, 2004    198
10 13   E-Mail Chain Ending Nov. 5, 2014     218
11 14   Lawrence Corna Letter, 7/1/03        234
12 15   Engagement Letter Between Lawrence Corna   236
13        Capital Markets and Gruppo Triad-FFC, S.P.A.

   16   Handwritten Letter by James Paolo        237
14        Pavanelli, August 12, 2003
15 17   Handwritten Letter by James,             238
        August 16, 2003
16
   18   Engagement Letter Between Lawrence Corna   241
17        Capital Markets and Gruppo Triad-FFC, S.P.A.
18 19   E-Mail, Aug. 28, 2003                243
19 20   Handwritten Document by James, Sept. 5,   247
        2003
20
   21   E-Mail Chain Ending Sept. 7, 2003    248
21
   22   Western Union Document               249
22
   23   Document with Handwritten Address        250
23
   24   Western Union Document               251
24
   25   Fax Document, Bates Stamped LP000462      252
25
```

---

**192**

```
1  26   Fax Document, Bates Stamped LP000463      252
2  27   Fax Document, Bates Stamped LP000464      253
3  28   Fax Document, Bates Stamped LP000465      253
4  29   Refundable Performance Retainer Agreement  253
5  30   E-Mail, July 17, 2003                254
6  31   E-Mail, July 17, 2003                254
7  32   E-Mail, July 21, 2003                255
8  33   E-Mail, July 23, 2003                256
9  34   Gruppo Triad Document with Various       258
        Addresses
10
11 35   List of Notes                        260
12 36   Translated Version and Italian Version of  270
        Extraordinary General Shareholders Meeting
13        of Gruppo Triad, March 16, 2010

14 37   Italian Version of Extraordinary General   272
        Shareholders Meeting of Gruppo Triad, March
15        16, 2010

16 38   Handwritten Gruppo Triad Document,       295
        30/1/2004
17 39   Schianchi Letter                     304
18 40   Wire Instructions                    305
19 41   SKYE005839, James Pavanelli letter to Skye 309
        Ventures
20
21 42   SKYE005840, similar James Pavanelli letter 309
        to Skye Ventures
22 43   List of Creditors of Triad FFC SPA Group   310
23 44   James Pavanelli September 28, 2007 letter  318
        with English translation
24
25 45   May 5, 2004 Letter from James Pavanelli to  320
        Crabbe, Brown & James
```

---

193

1   46   April 23, 2004 Crabbe, Brown & James letter 322
         to James Pavanelli
2
    47   June 23rd, 2004, Bandagro Notes Purchase   323
3        Agreement
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LARA PAVANELLI - Vol. 2                                    1/8/2015

243

1  Mr. Cooper, Page 451.  Are you with us?
2        MR. COOPER:  Yes.
3        (Exhibit 19 marked for identification.)
4    **A.  Actually, can you repeat the last question?**
5  **You asked me if I had received these documents before**
6  **which date?**
7    Q.  (By Mr. Schwartz) December 10, 2014.
8    **A.  I have to retract my previous answer.  I -- I**
9  **think I received them afterwards.**
10   Q.  All right.  So with regard, just so we're
11  clear, to Exhibits 14, 15, 16, 17, 18, are you now
12  saying that you received these sometime in the last
13  month?
14   **A.  Yes.**
15   Q.  From whom?
16   **A.  Do I have to answer this question?**
17       MR. KRENEK:  Probably so.  I'm not sure
18  where --
19   Q.  (By Mr. Schwartz) Yes, you need to answer the
20  question.
21   **A.  From my sister.**
22   Q.  How is it --
23       MR. COOPER:  What's the answer?
24       MR. SCHWARTZ:  From her sister.
25   Q.  (By Mr. Schwartz) When did you get them from

242

1    **A.  It's signed by my father, yes.**
2    Q.  And you recognize that as being his formal
3  signature, correct?
4    **A.  Yes.**
5    Q.  Okay.  And do you see on the same page, 457,
6  there's all -- there's a handwritten note to Larry from
7  James at the bottom of Page 457?
8    **A.  I see that.**
9    Q.  Does that look like your father's handwriting
10  to you?
11   **A.  It does.**
12   Q.  Other than having found this document in the
13  box that you gave to Mr. Krenek, do you have any
14  knowledge or information about it?
15   **A.  I do not.**
16   Q.  Do you know where you got it?
17   **A.  No, I do not.**
18   Q.  Do you know when you got it?
19   **A.  No, I do not.**
20   Q.  Is the same also true of Exhibits 17 and 16?
21   **A.  Correct.**
22   Q.  Did you receive Exhibits 14, 15, 16, 17 and 18
23  before December 10, 2014?
24   **A.  Yes.**
25       MR. SCHWARTZ:  Let me mark Exhibit 19.

244

1  your sister?
2    **A.  I don't know the exact date but sometime -- I**
3  **asked her again if she had any documents at all that --**
4  **that she could send me and she had a file and that's**
5  **what she sent me.  So a lot of these documents -- this,**
6  **you know, came from this file.**
7    Q.  Exhibits 14, 15, 16 and 18?
8    **A.  Yes.**
9    Q.  Did you have that conversation with your sister
10  after you received the subpoena?
11   **A.  Yes.**
12   Q.  How long after you received the subpoena?
13   **A.  I don't remember.  Days.**
14   Q.  What did you say to her?
15   **A.  That I had to produce documents, and so if she**
16  **had anything at all pertaining to this case to please**
17  **send them to me.**
18   Q.  This was a telephone call?
19   **A.  Yes.**
20   Q.  At a time when your sister was in Italy?
21   **A.  Yes.**
22   Q.  What else did you say to her?
23   **A.  That it's.**
24   Q.  How long a conversation was this?
25   **A.  Not very long.  Our phone conversations are**

245

1  never too long.
2      Q.  As best you recall, other than telling her that
3  you had to produce documents and asking her whether she
4  had any, what did you tell her?
5      A.  That's it.
6      Q.  What did she say to you?
7      A.  She said that there was a file that was left in
8  her house from years back, and you know, she doesn't
9  understand the documents and so she doesn't know if
10  they're relevant or not.  So I said, well, just send
11  them to me anyway.
12      Q.  What was the size of the file that she sent to
13  you?
14      A.  Very small.
15      Q.  Other than Exhibits 14, 16 -- 14, 15, 16, 17
16  and 18, do you recall what documents were in the file
17  that your sister had?
18      A.  I don't, but everything that she did send me, I
19  sent to my attorney.
20      Q.  To Mr. Krenek?
21      A.  Yes.
22      Q.  Did she explain to where she got the file?
23      A.  No.
24      Q.  Did she indicate to you that it was a file of
25  your father's business papers?

246

1      A.  Say that again.
2      Q.  Did she indicate to you that it was a file of
3  your father's business papers?
4      A.  No, she just said it was some papers from --
5  from dad, that's it.
6      Q.  Some papers from your dad?
7      A.  That's correct.
8      Q.  Other than what she sent you, do you have any
9  idea whether she has any additional papers from your
10  dad?
11      A.  She -- as far as I know she does not.
12      Q.  When did you receive the documents from her?
13      A.  Sometime after the subpoena.
14      Q.  All right.  Now let me show you Exhibit 19.
15      MR. SCHWARTZ:  Mr. Cooper, I -- if I
16  hadn't said so already, this is page 000451.
17      MR. COOPER:  Yeah, you said something,
18  Yeah.
19      Q.  (By Mr. Schwartz) So this is another document
20  that Mr. Krenek has produced on your behalf pursuant to
21  the subpoena, and it's an e-mail from Lawrence Corna to
22  your father from 2003.  And let me ask you this:  Is
23  this one of the documents that your sister made
24  available to you as well?
25      A.  Possibly, I don't know.

247

1      Q.  Well, if you didn't get it from her, how did
2  you get a copy of Exhibit 19?
3      A.  Like I said, I don't know.  I just took the
4  documents that I had in a box, and I gave it to
5  Mr. Krenek.  So I did not have the time to go
6  individually review each document.  I don't believe that
7  any of these, when I first read them, when I first
8  received them, I didn't think they were relevant at all,
9  but I produced them anyway, because it's something that
10  I had in my possession.
11      Q.  There's a reference in Exhibit 19 to a
12  Dr. Guzman, actually several references to a Dr. Guzman.
13  Have you ever heard of a Dr. Guzman?
14      A.  No.
15      Q.  Have you ever heard of anyone named Guzman
16  that's had anything to do with this case or the Bandagro
17  promissory notes?
18      A.  No, I have not.
19      MR. SCHWARTZ:  All right.  Let's mark
20  Exhibit 20.
21      (Exhibit 20 marked for identification.)
22      Q.  (By Mr. Schwartz) Ms. Pavanelli, I'm showing
23  you Exhibit 20.  This is another document that
24  Mr. Krenek produced on your behalf pursuant to the
25  subpoena in this case.

285

1 there's a paragraph missing --
2    Q.  All right.
3    A.  -- on Exhibit 36.  So did he change it at the
4 time of signature, or did he alter the document after
5 the -- after it was signed?  I don't know.  But that is
6 not the copy that I have.
7    Q.  I think you have made that clear.
8          At the same time, if you look at the
9 Exhibit 36, the Italian version, and in particular,
10 Bates stamp pages 5860, 5861, and 5862, each one of
11 those pages has your signature on it, correct?
12    A.  But it's also a copy.  This is not an original.
13    Q.  Okay.  But let's just --
14    A.  Did Skye receive an original?  How was this
15 transmitted to them?
16    Q.  You're asking the wrong person.  But all I'm
17 asking you is to confirm whether it's an original or a
18 copy or something else, your signature appears on Pages
19 5860, 61, and 62, correct?
20          MR. KRENEK:  Okay.  Hold on a second.
21    A.  I can't --
22          MR. KRENEK:  Hold on.  Stop.  I want to
23 object, because if you mean signature, she needs to see
24 the original to see it now that she calls it into
25 question.  So there is no way she answer that question

286

1 on its face unless she sees the original on it.
2          MR. SCHWARTZ:  I don't think that's true.
3          MR. KRENEK:  Absolutely.  Because now we
4 call into question the entire document.
5          MR. SCHWARTZ:  So you can object.
6          MR. KRENEK:  Okay.
7          MS. SCHWARTZ:  Say objection.  Your rights
8 are reserved.
9          MR. KRENEK:  Okay.  Objection to the form,
10 misleading.
11          MR. SCHWARTZ:  Okay.  Your objection is
12 reserved.
13    Q.  (By Mr. Schwartz) On Pages 5860, 61, and 62,
14 that's your signature, correct?
15    A.  I don't know if it's my signature.  This is not
16 an original.
17    Q.  Whether it's an original or a copy, that looks
18 your signature on --
19    A.  It looks like my signature, but I don't know if
20 it was put on this document before or after.  I -- I
21 don't know.
22    Q.  All right.  Fair enough.
23          And now I'm going to ask you some
24 questions about Exhibit 36.  Take a look at the first
25 page of the document.  There is a paragraph entitled

287

1 "Calculation of the shares held by each
2 shareholder."  And then the document -- I'm reading the
3 English version now on Page 5860.  The text recites,
4 "Attorney Schianchi explains that because the criminal
5 authorities have seized all documentation in the context
6 of the proceedings against him and Pavanelli, he is not
7 able to calculate the share quota held by each
8 shareholder."  Do you see that?
9    A.  I do.
10    Q.  And then it goes on to say that, "The
11 shareholders are not able to prove the amount of their
12 shareholding."  Do you see that?
13    A.  Correct.
14    Q.  Do you recall, at this March 16th, 2010
15 extraordinary general shareholders meeting, that there
16 was discussion concerning that subject?
17    A.  Yes.
18    Q.  What do you recall of that discussion?
19    A.  He was asking people to show their original
20 shares.
21    Q.  Incidentally, what language was this meeting
22 conducted in?
23    A.  It was conducted in Italian, I believe.
24    Q.  And when the minutes that have been marked as
25 Exhibit 36 on Page 5860 recite that the shareholders are

288

1 not able to prove the amount of their shareholding --
2          MR. COOPER:  I'm sorry.  I don't have your
3 English translation.  What did you say the translation
4 was?
5          MR. SCHWARTZ:  Quote, "The shareholders
6 are not able to prove the amount of their shareholding,"
7 end quote.
8          MR. COOPER:  Okay.
9          MS. SCHWARTZ:  So let me -- let me reframe
10 the question.
11    Q.  (By Mr. Schwartz) At this meeting, did all the
12 shareholders say that they were unable to prove the
13 amount of their shareholding?
14    A.  No.
15    Q.  Did any shareholder say that he or she was able
16 to prove the amount of his or her shareholding?
17    A.  Yes.
18    Q.  Which one?
19    A.  Sabina Fortin.
20    Q.  Did any other shareholder indicate that he or
21 she was able to prove the amount of his or her
22 shareholding?
23    A.  No.
24    Q.  Did all the others say that they would not be
25 able to do so?

293

1    Q.  Did you speak to Mr. Rogina before that
2 hearing?
3    **A.  Yes.**
4    Q.  Did you also speak with him after?
5    **A.  Yes.**
6    Q.  What did you --
7        MR. COOPER:  The answer was?
8        MR. SCHWARTZ:  "Yes."
9    Q.  (By Mr. Schwartz) What did you discuss with him
10 before the hearing?
11   **A.  What needed to happen.**
12   Q.  What needed to happen?
13   **A.  We needed to have a representative go and**
14 **present themselves to the prosecutor so we can also**
15 **obtain more information.**
16   Q.  What did you understand the hearing would
17 concern?
18   **A.  I actually don't know.  There has been an**
19 **investigation, I believe.  I don't know.  I don't**
20 **understand it.  The Swiss law is quite different from**
21 **ours and so.  And the information that I have received**
22 **up until then has been very confusing, to say the least.**
23   Q.  Do you recall any other aspect of your
24 discussion with Rogina before the hearing took place?
25   **A.  We discussed the hiring of this attorney.**

294

1    Q.  Serra?
2    **A.  Uh-huh, yeah.**
3    Q.  You may have testified to this yesterday.
4 Where does Rogina live?
5    **A.  Torino.**
6    Q.  Do you recall any other aspect of the
7 conversation you had with him before the hearing?
8    **A.  Before the hearing?  No.**
9    Q.  Besides the two of you, did anybody else
10 participate in that conversation?
11   **A.  Not that I know of.**
12   Q.  How long did the conversation last?
13   **A.  I don't remember.**
14   Q.  More than five minutes?
15   **A.  I doubt it.**
16   Q.  After the hearing, did -- strike that.
17       When you spoke with Rogina after the
18 hearing, what did he tell you?
19   **A.  He said that Schianchi was surprised to see**
20 **them at the hearing, and that they had a conversation**
21 **with the prosecutor who told them that the documents**
22 **were returned to Schianchi.**
23   Q.  What else did Rogina report?
24   **A.  That's it.**
25   Q.  What did you say to him?

295

1    **A.  I said that we need to somehow find a way to**
2 **legally recover those documents from Schianchi.  I don't**
3 **know that I said "legally," but...**
4    Q.  Have you completed your answer?
5    **A.  Yes.**
6    Q.  Do you recall anything else that you discussed
7 with Rogina after the hearing in Switzerland?
8    **A.  No.**
9    Q.  Have any efforts been made to recover these
10 documents from Schianchi after you got this report from
11 Rogina?
12   **A.  Yes.  We have asked him repeatedly, and he**
13 **continues to affirm that he doesn't have any documents.**
14   Q.  When was the hearing in Switzerland?
15   **A.  I don't know the exact date.**
16   Q.  Roughly?
17   **A.  A couple of months ago.**
18       MR. COOPER:  I'm sorry.  What was the
19 answer?
20       MR. SCHWARTZ:  "A couple of months ago."
21       MR. COOPER:  Thank you.
22       MS. SCHWARTZ:  Let's mark Exhibit 38.
23 We've got a few minutes left on the tape.  We'll take a
24 lunch break after this exhibit.
25       (Exhibit 38 marked for identification.)

---

**346**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3 DRFP L.L.C., d/b/a Skye      )
   Ventures,                    )
 4                              )
           Plaintiff,           )
 5                              )
   VS.                          ) CIVIL ACTION NUMBER:
 6                              ) 2:04-CV-0793
   Republica Bolivariana de     )
 7 Venezuela, et al.,           )
                                )
 8         Defendants.          )
 9
10 ****************************************************
11            ORAL/VIDEO DEPOSITION OF
12               LARA PAVANELLI
13                 VOLUME 3
14              JANUARY 21, 2015
15
   ****************************************************
16
17    ORAL DEPOSITION OF LARA PAVANELLI, produced as a
18 witness at the instance of the Defendant, was duly
19 sworn, was taken in the above-styled and numbered cause
20 on the JANUARY 21, 2015, from 10:14 a.m. to 3:08 p.m.,
21 before Chris Carpenter, CSR, in and for the State of
22 Texas, reported by machine shorthand, at the offices of
23 Reeves & Brightwell, LLP, Austin, Travis County, Texas,
24 pursuant to the Federal Rules of Civil Procedure and the
25 provisions stated on the record or attached hereto.
```

---

**347**

```
 1
 2
 3          A P P E A R A N C E S
 4 FOR THE PLAINTIFF:
 5    Charles "Chip" H. Cooper, Jr. (by telephone)
      Adam Richards (by telephone)
 6    Cooper & Elliott
      2175 Riverside Drive
 7    Columbus, OH 43221
      (614) 481-6000
 8    chipc@cooperelliott.com
 9
10 FOR THE DEFENDANT(S):
11    Andrew Z. Schwartz
      Kevin J. Conroy
12    FOLEY & HOAG LLP
      155 Seaport Blvd.
13    Boston, MA  02210-2600
      (617) 832-1000
14    aschwartz@foleyhoag.com
15 FOR THE DEPONENT:
16    Eddie Krenek
      KRENEK LAW OFFICES
17    423 Mason Park Blvd., Suite C.
      Katy, TX  77450
18    (281) 578-7711
      edkrenek@kreneklaw.com
19
20 ALSO PRESENT:
21    Brent Kirby, Videographer
22
23
24
25
```

---

**348**

```
 1                    INDEX
 2 Appearances......................348
 3 LARA PAVANELLI
 4    Examination by Mr. Schwartz............352
      Examination by Mr. Krenek..............478
 5
 6 Signature and Changes.......................480
 7 Reporter's Certificate.......................481
 8              EXHIBITS
   NO. DESCRIPTION                 PAGE MARKED
 9 35-A Color Copy of original document       362
      marked as Exhibit 35
10 48  Foreign Public Debt Bond Terms Revealed,  367
11     July 30, 2003, LP000856
12 49  Handwritten Letter, LP000907       368
13 50  Handwritten Letter, LP000906       369
14 51  E-Mail, Oct. 23, 2003, LP000912       370
15 52  E-Mail, Oct. 23, 2003, LP000910       371
16 53  E-Mail, Oct. 24, 2003, LP000909       371
17 54  E-Mail, Oct. 30, 2003, LP000908       372
18 55  E-Mail, Nov 1, 2003, LP000914 thru LP000915 372
19 56  Handwritten Note, Nov. 12, 2003, LP000919  373
20 57  E-Mail, Dec. 4, 2003, LP000932       373
21 58  E-Mail, Dec. 4, 2003, LP000931       374
22 59  Handwritten Letter, LP000867       383
23 60  Fax Cover Letter and Draft Memorandum,  384
24     LP000857 thru LP000866
25 61  Handwritten Letter, LP000868 thru LP000869 385
```

---

**349**

```
 1 62  Draft Memorandum, LP000920 Thru LP000924  386
 2 63  E-Mail, Dec. 30, 2003, LP000941       388
 3 64  E-Mail, Dec. 31, 2003, LP000936 thru  389
      LP000937
 4 65  E-Mail, 2004, LP000938 thru LP000940   389
 5 66  E-Mail, 2004, LP000854 thru LP000855   390
 6 67  Handwritten Letter, Jan. 8, 2004, LP000870  391
 7 68  Document, LP000901 thru LP000902    392
 8 69  E-Mail, 2004, LP000871           393
 9 70  E-Mail, 2004, LP000872           394
10 71  Option Purchase Agreement , LP000877 thru  395
11     LP000880
12 72  Option Purchase Agreement , LP000881 thru  395
      LP000884
13 73  Crabbe, Brown & James Letter, LP000873 thru  396
14     LP000876
15 74  Asset Protection Agreement, LP000859 thru  397
      LP000861
16 75  Addendum to Close, LP000962 thru LP000863  399
17 76  E-Mail, May 26, 2004, LP000957 thru   400
      LP000858
18 77  Escrow Agreement, LP000942 thru LP000944  401
19 78  Fax Cover Letter and Escrow Agreement,   402
20     LP000953 thru LP000956
21 79  Bandango Notes Purchase Agreement, LP000945 402
22     thru LP000948
23 80  Non Recourse Promissory Note, LP000949 thru 403
      LP000952
24 81  Corna Letter, LP000925 thru LP000929   404
25 82  Fax Cover Letter, LP000930         405
```

---

350

1   83   Document, LP000934              405
2   84   Antonio Letter, LP000904        406
3   85   List of Names and Figures, LP000899        407
4   86   Western Union Ledger, LP000900      409
5   87   Accounting Document, LP000903       410
6   88   Western Union Documents, LP000885 thru    412
         LP000898
7
8   89   E-Mail Chain Ending, Dec. 19, 2014,     416
         LP000827 thru LP000829
9   90   E-Mail Chain Ending, Dec. 25, 2014,     429
         LP000830 thru LP000831
10
11  91   E-Mail Chain Ending 1/2/2015, LP000832    430
12  92   E-Mail Chain Ending Jan. 8, 2015, LP000833  431
13  93   E-Mail Chain Ending 10/12/2014, LP000834  433
14  94   E-Mail Chain Ending Sept. 21, 2014,     435
         LP000835 thru LP000836
15  95   E-Mail, 9/17/2014, LP000837         438
16  96   E-Mail Chain, 3/1/2014, LP000838        439
17  97   E-Mail Chain Ending Feb. 18, 2014, LP000839 444
         thru LP000841
18
19  98   E-Mail Chain Ending 1/7/2014, LP000842    446
20  99   E-Mail Chain Ending 10/14/2014, LP000845  446
21  100  E-Mail Chain Ending Sept. 19, 2014, 448
         LP000846
22
23
24
25

351

1   101  E-Mail Chain Ending Jan. 12, 2015, LP000843 449
         thru LP000844
2
3   102  6 Pages of Color Photos              456
4   103  Privilege Log                        465
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LARA PAVANELLI - Vol. 3                              1/21/2015

373

1   914 to 15.

2        MR. COOPER:  Okay.

3        MR. SCHWARTZ:  Now I'm going to mark page

4   919, which will be Exhibit 56.

5        (Exhibit 56 marked for identification.)

6        MR. SCHWARTZ:  And let me know if I'm

7   going too fast at any point, Mr. Cooper.  I'm trying to

8   go fast, but I don't want to go too fast.

9    Q.  (By Mr. Schwartz) Ms. Pavanelli, I'm showing

10   you Exhibit 56.  It's another one of the documents that

11   Mr. Krenek produced on your behalf the night before last

12   in response to the subpoena that was served on you

13   personally.  Do you recognize Exhibit 56 as being one of

14   the documents that you gathered in response to the

15   subpoena in the case?

16    **A.  I believe so, yes.**

17    Q.  And looking at the signature that appears on

18   Exhibit 56, under the name James P. Pavanelli, do you

19   recognize that as your father's signature?

20    **A.  It appears -- certainly looks like his**

21   **signature.**

22        MR. SCHWARTZ:  We'll move to Exhibit 57.

23   Mr. Cooper, this is page -932.

24        (Exhibit 57 marked for identification.)

25    Q.  (By Mr. Schwartz) Ms. Pavanelli, I'm showing

374

1  you Exhibit 57.  It's another document that Mr. Krenek
2  produced on your behalf the night before last in
3  response to the subpoena that was served upon you
4  personally.  Do you recognize Exhibit 57 as another
5  document that you found in your house or among your
6  belongings as you gathered materials to produce in
7  response to the subpoena?
8      A.  I believe so.
9         MR. SCHWARTZ:  We'll mark Exhibit 58.
10 Mr. Cooper, it's page -931.
11        (Exhibit 58 marked for identification.)
12     Q.  (By Mr. Schwartz) Ms. Pavanelli, I'm showing
13 you what's been marked as Exhibit 58.  This is another
14 of the documents that Mr. Krenek produced the night
15 before last on your behalf in response to the subpoena
16 that was served on you personally.  Do you recognize
17 Exhibit 58 as being one of the documents that you found
18 as you searched through your house and belongings for
19 materials that were responsive to the subpoena?
20     A.  I believe so.
21     Q.  Just looking at Exhibits 57 and 58, as
22 examples, how is it that you had possession of these
23 documents as of December of 2014 or January of 2015?
24     A.  I'm not entirely sure.  I believe they were
25 recovered from the -- the house fire.

375

1      Q.  Who recovered documents from the house fire?
2      A.  My sister.
3      Q.  How long after the fire occurred did she do
4  that?
5      A.  They were given to us.
6      Q.  By whom?
7      A.  The authorities.
8      Q.  Which authorities?
9      A.  The local police.
10     Q.  When did the local police give you documents
11 that had been recovered from the house fire?
12     A.  They didn't give us documents.  They gave us a
13 key to a storage facility where they put all of the
14 belongings that had been recovered from the fire.  And
15 we had to go there and sort it out.
16     Q.  When did that happen?
17     A.  Soon after his death.
18        MR. COOPER:  I'm sorry.  I didn't hear the
19 answer.
20        MR. SCHWARTZ:  "Soon after his death."
21        MR. COOPER:  Thank you.
22     Q.  (By Mr. Schwartz) How soon after his death?
23     A.  I believe I was there either ten days after or
24 two weeks after.  I don't remember the exact dates.
25     Q.  How did you learn from the local police that

376

1  there were materials that were put in a storage
2  facility?
3      A.  Well, they told us.
4      Q.  Did they tell you personally?
5      A.  Me, no, they told my sister.
6      Q.  And your sister told you?
7      A.  Yes.
8      Q.  Did you have any dealings directly with any of
9  the local police concerning the fire or any of the --
10     A.  I did not.
11     Q.  -- materials --
12     A.  Never.
13     Q.  Let me just finish the question.  Any of the
14 materials that might have been recovered from the fire?
15     A.  I did not.
16     Q.  All of those communications took place between
17 your sister and the local police as far as you know?
18     A.  Right.
19     Q.  And whatever you learned, you learned from your
20 sister?
21     A.  Correct.
22     Q.  Did you -- on how many occasions did you access
23 the storage facilities?
24     A.  Just once, one day.
25     Q.  Where was it?

377

1      A.  In Switzerland.
2      Q.  Where?
3      A.  I -- I don't remember.  I think in Lausanne.
4      Q.  How do you spell that?
5      A.  L-A-U-S-A-N-N-E.
6      Q.  How far was that from the house that was burnt
7  down?
8      A.  Maybe -- I don't know.  Honestly, I don't know.
9  Half an hour, maybe, the drive.  I don't know.
10     Q.  Was this a police storage facility?
11     A.  It's -- I don't think it belongs to them, but I
12 think they contracted them to -- we had to pay for it.
13     Q.  You had to pay for the storage?
14     A.  Uh-huh.  Yes, we did.
15     Q.  How much?
16     A.  I don't remember.  It's all a blur.
17     Q.  Who made the payment?
18     A.  My sister.
19     Q.  For how long were the materials in storage?
20     A.  From the time of his death to the time that we
21 went there and emptied out the storage, so maybe three
22 weeks, a month, tops.  I don't remember.  Again, I don't
23 remember the exact dates.
24     Q.  How much time did you spend with the storage
25 facility the one day you visited it?

378

1   A.  One day.
2   Q.  Full day?
3   A.  Yes.
4   Q.  How many hours?
5   A.  I -- I don't know.  Maybe five or six hours.  I
6   don't know.  I don't recall exactly.
7   Q.  What did you find in the storage facility?
8   A.  Clothing, you know, seasonal clothing.  So it
9   was wintertime, so there were a lot of summer clothing
10  and personal effects of my father.
11  Q.  What do you mean by personal effects?
12  A.  You know, sunglasses, things -- things of that
13  nature.
14  Q.  Were there any computers?
15  A.  No.
16      MR. COOPER:  I'm sorry.  I didn't hear the
17  answer.
18      MR. SCHWARTZ:  No.
19      MR. COOPER:  Thank you.
20  Q.  (By Mr. Schwartz) Were there any other
21  electronic devices on which any type of data could be
22  stored?
23  A.  No.  There were just some files with these
24  documents.  That's it.
25  Q.  How many files were there?

379

1   A.  I don't remember.  I don't recall.
2   Q.  If you had to estimate in terms of inches or
3   feet of files, if you just stacked them up on this
4   table, how -- how high would they be?
5   A.  Maybe 2 inches high.  I don't know.  Honestly,
6   I don't really recall.  I mean, we had to do all this in
7   a hurry, because we didn't want to pay extra time for
8   the -- for the storage.  And a lot of the things had to
9   be thrown away in the trash anyway, because they were
10  partially burnt and wet.  So the amount of time that
11  they had been sitting in storage created mold, and you
12  know, not very hygienic, obviously, so.
13  Q.  Were there any paper files that were either
14  burnt or wet that you discarded?
15  A.  No.
16  Q.  Did you keep all of the paper files that you
17  found there, whether they were burnt, wet or charred or
18  otherwise damaged in whole or in part?
19  A.  Yes.
20      MR. COOPER:  I'm sorry.  I didn't hear the
21  answer.
22      MR. SCHWARTZ:  "Yes."
23      MR. COOPER:  Thank you.
24  Q.  (By Mr. Schwartz) Did you take those files with
25  you?

380

1   A.  No.
2   Q.  What happened to them?
3   A.  We stored them in -- we stored them in a safe
4   deposit box in Switzerland.
5   Q.  Where?
6   A.  In Lausanne.  Actually, I don't even know, to
7   be quite honest.  My sister did it, so I don't know.
8   Q.  In a bank?
9   A.  I believe so.  I'm not sure.
10  Q.  Are those documents or files still in the safe
11  deposit box?
12  A.  No, they're not.
13  Q.  When were the contents of the safe deposit box
14  emptied?
15  A.  A short while ago when I asked my sister to go
16  and get them.
17  Q.  This was after you were served with the
18  subpoena in this case?
19  A.  Yes.
20  Q.  When did your sister access the safe deposit
21  box?
22  A.  I have no idea.
23  Q.  Was it in December 2014?
24  A.  I don't know.
25  Q.  When did she provide -- well, let me back up.

381

1       At some point, did she provide to you the
2   contents of the safe deposit box?
3   A.  She did, yes.
4   Q.  When?
5   A.  After the subpoena.  Sometime after.  I'm not
6   sure exactly what date.
7   Q.  And the materials that were in this safe
8   deposit box, is this the same file of materials that you
9   testified a couple of weeks ago that your sister made
10  available to you at your request?
11  A.  Yes.
12  Q.  Did she provide all those materials to you at
13  one point in time?
14  A.  At one point in time?  What do you mean by
15  that?
16  Q.  Did your sister send you the files --
17  A.  Yes.
18  Q.  -- that had been in the safe deposit box all at
19  once?
20  A.  I asked her to send me all the documents that
21  were pertaining to the case and anything that was dated
22  from 2003 to 2010, yes.
23  Q.  And did she provide that all at once?
24  A.  Yes.
25  Q.  As opposed to installments?

LARA PAVANELLI - Vol. 3                                    1/21/2015

382

1    **A. Yes.**
2    Q. Do you know if there are any documents that
3    were in the safe deposit box that she still has and she
4    hasn't yet sent to you?
5    **A. Probably. I don't know for sure, but they're**
6    **not relevant to the case if there are any.**
7    Q. How do you know that?
8    **A. Because she told me so.**
9    Q. What did she tell you?
10   **A. That everything from 2003 to 2010 and anything**
11   **that is or was a communication relevant to this case,**
12   **she sent.**
13   Q. How would she know what was relevant to the
14   case?
15   **A. I think she just looked at the dates, to be**
16   **quite honest. She really doesn't know anything about**
17   **the case.**
18   Q. Just to get a sense of the scope of the
19   contents of the safe deposit box that your sister did
20   make available to you, do you believe that all of the
21   exhibits that I've shown you so far today, Exhibits 48
22   through 58, came from that safe deposit box?
23   **A. I believe so.**
24   Q. If you asked your sister to send you the
25   remaining contents of the safe deposit box, including

383

1    any documents that predated 2003, is it your expectation
2    that she would comply with that request?
3    **A. Yes.**
4    MR. SCHWARTZ: Well, let's move on to
5    Exhibit 59. Mr. Cooper, page -867.
6    (Exhibit 59 marked for identification.)
7    Q. (By Mr. Schwartz) Ms. Pavanelli, I'm showing
8    you Exhibit 59. This is another one of the documents
9    that Mr. Krenek produced the night before last on your
10   behalf in response for the subpoena that was served on
11   you in this case. Do you recognize this as being
12   another one of the documents that you found in your
13   house or among your belongings when you were gathering
14   materials to produce?
15   **A. I believe so, yes.**
16   Q. And let me direct your attention to the second
17   full paragraph that starts out in the left-hand margin,
18   it starts with the words, "In this way, Schianchi will
19   keep his $3,000." Do you see that?
20   **A. I do.**
21   Q. Do you recognize the handwriting in that
22   paragraph as that of your father?
23   **A. It looks like it.**
24   Q. And do you also recognize the signature of
25   James as being that of your father?

384

1    **A. It looks like it.**
2    MR. SCHWARTZ: All right. We're moved to
3    Exhibit 60. Mr. Cooper, this is page 5 -- I'm sorry --
4    857 through -866.
5    (Exhibit 60 marked for identification.)
6    Q. (By Mr. Schwartz) Ms. Pavanelli, I'm showing
7    you Exhibit 60. This is another of the documents that
8    was produced by Mr. Krenek the night before last in
9    response to the subpoena that was served on you
10   personally in this case. Do you recognize this document
11   as being one that you found in your house or among your
12   belongings as you were gathering materials to produce in
13   this case?
14   **A. I believe so.**
15   Q. Let me ask you this question: So before we
16   commenced your deposition on January 7th, Mr. Krenek
17   produced a certain collection of documents on your
18   behalf in response to the subpoena, right?
19   **A. Correct.**
20   Q. And now just two days ago, he produced a second
21   batch of documents on your behalf in response to the
22   subpoena. Do you understand that as well?
23   **A. I do.**
24   Q. Why is it that the materials, to that extent,
25   came in two separate batches so far apart in time?

440

1    A.  Yes.
2    Q.  It looks like the first e-mail is from
3  Mr. Bon --
4    A.  Yes.
5    Q.  -- to you; is that right?
6    A.  Yes.
7    Q.  What is he saying?
8    **A.  He says, "Hello, Lara.  You have not responded**
9  **to my e-mail."  And then he -- that I have not been able**
10  **to open that you sent me.  It actually makes -- the**
11  **sentence makes no sentence, but whatever.**
12    Q.  What did you say in response?
13    **A.  I said that I sent him an e-mail, which I**
14  **resent to him a few minutes ago, and I said nothing has**
15  **changed since November.**
16    Q.  When you said nothing had changed since
17  November, this is something you said in January of 2014,
18  what were you talking about?
19    **A.  Well, he makes periodic inquiries about what is**
20  **going on, so, generally, I -- I -- you know, in the last**
21  **few years, I've -- haven't had anything to report, so.**
22    Q.  His inquiries concern what is going on, on what
23  front?
24    **A.  Switzerland with Schianchi, and so forth and so**
25  **forth.**

441

1    Q.  What's your understanding now today as to
2  what's going on in Switzerland?  And by the way, I don't
3  want you to be sharing with me any legal advice that you
4  received from Mr. Serra, at least not at this point in
5  time, reserving my right at some point to take the
6  position that you might need to disclose that.  But for
7  purposes of today's questions, I'm just asking what's
8  your understanding of the state of affairs in
9  Switzerland.
10    **A.  I understand that one lawsuit has been placed**
11  **on hold.  And that is the -- I believe the criminal case**
12  **that is in Mendrisio.  And I believe there's another**
13  **civil case which also is on hold.  I don't know why**
14  **they're on hold.  I don't know what they're waiting for.**
15  **I don't have any details.  I don't have any documents**
16  **pertaining to any of it.  So I'm kind of in the dark.**
17    Q.  Who is the criminal case against?
18    **A.  Schianchi says that it's against him**
19  **against -- it was against my father, but obviously, he's**
20  **no longer alive, so it can't be against him anymore.**
21    Q.  Is there anyone other than Schianchi who's
22  currently the subject of that criminal case, as far as
23  you know?
24    **A.  Well, Gruppo Triad probably.  I don't know if**
25  **criminal charges can be brought upon a company.  I don't**

LARA PAVANELLI - Vol. 3                                   1/21/2015

442

1  know.  I'm not a lawyer.
2      Q.  What's your understanding of the civil case?
3      A.  It's a dispute with -- with another company.
4      Q.  Which other company?
5      A.  I believe it's called Wood Stripe.
6      Q.  Does this concern Wood Stripe's contention that
7  it's entitled to 25 percent of Gruppo Triad's purported
8  Bandagro promissory notes?
9      A.  I believe so.
10     Q.  As far you're aware, that's also on hold?
11     A.  I don't know why, from my understanding, every
12  motion has been -- I don't know what the correct
13  terminology is.  Quashed.  Squashed.  I don't know.
14  Refuted.  I don't know what legal terminology you guys
15  use.
16     Q.  Fair enough.
17     A.  Denied, I guess.
18     Q.  The matter -- the matter is in some holding
19  pattern as far as you're aware?
20     A.  As far as I'm aware of, yes.
21     Q.  And without getting at the moment into any
22  discussions you've had with Mr. Serra, he's been hired
23  to represent Triad's interests in these matters?
24     A.  Correct.
25     Q.  When was the last time you spoke with

443

1  Mr. Serra?
2      A.  A few months ago.
3      Q.  When was the last time you exchanged an e-mail
4  with Mr. Serra?
5      A.  It's been a while.
6      Q.  When was the last time you had any type of
7  correspondence with him?
8      A.  I don't recall the exact time, but we've been
9  going back and forth with trying to reach an
10  understanding and an agreement with him.
11     Q.  With Mr. Serra?
12     A.  Yes.
13     Q.  As to the terms of his engagement?
14     A.  Yes.
15     Q.  Who is handling that for you?
16     A.  What do you mean by that?
17     Q.  Are you -- are you the one who's negotiating
18  with Mr. Serra concerning the terms and conditions of
19  his engagement?
20     A.  Yes.
21     Q.  When was the last communication you had with
22  him concerning that subject?
23     A.  I don't remember.  It was, I believe, before
24  the holidays.
25         MR. SCHWARTZ:  All right.  Let's mark the