# Exhibit B

David J. Richards

Page 1

```
               IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
                            --|--
                    Case No. 02:04-cv-793
                            --|--
        DRFP, LLC, d/b/a Skye Ventures,
                Plaintiff,
                    vs.
        The Republican Bolivariana De Venezuela,
        et al.,
                        Defendants.
                            --|--

        Video
         Deposition of: DAVID J. RICHARDS
         Date and Time: Monday, December 22, 2014
                        9:09 a.m.

         Place:     Calfee, Halter & Griswold
                    1200 Huntington Center
                    41 South High Street
                    Columbus, Ohio
         Reporter:  Julieanna Hennebert, RPR, RMR
                    Notary Public - State of Ohio
                            --|--
```

Page 2

```
 1   APPEARANCES:
 2   On behalf of Plaintiff:
 3        MR. REX H. ELLIOTT
          MR. ADAM P. RICHARDS
 4        Cooper & Elliott, LLC
          2175 Riverside Drive
 5        Columbus, Ohio 43221
          614.481.6000
 6
     On behalf of Defendants:
 7
          MR. ANDREW Z. SCHWARTZ
 8        MR. RICHARD G. BALDWIN
          Foley Hoag, LLP
 9        Seaport World Trade Center West
          155 Seaport Boulevard
10        Boston, Massachusetts  02210
          617.832.1000
11
          MR. ALBERT J. LUCAS
12        Calfee, Halter & Griswold, LLP
          1200 Huntington Center
13        41 South High Street
          Columbus, Ohio 43215
14        614.621.1500
15   Also Present:
16        Mr. Gil Whitney, Videographer.
17                      --|--
18
19
20
21
22
23
24
25
```

Page 3

```
 1                        INDEX
 2                         --|--
 3   DAVID J. RICHARDS                         PAGE
       Examination by Mr. Schwartz              6
 4
 5                         --|--
 6           RICHARDS/SKYE EXHIBITS
 7   NUMBER  DESCRIPTION                    IDENTIFIED
 8     1    Responses to Interrogatories         17
 9     2    Plaintiff's Privilege Log            54
10     3    Case 06CR 09-6632 Indictment         72
11     4    Case 07CR 08-6125 Indictment         72
12     5    Case 06CR 09-6632 Guilty Plea        74
13     6    Case 07CR 08-6125 Guilty Plea        77
14     7    Bankruptcy Petition                  78
15     8    December Confidential Fax           118
16     9    6.28.2004 El Universal.com Article  147
            (Spanish)
9A 17
            6.28.2004 El Universal.com Article  147
18          (English)
19    10    Skye Ventures Website Page          150
20    11    3.18.2004 Fax                       156
21    12    4.8.2004 Agreement                  203
22    13    Bandagro Notes Purchase Agreement   203
23                       --|--
24
25
```

Page 4

```
 1               Monday Morning Session,
 2               December 22, 2014.
 3                       --|--
 4          VIDEOGRAPHER:  We're on the record.  This
 5   is the videotaped deposition of David Richards in the
 6   matter of DRFP, LLC, doing business as Skye Ventures,
 7   versus the Republican Bolivariana De Venezuela, et
 8   al., being heard before the U.S. District Court,
 9   Southern District of Ohio.
10          This deposition is being held at 41 South
11   High Street, Columbus, Ohio, on December 22, 2014, at
12   9:09 a.m.
13          My name's Gil Whitney and I'm the
14   videographer; the court is Julie Hennebert.
15          Counsel, will you please introduce
16   yourself and your affiliations.
17          MR. ELLIOTT:  Rex Elliott and Adam
18   Richards on behalf of the plaintiff, appearing with
19   Dave Richards, the witness.
20          MR. SCHWARTZ:  We'll each identify
21   ourselves.  Andrew Schwartz, Foley Hoag, LLP, for the
22   defendants.
23          MR. BALDWIN:  Richard Baldwin, Foley Hoag,
24   for the defendants.
25          MR. LUCAS:  And I'm Albert Lucas from
```

Page 33

1  was writing to the Ministry of Finance and saying
2  we're diligencing the Attorney General's opinion and
3  if there's anything wrong with it, please let me
4  know, kind of like that, and that was November 2nd
5  of or 3rd of 2003.
6      Q.  Excuse me for a second.  That's an email
7  from John Kennedy to whom?
8      A.  John Kennedy at Crabbe-Brown.
9      Q.  Yeah, to whom?
10     A.  To the Ministry of Finance, it's one or
11 two people at the Ministry of Finance.
12     Q.  Do you recall which two?
13     A.  No, I don't.  But it didn't recall me
14 specifically but reminded me of kind of what we were
15 doing back then and sort of the flow of things.  I
16 was apparently copied on the email so wasn't a record
17 that I'd had.
18         So that was something that sticks out in
19 my mind as seeing that thing and, boy, I didn't
20 remember that.  And what did we do right before and
21 right after that.
22         Then if I'm going to kind of go forward
23 there and think of the things that I saw, of course I
24 reviewed the agreements, the whole -- I went through
25 all the agreements and tried to resolve in my mind

Page 34

1  all of the back and forth that was going on with
2  those agreements and all of the negotiations and
3  remonstrations to finally get to where we were.
4          And so the agreements helped and more in
5  that sense of not so much looking at the exact legal
6  terms but kind of what was going on and what was
7  happening in consecutive order in this timeframe up
8  to the lawsuit being filed.
9          I reviewed -- the thing that really helped
10 me was when in the fall of 2004 we took out a -- we
11 were doing a transaction on behalf of Gruppo to try
12 and sell one of the notes in sort of the U.S.
13 financial system and we put together a short
14 memorandum to, not to offer the bonds but the term of
15 interest.  And so reading that helped me think about
16 kind of what our mental processes were at the time
17 and what we thought and helped me reflect back on how
18 we got to those opinions.
19         And I saw a -- I saw a document that was
20 prepared by Jess Ravich at Libra Securities, and
21 Libra -- Jess was an ex-managing partner at Kidder
22 Peabody, and so I remember all that back and forth
23 that started I think in June of '04 with him, because
24 he's very, very powerful -- or, not powerful but kind
25 of a big guy.  He's far above my level.

Page 35

1  And kind of their thought processes and
2  going back and forth with them that caused me to
3  remember kind of the bases we were trying to cover
4  then and all of that.
5          So I'd say the things that popped to my
6  head as you asked that question are those.
7      Q.  What note were you trying to sell in the
8  U.S. financial system in the fall of 2004?
9      A.  Note 9/12.
10     Q.  Where did you get the various documents
11 that you reviewed for purposes of preparing for these
12 depositions?
13     A.  From my counsel.
14     Q.  As far as you're aware were all of the
15 documents that you reviewed documents that had been
16 produced to the defendants in this case?
17     A.  I have no idea.  Either Chip or Rex can
18 answer that.
19     Q.  When you practiced law, what kind of work
20 did you do?
21     A.  For the first five or six years I was a
22 litigator, maybe seven, and for the last couple years
23 I was a tax guy.
24     Q.  Why did you make that change?
25     A.  Well, you want to know the real truth?

Page 36

1  I'm under oath.  Well, I looked around in Columbus
2  and every litigator I thought was really good was
3  either divorced, an alcoholic, or something, and I
4  was starting a family and I decided I wanted a
5  different life.
6          So I thought maybe tax would provide that
7  and I went to the Capital master's in tax program,
8  which I almost finished but got sick of that too, I
9  mean, tax, pretty bad for a litigator, right?  So and
10 then I went to business.
11     Q.  How long were you at Crabbe, Brown &
12 James?
13     A.  I was active there from I think '77 to '85
14 or '6 and then completely gone in '88 or somewhere
15 around there.
16     Q.  Was that the last law firm you worked at?
17     A.  That's the only law firm I worked at.  I
18 was a partner there.
19     Q.  Did you leave voluntarily?
20     A.  Over their objection, yeah.
21     Q.  Now, at some point you formed the entity
22 that's now known as Skye Ventures, LLC, right?
23     A.  Yes.
24     Q.  When was that?
25     A.  Well, it started out as a blank entity

Page 37

1 called I think DRFP, LLC I believe, and that was in
2 August of 2003.
3    Q.   And you also had formed an entity in the
4 same timeframe called Empire Advisors, LLC; is that
5 right?
6    A.   I don't know when that was, to be honest
7 with you. But probably was in the same timeframe.
8 Empire was related to another business that, well,
9 Empire was sort of a -- we formed that, I formed that
10 as a sort of an umbrella entity and it would hold
11 entities typically like DRFP or others. So as to
12 exactly when Empire was started, I don't know.
13      Empire involved sort of the same group of
14 investors, high-net-worth individuals that had been
15 with me since '90. So it was more of a -- nothing
16 discontinuous. So there was no event that makes me
17 remember when it was.
18      MR. SCHWARTZ: Let's take a
19 couple-of-minute break here.
20      VIDEOGRAPHER: Off the record 9:56.
21      (Recess taken.)
22      VIDEOGRAPHER: On the record 10:05.
23    Q.   We were talking about the formation of
24 Empire Advisors, LLC when we took a break and you
25 described it as an umbrella that would hold entities

Page 38

1 like DRFP, LLC. I don't want to spend a lot of time
2 on this, but what's the relationship between Empire
3 and DRFP, LLC, which is now known as Skye Ventures,
4 LLC? If there is one.
5    A.   Well, this is maybe too technical for me,
6 but I would guess that Empire owns a hundred percent
7 of Skye maybe. Is that right? We typically own all
8 or part of the entities that are group funds.
9    Q.   I don't know if it's right, I have to ask
10 you those questions.
11    A.   I don't either. I don't know. We've got
12 a million entities so it's hard for me to know the
13 details of any one of them.
14    Q.   Let me just pause for a second and get
15 some nomenclature understanding here with you. So
16 the plaintiff in this case is called Skye Ventures,
17 LLC, right?
18    A.   Yes.
19    Q.   And it was formerly known as DRFP, LLC,
20 right?
21    A.   Yes.
22    Q.   Those are one and the same.
23    A.   I believe so, yes. I'm sure of it.
24    Q.   So during the course of the deposition I'm
25 going to make reference to "Skye Ventures" or I'm

Page 39

1 going to make reference to "Skye" from time to time.
2 You'll understand when I do that that I'm referring
3 to the plaintiff Skye Ventures, LLC which was
4 formerly known as DRFP, LLC, right?
5    A.   We have, Empire has three or four entities
6 that are called Skye something, so I sometimes get
7 confused, but I know today if we're talking about
8 Skye, it will be Skye Ventures, that's the Bandagro
9 bonds holder.
10    Q.   Or Skye, just so we're --
11    A.   Or Skye.
12    Q.   Now, there's also an entity known as
13 Skye II, right?
14    A.   Yes.
15    Q.   What is that?
16    A.   I think Skye II is an entity that we
17 formed in connection with note 9/12. We viewed it as
18 a separate transaction and I think we formed a
19 separate entity for that. I believe that's how that
20 came about.
21    Q.   Which entity today owns note 9/12?
22    A.   I don't know the answer to that question.
23 I would assume it's Skye II but it might have
24 transferred to Skye. I don't know.
25    Q.   How could you figure out an answer to that

Page 40

1 question?
2    A.   Well, I could do another records
3 search and try to figure it out and it would be the
4 same, I would have to -- that's what I'd have to do,
5 I'd have to go figure it out and look at it.
6    Q.   If you don't know, who would know?
7    A.   Well it would only be me, I would know,
8 right? And would I have to go back and look and see
9 if it was still Skye II or what.
10    Q.   Is that something you could take on as a
11 homework project for tomorrow?
12    A.   You better start writing these down.
13      MR. ELLIOTT: We'll consider it. Can you
14 tell me, though, why it would be important to you to
15 know which entity holds note 9/12?
16      MR. SCHWARTZ: Not without revealing the
17 mental impressions of your adverse counsel.
18      MR. ELLIOTT: Okay.
19      MR. SCHWARTZ: But it is part of the
20 overall factual mix and we do want to know which
21 entity owns note 9/12. We particularly want to know
22 if the plaintiff owns it. But I don't consider this
23 to be the single most important issue in the case or
24 in the deposition.
25      MR. ELLIOTT: We'll talk about it.

10 (Pages 37 to 40)

CONFIDENTIAL

Page 57

1  now, I use Empire for everything.
2      Q.   And what's your email address at Empire?
3      A.   DRichards@EmpireAdvisorsLLC.com.
4      Q.   When was the Skye Ventures server
5  operational?
6      A.   Well, I don't know. I had a fellow that
7  did that, he died. I don't remember exactly when all
8  that happened.
9      Q.   Who was that fellow?
10     A.   His name was Eric Jones.
11     Q.   To the best of your recollection when did
12 you cease using an email address at SkyeVentures.com?
13     A.   To be honest with you, I don't know how
14 long that hung around. I really, honestly, I have a
15 lot of email addresses, so I just don't remember.
16     Q.   Back in 2003 and 2004 what email address
17 did you use for Skye Ventures' business?
18     A.   I think that's when we used Skye Ventures'
19 email I believe. Maybe not until -- maybe it wasn't
20 2003, maybe as it became a real active transaction we
21 did something with that. So maybe probably more
22 likely 2004 we started with that.
23     Q.   In that timeframe did you send emails to
24 Mr. Pavanelli?
25     A.   In 2004, yeah, I'm sure I did, yeah.

Page 58

1      Q.   And in that same timeframe, 2004, did you
2  send emails to Mr. Schianchi?
3      A.   I'm sure I did. Schianchi, he pronounces
4  it ski-ahn-ki.
5      Q.   So that's S-c-h-i-a-n-c-h-i.
6      A.   You would pronounce my wife's name
7  cas-si-ot-ti if you read it not cash-shotti, so they
8  get offended by that.
9      Q.   In 2004 did you send emails to anybody
10 else concerning the Bandagro notes?
11     A.   I'm sure I did.
12     Q.   To whom else?
13     A.   Well, we talked about Pavanelli and
14 Schianchi, certainly my attorneys.
15     Q.   Who were active as your attorneys at that
16 point?
17     A.   Crabbe-Brown.
18     Q.   Who at Crabbe-Brown?
19     A.   Most of the work was being done by Luis
20 Alcalde, John Kennedy some, and Jeff Brown, and there
21 were a couple others who worked on it. I dealt
22 mostly with Alcalde.
23     Q.   So you sent emails in 2004 to Schianchi,
24 to Pavanelli, to Alcalde, to John Kennedy, to Jeff
25 Brown, anybody else? Concerning Bandagro.

Page 59

1      A.   Probably some of the people on this list
2  in 2004.
3      Q.   Some of the investors.
4      A.   Yeah, probably.
5      Q.   Did you communicate with Mr. Jacir, that's
6  J-a-c-i-r, by email in 2004?
7      A.   I was copied on some emails by Jacir but
8  those were all Alcalde. Jacir does not speak
9  English, so.
10     Q.   So you were copied on emails from Jacir to
11 Alcalde that were sent in Spanish?
12     A.   Once or twice, yeah. They were almost all
13 in Spanish. I don't believe Miguel speaks any
14 English at all.
15     Q.   Did Schianchi -- does Schianchi speak
16 English?
17     A.   I'm not sure how much he speaks or doesn't
18 speak. But when I've interacted with him, I've
19 always had an interpreter.
20     Q.   And Pavanelli spoke English though,
21 correct?
22     A.   Yeah. He spoke English well.
23     Q.   Do you have copies of the emails that you
24 sent to any of these investors in which you solicited
25 their investment in the Bandagro notes?

Page 60

1      A.   No.
2      Q.   Where are they?
3      A.   I don't have any emails from back then at
4  all.
5      Q.   What happened to them?
6      A.   God knows. It's ten computers and who
7  knows. You might remember back then, you know,
8  Outlook only had small storage too. Today I
9  currently I have 50,000 emails in my In box but back
10 then that wasn't the case. So I don't have any. My
11 oldest email is about 2009. I'd have to look.
12     Q.   Let me ask you about a few people who are
13 on this list at the end of Exhibit 2.
14     A.   Okay.
15     Q.   About 55 percent of the way down on the
16 left-hand column there's somebody named Gary Post.
17 Do you see him?
18     A.   Yes.
19     Q.   Who's he?
20     A.   Gary is a financial guy from LA. He owns
21 a firm called Ambient Campo Capital. He's an
22 ex-Drexel-Burnham guy.
23     Q.   How much has he invested?
24     A.   I don't know.
25     Q.   Who is Jim Douglas? He's about 80 percent

15 (Pages 57 to 60)

Page 61

1  of the way down the left-hand column.
2    A.    Jim Douglas is a guy who owns a restaurant
3  in town here, a guy I play golf with.
4    Q.    Looking over at the right-hand column, who
5  is Michael Stirick?
6    A.    Mike Sitrick is the fellow who owns the
7  big PR firm in LA.
8    Q.    How much has he invested?
9    A.    I don't know.
10   Q.    Three from the bottom on the right-hand
11 column is John Kennedy. Do you see that?
12   A.    Yes.
13   Q.    Is that the same John Kennedy from
14 Crabbe-Brown?
15   A.    Yes.
16   Q.    How much has he invested?
17   A.    I don't know.
18   Q.    And just looking at the last two names,
19 you have Adam Richards and Chip Cooper from Cooper &
20 Elliott, with a paren (as attorney). Is that meant
21 to indicate they're just recipients of the
22 communications as attorneys as opposed to investors?
23        MR. ELLIOTT: We created the list and
24 that's what it was intended to convey.
25   A.    Yeah, I think there are several people on

Page 62

1  here that may get the communications that aren't
2  actual monetary investors, and certainly Adam and
3  Chip are two of those.
4    Q.    Are not monetary investors?
5    A.    Are two of those who were not monetary
6  investors, yes.
7    Q.    Understood.
8         When did you first become acquainted with
9  Pavanelli?
10   A.    I believe it was in October of 2003.
11 Although it's possible I spoke to him in September.
12   Q.    How is it that you came to be in contact
13 with him?
14   A.    We were looking at the transaction and he
15 was the acting officer of the people who owned the
16 notes.
17   Q.    How did you find out about this
18 opportunity?
19   A.    Well, it's an odd story, like about half
20 of my deals. So what happened was there was a fellow
21 in town named Dave Corna and Dave was a pretty good
22 friend, or at least a pretty good business friend and
23 had done a number of things with him in the past, and
24 he called me and asked me if I would talk to his
25 brother, Larry Corna, who I had never met. And I

Page 63

1  asked him about what. And he said well, just talk to
2  him for five minutes.
3         So as a favor to Dave who had done me a
4  lot of favors in life, I agreed to meet with Larry.
5  And Larry came over to my house, I was at my home
6  that day, came over right within the hour.
7    Q.    In Ohio?
8    A.    In Ohio, right, my Ohio home. Knocked on
9  the front door, and I don't know exactly when it was
10 but I remember it was very, very hot, and Larry was
11 there in a business dress shirt and sweating. It was
12 must have been a hundred degrees. So I think it was
13 late August or September.
14        And so I stood on the doorstep and talked
15 to him a little bit, and he was talking about this
16 bond deal that I should be interested in. And well,
17 I said to him, well, you know, if there's -- you're
18 standing on the doorstep of my house, I'm not going
19 to talk to you about a bond deal.
20        Well, what it really was, that Larry
21 wanted $5,000. So, and he was going to give me some
22 interest in this deal that he was describing and the
23 way he was talking about it, maybe I wasn't focused,
24 but didn't make a lot of sense.
25        So I said look, I'll loan you 5,000 bucks,

Page 64

1  which I did. I went inside, got a check, wrote him a
2  $5,000 check. And said that I could talk to him
3  about the deal later. And he said he'd give me an
4  interest in this deal and pay me back.
5         So there are a lot of Cornas in town, I
6  know Richie's a big builder, fellow member at
7  Muirfield, Mark's also a big construction guy and
8  president of banks, and I assumed I could trust a
9  Corna for 5 grand, so I wrote him a check and he
10 left.
11        And then maybe a week after that or two I
12 had a phone conversation with him about the deal and
13 he started telling me the story about the Bandagro
14 bond deal.
15   Q.    This was a phone conversation with Larry?
16   A.    With Larry. And that he was going to get
17 me papers on the deal and, you know, make sure that
18 my $5,000 was good. And he might even have asked me
19 for another 5 at the time, I'm not sure about that.
20        So I asked him how he got this deal and
21 where he heard of it, and he told me that it was sent
22 to him, so he told me some story about how it was
23 back in Italy where his family was from and then came
24 through a local fellow named Marvin Cantor and he
25 mentioned Antonio Usuelli's name, told me a little

16 (Pages 61 to 64)

Page 153

1  **A.** Yeah.
2  **Q.** What did you mean when you said in the
3  website "Skye's ownership interest is held through
4  Gruppo Triad FFC, S.P.A."?
5  **A.** That makes it clear, I was referring to
6  these deeds of trust that we own. Now I see that.
7  **Q.** The website screen shot goes on to say
8  that the materials available on a certain point of
9  the site include detailed documentation including
10 opinion of counsel. You see that?
11 **A.** Yes.
12 **Q.** Which opinion of counsel was available on
13 the website as of March of 2004?
14 **A.** I don't know.
15 **Q.** Was it is an opinion of Crabbe, Brown &
16 James?
17 **A.** I don't know.
18 **Q.** Was it an opinion from some Venezuelan
19 counsel?
20 **A.** Again, I don't remember which opinion of
21 counsel it was.
22 **Q.** Has Skye Ventures or any affiliated person
23 or entity engaged Venezuelan counsel for any reason
24 having to do with the Bandagro notes?
25 **A.** I've engaged a couple of lawyers in

Page 154

1  Venezuela, not at that time. If this is truly from
2  March of '04, again, which I don't know or not, but I
3  engaged Venezuelan counsel for various reasons, but
4  by then, I mean, guys like Bedell who filed
5  affidavits in this case and Duque-Corredor, and then
6  I spoke -- I've spoken to a raft of Venezuelan
7  attorneys but I don't think any were ever retained by
8  me.
9  **Q.** How many have you paid?
10 **A.** How many have I paid.
11 **Q.** Or has Skye Ventures paid. Or has any
12 affiliated entity paid for this purpose.
13 **A.** So paid Corredor, paid Bedell for their
14 work. I believe I paid a small payment to one of the
15 big firms there, I think Baker & Hostetler.
16 **Q.** What for?
17 **A.** We wanted their opinion as to whether the
18 decision was final and binding. But we ended up
19 not -- they wanted too much money so we didn't go
20 through with them. But they did say it was final and
21 binding. It wasn't Baker, it was one of the -- they
22 had an outlet here in Columbus too. Might have been
23 Baker.
24 **Q.** Were there any others you've paid?
25 **A.** No, I don't think so. Not that I can

Page 155

1  remember.
2  **Q.** This screen shot indicates that available
3  on the site was "Correct information on Gruppo Triad
4  and its owners." Do you recall what information was
5  available?
6  **A.** Nope.
7  **Q.** Do you recall if there were multiple
8  owners as to which information was provided?
9  **A.** Nope.
10 **Q.** Then it goes to say "Skye is also
11 interested in purchasing Bandagro notes which are
12 authentic."
13     Do you see that?
14 **A.** Uh-huh.
15 **Q.** You need to answer --
16 **A.** Sorry. Yes.
17 **Q.** -- verbally.
18     At that time, March 2004, was Skye looking
19 to obtain Bandagro notes from sources other than
20 Gruppo Triad?
21 **A.** Well, you know, we'd be interested to know
22 if other people out there were claiming that they had
23 authentic Bandagro notes. And, yeah, maybe we're
24 interested in purchasing.
25 **Q.** Did you have reason to think at that time

Page 156

1  that there were people out there who had Bandagro
2  notes which were not authentic?
3  **A.** I think, well, the Attorney General said
4  in their opinion there are notes out there which are
5  false and notes which are authentic. And so we
6  assumed there were.
7  **Q.** Let's mark Exhibit 11.
8     (RICHARDS/SKYE EXHIBIT 11 WAS MARKED.)
9  **Q.** Mr. Richards, I'm showing you Exhibit 11,
10 it's a two-page letter from you to Mr. Pavanelli,
11 dated March 18, 2004. Please review it and let me
12 know if you recognize it.
13 **A.** Yes. Okay, I remember this. I haven't
14 seen this before, so.
15 **Q.** Well, when you say you haven't seen it
16 before, looks like it's a letter you wrote and signed
17 and sent to Mr. Pavanelli by fax on March 18, 2004,
18 right?
19 **A.** Excuse me, it's not signed by me. There's
20 a signature stamp. I'm not saying I'm not the author
21 of the letter, but that's a stamp. And what I was
22 not saying is that I didn't do this, I just said I
23 didn't review this in preparation for this
24 deposition. I haven't seen it I guess since 2004.
25 **Q.** You did send this letter to Mr. Pavanelli

Page 177

1 impressive place, and waited around for about 45
2 minutes after our meeting was supposed to start. Sat
3 with a guy and had a conversation for about half an
4 hour or 45 minutes, and I left and went back home,
5 back to Ohio.
6    Q.   How did you come to learn that they hated
7 Pavanelli?
8    A.   That's what my -- the guy who arranged the
9 meeting said that the purpose was to -- they thought
10 Pavanelli was an irrational or crazy guy and the
11 purpose was to show them -- I guess they had
12 conversations, so the purpose was to show them that
13 oh, no, this guy is a reasonable fellow.
14   Q.   Did you ever hear further from any of
15 these people about this subject?
16   A.   Well, I know that nothing really ever came
17 of it specific. But I'm sure we had conversations
18 afterwards.
19   Q.   So if Alex was the only other guy in the
20 meeting who spoke English, did he act in effect as an
21 intermediary to communicate to Mr. Tovar and the
22 congressman?
23   A.   Yes.
24   Q.   Who was with you if anyone when you met
25 with Jacir in April of '04?

Page 178

1    A.   Alcalde.
2    Q.   What was the purpose of that meeting?
3    A.   Well, from Alcalde's standpoint, Luis
4 wanted to meet with Jacir. Jacir, we didn't know he
5 had Parkinson's at the time but we knew that on phone
6 calls he was very difficult to understand. And while
7 he would think that you were understanding what he
8 was saying, it was difficult for Alcalde.
9        In fact, if you were trying to ask Alcalde
10 listening to him and to get him to ask questions, he
11 would be shooing you off because he was straining so
12 hard to hear what Jacir was saying.
13       So from Alcalde's point of view was to go
14 and sit in a room with Jacir and get sort of the full
15 story and background and history of everything that
16 Jacir had done and what he knew and all of that.
17       From my point of view I, again, it was all
18 in Spanish, I was just looking at body language and
19 the situation and trying to gather what I could
20 gather from the surroundings and what else was going
21 on.
22    Q.   How long did that meeting last?
23    A.   It was very long. I was actually amazed
24 that Jacir could last that long because he was
25 clearly frail. So we met in two places. First, we

Page 179

1 met at his office, and then we drove to his home and
2 we met there.
3       I'd say that I think we met in his office
4 the evening or day before and then we went to his
5 house, and the session at his house was, I'll bet it
6 was 11 hours long. And we broke a couple of times
7 and but I think from start to finish it was about 11
8 hours, 12 hours. It was a long day.
9    Q.   How long did you spend in his office the
10 evening or the day before?
11   A.   I think it was a couple hours.
12   Q.   And this was -- all this conversation took
13 place between Alcalde and Jacir in Spanish and you
14 sat there for the 13 hours?
15   A.   Well, I kind of -- his wife Sandra can
16 talk a little bit of English and I kind of wandered
17 outside the office and spoke to her a little bit,
18 then there was a meal a little bit. And occasionally
19 I'd be saying what's he saying, what's he saying kind
20 of thing. But that as the extent of it.
21       I was more seeing what did Jacir look
22 like, did he seem like a reasonable guy, you know,
23 that kind of stuff. That body language, that kind of
24 thing.
25   Q.   Beyond body language and talking to his

Page 180

1 wife and the meals, if I wanted to find out what type
2 of substantive information was conveyed by Jacir
3 during that 13-hour event, I'd have to talk to
4 Alcalde or Jacir, correct?
5    A.   If you wanted any meaningful, because
6 again, I would ask questions and say what's he
7 saying. But Alcalde was the one that was going back
8 and forth, back and forth, and I would only interrupt
9 once every 45 minutes or so.
10   Q.   So I'd have to talk to Alcalde or talk to
11 Jacir or both.
12   A.   Yeah, I'd say Alcalde or Jacir. Probably
13 Jacir.
14   Q.   Are you still on good terms with Alcalde?
15   A.   Sure.
16   Q.   Does he have any residual interest in the
17 outcome of this case?
18   A.   I don't think so. You'd have to talk to
19 his law firm about that.
20   Q.   All right, so we were going to talk about
21 the meeting you had with Woodstrite but I took you on
22 two different excursions so we're going to get back
23 to that.
24       When did you first learn that Woodstrite
25 was claiming a 25 percent interest in the notes No. 7

45 (Pages 177 to 180)

## Page 193

1  **Q.**  Does Usuelli have any interest in the
2  outcome of this litigation?
3  **A.**  I believe I'm pretty sure he has an
4  interest in, you know, in Gruppo's notes. And should
5  Gruppo get paid on on their promissory note from
6  litigation, he may be entitled to some -- I think he
7  is entitled to some of those proceeds.
8  **Q.**  Are you saying that he has an interest in
9  the portion of the proceeds that Gruppo would get if
10 Skye prevails and collects in this case?
11 **A.**  Correct, yes.
12 **Q.**  So you described this very long pair of
13 meetings that you had with Alcalde and Jacir in April
14 '04. I want to make sure I've got an understanding
15 of how many other times you've met with Jacir. So
16 I'll start by asking have you ever met with Jacir
17 other than that time?
18 **A.**  Yes.
19 **Q.**  On how many occasions?
20 **A.**  One.
21 **Q.**  When was that?
22 **A.**  June of '04.
23 **Q.**  Where was that?
24 **A.**  At his home in Miami.
25 **Q.**  Again, this was before you purchased notes

## Page 194

1  7 of 12 and 8 of 12?
2  **A.**  Yes.
3  **Q.**  Where does he live in Miami? Or did he
4  live I should say.
5  **A.**  Pardon me?
6  **Q.**  Where did he live in Miami at that time?
7  **A.**  It was a bit south of Fort Lauderdale and
8  a bit north of Miami Beach. And I forget the name of
9  the community. It was on the water.
10 **Q.**  What was the purpose of that meeting?
11 **A.**  I think it was just part of this
12 continuing attempt to gather information, getting
13 everything we could. I'm sure there was specific
14 reasons for the meeting but I can't remember exactly
15 what they were.
16 **Q.**  Who else attended this meeting?
17 **A.**  Alcalde, obviously Jacir, Sandra. She was
18 helping, I mean, he was really frail then and she was
19 there to make sure he was okay and comforted and she
20 would help with the translations and what he said.
21 So she was active. And then one of the sons both of
22 whom I'd met in Caracas. I forget the son's name.
23 **Q.**  How long did this meeting last?
24 **A.**  I think it was an entire day.
25 **Q.**  Did you travel to Florida specifically for

## Page 195

1  the purpose of meeting Jacir?
2  **A.**  Yes.
3  **Q.**  As with the meeting that took place in
4  April with Jacir, was the meeting conducted in
5  Spanish?
6  **A.**  Yes.
7  **Q.**  Without going through this in quite as
8  methodical a manner we did with the regard to the
9  April meeting, was it more or less the same
10 experience with you?
11 **A.**  Yes. You know, I may have been -- if the
12 meeting was more pointed, I might have asked a few
13 more questions back and forth whereas in the first
14 meeting I'd let them pretty much go because they were
15 really going.
16 **Q.**  But for the most part this was a
17 discussion conducted in Spanish between Alcalde and
18 Jacir?
19 **A.**  Yes.
20 **Q.**  Did you get a download from Alcalde as to
21 what Jacir had communicated after the meeting was
22 over?
23 **A.**  I'm 100 percent sure I did. I just don't
24 remember what it was.
25 **Q.**  Do you remember any of it?

## Page 196

1  **A.**  As it relates to actually what he said
2  after that meeting, no. I mean, it just comes into
3  this larger thing of all the information was gathered
4  from when we started to when we bought the notes.
5  **Q.**  Was there any discussion at the meeting
6  with Jacir in June about Woodstrite?
7  **A.**  Possibly.
8  **Q.**  Was there any discussion at that meeting
9  about Woodstrite losing its action in the Venezuelan
10 Supreme Court?
11 **A.**  Possibly, but I don't know.
12 **Q.**  We'll revisit that issue if and when you
13 are successful in refreshing your recollection, as
14 you've indicated you'll attempt do?
15 **A.**  I'll do my best.
16 **Q.**  At some point did you learn that the
17 Ministry of Finance of Venezuela issued a report in
18 November '03 saying in substance that the Gruppo
19 Triad notes were fakes and should not be paid?
20 **A.**  No.
21 **Q.**  Have you ever learned that to this day?
22 **A.**  I don't know that that happened. That's
23 not what I understand happened.
24 **Q.**  Have you -- do you have any understanding
25 of there being some report issued by the Ministry of

Page 285

1  But I do remember that we did meet with them at this
2  hotel, which I think was the Marriott in Caracas.
3      Q.    And was that the last time you
4  communicated in any way directly or indirectly with
5  Oscar Guzman Cova?
6      A.    Yes.
7      Q.    To the best of your knowledge has Alcalde
8  ever communicated any further with Oscar Guzman Cova?
9      A.    He may have but I don't know.
10     Q.    Do you have any information as to whether
11 Oscar Guzman Cova had any ongoing interactions with
12 Jacir after this meeting?
13     A.    I remember he said he was really scared
14 and he was clearly kind of fidgety about being there,
15 he was scared, he didn't want to be involved, he was
16 afraid for him or his family or something. And I
17 think he just melted into the background after that.
18     Q.    Guzman Cova.
19     A.    Yeah. I don't think he wanted to be
20 there.
21     Q.    Have you ever learned in any way, shape,
22 or form that he had any financial interest in the
23 outcome of the situation involving any of these
24 notes?
25     A.    No.

Page 286

1      Q.    Has anyone ever suggested that to you?
2      A.    No.
3      Q.    How many further interactions did you have
4  with Delgado?
5      A.    So Delgado was involved somewhat with the
6  sisters and some of those meetings. So I saw him
7  there. Delgado I think tried -- got involved with
8  some guys that owned the note and tried to -- came to
9  Columbus to talk about joining in our lawsuit and I
10 saw him then. And I saw him one other time in
11 Cincinnati with his attorney.
12     Q.    Who was his attorney?
13     A.    A fellow named Pierce Cunningham.
14     Q.    He said he got involved with some guys who
15 owned the notes? Who did he get involved with?
16     A.    I don't know. It was a name of a company
17 of Benespa but I don't really know who it was or what
18 his position was there. But that was supposedly the
19 owner of the notes. I don't know even know if they
20 owned the notes, to be honest with you. But they
21 said they did.
22     Q.    Didn't they try to intervene in this
23 lawsuit at some point?
24     A.    They might have.
25          MR. SCHWARTZ: I think that's enough for

Page 287

1  today, gentlemen. We've more or less used seven
2  hours; is that correct?
3          MR. ELLIOTT: Yep.
4          MR. BALDWIN: About ten minutes to spare.
5          MR. SCHWARTZ: Thank you for hanging in
6  there today, we'll see you tomorrow.
7          THE WITNESS: Sounds good.
8          VIDEOGRAPHER: Off the record 5:20.
9          (Whereupon, at 5:20 p.m., the deposition
10 was concluded and signature was not waived.)
11                    --|--

Page 288

1                  AFFIDAVIT
2  State of Ohio      )
                      ) SS:
3  County of _____ )
4      I, DAVID J. RICHARDS, do hereby certify that I
   have read the foregoing transcript of my deposition
5  given on Monday, December 22, 2014; that together
   with the correction page attached hereto noting
6  changes in form or substance, if any, it is true and
   correct.
7
8          _____
              DAVID J. RICHARDS
9
10    I do hereby certify that the foregoing
   transcript of the deposition of DAVID J. RICHARDS was
11 submitted to the witness for reading and signing;
   that after he had stated to the undersigned Notary
12 Public that he had read and examined his deposition,
   he signed the same in my presence on the _____ day
13 of _____, 2014.
14
15          _____
              Notary Public
16
17 My commission expires _____, _____.
18                    --|--
19
20
21
22
23
24
25

Page 289

```
 3              CERTIFICATE
 4    State of Ohio      )
                         ) SS:
 5    County of Franklin )
 6       I, Julieanna Hennebert, RPR and RMR, the
      undersigned, a duly qualified and commissioned notary
 7    public within and for the State of Ohio, do certify
      that, before giving his deposition, DAVID J. RICHARDS
 8    was by me first duly sworn to testify to the truth,
      the whole truth, and nothing but the truth; that the
 9    foregoing is the deposition given at said time and
      place by DAVID J. RICHARDS; that I am neither a
10    relative of nor employee of any of the parties or
      their counsel and have no interest whatever in the
11    result of the action.
12       IN WITNESS WHEREOF, I hereunto set my hand and
      official seal of office on this 29th day of December,
13    2014.
14
15    _____
      Julieanna Hennebert, RPR, RMR,
      and Notary Public in and for the
16    State of Ohio.
17    My commission expires February 19, 2018.
18    (1134-JLH)
19            --|--
```

**ERRATA SHEET**

**Deposition Date:**   December 22, 2014
**Case Name:**   DRFP, LLC d.b.a Sþe Ventures v. The Republica Bolivariana De Venezuela, et al.
**Deponent:**   David J. Richards

| Page | Line | Now Reads | Should Read | Reason for Change |
|---|---|---|---|---|
| 33 | 16 | was apparently copied on the email so wasn't a record | was apparently copied on the email so it was a record… | Transcription Error |
| 34 | 14 | but the term of | but to determine the… | Transcription Error |
| 37 | 1 | called I think DRFP, LLC I believe | Called DelRio Family Partnership, LLC, … | Correct error |
| 42 | 6 | …was the original owner of the notes. | was an owner of the notes prior to Skye. | Correct error |
| 53 | 12 | …is they're Culmini funds,…. | …is they're money funds,… | Transcription Error |
| 60 | 21 | …called Ambient Campo Capital… | …called Ambient Capital… | Transcription Error |
| 67 | 12 | …it was interest in a… | ..if it was an interest in a… | Transcription Error |
| 70 | 4 | …if he were a stranger,… | …he was not a stranger,… | Transcription Error |
| 87 | 17 | was a bastard kind of turning… | was a master at turning... | Transcription Error |
| 108 | 8 | It did a bunch of stuff | We did a bunch of stuff. | Transcription Error |
| 110 | 10 | April 1st is my wife's birthday | April 2nd is my wife's birthday | Correct error |
| 111 | 25 | a small line | a small line of credit | Transcription Error |
| 116 | 17 | wasn't | was | Transcription Error |
| 120 | 14 | Yes. | I learned that Pavanelli had been charged with handling false notes and some sort of conspiracy charge. I learned that Pavanelli was acquitted of the charge related to handling false instruments; however, I also learned that he was convicted of a conspiracy charge unrelated to Skye's Notes. | Misunderstood question |
| 120 | 25 | I don't remember | I don't remember when I learned Pavanelli was acquitted of the charge related to handling false instruments and convicted of a conspiracy charge unrelated to Skye's Notes. | Clarification due to change above |

| 124 - 125 | 23-3 | In other words, I felt that these are bearer instruments that are valid or invalid. And if the guy who had them was an angel and they weren't valid, didn't matter. If the guy that had them was not an angel and they had it, didn't matter. | In other words, I felt that these are bearer instruments that are valid or invalid. And if the guy who had them was an angel and the instruments weren't valid, it didn't matter because the notes were invalid. If the guy that had them was not an angel and they were valid, didn't matter because the notes were valid. | Transcription Error; clarification |
|---|---|---|---|---|
| 127 | 6 | wasn't true. | wasn't true. Pavanelli did not have a Bandagro note on his computer that he was filling out. | Clarification |
| 154 | 4 | Bedell | Badell | Transcription Error |
| 154 | 13 | Bedell | Badell | Transcription Error |
| 159 -160 | 25-1 | Yeah. And my memory. Which is slightly different but probably wrong. | No. | Documents have been produced evidencing dates of trip |
| 163 | 12 | ….he took an interest in the notes. | he took a right to receive a distribution interest from the proceeds Skye received from the notes | Clarification |
| 183 | 14 | 12 | 12 and 8 of 12 | Transcription Error |
| 183 | 16 | of 12 | of 12 and 8 of 12 | Transcription Error |
| 245 | 24 | I'm pretty sure the answer to that is yes. | Yes | Clarification |
| 255 | 21 | Bedell, Yvonne Bedell... | Badell, Ivan Badell | Transcription Error (Note that change should be made throughout transcript) |
| 256 | 17 | Bedell | Badell | Transcription Error |
| 256 | 22 | Bedell | Badell | Transcription Error |
| 257 | 10 | Bedell | Badell | Transcription Error |
| 257 | 11 | Pretty sure, yes. In writing. | Yes. | Clarification; Documents have been produced evidencing dates of trip |

- 3 -

| | | | | |
|---|---|---|---|---|
| 262 | 11 | Bedell | Badell | Transcription Error |
| 270 | 17 | Chava Gato. Chava… | Csaba Kato. Csaba…. | Transcription Error |
| 270 | 23 | ….Chava Gato. | ….Csaba Kato. | Transcription Error |
| 271 | 2 | ….Chava was pretty close to Chavez | ….Csaba was pretty close to Chavez | Transcription Error |
| 276 | 25 | Well, it was Chava but I forget exactly | Well, it was Csaba but I forget exactly | Transcription Error |

2-16-2015
_____           /s/_____
Date                           David J. Richards, Deponent

- 3 -