IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRFP, LLC,                          :

          Plaintiff,                :

     v.                             :        Case No. 2:04-cv-793

The Republica Bolivariana de
Venezuela, et al.,                  :        JUDGE EDMUND A. SARGUS, JR.
                                             Magistrate Judge Kemp
          Defendants.               :


OPINION AND ORDER

     This 11-year-old dispute is set for trial on October 26,
2015.  Summary judgment motions are pending.  A number of
discovery-related motions have also been filed.  This order
addresses two motions to compel production of documents from
Plaintiff ("Skye") and from Gruppo Triad, the entity from which
Skye purchased the two bonds at issue in this case, as well as
its attorneys.  Advancing various theories, Venezuela contends
that the refusal of various entities to produce certain documents
on grounds of attorney-client or work product privilege are
legally insufficient because (1) those privileges do not apply;
(2) they have been waived; or (3) they have been overcome by
Venezuela's showing that the "crime-fraud exception" applies.
For the following reasons, the motions will be granted in part
and denied in part.

I.  The Crime-Fraud Exception

A.  Context

     As with most legal disputes, context matters.  Except here,
there are two wildly diverging descriptions of the context
against which Venezuela's primary argument - the crime-fraud
exception - is set.  The Court will set forth a brief version of

each, which would seem to foreshadow the positions each side will take in the trial on the merits.  These versions relate to Venezuela's first motion to compel (Doc. 462), which seeks otherwise privileged documents from either Gruppo Triad or its counsel, Crabbe, Brown, and Jones.

Venezuela's story: The major premises of Venezuela's version of the facts can be distilled to two assertions.  First, the Banco de Desarrolle Agropecuario ("Bandagro"), which was a real Venezuelan-owned bank, did not issue any notes on December 7, 1981; and second, James Pavanelli, Gruppo Triad's principal (who died in a fire several years ago) was a crook who consistently tried to defraud others, and then persuaded Skye to file a fraudulent lawsuit against Venezuela using forged Bandagro notes.

Venezuela spends the larger portion of its memorandum in support of the first motion to compel addressed in this Opinion and Order (Doc. 462) explaining how it reached these conclusions, and how the entire scheme purportedly fits together.  For current purposes, it suffices to say that Venezuela relies on Mr. Pavanelli's convictions in the United Kingdom and in Italy for Bandagro-related fraud, as well as other evidence, as the basis of an inference that he either forged all of the Bandagro notes which have been floating through foreign countries since about 1987, or arranged for their forgery; that he then attempted to use these forged notes to raise money from others; that he induced Skye's principal, David Richards, to loan him money based on a promised interest in the notes; that he eventually sold Skye the two notes in suit (notes 7/12 and 8/12, each in the face amount of $50 million) for just pennies on the dollar; and that, as part of his effort to both rope Skye into the plot through a sales agreement which obligated Skye to sue Venezuela on the notes, and to get Venezuela to pay, he bribed or attempted to bribe Venezuelan officials in order to have the Venezuelan

-2-

Ministry of Finance, and then the Venezuelan Attorney General, validate the notes.

The Alternative Story: Both Skye and Gruppo Triad disagree vehemently with Venezuela's narrative.  The two fundamental points they make are that (1) Bandagro did indeed issue notes (including notes 7/12 and 8/12) in 1981 (and Skye possesses the genuine original notes); and (2) Mr. Pavanelli was wrongfully convicted of Bandagro-related fraud based on perjured testimony from Venezuelan officials or on a total lack of evidence. According to this version of events, after the original notes were issued, Venezuela attempted to avoid payment through a number of methods, including, perhaps, creating forged notes itself and then having them declared forgeries in order to taint the actual notes.  Additional facts supporting this view of events include the fact that many members of the Venezuelan government were involved in the proceedings leading to the reports issued by the Ministry of Finance and the Attorney General validating these particular Bandagro notes; that the investigation was thorough and took Mr. Pavanelli's convictions into account; that the procedures through which Venezuela ultimately changed its mind about the validity of the notes were accomplished in violation of Venezuelan law and are nullities; and that Venezuela simply has many of the facts wrong or has distorted the record in order to support its conspiracy theory.

B.  The Involvement of Crabbe, Brown, and Jones

Obviously, the parties differ on whether any crime or fraud was committed (or, if one was, who perpetrated it).  Those differences cannot be resolved in the context of a motion to compel.  Legally, they need not be; a *prima facie* showing may be enough.  However, it may be more useful to focus on what role the law firm of Crabbe, Brown, and Jones ("CBJ") supposedly played in the scheme described in Venezuela's brief.  Both Skye and Gruppo

-3-

Triad have argued that even if Venezuela's version is given some facial credibility for purposes of ruling on the crime-fraud exception argument, there is no evidence to suggest that CBJ played a role in any crime or fraud, and therefore no basis to vitiate the privilege which attaches to the documents it has withheld.

These are the facts Venezuela alleges about CBJ's involvement, which neither Gruppo Triad nor Skye appear seriously to dispute.  Gruppo Triad retained CBJ in April, 2004.  There was a written retention agreement through which CBJ agreed to evaluate the notes and to prepare a legal opinion about the prospects of a successful collection action.  Two months later, Skye and Gruppo Triad executed an agreement by which two notes (but not the ones which make up the basis of this case) would be sold to Skye and Skye, using CBJ as counsel, would file suit. Luis Alcalde, then a CBJ attorney, sent a demand letter to Venezuela the next day requesting payment on notes 3/12 and 4/12. Skye had not, however, gotten the notes, and CBJ's efforts to obtain them from Mr. Pavanelli proved futile.  Consequently, CBJ stopped representing Gruppo Triad in July, 2004.

Shortly thereafter, the deal changed, and Skye purchased notes 7/12 and 8/12 instead.  Attorney Alcalde then wrote a revised demand letter to Venezuela.  Venezuela claims that this letter falsely stated that Skye was the bearer of the notes because it did not have them physically in its possession until several days later.  CBJ, acting on Skye's behalf, then filed this case on August 23, 2004.  Venezuela's statement of facts as to the crime-fraud exception argument makes no further mention of CBJ other than to note that in 2005, Mr. Pavanelli accused the firm of misconduct and threatened to report it to the bar association if it did not stop representing Skye and David Richards.  The docket reflects that CBJ continued to serve as

-4-

Skye's trial attorney until November 21, 2008, and that the firm is still listed as counsel of record for Skye.

It should be noted that CBJ did file a brief response to Venezuela's motion the day after it was filed. In it, CBJ characterizes Venezuela's claim that CBJ was somehow involved in Mr. Pavanelli's alleged criminal or fraudulent activities as "supported by nothing but speculation and conjecture...." Doc. 463, at 2. It further argues that there has been no showing that any of the 53 withheld documents were used to further any crime or fraud. However, it offered to permit an *in camera* inspection of the documents in order to demonstrate to the Court the correctness of its position. In its response, Skye argues that such a review would be improper because of the absence of any facts linking CBJ's activities to any crime or fraud.

Venezuela's reply brief does not add any facts to the analysis of CBJ's actions. Rather, it asserts that "Gruppo Triad ... was a vehicle through which the recidivist miscreant James Pavanelli conducted his illicit affairs" and, for that reason, it follows that "CBJ's communications with Pavanelli were in furtherance of Gruppo Triad's long-running crime or fraud." Doc. 516, at 3-4. Venezuela further argues that since "Gruppo Triad's only business is trying to monetize the bogus Bandagro notes," any communications it had with CBJ must have been in furtherance of a fraud. Id. at 3.

C. <u>Analysis</u>

The law in this area is not seriously disputed by the parties. The crime-fraud exception applies to communications between an attorney and client which are "intended in some way to facilitate or to actively conceal a crime or fraud." <u>Sutton v. Stevens Painton Corp.</u>, 193 Ohio App.3d 68, 96 (Cuyahoga Co. App. 2011). "A party invoking the crime-fraud exception must demonstrate that there is a factual basis for a showing of

-5-

probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance of the crime or fraud." State ex rel. Nix v. Cleveland, 83 Ohio St. 3d 379, 384 (1998). In Nix, the Ohio Supreme Court drew a dividing line between communications which *further* a fraud and those which merely relate to it, noting that "[t]he mere fact that communications may be related to a crime is insufficient to overcome the attorney-client privilege." Id. Communications which are intended to conceal, in an active way, a crime or fraud further the wrongful conduct, see Sutton, 193 Ohio App. 3d at 75, as do communications which facilitate a fraud, but communications defending against past conduct do not fall within the exception. Id. As that court noted, "a communication is not subject to disclosure merely because it contains relevant information that may help to prove that a crime or fraud occurred." Id. at 75-76. Finally, it does not matter whether the attorney had knowledge of the crime or fraud or intended to facilitate or conceal it; "[t]he pertinent intent is that of the client, not the attorney." In re Omnicom Group, Inc., Securities Litigation, 233 F.R.D. 400, 404 (S.D.N.Y. 2006).

Here, despite the vast differences in the parties' view of the world relating to Bandagro notes, the Court is satisfied that Venezuela has presented sufficient evidence of a fraudulent scheme to satisfy its burden of proof, which, as it notes, is not onerous. As that burden is described in United States v. Zolin, 491 U.S. 554, 572 (1989),

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person," Caldwell v. District Court, 644 P.2d 26, 33 (Colo. 1982), that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

A reasonable person could infer, from the evidence which
Venezuela has submitted (although the inference may not be as
strong as Venezuela suggests), that Gruppo Triad was involved in
some type of fraudulent scheme with respect to the notes in
question. Even disregarding Mr. Pavanelli's convictions, which
arguably may not establish much about the alleged fraudulent
nature of notes 7/12 and 8/12, and the evidence concerning the
1987 courier - which appears to relate to notes other than the
ones in suit - the fact that the government of Venezuela has made
a determination that these particular notes are forgeries, and
has sworn to that in other proceedings, creates enough of an
inference that there is something suspicious about them. The
circumstances under which Skye came into their possession are,
while perhaps explainable, unusual. The Court need not choose
between these competing storylines; it is enough that someone
could reasonably buy into Venezuela's version. And Venezuela is
right - if that version is credible, then everything about Gruppo
Triad's efforts to get someone else to present the bonds for
payment and to file suit while promising to pay some of the
proceeds of the suit to Gruppo Triad was done to further a
fraudulent scheme to obtain payment on notes which are not
genuine obligations of the Venezuelan government. That finding
is sufficient to justify an *in camera* review to determine if the
communications in question fall within the crime-fraud exception,
and the Court will direct that they be submitted for that
purpose. Because that review may moot the issue, raised in Doc.
462, of whether disclosure of some CBJ communications resulted in
a waiver of the privilege as to others, the Court makes no ruling
on that issue in this Opinion and Order.

III. <u>The Second Motion to Compel</u>

A. <u>Opinions about the Validity of the Notes</u>

In its second motion to compel (Doc. 521), which is directed

-7-

toward Skye, Venezuela argues that it is entitled to two separate sets of documents plus some miscellaneous documents that have not been produced. The first distinct set consists of "all attorney notes, legal memoranda, communications, and opinions generated for or furnished to Skye in connection with its investigation and purchase of the purported notes from the criminal enterprise known as Gruppo Triad." Doc. 521, at 5. The basis of Venezuela's argument that it is entitled to these documents is that Skye, by raising an affirmative claim of equitable estoppel (which is based on the Ministry of Finance and Attorney General opinions deeming the notes to be valid obligations), and then supporting that claim by arguing that it reasonably relied on those opinions because counsel had validated them, has waived the attorney-client privilege not only as to the opinions it has disclosed, but as to any other related communications.

In its supporting memorandum, Venezuela points out that, in its summary judgment motion on this issue, Skye has argued not only that it made its decision to purchase the notes based on the October, 2003 Attorney General Opinion - which is the basis of its claim that Venezuela is estopped from denying the validity of the notes - but that its reliance on that opinion was reasonable. As support for that latter contention, Skye cites to legal opinions issued by Roman Jose Duque Corredor and Ivan Dario Badell Gonzalez. According to Skye, both of these opinions have been disclosed in this litigation, and it does not appear that the motion to compel is primarily directed to communications with or notes prepared by these attorneys.

Venezuela's motion, rather, is seeking all of Skye's otherwise privileged communications with CBJ. Although Skye's summary judgment motion makes no mention of any opinions from that firm in connection with its "reasonable reliance" argument, David Richards apparently testified at his deposition that he

-8-

also relied on an opinion from Luis Alcalde to the same effect,
*i.e.* that the Attorney General Opinion was final, valid, and
binding. This testimony, according to Venezuela, "opened the
door" to discovery of any communications between Skye and CBJ
which had anything to do with the validity of the notes, and not
just the effect of the Attorney General Opinion, but any other
factors which related to the validity or collectability of the
notes.

In response, Skye appears to expand the number of legal
opinions supporting its "reasonable reliance" argument, citing
not only to the opinions referred to in its summary judgment
motion but to opinions from two of Gruppo Triad's attorneys,
Miguel Jacir and Siro Schianchi, which it has also produced to
Venezuela. But it argues that, while it clearly received
privileged opinions from CBJ about various topics related to the
notes, "Skye is not using these legal opinions to justify the
reasonableness of its reliance on the Ministry of Finance's
report and Attorney General's decision." Memorandum in
Opposition, Doc. 530, at 4. Additionally, it draws a distinction
between opinions concerning the final and binding nature of
Venezuela's position about the validity of the notes - which is
what all four of the opinions it relies upon address - and other
issues relating to its investigation and purchase of the notes,
which, it contends, it has not placed at issue. Finally, it
notes that none of the four opinions which it has disclosed and
claims to have relied upon came from its own attorneys, so such
disclosures could not have waived any privilege Skye enjoyed with
its own counsel.

In its reply memorandum (Doc. 537), which, incidentally, is
much longer than its initial memorandum in support of the motion,
Venezuela disputes that a distinction can be made between
opinions about the final and binding nature of the Attorney

-9-

General's opinion and opinions about other issues relating to the validity of the notes. It also argues that, in any event, the opinions which Skye has produced address those issues as well. Venezuela also contends that the Corredor opinion has not actually been produced, and that Skye may have received yet another legal opinion, perhaps from Baker & Hostetler, which it also refuses to produce.

There is no question that "a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation." Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994). But the clear prerequisite for that type of waiver is reliance on advice from the party's own attorney – that is, from an attorney with whom the party enjoys an attorney-client relationship. As the Rhone-Poulenc court explained, "[t]he advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." Id. (emphasis supplied). Further, no waiver occurs if the party from whom privileged communications are sought "has not used attorney-client communications to prove" the claim at issue. Sorensen v. Black & Decker Corp., 2007 WL 1976652, *2 (S.D. Cal. April 9, 2007).

Based on the statements made in its motion for summary judgment and in the response to the motion to compel, it does not appear that Skye is using any opinions it received from CBJ (or any other attorneys it retained) to prove the "reasonable reliance" element of its equitable estoppel claim. The four opinions it cites come from attorneys with whom it had no attorney-client relationship. The Court is aware of no legal basis for an argument that when a party supports a claim by asserting it relied on opinions of counsel other than its own

-10-

*attorneys*, it somehow has waived the attorney-client privilege with respect to the opinions of its own counsel, even if those opinions cover the same subject matter.  After all, the type of waiver which occurs when reliance on advice of counsel is put in issue is an implied waiver.  Under the implied waiver doctrine, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."  In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000).  Here, Skye has not done that; it has not affirmatively relied on any privileged communications to support its equitable estoppel claim, so it cannot be compelled to reveal such communications on the theory that an implied waiver has occurred.

Venezuela argues that Skye has "concede[d] that it must produce all of the opinions it received on the 'final and binding' issue," yet it refuses to do just that. Doc. 537, at 3. As direct support for its argument, it then refers to David Richards' testimony that he relied on Luis Alcalde's opinion on that subject.  It is clear that Skye's memorandum does not make the concession which Venezuela attributes to it; the pages from that memorandum cited by Venezuela simply state that Skye must produce those opinions which it will rely upon *in this case* to support its claim of reasonable reliance.  But Venezuela's reference to David Richards' testimony raises a different waiver issue, which is whether Mr. Richards' testimony about the Alcalde opinion is the type of voluntary disclosure of an attorney-client communication which constitutes a direct, rather than implied, waiver of the privilege.  See, e.g., Cooey v. Strickland, 269 F.R.D. 643, 652 (S.D. Ohio 2010)("Voluntary disclosure of communications made with one's attorney to a third party generally waives the attorney-client privilege").  Under that

-11-

theory, it does not matter whether Skye raised a claim which has, as an element, reliance on advice of counsel; what matters is whether Mr. Richards, through his testimony, voluntarily disclosed a privileged communication, and, if he did, how broadly he waived the attorney-client privilege by doing so.

Again, the Court stresses that whether Mr. Richards' deposition testimony that he relied on Mr. Alcalde's opinion in deciding to purchase the notes, and the scope of the implied waiver which allegedly attaches to the "reasonable reliance" claim, are separate issues because Skye, as a litigant, is not using Mr. Alcalde's opinion as the basis for its reliance argument. As to the issue of whether Mr. Richards waived any privilege by disclosing, in general terms, what the subject of CBJ's representation of Skye consisted of, the Court notes that there is a significant difference between disclosing why an attorney was consulted and disclosing the actual communications with the attorney. The former is not privileged, and making that disclosure is not a waiver of the privilege. See, e.g., New Jersey v. Sprint Corp., 258 F.R.D. 421, 426 (D. Kan. 2009)("[r]evealing the general topic of discussion between an attorney and client does not waive the privilege, unless the revelation also reveals the substance of a protected communication"). Moreover, "[c]ourts have consistently held that the general subject matters of clients' representations are not privileged. See, e.g., In re Grand Jury Subpoena, 204 F.3d 516, 520 (4th Cir. 2000). Nor does the general purpose of a client's representation necessarily divulge a confidential professional communication, and therefore that data is not generally privileged." United States v. Legal Services for New York City, 249 F.3d 1077, 1081 (C.A.D.C. 2001).

Here, the Court finds that Skye has not relied on privileged communications with CBJ (or any other attorneys it separately

retained) in order to support its equitable estoppel claim, and there is therefore no implied waiver of the attorney-client privilege as it relates to those communications. It also finds that Mr. Richards' testimony has none of the earmarks of a "selective disclosure" of privileged communications - that is, Skye is not attempting to use only the favorable part of any opinion rendered by Mr. Alcalde as a sword while shielding the rest of his opinions from disclosure - and that his testimony did no more than to describe the subject about which he consulted with Mr. Alcalde, and not the details of any communications between Skye and CBJ on that subject. For these reasons, the motion to compel production of CBJ opinions, drafts, and notes will be denied, although if Skye has not (as Venezuela claims) produced the entire Corredor opinion on which it does rely, it should do so promptly.

B. Disclosure of Documents to Sitrick

The second issue which Venezuela raises in its second motion to compel deals with documents which Skye shared with a public relations firm, Sitrick and Company. Skye apparently engaged Sitrick at or about the time it filed this case. By way of background, Venezuela served a subpoena on Sitrick, and while Sitrick did produce some documents, it also provided a privilege log indicating that it was withholding over 200 documents on either attorney-client or work product grounds. The privileges asserted belong either to Skye alone, or Skye and Sitrick. Venezuela asserts that any documents shared between Skye and its public relations firm lost their privileged nature because that sharing constitutes disclosure to a third party. In response, Skye argues that all of its communications with Sitrick are protected by the work product doctrine because those communications were made in anticipation of litigation. It also asserts that it was entitled to share work product with Sitrick

-13-

because, unlike disclosures of attorney-client communications to
third parties, disclosure of work product is a waiver of that
protection only when the disclosure is made to an adverse party.
Finally, it asserts that the Court cannot properly rule on
whether Sitrick properly asserted its own privilege with respect
to the documents at issue because Venezuela has not moved to
compel compliance with the subpoena and Sitrick is not a party to
this motion.  That contention is correct; the Court will
therefore address only Skye's arguments about whether, as it
asserts, everything it shared with Sitrick is entitled to work
product protection.

    This issue, while potentially a complex one, has an easy
answer based on the state of the record.  Venezuela has
challenged the designation of various documents as Skye's work
product.  Skye, while claiming both that the documents themselves
are work product and that it shared them with Sitrick in
anticipation of litigation, has not supported its claims with any
evidence.  "Once the party requesting discovery establishes
relevance, the objecting party has the burden of showing that the
material was 'prepared in anticipation of litigation or for
trial.'"  In re Powerhouse Licensing, LLC, 441 F.3d 467, 473 (6th
Cir. 2006), quoting Toledo Edison Co. v. G A Technologies, Inc.,
Torrey Pines Technology Div., 847 F.2d 335, 339 (6th Cir. 1988).
In United States v. Roxworthy, 487 F.3d 590, 597 (6th Cir. 2006),
the Court of Appeals observed that "[w]e have stated that a party
may satisfy its burden of showing anticipation of litigation 'in
any of the traditional ways in which proof is produced in
pretrial proceedings such as affidavits made on personal
knowledge, depositions, or answers to interrogatories,' and that
the showing 'can be opposed or controverted in the same manner,'"
quoting Toledo Edison, 847 F.2d at 339.

    Skye has neither argued that the documents in question are

-14-

not relevant nor produced any competent proof to sustain its claim of work product protection. As the Court of Appeals has said about another party who made that type of response to a motion to compel, "[b]ecause Quickway failed to carry its burden of demonstrating that Dailey's written statement was prepared in anticipation of litigation, the district court did not abuse its discretion in rejecting Quickway's claim that this document was protected by the work-product privilege." <u>Biegas v. Quickway Carriers, Inc.</u>, 573 F.3d 365, 382 (6th Cir. 2009). Given the current record, the Court has no basis upon which to find that the claim of work product is factually supportable, and it must therefore order these documents to be produced.

### C. Other Documents

Venezuela has identified three other categories of documents which it claims have been withheld improperly. They are (1) documents regarding Libra and Jess Ravich; (2) documents showing that Skye also owns Bandagro note 9/12, and documents relating to the purchase of that note from Gruppo Triad; and (3) agreements between Skye and its investors contained in a binder identified by David Richards in his deposition. The Court will provide a brief background about each.

According to Skye's memorandum in opposition (Venezuela's supporting memorandum does not provide any detail about any of these categories of documents apart from noting that they were identified in David Richards' deposition and that they should have been produced), Libra Securities and its founder, Jess Ravich, expressed interest in buying Bandagro note 9/12 in 2004. Skye has produced documents relating to that matter. The issue came up again in 2006. Venezuela subpoenaed those documents, and Skye claimed privilege as to some of them. It appears to believe that the only relevance of its communications with Ravich is that they may show how much Skye paid Gruppo Triad, and points out

-15-

that such documents have already been produced.

As to ownership of note 9/12, Skye admits that it is the owner of that note and that it purchased the note from Gruppo Triad.  Its position is that further documents concerning its ownership are both irrelevant to any issue in this case, and unnecessary to the extent that Venezuela's purpose in asking for these documents was to establish who currently owns that note.

Finally, as to the binder, Skye claims that its "investor records, including stock certificates or other documents ... have no relevance to any claim or defense in this case" and that "Venezuela's efforts to pry into Skye's relationship with its investors is simply harassment."  Doc. 530, at 13.

Venezuela's substantive arguments as to these three categories of documents are found in its reply.  As to the Ravich and Libra documents, after discussing why these documents are not privileged or protected work product, Venezuela says only that "the Court should compel Skye to produce all documents in Skye's possession, custody, or control concerning communications and agreements with Ravich and Libra."  Doc. 537, at 19.  Given that Skye has raised a relevance issue which Venezuela never addresses, the Court finds no basis for compelling production of these documents.

Second, as to documents relating to note 9/12, Venezuela contends that Skye has not only provided no basis for not producing such documents, but has admitted that there is a purchase agreement between it and Gruppo Triad for this note which it never produced.  Again, Venezuela does not address the relevance of this information, simply contending that Skye must produce that agreement and related communications.  Without some indication of the relevance of such documents to this case, the Court disagrees.

Finally, as to the investor binders, Venezuela concedes that

-16-

the Court's Opinion and Order of November 14, 2014 (Doc. 403) addresses some parts of the question.  There, the Court held that Venezuela had not explained how communications between Skye and its investors about the potential benefits to be derived from this case related to the question of whether Skye is a holder in due course.  The Court left open the possibility that, based on the content of such communications, they might be relevant to other issues.  Venezuela asserts in its reply that it is not seeking such communications, but rather the agreements between Skye and its investors.  It argues that they are relevant for several reasons: some investors may also be witnesses; some may be providing "support services" for the litigation; and some may have relevant documents not available from Gruppo Triad or Skye. Additionally, Venezuela asserts that the terms and conditions under which the investors made their investments might undermine Skye's reasonable reliance claim.

If any Skye investor will be a witness in the case, that person's interest in the litigation is an appropriate subject for discovery.  However, Venezuela has made no showing that any witness is also an investor, and because it raises this and other substantive arguments for the first time in its reply, the Court cannot grant its motion on that basis.  The Court sees no relationship between the fact that an investor who is not a witness is providing "support services" for the litigation and the terms under which that person made an investment.  Certainly, there is no credibility issue there.  Additionally, it is pure speculation that an investor might have possession of documents which neither Skye nor Gruppo Triad has, and there is no evidence to support even an inference that this is so.  That leaves only the argument about whether the terms of any investment contracts might undermine Skye's argument that it reasonably relied on Venezuela's Ministry of Finance and Attorney General Opinions

-17-

when purchasing the notes.

That, too, is speculative.  Apart from the fact that Skye had no opportunity to respond to this argument, the Court does not know if these agreements were entered into before or after Skye made its purchase of the notes.  Further, it is not intuitively obvious that such agreements would, in addition to setting the financial terms of the investment, contain information that would undercut Skye's reliance claim.  Assuming, however, that Venezuela has actually requested these documents through a properly-served Rule 34 request (which, again, is not apparent from the record), Skye's counsel should review them to determine if any of the terms could reasonably be viewed as relevant to the issue of reasonable reliance.  If so, such portions of the agreements should be produced.

## IV.  Order

Based on the foregoing, the Court grants in part and denies in part Venezuela's two motions (Docs. 462 and 521).  Any documents to be produced pursuant to this order shall be provided within fourteen days, including the documents to be provided to the Court for *in camera* inspection.

## V.  Motion to Reconsider

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a).  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

-18-

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.


/s/ Terence P. Kemp
United States Magistrate Judge