UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DRFP L.L.C., d/b/a SKYE VENTURES,

                Plaintiff,

       v.

REPÚBLICA BOLIVARIANA
DE VENEZUELA, *et al.*,

             Defendants.

Case No. 2:04-cv-0793
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court for consideration of the parties' cross-motions for summary judgment. This is an action for payment on a pair of promissory notes. For the reasons stated below, Defendants the Republic of Venezuela and the Venezuelan Ministry of Finance's (collectively, "Venezuela") Motion for Summary Judgment Based on the Statute of Limitations (ECF No. 359) is **DENIED**. Plaintiff's Motion for Summary Judgment (ECF No. 409) is also **DENIED**. Defendants' Motion for Summary Judgment that Plaintiff is Not a Holder in Due Course (ECF No. 413) is **DENIED**. Additionally, Plaintiff's Motion to File Sur-Reply in Opposition to Defendants' Motion for Summary Judgment that Plaintiff is Not a Holder in Due Course (ECF No. 459) is **DENIED without prejudice**.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to

support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment.  Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other

motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.*), 757 F.2d 698, 705 (5th Cir.1985)). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## II. BACKGROUND

The facts of this case are copious and complex. A summary of the relevant background information is as follows. As required, the Court has construed the facts in the light most favorable to the nonmoving party and makes a finding in the absence of resolving any factual disputes.

### A. The parties and the Promissory Notes

Plaintiff DRFP L.L.C., d/b/a Skye Ventures ("Skye"), an Ohio corporation, entered into an agreement (the "Purchase Agreement"), dated April 8, 2004, with Panamanian entity Gruppo Triad-FCC SPA ("Gruppo Triad"). (ECF No. 358-1.) Skye is a special purpose entity that was formed in August 2003. (ECF No. 258-2 ¶¶ 12-13.) Gruppo Triad is a collection of companies controlled and managed by President and CEO, Mr. James Paolo Pavanelli ("Pavanelli"). (ECF No. 358-1.)

Pursuant to the Purchase Agreement, Skye obtained two Promissory Notes (the "Notes") with face values of $50 million each to the bearer. (ECF Nos. 360-1, 360-2.) The Notes were purportedly issued[1] by a Venezuelan Bank, entitled Banco de Desarollo Agropecuario ("Bandagro"), to Gruppo Triad on December 7, 1981, with a 10-year maturation date, coming due on December 8, 1991. (Id.) Each note is identified as part of the series ICC-322. The first Note is identified as Note No. 7/12. (ECF No. 360-1.) The second Note is identified as Note No. 8/12. (ECF No. 360-2.) The Notes contain signatories on behalf of the borrower and represent that "all engagement of BANDAGRO have the explicit backing of the National Government of the Republic of Venezuela according to" a November 5, 1981 letter from the Minister of Finance. (ECF Nos. 360-1, 360-2.) Before the Notes matured, Defendant Venezuela took over the bank.

**Gruppo Triad Efforts to Collect on the Notes**

In 1987, Gruppo Triad retained Venezuelan businessman Jose Nicolas Tovar ("Tovar") to serve as its representative for the purposes of collecting payment on the Notes. (See ECF No. 415-22 ¶ 4.) Tovar continued to serve as Gruppo Triad's representative at various times between 1987 and 2010. (Id.) Tovar informed Pavanelli that he was "capable of investigating the origin of the Gruppo Triad Bandagro Notes, and that if they were legitimate instruments, [he] would seek payment from the Government of Venezuela . . . ." (Id. at ¶ 5.) Tovar proceeded to take various steps to confirm the authenticity of the Notes at issue in this case and others held by Gruppo Triad (collectively, the "Gruppo Triad Bandagro Notes"). To that end, Tovar wrote to Venezuela Ministry of Finance[2] officials in 1991 requesting, among other things, verification that Bandagro had issued ICC-322 promissory notes. (Id. at ¶ 12, Ex. D.) Tovar received a letter

---

[1] Venezuela disputes that the Notes were issued by Bandagro, maintaining instead that the documents sold by Gruppo Triad to Skye are forgeries.

[2] "Ministerio de Hacienda."

in response confirming that the Ministry of Finance's files contained records of Badagro's issuance of promissory notes in the ICC-322 series, including specific records of other Gruppo Triad Bandagro Notes.  Tovar did not specifically request or receive verification of Notes 7/12 and 8/12 at that time.  (*Id.* at ¶¶ 13-14, Ex. F.)  Tovar subsequently requested a judicial inspection of the files and records of the Ministry of Finance to confirm the existence of his correspondence.  The result of the inspection confirmed records of his correspondence.  (*Id.* at ¶ 15.)  Tovar also met in person with Venezuela's then-Minister of Finance, Bobby Pocaterra ("Pocaterra") who confirmed the issuance of Bandagro promissory notes in the ICC-322 series. (*Id.* at ¶ 16.)  Pocaterra told Tovar that he was concerned about Venezuela's ability to pay the ICC-322 promissory notes issued by Bandragro, and that the debts would likely have to be extended.  (*Id.* at ¶ 17.)

Political turmoil following an attempted cou d'etat in Venezuela on February 4, 1992 complicated Tovar's efforts to seek payment of the Notes.  (*Id.* at ¶ 18.)  Tovar states that he "was informed that the Republic of Venezuela would be able to pay the Gruppo Triad Bandagro Notes in approximately five years."  (*Id.* at ¶ 19.)  He further states that Pavanelli, on behalf of Gruppo Triad, "did not oppose, but rather assented to, the Republic of Venezuela's extension." (*Id.*)

At that point, Pavanelli requested that Tovar attempt to sell some of the Gruppo Triad Bandagro Notes.  In furtherance of this goal, Tovar traveled to Lugano, Switzerland to meet with a bank named Credito Subalpino regarding the sale of one or all of the Gruppo Triad Bandagro Notes.  (*Id.* at ¶ 20-21.)  In conducting diligence towards verification of the Gruppo Triad Bandagro Notes, the then-manager of Credito Subalpino, Luigi Plinio Piffaretti ("Piffaretti"), inquired to and received correspondence from Bandagro and Venezuela.  (ECF No. 415-36 ¶¶

10-16.) Specifically, in July 2013, Piffaretti received a letter confirming the existence of ICC-322 promissory notes issued by Bandagro and, in August 2013, a telex stating that the maturity date on said notes had been extended to December 8, 1996. (*Id.* at ¶¶ 16-25, Exs. B, C, D.)

In late 1995 or early 1996, Pavanelli again requested Tovar's assistance with obtaining payment on the Gruppo Triad Bandagro Notes from Venezuela. (ECF No. 415-22 ¶ 23.) At that time, Bandagro was in the process of liquidation and restructuring its debts. (ECF Nos. 415-36 ¶ 18, Ex. B; 415-22 ¶ 24(a).) Tovar contacted the Venezuelan Ministry of Finance regarding the maturity date and received a letter in response from Victor Urgelles ("Urgelles"), dated May 13, 1996 (the "Urgelles Letter"). (ECF No. 415-22 ¶ 24(a), Ex. H.) The letter states that the Republic of Venezuela has extended[3] the maturity date on ICC-322 promissory notes issued by Bandagro. (*Id.*) The letter confirms Venezuela's repurchase obligation of the promissory notes and concludes "the amount to be paid as of the new maturity date, i.e. DECEMBER 8, 1999, is being calculated." (*Id.*)

Following receipt of the Urgelles Letter, Tovar had a conversation with Pavanelli, in which the latter indicated "if Venezuela officially recognized the Gruppo Triad Bandagro Notes and that the notes would be paid on December 8, 1999, [Tovar] was to assent to the extension and not dispute it." (*Id.* at ¶ 24(c).) Tovar states that he thereafter "personally asked the Ministry of Finance to provide such confirmation" and received in response a certified copy of a document entitled "Acknowledgement of External Debt," dated September 13, 1996 (the "Acknowledgement of External Debt"). (*Id.* at ¶ 24(d), Ex. I.) The Acknowledgment of External Debt explicitly states "we owe and will pay" Bandagro's ICC-322 series promissory

---

[3] The original Spanish text of the letter is "A tales fines, el Ministerio de Hacienda *ha considerado* extender el plazo de vencimiento por ocho (8) anos mas…." (ECF No. 415-22, Ex. H (emphasis added).) Venezuela maintains the literal translation is: "For these purposes, the Ministry of Finance *has considered* extending the maturity term by an additional eight (8) years…." (ECF No. 360-10.) Skye maintains an alternate translation is "To this end, the Ministry of Finance *has decided* to extend the maturity for eight (8) years more…."

notes with serial numbers ranging from 1/12 to 12/12 "to their legal holders on December 8th, 1999….." (*Id.* at Ex. I.) It is signed by the General Sector Director of Public Finance at the Ministry of Finance. (*Id.*) Tovar authenticated the documents by legalizing the Urgelles Letter[4], and confirming the Acknowledgement of External Debt with an official from Venezuala's Fund for Social Protection of Bank Deposits, the government entity with supervisory authority over Bandagro, which was no longer in operation. (*Id.* at ¶¶ 24(b), (f).)

In the early 2000s, Gruppo Triad tasked Venezuelan attorney Miguel Jacir ("Jacir") with pursuing collection of the Gruppo Triad Bandagro Notes. (ECF Nos. 559-32, at 63:25-64:12; 415-22 ¶ 27.) Jacir then wrote to the President of Venezuela regarding payment. The President's secretary instructed the Venezuelan Minister of Finance to review Jacir's letter and the claim for payment. (ECF No. 559-32, at 63:25-64:12, 68:9-22.)

**Ministry of Finance Action on the Notes**

The Ministry of Finance assigned the investigation into the claim for payment to Oscar Guzman Cova ("Guzman"), its legal counsel. (*See* ECF No. 415-43 ¶ 18.) On August 8, 2003, Guzman issued a report (ECF No. 415-45; the "August 2003 Ministry of Finance Report"), which supported Gruppo Triad's claim for payment. The August 2003 Ministry of Finance Report was given to the Venezuelan Attorney General for review. On October 3, 2003, the Venezuelan Attorney General issued an opinion favoring the claims for payment on the Gruppo Triad Bandagro Notes. (ECF No. 415-50; the "October 2003 Attorney General Report".) At this point, the parties' versions of the facts sharply diverge.

Skye maintains that Venezuela's National Assembly formed a commission in response to the October 2003 Attorney General Report. (ECF No. 443-11 ¶ 21.) According to Skye, not long thereafter, the Ministry of Finance came under political pressure to change its report. The

_____

[4] This is a process in which an official from the Ministry of Foreign Affairs certifies that the letter is legitimate.

Attorney General, however, refused to change her conclusion on the validity of the Gruppo Triad Bandagro Notes. (*Id*.) Skye learned of this legal opinion sometime in mid-to late-October 2003. (*Id*. ¶ 8; *see also* ECF No. 417-9.) During the first half of 2004, Skye conducted diligence on the Gruppo Triad Bandagro Notes. As part of its due diligence, Skye solicited legal opinions from Venezuelan attorneys, which indicated that the October 2003 Attorney General Report was final and binding under Venezuelan law. (*Id*. ¶ 22.)

Venezuela asserts that shortly after the October 2003 Attorney General Report, Ministry officials alerted the Attorney General that the evidentiary record on which the report relied was incomplete or fraudulent. (ECF No. 555-40.) The Ministry of Finance reviewed the evidence and ordered a new report prepared as to the validity of Gruppo Triad's claim. (*Id*. ¶ 5.) On November 3, 2003, the Minister of Finance removed Guzman by accepting his resignation. (ECF No. 555-32, at VZ034986.) On November 17, 2003, the Ministry of Finance provided the Attorney General with the new report (the "November 2003 Report"), concluding that the Gruppo Triad Bandagro Notes were counterfeit. (ECF No. 555-41.) On December 8, 2003, the Attorney General revoked the October 2003 Attorney General Report and recommended that the Ministry of Finance not accept the Gruppo Triad Bandagro Notes for payment (the "December 2003 Report"). (ECF No. 555-46.) The December 2003 Report stated that the October 2003 Attorney General Report relied on fraudulent documents and was neither binding nor conferred any rights on private persons. (*Id*.) Venezuela maintains that both the November and December 2003 Reports received significant news coverage. Venezuela also maintains that Jacir told Gruppo Triad and Skye representatives about the November 2003 Report, prior to Skye's purchase of the Notes. (ECF No. 559-32, 277:5-20.) Skye vehemently denies any knowledge of

the November and December 2003 Reports prior to purchasing the Notes. In mid-2004, Skye

purchased the Notes and subsequently brought this action to compel payment.

**The Instant Lawsuit**

The procedural history of this case is long and not relevant to the motions at issue. Skye

filed suit for payment on the Notes against Venezuela on August 23, 2004. (ECF No. 1.)

### III. STATUTE OF LIMITATIONS

Venezuela argues that the statute of limitations has run on Skye's claim for payment of

the Notes. Skye makes the following five arguments in response: First, the date of maturation on

the Notes was extended to 1999. Second, if the date of maturation of the Notes was not extended

to 1999, the applicable statute of limitations under Ohio law is fifteen years, rather than six.

Third, the statute of limitations was renewed by Venezuela acknowledging the debt. Fourth, and

fifth, estoppel and waiver prevent Venezuela from availing itself of a statute of limitations

defense. The Court addresses each argument *ad seriatum* below.

**A. The Applicable Law**

"[I]n FSIA cases, [the Court] use[s] the forum state's choice of law rules to resolve all

issues, except jurisdictional ones." *O'Bryan v. Holy See,* 556 F.3d 361, 381 (6th Cir. 2009)

(internal quotations omitted). Under Ohio law, "if two jurisdictions apply the same law, or

would reach the same result applying their respective laws, a choice of law determination is

unnecessary because there is no conflict, and the laws of the forum state apply." *Wendy's Intern.,*

*Inc. v. Illinois Union Insur. Co.,* No. 2:05-cv-803, 2007 WL 710242, at *5 (S.D. Ohio Mar. 6,

2007); *see also Glidden Co. v. Lumbermens Mut. Cas. Co.,* 112 Ohio St. 3d 470, 474-75 (Ohio

2006) (holding that "an actual conflict between Ohio law and the law of another jurisdiction must

exist for a choice-of-law analysis to be undertaken"). Moreover, the party seeking application of

9

foreign law "bears the burden of showing that the foreign law is different from the local law: [w]here the party seeking application of the law of a foreign jurisdiction fails to demonstrate a conflict between local law and the law of that jurisdiction, local law ... governs." *Wendy's Intern.,* 2007 WL 710242, at *5 (internal quotations omitted); *see also Asp v. Toshiba Am. Consumer Prods., LLC,* 616 F. Supp.2d 721, 726 (S.D. Ohio 2008) ("When parties acquiesce to the application of a particular state's law, courts need not address choice of law questions.").

It is true that the limitations periods under Swiss and Venezuelan laws are potentially shorter than that under Ohio law. The Court has previously determined that Ohio's statute of limitations applies to Skye's claim and it declines to find differently now.

> The Ohio Supreme Court has formally adopted the 1971 version of the Restatement as the governing law for conflict issues. *Frisch v. Nationwide Mut. Ins. Co.*, No. 2:12-cv-415, 2012 WL 5595207, at *9 (S.D. Ohio Nov. 15, 2012). Under this standard, [w]hen there is a conflict between two states' statute of limitations, the Restatement provides that [a]n action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state.' *Matrix Acquisitions, LLC v. Hooks*, No. 10CA1112, 2011 WL 2464183, at *2 (Ohio Ct. App. June 15, 2011)).

ECF No. 298, pp. 34-35. While the Court finds that the law is clear as to the application of the Ohio statute of limitations, it is also necessary to resolve whether an extension took place after the maturity date of the Notes. This requires application of substantive contract law. The Court again notes that neither party has taken the position that the substantive contract law of another jurisdiction should apply, and, therefore, also applies Ohio law to the question of maturity date extension. *See Asp*, 616 F. Supp. 2d at 726.

## B. Maturity Date Extension

Venezuela first argues that, as a matter of law, the maturity date on the Notes could not be "unilaterally extended" by one party absent the other's consent.

"There is no support in Ohio case law for the argument that an extension of the time for repayment of a note after the note has matured and the debtor has defaulted on the loan is a material alteration of the terms of the note." *Schachner v. B Bar B, Inc.*, Court of Appeals No. L-94-176, 1995 WL 527927, at *3 (Ohio Ct. App. Sept. 8, 1995); *see also Fed. Deposit Ins. Corp. v. Galloway*, 856 F.2d 112, 117 (10th Cir. 1988) ("Acknowledgment or part payment of the debt does not constitute a new agreement. It only suspends the running of the statute of limitations against the party making such acknowledgment or partial payment.") (quoting *FDIC v. Peterson*, 770 F.2d 141, 143 (10th Cir. 1985)). Rather, in order for payment of a note to have been extended, "there must exist the same elements essential to the execution of a contract, i.e., adequate consideration and mutual consent." *Matter of Whitehead*, 31 B.R. 381, 384 (Bankr. S.D. Ohio 1983). "The agreement for extension must be for a definite time and must mutually bind the parties, payor and payee, the one to forbear suit during the time of extension and the other the right to pay the debt before the end of that time." *Id.*

As an initial matter, the cases cited by Venezuela in support of its unilateral argument hold that the lender may not unilaterally extend the life of a loan without a borrower's knowledge or consent. *See e.g. Matter of Whitehead*, 31 B.R. at 383-84; *In re Keenan*, 53 B.R. 913, 917 (Bankr. D. Conn. 1985). In particular, where the borrower has not sought the specific extension at issue—even where the borrower may have sought an extension for a different amount of time—courts have found a lack of the requisite agreement and consideration from the borrower. *Id.* These cases, however, do not address a situation where the borrower allegedly sought and later memorialized the extension. In any case, irrespective of which party initiates or requests an extension, mutual agreement and consideration are always required. The cases cited by Venezuela are, in other words, cases in which no meeting of the minds occurred with respect

11

to an extension, evidenced, in part, by the fact that the borrower did not request the alleged extension.

As Venezuela correctly asserts, there is no written memorialization of the extension on the record prior to the original 1991 maturity date. A memorialization in writing need not take place at the precise moment of the original maturation date of the note. Here, Skye asserts that an oral agreement was made to extend the maturation, later reinforced by several writings, albeit none signed by both parties.

"'The general rule is that a written contract may be orally amended if the oral amendment has the essential elements of a binding contract.'" *Ayad v. Radio One, Inc.*, No. 88031, 2007 WL 1501748, at *3 (Ohio Ct. App. May 24, 2007) (quoting *Carrocce v. Shaffer*, No. 96-T-5521, 1997 WL 703371, at *4 (Ohio Ct. App. Oct. 31, 1997) (citing *Richland Builders, Inc. v. Thome*, 88 Ohio App. 520, 527 (Ohio Ct. App. 1950)). The necessary elements of a valid contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object of consideration. *Id.* at 23, citing *Kostelnik v. Helper,* 96 Ohio St. 3d 1, 770 N.E.2d 58, 2002-Ohio-2985, at-16. In other words, it is imperative that there was a "meeting of the minds" as to the essential terms of the agreement. *Id.* Circling back to the "unilateral extension" point, this requirement, that an oral agreement contain all of the key elements of a binding contract, comports with the Ohio Revised Code and the Uniform Commercial Code, which allow for a lender to extend payment on negotiable instruments,[5] provided the extension is to a "further definite time." O.R.C. § 1303.07(B)(4); *accord* U.C.C. § 3-108(c).

Both consideration and a meeting of the minds are, therefore, essential for an extension to have been formed. Venezuela argues that no consideration was given from Skye in exchange for

---

[5] A promissory note is a negotiable instrument within the Ohio Revised Code. O.R.C. § 1303.03.

the extension. Skye responds that forbearance from bringing suit on the notes served as consideration for the alleged extensions. Under Ohio law, a promise to forbear may constitute sufficient consideration. *See Kidd v. Kidd*, No. 06CA119, 2007 WL 2206859, at *2 (Ohio Ct. App. Aug. 2, 2007) (*quoting Forester v. Scott*, 38 Ohio App. 2d 15, 17 (Ohio Ct. App. 1973)). However, nothing in the record here demonstrates that the lender made such a promise. Skye asserts that Pavanelli told Gruppo Triad's representative to assent to an extension, provided Venezuela acknowledged and promised to eventually pay the debt. But, there is no record evidence indicating that Gruppo Triad conveyed to Venezuela its willingness to forbear. Instead, Skye has produced witness testimony that Gruppo Triad requested acknowledgement of the debt and a promise to pay. This, the Court finds, does not constitute adequate consideration to support an extension of the life of the loan. A lender may request acknowledgment of a debt for several reasons, not the least of which is another of Skye's arguments regarding the statute of limitations—that acknowledgment by a debtor, even where a loan is past due, may restart the statute of limitations for the lender to bring suit on the claim. *See* O.R.C. § 2305.08. Requesting such an acknowledgment may be simply a clarification of the lender's rights and not necessarily a promise to forebear from bringing suit.

Skye nevertheless maintains that an extension may be enforced without consideration where "the parties have acted upon the [extension] and continued their performance over several years." *Software Clearing House Inc. v. Intrak Inc.*, 66 Ohio App. 3d 163, 171 (Ohio Ct. App. 1990). Under Ohio law, "[s]ubsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary." *Id*. at 172 (citing *Morrison v. DeVore Trucking Inc.*, 68 Ohio App. 2d 140 (Ohio Ct. App. 1980)). In other words, "[a] gratuitous oral agreement is binding if it is acted upon by the parties and if a refusal

13

to enforce the modification would result in a fraud or injury to the promisee." *Id* (citing *Mehurin v. Stone*, 37 Ohio St. 49 (1881); *Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App. 3d 176 (Ohio Ct. App. 1984)).

Fatal to Skye's argument is the fact that even where no consideration or writing may have been necessary to modify an agreement, mutual consent, or a meeting of the minds is always needed. *Bayer v. Nachtrab*, No. L-13-1209, 2014 WL 7225430, at *4 (Ohio Ct. App. Dec. 19, 2014) ("if the undisputed facts demonstrate that there was no meeting of the minds, summary judgment is appropriate"); *accord Adams v. Windau*, No. L-08-1041, 2008 WL 4408627, at *4 (Ohio Ct. App. Sept. 30, 2008); *Delta Fuels, Inc. v. Consolidated Environmental Servs., Inc.*, No. L-08-1186, 2009 WL 975833, at *3 (Ohio Ct. App. Apr. 10, 2009). Skye itself concedes this point. (ECF No. 611, p. 27.)

Under Ohio law, three types of contracts exist: express, implied-in-fact, and implied in law. *Percio v. Smith*, No. 2013-CA-56, 2014 WL 1338528, at *3 (Ohio Ct. App. Mar. 28, 2014) (citing *Stepp v. Freeman*, 119 Ohio App.3d 68, 73 (Ohio Ct. App. 1997)). Here, there was no writing so as to form an express extension. "A contract implied-in-fact is a contract inferred from the surrounding circumstances, including the conduct and statements of the parties, which lead to a reasonable assumption that a contract exists between the parties by tacit understanding." *Id*.

While not a formation of a new contract, the extension still required a meeting of the minds, for which the standard applicable to a contract implied-in-fact is that "the parties' assent or 'meeting of the minds' is inferred from the surrounding circumstances." *Id* (citing *Rumpke v. Acme Sheet & Roofing Inc.*, No. 17654, 1999 WL 1034455, at *10 (Ohio Ct. App. Nov. 12, 1999)). The touchstone is reasonable certainty—"a plaintiff must demonstrate that the

circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended." *Id* (citing *Stepp*, 199 Ohio App. 3d at 74). The record must bear "objective or compelling evidence that the parties assented to all of the essential terms. . . ." *Bayer*, 2014 WL 7225430, at *5. "As part of a meeting of the minds, 'there must be a definite offer on one side and an acceptance on the other.'" *Adams*, 2008 WL 4408627, at *3 (quoting *Garrison v. Daytonian Hotel*, 105 Ohio App. 3d 322, 325 (Ohio Ct. App. 1995)). "In other words, for a contract to be binding, the parties 'must have a common and distinct intention communicated by each party to the other.'" *Id* (quoting *Bradley v. Farmers New World Life Ins. Co.*, 112 Ohio App. 3d 696, 710 (Ohio Ct. App. 1996)).

Here, the record is deficient of such evidence. Construing the facts in the light most favorable to Skye, Venezuela communicated to Skye in late 1991 that it was unable to pay on the Notes, and, in early 1992, communicated that it would do so in five years. (ECF 415-22 ¶¶ 17-19.) However, Skye fails to set forth evidence that it responded with its assent to such an extension. Tovar states that Pavanelli "assented" on behalf of Gruppo Triad, but does not indicate that the assent was ever communicated to Venezuela. (*Id*. at ¶ 19.) Similarly, Pavanelli never communicated Gruppo Triad's intent to forbear, and Gruppo Triad could have brought suit for non-payment at that time. In 1996, Venezuela purportedly sent the Urgelles Letter. (*Id*. at ¶ 24(a), Ex. H.) Once again, however, there is an absence of evidence that Skye communicated agreement to an extension on the Notes in response. *See Delta Fuels, Inc.*, 2009 WL 975833, at *3 (Apr. 10, 2009) (upholding the grant of summary judgment where record contained no objective or compelling evidence of assent to a sheet of suggested terms and conditions). Tovar avers that Pavanelli indicated to Tovar that Gruppo Triad would assent to the extension if Venezuela provided official recognition of the Gruppo Triad Bandagro Notes. (ECF No. 415-22

¶ 24(c).) Yet, there is no evidence that either Tovar or Pavanelli ever relayed the same to Venezuela. Tovar requested confirmation of the Notes, but espouses no evidence that he agreed to the extension in exchange.

Skye's silence in response to Venezuela's verbal and written communications regarding the extension does not constitute assent. "It is axiomatic that the formation of a contract is dependent upon both offer and acceptance and that silence in response to an offer does not generally indicate assent." *Univ. Hosps. Of Cleveland, Inc. v. Lynch*, 96 Ohio St.3d 118, 130 (2002). In particular, the Court does not find sufficient record evidence of a meeting of the minds here, where the communication between the parties regarding an extension did not include assent to specific material terms, such as forbearance from bringing suit, interest, or the final amount that would be due on the Notes. *See Adams*, 2008 WL 4408627, at *4 (no meeting of the minds as a result of lack of evidence in the record that party ever directly responded to communication regarding amount owed); *see also Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3 (Ohio 2002) ("A meeting of minds as to the essential terms of the contract is a requirement to enforcing the contract."). Thus, no mutual agreement occurred and the due dates on the Notes were not modified by an extension agreed upon by the parties.

## C. Applicable Statute of Limitations

In 1991, at the time of the original maturation of the notes, former Ohio Revised Code § 2305.06 applied a fifteen-year statute of limitations for written contract claims. In 1994, Ohio Revised Code § 1303.16(A) was enacted, applying a six-year statute of limitations to any "action to enforce the obligation of a party to pay a note payable at a definite time." O.R.C. § 1303.16 (1994). Skye asserts that, absent any extensions on the notes, the fifteen-year statute of limitations, in effect at the time of the accrual, applies to its claims.

16

Venezuela initially argues that Skye belatedly asserts the alternative applicability of the fifteen-year statute of limitations. Skye brings its alternative argument before the Court for the first time in its Memorandum in Opposition, once discovery on the statute of limitations issue was complete, a practice discouraged by this Court. Nonetheless, Skye's somewhat belated raising of the issue is without consequences, as the Court considers the merits of this argument.

Skye asserts that § 1303.16 may not be applied retrospectively. It is well established under Ohio law, that "[a] statute is presumed to be prospective in its operation unless expressly made restrospective." O.R.C. § 1.48; *accord State v. Lasalle*, 96 Ohio St. 3d 178, 181 (Ohio 2002); *Hyle v. Porter*, 117 Ohio St. 3d 165, 167 (Ohio 2008). Here, the Ohio legislature did not make any pronouncement regarding the retroactivity or retrospectivity of § 1303.16. As a result, multiple Ohio appellate courts have interpreted § 1303.16(A) as having prospective applicability. *Friel v. Swartz*, No. 11AP-277, 2012 WL 1948865, at *5 (Ohio Ct. App. May 31, 2012); *Novak v. CDT Dev. Corp.*, No. 83655, 2004 WL 1119626, at *3 (Ohio Ct. App. May 20, 2004).

Venezuela contends that Ohio law defines retroactivity "with respect to the time at which the action was filed, not with respect to the time at which the underlying offenses occurred." *Evans v. Toys R Us Inc.*, 221 F.3d 1334, at *5 (6th Cir. 2000) (applying Ohio law). The Ohio Supreme Court has held that "statues of limitations are remedial in nature." *Schoenrade v. Tracy*, 74 Ohio St. 3d 200, 202 (Ohio 1996) (quoting *Gregory v. Flowers*, 32 Ohio St. 2d 48 (1972)). Further, "laws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws." *Id* (quoting *Kilbreath v. Rudy*, 16 Ohio St. 2d 70 (Ohio 1968)). In particular, "[t]he latter application of an amended statute is not unlawful as long as a prospective claimant or litigant … is still afforded 'a reasonable time in which to enforce' his right." *Cook v. Matvejs*, 56 Ohio St.

17

2d 234, 237 (Ohio 1978) (quoting *Flowers*, 32 Ohio St. 2d at 54). In *Cook*, the court considered

the applicability of a legislative change lowering the age of majority from 21 to 18. Under the

relevant statutes of limitation, a cause of action had to be initiated within two years after a minor

reached the age of majority, meaning the lowering of the age of majority effectively shortened

the statute of limitations. *Cook*, 56 Ohio St. 2d at 234. The court looked to *Flowers* for

guidance, and held that the new age of majority (i.e. the shortened statute of limitations period)

was applicable from the effective date of the statute. This, the court stated, provided for a

"reasonable" time in which to enforce the right. *Id*. at 237-38. Venezuela also points to *Walsh v.*

*Urban*, in which the court held that the ten-year statute of limitations on demand notes under §

1303.16(B), which took effect at the same time as the six-year statute in § 1303.16(A) was

applicable to a 1990 promissory note—four years prior to the statute's enactment. No. 85466,

2005 WL 1707006, at *2 (Ohio Ct. App. Jul. 21, 2005).

Skye cites to *Novak* in support of its contention that O.R.C. § 1303.16(A) may not be

applied retroactively to bring the statute of limitations down from fifteen years to six on a

promissory note that matured in 1991. 2004 WL 1119626, at *3. In *Novak*, the Ohio Court of

Appeals held that § 1303.16(A) was not applicable to a cause of action brought on a note that

became due on July 29, 1993, one year before the effective date of the new statute of limitations.

The Ohio Court of Appeals held similarly in *Friel*, that § 1303.16(A) was not applicable to a

promissory note that matured in 1990. 2012 WL 1948865, at *5. The *Friel* court distinguished

*Walsh*, pointing out that the statutory limitation provisions at issue were not the same.

Venezuela's argument is well taken. The Ohio Supreme Court has stated that statutes of

limitation are remedial and applied to all proceedings after their enactment. *Schoenrade*, 74

Ohio St. 3d at 202. It has also explicitly held that the later application of an amended statute of

limitations is not unlawful, so long as the plaintiff is afforded a reasonable amount of time within which to bring the action. *Cook*, 56 Ohio St. 2d at 237. The Supreme Court's interpretation of an Ohio statute is binding authority on Ohio law. And, the most recent case prior to *Friel* to consider whether § 1303.16 may be applied to notes which matured before to the statute's enactment, held that it could be. *Walsh*, 2005 WL 1707006, at *2. Here, even if the Court afforded Skye six years after the effective date of the 1994 statute, rather than six years from the maturation date of the Notes in 1991, Skye's action would still be untimely. Ultimately, however, the Court need not hold on this issue. If Skye's argument is correct, the claim is timely under the fifteen-year statute contained in § 2305.06. But, even if Venezuela's argument is correct, the claim was resurrected by an acknowledgment of the debt. (*See infra*, III.D.) Thus, Skye's claim is timely.

## D. Acknowledgment of the Debt

Skye argues that in August and October of 2003, Venezuela acknowledged the debt, thereby extending the statute of limitations. Under an Ohio statute, "[a] payment … made upon any demand founded on a contract, or an acknowledgment thereof, or a promise to pay it … signed by the party to be charged," will remove the bar of the statute of limitations. O.R.C. § 2305.08. Venezuela argues that § 2305.08 is not applicable to negotiable instruments, such as the Notes, which are a subset of contracts governed by a separate statute of limitations in Ohio Revised Code § 1303.16.[6] Venezuela cites to *Mohammad v. Awadallah*, No. 97590, 2012 WL 3132030, at *4 (Ohio Ct. App. Aug. 2, 2012), in which the Ohio Court of Appeals held that the partial payment provision of § 2305.08 had not previously been applied in Ohio to negotiable instruments governed by § 1303.16. In response, Skye points to *Bluestone Trading Co. v. Storey*

---

[6] O.R.C. § 2305.08 governs general contract actions, as do the statutes of limitations referenced therein.

*(In re Storey)*, No. 10-20926, 2011 WL 4005832, at *2 (Bankr. N.D. Ohio Sept. 7, 2011), in which the court applied the acknowledgment of debt rule to a promissory note.

The Court finds Skye's argument well taken. In *In re Storey*, the court denied a summary judgment motion where the creditor proffered sworn testimony of an oral acknowledgment of debt[7] and promise to pay from the debtor. 2011 WL 4005832, at *2-3. The statute of limitations against the creditor's claim on the promissory note had already expired when the acknowledgment and promise to pay occurred. *Id.* Indeed, the acknowledgment of debt or a promise to pay after the debt has been barred by the statute of limitations revives the original cause of action and the applicable statute of limitations begins to run again on the date of acknowledgment or promise. *Id; In re Butler's Estate*, 137 Ohio St. 96, 113 (1940).

The acknowledgment of a debt rule had an established common law history prior to its codification in the Ohio Revised Code. *See e.g. In re Butler's Estate*, 137 Ohio St. at 113; *Turner v. Chrisman*, 20 Ohio 332, 336 (Ohio 1851); *Hisey v. Hisey*, 33 N.E.2d 40, 41 (Ohio Ct. App. 1939). The rationale behind the rule was explained by the Ohio Supreme Court in *Turner*, which noted that "[t]he running of the statute of limitations does not discharge the debt. It only suspends the remedy on the presumption that the debt is paid. By an acknowledgment of the debt, or a new promise to pay, that presumption is removed and the remedy is restored." 20 Ohio at 336. At least one Ohio court has applied the common law precepts codified in § 2305.08 to a cause of action for recovery of debt that did not fall within the statute. *See Kordel v. Occhipinti*, No. 2007-L-163, 2008 WL 5329964, at *3 (Ohio Ct. App. Dec. 19, 2008) (statute of limitations tolled where equitable reasons favor applying partial payment rule to action not based in contract). Such an application is consistent with the rule's purpose enumerated in *Turner*.

---

[7] The Court notes that an oral acknowledgment of the debt does not satisfy the statutory requirements that the acknowledgment be in writing. *See Catz Ent., Inc. v. Valdes*, No. 07 MA 201, 07 MA 202, 08 MA 68, 2009 WL 3003925, at *6 (Ohio Ct. App. Sept. 17, 2009). However, the acknowledgment in this case is a signed writing.

Meanwhile, the case most supportive of Venezuela's position that § 2305.08 is not applicable to promissory notes, *Mohammad*, simply declined to apply the partial payment rule contained within § 2305.08 to negotiable instruments and did not address the effect of a subsequent acknowledgment of a debt. 2012 WL 3132030, at *4.

Here, Venezuela's Ministry of Finance issued a signed document, the August 2003 Ministry of Finance Report, stating that "the claimants of the Promissory Notes submitted to the present inquiry have the legitimate right to have them processed to cash them in accordance with the rules and procedures governing this activity." (ECF No. 415-50, p. 15.) Shortly thereafter, the Attorney General of Venezuela issued the signed October 2003 Attorney General Report, agreeing with the foregoing opinion, and finding for the "admissibility of the aforesaid claim." (*Id.* at 37.) Under Ohio law, no particular form of acknowledgment is required, other than a direct admission of a previous debt. *See In re Butler's Estate*, 137 Ohio St. at 113. The signed reports directly acknowledge the existence of debt, pursuant to the Notes. Both the Attorney General and Ministry of Finance are representative entities of the government of Venezuela. As a result, the reports comprise a written acknowledgment of the debt, sufficient to restart the statute of limitations on the repayment claim. Skye's claim, filed in 2004, is timely.

## E. Estoppel

Skye posits that Venezuela is estopped from arguing that the statute of limitations has run. There is no question that Ohio courts recognize and will apply principles of equitable estoppel in a proper case. See *Doe v. Archdiocese of Cincinnati.,* 116 Ohio St. 3d 538, 880 N.E.2d 892 (Ohio 2008). "Under Ohio law, the doctrine of equitable estoppel may be employed to prohibit the inequitable use of the statute of limitations." *Helman v. EPL Prolong, Inc.,* 139 Ohio App.3d 231, 246 (Ohio Ct. App. 2000) (citing *Hutchinson v. Wenzke* 131 Ohio App. 3d

613, 615 (1999); *Walworth v. BP Oil Co.*, 112 Ohio App. 3d 340, 345 (Ohio 1996); *Schroder v. Gillette*, 48 Ohio App. 3d 181, 183 (Ohio 1988)). However, as several Ohio Courts of Appeals have noted, in addition to the doctrine's general pleading requirements, there are particular limitations when a Plaintiff seeks to use the doctrine to avoid limitations.

> .... Furthermore, in the context of a statute-of-limitations defense, a plaintiff must show either "an affirmative statement that the statutory period to bring an action was larger than it actually was" or "promises to make a better settlement of the claim if plaintiff did not bring the threatened suit" or "similar representations or conduct" on defendant's part. *Cerney v. Norfolk & W. Ry. Co.*, 104 Ohio App. 3d 482, 488, (Ohio 1995); *see also Walworth v. BP Oil Co.*, 112 Ohio App. 3d 340 (Ohio 1996).

*Helman* at 246; *see also JRC Holdings, Inc. v. Samsel Servs. Co.*, 166 Ohio App. 3d 328, 335, (Ohio Ct. App. 2006) (citing *Helman*). Although the more recent rulings of the Ohio Supreme Court do not speak directly to this restriction on the doctrine's employment to avoid a defendant's use of the limitations defense, neither are those rulings inconsistent with such a restriction, *i.e.,* that the doctrine properly applies to the bar of limitations only where a defendant has affirmatively misrepresented the length of applicable limitations or the need to bring suit in order to recover. See, *e. g., Doe,* 109 Ohio St. 3d at 502 (Ohio 2006) ("It is therefore fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit * * *." (quoting *Zumpano v. Quinn,* 6 N.Y. 3d 666, 674 (Ohio 2006)); *Doe,* 116 Ohio St. 3d at 540 (Ohio 2008) ("[E]quitable estoppel will benefit Doe only if she has pleaded facts that, if proved, will demonstrate the efforts of the Archdiocese to prevent her from filing a lawsuit."). The same is true of the Sixth Circuit's application of Ohio limitations law in *Twee Jonge Gezellen Ltd. v. Owens-Illinois, Inc.*, 238 F. App'x 159, 163 (6th Cir. 2007) (party must show that the misrepresentation "was

calculated to induce a plaintiff to forgo the right to sue") (quoting *Hoeppner v. Jess Howard Elec. Co.,* 150 Ohio App.3d 216, 225 (Ohio App. Div. 2002)).

Here, the alleged misrepresentations are the 2003 Reports. Skye, however, fails to make an evidentiary showing that the 2003 Reports were intended to induce Gruppo Triad or subsequent holders of the Notes to forgo suit. The Court does not estop Venezuela from asserting its statute of limitations defense.

**F. Waiver**

Skye additionally argues that Venezuela has waived its statute of limitations defense. "A waiver is an intentional relinquishment of a known right." *State v. Blackburn,* 887 N.E.2d 319, 322 (Ohio 2008). "A waiver may be enforced by anyone having a duty to perform, but who has changed his or her position as a result of the waiver." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust*, 156 Ohio App. 3d 65, 93 (citing *Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St. 3d 275, 279 (Ohio 1998); *Andrews v. Teachers Retirement Sys.*, 62 Ohio St. 2d 202, 205 (Ohio 1980)).

Applying these principles to the instant case, and construing the evidence in the light most favorable to Skye as the nonmoving party, the Court does not find genuine issues of material fact as to whether Venezuela waived its statute of limitations defense. Nothing in the 2003 Reports or Venezuela's conduct suggested an intentional relinquishment of Venezuela's statute of limitations defense. The Court also notes that Skye did not change its position as a result of a purported waiver, but rather filed suit shortly after acquiring the Notes.

For the aforementioned reasons, Venezuela's Motion for Summary Judgment Based on the Statute of Limitations (ECF No. 359) is **DENIED**.

## IV. EQUITABLE ESTOPPEL AGAINST VENEZUELA

Skye moves for summary judgment on the grounds that Venezuela is equitably estopped from nonpayment on the Notes. At the outset, the parties disagree on whether Venezuela should be treated as a government actor or a private party for the purposes of Ohio's equitable estoppel law. Skye asserts that the Foreign Sovereign Immunities Act ("FSIA") provides that once the Court has jurisdiction over a case involving a foreign sovereign, "[a]s to any claim … the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Venezuela argues that the FSIA does not alter substantive state laws with respect to causes of action and that equitable estoppel is not a rule of liability. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) ("where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances"). Therefore, Venezuela concludes, the Court should apply the equitable estoppel test for private actors against it.

Skye argues that, even if the Ohio estoppel analysis for government actors is applied, immunity from equitable estoppel is only available to governments "in the exercise of a governmental function." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 199 (Ohio 2006). Here, Skye asserts, Venezuela was engaged in a "proprietary function" rather than a governmental function. This Court has already considered this question, in its Opinion and Order on Venezuela's Motion to Dismiss (ECF No. 298), stating:

> "In Ohio, as well as other jurisdictions, '[i]t is well-settled that, as a general rule, the principle of estoppel does not apply against a state or its agencies in the exercise of governmental function.'" *Hortman v. Miamisburg*, 110 Ohio St. 3d 194, 199 (Ohio 2006) (internal quotations omitted); *see also Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010) ("A party attempting to estop the government bears a very heavy burden.").

\*\*\*

> Plaintiff attempts to estop Defendants from arguing that the Notes are invalid based on the Venezuelan Attorney General's October 2003 opinion that concluded Venezuela was obligated to make payments on the Notes. This type of administrative determination is clearly a governmental function within the meaning of Ohio law.

(ECF No. 298, pp. 24-26.) In any case, the Court does not find it necessary to re-resolve the functionality question because, should the Court treat Venezuela as a government actor for the purposes of the equitable estoppel analysis, "at a minimum, Plaintiff must show some affirmative misconduct by the government in addition to establishing the other elements of estoppel." *Premo*, 599 F.3d at 547; *see also Abercrombie & Fitch Stores, Inc. v. Am. Commercial Const., Inc.*, No. 2:08-cv-925, 2010 WL 1640883, at \*3 (S.D. Ohio Apr. 22, 2010). Here, Skye has not submitted evidence into the record indicating the requisite affirmative misconduct on the part of Venezuela.

In an abundance of caution, the Court has also considered the equitable estoppel analysis applicable to private actors under Ohio law. As the Court stated in its previous Opinion and Order, "[e]quitable estoppel 'is a device by which courts bind parties to presentments made upon which an opposing party relies to his ... detriment ....' *Smith v. Safe Auto Ins. Co.*, 179 Ohio App. 3d 240, 247 (Ohio Ct. App. 2008). As one Ohio court has explained:

> The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice. *Doe v. Archdiocese of Cincinnati*, 109 Ohio St. 3d 491. A party may invoke the doctrine of equitable estoppel where it has "relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance [was] reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Ohio State Bd. Of Pharmacy v. Frantz*, 51 Ohio St. 3d 143, 145, 555 N.E.2d 630 (Ohio 1990).

*Cristina v. Bur. of Workers' Comp.*, 977 N.E.2d 742, 759 (Ohio Ct. App. 2012)." (ECF No. 298, p. 24.) The reasonable reliance on the part of the party asserting equitable estoppel must have

been a result of a misleading or misrepresentative statement. *Barnett v. Carquest Auto Parts of Whitehall*, No. 98AP-372, 1998 WL 869673, at *3 (Ohio Ct. App. Dec. 8, 1998) (citing *Schrader v. Gillette*, 48 Ohio App. 3d 181 (Ohio 1988)). "[T]he primary focus is on the *conduct* of the party against whom the estoppel is asserted and the *reasonable reliance* of the party asserting it." (Emphasis *sic*.) *Kosa v. Pruchinsky,* 82 Ohio App. 3d 649, 652 (Ohio Ct. App. 1992).

Skye asserts that it reasonably relied upon the August and October 2003 Reports to its detriment in purchasing the Notes. Venezuela argues: (1) that the August and October 2003 Reports were not fraudulent, and therefore neither misleading nor misrepresentative; and (2) that any reliance on the part of Skye thereon was not reasonable, due to the issuance of the November and December 2003 Reports, which contradicted the earlier reports. Skye argues that "a knowingly false representation or concealment of material fact" is not an "essential element of estoppel." *First Fed. Sav. & Loan Ass'n of Toledo v. Perry's Landing, Inc.*, 11 Ohio App. 3d 135, 144 (Ohio Ct. App. 1983). While Ohio courts have long espoused that the point of estoppel is to prevent fraud, "estoppel is not actionable fraud and is not treated like actionable fraud. There is usually no need for scienter, an intent to deceive, in estoppel cases, for example." *Id.*

The Court finds the parties' arguments reconcilable under Ohio law, which states, "[t]he purpose of equitable estoppel is to prevent actual or constructive fraud." *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (1990). Under Ohio law, "[c]onstructive fraud does not require fraudulent intent." *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 823 (S.D. Ohio 2007) (citing *Lake Hiawatha Park Ass'n v. Knox County. Agr. Soc.*, 28 Ohio App. 289, 291 (Ohio Ct. App. 1927)). "Constructive frauds are therefore assumed to have been committed by acts without regard to motive." *Id* (citing *Hanes v. Giambrone*, 14 Ohio App. 3d 400, 406 (Ohio Ct. App. 1984)). Given that the purpose of

estoppel is to prevent actual or constructive fraud, Venezuela's argument that misrepresentation in the August and October 2003 Reports is required in this case is well taken. However, because the fraud sought to be prevented by equitable estoppel may be either actual or constructive, as Skye points out, Venezuela need not have been knowingly misleading or misrepresenting in the reports. There is no record evidence that Venezuela knowingly mislead or misrepresented when it issued the October 2003 Attorney General Report. In the absence of evidence to that effect, the Court will not impute intent into Venezuela's actions. But, such intent is not required here. Rather, both parties agree that the August 2003 Ministry of Finance Report and the October 2003 Attorney General Report were supplemented with new opinions, dated months later,[8] in November 2003 and December 2003, disavowing the validity of and, therefore, any obligation of payment on the Notes. (ECF Nos. 559-41; 559-46.) As a result, Skye has satisfied the burden of demonstrating that the August and October 2003 Reports were, at the least, unintentionally misleading.

The Court next turns to whether Skye reasonable relied on the 2003 Reports in purchasing the Notes. Venezuela argues that any reliance was not reasonable, as the November 2003 and December 2003 Reports were issued prior to Skye's purchase of the Notes in the spring of 2004. Venezuela also argues that Skye had reason to doubt the veracity of the Gruppo Triad representatives and the authenticity of the Notes. Skye asserts that Venezuela did not publicly release the November 2003 and the December 2003 Reports and, as a result, Skye was not aware of their existence—and could not have discovered it through reasonable diligence—before purchasing the Notes. Venezuela responds that Skye knew of the November 2003 Report prior to purchasing the Notes. In support of its contention, Venezuela submits the Jacir Deposition, in

---

[8] Skye maintains that the December 2003 Report was not created at that time, but rather created much later, or as a result of the litigation in this case, and backdated.

which he states that he told Skye representatives about the November 2003 Report. (ECF No. 559-32, at 277:5-20.) That evidence is sufficient to create a question of fact as to whether Skye reasonably relied on the 2003 Reports when purchasing the Notes. *See Walworth v. BP Oil Co.*, 112 Ohio App. 3d 340, 347 (Ohio Ct. App. 1996) (where "conflicting testimony by the parties, the application of equitable estoppel hinged almost entirely on the credibility of the witnesses"). As a result, the Court finds genuine issues of fact as to whether Venezuela is equitably estopped from nonpayment on the Notes.

For the aforementioned reasons, Skye's Motion for Summary Judgment (ECF No. 415) is **DENIED**.

## V. HOLDER IN DUE COURSE

Venezuela additionally moves for summary judgment on the basis that Skye is not a holder in due course of the Notes. Skye argues that Venezuela's motion is not proper at this time, because, under Ohio law, an inquiry into holder in due course status is not available until a defendant has proven a defense. The Court finds Skye's argument well taken. The Supreme Court of Ohio has enumerated: "Whether one is a holder in due course is an issue which does not arise unless it is shown a defense exists. Once it is established a defense exists, the holder has the full burden of proving holder in due course status in all respects." *Arcanum Nat. Bank v. Hessler*, 69 Ohio St. 2d 549, 551 (1982) (citing Ohio Rev. Code § 1303.36)).

Venezuela argues that the issue is ripe for adjudication because it presents a timely controversy that will streamline the claims and defenses moving forward and the Court set a scheduling order for briefing on the issue. (*See* ECF No. 357.) "A court has the inherent power to manage its own docket," including the right to set motion deadlines. *In re Prevot*, 59 F.3d 556, 566 (6th Cir. 1995). The Court is not persuaded that by issuing a scheduling order on

summary judgment motions, it has adjudicated whether a particular claim is procedurally ripe. Here, Venezuela must first establish a defense before the burden shifts to Skye to prove holder in due course. Therefore, Venezuela's Motion for Summary Judgment that Plaintiff is Not a Holder in Due Course (ECF No. 413) is **DENIED**. Because this claim is not procedurally ripe, Plaintiff's Motion to file a Sur-Reply in Opposition to the same (ECF No. 459) is **DENIED without prejudice**.

## VI. CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment Based on the Statute of Limitations (ECF No. 359) is **DENIED**. Plaintiff's Motion for Summary Judgment (ECF No. 409) is also **DENIED**. Defendants' Motion for Summary Judgment that Plaintiff is Not a Holder in Due Course (ECF No. 413) is **DENIED**. Additionally, Plaintiff's Motion to File Sur-Reply in Opposition to Defendants' Motion for Summary Judgment that Plaintiff is Not a Holder in Due Course (ECF No. 459) is **DENIED without prejudice**.

**IT IS SO ORDERED.**

_____ 12-18-2015 _____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**