IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

--|--

Case No. 02:04-cv-793

--|--

DRFP, LLC, d/b/a Skye Ventures,
               Plaintiff,
     vs.
The Republican Bolivariana De Venezuela,
et al.,

          Defendants.

--|--

Video
Deposition of: DAVID J. RICHARDS
Date and Time: Monday, December 22, 2014
         9:09 a.m.

Place:     Calfee, Halter & Griswold
         1200 Huntington Center
         41 South High Street
         Columbus, Ohio
Reporter:   Julieanna Hennebert, RPR, RMR
         Notary Public - State of Ohio

--|--

**Page 2**

1  APPEARANCES:
2  On behalf of Plaintiff:
3     MR. REX H. ELLIOTT
      MR. ADAM P. RICHARDS
4     Cooper & Elliott, LLC
      2175 Riverside Drive
5     Columbus, Ohio 43221
      614.481.6000
6
7  On behalf of Defendants:
8     MR. ANDREW Z. SCHWARTZ
      MR. RICHARD G. BALDWIN
9     Foley Hoag, LLP
      Seaport World Trade Center West
10    155 Seaport Boulevard
      Boston, Massachusetts 02210
11    617.832.1000
12    MR. ALBERT J. LUCAS
      Calfee, Halter & Griswold, LLP
13    1200 Huntington Center
      41 South High Street
14    Columbus, Ohio 43215
      614.621.1500
15  Also Present:
16     Mr. Gil Whitney, Videographer.
17     --|--
18
19
20
21
22
23
24
25

**Page 3**

1          INDEX
2     --|--
3  DAVID J. RICHARDS         PAGE
   Examination by Mr. Schwartz     6
4
5     --|--
6     RICHARDS/SKYE EXHIBITS
7  NUMBER DESCRIPTION       IDENTIFIED

8  1  Responses to Interrogatories    17
9  2  Plaintiff's Privilege Log    54
10  3  Case 06CR 09-6632 Indictment    72
11  4  Case 07CR 08-6125 Indictment    72
12  5  Case 06CR 09-6632 Guilty Plea    74
13  6  Case 07CR 08-6125 Guilty Plea    77
14  7  Bankruptcy Petition    78
15  8  December Confidential Fax    118
16  9  6.28.2004 El Universal.com Article    147
     (Spanish)
9A 17
     6.28.2004 El Universal.com Article    147
18    (English)
19  10  Skye Ventures Website Page    150
20  11  3.18.2004 Fax    156
21  12  4.8.2004 Agreement    203
22  13  Bandagro Notes Purchase Agreement    203
23     --|--
24
25

**Page 4**

1        Monday Morning Session,
2        December 22, 2014.
3     --|--
4     VIDEOGRAPHER: We're on the record. This
5  is the videotaped deposition of David Richards in the
6  matter of DRFP, LLC, doing business as Skye Ventures,
7  versus the Republican Bolivariana De Venezuela, et
8  al., being heard before the U.S. District Court,
9  Southern District of Ohio.
10     This deposition is being held at 41 South
11  High Street, Columbus, Ohio, on December 22, 2014, at
12  9:09 a.m.
13     My name's Gil Whitney and I'm the
14  videographer; the court is Julie Hennebert.
15     Counsel, will you please introduce
16  yourself and your affiliations.
17     MR. ELLIOTT: Rex Elliott and Adam
18  Richards on behalf of the plaintiff, appearing with
19  Dave Richards, the witness.
20     MR. SCHWARTZ: We'll each identify
21  ourselves. Andrew Schwartz, Foley Hoag, LLP, for the
22  defendants.
23     MR. BALDWIN: Richard Baldwin, Foley Hoag,
24  for the defendants.
25     MR. LUCAS: And I'm Albert Lucas from

David J. Richards

Page 5

1 Calfee, Halter & Griswold here in Columbus, and I'm
2 for the defendants as well.
3 VIDEOGRAPHER: The court report may swear
4 the witness.
5 (Witness sworn.)
6 MR. SCHWARTZ: Before we start let's just
7 put on the record the stipulations that we have
8 agreed to before we began. All objections except as
9 to the form of the question will be reserved until
10 the time of trial. Motions to strike will likewise
11 be reserved until the time of trial.
12 The witness will have a specified period
13 of time to review the deposition transcript and make
14 whatever changes he believes are necessary. That
15 specified time is something the parties still need to
16 discuss sometime during a break this morning, so
17 we'll come back on the record at some point later and
18 clarify how much time Mr. Richards will have to
19 perform that review.
20 Is that generally acceptable, Mr. Elliott?
21 MR. ELLIOTT: It is.
22 MR. SCHWARTZ: Thank you.
23 --|--
24
25

Page 6

1 DAVID J. RICHARDS,
2 being by me first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4 CROSS-EXAMINATION
5 BY MR. SCHWARTZ
6 Q. Mr. Richards, can you state your full
7 name, please?
8 A. David J. Richards.
9 Q. Where do you live?
10 A. I reside in Florida.
11 Q. Whereabouts?
12 A. 17000 Golf Boulevard, Penthouse South,
13 North Redington Beach, Florida 33708 is my address.
14 Q. Do you also own a home in Ohio?
15 A. I have a partnership that owns a home in
16 Ohio, along with my wife.
17 Q. You have a partnership with your wife that
18 owns the home?
19 A. (Nods head.)
20 Q. What is the name of the partnership?
21 A. JD Partnership.
22 Q. And where is the home?
23 A. It's in Muirfield Village here in town,
24 it's 7964 Holyrood Court, Dublin, Ohio 43017.
25 Q. How old are you?

Page 7

1 A. Going on -- 63, going on 64.
2 Q. Do you hold a position with the plaintiff,
3 Skye Ventures, LLC?
4 A. Yes.
5 Q. What position?
6 A. I think my title is technically managing
7 member or president and managing member, one of those
8 two.
9 Q. Do you have a business card for your
10 position at Skye Ventures, LLC?
11 A. No; I don't carry business cards.
12 Q. Have you ever been deposed before?
13 A. Yes.
14 Q. How many times?
15 A. I believe two.
16 Q. When was the first such deposition?
17 A. It was in conjunction with my bankruptcy
18 filing back in, I don't know, 2003 or '4 or '5,
19 sometime in that timeframe.
20 Q. And what were the circumstances that gave
21 rise to the deposition occurring?
22 A. It was a request by a creditor,
23 Huntington. It was actually in this building.
24 Q. Huntington Bank?
25 A. Yep.

Page 8

1 Q. Was that in connection with one of the
2 adversary proceedings that Huntington Bank had
3 brought against you in the bankruptcy case?
4 A. I don't know the term "adversary
5 proceedings," but it's part of my bankruptcy filing,
6 I recall.
7 Q. And what was the other occasion upon which
8 you were deposed?
9 A. One of my businesses has a -- has
10 litigation against Colgate Palmolive and I was
11 deposed in that just a couple months ago, something
12 like that.
13 Q. What other business?
14 A. This was the business that Calfee has
15 represented me extensively on, it's called N8
16 Medical.
17 Q. Innate?
18 A. N as in letter N, number 8, Medical. Sort
19 of a play on words of the word "innate medical" since
20 the compounds mimic the innate immune system. So N8,
21 makes it easier to remember if you think about it
22 that way.
23 Q. Where is that litigation with Colgate
24 Palmolive pending?
25 A. Salt Lake City Federal Court.

David J. Richards

## Page 9

1     **Q.**   Is N8 Medical suing Colgate or vise-versa?

2     **A.**   N8 Medical is suing Colgate.

3     **Q.**   What's the nature of the claim in that

4 case?

5     **A.**   Well, basically Colgate was testing N8's

6 compounds under a material transfer agreement which

7 precluded them from in essence stealing the

8 compounds, which they did, they took the compounds

9 and filed patents on them without N8's permission.

10     **Q.**   Who represents you or N8 Medical in that

11 litigation in Salt Lake City?

12     **A.**   I have two firms representing me, Brigham

13 Young University is my co-plaintiff and they have a

14 different firm, but my firms are, there's a firm

15 there led by Brent Hatch Orinson and he's our local

16 counsel, and then the primary litigators are a

17 commercial litigation firm from Houston, Texas,

18 plaintiff's firm named, well, the head guy there is a

19 fellow name Paul Dobrowski and he's the fellow that

20 represents me, but they have seven or eight lawyers.

21     **Q.**   Who represents Colgate Palmolive?

22     **A.**   Well, I know it is -- there's a fellow

23 named Ken Black, and he's a main partner I believe.

24 It's a firm, big firm based in Seattle I think and

25 they have a -- they have a firm, one of their -- they

## Page 10

1 have a bunch of places where they have offices and

2 Salt Lake City is one of them.

3     **Q.**   How long ago was that deposition?

4     **A.**   If you want me to look at my calendar, I

5 can tell you exactly, but I would guess -- my life's

6 been such a whirlwind lately, I'm trying to put it in

7 context of other things I've done.

8     I think it was like the first week in

9 November I believe.

10     **Q.**   Of 2014?

11     **A.**   Yeah.

12     **Q.**   When you say you could look at your

13 calendar, what kind of calendar do you use?

14     **A.**   I have an Outlook calendar.

15     **Q.**   For how long have you used an Outlook

16 calendar?

17     **A.**   Oh, long time.

18     **Q.**   How many years?

19     **A.**   I don't know. Long time though.

20     **Q.**   What kind of calendar did you use in 2003?

21     **A.**   I would guess Outlook. I'm pretty sure it

22 was in Outlook, Microsoft. I'm always been a

23 Microsoft person, so.

24     **Q.**   Have you used an Outlook calendar

25 continuously from the beginning of 2003 until now?

## Page 11

1     **A.**   Continuously from 2003 until now. I have

2 used some form of an Outlook calendar. The software

3 changes and the businesses change and all that, but,

4 yeah, I've always used Outlook I think in that

5 timeframe continuously.

6     **Q.**   Do you speak Spanish?

7     **A.**   No.

8     **Q.**   Can you read Spanish?

9     **A.**   No.

10     **Q.**   Can you speak Italian?

11     **A.**   No.

12     **Q.**   Can you read Italian?

13     **A.**   No.

14     **Q.**   Can you speak or read any foreign

15 languages?

16     **A.**   I'm part of Italian -- my wife's Italian

17 so the only part I understand is the hand gestures,

18 so.

19     **Q.**   Other than being able to interpret Italian

20 hand gestures, do you speak or read any foreign

21 languages?

22     **A.**   No.

23     **Q.**   What's your wife's maiden name?

24     **A.**   Casciotti.

25     **Q.**   You have a law degree?

## Page 12

1     **A.**   Yes.

2     **Q.**   From Ohio State?

3     **A.**   Yep.

4     **Q.**   1977?

5     **A.**   Yes.

6     **Q.**   Are you still licensed to practice law?

7     **A.**   Oh, heavens, no.

8     **Q.**   Were you ever licensed to practice law?

9     **A.**   I practiced law until the mid-'80s and

10 stopped about then doing anything meaningful in law

11 and I think my license, I stopped getting continuing

12 education maybe, again another guess, '92 or

13 something like that. I don't know.

14     **Q.**   Did there come a time when -- let me just

15 back up half a step.

16     You did at one point have a law license,

17 right?

18     **A.**   Yes.

19     **Q.**   Did there come a time when that license

20 lapsed?

21     **A.**   I think it lapsed when I stopped taking

22 continuing ed classes.

23     **Q.**   Sometime in the early 1990s.

24     **A.**   That's what I recall. Again, don't make

25 me swear to it but that's what I think.

David J. Richards

Page 13

1     **Q.**    During the time that you were licensed to
2 practice law, was your license of suspended?
3     **A.**    No.
4     **Q.**    Were there ever any kind of disciplinary
5 proceedings brought against you?
6     **A.**    No.
7     **Q.**    Were you ever disbarred by any
8 jurisdiction?
9     **A.**    No.
10     **Q.**    Did you ever have a license to practice
11 anywhere other than Ohio?
12     **A.**    No.
13     **Q.**    Have you prepared for this deposition?
14     **A.**    Yes.
15     **Q.**    What have you done to prepare?
16     **A.**    Well, everything I've done's been trying
17 to jog this old memory as to what happened back in,
18 you know, 10 or 11 years ago. So I've tried to
19 look -- well, you probably want specific things, so
20 let me think what I've done.
21     So I've read some of the pleadings, I've
22 read the interrogatory answers that I gave. I've --
23 I looked at the sort of that mess of all the old
24 agreements, and then there were miscellaneous
25 documents surviving from 2003 that were in English

Page 14

1 that I read. And I've discussed -- I discussed the
2 case with counsel. I discussed the case with Luis
3 Alcalde as to what his recollection on various things
4 were.
5     I discussed the case with Rick Gerace who
6 used to work for me way back then. And thought a lot
7 about all of these things just trying to get the
8 events that occurred way back then correct.
9     MR. ELLIOTT: Just for clarification,
10 Andrew, much of what he just testified about, I
11 assumed your question related to what he did to --
12 for his deposition today. Much of what he just
13 testified about was in conjunction with preparing for
14 what will be his 30(b)(6) deposition tomorrow. Just
15 wanted to make sure that was clear on the record.
16     **A.**    If there's a difference, I still don't
17 understand it, but I'm doing my best to give you the
18 correct answers.
19     **Q.**    Is there anything else you did to prepare
20 for the depositions today and tomorrow?
21     **A.**    Tried to get some rest last night,
22 unsuccessfully, but tried.
23     **Q.**    Did you have trouble sleeping last night?
24     **A.**    I did.
25     **Q.**    Why?

Page 15

1     **A.**    Well, I'm in a room full of lawyers trying
2 to wrack my brain about what happened ten years ago.
3 I was running these events through my mind.
4     **Q.**    How much sleep did you get?
5     **A.**    Probably a good four and a half, five
6 hours. I was up early, I have a very important
7 transaction my company is closing and involves people
8 in Singapore and Indonesia, so they're up early. So
9 I was up early doing that.
10     **Q.**    What kind of transaction was that?
11     **A.**    It's a partial sale of a business that we
12 own.
13     **Q.**    Who owns the business?
14     MR. ELLIOTT: I'm going to object to that
15 question and I'll let you decide whether or not
16 that's something that you can disclose.
17     **A.**    Well, I don't think it's any secret that
18 Empire owns a copper mine in Utah and the transaction
19 is around that.
20     **Q.**    Now, you said that -- let me ask this
21 first: Have you completed your description of
22 everything you did to prepare for the two days of
23 deposition?
24     **A.**    Yeah, I think so.
25     **Q.**    How much time did you spend in the

Page 16

1 aggregate preparing?
2     **A.**    Oh, I have no idea. I did it over the
3 course of a number of days and always getting
4 interrupted with things, so if I had to make a guess,
5 a pure guess would be ten hours. Maybe a little
6 more, maybe a little less.
7     **Q.**    Now, you said that you reviewed
8 interrogatory answers. Just want to make sure I
9 understand which ones that you reviewed. There's a
10 set of interrogatory answers where there was
11 supplemental answers that you provided dated
12 December 20th of 2014, just two days ago. Do you
13 know what I'm referring to there?
14     **A.**    Yeah. I recall reading them and having to
15 sign a piece of paper.
16     **Q.**    And did you also review the interrogatory
17 answers that you had earlier signed in the case back
18 sometime I believe in 2006 or '7? I'll get you the
19 specific date.
20     **A.**    Yes is the answer to the question, I did
21 review those earlier interrogatories.
22     **Q.**    So these were the interrogatories that
23 were signed on November 20th of 2006. Does that
24 sound right?
25     **A.**    Yes.

4 (Pages 13 to 16)

Page 17

1    Q.    And when you reviewed the interrogatories
2    that you had originally signed back in 2006, did you
3    see anything in there that was incorrect?
4        A.    I recall seeing one or two things that I
5    thought were not precisely correct.
6        Q.    What were those?
7        A.    I don't recall at the moment.
8        Q.    Let's mark those and have you take a look
9    at them. So I'm going to ask the court reporter to
10   mark as -- let's go off the record just one second
11   here.
12          VIDEOGRAPHER: Off the record 9:20.
13          (Discussion off the record.)
14          VIDEOGRAPHER: On the record 9:26.
15          MR. SCHWARTZ: Following some colloquy off
16   the record, we're going to mark as Richards/Skye
17   Exhibit 1 the interrogatory answers from
18   November 20th of 2006. And I'd ask the court
19   reporter to please do that.
20          (RICHARDS/SKYE EXHIBIT 1 WAS MARKED.)
21       Q.    All right, Mr. Richards, you've now been
22   handed Deposition Exhibit 1, and this will be for
23   today's deposition and tomorrow's, we're going to
24   mark them consecutively.
25          So these are the interrogatory answers we

Page 18

1    were just discussing from November 20th of 2006,
2    and you can see on the last page that you signed them
3    that day, correct?
4        A.    I'm sorry?
5        Q.    Take a look at the last page of this
6    exhibit. Do you see your signature there?
7        A.    Yes.
8        Q.    So you signed these interrogatory answers
9    on November 20, 2006, right?
10       A.    Yes.
11       Q.    And you testified a few moments ago that
12   when you reviewed these in preparing for your
13   deposition, you saw one or two things that may not
14   have been precisely accurate. Is that a fair summary
15   of what you testified to?
16       A.    I think so.
17       Q.    So can you tell us, please, what are the
18   respects in which these interrogatory answers are not
19   completely accurate?
20       A.    So first thing that I thought I wasn't
21   sure was correct was the timeframe from which we paid
22   consideration for the notes.
23       Q.    This is on page 7?
24       A.    It's the very first question on page 7.
25   So, you know, technically I would say that since we

Page 19

1    had paid consideration prior to April 2004 that was
2    applied to the purchase of the notes, that it was
3    earlier than that and that it was at least
4    November 12, 2003.
5            I'm guessing, I'm guessing that the
6    August 2006 date is correct as to when we stopped
7    paying or didn't make any further payments after
8    that.
9        Q.    What was the date in November of '03 that
10   you just mentioned?
11       A.    It was at least as early as I think
12   November 12th or 13th. I know at that time that
13   we wired or that I wired $50,000 to Siro Schianchi
14   and I think there might have been a small payment or
15   two before. In fact, there was a small payment or
16   two before that, so certainly as early as
17   November 12th or 14th.
18       Q.    Excuse me for a second. You say there was
19   a small payment before November 12?
20       A.    Yeah, I believe there was a small, like,
21   $10,000 or something like that, not a lot. But the
22   first payment of size was November 12th or
23   November 14th. There's a record on that that we
24   have.
25          Then the second -- the second inaccuracy

Page 20

1    or the thing that I thought was not precisely correct
2    was the next answer for part C where it said we began
3    negotiations in late April. So I would say that we
4    began negotiations on March 30th.
5            So I don't think it was -- I think late
6    March was the correct -- is the correct time that we
7    began the negotiations of the contract that, you
8    know, or the transaction that we actually -- that we
9    actually did.
10          And then --
11       Q.    Anything else that you saw when you
12   reviewed these interrogatory answers that didn't look
13   right?
14       A.    Yes. There was, again, just not precise,
15   I think minor inaccuracies but inaccuracies. I
16   recall that there was one other thing that I saw that I
17   would have said a little differently, but going
18   through this just skimming through it I don't think
19   it was a major thing.
20          Well, I don't think it was a major, major
21   issue. I'll look at these again tonight if you want
22   me to rather than you sitting here watching me comb
23   through the language. Or I'll comb through language
24   if you like.
25       Q.    No, I'll accept that invitation, you can

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 21

1    look at it tonight and we'll remember to ask you
2    tomorrow if there's anything else. But as you sit
3    here this morning have you identified the two
4    respects in which you recall noticing there were
5    inaccuracies in these two interrogatory answers when
6    you reviewed them in preparation for the deposition?
7        A.    Yes, I would say, more directly I would
8    say I think there were three and we've identified the
9    two that I thought were significant.
10       Q.    And you'll look tonight for the third.
11       A.    Yeah.
12       Q.    All right.
13       A.    If you guys haven't beat me up too badly.
14       Q.    We'll try not to do that.
15            Now, let me ask you while you're looking
16   at page 7 with regard to the answer that talks about
17   the timing of the payments, as far as you're aware
18   today is this answer correct insofar as it indicates
19   that the payments for notes 7/12 and 8/12 ended in
20   August of 2006?
21       A.    That I'm not a hundred percent sure.
22       Q.    Why not?
23       A.    I was focused, preparing for the
24   deposition I was focused mostly on '03 and '04 and
25   '05 and to a lesser extent the timeframe after that

Page 22

1    after litigation had -- you know, I was really not
2    directly involved so much and it was more, I guess my
3    involvement was more kind of overseeing things as
4    opposed to being actively involved.
5            So the only thing I would say to you is if
6    there was a payment after August '6, there's no doubt
7    an agreement in there would reflect that. So I just
8    have not -- I've not looked at the '06 very, very
9    much. And I don't know what records we have for '06,
10   to be honest with you
11       Q.    Just so we're clear, what I'm trying to
12   find out is whether as far as you're aware of today
13   this answer is accurate to the extent it says the
14   payments went no further than August of 2006.
15       A.    And so let me repeat what I just said too.
16   So I'm trying to be as helpful as I can here. So I
17   focused in our preparation on '03, '04, and '05.
18   There was more than enough for me to do in that
19   timeframe.
20            And what I would say is that every time we
21   made a payment to Gruppo, we did an agreement. So if
22   there's an agreement that we have that shows a
23   payment beyond August '6, then that answer would not
24   be right. But I don't know that to be true or not
25   true at the moment.

Page 23

1        Q.    All right, I think I understand what
2    you're saying.
3            What is it about March 30th of 2004 that
4    stands out in your mind
5        A.    March 30th, 31st, April 1st, that
6    timeframe I was in Como, Italy, meeting with some
7    people, I was meeting with some people there,
8    Pavanelli and several other people, to take a look at
9    the deal, the transaction, and started talking about
10   the terms of what we might do then.
11       Q.    When you say "the deal, the transaction,"
12   what are you referring to?
13       A.    Well, we ended up in a purchase agreement
14   that we, you know, signed, we made a transaction or
15   an agreement with Gruppo to buy two of the notes.
16   And so there were all sorts of back and forth and
17   negotiation before you conclude a deal and the start
18   of how we might do something occurred then.
19       Q.    When did you conclude that deal?
20       A.    When did I conclude the deal? That's a
21   good question. A question I don't have a firm answer
22   for you. But I believe, my best belief it was in
23   July of 2004.
24       Q.    Why is it that you have difficulty
25   answering a question seemingly so simple?

Page 24

1        MR. ELLIOTT: Objection to form.
2        Q.    Let me rephrase the question.
3            Why is it that you have difficulty
4    answering the question?
5        A.    Well, the agreements morphed and changed
6    and went back and forth and there were various
7    versions of them, and Pavanelli was a very difficult
8    guy to deal with. And it was just till that
9    timeframe, till we finally had a deal.
10       Q.    What was the event that occurred that
11   confirmed that you had a deal?
12       A.    I think it was the agreement, that the
13   last part of it was the agreement of Pavanelli and
14   Gruppo to a -- to a couple of things; that is a
15   waterfall for the collection for the distribution of
16   proceeds in the event of success, and the agreement
17   to transfer possession of the instruments. And I
18   think those were the two final things that put the
19   agreement over the top.
20       Q.    Is it your position that you didn't have a
21   deal until you had possession of the instruments?
22       A.    I would say we had a deal when we executed
23   the contract but it would have been subject to
24   receipt of the instruments, is the way I would put
25   it.

6  (Pages 21 to 24)

David J. Richards

Page 25

1    Q.    When did you execute the contract?
2    A.    That's the part that's hard to figure out.
3    Again, my guess is end of July/early August of 2004.
4    Q.    You've been in business as an entrepreneur
5    for decades, right?
6    A.    Yeah, long time.
7    Q.    Do you normally have trouble identifying
8    when it is that you entered into a transaction?
9    A.    If you ask me about transactions that long
10   ago, I could.
11   Q.    Do you normally have difficulty
12   determining when you executed a contract?
13   A.    Unless it's dated and it's ten years ago.
14   If it's recent and it's dated, I wouldn't, of course.
15   Q.    So as you sit here today at the end of
16   2014, you don't know when you executed the contract
17   for the acquisition of notes 7/12 and 8/12?
18   A.    I don't know exactly when, I know
19   approximately.
20   Q.    Approximately was the end of July of 2004.
21   A.    End of July/early August of 2004.
22   Q.    And on what basis do you say it occurred
23   then?
24   A.    Well, it's just to the best of my memory
25   when we finally agreed to move forward. Looking at

Page 26

1    the surrounding events and what happened before and
2    after, I knew -- I know that I executed it right
3    after he agreed to transfer possession of notes 7
4    and 8. And I know that we received those notes
5    shortly after we agreed to do that.
6         And I know that it was after events that
7    occurred in mid-July where my attorneys had traveled
8    over to Como to meet with him, meet with Pavanelli
9    and others. So that's my basis for that approximate
10   timeframe.
11   Q.    Those attorneys were from Crabbe, Brown &
12   James?
13   A.    Yes.
14   Q.    So you didn't sign the contract for the
15   acquisition of notes 7 and 8 of 12 until after
16   Crabbe, Brown & James went to Como in July?
17   A.    That's the best of my memory. And whether
18   it's my memory or not, that's when we agreed to
19   proceed with the deal. I think that's when I signed
20   it.
21   Q.    When did Pavanelli sign it?
22   A.    I think he first signed it in mid-April,
23   something like that. And it was proposed to him
24   right at -- within a couple of weeks of the meetings,
25   I believe.

Page 27

1    Q.    The meetings that took place March 30th,
2    31st, April 1st?
3    A.    That timeframe approximately. And he was
4    ready to go on that transaction but he wasn't ready
5    to send me the notes.
6    Q.    But you weren't ready to go until sometime
7    in late July or early August.
8    A.    That's right.
9    Q.    So just so I understand what you're
10   saying, he signed in April, you signed at the end of
11   July or early August.
12   A.    He signed at least one time in April. He
13   may have re-signed it in July or August, I'm not sure.
14   Q.    But you didn't sign for the first time
15   until late July or early August --
16   A.    That's my best remember -- I was going to
17   say "remembery" but that's not a word I don't think.
18   That's my best memory.
19   Q.    Would there be anything you could do to
20   refresh your recollection as to when you actually
21   signed that agreement?
22   MR. ELLIOTT: You mean other than what
23   he's already testified about?
24   Q.    Sure.
25   A.    Well, I think the best thing -- so first

Page 28

1    off, I'm certain that the time that the agreement was
2    a go that we agreed to proceed is at the end of July
3    and that I signed an agreement at that time.
4         So as to when, whether I signed any other
5    agreements before then similar or like that, it
6    would -- the best thing would be a signature page
7    that's dated or a fax of a signature page that's
8    dated. And I've not been able to find anything like
9    that.
10   Q.    Have you looked?
11   A.    Yeah. Now, Schianchi might have one of
12   those. So that might be helpful. But even if he has
13   an earlier signature page, we went into other
14   agreements between April and when we finally agreed
15   to go in this agreement. And I was in no way ready
16   to go in the deal in April anyway.
17   Q.    Why not?
18   A.    Well, you know, I'm sure you've read the
19   agreement, we were assuming some major obligations
20   under the agreement, and we hadn't finished -- for
21   example, I had the obligation to, you know, bring
22   action if appropriate and pay lawyers, which could
23   have been a huge liability. And so I hadn't worked
24   all that out.
25        So there were other things as well so we

David J. Richards

| Page 29 |
| --- |

1 weren't over the hump on the diligence. So but he
2 was ready to go, he wanted money, that's what he
3 wanted. He wanted cash.
4     Q.    When you said that Pavanelli was difficult
5 to deal with, what made him difficult to deal with?
6     A.    Well, he was mercurial. I do a lot of
7 transactions where the companies are in difficulty.
8 We do distressed -- we've done distressed
9 transactions, this current deal I was talking to you
10 about this morning was a distressed transaction. And
11 so when people are under distress, they behave
12 irrationally a lot of times.
13     So, Pavanelli was no exception to
14 that, he was under a lot of stress and he at times
15 behaved irrationally. Primarily I think due to the
16 fact that he was in need of cash.
17     The second thing about Pavanelli that made
18 him difficult to deal with was he had a temper. He
19 seemed like a very, very smart guy but he just had a,
20 he had a bad temper and he would lose his temper
21 frequently and then one day later apologize.
22     So I think those are the two primary
23 things about Pavanelli that made him difficult to
24 deal with.
25     Q.    So he was under distress when you were

| Page 30 |
| --- |

1 dealing with him between late March and late July or
2 early August of 2004?
3     A.    Yes, I would say that's true.
4     Q.    Why was he under distress?
5     A.    Again, he was -- like many of our
6 transactions, they were short of funds, short of
7 cash. And I think there was some element of him
8 being just kind of -- back then I believe he was in
9 his mid-60s, I'm not sure if I'm right about that,
10 but he had been trying to collect on the notes since
11 he was a 50-year-old man. Starting to know how he
12 felt. I think he was a little worn out.
13     Q.    Other than being short of money was there
14 any other reason why he was under distress in that
15 timeframe?
16     MR. ELLIOTT: You mean other than what he
17 just testified about?
18     A.    What I just said. So people, when they're
19 tired and worn out, they behave differently. So, and
20 I think it was his mercurial personality as well. He
21 caused himself as much of his own problems just by
22 losing his temper and getting angry.
23     Q.    Other than being worn out from trying to
24 collect on notes and being short of money was there
25 anything else that you observed that had him under

| Page 31 |
| --- |

1 distress?
2     A.    Those are things that come to mind from
3 back then.
4     Q.    Between the time that you signed these
5 interrogatory answers that have been marked as
6 Exhibit 1 in 2006 and preparing for this deposition,
7 had you had occasion to review these?
8     A.    No.
9     Q.    So basically it had been eight years since
10 you last looked at them?
11     A.    Yeah.
12     Q.    And with the benefit of hindsight do you
13 have any insight as to how it is you could have
14 gotten these two answers wrong?
15     MR. ELLIOTT: Objection.
16     A.    No.
17     MR. ELLIOTT: That's not what he said. He
18 didn't say he got them wrong. You're
19 mischaracterizing his testimony.
20     MR. SCHWARTZ: I don't really accept the
21 objection but I'm going to try to avoid trouble, so
22 I'll rephrase the question.
23     Q.    As you sit here today do you have any
24 insight into how it is that you phrased these answers
25 in a way that today looks to you to be imprecise or

| Page 32 |
| --- |

1 inaccurate?
2     A.    I made a mistake. I didn't look at it
3 carefully enough. You know how these go, the
4 attorneys prepare the answers and they run them by
5 you for approval, so I missed that maybe.
6     Q.    In the course of the approximately ten
7 hours you spent preparing for the deposition during
8 which you reviewed the documents that you described,
9 did any of those documents, other than ones we've
10 talked about so far, refresh your recollection of any
11 of the events of 2003 and 2004?
12     A.    I mean, that's the whole purpose of
13 looking at things, to kind of get your brain working
14 about what happened. It's hard for me to think of
15 anything specific but just kind of getting back into
16 thinking about what the heck happened and what your
17 impressions were.
18     Q.    That's really what I'm asking. Was there
19 any particular document you reviewed in the course of
20 preparing for the deposition that stands out in your
21 mind as having sparked some recollection of some
22 particular relevant fact or circumstance?
23     A.    Well, that's hard to answer. Let me kind
24 of go through the -- well, I recall seeing a copy of
25 an email that -- where John Kennedy of Crabbe-Brown

David J. Richards

Page 33

1    was writing to the Ministry of Finance and saying
2    we're diligencing the Attorney General's opinion and
3    if there's anything wrong with it, please let me
4    know, kind of like that, and that was November 2nd
5    of or 3rd of 2003.
6    Q.    Excuse me for a second.  That's an email
7    from John Kennedy to whom?
8    A.    John Kennedy at Crabbe-Brown.
9    Q.    Yeah, to whom?
10   A.    To the Ministry of Finance, it's one or
11   two people at the Ministry of Finance.
12   Q.    Do you recall which two?
13   A.    No, I don't.  But it didn't recall me
14   specifically but reminded me of kind of what we were
15   doing back then and sort of the flow of things.  I
16   was apparently copied on the email so wasn't a record
17   that I'd had.
18       So that was something that sticks out in
19   my mind as seeing that thing and, boy, I didn't
20   remember that.  And what did we do right before and
21   right after that.
22       Then if I'm going to kind of go forward
23   there and think of the things that I saw, of course I
24   reviewed the agreements, the whole -- I went through
25   all the agreements and tried to resolve in my mind

Page 34

1    all of the back and forth that was going on with
2    those agreements and all of the negotiations and
3    remonstrations to finally get to where we were.
4        And so the agreements helped and more in
5    that sense of not so much looking at the exact legal
6    terms but kind of what was going on and what was
7    happening in consecutive order in this timeframe up
8    to the lawsuit being filed.
9        I reviewed -- the thing that really helped
10   me was when in the fall of 2004 we took out a -- we
11   were doing a transaction on behalf of Gruppo to try
12   and sell one of the notes in sort of the U.S.
13   financial system and we put together a short
14   memorandum to, not to offer the bonds but the term of
15   interest.  And so reading that helped me think about
16   kind of what our mental processes were at the time
17   and what we thought and helped me reflect back on how
18   we got to those opinions.
19       And I saw a -- I saw a document that was
20   prepared by Jess Ravich at Libra Securities, and
21   Libra -- Jess was an ex-managing partner at Kidder
22   Peabody, and so I remember all that back and forth
23   that started I think in June of '04 with him, because
24   he's very, very powerful -- or, not powerful but kind
25   of a big guy.  He's far above my level.

Page 35

1        And kind of their thought processes and
2    going back and forth with them that caused me to
3    remember kind of the bases we were trying to cover
4    then and all of that.
5        So I'd say the things that popped to my
6    head as you asked that question are those.
7    Q.    What note were you trying to sell in the
8    U.S. financial system in the fall of 2004?
9    A.    Note 9/12.
10   Q.    Where did you get the various documents
11   that you reviewed for purposes of preparing for these
12   depositions?
13   A.    From my counsel.
14   Q.    As far as you're aware were all of the
15   documents that you reviewed documents that had been
16   produced to the defendants in this case?
17   A.    I have no idea.  Either Chip or Rex can
18   answer that.
19   Q.    When you practiced law, what kind of work
20   did you do?
21   A.    For the first five or six years I was a
22   litigator, maybe seven, and for the last couple years
23   I was a tax guy.
24   Q.    Why did you make that change?
25   A.    Well, you want to know the real truth?

Page 36

1    I'm under oath.  Well, I looked around in Columbus
2    and every litigator I thought was really good was
3    either divorced, an alcoholic, or something, and I
4    was starting a family and I decided I wanted a
5    different life.
6        So I thought maybe tax would provide that
7    and I went to the Capital master's in tax program,
8    which I almost finished but got sick of that too, I
9    mean, tax, pretty bad for a litigator, right?  So and
10   then I went to business.
11   Q.    How long were you at Crabbe, Brown &
12   James?
13   A.    I was active there from I think '77 to '85
14   or '6 and then completely gone in '88 or somewhere
15   around there.
16   Q.    Was that the last law firm you worked at?
17   A.    That's the only law firm I worked at.  I
18   was a partner there.
19   Q.    Did you leave voluntarily?
20   A.    Over their objection, yeah.
21   Q.    Now, at some point you formed the entity
22   that's now known as Skye Ventures, LLC, right?
23   A.    Yes.
24   Q.    When was that?
25   A.    Well, it started out as a blank entity

9  (Pages 33 to 36)

David J. Richards

Page 37

1  called I think DRFP, LLC I believe, and that was in
2  August of 2003.
3      Q.    And you also had formed an entity in the
4  same timeframe called Empire Advisors, LLC; is that
5  right?
6      A.    I don't know when that was, to be honest
7  with you. But probably was in the same timeframe.
8  Empire was related to another business that, well,
9  Empire was sort of a -- we formed that, I formed that
10  as a sort of an umbrella entity and it would hold
11  entities typically like DRFP or others. So as to
12  exactly when Empire was started, I don't know.
13      Empire involved sort of the same group of
14  investors, high-net-worth individuals that had been
15  with me since '90. So it was more of a -- nothing
16  discontinuous. So there was no event that makes me
17  remember when it was.
18      MR. SCHWARTZ: Let's take a
19  couple-of-minute break here.
20      VIDEOGRAPHER: Off the record 9:56.
21      (Recess taken.)
22      VIDEOGRAPHER: On the record 10:05.
23      Q.    We were talking about the formation of
24  Empire Advisors, LLC when we took a break and you
25  described it as an umbrella that would hold entities

Page 38

1  like DRFP, LLC. I don't want to spend a lot of time
2  on this, but what's the relationship between Empire
3  and DRFP, LLC, which is now known as Skye Ventures,
4  LLC? If there is one.
5      A.    Well, this is maybe too technical for me,
6  but I would guess that Empire owns a hundred percent
7  of Skye maybe. Is that right? We typically own all
8  or part of the entities that are group funds.
9      Q.    I don't know if it's right, I have to ask
10  you those questions.
11      A.    I don't either. I don't know. We've got
12  a million entities so it's hard for me to know the
13  details of any one of them.
14      Q.    Let me just pause for a second and get
15  some nomenclature understanding here with you. So
16  the plaintiff in this case is called Skye Ventures,
17  LLC, right?
18      A.    Yes.
19      Q.    And it was formerly known as DRFP, LLC,
20  right?
21      A.    Yes.
22      Q.    Those are one and the same.
23      A.    I believe so, yes. I'm sure of it.
24      Q.    So during the course of the deposition I'm
25  going to make reference to "Skye Ventures" or I'm

Page 39

1  going to make reference to "Skye" from time to time.
2  You'll understand when I do that that I'm referring
3  to the plaintiff Skye Ventures, LLC which was
4  formerly known as DRFP, LLC, right?
5      A.    We have, Empire has three or four entities
6  that are called Skye something, so I sometimes get
7  confused, but I know today if we're talking about
8  Skye, it will be Skye Ventures, that's the Bandagro
9  bonds holder.
10      Q.    Or Skye, just so we're --
11      A.    Or Skye.
12      Q.    Now, there's also an entity known as
13  Skye II, right?
14      A.    Yes.
15      Q.    What is that?
16      A.    I think Skye II is an entity that we
17  formed in connection with note 9/12. We viewed it as
18  a separate transaction and I think we formed a
19  separate entity for that. I believe that's how this
20  came about.
21      Q.    Which entity today owns 9/12?
22      A.    I don't know the answer to that question.
23  I would assume it's Skye II but it might have
24  transferred to Skye. I don't know.
25      Q.    How could you figure out an answer to that

Page 40

1  question?
2      A.    Well, I could do another records
3  search and try to figure it out and it would be the
4  same, I would have to -- that's what I'd have to do,
5  I'd have to go figure it out and look at it.
6      Q.    If you don't know, who would know?
7      A.    Well it would only be me, I would know,
8  right? And would I have to go back and look and see
9  if it was still Skye II or what.
10      Q.    Is that something you could take on as a
11  homework project for tomorrow?
12      A.    You better start writing these down.
13      MR. ELLIOTT: We'll consider it. Can you
14  tell me, though, why it would be important to you to
15  know which entity holds note 9/12?
16      MR. SCHWARTZ: Not without revealing the
17  mental impressions of your adverse counsel.
18      MR. ELLIOTT: Okay.
19      MR. SCHWARTZ: But it is part of the
20  overall factual mix and we do want to know which
21  entity owns note 9/12. We particularly want to know
22  if the plaintiff owns it. But I don't consider this
23  to be the single most important issue in the case or
24  in the deposition.
25      MR. ELLIOTT: We'll talk about it.

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 41

1    A.    So my best belief is that Skye II owns it
2    but I'm just hesitant to go say that's a hundred
3    percent sure because I don't really know it or
4    haven't thought about it until you asked the
5    question.
6        Q.    (By Mr. Schwartz) All right, another entity
7    we're going to talk about you may already have talked
8    about today, but I want to get the nomenclature
9    straight so we can do this smoothly, so there's an
10   entity known as Gruppo Triad-FFC S.P.A./S.A.  You're
11   familiar with that entity, right?
12       A.    Well, I'm familiar with the company called
13   Gruppo Triad, and all the rest of that stuff you
14   added on there I'm not sure about, but I've always
15   dealt with Gruppo Triad and there's an entity known
16   as Gruppo Triad that I've always at least signed
17   transactions with.
18       Q.    And you think that its name is just Gruppo
19   Triad.
20       A.    No, no, there might be other initials to
21   it, but in my own head it's Gruppo Triad.  So if you
22   want me to testify as to accuracy of all those
23   initials and things, I couldn't.
24       Q.    Fair enough.  So we'll look later on at
25   some specific documents that have more elaborate

Page 42

1    names for Gruppo Triad and maybe that will jog your
2    memory, but for the time being as far as you were
3    concerned, it was just Gruppo Triad.
4        A.    Gruppo Triad, James Pavanelli, et cetera,
5    was the entity we were doing this transaction with
6    and was the original owner of the notes.
7        Q.    And it was your understanding that the
8    Gruppo Triad was the owner of notes 7 of 12 and 8
9    of 12 and that Pavanelli owned Gruppo Triad?
10       A.    Well, I think he was the acting officer
11   for Gruppo Triad.  I'm not sure about the ownership
12   of Triad.  I know there were, at least it was told to
13   me there were other owners than Pavanelli but
14   certainly that he was one of them.
15       Q.    Who were the others?
16       A.    I don't know.
17       Q.    You were just told there were others, you
18   were never given their names?
19       A.    Right, never asked for them.
20       Q.    Were you ever given any information as to
21   how much of Gruppo Triad Pavanelli owned?
22       A.    No.
23       Q.    One other attempt at a nomenclature
24   convention.  So you've heard of something called
25   Banco de Desarrollo Agropecuario, right?

Page 43

1        A.    Bandagro.
2        Q.    And that's an entity that used to be a
3    bank in Venezuela, is that your understanding?
4        A.    That's my understanding.
5        Q.    So if I refer to Bandagro, and for the
6    court reporter's benefit, that's capital letter
7    B-a-n-d-a-g-r-o, you'll understand that I'm referring
8    to Banco de Desarrollo Agropecuario, right?
9        A.    I'm making the assumption that that long
10   name's correct as you read it, but, yes, I know it's
11   Bandagro.
12       Q.    Let's return to an entity closer to home
13   for you, Skye Ventures.  What is that?
14       A.    LLC.
15       Q.    Who are the members of that LLC?
16       A.    I'm pretty sure it's myself and my wife I
17   believe, either that or it's a hundred percent
18   Empire, one of the two.
19       Q.    When Skye Ventures -- let me ask this:
20   Skye Ventures was formed sometime in 2003; is that
21   right?
22       A.    Yes.
23       Q.    When it was originally formed, who were
24   its members?
25       A.    Boy, I don't know.

Page 44

1        Q.    At some point between 2003 and today did
2    the members change?
3        A.    I don't know.
4        Q.    What would you need to do to figure out
5    the answer to that question?
6        A.    I'd have to look at all the annual
7    records.  I'd probably go to annual tax returns maybe
8    and look at them and see who got, you know, K1s,
9    whether it was myself or Empire.  I don't think it
10   would be anybody other than myself or Empire.
11       Q.    Now, you recently filed an affidavit in
12   this case in which you made reference to Skye
13   Ventures' investors.  Do you recall doing that?
14       A.    If you could show me the affidavit, it
15   would help me out.
16       Q.    I could but I'm going to try to move
17   forward a little more quickly.  If you want to see
18   it, I'll show it to you, but let me see if I can help
19   you a bit here because the particulars of the
20   affidavit at the moment are not critical.
21            This had to do with a motion for a
22   protective order that Skye Ventures --
23       A.    If you're asking me is there an entity
24   Skye Ventures Investors?
25       Q.    That's not what I was asking.

11 (Pages 41 to 44)

CONFIDENTIAL

David J. Richards

| Page 45 |
| --- |

1    **A.**   That's what I thought you were asking me.
2  That's why I was asking to see the affidavit, because
3  there's no such entity.
4    **Q.**   No, that's not what I was trying to
5  suggest. I'm sorry if I confused you.
6    But not long ago Skye Ventures' lawyers
7  filed a motion for protective order asking that Skye
8  Ventures not have to reveal the identity of its
9  investors. Are you familiar with that?
10    **A.**  Yes, I am.
11    **Q.**   And you filed an affidavit in support of
12  that motion, right?
13    **A.**  Yes.
14    **Q.**   In that affidavit when you referred to
15  "Skye Ventures' investors," what is the nature of
16  those investors' investment in Skye Ventures?
17    **A.**  Invested, you know, in this transaction.
18    **Q.**   How?
19    **A.**  By giving, by sending me cash.
20    **Q.**   What's the structure of those investments?
21    **A.**  Oh, I see what you're saying. Well, the
22  investors are not partners in Skye, they have a
23  distribution interest in proceeds from any proceeds
24  received from the notes. So they have a, I would
25  call it a distribution right.

| Page 46 |
| --- |

1    **Q.**   Roughly how many such investors are there?
2    **A.**  In this particular transaction in Skye, in
3  the Bandagro transaction you're talking about?
4    **Q.**   Sure.
5    **A.**  I would guess 60. 50 to 60.
6    **Q.**   What's the aggregate amount of their
7  investment?
8    **A.**  I don't know the answer to that question.
9    **Q.**   Can you approximate it?
10    **A.**  Yes, I can approximate it. I would
11  approximate $2 million. Million and a half to
12  $2 million.
13    **Q.**   Are these investments documented in some
14  way?
15    **A.**  Yes.
16    **Q.**   What type of documentation is there?
17    **A.**  Well, there's, for each investment there
18  is a subscription agreement and acknowledgment and
19  another attachment that I think it's an escrow
20  arrangement attachment.
21    **Q.**   Has each of the 50 to 60 investors
22  executed such a subscription agreement?
23    **A.**  Yes.
24    **Q.**   In substance what are the terms of the
25  subscription agreement?

| Page 47 |
| --- |

1    **A.**  The terms of the subscription agreement
2  describe, you know --
3    MR. RICHARDS: Portions of this is marked
4  confidential.
5    MR. ELLIOTT: Let me ask from a logistical
6  standpoint here, because I don't want to interrupt
7  your questioning, do you have an issue with us
8  designating portions of the transcript confidential
9  after the testimony's completed or would you like to
10  do that question by question?
11    MR. SCHWARTZ: I think it would be easier
12  if do you it after it's completed.
13    MR. ELLIOTT: I'm okay with that. I think
14  it would be a much smoother process if we do it that
15  way. Otherwise we're going to have to step in and
16  consult and try to figure this out as we go.
17    MR. LUCAS: I can't remember, do we have a
18  protective order in place in the case?
19    MR. RICHARDS: Yes.
20    MR. LUCAS: I think that protective does
21  discuss your right to designate transcripts
22  confidential, so whatever that says we should comply
23  with.
24    MR. ELLIOTT: I think it does too, and it
25  wasn't part of your opening spiel and I was going to

| Page 48 |
| --- |

1  bring it up at some point.
2    MR. SCHWARTZ: Spiel?
3    MR. ELLIOTT: Your opening salvo,
4  whatever.
5    MR. SCHWARTZ: I don't think that was a
6  pejorative designation.
7    MR. ELLIOTT: But as long as we're
8  comfortable with that, I think this will go a lot
9  smoother today and tomorrow.
10    MR. SCHWARTZ: I agree with that. And why
11  don't we, when we have our discussion, which we must
12  remember to have about how long Mr. Richards is going
13  to have to review the transcript, we should address
14  at the same time how long you'll need to make the
15  designations. But I think what you're suggesting is
16  fine.
17    MR. LUCAS: And I think the protective
18  order addresses that specifically.
19    MR. ELLIOTT: Right, but short of breaking
20  out the protective order right now and trying to
21  figure all that out.
22    MR. SCHWARTZ: Your rights on this is
23  protected.
24    THE WITNESS: Probably can get to it
25  within 28 days, but just as crazy as my life is at

12 (Pages 45 to 48)

CONFIDENTIAL

David J. Richards

Page 49

1  the moment.
2          MR. ELLIOTT:  We'll talk about that.
3          MR. SCHWARTZ:  We'll talk about that.
4  It's not inconceivable the transcript will need to be
5  used in whatever form it exists prior to that with
6  the understanding that he hasn't reviewed it.
7          MR. ELLIOTT:  As with everything, I can
8  tell you without having talked about it yet, it will
9  be a priority to us.  We are not interested in delay
10  at all.
11          MR. SCHWARTZ:  I wasn't meaning to suggest
12  you were trying to delay anything here.
13          MR. ELLIOTT:  I know.
14          MR. SCHWARTZ:  What is the pending
15  question?
16          MR. LUCAS:  It was one of the terms of the
17  subscription agreement.
18          (Record read.)
19      A.    So do you want me to continue?
20      Q.    (By Mr. Schwartz) Please.
21      A.    So the terms of the subscription
22  agreement, they lay out the generic things that are
23  in all subscription agreements, a lot of boilerplate,
24  accredited investor and blah, blah, blah, and then
25  but the meat of it is where it outlines the way in

Page 50

1  which their distribution will be calculated.
2          And then there was an attachment to the
3  subscription agreement that the escrow agent who
4  holds the bond also agrees to make sure the
5  distributions occur in the fashion described in the
6  subscription agreement.
7      Q.    Who's the current escrow agent?
8      A.    I think it's Robert Behal.
9      Q.    B-e-h-a-l?
10      A.    Yeah.
11      Q.    Who is he?
12      A.    He's an attorney in Columbus.
13      Q.    Does he practice in a firm or is he a solo
14  practitioner?
15      A.    He's, he actually is a solo practitioner.
16  He has, I think he has four or five people that work
17  for him but it's his firm.
18      Q.    How much did the investors who invested
19  the million and a half to $2 million stand to gain if
20  Skye Ventures is successful in this lawsuit?
21      A.    Today?
22      Q.    Well, you're not going to be successful
23  today, I assure you of that.  But how much do they
24  stand to gain --
25      A.    It's changed over time.

Page 51

1      Q.    Well, currently.
2      A.    Currently.  That's a bit of a tricky
3  question.
4      Q.    Wasn't meant to be.
5      A.    So I would estimate, without doing the
6  math, that it's approximately whatever is paid on
7  $35 million of face value, something like that.
8      Q.    Let me see if I understand what you're
9  saying.  So there's a hundred million dollars in face
10  value at issue in the lawsuit, right?
11      A.    Correct.
12      Q.    Are you saying that the people who
13  invested the million and a half to 2 stand to receive
14  35 percent of the litigation proceeds?
15      A.    That's not the way it's characterized.
16  But that's about what it would be if there were a
17  hundred million dollars paid, my guess, again,
18  without doing calculations, would be most likely
19  about $35 million.
20      Q.    What did Skye Ventures do with the million
21  and a half to 2 that was invested by the 50 to 60
22  people?
23      A.    We spent it, most of it.
24      Q.    On what?
25      A.    Well, we gave a lot of money to Gruppo,

Page 52

1  near a million dollars, and over ten years we've had
2  a decent amount of expenses and litigation expenses.
3  And we have some reserve.
4      Q.    How much reserve?
5          MR. ELLIOTT:  Objection.  I don't think
6  you need to answer that question.  I'll instruct you
7  not to answer the question.
8          MR. SCHWARTZ:  And the basis for that?
9          MR. ELLIOTT:  It's completely irrelevant,
10  it's proprietary information, and it's definitely not
11  information that I think you're entitled to.
12          MR. SCHWARTZ:  Well, I don't want to have
13  an argument now about this stuff, Mr. Elliott, but
14  those are not grounds upon which to instruct somebody
15  not to answer.
16          MR. ELLIOTT:  Well, he's not going to
17  answer the question.
18          MR. SCHWARTZ:  We shall reserve our rights
19  and move on.
20      Q.    (By Mr. Schwartz) Over what period of time
21  was the million and a half to 2 million invested?
22      A.    That gets back to the interrogatory answer
23  that we were talking about before.  So I would say
24  the bulk of it that went to Gruppo was between that
25  2003 timeframe to maybe that 2006 timeframe, or there

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 53

1 might have been a payment or two after that, I'm not
2 sure.
3 And then there was, as we've incurred
4 expenses throughout the case, it's been expended
5 debt.
6 Q. I'm not asking you about actual
7 expenditure of the investments at this point, I just
8 want to know when was the million and a half to 2
9 raised?
10 A. At various points. I have a -- the way in
11 which Empire operates, and all of its transactions
12 operate, is they're Culmini funds, so in other words,
13 we don't sit on a pile of money, we raise money as
14 needed. And so we've raised it periodically as
15 needed.
16 Q. And over what period of time have you had
17 a need that resulted in your raising a million and a
18 half to 2?
19 A. I would say late 2003 till this year.
20 Q. When was the most recent investment that
21 was made?
22 A. I think we put some money in the last time
23 in August maybe.
24 Q. Of 2014?
25 A. Yeah.

Page 55

1 Q. Do you have Exhibit 2 in front of you,
2 Mr. Richards?
3 A. I do.
4 Q. This is the document we were just
5 discussing?
6 A. The last page is the one I'm recalling
7 here, this one right here. I never saw this
8 privileged log before, so.
9 Q. But the last page of Exhibit 2 is the list
10 of people who are investors in Skye Ventures with the
11 exception of the three whose names you indicated were
12 mistakenly included, right?
13 MR. ELLIOTT: The document is titled
14 Recipients of Investor Communications from Skye
15 Ventures. I don't want your question to mislead the
16 witness or the record that the individuals on this
17 list are the investors of Skye because that's not
18 accurate.
19 MR. SCHWARTZ: All right, let me try to
20 clear that up. I wasn't trying to mislead anybody,
21 as I hope you appreciate, but I'll rephrase the last
22 question so as to perhaps address your concern and
23 get a clearer answer to the question.
24 Q. Are all the 50 or 60 investors in Skye
25 Ventures listed on this last page of Exhibit 2?

Page 54



Page 56

1 A. I'm pretty sure, yes.
2 Q. Before you obtained the investments from
3 these 50 or 60 people, did you send any of them some
4 form of offering memorandum, anything like that?
5 A. No.
6 Q. How is it that you were able to solicit
7 their investments?
8 A. Well, these are all people who invested
9 with me before and so what I would typically do is
10 either verbally or by email say got this interesting
11 deal, here it is, you want to put any money in it.
12 Q. When you say "verbally," you mean orally?
13 A. Orally, I guess that's right.
14 Q. So you'd either orally communicate to the
15 perspective investor or send an email to the
16 perspective investor in which you describe the
17 investment opportunity. Is that a fair summary?
18 A. Yeah. They're brief, nothing like an
19 offering memorandum. If there was an email, it would
20 be a couple paragraphs.
21 Q. What email address do you use for purposes
22 of conducting Skye Ventures' business?
23 A. Well, I think at one time we maintained a
24 Skye Ventures server but we don't any longer, I use
25 Empire. And that's sort of a practice that we do

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 57

1   now, I use Empire for everything.
2       Q.   And what's your email address at Empire?
3       A.   DRichards@EmpireAdvisorsLLC.com.
4       Q.   When was the Skye Ventures server
5   operational?
6       A.   Well, I don't know. I had a fellow that
7   did that, he died. I don't remember exactly when all
8   that happened.
9       Q.   Who was that fellow?
10      A.   His name was Eric Jones.
11      Q.   To the best of your recollection when did
12  you cease using an email address at SkyeVentures.com?
13      A.   To be honest with you, I don't know how
14  long that hung around. I really, honestly, I have a
15  lot of email addresses, so I just don't remember.
16      Q.   Back in 2003 and 2004 what email address
17  did you use for Skye Ventures' business?
18      A.   I think that's when we used Skye Ventures'
19  email I believe. Maybe not until -- maybe it wasn't
20  2003, maybe as it became a real active transaction we
21  did something with that. So maybe probably more
22  likely 2004 we started with that.
23      Q.   In that timeframe did you send emails to
24  Mr. Pavanelli?
25      A.   In 2004, yeah, I'm sure I did, yeah.

Page 58

1       Q.   And in that same timeframe, 2004, did you
2   send emails to Mr. Schianchi?
3       A.   I'm sure I did. Schianchi, he pronounces
4   it ski-ahn-ki.
5       Q.   So that's S-c-h-i-a-n-c-h-i.
6       A.   You would pronounce my wife's name
7   cas-si-ot-ti if you read it not cash-shotti, so they
8   get offended by that.
9       Q.   In 2004 did you send emails to anybody
10  else concerning the Bandagro notes?
11      A.   I'm sure I did.
12      Q.   To whom else?
13      A.   Well, we talked about Pavanelli and
14  Schianchi, certainly my attorneys.
15      Q.   Who were active as your attorneys at that
16  point?
17      A.   Crabbe-Brown.
18      Q.   Who at Crabbe-Brown?
19      A.   Most of the work was being done by Luis
20  Alcalde, John Kennedy some, and Jeff Brown, and there
21  were a couple others who worked on it. I dealt
22  mostly with Alcalde.
23      Q.   So you sent emails in 2004 to Schianchi,
24  to Pavanelli, to Alcalde, to John Kennedy, to Jeff
25  Brown, anybody else? Concerning Bandagro.

Page 59

1       A.   Probably some of the people on this list
2   in 2004.
3       Q.   Some of the investors.
4       A.   Yeah, probably.
5       Q.   Did you communicate with Mr. Jacir, that's
6   J-a-c-i-r, by email in 2004?
7       A.   I was copied on some emails by Jacir but
8   those were all Alcalde. Jacir does not speak
9   English, so.
10      Q.   So you were copied on emails from Jacir to
11  Alcalde that were sent in Spanish?
12      A.   Once or twice, yeah. They were almost all
13  in Spanish. I don't believe Miguel speaks any
14  English at all.
15      Q.   Did Schianchi -- does Schianchi speak
16  English?
17      A.   I'm not sure how much he speaks or doesn't
18  speak. But when I've interacted with him, I've
19  always had an interpreter.
20      Q.   And Pavanelli spoke English though,
21  correct?
22      A.   Yeah. He spoke English well.
23      Q.   Do you have copies of the emails that you
24  sent to any of these investors in which you solicited
25  their investment in the Bandagro notes?

Page 60

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 61



Page 63

1  asked him about what. And he said well, just talk to
2  him for five minutes.
3      So as a favor to Dave who had done me a
4  lot of favors in life, I agreed to meet with Larry.
5  And Larry came over to my house, I was at my home
6  that day, came over right within the hour.
7      Q.  In Ohio?
8      A.  In Ohio, right, my Ohio home. Knocked on
9  the front door, and I don't know exactly when it was
10 but I remember it was very, very hot, and Larry was
11 there in a business dress shirt and sweating. It was
12 must have been a hundred degrees. So I think it was
13 late August or September.
14     And so I stood on the doorstep and talked
15 to him a little bit, and he was talking about this
16 bond deal that I should be interested in. And well,
17 I said to him, well, you know, if there's -- you're
18 standing on the doorstep of my house, I'm not going
19 to talk to you about a bond deal.
20     Well, what it really was, that Larry
21 wanted $5,000. So, and he was going to give me some
22 interest in this deal that he was describing and the
23 way he was talking about it, maybe I wasn't focused,
24 but didn't make a lot of sense.
25     So I said look, I'll loan you 5,000 bucks,

Page 62

1  here that may get the communications that aren't
2  actual monetary investors, and certainly Adam and
3  Chip are two of those.
4      Q.  Are not monetary investors?
5      A.  Are two of those who were not monetary
6  investors, yes.
7      Q.  Understood.
8      When did you first become acquainted with
9  Pavanelli?
10     A.  I believe it was in October of 2003.
11 Although it's possible I spoke to him in September.
12     Q.  How is it that you came to be in contact
13 with him?
14     A.  We were looking at the transaction and he
15 was the acting officer of the people who owned the
16 notes.
17     Q.  How did you find out about this
18 opportunity?
19     A.  Well, it's an odd story, like about half
20 of my deals. So what happened was there was a fellow
21 in town named Dave Corna and Dave was a pretty good
22 friend, or at least a pretty good business friend and
23 had done a number of things with him in the past, and
24 he called me and asked me if I would talk to his
25 brother, Larry Corna, who I had never met. And I

Page 64

1  which I did. I went inside, got a check, wrote him a
2  $5,000 check. And said that I could talk to him
3  about the deal later. And he said he'd give me an
4  interest in this deal and pay me back.
5      So there are a lot of Cornas in town, I
6  know Richie's a big builder, fellow member at
7  Muirfield, Mark's also a big construction guy and
8  president of banks, and I assumed I could trust a
9  Corna for 5 grand, so I wrote him a check and he
10 left.
11     And then maybe a week after that or two I
12 had a phone conversation with him about the deal and
13 he started telling me the story about the Bandagro
14 bond deal.
15     Q.  This was a phone conversation with Larry?
16     A.  With Larry. And that he was going to get
17 me papers on the deal and, you know, make sure that
18 my $5,000 was good. And he might even have asked me
19 for another 5 at the time, I'm not sure about that.
20     So I asked him how he got this deal and
21 where he heard of it, and he told me that it was sent
22 to him, so he told me some story about how it was
23 back in Italy where his family was from and then came
24 through a local fellow named Marvin Cantor and he
25 mentioned Antonio Usuelli's name, told me a little

16 (Pages 61 to 64)

CONFIDENTIAL

David J. Richards

Page 65

1  bit about him.  Okay, so it sounded interesting.
2       So we do a lot of odd things, I said
3  sounds pretty odd.  And so I got on the phone, I
4  actually called Marvin, I asked him about the deal.
5       Q.  Did you know Marvin?
6       A.  Yeah.  I asked him and, yeah, we came
7  close to doing several deals together, plus I
8  invested in his company that Wendt Bristol, this
9  imaging business that he sold to the Cleveland
10  Clinic.
11       So at any rate, I called Marvin and I said
12  hey, what's going on here, and he said he didn't know
13  much about it but he heard about it from this Antonio
14  Usuelli guy.  And I so he told me a little bit about
15  Usuelli and said good things about him.
16       Marvin used to own a seat on the New York
17  Stock Exchange way back when, he was in the financial
18  business before medical imaging and Antonio was also
19  in the financial business and that's how they met I
20  guess.
21       And that led to a call with Antonio
22  Usuelli who told me a cogent story about the bond
23  transaction.  And the idea was there was some
24  administrative proceeding going on and that there
25  would be a resolution soon, and so I said great,

Page 66

1  sounds interesting, call me if that happens,
2  basically.
3       So that all happened at the, you know,
4  late August/early September timeframe.  That's how I
5  learned about the Bandagro.
6       Q.  So did you loan Larry Corna the second
7  5,000?
8       A.  My sense is that I did.  That he came back
9  and I -- but I don't really have a strong
10  recollection of whether I did or didn't at this time.
11       Q.  Do you have access to bank records that
12  would enable you to determine whether you loaned him
13  the other 5?
14       A.  Banks don't have records back then and I
15  certainly don't.
16       Q.  Did you ever get either the 5 or the
17  10,000 dollars back from him?
18       A.  I think what happened on that $5,000 was
19  that -- well, the answer is -- if the question is did
20  Larry ever hand me any cash back, the answer is no.
21  But I think we might have resolved it somehow in the
22  Bandagro deal I believe.  I think some how it ended
23  up getting applied to that purchase.
24       Q.  How?
25       A.  Well, I think what happened was that Larry

Page 67

1  delivered me some sort of security interest in the
2  Gruppo bonds that was prepared by Schianchi.  And I
3  don't know exactly when he did that.  So I had that,
4  I had -- and probably if I could -- probably if I
5  loaned him -- I think he was giving me $50,000
6  interest in the bonds, something like that.
7       Q.  Which bonds?
8       A.  The Gruppo bonds.
9       Q.  Which ones?
10       A.  You know, the ones they held.  I don't
11  know, it was a joint interest, it was interest in a
12  specific bond, I don't remember.  But it was like a
13  security document of some kind that Schianchi
14  prepared.
15       Q.  Do you still have that?
16       A.  I don't, no.
17       Q.  Why not?
18       A.  Well, when we did the -- I think what
19  happened when we did the larger deal, all that old
20  stuff got rolled into my purchase price.  So if it
21  was 5 or 10, it was applied toward the purchase price
22  of the bonds.
23       Q.  So what happened to the security
24  document --
25       A.  I wouldn't have any need for it any

Page 68

1  longer.
2       Q.  So you threw it out?
3       A.  Maybe.  It would have no use to me any
4  longer.
5       Q.  You didn't keep that document?
6       A.  I might have kept it for a while.  And if
7  I had it, I gave it to my attorneys.
8       Q.  Are you sure you don't have a copy of it
9  still?
10       A.  I'm sure I don't have any copies of
11  anything really.  But I gave everything to these
12  guys, so.
13       Q.  And when did you give everything to these
14  guys?
15       A.  Well, I typically would try to give -- I'm
16  known for being bad with paperwork, so I would
17  typically try to give stuff to the attorneys so it
18  wasn't lost.  So I would give it to the attorneys at
19  various times.  And or maybe throw it in a box.
20       Q.  Have you looked for it since you brought
21  this lawsuit?
22       A.  Oh, yeah, looked through everything.
23       Q.  So to the extent that Larry Corna gave you
24  a security document that Schianchi, however you
25  pronounce his name, drew up, you either gave it to

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 69

1  your attorneys in connection with this lawsuit or you
2  threw it out?
3      A.   If I had it today, it would have no affect
4  anyway, so.
5      Q.   That's not my question.  I'd like to know
6  where the document is today.
7      A.   I can say it again:  I don't know.
8      Q.   And you don't know because you either got
9  rid of it or you gave it to your attorneys, right?
10     A.   I either threw it out, gave it to
11 somebody, or it's somewhere that I don't know where
12 it is.
13     Q.   If that's the best you can do.
14     A.   That's the best I can do, yes, it is.
15     Q.   All we can ask.
16          So when Larry Corna first appeared
17 literally on your doorstep asking you for a
18 $5,000 loan, a guy you never met before, didn't that
19 strike you as a little strange?
20     A.   I forget what it struck me as.  I know I
21 gave him the $5,000.
22     Q.   In retrospect doesn't it seem a little
23 bizarre?
24     A.   Not to me.
25     Q.   On how many other occasions in your life

Page 70

1  has a stranger shown up on your doorstep and you
2  loaned them $5,000?
3          MR. ELLIOTT:  Objection.
4      A.   Well, if he were a stranger, if I didn't
5  know his brother and his family, he would not have
6  been on my doorstep.  So I don't think he was a
7  stranger.  And if he was a stranger, I wouldn't have
8  answered the door.
9      Q.   Well, on how many other occasions have you
10 loaned $5,000 to somebody who appeared on your
11 doorstep without you knowing that the person was
12 going to ask for such a loan?  Is that the kind of
13 thing you do all the time?
14     A.   I've met with people in my life many times
15 when I didn't know they were going to ask me for
16 money and they did.
17     Q.   And you gave them the money?
18     A.   Sometimes, yeah.
19     Q.   With regard to this particular individual,
20 you said there were a lot of Cornas in town, right?
21     A.   Yeah.
22     Q.   Relatives of Larry Corna, right?
23     A.   Yeah.
24     Q.   Who were you referring it in that regard?
25     A.   Well, the two I knew the best were David

Page 71

1  Corna, who was his brother, and Richie Corna, who was
2  his uncle.  And I knew both of them pretty well.
3      Q.   And what did you know of their financial
4  wherewithal back in the summer of 2003?
5      A.   Well, Richie's a pretty wealthy guy and
6  Dave has been wealthy and unwealthy at times.
7      Q.   Was he wealthy or unwealthy in the summer
8  of 2003?
9      A.   I don't know.  I assume that -- I don't
10 know.
11     Q.   The Cornas are a prominent family, or at
12 least in 2003 the Cornas were a prominent family in
13 Columbus, right?
14     A.   Some of them were, others were kind of
15 just normal people, you know.
16     Q.   It didn't seem odd to you that Larry Corna
17 was asking you for $5,000 as opposed to asking one of
18 his wealthy relatives?
19     A.   That didn't go through my mind.
20     Q.   Is this the same Larry Corna who ended up
21 pleading guilty to criminal offenses involving forged
22 financial instruments?
23     A.   I heard that Larry was incarcerated
24 sometime in the late 2000s.
25     Q.   Same guy who showed up on your doorstep.

Page 72

1      A.   I think that's the same guy.  I don't know
2  what he was incarcerated over.
3      Q.   Did you ever look into that?
4      A.   No.
5      Q.   Let's mark Exhibit 3, please.
6          (RICHARDS/SKYE EXHIBIT 3 WAS MARKED.)
7      Q.   Mr. Richards, I'm showing you what's been
8  marked as Exhibit 3.  Have you ever seen this
9  document before?
10     A.   No.
11     Q.   Add it to the pile.  I'll show you
12 Exhibit 4.
13          (RICHARDS/SKYE EXHIBIT 4 WAS MARKED.)
14          MR. ELLIOTT:  Do you have a copy for us?
15          MR. SCHWARTZ:  I'm sorry, I do.
16     Q.   Let me ask you to look at Exhibit 4.
17          MR. ELLIOTT:  I'm not sure he's done with
18 Exhibit 3 yet.
19     Q.   I'm sorry.
20          MR. ELLIOTT:  Just give him a moment to
21 look through these, if you would.
22     Q.   Yeah, sure.
23          Done looking at Exhibit 3?
24     A.   Yeah.  I've never seen it.  What was the
25 date of this?  Can you help me with that?

18 (Pages 69 to 72)

CONFIDENTIAL

David J. Richards

Page 73

1    Q.   Yes.
2         MR. ELLIOTT:  That reflects an '06 date.
3    Q.   You can see if you turn the document
4    sideways, you can see that this indictment against
5    Lawrence Corna was filed in the Franklin County
6    Common Pleas Court on September 1st of 2006.
7    A.   2006, okay.
8    Q.   While you're looking at that, you see that
9    Exhibit 3 is an indictment against Lawrence Corna?
10   A.   Does it say "indictment" somewhere?
11   Q.   Yeah, look in the upper right-hand corner.
12   A.   Yeah, it says "indictment" there.
13   Q.   Series of offenses.
14   A.   Yeah.  Yes.
15   Q.   By the way, if you look, while we're
16   looking again at Exhibit 3, as long as you've spent
17   some time with that, the indictment alleges that the
18   victims, or the charges that the victims of whatever
19   offenses Mr. Corna here charged with were Peter
20   and Annemarie Wenger.  Have you ever heard of them?
21   A.   No.
22   Q.   I want you to look at Exhibit 4 now.
23   A.   I know a Jeff Wenger but I don't think
24   Peter, if that's the correct name.
25   Q.   Take a look at Exhibit 4.

Page 74

1    A.   Yep, I'm looking at it here.
2    Q.   Have you ever seen that document before?
3    A.   No, I haven't.
4    Q.   This document is another indictment from
5    Franklin County, this is from 2007, again charging
6    Mr. Corna with various offenses and also charging
7    somebody by the name of Alan A. Csipke.  Have you
8    ever heard of Alan Csipke?
9    A.   No.
10   Q.   All right.  And then you'll see various
11   other people who are involved in these charges listed
12   in the count 1 on the first page, a P. Nini Raabe, a
13   Matthew R. Henry, J. Anthony Castranova, and entities
14   called MRH Holdings and Unique Construction
15   Additions, Inc.  Do you recognize any of those names?
16   A.   No.
17   Q.   Let me show you another document.  This
18   will be Exhibit 5.
19        (RICHARDS/SKYE EXHIBIT 5 WAS MARKED.)
20   Q.   Take as much time as you need with No. 4.
21   A.   I was just looking at the addresses in
22   here for the properties that looks like this was
23   something to do with mortgages.  I was just seeing if
24   I -- that's all.
25   Q.   Before you look at Exhibit 5, you

Page 75

1    mentioned that you had heard that Larry Corna, the
2    guy you loaned the $5,000 to, was incarcerated.  How
3    did you learn that?
4    A.   I think I learned it from somebody at
5    Crabbe-Brown.
6    Q.   From whom?
7    A.   I don't remember.
8    Q.   In what context?
9    A.   I think it was mentioned in a
10   conversation.  I don't remember the context.
11   Q.   About what?
12   A.   I don't know.  I don't even know when it
13   was.
14   Q.   All right, let me ask you to look at
15   Exhibit 5.  If you need more time to remember.
16   A.   No, I don't need some more time.
17   Q.   Exhibit 5 is the entry of a guilty plea by
18   Lawrence Corna.  Have you ever seen this before?
19   A.   No.
20   Q.   This pertains to the Case No. 06 that was
21   the subject of the indictment that's Exhibit 3.  You
22   see here on the first page Larry Corna is pleading
23   guilty to forgery, felony offense, and theft, another
24   felony offense?
25   A.   It says -- oh, yeah, it says securities

Page 76

1    theft, is that what it says?  It's hard to read.
2    Q.   Those are the charges.  You have to look
3    at the body under Entry of Guilty Plea to see the --
4    A.   Okay.
5    Q.   -- to see the accounts to which he pled
6    guilty.
7    A.   I see, okay, plead guilty to.  Okay.
8    Q.   When you learned that Mr. Corna had been
9    incarcerated, did you learn that --
10   A.   Wait a minute, you asked me a question
11   about this?
12   Q.   Oh.
13   A.   Or I don't have to read it anymore.
14   Q.   Take as much time and let me know when
15   you're ready.
16   A.   So I was just finishing trying to read
17   this, it's hard to read.  But there was a question
18   about this, you were asking me to read it for a
19   reason?
20   Q.   Well, I was asking you if you recognize
21   that this is a document in which Mr. Corna is
22   pleading guilty to forgery and theft.
23   A.   It looks like he is pleading guilty to
24   forgery and count 8 forgery and count 12 theft.  I
25   don't know what those are.

19 (Pages 73 to 76)

CONFIDENTIAL

David J. Richards

Page 77

1    Q.    When you learned that he had been
2    incarcerated, did you learn that one of the offenses
3    that led to his incarceration was forgery?
4    A.    No.
5    Q.    Let me show you one more document like
6    those others.  This will be Exhibit 6.
7         (RICHARDS/SKYE EXHIBIT 6 WAS MARKED.)
8    A.    I'll be quicker this time since I know
9    where everything is.
10   Q.    Just as a foundational matter, have you
11   ever seen Exhibit 6 before?
12   A.    No.
13   Q.    Can you see that it's another entry of a
14   guilty plea, this time in a case with a 2007 docket
15   number, again Lawrence Coma pleading guilty this
16   time for engaging in a pattern of corrupt activity,
17   money laundering, money laundering again?
18   A.    That's what it says.
19   Q.    When you learned that he had been
20   incarcerated, did you learn that he had pled guilty
21   or otherwise been convicted of offenses involving
22   corrupt activity and money laundering?
23   A.    No.
24   Q.    So you filed for bankruptcy in 2002,
25   right?

Page 78

1    A.    If you have a record there, it probably
2    says 2002, so I assume you're right.
3    Q.    No, you shouldn't assume.
4    A.    I think that's about the timeframe, yeah.
5    Q.    And when you filed for bankruptcy, it was
6    necessary at or about the time of the filing to list
7    in a schedule your assets and liabilities, right?
8    A.    Yes.
9    Q.    And do you recall that you had to itemize
10   various of the assets that you owned as of the time
11   you filed for bankruptcy?
12   A.    Vaguely, yeah.
13   Q.    And, well, let me show you this document,
14   let's not leave any of this to guesswork.  Let's mark
15   Exhibit 7.
16        (RICHARDS/SKYE EXHIBIT 7 WAS MARKED.)
17   Q.    Okay, I'm showing you Exhibit 7 and I'll
18   help you understand what this is.  The first page
19   you'll see is a voluntary petition for bankruptcy
20   filed by Richards, David J., right, that's you?
21   A.    Yep.
22   Q.    If you look at the lower right-hand corner
23   you'll see that filing was in the Bankruptcy Court
24   right here in Columbus in November of 2002, right?
25   A.    Yes.

Page 79

1    Q.    All right.  And you can see on the second
2    page that you signed the petition on November 8,
3    2002, right?
4    A.    Yes.
5    Q.    That's your signature?
6    A.    Yes.
7    Q.    And if you look at the next page, it says
8    Statement of Financial Affairs, up in the upper
9    right-hand corner it has a file stamp of
10   September 2nd, 2002.  Do you see that?
11   A.    Yes.
12   Q.    And that's the statement of financial
13   affairs that you had to submit in the bankruptcy,
14   right?
15   A.    Yeah, I think so.
16   Q.    If you turn to page 9 there you'll see you
17   signed that statement of affairs under the penalty of
18   perjury on December 20th?
19   A.    Page what?
20   Q.    You've got to flip maybe four, five, six
21   pages to the one that has a number 9 in the upper
22   right-hand corner.
23   A.    Yes.
24   Q.    Now turn to the next page.
25   A.    After 9?

Page 80

1    Q.    Yeah.  And you'll see there's something
2    called Summary of Schedules.
3    A.    Yes.
4    Q.    And that's where you listed the assets
5    that you had when you filed for bankruptcy in
6    November of 2002, right?
7    A.    Yes.
8    Q.    And if you look under personal property,
9    line B, it says total assets $269,000 and change?
10   A.    Yep, I see that's what it says.
11   Q.    Those were the assets you had as of
12   November of 2002, right?
13   A.    I'm sure it was accurate.
14   Q.    Turn to the next page where you'll see a
15   schedule of personal property, Schedule B.
16        MR. ELLIOTT:  I've actually got the next
17   page being real property.
18   Q.    Yeah, one more page, it's two-sided.  I'm
19   sorry.  Flip the page to the one that says
20   Schedule B, personal property.  We all see that?
21   Most importantly, Mr. Richards, do you see that?
22   A.    Yes.
23   Q.    And it lists that you had cash on hand of
24   $1,000 when you filed for bankruptcy, right?
25   A.    Yep.

www.IntegrityReportingGroup.com
614.875.5440

David J. Richards

Page 81

1   Q.   You had a dollar in the checking account
2   with Huntington, right?
3   A.   That's what it says.
4   Q.   And that was true, right?
5   A.   Well, if it's on here, I'm sure it was
6   true. I certainly don't remember it.
7   Q.   And you had one dollar with National City,
8   right?
9   A.   Again, that's what it says and I assume
10   that was true.
11   Q.   And $78 with Ameritrade, right?
12   A.   Again, same answer: If that's what it
13   says, I assume it's true.
14   Q.   So your total cash and amounts in
15   financial accounts was less than $1,100, right?
16   A.   Yep.
17   Q.   Then just so we close the loop on this
18   document, if you flip to the second-to-last full
19   page, you'll see -- hold on just one second.
20        Not quite that far. You'll see this is
21   on -- looking for a number for the page. If you look
22   in the lower left-hand corner, you'll see there's a
23   fax line and it's page 30 of 87, you'll see you
24   signed these schedules on December 20th under the
25   pains of penalty and perjury. You see that?

Page 82

1   A.   I'm sorry.
2   Q.   I think you need to turn a couple more
3   pages and you will see a signature page at the end.
4   A.   Do you mind if I just glance at this
5   quickly?
6   Q.   You take as much time as you need, sir.
7   After Schedule J you'll see the declaration.
8   A.   After Schedule J.
9   Q.   There's a declaration which you basically
10   attest that the schedules that --
11   A.   I'm in Schedule G and I don't see that.
12        MR. ELLIOTT: Keep going.
13   A.   Oh, and J is after G, that's correct.
14   Hold on.
15   Q.   Yeah, after J you'll see a signature page.
16   A.   This one right here?
17   Q.   Yes.
18   A.   Yep, I see that.
19   Q.   And that's your signature, right,
20   December 20, 2002? Right?
21   A.   Yep.
22   Q.   So you filed for bankruptcy in
23   November 2002 and you indicated you had a little less
24   than $1,100 of cash and money in other financial
25   accounts. Larry Corna shows up your doorstep give or

Page 83

1   take nine months later, right?
2   A.   August of '03.
3   Q.   Roughly --
4   A.   September of '03.
5   Q.   Roughly nine months after you filed for
6   bankruptcy, right? Nine, ten months?
7   A.   Sure.
8   Q.   And you handed him $5,000.
9   A.   I wrote a check for 5,000.
10   Q.   How much money did you have available at
11   that time?
12   A.   You know, my wife had plenty of money in
13   her name, so I have no idea. But I'd started a few
14   businesses. We had one that was doing really well at
15   the time, so she had one that was doing really well
16   at the time. So money was not an issue.
17   Q.   Do you recall whether you wrote the check
18   on a joint account?
19   A.   I don't.
20   Q.   So let's go back to the conversation you
21   had with Marvin Cantor, and let me make sure I
22   understand how he enters the picture. Is it correct
23   that Larry Corna mentioned to you that Marvin Cantor
24   knew something about this Bandagro opportunity?
25   A.   Yes. I didn't even know if I knew it was

Page 84

1   called Bandagro at the time but it was Marvin's name
2   mentioned and this fellow who Marvin knew, Antonio
3   Usuelli.
4   Q.   Before we get to Usuelli, do I understand
5   correctly Corna suggested that you talk to Marvin
6   Cantor?
7   A.   No.
8   Q.   How is it that Marvin Cantor enters the
9   picture here?
10   A.   Larry mentioned his name as somebody who
11   somehow, it was some circuitous way through David
12   that somehow he had this transaction.
13   Q.   Through David Corna?
14   A.   Marvin, David, so.
15   Q.   So Larry mentioned David's name and he
16   mentioned Marvin's name.
17   A.   And Usuelli.
18   Q.   And you'd never heard of Usuelli before,
19   right?
20   A.   No.
21   Q.   So what's the next thing you did to
22   explore this opportunity?
23   A.   So after I said to -- I think we already
24   talked about that I called Marvin, right?
25   Q.   Well, you started to describe that. I

21 (Pages 81 to 84)

CONFIDENTIAL

David J. Richards

Page 85

1  want to get into that, go ahead.
2      A.    So I called Marvin, asked him what he knew
3  about it, and he didn't say much, that he knew much
4  but that he'd talked to Antonio about it and then he
5  told me a little bit about Antonio and who he was.
6          He sounded like an impressive guy, so I
7  said man, I'd like to talk to Antonio.  And Antonio
8  was the guy that knew all about it and explained it
9  to Marvin.
10         So I think the way it had happened was I
11 think Marvin told me when I talked to him that the
12 way it had happened was that Antonio called Marvin
13 looking, or was looking for some assistance and
14 Marvin may have referred him to Dave Corna and Dave
15 kind of gave it to Larry is what happened.  I think.
16 That's what I got.
17         But, sorry, you asked me what I did when I
18 called Marvin.  I talked to Marvin a little bit about
19 it and he told me about this Usuelli fellow and I
20 said I'd like to talk to him.  And then I think I did
21 sometime in the next few days I did talk to Usuelli,
22 which was arranged by Larry because I didn't know
23 who -- wouldn't have known how to get ahold of
24 Antonio.
25     Q.    How did Larry arrange that?

Page 86

1      A.    I don't remember.  He may have either gave
2  me his phone number or he gave Antonio my phone
3  number and we spoke on the telephone.
4      Q.    Slow down just a second.
5          So last we saw Larry he left your doorstep
6  with $5,000 and you were going to follow up and call
7  Marvin.
8      A.    He was going to give me something that had
9  an interest in this deal.
10     Q.    And you've talked about that enough for
11 the moment.
12         But you learned from Larry that Marvin
13 knew something so you took it upon yourself to call
14 Marvin.
15     A.    Yep.  So remember, I want to make
16 something really clear, we're talking about stuff
17 that occurred 11 years ago and things might have
18 happened -- there's no documents or papers and I'm
19 remembering this from the best of my 63-year-old
20 brain.
21         So I'm not sure I got this all correct but
22 this is what I think to the best I can remember
23 happened.  I'm sure I'm omitting some details, I'm
24 getting things in reverse order, but I'm giving you
25 my best, just so you know.

Page 87

1      Q.    All we can ask is that you give us your
2  best recollection.
3          So after you talked to Marvin you decide
4  you're going to try to -- you want to talk to
5  Usuelli, right?
6      A.    Yeah, I talked to Marvin.  It turned out
7  Marvin wanted to start a healthcare business for
8  people who fell outside of Medicaid at the time but
9  really couldn't afford insurance, and he had a good
10 business plan for that.
11         So we ended up talking on the phone for
12 quite a bit about that and, in fact, tried to, later
13 on tried to make a deal with that.  And we tried to
14 do it here in Columbus.  But that was what most of
15 the call was about as I remember.
16         And then that's how I called and Marvin
17 was a bastard kind of turning things into what he was
18 interested in, but at the end of the day we talked
19 about Antonio, he told me Antonio had been with I
20 think Bear Stearns, that he had owned his own
21 insurance company, he was an attorney, he was the
22 heir to the Bertolini hat fortune.  He told me stuff
23 like that
24         So anyway, at the end of the day I was
25 impressed that Antonio might be interested, and he

Page 88

1  was also fluent in English.  So that made me want to
2  talk to Antonio.
3          I was mildly interested in this incident.
4  It was kind of, something about it piqued my
5  curiosity
6      Q.    Did you say "mildly interested"?
7      A.    I was mildly interested.
8      Q.    "Mildly."
9      A.    "Mildly."
10     Q.    Not "madly."
11     A.    No, not "madly."  I had too many things
12 going on to be madly interested in anything at that
13 time.
14     Q.    How is it that you obtained contact
15 information for Antonio?
16     A.    As I said, it was either Larry either gave
17 it to Antonio, Antonio gave it to me and somehow
18 there was a call arranged.  How, I don't know.
19     Q.    Do you have a recollection of reaching out
20 to Larry to obtain information for Antonio or to get
21 your information to Antonio?
22     A.    I don't know how that happened.  One of
23 those two happened probably though.  Because I didn't
24 reach directly to Antonio, I think it was provided.
25 I was busy.  He was kind of sort of an errand boy

22  (Pages 85 to 88)

CONFIDENTIAL

David J. Richards

## Page 89

1  type guy. So he would do that kind of thing. I
2  wouldn't do it.
3      Q.   Larry would do it.
4      A.   Larry would do that kind of thing.
5      Q.   How would you even know how to find Larry
6  at this point?
7      A.   I don't know. Email or cell probably.
8      Q.   When he walked away with the check for the
9  5,000, did he leave some contact information with
10  you?
11      MR. ELLIOTT: I think he testified earlier
12  there was a subsequent call from Larry to
13  Mr. Richards. So that's not, the front porch step
14  conversation is not the only one he's testified
15  about.
16      Q.   Fair enough.
17          I know there was testimony about the
18  possibility of some security document that no one has
19  seen, but let me approach it a little differently in
20  light of Mr. Elliott's comment.
21          We'll start by asking when he left the
22  doorstep, did he leave any contact information with
23  you?
24      A.   I don't remember. It was mostly you
25  better pay me back.

## Page 90

1          Incidentally, I noticed going through the
2  bankruptcy schedules that there was another guy that
3  I had loaned money to that never paid me back.
4      Q.   Who was that?
5      A.   This fellow Tommy Piolata.
6      Q.   That's one the accounts receivable you
7  listed?
8      A.   It's similar.
9      Q.   There's another account receivable there,
10  who's that?
11      A.   I didn't notice that so much.
12      Q.   Let's look at it.
13      VIDEOGRAPHER: Excuse me, I need to change
14  DVDs.
15      MR. SCHWARTZ: All right.
16      VIDEOGRAPHER: Off the record 11:18.
17  (Recess taken.)
18      VIDEOGRAPHER: On the record 11:27.
19      Q.   Mr. Richards, you mentioned that you
20  noticed in reviewing Exhibit 7 there was an
21  individual to whom you had loaned money by the name
22  of Thomas Piolata, right?
23      A.   Yep.
24      Q.   And I'm looking at that exhibit now and
25  beneath Mr. Piolata's name is a Gil Gradisar?

## Page 91

1      A.   Gradisar.
2      Q.   Gradisar. And at the time you filed for
3  bankruptcy in November of 2002, you listed an account
4  receivable from Mr. Gradisar for $165,000. What was
5  that about?
6      A.   Well, first off, I'm not sure exactly.
7  That's my real answer. I can guess at it if you'd
8  like. I have a really vague recollection of it.
9      Q.   Your lawyers probably don't want you to
10  guess and I really don't want you to do so either, if
11  you don't know, you don't know. Or if you don't
12  recall, you don't recall. That's your testimony?
13      A.   Yeah.
14      Q.   All right. Is Marvin still alive? Marvin
15  Cantor?
16      A.   Well, I don't know. I didn't hear that he
17  passed but he was getting up there, so. He was
18  pretty active for a really elderly guy, but I just
19  don't remember. I don't live here, I don't spend
20  very much time here anymore so I lose touch with the
21  community.
22      Q.   Last you know he lived in the Columbus
23  area?
24      A.   He lived over on Summit Chase and had an
25  office up on Bethel Road.

## Page 92

1      Q.   If you needed to find Larry Corna today,
2  where would you go?
3      A.   God knows. I have no idea. I probably
4  last had contact with Larry so long ago that I would
5  have no idea. I would call his brother if I wanted
6  to, but his brother passed.
7      Q.   Which of his brothers passed?
8      A.   David.
9      Q.   When was the last time you did have
10  contact with Larry Corna?
11      A.   I was trying to figure that out. Because
12  I was recalling events and this and my thinking,
13  which could be wrong, is 2004. I might have -- he
14  was a persistent guy. He kept -- show up, always
15  kind of he might show up out of the blue or send you
16  an email out of the blue or something like that. But
17  I'm sure I've never seen him since 2004.
18      Q.   Did you give him any money after the
19  10,000?
20      A.   I can say for sure that I didn't give him
21  any money after February or March of '04 because I
22  think we ejected dealings with him as best we could
23  at that time. But it's possible I gave him a little
24  bit before then.
25      Q.   For what reason?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 93

1    A.    Either he was giving me some bonds or was
2    begging, one of the two. I don't remember. But
3    again, I don't remember if I actually gave him or
4    didn't give him any, but if I did, one of those two
5    would have been the reasons.
6    Q.    What kind of bonds?
7    A.    You know, these interest in the bonds that
8    I was acquiring before I actually bought the notes.
9    Q.    What was the nature of the interest in the
10   bonds that you were acquiring before you "bought the
11   notes," to use your terminology?
12   A.    Well, they were called -- they were
13   similar to a, you know, UCC filing in Italy, or
14   Switzerland, I forget which, I think it was
15   Switzerland.
16         And the way you -- according to what I
17   understood at the time, the way you did that was you
18   got this legal filing and they prepared what was
19   called this notarial, this deed of trust and which
20   would be issued by a Swiss notary and there was some
21   central filing system in Switzerland that you would
22   go to check just like you'd check UCC here. That's
23   my best memory of that.
24         And so the idea was I was trying to see if
25   there was going to be a transaction as we got into

Page 94

1    it, and in the meantime you're protecting yourself
2    with the security interest of some kind, whatever
3    protection it was.
4    Q.    So this was in the nature of a secured
5    transaction where you were lending money to somebody
6    and in exchange for that you got the equivalent of a
7    UCC security interest?
8    A.    So secured transaction, a legal term,
9    right, I'm not sure I would call it a secured
10   transaction, it might be, it might not be, I don't
11   know.
12         But what I got was I was investing or
13   sending money, debt money or interest money to Gruppo
14   Triad and in return the thing that evidenced I sent
15   them the money was I would get this deed of trust
16   back from them.
17   Q.    So let's forget about labeling it as any
18   kind of secured transaction or talking about the UCC.
19   What was the economic substance from your standpoint
20   of the deal?
21   A.    Well --
22   Q.    You were giving money to somebody, what
23   were you getting?
24   A.    Just like I just said, like a security
25   interest in the notes, the group of notes that Gruppo

Page 95

1    Triad owned.
2    Q.    Were you expecting to get the money back?
3    A.    If the notes cashed, yes, I would have got
4    more than my money back. I would have got something
5    like ten times my money back.
6    Q.    That's what I'm trying to understand, what
7    were the terms of the transaction. You invested how
8    much money for what return under what conditions with
9    what protections in the meantime, if any?
10   A.    Well, like I said, Larry told me, when
11   Larry came to my door he told me he would give me ten
12   times my money back in this deal he had. And so I
13   think that was how it started. Then like I think I
14   said, the next larger sum of money was sent in
15   November 2003 to Gruppo Triad directly. And there
16   was a lot of back and forth about what the exchange
17   rate would be there.
18         And since this was after the issuance of
19   the Attorney General opinion, Pavanelli wanted a high
20   price. He wanted, you know, 50 cents on the dollar
21   or something like that. And but we said the
22   economics stay the same as they started, 10 to 1, and
23   he ultimately consented to that.
24         So we would get a deed of trust back, I
25   think we did there, that gave us a $100,000 interest

Page 96

1    in any recovery they made.
2    Q.    For every 10,000 you invested?
3    A.    Well, for 10 to 1. So for the 50 and he'd
4    collect on the bonds, I would have received $500,000.
5    Q.    Okay.
6    A.    And go ahead, sorry.
7    Q.    Are you done?
8    A.    That was my answer I guess.
9    Q.    All right. Now, other than these notarial
10   deeds of the trust that you've described was there
11   any other transaction documentation?
12   A.    No, I don't think so. Not until after we
13   entered into this -- started exchanging purchase
14   agreements.
15   Q.    Let's stick to the period before the
16   purchase agreements.
17   A.    Before the purchase agreements, no. Well,
18   I take that back, there might have been, like before
19   I think I recall seeing -- I don't know if it was
20   this time or later, forgive me, but there were times
21   when if we would send money in addition to the --
22   because they would not issue the notarial deed until
23   after they sent the money.
24         So there were times we had wire
25   instructions I think they were called, where describe

24 (Pages 93 to 96)

CONFIDENTIAL

David J. Richards

Page 97

    1    what money was coming from where we would receive and
    2    signed by me and Gruppo.  And it was evidence that
    3    I'd sent them the money.
    4            Then right after that the notarial deed
    5    would come back.  And I think there were -- that
    6    happened three times maybe.  I don't know.
    7        Q.  Where are those notarial deeds today?
    8        A.  I think we've gone over this.  I have know
    9    idea.
   10        Q.  To the best of your recollection was the
   11    10-X return specified on the face of the notarial
   12    deed?
   13        A.  They were in Italian I believe.  They were
   14    some foreign language.  And they may have said what
   15    we -- the money we gave them, they may have said the
   16    interest, but they in some way, shape, or form they,
   17    I think they had to say the interest is what I would
   18    remember.  They had to say how much we were going to
   19    get in the case.
   20            So if you're like a mortgage holder on a
   21    piece of property, your mortgage is for 90 percent of
   22    the loan or whatever, you have to have that amount in
   23    there that or people don't know how to pay off the
   24    mortgage.  So I think there had to be that amount in
   25    there.

Page 98

    1        Q.  Was it your understanding that if Gruppo
    2    Triad had defaulted on paying the 10-X had
    3    rights similar to those of a secured creditor to
    4    protect yourself?
    5        A.  I wasn't completely sure of that but
    6    that's -- I was told that I would be protected.
    7        Q.  By whom?
    8        A.  By Schianchi through Usuelli who was
    9    interpreting for him.  And Antonio was also a lawyer
   10    and he said this is the way you do it.
   11        Q.  At this period of time with regard to
   12    these deed of trust transactions, did you engage any
   13    counsel to assist you?
   14        A.  Well, I had I'll call it a Kennedy, Brown
   15    and crew as my counsel at the time.  And as to
   16    whether I consulted with them about the legal effect
   17    of this deed of trust, I don't remember.
   18        Q.  When did you first engage Crabbe, Brown &
   19    Janes in connection with anything having to do with
   20    Bandagro?
   21        A.  I would say, you know, right after they
   22    presented or they told me, I forget who it was that
   23    told me, but right after I learned that the Attorney
   24    General had ruled that the bonds had to be paid.  And
   25    then shortly after that, because it was like hmm,

Page 99

    1    they were successful like they said they were going
    2    to be.
    3        Q.  So sometime in October of 2003 you engaged
    4    Crabbe, Brown & James?
    5        A.  Yeah.
    6        Q.  Was there an engagement letter?
    7        A.  I don't think so at that time.
    8        Q.  And this would have been Skye Ventures
    9    hiring Crabbe, Brown & James?
   10        A.  You know, Dave Richards, Skye Ventures,
   11    most people look at my entities as the same thing.
   12        Q.  Sometimes lawyers get technical about
   13    these kinds of distinctions as to who the clients
   14    are.
   15        A.  I understand that, so I was an ex-partner
   16    there, I knew the guys, I think, you know, it was
   17    like that.
   18        Q.  So Marvin told you you should be talking
   19    to Usuelli and somehow Larry hooked you up with
   20    Usuelli or vise-versa.
   21        A.  So Marvin is not the kind of guy that says
   22    you should talk to Usuelli.  He just told me how he
   23    learned the deal and this guy knew more about it.
   24        Q.  And you were mildly interested so you
   25    decided to pursue it.

Page 100

    1        A.  Yeah.  I'm kind of a deal guy, you know, I
    2    like -- sounds kind of interesting.
    3        Q.  And we've covered how it is or the
    4    uncertainty surrounding how it is that you ended up
    5    being able to talk to Usuelli but somehow or another
    6    you managed to talk to him.  Right?
    7        A.  Yes.
    8        Q.  When did that happen?
    9        A.  Again, in early September.  It was kind of
   10    quick, boom, boom, boom.
   11        Q.  When you first spoke with him, did you do
   12    it on the phone?
   13        A.  Yeah.
   14        Q.  How long did you talk to him for?
   15        A.  You look at me like I really would
   16    remember that.  I remember I had a conversation about
   17    bonds, I talked to him about himself and where he
   18    lived and his family and his background, and I told
   19    him about myself, and to be honest with you, we kind
   20    of became fast friends.
   21            He was a very erudite guy.  He's brought
   22    up in Italy, living in Switzerland, very interesting
   23    fellow and we talked about all of that and talked
   24    about the bonds too.
   25            So if I had to guess how long it was, 20

25  (Pages 97 to 100)

CONFIDENTIAL

David J. Richards

## Page 101

1    minutes. Again, that's like as pure as guesses can
2    get. Could have been an hour, could have been 15
3    minutes.
4       Q.    What do you recall him telling you about
5    bonds in that first call?
6       A.    Well, I think he told me a little bit
7    about Pavanelli and told me a little bit about how
8    he'd been trying to collect the notes for a long time
9    and that there was this administrative proceeding
10    going on in Venezuela that should lead to some
11    determination of whether the notes were valid or not.
12       He didn't know when that would happen but,
13    and so it was he was talking about some stuff I
14    didn't really know much about. First off, I didn't
15    know anything about Venezuela at the time. We'd
16    never done a sovereign debt deal so I was kind of
17    asking questions about that.
18       But mostly I'd say it was mostly an
19    introductory, personal, that kind of thing. I said
20    and basically I believe what I told him was well, you
21    know, I'm a busy guy, I'm running three businesses
22    already looking at other deals at the same time, and
23    I said that sounds great if that ever happens, boy,
24    it would be great, call me. Call me if you need
25    anything else. That was kind of it.

## Page 102

1       Q.    By the way, in your testimony you've been
2    referring occasionally to "bonds," occasionally to
3    "notes." Are you using those terms interchangeably?
4       A.    I think they're the same thing myself.
5       Q.    All right. So what happened next?
6       A.    I somehow learned that the ruling had come
7    down. I didn't do anything after I talked to
8    Antonio, that I remember anyway.
9       Q.    Was it in your first conversation with
10    Usuelli that you first learned of Pavanelli's name?
11       A.    It's possible that Larry sort of blah,
12    blah, blah, blah, blah he might have mentioned
13    Pavanelli but it didn't mean anything to me.
14       Q.    First time it registered was when you
15    spoke to Usuelli?
16       A.    Yeah, this guy who was the CEO of Gruppo
17    or the president of Gruppo.
18       Q.    And you made reference, to use your
19    terminology, to your learning that "the ruling had
20    come down." When did you learn that and from whom?
21       A.    So I remember neither when nor whom. I
22    can approximate that it was toward the end of
23    October, mid-late October kind of thing. And I don't
24    know how I learned about it. I might have heard it
25    from Larry Corna, I might have heard it from Usuelli.

## Page 103

1       Crabbe-Brown might have heard about it.
2    But I don't think that's right. I don't think I
3    heard it from them. I think it was probably either
4    had to be either Usuelli or Corna.
5       Q.    And as of that time when you first learned
6    that information, how much money had you put into
7    these deeds of trust?
8       A.    Is that either 5 or 10 that I had loaned
9    Larry.
10       Q.    After you learned this information then
11    what happened?
12       A.    Well, you know, I thought I was going to
13    get 50,000 or a hundred thousand. That sounded
14    pretty good. And so I was interested in it
15    obviously, wanted to see what happened.
16       And I think I talked to Usuelli again, I
17    might have even talked to Pavanelli then for the
18    first time. But by then it was, you know, was a few
19    weeks after the ruling and so I was interested in
20    what the ruling was and how they would go about, you
21    know, monetizing the ruling, that kind of thing.
22       And I think that's when I got the
23    decision, got Kennedy and Alcalde involved and we
24    started looking at it seriously.
25       Q.    If Usuelli had told you that Pavanelli had

## Page 104

1    been trying for some period of time to collect on the
2    bonds and then you learned that there was a favorable
3    ruling, what was your understanding of what
4    involvement there would be for you from that point
5    going forward?
6       A.    Well, when I -- the reason I think I might
7    have talked to Pavanelli at the time was that he was
8    requesting some money to pay his lawyer in Venezuela
9    that he owed money to. And so he, again, he wanted
10    me to send him money and I thought well, you know,
11    why would he want money if he's going to get all this
12    money? So we started looking into it.
13       At the same time if there was an
14    opportunity to somehow be in the middle of a sort of
15    transaction where a payment was in the future but you
16    could leverage a payment now to gain on that, that
17    was a possibility too, so we looked into it. And we
18    went from there.
19       Q.    When you say that Pavanelli was requesting
20    money to pay his lawyer in Venezuela, was that
21    Mr. Jacir?
22       A.    Yes.
23       Q.    Did you --
24       A.    I didn't know the name then, but.
25       Q.    When did you first learn of Jacir's name?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 105

1    A.    It probably was right about then or it was
2  pretty close to then, whenever it was that I talked
3  to Pavanelli.  If I talked to Pavanelli.  Sorry.
4    Q.    Recognizing that you're not sure when you
5  first spoke to Pavanelli, when's the latest date by
6  which that occurred?
7    A.    Probably didn't talk to him after sometime
8  in '05 or '06 ever again.
9    Q.    I asked a bad question.
10       MR. ELLIOTT:  It was the latest date that
11  he would have first talked to him, right?
12       MR. SCHWARTZ:  Too confusing a question.
13  As it was coming out of my mouth, I knew he might not
14  get it, and that's my fault.
15    Q.    You don't know when you first talked to
16  Pavanelli, right?
17    A.    No.
18    Q.    Is there date by which you can say you
19  certainly had first talked to him?
20    A.    I can say almost certainly because we sent
21  him money in November 12th, 14th, that timeframe,
22  I've seen a document, I just can't remember the exact
23  date, showing the wire.  And so I can't imagine that
24  I would have sent $50,000 over there without having
25  talked to Pavanelli.  So I must have talked to him

Page 106

1  before then.  And I believe I did.
2    Q.    And what is your best recollection of what
3  occurred when you spoke to him before you sent the
4  money in the middle of November of '03?
5    A.    I don't remember.  Whatever he told me
6  must have been convincing enough for me to send
7  $50,000.
8    Q.    What were the terms of the transaction
9  under which you sent the 50,000?
10    A.    Same terms as before, 10 to 1.
11    Q.    10 to 1 and deeds of trust?
12    A.    Ultimately I believe we got a deed of
13  trust for that.  We didn't get it before we sent the
14  money I don't think.  And I didn't send it to Gruppo,
15  I sent it to Schianchi.
16    Q.    With the understanding that Schianchi was
17  acting on behalf of Gruppo?
18    A.    Yeah.  And also that he was a Swiss notary
19  at the time, which apparently applies something
20  different than being a notary in America.
21    Q.    After you sent the $50,000 to Pavanelli in
22  the middle of November of 2003, what happened next in
23  the course of your dealings with him?
24    A.    Well, first, I don't think it was a serial
25  kind of thing.  So I think that there was a lot going

Page 107

1  on at the time.  I think Kennedy was doing stuff and
2  I think Alcalde was doing stuff.  We were trying to
3  figure out if there really was an opportunity there.
4       Alcalde may have spoken with Jacir before
5  we sent the 50,000, before I sent the 50,000, and I
6  know that Kennedy was engaged because, like I told
7  you earlier today, I remember seeing an email from --
8  in my preparation, from Kennedy to the Ministry of
9  Finance and that was early November, so I know that
10  we were on top of it.
11       We viewed the idea that maybe there is a
12  short-term opportunity, we could capitalize on this
13  before it's paid, and so they were working on it.
14       So I don't think --
15    Q.    Does Kennedy speak Spanish?
16    A.    No.
17    Q.    Go ahead.  I assume Alcalde does.
18    A.    Yeah.  He actually lived in Venezuela and
19  lived in Cuba for part of his life before he came to
20  America.  So he was a good lawyer to have in the
21  case.
22       So I forgot if there was a question.
23    Q.    No, you were -- I interrupted your
24  testimony to ask you about Kennedy, but you were
25  describing how you were exploring the possibility of

Page 108

1  a short-term opportunity.
2    A.    You asked me what happened after
3  November 14th or 12th.  I said to you well, it was
4  a continuous bunch of things that was going on.  And
5  that's.
6    Q.    Where Kennedy had written to the Ministry
7  of Finance, et cetera.
8    A.    It did a bunch of stuff.  Again, we were
9  just trying to analyze whether there was an
10  opportunity here.
11    Q.    Do you know why Alcalde left Crabbe,
12  Brown & James?
13    A.    He went to work for another firm.
14    Q.    That much I know.  But do you know why he
15  did?
16    A.    Well, I think he saw big business
17  opportunity.  Maybe it was because -- I'm just
18  kidding, I was going to give you the same reason as a
19  joke that I gave you before.
20       No, I think he saw real opportunity at the
21  place he went and then he moved to where he is now, I
22  think at, I think he's right over here as I recall.
23    Q.    For how long did you continue to explore
24  this short-term opportunity?
25    A.    Well, it really never stopped.  I mean, it

27 (Pages 105 to 108)

CONFIDENTIAL

David J. Richards

## Page 109

1  was -- these are living, breathing things and so it
2  was just one continuous thing. All the way through
3  the purchase and filing of the lawsuit, it never
4  stopped.
5      Q.    Well, I want to draw a distinction that I
6  think you yourself have drawn between purchasing the
7  notes themselves, as Skye Ventures eventually did,
8  and this less definitive type of short-term
9  opportunity that you indicated you were exploring
10 initially.
11     What I'm trying to find out from you, and
12 maybe I'm not tracking your testimony accurately, but
13 I'm trying to find out from you is how long you spent
14 focused on the so-called short-term opportunity.
15     A.    Well, again, it was sort of a transitional
16 thing, right? There was never one moment where we
17 said no more short-term opportunity because the way
18 things were going, it was always our belief there was
19 a chance it would be paid, but at the same time we
20 were gathering more information that was taking
21 longer and we had started to think it might be a real
22 opportunity, an opportunity worth spending
23 considerable time and money on.
24     Q.    Well, you testified at the beginning of
25 the deposition when we went through the

## Page 110

1  interrogatories where you indicated there was some
2  imprecision or inaccuracy that you began negotiating
3  for the purchase of the notes 7 and 8 of 12 at the
4  end of March or on April Fool's Day in 2004, right?
5      MR. RICHARDS:  Object to the form.
6      Q.    That's what you said, right?
7      A.    Yeah, I think it was March 30th, 31st.
8  I think I was back by April 1st.
9      Q.    You're ruling out April 1st now?
10     A.    April 1st is my wife's birthday so I
11 think I was back here or she would have had my skin.
12     Q.    All right.
13     A.    But I'm not sure.
14     Q.    So is it true that before the end of March
15 of 2004 you were focused on a different form of
16 transaction --
17     A.    No, I would say that sometime -- I would
18 not have gone to Italy and spent all that time and
19 money unless we were focusing on making a larger
20 opportunity. So sometime before March we decided
21 that this really looked like a strong opportunity.
22     When was that is your next question. He
23 tells me I'm not supposed to do that. Sometime
24 before that. I would say, I don't know, February,
25 maybe mid-February was when we were starting to think

## Page 111

1  that this looked like it had the possibility of being
2  a very good investment.
3      Q.    What made you think that?
4      A.    Well, from the very beginning we were
5  focused on the AG decision and we had -- our lawyers
6  reached the conclusion that it appeared that it was a
7  final and binding decision and that it couldn't be
8  changed under the law of Venezuela.
9      So I think they spent a lot of time
10 analyzing the law, talking to Jacir, doing things
11 like that. I wasn't so much online for that at the
12 time but they were doing it and advising me, and so
13 as that got seemingly more certain, well, looked like
14 you know, my fund's opportunist, right, so we don't
15 have any religion about the kind of thing that we do
16 so we look for opportunity, looked like it might be
17 opportunity.
18     Anytime we spend -- I shouldn't say that
19 occurred -- anytime we -- I stick a little bit of
20 money in something, like when I sent the 50 in
21 November, you're always thinking about the
22 possibility it might turn into something.
23     The copper deal I have right now as we're
24 selling it for over $200 million and it started with
25 a small line to a CEO. So you never know where these

## Page 112

1  things lead. And sometime, like Mr. Piolata, they
2  lead nowhere.
3      So we were looking assessing the
4  opportunity the entire time and but by the time I
5  went to Como, Italy, we were thinking that it had the
6  potential to be a real opportunity.
7      Q.    Between the time you put in the 50 and the
8  time you decided this was serious enough to go to
9  Como, did you put in any more money?
10     A.    Yes.
11     Q.    How much?
12     A.    So I put a little bit of money in in
13 January because Pavanelli was desperate. I knew he
14 was, you know, financially in difficult straits but
15 he was saying at least that he was really desperate
16 and that he needed the money today. He was calling
17 me on the telephone.
18     And, you know, he wanted me to actually
19 Western Union him some money, which I didn't know how
20 to do, so I said I don't know how to do that. And he
21 said that Larry could do it. And so I said okay.
22 And so Larry came and got money some way and he
23 Western Unioned a small amount of money, not a lot,
24 in January to Pavanelli.
25     That was the next time we put money in. I

CONFIDENTIAL

David J. Richards

Page 113

1 take that back, I think we put a little bit of money
2 right before Christmas, and that was a similar wire
3 to Schianchi kind of thing.
4 　　　　The reason that Pavanelli thing sticks out
5 at me, it was so weird trying to run and get -- I
6 guess to wire money Larry had to go to like the local
7 grocery store and set up the customer service thing
8 and wire I think it was $5,000 to Pavanelli. So
9 that's the next time we put some money in.
10 　　Q.　　So how much more did you put in right
11 before Christmas?
12 　　A.　　I think it was something in the order of
13 25 or 30,000 dollars.
14 　　Q.　　And this was at a time when Pavanelli was
15 desperate?
16 　　A.　　Well, I think that if you listen to
17 Pavanelli, he was desperate always. And he had to
18 have money the next morning. So that's kind of his
19 modus operandi. So I don't know exactly why we sent
20 him the money at that time but we did.
21 　　Q.　　In what form?
22 　　A.　　It was a wire to Schianchi.
23 　　Q.　　Not a Western Union wire but a --
24 　　A.　　No, it was a regular --
25 　　Q.　　Regular bank transfer.

Page 114

1 　　A.　　Regular bank wire.
2 　　Q.　　And then after that money went in before
3 Christmas '04 there was another scenario that arose
4 where some smaller amount of money had to be sent
5 from the grocery store?
6 　　A.　　Larry sent it. I heard, he told me or
7 sometime later that he had to go to Kroger's, which
8 at the time, I think we still have Kroger's, the
9 Kroger store, the Big Bear store or something like
10 that.
11 　　Q.　　What was your involvement with the Western
12 Union transfer of money to Pavanelli from the Kroger?
13 　　A.　　I gave Larry the money or gave him a check
14 to get the money or something. I don't remember
15 exactly how it happened.
16 　　Q.　　Where did you get that money?
17 　　A.　　It was my money.
18 　　Q.　　Your personal money?
19 　　A.　　Yeah.
20 　　Q.　　And how much, again, did you say was sent
21 in that matter?
22 　　A.　　5 or 6,000.
23 　　Q.　　So to recap, we have the 50 that went in,
24 the 25 or 30 before Christmas, the 5 or 6 from
25 Kroger. Did you have any involvement in sending any

Page 115

1 more money to Pavanelli or Gruppo Triad before the
2 time you decided to go to Lake Como?
3 　　A.　　Yes.
4 　　Q.　　How much more money and when?
5 　　A.　　So I'm trying to think about that right
6 now, and I think we were getting pretty serious about
7 the deal. And so I think it was in February, toward
8 the end of February that we sent the next chunk of
9 money, which I believe was either 25 or 50,000
10 dollars.
11 　　Q.　　What else do you recall about the
12 circumstances surrounding that transaction?
13 　　A.　　Well, I don't recall, like I said, the
14 normal thing was that they need the money for
15 something, they were broke and couldn't do it but he
16 tried to -- when we sent the money, we tried to
17 define really what they wanted it for so it was going
18 toward a purpose to further whatever efforts were
19 going on at the time. But I don't remember exactly
20 at that time what it was.
21 　　Q.　　Was Larry Corna involved in any way in
22 that next transfer of 25 to 50?
23 　　A.　　No, that's when Larry Corna's involvement,
24 we asked him to step out I think it was.
25 　　Q.　　Why?

Page 116

1 　　A.　　Well, when -- there was a dispute between
2 Pavanelli and Corna and we didn't want to get
3 involved and we really had no need for Larry any
4 longer since we were dealing directly with Gruppo.
5 Larry is kind of their errand boy and trying to raise
6 money for them and we didn't need that.
7 　　Q.　　What was the dispute between Pavanelli and
8 Corna?
9 　　A.　　I think Larry might have kept some of the
10 6,000 or 5,000 I gave to him to wire to Pavanelli and
11 the issue between them I think was whether Larry was
12 entitled to do that or not.
13 　　Q.　　How did you learn about this?
14 　　A.　　I forget.
15 　　Q.　　What was the outcome of that dispute?
16 　　A.　　I don't remember. It was not a lot, it
17 wasn't over a thousand bucks so I don't think I paid
18 too much attention to it.
19 　　Q.　　So basically Larry pocketed a thousand of
20 the 6,000 as some kind of service fee for money being
21 sent?
22 　　A.　　For representing Pavanelli in America or
23 something is what Larry said.
24 　　Q.　　And Pavanelli had a problem with that?
25 　　A.　　Pavanelli said I didn't give you

29 (Pages 113 to 116)

CONFIDENTIAL

David J. Richards

Page 117

1    permission to do that or something, it was like that.
2         Q.    And that was the last involvement you had
3    with Larry Corna in any way related to Bandagro?
4         A.    It was one of the many times I told Larry
5    hey, don't call me anymore.
6         Q.    One of many times?
7         A.    He came back.
8         Q.    How many more times?
9         A.    I don't know, several times. He would
10   come back by saying hey, I have a guy that would like
11   to join your investment group, and it was the CEO of
12   this company. I mean, actually hooked me up with a
13   couple of impressive guys. I mean, he mentioned a
14   couple of impressive guys. So it happened
15   periodically. He was never really involved after
16   that though I can remember.
17        Q.    When did he stop pestering you?
18        A.    Again, I think it's 2004 sometime. He's a
19   persistent guy so I'm not sure when he finely quit.
20        Q.    Was this strategy of 25 to 50 that you
21   sent at the end of February the last tranche you sent
22   before you embarked for Como?
23        A.    I'm pretty sure, yes.
24             Incidentally, it occurred to me, not that
25   it's totally germane, but your term of Larry

Page 118

1    "pestering" me, that was also Antonio's term of Larry
2    constantly pestering him. So I think that's a good
3    characterization of Larry.
4         Q.    Thank you.
5             Let's mark Exhibit 8.
6             (RICHARDS/SKYE EXHIBIT 8 WAS MARKED.)
7         Q.    Before you look at this document I want to
8    ask you one question. At any point before you
9    embarked for Como to meet with Pavanelli in March of
10   2004 did you learn that he had had run-ins with the
11   law?
12        A.    No. Before Como.
13        Q.    Before Como.
14        A.    No, I didn't know that.
15        Q.    At some point did you come to learn that
16   Pavanelli had been convicted in 2003 in Italy for
17   crimes involving Bandagro notes?
18        A.    I don't think that's accurate, but if it
19   is, I didn't learn that. I knew he had a bankruptcy,
20   I knew about three that he had. And I knew about the
21   Italian bankruptcy where he was accused of something
22   to do with Bandagro notes.
23        Q.    Well, at some point did you learn he was
24   convicted of crimes in Italy and sentenced to prison
25   for offenses having to do with Bandagro notes?

Page 119

1         A.    Yes, I did at some point.
2         Q.    When did you learn that first?
3         A.    I think it was like 2006 or something, '5
4    maybe.
5         Q.    How did you learn that?
6         A.    I think Venezuela had -- one of their
7    counsel had made the statement that he had blank
8    Bandagro notes on his computer and it was revealed in
9    this case. And so that was a surprise to me if that
10   were true, and we did some investigation and found
11   that it was not true.
12        Q.    Found out what was not true?
13        A.    That he didn't have blank copies of
14   Bandagro notes on his computer. What they had in the
15   criminal file was like a promissory note you get from
16   the stationery store, not of Bandagro.
17        Q.    But you did find out sometime after this
18   litigation was filed that Pavanelli had been
19   convicted in Italy, correct?
20        A.    It was a tax case of some kind. I didn't
21   know that it was criminal or civil but it was a tax
22   case. At one point the lawyers looked at it and told
23   me something about it, or maybe the investigator did.
24   But I did -- I think I did learn, I just don't know
25   when.

Page 120

1         Q.    What investigator?
2         A.    Crabbe-Brown had an investigator.
3         Q.    Who?
4         A.    A fellow named Vince Volpi, Pica
5    International.
6         Q.    How do you spell the last name?
7         A.    V-o-l-p-i, or V-o-l-p-e, I'm not sure
8    which.
9         Q.    And the name of the entity?
10        A.    P-i-c-a International.
11        Q.    At some point did you learn that Pavanelli
12   had been convicted in the United Kingdom in 1989 for
13   conspiracy to use fake Bandagro notes?
14        A.    Yes.
15        Q.    When did you learn that?
16        A.    I don't remember. It was in 2004 and it
17   was either at or after my Como meeting with
18   Pavanelli.
19        Q.    This was before you purchased or Skye
20   Ventures purchased notes 7 of 12 and 8 of 12?
21        A.    Yes.
22        Q.    How did you learn that Pavanelli had been
23   convicted in the United Kingdom in 1989 for
24   conspiracy to use fake Bandagro notes?
25        A.    I don't remember.

30 (Pages 117 to 120)

CONFIDENTIAL

David J. Richards

Page 121

1    Q.    Who did you learn it from?
2    A.    Well, I thought that was the previous
3  question how I learned it. So same answer.
4    Q.    What was your reaction when you learned
5  it?
6    A.    Well, I wanted to -- I think what I did
7  was -- and again, it might have been Pavanelli
8  himself who told me this, very well could have been,
9  and if it was, or if it were, if it was Pavanelli who
10  told me that, I would have asked him well, what is
11  the deal, what happened?
12      And then -- but at the same time I learned
13  about two cases, not just one, there was a Swiss case
14  as well that I learned about.
15    Q.    This was in 2004 that you learned about
16  the Swiss case?
17    A.    Yeah, both I think at the same time.
18    Q.    What did you learn about the Swiss case at
19  that point?
20    A.    It was the same sort of general thing as
21  London where they went after him, Venezuela did.
22  According to him they got, you know, they instigated
23  authorities coming after him. In the Swiss case he
24  was convicted of something or other, I forget exactly
25  what it was, but it was related to the Bandagro

Page 122

1  situation. And then there was an appeal that
2  declared him innocent.
3      In England I remember he said he was
4  accused of a couple of things, one of which was
5  holding false instruments, fraudulent instruments, of
6  which he was acquitted. And another of which there
7  was some kind of conspiracy related to some woman who
8  came from New York and that he was convicted of that.
9  And he was briefly jailed, they let him go and he
10  appealed it but he didn't have the wherewithal to
11  prosecute the appeal.
12      So in sum that's what I learned.
13    Q.    Did you discuss -- let me rephrase that.
14      So as you're describing the testimony,
15  originally you said you weren't sure the source of
16  the information that you first learned about the UK
17  conviction, correct?
18    A.    That's correct.
19    Q.    That remains true?
20    A.    But I said it might have been Pavanelli
21  himself.
22    Q.    But you don't recall that specifically.
23    A.    I'm not sure.
24    Q.    Do you recall, regardless of how you first
25  learned about the UK conviction, discussing it with

Page 123

1  Pavanelli at some point?
2    A.    I don't recall the actual conversation. I
3  recall what I learned about it. I don't recall
4  exactly when or who was involved. But I know
5  Pavanelli was involved. I think Usuelli might have
6  been involved in some way. But I don't really
7  remember.
8      The reason I don't remember and, you know,
9  remember, we were focused on whether the Attorney
10  General's opinion was final, so that's kind of what
11  most everything we did was surrounding.
12    Q.    I know you want to say that.
13      MR. ELLIOTT: Objection. Let's not --
14    Q.    I'm asking you something a little
15  different.
16    A.    I'm not saying that because obviously it's
17  our position. I don't want to say but I'm telling
18  you the reason I don't remember those exact dates and
19  time is we didn't consider it something we were
20  really focusing on.
21    Q.    Let me ask the question of you this way:
22  At the time you first learned of Pavanelli having
23  been convicted in the UK in 1989, you'd already
24  invested nearly $200,000 in these transactions,
25  correct?

Page 124

1    A.    Whatever we just talked through, probably
2  about 200, yeah.
3    Q.    Having invested the up to $200,000 at that
4  time, when you learned that Pavanelli had been
5  convicted in the UK of conspiracy to use fake
6  Bandagro notes, were you concerned?
7    A.    I didn't say that I learned that specific
8  thing. I learned what I told you that I learned,
9  that there was some conspiracy theory that he'd been
10  convicted of related to something other than these
11  notes. The conviction was unrelated to the notes in
12  this particular case.
13    Q.    When you learned that after you'd invested
14  up to $200,000 with Pavanelli that he had been
15  convicted in the UK in 1989 of some conspiracy
16  charge, did that cause you any concern?
17    A.    Well, any? Did I want to follow up on it?
18  On a scale of zero to a hundred, yes, somewhere in
19  that scale was something I wanted to follow up.
20    Q.    At what point on the scale?
21    A.    At that point we were, again, like I told
22  you, you think I want to say this, but we totally
23  focused on the legality of it. In other words, I
24  felt that these are bearer instruments that are valid
25  or invalid. And if the guy who had them was an angel

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

Page 125

1   and they weren't valid, didn't matter.  If the guy
2   that had them was not an angel and they had it,
3   didn't matter.
4           We looked at the idea that the instruments
5   were valid or not and so it wasn't of great concern.
6       Q.   So on the David Richards scale of concern
7   of 1 to 100, how high did this one register?
8       A.   Low.  It was low.  I didn't put a number
9   on it at the time.
10      Q.   Was it less than 20?
11          MR. ELLIOTT:  Objection.  Come on.  Can we
12  get off the hypothetical scale.  He's answered it for
13  you.
14      A.   It was not that important, again, for the
15  reason that it didn't bear on the outcome of the
16  investment.  The outcome of the investment in our
17  view at the time was the outcome of the investment
18  didn't depend on the people, depended on the
19  instrument and legality and binding nature of the
20  Attorney General thing.
21          So, no, it wasn't of great concern.  We
22  looked into it, we were satisfied with Pavanelli's
23  explanation.  We did follow up to get documents and
24  we got the Swiss documents, couldn't get the London
25  ones.  And the Swiss documents bore out what he told

Page 126

1   us about that one.
2       Q.   When you learned about the Italian
3   conviction that occurred in 2003, which you say you
4   learned about in 2005, were you concerned about that?
5       A.   We learned about it when it was on appeal.
6   And so was I concerned?  It was a business bankruptcy
7   where -- Italian law is funny, it's not like you did
8   some mens rea or something like we have in America is
9   what it was explained to me, so it was kind of a
10  financial thing.  He explained it that he went broke
11  and people were after him.
12      Q.   Did he explain that he was sentenced to a
13  prison term?
14      A.   He was sentenced and I learned about it
15  when the sentence was on appeal.
16      Q.   And the appeal resulted in an affirmance
17  of the sentence, right?
18      A.   I don't know that that was the outcome.
19      Q.   You didn't monitor that?
20      A.   No.  Again, it was irrelevant, right?
21      Q.   But when you first learned about the
22  sentence that was on appeal, did it cause you
23  concern?
24      A.   The thing that caused me concern is that
25  they claimed, Venezuela claimed that he had this

Page 127

1   Bandagro note on his computer that he was filling
2   out.  And that he had -- that's what they said in the
3   case.  And so I was -- that was the thing that
4   concerned me the most.  And so I got involved to see
5   if that were true or not and we found out that it
6   wasn't true.
7       Q.   So my question for you is when you found
8   out about the conviction and the prison sentence
9   which you found out in 2005 --
10      A.   Or '06.  2005 or '6, whenever it was.
11      Q.   Whenever.
12          -- did it cause you any concern?
13      A.   I probably asked Pavanelli about it and he
14  probably told me what I just told you, that it was a
15  financial thing and that he was appealing it and I
16  was -- again, my concern, I was concerned about this
17  idea that he had some Bandagro note on his computer,
18  that was new to me, and I wanted to find out if that
19  was true or not.
20      Q.   Did you ever learn that Pavanelli had been
21  jailed in Panama in 2001?
22      A.   No.
23      Q.   First you've heard of it is right here and
24  now?
25      A.   Yes.

Page 128

1       Q.   Did you ever learn that he was sought by
2   Interpol in 1981?
3       A.   No.
4       Q.   First you heard of it is today?
5       A.   I think so, yeah.
6       Q.   Let's look at Exhibit 8.  Do you recognize
7   this document?
8       A.   Well, I recognize that that's my
9   signature.
10      Q.   By the way, it's a several-page document,
11  even though this is repetition of the pages, look at
12  all of them because they're not identical.  Just let
13  me know when you've had some time to look at this and
14  let me know whether you recognize it.
15      A.   Okay.
16      Q.   Let's look at the first page.  Is this a
17  letter that you sent to Pavanelli in the form of a
18  fax?
19      A.   It says fax sheet.  I don't know if I sent
20  it or not.  Probably the other documents will say
21  whether it's sent or not.  But looking at the first
22  page it looks like a fax, sort of a sheet you'd use
23  to fax.
24      Q.   What's JG Capital, LLC?
25      A.   Well, it's an entity, for sure.  It's one

32  (Pages 125 to 128)

CONFIDENTIAL

David J. Richards

## Page 129

1    of my entities. But beyond that, I don't remember
2    exactly. We have a lot of entities, like I said.
3    It's probably related to the real estate business.
4         Q.    But that's one of your businesses and you
5    recognize the address, 500 South Front Street, Suite
6    1200, Columbus, right?
7         A.    Yeah.
8         Q.    And that's your signatures there, right?
9         A.    Yes.
10        Q.    That's not a forgery, right?
11        A.    Yes, it's not a forgery.
12        Q.    And take a look at the second page so we
13   can put this in a little time context. And look at
14   the upper left-hand corner of the second page. This
15   is a document from a different telecommunications so
16   you can see fax legends at the top. You see that
17   12/28/2003, 9:17 a.m. fax legend in the upper
18   left-hand corner?
19        A.    Well, my recollection before was 12 --
20   before Christmas, so is that 12/28?
21        Q.    That's 12/23, my mistake.
22        A.    I can't really see that without my little
23   magnifying glass.
24        Q.    If you look down at the body of the
25   document, you'll see there's toward the bottom

## Page 130

1    handwriting essentially signed by Pavanelli and the
2    date of 12 -- 23rd of December, right?
3         A.    Yeah.
4         Q.    So with that in mind, and actually I'll
5    help you out just a little further, take a look at
6    the next page, the last page of this document. As I
7    mentioned to you before, these things are not
8    identical exactly.
9              And you'll see on the page with the Bates
10   Stamp 5868 at the bottom there's some handwriting and
11   looks like you said "James, please let me know if I
12   can attend the meeting? David." That's your
13   handwriting, right?
14        A.    For my handwriting that looks very neat
15   but in the context it appears that it's mine.
16        Q.    So now let's take it from the top. So if
17   you look at the first page, this is a letter that you
18   faxed to Pavanelli on or about December 23, 2003,
19   right?
20        A.    Uh-huh.
21        Q.    Correct? You need to say audible answers.
22        A.    Yes. I was kind of thinking of that.
23   Yeah, that's right, 12/23 exactly.
24        Q.    So this is a letter you sent to Pavanelli
25   around that time by fax, right?

## Page 131

1         A.    Yes.
2         Q.    Let's look at the text of it.
3         A.    Okay.
4         Q.    Starting with the second paragraph which
5    you began with the sentence "Here is what we have
6    decided." Do you see that?
7         A.    Yes.
8         Q.    When had you decided what you then proceed
9    to describe?
10        A.    I don't know. Sometime before that fax.
11        Q.    How had you decided that?
12        A.    Well, I mean, I don't know what the
13   question means how did I decide it? I decided it.
14        Q.    There must have been some communication
15   between you and Pavanelli before you sent this
16   letter, right?
17        A.    Oh, I'm sure he was calling asking for
18   money.
19        Q.    So you had a conversation with him on the
20   phone before you sent this letter?
21        A.    Most likely. I don't recall the
22   conversation but that's probably what happened.
23        Q.    Then you said the next clause or the
24   sentence "Because you are in a difficult spot..."
25              Do you see that?

## Page 132

1         A.    Yeah.
2         Q.    What do you recall of that?
3         A.    His spot of needing money.
4         Q.    That was the extent of the difficulty, he
5    had no money?
6         A.    Yeah.
7         Q.    Had he told you at that time that he'd
8    been convicted in Italy in June of 2003?
9         A.    Like I already said, no.
10        Q.    Then you said "I'll send you $20,000 by
11   Western Union today/tomorrow." You see that?
12        A.    Yep.
13        Q.    Now, didn't you testify earlier that you
14   didn't know how to send money by Western Union?
15        A.    Yeah, I've never sent Western Union money
16   my entire life.
17        Q.    So why are you then telling him that's
18   what you're going to do?
19        A.    That's what he was asking for. I believe.
20   He wanted it now.
21        Q.    What about that caused you to say you'd
22   send it in a manner you didn't know how to employ?
23        A.    Well, you know, I don't think it takes a
24   genius to figure out how to do it. I could have
25   figured it out if I decided to do it. Or had

David J. Richards

Page 133

1    somebody figure it out.
2        Q.    All right, then you went on to say "To do
3    any or all of the remaining amount...."  Do you see
4    that?
5        A.    Yeah.
6        Q.    What remaining amount?
7        A.    He was asking me for more.
8        Q.    How much more?
9        A.    I don't remember.
10       Q.    You go o to say that would take our
11   investment over a hundred thousand, and then you say
12   to do that, I'm paraphrasing slightly, I must have
13   the full permission of my partners.  Do you see that?
14       A.    Yep.
15       Q.    What partners?
16       A.    Well, that's maybe a defensive statement
17   to let him think I had to go through some sort of big
18   process to kind of slow down his calling for money
19   every day.  But at this point the partners were, my
20   partners in the transaction were I think Houze was
21   there at the time.  Houze had become involved by
22   then, David Houze, and then Kennedy.
23       Q.    Was it true that to send him an amount
24   that would bring the total to over 100,000 you needed
25   permission of anybody?

Page 134

1        A.    Well, "need" is a, you know, I could,
2    obviously could have sent it myself.  But I was
3    starting to think, you know, I had two other guys
4    doing this with me, so at the time I think I believe
5    so it would have been them.  You want to get
6    consensus before you go farther.
7        Q.    But there was no written guideline
8    governing any partnership that had some threshold
9    beyond which some consent was required, correct?
10       A.    No. No.
11       Q.    So what you were telling here wasn't
12   exactly true, was it?
13       MR. ELLIOTT:  Objection.
14       A.    Well, in my mind I wanted to get full
15   permission of my partners.  And I also wanted to sort
16   of stiff arm Pavanelli from badgering me for money
17   every day.  So I told him that.
18       Q.    So in order to stiff arm him, you told him
19   something that wasn't quite true.
20       MR. ELLIOTT:  Objection, asked and
21   answered.  Two times he told you that.  You just
22   mischaracterized his answer.
23       MR. SCHWARTZ:  On the contrary.
24       MR. ELLIOTT:  No, it's not.
25       A.    I didn't say I'm legally required or there

Page 135

1    was any legal document, I said I must.  I felt like I
2    had to do it.
3        Q.    You were playing for time.
4        A.    No, I wasn't playing for time, I was
5    trying to have him leave me alone.  It was the night
6    before Christmas, like this is, as a matter of fact.
7        Q.    Then you said "We will meet next week to
8    evaluate," and that was talking about you and your
9    partners, right?
10       A.    Yeah.
11       Q.    At that point did you have a meeting
12   scheduled with your partners?
13       A.    Well, if I'm right that it was Kennedy and
14   Houze, we could meet anytime or talk anytime on the
15   phone.
16       Q.    But this didn't say we can talk anytime,
17   it said we will meet next week.  Did you have a
18   meeting scheduled at that time?
19       MR. ELLIOTT:  It doesn't say he has a
20   meeting scheduled at that time.
21       MR. SCHWARTZ:  That's what I'm asking him.
22       MR. ELLIOTT:  No, that's what you're
23   stating.  Go ahead and answer it again.
24       Q.    That's what I'm asking.
25       A.    What's the question again?

Page 136

1        Q.    When you wrote this letter on December
2    23rd, did you have a meeting scheduled for the
3    following --
4        A.    No, not that I -- let me put it this way,
5    not that I remember.  Could have, it's possible.
6        Q.    And then it says if the group approves,
7    you'll send the remaining $80,000.  Did the group
8    approve?
9        A.    We decided to go a little farther, look
10   into it a little more before we sent any more money.
11       Q.    Then you say if you need more than
12   $80,000, we can discuss that.  Do you see that?
13   Second-to-last sentence of the second paragraph.
14       A.    Yeah.
15       Q.    And then the final sentence of that
16   paragraph says "This will occur after your meeting
17   with the banker and Mr. Guzman, so we would want to
18   be kept advised."
19           Do you see that?
20       A.    Yep.
21       Q.    What is that referring to?
22       A.    Apparently he was telling me that he was
23   meeting with a guy, an investment banker and a guy
24   named Guzman.
25       Q.    Do you recall him telling you that?

34  (Pages 133 to 136)

CONFIDENTIAL

David J. Richards

### Page 137

1      **A.**   Well, it's in there, so it must be what I
2 thought he told me.
3      **Q.**   Who was Mr. Guzman?
4      **A.**   I don't know. Some guy.
5      **Q.**   Was the some guy Oscar Guzman Cova who had
6 worked in the Venezuelan Ministry of Finance?
7      **A.**   Guzman was the name I recall when I wrote
8 the thing. Nothing was mentioned of like that what
9 you just said. Just some guy named Guzman.
10      **Q.**   Have you ever heard of Oscar Guzman Cova?
11      **A.**   Yes.
12      **Q.**   When was the first time you heard of him?
13      **A.**   I don't remember.
14      **Q.**   Was it before the time you sent this
15 letter on or about December 23rd?
16      **A.**   Oh, no, I don't think so.
17      **Q.**   What banker was Pavanelli meeting with at
18 the same time he was meeting with Mr. Guzman?
19      **A.**   I apparently forgot or I would have
20 mentioned the name of the banker.
21      **Q.**   Why would you want to be kept advised, as
22 you indicate here that you did?
23      **A.**   Well, if he has, you know, a banker that
24 will finance the notes, I want to know about that,
25 obviously.

### Page 138

1      **Q.**   In the next paragraph of this document you
2 make reference to receiving $200,000 in bonds for the
3 first $20,000. Do you see that?
4      **A.**   Yep.
5      **Q.**   So that's that same 10-X return you've
6 testified to before, right?
7      **A.**   Yep.
8      **Q.**   And you go on to say Schianchi will
9 prepare and send a deed of trust in the same form as
10 before. Do you see that?
11      **A.**   Yes.
12      **Q.**   That's the same kind of instrument we've
13 talked about?
14      **A.**   Yes. And then the next sentence is
15 probably the real reason I was trying to get him to
16 sign it; if there was a liquidity event, we'd get
17 paid from this banking thing.
18      **Q.**   All right, so take a look at the next page
19 of the document. Now, this appears to be
20 Schianchi -- I'm sorry, Pavanelli sending this back
21 to you basically accepting the terms that you had put
22 in your original letter. You see that acceptance at
23 the bottom there?
24      **A.**   Oh, yeah. Yeah. Exactly.
25      **Q.**   And to best of your recollection did you

### Page 139

1 get this return fax from Pavanelli on or about
2 December 23rd, 2003?
3      **A.**   Yeah. Well, yeah, looks like a separate
4 fax header there on the two things, so it must have
5 come back pretty quickly.
6      **Q.**   To the best of your recollection you got
7 this back from Pavanelli after you had sent it to
8 him, right?
9      **A.**   Yeah, I think so. Yeah, of course.
10      **Q.**   Take a look if you can at the somewhat
11 difficult-to-read language of this re-fax in the same
12 paragraph we were focused on in the second paragraph
13 where Guzman's name had appeared. Do you see that
14 somebody crossed out "Guzman" and wrote what appears
15 to be "Delgado"?
16      **A.**   Yeah.
17      **Q.**   Do you have any idea who did that and why?
18      **A.**   I assume it was him, that I had the name
19 wrong. But I don't remember. I don't have a
20 recollection of this at all.
21      **Q.**   And then somebody also changed the word
22 "reimbursed" to "paid in full."
23      **A.**   Yep. I see that.
24      **Q.**   Who did that?
25      **A.**   I don't know.

### Page 140

1      **Q.**   Then as we saw before, it appears that you
2 wrote, and you see this both on the second and the
3 third page, "James, please let me know if I can
4 attend the meeting. David." Do you see that?
5      **A.**   Yeah. "Dave."
6      **Q.**   "Dave," all right.
7      Did Pavanelli respond to that inquiry on
8 your part?
9      **A.**   I don't remember. I don't think he did.
10      **Q.**   Did you attend any meeting between
11 Pavanelli, a banker, and either Mr. Guzman or
12 Mr. Delgado?
13      **A.**   No.
14      **Q.**   Do you know who Mr. Delgado is?
15      **A.**   No.
16      **Q.**   Do you know if he's somebody who at one
17 point worked in the Venezuelan Ministry of Finance?
18      **A.**   I don't know.
19      **Q.**   Is this one of the documents --
20      **A.**   I mean, I know there is a Delgado who did
21 but I don't know if that's who we referred to.
22      **Q.**   At the time did you know who Guzman or
23 Delgado were?
24      **A.**   Not really.
25      **Q.**   Did you ask?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

## Page 141

1    A.   You know, no.  I don't think we'd have
2   gotten to that level of detail in our looking at the
3   thing yet.
4    Q.   Is this one of the documents, Exhibit 8,
5   that you reviewed in preparing for the deposition?
6    A.   I don't think I saw this.  Maybe I did.
7   Did I?  Did you show this to me?
8    Q.   You can't ask him.  Doesn't work that way.
9    A.   I must have or I might have because, you
10  know, I think this is what refreshed my memory about
11  the 20 or 30 grand before Christmas.
12       MR. SCHWARTZ:  Let's break for launch.
13       VIDEOGRAPHER:  Off the record 12:37.
14       (Lunch recess taken.)
15               --|--
16
17
18
19
20
21
22
23
24
25

## Page 142

1       Monday Afternoon Session,
2       December 22, 2014.
3               --|--
4       VIDEOGRAPHER:  We're back on the record,
5   1:16.
6       MR. ELLIOTT:  Andrew, real quick, right
7   before we broke, and I want to make sure you're not
8   confused about the testimony, when you were asking
9   Mr. Richards about Guzman and Delgado, he was
10  interpreting your questions as to whether or not he
11  knew who they were at the time the fax was exchanged.
12       I thought your question was broader than
13  that:  Have you ever known of those people.  And I'm
14  just not sure, he obviously does know of those people
15  but he was answering your question as of the time of
16  the fax.  I don't know if I'm wrong but I wanted to
17  give you the opportunity if you needed to clarify
18  that.
19               --|--
20       DAVID J. RICHARDS
21       CONTINUED CROSS-EXAMINATION
22  BY MR. SCHWARTZ
23    Q.   Mr. Richards, is what Mr. Elliott just
24  said consistent with your view?
25    A.   I thought that's exactly what I said, so,

## Page 143

1   yes.
2    Q.   Do you still have Exhibit 8 there in front
3   of you?
4    A.   Yes.
5    Q.   Did you ever get a report from
6   Mr. Pavanelli about any meeting that he may have
7   attended with a banker and with either Mr. Guzman or
8   Mr. Delgado?
9    A.   No, not that I remember.  Not saying I
10  didn't but I don't remember.
11   Q.   Between the time you sent Exhibit 8 at the
12  end of 2003 and the time you went to Como, Italy, at
13  the end of March 2004, did you conduct any due
14  diligence concerning the opportunity associated with
15  the Bandagro notes?
16   A.   I think that the primary work at that time
17  was being done by Alcalde.  I was looking into the
18  decision, its finality, et cetera, those kinds of
19  things.
20       And I remember that I had shoulder surgery
21  right after the first of the year and I had a
22  difficult time with it, so, and also, again, as I
23  think I told you, I was running a few other
24  businesses at the time, so I don't think I was very
25  active in that first month of the year or so or five

## Page 144

1   weeks.  I don't recall doing anything.  Maybe talking
2   to Alcalde or someone else at Crabbe-Brown.  So I
3   think they were primarily carrying the ball at that
4   point.
5    Q.   Were you undertaking any type of due
6   diligence effort independent of Crabbe-Brown?
7    A.   Well, I did my own diligence before I
8   bought the notes sometime as throughout the process.
9   Things like meet with Pavanelli and that kind of
10  stuff.  But if you're asking me in this timeframe of
11  January of right after this thing, I don't think
12  there was much that I did.
13   Q.   You first met Pavanelli when?
14   A.   When I went to Como in March.
15   Q.   What I'm asking now, just to be clear, is
16  between the time you sent the letter at the end of
17  December and the time you went to Como in March did
18  you personally conduct any due diligence on Bandagro
19  or Bandagro notes or bonds or anything like that?
20   A.   I'm sure I did something, but again, it
21  would only have been incidental to what was being
22  done by Alcalde and Crabbe-Brown, that is look into
23  the law surrounding the decision.
24   Q.   What was the "something" that you
25  personally did?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

## Page 145

1   A.   Well, I didn't say I did a specific thing,
2   I said I'm sure I did something.  What it was, I
3   don't remember.  Again, the primary thrust of
4   everything was on the law and the decision and that
5   was all Spanish stuff anyway and it was Jacir,
6   primarily Jacir and Alcalde.
7       Q.   Other than engaging Crabbe-Brown in this
8   timeframe, did you hire any other professional to
9   assist you in any way in exploring this opportunity?
10      A.   I don't think so.
11      Q.   Was there any point between the end of
12  2003 and the end of March of 2004 that you did any
13  kind of research into newspaper articles or other
14  media reports concerning what was going on in
15  Venezuela?
16      A.   Well, if I had, I wouldn't have been able
17  to read them.  But I think Alcalde was doing some of
18  that.
19      Q.   And was he reporting to you?
20      A.   Yeah, he reported to me periodically.
21      Q.   Were you yourself accessing any type of
22  online news reports concerning developments in
23  Venezuela concerning the Bandagro notes?
24      A.   None that I remember.  Let me correct that
25  answer because I'm just thinking back there.  I

## Page 146

1   remember that March of '03 was a time of turmoil in
2   Venezuela, I believe it's either March or April, May.
3       Q.   '03 or '04.
4       A.   I'm sorry, '04.  And I think I remember as
5   we were looking into this that I'd read some articles
6   about turmoil in Venezuela at the time, riots, things
7   like that.
8       Q.   Where did you read those?
9       A.   I don't remember.
10      Q.   Did you ever access the Venezuelan
11  newspaper El Universal?
12      A.   Ever?
13      Q.   Let's start with ever.
14      A.   Ever.  Possibly.
15      Q.   In the first quarter of --
16      A.   We might have been given stuff.  The name
17  sounds familiar.
18      Q.   Have you ever heard of El Universal?
19      A.   Through this case I've heard about it.
20      Q.   Do you recognize that as being the name of
21  a newspaper in Venezuela?
22      A.   Yes.
23      Q.   In the first quarter of 2004 did you
24  access El Universal online to monitor developments in
25  Venezuela?

## Page 147

1   A.   Again, it's very possible but I don't
2   remember.  Do they have an English language version,
3   do you know?
4       Q.   The way this exercise works, I ask the
5   questions and you answer them.  So I don't mean to be
6   curt or rude, but you don't get to ask questions
7   today.
8       A.   Well, then let me answer it this way, it
9   wouldn't have made much difference if it was a
10  Spanish site.  If there were English, I might have.
11      Q.   So I'm going to mark Exhibit 9 and we'll
12  have a 9A because I have a Spanish language document
13  and then I have a certified translation of the
14  Spanish language document.
15           (RICHARDS/SKYE EXHIBITS 9-9A WERE MARKED.)
16      Q.   Mr. Richards, take a look at these two
17  related documents, Exhibit 9 and Exhibit 9A.  What
18  you will see, I'll preview for you, is that Exhibit 9
19  is an article from ElUniversal.com and Exhibit 9A is
20  an English translation of the same news report.  So
21  just let me know when you've had a chance to look
22  primarily at the Exhibit 9, the one in Spanish.
23      A.   Oh, okay.  I've seen it.
24      Q.   Now, take a look -- before I ask the next
25  question, do you recognize this?

## Page 148

1   A.   No.
2       Q.   So take a look now at the last line of
3   text on the first page of this exhibit.  You see
4   there's a what we'll call a ribbon that gives some
5   information reflecting that this article was copied
6   onto somebody's computer?
7       A.   I don't know what that means, but I see
8   there's this thing that says "C:\documents."
9       Q.   Et cetera.
10      A.   Yeah, some other stuff there.
11      Q.   You ever seen a legend like that or a
12  ribbon like that at the bottom of a document?
13      A.   Well, no.  To the extent it goes
14  C:documents, I've seen that.  The rest of it.
15      Q.   So this is a document that was produced in
16  this litigation by Skye Ventures, as is evidenced by
17  the Bates Stamp No. 002009.  You see that Bates Stamp
18  in the lower right-hand corner of the Spanish
19  version?
20      A.   Yes.
21      Q.   Do you have any idea how this document
22  ended up in the files of Skye Ventures?
23      A.   I don't know if it was in the files of
24  Skye Ventures.  I don't know where it came from.
25      Q.   Well, your lawyers produced it to us in

37 (Pages 145 to 148)

David J. Richards

Page 149

1  this case.
2      A.    They obviously got it somewhere. I don't
3  think they got it from me.
4      Q.    Okay. Do you have any idea where they got
5  it?
6      MR. ELLIOTT: Objection. If he did,
7  you're not going to get that information.
8      MR. SCHWARTZ: Well, we might be able to
9  get that information. I don't know that that would
10  be priveledged.
11      MR. ELLIOTT: I think it would be.
12      MR. SCHWARTZ: I asked him if he had any
13  idea so he doesn't have to answer other than yes or
14  no.
15      A.    I have no idea.
16      Q.    Did there come a time in February of 2004
17  when you personally were conducting online research
18  into news reports concerning developments in
19  Venezuela?
20      A.    No, I don't think so.
21      Q.    So to the extent that this ribbon, as I'm
22  describing it, at the bottom of the first page of
23  Exhibit 9, which also had a date of 2/14/2004 on it,
24  reflects that somebody downloaded this article or
25  copied it onto their desktop on February 14, 2004,

Page 150

1  you don't think that was you.
2      MR. ELLIOTT: Objection to the form.
3      A.    No.
4      MR. SCHWARTZ: What's wrong with the
5  question?
6      MR. ELLIOTT: I think you put an awful lot
7  of factual foundation in there that has not been
8  established.
9      MR. SCHWARTZ: That's fine, it was cast
10  that way. I'm going to rephrase the question just so
11  we're clear.
12      Q.    As far as you recall you did not download
13  or copy this article onto your desktop at your office
14  or on your laptop on February 14, 2004, right?
15      A.    Yes, correct.
16      Q.    Did you task Alcalde with the role of
17  monitoring developments in the Venezuelan press
18  during this timeframe?
19      A.    Did I tell him to do that? No. But if he
20  was interested in it, I'm sure he did.
21      Q.    Let's mark Exhibit 10.
22      (RICHARDS/SKYE EXHIBIT 10 WAS MARKED.)
23      Q.    Mr. Richards, please take a look at
24  Exhibit 10. And when you're done looking at it, let
25  me know if you recognize this.

Page 151

1      A.    Well, I recognize the logo for sure. And
2  it's obviously a website because it has this "click
3  here" stuff on it. So that must have been a button
4  of some kind. So, yeah, that's what it looks like.
5      And then at the top I see this
6  http://wwwSkyeVentures.com. Looks like it's a web
7  page.
8      Q.    In March of 2004 did Skye Ventures have a
9  website?
10      A.    We put up a website and I don't remember
11  exactly when. It was in the spring of 2004 I think.
12      Q.    And does this screen shot look to you like
13  what was on the Skye Ventures' website in March of
14  2004?
15      A.    Well, again, like I say, I don't remember.
16  It looks like the page itself, although it's missing
17  an image or two. Looks like kind of I really vaguely
18  recall what our website looked like back then. This
19  date at the top, I don't know where it came from.
20  I've never seen anything like that in a web browser.
21      Q.    In March of 2004 was Skye Ventures
22  representing on its website that Skye was an owner of
23  Bandagro promissory notes?
24      A.    That's what's curious because we weren't
25  an owner of Bandagro notes in March of 2004. We may

Page 152

1  have been an owner of interest in Bandagro notes. So
2  maybe that's what we're trying to say.
3      Q.    Who created this website?
4      A.    Well, I think -- I don't know. I don't
5  remember.
6      Q.    You must have hired somebody to do it,
7  right?
8      A.    Well, remember I told you I had a guy that
9  did this kind of thing for me and I told you his
10  name, and it might have been him.
11      Q.    So do you recall whether in the middle of
12  March of 2004 you were or Skye Ventures was holding
13  out on the Internet that it was the owner of Bandagro
14  promissory notes?
15      A.    I was an owner of an interest in
16  promissory notes. So whether you want to . . .
17      Q.    Did you create this content? Nevermind
18  who handled the technical aspect of setting up the
19  website. Who created the content?
20      A.    Well, I probably had a lot to do with it.
21  I'm sure that in here there's a history of Bandagro
22  notes, I'm sure somebody prepared that for me.
23  Correct information I'm sure -- I'm sure most of this
24  was information obtained from the law firm.
25      Q.    From Crabbe-Brown?

38 (Pages 149 to 152)

David J. Richards

Page 153

1    A.   Yeah.
2    Q.   What did you mean when you said in the
3    website "Skye's ownership interest is held through
4    Gruppo Triad FFC, S.P.A."?
5    A.   That makes it clear, I was referring to
6    these deeds of trust that we own.  Now I see that.
7    Q.   The website screen shot goes on to say
8    that the materials available on a certain point of
9    the site include detailed documentation including
10   opinion of counsel.  You see that?
11   A.   Yes.
12   Q.   Which opinion of counsel was available on
13   the website as of March of 2004?
14   A.   I don't know.
15   Q.   Was it is an opinion of Crabbe, Brown &
16   James?
17   A.   I don't know.
18   Q.   Was it an opinion from some Venezuelan
19   counsel?
20   A.   Again, I don't remember which opinion of
21   counsel it was.
22   Q.   Has Skye Ventures or any affiliated person
23   or entity engaged Venezuelan counsel for any reason
24   having to do with the Bandagro notes?
25   A.   I've engaged a couple of lawyers in

Page 154

1    Venezuela, not at that time.  If this is truly from
2    March of '04, again, which I don't know or not, but I
3    engaged Venezuelan counsel for various reasons, but
4    by then, I mean, guys like Bedell who filed
5    affidavits in this case and Duque-Corredor, and then
6    I spoke -- I've spoken to a raft of Venezuelan
7    attorneys but I don't think any were ever retained by
8    me.
9    Q.   How many have you paid?
10   A.   How many have I paid.
11   Q.   Or has Skye Ventures paid.  Or has any
12   affiliated entity paid for this purpose.
13   A.   So paid Corredor, paid Bedell for their
14   work.  I believe I paid a small payment to one of the
15   big firms there, I think Baker & Hostetler.
16   Q.   What for?
17   A.   We wanted their opinion as to whether the
18   decision was final and binding.  But we ended up
19   not -- they wanted too much money so we didn't go
20   through with them.  But they did say it was final and
21   binding.  It wasn't Baker, it was one of the -- they
22   had an outlet here in Columbus too.  Might have been
23   Baker.
24   Q.   Were there any others you've paid?
25   A.   No, I don't think so.  Not that I can

Page 155

1    remember.
2    Q.   This screen shot indicates that available
3    on the site was "Correct information on Gruppo Triad
4    and its owners."  Do you recall what information was
5    available?
6    A.   Nope.
7    Q.   Do you recall if there were multiple
8    owners as to which information was provided?
9    A.   Nope.
10   Q.   Then it goes to say "Skye is also
11   interested in purchasing Bandagro notes which are
12   authentic."
13        Do you see that?
14   A.   Uh-huh.
15   Q.   You need to answer --
16   A.   Sorry.  Yes.
17   Q.   -- verbally.
18        At that time, March 2004, was Skye looking
19   to obtain Bandagro notes from sources other than
20   Gruppo Triad?
21   A.   Well, you know, we'd be interested to know
22   if other people out there were claiming that they had
23   authentic Bandagro notes.  And, yeah, maybe we're
24   interested in purchasing.
25   Q.   Did you have reason to think at that time

Page 156

1    that there were people out there who had Bandagro
2    notes which were not authentic?
3    A.   I think, well, the Attorney General said
4    in their opinion there are notes out there which are
5    false and notes which are authentic.  And so we
6    assumed there were.
7    Q.   Let's mark Exhibit 11.
8        (RICHARDS/SKYE EXHIBIT 11 WAS MARKED.)
9    Q.   Mr. Richards, I'm showing you Exhibit 11,
10   it's a two-page letter from you to Mr. Pavanelli,
11   dated March 18, 2004.  Please review it and let me
12   know if you recognize it.
13   A.   Yes.  Okay, I remember this.  I haven't
14   seen this before, so.
15   Q.   Well, when you say you haven't seen it
16   before, looks like it's a letter you wrote and signed
17   and sent to Mr. Pavanelli by fax on March 18, 2004,
18   right?
19   A.   Excuse me, it's not signed by me.  There's
20   a signature stamp.  I'm not saying I'm not the author
21   of the letter, but that's a stamp.  And what I was
22   not saying is that I didn't do this, I just said I
23   didn't review this in preparation for this
24   deposition.  I haven't seen it I guess since 2004.
25   Q.   You did send this letter to Mr. Pavanelli

39 (Pages 153 to 156)

David J. Richards

## Page 157

1 by fax on March 18, 2004, or thereabouts; is that
2 correct?
3     A.    Having read it, sounds like -- seems like
4 I did.  Having looked at it.
5     Q.    While we're on the signature stamp issue,
6 I see that it looks like somebody with initials "bb"
7 may have prepared this letter for you or typed it.
8 Who's bb?
9     A.    Well, it's no doubt a secretary I had at
10 one of the businesses.  But I'm trying to think who
11 it might be.  I can't remember who it was.  I don't
12 remember anybody working for me, any secretary being
13 bb.
14     Q.    Let's look at the -- any secretary with
15 the initials bb.
16     A.    Bb, right.
17     Q.    Let's look at the first paragraph of your
18 letter to Mr. Pavanelli.  You say you're looking
19 forward to meeting with him, would like to see if you
20 can establish a more formal relationship, and you're
21 enclosing a CV.  Right?
22     A.    Yep.
23     Q.    Did you send the CV when you sent this
24 letter?
25     A.    I don't remember.

## Page 158

1     Q.    Have any reason to doubt that you did?
2     A.    No, I don't.
3     Q.    The reason I ask is it has not been
4 produced along with the letter, so, but we'll follow
5 up with your counsel on that.
6           In any event, next paragraph discusses
7 your itinerary.  Does this refresh your recollection
8 as to when you actually traveled to Como?
9     A.    Yeah.  I'm really surprised.  Must have
10 been when I went.  I don't remember my wife yelling
11 at me and all of that, me going to Italy without her
12 on her birthday, but must be true.
13     Q.    So you were meeting with Mr. Pavanelli on
14 April Fool's Day after all.
15     A.    It must be true, yeah.
16     Q.    Let's look at the next paragraph.
17     A.    I should say it could be true.
18     Q.    What's your best recollection as you sit
19 here right now?  Were you there arriving on the
20 31st and leaving on the 5th?
21     A.    Again, my best recollection was what I
22 gave you before, that I was there on the 30th and
23 31st.  I thought I would have gotten back by my
24 wife's birthday.
25     Q.    Other than the fact it's you're wife's

## Page 159

1 birthday do you have any reason to think that you
2 would have scheduled it that way?
3     A.    Well, I had a lot of other things going on
4 in my life too.  Aside from her birthday, my travel
5 schedule changes all the time.  But I'm willing to
6 say okay, let's assume it was then.
7     Q.    Okay, you're willing to assume it was
8 what's set forth in Exhibit 11.
9     A.    Yeah.  Even though my memory differs a
10 little bit.
11     Q.    Let's look at the paragraph after the
12 description of the itinerary.  Incidentally, before
13 we do that, I know this is more than ten years later,
14 but do you have any way you could consult any
15 records, whether it's your calendar, other
16 information you may have retained, that would tell
17 you when you were there in Como?
18     A.    I don't have any calendars or anything
19 like that from back then but I looked around to see
20 what I could -- I was trying to get some of these
21 dates and I couldn't find anything that would
22 indicate the days I was there.
23     Q.    So the best we have is what's in
24 Exhibit 11.
25     A.    Yeah.  And my memory.  Which is slightly

## Page 160

1 different but probably wrong.
2     Q.    So let's look at the next paragraph.  It
3 goes on to say, after you provide some more personal
4 background, "We can also discuss your need for funds,
5 both the immediate need as well as the possible need
6 for a prudent amount of funding, say 10 million, to
7 complete everything."
8           Do you see that?
9     A.    Yep.
10     Q.    And you go on to say "I feel that it would
11 be much easier to place the notes in a sale or as
12 collateral after an order from the commission."
13           Do you see that?
14     A.    Yep.
15     Q.    First of all, what commission were you
16 referring to?
17     A.    Well, I think at this timeframe there was
18 some sort of commission hearing on the Bandagro notes
19 in Venezuela.  And they were trying to figure out how
20 they were going to pay the notes and why they had to
21 pay them and that kind of thing.  Something like
22 that.
23           I got my information about this from
24 Alcalde and from Pavanelli, so I didn't have direct
25 knowledge.  So I think there was a governmental

www.IntegrityReportingGroup.com
614.875.5440

David J. Richards

Page 161

1    commission who was going to rule on how they were
2    going to pay the notes or something like that.
3        Q.   Do you recall having learned as of
4    March 18, 2004, that the Venezuelan National Assembly
5    had initiated a special mixed commission to
6    investigate not how to pay the notes but whether the
7    notes should be paid at all?
8        A.   No.  That was not what was told to me.
9        Q.   Have you ever learned that to be the case?
10       A.   I was never told that the commission
11   hearing was about whether the notes should be paid or
12   not.
13       Q.   Have you ever read any of the documents
14   that were generated in the course of the special
15   mixed commission's work?
16       A.   No.
17       Q.   Why not?
18       A.   I'm assuming they would have been in
19   Spanish and I wouldn't have been able to read them.
20       Q.   At any point from 2003 till today have you
21   ever, in connection with the dispute that has us
22   sitting in this conference room, have you ever read
23   any English translation of a Spanish document?
24       A.   Oh, yeah.
25       Q.   What types of documents have you read

Page 162

1    English translations of?
2        A.   Well, the primary one I can recollect is
3    the Attorney General's opinion.  There have been some
4    filings in the court by Venezuela that I've read of
5    documents.  And I'm sure there were others, don't
6    exactly remember.  If you give me some context, I can
7    tell you.
8        Q.   Have you read any translations of any
9    newspaper articles that appeared in the Venezuelan
10   press?
11       A.   Ever?
12       Q.   In connection with this matter.
13       A.   Yes.
14       Q.   What do you recall about that?
15       A.   Well, after I engaged Sitrick and Company
16   they had somebody that followed pretty much every
17   article that was -- one of their jobs was to look at
18   all the articles and if they thought something was
19   important, they would translate and send it to me.
20       Q.   What did you engage Sitrick to do?
21       A.   Sitrick's a publicity firm, a PR firm, so
22   I engaged them for PR.
23       Q.   In what period of time?
24       A.   I think it was spring of '04, maybe
25   April-May-June timeframe till today.

Page 163

1        Q.   Sitrick is still engaged in connection
2    with this matter?
3        A.   Yes.
4        Q.   Why do you need a PR firm?
5        A.   Well, I thought it was prudent to be
6    prepared to let the world know what we thought the
7    story in the Bandagro was.  That that might bring
8    pressure on Venezuela to honor its own laws.  That
9    was my theory.
10       Q.   How much have you paid Sitrick?
11       A.   Initially I paid them a little bit but
12   then he took an interest in the notes.
13       Q.   How much is "a little bit"?
14       A.   A few dollars.  Not much at all.
15       Q.   Less than a thousand?
16       A.   I don't remember.  Honestly, I don't
17   remember.  I think I paid him at first but I'm not
18   even sure of that.
19       Q.   How much does Sitrick stand to gain if you
20   prevail in the litigation?
21       A.   He has an interest that I think is
22   5 percent, something like that.
23       Q.   5 percent of your recovery?
24       A.   Yeah.
25       Q.   Will go to Sitrick.

Page 164

1        A.   Yeah.
2        Q.   For doing what?
3        A.   For being a PR guy for ten years.  He's
4    expensive anyway, so.
5        Q.   Apparently.  All right, let's take a look
6    at the same paragraph of Exhibit 11 we were looking
7    at just a moment ago.  So you made reference to an
8    immediate need for funds and then the possible need
9    for $10 million to complete everything.  So let's
10   start with the immediate need for funds.  What was
11   your understanding of what immediate need for funds
12   Pavanelli had as of mid-March 2004?
13       A.   Well, my recollection was that he was
14   paying or Jacir wanted to be paid cash instead of
15   just an interest and he wanted money to pay Jacir and
16   he was running the deal, if you will, for Gruppo and
17   he wanted money, he was out of money for that.  So I
18   think those were the two primary purposes that were
19   his needs for funds.  There may have been others that
20   don't come to mind.
21       Q.   And what was the quantity of funds he
22   needed in the immediate term?
23       A.   I don't remember.
24       Q.   And when you made reference to $10 million
25   to complete everything, what were you referring to

41 (Pages 161 to 164)

## Page 165

1   there?
2       A.   Well, so I was referring to how much he
3   might have to expend in cost before the notes were
4   honored.
5       Q.   What made you think that he might need
6   $10 million to accomplish that objective?
7       A.   Well, if you went to a law firm to
8   represent you in a case against a foreign sovereign,
9   you could see a scenario under which 10 million could
10   be spent, certainly 10 million would be a comfortable
11   number.
12       Q.   What made you think as of March 18, 2004,
13   he'd need to engage a law firm to sue a foreign
14   sovereign?
15       A.   Well, I didn't think that, and certainly
16   hoped not. We were hopeful that it would be paid.
17   But obviously it had been delayed for a while. So
18   the theory of the thinking was at this time you might
19   have to take action against Venezuela to make them
20   follow through in their ruling because they were
21   giving sort of what we call the four corners: Delay,
22   delay, delay.
23       Q.   So you went on to say in the sentence we
24   looked at a moment ago, "I feel that it will be much
25   easier to place the notes in a sale or as collateral

## Page 166

1   after an order from the commission."
2       So what is it about an order from the
3   commission that you thought would make it easier to
4   place the notes in a sale or as collateral?
5       A.   Well, if another governmental body rules
6   that there's a method to pay the notes, that would
7   make it easier.
8       Q.   And conversely, if the commission had
9   issued an order to the effect that the notes
10   shouldn't be paid, did you think that would make it
11   more difficult to place the notes in a sale or as
12   collateral?
13       A.   I was thinking more of couldn't be paid,
14   but, yeah, either way, it would have made it more
15   difficult to place the notes for Pavanelli.
16       Q.   What did you mean by "place the notes in a
17   sale or as collateral"?
18       A.   So you could, if he wanted to raise money,
19   he obviously could sell a promissory note or he could
20   take a loan that was secured by a promissory note
21   where the note was the collateral for the loan.
22       Q.   And what role would you or Skye Ventures
23   play in connection with that type of transaction,
24   either of those types of transactions?
25       A.   That's what I was going to talk to him

## Page 167

1   about, maybe help him play with that.
2       Q.   What role did you contemplate you might be
3   able to play in that regard?
4       A.   Well, I might be able -- I thought I could
5   put him in touch with people who would execute the
6   financial transactions.
7       Q.   As opposed to you providing the money
8   yourself?
9       A.   Yes. Or in addition. Could have been
10   either or both.
11       Q.   And the last full -- not last full
12   paragraph but the last paragraph that starts on the
13   first page of this memo, I'm sorry, letter, you say
14   "Please find enclosed a summary of what I'd like to
15   go over when I visit."
16       Do you see that?
17       A.   Oh, yeah. I was looking at the wrong
18   paragraph.
19       Q.   Sorry, last paragraph starts on page Bates
20   page 1181. Says "Please find enclosed a summary of
21   what I'd like to go over when I visit." Right?
22       A.   Yes.
23       Q.   And where's the summary?
24       A.   I don't know.
25       Q.   Did you send one?

## Page 168

1       A.   Maybe.
2       Q.   Do you have a recollection of what such a
3   summary would have included?
4       A.   Nope. I could guess as to today sitting
5   here today what I would have asked and what deal
6   point I might have but I don't know what was on this
7   one. But I was trying to set a tone or a topic of
8   things I wanted to do.
9       Q.   To the best of your recollection do you
10   still have a copy of the summary?
11       A.   No.
12       Q.   Why not?
13       A.   I don't know where this letter came from.
14   I don't think I have a copy of it, to be honest with
15   you.
16       Q.   Well, the letter was produced by your
17   lawyers in this case, but they didn't include the
18   summary. That's why I'm asking you.
19       A.   Well, I don't have it.
20       Q.   Do you know if they do?
21       MR. ELLIOTT: Objection.
22       A.   You would have to argue with them about
23   it.
24       Q.   Not arguing, just asking. I don't want to
25   argue.

David J. Richards

## Page 169

1    A.   I don't know where -- again, I don't know
2  where this letter came from be, to honest with you.
3    Q.   All right.  You went on to say in the same
4  paragraph we were just reading "Depending on what
5  happens in Venezuela, this may not be necessary."
6        What did you mean by that?
7    A.   Well, what I was referring to there is
8  that if this commission ruled as to how they were
9  going to pay it and follow through, then obviously I
10  was wasting time.
11    Q.   But if they ruled otherwise, you were not
12  wasting your time.
13    A.   Or if there were no ruling at all.
14    Q.   Now let's turn the page to Bates page
15  1182.  In the second line you went on to say "It
16  seems that the transaction has reached the point
17  where debt secured by the notes would be preferable
18  to a sale for less than face value."
19        Why was that true?
20    A.   Well, you have to look at it from his
21  point.  I was referring to from his -- more desirable
22  from his point of view and so the question would be
23  if you have a note that is worth a dollar and you can
24  sell it for 35 or 40 cents on the dollar, then that's
25  one way to go.

## Page 170

1        On the other hand you might be able to get
2  a loan for 30 cents against that so that when you're
3  paid, you're only giving up 30 cents plus interest.
4  Which if you believe your notes going higher gives
5  you higher leverage and puts you in a better
6  position.  So that's kind of what I was referring to
7  there.
8    Q.   You went on to say "And if you choose to
9  sell the notes to Delgado," and then you continued
10  from there.  Who was Delgado?
11    A.   Again, it was this banker that we looked
12  at, that other banker.  I meant to that group or the
13  Delgado group.
14    Q.   As of this time was Pavanelli engaged in
15  negotiations to sell the notes to Delgado or the
16  Delgado group as far as you know?
17    A.   He had told me that he had this -- I think
18  this must be kind of -- this must -- this thing that
19  he referred to around Christmas must be still ongoing
20  where this investment banker and this guy named
21  Delgado were looking at purchasing the notes or doing
22  some sort of financial deal with the notes.  And I
23  think that must be Pavanelli must have said that to
24  me and I'm telling him if you're going to do that,
25  you don't need any money from me, basically.

## Page 171

1    Q.   I just want to make sure I'm understanding
2  what you're saying here so we need to look back at a
3  different exhibit, which I want to say is No. 8.
4    A.   This one?
5    Q.   Yes.  Turn to the third page, please.
6    A.   Okay.
7    Q.   So just to connect the dots here for a
8  second, the Delgado that you're referring to in
9  Exhibit 11 is the same Delgado whose name was
10  handwritten onto the third page of Exhibit 8 where
11  Guzman had been crossed out?
12    A.   I'm pretty sure that's what I was
13  referring to.  Unless there is another -- Delgado I
14  guess is a fairly common name down there but I think
15  it's the same group.  I think they had -- the idea
16  was that they did have some kind of meeting and it
17  was ongoing as I recall, best I recall.
18    Q.   And then at the end of this letter that is
19  Exhibit 11 you wrote "I am looking forward to meeting
20  you as well as Antonio Usuelli and Dr. Schianchi."
21    A.   Yes, I did write that.
22    Q.   And when you went to Como at the end of
23  March and continuing for the first several days of
24  April, did you meet with not only Pavanelli but also
25  those two other individuals?

## Page 172

1    A.   Yes, I did meet the two other individuals.
2  And others I think.
3    Q.   Who were the others?
4    A.   There was a fellow there named Pedro Wick
5  and I met with Fabbiani.
6    Q.   Pedro Wick and Fabbiani.
7    A.   Yeah.
8    Q.   Are you familiar with an entity by the
9  name of Woodstrite?
10    A.   Yes.
11    Q.   What do you know about Woodstrite?
12    A.   I know that Woodstrite claims a 25 percent
13  interest in all the notes.  I met two guys from
14  Woodstrite in Caracas.  I know they owned newspapers
15  and I believe hotels.
16    Q.   Do you know anything else about
17  Woodstrite?
18    A.   Well, they brought -- I know they brought
19  legal action in Switzerland.  So if you have anything
20  specific, that's probably about the sum of my
21  knowledge, but there's probably a few other small
22  things.
23    Q.   Who are the two guys you met in Caracas?
24    A.   I think the guys' names were Marcel
25  Bonetti.

43 (Pages 169 to 172)

CONFIDENTIAL

Page 173

1　Q.　Marcello Bonetti?
2　A.　I thought it was Marcel but it might have
3　been Marcello.  And Gino Manfredi I believe.
4　Q.　How many times have you met those
5　gentlemen?
6　A.　Just that one time.
7　Q.　When was that?
8　A.　I'm pretty sure it was the last week of
9　June of 2004.
10　Q.　Before you purchased notes 7 out of 12 and
11　8 out of 12, right?
12　A.　I would say yes.
13　Q.　What were the circumstances under which
14　you met those guys?
15　A.　Well, I was there in Caracas with Alcalde
16　and we were there to have a group of meetings and
17　that was one of the meetings that we had.  The
18　rationale for having the meeting was that I believe,
19　I'm pretty certain that we had learned that they
20　claimed a 25 percent interest in the notes.  And we
21　wanted to figure out what that was all about.
22　Q.　Why did you meet them in Caracas?
23　A.　That's where they lived.  I think they
24　lived in both Italy and Venezuela.  So they were kind
25　of like me, half time both places, I think they were

Page 174

1　the same thing.  But they were in Caracas is why we
2　went to them.
3　Q.　How many trips have you ever made to
4　Caracas?
5　A.　I think three.
6　Q.　When were the other two?
7　A.　One was went down to meet with Jacir and
8　others in April of '04, and then subsequently I think
9　in probably '05 I went to meet with the Ministry of
10　Finance.
11　Q.　Who did you meet with in the Ministry of
12　Finance?
13　A.　Minister named Tovar.  I don't remember
14　the rest of it.  I think it was Jose Tovar but I
15　could be wrong about that.
16　Q.　Jose Nicholas Tovar?
17　A.　Tovar I'm sure of.  But if Jose Tovar is
18　the guy they jailed, then it's a different Tovar,
19　it's not the same guy.
20　Q.　Anybody else in the Ministry of Finance
21　that you met with?
22　A.　I don't recall if he had anybody else in
23　the meeting or not.
24　Q.　Who else was there with you?
25　A.　There was a congressman and a business

Page 175

1　guy.
2　Q.　Congressman from where?
3　A.　From Caracas.  He was a Venezuelan
4　congressman.
5　Q.　What was his name?
6　A.　Pedro something or other.
7　Q.　Was he a business guy?
8　A.　I want to say, oh, man, he ran Verizon
9　there.  Iribarren but that's an attorney's name.
10　Began with an I.  I think it was Illeorega was his
11　name.  Alex Illeorega.  I could be wrong.
12　Q.　Was there anybody else there with you?
13　A.　Well, I was with them.  They were with me.
14　They arranged the meeting, so.
15　Q.　Was anybody else there on the Skye
16　Ventures side of the table?
17　A.　No, just me.
18　Q.　Just you?
19　Do these gentlemen all speak English?
20　A.　Alex did.  Pedro and the minister did not.
21　Or vice minister, whatever you call him.
22　Q.　What led to that meeting occurring?
23　A.　It was allegedly at the request of the
24　minister.  I don't know if that's true or not.  And
25　it was presented to me as they wanted to meet me, and

Page 176

1　as my guy put it, realized that I was something
2　different than Pavanelli who they hated.  I was a
3　reasonable person and that I could be talked to.
4　And so the purpose was to have a cordial
5　conversation, which we did.
6　Q.　Who was your guy?
7　A.　Alex and Pedro were both sort of my guys.
8　Alex was the guy who I got to know and he was the one
9　who was friends with the congressman and they were
10　the ones having the meeting.
11　Q.　How did you get to know Alex?
12　A.　I think this is really hard to remember
13　but I think he was a friend of Jess Ravich's I think
14　somehow.  I think Jess Ravich referred him to me.
15　Maybe he was somewhere in the world and he was
16　somewhere in the world and somehow they talked about
17　it.  But at any rate --
18　Q.　Who's Jess Ravich?
19　A.　Jess Ravich is the guy from Libra
20　Securities who we talked about before.  He was the
21　fellow, one of the guys at Kidder.  The big guy from
22　LA.  So I think that's where I got his name from.
23　Q.　What happened in that meeting?
24　A.　I went all the way to Caracas, I was --
25　went to the Ministry of Finance, which is a fairly

44 (Pages 173 to 176)

David J. Richards

Page 177

1    impressive place, and waited around for about 45
2    minutes after our meeting was supposed to start. Sat
3    with a guy and had a conversation for about half an
4    hour or 45 minutes, and I left and went back home,
5    back to Ohio.
6        Q.    How did you come to learn that they hated
7    Pavanelli?
8        A.    That's what my -- the guy who arranged the
9    meeting said that the purpose was to -- they thought
10   Pavanelli was an irrational or crazy guy and the
11   purpose was to show them -- I guess they had
12   conversations, so the purpose was to show them that
13   oh, no, this guy is a reasonable fellow.
14       Q.    Did you ever hear further from any of
15   these people about this subject?
16       A.    Well, I know that nothing really ever came
17   of it specific. But I'm sure we had conversations
18   afterwards.
19       Q.    So if Alex was the only other guy in the
20   meeting who spoke English, did he act in effect as an
21   intermediary to communicate to Mr. Tovar and the
22   congressman?
23       A.    Yes.
24       Q.    Who was with you if anyone when you met
25   with Jacir in April of '04?

Page 178

1        A.    Alcalde.
2        Q.    What was the purpose of that meeting?
3        A.    Well, from Alcalde's standpoint, Luis
4    wanted to meet with Jacir. Jacir, we didn't know he
5    had Parkinson's at the time but we knew that on phone
6    calls he was very difficult to understand. And while
7    he would think that you were understanding what he
8    was saying, it was difficult for Alcalde.
9        In fact, if you were trying to ask Alcalde
10   listening to him and to get him to ask questions, he
11   would be shooing you off because he was straining so
12   hard to hear what Jacir was saying.
13       So from Alcalde's point of view was to go
14   and sit in a room with Jacir and get sort of the full
15   story and background and history of everything that
16   Jacir had done and what he knew and all of that.
17       From my point of view I, again, it was all
18   in Spanish, I was just looking at body language and
19   the situation and trying to gather what I could
20   gather from the surroundings and what else was going
21   on.
22       Q.    How long did that meeting last?
23       A.    It was very long. I was actually amazed
24   that Jacir could last that long because he was
25   clearly frail. So we met in two places. First, we

Page 179

1    met at his office, and then we drove to his home and
2    we met there.
3        I'd say that I think we met in his office
4    the evening or day before and then we went to his
5    house, and the session at his house was, I'll bet it
6    was 11 hours long. And we broke a couple of times
7    and but I think from start to finish it was about 11
8    hours, 12 hours. It was a long day.
9        Q.    How long did you spend in his office the
10   evening or the day before?
11       A.    I think it was a couple hours.
12       Q.    And this was -- all this conversation took
13   place between Alcalde and Jacir in Spanish and you
14   sat there for the 13 hours?
15       A.    Well, I kind of -- his wife Sandra can
16   talk a little bit of English and I kind of wandered
17   outside the office and spoke to her a little bit,
18   then there was a meal a little bit. And occasionally
19   I'd be saying what's he saying, what's he saying kind
20   of thing. But that as the extent of it.
21       I was more seeing what did Jacir look
22   like, did he seem like a reasonable guy, you know,
23   that kind of stuff. That body language, that kind of
24   thing.
25       Q.    Beyond body language and talking to his

Page 180

1    wife and the meals, if I wanted to find out what type
2    of substantive information was conveyed by Jacir
3    during that 13-hour event, I'd have to talk to
4    Alcalde or Jacir, correct?
5        A.    If you wanted any meaningful, because
6    again, I would ask questions and say what's he
7    saying. But Alcalde was the one that was going back
8    and forth, back and forth, and I would only interrupt
9    once every 45 minutes or so.
10       Q.    So I'd have to talk to Alcalde or talk to
11   Jacir or both.
12       A.    Yeah, I'd say Alcalde or Jacir. Probably
13   Jacir.
14       Q.    Are you still on good terms with Alcalde?
15       A.    Sure.
16       Q.    Does he have any residual interest in the
17   outcome of this case?
18       A.    I don't think so. You'd have to talk to
19   his law firm about that.
20       Q.    All right, so we were going to talk about
21   the meeting you had with Woodstrite but I took you on
22   two different excursions so we're going to get back
23   to that.
24       When did you first learn that Woodstrite
25   was claiming a 25 percent interest in the notes No. 7

45 (Pages 177 to 180)

CONFIDENTIAL

David J. Richards

Page 181

1  of 12 and 8 of 12?
2      A.    You know, in the last few days when I've
3  done looking at everything I could look at I saw
4  something that gave me an idea of when that was, and
5  right now I'm drawing a complete blank.  But I
6  believe it was certainly after or I believe it was
7  after I went to Como and before I went to see
8  Manfredi and Bonetti, sometime in that timeframe.
9      Q.    So let's put some bookends on that.  Como,
10  we know when that is.  Manfreddi and Bonetti you say
11  in the last week of June 2004.
12      A.    (Nods head.)
13      Q.    So April-May-June 2004.
14      A.    That's what I think.  But again, there was
15  some document that I saw in the last couple days,
16  I've kind of pinpointed it, but my pea brain, it will
17  happen to you in about five years, I can't remember.
18      MR. ELLIOTT:  And I think you said earlier
19  June '04.  His earlier testimony to you.
20      Q.    That may be.
21      A.    I might have remembered it then when I
22  said that.
23      MR. LUCAS:  Just for clarification are you
24  saying that he met with the Woodstrite guys in early
25  June or he found out about the 25 interest then?

Page 182

1      MR. ELLIOTT:  No, what I'm saying in
2  respect to Andrew's characterization of
3  April-May-June, there was some confusion with the
4  witness.  I'm just noting earlier --
5      A.    I think there's still confusion.  We're
6  saying I went to see them in the last week of June,
7  I'm pretty sure about that.  The questions as to when
8  I found out about Woodstrite, I saw as I was
9  explaining --
10      Q.    I'm not asking when you found out about
11  Woodstrite right now but when you found out that they
12  were claiming the 25 percent interest.
13      A.    I think it was the same day.
14      Q.    Mr. Elliott seems to think that earlier
15  you indicated that that was a more specific time than
16  you now say.
17      MR. ELLIOTT:  No, I think we're all a
18  little confused about when we talking about the
19  meeting, when he learned about the 25 percent, et
20  cetera.  All I was saying that earlier he testified
21  the meeting took place in June of 2004.
22      MR. SCHWARTZ:  I got that.  I appreciate
23  the clarification.  So let's just get reoriented
24  here.  Make sure Mr. Lucas, Mr. Elliott, me, and most
25  importantly Mr. Richards are on the same wavelength.

Page 183

1      Q.    (By Mr. Schwartz) So we know that you met
2  with the Woodstrite people in Caracas along with
3  Alcalde at the end of June '04, right?
4      A.    Yes, that's my -- I believe, I'm almost
5  sure it was then.  Almost.
6      Q.    And you have also testified that at some
7  point you learned Woodstrite was claiming a
8  25 percent interest in note 7 of 12 and 8 of 12, and
9  you're not sure when that was but you know it was
10  between the time you went to Como and the time you
11  met with the Woodstrite people.
12      A.    That's almost exactly correct except for I
13  didn't learn that they owned interest in note 7 of
14  12.  I know they had 25 percent interest in the
15  notes.  Because we hadn't focused in on the notes 7
16  of 12.
17      Q.    The notes?
18      A.    In general.
19      Q.    That raises another question.  Before you
20  went to Como did you have any idea how many notes
21  Pavanelli was claiming to own?
22      A.    Well, I think I have an understanding of
23  what notes he was claiming to own.  As to whether I
24  had it before or after I went to Como, I don't know.
25      Q.    That's what I'm trying to find out.  When

Page 184

1  did you, as best you can recall, if you can recall,
2  when did you first learn the extent of the notes he
3  was claiming he owned?
4      A.    My understanding was that he held all of
5  the notes that the Attorney General ruled on.  So,
6  you know, that I think would have been face value of
7  about a billion dollars.  And so that's what we knew
8  and I think we probably gathered that fairly early on
9  after the Attorney General's decision.
10      As to at the end he also claimed to own
11  some additional notes that were held in London.
12      Q.    What do you mean by "the end"?
13      A.    Say it again.
14      Q.    You said "at the end he also claimed."
15      A.    So after, I'm sorry, that was wrong.
16  After that, in the end, in the end we learned at some
17  point that he was claiming to own the notes that were
18  seized from him in London.  That I think were another
19  couple hundred million or something like that but
20  that's as far as I knew.  That was all the notes that
21  he ever said to me that he owned.  I don't know if he
22  held others, he didn't say he did or he didn't.
23      Q.    And now focusing in on Woodstrite, your
24  understanding, whenever you learned it, April, May,
25  or June of '04, was that Woodstrite was claiming

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

## Page 185

1    25 percent interest on all the notes that were the
2    subject of the Attorney General's opinion?
3        A.    Yes.
4        Q.    How did you learn that?
5        A.    Well, again, I saw something in my review
6    that remembered -- that caused me to remember how I,
7    maybe how I learned about it.  But, again, it was in
8    this timeframe that we found out somehow.  I just
9    can't remember exactly how.
10       Q.    What happened at the meeting you had with
11   Woodstrite in Caracas in the end of June '04?
12       A.    Well, we went to meet with them and I
13   don't know if I was aware then or aware before but
14   turns out they don't speak English.  They spoke
15   Italian and they spoke Spanish.  So this was another
16   meeting that I sat in the whole time and didn't know
17   what they were talking about.
18       Q.    How long -- oh, go ahead, I'm sorry.
19   Please continue.
20       A.    And unlike the one with Jacir, it wasn't
21   like in his house, it wasn't 11 hours, so I didn't
22   get a real sense of them.
23       Q.    Where was it?
24       A.    I think it was a hotel that they owned I
25   believe.  Maybe not, maybe I'm wrong about that.  But

## Page 186

1    they had a big room somewhere in the hotel that it
2    was just them and Alcalde talking and me.  I was
3    there listening.
4        Q.    How long did the meeting last?
5        A.    Oh, there was a guy, their attorney was
6    there as well.  I remember.  They had three guys
7    there, just occurred to me.
8        Q.    Who was their attorney?
9        A.    Carlos something, Ramirez, not Delgado.
10       Q.    A Venezuelan attorney?
11       A.    Yeah, he's a Venezuelan attorney.  And so
12   that was five of us were there.
13       Q.    And the Venezuelan attorney also didn't
14   speak English?
15       A.    I don't think he did, no.  I'm pretty sure
16   he did not.  There was not a single word of English
17   spoken the whole time I was there.
18       Q.    And how long was the meeting?  I don't
19   think you did answer that.
20       A.    I would guess two hours.
21       Q.    Did Alcalde give you a download of what
22   had happened at the meeting after it ended?
23       A.    I'm sure he did.  I think we were off
24   to -- I remember rushing out of there to try to get
25   somewhere else.  I think it was back to our hotel to

## Page 187

1    meet a couple of other attorneys.  But on the way I
2    think he did tell me a little bit about what was
3    said, because I was obviously curious.
4        Q.    What did he tell you?
5        A.    I don't remember.  I really don't.
6        Q.    Did he discuss with you that --
7        A.    The sense was they were serious about
8    their 25 percent interest and that they were men to
9    be reckoned with.
10       Q.    What do you mean by "men to be reckoned
11   with"?
12       A.    They had resources.  You couldn't just
13   say -- they were the kind of guys that would sue you
14   and had resources to do so.  You just couldn't tell
15   them you think this and they think that.  Here, deal
16   with them.
17       Q.    Have you ever done any analysis concerning
18   the legitimacy of their claim to the 25 percent?
19       A.    I think Alcalde did but I don't think I
20   did.  He was trying to determine if it was legal or
21   they had the right to it and all that and I think we
22   concluded they probably did.  But I don't recall
23   exactly why or the particulars or wherefores were.
24       Q.    Did that cause you any concern going
25   forward with a possible acquisition of notes 7 and 8

## Page 188

1    of 12?
2        A.    Just something would have to be dealt
3    with.
4        Q.    During the course of the meeting with the
5    Woodstrite guys did -- and I know you have to have
6    learned this from Alcalde -- did the Woodstrite guys
7    discuss that they had brought a lawsuit in Venezuela
8    in December '03 challenging whether the Ministry of
9    Finance could change its mind about the notes?
10       A.    I don't know.
11       Q.    Did there ever come a time when you
12   learned that Woodstrite had brought that kind of
13   legal action in Venezuela?
14       A.    Yes.
15       Q.    When did you learn that?
16       A.    I'm not sure.  I don't think it was
17   contemporaneous to the meeting.  It was either before
18   or after, I'm not sure which.
19       Q.    So it could have been before the time that
20   you made the arrangements to meet with Woodstrite at
21   the end of June 2004?
22       A.    Yes.
23       Q.    In the course of preparing for the
24   deposition when you say you saw something that jogged
25   your memory about Woodstrite, did whatever you came

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

---

Page 189

1  across in your preparation concern the lawsuit that
2  Woodstrite had brought in Venezuela?
3      A.   I'm just honestly drawing a blank to that.
4  I will relook for that.  That's one of those things I
5  will relook at for overnight.
6      Q.   Mr. Baldwin is going to keep track of your
7  homework assignments.
8      A.   He's going to give me a big piece of
9  paper.
10     Q.   We'll make that one of the things.
11          And in addition to learning that
12  Woodstrite had brought a lawsuit challenging whether
13  the Ministry of Finance could issue a different
14  decision, did you also come to learn that Woodstrite
15  lost that lawsuit in Venezuela?
16     A.   My recollection is that I learned that
17  they said they didn't have jurisdiction to make a
18  determination.  The way I looked at it was, and my
19  recollection is it was like sort of in American law
20  like asking for I've heard of, you know, where you
21  make somebody do something, an official do something.
22     Q.   Mandamus.
23     A.   Mandamus, right.  And that somehow they
24  said they didn't have the power to issue that.
25  That's how I remember it came out.

---

Page 190

1      Q.   And who is the source of your information?
2      A.   Maybe Alcalde.  I don't know.
3      Q.   In any event you learned that the lawsuit
4  didn't work for Woodstrite, correct?
5      A.   Yes.
6      Q.   But as you sit here now you don't know
7  exactly what that was.
8      A.   I don't.
9      Q.   You'll look and see.
10     A.   If I can find that.
11     Q.   Between the time that you sent I want to
12  say it's Exhibit 8 --
13     A.   Is it the Christmas fax?
14     Q.   -- Exhibit 8 to Pavanelli shortly before
15  Christmas '03 and the time you wrote to him on
16  March 18, '04, which is Exhibit 11, did you speak
17  with him?
18     A.   Oh, I'm certain I did.
19     Q.   How many times?
20     A.   Well, I don't know the answer to that
21  question but it was I think reasonably frequently.
22     Q.   As best you can recall what was the
23  discussed in those reasonably frequent calls?
24     A.   He wanted money.
25     Q.   Did you talk with Schianchi in that same

---

Page 191

1  timeframe?
2      A.   Sure, but again, remember, he could not
3  speak English so when I did, it was normally through
4  Usuelli and not Pavanelli.
5      Q.   Were you in constant communication, or
6  relatively frequent communication may be a better way
7  to put it, with Usuelli in this same timeframe in the
8  first two and a half months of 2004?
9      A.   We became friends and we talked often.  So
10 I don't know if we were quite that friendly back in
11 that, you know, first few months of that year, but it
12 got to the point where we did talk frequently.
13     Q.   And when you spoke frequently with him,
14 did you discuss the opportunity of entering into some
15 kind of transaction with Pavanelli or Gruppo Triad?
16     A.   Well, yes.  I mean, I asked him pretty
17 much to carry my water; when I had an idea or wanted
18 something, I would let him go deal with Pavanelli,
19 Schianchi.  First, I couldn't speak Schianchi's
20 language, and second, Pavanelli was difficult, so he
21 ended up doing a lot of that.
22          MR. ELLIOTT:  When you get a chance, let's
23 take about five minutes.
24          MR. SCHWARTZ:  Let's do it now.
25          VIDEOGRAPHER:  Off the record 2:30.

---

Page 192

1          (Recess taken.)
2          VIDEOGRAPHER:  On the record 2:42.
3      A.   So we were talking about when I saw this
4  Woodstrite thing where I might have found out they
5  tried to get the writ of mandamus or whatever we
6  called it and I think there is a document that will
7  tell me when I did that.  It might not have been --
8  probably actually wasn't before I met with Manfredi.
9          But again, there's a document that would
10 show that so I'm going to try and find that document
11 again tonight so I can give you an exact date.
12     Q.   Is Usuelli still alive?
13     A.   Yes.
14     Q.   Where does he live these days?
15     A.   He lives in the Alps in Switzerland.
16     Q.   When was the last time you spoke to him?
17     A.   Again, he's a friend so I talk to him on a
18 regular basis.  He actually called me this morning
19 and left me a Merry Christmas voicemail.  But I
20 probably talked to him as recently as -- I talked to
21 him about three weeks ago, two, three weeks ago.
22     Q.   How old is he?
23     A.   I would say he's about my age, maybe a
24 year or two younger.  I don't think I've ever asked
25 him the question.

---

48 (Pages 189 to 192)

Page 193

1   Q.   Does Usuelli have any interest in the
2   outcome of this litigation?
3   A.   I believe I'm pretty sure he has an
4   interest in, you know, in Gruppo's notes.  And should
5   Gruppo get paid on on their promissory note from
6   litigation, he may be entitled to some -- I think he
7   is entitled to some of those proceeds.
8   Q.   Are you saying that he has an interest in
9   the portion of the proceeds that Gruppo would get if
10  Skye prevails and collects in this case?
11  A.   Correct, yes.
12  Q.   So you described this very long pair of
13  meetings that you had with Alcalde and Jacir in April
14  '04.  I want to make sure I've got an understanding
15  of how many other times you've met with Jacir.  So
16  I'll start by asking have you ever met with Jacir
17  other than that time?
18  A.   Yes.
19  Q.   On how many occasions?
20  A.   One.
21  Q.   When was that?
22  A.   June of '04.
23  Q.   Where was that?
24  A.   At his home in Miami.
25  Q.   Again, this was before you purchased notes

Page 194

1   7 of 12 and 8 of 12?
2   A.   Yes.
3   Q.   Where does he live in Miami?  Or did he
4   live I should say.
5   A.   Pardon me?
6   Q.   Where did he live in Miami at that time?
7   A.   It was a bit south of Fort Lauderdale and
8   a bit north of Miami Beach.  And I forget the name of
9   the community.  It was on the water.
10  Q.   What was the purpose of that meeting?
11  A.   I think it was just part of this
12  continuing attempt to gather information, getting
13  everything we could.  I'm sure there was specific
14  reasons for the meeting but I can't remember exactly
15  what they were.
16  Q.   Who else attended this meeting?
17  A.   Alcalde, obviously Jacir, Sandra.  She was
18  helping, I mean, he was really frail then and she was
19  there to make sure he was okay and comforted and she
20  would help with the translations and what he said.
21  So she was active.  And then one of the sons both of
22  whom I'd met in Caracas.  I forget the son's name.
23  Q.   How long did this meeting last?
24  A.   I think it was an entire day.
25  Q.   Did you travel to Florida specifically for

Page 195

1   the purpose of meeting Jacir?
2   A.   Yes.
3   Q.   As with the meeting that took place in
4   April with Jacir, was the meeting conducted in
5   Spanish?
6   A.   Yes.
7   Q.   Without going through this in quite as
8   methodical a manner we did with the regard to the
9   April meeting, was it more or less the same
10  experience with you?
11  A.   Yes.  You know, I may have been -- if the
12  meeting was more pointed, I might have asked a few
13  more questions back and forth whereas in the first
14  meeting I'd let them pretty much go because they were
15  really going.
16  Q.   But for the most part this was a
17  discussion conducted in Spanish between Alcalde and
18  Jacir?
19  A.   Yes.
20  Q.   Did you get a download from Alcalde as to
21  what Jacir had communicated after the meeting was
22  over?
23  A.   I'm 100 percent sure I did.  I just don't
24  remember what it was.
25  Q.   Do you remember any of it?

Page 196

1   A.   As it relates to actually what he said
2   after that meeting, no.  I mean, it just comes into
3   this larger thing of all the information was gathered
4   from when we started to when we bought the notes.
5   Q.   Was there any discussion at the meeting
6   with Jacir in June about Woodstrite?
7   A.   Possibly.
8   Q.   Was there any discussion at that meeting
9   about Woodstrite losing its action in the Venezuelan
10  Supreme Court?
11  A.   Possibly, but I don't know.
12  Q.   We'll revisit that issue if and when you
13  are successful in refreshing your recollection, as
14  you've indicated you'll attempt do?
15  A.   I'll do my best.
16  Q.   At some point did you learn that the
17  Ministry of Finance of Venezuela issued a report in
18  November '03 saying in substance that the Gruppo
19  Triad notes were fakes and should not be paid?
20  A.   No.
21  Q.   Have you ever learned that to this day?
22  A.   I don't know that that happened.  That's
23  not what I understand happened.
24  Q.   Have you -- do you have any understanding
25  of there being some report issued by the Ministry of

## Page 197

1    Finance of Venezuela in November of '03 with regard
2    to Bandagro notes?
3    **A.** No. My recollection is that in the middle
4    of -- I learned later at some point as part of our --
5    all this work we were doing that the Ministry of
6    Finance requested the Attorney General to change
7    their mind and that she said no, it was final. But I
8    don't know if that was during our diligence period or
9    in context with what Venezuela had filed when they
10    filed the motion to dismiss in this case.
11    **Q.** So as you sit here today you have no
12    knowledge whatsoever that in November 2003 the
13    Ministry of Finance issued an unfavorable report?
14    **A.** No.
15    **Q.** I'm going to mark another pair of
16    documents as 12 and 12A, again, an English
17    document -- I mean a Spanish document and an English
18    translation.
19    MR. RICHARDS: Is he allowed to see this?
20    This is marked "highly confidential."
21    MR. SCHWARTZ: Hold on. I have to think
22    about that.
23    MR. RICHARDS: And we certainly haven't
24    showed it to him, so.
25    MR. SCHWARTZ: Let's go off the record for

## Page 198

1    one second.
2    VIDEOGRAPHER: Off the record 2:53.
3    (Off the record.)
4    VIDEOGRAPHER: On the record 3:06.
5    MR. SCHWARTZ: Let's have the record
6    reflect that with regard to what we were about to
7    mark as Exhibit 12 and 12A we have chosen not to mark
8    those documents. Mr. Richards, Mr. Adam Richards,
9    having raised the question about the "highly
10    confidential" designation on that document and the
11    parties having agreed to reflect further on its
12    potential use in this deposition and for that matter
13    for purposes of preparing the witness for this
14    deposition, this is going to remain an open issue
15    subject to further discussion. But we're not going
16    to use that document now.
17    **Q.** (By Mr. Schwartz) So switching gears a
18    little, Mr. Richards, at some point did you learn
19    that Gruppo Triad had engaged Crabbe, Brown & James
20    to represent it?
21    **A.** Yes.
22    **Q.** How did you learn that?
23    **A.** It was part of this back-and-forth that I
24    mentioned earlier on the negotiations about what to
25    do and how to do it. So I was somewhat involved, I

## Page 199

1    was pretty much involved in that back-and-forth where
2    that started to happen but ultimately didn't happen.
3    **Q.** What do you mean when you say "it started
4    to happen but ultimately didn't"?
5    **A.** Well, I don't think they ever filed a
6    lawsuit for him, so.
7    **Q.** Gruppo Triad did engage Crabbe, Brown &
8    James, right, for some period of time?
9    **A.** I know they were talking about engaging
10    and being, Gruppo being a party in the lawsuit but I
11    haven't seen an engagement letter or anything like
12    that. They were definitely in those discussions and
13    that sort of thing.
14    **Q.** Were you involved in those discussions?
15    **A.** I was involved somewhat but I would say
16    peripherally and I'm sure there were plenty of
17    discussions that I was not involved in.
18    **Q.** With whom did you discuss the possibility
19    of Gruppo Triad engaging Crabbe, Brown & James?
20    **A.** Probably Jeff Brown and Luis Alcalde and
21    I'm sure Pavanelli had some conversations with him
22    perhaps.
23    **Q.** What did you discuss with Pavanelli in
24    that regard?
25    **A.** Well, we were I think having a dispute or

## Page 200

1    a disagreement about him giving up possession of the
2    notes in connection with my purchase of them. And so
3    he was saying that what his preference was that he
4    would keep the notes and have Crabbe-Brown file a
5    lawsuit for him. That was his preference. And that
6    he wouldn't give up the notes and there would be some
7    sort of escrow arrangement. Which I thought was
8    doomed to failure and -- but we went down that path
9    for a while.
10    **Q.** Why did you think that was doomed to
11    failure?
12    **A.** Well, I think, again, I thought
13    Crabbe-Brown would get tired of him, he's a difficult
14    guy, and he proved to be a difficult guy and they got
15    tired of him.
16    **Q.** Do you recall anything else of the
17    discussions you had with Pavanelli about the
18    possibility of Crabbe-Brown representing Gruppo
19    Triad?
20    **A.** I mean, if you ask me something specific,
21    I could tell you whether I remember it or not. But
22    there was an ongoing discussion about it.
23    You got to remember, at the same time
24    we're still doing diligence and getting documents and
25    trying to, you know, make our final decision and he

Page 201

 1   was horsing -- what I thought was horsing around with
 2   this idea that Crabbe-Brown would represent him.
 3        So we were ongoing, we were visiting
 4   Jacir, we went to see Woodstrite while this was all
 5   going on.  So if you asked me -- and, of course,
 6   during that timeframe we were talking to Pavanelli
 7   for various reasons, so this Crabbe-Brown thing I'm
 8   sure was mentioned during those times.  I just don't
 9   know exactly how to answer your question.
10        Q.    And you also talked to Crabbe-Brown about
11   the possibility of it representing Gruppo Triad?
12        A.    Well, I might have -- yeah, I think I did.
13   I think I might have said, I might have told Alcalde
14   here's what Pavanelli wants to do, you work with him,
15   something like that.
16        Q.    Did you talk to anybody about this at
17   Crabbe-Brown other than Alcalde?
18        A.    I'm not sure, probably Kennedy and Brown
19   as well.
20        Q.    What do you recall discussing with
21   Crabbe-Brown about the possibility of it representing
22   Gruppo Triad?
23        A.    Just it was a way -- if we're going to
24   bring a lawsuit, it's a potential way to bring a
25   lawsuit and it could be worked out.  It was a way to

Page 202

 1   get possession of the notes.  Maybe there was
 2   something there.
 3        Q.    How could it have been if you were going
 4   to purchase the notes that Gruppo Triad would have
 5   been the party bringing the lawsuit?
 6        A.    Well, I was going to purchase the notes,
 7   which I wouldn't do unless he gave me the notes.
 8   Which he didn't want to do.  So I told him you're
 9   welcome to try to get Crabbe-Brown to represent you.
10   But I wanted to be possessor, you know, they're
11   bearer instruments, ownership is possession, so.
12        Q.    So whoever got possession was going to
13   bring the lawsuit.
14        A.    Well, possession was an aspect of
15   ownership and that was one of the things that would
16   determine who brought the lawsuit.  I didn't think it
17   could be -- I thought you should be the owner of the
18   notes to be the filer of the lawsuit.
19        Q.    And if you didn't possess the notes, you
20   couldn't make a claim on the notes, right?
21        A.    I didn't say couldn't, but it would be
22   suboptimal.
23        Q.    And to your use your terminology "destined
24   to fail"?
25        A.    It would be suboptimal, didn't say

Page 203

 1   "destined to fail."
 2        Q.    Why would it be suboptimal?
 3        A.    If you're going to bring a lawsuit as the
 4   owner of the notes and you don't possess them, that
 5   doesn't align correctly.  Even if you have an escrow
 6   agreement, I think that it's better if you have
 7   possession of the notes.  You're in control of your
 8   own destiny.
 9        Q.    So now we're up to 12 and 13, right?
10   Let's mark these two as 12 and 13.
11            (RICHARDS/SKYE EXHIBITS 12-13 WERE
12   MARKED.)
13        Q.    Mr. Richards, I'm showing you two
14   different agreements, one marked Exhibit 12, one
15   marked Exhibit 13.  The one marked Exhibit 12 says
16   it's entered into on April 8, 2004, and the one
17   marked Exhibit 13 says it's entered into on June 23,
18   2004.  Do you see that?
19        A.    April 8th and June 23rd.
20        Q.    Right.  You see that?
21        A.    Yep.
22        Q.    Looking at the one that bears the date of
23   April 8th, if you look at the last page of the actual
24   agreement as opposed to the promissory note, it's got
25   your signature there as the managing member of Skye

Page 204

 1   Ventures, right?
 2        A.    Yes.
 3        Q.    When did you sign that document?
 4        A.    Well, let me just look up one other thing
 5   that might help me answer that question inside of the
 6   document.
 7            Certainly I signed this document after
 8   June 23rd, I would guess that this was signed
 9   toward the end of 2004 by me, this document.
10        Q.    Exhibit No. 12, the one that says it's
11   entered into on April 8, 2004, you signed at the end
12   of 2004.
13        A.    This one, yes.  I think there were other
14   versions of this but this one -- the reason, just
15   looking at what's in there, I think I signed it,
16   that's the one I signed probably in December or
17   January kind of timeframe.
18        Q.    December 2004/January 2005?
19        A.    (Nods head.)
20            Yes.
21        Q.    After this lawsuit was brought.
22        A.    Yes.
23        Q.    Now let's look at Exhibit 13 --
24        A.    As I said, there were early versions of
25   this document that I also signed.

David J. Richards

## Page 205

1  Q.  Earlier versions of a document that said
2  it's entered into on April 8th?
3  A.  Yes.
4  Q.  Where are those?
5  A.  I think my attorneys have what I have and
6  I assume they've produced this to you.
7  Q.  Well, you would be mistaken on that
8  assumption.
9  A.  Pardon me?
10  Q.  You would be mistaken in that assumption.
11  A.  What part of it?
12  Q.  The part that your attorneys produced
13  other documents dated April 8, 2004.
14  A.  Oh, I didn't mean that. So the way -- the
15  reason I say that I didn't sign this particular one
16  until December-January kind of timeframe is the way
17  this document's constructed there's a provision in
18  the agreement that says who gets what money. The
19  waterfall, as we call it, if you will.
20  Q.  That's in the promissory note.
21  A.  Yeah, it's in the promissory note.
22  Q.  Attached as part of Exhibit 12, right?
23  A.  Yeah. So as we gave -- and I told
24  Pavanelli I would do this; as we gave him additional
25  funds, the waterfall changed. So that when the -- I

## Page 206

1  can tell by the waterfall here that this was more
2  like December or January when we had given him
3  additional funds because this was the correct
4  waterfall, this probably looked like the waterfall
5  when we originally signed this agreement.
6  Q.  Slow down. When you say "this" and "that"
7  and point to documents, you need to use exhibit
8  numbers or the record will not be clear what you're
9  saying.
10  A.  I'm sorry. So Exhibit 13 has a waterfall
11  in it. And the waterfall essentially describes
12  what's the priority of the distribution of funds.
13  And you'll see that in I think all the agreements,
14  they all have a waterfall in them. And that
15  waterfall changed over time. So that -- and it
16  basically changed in connection with me -- times that
17  we had brought some additional funding to Gruppo.
18  And so that's, when I refer to the
19  waterfall, that's what I refer to. In Exhibit 11
20  there's a waterfall.
21  Q.  13.
22  A.  13 there's a waterfall, right. And it
23  said that if there were payment of a hundred million
24  dollars, it would go X, Y, and Z. And first with the
25  lawyers and second with Skye. So Skye got a certain

## Page 207

1  amount of return in a certain priority right behind
2  the lawyers.
3  So, and I think that was probably the
4  accurate waterfall at that time and was probably the
5  same as the waterfall that was in the original
6  agreement. That's the original 12/22. So that when
7  we changed it, we just simply redid the document with
8  the waterfall in it.
9  I don't know if we re-signed the whole
10  thing or we just re-signed the promissory note or
11  whether we just agreed, but at any rate, this was not
12  the waterfall when we finalized the agreement in
13  June -- or, in July or August. This was the
14  waterfall as existed in December or January. And
15  it's different today.
16  Q.  So sticking now with the documents that
17  are in front of you, so we're clear, the one that's
18  marked Exhibit 12 which says it's entered into on
19  April 8, 2004, this version you believe you signed in
20  December 2004 or January 2005.
21  A.  Yeah, again, my testimony is I'm not sure
22  if we re-signed the agreement that was effective
23  April 8th or we just re-signed the promissory note
24  with the waterfall. But that's what tells me, I
25  mean, otherwise the agreement always remained the

## Page 208

1  same I believe.
2  Without looking at it really carefully,
3  the agreement always -- basic agreement always
4  remained the same within Exhibit A which contained
5  the waterfall did change as we provided additional
6  funds.
7  Q.  So if I understand what you're saying now,
8  there's actually two signatures of yours on
9  Exhibit 12.
10  A.  Yeah, there's the promissory note --
11  Q.  There's a signature, and use Bates stamped
12  pages to be clear about this. There's a signature of
13  you on page Skye 00897, David J. Richards, Managing
14  Member, effective date April 8, 2004, your signature,
15  right, on page 897?
16  A.  Yes.
17  Q.  Do you know when you signed there?
18  A.  The way this is written leads me to
19  believe that Bates Skye 0097 --
20  Q.  897?
21  A.  I'm sorry, what is that?
22  Q.  000897.
23  A.  000897, that page the way it's written
24  makes me believe that it was a follow on, it wasn't
25  the original page. Because we didn't sign it on

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

Page 209

1   April 8th, right. It was -- Pavanelli may have
2   signed it on the 8th, I believe he did. But it
3   says effective April 8th. It doesn't say signed on
4   April 8th. So makes me think it shows it was
5   signed later.
6       Q.   When? When did you sign it later? Just
7   the agreement, not the promissory note.
8       A.   I think I signed the promissory note and
9   the agreement at the same time when we finally had
10  the deal and the notes were either in our possession
11  or on the way.
12      Q.   So now let's look at page 000901 within
13  the same exhibit. There you've signed the
14  nonrecourse promissory note, right?
15      A.   Yep.
16      Q.   And if I understand correctly, you're
17  saying that you signed this nonrecourse promissory
18  note that ends on page 901 in December of 2004 or
19  January of 2005.
20      A.   I'm saying, yeah, I signed this particular
21  version of Exhibit A which had a changed waterfall in
22  it probably around December or January -- December of
23  '04 or January of 05.
24      Q.   I understand that. Now let's just go back
25  to the other signature that's on page 897.

Page 210

1       A.   Okay.
2       Q.   Your signature. When do you think that
3   you signed on page 897?
4       A.   End of July/early August.
5       Q.   Now let's look at Pavanelli's signatures
6   starting with the one that's on page 897. Do you
7   know when he signed Exhibit 12 on that page?
8       A.   Again, I believe he signed a document,
9   this document or a document exactly like it, in April
10  of 2004. Whether this is a later signature that
11  redid the agreement or not, I don't know. I don't
12  think so. I think it's exactly the same. I don't
13  think we ever changed the main agreement till much
14  later.
15      Q.   And then with regard to the nonrecourse
16  promissory note contained within Exhibit 12 on page
17  900, there's also Pavanelli's signature. What's your
18  recollection of when he signed that?
19      A.   Well, first off, I don't have a
20  recollection. And he either signed it as original,
21  you know, originally on -- in April of '04 or he
22  signed it later when I signed it.
23      Q.   But didn't you tell me that the promissory
24  note that's included as part of Exhibit 12 reflected
25  the state of the financing arrangements as of

Page 211

1   December 2004 or January 2005?
2       A.   Yeah. But it's a different page, right?
3   So you could have kept the pages the same and say
4   hey, I'm going to substitute this for in this page,
5   okay. You could have done that.
6       Q.   So the page that would have been
7   substituted if any was substituted was 000899 that
8   has the waterfall?
9       A.   The waterfall was the only thing that
10  changed.
11      Q.   So you don't know when Pavanelli signed
12  page 900.
13      A.   I don't know the specific day he signed
14  it, no.
15      Q.   What you're saying is it would have been
16  impossible for page 000899 to exist until sometime in
17  December '04 or January '05.
18      A.   Correct, yeah.
19      Q.   Now let's look at the other one,
20  Exhibit No. 13. This is another Bandagro note
21  purchase agreement, says it's entered into on
22  June 23rd, '04, and unlike Exhibit 12, this one's
23  got one of those old school fax legends on it that
24  makes it look like something happened on June 23,
25  '04. But let's go through it the same way we did

Page 212

1   Exhibit 12.
2       On page 5871 there's a Pavanelli signature
3   on the agreement portion of Exhibit 13. When did he
4   sign that?
5       A.   I'm pretty sure it was that day.
6       Q.   June 23rd, '04?
7       A.   Yes.
8       Q.   And then you signed on page 5872, a
9   document that's also got that same June 23rd, '04,
10  fax legend. When did you sign page 5872?
11      A.   I'm pretty sure the same day.
12      Q.   And if you then fast forward to the
13  nonrecourse promissory note contained within
14  Exhibit 13, we again have a June 23rd, '04, fax
15  legend carried forward and we have Pavanelli and you
16  signing on the same page, namely page 005875. Do you
17  see that?
18      A.   Yes.
19      Q.   When did --
20      A.   That's I think -- but, yes.
21      Q.   When did Pavanelli sign this promissory
22  note contained within Exhibit 13?
23      A.   Well, again, it appears, and I believe
24  that this was done at that time.
25      Q.   June 23, '04?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards

## Page 213

1    A.   Yes.
2    Q.   Same for you on the bottom there?
3    A.   Yes.
4    Q.   What happened when you went to Como?
5    A.   When I went to Como in you're talking
6    about --
7    Q.   The trip that included April Fool's Day
8    2004.
9    A.   Or not, depending if my memory's right or
10   that letter's right.
11        So I got in, went to the hotel, I think I
12   flew into Milan, got to the hotel and the next
13   morning --
14   Q.   Went from Milan to Como without passing
15   go?
16   A.   Yeah, straight to or I drove.  I had a
17   driver take me to Como.  And then I think the next
18   day, the next morning perhaps I kind of acclimated
19   myself in the hotel for a day or something, I don't
20   know exactly what the time and all worked out.  You
21   know how when you get over there you figure you don't
22   know whether it's day or night.
23        But either the next morning or after
24   acclimating for a day I had breakfast with Pavanelli
25   at Villa d'Este.

## Page 214

1    Q.   I'm sorry, you had breakfast with
2    Pavanelli?
3    A.   Pavanelli at Villa d'Este.
4    Q.   What's Villa d'Este?
5    A.   It's a hotel on Lake Como.
6    Q.   Just you and Pavanelli?
7    A.   For the breakfast, yes.
8    Q.   Is this the first time you ever met him?
9    A.   First time I ever saw him.
10   Q.   How long did you spend having breakfast?
11   A.   I don't remember.  It was a meal.
12   Q.   What occurred during the breakfast as far
13   as any discussion of business?
14   A.   Well, it wasn't -- I don't think we talked
15   any business there.  It was mostly pleasantries and,
16   you know, he seemed very, you know, very European and
17   it was common not to just jump right into business
18   like I would do.
19        So I think we chatted about this and that
20   and families and how he liked Como, which was a
21   beautiful place, that sort of thing.
22        He was a good-looking man.  He was tall,
23   had bearing.  Really well-dressed guy.  And a good
24   conversationalist.  Seemed like he was ordering --
25   Villa d'Este is a really fancy hotel, in fact, I

## Page 215

1    think it's the best hotel on earth, one of those
2    places you're afraid to walk almost, and he was like
3    in control telling everybody what to do.
4         So he seemed like an impressive guy when I
5    first saw him.  And talked a little bit about his two
6    daughters and stuff like that.  Just I was trying to
7    get a sense for the guy.
8    Q.   What happened after breakfast?
9    A.   I can tell you kind of the things that
10   happened.  I'm just having a little trouble
11   remembering in what order they happened.
12   Q.   Do the best you can.
13   A.   But so he picked me up in his car.
14   Q.   What kind of car?
15   A.   Believe it or not it was a blue Jeep
16   Cherokee, you know, an SUV.  American car, which I
17   was shocked when I got in when he pulled up.  Funny
18   the little things that you remember.
19        And so then we had a few meetings that we
20   wanted to do and what I think he did was he kind of
21   drove me around Como a little bit, showed me, talked
22   to me about this and that and what was good and what
23   was bad, why this was important, that kind of thing.
24        And then we ended up at a room, a meeting
25   room somewhere where it was just me and him for a

## Page 216

1    while, for a few hours.
2    Q.   Where?  Whereabouts?
3    A.   I don't remember.  Wasn't a hotel.  I
4    think it might have been a country club or something
5    like that or a club of some sort.  But there was a
6    meeting room there and there was a restaurant and so
7    we met at this meeting room.
8         And then I think what happened after that
9    is Schianchi and Antonio joined us for lunch at that
10   place and we had lunch.
11   Q.   Did you spend a couple of hours with
12   Pavanelli before you had lunch with Schianchi and
13   Antonio?
14   A.   Yes.
15   Q.   All right, keep going.
16   A.   And, I'm sorry, what was the question?
17   Q.   You were recounting in narrative form this
18   day; you started out with breakfast with Pavanelli,
19   you drove around Lake Como in a Jeep Cherokee, you
20   went to the country club and met in a private room
21   for a couple hours, then you had lunch with Schianchi
22   and Antonio.
23   A.   What was the question?
24   Q.   And the question was what happened that
25   day.

54 (Pages 213 to 216)

CONFIDENTIAL

David J. Richards

Page 217

1  A.  What happened after that?
2  Q.  Keep going as far as you can remember.
3  We'll go back and discuss certain aspects.
4  A.  So you want an overview kind of and we go
5  back and go into the details.
6  Q.  Works for me.
7  A.  So then I think we went to Pavanelli's
8  apartment where he was living.  And --
9  Q.  Who went; all three of you?
10  A.  Antonio and Schianchi came and that's
11  where I met this fellow Pedro Wick who was Swiss, I
12  remember that.  And he did speak some English too.
13  He was -- the only guy that didn't speak English
14  actually at the meeting there was Schianchi.
15  Schianchi did not speak English.  And so some of the
16  time during the meetings it was them talking in
17  Italian, them telling Schianchi what we were talking
18  about.
19         And so we stayed there for quite a while
20  and then I was exhausted and Pavanelli, maybe it
21  might have been Usuelli, took me back to my hotel.
22  Q.  That was day one.
23  A.  That was day one.  Then the next day we
24  were to meet with Fabbiani I believe.
25  Q.  Why?

Page 218

1  A.  I had learned that or I had been told that
2  there was this document expert that examined the
3  notes and I figured he was there, he was in Italy.  I
4  figured while I was there, I might as well meet with
5  the guy.
6         Of course, it turned out he didn't speak
7  English either.  But I did spend a decent amount of
8  time with Fabbiani that next day.  And he had a
9  report with him and we went through that.
10         And then after that I went back to Villa
11  d'Este I think with James and Antonio, we talked
12  further.  And I think that was the extent of it.  I
13  think we only had two actual days of meetings as I
14  recall.  And I might have spent -- I'd never bee to
15  Como so I might have spent a day on my own in Como
16  before I flew back.  Beautiful place in Italy, if
17  you've never been there.
18  Q.  When you met alone with Pavanelli in the
19  meeting room at the country club for a couple of
20  hours, did you talk business there?
21  A.  Yes.
22  Q.  What do you remember about that?
23  A.  Well, that's where I got the first sense
24  of the guy and what his full story was, and so he
25  basically recounted from beginning to end his entire

Page 219

1  story in a narrative that -- he was a hard guy to
2  interrupt.  And he often wouldn't answer questions or
3  wouldn't even acknowledge them.  So he was talking.
4         And he told a very interesting story as I
5  recall.  I recall that I was impressed with the
6  story.  And for such a strange deal it was a
7  believable story.  Or had some credibility to it.
8         And so then I, you know, you take this,
9  all this information for the first time and this
10  one-, two-, three-hour narrative, whatever it was,
11  you're kind of absorbing it and trying to figure out
12  does it all fit together, does it make sense, all
13  that sort of thing.  But he basically told me the
14  narrative.
15         It might have been then, it might have
16  been then that's when I learned about the -- learned
17  about how he got the notes.  It might have been then.
18  I think he told me generally that he -- how he got
19  them.  But all the way up to the where he was that
20  day.
21  Q.  What did he say about how he got the
22  notes?
23  A.  I recall -- now, in this conversation --
24  so I have some knowledge about how he got the notes
25  that came at various times, right.  So it's a little

Page 220

1  difficult for me to remember what part he said and
2  what part I learned later.
3         But I think what he told me then was that
4  he bought the notes in London from a representative
5  of the guys who owned the notes, and I forget who
6  they were.  He had been doing business in Venezuela
7  at the time and so he had done a little work, he had
8  done some significant work on this before he bought
9  them.
10         He was engaged in some metals trading and
11  so he was an intermediary and Venezuela at the time
12  was a significant gold producer as well as oil
13  producer and he was an intermediary in some gold
14  transactions where gold was finding its way
15  physically to Switzerland and he was making money
16  from that.
17         And he said, at least, that he got to know
18  a lot of people in Venezuela, including the
19  then-president pretty well.  And so he was doing
20  stuff this and that in Venezuela at the time that he
21  learned about the notes.  And then one thing led to
22  another and he bought the notes and the story went on
23  from there.
24  Q.  Did he say how much he bought them for?
25  A.  He might have given me a number in that

55 (Pages 217 to 220)

David J. Richards

Page 221

1  meeting.
2     **Q.**  What number?
3     **A.**  Again, he might have given me a number.
4  And the number that he gave me at one time or
5  another, whether it was on the phone or that meeting,
6  was I think a hundred million dollars or more or
7  less, something a little bit more, little bit less.
8     **Q.**  So he paid a hundred million plus or minus
9  for a billion dollars give or take of face amount.
10    **A.**  Yes.
11    **Q.**  And by this time you'd come to learn that
12  he was claiming to own a billion dollars of face
13  amount give or take?
14    **A.**  Yeah, I'm pretty sure I knew that then.
15    **Q.**  Did he indicate where he came up with the
16  hundred million?
17    **A.**  Yeah, investors. He had investors. He
18  put essentially all of his own personal assets in at
19  the time, which he represented to be in the millions
20  of dollars. And that he had investors who put in
21  with him. And the hundred million dollars consisted
22  of various kinds of consideration; there's cash and
23  bonds and something else, I forget what.
24    **Q.**  So a few million of his own in personal
25  assets and the remaining 95 million or more from

Page 222

1  investors.
2    **A.**  Repeat that, please, I'm sorry.
3    **Q.**  In order to come up with the hundred
4  million that he told you that he spent to buy the
5  billion dollars in face amount, he put in a few
6  million of his own assets and somewhere $95 million
7  or more from investors.
8    **A.**  Yeah, I would say a little more than a few
9  million is what he said I believe. Maybe it was like
10  6 or 7, but it was all his --
11    **Q.**  Give or take 95 million from investors.
12    **A.**  Yeah, yeah, something like that. In the
13  form of bonds. There was a German group that gave
14  him bonds and there was somebody else.
15    **Q.**  When did he buy those billion dollars in
16  face amount. Was it all at once?
17    **A.**  Yeah, I think so. I think that's what I
18  recall.
19    **Q.**  In London.
20    **A.**  At a closing at a bank. He called it the
21  Queen's Bank is what he said, whatever that means.
22    **Q.**  When did that occur?
23    **A.**  Are you asking me when he told me that
24  occurred or are you asking me when it actually
25  occurred?

Page 223

1    **Q.**  Well.
2    **A.**  I thought you were talking about what he
3  told me.
4    **Q.**  Let's talk about what he told you because
5  if we get into actually occurred, this would be a
6  very different conversation. So what did he tell you
7  about when he bought the notes?
8    **A.**  I mean, I think it's a matter of record in
9  the AG's decision but I think it was like '86 maybe.
10  Something like that.
11    **Q.**  Okay, so what other things did you cover
12  with him in this two-hour meeting where he told you
13  his whole story?
14    **A.**  Well, like from that point forward. So he
15  told me a lot about what he did before he bought the
16  bonds and why he bought them. And then he told me
17  the story of -- I recall the story about trying to --
18  the notes being extended somehow to -- Venezuela was
19  not in a position to pay in '91. There was some --
20  and they weren't going to pay, that was their
21  decision. But I think they made some agreement or
22  some arrangement to extend the notes.
23     And he was always, you know, had people in
24  Venezuela trying to work with the Minister of Finance
25  to say hey, are you going to pay these, are you going

Page 224

1  to pay them when they're due, whatever.
2     And then it was the, I think focused a lot
3  on the administrative case against Venezuela. And he
4  told me about this Supreme Court lawyer or this
5  ex-Supreme Court judge that represented him and he's
6  a brilliant lawyer in Venezuela, beyond reproach,
7  that kind of thing, that he had filed this
8  administrative case.
9     He told me that between 1999 and 2003 had
10  done several things to attempt to collect. And I
11  think that was -- unless that was when he told me
12  about the London case, which I'm sure we discussed in
13  more detail then, that's pretty much the gist of it.
14    **Q.**  Do you think he mentioned the London case
15  then?
16    **A.**  I think he might have but I'm not sure. I
17  just don't remember.
18    **Q.**  Is there anything else that he described
19  during that meeting?
20    **A.**  I'm sure there was.
21    **Q.**  Anything else that you recall?
22    **A.**  I think that's -- trying to think if
23  anything specific stood out from that day. It was a
24  little overwhelming and there was a lot of
25  information about -- so I think that's what sticks

Page 225

1    out.
2        Q.    Did you take any notes during the two-hour
3    meeting that you had with him?
4        A.    No.  I'm not a note-taker.  Back then I
5    used to have something -- I had a really great memory
6    back then.
7        Q.    How about now?
8        A.    It's still good but not as good.  You'll
9    find out, again.
10       Q.    Is there anything else you can remember
11   about the two-hour session you had with Pavanelli in
12   the private meeting room?
13       A.    If you have anything specific did he
14   mention X, Y, or Z, I might be able to answer that.
15   But just off the top of my head here thinking about
16   the narrative, I think I've told you what sticks out
17   in my mind.
18       Q.    Did he tell you that the Finance Ministry
19   had reversed its decision in November of 2003?
20       A.    No.  I think he -- I believe one of the
21   things, of course, you want to be sure of is that
22   they don't know of -- since we're basing our, you
23   know, 90 percent of our diligent efforts and to that
24   point almost all of our decision based on the
25   Attorney General's opinion, you would naturally want

Page 226

1    to make sure that it's still the Attorney General's
2    decision but nothing funny had gone on.  So I can't
3    believe I didn't ask him the question.  But I don't
4    recall asking him that.
5        Q.    Did he mention to you that the special
6    mixed commission was undergoing a review of the
7    situation?
8        A.    I think we learned that from Jacir, not
9    from him originally, but he may have mentioned it at
10   the time.  Because I'm sure that during the two days
11   that one of the discussions was why they hadn't paid
12   yet, what was going on.  What was the hold up.
13   What's going to take them to honor the decision, that
14   kind of thing.
15       Q.    Was the Woodstrite litigation mentioned?
16       A.    No, I don't think so.
17       Q.    Is there anything else you can recall at
18   all about the two-hour session?
19       A.    Again, if you'd ask me did he say X, I
20   could think about that, but for the most part I've
21   told you everything that comes to me.
22       Q.    Other than me prompting you with specific
23   questions is there anything that would refresh your
24   recollection as to what happened during that two-hour
25   session?

Page 227

1        A.    When it was just me and him.  Maybe if he
2    said I told you this, but we all know he's not here
3    anymore.
4        Q.    You say he's not here anymore.  Have you
5    done any investigation as to whether that's really
6    true?
7        A.    Oh, well, you mean whether he's still
8    alive or not?
9        Q.    Whether he went up in smoke or didn't.
10       A.    Well, we were obviously curious as to what
11   happened.  He always said Venezuela was out to get
12   him and so we were curious as to whether there was
13   some untoward activity against him.
14             So I think what we -- I had asked Antonio
15   to look into it and he talked to the sheriffs who
16   investigated, because he lived in Switzerland, and so
17   I think they said he was dead.  I think that was the
18   conclusion.
19       Q.    Did you ever see a death certificate?
20       A.    No.
21       Q.    Did you ever ask for one?
22       A.    No.  Remember, I hadn't talked to the guy
23   since 2005 or '6.
24       Q.    But it sounds like you have some concerns
25   about what had happened.

Page 228

1        A.    Well, you know, whether I had concern, it
2    was a guy's house gets burned down, you're probably
3    curious to know what happened.  I was too I think.
4    But it wasn't a burning curiosity.  And I'm not sure
5    if we ultimately got any documentary answer or
6    anything like that.
7        Q.    Was it only Usuelli who pursued that
8    subject for you?
9        A.    Well, I asked him about it.  I wouldn't
10   say he was pursuing it for me.  He might have been
11   just as interested himself.  And I don't know if
12   Crabbe-Brown ever got -- can I ask what the date was
13   that he died?  Do we know?  If you could help me with
14   that, it might jog my memory as to whether I did
15   anything or not.
16       Q.    Did you do anything in 2010 to investigate
17   the circumstances surrounding Pavanelli's alleged
18   death by house fire?
19       A.    You know, you say "alleged death."  It
20   never occurred to me that it might not be him being
21   dead.  So it's never even entered my mind.  I was
22   more concerned if it was an intentional act or not.
23   Whether they concluded whether it was -- and I think
24   they concluded it was smoking in bed or something is
25   what I heard.

David J. Richards

Page 229

1　**Q.**　Was he a smoker?
2　**A.**　Yes, he was a smoker.
3　**Q.**　After you returned from Como in April of
4　2004 did you report to anybody on the meetings that
5　you had had there?
6　**A.**　Well, notes, I don't really -- I probably
7　discussed what I found with some people.  I'm sure I
8　talked with Alcalde about what my conclusions were,
9　I'm sure I talked with Kennedy and Houze or there
10　might have been one or two other people involved by
11　then in my investment group.
12　　So I'm sure I did because then we were --
13　so, yes, I probably did report to those people.  Not
14　report to them, because didn't really report to
15　anyone, I discussed it with them.
16　**Q.**　Did you provide any kind of recap in
17　writing to anybody?
18　**A.**　I don't know.  Wouldn't necessarily --
19　wouldn't be like me to prepare a memorandum to hand
20　out to people, I would talk to people.  I'm more of a
21　verbal person -- oral person, excuse me.
22　**Q.**　What do you recall of the lunch meeting
23　that you had with Pavanelli, Schianchi, and Antonio
24　that first day you had meetings in Como?
25　**A.**　So like Pavanelli earlier that day, this

Page 230

1　is the first time I'd actually met Antonio and as
2　well Schianchi.  So there was a lot of that -- this
3　was sort of the counter to the meal with Pavanelli.
4　It was, as I remember, lots of social pleasantries,
5　Como, where are you living, that kind of stuff.
6　　And the business discussion didn't start
7　till we got to Pavanelli's apartment, as I recall.
8　**Q.**　So let's go to Pavanelli's apartment and
9　discuss what occurred there.
10　**A.**　Again, so we recounted through the case,
11　probably went over a lot of the stuff that Pavanelli
12　told me again.  I started to get a bit of a trust
13　toward Antonio as more of an independent
14　advisor/attorney type and so we were running asking
15　them all questions.  I had a lot of questions and
16　they answered my questions.
17　　I had questions of Schianchi and so it was
18　more -- I think less than sort of a long Pavanelli
19　narrative and more of a give and take there with just
20　not only Pavanelli but Usuelli and Schianchi
21　providing information, wasn't unfettered Pavanelli.
22　**Q.**　How long did that session last in the
23　apartment?
24　**A.**　I think it was a good long time.  My guess
25　would be -- and I was really worn out after it, I

Page 231

1　remember I was falling asleep on the way back to the
2　hotel.  I would guess three or four hours.
3　**Q.**　Is there anything else you can recall that
4　occurred during that three or four hours?
5　**A.**　About the specific give and take you mean?
6　**Q.**　Specific give and take regarding the
7　Bandagro notes as opposed to the environment of where
8　people lived.
9　**A.**　Yeah, I understand.  Well, I didn't talk
10　that much to Schianchi but I remember --
11　**Q.**　He doesn't speak English, right?
12　**A.**　He doesn't speak English.  So he was
13　really engaged as much in the conversation.  There
14　were only a few things like I directed to him, and
15　there was an interpreter.  I remember questioning him
16　on these notarial deeds and where they were filed and
17　how does this protect me and could somebody cash the
18　notes without him honoring those.  And I asked him a
19　lot of questions like that.
20　　Kind of like you're drilling into the
21　details to me today, well, that's the kind of details
22　I drill into.  So I was asking Schianchi a lot of
23　those questions and then Usuelli was interpreting
24　when Pavanelli wasn't interrupting.
25　**Q.**　Did Usuelli seem to have any independent

Page 232

1　knowledge of the facts and circumstances surrounding
2　the notes?
3　**A.**　Well, I don't know.  He had independent
4　judgment about everything and had asked a lot of
5　questions.  I mean, he'd never been to Venezuela and
6　I really didn't know when he came in the picture,
7　whether it was after the AG decision -- it was
8　certainly before the AG decision but I don't know how
9　much longer.  I don't know how long of a relationship
10　that he had.
11　　So I remember Schianchi represented one of
12　Antonio's companies and Schianchi introduced Antonio
13　to James Pavanelli who he also represented.  And I
14　think that was sometime in the early 2000s.  So we
15　had talked about maybe just before the AG decision.
16　　So that's -- there was a -- there was more
17　of a -- so I think Antonio said he represented him
18　for quite some time, more than just one company, so
19　he knew -- so there was a closer relationship between
20　Antonio and Schianchi.  So that's why kind of they
21　went back and forth and they were answering my
22　questions, and I remember that.
23　　So Antonio was the one who also explained
24　to me kind of a lot of legal details of how Swiss law
25　applied, where the filings of the Swiss notaries

58 (Pages 229 to 232)

David J. Richards

Page 233

1 were, and how Schianchi had the notes, how that
2 Schianchi could not distribute the notes without
3 honoring these notarial deeds. So that we were well
4 protected.
5 So we went through all that again. We may
6 have gone through some of that before, before I went
7 to Como. And I spent a decent amount of time on
8 that. And so I do remember that, that back and
9 forth.
10 Specifics, again, I'm just trying to wrack
11 my brain as to what I talked about. You learn so
12 many things, it's hard to remember what I learned at
13 this meeting or what I learned in a document.
14 Q. Understood. What was Pavanelli's
15 apartment like?
16 A. Well, it was pretty nice really. I'd
17 never been in an Italian person's apartment before so
18 I didn't have much to compare it to, and it was
19 small, for sure. But it was very tasteful and I
20 think it as, as I recall, there was a room off to the
21 side, there was a table, big round table with maybe
22 eight chairs around it, and then the main room which
23 was next to it and it was lined by bookcases that
24 were floor to ceiling full of books.
25 I remember there was no television. And

Page 234

1 there was a small kitchen and then some sleeping
2 quarters, which I didn't see. It was very
3 comfortable. He had a balcony that you could look
4 over part of the area where he lived. It was maybe
5 third floor or something like that.
6 Q. Were you ever there again?
7 A. No, that was it. So it was pretty nice.
8 Q. So he was a guy who had been desperately
9 pursuing you for relatively small amounts of money in
10 the grand scheme, at least of this case, for some
11 periods of months and now you're meeting with him at
12 some flat in a place where some relatively wealthy
13 people tend to congregate, Lake Como, Italy. Right?
14 He's hobnobbing with people like Usuelli.
15 Was there anything about the picture that
16 struck you as a little incongruent? This guy look
17 like a guy that was a pauper who had to be begging
18 people in the U.S. for 10,000 here and 10,000 there?
19 MR. ELLIOTT: Objection.
20 A. I don't know if I characterize him as a
21 pauper. He certainly always wanted money.
22 I think first of what you said, that he
23 lived in a wealthy area, I don't think it was a
24 wealthy area. Como has varying areas and it was not
25 in like the Antonio section of Como. It was kind of

Page 235

1 was okay.
2 If you were from here, I could tell you
3 like what I'd compare it to. It's like Grandview
4 kind of here. So was it bad? No. It was okay.
5 And one of the reasons I was a little
6 surprised was I say, yeah, it was pretty nice --
7 (Interruption.)
8 THE WITNESS: This is the -- hold on, this
9 is the 4:30.
10 MR. ELLIOTT: Can we go off the record.
11 VIDEOGRAPHER: Off the record.
12 (Off the record.)
13 VIDEOGRAPHER: We're back on the record.
14 THE WITNESS: I'll turn it off. That's
15 what I was waiting for. Honest to God, it never
16 stops. It's off.
17 MR. LUCAS: Tell him to go to his room.
18 MR. ELLIOTT: Did you go back on?
19 VIDEOGRAPHER: We're back on.
20 Q. We're back on the record.
21 A. Yeah, it was incongruent, but I've seen
22 this kind of thing where people act like they're
23 broke and they're always praying for a buck because
24 they want money. And I came to learn the guy was
25 kind of running out of money. Anybody -- ultimately

Page 236

1 I think he was kicked out of the apartment.
2 Q. When did that happen?
3 A. I don't know. But I remember that being a
4 fact.
5 Q. When did you learn that?
6 A. Again, I don't know. But I remember that
7 being a fact. Might have been the following year.
8 Q. Sometime in 2005?
9 A. Maybe. Maybe '6.
10 Q. Have you now told me everything --
11 A. I might have asked him that very question,
12 I might have asked him that.
13 Q. Seems like a natural question, doesn't it?
14 A. It was irritating that he was calling
15 me -- listen, so maybe "begging for money" is
16 pejorative, but he was always in need of capital.
17 The effort required money, he had to pay his lawyers,
18 had to -- and he wanted to pay his own sort of
19 management fees of Gruppo because they didn't have
20 any money to pay him a salary any longer. So he was
21 doing what any of us would do in his situation, he
22 was trying to get enough money to do what he had to
23 do.
24 He painted this picture, I remember I
25 think I asked him about that, and he just painted

## Page 237

1    this picture, I forget how he put it, but the sense
2    was that this Venezuela was just wearing him down
3    over all these years, that he wanted to get his money
4    and he put all his money in this and they'd worn him
5    down to a dusty nub and he'd about had it. That's
6    kind of the picture he painted.
7        Q.    Had you been to Lake Como before?
8        A.    No. I've been since but not before.
9        Q.    So you're in a hotel you described as,
10   what was it, the best hotel on earth?
11        A.    To me. There might be different opinions
12   about that.
13        Q.    So you're in the best hotel --
14        A.    It was the best hotel I'd ever been in,
15   put it that way.
16        Q.    So you're in the best hotel on earth in
17   your opinion and Pavanelli here is ordering the staff
18   around like he's royalty, right?
19        A.    Like he had presence. I wouldn't say like
20   royalty, but he was, like, in control.
21        Q.    He's in control of the best hotel on
22   earth, a well-dressed guy by Milanese standards,
23   right?
24        A.    Yeah.
25        Q.    And didn't it get your antenna up like

## Page 238

1    maybe there was something wrong with the picture?
2        A.    It did get my antenna up but it got my
3   antenna up in a different way.
4        Q.    In what way?
5        A.    Well, look, I could see that the guy
6   really, from what he said, was running out of money
7   and needed money. And I was there. And so I got the
8   sense, like I've had in other deals, other distressed
9   deals and when you're the guy there with cash, it
10   gives you a tremendous opportunity to create a good
11   deal for yourself and your investor group.
12        So I got the sense that unless somebody
13   else came along, that I would have a position to
14   command a pretty good deal for my group. That's the
15   sense, that's what came up in my mind.
16        Because you see, in distressed deals you
17   see people like this all the time. Like he may have
18   lived very high in the life and had a lot of money
19   but he was in a timeframe where he looked like he
20   might be on a financial slide. So I'm not sure he
21   had any answers. If he had any answers for me, I
22   probably would have never ended up getting the notes
23   for what I got them for. But I got the sense that
24   was the primary answer.
25        So that's what came up in my mind. What

## Page 239

1    he was going through is not too different than people
2   are kind of at the end of things.
3        Q.    So as you said earlier, you're an
4   opportunistic investor, right?
5        A.    Yes.
6        Q.    And you saw this as that kind of
7   investment.
8        A.    Potentially. I thought it could be a
9   point where I could really craft a good deal for me,
10   for myself and my group. That's what was going on in
11   my mind as I was thinking about this.
12        Q.    Was there ever any point during the course
13   of your trip to Como where you thought maybe you were
14   being conned?
15        A.    Well, that, you know, the whole diligence
16   routine was to make sure, in any transaction was to
17   make sure that it's legitimate. And that whatever
18   the guy -- any time people want your money, there's
19   some potential for them to not tell you the truth to
20   get your money.
21        So that's kind of, we were going through
22   that process. And for me, while we're doing all
23   sorts of diligence, 90 percent of our diligence is
24   focused on is the Attorney General's decision final
25   and binding of the laws of Venezuela, can it be

## Page 240

1    changed, those sorts of questions. That's what we
2   were focused on.
3        So, you're staring at me.
4        Q.    I'm not sure whether you're finished with
5   your answer.
6        A.    Oh, okay. Yeah, that's my answer.
7        Q.    At any point in the intervening years has
8   it occurred to you that maybe you were conned?
9        A.    I believe today like I believed then that
10   the notes were issued by the bank and I believe like
11   I do today that the Attorney General rendered a
12   decision and it was final and binding of the law of
13   Venezuela. That's what I believe today.
14        Q.    Has there been anything that's happened in
15   the intervening decade that's caused you to think
16   it's even possible that you were conned by Pavanelli?
17        A.    I think if I was conned, I was conned by
18   the AG or the Ministry of Finance, and I don't think
19   I was, so.
20        Q.    What about Pavanelli?
21        A.    I don't think I was conned by Pavanelli.
22        Q.    Has anything that's happened in the
23   intervening ten years caused you to question whether
24   he really put together a group that paid a hundred
25   million dollars in 1986 or '87 for those billion

www.IntegrityReportingGroup.com
614.875.5440

David J. Richards

## Page 241

1    dollars of face amount of purported notes?
2        A.    I think beyond listening to what he told
3    me and beyond getting some documents from him at a
4    later time that just put that behind me and really
5    never even thought about it.
6        Q.    Let's talk about the second day you spent
7    in Como.
8        A.    I thought we already did.
9        Q.    No, no, we went through the first day.
10    The second day of meetings.  You haven't told me
11    about the second day, the day that Fabbiani appeared,
12    we've only gone through the first day.
13        A.    I thought we said that I went to that same
14    place that I met with Pavanelli, sat with Fabbiani
15    and he had his thing and we went through his report.
16        Q.    Maybe I'm not tracking what you're saying
17    properly, and if that's the case, fine.
18        A.    You're probably remembering correctly so I
19    don't mind going through it again.
20        Q.    That's not necessarily true but let's make
21    sure we're on the same wavelength.
22            You've told me certainly the first day of
23    meetings, you had breakfast, you drove around, you
24    went to the private meeting room, then you spent
25    three or four hours in the nice apartment with the

## Page 242

1    bookcases, right?  And you were tired, you went home
2    and went to sleep.
3        A.    I'm sorry, I lost you in the middle of
4    that question, if you could repeat that.
5        Q.    I'm just trying to recap.  I know you've
6    been sitting here all day and I want to make sure --
7        A.    I just can't help myself thinking about I
8    was -- my mind drifted to the next meeting.
9        Q.    Let's go to the replay.  First day of
10    meetings, breakfast in the hotel, Pavanelli is
11    commanding the staff.  You drive around Como, you go
12    to the private meeting room you think was in a
13    country club, you spent two hours having lunch.  Then
14    you end up in Pavanelli's apartment where you're
15    joined by other people, you spent three or four
16    additional hours talking, somebody drives you home.
17    You're back at the hotel, that's the first day.
18        A.    Yes.
19        Q.    What happened the next day?
20        A.    So the next day I think I was satisfied
21    that we'd covered -- aside from just being exhausted,
22    I think we were satisfied that we covered most of
23    what I wanted to cover.  And I remember thinking that
24    I could -- I do think I spent a day in Como because I
25    remember thinking I've got a day to see this place.

## Page 243

1            Then the second day we met with, at the
2    same place, which I said like a country club, I don't
3    think there was actually golf there but there was a
4    parkland kind of thing.  Might have been golf but I
5    don't think it was.  If was a very nice place.  And
6    Fabbiani came there.  He lived in Torin which was a
7    bit of a drive for him I think.
8            And I think, I'm pretty sure -- I'm sure
9    Usuelli was there.  Usuelli was there.  I'm trying to
10    think if Schianchi was also there that next day but I
11    do not think he was.
12        Q.    How much time did you meet in that same
13    private meeting room?
14        A.    I think we got up late.  I got up late.  I
15    was exhausted.  And so I think it was more toward
16    lunch that we met with Fabbiani and I know we had
17    something to eat.  And so I think we met for maybe a
18    couple of hours.
19        Q.    What occurred during that meeting?
20        A.    Well, through an interpreter I talked a
21    little bit to Fabbiani, about his background, where
22    he's from, what he was doing now.
23        Q.    Who was the interpreter?
24        A.    Antonio.  And of course Pavanelli was
25    there too, so they would both pitch in.  It was a bit

## Page 244

1    hard to follow; you have three Italians, one talking
2    to Fabbiani and two talking to you.  So we did, we
3    went through that for a couple, three hours.
4            And we primarily focused then on Fabbiani
5    and he had his report with him, we went through his
6    report.  I was asking him about his conclusions and
7    how he reached them and what other sort of work he
8    did on documents.  Why he was an expert, that kind of
9    thing.
10            And then after that was over, God, for
11    some reason I want to think I went up to across the
12    border -- no, that couldn't have been, it's too far.
13    I know at one time I went across the border up in I
14    think Chiasso where Schianchi's offices were.  I was
15    thinking I might have gone there then to get maybe
16    one of the deeds or something like that but I don't
17    think that happened then.
18            I think we might have just -- I know we
19    talked a little bit after Fabbiani left to drive back
20    to Turin and then had enough of it and I said see you
21    later, thanks, kind of thing.  Unless that was the
22    time that I took the rest of the day and went up to
23    Schianchi's office and back.
24        Q.    Do you remember anything else about the
25    discussions you had during the meetings, that meeting

www.IntegrityReportingGroup.com
614.875.5440

---

Page 245

1    I should say, the second day?
2        A.    Those are the high points.
3        Q.    Did you get a copy from Fabbiani of his
4    report?
5        A.    No.
6        Q.    Did you ever get a copy of Fabbiani's
7    report?
8        A.    Yeah, I think I got one later.
9        Q.    How much later?
10       A.    I'm sure I asked for a copy, you know, and
11   I wanted a high-quality copy. It was the report he
12   was showing me was in color and had a lot of detail
13   to it so I think I may at that time have asked him
14   for that or I may have asked Pavanelli to get me it.
15   And I think we got it in sometime.
16       Q.    Soon thereafter?
17       A.    I wouldn't say soon but he had to go, I
18   remember he had to go somewhere and make a couple
19   copies or something. Or maybe even it was Pavanelli
20   that did it. But I don't know when, no, I don't
21   know, but it was after that.
22       Q.    Did you get a copy of Fabbiani's report
23   before you purchased notes 7 of 12 and 8 of 12?
24       A.    I'm pretty sure the answer to that is yes.
25       Q.    Did there come a time when you posted

---

Page 246

1    Fabbiani's report on the Skye Ventures' website?
2        A.    I think I posted a couple sections of it
3    or I think we might have used some of the pictures
4    from Fabbiani's report on the website. He has some
5    pretty cool little graphics of machines they use to
6    look at those things.
7        Q.    When you discussed the report with
8    Fabbiani in Como, did he mention or did it otherwise
9    come up that report had been submitted in the
10   criminal case against Pavanelli in Turin?
11       A.    In Turin?
12       Q.    Yes, in Turin.
13       A.    Is this new? We haven't talked about
14   this? Is Turin Switzerland or is it in Italy?
15       Q.    Turin, Italy. Torino.
16       A.    That's where the bankruptcy thing was?
17       Q.    That's where the criminal proceeding was.
18       A.    Well, what came up was -- I don't recall
19   that coming up, no.
20       Q.    Well, what was the circumstance that gave
21   rise to the report?
22            By the way, let me ask the question
23   differently --
24       A.    It was part of the administrative
25   proceeding I think.

---

Page 247

1        Q.    Was it your understanding that the report
2    that Fabbiani created was prepared in the first
3    instance for use in the Venezuelan administrative
4    proceeding?
5        A.    Well, I wouldn't have asked that that way
6    because I was only aware of it. I asked -- it came
7    up that it was prepared and it was submitted to the
8    Attorney General or Ministry of Finance.
9        Q.    Did anybody mention at the meeting in Como
10   the second day where Fabbiani was in attendance that
11   Fabbiani had prepared a report in support of
12   Pavanelli's defense in an Italian criminal
13   proceeding?
14       A.    No.
15       Q.    As you sit here today are you aware that
16   that's the case?
17       A.    No.
18       Q.    So until I suggested this to you you had
19   no idea that Pavanelli had prepared a report for use
20   in the defense of Pavanelli's criminal case?
21       A.    I don't recall that. I don't recall it
22   one way or the other. There might have been used there,
23   might have not been, but I don't recall ever asking
24   the question.
25       Q.    The copy of the report that you received

---

Page 248

1    from Fabbiani, whoever gave it to you, the Fabbiani
2    report, was it in English?
3        A.    No.
4        Q.    Did you get it translated?
5        A.    I think what happened was that Usuelli,
6    Antonio Usuelli translated a lot of the report for us
7    is what happened.
8        Q.    And when you posted it on the website, the
9    portions that you posted were in English, right?
10       A.    I don't recall that at all.
11       Q.    You think you posted them in Italian?
12       A.    What I think we did is we posted sections
13   of the report mostly pictures is what I think. I
14   don't think we translated it to put it on the website
15   that I remember.
16       Q.    At any point prior to the time Skye
17   Ventures purchased notes 7 of 12 and 8 of 12 from
18   Gruppo Triad did you ask Usuelli whether he was
19   providing any funding to Pavanelli or Gruppo Triad?
20       A.    It came up that he had I believe.
21       Q.    How did that come up?
22       A.    I think in conversation it mentioned that
23   he had provided -- he had an interest, remember that
24   I said got transferred or got put upon which Skye was
25   getting from Gruppo and that was transferred from an

---

David J. Richards

Page 249

1  investment that he made directly with Pavanelli. And
2  I think he had paid money for that investment.
3      Q.    So he's still, I think we may have covered
4  this, still has, as far as you know, some claim on
5  whatever Gruppo Triad might theoretically get as
6  proceeds of this litigation if Skye could possibly
7  prevail and collect. You follow that?
8      A.    No. I thought you were going a different
9  way then you threw me for a loop at the end.
10      Q.    I just want to make sure I understand.
11  Are you saying that Usuelli stands to benefit from
12  this litigation indirectly?
13      A.    Depends, right? I forget exactly where
14  the Gruppo participation would start, but if Gruppo
15  participates in the lawsuit, I think he would get
16  part of Gruppo's participation, maybe the first part.
17      Q.    So he's got some contingent hypothetical
18  interest in the outcome of this litigation that
19  you're prosecuting.
20      A.    He does now. He didn't always.
21      Q.    When did he get it?
22      A.    I know he has it now and I know for most
23  of the time he didn't have it. I think toward the
24  end of -- I think if we go through the agreements,
25  you'll see that his name appears kind of toward the

Page 250

1  '09 or '10 or something like that where he decided
2  that he would rather or somehow he got them to agree
3  to transfer his interest.
4      Q.    During the course of the two days of
5  meetings in Como that we've now been discussing, what
6  was discussed about the status of the administrative
7  proceeding in Venezuela?
8      A.    So we're going back to early April.
9      Q.    Late March/April Fool's Day thereabouts
10  2004.
11      A.    I don't like the insinuation you keep
12  calling this April Fool's Day.
13      Q.    It's the day you were there.
14      A.    Maybe.
15          MR. ELLIOTT: Maybe.
16      Q.    The day your letter says you were there.
17      A.    Yeah, but I was also there other than on
18  April Fool's Day. I think you're trying to imply I
19  was a fool.
20      Q.    I'm just sticking with what your letter
21  tell me was your itinerary.
22      A.    Well, my letter doesn't say April Fool's
23  Day, says April 1.
24      Q.    What were you talking about with regard to
25  the status of the Ministry of Finance or the

Page 251

1  administrative proceeding that was ongoing in
2  Venezuela at that time?
3      A.    So what did we discuss while I was there.
4      Q.    About the status of the administrative
5  proceeding.
6      A.    Yeah. I think the primary focus at that
7  point was the -- I think there were two discussions
8  about the status of that, of the Attorney General's
9  opinion and that was that there was this commission
10  going on, and I forget if it started it or was going
11  to start or whatever, and that Jacir was either
12  representing him or going to testify or something
13  like that. That was one thing.
14          And then the other thing was that Jacir
15  was going to file something in the Supreme Court of
16  Venezuela to require them to, I think this was
17  March 30th, but to require the -- have the Supreme
18  Court order them to process the paper as instructed.
19  Those were the things discussed about the ruling.
20      Q.    Was there any discussion during those two
21  days of any risk that those proceedings were not
22  going to work out well for Gruppo Triad?
23      A.    Well, you obviously want to think about
24  contingencies because they hadn't paid yet, right?
25  So what we discussed was what are you going to do if

Page 252

1  they don't pay? How are you going to make them meet
2  their obligation?
3          And so part of that was this, well, you
4  could sue in Venezuela, you could sue them somewhere.
5  You could engage lobbyists. There were all sorts of
6  things you could do. And so there was a general
7  discussion about that with the idea that hey, they
8  might agree to pay any day.
9      Q.    During the course of those two days did
10  anybody mention that the individual who had written
11  the Ministry of Finance report, Oscar Guzman Cova,
12  had been fired by the Ministry of Finance?
13      A.    No.
14      Q.    During the course of those two days did
15  anyone tell you that Oscar Guzman Cova's replacement,
16  somebody named Ludmilla Soto, had written a report
17  that took a contrary position?
18      A.    No.
19      Q.    Would you have liked to have known that at
20  that time?
21      A.    I'd like to know full information, right.
22  I would have no reason to suspect that. Kennedy had
23  written the Ministry of Finance and he never told him
24  anything like that.
25      Q.    Remind me when that happened.

63 (Pages 249 to 252)

## Page 253

1    **A.**   November 2nd.
2    **Q.**   Is that a document you reviewed --
3    **A.**   Yes, I saw it.
4    **Q.**   -- prior to this deposition?
5    Kennedy to the Ministry of Finance. You
6 reviewed it in the last few days?
7    **A.**   Yeah, like last Thursday or something like
8 that.
9    **Q.**   Would it have been material to your
10 decision whether to purchase notes 7 and 8 of 12 to
11 know that the guy who had written the Ministry of
12 Finance report had been fired?
13    **A.**   Material? Well, so let's go back to the
14 hundred percent analogy. So up there in a hundred
15 percent material was the attorney decision issued,
16 final, it was binding, could it be changed under
17 Venezuela law. That was really important.
18    And I would say that whatever went on
19 internally in Venezuela after that way was less
20 material. And whether Tobias Nobrega was fired or
21 anybody was fired or anybody was fired didn't --
22    **Q.**   We need to get the facts straight. Tobias
23 Nobrega fired Guzman Cova.
24    **A.**   Ultimately, whoever was fired, I think
25 wasn't he fired eventually, Nobrega? Whether it was

## Page 254

1 Nobrega himself fired, wouldn't have mattered to me
2 because the question was on October 3rd when this
3 was issued, was it final and was it binding and could
4 it be changed. That's what we were focused on.
5    **Q.**   So if you had learned that the guy who
6 wrote the Ministry of Finance report was fired and
7 replaced by somebody who wrote a contrary report,
8 that wouldn't have been so important to you in your
9 investment decision-making?
10    **A.**   It would have been -- it would have a
11 level of importance no matter what it was. It would
12 have been really important if we concluded or if my
13 lawyers concluded that the Attorney General's
14 decision could be changed.
15    And if it couldn't be changed, whether
16 somebody told somebody to issue something different,
17 I don't think that would have impacted the -- if the
18 decision, like you get a Supreme Court decision, it's
19 final and binding, if somebody else changed their
20 mind or one of the companies in the case were fired,
21 would that impact the final and binding nature of the
22 decision? Well, I might want to know it but it
23 wouldn't be very material. I would answer your
24 question the same way.
25    **Q.**   At some point in 2004 did you obtain

## Page 255

1 letters from Venezuelan legal experts concerning
2 whether the Supreme -- whether the Attorney General
3 opinion of October 2003 was final?
4    **A.**   Did I receive papers from Venezuela?
5    **Q.**   I'll rephrase the question.
6    At some point in 2004 did you receive
7 letters from Venezuelan legal experts concerning the
8 issue of whether the Attorney General's October 2003
9 opinion was final and binding?
10    **A.**   Oh, okay. I understand your question. So
11 you're saying did I get some writing from any other
12 lawyer that also, besides Jacir and Alcalde, said it
13 was final and binding, is that your question?
14    **Q.**   I'm asking whether you got anything from
15 any Venezuelan legal experts along those lines.
16    **A.**   Yeah, I got a lot of things. We got some
17 writings, we had some meetings.
18    **Q.**   Focusing on writings now.
19    **A.**   Writings. So, yeah, we got an opinion
20 from Jacir, right. And we got an opinion from
21 Bedell, Yvonne Bedell, an ex-Attorney General of the
22 country. We got an opinion from a fellow named Roman
23 Duque Corredor or something like that, I think that's
24 his name, that went to writing.
25    **Q.**   Those were all in writing.

## Page 256

1    **A.**   Others that we had talked to -- we had
2 oral conversations with them at the same time we were
3 talking to a number of attorneys there that didn't
4 get reduced to writing, I don't think. I think I
5 have a writing from -- there may be a writing
6 possibly that Alcalde got from a lawyer named Enrique
7 Iribarren, because I know we met with him and I have
8 just this really vague recollection. But he wrote a
9 long analysis or letter, a long letter, a long email
10 to Alcalde. So that might be in existence. He was
11 another one of these fellows that only spoke Spanish.
12    And I don't think there were -- I don't
13 think we reduced any of the other attorneys' opinions
14 to writing.
15    **Q.**   Were these all in Spanish?
16    **A.**   Jacir, yes. Alcalde, English. You didn't
17 ask about Alcalde. Bedell, English and Spanish.
18 Corredor, English and Spanish. We had them
19 translated I think.
20    **Q.**   Did you get all of those written opinions
21 before you purchased notes 7 of 12 and 8 of 12?
22    **A.**   I'm pretty sure, yes, on Bedell and I'm
23 not so sure if we had Corredor reduced to writing
24 before we filed the lawsuit. But we did have his,
25 I'm sure we had his -- pretty sure he had his verbal.

Page 257

1      Q.   I'm not asking about the lawsuit. I'm
2  asking about the purchase of the notes.
3      A.   Oh, well, it's so close in time, I would
4  say the answer's the same.
5      Q.   So let me just make sure I understand.
6  You got something in writing from Jacir before you
7  purchased the notes?
8      A.   Yes.
9      Q.   And you think you got something from
10  Bedell before you purchased the notes?
11      A.   Pretty sure, yes. In writing.
12      Q.   That's what I mean. And you're not sure
13  about Duque Corredor.
14      A.   Correct.
15      Q.   And there's another person named Enrique
16  Iribarren, or something like that, who may have sent
17  a writing to Alcalde.
18      A.   Correct.
19      Q.   And that may have happened before the
20  purchase, you don't know.
21      A.   Yeah. I'm pretty sure Iribarren did, but
22  like with Corredor, I'm not sure whether it was prior
23  to or after filing the lawsuit when we got the
24  writing, the written opinion.
25          There may have been -- I think there was

Page 258

1  one other opinion, written opinion that we got just
2  in the form of an email that said here's what the
3  statute means to --
4          (Interruption.)
5          I just had to turn this back on. Can we
6  take like a five-minute break?
7      Q.   Yes.
8          VIDEOGRAPHER: Off the record 4:30.
9          (Recess taken.)
10          VIDEOGRAPHER: We're on the record 4:39.
11      Q.   So, Mr. Richards, you were about to start
12  discussing some email in addition to these other
13  opinions that you had described when you had to take
14  a call. So I don't know where you were quite in that
15  train of thought.
16      A.   I apologize for that again.
17      Q.   But maybe you could continue if you can
18  pick up where you left off.
19      A.   So I think the -- I think we talked was it
20  the Enrique Iribarren opinion you're talking about?
21      Q.   How do you spell his name as best you
22  know?
23      A.   Enrique, and Iribarren is I-r-r-a-b,
24  single or double r-e-n. I think double. I think
25  double Rs.

Page 259

1      Q.   Yeah, so what do you recall about what if
2  anything you got in writing or Alcalde got in writing
3  from Iribarren?
4      A.   Iribarren's, I believe it was an email or
5  maybe it was a report attached to an email. We had
6  previously spoken at length to Iribarren when we were
7  in Caracas and what Alcalde told me was that the
8  email kind of bore out what we discussed. But his
9  feeling was that Attorney General's decision was
10  absolutely final, binding, could not be changed under
11  the Constitution.
12          Oh, I know what I was saying, now I
13  remember. So I think there might have been one other
14  written opinion in email format from the fellow from
15  Baker & Hostetler, I'm not sure about that but I
16  think there was an email to him. I might have seen
17  this email way back when or might have been told
18  about it by Alcalde, but to the extent that they felt
19  like the AG opinion was final and binding.
20          And I think the guy's name was Gustavo
21  Growel or Rodriguez, one of two of those. I can't
22  think of which one but it was one of those two I
23  believe.
24      Q.   Are you aware that in 2007 the Venezuelan
25  Supreme Court issued an opinion with regard to

Page 260

1  whether the Attorney General's opinion was, to use
2  your language, final and binding?
3      A.   Yes.
4      Q.   When did you learn of that decision?
5      A.   I don't know. Probably sometime after --
6  obviously sometime after it was rendered.
7      Q.   Promptly after it was rendered as far as
8  you know?
9      A.   I don't know. I knew -- I only even
10  knew -- I don't know. I don't know when.
11      Q.   After you learned of that decision did you
12  or Skye Ventures assert any claim in any form against
13  any of the law firms that had given you opinions
14  regarding whether the Attorney General decision was
15  valid and binding?
16      A.   No.
17      Q.   Why not?
18      A.   Well, I didn't think -- what I understood
19  was the Supreme Court decision wasn't inconsistent
20  with our position.
21      Q.   I'm sorry, you said what?
22      A.   The Supreme Court decision wasn't
23  inconsistent with our position.
24      Q.   What's your logic in that regard?
25      A.   It wasn't so much my logic as what I was

65 (Pages 257 to 260)

David J. Richards

Page 261

1    told about it, that the Supreme Court ruled that the
2    decisions were final and binding but they had to be
3    preceded by an administrative proceeding. And that
4    the Supreme Court either didn't know or was unaware
5    that there was an administrative proceeding before
6    this decision.
7          So that's what I know about the Supreme
8    Court decision. Obviously if it was in Spanish, I
9    didn't read it.
10     Q.   What's the course of your information on
11   the interpretation of the Supreme Court opinion?
12     A.   It was no doubt Alcalde.
13     Q.   Did you consult with any of the other
14   Venezuelan law firms who originally gave you written
15   opinions after the Supreme Court decision was issued?
16     A.   Me, no, I didn't.
17     Q.   To the best of your knowledge did anybody
18   on behalf of Skye Ventures do that?
19     A.   Maybe Alcalde. I've never asked him that
20   specific question.
21     Q.   I don't want you to speculate about that.
22   You don't know one way or the other?
23     A.   I don't.
24     Q.   And Alcalde's never told you that he
25   raised that question with any of those law firms,

Page 262

1    right?
2     A.   This is when, 2007?
3     Q.   That's when the decision happened.
4     A.   I think he told me he talked to Jacir
5    about it I believe.
6     Q.   What did he learn from Jacir?
7     A.   Well, I didn't ask him the contents of the
8    conversation, he sort of gave me a bottom line. I
9    told you what he gave me. Your question was who he
10   talked to, I'm pretty sure he talked to Jacir. I
11   don't know if he talked to Bedell or Corredor any of
12   those other people.
13     Q.   When did Alcalde leave Crabbe, Brown &
14   James?
15     A.   It was probably about little bit after
16   this I would guess. I would say, again a complete
17   guess, '08 or '09 maybe.
18     Q.   Before you went to Como did you do
19   anything to prepare for those meetings?
20     A.   Like in March before I went? You're
21   talking about when I went to Como in March?
22     Q.   Late March. Second half of March.
23     A.   I don't know. I mean, we were doing a lot
24   of stuff, not necessarily directly in respect to me
25   going to Como, but so I wouldn't say I did stuff. I

Page 263

1    was going there to talk to Pavanelli, so.
2     Q.   On how many other occasions did you meet
3    with Pavanelli?
4     A.   I think that might have been the only
5    time. There might have been -- it's possible I met
6    with him in -- I didn't meet with him before either
7    we purchased the notes or brought the lawsuit for
8    certain, if that's what you're asking. There's a
9    possibility I met with him another time later, a year
10   or two later.
11     Q.   I want to know if that happened.
12     A.   Yeah, I'm wracking my brain.
13     Q.   Please do so.
14     A.   I just can't remember.
15     Q.   As best you recall you never met with him
16   again?
17     A.   I might have met with him in connection
18   with meetings in Switzerland when I went back one
19   time. But that trip I spent a lot of time with
20   Usuelli and Schianchi and I can't remember if I saw
21   Pavanelli. I can't remember. Not saying I did or I
22   didn't. Not saying I didn't, I just can't remember
23   if I met with him or anything happened.
24     Q.   How many more times did you travel either
25   to Como or to Switzerland to meet with Schianchi

Page 264

1    concerning the Bandagro notes?
2     A.   Well, I met with Schianchi one other time
3    for sure -- two other times for sure: One was in
4    connection with a trip over there with a bunch of
5    Venezuelans, and I think that was in '06, early '06;
6    and then one other time I went in connection with
7    trying to arrange an escrow of all of the Gruppo
8    notes where we were hiring an escrow agent in
9    Switzerland to hold the notes instead of Schianchi,
10   and that was maybe '07, something like that, or '08.
11     Q.   Let's talk about the first meeting. Why
12   did you go to -- first of all, where did you go?
13     A.   I think I, I'm pretty sure I flew to Milan
14   and went to Villa d'Este and then -- Alcalde was
15   there too, and then we went up to I think it's
16   Chiasso where Schianchi's offices were, wherever his
17   offices were, and spent some time at his law office
18   or his notary office, whatever you want to call it,
19   and so I saw him in connection with that.
20     Q.   So you were with Alcalde and you said a
21   bunch of Venezuelans?
22     A.   Yeah.
23     Q.   Who were they?
24     A.   These were the -- this was in connection
25   with that proposed settlement that we dealt with with

66 (Pages 261 to 264)

David J. Richards

Page 265

1 the people we called "the sisters," you know. There
2 were two women who were sisters and who had
3 approached us about settling the case and so the
4 trip over there to see Schianchi was part of that
5 series of events.
6 Q. The sisters accompanied you?
7 A. I think so, yeah.
8 Q. Who else?
9 A. The sisters and, I mean, we didn't go with
10 them, we met them there. There were two guys, two or
11 three guys.
12 Q. Who were they?
13 A. Geez, I'm trying to think of their names.
14 They were connected with the sisters in some way,
15 shape, or form. And they were businessmen from
16 Venezuela. I recall one guy had a manufacturing
17 business and, God. I hadn't thought about this
18 before the deposition.
19 It was, I think one of the guys name was
20 Rudy Alicetti, Rudy Alicetti, and there was another
21 guy whose name I just don't remember. And their
22 purpose of going over there was to -- the reason we
23 went to Schianchi's office was to look at the notes.
24 Schianchi still had the notes at this time.
25 Q. In '06 he still had 7 of 12 and 8 of 12?

Page 266

1 A. No, he didn't have our notes. We had our
2 notes, like I told you before, in August of 2004.
3 But he had I think all or most of the remaining
4 notes. And they wanted to see those notes.
5 Q. So you, Alcalde, the sisters, two or three
6 other Venezuelan guys, and Schianchi ended up in
7 Chiasso, is that how you pronounce it?
8 A. Key-ah-so. I could be wrong.
9 Q. You'd know better than me.
10 Everybody descended upon Schianchi's
11 office?
12 A. Well, that's what I'm trying to think of,
13 if I saw Pavanelli there. Because the trip up to
14 Schianchi's office was up, there for an hour, back.
15 And mostly those guys were in a conference room with
16 Schianchi. And I wasn't even in there with them most
17 of the time, I was in and out. There was somebody
18 there that spoke Italian and they were talking.
19 And then I'm trying to think what else we
20 did when we were in Como. Might have seen Usuelli
21 for dinner. In fact, I think we did see Usuelli for
22 dinner. Pretty sure. Yeah, I think we did. He
23 picked us up wherever we were staying and took us
24 someplace for dinner, I remember that.
25 Q. So you all went together at the same time

Page 267

1 to Schianchi's office?
2 A. Yeah. We didn't go in the same car but we
3 all met at a specific time. I don't even recall that
4 they stayed in Como, they might have stayed at
5 someplace in Switzerland.
6 Q. How long were you all together at his
7 office?
8 A. Just that timeframe it took to inspect the
9 notes.
10 Q. Which was how long?
11 A. Maybe -- there was other conversation, I
12 think, but it was maybe an hour, little over an hour.
13 Q. Were there any meetings between or among
14 any of these participants other than the time that
15 the notes were being examined at Schianchi's?
16 A. That's what I'm trying to think of. This
17 was the culmination of a series of meetings that were
18 not in Switzerland or Italy and I think we might
19 have -- I can't believe that we didn't spend some
20 time together but I can't think of a setting where we
21 were talking and I just can't remember. We had spent
22 plenty of time together up until then.
23 Q. In other places.
24 A. Other places but I just can't remember a
25 place that we were. Normally I think of -- I'll

Page 268

1 remember this conference room and this deposition and
2 what it looked like and so that's the kind of the way
3 I remember things. I just can't remember a place
4 that we were.
5 I do remember going to a nice dinner with
6 Antonio and Alcalde. Antonio raises Dachshunds as a
7 hobby and I remember Alcalde having to sit in the
8 back seat where the dog hair was and him complaining
9 about it all the way back to America.
10 But other than that, I just don't
11 remember. I don't remember meeting with them while
12 we were there, I just don't.
13 Q. Was the other Venezuelan gentleman
14 Delgado?
15 A. I don't think Delgado was there. I'd met
16 with Delgado but, and he, it's possible that he or
17 somebody like him was there, you know. There was
18 another guy, might have been a fellow named Regala or
19 something like that. But it's possible but I don't
20 recall him being there.
21 Q. When had you met with Delgado?
22 A. Oh, I first met with Delgado in Caracas in
23 April of 2004.
24 Q. So other than the one-hour period of time
25 that various people were at Schianchi's office, what

67 (Pages 265 to 268)

David J. Richards

Page 269

1    happened during this trip as far as the -- and I
2    don't care about the dinner or the Dachshunds.
3        A.    You don't?
4        Q.    Not right now, time is short.  But what
5    happened -- unless something material to the case
6    happened in the back seat of the car or the dinner.
7    But assuming that it didn't, tell me what happened
8    business-wise.
9        A.    Well, listen, I'm telling you it just, I
10   think there was another meeting with the sister
11   people but I just can't remember it.  I think this
12   was -- so the way I remember it, it was the
13   culmination of a lot of meetings, right.  And so this
14   was the last thing they had to do, they had to go and
15   see notes and talk to Schianchi.
16           And so I think that was the whole purpose
17   of the trip, and we'd put a lot of time, effort, and
18   money in sort of this thing and so I think we wanted
19   to be there when that was happening.
20       Q.    So this was the culmination of a series of
21   activities, is that what you're saying?
22       A.    Yeah.
23       Q.    How did they start?
24       A.    Well, over the years we had been contacted
25   by a lot of people who say they had Bandagro notes or

Page 270

1    they want to help us settle the Bandagro notes and
2    that kind of thing.  So I was jaded to that sort of
3    thing by 2006.  And but -- maybe it was the end of
4    2005.
5            But the -- somebody reached out to Alcalde
6    I believe, or it was me maybe, and they presented
7    themselves as representatives of Chavez himself and
8    that they had been instructed to meet with us and
9    resolve the matter.  That's what they told us.
10           So I think we had them checked out by
11   Volpi and they were clearly close associates of
12   Chavez, known, and they seemed like the kind of
13   people that we should at least listen to.  So we told
14   them we would at least listen to them.
15           And there was a meeting -- I know how they
16   came to me.  They came to me through a man named
17   Chava Gato.  Chava, he was the consul general for
18   Venezuela in Houston for a long time and had retired
19   and I came to know him in some way, shape, or form, I
20   forget how, and so he called me and that's how I got
21   the introduction.  And then what I just said
22   happened.
23           So the introduction came from Chava Gato.
24       Q.    He told you somebody else would be calling
25   you?

Page 271

1        A.    He told me about the sisters.  He said
2    that they were -- Chava was pretty close to Chavez
3    and was well known in Venezuela and that he was the
4    consul general of Houston, probably their most
5    important -- maybe DC, maybe Houston in the U.S.  And
6    so the fact that he said it had credibility, we
7    checked them out.  And they checked out.  So we said
8    okay.  And I think he might have arranged the first
9    meeting.
10       Q.    Which took place where?
11       A.    Pretty sure it was Houston, Texas.  We met
12   with them in Miami once or twice and in Houston,
13   Texas.  I think the first time was in Houston, and.
14       Q.    Who was at these meetings with you?
15       A.    Alcalde.  Because they were in Spanish.
16   One of the sisters was okay in English.  I think she
17   was Beatrice Fritz.  And we've also met with them in
18   Columbus once or twice.  They came here.
19           So actually I think the first meeting
20   might have been here in Columbus.  Yeah, that's -- so
21   it was some combination of Columbus, Houston, Miami,
22   Como or Chiasso, and that was the progress of it.
23       Q.    Over what period of time?
24       A.    Four or five or six months.
25       Q.    When you had the first meeting wherever,

Page 272

1    whether it was in Columbus or Houston, what happened
2    there?
3        A.    Well, it was actually kind of amusing
4    because I think it was here and so they stayed in the
5    most expensive hotel in Columbus.
6        Q.    Which is which one?
7        A.    Which at the time was that big Hilton by
8    Easton.  There's a shopping development where as
9    Columbus was kind of growing up they brought in --
10   Les Wexner brought in and built this thing with
11   Nordstrom's and all the best shops and there was this
12   big hotel right by the shopping center.
13           And so we thought oh, geez, they're
14   staying at the Hilton, it's a -- so we're going to
15   meet with them at the Hilton and this is another one
16   of these we were apparently on Venezuela time because
17   we were supposed to meet at a certain time, we're in
18   the lobby of the Hilton waiting for them and of
19   course they're not there.
20           And when they finally do show up they're
21   coming in from the shopping area and they had,
22   themselves and three men carrying bags of like
23   Nordstrom's and all this stuff, and so they were out
24   shopping the whole time that we were waiting for
25   them.

www.IntegrityReportingGroup.com
614.875.5440

David J. Richards

## Page 273

1    And that was kind of the attitude they had
2  toward us the entire deal was like she ran things.
3  And even when the men were in the room, if she
4  snapped her fingers, they would just shut up.  It was
5  really pretty funny.
6    But to get to the business part of it, we
7  met with her and the meetings were conducted in
8  Spanish and what she essentially said was the
9  Republic would like to settle the case, they would
10  like to settle the entire case, not just the Skye
11  case, and that they would like me to get control of
12  the case and all of the notes and they could deal
13  with me.  And that we would make a deal and could I
14  do that.
15    And it wasn't -- that was exactly what was
16  accomplished, that it was long and drawn out and I
17  don't know what they were talking about in Spanish
18  and how they were dancing back and forth but that was
19  the end of it:  Could you get control of the notes so
20  we could settle with one person.
21    And there was, I don't know, could we get
22  them, and we only control our own destiny, that kind
23  of thing, and they were adamant, they wanted to
24  settle the whole thing.  They wanted to get all these
25  notes associated with the Attorney General taken off

## Page 274

1  the horizon.
2    So that was the start of it and we went
3  about trying to do that.  And then I think we
4  accomplished that, we got control of the notes.  Or
5  we got power to negotiate the notes from Gruppo,
6  Schianchi, and Pavanelli.  And which was an ordeal in
7  itself.  But eventually we got it.
8    We got it, we called them back and said we
9  think we have control of the situation and that we
10  had another meeting, that was either Miami or
11  Houston.
12    And again, I forget where we were but I
13  remember, whether it was Houston or Miami, they were
14  staying at the best places and I remember Alcalde
15  saying to me, boy, these are our kind of Communists,
16  that question.
17    So then so we continued to work on it, it
18  seemed very promising, seemed like we were going to
19  get things settled finally, and then the question --
20  then there was a lot of negotiation about how much
21  would be paid and who would get what and that kind of
22  thing.
23    And so we had another meeting then to go
24  over that, we reached an agreement, there was a lot
25  of back and forth between Gruppo and us about how we

## Page 275

1  would get paid, what the sisters wanted for their
2  service or whatever.  And then we finished the deal,
3  we signed some papers and -- some settlement papers I
4  think, and they took them to Chavez saying that he
5  was going to approve them, and then he didn't.
6    Q.    Papers were signed before or after the
7  inspection in Switzerland?
8    A.    I think after.  But it could have been a
9  contingency to the papers, I don't know.  They had to
10  go see the notes.
11    Q.    And what were the basic terms of the
12  settlement?
13    A.    I don't remember, honestly.
14    Q.    Ballpark.
15    A.    I remember that we ground them down to a
16  small amount of money to, you know, small percentage
17  on face and that we were going to receive something
18  like two times face value or something like that, or
19  one and a half or two times face.
20    Q.    So you were going to get 150 to
21  200 million?
22    A.    Something like that, yes.
23    Q.    And Gruppo how much?
24    A.    It was about what we were going to get.
25  On a percentage basis though it was much lower.

## Page 276

1    Q.    And how about the sisters?
2    A.    I don't recall if they were getting
3  anything directly or whether we were paying the,
4  like, the Alicetti or the guy with them I think was a
5  lawyer.
6    Q.    You were going to pay them, Gruppo was
7  going to pay them?  Who was going to pay them?
8    A.    Venezuela was going to pay them.
9    Q.    And that was part of the written
10  agreement?
11    A.    I think so.  The terms are very fuzzy in
12  my mind.  But there was a written document.
13    Q.    Who prepared the written document?
14    A.    I don't know.  Wasn't me.
15    Q.    Was it in English?
16    A.    I don't know.  Probably not.
17    Q.    Who handled this for you, Alcalde?
18    A.    I think so, yeah.
19    Q.    So as far as you recall it just died, it
20  went to President Chavez, that's what you recall, and
21  it wasn't approved.
22    A.    Yeah.
23    Q.    Who was the source of your information
24  about the outcome of this?
25    A.    Well, it was Chava but I forget exactly

69 (Pages 273 to 276)

David J. Richards

Page 277

```
 1   who his source was.  I think it was a high-up person
 2   close to Chavez, it wasn't the sisters.
 3        Q.   All right.  You mentioned that there was
 4   one other time you visited Schianchi in Chiasso to
 5   arrange a change of the escrowing of certain notes;
 6   is that correct?
 7        A.   Yeah, I think there was more than one
 8   purpose.  I think we had sent them some more money
 9   and maybe been a little careless about all the
10   documentation so were trying to get all the documents
11   exactly right.
12        Q.   You sent more money to Gruppo Triad in '07
13   and '08?
14        A.   Whatever it was before I went over and it
15   was after the sisters things because the notes were
16   in Schianchi and the purpose of this was to get the
17   notes into a bank in Geneva.
18        Q.   Why were you giving more money to Gruppo
19   Triad at this point?
20        A.   It was the same sort of story, that they
21   really needed this to -- what happened was they got
22   involved in a lawsuit in Switzerland with the
23   Woodstrite guys and they needed some funding for
24   that, I think I helped them with that.
25        Q.   Why?
```

Page 278

```
 1        A.   Well, I told Pavanelli originally that,
 2   you know, in addition to the money I had given him I
 3   could give him up to a million dollars if things were
 4   properly spent and things were needed, but I'd have
 5   to decide at that time.  And I don't think I was, I
 6   don't think I was at a million dollars yet.
 7             So they were giving me good reasons for
 8   the money, the lawsuit was important, and they were
 9   going to -- they thought they could win it.  First
10   over jurisdiction, and which I think they did win,
11   and then so it was for that.
12        Q.   Was this lawsuit some threat to your
13   situation?
14        A.   Well, obviously for us if there was a
15   Swiss case and there was a ruling in a Swiss case as
16   to the validity of the notes, it had the potential to
17   affect our case.  I don't know if our court would
18   follow the Swiss court or not.  But, and I don't even
19   know if that was the -- I thought the main thing
20   there was there was a fight over whether the
21   25 percent interest in the notes was due to
22   Woodstrite.  I think that was the main thing.
23        Q.   And that would have been a threat to you
24   because if Woodstrite prevailed, that 25 percent
25   would have eaten into what you thought you had
```

Page 279

```
 1   bought, right?
 2        A.   Well, that -- no, that wasn't why I did
 3   it, but we took -- when we made our investment, we
 4   took into account we might have to pay them
 5   25 percent.  So, for example, when we were
 6   negotiating with the sisters, we assumed that we
 7   would have to turn over 25 percent to those guys too.
 8             So what I really gave it to them for was
 9   even though I didn't get along with the guy, I told
10   him I'd give him more if there were legitimate
11   purposes.  I think it's even in the document
12   somewhere.  So I was just following through on that.
13             And, of course, when I gave him the money,
14   he would change the waterfall a little bit in our
15   favor.  So there was -- that's what was in it for me;
16   their need and my creating the deal slanting the
17   waterfall a little more in favor of Skye when they
18   asked for money.
19        Q.   So that's some three years after this
20   lawsuit began you're still modifying the waterfall in
21   your ongoing dealings with Gruppo Triad.
22        A.   Every time I gave them money, changed the
23   waterfall.
24        Q.   Including three years after this lawsuit
25   was --
```

Page 280

```
 1        A.   Yes, including even farther than that.
 2        Q.   When was the last time you gave money to
 3   Gruppo?
 4        A.   I don't know.
 5        Q.   What was the reason why you gave them
 6   money the last time?
 7        A.   I don't know.  I don't know when.
 8        Q.   Was there any reason after this Swiss
 9   lawsuit with Woodstrite that you gave --
10        A.   Well, the Swiss lawsuit is still ongoing
11   as far as I know.
12        Q.   I know, but have you funded it after that
13   first time?
14        A.   Yeah.
15        Q.   How many times?
16        A.   More than once, for sure.  And the answer
17   is I don't know.
18        Q.   Is that all reflected in the modifications
19   to the waterfall that are embodied in the many
20   different versions of the purchase agreement that
21   appear to exist?
22        A.   Consecutive versions, yes.  I won't say
23   they're different, I would say they're serial.  And
24   so every time I wouldn't give them money for free,
25   what we would get was a modified waterfall.  And so I
```

70 (Pages 277 to 280)

CONFIDENTIAL

David J. Richards

Page 281

1    think, I don't know, I know that the one when we went
2    up to Switzerland and got him -- them to agree to
3    give possession of the notes to a neutral party and I
4    was in Geneva, and I met Schianchi in Geneva and I
5    had some other lawyers there, and I that know I gave
6    him some money then and we signed documents and we
7    had the total amount of money in the agreement then.
8         As to the agreements, I think there were a
9    couple subsequent modifications, two or three, where
10   the waterfall was changed again.  And I'm certain
11   that those were in connection with some additional
12   funding, which I think was for the Swiss litigation.
13        And I don't know if in those -- I don't
14   recall right now if in those agreements we say how
15   much money was given to them or whether there's some
16   different evidence of payment.
17        Q.    But every funding after this lawsuit began
18   is reflected in some documentation?
19        A.    In some way, shape, or form, yes, I would
20   say.
21        Q.    So you mentioned that you had met Delgado
22   not when the sisters were in Switzerland but sometime
23   in 2004; is that right?
24        A.    I'm not saying I didn't meet him, I just
25   said I don't recall meeting him.  But the first time

Page 282

1    I met him was in April of 2004.
2         Q.    What were the circumstances under which
3    you met him?
4         A.    Well, it was part of this diligence effort
5    that we had that we're trying to talk to everybody we
6    could and so when we went to Caracas, Alcalde and I,
7    and spent some time with Jacir and going through all
8    the documents in some detail, Jacir and Alcalde going
9    through the documents in some detail, the next day
10   after that there was a meeting with Delgado and
11   Guzman.
12        That was at a hotel that we were staying
13   and it was -- I don't know how we learned about
14   Guzman or Delgado, whether Jacir had mentioned them
15   or Alcalde developed it himself or whether it was
16   spur the moment or whether we planned to do it, but
17   the following day we did meet with them.
18        And I think we did learn then that Guzman
19   had been let go by the Ministry of Finance and so we
20   basically talked to him about -- Alcalde talked to
21   him, again.  It was all in Spanish.  Delgado did
22   speak English but Guzman didn't, so they conducted
23   their discussion in Spanish.
24        Q.    Delgado you understood to be some type of
25   financial figure?

Page 283

1         A.    Well, he said that, I mean, he introduced
2    himself, again, there was a little talk and he said
3    in English that he was the grandson of a past
4    president of Venezuela, that he was in the financial
5    business, and he gave some sort of discussion of what
6    he had done in the financial business, which I don't
7    recall what it was.
8         And then that part I think was in English
9    because he understood that I didn't speak Spanish.
10   And then they talked for a couple, few hours.
11        Q.    About what?
12        A.    Well, I don't know exactly everything.
13   But I was asking what they said because they were --
14   had both been involved, they'd both been previously
15   employed by the Ministry of Finance but were no
16   longer.  And so the question was what happened?  What
17   did you do?
18        And the gist of it was that Guzman said,
19   you know, he stands behind his report, it was
20   correct.  I think that's the -- so I didn't actually
21   hear what he said.  I said what did he say, right.
22        Q.    Presumably you got a download from
23   Alcalde, right?
24        A.    Yeah, I think we went to the hotel bar
25   after, that was late at night I remember, and not

Page 284

1    late at night but had gotten dark and we went to the
2    hotel bar or restaurant and had dinner and talked a
3    little bit about that.
4         Q.    Just you and Alcalde?
5         A.    Yeah, just me and Alcalde.  And we talked
6    a little bit about -- a lot about Jacir and his
7    thoughts on the case and how is he feeling, is he
8    still feeling strongly about his opinions, and how
9    solid a ground are we on, that kind of stuff.
10        And I don't remember that I had -- it was
11   the only time I've ever seen or talked or been in the
12   presence of Guzman while he was talking so I don't
13   remember getting much of an impression from him.  He
14   was a little guy.
15        And but Alcalde did tell me that he said
16   absolutely sure his opinion was right.  And that they
17   fired him and that he was, you know, he needed that
18   job.  And I don't remember if he talked about why he
19   was fired or.  I don't remember.
20        Q.    Who had arranged the meeting between you,
21   Alcalde, Delgado, and Guzman Cova?
22        A.    I don't know.  I don't know if Alcalde did
23   it independently or Jacir knew how to get in touch
24   with one or the other of them and gave Alcalde their
25   numbers.  I just don't remember how that occurred.

71 (Pages 281 to 284)

CONFIDENTIAL

David J. Richards

Page 285

1  But I do remember that we did meet with them at this
2  hotel, which I think was the Marriott in Caracas.
3      Q.    And was that the last time you
4  communicated in any way directly or indirectly with
5  Oscar Guzman Cova?
6      A.    Yes.
7      Q.    To the best of your knowledge has Alcalde
8  ever communicated any further with Oscar Guzman Cova?
9      A.    He may have but I don't know.
10     Q.    Do you have any information as to whether
11 Oscar Guzman Cova had any ongoing interactions with
12 Jacir after this meeting?
13     A.    I remember he said he was really scared
14 and he was clearly kind of fidgety about being there,
15 he was scared, he didn't want to be involved, he was
16 afraid for him or his family or something.  And I
17 think he just melted into the background after that.
18     Q.    Guzman Cova.
19     A.    Yeah.  I don't think he wanted to be
20 there.
21     Q.    Have you ever learned in any way, shape,
22 or form that he had any financial interest in the
23 outcome of the situation involving any of these
24 notes?
25     A.    No.

Page 286

1      Q.    Has anyone ever suggested that to you?
2      A.    No.
3      Q.    How many further interactions did you have
4  with Delgado?
5      A.    So Delgado was involved somewhat with the
6  sisters and some of those meetings.  So I saw him
7  there.  Delgado I think tried -- got involved with
8  some guys that owned the note and tried to -- came to
9  Columbus to talk about joining in our lawsuit and I
10 saw him then.  And I saw him one other time in
11 Cincinnati with his attorney.
12     Q.    Who was his attorney?
13     A.    A fellow named Pierce Cunningham.
14     Q.    He said he got involved with some guys who
15 owned the notes?  Who did he get involved with?
16     A.    I don't know.  It was a name of a company
17 of Benespa but I don't really know who it was or what
18 his position was there.  But that was supposedly the
19 owner of the notes.  I don't know even know if they
20 owned the notes, to be honest with you.  But they
21 said they did.
22     Q.    Didn't they try to intervene in this
23 lawsuit at some point?
24     A.    They might have.
25           MR. SCHWARTZ:  I think that's enough for

Page 287

1  today, gentlemen.  We've more or less used seven
2  hours; is that correct?
3           MR. ELLIOTT:  Yep.
4           MR. BALDWIN:  About ten minutes to spare.
5           MR. SCHWARTZ:  Thank you for hanging in
6  there today, we'll see you tomorrow.
7           THE WITNESS:  Sounds good.
8           VIDEOGRAPHER:  Off the record 5:20.
9           (Whereupon, at 5:20 p.m., the deposition
10 was concluded and signature was not waived.)
11                        --|--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 288

1                    AFFIDAVIT
2  State of Ohio        )
                        ) SS:
3  County of _____ )
4      I, DAVID J. RICHARDS, do hereby certify that I
   have read the foregoing transcript of my deposition
5  given on Monday, December 22, 2014; that together
   with the correction page attached hereto noting
6  changes in form or substance, if any, it is true and
   correct.
7
8  _____
              DAVID J. RICHARDS
9
10     I do hereby certify that the foregoing
   transcript of the deposition of DAVID J. RICHARDS was
11 submitted to the witness for reading and signing;
   that after he had stated to the undersigned Notary
12 Public that he had read and examined his deposition,
   he signed the same in my presence on the _____ day
13 of _____, 2014.
14
   _____
15            Notary Public
16
17 My commission expires _____, _____.
18                        --|--
19
20
21
22
23
24
25

72  (Pages 285 to 288)

David J. Richards

Page 289

```
1
2
3              CERTIFICATE
4   State of Ohio        )
                         ) SS:
5   County of Franklin   )
6       I, Julieanna Hennebert, RPR and RMR, the
    undersigned, a duly qualified and commissioned notary
7   public within and for the State of Ohio, do certify
    that, before giving his deposition, DAVID J. RICHARDS
8   was by me first duly sworn to testify to the truth,
    the whole truth, and nothing but the truth; that the
9   foregoing is the deposition given at said time and
    place by DAVID J. RICHARDS; that I am neither a
10  relative of nor employee of any of the parties or
    their counsel and have no interest whatever in the
11  result of the action.
12      IN WITNESS WHEREOF, I hereunto set my hand and
    official seal of office on this 29th day of December,
13  2014.
14
15      Julieanna Hennebert, RPR, RMR,
        and Notary Public in and for the
16      State of Ohio.
17  My commission expires February 19, 2018.
18  (1134-JLH)
19             --|--
20
21
22
23
24
25
```



www.IntegrityReportingGroup.com
614.875.5440