## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

--|--

Case No. 02:04-cv-793

--|--

DRFP, LLC, d/b/a Skye Ventures,
        Plaintiff,

        vs.

The Republican Bolivariana De Venezuela,
et al.,

        Defendants.

--|--

30(b)6
Video
Deposition of: DAVID J. RICHARDS

Date and Time: Tuesday, December 23, 2014
        9:00 a.m.

Place:      Calfee, Halter & Griswold
        1200 Huntington Center
        41 South High Street
        Columbus, Ohio

Reporter:   Julieanna Hennebert, RPR, RMR
        Notary Public - State of Ohio

--|--

## Page 2

1   APPEARANCES:
2   On behalf of Plaintiff:
3       MR. REX H. ELLIOTT
        MR. ADAM P. RICHARDS
4       MR. CHARLES H. COOPER, JR.
        Cooper & Elliott, LLC
5       2175 Riverside Drive
        Columbus, Ohio 43221
6       614.481.6000
7   On behalf of Defendants:
8       MR. ANDREW Z. SCHWARTZ
        MR. RICHARD G. BALDWIN
9       Foley Hoag, LLP
        Seaport World Trade Center West
10      155 Seaport Boulevard
        Boston, Massachusetts
11      617.832.1000
12      MR. ALBERT J. LUCAS
        Calfee, Halter & Griswold, LLP
13      1200 Huntington Center
        41 South High Street
14      Columbus, Ohio 43215
        614.621.1500
15
    Also Present:
16
        Mr. C. Benjamin Cooper,
17      Mr. Gil Whitney, Videographer.
18      --|--
19
20
21
22
23
24
25

## Page 3

1              INDEX
2              --|--
3   DAVID J. RICHARDS              PAGE
    Examination by Mr. Schwartz        6
4
5              --|--
6        RICHARDS/SKYE EXHIBITS
7   NUMBER DESCRIPTION              IDENTIFIED
8   1   Responses to Interrogatories    16
9   2   Plaintiff's Privilege Log      25
10  8   December Confidential Fax      233
11  12  4.8.2004 Agreement         57
12  13  Bandago Notes Purchase Agreement   44
13  14  First Amended Escrow Agreement   34
14  15  6.24.2004 Letter         80
15  16  8.11.2004 Letter         84
16  17  5.23.2004 Letter (Spanish)     91
17  18  12.23.204 Fax          120
18  19  Agreement and Instructions to   124
        Escrow Agent
19
    20  Agreement Regarding Bandagro    135
20      Note 9/12
21  21  Amended Bandagro Notes Agreement  152
22  22  Musheer Robinson Email String    171
23  23  Fabbiani Report         181
24  24  11.30.2003 ElUniversal.com Article  199
        (Spanish)
25

## Page 4

1           INDEX (Continued)
2              --|--
3        RICHARDS/SKYE EXHIBITS
4   NUMBER DESCRIPTION              IDENTIFIED
5   25  11.17.2003 ElUniversal.com Article  200
        (Spanish)
6
    26  11.17.2003 ElUniversal.com Article  204
7       (English)
8   27  Wire Transfers          225
9   28  1.30.2004 Letter         263
10             --|--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      Tuesday Morning Session,
2      December 23, 2014.
3      -|-
4          VIDEOGRAPHER:  We're on the record.  This
5   is the videotaped deposition of David Richards in the
6   matter of DRFP, LLC, doing business as Skye Ventures,
7   versus Republican Bolivariana De Venezuela, being
8   heard before the U.S. District Court of Ohio.
9          This deposition is being held at 41 South
10  High Street, Columbus, Ohio, on December 23, 2014, at
11  9:00 o'clock.
12         My name is Gil Whitney and I'm the
13  videographer, the court reporter is Julie Hennebert.
14         I'd like for the attorneys to identify
15  themselves and the parties they represent.
16         MR. ELLIOTT:  Rex Elliott and Adam
17  Richards with Ben Cooper today on behalf of the
18  plaintiff for the 30(b)(6).
19         MR. SCHWARTZ:  Andrew Schwartz, Foley
20  Hoag, LLP, Boston, Massachusetts, for the defendants.
21         MR. BALDWIN:  Richard Baldwin, Foley Hoag,
22  LLP for the defendants.
23         MR. LUCAS:  And I'm Al Lucas from Calfee,
24  Halter & Griswold also for the defendants.
25         MR. ELLIOTT:  Let me clarify one thing,

Page 6

1   Ben Cooper is admitted to the bar in the District of
2   Columbia and I believe Virginia but not Ohio, so he's
3   not making a formal appearance today.
4          MR. SCHWARTZ:  That's fine.
5          Welcome, Mr. Cooper.
6          VIDEOGRAPHER:  The court reporter may
7   swear the witness.
8          (Witness sworn.)
9          -|-
10             DAVID J. RICHARDS,
11  being by me first duly sworn, as hereinafter
12  certified, deposes and says as follows:
13             CROSS-EXAMINATION
14  BY MR. SCHWARTZ
15     Q.    Good morning, Mr. Richards, how are you?
16     A.    Morning.  Good.  How are you?
17     Q.    Fine, thank you.  Did you sleep any better
18  last night?
19     A.    Way worse.
20     Q.    How many hours of sleep did you get last
21  night?
22     A.    Oh, my gosh, three or four.
23     Q.    So we had given you and you had accepted
24  some homework assignments for last night.
25     A.    Well, you were supposed to give me,

Page 7

1   somebody was supposed to give me homework
2   assignments, I thought it was you but nobody gave me
3   anything, so.
4      Q.    So you were awaiting some formalization of
5   the homework assignments.
6      A.    I only remembered one thing that I checked
7   or I checked -- I read some stuff but only in regard
8   to one specific thing, and that was I think it was
9   about when and how I learned about this Bonetti
10  action.  I was trying to figure out how I learned
11  about it.
12     Q.    Bonetti being Woodstrite.
13     A.    Woodstrite, I'm sorry, excuse me.  And I
14  went back to the document where I learned about it
15  and I realized it was a pleading filed in this case
16  and so I don't know if I clarified this completely,
17  Rex said I did but I'm not sure I did, and so during
18  the course of this period before we purchased the
19  notes, I knew about Bonetti's 25 -- claim for
20  25 percent of the recovery but I didn't learn about
21  that they had filed a Supreme Court action or some
22  kind -- I don't even know if it was Supreme Court but
23  some kind of legal action till later in connection
24  with the pleading that I believe you filed in the
25  case.  Or maybe one of your predecessors.

Page 8

1      Q.    What pleading was that?
2      A.    Might have been one of the motions for
3   summary judgment.  But it was in a pleading.
4      Q.    Well, the motions for summary judgment
5   weren't filed until very recently, so in late 2014,
6   so you're saying you didn't learn about the
7   Woodstrite action in Venezuela until sometime in the
8   last several months?
9      A.    Till preparation for this case.
10  Preparation for my deposition was when it was brought
11  to my attention.  And I -- when that occurred, I
12  recall being surprised that either I never knew it or
13  didn't recall knowing.
14     Q.    Just to be clear, you learned sometime in
15  the last two months that there had been an action
16  brought by Woodstrite in the Venezuelan Supreme Court
17  back in 2003?
18     A.    Yes.  There were, as I was thinking about
19  my testimony, there were a couple other minor points
20  that I, just trying to fall asleep I was thinking
21  about everything that happened during the day, and
22  there were one or two things that I thought I might
23  not have said correctly, but I can either wait till I
24  get my transcript and change it then or I can tell
25  you what I think they were now.  It's up to you.

2  (Pages 5 to 8)

CONFIDENTIAL

David J. Richards - 30(b)6

## Page 9

1 **Q.** Why don't you tell me now.
2 **A.** So I think you had asked me yesterday if I
3 got the Fabbiani report when I was in Como in the end
4 of March or early April of 2004, and thinking back on
5 it I now believe I did have the Fabbiani -- a
6 Fabbiani report. And the reason I believe that is I
7 recall that I came back from Como with a lot of paper
8 that I got from Pavanelli and Schianchi, and maybe
9 Fabbiani.
10 So I don't remember exactly what the
11 documents were because I'm sure I gave them to
12 counsel, but I had a lot of paper and my bet is that
13 there was at least a copy of some kind of a Fabbiani
14 report in there.
15 So when I said I didn't come back with
16 that, I think I might have been -- I might have been
17 mistaken.
18 Then two other things, one that I think I
19 might have been incorrect on or might have said
20 incorrectly was I said, I think you asked me how much
21 Sitrick was being paid and I said $5 million. That's
22 not exactly right.
23 What Sitrick would have gotten would be
24 far less than that, most likely, because he was
25 getting 5 percent of the recovery that Skye made and

## Page 10

1 on every dollar of the notes, you know, there was
2 liens that might have equated to 70 or 80 cents so he
3 would be getting 5 percent of that net, whatever that
4 turned out to be.
5 So that was a little inaccurate.
6 And then we talked I think either on or
7 off the record about the fact that both Calfee had
8 extensively represented me and your small business
9 investment corporation guy Ken Wyatt I think had
10 represented me in the past, but, and I don't know, I
11 don't know if that's a big deal or not because it
12 didn't have anything to do with Bandagro, the
13 Bandagro case, except for Wyatt might have seen that
14 in the documents we were talking about in the deals,
15 I don't know if he did or not.
16 But I think that the only thing that I
17 didn't mention that concerns me is that when we were
18 transitioning from lawyers from when Alcalde left
19 Crabbe-Brown and he was the driver, Crabbe-Brown was
20 looking for different options for attorneys, we
21 interviewed a number of attorneys around the country,
22 there's a big firm in New York that made us an offer,
23 but relative to this there was a very strong
24 litigation guy in DC, and this again, this predates
25 Cooper & Elliott's representation and so we went very

## Page 11

1 close back and forth on the case and we were trying
2 to find --
3 We were trying to engage a law firm that
4 would go on a contingency fee and this guy who was
5 again a very well known litigator at the time was
6 seeming like he was going to do the case and then he
7 left this firm or this firm was merged, and I think
8 there's a good chance that he went to your firm. So
9 he went to another big Washington firm and in my mind
10 I'm thinking it was Foley but I could be wrong about
11 that.
12 So I thought about that as I was falling
13 asleep last night. I was thinking back in the day
14 about what had happened, your questions caused me to
15 think about a lot of things, so.
16 And I can probably find the name of the
17 guy somehow, but so at any rate, those are the things
18 that I can -- were definitely that I thought about
19 last night that I would have said that I might have
20 said wrong or incorrectly or I would have said
21 differently.
22 **Q.** So let's go through these in reverse
23 order. There came a time when you say you ceased
24 using Crabbe, Brown & James as litigation counsel in
25 this matter?

## Page 12

1 **A.** Well, when Alcalde left, yes. We didn't
2 cease using them, we were looking for an option.
3 There was never a time when we stopped using
4 Crabbe-Brown, they didn't want to be the primary
5 point on the litigation at some point and that was
6 when Alcalde left.
7 **Q.** Why wouldn't they want to be the
8 primary --
9 MR. ELLIOTT: Objection. Don't answer the
10 question.
11 **Q.** Why didn't you keep using Alcalde?
12 **A.** Alcalde was out of the practice of law.
13 He went to work for a company.
14 **Q.** With regard to Stirick --
15 **A.** Sitrick.
16 **Q.** Sitrick, sorry. What do you mean when you
17 say every dollar of the notes has liens of 70 or
18 80 percent?
19 **A.** Well, so if you look at it from an
20 investment perspective, from Skye's perspective, the
21 question is if there was a recovery on the notes, go
22 through negotiation or litigation, there were claims
23 on the notes just like if you sold a house, there's a
24 a mortgage on your house and you have to pay that.
25 So we had learned that there was a

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

1   25 percent lien from Woodstrite on the notes. We had
2   learned --
3       Q.   And you learned about that before you
4   even --
5       A.   Before we bought the notes.
6       Q.   -- purchased?
7       A.   We knew that before we purchased the
8   notes. Jacir had a claim for 8 percent recovery on
9   the notes that allegedly he had filed some sort of
10  lien on them in Venezuela.
11      Q.   When did you first learn about that?
12      A.   I don't know. I know that he had
13  mentioned that he was entitled to a legal fee for his
14  success in the Attorney General administrative
15  proceeding of 8 percent, and I think he said that
16  consistently throughout after we met him. So we
17  probably learned about it early.
18      Q.   Before you purchased the notes.
19      A.   We knew about it certainly before we
20  purchased the notes. So there's 33 percent of the
21  notes. And then the law firm would take their --
22          MR. ELLIOTT: I don't think you need to
23  disclose the percentage.
24      A.   So there was obviously an amount to pay to
25  the law firm to be negotiated, and then at the end we

1   had to give Pavanelli both cash and a note, a
2   nonrecourse note, to purchase the notes.
3          So if you add all that up, you know, it
4   doesn't leave that much, our net recovery might have
5   been 10 cents on a hundred million -- or 10 million
6   on the first hundred million. So our investments
7   that could have been the max on the resolution
8   negotiation. So Sitrick was in no way, shape, or
9   form getting $5 million, he was getting 5 percent of
10  the net.
11      Q.   You say that you came back from Como with
12  a lot of paper. Other than the Fabbiani report what
13  other paper did you come away from Como with?
14      A.   So I don't remember. In the context of
15  this time period we were doing diligence, right, and
16  we were gathering information on everything we could.
17  Naturally, of course, it was focused, as I said all
18  day yesterday, it was focused on the finality and the
19  binding nature of the Attorney General opinion
20  whether it could be reversed, the laws of Venezuela,
21  that was the focus. And certainly from my point of
22  view that was the most important thing.
23          But at the same time the group, the law
24  firm, et cetera, were gathering everything they can.
25  So we had, you know, thousands and thousands of pages

1   of documents. Which of those came from Pavanelli on
2   that -- that he gave to me to take home on my trip
3   back, I honestly don't remember.
4          I'm almost certain I would have given them
5   to the law firm. I'm not the kind of guy -- Skye
6   was -- I'm not the kind of guy who would on the plane
7   back make a log of documents. I would give them to
8   the lawyers, I was a busy guy and that was their job
9   to read them.
10          So the only way I would remember which
11  document would be in connection with something
12  Pavanelli said to me and handed to me. And like my
13  testimony yesterday, I think I told you about as much
14  as I remember about that meeting. Without -- you
15  could show me a document, maybe say where did you get
16  this and that might refresh my recollection, but.
17      Q.   What was the volume of papers that you
18  brought back from Como that you didn't have when you
19  got there?
20      A.   I would say if I had to just guess, I
21  would say more than a thousand pages of documents. I
22  remember they were difficult to get in my suitcase,
23  which is why I remembered it mainly.
24      Q.   Now, with regard to the Woodstrite action
25  that was brought in the Venezuelan Supreme Court in

1   December of 2003, you mentioned this morning that in
2   preparing for this deposition you saw some pleading
3   that referenced that; is that correct?
4       A.   Yes.
5       Q.   Do you recall what pleading?
6       A.   No.
7       Q.   You mentioned that it may have been one of
8   the summary judgment motions but you're not sure of
9   that?
10      A.   That was a complete guess. I probably
11  shouldn't have said that. I've been cautioned to
12  stop guessing by both you and my own counsel.
13          MR. ELLIOTT: I'll caution you not to
14  disclose what you talked about as well.
15      A.   Sorry.
16      Q.   With regard to the homework assignments
17  that we had discussed, one of them was reviewing the
18  interrogatory responses that had been marked I
19  believe as Exhibit 1, yes, Exhibit 1, to see whether
20  there was a third respect in which the answers were
21  either imprecise or inaccurate. Do you remember that
22  now that was one of the home work assignments?
23      A.   Yes, I do. If it were on a list, I would
24  have done it but I didn't do that.
25      Q.   Have you had any further thought about

CONFIDENTIAL

<table>
<tr><td>

Page 17

1  what that might have been even if you didn't
2  specifically undertake the mission?
3      A.   I don't. I certainly would be willing to
4  do that if my counsel tells me to do it after this
5  deposition.
6      Q.   All right, we can discuss that.
7          Let me ask you this, let's find Exhibit 1.
8  Why don't you take a look at Exhibit 1, which are the
9  interrogatory answers. And turn if you would to
10 page 10. Actually you're going to need to turn to
11 page 9.
12     A.   Okay.
13     Q.   Bear with me a second, I may actually have
14 to go back further. The answer's on page 10, I'm
15 trying to find the subquestion.
16     A.   These get confusing, don't they?
17     Q.   No. All right, you need to turn actually
18 to page 8 to get the question.
19     A.   Okay.
20     Q.   Or the beginning of the question. So you
21 see there's question 3 on page 8 with regard to the
22 October 3, 2003, opinion?
23     A.   Yes.
24     Q.   Then there's a sub A on page 8?
25     A.   Yes.

</td><td>

Page 19

1      A.   Well, I think they're talking about so
2  if -- I haven't read it that carefully, but I think
3  they're talking here about counsel communications
4  they're not giving you or something. But they
5  definitely, you know, wrote such an email. I saw it.
6      Q.   I understand. I'm just trying to lay a
7  little foundation here to help you.
8          So this answer to question 3.d. doesn't
9  mention the Kennedy email to the Ministry of Finance,
10 right?
11     A.   Well, it says -- so here's how I would
12 read it: It says that other than communications
13 between counsel for the respective parties -- okay,
14 wait a minute. There have been no -- yeah, okay,
15 you're right. I was thinking it did disclose it but
16 it doesn't.
17     Q.   So by the way, these are your answer, you
18 signed these, we already established, back in 2006,
19 right?
20     A.   Yeah, but you know. Yes.
21     Q.   So is this the third inaccuracy or
22 imprecision that you noticed when you noticed that
23 there were such inaccuracies --
24     A.   I think you're right, I think that is it.
25 I think you're right.

</td></tr>
<tr><td>

Page 18

1      Q.   There's a sub B on page 9, and then there
2  are sub C and D on page 10.
3      A.   Okay.
4      Q.   So with regard to the October 3, 2003,
5  opinion, look at sub D. It says identify the date
6  and participants and any communication in whatever
7  form, I'm paraphrasing, between plaintiff and any
8  agent or representative of the Venezuelan Ministry of
9  Finance regarding the October 3, 2003, opinion.
10         Do you see that question?
11     A.   Yes.
12     Q.   And then the answer says, in substance,
13 other than the lawyers talking to each other, there
14 have been no such communications between Skye
15 Ventures and the Venezuelan Ministry of Finance.
16         Do you see that?
17     A.   Yes.
18     Q.   And you testified yesterday that at least
19 on one occasion Mr. Kennedy at Crabbe, Brown & James
20 communicated directly with the Venezuelan Ministry of
21 Finance by email, right?
22     A.   Yes.
23     Q.   And this answer to question -- subpoena
24 D on page 10 does not reveal that Mr. Kennedy sent
25 that email, correct?

</td><td>

Page 20

1      Q.   Well, that was one of the homework
2  assignments, so would we did it for you.
3      A.   Thank you, I appreciate that.
4          MR. SCHWARTZ: Mr. Elliott, do you think
5  we could get that email from Mr. Kennedy to the
6  Ministry of Finance?
7          MR. ELLIOTT: Yes.
8          MR. SCHWARTZ: Thank you, appreciate that.
9      Q.   As long as we're looking at this question
10 and answer, other than the communication from
11 Mr. Kennedy to the Ministry of Finance which you told
12 us about yesterday and which we've now discussed this
13 morning, are there any other respects in which this
14 particular answer is inaccurate or imprecise?
15     A.   Well, I think we could argue about
16 precision but I think incorrect I can answer, I think
17 that was the thing where I thought it was incorrect.
18     Q.   Are you aware of any -- other than what
19 appears here on page 10 of Exhibit 1, are you aware
20 of any other communications between Skye Ventures or
21 any of its representatives and anybody at the
22 Venezuelan Ministry of Finance?
23     A.   Wow, that's a big question. I'm aware of
24 the one -- are you talking like before the lawsuit
25 was filed or after --

</td></tr>
</table>

5 (Pages 17 to 20)

1    Q.    At any time --
2    A.    -- or any time?
3    Q.    -- beyond what you told me yesterday about
4  meetings with former employees of the Ministry of
5  Finance and beyond what we've talked about today and
6  beyond what appears here on page 10.
7    A.    And I had a direct meeting with the
8  Ministry of Finance, as we discussed yesterday.
9    Q.    Anything you said yesterday you've already
10  put on record.
11    A.    Okay.  So I would -- you say
12  "representative," that's the trouble I'm having with
13  the question.  Did anybody representing me ever
14  contact the Ministry of Finance and so --
15    Q.    Let's make it simple:  Did you ever
16  contact the Ministry of Finance directly?
17    A.    No.
18    Q.    As far as you're aware did any of your
19  lawyers ever contact the Ministry of Finance directly
20  except when Mr. Kennedy sent this email?
21    MR. ELLIOTT:  And if you acquired any such
22  information through your lawyers, I'd caution you not
23  to disclose that.
24    Q.    Well, just to be clear, I'm not asking
25  about the communications you may have had with the

1  lawyers.
2    MR. ELLIOTT:  That's what I wanted to make
3  clear.  I just don't want him to blurt out some
4  conversation he had with the lawyers.
5    MR. SCHWARTZ:  Fair enough.
6    A.    So you're asking me if anybody who was
7  engaged by me formally, like, had a written agreement
8  with them, like a lawyer or somebody I talked to?
9    Q.    Well, let's start with one of your
10  lawyers.  We're trying to make this simple.
11    A.    Okay, so that was your question, did any
12  of my lawyers ever contact --
13    Q.    Other than Mr. Kennedy sending the email
14  which you testified about today and yesterday.
15    A.    Geez, it's a long timeframe, obviously,
16  and I have a sense that in that timeframe that
17  Alcalde at one time engaged with somebody at the
18  Ministry of Finance.  You would have to ask him.  But
19  I'm just having trouble trying to remember why I have
20  that sense.
21    And you're not talking about interactions
22  between Alcalde and Venezuela's lawyers here in the
23  United States or there in Venezuela, you're not
24  talking about that.
25    Q.    Correct.

1    A.    Yeah, I just have the sense that Alcalde
2  at one time did have an interaction with maybe a guy
3  named Morentez but I honestly don't know why I had
4  such a -- I can't place it in context of what was
5  going on or why it happened or what the answer was.
6  So other than that, no, I don't remember anything
7  else.
8    Q.    Now, do you recall any other
9  communications by any other representative of you
10  other than counsel directly with the Ministry of
11  Finance?
12    A.    Well, I mean, you're asking me to go back
13  and think over a long period of time, so I'm not
14  trying to dodge your question, I'm just trying to
15  think if I can ever remember anything, which I'm
16  having trouble doing right now.
17    So I don't remember.  My sense is that in
18  some of these things, perhaps when the sisters were
19  involved or other times, that there was contact with
20  the Ministry of Finance but I don't remember any
21  specific occasion.
22    Q.    The final homework question that we talked
23  about yesterday was your reviewing documents to see
24  if you could determine which entity owns the
25  purported note No. 9 of 12.

1    A.    Oh, I did not do that.
2    Q.    Do you have documents in your possession,
3  custody, or control that would enable you to answer
4  that question?
5    A.    I'm pretty sure I do.
6    Q.    And remind me, what's the best
7  understanding you have now, not having reviewed those
8  documents last night?
9    A.    That there's an entity named Skye
10  Ventures II that owned the note, certainly owned the
11  note back when we acquired it and I just don't recall
12  if that was ever changed or not.
13    Q.    If it was changed, would you expect that
14  the agreements that have been produced to us in this
15  case would reflect the change in some way?
16    A.    I don't know if we produced agreements
17  to -- related to 9/12 or not.  But if we had, it
18  might or might not.  There might have been no further
19  agreement after -- you know, if Skye II changed its
20  name or changed -- I don't think that would have
21  necessitated an agreement with Gruppo Triad.
22    Q.    What was the purpose of having Skye II
23  take ownership of that particular instrument?
24    A.    It was part of this effort that we'd
25  undertaken to fund Gruppo Triad.  They wanted us to

CONFIDENTIAL

## Page 25

1  sell the note that started -- we started discussions
2  of in March of 2004.
3      Q.  Why would you have formed a separate
4  entity for that purpose?
5      A.  Well, it was a separate thing.  So we
6  typically do separate -- I mean, it was not a note
7  that we intended to own or long term when we did the
8  thing, it was a note we intended to place for Gruppo.
9      Q.  Are there different investors in Skye II
10  than in Skye Ventures, LLC?  I guess I should ask a
11  foundational question:  Are there any investors in
12  Skye Ventures II?
13      A.  If there are, and again I'm not sure that
14  there are, it would be basically the same people.  Or
15  it would be a subset of the same people because it
16  was a small thing, as I recall.
17      Q.  Take a look at Exhibit No. 2, please, as
18  long as we are reviewing this.  This is the document
19  that the last page of which includes the list of
20  recipients of investor communications.
21      A.  Oh, okay, yeah.  I see.
22      Q.  And you testified yesterday that many of
23  the people, not necessarily every last one on this
24  page, are investors in Skye Ventures, LLC, right?
25      A.  No, they're not investors.  Nobody here --

## Page 26

1  Skye Ventures is owned by myself and my wife.  Every
2  person on this acquired an interest in proceeds if
3  there was a distribution to Skye on the note.  So no
4  one here was an owner of Skye, right.  I think we
5  went through that in some detail yesterday.
6      Q.  I'll restate the question.  You testified
7  yesterday that many, though not necessarily every
8  last one of the people on the last page of Exhibit 2,
9  are investors in the purported notes No. 7 of 12 and
10  8 of 12, correct?
11      A.  Well, sometimes you correct me in terms of
12  saying things legally wrong so I would say it
13  differently as sort of an investment matter.
14      Q.  How would you say?
15      A.  I would say just as I said it, these are
16  people who purchased a distribution interest from
17  anything paid on the Skye notes.  In other words,
18  they had nothing to do with the management of Skye,
19  they were not empowered in the management, they
20  didn't participate in the management decision.  They
21  had no legal power to participate in the management
22  decisions.
23      Q.  Where did you find all these people?
24      A.  Where did I find, you mean like find their
25  names on the list or did I start, begin interacting

## Page 27

1  with them as investors?  I don't understand what your
2  question is.
3      Q.  At some point you decided that you were
4  going to market investment interests in the
5  distribution or potential distribution from these
6  notes, right?
7      A.  Say it again.  Say that again.
8      Q.  At some point in time you decided to
9  market distribution interests in the notes the way
10  you just described it.
11      A.  I wouldn't say I was marketing them.  This
12  is a group of investors that have invested in my
13  transactions since long before this.  So I'd let the
14  people know about the opportunity.  And they said
15  hey, I'd like to get in, basically.
16      Q.  How is it that over the years you've
17  assembled this list of dozens of investors?
18      MR. ELLIOTT:  Andrew, are you going to tie
19  this in some of way to the litigation?  Because now
20  you're getting into his method of doing business, et
21  cetera, for investors, now you're asking about prior
22  transactions, how he got these folks.  I mean, how is
23  that in any way related to this case?
24      MR. SCHWARTZ:  I'll have to see what the
25  answer to the next question is.  I don't intend to

## Page 28

1  spend a lot of time.
2      MR. ELLIOTT:  Okay, because I'm not going
3  to let it go very long.
4      A.  So I started doing investment
5  transactions, bridge loans and that kind of thing, in
6  1988 or so and the first transaction I did I had nine
7  men that I knew did it with me.  And that was very
8  successful.
9      And so it was basically as we did other
10  transactions it was those guys or their friends, word
11  of mouth, and we kept doing very well and so the list
12  grew and grew and grew.  And so it was mostly just
13  word of mouth.
14      And almost all these people on the list I
15  know pretty well, some I don't know well at all but I
16  know -- I've come to know them because they've
17  invested with me for a long time.
18      Others may have just been involved,
19  there's a few, I see several on here that were simply
20  involved in this particular investment and no others.
21      Q.  Do you have social relationships with any
22  of the people on this list?
23      A.  Yes, I do.
24      Q.  With most of them?
25      A.  I could answer yes or no to any specific

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6



www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

Page 33

1 subscription agreements and interest and he kept all
2 that very carefully and so he did that for me.
3      Then when it came time to do the annual
4 tax returns, he would prepare the underlying
5 information for those tax returns, and it was at
6 points it was a joint effort to figure out exactly,
7 make sure we knew what had happened during the year,
8 so he would do that.
9      And then he would do miscellaneous tasks
10 for me.  There were times when we were wiring money
11 that he would prepare a wire request that either CNBC
12 or Fifth Third needed because they wanted a written
13 documentation and he would do that to them at times.
14 I think sometimes I might do it.
15      And then miscellaneous this and that.  He
16 was always there to help.  He was a good guy.
17      Q.  When you make reference to "tax returns,"
18 was Skye Ventures or is it still -- let me start
19 over.
20      Skye Ventures, LLC, is that a pass-through
21 entity for tax purposes?
22      A.  It's an LLC so it's a pass-through entity
23 in the same sense all LLCs are.
24      Q.  So when you say "tax returns," what type
25 of tax returns are prepared?

Page 34

1      A.  Just because you're a pass-through entity
2 doesn't mean you don't file tax returns, of course
3 you do.
4      Q.  What kind of tax returns does Skye
5 Ventures do?
6      A.  Federal tax returns.
7      Q.  With K1s?
8      A.  Yeah.
9      MR. ELLIOTT:  Are we doing this
10 Richards/Skye 14?
11      MR. SCHWARTZ:  Yeah, I think that's what
12 we agreed yesterday.
13      A.  That's what these say.
14      Q.  Yeah.
15      (RICHARDS/SKYE EXHIBIT 14 WAS MARKED.)
16      Q.  Mr. Richards, I'm showing you Exhibit 14,
17 I ask that you take a look at it and see if you
18 recognize it.  Questions I'm going to have for you
19 will mostly concern the last page of Exhibit 14.
20      MR. ELLIOTT:  Read it through.
21      Q.  Mr. Richards, while you're reading it
22 through I'm just going to take a break for a second.
23 I thought Mr. Elliott would -- to take a moment and
24 read it.  So while you're reading it I'm going to
25 step out for one second.

Page 35

1      A.  Okay.
2      (Off the record.)
3      VIDEOGRAPHER:  On the record 9:52.
4      Q.  Have you had a chance to review that
5 document?
6      A.  Yes, uh-huh.
7      Q.  Do you recognize Exhibit 14?
8      A.  Yes.
9      Q.  What is it?
10      A.  Looks familiar.  This is the method by
11 which an investor would acquire an interest in the
12 distribution from the Bandagro notes.
13      Q.  Directing your attention to the last page
14 of Exhibit 14, which is captioned a Form of Exhibit A
15 to Amended Escrow Agreement between Skye Ventures and
16 Robert J. Behal, is this blank form the form that
17 each of the investors in the distribution rights, as
18 you've described them, would sign?
19      A.  Well, if it wasn't the precise form, it's
20 very close to it.  We change it around quite a bit
21 off and on.  So at one time I'm sure this was the
22 form.
23      Q.  How many different iterations of this form
24 are there?
25      A.  I don't know.

Page 36

1      Q.  Do you have signed versions of this form
2 from each of the investors in the distribution
3 rights?
4      A.  Yes.
5      Q.  How many such signed forms do you have?
6      A.  Like we said yesterday, you asked me how
7 many investors there were and I think I said 50 or
8 60, so the answer would be the same, 50 or 60.
9      Q.  Where are these 50 our 60 signed forms of
10 Exhibit A or something like it?
11      A.  They're in an investor binder in my
12 office.
13      Q.  Have you made that investor binder
14 available to Skye Ventures' counsel?
15      A.  They haven't asked me for it.
16      Q.  So that's a no?
17      A.  No.
18      By the way, thinking back on your question
19 about contacts with the Ministry of Finance, of
20 course, as you know, at one point, actually one point
21 we made demand on the Ministry of Finance for
22 payment, our lawyers did directly.  So that was one
23 of the times that it occurred to me as we were taking
24 a break.
25      Q.  You testified yesterday, Mr. Richards,

9 (Pages 33 to 36)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 37

1  that you believe you are the managing member of Skye
2  Ventures, LLC, the plaintiff in this litigation; is
3  that right?
4      A.    Yes.
5      Q.    And am I correct that you have consented
6  to testify on its behalf here today at this
7  deposition?
8      A.    I think "consented" might be a liberal use
9  of the word "consent" but here I am testifying for
10  Skye Ventures.
11      Q.    You are consenting to do that, correct?
12      MR. ELLIOTT:  He is our 30(b)(6) designee
13  for Skye.
14      Q.    And you've consented to serve in that
15  capacity?
16      A.    Again, it sounds like a loaded question.
17  I've been asked by my lawyers to come and testify
18  pursuant to your request.
19      Q.    And you've agreed to do so.
20      A.    Here I am, yes.
21      Q.    You still have Exhibit 1 there in striking
22  distance, the interrogatory answers?
23      A.    I got it here.  Yep.
24      Q.    We may have covered this yesterday, but
25  I'm going to cover it again just so it's firmly in

Page 38

1  our mind.  And we may not have covered all of it.
2      Take a look at page 6 of Exhibit 1,
3  please.
4      A.    Yes.
5      Q.    The first question there is "State the
6  date on which the plaintiff obtained possession of
7  the promissory notes," and the answer is August 18,
8  2004, as to the numbers 7 of 12 and 8 of 12 and
9  December 1, 2004, as to 9 of 12.  Do you see that?
10      A.    Yes.
11      Q.    Is that correct?
12      A.    I think so.
13      Q.    Before you obtained possession of 7 of 12
14  and 8 of 12 on August 18, 2004, had you ever seen
15  copies of those two purported notes?
16      A.    I might say -- you're pointing me to this
17  question, that might be one of the other things I
18  thought was not precisely correct.  Because obviously
19  as we've already discussed, the entity that got --
20  the technical legal entity that received the note was
21  Skye Ventures II.  So I don't know if that makes a
22  difference, but.
23      Q.    You're talking about 9 of 12?
24      A.    9 of 12.  So, again, the question, I'm
25  sorry, I didn't mean to -- the question was -- could

Page 39

1  you tell me what the question was again?  I know it
2  was did I ever see.
3      Q.    I'll repeat the question.  It's not a
4  complicated one.
5      Setting aside this wrinkle that you're
6  introducing about maybe it was Skye Ventures II and
7  not Skye Ventures that took possession of note 9/12,
8  is the information contained in the answer to
9  question 1 otherwise correct?
10      A.    Yes.
11      Q.    The next question was prior to the time
12  Skye Ventures took possession of notes 7/12 and 8/12
13  had you personally ever seen copies of those notes?
14      A.    I'm pretty sure I had, yeah.
15      Q.    When?
16      A.    Well, I believe they're exhibits, maybe
17  I'm wrong about this but I believe they're exhibits
18  either to the Attorney General report or the Ministry
19  of Finance report or may have been in documents that
20  they gave me, they may have given us copies of all
21  the notes.  So my belief is that I did see a copy of
22  them before I received it.  But exactly when or how,
23  I don't recall.
24      Q.    And when you first -- well, let me
25  rephrase this question.

Page 40

1      When was it that it was first determined
2  that the notes that you would purchase would be
3  numbers 7 of 12 and 8 of 12?
4      A.    When did we identify those numbers as
5  opposed to like they had 3 and 4 before it you mean?
6      Q.    When did you first identify numbers 7 of
7  12 and 8 of 12 as the ones you were going to
8  purchase?
9      A.    Well, certainly before we received them on
10  August 18.  And sometime after mid-July of '04.
11  Sometime in that timeframe for sure.  And
12  specifically thinking that it was probably in early
13  August.
14      Q.    Were those notes identified as the ones
15  you were going to purchase before you agreed to make
16  the purchase?
17      MR. ELLIOTT:  Can you read that question
18  back for me, please?
19      (Record read.)
20      MR. ELLIOTT:  I'm going to object to the
21  form.
22      MR. SCHWARTZ:  What's the problem with
23  that question?
24      MR. ELLIOTT:  It's vague.
25      Q.    Do you understand that question?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 41

1    A.    Well, I think we --
2    Q.    Let's just start with whether you
3  understand the question.
4    A.    I don't in the sense that --
5    Q.    I don't want you answering questions you
6  don't understand.  If you have a problem with the
7  question for whatever reason is bothering your
8  counsel or otherwise, I'm going to change the
9  question.
10   A.    Okay, change the question.
11   Q.    You testified yesterday that it was
12 sometime in late July or early August that you agreed
13 to purchase two notes, right?
14   A.    Yes.
15   Q.    But you can't pinpoint which time in late
16 July or early August that occurred, right?
17   A.    That's right.
18   Q.    But there was such a time.
19   A.    Yes.
20   Q.    Prior to that time did you know it was
21 going to be notes 7/12 and 8/12?
22   A.    I believe they were identified before we
23 finalized everything, yes.
24   Q.    How long before you finalized everything
25 were they identified?

Page 42

1    A.    It was pretty close in time.
2    Q.    And what do you recall about their being
3  identified in that time frame?
4    A.    I recall that we were trying to acquire
5  notes where Pavanelli had not encumbered them in --
6  with any of these deeds, specific deeds of trust.
7  So --
8    Q.    Including to you?
9    A.    Well, mine were disappearing, so they
10 didn't matter.  But the -- in other words, the deeds
11 of trust that I had were merged into the or were
12 going to disappear.  So we were more concerned about
13 others that we didn't know about.
14        And apparently we were thinking we were
15 going to go with notes 3 and 4, I recall, but there
16 was some issue with them.  So that we -- somebody --
17 he had given some sort of deed of trust specifically
18 as to those notes.
19   Q.    How did you find that out?
20   A.    I think actually Antonio found it out in
21 questioning Gruppo.  Or something, we had a
22 discussion and Antonio maybe asked Schianchi a
23 specific question was there any other deeds of trust,
24 and I said I'm not sure we had, can you find out.
25        So I think it was an interchange like that

Page 43

1  that led to us finding out and us changing the notes
2  we were purchasing to ones that didn't have any
3  specific deeds of trust attached to them, is my
4  guess.
5    Q.    Who determined that notes 7/12 and 8/12
6  didn't have any liens or encumbrances?
7    A.    Well, only Schianchi can determine that
8  because he was the only one who would know unless we
9  did a records search, which we didn't do.
10   Q.    Did you rely on Schianchi as the source of
11 information that numbers 7/12 and 8/12 were not
12 encumbered?
13   A.    We assumed what he was saying was true.
14   Q.    Did you make any attempt to confirm that
15 what he said was true?
16   A.    We may have but I don't remember that we
17 did.
18   Q.    Was there a time before -- let me rephrase
19 that.
20        Do I understand that what you're saying,
21 that some point before late July or early August you
22 were considering purchasing notes No. 3 and 4?
23   A.    I think if you looked at the document that
24 we looked at yesterday at one point, the Crabbe-Brown
25 document, that was in relation to notes 3 and 4.

Page 44

1    Q.    Are you talking about Exhibit 13?
2    A.    I don't know what exhibit.
3    Q.    Why don't you break out Exhibit 13.
4    A.    From June.  Okay, I got these a little bit
5  out of order but we'll just . . .
6        Okay, there we go.  All right.  Sorry
7  about that.  I got them all messed up.
8        So we're looking at 13?
9    Q.    Yes.  I'm asking you to look at 13.
10   A.    Yes.
11   Q.    If you look at the second page of 13, it
12 makes reference to 3/12 and 4/12 in section 2.4,
13 right?
14   A.    Yes.  That's where I got that.
15   Q.    So as of June 23rd of 2004 was it your
16 expectation that you were going to be purchasing
17 notes 3/12 and 4/12?
18   A.    That was the expectation of the notes that
19 were going to be transferred.  I forget how we
20 determined that it was 3 or 4, but that's what it
21 was.  And I think we were going to assume that as we
22 finalized everything we thought it would be 3 and 4 till we
23 found out that there was a lien on them.
24   Q.    And your best recollection is that Antonio
25 figured that out?

11  (Pages 41 to 44)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 45

1    A.    I'm not sure if he figured it out, I think
2  he communicated with Schianchi, since he could speak
3  Italian.
4    Q.    And your assumption is that Schianchi told
5  him that 3 and 4 weren't good candidates for this
6  transaction because they were encumbered by a deed of
7  trust?
8    A.    Yeah, he said there was an encumbrance on
9  them.
10   Q.    What were the circumstances leading to
11 Skye or Skye II receiving No. 9/12 on December 1st,
12 2004?
13   A.    Well, if I remember correctly, and I
14 really haven't reviewed much about this so I'm going
15 purely on memory here, the only thing I have reviewed
16 there I think you recall I suggested I read that
17 little memorandum, that summary memorandum that we
18 had prepared.
19   Q.    Which summary memorandum are you talking
20 about?
21   A.    There was a little glossy summary
22 memorandum that we prepared that I said I'd reviewed
23 before the deposition.  And it had to do with the
24 placement of note 9/12.
25        So I think at that timeframe we had

Page 46

1  decided by then -- to go back a minute, we had
2  started working with Libra in June and Libra was
3  going to purchase the note 9/12.  Or a note I believe
4  it was -- I don't know exactly when we identified
5  9/12.
6        And so Libra went through the typical work
7  that an investment banker would do.  Did a little
8  differently than I do my things, they were a
9  little -- they were, well, they were going through a
10 more traditional or formulized process.  And so we
11 went through it with Libra during this timeframe off
12 and on.
13        I think by about November or so I think
14 Libra decided not to move forward with the purchase.
15 And so we felt like we had to go out and try -- Libra
16 seemed to be very close and I forget the exact reason
17 they passed at the end, but so we were going to go
18 out to market 9/12.
19        Well, looking ahead, Pavanelli had become
20 increasingly difficult saying things that were
21 inaccurate and so what we wanted to do before we went
22 out to place the note is we wanted to get control of
23 the situation so that if somebody was prepared to
24 lien on the note, that we had actually the note so
25 that we could execute the transaction without going

Page 47

1  back through another round of rigmarole with Gruppo,
2  Pavanelli.
3        So at that point we said look, Libra
4  passed, we're prepared to go out, we think we can
5  still be successful in placing the note or debt on
6  the note but we want the note.  And that's -- it was
7  through that that we acquired possession of 9/12.
8    Q.    You said that Pavanelli was saying things
9  that were inaccurate.  What was he saying that was
10 inaccurate?
11   A.    Well, it's difficult to remember
12 everything he said inaccurate, but he had become
13 increasingly broke throughout this whole process,
14 right.  He still was in need of money, and if
15 anything more so than at the beginning.
16        And so he would say -- he got to the point
17 where he was accusatory and he was calling
18 Crabbe-Brown and everybody liars and it was just very
19 contentious and that, I think that's perhaps one of
20 the reasons that Crabbe-Brown got rid of him.  And he
21 would say things like you're not the owner of the
22 notes, and then I would say of course we're owners of
23 the notes.  We would get into arguments over that.
24        And just irrational things like that.  And
25 he would just say something like you're not the owner

Page 48

1  of the notes and then he would say well, if you send
2  me $25,000, I'll admit you're the owner of the notes,
3  it would be an issue no more.  Like that.
4        So he was, as you see this in sometimes
5  people on this downside I was describing to you
6  yesterday, they get a little irrational, they get
7  desperate, and he was at that point I think really in
8  need of funding capital not just for his ongoing
9  efforts at Gruppo but for his own personal life.  So
10 I wanted to insulate myself through that, which is
11 why we got the note.
12   Q.    Speaking about the relationship between
13 Crabbe-Brown and Gruppo Triad or Pavanelli, did you
14 ever learn that in 2004 Crabbe, Brown & James had
15 prepared a legal memorandum for Gruppo Triad or
16 Pavanelli?
17   A.    They prepared one for me, I believe.  But
18 I don't know that they prepared one for Pavanelli.
19   Q.    Did you ever learn that in 2004 Crabbe,
20 Brown & James prepared a draft complaint for Gruppo
21 Triad to file?
22   A.    I didn't.  Not saying it didn't happen,
23 but I just don't recall that.
24   Q.    At any point in the course of your
25 relationship with Crabbe, Brown & James did that law

12 (Pages 45 to 48)

Page 49

1  firm share with you any communications that it had
2  had in writing with Gruppo Triad or Pavanelli?
3      A.    Well, there were some communications that
4  we were jointly on where we were discussing things
5  jointly, but there were things that Crabbe-Brown did
6  with him that they wouldn't share with me.  And
7  Alcalde was, you know, he even one time -- I was -- I
8  kind of wasn't understanding the reason they were
9  doing it, I was saying well, tell me what happened
10 kind of thing --
11     MR. ELLIOTT:  I don't want you to disclose
12 communications that you had with Luis Alcalde.
13     A.    So I guess the short answer is no.  Not
14 unless the ones we were all jointly discussing
15 something.
16     Q.    So there were communications you received
17 from Crabbe-Brown that went both to you and to Gruppo
18 or Pavanelli?
19     A.    Yeah.  Not in respect to what you just
20 asked me about the filings of the complaint, that
21 kind of thing, or what their arrangement was going to
22 be but there were things that we were jointly
23 discussing.  I forget exactly what they were.  And I
24 don't really, like, when they had their breakup, even
25 though I predicted it, I wasn't involved in any of

Page 50

1  that either.
2      Q.    There were written communications that
3  were sent by Crabbe-Brown that were addressed both to
4  you and to Pavanelli or Gruppo Triad?
5      A.    I didn't say that.  What I said was there
6  were emails that three of us were on.  I'm not saying
7  who sent them.  I might have sent them, Pavanelli
8  might have sent them, Crabbe-Brown possibly could
9  have sent them.  But there were things that the three
10 of us discussed.  And certainly that was the case
11 from early on, from when we first started doing our
12 diligence and when Alcalde was involved.
13     Q.    When did you learn that the breakup
14 between Gruppo Triad and Crabbe-Brown that you had
15 predicted actually occurred?
16     A.    I believe it was mid-July.
17     Q.    Who told you about it?
18     A.    I believe Alcalde.
19     Q.    What did he tell you?
20     MR. ELLIOTT:  I don't want you to disclose
21 that.  Privileged communication.
22     MR. SCHWARTZ:  That's far from clear.
23     MR. ELLIOTT:  Why do you think that?  I'm
24 willing to talk through this.  Why do you think
25 that's not privileged?

Page 51

1      MR. SCHWARTZ:  I don't know that doing
2  this on the record is necessarily the best use of our
3  collective time, but if there's a report from
4  Mr. Alcalde, even if he's serving at that time as
5  counsel to Skye Ventures, to Mr. Richards concerning
6  the deterioration of Mr. Alcalde's relationship with
7  another client, it's far from clear to me that that
8  consists of rendering legal advice or someone seeking
9  legal advice in a relationship as between
10 Crabbe-Brown and Skye Ventures.
11     MR. ELLIOTT:  What I'm not clear about is
12 whether that communication occurred between
13 Mr. Alcalde and Mr. Richards in their attorney/client
14 relationship, so I want to be careful there.  Maybe
15 you can get to it another way.
16     MR. SCHWARTZ:  Let me suggest this, I
17 understand why you're being cautious in this respect
18 but maybe you should take a break off the record and
19 have a conversation with Mr. Richards and then you'd
20 have a little more information as to whether to stand
21 on the objection or not.
22     MR. ELLIOTT:  I'm happy to do that, yeah,
23 that's fine.
24     MR. SCHWARTZ:  Why don't you do that and
25 then if you want to stand on the privilege, you'll so

Page 52

1  state, or if you think that maybe it's not
2  privileged, he'll have to answer.
3      VIDEOGRAPHER:  Off the record 10:07.
4  (Recess taken.)
5      VIDEOGRAPHER:  On the record 10:15.
6      MR. ELLIOTT:  I think that having learned
7  the content of the communication, that it is mixed.
8  I think that there is part of the communication that
9  sounds to me like it relates to Mr. Alcalde's
10 representation of Gruppo Triad and then further
11 communications about his relationship with Skye
12 Ventures.
13     So to the extent that the information
14 relates to Mr. Alcalde's relationship with Gruppo,
15 I'll allow him to answer the question.  But I've
16 instructed him not to divulge communications that
17 Alcalde had with Mr. Richards as to the relationship
18 with Skye Ventures.
19     MR. SCHWARTZ:  Okay, so we'll reserve our
20 rights on that.  I appreciate your conferring with
21 Mr. Richards off the record.
22     Q.    (By Mr. Schwartz) So, Mr. Richards, why
23 don't you answer that question for the time being to
24 the extent you can do so consistent with your
25 counsel's instruction.

13 (Pages 49 to 52)

David J. Richards - 30(b)6

Page 53

1    A.   Is it possible to read back the question
2  or reask it?
3    Q.   Why don't we read it back.
4         (Record read.)
5    A.   Okay.  So the answer to that question is
6  he in essence told me that they had gone over to
7  Chiasso and one of the reasons they had gone is to
8  pick up the notes 3 and 4 from Pavanelli and resolve
9  some of the final issues in the representation, and
10  the gist was that he wouldn't give them the notes, he
11  wouldn't hand over the notes, and that he was
12  impossible.
13    Q.   Is there anything else you can recount
14  about that conversation with Mr. Alcalde that will
15  not run afoul of the privilege instruction you've
16  received from your counsel?
17    A.   As to your question I had reasoned that
18  they weren't going to proceed in that way, no.
19    Q.   You mentioned a short while ago that you
20  received a legal memorandum from Crabbe, Brown &
21  James, correct?
22    A.   Yes.
23    Q.   That was sometime in 2004?
24    A.   Oh, yes.
25    Q.   Before you purchased notes 7 and 8 of 12?

Page 54

1    A.   Yes.
2    Q.   To the best of your knowledge did Crabbe,
3  Brown & James share that legal memorandum with
4  Pavanelli or Gruppo Triad?
5    A.   Not that I know of.
6    Q.   Did you ever authorize Crabbe, Brown &
7  James to share that memorandum with Pavanelli or
8  Gruppo Triad?
9    A.   I don't think so.
10    Q.   Did Alcalde or anybody else at Crabbe,
11  Brown & James ask you if Crabbe, Brown & James could
12  share that memorandum with Gruppo Triad or Pavanelli?
13    A.   You know, they may have prepared a
14  memorandum, a different memorandum for Pavanelli.
15         MR. ELLIOTT:  That's not the question.
16  He's asking you about the memo he prepared for Skye.
17    A.   Did my memorandum?  I don't know.  I
18  forget exactly when I got it, so.  I mean, it was in
19  various stages throughout 2004.
20    Q.   I'm not asking you when you got it, I'm
21  asking you after it was complete do you have any
22  information regarding whether that was shared by
23  Crabbe, Brown & James, or for that matter by you,
24  with Gruppo Triad or Pavanelli?
25    A.   No.

Page 55

1    Q.   Did you share that memorandum with
2  Usuelli?
3    A.   Again, I don't -- I have no -- like
4  Pavanelli, I just don't remember that I did or
5  didn't.
6    Q.   Did you share it with anybody?
7    A.   I don't remember that I did or didn't.
8    Q.   Did you share it with any of your
9  investors?
10    A.   Probably not.  They probably would have
11  generally gone with my judgment.
12    Q.   With reference to Exhibit 13, if you have
13  that one, the June 23rd document.
14    A.   Yep.
15    Q.   Did Skye Ventures actually purchase notes
16  3/12 and 4/12?
17    A.   Well, I can say that it appears that we
18  executed this document.  I would say that we never
19  actually completed the work here, so.  It appears
20  that we signed this document.
21    Q.   More specifically, it appears that on
22  Bates stamped page 5871, Pavanelli signed for Gruppo
23  Triad, right?
24    A.   Yep.  Yes, it does.
25    Q.   And on page 5872 you signed for Skye

Page 56

1  Ventures.
2    A.   Yes, that's my signature.
3    Q.   And on the nonrecourse promissory note
4  that's attached as part of Exhibit 13, that document
5  also bears both your signature and Pavanelli's on
6  page 5875, correct?
7    A.   Yep.
8    Q.   Was the Bandagro notes purchase agreement
9  that's been marked as Exhibit 13 ever rescinded or
10  revoked or terminated?
11    A.   I would call it as executory because I
12  think there still had to be representation agreement
13  between Gruppo and Brown and the notes had to come
14  over and so all that never happened, and I would say
15  this agreement was just abandoned.
16    Q.   Is there any transactional document that
17  Skye entered into with Gruppo Triad that abandoned
18  Exhibit 13?
19    A.   I don't know if the other, the 7 and 8
20  agreement does that or not or if there's a separate
21  document I don't know about.
22    Q.   So you don't know of any separate document
23  that affected such an abandonment?
24    A.   I don't.
25    Q.   When you say "the 7 and 8 agreement,"

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 57

1   you're referring to Exhibit 12?
2       A.   Yes.  So what I said was I don't know if
3   there's anything here that says this is the only
4   transaction, everything else is gone, or whether -- I
5   doubt, if we just abandoned the transaction I doubt
6   we would have done another formal abandonment, but
7   it's possible one was done.
8       Q.   But you're not aware of one.
9       A.   I've not seen it.  I don't remember it,
10  one being done.  I do remember that the transaction
11  was abandoned though.
12      Q.   Was there any form of written
13  communication between Skye on the one hand and Gruppo
14  Triad on the other that states that the transaction
15  that's embodied in Exhibit No. 13 was abandoned?
16          MR. ELLIOTT:  I'm going to object.  Hold
17  on.  I'm going to object to the extent that your
18  question calls for a legal conclusion.
19          Having said that, you can answer the
20  question.
21      A.   I'm sure there were emails between
22  Pavanelli and I saying let's do it this way, that way
23  didn't work kind of thing.  Let's start the process
24  to get to the agreement that's related to 7 and 8.
25      Q.   Where are those emails?

Page 58

1       A.   I think we discussed this topic yesterday
2   of whether I had any emails and I don't.
3       Q.   You don't.  In preparing for your
4   deposition have you seen any such email?
5       A.   There was a file of printed-out emails
6   between me and counsel, a few of them that I looked
7   at.  That's where I saw the Kennedy email.  But in
8   terms of, like I explained to you yesterday, I didn't
9   have my daily email records from back then.
10      Q.   So you're not aware of any specific email
11  as you sit here today and you couldn't produce a
12  specific email that discusses the abandonment of
13  Exhibit 13.
14          MR. ELLIOTT:  I'm going to object to that.
15  It's compound:  "Aware of" he has testified about and
16  he's told you what happened to his emails; "can't
17  produce" is a different question.  So if you could
18  break those up, it would be easier for the witness to
19  answer.
20      Q.   I'm going to accommodate that objection.
21      A.   Thanks.
22      Q.   Are you able today to produce an email
23  between Skye Ventures and Gruppo Triad that states in
24  words or substance that the parties were going to
25  abandon Exhibit 13?

Page 59

1       A.   I have no such email to produce.  Like I
2   have no other emails back then on any business.
3       Q.   Do you have any other such written
4   communication to produce?
5       A.   Like -- I don't have any emails like that,
6   no.  And I said there might have been emails.  I
7   don't think there -- what I said was I don't believe
8   there's a written document but there might be, I
9   don't have it.  And I don't have any emails from back
10  then from this business or any other.
11      Q.   Now, with regard to the reason why you
12  eventually went forward with 7/12 and 8/12 instead of
13  3/12 and 4/12, you testified that Antonio had found
14  out from Schianchi that there were deeds of trust
15  encumbering numbers 3 and 4, right?
16      A.   Yes.
17      Q.   Is it your understanding that these deeds
18  of trust that had been used prior to June of 2004
19  encumbered specific promissory notes?
20      A.   My sense is yes, that's what I recall.
21  And that there were others that didn't, there were
22  other notes that weren't covered by deeds of trust.
23  So I think that was a distinction.
24      Q.   Correct me if I'm wrong about this:
25  Didn't you testify yesterday that the deeds of trust

Page 60

1   that you began getting in 2003 and continuing into
2   2004 encumbered all of the notes that Gruppo Triad --
3       A.   I said that was my best memory, that I
4   believe my deeds of trust encumbered all of the
5   notes.
6       Q.   So if I understand what you're saying, you
7   had deeds of trust that encumbered all the notes but
8   there were other deeds of trust that only encumbered
9   some of the notes.
10      A.   That's, well, so I think you've kind of
11  summarized what I said.  So what I said is I believe
12  my deeds of trust were general on all the notes.  But
13  that there were notes that had no deeds of trust
14  other than mine.
15      Q.   And there were notes that had deeds of
16  trust that covered them but not others.
17      A.   Yes.
18      Q.   And you formed that understanding based on
19  what information?
20          MR. ELLIOTT:  Objection, asked and
21  answered.
22      A.   I think we've gone over this.  So I
23  asked -- we somehow came about, whether I asked
24  Antonio or he brought it up, we asked Schianchi,
25  Schianchi told us this information and blah, blah,

15 (Pages 57 to 60)

Page 61

1    blah. I mean, we've answered that.
2        Q.   Who drafted Exhibit 13?
3        A.   Regrettably, I did.
4        Q.   Did anybody help you?
5        A.   Wait, let me see what 13 is. Oh, I was
6    thinking 13 was 12.
7            But, yeah, I think this answer is the
8    same; I believe I drafted this.
9        Q.   Why do you say "regrettably"?
10       A.   Well, I don't think any of the -- I mean,
11   I don't think anybody would say I'm really a great
12   legal contractor so I wouldn't say I'm very good at
13   it myself.
14       Q.   Did you also draft Exhibit 12?
15       A.   Yes.
16       Q.   Was there ever a point with regard to the
17   ensuing agreements between Skye and Gruppo Triad
18   where somebody else began to draft them?
19       A.   Well, I pay so many lawyers, I'm just
20   trying to think at any time one of them might have
21   reviewed these documents.
22           MR. ELLIOTT: I don't think that's the
23   question. I think he asked if somebody else started
24   to prepare them.
25       A.   Prepare them, no. I think I prepared them

Page 62

1    all. Sorry.
2            THE WITNESS: Thank you, Rex.
3        Q.   Did you retain drafts of any of these
4    agreements that were entered into between Skye and
5    Gruppo Triad?
6        A.   No, I don't think so.
7        Q.   Were the terms of -- let me rephrase that.
8            Was the language of Exhibit 13 negotiated
9    with Pavanelli?
10       A.   I don't know what that means.
11       Q.   You've done a lot of deals in your
12   professional career, right?
13       A.   Of 13 or 12 did you say, I'm sorry?
14       Q.   Well, I asked about 13.
15       A.   Okay. All right, so again, what do you
16   mean "negotiated"?
17       Q.   Well, as I was going to say, you've done a
18   lot of deals in your life, right?
19       A.   I have.
20       Q.   And there must have been some where the
21   actual transactional documents were negotiated,
22   right?
23       A.   Well, they're all negotiated to a certain
24   point. In each transaction one party might have a
25   stronger position in negotiation.

Page 63

1        Q.   I'm not trying to make this a trick
2    question of any kind.
3        A.   Okay.
4        Q.   But in doing deals parties exchange drafts
5    of agreements and the language changes, right?
6        A.   Yeah, it can. Could. Or sometimes not,
7    sometimes it's sort of a take-it-or-leave-it sort of
8    deal.
9        Q.   That's what I'm trying to find out. Let's
10   start with Exhibit 13. Was this an instance in which
11   the parties actually negotiated the language of the
12   agreement?
13       A.   I don't remember.
14       Q.   Let me ask you the same question with
15   regard to Exhibit 12. Was this one of these
16   instances where the parties actually negotiated the
17   language of the agreement?
18       A.   In terms of the legal language, I'm not so
19   sure. I know that the waterfall was the subject of
20   negotiation, the construct of the agreement was a
21   subject of discussion early on, but as to whether we
22   traded actual drafts of the we're picking over words,
23   you know, no, I don't think so.
24           We had, each had lawyers, I'm sure there
25   would have been a lot of picking back and forth, but

Page 64

1    we were just trying to get the essence of the
2    transaction and get it done.
3        Q.   Let's just stick with 13 for a moment, the
4    June 23rd agreement. To the best of your
5    recollection was this a situation in which you sent
6    the draft of the agreement to Pavanelli and he sent
7    it back with changes to the words and then you sent
8    it back to him and vise-versa?
9        A.   I don't remember.
10       Q.   Okay. And how about with regard to 12, do
11   you know whether that occurred in that context?
12       A.   What I just said happened but as to
13   whether actual drafts and redlines were exchanged
14   back and forth, I don't know, I don't remember.
15       Q.   Now, as of June 23, 2004, you didn't know
16   that eventually you were going to purchase 7/12 and
17   8/12, right?
18       A.   As terms of the specific numbers, correct.
19       Q.   In light of that, do you have a
20   recollection of whether you specifically reviewed
21   even copies of notes 7/12 and 8/12 before you
22   eventually agreed to purchase those?
23       A.   I don't have a specific recollection.
24       Q.   What is your recollection of the extent to
25   which prior to purchasing notes 7/12 and 8/12 you

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 65

1  reviewed any of the purported Bandagro promissory
2  notes?
3       MR. ELLIOTT: I think you asked that
4  question.
5       MR. SCHWARTZ: I'm doing it from a
6  different direction. We began to touch on it but
7  we're going to get into a little more detail now. So
8  let me rephrase so we don't have colloquy in between
9  the question.
10      Q.    Recognizing that at least as of June 23,
11  2004, you didn't know which notes you were going to
12  eventually purchase, what's your best recollection of
13  the extent to which you reviewed any of the notes
14  before agreeing to purchase 7/12 and 8/12?
15      A.    I would say that I'm sure we looked at the
16  notes before then but I don't have a specific
17  recollection.
18      Q.    When you say "we", who do you mean?
19      A.    Both myself and the attorneys.
20      Q.    Which attorneys?
21      A.    Crabbe-Brown.
22      Q.    When did you personally -- set aside
23  Crabbe-Brown now. When did you personally review the
24  notes prior to agreeing to purchase them?
25      A.    Again, as I just said, I don't have a

Page 66

1  specific recollection. So it would be hard to give
2  you a date.
3       Q.    What's your best recollection?
4       MR. ELLIOTT: He doesn't have one.
5       Q.    No recollection?
6       A.    Could have been once, twice --
7       MR. ELLIOTT: We don't want you to
8  speculate.
9       Q.    Are you sure you did it?
10      A.    Pretty sure.
11      Q.    And what's your understanding of when
12  Crabbe-Brown reviewed the notes?
13      A.    I'm sure they reviewed them more than
14  once. I wasn't looking over their shoulder anytime
15  that I remember, so. I know that Alcalde looked at
16  them carefully when we got them, for sure, I remember
17  that.
18      Q.    Yeah, I just want to be clear, I'm talking
19  about before you agreed to purchase them.
20      A.    Okay. So could have been -- those things
21  are so close in time, you know, could be --
22      Q.    Let's make sure, because this may be a
23  little too choppy.
24      So I know that your interrogatory answer
25  says that you received 7/12 and 8/12 on August 18,

Page 67

1  2004, right?
2       A.    Yes.
3       Q.    And you've also testified that you agreed
4  to purchase those two instruments sometime at the end
5  of July or early August 2004, right?
6       A.    Yes.
7       Q.    What I'm trying to find out is what
8  efforts anybody made on your behalf, you've already
9  testified as to yourself, now we're talking about
10  Alcalde. What efforts were made to review any of the
11  Bandagro notes prior to the time you purchased them?
12  So is that clear enough?
13      A.    Yeah. So, again, what I answered was I
14  don't recall any specific times.
15      Q.    As to yourself. Now I'm asking about
16  Alcalde.
17      A.    And again, like I said, I was not over
18  their shoulder anytime they reviewed them so I don't
19  recall any specific occasion other than the one that
20  when they got the notes, they were looking at the
21  originals.
22      Q.    Are you sure that Alcalde or anybody else
23  at Crabbe-Brown reviewed any of the Bandagro notes
24  prior to the time they arrived on August 18th?
25      MR. ELLIOTT: And your talking about

Page 68

1  copies, originals? Any version of the notes that
2  they purchased, right?
3       Q.    Even more broadly. Any version of any of
4  the notes that Bandagro is alleged to have issued.
5       A.    Yes, I'm sure.
6       Q.    And what's your best recollection of when
7  Crabbe-Brown did that?
8       A.    I don't have a recollection as to a
9  specific time.
10      Q.    Did you think it was important to review
11  the notes themselves before you agreed to purchase
12  them?
13      A.    So we're going to get into another
14  colloquy about importance if you're asking me,
15  because it's not a black-and-white question. All
16  things have a sliding scale of importance. And so we
17  did everything we could do in looking, I'm sure
18  looking at the notes was one of them.
19      Was it -- most of our diligence was
20  focused -- from my point of view the most important
21  focus was the Attorney General decision rendered,
22  was it final and binding, could it be changed, what
23  was the law of Venezuela.
24      On a lesser scale of importance to me,
25  maybe more so to Alcalde, was to read -- do the other

17 (Pages 65 to 68)

Page 69

1  things. I'm not saying it wasn't important to me, we
2  spent a lot of time, money, and effort getting all
3  this other stuff. But to me was it important? Well,
4  even the slightest thing is of interest. So I don't
5  know how to answer your question was it important.
6  That's how I would answer it.
7      Q.   That certainly was of interest to you to
8  review the notes.
9      A.   Yeah, we wanted to look at them.
10         VIDEOGRAPHER: Excuse me, Mr. Richards,
11  your mic is falling off.
12         THE WITNESS: I'm sorry.
13      Q.   Once you determined sometime after
14  June 23rd of 2004 that you were going to purchase
15  7/12 and 8/12 and not 3/12 and 4/12 or any other
16  note, was it of interest to you at that time to
17  examine the particular instruments that you were
18  going to be purchasing?
19      A.   I don't recall that. Maybe I'm wrong
20  about this, but I assumed that the notes were all
21  essentially the same. So I could be wrong about
22  that, but my recollection today is that was the case.
23      Q.   When you examined them, 7/12 and 8/12,
24  before agreeing to purchase them -- let me rephrase
25  that question.

Page 70

1         When you examined any of the notes prior
2  to agreeing to purchase 7/12 and 8/12, did you notice
3  anything unusual about them?
4      A.   I can't say that I did, looking at it,
5  thinking about it today.
6      Q.   Did you notice anything on the face of the
7  notes that raised any question in your mind as to
8  their authenticity?
9      A.   No.
10      Q.   After reviewing the notes did you have any
11  questions for anybody about them?
12      A.   Again, I don't remember when I reviewed
13  them, so.
14      Q.   How many of them did you review before you
15  agreed to purchase 7/12 and 8/12?
16      A.   I don't know.
17      Q.   After the notes were received on
18  August 18, 2004, did you review them then?
19      A.   I looked at them, for sure. Reviewed,
20  looked at them, for sure.
21      Q.   How long after their arrival?
22      A.   I was there when they arrived.
23      Q.   What do you mean by "then"?
24      A.   When the Brinks guy, or maybe it wasn't
25  Brinks, I think it was a different security firm,

Page 71

1  MAT, MAT International I think it was or something
2  like that. When they delivered the notes, the guy
3  had picked them up at Schianchi's office and they
4  were in his possession till he delivered them to
5  Alcalde.
6         So they kept us advised of his progress
7  coming across and so we knew about when the guy was
8  going to arrive at Crabbe-Brown and I knew about that
9  so I was there when they arrived with the security
10  carrier.
11      Q.   How did they keep you apprised of the
12  progress?
13      A.   They had some of -- today it's easy,
14  right? We have Internet and you can see where your
15  FedEx, what truck it's in. Back then it was
16  different and I don't remember exactly how they did
17  that but I think he was -- he may have had a phone
18  that he called Alcalde when he arrived in America,
19  when he picked up there was some method of
20  communication that he reported to Alcalde at each
21  respective step and I forget exactly what that was.
22      Q.   And then the person who had the notes was
23  from Matt, M-a-t-t?
24      A.   One of these international couriers,
25  security couriers. I was thinking it was Brinks but

Page 72

1  I think it was something called MAT. Might have been
2  Brinks.
3      Q.   And whether it was Brinks or MAT, the
4  delivery person brought the notes to Crabbe-Brown and
5  were you waiting for this individual to arrive?
6      A.   Yes. He had a like handcuff or secure
7  bracelet thing that had a chain to his arm and the
8  chain went to the bag and the bag had a seal on it.
9  So it was kind of a formal production where he was
10  saying -- so I remember that day.
11      Q.   And then when the handcuffs were taken off
12  and the seal was broken, the notes were unfurled and
13  you reviewed them right then and there?
14      A.   Might have been that Alcalde had a key as
15  well as the guy had a key and it might have taken two
16  keys to open the thing. But I remember it was kind
17  of a serious effort.
18         So, I'm sorry, the question was?
19      Q.   Once the serious effort was undertaken to
20  unlock the security system and unfurl the notes, did
21  you actually review them right then and there with
22  Alcalde?
23      A.   I looked at them.
24      Q.   How much time did you spend?
25      A.   Well, Alcalde -- I was there for a short

18 (Pages 69 to 72)

David J. Richards - 30(b)6

---

Page 73

1 period of time I think and I left them with Alcalde
2 and he looked at them.
3     Q.   Had you ever received a delivery in this
4 manner before?
5     A.   Never before or since.
6     Q.   Have you looked at the notes again since
7 that day, August 18, 2004?
8     A.   I think -- the actual notes -- the
9 original copies I have, they went into a safe and I
10 haven't seen them since.
11     Q.   When you examined them on August 18, 2004,
12 did you notice anything about them that raised any
13 question about whether they were authentic?
14     A.   So again, I said "looked," you said
15 "examined," that might mean something a little
16 different to most people.  So I looked at them and I
17 didn't notice anything.
18     Q.   Did you read the text of them?
19     A.   I probably didn't.
20     Q.   When you had reviewed them previously or
21 reviewed others previously, did you read the text of
22 them then?
23     A.   I think I already answered that I don't
24 recall that.
25     Q.   When you eventually agreed to purchase

---

Page 74

1 notes 7/12 and 8/12, what was the purchase price?
2     A.   Well, the purchase price consisted of
3 varying forms of consideration and I think that we --
4 I think that we outline it in the agreement, if I
5 recall correctly.
6     Q.   You're talking about Exhibit 12?
7     A.   Yeah, we agreed to pay -- excuse me, yes,
8 Exhibit 12.
9     So we -- the consideration we gave for the
10 notes was as follows:  $250,000 in cash, we agreed --
11 excuse me.
12     We had agreed to give them some additional
13 funding of $200,000, we were going to incur the --
14 cover the legal fees and expenses in the case, so we
15 agreed to undertake to prosecute a lawsuit and follow
16 that through.
17     We had agreed to incur a bunch of the
18 obligation to manage that for however long it took
19 and we agreed to sort of put a team together to
20 execute on that legal -- Sitrick was part of that
21 team.
22     And I say that I'll use my efforts to
23 manage and oversee the lawsuit and to do various
24 things that are necessary to support the lawsuit.
25 And that I'll manage the lawsuit and all matters in

---

Page 75

1 the lawsuit will be decided and controlled by me.  So
2 that was part of it.  So I was in charge of the
3 lawsuit, however long it took.
4     That I also agreed to undertake to
5 interview and engage other professionals, like
6 investment bankers.  In other words, to work on the
7 thing.  And then I also agreed to make future
8 payments as agreed to by the parties.
9     And it was implied that if there was good
10 reason for him to have money beyond the 450, that we
11 would provide that to him.
12     Q.   So what was the purchase price?
13     MR. ELLIOTT:  He just answered that
14 question.
15     A.   Some of the noncash -- some of the noncash
16 consideration you'd have to value for yourself.  I'd
17 say I value -- my time is valuable and all the other
18 stuff.  So put it into legal fees, who knows what
19 that would have been.
20     Q.   Let me ask the question in a slightly
21 different way.  Let me ask a slightly different
22 question.
23     A.   Okay.
24     Q.   When you agreed to purchase notes 7/12 and
25 8/12 at the end of July or early August of 2004, did

---

Page 76

1 you perform some kind of analysis as to what the risk
2 was and what the reward was of this -- potential
3 reward was of this transaction?
4     A.   Well, you do that, I mean, that's kind of
5 in my DNA thinking, sure.
6     Q.   So when your DNA was thinking at that
7 time --
8     A.   I don't think my DNA had thoughts.  It's
9 part of your decision, the risk versus the reward.
10     Q.   I get that.
11     A.   Yeah.
12     Q.   That's how you think, right?
13     A.   Yeah.
14     Q.   So when you make that kind of assessment,
15 do you typically try to quantify the risk and the
16 potential reward?
17     A.   As best you can at the time.
18     Q.   So when you entered into this transaction,
19 how did you quantify the risk and how did you
20 quantify the reward?
21     A.   Well, you have to understand at this time
22 we had no idea what Venezuela was going to do when we
23 filed the lawsuit.  So to that point they had ignored
24 at least two things that was sent to them; Kennedy's
25 email, and the demand letter that was sent in June.

---

19 (Pages 73 to 76)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 77

1  So we had no idea what was going to happen.
2      So lack of knowledge is a risk, so there
3  was risk there. Obviously there's risk that if you
4  had to go ahead and file a lawsuit, that you would
5  lose the lawsuit. So the risk, the downside risk is
6  zero, so it's a loss of all of your money.
7      Additionally, risk is time and effort. So
8  there was a potential, as we are demonstrating here
9  today, that 12 or 13 years or 15 years later you
10  would still be putting a tremendous amount of time
11  and effort into the thing. So there's the specter of
12  10 or 12 or 15 years of effort. So those are all
13  risks. And there were other risks as well.
14      But basically what the risk is, loss of
15  not only anything you spend but risk is also time,
16  money, and effort. There's limited bandwidth as to
17  what we can do and so if we're devoting a lot of time
18  to this, something else we can't devote time to.
19      So all of that were risks of the deal.
20  Then you had the risk of all of these other liens on
21  the notes. You had the risk of the Woodstrite lien,
22  you had the risk of the Jacir lien, and then there's
23  always the risk of the unknown. You didn't know
24  there were other liens for sure.
25      It's not like a secured transaction in the

Page 78

1  United States where you can go to the local Secretary
2  of State's Office and you can find UCC's filings if
3  you're not -- you're 98 percent sure you're clear.
4      So there's always the risk of the unknown
5  and certainly in a transaction like this involving
6  bearer instruments there's risks. So all of that is
7  on the risk side. The risks were high and very high.
8      And on the reward side we were going to
9  get a return on our funding. As of the time we filed
10  the lawsuit, I believe our -- the waterfall would
11  have put us at, after the attorneys were paid, the
12  next $10 million.
13      So the potential at that point was that we
14  would have put all of the cash, all the 15 years of
15  effort, all the risk for just the $10 million return.
16      So we were looking at that and actually,
17  you know, it's not a great deal. I've got a lot
18  better deals in my life than that. So one of the
19  things we thought we could do was we could improve
20  the deal as time went on as Gruppo needed more
21  funding.
22      So the deal as structured when we -- it
23  was certain when we filed the litigation is we would
24  receive something short of $10 million that in return
25  for not only the cash and my time but the commitment

Page 79

1  to put all the effort into the lawsuit. That's how I
2  looked at it.
3      Q.    I'm just trying to understand one thing
4  you said. Take a look at the waterfall that's
5  contained within Exhibit 12. It's on page 000899.
6  You have that page in front of you?
7      A.    I'm sorry, what's the number? Oh, it's in
8  the promissory.
9      Q.    Yeah, it's on 00899 within the promissory
10  note portion of Exhibit 12.
11      A.    Yeah.
12      Q.    So this is the waterfall that existed at
13  the time that you agreed to purchase 7/12 and 8/12 in
14  late July or early August, right?
15      A.    Well, I think we went over this very
16  carefully yesterday so maybe I wasn't clear. This is
17  the waterfall I said -- testified yesterday
18  specifically that it was the waterfall in December or
19  January of -- December of 2004 and January of 2005.
20  And we went through all of the reasons why that was
21  the case.
22      Q.    All right. Thank you.
23      A.    And I think I said --
24      Q.    Thank you for that clarification. I
25  understand now what you're saying and I appreciate

Page 80

1  that, so you don't have to continue explaining it to
2  me, I have it. So let's look at that other document,
3  No. 13.
4      And let's look at the waterfall that's
5  contained within Exhibit 13, that's on page 005874.
6      A.    Yes.
7      Q.    Okay. And if you look at that waterfall,
8  is that the one that was in effect when you agreed to
9  purchase 7/12 and 8/12 in late July or early August
10  of 2014 [verbatim]?
11      A.    I believe so, yes.
12      Q.    Let me ask you to look at another
13  document. We'll mark this as Exhibit 15.
14      (RICHARDS/SKYE EXHIBIT 15 WAS MARKED.)
15      Q.    Mr. Richards, I'm showing you what's been
16  marked as Exhibit 15. This is a letter from Crabbe,
17  Brown & James to the Honorable Tobias Nobrega Suarez,
18  the Minister of Finance of Venezuela, dated June 24,
19  2004. It's apparently signed by Mr. Alcalde. Please
20  take a moment and look at this and let me know if
21  recognize it.
22      A.    This appears to be the demand letter that
23  was sent by Crabbe-Brown to Nobrega that we referred
24  to earlier.
25      Q.    Did you receive a copy of Exhibit 15 on or

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 81

1   about June 24, 2004?
2       A.   I know the demand was made but I don't
3   recall receiving this.
4       Q.   Have you ever seen this before?
5       A.   I think I saw it in -- might have seen it
6   in preparation for deposition but I may not have.
7       Q.   But you knew back in June of 2004 that
8   Alcalde had sent this letter, right?
9       A.   I knew he had sent a demand to the
10  Ministry of Finance, yes.
11      Q.   And Exhibit 15 has a date on it that's
12  just one day after Exhibit 13, right?
13      A.   Yep.
14      Q.   And Exhibit 13 is the document that has
15  Skye Ventures purchasing notes 3/12 and 4/12, right?
16      A.   Yes.
17      Q.   Now, if you look at the second paragraph
18  of Exhibit 15, you'll see that Mr. Alcalde wrote
19  "Skye Ventures, having obtained two notes from Gruppo
20  Triad FCC SPA, is the lawful bearer of the securities
21  hereinafter described," and then he hereinafter
22  describes them in the next page note 3/12 and 4/12,
23  right?
24      A.   Yes.
25      Q.   So as of June 24, 2004, Skye Ventures had

Page 82

1   not obtained two notes from Gruppo Triad, correct?
2       A.   Correct, we had no possession of notes at
3   that time.
4       Q.   So this letter that Alcalde sent was
5   false, right?
6       MR. ELLIOTT:  No, that's not true.
7       MR. SCHWARTZ:  Wait a minute, you can't
8   answer.
9       MR. ELLIOTT:  No, what I can do though is
10  tell you that this is a letter that he's testified to
11  you that he didn't prepare, obviously, and that he
12  may have seen for the first time in preparing for his
13  deposition.  And now you are asking him to interpret
14  Mr. Alcalde's words and I think that's improper.
15      MR. SCHWARTZ:  Well, you can object.
16      MR. ELLIOTT:  I did.  You quarreled with
17  my objection so I explained it to you.
18      Q.   This letter's false, correct?
19      MR. ELLIOTT:  Objection.
20      A.   Well, so what I would say is if "bearer"
21  means that you're actually holding the notes, I could
22  see that I had obtained or had rights to two notes,
23  that could be correct, but I was certainly not the
24  bearer of two notes at that time.
25      Q.   So to the extent Alcalde was telling the

Page 83

1   Venezuelan Ministry of Finance that Skye Ventures is
2   the lawful bearer of notes 3/12 and 4/12, that was
3   false.
4       MR. ELLIOTT:  Objection.
5       A.   Well, again, you have Exhibit 13 here that
6   said I'm -- that Skye was the owner, had signed it
7   right before they sent this.  So you may be arguing
8   over legal differences as to who's the owner or who's
9   the bearer, but if you're asking me does this letter
10  say that I had the notes in my hand, I didn't.  If
11  that's the way you're interpreting it.
12      Q.   I don't think it's a matter of
13  interpretation, it says you are the bearer, correct?
14      A.   Yes.
15      Q.   You were not the bearer, correct?
16      A.   Again, if I'm the bearer of the notes, so
17  here's -- this is something I'm just doing off the
18  seat of my pants here, so I would tell you today I'm
19  the bearer of the notes.
20      Q.   Which ones?
21      A.   7 and 8.  But on the other hand, I don't
22  have them in my hands, an escrow agent holds them for
23  me.  So --
24      Q.   That escrow agent is somebody who is
25  operating under an agreement, correct?

Page 84

1       A.   Yes.
2       Q.   All right.
3       A.   And so I don't know, there may have been
4   an escrow agreement in place at the time, there may
5   be.  You'd have to ask Crabbe-Brown for that.
6       Q.   Let me ask you this, where were notes 3/12
7   and 4/12 on June 24, 2004?
8       A.   I'm assuming that they were in the
9   possession of Siro Schianchi.
10      Q.   Were they in Ohio?
11      A.   No.
12      Q.   I'm going to show you another document
13  we'll mark as Exhibit 16.
14      (RICHARDS/SKYE EXHIBIT 16 WAS MARKED.)
15      Q.   Mr. Richards, please take a look at
16  Exhibit 16 and let me know if you recognize this
17  document.
18      A.   It's a letter from Crabbe-Brown to
19  Ministry of Finance, dated August 11, 2004.
20      Q.   Have you ever seen this one before?
21      A.   Probably have.
22      Q.   Did you get a copy of this from
23  Crabbe-Brown in August of 2004?
24      A.   I may have, for sure.
25      Q.   You have a recollection one way or

21  (Pages 81 to 84)

Page 85

1 another?
2 A. No.
3 Q. Did you know that Mr. Alcalde was going to
4 be sending a letter in August of 2004 to the Ministry
5 of Finance amending Exhibit 15 so that the letter
6 would now apply to notes 7/12 and 8/12 instead of
7 3/12 and 4/12?
8 A. Yes.
9 Q. And we've seen that Exhibit 15 was sent
10 one day after Exhibit 13, right?
11 A. Yes.
12 Q. Bearing that in mind, and with reference
13 to the August 11, 2004, date of Exhibit 16, does that
14 give you any insight into when in late July or
15 August -- or early August of 2004 you agreed to
16 purchase notes 7/12 and 8/12?
17 A. Well, it makes me think that the execution
18 was probably close to the time of this letter, either
19 right before or right after. So it was probably
20 closer to this early August or this timeframe.
21 MR. SCHWARTZ: Let's take a break.
22 VIDEOGRAPHER: Off the record 11:03.
23 (Recess taken.)
24 VIDEOGRAPHER: On the record 11:17.
25 Q. Mr. Richards, when you eventually arrived

Page 86

1 at the waterfall that's contained within Exhibit 12,
2 the agreement dated April 8th --
3 A. Yes.
4 Q. -- why did you incorporate that as part of
5 the agreement that was dated roughly eight months
6 earlier?
7 A. Well, I just don't think we changed the
8 date. I think we went through this yesterday, that
9 my sense is that we just changed the page or that had
10 the waterfall in there.
11 Q. Why did you do it that way?
12 A. Easier rather than redoing a whole
13 agreement.
14 Q. Why didn't you take Exhibit 13 and just
15 include the updated waterfall in that document and
16 change 3/12 and 4/12 to 7/12 and 8/12?
17 A. Well, I don't know. But I was comfortable
18 with the agreement that I'd originally had. Or
19 proposed.
20 Q. Why didn't you add a specific reference to
21 7/12 and 8/12 in Exhibit 12?
22 A. Exhibit 12 is the -- I don't know why I
23 didn't. We already had it, so I think that kind of
24 was -- those are irrelevant.
25 Q. Take a look at Exhibit 13 on the first

Page 87

1 page.
2 A. Exhibit 13.
3 Q. Yes.
4 A. Here we go.
5 Q. I'd like you to look at the second-to-last
6 whereas clause on that page. Says "Whereas,
7 beginning in August of 2003, Skye has previously
8 purchased $5,910,000 in notes and Skye purchase an
9 additional $100 million face value of the Notes."
10 You see that?
11 A. Yep.
12 Q. What's the $5,910,000 correspond to?
13 A. I assume in relation to the deeds of
14 trust.
15 Q. And then there's a line that says "...and
16 Skye purchase additional $100 million face value of
17 the Notes." What does that mean?
18 A. Well, first it means I'm a lousy draftsman
19 with contracts because it doesn't seem to make any
20 sense. But I think the idea was to purchase an
21 additional hundred million.
22 Q. Right then and there on June 23, 2004?
23 A. Yeah. I think that's what it means. But
24 I guess it doesn't -- maybe it should say "Skye will
25 purchase it," now as I -- I shouldn't probably say

Page 88

1 look at one small part of an agreement and make a
2 statement, because as I flip the page I see it says
3 "Skye will purchase." So that's obviously not what
4 it meant. So sorry about that.
5 So my answer to your first question that
6 what does the 5 million signify stands; as to what
7 that second little clause said, I don't know. Poor
8 draftsmanship.
9 Q. Was the idea when you executed Exhibit 13
10 that the $5,910,000 in deeds of trust were going to
11 be retired?
12 A. I don't remember this part of it. That
13 was certainly the idea when we -- Skye ultimately
14 completed the purchase in August. Or late July or
15 early August.
16 Q. We've now seen most likely on or around
17 August 10th.
18 A. I would say before August 11. I don't
19 know if it was August 10.
20 Q. Close to August 11.
21 A. Maybe.
22 Q. Isn't that what you testified to before we
23 took the break?
24 A. I think I said it refreshes my
25 recollection that it might have been closer to that.

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

Page 89

1  It doesn't mean that it actually was. If it makes a
2  difference, I'll think harder.
3        Q.    Well, think harder. It makes a
4  difference.
5        MR. ELLIOTT: The question is what: When
6  did he complete the purchase of 7/12 and 8/12; is
7  that what you're asking?
8        MR. SCHWARTZ: Yes, we had looked at the
9  demand letter from Mr. Alcalde.
10       MR. ELLIOTT: Right.
11       Q.    Let's just get the exhibit number. I want
12 to say 16. That was dated August 11, 2014
13 [verbatim], and I don't want to put words in your
14 mouth but I thought you had said in light of the
15 August 11, 2014, date on Exhibit 16, you thought that
16 gave you a reasonably good indication that you
17 completed the purchase of the agreement to purchase 7
18 of 12 and 8 of 12 around that date.
19       MR. ELLIOTT: That's not what he said.
20       MR. SCHWARTZ: Let's ask him about that.
21       A.    I think what I said or what I should have
22 said, what I meant to say is it makes it seem like it
23 was closer toward August 11th than it would be
24 toward July. It made it seem like early August was a
25 more likely time of having -- that's what I meant. I

Page 90

1  didn't mean it was like August 10th, I remember it
2  was August 10th, that's not what I meant to say.
3        Q.    All right, now, let's just use early
4  August 2014 so we don't have to spend a lot of time
5  on the transcript.
6        A.    Let's use early August but with, you know,
7  my uncertainty that's already on the record noted.
8        Q.    I'll tell you what, I'll waste pages and
9  use the late July/early August just so we don't have
10 to have disagreement about this right now.
11       So when in late July or early August of
12 2014 --
13       A.    You can say "early August" if it's easier.
14 I'm okay with that.
15       MR. ELLIOTT: Let's use the way he's
16 asking the questions so we can get somewhere here.
17       A.    Okay. Sorry.
18       Q.    When you entered into the agreement to
19 purchase 7/12 and 8/12 either late July or early
20 August that's Marked as Exhibit 12, recognizing that
21 the waterfall was later added in December or amended
22 in December --
23       A.    Was later amended at least once, maybe
24 more than once.
25       Q.    -- did you include any provision that

Page 91

1  retired the $5,910,000 in deeds of trust?
2        A.    To the, you know, the agreement is the
3  agreement. If it's in there, it's in there. But
4  that was the understanding, for sure.
5        Q.    To this day do you know if any steps have
6  been taken to release the liens in the deeds of trust
7  that you obtained?
8        A.    Well, the actions of the parties behaved
9  like that's how we behaved. I'm sure there were
10 emails to that effect. That was the basis for the
11 waterfall in the agreement, the existing deeds of
12 trust, so.
13       As to whether there was a specific
14 agreement that said I hereby abandon the deeds of
15 trust, I don't know. I don't think there was one but
16 I wouldn't see any reason to do that myself.
17       Q.    Well, those deeds of trust applied not
18 just to 7/12 and 8/12 but to all the other Bandagro
19 notes that are the billion of face value that
20 Pavanelli Gruppo Triad owned, right?
21       A.    So I'm assuming that they were comfortable
22 it was abandoned too.
23       Q.    Let's mark Exhibit 17.
24       (RICHARDS/SKYE EXHIBIT 17 WAS MARKED.)
25       Q.    Mr. Richards, I'm going to show you

Page 92

1  Exhibit 17. It's a letter from Mr. Jacir to you and
2  Mr. Alcalde from May 23rd of 2004. It's in
3  Spanish. Let me know if you recognize this document.
4        A.    Not particularly. In the mass of the
5  thousands of pages of Spanish documents, I don't
6  remember this standing out, but. I don't recall. I
7  certainly wouldn't have read it specifically.
8        Q.    Do you have any recollection of receiving
9  a letter from Mr. Jacir addressed to you in Spanish
10 around this timeframe?
11       A.    I know we received, you know,
12 communications from Jacir throughout this timeframe
13 for sure. Whether this particular -- if you told
14 me -- what would have happened is that Alcalde might
15 have told me the subject of the inquiry and if I knew
16 what that was, then I could tell you whether I recall
17 or not.
18       Q.    Do you recall getting a letter from Jacir
19 in this timeframe, the end of May 2004, in which he
20 discussed the action that Woodstrite had brought in
21 the Venezuelan Supreme Court at the end of 2003?
22       A.    No. If that's what's in here, I don't
23 recall being aware. That's not, of course, to say
24 that the letter wasn't transmitted to Alcalde and
25 that Alcalde didn't read it.

23  (Pages 89 to 92)

David J. Richards - 30(b)6

Page 93

1     **Q.**   In a situation like this if Jacir had
2  written a letter to you and Alcalde in Spanish, do
3  you think you would have consulted with Alcalde as to
4  what it said?
5     **A.**   If I knew about it, I might have asked
6  well, what's he talking about.
7     **Q.**   Do you recall having had an interaction
8  like that with Alcalde in which you asked what Jacir
9  was talking about in some written communication?
10     **A.**   I do. I mean, there were emails, there
11  were a couple of emails that Jacir sent to Alcalde,
12  and maybe more than a couple, that I was copied on.
13  I remember that for sure and asking Alcalde what's he
14  saying.
15     **Q.**   And with respect to any such communication
16  was there a situation where Alcalde told you what
17  Jacir is saying concerns the Woodstrite litigation?
18     **A.**   No, not that I remember.
19     **Q.**   In the course of preparing to testify as
20  the Rule 30(b)(6) designee of Skye Ventures in this
21  deposition, did you speak to Mr. Alcalde?
22     **A.**   I did.
23     **Q.**   When?
24     **A.**   It was recently, within the last week,
25  maybe Saturday or Friday.

Page 94

1     **Q.**   How long did you talk to him?
2     **A.**   I think a couple hours. Between one and
3  two hours.
4     **Q.**   Other than counsel at Cooper & Elliott did
5  you talk to anybody else to prepare to testify under
6  Rule 30(b)(6)?
7     **A.**   I talked to Rick Gerace.
8     **Q.**   Anybody else?
9     **A.**   I heard a snippet of a conversation
10  between my attorneys and somebody else but it wasn't
11  me doing it.
12     **Q.**   Who were they talking to?
13     **A.**   Laura Pavanelli.
14     **Q.**   When did this take place?
15     **A.**   Again, Friday or Saturday.
16     **Q.**   Did you talk to anybody else or hear
17  anyone talking to anyone else in the course of
18  preparing to testify under your Rule 30(b)(6)?
19     **A.**   Help me, I'm getting a little worn here.
20  Let me think about that for a second. Trying to
21  think back what I've done over the course of the last
22  week or two.
23     Alcalde, listened to a little bit of Laura
24  Pavanelli talk, Gerace. I think that's all I can
25  remember at this time.

Page 95

1     **Q.**   What did you hear Laura Pavanelli saying?
2     **A.**   Just some general stuff, that she didn't
3  know much or her dad didn't tell her much about
4  things. That kind of thing. I listened to enough to
5  know that, you know, there wasn't much there to be
6  learned by sitting around and talking to her.
7     **Q.**   Which one of your lawyers was talking to
8  her?
9     **A.**   I think Adam was talking to her and Ben or
10  Chip might have been there. I think Chip was there
11  and Ben was there. Although Ben's not my lawyer I
12  guess.
13     And I'm not sure if they all were there
14  the entire time but they were talking to her on
15  speakerphone, which is why I heard. I was not
16  sitting there for the entire time listening to it. I
17  think they were trying to find if she had any
18  documents.
19     **Q.**   How long was the portion of the
20  conversation that you overheard?
21     **A.**   Five minutes, two minutes. Short. So I
22  got bored.
23     **Q.**   Have you ever met Laura Pavanelli?
24     **A.**   Yes.
25     **Q.**   When?

Page 96

1     **A.**   She came to Columbus one time after her
2  father died.
3     **Q.**   Why?
4     **A.**   She was taking over Gruppo Triad or
5  something or thinking about taking over Gruppo Triad
6  and she wanted to come and talk to the lawyers, me,
7  about what, you know, about generally what was going
8  on.
9     **Q.**   When did this occur?
10     **A.**   I can't really give you, I mean, it really
11  wasn't a significant event. It was nothing important
12  happened, so. I know it was after her father died,
13  which was I think you told me yesterday '08 -- or
14  '10. '10. My lawyer corrects me, so it was sometime
15  after '10 and before today. And it was probably
16  close to the time he died but I just don't have --
17  zero memory of what it was.
18     **Q.**   There was a meeting though that took place
19  here in Columbus?
20     **A.**   Yeah.
21     **Q.**   Where?
22     **A.**   Crabbe-Brown.
23     **Q.**   Who participated?
24     **A.**   I think it was Jeff Brown, John Kennedy,
25  and me. And also perhaps Chip I think was there.

24 (Pages 93 to 96)

David J. Richards - 30(b)6

Page 97

1    Q.    How long did that meeting last?
2    A.    Couple hours.
3    Q.    What was discussed?
4    A.    Well, I think we generally discussed where
5    we were in the litigation, what was likely to happen.
6    She was asking some questions about Schianchi. It
7    sounded like they were having some difficulty whether
8    she was trying to get information and he wouldn't
9    give it to her or whether it was the estate, I forget
10   what it was.
11         And I was interested if she had any
12   knowledge about Bandagro, she didn't. She said her
13   dad kept things, business from -- even from when she
14   was a young girl he kept the business separate from
15   family so she didn't know much.
16         She did remember that he was doing mineral
17   deals and I remember that she said something about
18   him doing deals related to minerals or something like
19   that in Venezuela in the '80s, she remembered that.
20   Q.    How old is she?
21   A.    I don't know. I can't place her face, to
22   be honest with you, today. But she was -- so she was
23   Pavanelli's daughter so he's probably 75 today if he
24   were alive, something like that, so she's probably in
25   her 40s I would guess.

Page 98

1    Q.    She speak English fluently?
2    A.    Yeah. She lived in America quite some
3    time.
4    Q.    What do you remember being discussed as to
5    where you were in the litigation?
6    A.    I don't remember where we were. Probably
7    told her.
8    Q.    What do you remember about there being
9    difficulty between her and Schianchi?
10   A.    I think she was having difficulty getting
11   information from Schianchi that she wanted.
12   Q.    At some point prior to the house fire that
13   is said to have killed Pavanelli did you come to
14   learn there was any kind rift that had existed
15   between him and Schianchi?
16   A.    They were always arguing. So that was
17   always the case. I mean, I wouldn't say -- "arguing"
18   may be not the right term but there was always a back
19   and forth between, even from the first day that I met
20   with Pavanelli. It was No, no, it's this or No, no
21   it's that. So they had -- they were always a little
22   bit contentious I would say. Because like I said,
23   Pavanelli's a difficult guy.
24   Q.    Concerning what types of issues?
25   A.    I don't remember. I just remember the

Page 99

1    context of him arguing with his lawyer a decent
2    amount. Of course, he argued with everyone. He
3    argued with me quite a bit too.
4          So, I'm sorry, I -- when my lawyer goes
5    like this, I can tell I'm just going on too long.
6    What was the question? I forgot.
7    Q.    I was asking whether you'd come to learn
8    there was some rift between Schianchi and Pavanelli
9    prior to 2010 --
10   A.    I don't know if there was a rift or not.
11   Remember, I never spoke with Pavanelli after
12   something like '06 or something like that.
13   Q.    And your last communication with Schianchi
14   was when?
15   A.    Was after that, for sure. So you can see
16   the agreements that I think went through -- whatever
17   agreements certainly went through 2010 or '9 or '11,
18   something like that. So certainly to the timeframe
19   of those agreements. I haven't talked to him
20   recently, for sure. But I don't know how long it's
21   been since I talked to him.
22   Q.    Have you talked to him in this decade?
23   A.    Oh, yeah. Like 2011 for the agreements
24   for sure and he has periodically sent emails asking
25   for an update on litigation or what is going on in

Page 100

1    the litigation and that kind of thing. So I may have
2    seen that in one of those a couple years ago.
3    Q.    Have you responded to those emails?
4    A.    It's possible. I might have just referred
5    it to Crabbe-Brown or to Rex and Chip. Or I might
6    have sent him an innocuous response.
7    Q.    Have you been copied on any type of email
8    communications between any of your lawyers and
9    Schianchi?
10   A.    It's possible.
11   Q.    In what language have you been
12   communicating with Schianchi by email?
13   A.    English. I can't communicate in Italian
14   because I don't know.
15   Q.    Huh?
16   A.    I can't communicate in Italian because I
17   don't know.
18   Q.    And he's capable of communicating at least
19   in writing in English?
20   A.    He gets somebody to translate. If I see
21   something, I would try to get some way to interpret
22   it.
23   Q.    At any point have you asked Pavanelli,
24   Gruppo Triad, or Schianchi for any evidence that
25   Gruppo Triad or Pavanelli ever paid any real money

25 (Pages 97 to 100)

David J. Richards - 30(b)6

Page 101

1   for notes 7 of 12 and 8 of 12?
2       A.   That was part of this diligence effort we
3   did, we asked everything we could ask and I think we
4   asked that.
5       Q.   Well, you told us yesterday that Pavanelli
6   told you something about having paid a hundred
7   million dollars for the billion and having used give
8   or take 5 million of his own money in '95 that he
9   raised some other way.  Do you remember that
10  testimony from yesterday?
11      A.   I did.  That might have been incorrect.
12  It might have been 200 million he told me, I forget.
13  I think I said I was not certain of that.  But, yeah.
14  But that's what he told me, something like that.
15  Might have been 200, might have been 100.
16           I was thinking last night before I fell
17  asleep that it might have been 200, the number that
18  was taken, but I might have been wrong about that
19  too.
20      Q.   As you sit here today do you remember what
21  he told you?  Yesterday you said 100.  What are you
22  saying today?
23      A.   I'm thinking yesterday -- I thought 100
24  yesterday, I'm thinking it might have been more.
25  Might have been 200.

Page 102

1       Q.   What makes you think from yesterday to
2   today that the number doubled?
3       A.   Well, so the number didn't double, it was
4   either one or the other.  So it didn't double, it was
5   one or the other.  But what made me think that, I was
6   thinking about thinking back on that and I was kind
7   of thinking of the financial environment at the time
8   and, you know, what would have been appropriate price
9   for the promissory notes and would have been probably
10  about 200 million would have been the actual market
11  price if there wasn't too much discount for the risk
12  in Venezuela.
13           And I remember the feeling when he told me
14  the amount that it was about right.  So that's what I
15  was thinking about last night.  So thinking what he
16  told me was about right and I think the about right
17  number would have been 200 million or something in
18  that neighborhood.
19      Q.   How is it that last night you
20  reverse-engineered to 200 million?
21           MR. ELLIOTT:  Objection.
22      A.   I didn't reverse-engineer anything.  I
23  don't think that's the correct characterization.  But
24  in the sense I did arrive at that number by my memory
25  that it was --

Page 103

1       Q.   Let me just rephrase the question.
2       A.   Okay.
3       Q.   How is it that last night you arrived at
4   the $200 million figure?
5       A.   So last night, again, I was having trouble
6   falling asleep and I was thinking about everything
7   that we talked about yesterday as much as I could
8   remember, and I remember saying -- thinking did I say
9   anything incorrect or kind of, and this was one of
10  the questions I was -- I think I expressed some
11  uncertainty about the 100 and I was uncertain about
12  it and I was thinking about it.
13           And so I was thinking back as to what was
14  that and what did I know about it and I remembered
15  the impression that I had when he told me how much he
16  paid for them that it was about the right amount of
17  money.
18           And so then I started to think what would
19  the right amount of money have been and for a
20  Venezuelan zero coupon bond in 1985 that was issued
21  in 1981 the correct number would have been maybe a
22  little less or a little more than 200.  Again, not
23  taking in account the risk of nonpayment.
24           So I think, yeah, that's right, he must
25  have told me about 200.  So that was my internal

Page 104

1   thinking about the 200.  Which I actually forgot
2   about until you just brought it up
3       Q.   And in the course of doing that internal
4   thinking what were your calculations?
5       A.   Well, there we again, I was in bed, it
6   was in my head, but when these notes were issued, you
7   might remember, we were both around, prime rates in
8   the U.S. were even 21 or 22 percent.  This was a
9   crazy time for interest rates when these were issued.
10           So the value of the notes in that context
11  of those high interest rates, say call it 20 percent,
12  well, if you take a zero coupon bond and you multiply
13  it by 20 percent every year to get to the face value,
14  my thumbnail in-my-head calculations would be about
15  $200 million, that's what I was thinking last night.
16      Q.   Now let me get back to the question I
17  started with.
18           At any point did you ask Pavanelli, Gruppo
19  Triad, or Schianchi for evidence that they had
20  actually paid real money to obtain the notes that
21  were eventually sold to you, numbers 7 of 12 and 8 of
22  12?
23      A.   Yes.
24      Q.   And did they give you evidence?
25      A.   Yes.

David J. Richards - 30(b)6

Page 105

1    Q.    What evidence?
2    A.    They produced closing documents from a
3    closing that occurred in London at a bank.  Notarized
4    closing documents.
5    Q.    What did those documents consist of?
6    A.    If you could show them to me, I'd
7    appreciate it.  I think you must have them.  But, and
8    I didn't look at them as recent as I would have liked
9    to, if you're going to ask me specific questions
10   about them.  So I'd prefer to look at the documents
11   before I answer the question as to what was in there,
12   since the documents exist.  But if you want me do it
13   from memory, I will.
14   Q.    Please.
15   A.    So the documents were, again, consisted of
16   a bunch of notarized -- they were documents under
17   notary seal and in there there were purchase
18   agreements and I think they had the amount of the
19   purchase in there, whether it was 100 million or
20   200 million, whatever that was, they had that number
21   in there.
22   Q.    You still have those documents?
23   A.    As I said yesterday, my attorneys have
24   everything.
25   Q.    And included within those documents were

Page 106

1    there any type of financial records that actually
2    reflected the flow of funds or movement of money?
3    A.    I'd have to see the documents.  I don't
4    know if they would be in there or they should be in
5    there.
6    Q.    When did you ask for this evidence?
7    A.    Well, when did I ask for the evidence.  I
8    think it was in, it's possible that Pavanelli gave me
9    the evidence when I was there in the end of March or
10   April.
11   Q.    Of 2004?
12   A.    Of 2004.  But I think it was in June of
13   2004 that we actually got the full raft of documents.
14   I know that we got -- I'm certain that we got a lot
15   of these documents in June.  I'm not sure if I got
16   any earlier all or part of them.
17   Q.    Why did you ask for evidence of documents
18   that Pavanelli or Gruppo Triad had paid real money to
19   obtain notes 7/12 and 8/12?
20   A.    Libra requested it.
21   Q.    What involvement did Libra have in the
22   period up to June 2004?
23   A.    So I think I testified yesterday that
24   Libra, we had interacted with Libra, they were
25   interested in purchasing in some way or form an

Page 107

1    interest in the notes, and --
2    Q.    Which notes?
3    A.    Well, it wasn't defined at that time.
4    They were looking at the deal, ideally it would have
5    been 9/12.  A separate note that they would have.
6    So that started the process and throughout
7    that they had diligence questions, some of which
8    we'd, you know, some of which -- they asked for
9    documents, some of which we had, some of which we
10   didn't.
11   And so when they asked for documents, we
12   would turn -- if we didn't have them, we would ask
13   Schianchi or Gruppo for them.  And I know that we got
14   the full set of documents that we have today were
15   completed in June.  Pavanelli brought it.
16   Q.    How do you spell Libra?
17   A.    L-i-b-r-a, as the sign.
18   Q.    Where is Libra based?
19   A.    LA.
20   Q.    LA?  Do you know where in LA?
21   A.    Well, I don't know if Libra -- if Jess
22   still has Libra.  These firms all get bought and
23   changed and that was a long time ago.  So I'd be
24   surprised if they were still there but Jess certainly
25   is still around.

Page 108

1    Q.    What is his last name?
2    A.    Ravich, R-a-v-i-c-h.  I think he's still
3    around.
4    Q.    Do you know the name of the business or
5    businesses with which he's currently affiliated?
6    A.    No.  I really didn't have much dealings
7    with him after he passed in this transaction, he was
8    not a member of my investor group.
9    Q.    Why did he make a pass on this?
10   A.    I don't know that I know exactly why.
11   But, you know, we went a long time with them, spent a
12   lot of money with them.  They prepared memorandums.
13   So I don't know why they passed in the end.  It was
14   four months of work with him.
15   I remember being a little surprised that
16   they passed, and disappointed.  Could have been
17   something simple as they just thought the risk, even
18   if they could get in the deal 10 percent, they
19   thought the risk was too high.  Or could have been
20   maybe they changed their focus inside the firm.  I
21   don't know.
22   Q.    Did Jeff Ravich --
23   A.    Jess.  J-e-s-s.
24   Q.    Did Jess Ravich or anyone else at Libra
25   tell you why they declined to get involved with the

27 (Pages 105 to 108)

David J. Richards - 30(b)6

| | |
|---|---|
| **Page 109** | **Page 111** |

**Page 109**

1  Bandagro notes?
2  A. No. Sorry, we're taking a pass is the
3  kind of normal thing you would get.
4  Q. Now, you said that you got a full raft of
5  documents from Pavanelli in June 2004; is that right?
6  A. We got a lot of documents from Pavanelli.
7  "Full raft," I don't know exactly what the technical
8  numeric term. So we got a lot of documents.
9  We were transmitting requests from Libra
10  and getting documents and transmitting them to Libra.
11  And they had a couple -- wasn't Jess who was actually
12  doing the work, he had a few younger analysts at the
13  time.
14  Q. Who were when?
15  A. I don't remember their names.
16  Q. What type of requests was Libra making?
17  A. All the requests that you might make: Why
18  do you think this is final and binding? They were
19  also focused on the sort of same thing we were
20  focused on but they also were -- these are young
21  analysts and so they were just trying to cover
22  everything.
23  So, you know, you asked me in specific
24  reference to these documents on the purchase, that
25  was one thing they wanted, I remember that. If you'd

**Page 110**

1  ask me about some specific thing, maybe I could
2  recall something they specifically asked for or not.
3  Q. So they wanted evidence that actual value
4  had been paid by Pavanelli and Gruppo Triad for the
5  notes.
6  A. They wanted everything and that was one of
7  the things they wanted.
8  Q. Before Libra asked you to get information
9  from Pavanelli showing that Pavanelli or Gruppo Triad
10  had actually paid money for the notes, had you asked
11  for any such evidence?
12  A. Well, like I said, I know we discussed
13  that when I was in Como the first time and it might
14  be that might have been part of what I brought back
15  from Como.
16  When I came back from Como, the reason I
17  think I don't remember is while we were gathering
18  everything we could, we were focused on the key part
19  of this case and if we hadn't concluded that the
20  Attorney General decision was valid, binding,
21  couldn't be reversed under the laws of Venezuela,
22  there would have been no deal. That was the key part
23  of this, we would have never made further investment,
24  so.
25  Q. When was it that Libra passed on this

**Page 111**

1  opportunity?
2  A. I think it was in October-November-ish.
3  And that's what caused us to go do the further
4  marketing of 9/12 or the further effort on 9/12.
5  Q. Did Libra make requests for information
6  from you in writing?
7  A. Probably. Probably there were emails
8  asking for this or that. I'm sure there were verbal
9  requests.
10  Q. And did you exchange emails with Libra?
11  A. Probably. They also had a -- they had
12  a call -- yes, I did for sure.
13  Q. You were going to say they also had a call
14  with whom?
15  A. They had calls with us regularly. So
16  whether there may have been a written, it might have
17  been an oral request.
18  Q. How many calls with Libra did you have
19  concerning the possibility of Libra getting involved?
20  A. There were a number of them. I don't
21  remember the number. It's June of 2004. You went
22  back and forth as frequently as you had to.
23  Q. Can you estimate?
24  A. No.
25  Q. Who else other than you on your side of

**Page 112**

1  this discussion participated?
2  A. I can assume who participated but I don't
3  remember.
4  Q. Did Alcalde communicate directly with
5  Libra?
6  A. That's one of the people I would have
7  assumed that did, but I don't remember.
8  Q. Did Kennedy?
9  A. Probably not.
10  Q. Was there anybody else other than yourself
11  and Alcalde who you think may have dealt with Libra
12  for Skye Ventures?
13  A. Probably Gary Post as well.
14  Q. What was his connection?
15  A. Gary was the guy, Gary had been in
16  business with Jess prior to, prior to that. I think
17  at Kidder Peabody or it might have been Drexel.
18  Q. Did Gary bring Jess to you?
19  A. I think he was the connection, yes.
20  Q. Was Gary copied on the email
21  communications between you and Libra concerning this
22  possible investment by Libra?
23  A. Probably. To the extent there were them,
24  which I'm sure there were, yes.
25  Q. Other than asking Pavanelli for or

28 (Pages 109 to 112)

David J. Richards - 30(b)6

Page 113

1  Schianchi for evidence that Gruppo Triad had paid
2  real value for the notes at the request of Libra, on
3  any other occasion did you request that information?
4      A.   So to repeat what I said, I think that I
5  got a bunch of documents from him we had discussed
6  when I was there at the end of March, and there might
7  have been some payment records in there, possible
8  maybe probable, but there were.
9           And as to whether we had discussed that
10  any other time, again, that was not the primary
11  focus, I just don't remember.
12      Q.   At any point after you purchased notes
13  7/12 and 8/12, did you ask Pavanelli or Schianchi for
14  any further evidence that Gruppo Triad had actually
15  paid for the notes?
16      A.   I don't recall asking for that.
17      Q.   At any point after you purchased notes
18  7/12 and 8/12 did you ever ask Pavanelli or Gruppo
19  Triad or Schianchi for any further assurances that
20  Gruppo Triad had actually paid value for the notes?
21      A.   Again, I think like I also said yesterday,
22  our view was that if he paid $100 million for the
23  notes and they were not valid, they were not valid,
24  it didn't matter.  And if he paid even nothing for
25  the notes and they were valid, they were valid.

Page 114

1           So once we filed the lawsuit, the question
2  was is the Attorney General's decision final or
3  binding and I don't recall focusing on any of that
4  afterwards.
5      Q.   So you never made another request of
6  Schianchi or Pavanelli for assurances that Gruppo
7  Triad had actually paid value for the notes.
8      A.   I don't recall doing that.  I'm not saying
9  I didn't but I don't recall doing that.
10      Q.   Yesterday you made reference to the person
11  who did the website for Skye Ventures but I don't
12  know that you mentioned that person's name.
13      A.   I did, you asked me, his name was Eric
14  Jones.
15      Q.   I'm sorry, Eric?
16      A.   Jones.
17      Q.   And this is somebody with whom you
18  contracted?
19      A.   He agreed to do it and I agreed to give
20  him something for it, yes.  If you're asking was
21  there a written contract, no.
22      Q.   And is he still alive?
23      A.   No, he died.
24      Q.   That's what I thought.
25           Was there any other person or organization

Page 115

1  other than yourself and Mr. Jones who was involved in
2  that website project?
3      A.   I don't think so, no.  Perhaps
4  Crabbe-Brown transferred some documents to him, it's
5  possible, but.
6      Q.   Did Jones work for himself or was he --
7  did he work for an organization?
8      A.   He was the husband of a manager of one of
9  my businesses, and that I think he just worked out of
10  his house at the time.  He had worked for other
11  people.  He was in some -- but I don't think he was
12  at the time.  I think it was just doing sort of
13  subcontract work like he did for me there.
14      Q.   What was the name of the manager he was
15  married to?
16      A.   Beth Hamlin is her name.
17      Q.   Is she still alive as far as you know?
18      A.   I don't know either way.  I think, yeah, I
19  think she's still alive.  I think I might have talked
20  to her a couple years ago.
21      Q.   Does she live in the Columbus area?
22      A.   I think she did at the time, yeah.  She
23  was here.  She was talking about going to Florida
24  but.
25      Q.   Also going back to yesterday's testimony,

Page 116

1  you mentioned somebody named Pedro Wick.
2      A.   Pedro Wick.
3      Q.   How do you spell Wick?
4      A.   I would guess W-i-c-k.
5      Q.   And Pedro Wick was with you in Como at
6  least for the second day of meetings that you had; is
7  that correct?
8      A.   He was in Pavanelli's -- the second part
9  of the first day where we met at Pavanelli's
10  apartment.
11      Q.   Did he also participate the next day?
12      A.   I don't think so.
13      Q.   Who was he?
14      A.   He was represented either by himself or by
15  Pavanelli, I think by himself, as an ex-USB
16  investment banker who was somehow getting associated
17  with Pavanelli.
18      Q.   He was present for the period of time you
19  spent in Pavanelli's apartment, was that it?
20      A.   I believe so.  I believe he was there the
21  entire time.  I'm not sure.
22      Q.   What did he contribute to that meeting?
23      A.   I don't know.  I don't remember.  I don't
24  think it was -- he said -- the only thing I really
25  remember him saying is that he would be working with

Page 117

```
 1      Gruppo, he would be helpful. I could feel free to
 2   contact him. Something like that.
 3      Q.   Did you ever do that?
 4      A.   I don't remember doing that. He may have
 5   facilitated the transfer of information once or
 6   twice, but I don't remember that specifically.
 7      Q.   After the summer of 2004 did you ever have
 8   anything to do with him again?
 9      A.   No.
10      Q.   Do you know what country he was a citizen
11   of?
12      A.   I think Switzerland.
13      Q.   You mentioned that Usuelli lives in the
14   Swiss Alps. Could you be more specific about where
15   he resides?
16      A.   I know I have his address because I've
17   sent him a Christmas card but I don't remember it.
18   All those names are difficult. It's not like
19   Pittsburgh, it's da-da-da-da-da, so.
20      Q.   Do you have his contact information in
21   your phone?
22      A.   I could check.
23      Q.   Please do.
24      A.   I have to turn it on.
25      Q.   You're allowed to do so.
```



CONFIDENTIAL

David J. Richards - 30(b)6

Page 121

1  say it's an agreement between the -- purports to be
2  an agreement between Skye Ventures and escrow agent.
3  I can read the whole thing. Doesn't look like I've
4  signed it, so I don't know what that means, to be
5  honest with you.
6      Q.   Well, I was going to ask you about that.
7  Appears Mr. Schianchi signed this and you did not,
8  correct?
9      A.   Well, this particular document is not
10 signed by me. I don't know if there is one signed by
11 me or not. And, in fact, I really don't know what
12 this is about till I read it.
13         MR. ELLIOTT: Just take a minute and let
14 him read it.
15     Q.   Take as much time as you need. Got the
16 first page there.
17     A.   Yeah, okay, I kind of remembered what was
18 going on then.
19     Q.   What was going on?
20     A.   What was going on in December of 2004 is
21 that we were, I think as we discussed before, we were
22 resuming efforts to sell 9/12 for Gruppo, or not
23 maybe sell it but do some sort of financing with
24 respect to it.
25     Q.   And you had already obtained possession of

Page 122

1  No. 9/12 on December 1st of 2004, correct?
2      A.   I think that's been mentioned before in
3  the deposition. So if there's a document -- so let
4  me ask it to you this way: I think so, I think
5  you're right. If there's a document that says
6  exactly when I got possession, I'd like to see it.
7  If you say it's December 1, I'll trust you.
8      Q.   I don't want you to do that. You looked
9  already today and yesterday at your interrogatory
10 answers in this case.
11     A.   So I said it was December 1?
12     Q.   Yeah, you were the one that said it.
13     A.   Okay.
14     Q.   You want to check that yourself?
15     A.   No, I trust you that you're not
16 misrepresenting.
17     Q.   So does that help you understand better
18 what this document represents?
19     A.   Well, I think it's just what I just said,
20 we were just trying to discuss whether I'd had the
21 note already or not. I apparently did.
22     Q.   Okay. So who prepared this document?
23     A.   Me probably. Almost certainly.
24     Q.   I'll ask you to look down at the first
25 provision under Article I, Investment.

Page 123

1      A.   Okay.
2      Q.   It says "Skye will invest $50,000 in U.S.
3  dollars, pursuant to its agreement of October 6...."
4         Do you see that?
5      A.   Yes.
6      Q.   What agreement of October 6?
7      A.   I don't know.
8      Q.   And if you look at the back above the
9  second whereas clause has a recital that Skye
10 Ventures is the owner of notes 7/12 and 8/12, right?
11     A.   Yes.
12     Q.   Now, turn the page to the second page and
13 look at provision 1.2, it says Gruppo will
14 irrevocably transfer title and interest in the
15 Bandagro Notes 7/12 and 8/12 in the amount of
16 $1 million.
17         Do you see that?
18     A.   Yes.
19     Q.   What does that mean?
20     A.   Changing the waterfall another million in
21 my favor.
22     Q.   To the best of your knowledge was this
23 agreement ever signed?
24     A.   I don't have an independent recollection
25 of that but, you know, there should be a signed copy

Page 124

1  of it somewhere if it were. So.
2         So what was your question, was it signed
3  or not signed?
4      Q.   Yes. It's been produced to us -- excuse
5  me. We've been doing a good job of not talking over
6  each other up till now.
7         This has been produced to us by your
8  lawyers in this case in this form, no signature from
9  you. This leads me to ask did you ever sign it?
10     A.   I probably did. Almost for sure.
11     Q.   All right.
12     A.   Here it says MAT International was the
13 transfer, so it was MAT.
14         MR. ELLIOTT: No question pending.
15     Q.   Let's mark Exhibit 19.
16         (RICHARDS/SKYE EXHIBIT 19 WAS MARKED.)
17     Q.   Before we look at Exhibit 19 let me ask
18 you this question, when note 9/12 came into your
19 possession on December 1st of 2004, was that also
20 delivered by a MAT's guy?
21     A.   I don't remember the circumstances under
22 which it was transferred.
23     Q.   You don't have the same recollection of
24 the guy showing up with the handcuffs and the sealed
25 bags and the keys?

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 125

1     A.    I don't.
2     Q.    All right, let me ask you to look at
3  Exhibit 19.  This one is signed by you and Pavanelli
4  and Crabbe-Brown, it's a shorter agreement.  Take a
5  look at that and see if you recognize it.
6     A.    Yeah, it looks like an agreement and
7  instructions to escrow agent signed by myself,
8  Pavanelli, and Crabbe-Brown.
9     Q.    Take a look at the second paragraph here
10  of Exhibit 19 under the heading Note 9/12.  Do you
11  see that?
12     A.    Yeah.
13     Q.    The first sentence says "Note 9/12 is
14  fully and completely owned by Skye Ventures...."
15     A.    Yes.
16     Q.    That's Skye Ventures, LLC, the plaintiff
17  in this case, right?
18     A.    Yes.
19     Q.    How and when did Skye Ventures come to own
20  note 9/12?
21     A.    How and when.  Well, I can see from this
22  document that everyone's agreeing that as of the date
23  of this document Skye owns the document -- Skye owns
24  the note.  And the date of this is June 5th.  We've
25  already discussed --

Page 126

1     Q.    It's June 16th, just to be clear.
2     A.    What is it, 6/16/05, is that how you
3  interpret that?  June 6 or May 6?
4     Q.    I interpret it as June 16, '05, and I
5  don't think it's much room for interpretation.  You
6  agree with me about that?
7     A.    It seems like that.
8     Q.    Just look at the last page also on the
9  Pavanelli signature line in addition to the fax
10  legend.
11     A.    Yeah, gotcha, 06/16/05.  So I received
12  possession of the note December 1st.  This is a
13  document from June saying that the note is fully
14  owned by me free of any contractual relations.
15         So if you ask me when I owned the note, I
16  would tell you December 1st I was the bearer of the
17  note and that would be my recollection.  As to why
18  this was in this agreement, I can -- I have a
19  speculation but I can only speculate.
20     Q.    And what is that speculation?
21     A.    My speculation is that there was this back
22  and forth that was constant with Pavanelli and he may
23  have made some statements about oh, you still --
24  there are still restrictions on the note, you can't
25  do this, you can't do this, and that this was a --

Page 127

1  this was probably gratuitous in the sense we were
2  sending the money really for the waterfall but we
3  threw that in just to, you know, basically tell him
4  stop saying the stuff, clarify it.
5     Q.    The last agreement we saw, the one that
6  was not signed by you but which you think you signed,
7  which was Exhibit 18, had Gruppo Triad still owning
8  note 9/12, right?
9     A.    No, I don't think that's right but I could
10  be wrong.
11     Q.    Well, turn back to Exhibit 18.
12     A.    Okay.
13     Q.    And look at paragraph 2.2.  You see that
14  paragraph?
15     A.    Yes.
16     Q.    It says "Skye Ventures and Ambient Capital
17  will resume reasonable efforts to sell all or a part
18  of note 9/12 as agents for Gruppo Triad...," right?
19     A.    Yes.
20     Q.    Doesn't that indicate that Gruppo Triad as
21  of that time was the owner?
22     A.    Yes.
23     Q.    So how is it between the time that
24  Exhibit 18 was in circulation the middle of the
25  summer 2004, and the time of Exhibit 19, June 16th,

Page 128

1  '05, that Skye Ventures came to be the full and
2  complete owner of note 9/12?
3     A.    There was either an intervening agreement
4  between the one that we looked at and this agreement
5  or there were discussions surrounding that hey, I
6  want to be the owner, acknowledge we're the owner.
7         My sense is there must have been some
8  other agreement between the one that we looked at on
9  Exhibit 18 and this.
10     Q.    Well, I'm going to represent to you to the
11  best of my current knowledge that your counsel has
12  not produced any such intervening agreement.
13     A.    I gave him all agreements I had.
14     Q.    So if you assume I'm correct in what I'm
15  representing to you, how is it that Skye Ventures
16  came to become the owner of note 9/12 prior to
17  June 16, '05?
18     A.    Just looking at these two documents it's
19  difficult for me to remember how that occurred.
20     Q.    With regard to the contractual
21  restrictions -- you anticipated a question I was
22  going to ask but let's just make sure I ask it, since
23  you answered it without a question in a way.
24         I was going to ask what contractual
25  restrictions were being removed?

32  (Pages 125 to 128)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 129

1    A.    Yeah, I'm not supposed to do that so I
2  tried to stop it.  But again, without knowing what
3  they were, it's difficult to tell me -- tell you what
4  were removed.  But my sense is it was just to give me
5  more freedom to do what we had to do with note 9/12.
6    Q.    And this same paragraph goes on to say "In
7  the event of a payment on note 9/12 by Venezuela,
8  Escrow Agent," that's Crabbe, Brown & James, "will
9  distribute $5 million to Gruppo Triad plus any
10  interest due under the promissory note executed by
11  Skye Ventures II to Gruppo Triad."
12         You see that?
13    A.    Yes.
14    Q.    First of all, why is $5 million being
15  distributed to Gruppo Triad?
16    A.    Apparently that was the agreement.
17    Q.    In consideration of what?
18    A.    I can only imagine that it was in
19  connection with Skye II acquiring ownership.
20    Q.    And this makes reference to a promissory
21  note executed by Skye Ventures II to Gruppo Triad.
22  Was there such a promissory note executed prior to
23  June 16th of 2005?
24    A.    This certainly makes it look like there
25  was.

Page 130

1    Q.    With that I would agree.  But did it
2  happen?
3    A.    Trying to think.  I had not really thought
4  much about 9/12, as I said before.  There are a lot
5  of things running through my head that I haven't
6  had -- some mishmash of recollections about how a
7  definition of the note that I haven't had a chance to
8  think through and resolve.
9    Q.    This is my only chance for the time being
10  to ask you about it.
11    A.    I hadn't thought about this timeframe in
12  9/12.  So I can sort of guess at what happened.
13         MR. ELLIOTT:  Well, don't guess.
14    A.    If I had a chance to maybe look at some
15  documents and think it through, I could come up with
16  a rational sort of timeline as to what led to this.
17    Q.    I'm showing you the documents.
18         MR. ELLIOTT:  What's the question?
19    A.    So from looking at this the answer is no,
20  I can't remember.
21    Q.    Let me ask you to look at this
22  modification of the waterfall that's embedded here
23  within Exhibit 19.  Why was the waterfall modified on
24  June 16, 05?
25    A.    No doubt we sent some money to them.

Page 131

1    Q.    How much?
2    A.    I don't know.
3    Q.    Take a look at the fourth modification or
4  the fourth provision of the waterfall as it's
5  modified here in Exhibit 19.  And this introduces two
6  new players, Jay Ramsey and Ray Henehan.  Do you see
7  that?
8    A.    Yes.
9    Q.    Who are they?
10    A.    Ray Henehan was a lawyer in Chicago and
11  Jay Ramsey owned a business in Chicago.
12    Q.    Why is that on June 16, 2005, they were
13  each being granted contingent waterfall interests of
14  $500,000?
15    A.    Well, that represents an investment they
16  had made in Gruppo Triad where they achieved -- I've
17  never seen the adjustment documents, but where they
18  acquired an interest like I had previous a deed of
19  trust or security type interest in the million
20  dollars of Gruppo notes.
21    Q.    How do you know that?
22    A.    Because they told me so.
23    Q.    When did you first come into contact with
24  either/or both of those two individuals?
25    A.    Well, obviously it was before May 6th of

Page 132

1  2005.
2    Q.    How about June 16th of 2005?
3    A.    I'm sorry, it's hard for me to get used to
4  this reversed date.  So, yes, before June 16, 2005.
5  And certainly after the -- I think it was after the
6  previous, whatever the previous waterfall draft was,
7  this is the one that's the first one.
8         And I actually forget how they came into
9  contact with me.  But it was an introduction by
10  somebody that I knew in Chicago.  One of my Chicago
11  investors.
12    Q.    Did you introduce Ramsey and Henehan to
13  Pavanelli?
14    A.    No.  This investment they had made
15  predated my investment.  It was independent of my
16  investment.  Predated then but it was independent of
17  my investment.
18    Q.    How did you learn that those two
19  individuals had invested in Gruppo Triad?
20    A.    I think I just said that I don't really
21  remember but I think it was through one of my Chicago
22  investor who knew them.  And somehow in conversation
23  it had come up.
24    Q.    Which one of your Chicago investors?
25    A.    I think it was Michael McGee.

33 (Pages 129 to 132)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 133



Page 135

1  some time and then did later bring suit.
2      Q.    And you have no explanation for why you
3  didn't?
4      A.    No. Just that we didn't.
5      Q.    While Mr. Baldwin is looking for a
6  document, let me ask you another question. At any
7  point did Pavanelli ever assert that Schianchi lacked
8  authority to sign any of the agreements that
9  Schianchi signed on behalf of Gruppo Triad with Skye
10 Ventures?
11     A.    It's possible that he -- he also said --
12 he said all kind of things that were crazy. That
13 were not crazy but not true. He possibly said that,
14 I don't remember that. He may have said it though.
15 Sounds like something he could have said in order to
16 get additional funding.
17     Q.    Let's mark the next exhibit.
18         (RICHARDS/SKYE EXHIBIT 20 WAS MARKED.)
19     Q.    I'm showing you Exhibit 20, Mr. Richards.
20 I'd ask you to take a look at that and let me know if
21 you recognize it.
22     A.    It's an agreement regarding -- calls
23 itself an Agreement regarding Note 9/12.
24     Q.    And this one's signed by all the parties,
25 correct?

Page 134

1              Tuesday Afternoon Session.
2              December 23, 2014.
3                  --|--
4       VIDEOGRAPHER: On the record 1:20.
5                  --|--
6              DAVID J. RICHARDS
7        CONTINUED CROSS-EXAMINATION
8  BY MR. SCHWARTZ
9      Q.    Mr. Richards, why has no suit been brought
10 by Skye Ventures or Skye Ventures II on note 9/12?
11     A.    Well, I think it would have been a
12 different answer at different times. I don't think
13 we could have brought suit till a certain point of
14 time. And I don't know why we didn't pursue it, we
15 just never did.
16     Q.    When you say you couldn't have brought
17 suit until a certain point in time, what do you mean
18 by that?
19     A.    Well, I would have said that I wanted to
20 have legal, whatever rights required for legal
21 ownership, so I think with the documents that we just
22 went through I didn't become legal owner till
23 sometime in 2005 most likely. So that would have
24 been the first thing.
25         But I obviously did become legal owner at

Page 136

1      A.    Yep.
2      Q.    On June 13th of 2006 it appears; is that
3  right? Did I say '06? Let's back up a second.
4         The fax legend makes it look like it's
5  '05. I'm sorry, my mistake. Let me start over.
6         Yeah. The attachments are a different
7  date. Okay. Let me regroup and start over because
8  there's two different documents comprised within
9  Exhibit 20, they have different dates.
10        So let's just start with the base document
11 which is the first three pages of Exhibit 20. Does
12 that look like an agreement regarding Bandagro note
13 9/12 entered into between Gruppo Triad, Schianchi,
14 and you?
15     A.    Let me -- just give me a second to skim
16 through this quickly.
17        Okay, I've seen that and I've kind of
18 glanced through the attachments, and you're asking me
19 to look at the first three pages, right?
20     Q.    Yes. You can look through as much of this
21 as you like but I'm going to start by asking you
22 about the first three pages and I will have questions
23 about the remainder of the document.
24     A.    Yes, okay, I've got it now.
25     Q.    All right, so the first three pages are an

34 (Pages 133 to 136)

Page 137

1    agreement entered into between Gruppo Triad,
2    Schianchi, and you personally, and it appears to have
3    been signed on or around June 13th of 2006,
4    correct?
5        A.    I don't know if it was me personally or me
6    on behalf of Skye, but this is an agreement where
7    there's some writing here at the bottom.  The only
8    date I see, correct me if you want to point me to
9    something else, the only writing I see that has a
10   date is this, there's a very light legend that I
11   can't really read, to be honest with you, that looks
12   like something in 2006.
13       Q.    Doesn't it look like the 13th of
14   June 2006?
15       A.    To me it looked like -- the one I have
16   looks like 00.  Which obviously is not a date, or
17   13.  Looks like 13, the one in the middle looks like
18   EC, and then 2006.  But I don't want -- not to
19   quibble, but.  That's the only thing I see that has a
20   date on it.  If there's something else.
21       Q.    Do you recall entering into an agreement
22   regarding Bandagro note 9/12 in the middle of 2006?
23       A.    I recall generally, yeah, I do.
24       Q.    And if you look at the last whereas clause
25   on the first page of this agreement that says that

Page 138

1    Skye is the legal holder and owner of notes 7/12,
2    8/12, and 9/12.
3        A.    Yes.
4        Q.    Was that the then-current state of
5    affairs?
6        A.    It must have been.  Although I would hate
7    to hang my hat on just this one clause.  It could
8    have been inaccurate.  But that's what it says.
9        Q.    And that's what you signed.
10       A.    I think we've established that I signed
11   this, yes.
12       Q.    And if you look at III on the first page
13   of this three-page agreement, it lists five
14   categories of documents only four of which are
15   populated, right?
16       A.    Yes.
17       Q.    And one is a Schianchi power of attorney,
18   correct?
19       A.    Yes.
20       Q.    And that's page 5938.
21       A.    Yes.
22       Q.    Then it lists under No. 2 the purchase
23   agreement for note 9/12, right?
24       A.    Yes.
25       Q.    And that must be the document with the

Page 139

1    Bates Stamp pages 5940 through 5943, correct?
2        A.    Yes, appears that way.
3        Q.    And you can see your signature on page
4    5943 dated June 18th of '05?
5        A.    Dated what?
6        Q.    June 18, 2005.
7        A.    Looks like June 16 to me, but it's dated
8    like that.
9        Q.    You're looking at page 5943?
10       A.    Oh, no, I'm sorry, I was looking at 5947.
11   Yeah, June 18, 2005.
12       Q.    And if you look at the agreement that runs
13   from pages 5940 through 5943, it appears that this
14   agreement contemplates that Skye II is going to be
15   executing a promissory note in connection with the
16   agreement, correct?
17       A.    5944 you're talking -- I'm sorry.  5940
18   what?
19       Q.    I'm looking at the entire agreement that
20   runs from 5940 to 5943.
21       A.    Okay.
22       Q.    And starting with the whereas clause, the
23   last one that says Skye II desires to
24   contemporaneously execute a promissory note, and the
25   next whereas, Gruppo wishes to accept the obligation

Page 140

1    from Skye II, this agreement contemplates that
2    Skye II is going to be executing a promissory note in
3    favor of Gruppo Triad, right?
4        A.    Yes.
5        Q.    Why?
6        A.    Well, I'm sure it's explained in the
7    agreement.
8        Q.    See if you can figure out from the
9    agreement or from your recollection why that's the
10   case.
11       A.    Well, it appears by the terms of the
12   document that a promissory note is given and received
13   by Gruppo and Gruppo is removing certain contractual
14   restrictions on Skye's ownership.  So the exchange,
15   it looks to me like the exchange was restrictions on
16   note 9/12 in turn for a promise to pay on a
17   nonrecourse promissory note.  I think that's the gist
18   of the transaction.  Unless I'm missing something.
19       Q.    So it's a nonrecourse promissory note from
20   Skye Ventures II which you see at pages 5944 through
21   5947, correct?
22       A.    Yes.
23       Q.    And in exchange for Skye II agreeing to
24   this promissory note, restrictions are being lifted
25   on Skye I's ownership, or let's call it Skye

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

## Page 141

1 Ventures' ownership of note 9/12?
2     A.   No, no, I think that's just a misprint.
3 It's all Skye II till this point, so. It's clearly
4 Skye II acquired the note in 2004, not Skye.
5     Q.   So this agreement is mistaken?
6     A.   I think it should have "Skye II" in there
7 where you just read -- not just "Skye." It's
8 omitting the "II" there.
9     Q.   Let's double back here for a second
10 because there's a few places in which these documents
11 that have been marked collectively as Exhibit 20 say
12 it's Skye I that is the owner of 9/12. So if you
13 look at page 5935, the last whereas clause, right?
14     A.   529?
15     Q.   5935, the first page of the exhibit. Last
16 whereas clause, Skye, for adequate and valid
17 consideration, is the legal holder and owner of 7/12,
18 8/12, and 9/12, right?
19     A.   Yes.
20     Q.   Now you turn to page 5940, the so-called
21 purchase agreement for note 9/12?
22     A.   It's called Agreement.
23     Q.   I understand. But it's characterized on
24 page 5935 under No. 2 as the purchase agreement for
25 note 9/12, right?

## Page 142

1     A.   Point me to where it says that.
2     Q.   Page 59345, III, item 2.
3     A.   Yes. Small "p," small "a" maybe. But
4 it's called agreement.
5     Q.   So that's two places already on page 5935
6 where the document identifies Skye Ventures as the
7 owner of note 9/12, right?
8     A.   Two places?
9     Q.   Yes, the last whereas clause and
10 section 3.2.
11     A.   Well, these are completely different
12 documents. So one is 2005 --
13     Q.   Slow down just a second.
14     MR. ELLIOTT: Let him finish.
15     A.   One is in 2005 and one is in 2006.
16     Q.   I understand. The document in 2006 says
17 in the last whereas clause that the owner of note
18 9/12 is Skye Ventures, right? We've covered that.
19     A.   Yes. Last whereas clause.
20     Q.   Now flip to page 5940.
21     A.   Yes.
22     Q.   This is an agreement from a year earlier
23 almost to the day.
24     A.   Correct.
25     Q.   And it says in article 1.1 Skye, that's

## Page 143

1 Skye Ventures, acquired the status of bearer and
2 owner of note 9/12 in 2004, right?
3     A.   Yes. And that's a misprint, just so you
4 know.
5     Q.   All right, that's a mistake?
6     A.   That's a mistake.
7     Q.   And is it also a mistake in the -- one,
8 two, three, four, fifth -- sixth whereas clause on
9 page 5940 where it says substantially the same thing?
10     A.   Yes; it's Skye II. It's inconsistent.
11 Says Skye II and Skye at various places. But it's
12 clear that Skye II was the holder in 2004.
13     Q.   All right.
14     A.   No doubt.
15     Q.   Just so we're clear, your testimony is
16 that there are at least three mistakes within
17 Exhibit 20 which say that the owner of 9/12 was Skye
18 which you're now saying should have said Skye II.
19     A.   So I would say -- no, that's not what I'd
20 say. I would say that it's beyond clear that in the
21 document that starts at page 5940 that in December --
22 which refers to acquisition of the note in 2004 that
23 Skye II was the acquirer of the note in 2004 and
24 thus --
25     Q.   Excuse me for a second. Where do you see

## Page 144

1 that? Doesn't it say exactly the opposite twice?
2     A.   Well, okay, maybe I should be read back if
3 I said it wrong, but it's clear that Skye II became
4 the owner of the note and received possession of the
5 note in 2004. So that's a hundred percent clear.
6     Q.   From what?
7     A.   From the documents we went through
8 earlier.
9     Q.   Which ones?
10     A.   We've gone through this whole thing over
11 Skye II and so my testimony is that Skye II was the
12 owner of the note and that this is a misprint.
13     Q.   That may be your testimony but we haven't
14 seen any documents so far that says anything remotely
15 like that.
16     A.   I think we have.
17     Q.   Which one?
18     A.   Well --
19     MR. ELLIOTT: Let him look.
20     A.   You want me to go through the exhibits?
21     Q.   You tell me which one says that Skye II
22 acquired the ownership.
23     A.   I think my belief is that we went through
24 a document earlier on that you handed me that talked
25 about the receipt of the notes and there was an

Page 145

1   agreement, I don't know if you marked it or not, but
2   I assume you did.
3       Q.   Any document I've shown you I've marked.
4       A.   Okay, so there was an agreement in
5   December of 2004 related to this, was there not?
6       Q.   You tell me. You were there,
7   Mr. Richards.
8       MR. ELLIOTT: How about Exhibit 19.
9       MR. SCHWARTZ: Exhibit 19? This is the
10  one that says in this first full paragraph under Note
11  9/12 that note 9/12 is fully and completely owned by
12  Skye Ventures. That seems to be inconsistent with
13  what Mr. Richards is now saying. That's yet another
14  mistake I suppose.
15      Q.   Look at Exhibit -- Mr. Elliott wants you
16  to look at Exhibit 19, let's do that. You have 19 in
17  front of you?
18      A.   Yes.
19      Q.   All right. There's a section at the top
20  of the first page, Note 9/12, right?
21      A.   Yes.
22      Q.   It says quote "Note 9/12 is fully and
23  completely owned by Skye Ventures...." Correct?
24      A.   Yep.
25      Q.   Have I read that correctly?

Page 146

1       A.   Yep.
2       Q.   Okay, that's June 16th of 2005, right?
3       A.   Yes.
4       Q.   Is that true at the time?
5       A.   My belief is that that is a typographical
6   error.
7       Q.   Okay. So now let's go back to Exhibit 20.
8   In the last whereas clause on page 5935 it says that
9   Skye Ventures is the legal holder and owner of note
10  9/12, right?
11      A.   Yeah. I would fully acknowledge that it
12  was possible at that time that Skye had become the
13  owner.
14      Q.   Okay, I'm trying to get a straight story
15  from you, Mr. Richards.
16      MR. ELLIOTT: Objection. Let's get a
17  question.
18      Q.   I'm simply trying to find out who owned
19  what at what time. All these documents we're looking
20  at, Exhibit 19 and Exhibit 20, repeatedly say that in
21  2004 and 2005 the owner of note 9/12 was Skye
22  Ventures, correct? That's what these documents say.
23      A.   We've excited -- we've kind of looked at
24  three or four examples that says that right now. I'm
25  not sure -- I'd be surprised if that's what all the

Page 147

1   documents said, that would be a coincident hard to
2   explain.
3       Q.   I agree. But at least in Exhibits 19
4   and 20 that seems to be what happened, right?
5       A.   Yes. It doesn't say -- doesn't have the
6   "II" in there, it just says Skye.
7       Q.   And there are other respects in Exhibit 20
8   where Skye II is mentioned, right?
9       A.   Yes.
10      Q.   Are you aware of any document that you can
11  identify where prior to June of 2006 title to note
12  9/12 passed between Skye Ventures and Skye
13  Ventures II in either direction?
14      A.   So I said when you started questioning me
15  about 9/12 earlier what I said was I hadn't focused
16  on 9/12 and I don't recall seeing many things about
17  it. So the answer is I don't recall seeing such
18  documents. There may be some. I don't know. Or I
19  could have it wrong, it's possible.
20      Q.   Let me ask you to look at the promissory
21  note that's contained within Exhibit 20. If you look
22  under II, interest rate and payments, we have the
23  payment terms of this promissory note from Skye
24  Ventures II to Gruppo Triad. The payments are due to
25  Gruppo Triad, right? Is that how this note was

Page 148

1   supposed to work?
2       A.   Just give me one second, please.
3       I'm sorry, your question again, please?
4       Q.   The way this promissory note was set up
5   in II, entitled Interest Rate and Payments, the
6   payments were going to be made with Skye Ventures II
7   to Gruppo Triad, right?
8       A.   Yes.
9       Q.   And provision 2.1 said the payment of the
10  note shall be five years after the execution, right?
11      A.   I don't see where you're saying that.
12      Q.   Page 5945, 2.1, "Payment of note shall be
13  on the day which is five years after the execution of
14  this promissory note is completed by all parties."
15      Do you see that?
16      A.   Yes.
17      Q.   So it's a five-year note.
18      A.   Yes.
19      Q.   2.2 says the initial interest rate for
20  year one will be $250,000. Do you see that?
21      A.   Yes.
22      Q.   Did Skye Ventures II ever pay the $250,000
23  interest payment for the first year to Gruppo Triad?
24      A.   I don't remember.
25      Q.   The next paragraph, 2.3, says thereafter

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 149

```
1    interest will be 4 percent payable semi-annually in
2    arrears.  Did Skye Ventures II ever make those
3    semi-annual 4 percent interest payment in arrears to
4    Gruppo Triad?
5         A.    I don't remember.
6         Q.    After the note purchase agreement for 7/12
7    and 8/2 -- strike that question.
8         Let's look at 2.5 of the same section of
9    this Exhibit No. 20.  It says Skye II at its sole
10   option and if Skye II is current with all interest
11   payments has the right to extend this note for an
12   additional five-year term.  Did that ever happen?
13        A.    I don't remember.
14        Q.    If you look at section 3.9 on page 5946,
15   this promissory note under representations and
16   warranties of Pavanelli and Gruppo Triad, III, has a
17   provision that says in 3.9, "Gruppo Triad obtained
18   the Bandagro Notes by paying good and valuable and
19   significant consideration, worth in excess of
20   $100 million."
21        Do you see that?
22        A.    It's one of a bunch of reps and warranties
23   that we stuck in there.  And it's, yes, I see that,
24   yes.
25        Q.    Why did you stick that in there at this
```

Page 150

```
1    point?
2         A.    Well, it was not anything particular to
3    this but we stuck just a bunch of things in there for
4    him to rep and warranty.
5         Q.    And why did you want him to rep and
6    warranty that Gruppo Triad had paid good and valuable
7    significant consideration worth in excess of
8    $100 million to obtain the Bandagro notes?
9         A.    Well, if you read through the 3.1 through
10   3.11, it's kind of just a repetition of everything
11   that had happened.  So we probably threw it in there
12   for that reason.
13        Q.    Did you draft this promissory note and
14   agreement that starts on page 5944?
15        A.    I think I did.
16        Q.    And take a look at section 3.10, it's
17   another warranty and representation by Gruppo Triad
18   and Pavanelli that states "Filed claim with Venezuela
19   through its duly hired representative Jacir and did
20   not engage in nor participate in nor cause any
21   illegal, or fraudulent or dishonest activity during
22   claim."
23        Do you see that, that language?
24        A.    Yeah.
25        Q.    Why did you throw that in there?
```

Page 151

```
1         A.    Might be because that was alleged by
2    Venezuela's counsel at the time and we had not
3    focused on that before.  Might be in previous
4    agreements and be a throw-in from that or it might be
5    something that we added in because of allegation by
6    Venezuela.
7         Q.    As of the time that you prepared this
8    promissory note sometime around June 16th of 2005,
9    were you concerned that Pavanelli or Gruppo Triad had
10   engaged in or participated in or caused an illegal or
11   fraudulent or dishonest activity?
12        A.    No.
13        Q.    Let me ask you to turn back to page 5941,
14   that's the identical form of warranty and
15   representation type section, this time in the actual
16   agreement as opposed to the attached promissory note.
17   You see the warranties and representations in 3.9 and
18   30.10?
19        A.    Yes.
20        Q.    Those are the same ones we just covered in
21   the promissory note, correct?
22        A.    Well, I can compare them, if you would
23   like me to, but.
24        Q.    Aren't they substantially if not verbatim
25   the same?
```

Page 152

```
1         A.    Just let me see how many of them there are
2    in comparison.
3         Q.    I'm focused on 3.9 and 3.10.
4         A.    And there's 12 of them here and there's 11
5    of them there, so there's some difference.
6         Q.    Aren't 3.9 and 3.10 identical or virtually
7    identical --
8              MR. ELLIOTT:  Go ahead and compare them.
9         Q.    -- to the ones that are in the promissory
10   note?
11        A.    3.9 is the same essentially.  And 3.10 is
12   essentially the same.
13        Q.    Had you previously included any such
14   warranty or representation such as the ones we just
15   looked at in 3.9 and 3.10 in any prior agreement
16   between Skye or Skye II and Gruppo Triad or
17   Pavanelli?
18        A.    Well, we would have -- we've gone over the
19   agreements so, you know, I could go through them
20   again, if you like.  I don't recall exactly.
21        Q.    Let's mark Exhibit 21.
22             (RICHARDS/SKYE EXHIBIT 21 WAS MARKED.)
23        Q.    Mr. Richards, I'm showing you Exhibit 21.
24   This is a somewhat lengthy document.  It's entitled
25   Amended Bandagro Notes Agreement.  Please take a
```

38  (Pages 149 to 152)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 153

```
 1    moment and look through it as much as you think is
 2    necessary.  I see it's got some attachments, and then
 3    let me know when you're ready to field some questions
 4    about this one.
 5        A.    Okay.  Looked just to see what it was.  So
 6    as looking at this I can certainly see there is an
 7    agreement we entered into with Gruppo.
 8        Q.    And it's an agreement that's dated
 9    January 1st, New Year's Day, 2010.  Correct?
10        A.    Yes.
11        Q.    Although if you look at the signature page
12    on page 4479, it appears that at least certain of the
13    signatories were signing this document on
14    November 9th of 2009.  If you look at pages 4479
15    and 4480 you see the indication that at least certain
16    signatories appear to have signed on November 9,
17    2009?
18        A.    Yes.
19        Q.    And you signed this document on page 4480
20    on behalf of Skye Ventures.
21        A.    I did.
22        Q.    And although the agreement was set up for
23    you to be a participant individually, you appear not
24    to have signed it in your individual capacity,
25    correct?
```

Page 154

```
 1        A.    This one does not contain a signature of
 2    mine individually.
 3        Q.    Who prepared this agreement?
 4        A.    I don't know, to be honest with you.  It
 5    certainly looks like I had some help here.
 6        Q.    Why do you say that?
 7        A.    Well, just that the -- if you look at
 8    just -- without actually reading it, which I haven't
 9    done, if you look at just kind of the way it's laid
10    out and the fonts and the length of it and things
11    like "the remainder of page intentionally left
12    blank," just sort of the whole structure of the
13    agreement looks like it is beyond what I would have
14    had patience to do myself.
15        Q.    All right.  Look at recital D on the first
16    page.  Are you with me?
17        A.    Yep.
18        Q.    It says "Skye is the owner of certain zero
19    coupon, bearer Bandagro promissory notes denominated
20    as ICC 7/12, 8/12, and 9/12...."
21              You see that?
22        A.    Yes.
23        Q.    And if you skip down one, two, three, four
24    lines, it says Skye owns those notes free and clear
25    of any liens which are claims, liens, or encumbrances
```

Page 155

```
 1    correct?
 2        A.    Yep.
 3        Q.    Here again we have a document this time
 4    effective January 1, 2010, four years later or in the
 5    fourth year later or the beginning of the fourth year
 6    after the 2006 document we looked at which was
 7    Exhibit 20, and this one is still saying that Skye
 8    Ventures is the owner of 9/12, correct?
 9        A.    Well, maybe you've misunderstood what I
10    said earlier.  I think I said I was willing to
11    concede that Skye was the owner of the first
12    agreement of Exhibit 20.  So if that were true,
13    certainly it would still be true in 2010.
14        Q.    What was the purpose of this agreement?
15        A.    Well, I think it's whatever is in there is
16    the purpose of it.  We were achieving what's ever in
17    there.
18        Q.    Do you have a recollection of without
19    reading this what the purpose of this agreement was?
20        A.    Well, it looks like it had a number of
21    purposes, just going through it quickly.
22        Q.    This document was granting some additional
23    rights to Skye Ventures in relation to Gruppo Triad,
24    correct?
25        A.    Are you referring to anything specific I
```

Page 156

```
 1    should look at?
 2        Q.    Let's, for example, look at section 4.7.
 3    4.7 reads "Gruppo has granted, and hereby grants,
 4    Skye a lien and security interest in the Gruppo Notes
 5    and any other Bandagro notes in its possession in
 6    order to secure all payment obligations owed to Skye
 7    set forth herein and in the Escrow Agreement."
 8              Do you see that?
 9        A.    Yes.
10        Q.    And then Gruppo authorized Skye to file
11    and perfect its lien on the Gruppo notes in
12    Switzerland and anywhere else.  Do you see that?
13        A.    Yes.
14        Q.    And are those rights that Skye had
15    vis-à-vis Gruppo prior to January 1st, 2010?
16        A.    I don't think so.  I'm not sure but I
17    don't think so.
18        Q.    And did Skye go ahead and do anything to
19    file to perfect this lien on the so-called Gruppo
20    notes in Switzerland or anywhere else on or after
21    January 1, 2010?
22        A.    This, incidentally, this paragraph's
23    another paragraph that makes me almost certain that I
24    didn't write this agreement because it's not the kind
25    of sort of direct language that I would have used.
```

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 157

1    But to answer your question, did we ever
2    file to perfect the liens, no, we did not.  We had
3    the right to do it anytime.
4        Q.    And this was giving you a right to take a
5    lien not in notes 7/12, 8/12, or 9/12 that Skye
6    Ventures already owned but in all the other so-called
7    ICC Bandagro notes that Gruppo Triad claimed to own,
8    correct?
9        A.    I think this, as I understand it, this
10   gave us the lien.  We had the lien.  The question of
11   perfecting it against third-party purchasers would
12   have required a filing that we didn't -- I don't
13   think we made.
14       Q.    But this lien that you're talking about,
15   this was against all the other Bandagro notes that
16   Gruppo allegedly held, correct?
17       A.    Yes.
18       Q.    And those are set forth on this Exhibit A
19   which is referenced in recital C, right?
20       A.    I'm sorry, say that again.
21       Q.    Look at recital C.  It identifies the
22   Gruppo notes, correct?  You see recital C
23   definitionally identifies the Gruppo notes and then
24   turn to 3481, that's Exhibit A, right?
25       A.    Yes.

Page 158

1        Q.    And then there's a long list of these
2    supposed Gruppo notes, right?
3        A.    There's a long list, there's a page of
4    notes which is Exhibit A, lists numbers on the notes.
5        Q.    If you look at the series of ICC 322
6    Caroni, you'll see that 7, 8, and 9/12 are not
7    listed, right?
8        A.    That's right.
9        Q.    That's because those are the ones that
10   were owned by Skye Ventures at this time, right?
11       A.    Well, I assume that's right, yes.  We've
12   had this back and forth about Skye II or Skye I
13   owning the notes and I would concede that it's pretty
14   clear maybe as early as 2006 that Skye became the
15   owner of note 9/12.  There's also --
16       Q.    And that's certainly what the documents
17   say, correct?
18       A.    I'm sorry?
19       Q.    That's certainly what the documents say,
20   correct?
21       A.    Well, my sense is the documents say what
22   the parties intend, and if there's a misprint the
23   documents would read what the parties intended.  But
24   you're right, it's inconsistent.  I can't explain to
25   you today why.

Page 159

1        If my belief that Skye II became the owner
2    of the notes in December of 2004 is correct, there's
3    those statements -- those saying Skye instead of
4    Skye II is inconsistent with that.
5        Q.    In the meantime the rights that you were
6    getting, that Skye Ventures was getting in Exhibit 21
7    extended beyond notes 7/12, 8/12, and 9/12 to all
8    these other ones, these purported notes listed on
9    Exhibit A, correct?
10       A.    Yes, correct.
11       Q.    Let me ask you to turn to section 5.9 on
12   page Bates Stamp 4474 of Exhibit 21.
13       A.    Yes.
14       Q.    You on that page?
15       A.    Yes.
16       Q.    5.9 again is in the section of the
17   agreement that contains warranties and
18   representations.  This one is entitled, on page 4473,
19   section 5, Reacknowledgment and Reaffirmation of
20   Prior Representations.  Do you see that?
21       A.    Yes.
22       Q.    And then it has Gruppo reacknowledging,
23   reaffirming, representing, and warranting various
24   things, right?
25       A.    Yep.

Page 160

1        Q.    And among the various things it warrants
2    are what is set forth in section 5.9, right?
3        A.    Yes, among 12 reaffirmations that this was
4    one of them.
5        Q.    And 5.9 reads "Gruppo obtained Skye notes
6    7/12 and 8/12 by paying valuable, significant, bona
7    fide consideration in excess of One Hundred Million
8    Dollars ($100,000,000), and obtained all other Skye
9    notes and Gruppo notes by paying valuable,
10   significant, bona fide consideration."
11       Do you see that?
12       A.    Yes.
13       Q.    So this warranty and representation states
14   that Gruppo obtained notes 7/12 and 8/12, which
15   between the two of them had a face value of a hundred
16   million dollars, by paying valuable significant bona
17   fide consideration in excess of $100 million.  Do you
18   see that?
19       A.    I'm sorry, I was --
20       Q.    Do I need to read that to you again?
21       MR. ELLIOTT:  He just read you 5.9.
22       Q.    Stop and look at page 5.9.
23       A.    No, I get the gist of your question.
24       Q.    This is the warranty and representation
25   you had Gruppo make, "Gruppo obtained Skye Notes 7/12

40 (Pages 157 to 160)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 161

1    and 8/12 by paying valuable, significant, bona fide
2    consideration in excess of $100 million."  Do you see
3    that?
4        A.    I see that, yes.
5        Q.    Now, why did you have Gruppo make that
6    representation in an agreement effective as of
7    January 1, 2010?
8        A.    I think that they meant to say -- again,
9    this is not me preparing this.  I think the lawyer
10   meant to say repeat this -- I think his misrepeated
11   the 3.9 from the earlier agreements is what I take
12   out of it.  Because they never told me that.
13       Q.    Who misrepeated?
14       A.    The lawyer.  If you see it's kind of a
15   repeat of the earlier warranty and rep.
16       Q.    Well, it says a little more than the
17   earlier warranty and rep, doesn't it?
18       A.    It's a repeat but I think it's a
19   misrepeat.  The point of fact, until you just
20   mentioned that, I never caught that and I'm assuming
21   they didn't either.
22       Q.    Who's "they"?
23       A.    Gruppo.
24       Q.    Who drafted this agreement that's been
25   marked as Exhibit 21?  Was that done by Crabbe,

Page 162

1    Brown & James for you?
2        A.    I don't know.
3        Q.    Who else would have done it?
4        A.    Oh, I have tons of lawyers that work for
5    me.
6        Q.    You have tons of lawyers working on your
7    dealings between you and Gruppo Triad in 2010 or
8    2009?
9        A.    I didn't say that, of course.  You're
10   misstating what I said.  What I said was that I had a
11   lot of lawyers working for me.  So which of them
12   helped me with this agreement, I would think it was
13   not Crabbe-Brown because they weren't litigators,
14   they were transactional lawyers and this is more of a
15   transactional document.  So I may have asked -- I
16   think I had asked one of the lawyers who did
17   transactional work for me to take a look at it.
18       Q.    Which ones?
19       A.    Again, I said I don't remember.
20       Q.    You testified that Exhibit 21 is not
21   drafted in a form that makes it look like you wrote
22   it, correct?
23       A.    That's right.
24       Q.    And certainly to the uninitiated reader it
25   certainly looks like it's different than the

Page 163

1    predecessor agreements that we've seen, right?
2        A.    It's a real -- this is done by an
3    experienced transactional lawyer, you can tell by a
4    lot of the lingo, or at least a lawyer who had access
5    to forms.
6        Q.    And you signed Exhibit 21, correct?  On
7    page 4480, right?
8        A.    Yes.
9        Q.    Now, when you signed it, you signed an
10   agreement that had a representation by Gruppo that it
11   paid more than a hundred million dollars in notes
12   7/12 and 8/12, right?
13       A.    That's what it says.  Once again --
14       Q.    Do you believe that to be true?
15       A.    I never said it was true before and I
16   don't think anybody's ever said it was true.  Again,
17   it's a misprint.
18       Q.    Who other than Crabbe, Brown & James had
19   you engaged by November of 2009 to assist you in any
20   way, which law firm or lawyer had you hired to assist
21   you in any way in connection with your dealings with
22   Gruppo Triad, Pavanelli, or Schianchi?
23       A.    Whatever lawyer it was that helped me with
24   this was the only lawyer that -- I never engaged
25   anybody else.  And I may have asked a lawyer to take

Page 164

1    a look at it.
2        Q.    Well, you've told us that some experienced
3    transactional counsel must have created Exhibit 21
4    because this is beyond what you were capable of doing
5    or had the patience to do, right?
6        A.    That's true.  I'd like to characterize it
7    as patience but it's probably ability.
8        Q.    And perhaps both.
9        A.    It could be both, yes.
10       Q.    So this isn't something, you've been
11   around the practice of law enough to know, that
12   somebody would have done in 15 minutes, right?
13       A.    That's right.
14       Q.    So who did you engage in this timeframe,
15   November 2009 or thereabouts, to assist you, whether
16   you paid this lawyer or not, in connection with an
17   agreement of this nature for your dealings with
18   Gruppo Triad and Pavanelli?
19       A.    I don't remember.
20       MR. ELLIOTT:  I think you've answered that
21   question now at least five times.
22       Q.    You have no idea?
23       A.    I have no guess.  I would have to go back
24   and think of all the deals that were involved at the
25   time, who the lawyers were working on the

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 165

```
1    transactions, and try to remember if one of them did
2    this as a favor to me or I might have even paid them,
3    I don't know.
4        Q.    What could you do to refresh your
5    recollection in that way?
6        A.    Well, like I said, I can go back to sort
7    of the turn of the year in January '10 and figure
8    which transactions I had active, who were the law
9    firms working on those transactions, so if they were
10   Crabbe-Brown or Cooper & Elliott, and try to think
11   back if one those guys were the kind of guy I would
12   have said hey, would you take a look at this for me
13   or help me out.
14       Q.    And you told me you eventually became a
15   tax lawyer at Crabbe-Brown after being a litigator
16   for a while, right?
17       A.    I aspired to become a tax lawyer and went
18   to a master's in tax.  Did a little bit of tax work.
19       Q.    Does Crabbe-Brown do transactional work?
20   Or more specifically, in 2009 and 2010 --
21           MR. ELLIOTT:  Let him answer the question.
22           MR. SCHWARTZ:  I'm going to make it a
23   different question.
24           MR. ELLIOTT:  I want him to answer the
25   question that you asked.
```

Page 166

```
1        Q.    Go ahead answer that one first.  Does
2    Crabbe-Brown do transaction work?
3        A.    They probably do some.
4        Q.    Did they do transactional work in 2009 and
5    2010?
6        A.    They may have.
7        Q.    Have you ever engaged or worked with a
8    Crabbe-Brown transactional lawyer after you left that
9    firm?
10       A.    There was a guy there named Rick Wetzel
11   that I may have done one transaction with, I forget
12   the exact nature of it, but I did one I think
13   transaction with him.
14       Q.    Did it have anything to do with Gruppo
15   Triad or Pavanelli?
16       A.    I don't think so, no.  I'm sure not.
17       Q.    Is there any Crabbe-Brown transactional
18   lawyer you ever worked with on any matter concerning
19   Gruppo Triad, Schianchi, or Pavanelli?
20       A.    I think Wetzel was their only guy who did
21   transactions and I'm almost certain he never worked
22   on anything with regard to Bandagro.
23       Q.    In 2003 and 2004, I think you told me
24   yesterday for a period of time there was a Skye
25   Ventures server and we saw that you had an email
```

Page 167

```
1    address of @SkyeVentures.com.  Do you remember seeing
2    that document yesterday?
3        A.    I don't remember seeing a document.  I
4    remember talking about that subject.
5        Q.    All right.  Let me see if I can show you a
6    document.  If we didn't see it yesterday, I may be
7    mistaken in that respect.  Maybe you just testified
8    about it and we did not mark the document but I'm
9    questioning.
10       A.    I hate to be the guy that causes any break
11   but I really have to go to the bathroom.
12       Q.    Go ahead and I'll see if we can put our
13   hands on what we're talking about.
14           VIDEOGRAPHER:  Off the record 2:12 p.m.
15           (Off the record.)
16           VIDEOGRAPHER:  On the record 2:22.
17       Q.    Mr. Richards, when we took a break we were
18   beginning to talk about the email address --
19       A.    Yes.
20       Q.    -- or addresses you may have used in 2003
21   and 2004.  And my recollection, although the record
22   will speak for itself, is that you did indicate that
23   there was a server that you had of SkyeVentures.com.
24   Do you recall talking about that yesterday?
25       A.    I do.  We did discuss that yesterday.
```

Page 168

```
1        Q.    And you had an email address on that
2    server, correct?
3        A.    Well, we didn't have a server, we rented
4    space on a commercial server somewhere.
5        Q.    Where did you rent space?
6        A.    I don't know.
7        Q.    Who would know?
8        A.    Eric.  Eric did it.
9        Q.    Is there any other potential source of
10   information?
11       A.    I don't know how you'd find that out.
12       Q.    In any event, the domain was
13   SkyeVentures.com?
14       A.    Yes.
15       Q.    And your email address was
16   DRichards@SkyeVentures.com?
17       A.    I think so, yes.
18       Q.    And for how long did you rent that server
19   and use that email address?
20       A.    For all I know we still have it, but I
21   don't think so.  I think we stopped using it maybe
22   '05-'06 perhaps.
23       Q.    You also mentioned yesterday that you had
24   many email addresses.
25       A.    Yes.
```

42 (Pages 165 to 168)

David J. Richards - 30(b)6

Page 169

1      Q.    In '03 and '04 how many different email
2   addresses did you use?
3      A.    I think there were at least five companies
4   that I had an email -- we had at the time that I had
5   an email address at each one.
6      Q.    What were the five companies?
7      A.    So we just talked about Skye Ventures,
8   there was a company called EBRx, that was a pharmacy
9   benefit manager and I had an email address there.
10     Q.    What was your email address there?
11     A.    Boy, I don't remember but it was probably
12  something like DRichards@EBRx.com, something like
13  that.  It wasn't a really huge -- they had 30 or 40
14  employees so I doubt there was another Dave Richards.
15         We had the Workers' Comp pharmacy benefit
16  manager called OccMeds.
17     Q.    Would you please spell that?
18     A.    O-c-c-M-e-d-s, as in occupational
19  medicine, OccMeds.
20     Q.    What was your email address there?
21     A.    I don't remember, but again I would guess
22  it was something like DRichards or DJR, Dave
23  underscore Richards, something like that,
24  @OccMeds.com.
25         Then we had a business that was related to

Page 170

1   OccMeds called OFS Financial, and I had an email
2   address at OFS I believe.
3      Q.    OFS.com?
4      A.    I just don't remember what that one was.
5   It's unlikely we could have gotten OFS, it was
6   probably a domain that's long been taken.  So it was
7   something like that.  OFSFinancial.com maybe.
8         And then I had an imaging business that I
9   had an email address at called Ohio Heart.  Again,
10  probably DRichards@OhioHeart.com.  Might have been
11  Ohio-Heart.com.  Because I don't think Ohio Heart was
12  available.
13         And I might have had an email address
14  associated with a real estate business but I don't
15  remember that specifically.
16     Q.    Did you also have a personal email account
17  at that time?
18     A.    Yeah, I did.  I had an email address
19  named -- at a place called Netwalk, which is a friend
20  of mine that owned the business and was a personal
21  email which I don't think I ever used really.  I used
22  some but didn't use it regularly.
23     Q.    Have you now told me all the email
24  addresses having used -- in 2003 and 2004 have you
25  now described all the email addresses used in that

Page 171

1   timeframe?
2      A.    I think those that I recall, yes.  I think
3   pretty sure that was it.
4      Q.    When you ceased using the SkyeVentures.com
5   domain while this case was pending, what steps did
6   you take to secure the information and data on that
7   server?
8      A.    I don't recall taking any steps.
9      Q.    During the time the case has been pending
10  have you made any effort to retrieve any data from
11  that server?
12     A.    No.  Everything on there was -- no.
13     Q.    Let's mark the next exhibit.
14         (RICHARDS/SKYE EXHIBIT 22 WAS MARKED.)
15     Q.    Mr. Richards, I'm showing you a document,
16  it's a two-page document Bates stamped Skye
17  005539-40.  Not quite as lengthy as some of the last
18  exhibits but please take a look at Exhibit 22 and let
19  me know if you recognize this.
20     A.    It looks like an email that I was copied
21  on in 2007.
22     Q.    It's actually a series of emails, at least
23  the last one of which you're copied on.  Do you
24  recognize this?
25     A.    Not really.  I have no memory of it.

Page 172

1      Q.    First of all, let's start at the top where
2   somebody named Musheer_Robinson@AJG.com is emailing
3   you on April 10 -- 12, rather, 2007.  You see that?
4      A.    Yep.
5      Q.    Do you have any reason to doubt that you
6   received this email?
7      A.    No.
8      Q.    And this document reflects that at least
9   as late as April 12th of 2007 you were still
10  receiving email at DRichards@SkyeVentures.com,
11  correct?
12     A.    It looks like it was sent to
13  DRichards@SkyeVentures.com.  I don't know if I
14  received it there.  I don't know if it was still
15  alive at that time.
16     Q.    Well --
17     A.    Because, again, I don't remember it.  I'm
18  not saying it didn't or did.  But it doesn't say that
19  it was active, I said that somebody sent an email to
20  that address, certainly.
21     Q.    Does this refresh your recollection as to
22  whether you were still receiving email at
23  SkyeVentures.com in 2007?
24     A.    Again, I don't recall this so and I'm not
25  saying I -- I think I already said I don't know how

43 (Pages 169 to 172)

David J. Richards - 30(b)6

Page 173

1  long we kept Skye Ventures open.
2      Q.    Let's work our way through this email
3  string.  If you look at the bottom of the first page
4  of Exhibit 22, someone named Jorge von Fedak at
5  swiftships.com was writing to Musheer Robinson and
6  describing reservations for two gentlemen at a hotel
7  in Miami.
8          Then Jorge appears to be responding to
9  Musheer and talking about flying from Caracas to
10  Huston to Fort Lauderdale on the 20th and
11  describing what's happening with these two gentlemen.
12  You see that?
13      A.    Yes.
14      Q.    Is this ringing a bell yet?
15      A.    No.
16      Q.    Then Musheer is writing to you, emailing
17  to you and Alcalde and to Kennedy at CBJ about a
18  meeting in Miami and including "details regarding our
19  colleague's travel."  Are you tracking with me here?
20      A.    Yeah, I'm tracking, I'm just trying to
21  shake the dust off my old brain here and figure out
22  what this was about.  And I'm getting -- I think I
23  remember.
24      Q.    What do you remember?
25      A.    So first, Musheer Robinson, he was a --

Page 174

1  worked at this fairly large insurance firm named A.J.
2  Gallagher, AJG.com.
3          (Interruption.)
4      A.    Sorry, I didn't know I didn't have this
5  off.
6          So Musheer Robinson was a fellow who he
7  worked for an insurance agency or was an insurance --
8  worked for A.J. Gallagher in some way, shape, or
9  form, but I came to know Musheer Robinson through a
10  company called Swiftships.  And Swiftships is a boat
11  builder and so we had done a financing with
12  Swiftships.
13          So I don't remember there ever was any guy
14  named Jorge Fedak at Swiftships.  They were a
15  reasonable size company, maybe a hundred employees,
16  but I don't remember any Jorge Fedak.  I do remember
17  Musheer, who wasn't an employee of the company but he
18  consulted with them in some way.
19      Q.    Do you have any reason why Musheer
20  Robinson was informing you and Alcalde about
21  somebody's travel from Caracas or some number of
22  people traveling from Caracas?
23      A.    This is what is curious to me.  I just
24  don't know why this was occurring in April of 2007.
25      Q.    Other than the meeting you testified you

Page 175

1  had with Jacir in Miami, did you meet with anybody
2  else in connection with Bandagro notes in Miami at
3  any time?
4      A.    Well, we talked about the sisters.
5      Q.    Ah, yes, the sisters.  Other than Jacir
6  and the sisters.
7      A.    At a different time I met with an attorney
8  there named Rafael Chavera.
9      Q.    Did you have any other meetings in Miami?
10      A.    I met with --
11          (Interruption.)
12      Q.    Where are we?
13          (Record read.)
14      Q.    You told us about Rafael.
15      A.    I met with Chavera there with Chip I
16  believe, maybe it was Alcalde but I believe it was
17  Chip.  And maybe more than once.  And then I had met
18  with Volpi there, Vince Volpi and counsel, and I
19  would struggle to figure out when that was.  But who
20  else?
21          I think I met -- I'm pretty sure I met
22  once with Alex Illeorega once there?
23      Q.    Remind me the spelling the best you can of
24  his name?
25      A.    I-l-l-e-o-r-g-a, g-i-a, or maybe g-a,

Page 176

1  maybe double G.
2          And that's all that comes to mind.
3      Q.    None of those meetings had anything to do
4  with Musheer Robinson or Swiftships?
5      A.    No.  I don't recall ever meeting with
6  Musheer in Miami.  I'm not saying it didn't happen
7  but --
8      Q.    I'm not saying it did happen, I'm just
9  asking.
10      A.    Okay.
11      Q.    Could be that these people for some reason
12  wanted you to know about this meeting even though you
13  weren't invited.
14      A.    Could be.  But again, I'm just having
15  trouble remembering exactly what all this was about.
16      Q.    Who is Rafael Chavera?
17      A.    An attorney we hired.
18      Q.    An attorney where?
19      A.    Venezuela.  Caracas.
20      Q.    What did you hire Rafael Chavera to do?
21      A.    Alcalde hired him to do certain things and
22  he'd been around, he was around for a while so he did
23  I think more than one thing.  But I don't recall
24  exactly what.  The only time I ever met him was when
25  I met him in, once or possibly twice in Miami with

www.IntegrityReportingGroup.com
614.875.5440

David J. Richards - 30(b)6

Page 177

1  Alcalde or Chip.
2      Q.   Does he speak English?
3      A.   Yes.
4      Q.   So what different tasks had he been hired
5  to undertake?
6          MR. ELLIOTT:  I think he just answered the
7  question.
8      A.   Honestly, I don't remember specifically
9  what Alcalde had him doing.
10     Q.   Is he still working for you?
11     A.   Well, I think if I called him and asked
12 him to do something, if we called him and asked him
13 to do something, he would.  He's not working for us
14 at the moment.
15     Q.   Are there any other Venezuelan lawyers who
16 are working for you at the moment?
17     A.   Well, not other because he isn't.  But,
18 no, I don't think we have anybody from Venezuela.
19     Q.   When did you meet with Rafael Chavera?
20     A.   I would say as just a wild guess --
21         MR. ELLIOTT:  No, no, don't wild guess.
22 He doesn't want you to wild guess.
23     A.   I don't remember.
24     Q.   A regular guess is one thing, but a wild
25 guess.

Page 178

1      A.   I really don't remember.  Honestly, I
2  don't.
3      Q.   Remind me who Vince Volpi is.
4      A.   Vince Volpi is the CEO of Pica.
5      Q.   Spell that, please.
6      A.   P-i-c-a.
7      Q.   What is Pica?
8      A.   It's the investigation firm.
9      Q.   Ah, yes.  When you say you met with Vince
10 Volpi and counsel, who's counsel?
11     A.   I met with Vince and Chip in their offices
12 down there, in Pica's offices.
13     Q.   What did you hire Pica to do?
14     A.   Well, Pica had been doing investigation in
15 the case for many years and Chip, when there was a
16 transition from Crabbe-Brown to Cooper & Elliott they
17 had met, so I just introduced them.  And they had a
18 meeting.
19     Q.   Where is Volpi based?
20     A.   They have more than one office.  They
21 certainly have an office in Columbus and they
22 certainly have an office in Miami and they have
23 offices around.
24     Q.   What was he hired to investigate?
25     A.   Well, I think you're better --

Page 179

1          MR. ELLIOTT:  Yeah, I think that's work
2  product.
3      A.   You better ask Alcalde that because he was
4  working under Alcalde.
5      Q.   Who is Alex Illeorega?
6      A.   He's the fellow that had helped me arrange
7  with the congressman named Pedro something or other
8  with the Minister of Finance with the guy named
9  Tovar.
10     Q.   When was that meeting?
11     A.   I think we went through that yesterday.
12     Q.   Give me the timeframe so I can place it
13 again, please.  I'm sorry if I covered this.
14     A.   I think I had trouble placing it even
15 then.
16     Q.   I'm having trouble placing it myself, so.
17 I apologize if you struggled with this yesterday.
18     A.   I did.  And I'm guessing it was '05
19 sometime maybe.  Maybe '06.
20     Q.   Did you ever come to learn at any time
21 that Pavanelli was upset with Jacir because Jacir had
22 shared certain information with you?
23     A.   I mean, he was in a constant state of
24 agitation over one thing and another.  So maybe, but
25 I don't specifically recall that.

Page 180

1      Q.   Did Alcalde ever report to you that he had
2  heard from Jacir that Pavanelli was complaining about
3  Jacir's interactions with Alcalde or you?
4      A.   I don't remember that.
5      Q.   Let me ask you to look at the first page
6  of Exhibit 22 which I hadn't previously asked you to
7  focus on.
8      A.   I was just actually looking at that.
9      Q.   That appears to have or may have a copy of
10 a business card or some other identifying information
11 for Centro de Estudios Geopoliticos de Venezuela.
12 Looks like the Center of Study of Geopolitics of
13 Venezuela.
14         That mean anything to you?
15     A.   Really doesn't.
16     Q.   Recognize the name there, Tomás Antonio
17 Mariño Bianco whose title appears to be Capitán de
18 Navio?
19     A.   Something inside me says I should remember
20 but I don't.
21     Q.   Means nothing to you now?
22     A.   Not without more.
23         (Mr. Cooper joins the deposition.)
24         MR. SCHWARTZ:  Good afternoon, Mr. Cooper.
25         MR. COOPER:  Good afternoon.

45 (Pages 177 to 180)

David J. Richards - 30(b)6

Page 181

1    (Discussion off the record.)
2    Q.   At any point were you given copies of any
3    written communications between Jacir and Pavanelli?
4    A.   Me personally?
5    Q.   Yes.
6    A.   I don't think so.  Possibly but -- it's
7    possible I was copied on communications.  I don't
8    remember anything specific though.
9    Q.   Let's mark Exhibit 23.
10   (RICHARDS/SKYE EXHIBIT 23 WAS MARKED.)
11   Q.   Mr. Richards, I'm showing you a document
12   marked Exhibit 23.  You'll notice it's in Italian.
13   I'll just ask you to take a look at it and see if
14   you're familiar with it.
15   A.   I'm assuming you're not asking me to read
16   it.
17   Q.   I am not asking you to read it.
18   A.   Just by looking at the first page and kind
19   of filtering through it, it looks similar to the
20   Fabbiani report and may be the Fabbiani report that
21   we have.
22   Q.   Well, I was going to ask you, is this the
23   Fabbiani report that you left Como with in early
24   April of 2004?
25   A.   Well, again, as I've already explained to

Page 182

1    to you, I had -- you know, we had so many documents
2    and I would doubt that I could tell you exactly which
3    one it was.  Even -- I think I've already said I
4    wasn't a hundred percent sure it was in there.  I
5    think it might have been.
6    Q.   If you didn't get it at some point while
7    you were in Como in late March/early April of 2004,
8    you got it sometime shortly thereafter, right?
9    A.   Well, I don't know that.  I know that I
10   came back with a lot of documents.  I believe -- and
11   I'm certain I had it before -- I had maybe not this
12   one but a report before June, so.
13   Q.   That's fair enough.
14   A.   We did acquire it.
15   Q.   Were you able to tell looking at the first
16   page of Exhibit 23 whether this resembles the
17   Fabbiani report that you eventually ended up with
18   whether you got it at Como or some point?
19   A.   Yeah, it bears a resemblance to it, for
20   sure.  Again, I'm not sure if it's the exact one or
21   not, but it bears a resemblance and I see some things
22   in there that I remember from the meeting with
23   Fabbiani.
24   Q.   Do you recall if the report that you
25   received -- strike that for a second.

Page 183

1    Let me just notice, point out to you for a
2    moment, this document bears a Bates Stamp number Skye
3    000718.  So this was produced to us by your lawyers.
4    You recognize that's what this "718" means at the
5    bottom?
6    A.   Based on what we've done for the last two
7    days, I assume you guys put these numbers at the
8    bottom of things, so.
9    Q.   We guys didn't do it but your guys did.
10   MR. ELLIOTT:  We'll stipulate it came from
11   us.
12   A.   I'll take your word for it.
13   A.   Take Mr. Elliott's word.
14   A.   I'll take both your words for it.
15   Q.   That being the case, when you received
16   your copy of the Fabbiani report, do you recall
17   trying to form an understanding of the circumstances
18   that led to it being generated?
19   A.   I don't.
20   Q.   Did you ever ask anybody why did Fabbiani
21   prepare this report?
22   A.   Well, when I was interviewing him and
23   talking to him in Como, it's possible I asked him
24   that.  I don't recall asking him that.
25   Q.   When you got your copy, did you happen to

Page 184

1    notice that the first page of it made reference to a
2    Tribunale Di Torino 1st Sezione Penale?
3    A.   No, I don't recall noticing that.
4    Q.   Prior to the time you purchased the
5    purported notes 7/12 and 8/12, had you come to
6    understand that Fabbiani had prepared this report in
7    connection with some penal proceeding against
8    Pavanelli in Torino?
9    A.   So the answer the first is, again, as I've
10   consistently said, I don't know if this was the
11   particular report I saw or -- at that time or the one
12   that we had.  If it was, I didn't notice it.
13   MR. ELLIOTT:  Well.
14   Q.   You did not notice it.
15   A.   I did not.
16   Q.   And regardless of whether the one that's
17   been marked as Exhibit 23 is the one that you
18   received sometime in or before June of 2004, when you
19   got the copy you got, did you notice that it involved
20   a penal proceeding against Pavanelli in Tornio?
21   A.   No.
22   Q.   What would you need to do, if you could do
23   this at all, to determine whether the document that's
24   been marked as Exhibit 23 is the copy of the Fabbiani
25   report that you received in or before June 2004?

David J. Richards - 30(b)6

Page 185

1    A.    I thought -- hold on, I thought you were
2  going to ask me a different question, you threw me
3  for a loop there.
4            What would I need to do what?  To
5  determine if this was the one that I actually
6  received?
7    Q.    Yes.
8    A.    So again, let me recap by saying I don't
9  know if I received it in March.
10    Q.    I didn't say you had received it in March.
11  You told me you received it by June of 2004, right?
12    A.    We received it.
13    Q.    Yes.  "We" meaning?
14    A.    Might have gone straight to Alcalde.
15    Q.    When did you first see it?
16    A.    I saw it when I was sitting there with
17  Fabbiani.  I saw a report when I was sitting there
18  with Fabbiani and got to ask him questions about it.
19    Q.    And when did you first see the report that
20  you thereafter received a copy of?
21        MR. ELLIOTT:  Do you understand that
22  question?
23    Q.    Do you?
24    A.    I don't.
25    Q.    You saw a copy of the report when you were

Page 186

1  in Como, right?
2    A.    Yes.
3    Q.    You may have left Como with a copy of it,
4  you're not sure.
5    A.    Correct.
6    Q.    At some point by June of 2004 you know you
7  had received your own copy of it.
8    A.    I do.  I believe it was -- I know that
9  because I believe it was part of the stuff that was
10  provided to Libra.
11    Q.    But you don't recall whether you noticed
12  whether there was any reference to a penal proceeding
13  on the first page of the copy you received.
14    A.    Yeah.  Correct.
15    Q.    Has Skye Ventures made any investment
16  other than the notes 7/12, 8/12, and 9/12?
17        MR. ELLIOTT:  Has Skye Ventures bought
18  anything else other than those three notes, is that
19  what your question is?
20        MR. SCHWARTZ:  My question certainly
21  includes that.
22        MR. ELLIOTT:  Relating to Bandagro or
23  anything else?
24        MR. SCHWARTZ:  Anything.
25    A.    Our typical practice is we create a

Page 187

1  special entity for every investment, so I doubt it.
2    Q.    Did you use some of the $2 million that
3  you raised from outside investors to contribute to
4  the funding of Gruppo Triad's Swiss litigation with
5  Woodstrite?
6    A.    I didn't -- I think some of the money that
7  I sent to them was they'd asked me because they
8  needed money in the litigation.  If that's what
9  you're asking.
10        MR. SCHWARTZ:  Can you read back that
11  answer, please.
12        (Record read.)
13    Q.    It's not exactly what I'm asking.  Did you
14  use any of the million and a half to $2 million that
15  you raised from outside investors for that purpose?
16    A.    Well, yes.  The money that -- I'm sorry,
17  for what purpose again?  I'm not sure --
18    Q.    To fund Gruppo Triad's litigation in
19  Switzerland with Woodstrite.
20    A.    No, no.  We used it to increase the
21  waterfall in our notes.  What they used it for was up
22  to them.  The reason I sent it to them was because
23  they said they were going to spend it on the
24  litigation and they were running out of money for
25  that.

Page 188

1    Q.    Let me just ask you a couple more
2  questions about the Fabbiani report.  Do you recall
3  whether you obtained a translation for any or all of
4  it at any time?
5    A.    I did.  We did.
6    Q.    When did you do that?
7    A.    I don't remember exactly when but it was
8  one done by Usuelli.  He translated all or part of
9  it.
10    Q.    Did he do that before you purchased notes
11  7/12 and 8/12?
12    A.    I think he did but I'm not sure.
13    Q.    Did you read the translation before you
14  purchased notes 7/12 and 8/12?
15    A.    Again, I don't remember when I read the
16  translation and I don't remember when we got it.  So
17  it's certainly possible that I did.  But I don't
18  recall.  It would be better if we have -- we could
19  find out exactly when he transmitted the translation,
20  I could answer that question more precisely.
21    Q.    Do you still have a copy of the
22  translation?
23    A.    I may.  If I do, I would have given it to
24  counsel.
25    Q.    Do you still have a copy of the

David J. Richards - 30(b)6

Page 189

1   transmittal note or memo or email that accompanied
2   the translation?
3       A.   I don't know.
4       Q.   When you read the translation, did you
5   notice that the report had been created in the
6   context of the criminal proceeding?
7       A.   Well, you're asking me -- I don't think he
8   translated the entire report.  He did selective
9   sections of the report that he thought was important.
10  So I don't know that he actually -- he didn't
11  translate the whole report verbatim word for word the
12  entire thing.  He translated selective portions of
13  it.  So it would be doubtful that he would have
14  possible that he would have translated the title
15  page.  I don't think he did though.
16      Q.   You're not sure as you sit here today?
17      A.   I'm not sure.
18      Q.   We may have covered this yesterday but let
19  me just ask the question to make sure we cover
20  it one of these days.  Did anybody in Como describe
21  for you the circumstances that led to the Fabbiani
22  report being created?
23      A.   Again, I think we did answer that
24  yesterday, and I said that I don't recall that.  My
25  questioning, they had said it was part of the

Page 190

1   Attorney General file or Ministry of Finance file and
2   that it was submitted to them and so that's what I
3   remember, primarily remember about its use.
4        But they had this guy's report and said
5   the signatures were real, and it was part of the
6   investigation in some way.
7       Q.   Who made the decision to include some or
8   all of the Fabbiani report on the Skye website?
9       A.   Well, to me I remember having pictures on
10  the Skye website from the Fabbiani report.  That's
11  what I remember.
12      Q.   Who made the decision to post the pictures
13  or any other content?
14      A.   It was probably me, for sure.
15      Q.   What was your reasoning?
16      A.   I just thought they were cool pictures.  I
17  liked the way they looked and it probably was said in
18  reference to the fact that this fellow who was of
19  some substance had found the notes, the signatures on
20  the notes were those of the Bandagro founders.
21      Q.   You testified yesterday that the last time
22  you spoke with Pavanelli was in 2005 or 2006, right?
23      A.   I don't remember saying that but I think
24  that is -- there was a time at which I'd stopped
25  talking to him and I believe it was 2005 or '6.

Page 191

1   Maybe '7 at the worst.
2       Q.   Do you recall the substance of your last
3   conversation with him?
4       A.   I don't know if there was any substance to
5   the conversation.  I was just busy and tired of
6   dealing with him.  And when he was calling, since we
7   had our case underway, there wasn't a lot of reason
8   for me to talk to him.
9       Q.   You testified yesterday that when you
10  learned Pavanelli had been involved in a criminal
11  case in the United Kingdom, you or somebody at your
12  direction attempted to get documents relating to that
13  proceeding, right?
14      A.   Well, I think what I said was that we
15  learned about three, two or three proceedings that
16  Pavanelli was involved; one was the Swiss case, one
17  was the London case, and then to a certain extent I
18  knew about this tax case, what I call the bankruptcy
19  case and you called the criminal case.
20       So we started finding out what we could
21  find out about that just to verify it.  We found the
22  Swiss records and they proved out to be exactly what
23  he told us they were, and I think we tried to access
24  the London records but they were unavailable to us.
25      Q.   Who did you employ to try to find the

Page 192

1   London records?
2       A.   I didn't employ, Crabbe-Brown employed
3   people to do it.
4       Q.   Who?
5       A.   Pica.
6       Q.   When did Volpi make that effort?
7       A.   I think it wasn't just at one time.  I
8   think he stuck at it a little bit and he picked up a
9   couple of collateral things but never got the London
10  case ever.
11       So I think he may have tried as recently
12  as a couple of years ago to find something about it
13  but when he was looking, when the time period that we
14  just talked about the previous question was this
15  run-up to the purchase of the notes and filing the
16  lawsuit timeframe.
17      Q.   What efforts did you make or did anyone
18  make at your direction to find documents concerning
19  the Italian proceedings?
20      A.   So that's the one I think we discussed
21  yesterday that I'm not so clear on about when I found
22  out about, whether I found out about it in March of
23  2004 or sometime later.  So I do specifically recall
24  the London case and the Swiss case and was checking
25  out the Swiss case and conforming with what he had

48  (Pages 189 to 192)

David J. Richards - 30(b)6

Page 193

1    said.
2           And my memory as to the tax case or
3    bankruptcy case or criminal tax case, whatever that
4    means in Italy, is less clear.
5       Q.    And what I'm trying to do is probe your
6    memory to see what you recall about what steps were
7    taken by whom when.
8       A.    Well, like I told you yesterday --
9           MR. ELLIOTT:  I don't think he has a
10   question on the table just yet.
11      A.    I'm sorry.
12      Q.    What steps were taken by whom when?
13      A.    So I think we discussed this in some
14   detail yesterday.
15      Q.    I want to push for a little more detail.
16      A.    If I answer you more quickly, it probably
17   doesn't mean we're going to end more quickly so I
18   should probably be a little more patient.
19   I know we touched on this yesterday, but
20   as you acknowledged, your reaction of this is not as
21   firm as it is of certain other matters, right?
22      A.    That's right.  So what I do remember, and
23   told you I remember clearly yesterday, was an
24   allegation by Venezuela that one of the filings that
25   he had a Bandagro note on his computer that he could

Page 194

1    fill in.
2           And so we went to the court, I think I saw
3    this name here, Cajelli, and I think there was a
4    lawyer named Cajelli that we interacted with and got
5    those records and found out that allegation was
6    false.
7           So what else --
8       Q.    Excuse me for just one second.  You're
9    saying the allegation was false or the finding by the
10   Italian court was false?
11      A.    I'm saying the allegation by Venezuela
12   that Pavanelli had a Bandagro note on his computer
13   making it look like he was filling out false
14   documents, that he did not, and that was not what was
15   the case.  That's what we discussed.
16      Q.    Excuse me for us one more second just so I
17   understand what you're saying.  You're saying that
18   some allegation that Venezuela had made in this
19   lawsuit?
20      A.    Correct.
21      Q.    You sought to confirm by your own
22   independent examination of the Italian court records
23   or the independent investigation of somebody working
24   for you, and based on that determination you formed
25   the opinion that whatever Venezuela had been alleging

Page 195

1    in this lawsuit was not correct.
2       A.    Not whatever they had been alleging, they
3    had been alleging specifically that he -- in this
4    case that it was shown or part of the record that he
5    had a Bandagro note in his computer that he was
6    filling out, and that was not true.
7       Q.    You formed the view that Venezuela's
8    characterization of the Italian criminal proceeding
9    was incorrect in that respect.
10      A.    Certainly in that respect for sure.  And
11   so then you asked me yesterday what else did you find
12   out.  And I said that's really what stands out
13   clearly in my mind.
14           So, and to the extent as to when or what
15   else I remember about that particular case, I
16   remember learning that there was such a case, I
17   remember learning that it was going -- it was on
18   appeal when I learned about it, so that might give
19   you a timeframe.  And that's about all I remember
20   about it.
21      Q.    And you made reference to somebody named
22   Cajelli.  Who was that?
23      A.    I think his lawyer in Italy's name was
24   Cajelli for that case.
25      Q.    Pavanelli's lawyer.

Page 196

1       A.    I believe.  That strikes a bell, if you
2    will.
3       Q.    And did you or somebody working for you
4    interact directly with Cajelli?
5       A.    I think the attorneys interacted with each
6    other, Alcalde and Cajelli.
7       Q.    When did that happen?
8       A.    Again, I just don't remember.
9       Q.    Did you get a report from Alcalde and his
10   dealings with Cajelli?
11      A.    I know that it did happen in connection
12   with that filing by Venezuela.  It obviously was
13   subsequent to the filing of the case, this specific
14   event.  So other than that, I don't know how to say
15   when right now.  I just don't remember when.
16      Q.    Do you know if Alcalde obtained documents
17   from Cajelli?
18      A.    I think he did.  I'm not sure but he may
19   have.
20      Q.    What kind of documents?
21      A.    In my mind's eye I either -- I don't know.
22      Q.    That would be a question for Alcalde?
23      A.    Yeah, if he remembers, yes.
24      Q.    Did Pavanelli ever tell you why he didn't
25   file a lawsuit in the United States on behalf of

49 (Pages 193 to 196)

Page 197

1    Gruppo Triad to attempt to enforce any of his other
2    purported notes?
3        A.    No.
4        Q.    Did you ever ask?
5        A.    Well, I don't think it ever occurred to me
6    to ask.
7              MR. SCHWARTZ:  Let's take a break for a
8    few minutes.
9              VIDEOGRAPHER:  Off the record 3:08.
10             (Recess taken.)
11             VIDEOGRAPHER:  On the record 3:25.
12       Q.    Mr. Richards, I'd like you to turn back to
13   Exhibit 9.  It's a document we looked at yesterday
14   briefly.  You doing okay?
15       A.    Just tangled up a little bit there.  Okay.
16       Q.    No. 9, please.
17       A.    Yes, okay.
18       Q.    This is the ElUniversal.com article from
19   January 28th of 2004, and as you may remember, it
20   has the ribbon at the bottom of the first page with
21   the Valentine's Day 2004 indication that this
22   document was copied or downloaded to a desktop.
23   Remember this one?
24       A.    Yes.
25       Q.    You're here today testifying as the Rule

Page 198

1    30(b)(6) representative of Skye Ventures, the
2    plaintiff, so in that capacity do you know how this
3    document ended up in the files of Skye Ventures?
4        A.    I do not.
5        Q.    How could you figure that out?
6        A.    Well, so since when we discussed this
7    document yesterday I said I didn't think I'd ever
8    seen it before, right.  So if we produced it, if my
9    attorneys produced it, I would ask my attorneys where
10   did they get the document.  And then I would go to
11   that person and ask that person where did you get the
12   document.  That's what I would do.
13             MR. SCHWARTZ:  I'm thinking maybe you
14   ought to do that.  Because let me suggest to counsel,
15   there's a handful of documents that have been
16   produced with a similar such ribbon and I'm going to
17   mark them all and show them to Mr. Richards and I'll
18   do that first, but while I'm doing that maybe you
19   gentlemen on the other side of table could consider
20   whether you may be able to assist Mr. Richards in
21   answering that question, with there being of course
22   no suggestion that that would be a waiver of the
23   privilege.
24             But he's here under 30(b)(6), he should be
25   able to answer that question, it's obvious he can't

Page 199

1    from his own knowledge, and I don't really mean to
2    ask him the same question in that respect repeatedly,
3    but this is something we are entitled to know.
4              Let me mark the other documents, let's see
5    if he knows anything about them, and then we can see
6    if you want to think about having a colloquy with him
7    off the record and see if that changes things.
8              So here's Exhibit 24, let's mark that.
9              (RICHARDS/SKYE EXHIBIT 24 WAS MARKED.)
10       Q.    All right, Mr. Richards, I'm showing you
11   Exhibit 24, and as foreshadowed, this is another
12   ElUniversal.com article.  This one comes from
13   the 30th of November 2003, but like Exhibit 9,
14   you'll see this has a similar ribbon at the bottom
15   reflecting that on Valentine's Day, February 14,
16   2004, somebody downloaded this or copied it to a
17   desktop.  This document, like Exhibit 9, bears a Skye
18   Bates Stamp, in this instance 0002025.
19             Do you recognize this document?
20       A.    No, I don't.  But I do see that you're
21   correct, that it has the same marking at the bottom.
22       Q.    Do you have any knowledge as you sit here
23   today as the Rule 30(b)(6) designated witness of Skye
24   Ventures how this document came to be downloaded and
25   came to be in the files of Skye Ventures?

Page 200

1        A.    Nope.  Never seen it before.
2        Q.    You can set that document aside for now.
3    I'll mark another one.  It's going to look the same
4    or substantially the same.
5        A.    Okay.
6              (RICHARDS/SKYE EXHIBIT 25 WAS MARKED.)
7        Q.    Mr. Richards, do you have in front of you
8    Exhibit 25 now?
9        A.    Oh, I thought we were doing 24.  Okay, 25.
10       Q.    I'm showing you Exhibit 25.  This is
11   another document with a Skye production number on it,
12   002007.  It's another article from ElUniversal.com,
13   this one is dated the 17th of November 2003.
14             Like Exhibit 24 and like Exhibit 9, this
15   one has a ribbon with a Valentine's Day 2004 date on
16   it reflecting that somebody downloaded or copied this
17   to a desktop on that date and I'd ask you do you
18   recognize Exhibit 25?
19       A.    No, I do not.
20       Q.    Have you ever seen this before?
21       A.    I don't think I have.
22       Q.    Do you have any idea how this document
23   ended up in the files of Skye Ventures?
24       A.    I don't.  I don't know that it was
25   anything other than my attorneys' files, if that's

50 (Pages 197 to 200)

David J. Richards - 30(b)6

Page 201

1    the same thing to you, so.
2        Q.    Well, it's been produced by Skye Ventures
3    so you're the representative here of Skye Ventures
4    and I'm asking you whether you know how it ended up
5    in Skye's files.
6            MR. ELLIOTT: Can you tell me, Andrew --
7        Q.    And you don't know, right?
8        A.    I would say that I would doubt it was in
9    Skye's files but it certainly could have been in
10   Skye's attorneys' files.
11       Q.    And just so the record is clear on this,
12   you don't know how it is that your attorneys came in
13   possession of these documents and produced them to
14   us.
15       A.    That's right.
16           MR. ELLIOTT: Can you just identify for me
17   which of the 30(b)(6) requests these exhibits pertain
18   to? I'm not suggesting that you can't ask questions
19   about this but I think there's a legitimate concern
20   about whether or not this is the proper subject to
21   testimony under the notice.
22           And we don't need to deal with it
23   immediately either, if you want to continue, as long
24   as we can agree we don't waive our right to object as
25   to this line of questioning, we can continue on and

Page 202

1    we can talk about it at a break.
2            MR. SCHWARTZ: Well, I don't have further
3    questions of Mr. Richards regarding these documents
4    because I think it's pretty clear we've exhausted his
5    knowledge, but it's not inappropriate in the Rule
6    30(b)(6) scenario for the designee to consult with
7    counsel who may have information of a nonpriveledged
8    nature concerning the source of information.
9            MR. ELLIOTT: Agreed.
10           MR. SCHWARTZ: I'm not trying to invade
11   the privilege, I just want to know where the
12   documents came from.
13           MR. ELLIOTT: I know. What I'm saying is
14   can you point me to the request that this pertains to
15   and we can certainly have a dialogue with
16   Mr. Richards at a break.
17           MR. SCHWARTZ: Yeah, I'm happy to do that.
18   Let me see if I can quickly identify a topic.
19           At a minimum No. 11, the due diligence
20   Skye conducted before it purchased the notes, that's
21   the first one I'm seeing that jumps off the page.
22           It may also tie to No. 12, Skye's
23   investigations if any concerning a variety of
24   subjects, including the authenticity of the notes and
25   any other notes.

Page 203

1            And to the extent this came from Crabbe,
2    Brown & James, it would be swept into No. 16.
3            To the extent it came from Gruppo Triad,
4    which I can see there's a long shot, it would come
5    within No. 14.
6            It bears on No. 25. Fairly specifically
7    comes within No. 27. Talks about the Ministry of
8    Finance statements, you could see just if you look at
9    that headline, even if you can't speak Spanish, which
10   I can't, but if you look at the headline of the last
11   exhibit, 25, seems to involve activities of the
12   Ministry of Finance concerning the validity or
13   invalidity of the notes.
14           And then last but not least, and probably
15   most directly relevant, No. 35, Skye's efforts to
16   collect documents responsive to the document
17   requests. This one here was produced pursuant to a
18   document request and we're trying to find out how it
19   got here.
20           MR. ELLIOTT: And I don't want to play
21   games with words, but "efforts to collect" is
22   different to me than "where documents came from."
23   But having said that, I get what you're saying. I
24   don't necessarily agree with it but what we'll do is
25   talk to Mr. Richards and see if we can resolve this.

Page 204

1        Q.    (By Mr. Schwartz) We'll show you one more in
2    a similar vein. Let's mark Exhibit 26. This one's a
3    little different actually, similar but different.
4            (RICHARDS/SKYE EXHIBIT 26 WAS MARKED.)
5        Q.    Let me ask you to look at Exhibit 26
6    please, Mr. Richards. Is that document in front of
7    you?
8        A.    Yes.
9        Q.    So this is a two-page document that's
10   different than Exhibits 25, 24, and 9 in the sense
11   that it's in English translation, albeit a crude one,
12   of another El Universal article dated Monday,
13   the 17th of November 2003.
14           And this one, if you look at the ribbon at
15   the bottom of the first page, it's also on the second
16   page, this was apparently downloaded or copied to a
17   computer on March 16, 2004. So roughly a month after
18   the Exhibits 25, 24, and 9.
19           Like those other three, though, this has
20   got a Skye Bates No. 001975 and 1976. So it's
21   another document that was produced to us by Skye's
22   counsel, looks like somebody attempted to obtain a
23   translation of it perhaps through Babelfish or
24   AltaVista.com and I'm wondering if you can shed any
25   light on how this document ended up in the files of

51 (Pages 201 to 204)

David J. Richards - 30(b)6

Page 205

1  Skye Ventures.
2      A.   Like the others, like these series of
3  documents that we've already talked about, I don't
4  know if or -- I don't know if or when our attorneys
5  got possession of those or how they got possession of
6  them, if they produced them to you.  So my knowledge
7  is very limited there.  In fact, is nonexistent.
8      Q.   Just so the record is clear, as best you
9  can recall until the deposition began yesterday,
10  you'd never seen Exhibits 9, 24, 25, or 26 before; is
11  that right?
12      A.   I don't recall seeing them, no.
13      Q.   You testified yesterday that one task that
14  Sitrick was going to perform in exchange for its
15  interest in notes 7/12 and 8/12 was monitoring press
16  coverage in Venezuela, correct?
17      A.   Correct.
18      Q.   Did these documents end up with Skye
19  Ventures as a result of work Sitrick was doing?
20      A.   I don't think so because the dates here
21  that these were printed I don't think he was working
22  for me.  But at the same time he might have acquired
23  them from someone who could have been, but I don't
24  think so.
25      Q.   The dates of February 14, 2004, and

Page 206

1  March 16, 2004, precede when Sitrick began to work
2  for Skye Ventures?
3      A.   I think so, yes.
4      MR. SCHWARTZ:  All right, so addressing
5  counsel, with the foundation that we've been able to
6  establish here and the limitations on the witness'
7  knowledge, would ask when we take one more break
8  here today that you confer and see if there's some
9  way we can obtain an answer while the deposition is
10  still ongoing today from the 30(b)(6) witness perhaps
11  better informed on this line of questioning as to
12  where these documents came from.
13      Otherwise what we will do is leave the
14  deposition open with regard to that issue.  The first
15  such problem we've encountered of that nature.
16      MR. ELLIOTT:  I'm not sure it's a problem
17  just yet.  We'll deal with it at the break.
18      MR. SCHWARTZ:  Let's see if we can resolve
19  it.
20      Q.   (By Mr. Schwartz)  Mr. Richards, I want to
21  get a better idea of the role that Mr. Alcalde
22  performed for you in the due diligence process prior
23  to the acquisition of notes 7/12, 8/12, and 9/12.
24  When did you first engage Crabbe, Brown & James to
25  assist in due diligence?

Page 207

1      A.   Well, I don't want to get hung up like we
2  have a couple times today on like technical words
3  "engage," but they started helping me in October, end
4  of October of 2003.
5      Q.   Was Mr. Alcalde a partner at Crabbe-James
6  at that time?
7      A.   Crabbe, Brown & James, I'm pretty sure he
8  was, yes.  Certainly Kennedy was.
9      Q.   And eventually became one of the lawyers
10  who represented Skye in this litigation, correct?
11      A.   He filed, for sure.
12      Q.   What role did Mr. Alcalde play in the due
13  diligence process?
14      A.   Well, there was obviously a tremendous
15  amount of information in Spanish and he was fluent
16  both in speaking and reading it.  So I believe that
17  everything we obtained in Spanish he was able to read
18  and analyze.  So, and we had, again, we had so many
19  documents.
20      So he had read the Attorney General's
21  opinion and translated sections of it.  We ultimately
22  obtained the Minister of Finance report and the
23  administrative record, so he had read all of that or,
24  you know, didn't read it all at one sitting, it was a
25  lot of documents.

Page 208

1      And then as we started talking to Jacir,
2  which I believe was as early as the end of October of
3  2003 since we began conversations with him, Alcalde
4  conducted those conversations.  And then when we went
5  to visit Jacir, Alcalde conducted that.
6      Alcalde went through rafts of documents
7  with Jacir that were all in Spanish that Jacir
8  pointed out to him and some of which -- all of
9  which -- some of which we got eventually.
10      And then throughout this he was
11  performing -- working toward this idea that I'd asked
12  them to determine is -- from the very beginning, is
13  this Attorney General opinion, is it a final opinion,
14  is it binding, can it be changed.
15      And so he was working on reading the laws
16  of Venezuela, he was talking to attorneys in
17  Venezuela, I think most of whom we've discussed
18  already.  And reaching his own conclusions about the
19  laws of Venezuela.
20      And as the case was -- as the transaction
21  was developing, he was giving me an ever-stronger
22  opinion that the -- it appeared -- started out that
23  it appeared it was final and binding and couldn't be
24  changed and then that got stronger and stronger and
25  stronger and was confirmed many, many times by many

52 (Pages 205 to 208)

CONFIDENTIAL

Page 209

```
 1    different attorneys.  So he was doing that.  Most of
 2    those attorneys spoke Spanish.
 3         So I would say generally that sort of
 4    covers the process of what he did for me.  You know,
 5    without going into the day-to-day.  I know he spent a
 6    tremendous amount of time on it.
 7         Q.    Is it fair to say that you you relied on
 8    the work of Mr. Alcalde more so than any other
 9    individual in making your investment decision to
10    purchase notes 7/12 and 8/12?
11         A.    I relied on his opinion, for sure.  His
12    conclusion, right, that the Attorney General's
13    decision was -- excuse me -- was final, valid, and
14    binding, and couldn't be appealed.  That's the key
15    thing I -- that was what everything was directed to.
16         Q.    And is it fair to say that you relied on
17    Mr. Alcalde more so than any other person in the
18    course of deciding to make this investment decision?
19         A.    Me personally, I relied on what Alcalde
20    concluded.  But I think it was more of a sort of a
21    pass-through, a lot of things he'd learn from Jacir
22    and other lawyers like that.  So my direct alliance
23    was on what Alcalde had learned through all of these
24    sources but also what I had learned too.
25         Q.    Is there any person you relied on more so
```

Page 210

```
 1    than Alcalde in the due diligence process?
 2         A.    Well, to me the conclusion of Jacir that
 3    the opinion was final and binding was very important.
 4    I can't say how impressed I was with Jacir when I
 5    visited him.  Even though I didn't understand what he
 6    said, you know, he was an author, he was a Supreme
 7    Court magistrate, he seemed like a good family man,
 8    and he -- I had no doubt he reached his conclusion
 9    with a strong internal belief and that it was an
10    educated opinion.  So I relied on that a lot.
11         And certainly I relied on Alcalde and
12    Crabbe-Brown's opinion a lot to make the final
13    decision to go through with the full investment.
14         And other than that, in terms of Kennedy
15    has what I think is great judgment and he was
16    intimately involved all the time, so relying on his
17    legal judgment was really important to me.
18         And I think those were the sort of the --
19    we had to isolate all these many, many things that
20    we did and looked at and relied on, those were I
21    think the three primary things.
22         Q.    Can I ask the question I asked a moment
23    ago:  Was there anybody you relied on more than
24    Alcalde?
25         A.    For what I guess is the question.
```

Page 211

```
 1         Q.    In making the judgment ultimately to go
 2    ahead with the transaction to purchase these
 3    purported notes numbers 7/12 and 8/12.
 4         A.    So I think I'd stand on my answer that I
 5    just said as to whether it was more Alcalde or
 6    Kennedy or more Jacir.  It's hard for me to think
 7    back.  I know they're all very important.  And but I
 8    know in terms of relying on somebody to look at
 9    something in Spanish and tell me what it said, I was
10    essentially near a hundred percent Alcalde.  So I
11    don't know how to answer the question any differently
12    than that.
13         Q.    And a great deal of the underlying source
14    materials that needed to be analyzed were in Spanish,
15    correct?
16         A.    Correct.
17         Q.    Did you testify that eventually sometime
18    prior to late July of 2004 you received a formal
19    legal memorandum from Crabbe, Brown & James upon
20    which you relied?
21         A.    I know that I did receive a formal legal
22    memorandum.  I don't recall saying it was before
23    July.  I know that I received various opinions from
24    Alcalde, verbal and things that he sent me in emails
25    that said their conclusion, they had reached their
```

Page 212

```
 1    conclusion that was final and binding but the
 2    transaction could be enforced in the United States
 3    courts, which was also important to me.
 4         And I think there was a process from maybe
 5    as early as April or May that began the preparation
 6    of the opinion that concluded in the final one.  I
 7    just don't remember exactly when I got the final one.
 8         Q.    Did you get the final one before you
 9    agreed to purchase notes 7/12 and 8/12?
10         A.    I had their final opinion.  Whether it was
11    in this final written format, but I had their firm
12    opinion in writing.
13         Q.    In writing?
14         A.    In email writing or other writing.  I'd
15    seen drafts of it that might not have been -- needed
16    some cleaning up.
17         Q.    How many different drafts of it did you
18    see?
19         A.    Certainly more than one.  Maybe less than
20    five or ten.  It was a back and forth I think.
21         Q.    What was the length of the final opinion?
22         A.    I don't remember.
23         Q.    More than ten pages?
24         A.    I don't remember.
25         Q.    To the best of your knowledge when did you
```

David J. Richards - 30(b)6

Page 213

1  receive the final opinion?
2      A.   I think I'd stand on what I just said,
3  that if you said I guessed end of July, might have
4  been then.  But I don't remember.
5      Q.   Before you agreed to purchase notes 7/12
6  and 8/12?
7      A.   Let me repeat what I just said:  There was
8  a firm and final opinion from Alcalde, whether it was
9  in form of this longer writing that I remember that
10 was also prepared, that the Attorney General decision
11 was final and binding, could not be reversed in the
12 law of Venezuela, and could be enforced in the United
13 States before we filed the lawsuit.
14     Q.   What about before you bought notes 7/12
15 and 8/12?
16     A.   Yes, before we proceeded.
17     Q.   Before you bought the notes.
18     A.   Yeah.
19     Q.   And you relied on that memorandum in
20 making the decision, or that email or whatever it was
21 that had the firm conclusion before purchasing the
22 notes?
23     A.   I relied on Alcalde's opinion.  Whether it
24 was delivered to me verbally in discussions or I'm
25 sure there were many discussions about it back and

Page 214

1  forth about this topic.  It wasn't something
2  isolated.
3      Q.   Over the course of the last two days we
4  discussed at some length the efforts you made before
5  agreeing to purchase notes 7/12 and 8/12.  Is there
6  any other type of due diligence you conducted that
7  you haven't testified to yet either yesterday or
8  today?
9      A.   I was trying to respond to your questions
10 normally, but I don't know if we covered everything
11 specific, but there was, as I told you, there are
12 many, many, many, many documents and it was -- we
13 had, Alcalde had or Crabbe-Brown had Pica
14 investigating things, we got stuff there.  So I think
15 other than that sort of long process that we
16 discussed and the various trips, I think we've pretty
17 well covered it is what I think.
18     Q.   Let me ask you just a few more specific
19 questions.  Did you at any point talk to an Alfredo
20 Aagard in the course of your investigation?
21     A.   No.
22     Q.   Did you make any effort to talk to Alfredo
23 Aagard?
24          MR. ELLIOTT:  During the investigation?
25     Q.   Yes.

Page 215

1      A.   I don't remember.
2      Q.   Have you ever made any effort to talk to
3  Alfredo Aagard?
4      A.   Yes.
5      Q.   When?
6      A.   It was after the filing of the lawsuit,
7  for sure.  I forget exactly how I located, or we,
8  Crabbe-Brown located Aagard.  Or when.  But I know
9  it's before today that we spoke to him.
10     Q.   Who spoke to him?
11     A.   I believe it was Alcalde that spoke to
12 him.
13     Q.   Only Alcalde?
14     A.   I think I might have spoken to him one
15 time, I can't -- I remember him I think I did talk to
16 him but I don't know if it was different from the
17 time with Alcalde but I remember at least once being
18 there, whether it was a time with Alcalde or by
19 myself.
20     Q.   Where did this take place?
21     A.   I think it was a phone.  I've never met
22 the man in person.
23     Q.   When did this occur?
24     A.   Again, I said it was sometime after '05 or
25 '06 and before today.  I don't remember.  Hadn't been

Page 216

1  very recently.  So maybe a few years ago.
2      Q.   After the lawsuit was brought?
3      A.   Yes.
4      Q.   What precipitated the call?
5      A.   I don't remember.
6      Q.   Was there anybody else who participated in
7  the discussion besides yourself and possibly
8  Mr. Alcalde and Aagard?
9      A.   Since I'm having trouble remembering the
10 exact even time of the conversation, I don't know.
11     Q.   How long did the conversation last?
12     A.   Wasn't that long.  It was maybe a short
13 period of time.  I got a number of things flashing
14 through my head about what might have happened.  I'm
15 just having very inconsistent.
16     Q.   Well, why don't you share them with us.
17     A.   Well, I think it was a very short call.
18 My recollection is that he was in Venezuela and
19 wanted to leave Venezuela before he had any
20 meaningful interaction with us.  And that he was
21 going to leave Venezuela.
22          And then so I think that was the gist of
23 it; he wasn't -- he sounded like he was interested in
24 telling the story but I don't think he told us the
25 story in that meeting.

54 (Pages 213 to 216)

David J. Richards - 30(b)6

Page 217

1     Q.    When you say "meeting," you mean telephone
2  call?
3     A.    Telephone call, telephone meeting.
4     Q.    What do you mean when you say he wanted to
5  leave Venezuela before interacting with you?
6     A.    He expressed some fear that if he spoke up
7  about what happened in Bandagro, he'd be arrested.
8     Q.    What else did he say?
9     A.    I think that's what I remember.
10    Q.    And he indicated to you he was going to
11 leave the country?
12    A.    Yes.
13    Q.    Do you know if he ever did?
14    A.    Yeah, he did.
15    Q.    Where did he go?
16    A.    I think he went to Switzerland, I believe.
17    Q.    When?
18    A.    Again, I don't know.
19    Q.    After this one call that you're
20 describing, did you have any additional interaction
21 with him?
22    A.    I think counsel did.
23    Q.    Alcalde?
24    A.    He was -- he could speak English, so it's
25 possible it was Alcalde or someone else at Crabbe,

Page 218

1  Brown and Jones -- James, sorry.
2     Q.    When did that occur?
3     A.    I don't know.
4     Q.    Did you get a report from Crabbe, Brown &
5  James as to any conversation they had with Alcalde?
6     A.    Yes, I did.
7     Q.    What did you learn?
8           MR. ELLIOTT:  No.  That's privileged.
9  It's privileged and it's work product.
10    Q.    Plus I asked the question improperly it
11 sounds like.
12    A.    Always assume I know the question you're
13 asking.  I got to be careful about that.
14    Q.    Try to keep the players straight but every
15 once in a while after two days you can have a slip of
16 the tongue, so let me rephrase the question and then
17 your counsel will object and see where this goes.
18          Did you get a download from Crabbe,
19 Brown & James as to its conversation with Aagard?
20    A.    Yes.
21    Q.    What did they tell you?
22          MR. ELLIOTT:  Objection, the communication
23 from Crabbe, Brown & James to Mr. Richards is
24 privileged.  And in addition, they are reporting
25 attorney work product information.  And I'll instruct

Page 219

1  the witness not to answer.
2     Q.    As far as you're aware, how many such
3  conversations, whether they were telephonic or
4  meetings, did anybody from Crabbe, Brown & James have
5  with Aagard?
6     A.    I know there was at least one.  There
7  might have been more than one but I know there was at
8  least one.
9     Q.    What's the best you can do to pinpoint
10 when that occurred in time?
11    A.    I'm having trouble putting in context of
12 anything else that happened, so normally you can
13 think of something that happened and in relation to
14 something else in context.  I'm just having trouble
15 thinking of this or other than one-off kind of event.
16 It could have occurred anytime.  I think was after
17 2006.  And it could have occurred anytime until
18 recently.
19    Q.    To the best of your knowledge have your
20 attorneys at Cooper & Elliott spoken to Aagard?
21    A.    Yes.
22    Q.    When did that happen?
23    A.    I don't know.
24    Q.    How long ago?
25    A.    I believe it was within the last couple of

Page 220

1  years.
2     Q.    How many times has Cooper & Elliott spoken
3  to Aagard as far as you know?
4     A.    At least once.
5     Q.    Did you get a download from Cooper &
6  Elliott as to what Aagard told them?
7     A.    I don't think I did at the time but I have
8  since in discussions about the case.
9     Q.    I suspect that there will be an objection
10 to this question, but just so there's a record of the
11 objection, let me ask you this:  What did they tell
12 you that Aagard told them?
13          MR. ELLIOTT:  Objection both on privilege
14 and work product grounds.  Instruct the witness not
15 to answer.
16    Q.    Other than your --
17          MR. ELLIOTT:  I have to excuse myself, so
18 Mr. Cooper is going to take the mic.  Just give me
19 one minute.
20          MR. LUCAS:  Can we take a two-second
21 break.
22          MR. SCHWARTZ:  Yeah, we might as well take
23 a break.
24          VIDEOGRAPHER:  Off the record 4:01.
25          (Off the record.)

55 (Pages 217 to 220)

Page 221

1      (Mr. Elliott leaves the deposition.)
2      VIDEOGRAPHER: We're back on the record
3   4:13.
4      Q.   Mr. Richards, other than yourself and
5   Mr. Alcalde and the lawyers at Cooper & Elliott, has
6   anybody else who's been working for or with Skye
7   Ventures interacted with Mr. Aagard?
8      A.   I don't think so, no.
9      Q.   As best you know, where is Mr. Aagard
10  today?
11     A.   I don't know where he is today. I know --
12  I believe he went to Switzerland but that's about the
13  sum of my knowledge.
14     Q.   When you met with Pavanelli and others in
15  Como in late March and early April of 2004, did they
16  give you documents concerning this notion that the
17  maturity date of the notes had been extended?
18     A.   Perhaps.
19     Q.   What documents did they give you regarding
20  that subject?
21     A.   I don't know. I don't remember. I
22  remember, as I've said before, I remember I had this
23  large stack of documents and I don't think they could
24  have or would have given me -- I don't know.
25     Q.   Have you retained whatever documents they

Page 222

1   gave you when you visited them in Como at that point
2   in time?
3      A.   I believe I gave them to Alcalde after my
4   return.
5      Q.   After you left Como in late March or early
6   April 2004 did you have any further communications
7   with Pavanelli or Schianchi or Usuelli regarding this
8   issue of whether the maturity date had been extended?
9      A.   Did I talk with them about that when I was
10  there? Is that the question? I'm sorry.
11     Q.   No, after you left.
12     A.   Oh, after I left.
13     Q.   Did you communicate with them in any way
14  after you left?
15     MR. COOPER: About that topic or in
16  general?
17     Q.   We've covered other communications while
18  you haven't been here, but about that topic, which we
19  haven't discussed.
20     A.   Possibly. That's the best answer I can
21  give you.
22     Q.   You have no recollection of the details of
23  any such discussion?
24     A.   I don't of my own personal discussion.
25  Skye's discussion certainly when I was talking to

Page 223

1   Alcalde, I don't recall us discussing that very
2   point.
3      Q.   Have you ever heard the name Victor
4   Argais?
5      A.   Yes.
6      Q.   Do you understand that there's some
7   controversy in this case concerning whether
8   Mr. Argais ever existed?
9      A.   I've heard that from my attorneys.
10     Q.   Have you ever made any effort to determine
11  whether Victor Argais was a real person?
12     A.   Me?
13     Q.   Yes.
14     A.   No.
15     Q.   Has anybody working for you ever made any
16  effort to determine whether Victor Argais is a real
17  person?
18     A.   Oh, I understand that that's an issue that
19  attorneys, that you guys are discussing or working on
20  now.
21     Q.   That answer is not quite responsive to the
22  question. What I'm trying to find out is whether
23  you've made any effort or anybody working for you has
24  made any effort to determine whether this individual
25  is a real person.

Page 224

1      A.   So I believe I said that -- I thought I
2   clearly answered that I had not, right.
3      Q.   We've moved beyond you to people working
4   for you.
5      A.   So to people working for me who we've
6   agreed are my attorneys, I think they have made
7   efforts in the case. They're doing stuff on that
8   issue I believe.
9      Q.   Have you seen any evidence that Victor
10  Argais is a real person?
11     A.   Well, I saw the fact that -- I understand
12  the fact and may have seen a document that said --
13  that the Attorney General or the Ministry of Finance
14  produced that said he was involved in some way. So I
15  assume that he is a real person.
16     Q.   What document are you referring to?
17     A.   It was in regard to this topic that you're
18  discussing. I don't remember specifically what
19  document his name was in reference but I think his
20  name came up in connection with this series of events
21  in the '90s that related to the extension of the
22  notes.
23     Q.   Have you ever met with anybody who has
24  identified himself as Victor Argais?
25     A.   No.

David J. Richards - 30(b)6

| Page 225 |
| --- |

1      **Q.**   Have you ever had a telephone conversation
2   with anyone who has identified himself as Victor
3   Argais?
4      **A.**   No.
5      **Q.**   Have you ever exchanged an email with
6   anybody who has identified himself as Victor Argais?
7      **A.**   No.
8      **Q.**   Have you ever exchanged correspondence
9   with anybody who's identified himself as Victor
10   Argais?
11      **A.**   No.
12      **Q.**   At any point since Larry Corna turned up
13   on your doorstep in 2003 have you seen any form of
14   written communication dated 2003 or later from
15   anybody purporting to be Victor Argais?
16      **A.**   Again, no.  I wasn't certainly focused on
17   that.
18      **Q.**   Let's mark Exhibit 27.
19      (RICHARDS/SKYE EXHIBIT 27 WAS MARKED.)
20      **Q.**   Mr. Richards, I'm showing you what's been
21   marked as Exhibit 27.  This is a compilation of
22   documents that have been produced by Skye Ventures in
23   the case.  The Bates Stamp range runs from 5830 until
24   5855.
25           Please take a moment, review these

| Page 226 |
| --- |

1   documents, and then I'm going to have some questions
2   about them.  You don't need to scrutinize each and
3   every one at the moment.
4      **A.**   Okay, I won't then.  I've looked at the
5   top page and I can kind of see generally what these
6   are, and then I see some more detailed things that
7   look like sort of agreements or acknowledgments in
8   there, and I see these wire instructions that I
9   mentioned to you sometime that Gerace would do for
10   me.  And I see this Western Union thing that we
11   discussed.  So I see, yes, that's generally speaking
12   that's what.
13      **Q.**   Are these the documents that Skye Ventures
14   produced in this case after a recent court order was
15   entered requiring it to produce documents concerning
16   payments by Skye Ventures to Gruppo Triad?
17      **A.**   These look like the documents that we were
18   able to locate and we gave to counsel, yes.
19      **Q.**   What did you do to locate them?
20      **A.**   Well, I looked on my computer, we looked
21   at -- we ruffled through the boxes and investor
22   records, we looked to see, we have some more recent
23   bank statements and we looked in those, and I met
24   with Rick Gerace to see what he had and what he could
25   remember.

| Page 227 |
| --- |

1      **Q.**   Did he have documents?
2      **A.**   He had just two of the documents which I
3   think I saw in here.  He had a couple of these type
4   of documents, the wire requests which he prepared and
5   sent to --
6      **Q.**   Just so the record is clear, can you just
7   identify the Bates page?
8      **A.**   I'm sorry.  He gave me or he had like a
9   couple of these documents that are similar to
10   Skye 005833 in which there are what we would call
11   them is a wire request.
12      **Q.**   Had you previously communicated with
13   Mr. Gerace concerning whether he had any documents
14   that are relevant to this lawsuit?
15      **A.**   Previous to today?
16      **Q.**   Previous to the time you recently spoke to
17   him for purposes of gathering the documents
18   concerning payments to Gruppo Triad.
19      **A.**   I think I had occasion to talk to him a
20   little while ago about clearing up the investor -- an
21   investor log record.  And he had maintained those.
22      **Q.**   When was that conversation?
23      **A.**   I'm guessing about a year ago.
24      **Q.**   Did he provide information to you at that
25   time?

| Page 228 |
| --- |

1      **A.**   I think he gave me the requested
2   information.  I forget what it was, but.
3      **Q.**   And the requested information was in the
4   form of documents?
5      **A.**   I think it was in the form of -- it was a
6   specific thing and I think it was more of a question
7   as to certain investors' interest.
8      **Q.**   Other than that relatively recent
9   interaction, at any point since you brought this
10   lawsuit in August of 2004 had you interacted with
11   Mr. Gerace to see whether he had any documents
12   available to him that are relevant to the issues in
13   the case?
14      **A.**   I'm maybe not following the question.  He
15   worked for me, you know, he worked for me through '04
16   and '05 and he kept a lot of the records so I would
17   talk to him about that, sure.
18      **Q.**   But you understand that at various points
19   in this case Skye Ventures has produced documents to
20   the defendants as part of the litigation process?
21      **A.**   Yeah.
22      **Q.**   You're generally familiar, having spent
23   five or six years as a litigator, with this idea that
24   the parties in the case exchange documents, right?
25      **A.**   Yes.

57 (Pages 225 to 228)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 229

1      Q.     In the context of that exercise had you
2  ever previously spoken to Mr. Gerace about whether he
3  had available to him documents that are relevant to
4  the suit?
5      A.     I don't recall having done that.
6      Q.     Even when he worked for you?
7      A.     Well, you know, his was -- his were -- he
8  had investor and payment records and his involvement
9  wouldn't have been too much beyond that except beyond
10  miscellaneous tasks.
11         So I think until now we've always taken
12  the position that it was irrelevant how much we paid
13  for them and we objected to providing financial
14  information.  And until -- and I thought that was the
15  correct position to take, it seemed to me.  Because
16  again, I've been of the position that it doesn't
17  matter.
18         But then we had this ruling recently where
19  I guess the judge said that I had to bring suit, so
20  that's when I went to see him.
21      Q.     What is this first page of Exhibit 27?
22      A.     This is a download from the CNBC website
23  and I did this for 2004 I believe.  I think I did it
24  one or two times.  Might have been twice and then
25  combined them.  But I got this information directly

Page 230

1  from the CNBC website, and.
2      Q.     What is CNBC?
3      A.     Commerce National Bank.  It was the bank
4  we were using in 2003 and '4.
5      Q.     Why didn't -- did you cease using that
6  bank in 2004?
7      A.     Maybe.  We did move to Fifth Third Bank.
8      Q.     When did you move to Fifth Third?
9      A.     I think it was '05 or '06.  Probably I'm
10  guessing '05.
11      Q.     So you were starting to say this is a
12  download from the CNBC website for 2004.
13      A.     Yes.
14      Q.     What does it show?
15      A.     It just shows what the bank statements
16  would have shown, you know, they have these entries
17  on the bank statements.  So they offered you a -- you
18  could download transactions, as I recall.  And I
19  downloaded all the transactions for 2004.
20      Q.     Are these all the transactions -- strike
21  that.  Let me just start with this foundation
22  question:  For what bank account did you do this
23  download?
24      A.     Skye Ventures I think.
25      Q.     Did you download all the transactions in

Page 231

1  the Skye Ventures account or did you pick and choose
2  the ones you thought were relevant to the issues in
3  this case?
4      A.     Well, I --
5      Q.     Or is there no difference between the two?
6      A.     I downloaded all the transactions.  My
7  only question when I was looking at this was this gap
8  in '3 between March and July there are no
9  transactions at all.  So that question to me --
10  that's why I said I might have downloaded them two
11  separate occasions.
12         But I might not have, there just might
13  have been nothing, no transactions at that time.  The
14  best I remember I did this at the end of 2004 in
15  one download.
16      Q.     So this isn't something you did recently,
17  this is something you had in your file, a hard copy
18  of this?
19      A.     Yeah, I found it in my file.
20      Q.     Can you eyeball this first page and tell
21  me which of the transactions reflect payments to
22  Gruppo Triad?
23      A.     Yeah, we can certainly say the
24  international wire and fee were wires to Gruppo, for
25  sure.  And then I don't know what "forced pay debit"

Page 232

1  is.  I have no idea what that is.
2         So the things that go out of the account
3  are wire fees and debit memos.  So I don't know,
4  again, where those are, except for it looks like --
5  it looks like there's a 5,000 debit memo that might
6  be consistent with the timeframe of the wire.
7      Q.     What are you looking at, which entry?
8      A.     1/22/04.  There's a wire in January of '04
9  and that might be related to that, it might not have
10  been the actual money used for the wire but it might
11  be related to that.
12         So I would think that -- I'm going down
13  here looking at the debits.  And so certainly the
14  wire -- wires were things I would say went to Gruppo
15  Triad.  And I wouldn't say that I knew the rest of
16  them went to Gruppo Triad.
17      Q.     So looking, for example, 12/23/04, there's
18  a withdrawal of $20,000, you can't say what that went
19  to or for?  Third-to-last entry.
20      A.     It looks like there was a transfer into
21  the account and a transfer out of the account of
22  $20,000.  And that -- was that the timeframe that we
23  talked about there might have been a wire?  No, that
24  was '03.  So I don't know, no, I don't know what that
25  is.  Nets out as a zero so I don't know what that is.

58 (Pages 229 to 232)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 233



Page 234

1 think in this Exhibit 27, Skye 005831.

2 Q. That's the $20,000 there at the bottom?

3 A. Yeah, it's consistent with what we
4 discussed before.

5 Q. Where is the evidence, though, of the
6 actual wire?

7 A. I think we had discussed -- so first off,
8 I don't know that it was a wire or Western Union. I
9 think we discussed this topic yesterday about whether
10 it was a wire or a Western Union or some other form
11 of payment. But, again, you have all -- I don't have
12 anything other than what I've given you.

13 Q. Let me approach it this way, take a look
14 at page 5832.

15 A. Yeah. Yep.

16 Q. You see there's a debit for $50,040 on
17 Commerce National Bank and that somebody's written
18 "wire for deed of trust" on it. Do you see that?

19 A. Yes.

20 Q. By the way, was that written recently or
21 was that historically there?

22 A. I found it like this.

23 Q. So now you turn back to page 5831 and you
24 can match that $50,040 against the $50,000 entry on
25 page 5831, right? Those things seem to correspond.

Page 235

1 A. Yes, they do.

2 Q. So where are the wires for the other two
3 bond payments that appear on page 5831?

4 A. Well, I found this one per chance mixed in
5 with some other stuff. So this is the only one I
6 found.

7 Q. Take a look at page 5834.

8 A. Okay, I'm there. That's the one I was
9 actually just looking at.

10 Q. What is that document?

11 A. So we talked about documents like this
12 earlier when we were discussing, you'd asked me
13 whether I always got a deed of trust before I sent
14 him money and I said no, they were generally after,
15 and sometimes we would have an agreement prior to the
16 wire that we thought at least protected us, and this
17 is one of those documents. We were trying to get --
18 I think in here it says that he has the obligation to
19 issue the deed of trust and this was one of those
20 documents.

21 Q. This one was never signed though.

22 A. There may be a signed version but, and
23 there probably was, but I don't -- this one's not
24 signed, that's correct.

25 Q. To the best of your recollection you don't

Page 236

1 have a signed version of the page that's Bates
2 stamped 5834? If you did, you would have produced
3 it?

4 A. If I did, I would have produced it. And
5 once you got the deed of trust, it was sort of
6 irrelevant.

7 Q. Do you know if this was ever signed, this
8 page?

9 A. I assume it was. My assumption is that
10 was signed, but again, I don't know specifically.

11 Q. Take a look at page 5837. Now, you'll see
12 this has a date of August 11th of 2004, right?

13 A. Yes.

14 Q. And do you remember that's the date of the
15 second Alcalde demand letter to the Ministry of
16 Finance which switches out notes 7 and 8 of 12 for 3
17 and 4 of 12?

18 A. I think that's right.

19 Q. Want to confirm that or do you recall it?

20 A. If it's important to you, it seems like it
21 might be, but yes, let me just double check that.

22 Can you tell me what exhibit that is by
23 any chance?

24 Q. 16.

25 A. 16. Yeah, August 11th of 2004.

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 237

```
 1      Q.    And you'll recall we had a little
 2   discussion about whether the date on Exhibit 16
 3   helped you recall when it is that you actually agreed
 4   to purchase notes 7/12 and 8/12, right?
 5      A.    Yeah, it helped me or confirmed my memory,
 6   yeah.
 7      Q.    And now we see another document dated
 8   August 11, 2004, which appears to reflect the
 9   initiation of a wire transfer by Skye Ventures to
10   Schianchi.
11      A.    Yes.
12      Q.    When you put together Exhibit 16 with page
13   5837 here within Exhibit 27, does that help you
14   recall when it was in late July or August of 2004
15   that you actually agreed to purchase notes 7/12 and
16   8/12?
17      A.    So you're saying these two documents, this
18   demand letter and this wire instruction?
19      Q.    Yes, they're both dated August 11, 2004,
20   right?
21      A.    Well, it's the same.  It would have been
22   before August 11.  They wouldn't tell me a whole lot
23   more than that.
24      Q.    Would they tell you in what proximity to
25   August 11, 2004, you actually agreed to purchase
```

Page 238

```
 1   notes 7/12 and 8/12?
 2      A.    Well, there's nothing in either of those
 3   documents about that so it would not tell me.  But I
 4   think we've agreed already today that it was in early
 5   August, probably in early August.  And when I say
 6   "late July or early August," it was more likely early
 7   August.  So long as subsequent to signing the
 8   agreement it went smoothly to talk to him about the
 9   arrangements to get the notes over.
10      Q.    Take a look at page 5839 in this
11   Exhibit 27.  Do you recognize this document?
12      A.    Just looking at it without reading it, it
13   looks like another one of these documents that we
14   would send in connection with and before wiring him
15   money.
16      Q.    You ought to take a closer look at it
17   because it doesn't appear that it was something you
18   sent to anybody.  On the other hand, it does look
19   like it's something you may have received.
20      A.    Well, this is the same -- this is the same
21   thing and I may have sent this to him because he's
22   crossed something out up here that might have said
23   "Dear Mr. Richards."
24            But, so, but it is the same thing, it was
25   in connection with sending him some more money and
```

Page 239

```
 1   protecting whatever rights we'd agreed to in
 2   connection with that wire.
 3      Q.    Looking at page 5839, this is some form
 4   of memorandum from Pavanelli to you and Mr. Gerace,
 5   right?
 6      A.    No, I think it was sent to him and he had
 7   to sign it.  So this, I think he is signing something
 8   that we sent to him.  He is not volunteering all of
 9   this.
10            He's acknowledging that we paid for the
11   MAT transfer, he's agreeing to give us a difference
12   in the waterfall.  So this is something that we sent
13   to him to sign before we would send him money to
14   protect our rights
15      Q.    So page 5839 is a memorandum from
16   Pavanelli to you that you drafted for Pavanelli to
17   sign to you?
18      A.    I wouldn't call it a "memorandum."  Again,
19   I don't want to get hung up on these words.  But it
20   is a piece paper for sure that confers, I think
21   confers rights to Skye.  I would call it one of these
22   wire agreements is what I would call it.
23      Q.    I'm operating at a more basic level here.
24   It says from Pavanelli to Skye Ventures, right?
25      A.    Yes.
```

Page 240

```
 1      Q.    Are you testifying that you drafted this
 2   for Pavanelli to sign and send back to you?
 3      A.    Yeah.  I can't imagine it occurring any
 4   other way, for sure.
 5      Q.    Take a look at the fax legend from
 6   yesteryear at the top.  What's AM Managed Care of
 7   America?  Is that one of the businesses you were
 8   affiliated with?
 9      A.    EBRx was a subsidiary of a larger company
10   called Managed Care of America.  So that was EBRx.
11      Q.    So does it look to you like it is
12   something, albeit page 4 of something, that you faxed
13   Pavanelli, then he signed and faxed back to you?
14      A.    Yeah, that might be the case.  I don't
15   know why we wouldn't have sent it by email to him but
16   it seems like that's the way it went.
17      Q.    Where did you find Skye 005839?
18      A.    I think the same place I found all these
19   other agreements that I gave to the attorneys.
20      Q.    And recognizing that in the upper
21   right-hand corner it appears that this was at one
22   point a four-page fax, do you have any idea where the
23   other three pages are?
24      A.    Well, looks like the one that was sent to
25   him was a four-page fax and the one that he sent back
```

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

Page 241

1   was a one-page fax.  So I don't know what the four
2   pages, there probably was a cover page, so at least
3   two, and I don't know what else there was.  Maybe
4   Rick might have included this wire thing because
5   we're talking about the wire thing in there.  I don't
6   know what else he included.
7       Q.   There's a reference in the second
8   paragraph to an investment/advisory contract between
9   Skye Ventures, Ambient Capital, and Gruppo Triad from
10  April of 2004.  Do you see that?
11      A.   Yes.
12      Q.   What contract is that?
13      A.   Well, I think we discussed this yesterday
14  also that they had engaged Skye and Ambient as well
15  through me to act on behalf of them to get -- to
16  raise money up to $10 million to finance the notes in
17  some way, whether it was by a debt financing or a
18  sale, and Gary and I were working on that.
19      Q.   But we haven't seen any agreement from
20  April of 2004 that would address that subject matter,
21  have we?
22      A.   I didn't find any agreement, so.
23      Q.   So what is this document talking about?
24      A.   There obviously was some form of
25  agreement, whether it was oral or written, I don't

Page 242

1   know.  My practice certainly with Pavanelli became
2   that everything had to be in writing, and I doubt
3   that I would have started in this process without
4   something written confirmation that we had a deal.
5       So, again, I don't know where it is.  I
6   don't know.
7       Q.   Did you look for it?
8       A.   Yeah.  Like I say, I looked in everything
9   I had.  I even looked in files that weren't Bandagro
10  to see if there they were stuffed in there.
11      Q.   Why is it that you needed to put
12  everything in writing with Pavanelli?
13      A.   Well, you can see here that, and you'll
14  see this repeatedly through these agreements, that
15  you see that he acknowledges that we've paid him or
16  he acknowledges that we're the owner of notes, and it
17  was always because he was trying to -- he was a
18  difficult guy, he was trying to backtrack:  Oh,
19  you're not the owner; oh, there are restrictions.
20      So you just keep saying that so you didn't
21  have -- and at one point I think we even made him
22  promise to stop saying stuff about Skye or Skye
23  Ventures, so we tried to -- we just tried to get that
24  basic stuff in writing so that it was clear what he
25  agreed to.

Page 243

1       Q.   Did you think it was necessary to get that
2   basic stuff in writing because you couldn't trust
3   him?
4       A.   You know, I wouldn't say that.  But I
5   would say he was a contentious guy.
6       Q.   Did you think you could trust him?
7       A.   Never -- tried not to -- I never made that
8   determination.
9       "Did you ever determine you couldn't trust
10  him," was that your question?
11      Q.   I think you answered the question.
12      MR. COOPER:  I don't know if he did.
13      A.   I just wanted to make sure I understood
14  the question.
15      MR. SCHWARTZ:  You want to read the
16  question back.
17      (Record read.)
18      A.   Oh.  Yeah, I mean, I did think I could
19  trust the guy for the most part.  But again, as we've
20  discussed, so first off when you're in the business,
21  it's not just trust, it's trust and document, trust
22  and verify as best you can.
23      And so I would say that, again, aside from
24  his difficulty, him being in this tough spot where
25  he's behaving like most other people behave when they

Page 244

1   are in a similar tough spot, I thought he was an
2   honorable guy.  That he would keep his word
3   ultimately.  Even if there was a bunch of
4   remonstrations in the meantime.
5       Q.   Did you ever reach a point where you
6   determined that you could not trust him?
7       A.   No.
8       Q.   That's true to this day?
9       A.   Well, remember, I stopped dealing with the
10  guy way, way back when, so.
11      Q.   As you sit here today in retrospect do you
12  think it was a mistake to trust him?
13      A.   I --
14      MR. COOPER:  Just note an objection to
15  relevance.  Go ahead and answer.
16      A.   So if a guy told you ten things and nine
17  were true and one were not true, that would cause you
18  to have less trust.  So I'm trying to think if he
19  ever told me something that wasn't true and I don't
20  recall anything specific.
21      The thing that was difficult with him was,
22  again, the same thing as I've said, shortage of funds
23  and his difficult personality.
24      Q.   Wasn't there some point in time you
25  testified where he said you didn't own the notes that

61 (Pages 241 to 244)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 245

1  you thought you'd purchased?
2      A.    I think he might have said that. I think,
3  yes, of course, he said that.
4      Q.    Was that true?
5      A.    No, it wasn't true. It was never to, say,
6  get him to sign another document which said that I
7  owned the notes free and clear, which we did many
8  times. It worked for him a couple of times that I --
9  or, once I should say.
10     Q.    Looking at page 5839, this makes reference
11 to the investments contract between Skye Ventures and
12 Gruppo from April 2004, correct?
13     A.    Yep.
14     Q.    And that's the document that we've seen
15 and we've looked at extensively already.
16     A.    Yeah.
17     Q.    That's been marked as Exhibit No. 12,
18 right?
19     A.    Yes. Wait a minute. Yes.
20     Q.    Let me just ask you to look back one more
21 time at that.
22     A.    Okay.
23     Q.    May not be the last time but it will be
24 one of the last times for today.
25           And if you look at the sixth whereas

Page 246

1  clause, the one that reads "Whereas Gruppo has
2  provided documents demonstrating the Notes were
3  extended for payment until 1999 by officials of
4  Venezuela."
5           Do you see that, that whereas clause?
6      A.    Yes.
7      Q.    Had Gruppo provided any such documents to
8  Skye Ventures after the meetings that you had in Como
9  in late March and early April of 2004?
10     A.    Any such documents?
11     Q.    Any additional such documents?
12     A.    You mean documents related to this whereas
13 as are described in this whereas clause or any
14 documents at all?
15     Q.    Let me set the stage for this a little
16 differently.
17     A.    Okay.
18     Q.    You've testified that you signed
19 Exhibit 12 sometime in early August of 2004, right?
20 We've been over this a lot of times.
21     A.    I did.
22     Q.    And then you changed the waterfall and you
23 signed that again sometime give or take December
24 2004.
25     A.    Yes.

Page 247

1      Q.    Right?
2      A.    I did.
3      Q.    So keeping in mind you didn't sign the
4  body of Exhibit 12 until early August of 2004,
5  between the time you left Como in early April of 2004
6  and the time you signed Exhibit 12 did Gruppo provide
7  any documents to you demonstrating that notes were
8  extended for payment until 1999?
9      A.    So not to be picky about your question,
10 but I think yesterday I testified that I signed this
11 in April and -- or, in August and/or late July and
12 this was the agreement. I did not say that I didn't
13 sign it in April. I don't think I did. But I didn't
14 testify that I didn't.
15           So with that caveat, to answer your
16 question, Gruppo provided us a lot of documents
17 after -- so remember, the context is that when I came
18 back from Como the first time, I had a lot of
19 documents.
20     Q.    Right, couldn't even fit them in your
21 suitcase.
22     A.    Like a thousand pages.
23     Q.    Trouble fitting them in your suitcase.
24 We've been over this.
25     A.    Right, was a lot of documents, and I gave

Page 248

1  those to Alcalde. And that started a process whereby
2  we were gathering more and more information,
3  including just shortly after that we flew to Caracas
4  and got information from Jacir.
5      Q.    So you were gathering information from a
6  variety of sources in that timeframe, I understand
7  that.
8      A.    That's right. And so in that context I
9  don't know if they sent us any other information on
10 the payment other than what was already in the, you
11 know, the administrative proceedings records.
12     Q.    What about the alleged extension? That's
13 what I'm asking.
14     A.    Yeah, any, anything. I don't know because
15 I believe all those papers were in the record I
16 believe, so.
17     Q.    What record?
18     A.    The record for the administrative
19 proceeding conducted by the administrative finance
20 and the Attorney General.
21     Q.    I'm trying to ask a relatively narrow
22 question, and that is whether at any point after you
23 left Como in early April of 2004 before you signed
24 Exhibit 12, I don't remember which one it is, 12,
25 before you signed Exhibit 12 in August 2004, Gruppo

Page 249

1   Triad gave you any documents concerning the alleged
2   extension of the maturity date to 1999.  That
3   question clear?
4       A.   Yeah.  I think I know what you're asking
5   me and I'm obviously not answering like I want to.  I
6   believe we got documents like this from Gruppo.  When
7   I came back with all those documents in the end of
8   March and early April, it may have been in there or
9   it could have been at a later time.  It was a
10  continuous effort to collect documents.
11      Q.   So as you sit here today you're not sure.
12      A.   I'm not sure, no.
13      Q.   Take a look at page 5845 within this
14  Exhibit 27, please.  You have that page in front of
15  you, 5845?
16      A.   I was just noticing that there's a second
17  document on this September 23rd fax that relates to
18  it and which I didn't see, so.
19      Q.   Do you need to amend your answer?
20      A.   Well, I don't know because it looks as if
21  that -- it's the same -- looks as if it's the same
22  agreement and that -- well, okay.  It looks as if
23  Schianchi was involved too, first he sent back this
24  thing with the phone approval, and perhaps we said
25  that's not good enough, find him and get him to sign

Page 250

1   it.  That's all it is.  Doesn't change anything that
2   we've discussed.
3       Q.   All right, 5845.  Here's a wire
4   instructions to Schianchi, looks like there's a David
5   Richards stamped signature of February 11, 2005; is
6   that right?
7       A.   Yep.  Yes.
8       Q.   $25,000 being wired to Schianchi in
9   conjunction with agreements.  It says "If the
10  agreements are not signed immediately the $25,000 is
11  to be returned to Skye immediately."
12           What agreements were those?
13      A.   Unless there's some other agreements that
14  are about this time, I don't know.  Might have been
15  just referring to this agreement, although that
16  doesn't seem likely to me.
17      Q.   There haven't been any agreements produced
18  dated 2/11/05, that's why I'm asking this question.
19      A.   Well, no, I don't think necessarily it
20  was -- the agreements were not, probably, most likely
21  but maybe not sent on 11 -- maybe this was something
22  that had been occurring and finally they said they'd
23  sign but we need $25,000 to do this and we said okay,
24  here's 25, you have to sign the agreements.
25      Q.   Do you know which agreements though?

Page 251

1       A.   No, I don't.  There might be a document
2   that I can use to remember that but I don't -- it's
3   not here.
4       Q.   I want to ask you the same question about
5   page 5848, this one makes reference to an agreement
6   dated September 22, 2004.  We haven't seen any such
7   thing.  Do you have any idea what that's referring
8   to?
9       A.   You're talking about 5848?
10      Q.   Yes.  There's a reference there, the
11  language in this on this page is similar to one of
12  the pages we just looked at except the date of the
13  agreement here is different.  This one refers to
14  another date for an agreement which we don't have,
15  particularly one dated September 22, 2004, which is
16  attached hereto, except it's not attached hereto.
17           So I'm asking you if you have any idea
18  what agreement you entered into with Gruppo Triad on
19  September 22, 2004, because we can't tell from
20  anything you've produced to us.
21      A.   Well, I don't know.  It looks like a
22  two-page fax and it would have been a cover page, and
23  so if there wasn't a cover page, there could have
24  been another page that was attached hereto that would
25  have been obviously something short.  Perhaps it was

Page 252

1   a sort of a waterfall rep or something like that, but
2   again, I shouldn't guess or speculate, I don't know.
3       Q.   We'll be asking when the deposition's over
4   with regard to these various agreements that are
5   referred to in the payment documents that have dates
6   that don't match any of the agreements for you to
7   redouble your efforts and see if you can find them.
8       A.   I've looked pretty hard already.
9       Q.   We're going to ask that you look again
10  because the dots don't connect with some of these
11  documents.  That's why I'm asking you about it.
12           You can't -- the date September 22, 2004,
13  that's not ringing a bell in your mind as to the date
14  of any particular agreement, right?
15      A.   Well, I remember we sent him some money
16  and changed the waterfall but that's what I recall.
17      Q.   On that date in particular?
18      A.   That timeframe.
19      Q.   Let's take a look at page 5849.
20      A.   Okay.
21      Q.   Here we have a Western Union document
22  reflecting a wire transfer in some manner of
23  $5,000 from David Richards to Schianchi of $5,000.
24  And there is a receipt from Kroger.  You see that?
25      A.   Yes.

www.IntegrityReportingGroup.com
614.875.5440

CONFIDENTIAL

David J. Richards - 30(b)6

Page 253

1  Q.  Is this the -- does this document pertain
2  to the Larry Corna incident where he stole the
3  thousand dollars?
4  A.  I wouldn't say that he stole. I don't
5  think that I said that he stole the thousand dollars.
6  I think he retained it as a commission and we
7  evidently disagreed whether he had a right to do
8  that.
9  Q.  Does this document pertain to that
10 incident?
11 A.  I think so, yes.
12 Q.  Take a look at the next page, 5850.
13 Customer copy of some form of Western Union money
14 transfer and customer signature looks like yours.
15 Looks like it might be somebody writing "David
16 Richards." Is that your signature there? You have
17 to turn the page upside down and look at 5850.
18 A.  I'm trying to see what this is. But if
19 your question is only --
20 Q.  I'll tell you what it is first, so you
21 understand it. It looks like it pertains to the
22 preceding page 5849 because the amount net of the
23 service fee to Western Union to Corna is $215 so
24 you've got a $5,000 transaction, net 215, comes out
25 on 4785. You see that number on page 5849 and you

Page 254

1  see the same number on the form that's filled out on
2  page 5850. These seem to be of a piece.
3  You with me so far?
4  A.  I see the 4875.
5  Q.  4785.
6  A.  I'm dyslexic, so, yes.
7  Q.  Now, with all that behind us, is this your
8  signature at the bottom of 5850 turned upside down?
9  A.  It looks like it, yeah.
10 Q.  So how did this transaction with Corna
11 happen? Did you actually go with him to Kroger?
12 A.  No. He might have probably brought me
13 this piece of paper to sign.
14 Q.  He brought you the Kroger form and you
15 signed it.
16 A.  I assume so, yeah.
17 Q.  Let me just ask you quickly about the last
18 page of these documents, 5855, what's that?
19 A.  The very last page?
20 Q.  Yeah.
21 A.  I think that's a record we -- I might have
22 found on computer that I produced to the attorneys.
23 Q.  Something you found recently after Judge
24 Kemp ordered Skye Ventures to produce the payment
25 documents?

Page 255

1  A.  In connection with that looking for
2  anything I had on payment, yes. Or it's possible
3  that Rick gave me this, so.
4  Q.  When you asked him if he had anything
5  along these lines?
6  A.  And we met.
7  Q.  Recently.
8  A.  Yeah.
9  MR. SCHWARTZ: We'll take a break here for
10 a few minutes, I think we have a little less than an
11 hour to go and we'll wrap it up in the final wave.
12 VIDEOGRAPHER: Off the record 5:07.
13 (Recess taken.)
14 VIDEOGRAPHER: On the record 5:21.
15 Q.  Mr. Richards, is it Skye Ventures'
16 position that Venezuela entered into an agreement
17 with Gruppo Triad to extend the maturity date on
18 notes 7 of 12 and 8 of 12 in 1991 to 1999?
19 MR. COOPER: Object to the extent it calls
20 for a legal conclusion. You can answer.
21 A.  I would state the situation as I
22 understand it a little differently than that. So
23 that I would not specifically say that.
24 Q.  So your answer to that question is no?
25 A.  I would not -- I would say I have a

Page 256

1  position that's similar to that but not just exactly
2  as you said it.
3  Q.  Can you answer my question?
4  A.  If you could read it again or say it
5  again.
6  Q.  Is it Skye Ventures' position that
7  Venezuela entered into an agreement with Gruppo Triad
8  to extend the maturity date on notes 7 of 12 and 8
9  of 12 from 1991 to 1999?
10 A.  I believe that at some point they reached
11 such a consensus or agreement.
12 Q.  When did that reach such an agreement?
13 A.  So --
14 Q.  Let me just rephrase the question.
15 My question has nothing to do with a
16 consensus. My question has to do with an agreement.
17 So you've got a law degree, right?
18 A.  I'm not a practicing lawyer, haven't been
19 for 20-some years.
20 Q.  Do you have a law degree?
21 A.  I graduated from law school, yes. And it
22 has not been taken back from me.
23 Q.  And you've been a businessman for a long
24 time now, right?
25 A.  Yes.

64 (Pages 253 to 256)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 257

1      Q.    And you've entered into many agreements
2  either personally or on behalf of the companies with
3  which you've been involved, right?
4      A.    I've entered all kinds of agreements,
5  verbal, written, et cetera, sure.
6      Q.    You think you know what an "agreement" is?
7      A.    I think the legal definition of an
8  "agreement" is a meeting of the minds.
9      Q.    Is it Skye's position that Venezuela
10  entered into an agreement with Gruppo Triad to extend
11  the maturity date on notes 7 of 12 and 8 of 12 from
12  1991 to 1999; yes or no?
13      A.    Again, something like that but it might be
14  easier for me to tell you what factually happened as
15  opposed to reach a conclusion as to whether it was an
16  agreement or not, but I think in essence there was,
17  yes.
18      Q.    Was that agreement in writing?
19      A.    I don't think -- I've never seen a written
20  agreement to that effect.
21      Q.    Do you believe that Venezuela entered an
22  oral agreement with Gruppo Triad to extend the
23  maturity date on notes 7/12 and 8/12 from 1991 to
24  1999?
25          MR. COOPER: Before you answer I want to

Page 258

1  make sure we're on the same page. Just for my own
2  knowledge which topic are we on?
3          MR. LUCAS: I think we should go off the
4  record if we're going to do this.
5          MR. SCHWARTZ: Yeah, I don't want to take
6  the time to be combing through the records.
7          MR. COOPER: Rather than do that, I can
8  put a general objection to the extent it exceeds the
9  scope.
10          MR. SCHWARTZ: You can object. Obviously
11  we're not acquiescing on the objection but your
12  objection is noted.
13          MR. COOPER: So back on the record then.
14          THE WITNESS: I think we stayed on the
15  record.
16          MR. SCHWARTZ: We're on the record.
17          VIDEOGRAPHER: Yeah, we are.
18      Q.    You want the question read back?
19      A.    Yes.
20      Q.    Please read it back.
21          (Record read.)
22      A.    My understanding was there was oral
23  discussions and essential basically consensus to
24  extend the notes.
25      Q.    What do you mean when you say "essential

Page 259

1  consensus to extend the notes"?
2      A.    Well, I mean, that obviously if it's
3  Venezuela that makes the decision unilaterally
4  whether they are going to pay or not, and so I
5  believe there were oral discussions with Venezuela
6  both before and immediately after or soon after
7  concerning whether they were going to pay the notes.
8  And I think it was discovered that they didn't have
9  the ability to pay the notes.
10          And I think there was discussion -- I
11  think there was discussion as to what they would do
12  and I think they went along with or agreed to or
13  there was a consensus that they weren't going to do
14  anything, the notes were extended.
15          Now, I obviously don't read Spanish and I
16  have not recently read what the Attorney General or
17  the Ministry of Finance concluded as to exactly what
18  happened. I do know that they said that the notes
19  were extended until 1999 and I do know that they
20  concluded that the statute of limitations did not bar
21  the bringing of an action on the notes. So this is
22  independent of that.
23          You're asking me if I think that, you're
24  not asking me if I think it's important or crucial or
25  whether my diligence focused on it, but that's what I

Page 260

1  think, that's what I understand happened.
2      Q.    And in making that assertion what evidence
3  are you relying on?
4          MR. COOPER: Objection, exceeds the
5  scope --
6      A.    Discussions with counsel --
7          MR. COOPER: Make sure I get my objection
8  out.
9          THE WITNESS: I'm sorry.
10          MR. COOPER: Objection, exceeds the scope
11  of the 30(b)(6).
12          MR. LUCAS: Rather than wasting time,
13  we'll just give you a standing objection on that. It
14  will be there. We've already agreed you can make
15  objections other than to form afterwards.
16          MR. COOPER: My only concern is that some
17  of the judges in this District say there's no such
18  thing as a standing objection.
19          MR. SCHWARTZ: Let's not waste time
20  arguing about it. If you want to object to every
21  question, go right ahead.
22      Q.    (By Mr. Schwartz) Can you answer that one?
23      A.    I thought I answered it when he --
24      Q.    No, no, he interrupted, and I'm not
25  suggesting he was trying to interrupt. Let's read

65 (Pages 257 to 260)

Page 261

1    the question back.
2        (Record read.)
3        A.   I think mostly discussions with counsel.
4    I don't think I had -- I didn't have this discussion
5    with Pavanelli or anybody at Gruppo.
6        Q.   Do you have any knowledge of any evidence
7    to support your assertion that there was an oral
8    agreement to extend the maturity date that you
9    received from any source other than your lawyers?
10       MR. COOPER:  Same objection.
11       A.   My assertion wasn't that simple or black
12   and white.  I said there was discussions and oral
13   consensus of some type reached that Gruppo didn't
14   file action.  That's my understanding.
15       Q.   And who participated in the discussions
16   that you say gave rise to an oral consensus?
17       MR. COOPER:  Same objection.
18       A.   I think Gruppo had people working for them
19   in Venezuela that had those.  And I --
20       Q.   Who were they?
21       A.   I'm trying to think of their names but I
22   don't remember.
23       Q.   Who participated in those oral discussions
24   on the part of Venezuela or the Ministry of Finance?
25       A.   I don't know.

Page 262

1        MR. COOPER:  Same objection.
2        Q.   By the time you first met Pavanelli in
3    Como, Italy, in late March or early April of 2004,
4    how much money had you paid to Gruppo Triad,
5    Schianchi, or Pavanelli?
6        A.   Well, I know that by April I'd paid him
7    approximately $250,000.  And that sometime in the
8    course of this I had made -- before that I had made
9    various payments that equated to that.  And I'm
10   looking at this register that I gave you that I
11   downloaded from CNBC and it appears to say that -- by
12   March 31st you're saying?  When I went to Como?
13       Q.   Yes.
14       A.   When I went to Como it looks as if, if I
15   were eyeballing it, yeah, looks like about 250 that I
16   would have paid him by then.
17       Q.   And by the time you agreed to buy notes
18   7/12 and 8/12 in early August of 2004, how much money
19   had you paid to Pavanelli, Gruppo Triad, or
20   Schianchi?
21       A.   Well, according to this register, it looks
22   as if I had paid another $80,000 cash.  Well, no,
23   take that back.  Maybe -- no -- yeah, I would say it
24   looks as if after 3/19 there were only, in terms of
25   cash payments there were only two additional

Page 263

1    payments, one of 50,000 and one of 29,000.
2        Q.   So what is the total of the amount of
3    money that you had paid to Gruppo Triad, Pavanelli,
4    and Schianchi by the time you agreed to purchase
5    notes 7/12 and 8/12 in early August of 2004?
6        A.   You're just talking only the cash
7    consideration?
8        Q.   Yes, cash consideration.
9        A.   Looks to me as if it were, if 250's the
10   correct eyeball-looking-at-it number for prior to
11   3/31, it looks like it would be 330.
12       Q.   We're going to mark Exhibit 28.
13       (RICHARDS/SKYE EXHIBIT 28 WAS MARKED.)
14       Q.   Mr. Richards, I'm showing you what's been
15   marked as Exhibit 28.  Please take a moment and
16   review this document and let me know if you've seen
17   this before.
18       A.   No, I haven't seen it before.
19       Q.   This is a letter -- translation, actually,
20   of a letter from Schianchi to Carlos Delgado Morean.
21   Do you recognize that name, Carlos Delgado Morean?
22       A.   Well, there's a Roman Delgado that I
23   mentioned having met with in April, we talked about
24   having met with Roman Delgado.  So this, I don't know
25   if this is the same person or not.  Might be.  But

Page 264

1    this is also probably the Delgado that was referred
2    to in the letter about the guy who had the buyers for
3    the notes.
4        Q.   Had you ever received any information that
5    Schianchi, on behalf of Gruppo Triad, was making an
6    offer to anybody in the January 2004 timeframe along
7    the lines of what's described in Exhibit 28?
8        A.   The only knowledge I had was generic that
9    there was some banker --
10       MR. COOPER:  Hang on.  Have you read his
11   letter completely?
12       THE WITNESS:  No.
13       MR. COOPER:  Before you answer any
14   questions about whether something's been done along
15   the lines, I want you to read the letter entirely.
16       THE WITNESS:  Oh, "along the lines."
17       A.   So, yes, okay, I've read it.
18       Q.   In the early 2004 timeframe, let's say the
19   first quarter of 2004 to be more precise, did you
20   ever come to learn that Schianchi, acting on behalf
21   of Gruppo Triad, was making an offer to anyone along
22   the lines that are described in Exhibit 28?
23       A.   No.  The only knowledge I had is what we
24   had discussed yesterday generically.
25       Q.   Did you ever learn that in the first

66 (Pages 261 to 264)

CONFIDENTIAL

David J. Richards - 30(b)6

Page 265

1    quarter of 2004 Schianchi or Pavanelli or Gruppo
2    Triad were attempting to obtain the original
3    October 3, 2003, Attorney General opinion?
4        A.    No. I don't even see where it says that
5    in there.
6        Q.    Well, look at the end of the first
7    paragraph. You see the sentence that says
8    "Additionally, I can confirm that this transaction
9    will only take place after the original 'dictate of
10   the Public Prosecution of the Venezuelan Republic'
11   dated 3 (third) October 2003, (two thousand and
12   three) has been deposited with me, signed by the
13   Prosecutor Dr. Marisol Plaza"?
14       A.    I see that.
15       Q.    So did you know in the first quarter of
16   2004 that Gruppo Triad or Pavanelli or Schianchi or
17   some combination of them was -- were trying to obtain
18   the original October 3, 2003, opinion?
19       A.    I didn't know that --
20           MR. COOPER: Object to foundation. You
21   can answer.
22       A.    I didn't know that.
23       Q.    Did they ever tell you that they were
24   attempting to do that?
25       A.    No. We had, Jacir had obtained copies by

Page 266

1    then and we had gotten them but nothing had ever come
2    up about trying to get the original one sworn to by
3    Maurice Marisol Plaza.
4        Q.    In deciding to purchase the purported
5    notes numbered 7/12 and 8/12, did you rely on advice
6    that Alcalde gave you?
7        A.    Yes.
8        Q.    What advice from Alcalde did you rely on?
9        A.    Well, I think, I mean, I don't mean to be
10   difficult but I think I went through this entire
11   thing of everything that he did I relied on already.
12   I can do it again if you like.
13       Q.    What advice did he give you that you
14   relied on?
15       A.    You mean like legal advice, what legal
16   advice did he render to me?
17       Q.    Any advice that he gave you that you
18   relied on.
19           MR. COOPER: Objection to the extent it
20   calls for you to disclose legal advice from your
21   counsel. To that extent you're not to answer.
22       A.    Well, I can't tell you everything he told
23   me. I can't tell you -- you're making this
24   distinction between attorney/client and diligence, so
25   it would be difficult for me to --

Page 267

1        Q.    I'm not making that distinction,
2    Mr. Cooper on his objection. We don't
3    acquiesce on his objection but this is not the time
4    to argue about those things. I'm asking you what
5    advice from Alcalde did you rely on in making your
6    decision to purchase notes 7/12 and 8/12?
7        A.    Okay. So --
8            MR. COOPER: Same objection.
9            THE WITNESS: So should I answer?
10           MR. COOPER: Not to the extent it requires
11   you to divulge legal advice, but otherwise you can.
12       A.    Well, I'm in a -- this is a case about
13   legal meanings of something so it's all legal. I
14   don't know what else to say. I think I've said
15   already in this deposition that I was relying on
16   Alcalde to tell me was the Attorney General decision
17   final and binding, was it irreversible under the law
18   of Venezuela. That was the primary thing I was
19   waiting for advice and that was the basis, the
20   primary basis, nearly the entire basis that we based
21   our claim on.
22           Everything else kind of was -- every other
23   thing that he did for me or advised me on or told me
24   about was sort of derivative of that main point. So
25   he began telling me things as early as November of

Page 268

1    2003. He told me a lot of things and all the way
2    through the point at which we filed the lawsuit. And
3    I think we've gone through a lot of those over the
4    course of the past two days.
5        Q.    Have you completed telling me what advice
6    you received from Alcalde that you relied on in
7    deciding to purchase the purported notes numbered
8    7/12 and 8/12?
9        A.    Yeah, I would think I answered it and I,
10   like, I referred to all the stuff that he told me and
11   all the stuff I've told you for last day or two. So,
12   yes, I think I've answered that question.
13       Q.    Earlier today you talked about the risks
14   inherent in making the purchase of the notes numbered
15   7/12 and 8/12. Do you recall that testimony?
16       A.    Yes, I recall talking about that. I don't
17   recall the exact testimony.
18       Q.    Prior to Skye deciding to purchase the
19   notes numbered 7/12 and 8/12, did you understand
20   there was a risk that the Venezuelan Attorney General
21   could change its opinion and determine that the notes
22   were invalid and not enforceable?
23       A.    I did not believe that was a risk. I'm
24   not saying that she couldn't try to change her
25   opinion, but as recently as, you know, shortly before

67 (Pages 265 to 268)

Page 269

1    we filed the lawsuit, she confirmed her opinion.
2         So could she change her mind after we
3    filed the lawsuit?  I suppose she could try, but the
4    advice that I received that that would not be legal,
5    under the Constitution of Venezuela that it was final
6    and binding and could not be appealed or changed.
7         Q.   Prior to making the decision to purchase
8    the purported notes 7/12 and 8/12 did you think there
9    was any risk that the Attorney General of Venezuela
10   could change its opinion and determine that the notes
11   were not valid and were not enforceable?
12        A.   She could try to do that or it could be
13   effective?  So I would distinguish between the two.
14   She could try to do anything.  Anybody could try to
15   do anything, of course.  But we believe that it could
16   not be done legally.
17        Q.   No risk whatsoever.
18        A.   Not -- well, any legal -- there's -- I
19   think lawyers have often told me there's nothing a
20   hundred percent.  But we viewed that that was -- we
21   didn't view that as any -- we honestly thought they
22   might pay.  I mean, we didn't know what they were
23   going to do.  So could they have done anything?  Yes,
24   they could have done anything they wanted to do.
25        Q.   Prior to the time you made the decision

Page 270

1    for Skye to purchase the purported notes numbered
2    7/12 and 8/12, did you think there was any risk that
3    the legal opinions you had received that the Attorney
4    General opinion was final and binding could be wrong?
5         A.   No lawyer is infallible, so there's some
6    chance of that, but I didn't believe that by any
7    means.  We had asked enough -- so many lawyers and
8    they -- if one lawyer tells you something and this is
9    true, okay, that's something and they back it up,
10   that's good, and you ask another lawyer and you ask
11   another lawyer and by the time you file the case we
12   must have asked in some detail a lot of lawyers we've
13   talked about.
14        So I didn't -- as anything is possible,
15   even if it had a one-one-thousandth of 1 percent risk
16   that you could characterize it as a risk, but there's
17   nothing that entered our mind as a risk.  We thought
18   we would prevail upon that issue.
19        Q.   Incidentally, to the extent you were
20   relying on information from Jacir, is it true that
21   Alcalde was, for all intents and purposes, the
22   conduit through which you received that information?
23        A.   I don't think I got information from Jacir
24   any other way than he gave it to Alcalde.  I think
25   we've also been over this in the last two days, that

Page 271

1    whether I got anything directly from Jacir, and I
2    think my response was that I might have been on an
3    email or two that was between Jacir and Alcalde in
4    Spanish.
5         So, and it's certainly possible that some
6    of the documents I got from Pavanelli in Chiasso and
7    brought back were from Jacir.  But I would say the
8    bulk of it from Jacir was through Alcalde.
9         Q.   So it's fair to say that for the most part
10   to the extent you were relying on anything from
11   Jacir, Alcalde was the conduit for that information.
12        A.   I think that's a fair characterization.
13        Q.   Prior to the time Skye decided to purchase
14   the purported notes numbered 7/12 and 8/12, did you
15   think there was any risk that the evidence would show
16   that those two notes were counterfeit and that
17   Venezuela would refuse to pay the notes because they
18   were counterfeit?
19        A.   I wouldn't -- vis-à-vis the risk that
20   anything could happen, we would say that, but our
21   view was that determination had been made by the
22   person -- I mean, the Attorney General had access to
23   all of this information and had made that
24   determination in a final and binding way.
25        So, again, we would say that there is

Page 272

1    nothing in life that is a hundred percent certain
2    except death, and so we did not view that as
3    significant risk.
4         Q.   Prior to the time Skye decided to purchase
5    the purported notes numbered 7/12 and 8/12, did you
6    think there was any risk that it would turn out there
7    was no agreement between Venezuela and Gruppo Triad
8    to extend the maturity date of those notes?
9         A.   Well, you asked me what I thought about
10   that.  I didn't -- we wouldn't have -- what our --
11   what we thought was that the Attorney General had
12   found that the notes were extended, and that for us
13   at the time was the end of it.
14        This issue that I told you I learned from
15   my lawyers of agreement and we talked about what
16   happened is a very recent thing.  So when we filed
17   the lawsuit, I would say that if it was a risk, if
18   that was a risk, I missed it.  We didn't focus on it,
19   so.
20        Q.   Is that also true at the time you
21   purchased the notes; if it was a risk, you missed it?
22        A.   Yeah, filed the lawsuit, purchased the
23   notes.  In my mind when I say that, I'm thinking
24   about essentially the same thing.
25        Q.   Now, you've testified many times over the

68 (Pages 269 to 272)

Page 273

1  last two days, including just now, that in your mind
2  when Skye purchased the notes marked 7/12 and 8/12,
3  the most important consideration in your mind was
4  your belief that the Attorney General's October 2003
5  opinion was final and binding, correct?
6      A.    That was the most important thing, yes.
7      Q.    And you've also testified that all the
8  other information that you had gathered about
9  Pavanelli and Gruppo Triad and the Bandagro notes was
10 interesting but was dwarfed in importance by your
11 belief as to the finality of the Attorney General
12 opinion; is that true?
13     A.    The only thing I would change about your
14 question is the word "interesting" to consider.  It
15 was considered but was dwarfed in importance and the
16 investment decision was made primarily based on the
17     Q.    If you had learned prior to purchasing the
18 purported notes 7/12 and 8/12 that Gruppo Triad had
19 never paid a dime for those notes, would you have
20 proceeded with the purchase of them?
21     A.    If you're asking me a hypothetical whether
22 I would or I wouldn't, the way I would answer the
23 question is I don't know.  But that, again, what we
24 were focused on was the Attorney General's decision
25 final and binding, could it be changed, what were the

Page 274

1  laws of Venezuela.
2         And again, I've said this before and I
3  want to emphasize it, if they paid 200 or 500 million
4  dollars for the notes and Pavanelli, the whole bearer
5  of the notes was the most perfect saint in the world
6  and the notes were not final and binding by the
7  Attorney General of Venezuela, we would have never
8  bought them.  And something close to the reverse is
9  true.
10     Q.    If you had learned prior to purchasing the
11 purported notes 7/12 and 8/12 that the maturity dates
12 for those purported notes had never been extended
13 beyond 1991, would you have proceeded with the
14 purchase?
15     A.    I proceeded --
16         MR. COOPER:  Note an objection,
17 hypothetical.  Go ahead.
18     A.    Again, same, right?  So if I don't know
19 what I would have done but I wasn't relying so much
20 on the actual event, I was relying on the finding of
21 the Attorney General who found that the notes were
22 extended and what we thought was a final and binding
23 opinion that couldn't be changed.
24         So if somebody had said to me well,
25 there's some question about whether these notes

Page 275

1  were -- when and how they were extended, I would have
2  said well, it doesn't really matter if somebody's
3  saying there was a question, this has already been
4  determined in a final and binding way.
5      Q.    If you had learned prior to purchasing
6  notes 7/12 and 8/12 that Pavanelli had been convicted
7  not once but twice for dealing in fake Bandagro
8  notes, including notes in the same series as the ones
9  you were going to be buying, would you have proceeded
10 with the purchase?
11         MR. COOPER:  Objection, foundation,
12 hypothetical.  You can answer.
13     A.    If -- well, remember, the Attorney General
14 herself said that there were notes that were false
15 and -- there were Bandagro notes that were false and
16 there were Bandagro notes that were legitimate.  And
17 so I would have had to know if --
18         So, if we got over this hurdle, that the
19 Attorney General decision was final and binding and
20 could not be changed, and then this additional
21 information was thrown into the mix, we would have
22 analyzed whether that would -- whether those
23 convictions had to do with these notes that the
24 Attorney General examined, how did the conviction
25 happen, was it an accurate conviction.  We would have

Page 276

1  looked into it.
2         And so we'd have gathered as much facts as
3  we can, compared it to our conclusion that the
4  Attorney General's decision was final and binding and
5  couldn't be changed, and made a decision.  What it
6  would be, I don't know.
7      Q.    And suppose you had learned that the
8  Italian conviction of Pavanelli concerned the very
9  same notes that he was trying to sell to you through
10 Gruppo Triad, would you have gone through with the
11 purchase in those circumstances?
12         MR. COOPER:  Same objection.
13     A.    I don't believe the notes were found false
14 in that, there was a declaration or a finding of
15 notes was false there.  That would be news to me.
16     Q.    The question was if you found out that the
17 Italian conviction involved the very same notes as
18 the ones that Pavanelli was trying to sell to you
19 through Gruppo Triad, would you have purchased them
20 anyway?
21         MR. COOPER:  Same objection.
22     A.    I would say exactly the same answer you
23 asked generically about the criminal case.  We would
24 have gathered information, we would have valued it, I
25 think we did that in the context of the Swiss

69 (Pages 273 to 276)

Page 277

1  conviction, which we did find records that were
2  consistent with Pavanelli's explanation, and so I
3  would have considered the facts at the time.
4        Remember, Pavanelli's story to me was this
5  story about the founder or the signers of the notes
6  trying to catch him and wear him down to a nub over
7  time and go around and testify and swear affidavits
8  against him.
9        So I'd have to take his story into
10 account, what was in that particular case into
11 account that we found and if we knew about it and
12 we'd make a decision.,
13    Q.    If you had learned prior to late July of
14 2004 that those notes marked 7/12 and 8/12 were
15 counterfeit, would you have proceeded with the
16 purchase anyway?
17        MR. COOPER: Objection, no foundation. Go
18 ahead.
19    A.    Probably not.
20    Q.    In making the decision that you did for
21 Skye to purchase notes 7/12 and 8/12, did you rely on
22 Pavanelli's story?
23    A.    In any degree? Everything that Pavanelli
24 told me that we checked out turned out to be
25 accurate. And there are some things that we were

Page 278

1  unable to check out, which we assumed were accurate.
2  Which had the ring of truth and we assumed to be
3  true.
4        So did it affect me in any way? Yeah,
5  probably in some way did. I mean, again, I would say
6  that the bulk of this was relying on the opinions
7  that the AG decision was final and binding and
8  couldn't be changed, et cetera, et cetera, that we've
9  discussed to some extent what he told me about his
10 story and more or less some parts of it we did rely
11 on.
12    Q.    Are there any parts of the story that he
13 told you prior to late July of 2004 that you
14 disbelieved?
15    A.    Say that again.
16    Q.    Is there anything Pavanelli told you prior
17 to the time you purchased the purported notes 7 of 12
18 and 8 of 12 in early August 2004 that you did not
19 believe?
20    A.    I'm trying to think back. Of course, I
21 don't think I have to go back and say we had a long
22 conversation, there was a lot of stuff, and I don't
23 think there was anything that I viewed as really
24 important that I didn't believe.
25    Q.    Independent of whether it was important,

Page 279

1  did he tell you anything prior to late July or early
2  August 2004 that you did not believe at that time?
3    A.    I don't think so. I just can't recall
4  anything like that.
5    Q.    In the intervening ten and a half years
6  have you come to believe that anything he told you
7  prior to the note purchase was false?
8    A.    I don't -- of course, I would mostly
9  remember things that were important to me. He maybe
10 said he had three daughters and only had two or
11 something like that that was unimportant. But to my
12 recollection everything he told me that was important
13 or that I recall turned out to be accurate. I just
14 don't remember anything else.
15    Q.    And that remains your view as of today.
16    A.    Well, it would have been more true then
17 because today my memory's faded as to what he told
18 me. So if it was true then.
19    Q.    But as you're sitting here today on
20 December 23, 2014, you can't think of anything he
21 told you prior to July 31, 2014, that was false?
22        MR. COOPER: Did you say "2014"?
23    Q.    I should have said "2004." Although the
24 question would probably have the same effect.
25    A.    Again, nothing comes to mind. If you have

Page 280

1  anything you would like to show me that you think is
2  false, I'll be happy to look at and tell you, but I
3  just don't remember anything like that.
4        MR. SCHWARTZ: Let's take a very quick
5  break. We've got just a few minutes left, I'll check
6  my notes and see if I have anything further.
7        VIDEOGRAPHER: Off the record 5:58.
8        (Off the record.)
9        VIDEOGRAPHER: On the record 6:06.
10   Q.    You testified yesterday, Mr. Richards,
11 that in the summer of 2004 Pavanelli was refusing to
12 turn over any of the purported promissory notes to
13 Skye. Do you recall that?
14   A.    Yes.
15   Q.    Did Pavanelli ever tell you why he was
16 unwilling to turn over any of the notes to Skye?
17   A.    Just the way he was, he didn't want to
18 give up holding the notes. That was in his nature.
19   Q.    Did he ever say anything to you about why
20 he wouldn't surrender possession of them?
21   A.    Other than "I will not give you the
22 notes," something like that.
23   Q.    Did you ever ask him why not?
24   A.    Well, I asked him, I might have told him,
25 well, you have to give me the notes or this is not

70 (Pages 277 to 280)

David J. Richards - 30(b)6

Page 281

1    going to go forward. I really don't care why. I had
2    to have the notes.
3        Q.    And what did he say?
4        A.    "I want to keep my notes." And then
5    eventually that was a typical back and forth with
6    Pavanelli that went on for a time and finally he
7    agreed to do it.
8        Q.    Do you know -- well, let me rephrase that
9    question.
10           What's your understanding of how many
11   holders of the notes there were before Gruppo Triad
12   got its hands on it?
13       A.    I have no understanding.
14       Q.    Have you ever investigated that?
15       A.    It might have been, I just don't remember
16   it.
17       Q.    Was it part of your due diligence?
18       A.    It might have been, I just don't remember
19   it.
20       Q.    Did you ever ask for any evidence of
21   payments having been made for the notes by anybody
22   who was a prior holder to Gruppo Triad?
23       A.    No.
24       Q.    Did Alcalde inform you of any risks in
25   going forward with the note purchase transaction?

Page 282

1        MR. COOPER: Objection to the extent it
2    calls for legal advice given to you by Alcalde. To
3    that extent, don't answer.
4        A.    Okay, well, I would say it was in this
5    legal discussion about his opinion I might have asked
6    him are you a hundred -- I don't remember, I guess.
7        Q.    I want to -- this is a yes or no question
8    to begin with. Did he tell you of any risks of going
9    forward with the note purchase transaction? Just
10   answer that yes or no.
11       A.    I don't remember.
12       Q.    Now, you say you consulted with many other
13   lawyers, correct?
14       A.    Yes.
15       Q.    Prior to making the note purchase?
16       A.    Yes.
17       Q.    Did any of those other lawyers tell you
18   there was a risk in going forward?
19       A.    I was pretty shocked by how consistent
20   these varying lawyers were that it was final and
21   binding, there's no doubt this is the Constitution of
22   Venezuela. It was very consistent. And I think I
23   asked well, can it be changed. No, it cannot be
24   changed. That kind of thing.
25           So I don't recall anyone saying to me that

Page 283

1    there was any specific risk, except the country is
2    ruled by a I think some -- I don't know who told me
3    this but I think it's probably true, that the country
4    is ruled by a dictator and he can make anything
5    happen in the country. I viewed that as at risk.
6            Like it was Hugo Chavez that was running
7    the country and he had all power and that was kind of
8    a risk, he could do anything he wanted.
9        Q.    Did any of the other lawyers, setting
10   aside now Alcalde, tell you that there was any risk
11   going forward with the transaction?
12       A.    One of them might have told me what I just
13   told you about Chavez and I think one of them did and
14   I don't remember who.
15       Q.    Other than that risk did any of the other
16   lawyers tell you there was any risk in going forward
17   with the transaction?
18       A.    I don't recall that happening.
19           MR. SCHWARTZ: All right, those are all
20   the questions that we have for Mr. Richards in his
21   capacity as a 30(b)6 witness for Skye Ventures at
22   this juncture.
23           I'm going to indicate that we're going to
24   hold the deposition open to deal with any potential
25   follow-up questions based on documents we have not

Page 284

1    yet seen.
2            I'm sure that our friends across the table
3    will not acquiesce in that position, as is the normal
4    dynamic in such circumstances. But in our standpoint
5    the deposition is suspended pending the production of
6    additional documents that should previously have been
7    produced, of which there are quite a few. We will
8    itemize all those in the appropriate manner for
9    opposing counsel.
10           Subject to that observation, we have no
11   further questions at this point in time.
12           MR. COOPER: And while we don't agree, I
13   think you've correctly noted, we don't agree that the
14   deposition should be left open or that documents have
15   not been produced that should have been produced, we
16   understand that's your position and I think we've had
17   some discussions off the record either between you
18   and Rex or you and I about our willingness to
19   continue to look for any documents that may be
20   responsive to prior requests as part of an ongoing
21   obligation.
22           MR. SCHWARTZ: And we appreciate that and
23   we'll be in contact about that.
24           Mr. Richards, I want to thank you very
25   much for your being here over the last two days and

Page 285

```
1    providing your testimony.
2         And I wish everybody here a happy and
3    healthy holiday season.
4         THE WITNESS:  Same to you.
5         MR. SCHWARTZ:  We can go off the record.
6         MR. COOPER:  Stay on the record briefly.
7         Dave, you have the right to read or waive.
8         MR. SCHWARTZ:  We've talked about that.
9         MR. RICHARDS:  We'll read.
10        MR. COOPER:  We'll waive the viewing of
11   the video.
12        (Whereupon, at 6:11 p.m., the deposition
13   was concluded and signature was not waived.)
14                       --|--
15
16
17
18
19
20
21
22
23
24
25
```

Page 287

```
1
2
3                    CERTIFICATE
4    State of Ohio        )
                          ) SS:
5    County of Franklin   )
6        I, Julieanna Hennebert, RPR and RMR, the
     undersigned, a duly qualified and commissioned notary
7    public within and for the State of Ohio, do certify
     that, before giving his deposition, DAVID J. RICHARDS
8    was by me first duly sworn to testify to the truth,
     the whole truth, and nothing but the truth; that the
9    foregoing is the deposition given at said time and
     place by DAVID J. RICHARDS; that I am neither a
10   relative of nor employee of any of the parties or
     their counsel and have no interest whatever in the
11   result of the action.
12        IN WITNESS WHEREOF, I hereunto set my hand and
     official seal of office on this 29th day of December,
13   2014.
14
15            Julieanna Hennebert, RPR, RMR,
              and Notary Public in and for the
16            State of Ohio.
17   My commission expires February 19, 2018.
18   (1135-JLH)
19                       --|--
20
21
22
23
24
25
```

Page 286

```
1                    AFFIDAVIT
2    State of Ohio        )
                          ) SS:
3    County of            )
4        I, DAVID J. RICHARDS, do hereby certify that I
     have read the foregoing transcript of my deposition
5    given on Tuesday, December 23, 2014; that together
     with the correction page attached hereto noting
6    changes in form or substance, if any, it is true and
     correct.
7
8    _____
              DAVID J. RICHARDS
9
10       I do hereby certify that the foregoing
     transcript of the deposition of DAVID J. RICHARDS was
11   submitted to the witness for reading and signing;
     that after he had stated to the undersigned Notary
12   Public that he had read and examined his deposition,
     he signed the same in my presence on the _____ day
13   of _____, 2014.
14
15   _____
         Notary Public
16
17   My commission expires _____, _____.
18                       --|--
19
20
21
22
23
24
25
```