UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRFP LLC, D/B/A SKYE          )
VENTURES,                     )
                              )
  PLAINTIFF,                  )          CASE NO. 2:04-cv-0793
                              )
        vs.               )
                              )
REPUBLICA BOLIVARIANA         )
DE VENEZUELA, ET AL.,         )
                              )
  DEFENDANTS.                 )
_____)


VOLUME 1
TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
MONDAY, FEBRUARY 1, 2016; 8:45 A.M.
COLUMBUS, OHIO

  FOR THE PLAINTIFF:
      Cooper & Elliott, LLC
      By:  Charles H. Cooper, Jr., Esq.
          Rex H. Elliott, Esq.
          Charles B. Cooper, Esq.
          Adam P. Richards, Esq.
      2175 Riverside Drive
      Columbus, Ohio 43221


      Law Offices of John C. Camillus
      By:  John C. Camillus, Esq.
      P.O. Box 14140
      Columbus, Ohio 43214

FOR THE DEFENDANTS:
       Foley Hoag, LLP
       By:  Andrew Z. Schwartz, Esq.
            Matthew L. Baltay, Esq.
            Madeleine K. Rodriguez, Esq.
            Richard G. Baldwin, Esq.
            Thomas R. Ayres, Esq.
            Christopher E. Hart, Esq.
       155 Seaport Boulevard
       Boston, Massachusetts 02210

       Calfee, Halter & Griswold
       By:  Albert J. Lucas, Esq.
       1200 Huntington Center
       41 South High Street
       Columbus, Ohio 43215


FOR INTERESTED PARTY MIGUEL JACIR:
       Graydon Head & Ritchey
       By:  John B. Pinney, Esq.
       511 Walnut Street, Suite 1900
       Cincinnati, Ohio 45202


                         - - -


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

                    LAURA SAMUELS, RPR
              FEDERAL OFFICIAL COURT REPORTER
               85 MARCONI BOULEVARD, ROOM 121
                    COLUMBUS, OHIO 43215
                TELEPHONE NUMBER 614-719-3245

1    Monday Morning Session

2    February 1, 2016

3                    - - -

4        COURTROOM DEPUTY CLERK:  C-2-04-793, DRFP, LLC, d/b/a

5    Skye Ventures vs. Republica Bolivariana de Venezuela.

6        THE COURT:  Counsel, good morning to all of you.  I

7    understand that we are ready to, and prepared to, proceed with

8    testimony, but there is a preliminary matter that one of you

9    would like to address with me.

10       Mr. Schwartz, good morning.

11       MR. SCHWARTZ:  Good morning, Your Honor.  Thank you

12   very much for having this opportunity.

13       You made a comment in passing during the pretrial

14   conference on Friday regarding the jurisdictional issue in the

15   case that we believe warrants some brief discussion.  It

16   doesn't necessitate any argument or any ruling at this time,

17   but a brief mention of a few points.

18       When this case was before the Sixth Circuit, which was

19   before your time on the case, Your Honor, and before many of

20   ours, the Sixth Circuit rendered its ruling in a matter where

21   the case was before it on the pleadings and assumed in that

22   procedural posture that the alleged promissory notes were

23   valid, and then proceeded on that basis to conduct its

24   analysis.  But that was a hypothetical state of affairs based

25   on allegations of a complaint, and we're now moving from the

1  realm of the hypothetical to the realm of the real.

2       And the upshot of the Sixth Circuit's decision is that,

3  in order for there to be jurisdiction under the Foreign

4  Sovereign Immunities Act, the Plaintiff has to show that the

5  notes are real.  So, we just want to make clear, and that there

6  are no surprises, that from our standpoint that very much

7  remains an issue in the case.

8       THE COURT:  Well, I think you'd agree that we were

9  framing triable issues in the final pretrial conference.  The

10  validity of the notes is one of the triable issues.  I think

11  what your contention would be is that, if you can prove the

12  invalidity, you will win not only on the merits, but you will

13  deprive the Court of jurisdiction.  But the trouble is it still

14  means the validity of the notes is the same triable issue.  Do

15  you agree?

16       MR. SCHWARTZ:  It's absolutely clear, if the Plaintiff

17  can prove that the notes are real, then it can overcome this

18  part of the jurisdictional issue.  But it's important just that

19  we clarify that, because we passed it very quickly at the

20  pretrial conference.  It doesn't affect the evidence at all.

21  It's the same evidence.

22       THE COURT:  Right.  So, I'll note that.  But I think

23  we both agree it's the same —— the same issues will be before

24  the Court, but on two separate legal theories in the event you

25  can persuade me that the notes were invalid from the beginning.

1    MR. SCHWARTZ: Yeah. From our standpoint -- One of

2    the reasons that I raised this is, if the Plaintiff has any

3    theory under which it might try to prevail without showing the

4    notes are real, it will be our same position there is no

5    jurisdiction.

6    THE COURT: Well, I'm not deciding anything at this

7    point. We may have to reserve the legal aspects of this, but

8    I'll note your mentioning of the final decision in the Sixth

9    Circuit.

10    MR. SCHWARTZ: We're not asking for validity. I'm

11    very clear about that.

12    One other aspect of the Sixth Circuit decision -- It's

13    the last thing I have to say -- as we were reviewing this in

14    connection with the jurisdictional question I've just

15    addressed, there's an observation that the Sixth Circuit made

16    in its decision that's another subject we think the Court

17    should bear in mind going forward. Again, no ruling required

18    at this time. We're not asking for one.

19    But the Court did say -- and this is material to some of

20    the issues in the case -- that neither the first Attorney

21    General opinion, nor the second one, is settled law, in

22    Venezuela, binding the parties to this litigation. And I'm not

23    going to make any argument in any detail about the implications

24    of that statement, but I think it is something the Court should

25    bear in mind, and it concerns some of the subjects that we

1   touched on briefly on Friday.

2        That's all I have to say.

3        THE COURT:  Very good.  Thank you.

4        MR. SCHWARTZ:  Thank you.

5        THE COURT:  With that, I think we're ready for the

6   first witness.

7        Mr. Cooper, Mr. Elliott, you may call your first

8   witness.

9        MR. ELLIOTT:  Your Honor, before the first witness is

10  called, I'd like to, just because of the space constraints

11  here, introduce the representative of Skye Ventures, Dave

12  Richards, who will be sitting in the back of the courtroom.

13       MR. RICHARDS:  Good morning, Your Honor.

14       THE COURT:  Good morning.

15       MR. ELLIOTT:  Thank you, Your Honor.

16       THE COURT:  Very good.

17       MR. C. COOPER:  Good morning, Your Honor.

18       The Plaintiff's first witness will be Luis Alcalde.

19       THE COURT:  If you will come forward.

20       One thing that has changed over time, where

21  normally -- Thank you for getting the witness, but normally the

22  Court's security officers will stay in the courtroom.  So, if

23  you could have someone else arrange for the witness to appear,

24  that would be helpful.  And that's on both sides.

25       MR. C. COOPER:  Thank you, Your Honor.

1                          - - -

2                    LUIS MANUEL ALCALDE

3     Called as a witness on behalf of the Plaintiff, being first

4   duly sworn, testified as follows:

5                     DIRECT EXAMINATION

6     BY MR. C. COOPER:

7     Q.    Mr. Alcalde, would you begin by stating your full name

8   for the record?

9     A.    Luis Manuel Alcalde.

10    Q.    Could you spell your last name for the court reporter?

11    A.    A-l-c-a-l-d-e.

12    Q.    Thank you.

13          Mr. Alcalde, are you familiar with the dispute that

14  brings us to this court today?

15    A.    I am.

16    Q.    In general terms, what is your connection to this

17  dispute?

18    A.    I was hired by Skye Ventures, sometime in 2004, 2003, to

19  investigate the opinion of the Attorney General of Venezuela,

20  related matters, and then to file a lawsuit against the

21  Republic of Venezuela.

22    Q.    Before we delve into that, let's begin with some

23  background information.

24          Mr. Alcalde, where were you born?

25    A.    I was born in Havana, Cuba.

1    Q.    And where do you live now?

2    A.    Columbus, Ohio.

3    Q.    How long have you lived in Central Ohio?

4    A.    I've lived in Central Ohio -- With the exception of

5    three years when I was in the United States Army Judge Advocate

6    General's Corps, I've lived in Columbus, Ohio, or Central Ohio,

7    since 1971.

8    Q.    What languages do you read and speak?

9    A.    Spanish and English.

10    Q.    Are you fluent in Spanish?

11    A.    Yes.

12    Q.    Both reading it and speaking it?

13    A.    Yes.

14    Q.    Let's turn to your professional background, which you

15    mentioned a little bit about.  I would like to have you begin

16    by describing your education for the Court, please.

17    A.    Okay.  So, I, of course, graduated from high school.  I

18    graduated from Reynoldsburg High School.  I have a bachelor of

19    arts in political science from The Ohio State University.  I

20    have a J.D. from The Ohio State University College of Law.  And

21    I have a master's of law in business and tax from Capital

22    University Law School.

23    Q.    Are you licensed to practice law in Ohio?

24    A.    Yes, I am.

25    Q.    When did you become licensed to practice law in the

1    State of Ohio?

2      A.    1980.

3      Q.    Could you describe your professional career after you

4    obtained your law license?

5      A.    Yes.

6      Q.    After law school.  I'm sorry.

7      A.    Yes.  I went into the United States Army.  I was a JAG

8    officer with the Third Infantry Division in West Germany.  I

9    spent 14 months as a prosecutor, essentially trying felony

10   criminal cases.  Then I spent 16 or so months in the United

11   States Army Trial Defense Service, in Germany, essentially

12   defending felony criminal cases.

13        After that, I came back to Columbus.  I started working

14   for the Ohio Attorney General's Office.  Tony Celebrezze was

15   the Attorney General at the time.  I spent a year in a section

16   that was then called Administrative -- No.  It was called

17   Government Agencies.  And we provided advice to numerous

18   administrative agencies of the State of Ohio.  I was

19   responsible for several of those agencies.

20        The Attorney General then started a section to enforce

21   Ohio's prevailing wage law.  I became the first chief of that

22   section, and I did that for a year.

23        Then I spent a year as the Assistant Chief of Medicaid

24   Fraud, where I supervised the financial auditors and worked

25   with a grand jury investigating Medicaid fraud.

1    I then left the Attorney General's Office, and I went to

2    Crabbe, Brown and James, where I spent 22 years or so at that

3    law firm.  My legal career there sort of evolved.  I started

4    doing -- About two years, I started doing a lot of accident

5    litigation.  I then started doing a lot of products liability

6    litigation.

7    I worked with the -- We were representing Chrysler at

8    the time, which is where I met David Richards.  He was part of

9    Crabbe Brown at that time.  And we worked together, with

10   Charlie Brown, defending Jeep rollover cases and a number of

11   product liability cases involving Chrysler products.

12   My career then evolved again.  I started representing a

13   company that was doing a lot of trademark investigations, and I

14   sort of became their outside general counsel.  That company was

15   PICA.  I was working with them, doing sort of not criminal

16   investigations, but very akin to criminal investigations where

17   we were trying ferret out counterfeiters, making buys, and

18   working our way up the chain.  And I was providing the legal

19   advice for those investigations.

20   That also started me doing some international work.  The

21   company was doing work all over the world.  I represented the

22   State of Ohio in three class-action lawsuits against all the

23   mental state hospitals.  I represented the City of Columbus in

24   a 1983 action involving police activities.

25   I then started getting asked to do business and

1   commercial litigation.  I didn't have a background in business.

2   So, 19 years or so after I got my J.D., I went back to law

3   school; and I got an LL.M. in business and tax, not necessarily

4   to do tax, but simply so I could understand business better.

5         So, my practice, after that, changed to a combination of

6   I was still doing a lot of litigation, but I was doing a lot of

7   sort of business and some business litigation, which, you know,

8   brings us up to -- I don't know -- maybe about 2003, when I

9   became involved with this case because of my international

10  background and my Spanish and some of the other things.

11        I was at Crabbe Brown 'til 2008.  In 2008, I left to

12  work with PICA.  I worked with PICA for about ten or eleven

13  months.  Mr. Volpi and I, who I had represented for a number of

14  years, had a dispute about the nature of how the business

15  should go, and so I left.

16        I then spent the next three years representing Motley

17  Rice, which I had represented in the lead paint litigation

18  throughout the State of Ohio.  They were then in a lawsuit with

19  Sherwin Williams and Jones Day.  So, I essentially had one

20  case, which was representing Motley Rice.  I hired Kegler Brown

21  to be my co-counsel in that case.  And I spent the next

22  two-and-a-half to three years essentially traveling to Cuba,

23  trying to develop a lot of ties and a lot of business with

24  respect to Cuba, sort of anticipating the current scenario.

25        In 2011, I went to work for Kegler Brown as the team

1  leader for Latin America and started a practice focused on

2  Cuba, as well.

3      My work at Kegler Brown is sort of multi-disciplinary.

4  I get involved in cases that involve a variety of issues:

5  Civil, regulatory, criminal; for example, if there are expert

6  control violations and those sort of things.  I have

7  done -- I've done FCPA investigations, internal corporate

8  investigations with respect to large companies in Asia, and I

9  get involved in basically anything that has to do with Latin

10  America or Spanish because I spent a significant amount of time

11  also writing documents, legal documents, in English and

12  Spanish.

13  Q.    And does that bring us current on your legal career?

14  A.    I think so.

15  Q.    Let's shift gears.  Mr. Alcalde, are you familiar with

16  the word "Bandagro"?

17  A.    Yes.

18  Q.    What does "Bandagro" mean?

19  A.    Well, "Bandagro" means two things to me.  It means the

20  Bandagro Bank in Venezuela or the notes that are at issue, as

21  well.  So, sometimes I refer to the Bandagro notes as the notes

22  at issue in this litigation.  Obviously, it all initiates with

23  the Bandagro Bank.

24  Q.    And is the word "Bandagro" a shortened name for the

25  bank?

1    A.    Yes.

2    Q.    What is the full name?

3    A.    Banco de Desarrollo Agropecuario.

4    Q.    We'll refer to it as "Bandagro" --

5    A.    Yes.

6    Q.    -- for simplicity.

7          Approximately when did you first hear the name

8    "Bandagro"?

9    A.    I would say sometime in the fall, early winter, of 2003.

10   The exact date, I'm not sure.  But either David Richards or

11   John Kennedy -- well, probably David Richards -- mentioned to

12   me that there was something that he wanted me to look at with

13   respect to a matter in Venezuela.

14   Q.    In 2003, you were employed at Crabbe Brown at the time;

15   is that correct?

16   A.    Correct.

17   Q.    Have you told the Court all you recall from your first

18   recollections of hearing about Bandagro?

19   A.    Well, I mean, I recall that I was given a document to

20   read at some point in time, which turned out to be a copy of

21   the opinion of the Attorney General of Venezuela.  And I was

22   asked to call an attorney in Caracas, Venezuela, by the name of

23   Miguel Jacir.

24         And I recall that I was in John Kennedy's office, and we

25   made a call to Miguel Jacir.  He had been -- I think the time

1   had been prearranged.  I don't recall if I had prearranged the

2   time of the call or if someone else had, but there was a set

3   time for me to call Dr. Jacir.  And I recall that John Kennedy

4   and Dave Richards were in the office at the time.

5   Q.   Were you asked to undertake any specific tasks with

6   respect to, or that related to, Bandagro?

7   A.   Well, yes.  I mean, it was sort of an evolving -- I was

8   initially asked to read the document that I was given.  I was

9   initially asked to talk to Dr. Jacir on the telephone and sort

10   of start getting an understanding of the meaning and effect of

11   this opinion that the Attorney General of Venezuela had issued.

12         Then, after that initial phone call, after that initial

13   reading of the decision, which I was not reading in any

14   context, of course, I started having more communications with

15   Dr. Jacir in sort of trying to get an understanding of the

16   context of this opinion.

17         I recall that he had sent me a copy of the text of the

18   law that applied to the Attorney General of Venezuela which was

19   at issue.  I then started doing Internet searches for what I

20   could learn about this decision and the Bandagro Bank.  And I

21   would guess I was engaged in a process of learning both facts

22   and law with respect to this opinion, the circumstances

23   surrounding the opinion, the aftermath of the opinion, which

24   culminated in a trip that Mr. Richards and I took to Caracas,

25   Venezuela.

1     I believe our first trip was sometime in April of 2004,

2  where I -- I and Mr. Richards spent the better part of -- I

3  think we were there a couple of days, but pretty much the

4  better part of a day and a half, meeting with Dr. Jacir at his

5  house.

6     Later, we went to his office, obtained some documents.

7  Then I had a meeting with Roman Delgado and Oscar Guzman.  It

8  was a dinner meeting with Mr. Guzman, who, as I learned, had

9  been the individual that had led the investigation for the

10 Ministry of Finance.

11 Q.  I'm going to break those down in a moment and kind of

12 explore those.  But, before we do, did you have an

13 understanding of why you were being asked to perform these

14 tasks that you described?

15 A.  I didn't have an understanding, initially, other than

16 Mr. Richards thought that this was something that he wanted to

17 get a good understanding about.  As this timeline progressed, I

18 understood that Mr. Richards, representing a number of

19 investors, was evaluating whether or not this opinion of the

20 Attorney General of Venezuela was final and binding and whether

21 or not he wanted to invest in the notes that were the subject

22 of the opinion.

23 Q.  Okay.  Let me pause right there for a second and ask you

24 to look at Exhibits 1 and 2 in Binder Number 1, please.  That's

25 Binder Number 1, Exhibits 1 and 2.

1      Mr. Alcalde, you've been handed the original documents

2  of Exhibits 1 and 2.  Could you identify those for the record,

3  please?

4    A.    Yes.  These appear to be the notes that were eventually

5  obtained by Skye Ventures and which I had seen in Europe and

6  then were later delivered to my office at Crabbe, Brown and

7  James.

8    Q.    Are the notes designated in some way?

9    A.    Yes.  One note is designated "7/12," and the other note

10  is designated "8/12."

11    Q.    You have the originals in hand.

12        MR. C. COOPER:  And, Your Honor, with the Court's

13  permission, we'll retain the originals, but introduce copies to

14  replace them.

15        THE COURT:  I assume there is no objection.  Is that

16  correct?

17        MR. SCHWARTZ:  Well, there is an objection to the

18  extent that any of what's recited in the document would be

19  submitted for the truth of it because --

20        THE COURT:  Actually, the witness said -- I think he

21  used the word "purported."  At this point, this is what the

22  trial is about, but let's just identify them as where we start.

23  Is that fair enough?

24        MR. SCHWARTZ:  There is no question that these are the

25  two notes that the Plaintiff is trying to enforce.  There are

1  substantial questions about authenticity and hearsay.

2      THE COURT:  I understand.  But, in terms of what was

3  just requested by Mr. Cooper, you hold on to the originals.

4  The copies, for now, will suffice.  We may have to have some

5  people review the originals.  So, they have to be around, but

6  the copies satisfy you, Mr. Schwartz, for now?

7      MR. SCHWARTZ:  Yes.

8      THE COURT:  Very good.

9      MR. SCHWARTZ:  I don't want to have to keep popping up

10 and saying we contest the authenticity and it's pervaded by

11 hearsay.

12     THE COURT:  Right.

13     MR. SCHWARTZ:  So, hopefully, that will be understood.

14     THE COURT:  That is the number-one triable issue in

15 the case.  So you don't need to do that.

16     MR. SCHWARTZ:  Thank you.

17     THE COURT:  Thank you.

18  BY MR. C. COOPER:

19  Q.   Mr. Alcalde, you've mentioned in your testimony an

20 Attorney General opinion, or an opinion that you had reviewed.

21 Did you receive a copy of this opinion?

22  A.   Yes.

23  Q.   Do you recall approximately when you received a copy of

24 it?

25  A.   I don't recall approximately when, but I'm assuming

1   sometime in that October-November-December time period.

2   Q.   Of what year?

3   A.   2003.

4        MR. C. COOPER:  Could I ask that the witness be given

5   Exhibit 3 from Binder 1, please?

6        THE COURT:  It's Binder 2.

7        MR. C. COOPER:  I'm sorry, Your Honor.  We do have

8   that -- We had combined them into 1 and 2.

9        That's correct.

10  BY MR. C. COOPER:

11  Q.   Mr. Alcalde, could you identify exhibit -- Plaintiff's

12  Exhibit 3, please?

13  A.   Well, part -- The first 32 pages or so -- Okay.  Well,

14  here's what is confusing me.  You've given me an English one.

15  And, of course, I didn't see an English one until much later.

16       So, the first part of this appears to be a translation

17  of the opinion of the Attorney General of October 3, 2003.

18       Then we appear to have a copy, in Spanish, of the

19  opinion of the Attorney General of Venezuela dated October 3,

20  2003.

21       Then we appear to have another copy of the opinion of

22  the Attorney General of Venezuela dated October 3, 2003.

23       THE COURT:  Mr. Schwartz, is there an objection?

24       MR. SCHWARTZ:  No.  I'm just trying to --

25       THE COURT:  That's all right.  You can stand.

1          MR. SCHWARTZ:  -- take stock of the bulk of this

2     exhibit.

3          THE WITNESS:  Likewise.

4          THE COURT:  Well, just for my edification, we start

5     with the English version --

6          THE WITNESS:  Right.

7          THE COURT:  -- that Mr. Alcalde just mentioned.

8        The translation is not disputed; is that correct?

9          MR. SCHWARTZ:  The first part of this, I don't believe

10    so.  But this is a very large document.  And actually embedded

11    within -- By the way, I hope it's okay for me to be speaking

12    from here.

13         THE COURT:  Yes.

14         MR. SCHWARTZ:  Embedded within this document are many

15    objectionable aspects, but I'm trying not to disrupt the

16    examination any more than is necessary.

17         THE COURT:  All right.

18         MR. C. COOPER:  Your Honor, just for clarification,

19    what we've done with this translation is, we've taken

20    Venezuela's translation, Defendant's translation, and used that

21    in this case.

22         THE COURT:  So, as far as this document, there is not

23    a dispute as to the interpretation?

24         MR. SCHWARTZ:  As far as the English translation that

25    appears at the outset of this voluminous exhibit, that's

1  correct.

2       THE COURT:  Okay.

3       MR. C. COOPER:  There will be an explanation of one

4  word at the end of this; but for the bulk of the document, the

5  translation, I don't believe there is a dispute.

6       THE COURT:  All right.  Very good.

7       THE WITNESS:  Then the last copy of the October 3rd

8  opinion appears to be one copy in which Oscar Guzman has

9  certified each page of the opinion.

10  BY MR. C. COOPER:

11  Q.   I'm going to ask you, for now, to just set aside that,

12  the October 3, 2003, opinion.  And I want to go back and have

13  you walk through, for the Court, the steps that you took.  You

14  indicated that you recalled, in the early stages, speaking with

15  an individual named Miguel Jacir?

16  A.   Yes.

17  Q.   Could you spell his last name for the Court, please?

18  A.   J-a-c-i-r.

19  Q.   And who was Mr. Jacir?

20  A.   Dr. Jacir, as I learned, was the attorney for Gruppo

21  Triad that presented the claim in Venezuela respecting the

22  Bandagro notes at issue.

23  Q.   Do you recall approximately when you first spoke with

24  Mr. Jacir?

25  A.   Sometime in October-November 2003.

1    Q.    What did you discuss in the first conversation?

2    A.    Well, frankly, I had a very difficult time understanding

3    Dr. Jacir, but the intent of the telephone call was to discuss

4    the Attorney General opinion and its meaning, impact,

5    relevance.

6    Q.    Let me interrupt.  Why did you have a difficult time

7    understanding Mr. Jacir?

8    A.    Well, I didn't -- I had never met Dr. Jacir; and I

9    didn't realize, of course, when I called him, that he had

10   Parkinson's.  And, so, I was asked to call Dr. Jacir.  And, you

11   know, he's not an easy person to understand until you realize

12   that he's got Parkinson's and, you know, you attune yourself to

13   his speech pattern.  And, since I had no clue, I really had a

14   really hard time.  And when you don't know somebody and you're

15   not understanding what they're saying and you don't want to

16   keep saying "Slow down and repeat it," I mean, I did it a

17   couple of times; but, you know, it starts getting embarrassing.

18        So, frankly, you know, when I left that conversation,

19   you know, I jokingly thought that I was pretty sure that David

20   Richards and John Kennedy didn't believe that I really spoke

21   Spanish because I had -- you know, I was not able to really --

22   you know, I said more "I don't know" than anything else.

23   And -- but, you know, we spoke, I'm sure, a few more times.  I

24   started getting attune to it.

25        I still didn't know that Dr. Jacir was suffering from

1    Parkinson's until I actually met him in Caracas in April, but

2    he sent me an e-mail with the law.  And I started reading that.

3    I started doing my own research.  And then, you know, we

4    finally went down there to meet Dr. Jacir.

5              THE COURT:  Let me jump in.

6         You refer to him as "Doctor."  What is the significance

7    of that title?

8              THE WITNESS:  Your Honor, he's not a medical doctor.

9    He's a legal doctor.  But, in Latin American countries, unlike

10   the U.S., lawyers go by "Doctor."

11             THE COURT:  You could probably convince most of the

12   people in the room to go with that designation.

13             THE WITNESS:  I'd almost like to.

14             MR. SCHWARTZ:  Or Doctora.

15             THE COURT:  But this is the designation all lawyers in

16   Venezuela would use?

17             THE WITNESS:  Yes, sir.  Doctor, yeah.

18             THE COURT:  Thank you.

19             MR. SCHWARTZ:  Doctor or Doctora.

20             MR. C. COOPER:  Your Honor, we'll see that in the

21   correspondence and pleadings with "Doctor," and then "DRA" for

22   Doctora.

23             THE WITNESS:  If I'm referring to a medical doctor,

24   I'll make that difference.

25             THE COURT:  Thank you.

1          MR. SCHWARTZ:  That won't happen until

2    cross-examination.

3          THE WITNESS:  I don't know how to take that.

4    BY MR. C. COOPER:

5    Q.   Did you communicate with Dr. Jacir in writing?

6    A.   Yes.  I think there were a few e-mails.  But, really, I

7    mean, bulk -- most of my conversation -- you know, I don't know

8    that I had a lot of communications with Dr. Jacir until I

9    actually went down and met him.

10         MR. C. COOPER:  Could I have the witness be handed

11   Exhibit 78, please, in Binder 6?

12         COURTROOM DEPUTY CLERK:  Binder --

13         MR. C. COOPER:  -- 6.

14   BY MR. C. COOPER:

15   Q.   Mr. Alcalde, you've been handed Plaintiff's Exhibit 78.

16   Do you recognize this document?

17   A.   Well, it appears to be an e-mail that I sent to Mr.

18   Kennedy and Mr. Richards on or about February 14, 2004.  By

19   reading the text that's visible on here, I assume that I had

20   spoken to Dr. Jacir again on the telephone and was relaying

21   what Dr. Jacir had stated.

22   Q.   Did you send this e-mail on or about February 14th of

23   2004?

24   A.   I would have sent it on the date that is stated on here.

25   Q.   Do you have knowledge of the information that's set

1    forth in your e-mail?

2      A.    Well, I have knowledge that I spoke to Dr. Jacir and

3    what he told me about the -- "PG" there, Procuradora General,

4    Attorney General.

5      Q.    When you practiced at Crabbe Brown --

6            MR. SCHWARTZ:  Excuse me for a second.

7            Your Honor, just to make sure we have the ground rules

8    straight for something like this, consistent with the colloquy

9    we had at the pretrial conference, I'm operating under the

10   assumption, when we have a document with an out-of-court

11   statement like this and there is just testimony of this nature,

12   it's not necessary to stand up every time and say "hearsay":

13   we'll deal with it if the document is ever moved into evidence

14   later?

15           THE COURT:  Well, as I understand -- I'll hear from

16   both of you on this -- this would otherwise be hearsay, but

17   you're offering this more in an area of reliance, not so much

18   the truth of the matter?

19           MR. C. COOPER:  Yes, Your Honor.

20           THE COURT:  And your position?

21           MR. SCHWARTZ:  If the Plaintiff -- Well, let me back

22   up half a step.

23           As we've said before, and I'm not going to belabor right

24   now, we don't think that there is any place for reliance in the

25   case.  And I'm not going to explain it any further.

1          THE COURT:  We discussed this on Friday.  You

2     understand my view is narrower.  It's not reliance in a general

3     sense, but with regard to the opinion we're talking about, and

4     only that.

5          MR. SCHWARTZ:  Yes.  And that creates trouble from our

6     standpoint because, if there is any reliance in the case, then

7     we believe it can't be so narrowly cabined; but that's an

8     argument, I think, for another moment.

9          But, for now, since the document is not being introduced

10    into evidence and I'm trying, in the context of a bench trial,

11    not to be obstreperous, I just want to make sure we understand

12    that our not popping up every time for something like this is

13    without prejudice to our later opposing the introduction of the

14    exhibit.

15         THE COURT:  Right.  And, at this point, it's not being

16    offered.  So, that's all fine.

17         You may continue.

18         MR. C. COOPER:  Thank you, Your Honor.

19    BY MR. C. COOPER:

20    Q.   Mr. Alcalde, this e-mail is addressed to John Kennedy.

21    Who is John Kennedy?

22    A.   He was a partner of mine at Crabbe Brown.

23    Q.   And it's addressed to D. Richards.  Who is D. Richards?

24    A.   David Richards.

25    Q.   In this e-mail, there is a reference to the PG.  What

1    does that refer to?

2     A.    The Attorney General of Venezuela.

3     Q.    And why is it "PG"?

4     A.    That's -- That would have been using the Spanish.

5     Q.    And which stands for what?

6     A.    Procuradura General.

7     Q.    In the -- In this e-mail, there is a reference to

8    wanting you to read the law first.  What does that refer to?

9     A.    He wanted me to read the organic law of the Attorney

10   General.

11    Q.    Were you able to do that?

12    A.    Yes.

13    Q.    How did you obtain a copy of it?

14    A.    He sent me a copy.

15         MR. C. COOPER:  Could we show the witness Exhibit 121

16   in the same binder?

17    BY MR. C. COOPER:

18    Q.    Mr. Alcalde, you've been handed Plaintiff's Exhibit 121.

19   Could you identify that, please?

20    A.    This is an e-mail that I received on or about February

21   14, 2004, with the address for Miguel Jacir.  And embedded in

22   the e-mail is the text for the organic law of the Attorney

23   General of Venezuela.

24    Q.    When you received e-mails such as this related to

25   Bandagro, did you retain them as part of the file?

1    A.    Well, I am assuming that this e-mail was retained.

2    Q.    Was it your practice to retain the e-mails that you

3  either sent or received related to the Bandagro matter?

4    A.    It was my practice to retain e-mails that were what I

5  thought material.

6    Q.    In general terms, what is the text -- You don't need to

7  read it, but what is set forth in this Exhibit 121?

8    A.    The text of the -- Well, it starts out with what we can

9  call the legislative intent of the law, exposicion de

10  motivos -- e-x-p-o-s-i-c-i-o-n -- new word d-e -- motivos,

11  m-o-t-i-v-o-s -- which is akin to the legislative intent.  And

12  then we go into the actual articles of the law.

13      MR. C. COOPER:  Could we have the witness be given

14  Exhibit 7 from Binder 3?

15    BY MR. C. COOPER:

16    Q.    Mr. Alcalde, do you have Exhibit 7, Plaintiff's Exhibit

17  7?

18    A.    Yes.

19    Q.    All right.  It might be a little easier -- What is

20  Plaintiff's Exhibit 7?

21    A.    Exhibit 121 was the text of the law -- I'm sorry -- was

22  the text of the law in Spanish.

23      And Exhibit 7 appears to be an English translation of

24  the organic law of the Attorney General and, I should add, the

25  organic law at the time of the issuance of the opinion of the

1   Attorney General of October 2003.

2       Q.   Did that subsequently change?

3       A.   I don't know.  But, since I'm not sure, I thought I'd

4   make that clear.

5           THE COURT:  What's the date of this?

6           THE WITNESS:  December -- Well, let's see -- 2001 is

7   the presidential decree here.  It looks like it was signed and

8   published in the *Official Gazette of Venezuela* on the 13th of

9   December 2000.

10          THE COURT:  All right.  Thank you.

11      And, Mr. Cooper, is it your position this would have

12  been in effect in 2003-2004?

13          MR. C. COOPER:  It is, Your Honor.  I don't believe

14  there is any dispute.

15          THE COURT:  All right.

16    BY MR. C. COOPER:

17      Q.   Mr. Alcalde, what is the significance, if any, of this

18  information, the legislative history, if you will, and the

19  organic law of the Attorney General, to your task of assessing

20  the Attorney General opinion?

21      A.   Well, I was -- I was informed by Dr. Jacir that the

22  opinion of the Attorney General of October 3, 2003, was final

23  and binding against the Republic of Venezuela.  And, so, I

24  wanted to get a better understanding of that, obviously, by

25  doing several things.

1    Number one, since I speak Spanish, I wanted to read the

2    actual text of the statutes myself and understand them.  And I

3    also wanted to hire the best experts in Venezuela that I could

4    find to shed light on what Dr. Jacir was telling me with

5    respect to the finality of the Attorney General's opinion.

6    And as I -- you know.  This was an evolution on my part.

7    The more I learned, the more I wanted to learn about it.  And

8    so I wanted to understand the process, and I even looked

9    at -- I got a copy of the constitution of Venezuela.  I got a

10   copy of administrative procedure statutes.  And I engaged in

11   discussions with, at least in my opinion, preeminent experts on

12   the law in Venezuela.

13   Q.   Let's focus for a moment on the exhibit before you,

14   Exhibit 7.  What, if anything, did you learn about the organic

15   law of the Attorney General's Office as you undertook to

16   educate yourself about it?

17   A.   Sure.  I learned that, in 1999, a new constitution had

18   been enacted in Venezuela with the takeover of the Government

19   by El Partido Bolivariano, the Bolivarian Party, and with Hugo

20   Chavez becoming President.

21   After the new constitution was enacted, this specific

22   law -- There could have been other laws, but I was focusing on

23   this specific law.  This specific law was enacted, as it stated

24   in the legislative intent, to bring the Attorney General within

25   the framework of the new constitutional order and to, in

1  essence, empower the Attorney General of Venezuela as the sole

2  and principal attorney representing the State of Venezuela in

3  looking out for the interests of the patrimony of the State.

4        And it was -- it was important and, you know, it was set

5  forth in the legislative intent that that was the role of the

6  Attorney General.

7        In addition to that, the law created, what it says in

8  the legislative intent, an administrative procedure for claims

9  against the Republic of Venezuela, and also says in the

10  legislative intent to raise the relevancy of the role of the

11  Attorney General with respect to deciding the legality of

12  claims against the State and to also serve as a check on the

13  activities of other ministers when the patrimony of Venezuela

14  was at stake.

15        And, so, the significance to me was, number one, that

16  this was a new law; that the legislative -- that the General

17  Assembly was pretty clear in the intent and role for the

18  Attorney General, this new role for the Attorney General; and

19  then, of course, there was the articles that dealt with what

20  happens when there's a claim against the State of Venezuela and

21  the role of the Attorney General with respect to those claims.

22        So, the significance to me was that, as I was speaking

23  to Dr. Jacir, as I was talking to experts in Venezuela about

24  this law, you know, I was reading the text of these laws

25  myself; and I was able to ask questions about the text of these

1   laws to the attorneys and, you know, pose hypotheticals and,

2   you know, what if this and what if that, those sort of things.

3   Q.   You mentioned looking at articles or provisions of the

4   new organic law itself.  Could you turn to, in Exhibit 7, to

5   the page that's Bates stamped SKYE57, SKYE00057, please?

6   A.   Yes.

7        Am I going to need some of these exhibits?  It's getting

8   a little crowded over here.

9        COURTROOM DEPUTY CLERK:  You can just put them down.

10       THE WITNESS:  I want to make sure they don't all fall

11  at some point.

12       COURTROOM DEPUTY CLERK:  That's fine.

13       THE COURT:  I don't want to say I told you so, but I

14  warned you about multiple binders with witnesses on Friday.

15  But go ahead.

16       MR. C. COOPER:  And, Your Honor, I think we'll rectify

17  that on a break.

18       THE COURT:  Very good.

19  BY MR. C. COOPER:

20  Q.   Mr. Alcalde, looking at the page within Exhibit 7 marked

21  "Skye 57," could you tell us the significance, if any, of the

22  text on this page?

23  A.   Yes.  So, I read this text.

24       MR. SCHWARTZ:  Excuse me for a second.

25       I'm going to have to object to that question, Your

1    Honor, to the extent it's calling for Mr. Alcalde, who's not a

2    Venezuelan lawyer or a legal scholar, to be opining on the

3    significance of Venezuelan statutory provisions.

4         If the understanding of the question is what did he take

5    this to mean in the course of the assessment he was doing,

6    that's fine.  But the question is posed as though it's

7    addressed to an expert.

8           THE COURT:  Yeah.  And I think there is a nuance

9    there.

10        I think you would agree with that, Mr. Cooper?

11         MR. C. COOPER:  I agree, Your Honor.

12         THE COURT:  You'll each have experts on this issue,

13   anyway.

14         MR. C. COOPER:  Sure.

15         THE COURT:  So I'll listen to -- You can go ahead and

16   finish the answer.

17         MR. SCHWARTZ:  And, again, I'm not going to keep

18   standing up every this time happens.  Okay?

19         THE COURT:  Right.

20         MR. C. COOPER:  We're not trying to qualify Mr.

21   Alcalde as an expert on Venezuelan law.

22         THE COURT:  Yes.  I understood.

23       You may answer.

24         THE WITNESS:  Could you repeat the question?

25    BY MR. C. COOPER:

1   Q.   As you were assessing the laws in an effort to

2   understand the impact of the Attorney General opinion, what

3   significance, if any, did the text on this page have in that

4   process?

5   A.   Well, the significance to me was that, you know, I read

6   the relevant portions of the organic law of the Attorney

7   General with respect to the process of what happens when a

8   claim is filed with a minister that allegedly owes a debt; that

9   that minister is supposed to, in essence, you know, conduct an

10  investigation, then submit that investigation, duly documented,

11  to the Attorney General for the Attorney General to decide

12  whether the claim is under Venezuelan law procedente or not

13  procedente -- p-r-o-c-e-d-e-n-t-e, procedente -- which my

14  interpretation of "procedente" means whether it was a lawful

15  claim or not.

16        And, so, the significance to me was that, when that --

17  that -- I was reading, firsthand, the text that indicated that

18  the -- well, and then the text went on to say that the opinion

19  of the Attorney General was in this -- in the English

20  translation, it says has a binding effect.  In Spanish, the

21  word is "vinculante" -- v-i-n-c-u-l-a-n-t-e -- meaning that

22  it's final and binding.

23  Q.   And where within the articles do we see -- well, at

24  least where do we see the English?

25  A.   Article 56.  And, in this particular translation,

1  it's –– This translation says, her legal opinion –– If we look

2  in Article 56, the next-to-the-last sentence, it said:  "her

3  legal opinion concerning the admissibility of the claim."

4       I dispute that translation.  I dispute that the word

5  "procedente" means admissible.  The word "procedente" means

6  lawful, in the right, not admissible.

7  Q.    And, when you say "procedente," we have been looking at

8  the English translation on SKYE57.  Within the same exhibit, in

9  the second half of it, there's the Bates number Skye 57.  Could

10  you point to us, in the Spanish version, where we would find

11  "procedente"?

12  A.    Which exhibit?

13  Q.    Same exhibit.

14  A.    Oh!  The Spanish is behind?  Okay.

15       So, if we go to –– if you go to Skye 57 and we look at

16  Article 56 in the Spanish, the third sentence from the –– We

17  can see the word "vinculante" closing the last sentence, but

18  the sentence above reads:  "Su opinion juridica respecto a la

19  procedencia o no de la reclamacion."

20       Let me spell that for you.

21       First word is s-u.  Then opinion, o-p-i-n-i-o-n.  The

22  next word is j-u-r-i-d-i-c-a.  The next word is

23  r-e-s-p-e-c-t-o.  The letter a.  The next word is l-a.

24  Procedencia is p-r-o-c-e-d-e-n-c-i-a.  The letter o, a new

25  word.  Then the word n-o.  D-e.  New word l-a.  New word

1    r-e-c-l-a-m-a-c-i-o-n.

2    Q.   Mr. Alcalde, you've said --

3         MR. SCHWARTZ:  Excuse me for a second, Your Honor.

4         THE COURT:  My first question -- then I want to hear

5    from you -- is do we have a translation dispute here, because

6    if we do, we've talked about how we're going to resolve that?

7         MR. SCHWARTZ:  The parties don't have a dispute.

8         THE COURT:  All right.

9         MR. SCHWARTZ:  It appears that the Plaintiff has a

10   dispute with Mr. Alcalde.

11        This is a Plaintiff's Exhibit.

12        THE COURT:  Is the word in question with Mr. Alcalde

13   going to have some legal significance as we go forward?

14        MR. C. COOPER:  I believe it is, Your Honor.

15        THE COURT:  All right.  And, then, you know, I'd

16   mentioned to you I'm not fluent in Spanish.  I'm not the person

17   to resolve this.

18        Do we need to go to the third party, agreed upon, to

19   make the translation final decision?

20        MR. C. COOPER:  We may.  What I'm simply asking Mr.

21   Alcalde is, as he read this, what was his understanding of that

22   phrase.

23        THE COURT:  All right.  And you had another matter,

24   Mr. Schwartz.

25        MR. SCHWARTZ:  I have this matter:  I'm going to

1    object to the testimony and move to strike it.

2          This is the Plaintiff's exhibit and the Plaintiff's

3    exhibit translation.  The case has been going on since 2004.  I

4    haven't been with the case since 2004; but, to the best of my

5    knowledge --

6          THE COURT:  Well, let me ask you directly, when did

7    you first become aware of this translation issue?  Was it just

8    now?

9          MR. SCHWARTZ:  Yes.

10          THE COURT:  All right.

11          MR. C. COOPER:  Well, I don't know that that's true,

12    Your Honor.

13          MR. SCHWARTZ:  I'm speaking for myself.  I tell you

14    I'm blind-sided that Mr. Alcalde is taking issue with the

15    translation that the Plaintiff has --

16          THE COURT:  All right.  It's a one-word issue.

17          Is that right?  Is that what you said, Mr. Alcalde?

18          THE WITNESS:  Well, Your Honor, I've always taken

19    issue with that word, even when I was litigating the case.

20    I've always taken issue with it.

21          THE COURT:  You're a witness now.

22          Lawyers as witnesses, always an issue.  But here is my

23    question:  There is a word -- Is it a single word that's in

24    dispute, or is it a phrase?

25          THE WITNESS:  It's an important word.

1          THE COURT:  But one word?

2          THE WITNESS:  One word, yes.

3          THE COURT:  Let's just write this down.  What's the

4    word?

5          THE WITNESS:  Procedencia, p-r-o-c-e-d-e-n-c-i-a.

6          THE COURT:  All right.  And just so I'm clear, your

7    understanding of that word would be --

8          THE WITNESS:  That it's lawful, in accordance with

9    law, not -- The term that was used in the translation is

10   "admissible."

11       I can elaborate why I dispute it.

12         THE COURT:  No.  In other words, it's in accordance

13   with law, versus admissible in law?

14         THE WITNESS:  Yes, sir.  Yes, sir.

15         THE COURT:  And do you both see some legal consequence

16   as to which of the two is accepted?

17         MR. SCHWARTZ:  Potentially, although I would add that

18   we just can't focus on one word in the context of a clause like

19   this.  It needs to be read in context.  But, from our

20   standpoint, the larger issue is that the parties have been

21   working with the one translation forever.

22         THE COURT:  And that's the other one:  The admissible

23   in law?

24         MR. SCHWARTZ:  Yeah.

25         THE COURT:  That's what you're assuming?

1          MR. SCHWARTZ:  I'm reading from the Plaintiff's

2     exhibit.  This is the version that's been in circulation.  The

3     Plaintiff has never taken issue with its own translation of its

4     own exhibit.  And I think it's very late in the day to attempt

5     to do that by having Mr. Alcalde as some type of translation --

6          THE COURT:  There are one of two ways this could

7     happen.  Obviously, we'd want the witness to be scrupulously

8     truthful as he goes through this.  And if he disagrees with an

9     interpretation, he should say so, but that doesn't mean that

10    you have disputed what has been originally agreed upon.

11         Where are we with that, Mr. Cooper?

12         MR. C. COOPER:  Your Honor, our position has been

13    throughout this case, I believe, as Mr. Alcalde indicated, even

14    before we were involved, there was a dispute over that word.

15    In order to get past those disputes during the pleading

16    stage -- This wasn't our translation -- we adopted Venezuela's,

17    or just simply used, their translation, but recognized that

18    that word, to the extent it is a significant difference -- and

19    I'm not convinced that it is, but --

20         THE COURT:  Do we know at this -- I can't see -- I

21    don't know what else is coming from your experts, so I don't

22    want to be presumptuous, but these two are not irreconcilable

23    terms, it wouldn't seem to me.

24         MR. SCHWARTZ:  Well, they may be because Mr. Alcalde

25    is trying to add another dimension to binding by adding the

1    word "final," and it may have potential significance.

2          THE COURT:  That's why we went through this.  What I'd

3    written down doesn't include the word "final."  That's one of

4    the key issues here, it would seem to me.  But neither one of

5    these interpretations address that issue, do they?

6          MR. SCHWARTZ:  Well, I heard Mr. Alcalde say he was

7    taking issue with the translation to that extent.  But my point

8    is substantive, but also procedural.

9          You asked us to iron these types of issues out.

10          THE COURT:  That part, I understand.

11          MR. SCHWARTZ:  We ironed.  And here we are with this

12   Plaintiff's exhibit.

13          THE COURT:  I told you my intention will be -- You've

14   agreed on it, first and fortunately, but any interpretation

15   issue is going to be sent to someone with special knowledge in

16   Spanish.  And we can do that quickly, I understand.  But I

17   would just caution you there has to be some reason.  If it's

18   just a phrase that when you put these side by side they have no

19   legal consequence, then we're spinning wheels.

20          MR. SCHWARTZ:  Correct.  This one may have, but I

21   don't view this as a translation dispute in the sense that

22   you've contemplated there may be any.  This is a situation

23   where there was no dispute until a moment ago.

24          THE COURT:  I understand.  Well, unless you can

25   persuade me that there is some legal effect to this -- if there

1  is, then we need the third party involved.  But at this point

2  you're willing to indicate you're not sure?  Would that be the

3  best way to put it?

4       MR. SCHWARTZ:  I think the Plaintiff has to live with

5  its own exhibit.  That's our stance.  I'm telling you there is

6  not a dispute that needs being outsourced to the translation

7  czar.

8       I don't think Mr. Alcalde should be permitted to testify

9  as the faux translation --

10       THE COURT:  Well, if there is a dispute, I've already

11  said I'm not going to resolve an interpretation dispute.  I

12  guess the question to you, Mr. Cooper, is do we need to

13  activate our dispute resolution as far as language?

14       MR. C. COOPER:  I mean, I don't know that we do, but

15  we can certainly consult and let the Court know.  It can be

16  done very quickly if we do need to.

17       THE COURT:  I'll note, at this point, we have sort of

18  a dissident unresolved chord, so to speak.

19       So, with that, you may continue.

20       MR. C. COOPER:  Thank you.

21  BY MR. C. COOPER:

22  Q.  So, Mr. Alcalde, as you read the statute -- What I'm

23  seeking is your understanding of it as you began to form

24  impressions about the law and how it interacted with the

25  Attorney General's opinion.

1    A.   Well, my impression of it is that the opinion of the

2   Attorney General was issued in accordance with the organic law

3   of Venezuela from what I was reading and learning -- from the

4   organic law of the Attorney General.  I'm sorry.

5        MR. C. COOPER:  And so the record is clear and in

6   response to one of the Court's questions, if we could hand the

7   witness Exhibit 8, please, which I believe is a joint exhibit.

8        Is it 15 or 16?  This is in Binder 3.

9   BY MR. C. COOPER:

10   Q.   Mr. Alcalde, do you have Exhibit 8 in front of you?

11   A.   I do.

12   Q.   All right.  And does that indicate the date, the

13   effective date, of the Attorney General -- the organic law of

14   the Attorney General that we've been discussing?

15   A.   It has a date of November 13, 2001, at the top.

16   Q.   You've indicated that, in the course of trying to get an

17   understanding of Venezuelan law, you also reviewed other

18   sources of law, other statutes.  Did I understand you

19   correctly?

20   A.   Yes.

21   Q.   All right.  In Binder 4 --

22        MR. C. COOPER:  Could we have the exhibit -- the

23   witness be handed Exhibits 31, 32 and 33, please?

24        COURTROOM DEPUTY CLERK:  Binder 4?

25        MR. C. COOPER:  Binder 4.  And it's 31, 32 and 33.

1    BY MR. C. COOPER:

2    Q.    Mr. Alcalde, do you have Exhibit 31 in front of you?

3    A.    I do.

4    Q.    What is Plaintiff's Exhibit 31?

5    A.    It is the Spanish copy of the Constitution of Venezuela

6    of 1999.

7    Q.    At the bottom, there is a footer, kind of a print line

8    there.  Do you see the date to the right:  5-6, 2004?

9    A.    Yes.

10   Q.    What, if anything, does that indicate?

11   A.    Most likely, the day that I may have printed this off.

12   Q.    Did you review the Venezuelan Constitution, the 1999

13   Constitution, as part of your efforts to get an understanding

14   of the impact of the Attorney General opinion?

15   A.    Yeah.  I reviewed -- I didn't review all of the

16   Constitution, but I reviewed the parts that dealt with the

17   Attorney General, which start on Article 247 and go through

18   250.  I reviewed a little bit about how the Council of

19   Ministers was set up in Venezuela.  I may have looked at a

20   couple other sections, but I mostly focused on the

21   constitutional basis and foundation for the Office of Attorney

22   General.

23   Q.    If you could turn to Exhibit 32, please.

24   A.    (Witness complies.)

25   Q.    What is Exhibit -- Can you identify Exhibit 32 for us,

1    please?

2       A.    It is the Organic Law of the Supreme Court of Venezuela

3    in Spanish.

4       Q.    Did you review this document during your efforts to --

5       A.    I printed it out.  I'm not sure that I spent a whole lot

6    of time on it, but I printed out -- I must have had some

7    interest in it at the time.

8       Q.    If you could turn to Exhibit 33, please.

9       A.    Exhibit 33 is the Organic Law of Public Administration.

10   It, again, has a printout date of June 24, 2004.  I was

11   interested in getting some background on administrative

12   procedures in Venezuela.

13      Q.    Exhibits 31, 32 and 33, why did you review these

14   different laws?

15      A.    Well, I mean, obviously, I wanted to understand -- When

16   I -- When I read the legislative intent for the Organic Law of

17   the Attorney General, the legislative intent cited to the

18   Constitution and the Constitutional sort of role of the

19   Attorney General of Venezuela.  So, I was interested in going

20   back and actually seeing what the Constitution of Venezuela of

21   1999 said about the role of the Attorney General.

22         My review of the administrative procedure law and the

23   organic law was because I was interviewing and talking to some

24   lawyers when I had been -- In June, I had been back to Caracas,

25   and I had met with some lawyers that were experts in

1    administrative law and administrative procedure in Caracas.

2    And I had engaged in conversations with them as I was trying to

3    identify experts about the opinion of the Attorney General.

4    And, so, I was talking to lawyers who were experts in these

5    various fields.  And I don't know -- I kind of wanted to know

6    more about what they did and what the laws of Venezuela were

7    about.

8       Q.    During this time in 2004 when you were reviewing the law

9    pertaining to the Venezuelan Attorney General, did you attempt

10   to gather any information about Bandagro?

11      A.    Yes.

12      Q.    How did you go about trying to get information on

13   Bandagro?

14      A.    Well, you know, it's, you know, hard to believe; but, in

15   2016 -- 2016, Googling or searching on the Internet is not the

16   same as 2004, although, you know, we kind of tend to forget.

17   But, so, I was searching the Internet for newspapers in

18   Venezuela that were perhaps publishing stories about Bandagro.

19         At that time, I was at Crabbe Brown.  I was in charge of

20   our electronic legal research contract.  And, you know, I met

21   with Lexis and Westlaw representatives and pushed to contract

22   for databases, let's say, that, you know, might have -- that

23   might carry publications in Spanish, the *Wall Street Journal,*

24   also, and those sort of things.  And, so, I was doing what I

25   could to, you know, do a lot of Internet research to try to get

1    stories about Bandagro and what was going on with it in

2    Venezuela.

3         MR. C. COOPER:  Could I ask that the witness be given

4    Plaintiff's Exhibit 74, which is in Binder 5?

5         COURTROOM DEPUTY CLERK:  74.

6    BY MR. C. COOPER:

7    Q.   Mr. Alcalde, I'll have you first flip through

8    Plaintiff's Exhibit 74 and ask if you recognize the documents

9    in Exhibit 74.

10   A.   Well, there are several documents here, but the first

11   document is an article of June 29, 1981, with respect to a bank

12   in Florida that had been involved in some Bandagro notes, ICC

13   notes.

14   Q.   When did you obtain this?

15   A.   I would have obtained that during the period of time

16   that I was investigating Bandagro and, you know, learning about

17   everything I could about Bandagro and the history of Bandagro.

18   So I wasn't only trying to learn about the law of Venezuela, I

19   was also trying to learn what I could about the history of the

20   Bandagro Bank in Venezuela.

21        I had received from Dr. Jacir -- He and I had spoken

22   about the history of that bank.  I think he sent me an article

23   that dealt with the banking situation in Venezuela in the early

24   '80s.  And, so, I was also trying to learn about -- what I

25   could about the history of the Bandagro Bank, and also about,

1    just in general, Venezuela's management of its state banks and

2    Venezuela's management of its external debt.  So these --

3    Q.   I'm sorry.  In this first article, what significance, if

4    any, did this have to your efforts to get an understanding of

5    Bandagro?

6    A.   The significance here is on page 2 of this article, the

7    second full paragraph -- This article dealt with a merger of

8    two banks.  And the merger -- the date of the merger, according

9    to this article, was being held up over a dispute with Bandagro

10   with respect to the mismanagement or the misplacement of some

11   promissory notes of Bandagro in the amount of $500 million.

12        So, the significance of this article, to me, was that,

13   obviously, my task was to investigate the finality of the

14   Attorney General's opinion with respect to a billion dollars in

15   notes that were issued by the Bandagro Bank.  So, the

16   significance of when I found this article was -- to me was, oh,

17   okay, look, you know, here's a reported incident of the

18   Bandagro Bank involving notes in the amount of a significant

19   amount, $500 million.

20        MR. SCHWARTZ:  Excuse me a second.

21        Just for the record, Your Honor, I'm going to move to

22   strike the answer to the extent it is intended for any purpose

23   having to do with the truth of the various assertions in this

24   document.  If it's, again, information that was in Mr.

25   Alcalde's head, that's the sole purpose, we understand.

1      THE COURT:  I understand that's the sole purpose.

2   Isn't it?

3      MR. C. COOPER:  Agreed, Your Honor.

4      THE COURT:  So, the objection is well taken.  But I

5   assume the answers will be given on that basis.

6    BY MR. C. COOPER:

7    Q.   Mr Alcalde, what was the date of that article that you

8   just referred to?

9    A.   The date of the article is June 29, 1981.

10    Q.   If you can remind the Court, what is the date on the

11   promissory notes that you identified at the outset of this case

12   as Exhibits 1 and 2?

13    A.   They were taken away.  I don't want to guess.

14      MR. SCHWARTZ:  I think we can stipulate to what's on

15   those documents, Your Honor.  It's not an issue in dispute as

16   to what it says.

17      THE COURT:  Any objection to using the stipulation --

18      MR. C. COOPER:  No, Your Honor.  We'll stipulate that

19   the date of the notes is December 7th, 1981.

20      MR. SCHWARTZ:  That's what it says on the face of it.

21   Yes.

22      THE COURT:  All right.  Very good.

23      THE WITNESS:  Very good.

24    BY MR. C. COOPER:

25    Q.   All right.  Mr. Alcalde, if you could turn to the next

1   article, Exhibit 74.  Do you recall -- do you recognize this

2   article?

3   A.   Yes.

4   Q.   Do you recall when you first saw it?

5   A.   Yes.  When I was investigating, as I said, the -- well,

6   the task that I'd been given with respect to Bandagro and the

7   notes -- Can I just refer to that as the Bandagro matter so --

8   Q.   (Nodding affirmatively.)

9   A.   When I was investigating the Bandagro matter, obviously,

10  one of the issues was whether or not Venezuela had assumed the

11  obligations of Bandagro.  It was, obviously, a prominent issue

12  in the opinion of the Attorney General.  And, so, this was an

13  article that, again, in my head, backed that up.

14        MR. SCHWARTZ:  The same objection and limitation,

15  please, Your Honor.

16        THE COURT:  The same issue we just talked about?

17        MR. SCHWARTZ:  Yes.

18        THE COURT:  All right.  That will be a continuing

19  objection, but the ruling is the same.

20        MR. SCHWARTZ:  Thank you.

21        THE COURT:  This is as far as -- This is not the truth

22  of the matter, is the long and the short.

23        MR. SCHWARTZ:  Okay.  It's okay if I don't keep

24  standing up to say the same thing?

25        THE COURT:  (Nodding affirmatively.)

1          MR. SCHWARTZ:  Thank you.

2          MR. C. COOPER:  Your Honor, for this article and the

3   next one, which is a similar version of it, the Plaintiff wants

4   to reserve the right to argue about using it for the truth of

5   it as an ancient document and periodical.

6          THE COURT:  Why don't we save that as we get towards

7   the end and we'll deal with admissions of exhibits.

8          MR. C. COOPER:  Thank you.

9   BY MR. C. COOPER:

10  Q.   So, Mr. Alcalde, what, if anything, was significant

11  about this article to you as you were considering the Bandagro

12  matter?

13  A.   What was significant to me about this was that, besides

14  the assumption of the obligations, just like in the last one,

15  that foreign banks were being informed that Venezuela was

16  assuming the responsibility for the credit obligations of the

17  Bandagro Bank.  But significant to me was that this was just

18  like the last article.  I mean, it's being reported in the

19  major financial newspaper of the United States.

20         THE COURT:  Well, let's back up for a moment.

21         One of the triable issues when I was looking through

22  your final pretrial order, is whether -- Let's make all sorts

23  of assumptions here for the sake of argument.  One thing that

24  has to be established is that the bank notes were assumed by

25  the Government.  Do you still see that as a triable issue?

 1          MR. SCHWARTZ:  Absolutely.

 2          THE COURT:  All right.

 3          MR. SCHWARTZ:  The way I'd phrase it is whether the

 4   purported guarantee embedded in the purported notes is valid,

 5   but my answer is, substantially, yes, that's certainly a

 6   triable issue.

 7          THE COURT:  Well, then, we probably need to address

 8   the merits of this as far as an exception to the hearsay rule.

 9          So, your position, Mr. Cooper?

10          MR. C. COOPER:  Your Honor, our position would be

11   that, for two reasons, this is excepted from the hearsay rule.

12   As the Court will see on the documents themselves, this is from

13   1981.  It's from the *Wall Street Journal,* a respected

14   publication.  *The Wall Street Journal* is reporting on matters

15   that it typically reported on, such as the financial affairs of

16   various governments.

17          THE COURT:  So, you're arguing this is -- I hesitate

18   to call something 20 years or older an ancient document, but

19   that's what the rules say.  And this is well beyond that.

20          MR. C. COOPER:  It is.  It's 803.16.

21          THE COURT:  Yes, 803, Subpart 16.  The issue there is

22   whether or not the authenticity is established.  And the

23   representation is this came from a printout from the LexisNexis

24   that indicates this is an article in the *Wall Street Journal.*

25          So, Mr. Schwartz, where does that take us?

1    MR. SCHWARTZ:  I have no objection to the authenticity

2  of the document.  However, it is hearsay within hearsay.

3    If you take a look at this, first of all, we don't know

4  who the reporter is.  So, you've got a reporter talking about

5  the Venezuelan Government having informed foreign banks,

6  something, a generalization.  Then there is a reference to the

7  announcement.

8    Evidently, this is a reference to some announcement in

9  the second paragraph, which, although it's -- no one would know

10  for sure, it appears to be, or could be, some other writing.

11  You don't have the announcement before you.  And to add another

12  layer of hearsay within hearsay within hearsay, then you have,

13  sources close to Bandagro.  Who are they?  There's no

14  indication there that those are people who are authorized

15  representatives of the Venezuelan Government speaking within

16  the scope of their responsibility.

17    So, you have layer upon layer upon layer of hearsay in

18  the document.

19    THE COURT:  Well, we view that a bit differently.  I

20  think there's nothing internal that indicates another declarant

21  is speaking.  But the point is -- Let me ask Mr. Cooper, do you

22  have other evidence regarding the alleged assumption of the

23  obligations by the Government of Venezuela?

24    MR. C. COOPER:  We will present a letter, later on in

25  the testimony, that they deny the authenticity of.

1    THE COURT:  You deny the authenticity of the letter,

2  as well as the notes?

3    MR. SCHWARTZ:  On both, sir.

4    THE COURT:  All right.  I think this is the classic

5  fit of evidence for 803.16.  I don't see any question.  There

6  could still be some.  I'll give you that opportunity; but there

7  is no question, at this point, of the authenticity of the

8  document.  So, as a preliminary matter, I'm going to rule it is

9  admissible, substantive evidence.

10  BY MR. C. COOPER:

11  Q.  Mr. Alcalde, the article that you just referred to makes

12  reference to, in the second paragraph, to an intervention.  At

13  the time you obtained this article, were you aware of any

14  intervention by the Government in the Bank?

15  A.  Yes.  The Government had intervened on behalf of the

16  Bandagro Bank.  I don't think that that's disputable.  It's in

17  the history of the AG opinion and the Ministry of Finance

18  investigation.  And Waldemar Cordero, it's my understanding,

19  who had been a prior officer of the bank, was appointed the

20  intervenor, or the trustee, of the bank.

21  Q.  If we could turn to the next page within this Exhibit

22  74, could you identify this document, please?

23  A.  Again, it's a document that I would have obtained while

24  I was doing my investigation of the Bandagro matter.

25  Q.  Looks like the same as the previous document, but in a

1  different format?

2    A.   Yes.

3    Q.   As you read the article and you look at the third

4  paragraph, by the time you read this article, had you received

5  any information about what's referred to there as the foreign

6  debt obligations of Bandagro?

7    A.   Well, that was an issue that was addressed in the

8  opinion of the Attorney General.  So, that's the information

9  that I would have had.  So, part of what I was doing was

10 looking for information that was either in line with what the

11 Attorney General had said or not said.

12   Q.   If you could turn to the next document within Exhibit

13 74, please, do you recognize this document?

14   A.   Yes.

15   Q.   What is this?

16   A.   A document that I would have obtained during my

17 investigation of Bandagro.

18   Q.   Did this have any significance to your investigation?

19   A.   Well, the only significance that it had was with respect

20 to, you know -- I forgot to mention that -- you know, you

21 didn't ask me.  But as a child I lived in Venezuela.  I

22 actually lived in Venezuela from 1957 to 1960.  My brother was

23 born in Venezuela.  And we went back to Cuba, to Havana, from

24 Caracas, after Fidel Castro won the revolution.  And, so, I had

25 always, you know, had an interest in Venezuela, as well, and

1   always had, let's say, opinions about Venezuelan's management

2   of its economy and its banks.  And, you know, we read a lot

3   about the issues that are happening in Venezuela today, but

4   those issues are not necessarily new to Venezuela.

5       I had discussions, you know, as a child, with my father

6   about the issues in Venezuela.  And then when I became involved

7   in Bandagro and started, you know, studying what was happening

8   in the '70s and '80s with banks in Venezuela, this article was

9   not -- you know, was sort of in line with those -- with my

10  general understanding and learnings about Venezuela.

11  Q.   By the time you obtained this article, had you read the

12  Attorney General's opinion?

13  A.   Yes.

14  Q.   Was the content of this article in line with, or

15  contrary to, what you were reading in the Attorney General's

16  opinion?

17          MR. SCHWARTZ:  Objection.

18          THE COURT:  Overruled.

19       You may answer.

20          THE WITNESS:  Well, it was in alignment with it.

21  BY MR. C. COOPER:

22  Q.   In what way?

23  A.   That there was a discussion in the Attorney General's

24  opinion about -- and also in the Ministry of Finance

25  investigation -- about disputes, for example, with respect to

1  documents that would have been of a public nature; that there

2  were some documents that couldn't be found; that there were

3  disputes about whether people had signed certain documents,

4  yet, despite those disputes, there were other documents that

5  were found in public notaries and which carried some sort of

6  official weight, under Venezuelan law, that those documents

7  were there; that -- you know, for lack of a better word, issues

8  of mismanagement.

9        And, when I combined that, for example, with my

10  understanding of what happened with the Atlantic Bank in

11  Florida and the fact that there were Bandagro notes involved in

12  that matter, all of these issues, I was not surprised.

13  Q.   Could you turn to the next article in this exhibit, in

14  Exhibit 74?

15  A.   (Witness complies.)

16  Q.   Do you recognize this article?

17  A.   Yes.

18  Q.   When did you first see this article?

19  A.   When I was investigating the Bandagro matter.

20  Q.   Did this article have any significance to your

21  investigation?

22  A.   Well, the significance to me was, you know, obviously,

23  this article deals with a delay on making payments on notes

24  that were owed by Venezuela and an extension or rolling over by

25  the Government entities with respect to these bonds.

1     Q.    What was the source of this article?  What periodical

2  did you obtain this from?

3     A.    Looks like the *Wall Street Journal.*

4     Q.    The first paragraph indicates, mentions, Venezuela

5  unilaterally postponing payments on nearly $1 billion in

6  Republic of Venezuela bonds.

7        By the time you read this article, had you received any

8  information about Venezuela taking unilateral action to

9  postpone payments on a significant dollar value of bonds?

10    A.    With respect to the Bandagro notes, yes.  That was also

11  discussed in the opinion of the Attorney General.

12    Q.    Could you turn to the last article in this exhibit, in

13  Exhibit 74?

14    A.    (Witness complies.)

15    Q.    Do you recognize this?

16    A.    Yes.  Again, it was an article that I would have

17  obtained when I was investigating the Bandagro matter.  And the

18  significance of this article from the Financial Times, dated

19  February 22, 1982, was that it was being reported in this

20  article that, the week prior to this, the Bandagro Bank had a

21  new mandate for 200 million -- I'm guessing dollars here -- 200

22  million.

23        So, the significance to me was that these sums of money

24  were being reported with respect to the Bandagro Bank during

25  the relevant time period of the Bandagro notes at issue in this

1   case.

2       MR. C. COOPER:  Your Honor, we could segue into a

3   different topic.

4       THE COURT:  This may be a good time for our morning

5   recess.

6       We'll be in recess for 15 minutes.

7     (A recess was taken at 10:22 a.m. until 10:37 a.m.)

8       THE COURT:  Mr. Cooper, you may continue.

9       MR. C. COOPER:  Thank you, Your Honor.

10   BY MR. C. COOPER:

11   Q.   Mr. Alcalde, you testified that you spoke with a Miguel

12   Jacir on various occasions.  Did you share with anyone what, if

13   anything, you learned from Mr. Jacir?

14   A.   Well, I shared all material knowledge that I was gaining

15   with David Richards.

16   Q.   If we could turn to Exhibit 79 in binder 6, please.

17       THE COURTROOM DEPUTY:  Plaintiff's Exhibit 79.

18   BY MR. C. COOPER:

19   Q.   Mr. Alcalde, do you have Exhibit 79?

20   A.   I do.

21   Q.   Do you recognize it?

22   A.   Yes.

23   Q.   What is Exhibit 79?

24   A.   It's an e-mail I sent to David Richards on or about

25   February 22nd, 2004.

1     Q.    Why did you send this e-mail to Mr. Richards?

2     A.    Well, Mr. Richards had entasked me with the

3 investigation of the Bandagro matter. I was keeping him

4 advised of what I was learning.

5     Q.    At this point, in February of 2004, had you formed any

6 final opinions about the legal effect, if any, of the Attorney

7 General's October 2003 opinion?

8     A.    No.

9     Q.    This e-mail indicates that you had spoken with

10 Mr. Jacir. Did you ever meet with Mr. Jacir?

11     A.    Yes.

12     Q.    How many times?

13     A.    Well, I think I met with Dr. Jacir three times before

14 the notes were purchased by Skye Ventures and before the

15 lawsuit was filed. And I think I met with him on other

16 occasions after the litigation was filed; that I met with him,

17 I believe, in April of 2004 in Caracas, I met with him I think

18 in June of 2004 in Caracas and I think there was another time

19 that I met -- he had a condominium just north of Miami in

20 Florida and I met with him and his wife there, as I recall.

21     Q.    So Exhibit 79 is an e-mail dated -- we saw dated

22 February 22nd, 2004. Had you met with Mr. Jacir by that point?

23     A.    No. I had not met with him in person at that point.

24     Q.    So up to this point your conversations with him were by

25 telephone?

1    A.   Correct.

2    Q.   And in this e-mail does it accurately describe what --

3    in your e-mail to Mr. Richards, does it accurately describe

4    what Mr. Jacir had been telling you about the appealability of

5    the decision?

6              MR. SCHWARTZ:  Objection.

7              THE WITNESS:  Well --

8              THE COURT:  Just one moment.  There's an objection.

9              MR. SCHWARTZ:  It's another hearsay objection.

10             THE COURT:  It's clearly hearsay.  So I guess the

11   issue is for what purpose is it being offered?

12             MR. C. COOPER:  It's simply being offered to show that

13   he communicated this to the client.  He's passing it on.

14             THE COURT:  It's not being offered as substantive

15   testimony?

16             MR. C. COOPER:  Correct.

17             MR. SCHWARTZ:  No objection to that extent.

18             THE COURT:  The objection is overruled.  You may

19   continue.

20             THE WITNESS:  The e-mail indicates, my reading, my

21   synopsis of reading the opinion of the Attorney General and

22   what Jacir had been communicating to me with respect to the

23   law.

24    BY MR. C. COOPER:

25    Q.   So by this time had Mr. Jacir indicated to you that the

1  decision could not be appealed?

2   A.    Yeah.  Well, that was always Mr. Jacir's opinion but,

3  you know, you asked me if I had come to any conclusions.  I was

4  in the process of doing my own investigation.

5   Q.    So let's talk about the first meeting -- the first time

6  you actually met with Mr. Jacir.  I think you indicated that

7  occurred in April of 2004?

8   A.    Yes.

9   Q.    Where did that take place?

10   A.    In Caracas.

11   Q.    Where in particular?

12   A.    Well, Mr. Richards and I flew to Caracas.  We were

13  staying at a hotel that Dr. Jacir had suggested.  He came to

14  pick us up.  I don't recall, we may have had lunch at the hotel

15  but then we went to his home.  Dr. Jacir had an office in his

16  home.  And by that I mean he had a working office with

17  computers and printers and law books and a lot of information

18  on the Bandagro matter.  In addition to that, he had a law

19  office in a business section of Caracas.  But that first

20  meeting after I think having lunch, we went to his home.

21   Q.    Why did you and Mr. Richards travel to Caracas,

22  Venezuela to meet with Mr. Jacir?

23   A.    Because we were investigating the Bandagro matter.  We

24  wanted to learn the facts about the Bandagro matter.  We wanted

25  to understand the law.  We wanted to understand what Dr. Jacir

1  had to say about it.  And as I told you, it was difficult to

2  communicate with Dr. Jacir on the telephone and so the decision

3  was made to go to Caracas and start investigating this matter

4  in person in Caracas.

5  Q.   How long did the meeting last with Mr. Jacir?

6  A.   I think the first day we must have been there, I don't

7  know, eight, nine hours.  It was an all day, pretty exhaustive

8  meeting.  Went into the evening and then I think we met again

9  the next day.

10  Q.   Did Mr. Jacir provide you with any documents?

11  A.   Yes.  Essentially the way the meeting went was

12  Mr. Richards and I are in Dr. Jacir's office.  I'm speaking

13  with Dr. Jacir in Spanish, essentially, you know, trying to

14  extrapolate from him lots of information.  Whenever he would

15  tell me something, for example, that I needed more

16  clarification, I recall that we were having a discussion about

17  the word *vinculante*, you know, final and binding, and I told

18  him -- and I recall that we -- you know, I was very --

19  obviously that was of great interest to me that this was a

20  final and binding opinion.  I made him get the text of the

21  statute.  We were reading the text of the statute and looking

22  at various -- I said, let me see a legal dictionary.

23       So it was sort of that sort of a give and take about a

24  number of issues and Mr. Richards of course would, like,

25  patiently wait for about ten minutes of me and Jacir talking

1   and he would bug me to tell him what was said and I would

2   summarize the key aspects of it.  At one time he jokingly said,

3   what, you talk for ten minutes and tell me he said yes?  And it

4   was sort of that sort of thing because I was trying to give him

5   just the material aspects of what was happening so we could

6   keep working with Jacir because I was concerned.

7        His wife, you know, was very attendant to Dr. Jacir and

8   whether or not he was getting tired and needed to rest.  You

9   know, so those dynamics were in play as well.

10  Q.   So let's discuss what took place at that meeting.  Can

11  you tell the Court over the course of this nine-hour meeting

12  what was discussed with Dr. Jacir?

13  A.   Essentially, you know, the history of his involvement,

14  the history of how he had initially filed the claim on behalf

15  of Gruppo Triad.  The Minister of Finance had rejected the

16  claim on the basis that the notes were faked and all prior

17  investigations of the Bandagro notes had determined that they

18  were fake, and how Dr. Jacir had then written to the Office of

19  the Presidency of Venezuela on behalf of his client requesting

20  that -- essentially saying, look, you can't just deny my

21  client's claim without doing an investigation and so you at

22  least owe my client investigating these notes.

23       So he explained how he had written the Office of the

24  Presidency.  He explained that there had been a powerful member

25  of the General Assembly that had also become involved and had

1   also sent a letter requesting an investigation how as a result

2   of those directives from the Office of the Presidency and as a

3   directive from Luis Alvaray, the member of the General Assembly

4   that was head of a subcommittee involving Public Credit.  The

5   Minister of Finance had been -- opened an investigation on

6   these specific Bandagro notes of Gruppo Triad.

7        He showed us documents.  I didn't take documents at that

8   time but showed documents about the investigation and the

9   process of the Organic Law.  That was the first time that I had

10  gotten an opportunity to actually speak to him person to

11  person.  How the Organic Law came about, why he was so

12  convinced that -- of the correctness that it was a final and

13  binding decision.

14       We may have talked at that point in time about, you

15  know, other potential people that I could speak to because

16  obviously, I mean, I wanted to speak to other attorneys, right.

17  I wanted to speak to, you know, what I might call independent

18  attorneys, right, that weren't involved in the case, get their

19  opinions about the law.  We may have had discussions about

20  potential experts.

21       Then I think that -- I don't know if it was either then

22  or the next day, it was arranged for us to meet with Oscar

23  Guzman.

24  Q.   Before we get to that, did you end up consulting with

25  other attorneys, other than Mr. Jacir, about the effect of the

1   October 2003 Attorney General opinion?

2    A.    I did, but not during that trip.  I laid the groundwork

3   for wanting to search out other attorneys.  Then after that

4   trip I followed up with speaking to other attorneys and then I

5   actually came back to Caracas to speak to a number of other

6   attorneys.

7    Q.    Could you identify the other attorneys that you

8   consulted with?

9    A.    Well, one of them was Ivan Badell who was a former --

10   the equivalent -- he was *Fiscal General* which kind of the

11   equivalent of the head of the justice department in the United

12   States.  I then consulted with a former Attorney General of

13   Venezuela.

14   Q.    Who is that person?

15   A.    Duque Corredor.  I initially started consulting with a

16   partner of his by the name of Irribarren who was a younger

17   attorney but worked in the administrative sector but when it

18   came time to file an affidavit of course, you know, we wanted

19   to go with the former attorney general and so then I started

20   consulting with Duque Corredor.

21       Then I consulted with a couple of other administrative

22   law lawyers that I don't recall their name but, you know,

23   again, to get their thoughts and opinions about it.

24       At one point in time, and I don't recall when I first

25   met Rafael Chavero but I had spoken to Rafael Chavero about the

1    Organic Law before I actually made the decision to retain him

2    as an expert because I already had Ivan Badell and Duque

3    Corredor as experts.

4    Q.   All the individuals that you mentioned that you

5    consulted with, were they all Venezuelan attorneys?

6    A.   Yes.

7    Q.   Could you turn to Exhibit 134 in binder 6, please.

8         THE COURTROOM DEPUTY:  Plaintiff's Exhibit 134.

9    BY MR. C. COOPER:

10   Q.   Mr. Alcalde, do you recognize Exhibit 134?

11   A.   Yes.

12   Q.   What is Exhibit 134?

13   A.   Looks like an e-mail that I -- it's a translation.  The

14   first page is a translation.  I don't believe that Dr. Jacir

15   ever e-mailed me in English.

16   Q.   I think if you look at the back of the exhibit I think

17   you'll see the Spanish.  In each of these, the English precedes

18   the Spanish version.

19   A.   It's an English translation of an e-mail that Dr. Jacir

20   would have sent to me regarding the CV for Dr. Badell.

21   Q.   This e-mail is dated May 22nd, 2004.  Did you meet with

22   Dr. Badell?

23   A.   Yes.  When I went back in June.  And I also would have

24   spoken to him on the phone.

25   Q.   Did you ask Dr. Badell for his opinion regarding the

1   October 3rd, 2003 Attorney General opinion?

2          MR. SCHWARTZ:  Objection.  Beyond any answer of yes or

3   no.

4          THE COURT:  I'm sorry?

5          MR. SCHWARTZ:  The question is a yes or no question.

6   That's fine.  But Mr. Alcalde has a tendency to run with the

7   ball a bit and I want to make sure he doesn't run with this

8   one.

9          THE COURT:  And this, again, is being offered not for

10  the truth but simply to indicate what was told to the clients

11  in this case.

12         MR. C. COOPER:  Exactly.  What information was

13  gathered and what was told to the client.

14         THE COURT:  On that basis you can ask the question and

15  it can be answered.

16         MR. SCHWARTZ:  As long as this is not a back-door

17  opinion from a Venezuelan law expert.

18         THE COURT:  I think I ruled.

19         MR. SCHWARTZ:  Okay.

20         THE WITNESS:  Yes, he gave me an opinion.

21   BY MR. C. COOPER:

22   Q.   And, Mr. Alcalde, did you pass that opinion from

23  Dr. Badell on to the client --

24   A.   Yes.

25   Q.   -- Skye Ventures?

1    What opinion did Dr. Badell give you about the effect of

2  the Attorney General's October 2003 opinion?

3    A.   Well, let me make clear first, Dr. Badell's opinion is a

4  pleading in this case filed and it was a sworn affidavit which

5  he signed.  So his opinion at that time, but all his opinions,

6  of course, are a matter of affidavit and of record in this

7  case.  But his opinion was that the opinion of the Attorney

8  General of Venezuela was final and binding, and we had a

9  discussion about the Organic Law which by the time -- by that

10  time I had already read both the legislative intent and the

11  relevant articles.  And his opinion is that this was subject --

12  that this investigation was an administrative investigation

13  under the Organic Law, the Republic of the Attorney General,

14  and that she had issued a final and binding opinion.

15    Q.   You indicated that Dr. Badell's opinions were committed

16  to writing.  Did you ask him to put his opinions in writing?

17    A.   At some point later his opinions were committed to

18  writing and were put in an affidavit and were filed in a

19  pleading in this case.

20        MR. C. COOPER:  Could I ask that the witness be handed

21  Exhibit 86 in the same binder?

22        THE COURTROOM DEPUTY:  Plaintiff's Exhibit 86.

23  BY MR. C. COOPER:

24    Q.   Before we turn to Exhibit 86, Mr. Alcalde, you've

25  indicated that you met with Dr. Badell.  How many times do you

1  recall meeting with him?

2      A.    I don't know if I met with him more than once.  I spoke

3  to him more than once, of course, because later we -- I spoke

4  to him preparing the affidavit.

5      Q.    Where did you meet with him?

6      A.    In Caracas.

7      Q.    Was this a trip that was different than the trip you

8  described?

9      A.    I think it was in June.

10     Q.    Was anyone else with you in the meeting with Dr. Badell?

11     A.    I don't recall if Mr. Richards was with me or not.

12     Q.    Now, if you turn to Exhibit 86.  Do you recognize

13  Exhibit 86?

14     A.    Again, the beginning of Exhibit 86 is an English

15  translation.  I would have received the Spanish copy that

16  starts at SKYE308 which is -- appears to me to be sort of a

17  preliminary letter that he sent to me because -- I could be

18  wrong about this, but I think later I reformatted this perhaps

19  in a more affidavit format, but I don't recall.  I'd have to

20  look at the pleadings to see.

21          But this is -- this document contains opinions of

22  Dr. Badell.

23     Q.    And this document is dated July 22nd, 2004.  Had

24  Dr. Badell given you opinions verbally before that date?

25     A.    Yes.

1  Q.  And were the opinions that he gave to you orally, were

2  they consistent or different than the opinions that are

3  reflected in writing in Exhibit 86?

4      MR. SCHWARTZ:  Excuse me.  Same continuing objection,

5  Your Honor.

6      THE COURT:  Overruled.

7      THE WITNESS:  Well, I mean, he elaborated more in the

8  written form than perhaps the oral conversation.

9  BY MR. C. COOPER:

10  Q.  Approximately how many different Venezuelan attorneys

11  did you consult with in addition to Mr. Jacir who obtained

12  opinions as to whether the Attorney General's October 2003

13  opinion was final and binding?

14  A.  Badell, Duque Corredor, his partner Irribarren, Rafael

15  Chavero and I think there was one or two other younger lawyers

16  that I recall having lunch with who had been -- who also

17  practiced in the administrative sector.

18  Q.  Were those opinions that you obtained from these various

19  Venezuelan lawyers important to your due diligence?

20  A.  Of course.

21  Q.  Why?

22  A.  Because it was very important to understand if the

23  opinion of the Attorney General of Venezuela regarding the

24  validity of the Bandagro notes that were in that tranche, given

25  the fact that Skye Ventures was thinking of investing in that,

1    it was very important to understand whether that opinion was

2    final and binding under the law of Venezuela.  In other words,

3    it was akin to a final judgment.  And one of my principal

4    tasks, if not my principal task at that time, was to make that

5    determination, marshal expert's opinion on that issue and

6    communicate that to Mr. Richards.  It was no doubt in my mind

7    that that's what Mr. Richards was expecting from me.

8        Q.    So did you rely on the opinions of these consultants in

9    providing your opinion, your ultimate opinion, to Skye

10   Ventures?

11       A.    I relied on everything I studied and read on my own, and

12   on the opinions of all these Venezuelan attorneys.

13       Q.    During your due diligence did anyone you consulted with

14   provide you with an opinion or indicate in any way that the

15   Attorney General's October 2003 opinion was not final and

16   binding?

17       A.    Never.

18       Q.    Let's turn to that opinion, please.  It was Exhibit 3 in

19   binder number 1.  Binder 2, I'm sorry.

20           THE COURTROOM DEPUTY:  Plaintiff's Exhibit 3.

21   BY MR. C. COOPER:

22       Q.    Mr. Alcalde, do you have Exhibit 3 in front of you?

23       A.    I do.

24       Q.    I'm going to work with the English translation.  If you

25   need to consult with the Spanish, of course as a Spanish

1    speaker, feel free to do so.

2         Let's turn to the opinion.  Turn to the first page,

3    please.

4         Mr. Alcalde, I'm going to ask you some questions and

5    have you walk us through the opinion, if you would.  Let's

6    begin with the first page and essentially the header-type

7    information and the first paragraph.  What, if anything, did

8    you learn from the opening information in this document?

9    A.   Well, I think one of the first things to note is that

10   this is on the header of the Office of the Attorney General.

11   Of course this is a translation.  But you note that the header,

12   the slogan of the Attorney General is in defense of the

13   nation's patrimony.

14        So this is an opinion being rendered by the

15   Constitutional Officer of Venezuela whose job is, as we went

16   over, when we discussed the legislative intent of the Organic

17   Law, and when we discussed the 1999 constitution, it is the

18   principal lawyer, it is the lawyer of the state whose job it is

19   to protect and defend the patrimony of the nation.  So that's

20   the first thing that calls out to me when I look at this

21   document.

22        Then we see that this is a document that is directed to

23   another minister of the government of Venezuela.  Not just

24   another minister but the minister in charge of the finances of

25   Venezuela.

1          So in this first page, and of course it's dated

2    October 3rd of 2003, and in this first page we learned that

3    there's a number down there which says administrative file

4    number MF-DGCJ-1-2003 which I think we'll see is the number --

5    the administrative file number of the administrative

6    investigation that was open by the Minister of Finance as a

7    result of Dr. Jacir's request to the President, to the Office

8    of the Presidency of Venezuela by Luis Alvaray, the member of

9    the General Assembly that was in charge of the Subcommittee on

10   Credits of the General Assembly.

11         So this was a very important document addressed by the

12   Attorney General to one of the most important ministers in the

13   government of Venezuela.

14         MR. SCHWARTZ:  Objection, Your Honor.  And I'm going

15   to move to strike.  Here we have a situation now where

16   Mr. Alcalde, not an expert and not proposed as an expert, is

17   going to begin a tutorial concerning this opinion about --

18         THE COURT:  Let's go back to what we talked about on

19   Friday.  We don't have a jury here.  I'm the trier of fact.

20   That's one of my roles.  The other, though, is the interpreter

21   of the law.  As I mention to you, usually we don't take expert

22   opinion on what the law is and Mr. Alcalde, as I understand,

23   has not been offered as an expert.  His testimony now is to

24   what was done on behalf of the client.

25         We're going to get to experts though.  They are not

1    going to be treated as experts.  They're going to be treated as

2    we discussed, as people who will inform me as to the law.  But

3    theirs will be more akin to filing amicus briefs or more your

4    summations of memorandums of law.

5        To be clear on that, we're not taking expert opinion on

6    the law and I'm not treating it that way.  This is his

7    rendition.  And we're going to hear from people who are being

8    offered as experts, but again, within the confines of how this

9    trial is going to go this will be simply to help me, in the

10   end, reach a decision on what the law of what it is that

11   applies here.

12       MR. SCHWARTZ:  May I be heard further on this?

13       THE COURT:  Briefly.

14       MR. SCHWARTZ:  There are experts from both sides --

15       THE COURT:  I understand.

16       MR. SCHWARTZ:  -- on the Organic Law and related

17   matters.

18       THE COURT:  But this has to be relayed to a party and

19   that's what I'm taking this for right now and nothing more than

20   that.

21       MR. SCHWARTZ:  Mr. Alcalde is in a somewhat unique

22   position having been counsel of record in the case for four

23   years.

24       THE COURT:  True.

25       MR. SCHWARTZ:  And this testimony is trending toward a

1    piece of advocacy by erstwhile trial counsel.

2         THE COURT:  Again, I understand you are each

3    submitting someone to me you believe who is the most

4    knowledgeable in Venezuelan law.  I will rely on the two of

5    them when we get to that issue.

6    BY MR. C. COOPER:

7    Q.   Mr. Alcalde, as you read through and absorbed the

8    October 3rd, 2003 opinion from the Attorney General, you were

9    addressing what was significant to you as you formed your

10   opinions about the effect of this Attorney General decision.

11   We're in the first paragraph.  You've identified the

12   administrative file, you've identified who this is addressed

13   to.  Is there anything else in the initial paragraph that was

14   of significance to you?

15   A.   Yes.  So this is addressing -- after we talk about what

16   the administrative file number was given, it's addressing

17   promissory notes, presumably issued by the Bandagro bank

18   identified as ICC290 and ICC322 filed by Miguel Jacir on behalf

19   of Gruppo Triad.  And what was significant to me also about

20   this first paragraph was that it was for the purpose of having

21   this office, meaning the Attorney General, issue its legal

22   opinion in accordance with the provisions of Article 56 of the

23   Organic Law of the Attorney General.

24   Q.   Could you remind the Court what Article 56 of the

25   Organic Law of the Attorney General is?

1    A.    Yes.   Article 56 was the article whereby the Attorney

2   General is to review the investigation of the ministry that

3   supposedly owes a debt to make for the Attorney General to rule

4   on whether that claim is in accordance with law or not and to

5   render a final and binding opinion.

6    Q.    The opinion then turns to a section that in English says

7   administrative background.   If we turn to page 2, I'd like you

8   to kind of walk through this report as to what was significant

9   and why it was significant to you as you were attempting to

10   understand the impact of this decision.

11    A.    Well, one of the things that I think was very

12   significant to me and which I conveyed to Mr. Richards was that

13   in the opening of this opinion, the Attorney General sort of

14   recounts the background of how this investigation came to be.

15   And so in this particular section, the Attorney General is

16   recounting how these Claimants, meaning Gruppo Triad, have

17   exhausted their attempts to get these notes paid by the

18   government of Venezuela but they have run into this general

19   opinion, this matrix of opinion, particularly within the

20   Ministry of Finance of Venezuela but really beyond that, that

21   the -- that all the Bandagro notes are counterfeits.   And that

22   because of this opinion that all the Bandagro notes are

23   counterfeit, they have been unable to get what they consider to

24   be a fair and equitable investigation of the particular

25   Bandagro notes that they hold.   And they in fact, the Attorney

1   General in fact notes here that since the year 1991, if we're

2   looking at the third paragraph here of the second page --

3   Q.   You say '91 or 1981?

4   A.   I'm sorry.  1981.  This acknowledgment that there are

5   counterfeit notes floating in the international markets.  And

6   that as a result of that, you know, the opinion then goes on to

7   discuss how the Office of the President was contacted.

8        If we turn to the third page, the Office of the

9   President was contacted, the General Assembly got involved, and

10  the Minister opened the investigation.

11  Q.   Before we get to that, was there any significance to you

12  in the fact of the reference or acknowledgment that there were

13  duplicate notes or counterfeit notes?

14  A.   The significance of that is that, well it's not just

15  here but as we understand the opinion of the Attorney General,

16  the Attorney General clearly understood that there were

17  counterfeit Bandagro notes alleged to be in the international

18  markets, and as we'll see later, clearly understood that there

19  had been prior investigations rejecting these notes or other

20  notes.

21  Q.   And then you indicated there's a reference to the

22  contacts made by the Office of the President and by a member of

23  the Venezuelan National Assembly.  Where do we see that?

24  A.   We see that beginning at the bottom of page 2.  The

25  Claimants request the intervention and prompt action of

1   different authorities, to wit, for the record and then listed

2   there is the private secretary to the President of the Republic

3   and they cite to the letter which I believe is part of the

4   record.  And also to the request by Luis Velazquez Alvaray, the

5   President of the National Assembly, as translated here, the

6   Public Spending Oversight Committee, requesting an

7   investigation.

8      Q.   Could you turn to Exhibit 14 and Exhibit 16, both in

9   binder 3?  We have these in our exhibit binder.  I believe

10  they're also joint exhibits.  I believe Exhibit 14 is Joint

11  Exhibit 17 and the next is Joint Exhibit 22.

12       THE COURTROOM DEPUTY:  Plaintiff's Exhibit 14 and

13  Plaintiff's Exhibit 16.

14  BY MR. C. COOPER:

15     Q.   Let me begin with the first one, Mr. Alcalde,

16  Plaintiff's Exhibit 14.  The Attorney General's October 2003

17  opinion refers to an official letter number 711 dated

18  June 25th, 2002 from the secretary to the Office of the

19  President.  Looking at Exhibit 14, could you identify this for

20  us?

21     A.   Yes.  This is a copy of a letter that was in the

22  Ministry of Finance report.  The interesting thing about this

23  letter is you'll see the word Miraflores.  Miraflores is the

24  equivalent of the White House in Venezuela.  It's the palace of

25  the President.  And this is the letter that came from

1   Miraflores from the secretary of the President of the Republic

2   requesting that the Minister of Finance investigate the claim

3   of Gruppo Triad.

4     Q.    Did the letter request that the Minister do anything

5   after investigating?

6     A.    To report -- yeah.  If what you mean is to report back

7   the results of the investigation.

8     Q.    Could you turn to Exhibit 16, please?  The Attorney

9   General, as you've indicated, the Attorney General's

10   October 2003 report also referred to correspondence from a

11   member of the General Assembly, Luis Velazquez Alvaray?

12    A.    Yes.

13    Q.    Do you recognize Exhibit 16?

14    A.    Yes.  This is from the Minister of Finance report as

15   mentioned in the Attorney General's opinion is the letter of

16   Luis Velazquez Alvaray requesting an investigation of the

17   Bandagro notes.  But Alvaray does one thing here.  He doesn't

18   just request an investigation, he says if there are crimes have

19   been committed --

20    Q.    I'm sorry.  What page are you referring to just so we

21   can follow?

22    A.    Let me look at the English.  So if we look the page

23   marked JACIR61-03, the translation says, by reason of these

24   issues and having regard to the powers established in Article

25   223 of the Constitution, I urge you to order the relevant

1   investigation be carried out to determine in a reliable manner

2   whether these promissory notes are genuine, if they were indeed

3   issued by Bandagro and whether they were acknowledged and

4   backed subsequently by the Republic, and whether, in short,

5   these debts are legitimate or not.

6        And then he goes on to say, if these promissory notes

7   are counterfeit, an immediate report should be sent to the

8   public prosecutor's office so that relevant criminal

9   investigations may be made.

10  Q.   This is a letter from Luis Velazquez Alvaray addressed

11  to the Minister of Finance Dr. Tobias Nobrega, what is the date

12  of this letter?  Or better yet, can you tell from the

13  document --

14  A.   The letter doesn't appear to have a date on the first

15  page.  It does have a stamp, in the Spanish version, appears to

16  have a stamp that appears to be from the Minister of Finance

17  indicating that it was received in the Office of the Minister

18  on 14 February, 2003.

19  Q.   During your due diligence did you learn whether or not

20  Minister Nobrega had responded to the letter from Luis

21  Velazquez Alvaray?

22  A.   Well, he responded in two ways.  Later on when I was

23  able to see the Minister of Finance investigation, I believe

24  that he responded saying that he was going to investigate the

25  matter.  And of course his primary response was that he opened

1    an administrative file on the matter.

2    Q.   If you turn to Exhibit 17, please.

3        THE COURTROOM DEPUTY:  Plaintiff's Exhibit 17.

4    BY MR. C. COOPER:

5    Q.   Do you recognize Exhibit 17?

6    A.   Exhibit 17 is -- I'm assuming there's no English

7    translation.  I only have the Spanish here.  But it is a

8    letter -- purports to be a letter from Tobias Nobrega Suarez,

9    Minister of Finance to Luis Velazquez Alvaray, I don't know,

10   maybe dated 10 March, 2003, where he is essentially stating

11   that -- acknowledging receipt of his letter of 14 February

12   where he, meaning Alvaray, presents or puts forth the matter

13   about the claim of Gruppo Triad with respect to the Bandagro

14   notes.  And he states in there that he has instructed his

15   (exhibit 17) judicial consul within that ministry, within his

16   ministry.  And also the judicial counsel of the Office of

17   National Credit to essentially start inquiries investigation of

18   this matter.

19   Q.   And does he say what the purpose of that investigation

20   would be?

21   A.   He says that it is to, you know, to confront, review the

22   existing documentation and to make pertinent inquiries with the

23   end of determining if said credits are or are not legitimate

24   which results thereof will be informed in due order.

25   Q.   And according to the Attorney General's opinion, did the

1    Ministry of Finance take formal action in response to the

2    letters received?

3      A.   Yes.  The Minister of Finance opened an administrative

4    inquiry.

5      Q.   If you could turn to Exhibit 18, please, the same

6    binder.

7            THE COURTROOM DEPUTY:  Plaintiff's Exhibit 18.

8      BY MR. C. COOPER:

9      Q.   Do you recognize Exhibit 18?

10           MR. SCHWARTZ:  Your Honor, just for the purposes of

11   clarification.  This is not a letter that was either sent or

12   received by Mr. Alcalde.  And if this is a form of examination

13   that you're finding helpful in the context of the bench trial,

14   I'm not going to continue objecting.  But in essence,

15   Mr. Cooper is just -- he doesn't needs Mr. Alcalde to make this

16   presentation.  It's just the discussion between two trial

17   lawyers presenting the plaintiff's case.

18           THE COURT:  Mr. Cooper.

19           MR. C. COOPER:  Your Honor, what I'm trying to do is

20   these were attachments, I don't believe there's any dispute, to

21   the ministry of Finance's report.  I'm simply trying to walk

22   through as efficiently as possible the order of events so the

23   Court can understand.

24           THE COURT:  To be clear, I'm going to assume this

25   witness sent the Attorney General's opinions, the Finance

1   Minister's opinions.

2            MR. C. COOPER:  And attached.

3            THE COURT:  Probably not the letters in between.  Is

4   that a correct assumption?

5            MR. C. COOPER:  I'm sorry?

6            THE COURT:  The letters in between sort of tee up the

7   opinions.

8            MR. C. COOPER:  They do.  They were attachments to the

9   Ministry's reports.

10           THE COURT:  On that basis we'll hear them briefly.

11           THE WITNESS:  This appears to be an internal memo that

12   was within the Minister of Finance binders that basically it's

13   just internally sending to Oscar Guzman the letter of Velazquez

14   Alvaray.

15   BY MR. C. COOPER:

16   Q.    Could you look at Exhibit 19, please?

17           THE COURTROOM DEPUTY:  Plaintiff's Exhibit 19.

18   BY MR. C. COOPER:

19   Q.    And before you do that, Mr. Alcalde, the Attorney

20   General's opinion, does her opinion indicate whether the

21   Finance Ministry's legal department took steps to initiate an

22   investigation?

23   A.    Yes.

24   Q.    What is Exhibit 19?

25   A.    It is a letter from Oscar Guzman to a counsel in Miami,

1   United States, informing that the Ministry has opened an

2   investigation on the Bandagro notes, on the specific Bandagro

3   notes that are listed in this document and that a lawyer from

4   the Ministry by the name of Hespie Hurtado has been appointed

5   to carry out formalities with respect to the possession of

6   those Bandagro notes which happen to be located or physically

7   located in Miami.

8   Q.   The notes that are listed there list notes 1/12, 2/12,

9   3/12, 4/12, 5/12, 6/12, 7/12 and 8/12.  Could you remind the

10  Court the numbers of the notes that are at issue in this case?

11  A.   7/12 and 8/12.

12  Q.   Who was Hespie Hurtado, do you know?

13  A.   An attorney within the Ministry of Finance that was

14  involved in the Minister of Finance investigation under the

15  direction of Oscar Guzman.

16  Q.   Based upon your review of the -- let me ask a

17  preliminary question.  You've indicated you reviewed the

18  Attorney General's October 2003 opinion.  Did you review the

19  Ministry of Finance materials that led to that opinion?

20  A.   Yes.

21  Q.   Based upon your review of the Ministry of Finance

22  materials or the Attorney General's opinion or both, do you

23  have an understanding as to the role, if any, that Hepsie

24  Hurtado played in this Bandagro investigation?

25  A.   She did an inspection on notes that were located in

1    Miami and reported back as to what she found.

2      Q.    Could you turn to Exhibit 20, please, also in binder 3?

3           THE COURTROOM DEPUTY:  Plaintiff's Exhibit 20.

4      BY MR. C. COOPER:

5      Q.    Mr. Alcalde, what is Exhibit 20?

6           MR. SCHWARTZ:  I'm going to object, Your Honor.  This

7    document was the subject of testimony by its author.  Again,

8    Mr. Alcalde had no role in this investigation.  This is akin to

9    my putting Mr. Lucas on the stand.

10          THE COURT:  Tell me if I'm wrong, this is not going to

11   go to a major issue in the case.  This is sort of a lead up to

12   the reports that are at issue.  I don't want to get us on

13   things that aren't going to matter here.  Will this come in

14   through other witnesses?

15          MR. C. COOPER:  Your Honor, it's true that Mr. Guzman,

16   who wrote the Ministry's report, identifies the attachments.

17   It's in transcript form.  We're happy to -- we've designated

18   the transcript form.

19          THE COURT:  I don't see any harm here.  I'd want to

20   hear more from you.  This is just a document that says I'm also

21   joining in this designation of the attorney as an investigator.

22          MR. SCHWARTZ:  This is symptomatic of a more

23   widespread pattern that's developing here which I've been

24   repeatedly now objecting to and I'm trying to --

25          THE COURT:  I take these one at a time.  Go ahead.

1          MR. SCHWARTZ:  Taking this one.  This gentleman,

2     Mr. Alcalde, had nothing to do with the issuance or receipt of

3     this document.  Mr. Cooper is doing a presentation one trial

4     lawyer talking to another to display the documents he likes in

5     the case.  I could call Mr. Lucas on our case and do the same

6     thing but that's not how you do trials.  You need witnesses

7     with specific knowledge.

8          THE COURT:  I'm taking this to tell a story.  I don't

9     see any harm here to either side.  If this was used by

10    Mr. Alcalde and forming what opinion he gave, the objection

11    would be improper.

12          The objection is overruled.  You may continue.

13          MR. C. COOPER:  Thank you.

14    BY MR. C. COOPER:

15    Q.    Mr. Alcalde, what is Exhibit 20, please?

16    A.    It's the opening of the investigation, basically, by

17    Oscar Guzman to comply with the Minister of Finances' orders.

18    Q.    This document mentions Hepsie Hurtado.  It also

19    mentioned a Carlos Delgado Morean.  Do you see that?

20    A.    Yes.

21    Q.    You mentioned previously a Mr. Delgado.  Is that the

22    person that you were referring to?

23    A.    It was.

24    Q.    As a result of the Ministry's materials and the Attorney

25    General's opinion, do you have an understanding as to the role,

1    if any, that Mr. Delgado played in the Ministry's

2    investigation?

3    A.    In the Ministry's investigation, my understanding of his

4    role was to, based on what I read, was in discussions with him

5    probably to simply go to Switzerland and do pretty much the

6    same thing that Hespie Hurtado did in Miami, which was to

7    inspect the notes.  There were some notes in Miami and some

8    notes in Switzerland.  Hespie inspected the notes in Miami,

9    Delgado inspected the notes in Switzerland.

10    Q.    And Skye's notes were in which location?

11    A.    Miami.

12    Q.    Could you turn to Exhibit 21, please?

13         THE COURTROOM DEPUTY:  Plaintiff's Exhibit 21.

14    BY MR. C. COOPER:

15    Q.    Do you still have Exhibit 3 handy, Mr. Alcalde?

16    A.    Yes.

17    Q.    Could you look at I think it's the third page of

18    Exhibit 3?

19    A.    What's the bates number?

20    Q.    Looking for a paragraph with the reference to a date of

21    April 29th, 2003.

22         THE COURT:  Mr. Schwartz?

23         MR. SCHWARTZ:  Are we within Exhibit 21 now?

24         THE COURT:  It's my understanding.

25         THE WITNESS:  Are you asking me to look at 3 or 21?

1        MR. C. COOPER:  I've toggled back to the Attorney

2   General opinion in Exhibit 3.

3        MR. SCHWARTZ:  When 21 re-emerges, if it does, I'll

4   have something to say.  Three I'm okay with.

5        THE WITNESS:  I'm sorry.  I didn't hear that.

6        MR. SCHWARTZ:  If and when Mr. Cooper returns to

7   Plaintiff's Exhibit 21, I'll have a document-specific

8   objection.

9        THE COURT:  All right.

10   BY MR. C. COOPER:

11   Q.   On page 4, Mr. Alcalde, do you see a reference to the

12   date of April 29, 2003?

13   A.   Yes.

14   Q.   Page four of the Attorney General's October 2003

15   opinion.

16   A.   I'm looking at the translation and it says page 3.

17   Where I see April 29, 2003 the Minister of Finance has issued

18   the respective decree.  It says 3 at the upper right-hand

19   corner and it's bates stamp SKYE5600.

20   Q.   Thank you.  Now you see the reference of April 29, 2003

21   in the Attorney General's opinion?

22   A.   Yes.

23   Q.   Turning to Exhibit 21.  Based on your review of the

24   Ministry's material and the Attorney General's opinion, do you

25   have an understanding as to what this document is?

1        MR. SCHWARTZ:  Objection.  This document, Your Honor,

2   has a specific authenticity problem associated with it where

3   Mr. Alcalde's lack of personal knowledge presents a serious

4   problem.

5        THE COURT:  Give me a little cue in.  What's the

6   authenticity issue?

7        MR. SCHWARTZ:  The authenticity issue with regard to

8   Plaintiff's Exhibit 21 is that there are two different versions

9   of this essential document in circulation and an issue about

10  which, if either of them, is the one that was part of the

11  official file of the Ministry of Finance.  And this is

12  something well beyond the competence of Mr. Alcalde.  So you

13  may want him to tell a story or permit him to tell the story

14  about what went on in this investigation from his distant

15  perspective but as to this document, he's in no position to

16  authenticate.

17            THE COURT:  Mr. Cooper.

18        MR. C. COOPER:  Thank you, Your Honor.

19        As the Court probably would expect, during the course of

20  this litigation we asked the defense to produce authentic

21  copies of the Ministry's report and its attachments.  The

22  document that's within this exhibit that's bates stamped FS507

23  and 508 was identified by Defendants as part of the bates range

24  of the authentic copies of attachments to the Ministry's

25  report.  I'm happy to provide the Court with --

1       THE COURT:  I'll take your word at this point.

2       Mr. Schwartz.

3       MR. SCHWARTZ:  I think Mr. Cooper is referring to the

4  wrong version of this document actually.

5       THE COURT:  The FS documents start at the very end.

6  Make sure I understand this.  We've got a JACIR set of

7  documents and we have a set of Skye documents.  Then at the end

8  we have two pages that are FS documents.

9       MR. SCHWARTZ:  Yes.  Herein lies the problem.  And

10  this is an issue well beyond the competence of Mr. Alcalde and

11  this dispute here is something of a story unto itself and it

12  may take a few minutes to go into.  But this is a good reason

13  why Mr. Alcalde, he couldn't tell you possibly which of these

14  two documents --

15       THE COURT:  Let me ask you because I'm a little

16  confused.  In this exhibit there are three parts.  Why don't we

17  take a look at these.  The last two pages, let me make sure I'm

18  clear, this is what has been represented to be what your client

19  submitted.  Those two pages aren't the issue?  Am I correct in

20  assuming that?

21       MR. SCHWARTZ:  That's part of the issue.

22       THE COURT:  All right.

23       MR. SCHWARTZ:  If you'll indulge me for a moment, I'll

24  try and give you the history of the issue.  The document with

25  the FS bates numbers at the end.

1        THE COURT:  These are the last two pages, for the

2   record.

3        MR. SCHWARTZ:  Correct.  Was produced by our

4   predecessor counsel early in the process.  If this will be

5   helpful to you, because there will be different designations on

6   documents where history matters, the FS documents were among

7   the original documents produced by the defendants many years

8   ago.  And those were produced.  Mr. Cooper is right to that

9   extent.  However, much later -- and by the way, you'll notice

10  the FS version of this, not signed.  That's important.

11       The version at the beginning, which is also

12  translations, is the version produced by Miguel Jacir, the

13  Gruppo Triad lawyer, who was involved in the administrative

14  investigation of 2003.  And you need to evaluate the bates here

15  in the context of our position that this entire investigation

16  was --

17       THE COURT:  You're saying the first two pages are

18  simply not accurate and ties into your case.  Essentially

19  they're forgeries at play here?

20       MR. SCHWARTZ:  Not necessarily.  Let's look at the

21  Spanish origins.  Page JACIR57001 and 002.

22       THE COURT:  I'm sorry.  The first two pages.

23       MR. SCHWARTZ:  But you have to look at the Spanish

24  originals to track this complex argument.  If you look at the

25  Spanish original, it is signed or appears to be signed by

1  Tobias Nobrega Suarez, the Minister of Finance.  If you look at

2  the first page in the upper left-hand corner it has number 1335

3  on it.  Then there's a list of notes here which you're going to

4  see in a moment is not the same as the list -- I'll make this

5  easy to follow.

6      If you look at the first block of notes on the signed

7  Spanish Jacir version, first block ends note 8/12.

8          THE COURT:  All right.  But let me.  So long story

9  short, you dispute these, the authenticity and the accuracy of

10  the first two pages especially; is that right?  Just is that

11  right?

12          MR. SCHWARTZ:  Yes.

13          THE COURT:  So here's my point.  If these are

14  contested documents, I'm going to be much more cautious here.

15  This is a bench trial.  I don't want to be sloppy but if this

16  is important then I want to hear from you on this.  This is the

17  meat of the case it sounds like.

18          MR. SCHWARTZ:  It's part of it.

19          THE COURT:  And this is not going to be the witness

20  who's going to resolve this for us.  He's a document identifier

21  as far as this document goes.  That's your whole point, right?

22          MR. SCHWARTZ:  Yes.  And the plaintiff is relying on

23  the unsigned version at the end.  I'm telling you there's a

24  discrepancy between these two documents and it may be neither

25  is authentic.  But more importantly, this was the subject of

1    questioning of the witness who would know.

2         THE COURT:  So jumping ahead, in the event that I find

3    a discrepancy, is it material to your position?

4         MR. SCHWARTZ:  Absolutely.

5         THE COURT:  All right.  Just briefly give me a heads

6    up as to why I should -- what makes it material?

7         MR. SCHWARTZ:  Because the version in the Ministry of

8    Finance files, the unsigned version without the number, has a

9    different list of notes.

10         THE COURT:  So you're talking about the last two pages

11    here?

12         MR. SCHWARTZ:  Yes.  The FS version.

13         THE COURT:  Different notes.  Does it exclude the two

14    at issue here?

15         MR. SCHWARTZ:  I don't believe so but there's more

16    than two at issue here, as you're going to hear.  It includes 7

17    of 12 and 8 of 12.  It's unsigned and lacks a number.

18    Mr. Alcalde would have no idea who created these documents when

19    unsigned.  But the first version --

20         THE COURT:  Again, I understand your position.  A big

21    fraud that's taken place here.  I want to get to that.  But I

22    want to brush away what we don't need to get there.  Somewhere

23    does this document support your theory of fraud?

24         MR. SCHWARTZ:  Yes.

25         THE COURT:  But if the notes are in the version you

1    say is correct, if the notes were included that are at issue in

2    this case, then where does that take us?

3         MR. SCHWARTZ:  You'll see that there are some others

4    that aren't included in this list that are material to this

5    case, and it would take me a while to explain why, and there

6    are other discrepancies between these two documents.  Here's

7    the point for now.  You really don't have to resolve this now.

8    But this witness should not be resolving it for you.

9         The question you'll have to ask yourself when Dr. Jacir

10   is testifying is what is he doing in his files, having in his

11   files a signed version of this document when the version the

12   Ministry of Finance file is unsigned and it has different

13   information on it?

14        THE COURT:  But you've agreed this witness is not the

15   person to resolve any of these.  Let's start with that.

16        In terms of the rest of this case, Mr. Cooper, this is

17   an important document; you'd agree, right?

18        MR. C. COOPER:  I agree.

19        THE COURT:  And Mr. Alcalde is not the best person to

20   identify this other than say he passed it along?

21        MR. C. COOPER:  Exactly.

22        THE COURT:  We'll just leave it at that.  You may

23   continue.

24    BY MR. C. COOPER:

25    Q.   Mr. Alcalde, as you review the materials that you'd been

1   provided, the Ministry of Finance materials and the AG opinion,

2   do you have an understanding as to the significance, if any, of

3   the document dated April 29th, 2003?

4   A.   Well, the Minister -- the Ministry of Finance was

5   reviewing a specific tranche of notes, some of which were in

6   Miami, some of which were in Switzerland and sent, as we just

7   went over, two members of the Ministry of Finance staff to look

8   at those notes and identify those notes, render opinions or

9   views about them and the notes that were at issue were

10  identified in the Ministry of Finance report.

11  Q.   And in the April 29, 2003 document, from what you read,

12  did the Minister issue any orders?  I direct your attention to

13  page 2.

14  A.   Yeah.  The orders are listed there in the translation to

15  create an administrative file, to certify originals, get

16  legible copies of matters that are relevant, add them to the

17  file, to interview relevant person -- people with knowledge, to

18  comply with the formalities that are required for an

19  investigation, and to notify the Attorney General of the

20  Republic of the investigation.

21  Q.   I'm going to send you back to Exhibit 3 now, the

22  Attorney General's October 2003 opinion.  We were at page 3 and

23  you were addressing what information you found to be

24  significant in forming your views of the effect of the Attorney

25  General's opinion and ultimately the opinion that you rendered

1    to Skye Ventures.  We've kind of tracked down through the

2    paragraph addressing the April 29th, 2003 document that we've

3    just looked at.  Could you continue down through there and

4    identify any information that was significant to you as you

5    continued your investigation and formed your opinions?

6    A.    Well, you know, let me explain the process that I

7    ultimately used was at some point in time I had the opinion of

8    the Attorney General.  Of course I had had that for a while.  I

9    had the Ministry of Finance documents and I would go through

10   the Attorney General's opinion and look for documents that were

11   in the Ministry of Finance file as I read the Attorney

12   General's opinion with respect to what been done.  And that

13   process of course helped me to make my ultimate informations to

14   Mr. Richards and Skye.

15        Noteworthy here is a rendition the Attorney General was

16   sort of summarizing and pointing out to what was in the

17   Ministry of Finance -- what the Minister of Finance did which

18   if we start after when you mention the April 29, 2003 document

19   that we just talked about, it goes on to say that the Ministry

20   of Finance proceeded to compare documents that the Claimant had

21   submitted, meaning Gruppo Triad, to documents that were in

22   various different offices of the government of Venezuela.  And

23   those were listed.

24        Public Credit, Auditing, the Director General of

25   Internal Security legal department and files in the Minister's

1   office, originals of the Official Gazettes published at the

2   time were reviewed.  That records and files and court

3   proceedings that were authenticated by Notary Publics were

4   reviewed.

5       Going on to page 4 --

6   Q.    Let me stop you.  Why was that important to you, if it

7   was?

8   A.    Well, it was important because it was important to

9   understand that the Minister of Finance had looked at all these

10  issues and that the Attorney General had looked at all these

11  issues or acknowledged them.  It was important to me, I mean --

12  I have to back up.

13      I'm dealing with, as I'm learning, an investigation, at

14  least in what I was learning in conveying to Mr. Richards, that

15  we're dealing with an investigation that was, in essence,

16  requested by the Office of the President of Venezuela and an

17  important member of the General Assembly.  That's where I

18  started out from.  This is an important and a very serious

19  investigation giving me the assumption that the Minister of

20  Finance took this seriously and that the Attorney General took

21  this seriously.  We're dealing with an important and

22  significant amount of money, a billion dollars, acknowledged by

23  the Attorney General in her opinion, acknowledged by the

24  Minister of Finance in his investigation.

25      So within the framework of that understanding, it's

1   important to understand what all they did, who all they checked

2   with, and the importance which they took this investigation

3   because I have a client that is looking to invest in this

4   matter, right, and wants to know if this is a final and binding

5   opinion.  So all of these issues are important to understand

6   how important it was to Venezuela.

7       Q.   The next page is a reference to an entity it's on the

8   screen now called -- the initials are F-O-G-A-D-E.

9       A.   FOGADE, which is an entity that sort of insures banks.

10      Q.   What was your understanding as to the significance, if

11  any, of FOGADE to this matter?

12      A.   Well, there was a request for their cooperation and to

13  review what Bandagro files they may have had.  As you know, the

14  Bandagro bank, from our prior discussions, had required an

15  intervenor basically, had gone into bankruptcy.  So an

16  intervenor had been appointed.  So it would be logical that the

17  Minister of Finance would look at what files may be there.

18  Then we have the -- it goes on to list that they requested the

19  cooperation of the Central Bank of Venezuela.

20          MR. SCHWARTZ:  Excuse me just a second, Your Honor.

21  Mr. Alcalde is now asking and answering the questions.  There

22  was just a question about FOGADE.  He's on to the Central Bank.

23          THE COURT:  Let's leave it there.  You can go ahead

24  and phrase the next question.

25

1    BY MR. C. COOPER:

2    Q.   Mr. Alcalde, you were addressing the information that

3    from your perspective was significant because it indicates, to

4    paraphrase, the seriousness of the investigation.  Are there

5    other aspects to the information on this page, on page 4, that

6    led you to that same conclusion?

7    A.   Sure.  That the Central Bank had been consulted, that a

8    criminal -- Scientific and Criminal Investigation Corps had

9    been consulted with respect to handwriting and expert analysis

10   of 47 promissory notes that presumably had been issued.  This

11   report will discuss that there had been four prior

12   investigations of the Bandagro notes.  This part of the prior

13   investigation.  I don't know if they considered part of four or

14   not.  But this is a prior review of Bandagro notes.

15        So the Ministry of Finance and the Attorney General

16   recognize and list four prior investigations in which the

17   Ministry of Finance, for a variety of other reasons, had

18   rejected claims and had alleged that some of these notes were

19   counterfeit.

20        The reason that was important to me, because as I'm

21   evaluating this opinion in the matrix of everything I've just

22   said, the importance that they found these specific notes valid

23   and different was overwhelmingly significant.  Because if they

24   were looking for a reason to deny these notes, they certainly

25   had them.  And they didn't.  And they made the decision that

1   these notes were legitimate and valid obligations.

2          So it was significant to me, all of these things that

3   they reviewed, including the four prior investigations where

4   they had rejected the notes.

5          MR. C. COOPER:  Your Honor, I'm at a good stopping

6   point and I'm mindful of the Court's schedule.

7          THE COURT:  We're right up to the noon hour.  We'll be

8   in recess for one hour.

9       (A recess was taken at 12:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Monday Afternoon Session

2              February 1, 2016

3              1:00 p.m.

4                  - - -

5          THE COURT:  And, Mr. Cooper, you may continue.

6          MR. C. COOPER:  Thank you, Your Honor.

7      BY MR. C. COOPER:

8      Q.   Mr. Alcalde, if you turn back to Exhibit 3, which is the

9      Attorney General's October, 2003, opinion, Mr. Alcalde, and

10     directing your attention to page 5?

11     A.   Just so I can follow you when you say 5, you mean the

12     number in the upper right-hand corner?

13     Q.   Exactly.  Do you see a reference on this page to a Bruno

14     -- and it's spelled here Fabini, but I think the parties would

15     agree it's Fabbiani.  Do you see a reference there?

16     A.   Yes, in the third paragraph.

17     Q.   Yes.  When you were evaluating the Bandagro matter, did

18     you have an understanding as to who this Bruno Fabbiani was?

19     A.   He was a document -- He was an Italian document expert

20     that was my understanding had issued some opinions regarding

21     handwriting analysis and signatures with respect to the

22     signatures that appeared on the promissory notes.

23     Q.   And of what significance was that, if any, as you saw a

24     reference to him in the Attorney General's October, 2003,

25     opinion?

1    A.   Well, the Attorney General's opinion discussed the fact

2    that there was evidence in the files, meaning the Ministry of

3    Finance investigation, which, of course, was based on other

4    documents, that the signators to the notes, meaning the three

5    principal individuals of the Bandagro Bank, had denied signing

6    the notes.  There was reference in both the Ministry of Finance

7    investigation and the Attorney General's opinion acknowledging

8    those denials.

9         But in addition to that in the files of Notary Publics

10   in Venezuela, at least in one Notary Public, a document had

11   been found, a notarized document, in which the three signators

12   to the Bandagro notes had admitted signing the notes.

13   Then there was the investigation that Bruno Fabbiani had done

14   which included, in my understanding, going to Caracas and

15   looking at documents in Caracas, comparing notes, doing other

16   types of forensic analysis of the paper and those sorts of

17   things, in which he opined that the signatures on the notes

18   were the signatures of the three principals of Bandagro.

19        So the significance was, you know, basically two fold.

20   Number one, that there was an acknowledgement in the

21   investigation that there was an issue about the signatures,

22   that there was an acknowledgement of a denial of the

23   signatures, that there were documents in Venezuela that carried

24   legal weight that acknowledged the contrary, that they had

25   signed notes.  And then there was an investigation of Bruno

1  Fabbiani giving his opinion about the genuineness of the

2  signatures and other indicia with respect to the notes.

3       MR. SCHWARTZ:  Your Honor, I will move to strike

4  Mr. Alcalde's description of what Fabbiani is alleged to have

5  done and determined.  He's not here.  This is -- Mr. Alcalde is

6  a conduit for an alleged expert opinion.

7       THE COURT:  He's -- This is not substantive evidence

8  as far as I can hear.  He's just relaying what's in here,

9  what's passed along to the client.  On that basis, it would be

10  -- I will listen to it, but it doesn't go to prove what's

11  asserted.

12       MR. SCHWARTZ:   All right, I will try to resist the

13  impulse to object for the remainder of the afternoon session.

14  I just thought I should get one on the record at the beginning.

15       THE COURT:  And I will note, we'll probably have some

16  more of this on the way, but it will not be substantive proof

17  of what's being stated here.  It's simply what's being

18  transmitted.

19       MR. SCHWARTZ:   Your Honor, I hope you can appreciate

20  I'm trying to strike the right balance between making sure my

21  client's rights on this issue are preserved and not making

22  myself --

23       THE COURT:  I can assure you I would not be making a

24  finding about what the handwriting expert said based on his

25  testimony.  I don't think Mr. Cooper asked me to either.  We

1    are on the same page.

2            MR. SCHWARTZ:  Thank you.

3      BY MR. C. COOPER:

4      Q.   Mr. Alcalde, turning to page 5 and carrying over to page

5    9, there are references to four reports.

6      A.   Yeah.  I might add that I also met Fabbiani in Italy and

7    talked to him.

8      Q.   Okay.

9      A.   And I conveyed that to the client as well.

10            MR. SCHWARTZ:  I'm going to move to strike.  He's

11    asking and answering questions.  This is a real trial, not a

12    dialogue.

13            THE COURT:  And I don't think that there's any harm

14    here.  Let's just move forward, if we could.

15      BY MR. C. COOPER:

16      Q.   If we look at the bottom of page 5 and carrying over to

17    page 9 of the Attorney General's October, 2003, opinion, there

18    is a reference to a series of four reports.  I think on page 9

19    finally gets to the fourth report.  As you considered the

20    Ministry of Finance's materials, and it's in its report, and

21    the Attorney General's opinion, you have had -- you've

22    testified a little bit about four reports.  Of what

23    significance were the four reports and the fact that they are

24    addressed in the Attorney General's opinion?

25      A.   Well, the significance to me -- and as I conveyed that

1   to Mr. Richards -- was that as we learned about issues with the

2   allegation that there were Bandagro notes floating in the

3   international market that were counterfeit, as we learned that

4   there were allegations -- as I learned that there were

5   allegations against James Pavanelli, okay, as to whether or not

6   he was involved in those prior notes or not, it was very

7   significant that the government of Venezuela was, in essence,

8   aware of these issues.  They were noted in the Ministry of

9   Finance investigation, particularly that there had been

10  Bandagro notes that people had attempted to collect on in the

11  past and that the Ministry had rejected as being counterfeit,

12  that many of these allegations and claims that are -- that were

13  being raised that, number one, that Bandagro never issued

14  notes, that these people never signed the notes, all of these

15  types of allegations were well known to the Ministry of

16  Finance, acknowledged in their investigation, communicated to

17  the Attorney General, acknowledged by the Attorney General,

18  written down in her opinion, the reasons therefore, and

19  nevertheless concluded that these notes were different, were

20  genuine, there was no proscription to paying them, and that the

21  claim was valid.

22          So when I was evaluating this for Mr. Richards -- and

23  I go back to what I said at the very beginning, that this was

24  an investigation ordered by the highest levels of the

25  Venezuelan government, that acknowledged all the warts, let's

1    say, that had -- were in existence and everyone knew about it,

2    declared these notes to be valid and an obligation of the

3    Republic, under a procedure that was tasked to determine if it

4    was final and binding.

5          So it was very significant for those reasons.

6    Q.   If you would turn to page 12 of the opinion.

7    In the Attorney General's October, 2003, opinion, did the

8    Attorney General indicate in any way whether -- anything about

9    the significance in the Attorney General's view of the matter?

10   A.   Yes.  The Attorney General acknowledged that this was a

11   matter of great importance.  And if we look at the English

12   translation --

13   Q.   Where are you on page 12, please?

14   A.   The first full paragraph, that it is evident that the

15   documents related to this case deemed as of great importance

16   due to their amount, the circumstances that surrounds

17   securities claims -- They are addressing the issue that I just

18   mentioned -- and because the nation's patrimony is involved --

19   which is what her duty is to defend and represent -- are

20   dispersed in various files -- So, in other words, in my

21   opinion, reading this, in all the circumstances that I have

22   relayed, no doubt in my mind that everyone understood all the

23   facts and that this was a very, very serious issue they were

24   paying attention to.

25   Q.   Did the Attorney General in her October, 2003, opinion,

1  indicate what she -- according to her opinion, what she

2  understood the Ministry's conclusion to be, the Ministry of

3  Finance conclusion to be?  I direct your attention to page 15.

4  A.   So on page -- Starting really on page 14, she's starts

5  addressing the representations of the legal department of the

6  Ministry of Finance.  And on page 15 she gets to the

7  conclusion, which she is essentially quoting the conclusion

8  from the Ministry of Finance report.  And if we look at the

9  third full paragraph there that's in italics, having reviewed

10 and analyzed, as we have, all of the elements, arguments and

11 evidence appearing in the documents that have been described

12 throughout the present investigation, it appears evident that

13 there is an irregular situation with some of the promissory

14 notes that were subject to the judgment handed but which

15 together create an array of opinion -- Is that what you're

16 referring to?

17 Q.   Well, let me direct your attention to the bottom

18 paragraph.

19 A.   Yes.

20 Q.   Does the Attorney General indicate what she understands

21 the Ministry of Finance's legal department to be concluding?

22      MR. SCHWARTZ:  Your Honor, now we're moving into the

23 problem of the leading nature of the questions.  And Mr. Cooper

24 has certain parts that he likes.  The documents are going to be

25 evidence.  He can argue about it in post-trial briefs.

1    THE COURT:  Let's go back.  The objection is leading.

2  Rephrase the question, if you would.

3  BY MR. C. COOPER:

4  Q.  Mr. Alcalde, does the Attorney General indicate in her

5  opinion at any point --

6  A.  Yes.

7  Q.  -- what she understands the Ministry of Finance's

8  conclusions to be?

9  A.  Yes.  So the last paragraph on page no. 15 in the upper

10  right-hand corner, starts out with the fact that the existence

11  of the notes have been established in Miami and in Switzerland.

12  And the conclusion is, she quotes, this Legal Department

13  concludes that the claimants of the promissory notes submitted

14  to the present inquiry have the legitimate right to have them

15  processed in order to cash them in accordance with the rules

16  and procedures governing this activity.

17       So she's quoting the Ministry of Finance's

18  recommendation.

19  Q.  Turn your attention to the next page.  Does the Attorney

20  General indicate in her report what she understands her role to

21  be in this matter?

22  A.  Yes.  She understands her role to be as -- that the

23  investigation has been submitted to her by the Ministry of

24  Finance in accordance with the provisions of the Organic Law of

25  the Attorney General's office as it is that agency, meaning her

1  agency, that has the authority to provide a definite opinion on

2  the mandatory compliance for which reason these proceedings

3  must be sent to it, meaning the Attorney General, for the

4  pertinent legal purposes.

5  Q.   Beginning on page 16 there is a section titled The

6  Opinion of Attorney General's Office.  I'm not going to go

7  through each point, but did you review this section of the

8  Attorney General's Office's opinion understanding as to what,

9  if anything, the Attorney General might have found significant?

10  A.   I mean I read the opinion of the Attorney General a

11  number of times.  So I have already talked about a lot of the

12  things that the attorney -- that I thought the Attorney General

13  found significant that were significant to me.

14       But I don't know where it is right now, but

15  significant to me were the fact that the Attorney General ruled

16  that there was no proscription, for example, no lapse, no

17  statute of limitations issue, no legal impediment under the

18  laws of Venezuela to have these notes paid and that she -- you

19  know, she concluded that it was a valid claim.

20  Q.   On the bottom of page 19, there is a reference to

21  something called a Judicial Inspection.  Do you see where I'm

22  referring to under the paragraph numbered 12?

23  A.   Yes.

24  Q.   During the time that you were evaluating the Attorney

25  General's October, 2003, opinion and providing information to

1   Skye, did you have an understanding as to what a Judicial

2   Inspection was under Venezuelan law?

3      A.   That a judge and some other functionaries would have

4   physically inspected a document.

5      Q.   The reference to the Judicial Inspection at the bottom

6   of page 19, carrying over to page 20, during the course of your

7   assessment of the Attorney General's October, 2003, opinion,

8   did you -- were you able to obtain a copy of any of the

9   documents that were referred to as a Judicial Inspection --

10  that were referred to in the Attorney General's opinion?

11     A.   Well, I obtained a copy of the Ministry of Finance

12  investigation and whatever documents were therein.  From time

13  to time other people would provide me documents or I would

14  obtain documents.  But I don't know if you are referring to a

15  specific document.  I mean I obtained a lot of documents.

16     Q.   Okay.  If we look at the text at the bottom of page 19

17  and carrying over page 20, of what significance, if any, was

18  that to you of the description of the Judicial Inspection that

19  was recounted in the Attorney General's October, 2003, opinion

20  of what significance of any opinion was that to you as you

21  decided what advice to give to Skye?

22     A.   Well, I mean I -- Let me be clear.  You know, I didn't

23  pick and choose documents.  Okay?  That the Attorney General of

24  Venezuela necessarily -- I mean I didn't go around picking and

25  choosing what I thought was important in what the Attorney

1  General and the Ministry of Finance thought was important,

2  okay?  You know, I studied very closely what they looked at,

3  okay, what they reviewed, what they discussed good and bad, and

4  studied their conclusions within the legal framework of

5  Venezuela, right?  And their conclusion was that the notes --

6  that it was a valid claim, all right?  So I didn't -- I didn't

7  particularly necessarily think that this document was more

8  important than some other document, okay, because that was

9  their job to do.  That was their job to decide what was

10  important or not.

11       With respect to this particular document, you know,

12  which -- They're deciding that the document, you know, is in

13  existence someplace.  But you'll have to give me the actual

14  document.

15  Q.    Let me -- Actually, let me move to this.  You have

16  mentioned several times now that your focus was on the

17  conclusion of the Attorney General.  Did you -- In her October,

18  2003, opinion, does the Attorney General reach a conclusion?

19  A.    Yes.

20  Q.    And where does she reach that conclusion?  Can you

21  direct the Court to that?

22  A.    If we look at the English translation, it starts on page

23  37, which is SKYE5634, the last paragraph.  It accepts the --

24  I'll read, It accepts the evaluation and opinion maintained by

25  the Finance Ministry's legal department in the terms set forth

1   above and, in this regard, the Attorney General pronounces

2   itself in favor of the admissibility of the aforesaid claim

3   filed.

4           And, again, I raised my objection to that as I stated

5   before.

6           The present opinion addresses only the admissibility

7   of the claim and does not encompass an estimate of the amounts

8   and sums claimed, the calculation of which falls to the

9   respective Ministry, nor the form or methods of payment.

10          Then she goes on saying, all other claims and

11  compensation sought by individuals in these administrative

12  proceedings which gave rise to the claim including but not

13  limited to the payment of any type of interest claimed or

14  damages adjustments for inflation, etcetera, are expressly

15  dismissed.

16          So that's her conclusion.

17  Q.   Were you ever provided with a certified copy of the

18  Attorney General's October, 2003, opinion?

19  A.   Yes.

20          MR. SCHWARTZ:  I'm going to object to the form of that

21  question, if I can, Your Honor.  I don't know if he means

22  whether if a copy was, an official certified copy, was given to

23  Mr. Alcalde or a copy of a certified copy.

24          THE COURT:  I want you to clear that up.

25          MR. C. COOPER:  Let me clear it up with a document, if

1    I could, Your Honor.

2      BY MR. C. COOPER:

3      Q.   If you turn to Exhibit 133 in Binder 6, please.

4    Mr. Alcalde, do you have Exhibit 133?

5      A.   Yes.

6      Q.   Do you recognize this document?

7      A.   Well, the first page is an e-mail that I sent to Dave

8    Richards on May 17, 2004.  With this is a copy of the opinion

9    of October 3, 2003, of the Attorney General of Venezuela with a

10   notarization in front of it.

11     Q.   The e-mail on the first page indicates under the subject

12   the line forward Dictamen.

13     A.   Yes.

14     Q.   What does dicta mean?

15     A.   That's the -- In Spanish, the Spanish opinion says Dicta

16   Fiscal General.  We have been referring to it as the Opinion of

17   the Attorney General.

18     Q.   And then it indicates there is an attachment, it says

19   3-10-2003, which in the western world would indicate March 10,

20   2003.  Can you explain that date, please?

21     A.   October 3, 2003.

22     Q.   Okay.  So in Venezuela, are the months and dates

23   transposed?

24     A.   Yes.

25     Q.   And then does this e-mail indicate where you obtained or

1  received this attachment?

2  A.    Well, I don't know -- Well, it looks like -- I was going

3  to guess Jacir, but it is Jacir.  So I think Gerardo Jacir may

4  be one of his sons.

5  Q.    And does the e-mail itself below have your signature?

6  A.    Yes, it does.

7  Q.    Does the attachment indicate whether or not this copy of

8  the Attorney General's October, 2003, opinion has been

9  certified by anyone?

10        MR. SCHWARTZ:  Objection, Your Honor.  Mr. Alcalde is

11  just not competent to answer that question.

12        THE COURT:   Well, let's get to his knowledge first.

13  But at this point, good point.

14        MR. SCHWARTZ:  I don't want to make a big deal out of

15  this.  If the question is whether Jacir sent him a copy of this

16  document with what appears to be a certification on it, I am

17  not going to make a problem for you.  He couldn't know what

18  somebody did in Venezuela --

19        THE COURT:  I don't know.  Maybe he does.  Let's ask

20  him, Mr. Cooper.

21        MR. C. COOPER:  I am simply trying to ask what

22  Mr. Schwartz indicated.

23  BY MR. C. COOPER:

24  Q.    Did the copy you received indicate to you whether it has

25  been certified or not?

1    A.    What this document states is that Gerardo Jacir, okay,

2    with the following document that is found in a Public Notary,

3    okay?  And the Notary, it is noted up in the upper right-hand

4    corner, okay, is submitting a document -- is -- has a certified

5    copy of this document.

6    Q.    Then if we turn to the page marked SKYE6068?

7    A.    6068?

8    Q.    In the lower right-hand corner.

9    A.    Okay.  My documents read like 6027, 6028, 6029.

10   Q.    I'm sorry, what's the last page of the document in front

11   of you?

12   A.    67.

13   Q.    Okay.  There may be a copying error.  That's the last

14   page you have, 67?

15   A.    Yeah, SKYE67.

16        MR. C. COOPER:  Let me see if we can fix this copying

17   error.  May I ask counsel if they have a full set as well?  I

18   want to make sure that --

19        THE COURT:  Sure.

20        MR. SCHWARTZ:  Mine looks like this, it starts at

21   6026, and it goes to -- Mr. Alcalde, 67.  But there are a few

22   documents in here.

23        MR. C. COOPER:  I don't believe his went to 67.

24        MR. SCHWARTZ:  I am not sure he enunciated it clearly.

25   It might be the same thing that you are saying.

1    Mr. Alcalde, 6070.  Is that the last page that you have?

2         THE WITNESS:  The last page that I have is 6070.

3         MR. SCHWARTZ:   I don't know that Mr. Cooper heard

4    what you said.

5    BY MR. C. COOPER:

6    Q.   I didn't hear what you said the last time.  Could you go

7    in two pages from the end, or three, to 6068?

8    A.   Yes.  6068.

9    Q.   Yes.  When you received this copy, did you have an

10   understanding as to what this page represented?

11   A.   Yes, a certification by Marisol Plaza Irigoyen, the

12   Attorney General, that this was a copy of her opinion.

13   Q.   Did this page indicate to you when the certification

14   occurred?

15        MR. SCHWARTZ:  Objection.  Again, if the only point is

16   that he received a copy of this from Venezuela, no problem.  If

17   he is going to be trying to testify as to the underlying

18   documents he didn't receive, I have a problem.

19        THE COURT:   Well, you know, I am not sure what the

20   certification does.  And that might help.  But in terms of what

21   the witness's knowledge is, that would help also.

22        THE WITNESS:  Well --

23        THE COURT:  Let Mr. Cooper frame the question.

24   BY MR. C. COOPER:

25   Q.   That's what I am asking.  What is your knowledge as to

1   when this certification took place?

2   A.   On --

3        MR. SCHWARTZ:  Objection.  No foundation.

4        THE COURT:  We're back.  First of all, I distinctly

5   remember in the course of the motions there is something about

6   notarization that you both referred to.  If the witness can

7   clear that up, that would be helpful to me as the trier of

8   fact.  In other words, we have Notaries here, but that doesn't

9   make it a public document.  If there is something about

10  notarization in Venezuela that was different.

11       MR. C. COOPER:  Thank you, Your Honor.

12  BY MR. C. COOPER:

13  Q.   Mr. Alcalde, before we get to that page then, during the

14  course of your evaluation of the AG opinion for Skye, did you

15  gain any understanding as to the role or function of Notary

16  Publics in Venezuela?

17  A.   Yes.

18  Q.   What did you understand the role of the Notary Public in

19  Venezuela?

20  A.   I also have the knowledge of Notary Public because of my

21  work as an attorney that does work in Latin America as well.

22  Q.   Perhaps can you compare it to the Notary Public in the

23  United States.

24  A.   Notary Publics in Venezuela and many other countries

25  serve as a -- They are not just a Notary that stamps like

1  something here.  They also serve as a depository sometimes of

2  documents.  Okay?  In this particular case, this document

3  appears -- and it's a copy, I don't have an original -- but it

4  appears to have been notarized by Marisol Plaza, okay?  But the

5  significance to me of the document was the date of 17 November

6  2003.

7  Q.  Why was that significant to you?

8  A.  Well, it was significant to me because in my

9  investigation of the Bandagro matter, prior to the purchase of

10  the notes, I, of course, read newspaper articles of what was

11  occurring in Venezuela with respect to the opinion of the

12  Attorney General of October 3, 2003.  And I had become aware

13  through my research, not just in reading but also traveling to

14  Caracas, that, of course, her opinion had created quite an

15  uproar in Venezuela.  Major newspapers at the time as well as

16  minor newspapers, many of them one could characterize as not

17  friendly to the government, were heavily criticizing the

18  October, 2003, opinion.  The Ministry of Finance had been

19  reported as supposedly refusing to pay and perhaps taking some

20  steps to not pay.  And so it was significant to me that not

21  just that in November of 2013, the Attorney General was

22  standing by her opinion --

23  Q.  Did you say 2013?

24  A.  2003, I am sorry.  And all throughout the time that I

25  was traveling to Caracas and prior to the notes being purchased

1    and prior to the demand being made and prior to the litigation

2    being filed, the Attorney General, to my knowledge, publicly

3    defended her October opinion.

4         MR. SCHWARTZ:  Objection.  Motion to strike that, the

5    last segment of the answer, to the extent that it went beyond

6    the date that appears in the document and is not responsive to

7    the question.

8         THE COURT:   Well, again, he's relaying what he read

9    in the newspapers, first of all.  So I will take it for that

10   and nothing more.  But also what this document then winds up

11   being -- I still want to get us back to the notarization

12   process.

13     BY MR. C. COOPER:

14     Q.   So you have explained why the date was important.  You

15   have explained a little bit about the Notary Public process.

16   Did you develop an understanding what legal significance, if

17   any, that a document filed with a Notary Public took on in

18   Venezuela?

19     A.   Yes.  A document filed in a public office carries legal

20   significance as -- you know, for the truth of the matter

21   contained therein.  And it has to be, my understanding was that

22   one had to go through a formal process to remove or strike the

23   document if one were claiming that there was some falsity about

24   it.

25          Those same sort of issues were addressed in the

1   Attorney General opinion when I testified earlier that there

2   had been -- there was evidence that the signators claimed that

3   they had not signed the Bandagro notes but then there were

4   documents in a Public Notary where they acknowledged those

5   signatures in front of a notary.  I mean it's discussed in the

6   Attorney General's opinion that that carries weight.

7        MR. C. COOPER:  If I may address the bench directly, I

8   want to make sure we answered the Court's question.

9        THE COURT:  I have got it.  Thank you.

10  BY MR. C. COOPER:

11  Q.   Mr. Alcalde, you have testified about the Attorney

12  General's October, 2003, opinion and its review and the review

13  and the conclusions that were reached regarding the Ministry of

14  Finance report.  During the course of your evaluation of the

15  Bandagro matter, did you obtain a copy of the Ministry of

16  Finance report, the Ministry of Finance report that's

17  referenced in the Attorney General's opinion?

18  A.   Yes.

19  Q.   Do you recall approximately when you obtained a copy of

20  the Ministry of Finance's report?

21  A.   I think it was -- I don't know if it was -- I don't

22  think it was in April when I first met Jacir.  I think it was

23  after that.  But I don't recall the exact date.

24  Q.   Did you review the Ministry of Finance report?

25  A.   I reviewed the Ministry of Finance report in conjunction

1    -- At one point in time I went through the Attorney General's

2    opinion.  When a reference was made to something, I would try

3    to find it.

4         MR. C. COOPER:  If we could turn to Exhibit 6, which I

5    believe is in Binder 2.

6         THE DEPUTY CLERK:  Exhibit 6.

7    BY MR. C. COOPER:

8    Q.   Mr. Alcalde, do you have Exhibit 6?

9    A.   Yes.

10   Q.   Do you recognize Plaintiff's Exhibit 6?

11   A.   It's a -- purports to be the final report of the

12   Ministry of Finance regarding these specific Bandagro notes.

13   Q.   When you reviewed the Ministry of Finance report, did

14   the report you reviewed have any attachments?  Was it

15   accompanied by any documents?

16   A.   Yes, there were a lot of documents.

17        MR. C. COOPER:  If we could provide the witness with

18   Exhibit 6A?  It's in the same binder.

19        THE DEPUTY CLERK:  6A.

20   BY MR. C. COOPER:

21   Q.   Mr. Alcalde, do you recognize this document?

22   A.   These are the annexes to the Ministry of Finance report.

23        MR. C. COOPER:  And if you can provide the witness

24   with Exhibit 6B, please?

25        THE DEPUTY CLERK:  6B.

1    BY MR. C. COOPER:

2    Q.   Do you recognize Exhibit 6B?

3    A.   A second set of annexes to the Ministry of Finance

4    report.

5    Q.   When you say first set of annexes and second set of

6    annexes, just so the record is clear, what does that mean?

7    A.   The first one is titled the first set of annexes.  And

8    it says from A to U and then -- that's 6A.  And then behind

9    that are a number of documents that constitute this first set

10   of exhibits.

11        6B is titled the second set of annexes.  And it, you

12   know, goes from A to -- it says here from A to O, but it

13   basically contains several other -- a number of other

14   documents.

15   Q.   Let me turn to the report itself so let's go back to

16   Exhibit 6, if we could.

17        And I want to take you back to when you reviewed the

18   Ministry of Finance report as you were assessing the Bandagro

19   matter on behalf of Skye and deciding what opinions to provide

20   Skye, if we look at the -- starting with the first page, what,

21   if anything, was significant about the text on the first page

22   as it related to your review of the Bandagro matter?

23   A.   I'm not sure that I -- I just want to make sure I'm

24   clear here.  I'm not sure that I reviewed the English

25   translation.  I would not have had -- I am pretty sure what I

1  initially reviewed would have been a copy of the Spanish.  All

2  right?  So this appears to be here on the first page of 6A --

3  well, a translation, let's say.  Okay?

4       Well, so --

5  Q.    What is the date of the report?

6  A.    The date of the report is August 8, 2003.

7  Q.    Do you see above the date a reference to a file number?

8  A.    Yes.

9  Q.    Do you know how that file number -- whether that file

10  number matches the file number that was referenced in the --

11  A.    I would have to look at the letter that we identified,

12  which was the opening of the administrative procedure.  I don't

13  have it memorized.  But to the extent that that number matches

14  with the exhibit of the administrative procedure that was

15  opened.

16       MR. SCHWARTZ:  Just one second.  There appears to be a

17  potential discrepancy in the exhibit that I have in my binder

18  is not quite the same one on the screen.  Are we looking at the

19  one that we're looking at the screen and the one under mine?

20       THE COURT:  Where is the discrepancy, what part?

21       MR. SCHWARTZ:  I have a Plaintiff's Exhibit 6 that is

22  not quite the same document as Plaintiff's Exhibit 6.

23       THE COURT:  Well, where?

24       MR. SCHWARTZ:  On the first page.

25       THE COURT:  What part?

1    MR. SCHWARTZ:  I'm being told by Ms. Rodriguez the

2  plaintiffs have may have added a translation which they didn't

3  get into the binders here.

4    MR. C. COOPER:  I have the Spanish.  You don't have

5  the English translation on top.

6    MR. SCHWARTZ:  That appears to be the case.

7    MR. C. COOPER:  I will give you mine.

8    MR. SCHWARTZ:  Do you have the English on top of the

9  Spanish or the second.

10    THE COURT:  I'm looking at Plaintiff's Exhibit 6.

11  It's exactly as the one on the screen.

12    MR. SCHWARTZ:  I am the only one that's different.  So

13  Mr. Cooper has given me his copy so I'm all set.

14    THE COURT:  You may continue.

15  BY MR. C. COOPER:

16  Q.   Mr. Alcalde, how was this report titled?

17  A.   Well, the English translation titles it final report on

18  the results of the internal administrative investigation

19  related to promissory notes Caroni Code series IIC-290,

20  ICC-322, allegedly issued by the extinct Banco de Desarrollo

21  Agropecuario, Bandagro.

22  Q.   Does the first page indicate who the notes are being

23  claimed by?

24  A.   Yes, down at the bottom, claimed by Lawyer Miguel Jacir

25  in representation of Gruppo Triad-FCC.

1   Q.   I'm going to move to page 6 of this, which has a number

2   in the lower right-hand corner, VZ15639.

3   A.   Okay.

4   Q.   As you reviewed the report, did you try to develop an

5   understanding of the methodology, if any, that the Ministry of

6   Finance had undertaken to conduct its investigation?

7   A.   I would say that, yes, in the sense that it's, you know,

8   described -- the methodology used was described both in the

9   Attorney General opinion and as described here.  And I spoke to

10  Mr. Guzman as well.

11  Q.   In the first paragraph under the section Presentation of

12  the Case, there is a reference to determining the truthfulness

13  of some security.  Do you see the English translation there?

14  A.   Yes.

15  Q.   What did you understand that to mean?

16  A.   I understood it to mean that they were pursuing an

17  investigation as had been requested by the claimant as had been

18  requested by Luis Alvaray to determine if these Bandagro notes

19  were genuine and if they were a legitimate obligation to the

20  Republic of Venezuela.

21  Q.   If you would turn to page 9?

22  A.   What's the Bates number.

23  Q.   VZ15642.

24  A.   Okay.

25  Q.   I'm going to just note that -- or ask you, there's

1  references on page 9 near the top that something was attached

2  and identified as D and something attached and identified as E.

3  Do you know if those are references to the annexes that you

4  have identified?

5  A.   Yes.

6  Q.   If you would turn to page 11, please.

7  A.   Is that 44?

8  Q.   Let's start at page 10 of VZ.  Do you see the section

9  titled Field Research?

10 A.   Yes.

11 Q.   Now let's go to page 11.  Within this section entitled

12 Field Research, there's a subparagraph 3.3.  Do you see where

13 I'm referring?

14 A.   Yes.

15 Q.   In this paragraph it indicates that Hepsie Hurtado, who

16 you have already addressed, together with Ludmila Soto traveled

17 to Barquisimeto to interview Elbano Fontana Nieves.  Did you

18 have an understanding while you were evaluating the Attorney

19 General's opinion who Elbano Fontana Nieves was?

20 A.   Yes, he was one of the principals of the Bandagro Bank.

21 Q.   Did you have an understanding what, if any, relationship

22 he had to the notes under investigation?

23 A.   A signator.

24 Q.   Of what significance, if any, was it to you that

25 according to the Ministry of Finance report under Field

1   Research, the Ministry had sent some individuals to go

2   interview Mr. Fontana?

3     A.    That the significance was that it appeared they were

4   doing good investigative techniques.

5     Q.    If you would turn to the very next page, page 12.

6   There's a heading titled Analysis of the First Report.  What do

7   you understand that to be?

8     A.    I am sorry, you will have to direct me by Bates number.

9     Q.    VZ15645.

10    A.    What section now?

11    Q.    There's a heading that says Analysis of the First

12  Report.  Did you have an understanding of what was meant by the

13  first report?

14    A.    I am assuming we're talking about one of those four

15  reports that had rejected the Bandagro notes.

16    Q.    During the course of your evaluation of the Bandagro

17  matter, did you review the four reports?

18    A.    I would not have reviewed four reports to the extent

19  that those documents were not contained in the Ministry of

20  Finance documents.  I don't know that I independently obtained

21  the four reports.

22    Q.    Did you see any need to try to independently obtain

23  them?

24    A.    No.

25    Q.    Why not?

1    A.    Because I wasn't reinvestigating what the Ministry of

2    Finance had done or what the Attorney General had done.  They

3    had done their investigation.  My job was to decide to the best

4    of the ability that we could with my understanding and my

5    research and the experts that I hired whether the opinion of

6    the Attorney General of Venezuela was final and binding.  I

7    wasn't reinvestigating their investigation or redoing their

8    investigation.

9         Obviously, I wanted to understand it because I wanted

10   to understand how serious this matter was and what they had

11   done, but I wasn't there to reinvestigate what they had

12   investigated.

13   Q.    After about five-and-a-half or six pages, if you get to

14   VZ15650, there's now a section entitled Analysis of the Second

15   Report.  Let me know when you're there.

16   A.    Yes.

17   Q.    If this -- In the initial language, it refers to a

18   report by Marta Isabel Gomis Amendola.  During the course of

19   your evaluation of the Bandagro matter, did you gain any

20   understanding of who this person was?

21   A.    My understanding was that she had done a prior

22   investigation and may have -- I think she was still perhaps

23   part of the Ministry of Finance in the early 2000s when this

24   additional -- when the report we're talking about came into

25   being.

1    Q.    And still within this Analysis of the Second Report, if

2    you would turn to page VZ15653, which is page 20, in the middle

3    of this page you will see a reference to an analysis of

4    authenticated documents.  Do you have see that?

5    A.    Uh-huh.

6    Q.    And there's a bold section that refers to the fact that

7    an authenticated document, that is a public document that has

8    legal consequence, that such signature cannot be annulled by

9    unknowing it.  What did you understand it to mean?

10    A.    What I testified to earlier, that one cannot simply,

11    let's say, contradict the document that has been authenticated

12    and, you know, filed.  That one has to go through a specific

13    process to strike it.

14    Q.    Was that ever a topic of conversation between you and

15    Mr. Jacir?

16    A.    I think that the question -- It was of interest to me

17    because the -- There were some things about this Venezuelan law

18    that are dissimilar to our American system where, you know, one

19    could disavow a document that has been notarized.  But since we

20    don't have this particular depository, let's say, of a Public

21    Notary or something like that, it was of interest to me.  But

22    it's it's kind of akin to a, let's say, more of an official

23    document or birth record or something that -- a document that

24    is in a public office, right, that makes a statement about a

25    fact in the U.S.

1     And, of course, denying him that, that doesn't mean

2 one can't deny it, and it may be a question of weight in

3 denying it, but in Venezuela it seemed that this was more than

4 just a question of weight, that you really just couldn't deny

5 it without going through a specific process of actually

6 striking it because the document itself despite a verbal

7 denial, let's say, or some other denial, that document had an

8 independent legal weight.

9     MR. SCHWARTZ:  Objection, move to strike, Your Honor.

10 The question was whether he discussed this document with

11 Mr. Jacir.

12     THE WITNESS:  I'm sorry, yes, I discussed it.

13     THE COURT:  One moment.  There's an objection.  You're

14 the witness, Mr. Alcalde.

15     MR. SCHWARTZ:  The answer went off on some excursion

16 about Mr. Alcalde's understanding of notarization regimes

17 comparatively in Venezuela and the United States.

18     THE COURT:   Well, again, we are going to get

19 testimony from this I assume from your expert, right?

20     MR. SCHWARTZ:  It's certainly not a subject a United

21 States lawyer should be opining about.

22     THE COURT:   Well, who has been dealing with

23 Venezuelan law.  But we have two people you have each selected,

24 and that will be the primary source, if not the exclusive

25 source, of Venezuelan law that I will take.  At this point

1   we're still in the area about what was known by the client.

2   The objection is noted, but you may continue, Mr. Cooper.

3         THE WITNESS:  Yes, we -- I did discuss it with

4   Mr. Jacir.

5    BY MR. C. COOPER:

6    Q.   Did you try to develop an understanding of the legal

7   significance of publicly filed documents and how they can be

8   overcome?

9    A.   Yes.

10        MR. SCHWARTZ:  Objection.  We have been over this

11  twice.

12        MR. C. COOPER:  Well, I was trying to correct what

13  Mr. Schwartz's -- That's fine.

14        THE COURT:  I think we are getting bogged down, to be

15  honest.

16        THE WITNESS:  Yes, and I discussed, you know, lost in

17  this is the fact that Mr. Richards is a lawyer.  Okay?  So

18  Mr. Richards and I, you know, would have these sort of

19  discussions as well because, you know, he's also a lawyer.  And

20  when these issues came up about contradictions, let's say, you

21  know, we had these discussions as well.

22   BY MR. C. COOPER:

23   Q.   Can you turn to page VZ15662, which is page 29 of the

24  exhibit.  There's a little bit of a heading in the middle of

25  this Announcement to the Public Opinion, and then a recitation

1   of a notice, a Public Notice.

2          During the course of your evaluation of the Bandagro

3   matter, did you receive any information about any Public

4   Notices that had been filed concerning Bandagro ICC promissory

5   notes?

6   A.   Yes.

7   Q.   What did you learn?

8   A.   I learned that the -- in addition to the four

9   investigations that had rejected the prior claims, that the

10  government of Venezuela, specifically the Ministry of Finance,

11  had issued by public announcements, sometimes posted on their

12  website and also, perhaps, issued them to international banks,

13  about the fact that there were counterfeit Bandagro notes in

14  the international markets.

15  Q.   Was that of concern to you?

16  A.   It would have been a concern to me had the Attorney

17  General not taken note of all of these and the Ministry of

18  Finance not taken note of all of this and issued an opinion

19  deciding that these notes were different and that these notes

20  were valid and had to be paid.

21  Q.   Turn to page VZ15656 on page 33 of the Ministry's

22  report.  You will see at the bottom the heading Analysis of the

23  Third Report.  Do you see that?

24  A.   Yes.

25  Q.   If you would turn to the very next page, stamped

1   VZ15667, there's some -- there's a paragraph next to a number

2   2.

3   A.   Yes.

4   Q.   That indicates the existence of a public document where

5   citizens Waldemar Cordero Vale, Elbano Fontana Nieves and

6   Pascual Puigbo Morales appeared declaring that they were the

7   authors of the promissory notes and that their signatures were

8   those set on such instruments.

9       Of what significance, if any, was this to you as you

10  read the report?

11  A.   It was significant to me because this was noted in the

12  Ministry of Finance investigation and in the Attorney General

13  as part of the evidence that they -- both of those ministries

14  considered in light of the fact that there was other evidence

15  where the signatories had denied signing the notes.

16  Q.   Can you turn to the page marked VZ15672, please?

17  There's a paragraph J near the top of the page.

18  A.   Yes.

19  Q.   And it refers to a graphotechnical assessment.  What is

20  a graphotechnical assessment?

21  A.   A forensics analysis of, in this case, documents.

22  Q.   This paragraph indicates that a graphotechnical

23  assessment was paid to 47 alleged promissory notes in the

24  session apparently made in Geneva, Switzerland, and determined

25  that such promissory notes were not genuine.  When you read

1   that in the Ministry of Finance's report, did that cause you

2   any concern?

3     A.   It did not -- Well, it did not cause me concern.  What

4   it did was gave me more faith and confidence in the decision of

5   the Attorney General and the Ministry of Finance.

6     Q.   If you would turn to page VZ15676, please?  There's a

7   title Other Elements Arising From Our Investigation.  What do

8   you understand this section to represent?

9     A.   Well, this -- It represents -- The investigation, in my

10  understanding, had several phases.  Number one, it had a phase

11  that we might say a review of the documents, a review of the

12  documents that were found in a variety of different public

13  offices, a review of the documents submitted by the claimants,

14  a review of the notes themselves, a review of the prior

15  investigations.  And so other elements, as was pointed out

16  earlier, there were interviews that were conducted.  This is

17  part of -- this is essentially the history of some of the

18  players, Cordero, Jacir, their sort of involvement in this.

19         MR. SCHWARTZ:  Excuse me for a second.  Your Honor,

20  that mis-characterizes the prior testimony in the report, that

21  there were not interviews, plural --

22         THE COURT:   I am sorry, I'm not hearing you too well.

23         MR. SCHWARTZ:   I am sorry.  I am sure it was

24  unintentional, but where Mr. Alcalde makes reference to

25  interviews plural, it's both inconsistent with his prior

1  testimony and with the report itself.  So to the extent he's

2  being permitted now to be a summarizer of what is documented,

3  at a minimum he's going to have to be accurate in doing so.

4         THE COURT:  You may wish to readdress.

5   BY MR. C. COOPER:

6   Q.   Mr. Alcalde, you saw reference in the Ministry's report

7  to field research?

8   A.   Yes.

9   Q.   What did you understand that field research to be?

10  A.   Well, there was an interview of Fontana.  We discussed

11  that.  There were trips to Switzerland and Miami.  I'm assuming

12  -- perhaps I'm wrong -- but I'm assuming that there were

13  discussions with people at banks that said, are there notes

14  here?  Where are the notes?  Can you show us the notes?  Can

15  you produce the notes?  If I am wrong on that assumption,

16  perhaps things happened in a way that I don't understand.  But

17  assuming that was a logical assumption, there would have been

18  interviews to identify the notes physically and find them.

19         When I read sections of the Attorney General's

20  opinion, notes were -- it was noted in there that there were

21  requests made of FOGADE, that there were requests made of

22  criminal corps.  There were all kinds of requests made of other

23  ministries.

24         If I am incorrect in my assumption that people would

25  have been interviewed and showed up, shows us documents and

1  show us what there were, I stand corrected.  But that's what I

2  meant.

3       MR. SCHWARTZ:  I'm going to move to strike the

4  conjecture.  He can't be making assumptions about what's --

5       THE COURT:  I am going to sustain the objection.

6       MR. SCHWARTZ:  Thank you.

7       THE COURT:   Rephrase the next question, if you would,

8  please.

9  BY MR. C. COOPER:

10  Q.   Mr. Alcalde, could you turn to VZ15682, please?  There's

11  a section titled Opinion.  Do you see that?

12  A.   Yes.

13  Q.   All right.  If you turn to the next page, the very last

14  page.  Did you, as you assessed the Bandagro matter on behalf

15  of Skye, did you read the Ministry's opinion?

16  A.   Yes.

17  Q.   What did you take away from it?

18  A.   Well, this was essentially the opinion that we discussed

19  earlier that was contained within the opinion of the Attorney

20  General where the Attorney General is relaying what the

21  recommendation of the Ministry of Finance was and that it needs

22  to go to the Attorney General for a final and binding decision

23  because this is the office that is empowered, meaning the AG.

24  Q.   Where does it say that in the Ministry of Finance's

25  conclusions?

1    A.    It says, if we look at page VZ15683, if we start with

2    the paragraph that says, once verified, the existence of the

3    promissory notes claimed in custody of institutions in Miami

4    and Switzerland.

5         And if we go down, it is here understood that this is

6    the opinion of the Legal Advisory Office of the Ministry of

7    Finance, but that pursuant to provisions of Article 2 of the

8    decree having the force of Organic Law of the Office of the

9    Attorney General, that is the Organic Law of the Attorney

10   General that we discussed earlier, it is that entity which has

11   the competence to give a final opinion of compulsory

12   performance; therefore, these proceedings need to be referred

13   to the corresponding legal purposes.

14   Q.    Does the author of this report appear at the bottom of

15   this page?

16   A.    Yes, Oscar Guzman.

17   Q.    I believe earlier in your testimony you indicated that

18   you met with Mr. Guzman?

19   A.    Yes.

20   Q.    Why did you meet with him?

21   A.    Dr. Jacir had arranged a meeting with Dr. Guzman when I

22   was in Caracas, and so I met with Dr. Guzman to get a -- you

23   know, to get an understanding of a couple of things that were,

24   first of all, who he was, what his background was, what his job

25   had been at the Ministry of Finance, how it was that he was

1  tasked to do this investigation.  And it was my understanding

2  at the time that he had been either fired or asked to resign

3  from the Ministry of Finance.  So I, of course, was also

4  interested in understanding that.

5  Q.   Did you try to obtain from Mr. Guzman any view of -- his

6  views about the effect of the Ministry's report or the Attorney

7  General's opinion?

8  A.   Well, he was -- His opinion was that it was final and

9  binding, but I wasn't really --

10       MR. SCHWARTZ:  Objection.

11       THE COURT:  He's not giving the opinion as final and

12  binding.  He's giving a recitation of what Guzman said.  That's

13  all I am taking it for and what was ultimately relayed to the

14  client.

15       MR. SCHWARTZ:  As long as it's not coming in for a

16  hearsay purpose --

17       THE COURT:  It's not.

18       MR. SCHWARTZ:  Understood.

19       THE WITNESS:  But I didn't hire him as an expert -- I

20  mean I was looking for independent experts on that issue.

21  BY MR. C. COOPER:

22  Q.   You testified earlier that you met with Professor Bruno

23  Fabbiani.

24  A.   Yes.

25  Q.   Where did you met with him?

1    A.    Probably in Lake Como.  It could have been in Milan.

2  Certainly in Italy.  But I don't know if he came to Lake Como

3  when I was on a trip to Lake Como meeting with James Pavanelli.

4  But I met with him in Italy.

5    Q.    Okay.  And why did you meet with Professor Fabbiani?

6    A.    Because he had submitted this report, this forensic

7  report, on the signatures and the notes, and I wanted to get an

8  understanding of who he was and what his background was.

9    Q.    Did you obtain a copy of reports from Professor

10 Fabbiani?

11   A.    I did.  I think it was in Italian, but I did obtain a

12 report, yes.

13   Q.    Do you read or speak Italian?

14   A.    I don't read Italian.  It's amazing you can -- a Spanish

15 speaker and an Italian speaker can communicate.  But it's

16 harder to read it than it is to speak it, unlike, for example,

17 it's a lot easier for me to read Portuguese than it is to read

18 Italian, but no, I don't read Italian.

19   Q.    Did you gain an understanding of what the report said?

20   A.    Yes.

21   Q.    How did you do that?

22   A.    Well, he and I talked.  We also had an individual there

23 that spoke Italian and English.

24        MR. C. COOPER:  Could you provide the witness with

25 Exhibits 45, 45 and 46, please, in Binder 4?

1       THE DEPUTY CLERK:  45, 46 and 47.

2       MR. SCHWARTZ:  Your Honor, while we're shuffling

3  exhibits, to save time, can I just have a standing objection to

4  the hearsay problem that they're going to present?

5       THE COURT:  All right.  Again, this is not being

6  offered as substantive evidence, as I understand, Mr. Cooper.

7       MR. C. COOPER:  That's fair.

8       THE COURT:  All right.

9  BY MR. C. COOPER:

10  Q.   Mr. Alcalde, do you have Exhibit 45 in front of you?

11  A.   Yes.

12  Q.   There's an English translation on top.  Behind it is the

13  -- a different document.  Do you recognize Exhibit 45?

14  A.   Yes.  This was part of Fabbiani's study with respect to

15  the signature of Waldemar Cordero.

16  Q.   Of what significance, if any, was this to you as you

17  assessed the Bandagro matter?

18  A.   Well, it had two significances.  The primary

19  significance was that it was a report I understood that had

20  been relied upon by the Ministry of Finance of Venezuela in

21  their investigation, and also relied upon by the Attorney

22  General or at the very least commented on by the Attorney

23  General in her legal review of the investigation.

24       And really meeting with Fabbiani was more of a

25  fleshing out, let's say, of how this report had come about.

1    But the significance, the bottom line significance, was that it

2    was part of the Ministry of Finance investigation and the

3    Attorney General's opinion.

4       Q.   Could you turn to Exhibit 46, please?  What is 46?

5       A.   Again, it's an English translation of a report by

6    Fabbiani.

7       Q.   As we looked beyond the English into the next section,

8    there's a -- the front page of the report has the words "Skye

9    Ventures" kind of stamped diagonally across the document.  It

10   says SKYE705?

11      A.   Yes.

12      Q.   What is the significance, if any, of that stamp?  Why

13   does that appear on this document?

14      A.   Well, I mean I didn't have a Skye Ventures stamp so I'm

15   assuming that Mr. Richards stamped this.  But it was provided

16   to us.

17           MR. SCHWARTZ:  Again, there shouldn't be any

18   assumptions as to what happened.  So I'm going to move to

19   strike.

20           THE COURT:  That will be sustained.

21   BY MR. C. COOPER:

22      Q.   Was Exhibit 46 the report of Fabbiani provided --

23      A.   Yes.

24      Q.   -- to you --

25      A.   Yes.

1    Q.    -- during the course of your assessment of the Bandagro

2    matter?

3    A.    Yes.

4    Q.    And before Skye purchased 7/12 and 8/12?

5    A.    Yes, and I had a copy of that report and so did

6    Mr. Richards.

7    Q.    Exhibit 47, please?  Do you recognize this document?

8    A.    Yes, it was a report that Fabbiani presented in a case

9    that had been filed against Pavanelli regarding the -- that in

10   some way involved the notes.

11        MR. C. COOPER:  And if we could provide the witness

12   with Exhibit 48, please?

13        MR. SCHWARTZ:  For the record, Your Honor, the same

14   objection to this one as the prior three.

15        THE COURT:  Noted, and the same decision.  Thank you.

16   BY MR. C. COOPER:

17   Q.    During the course of your evaluation of the Bandagro

18   matter, did you provide any information to Professor Fabbiani?

19        I will direct your attention to the page marked

20   SKYE1741.

21        MR. SCHWARTZ:  Was there an answer to the prior

22   question?  I didn't hear one.

23        THE COURT:   Mr. Cooper?

24        MR. C. COOPER:  I don't know that he answered the

25   question.

1    THE WITNESS:  I don't recall that I provided anything

2 to him.

3    BY MR. C. COOPER:

4    Q.    What is Exhibit 48, please?

5    A.    It's an analysis, a testing, of the originality of some

6 of the Bandagro securities.

7    Q.    You testified a moment ago that you met with James

8 Pavanelli.

9    A.    Yes.

10    Q.    When did you meet with Mr. Pavanelli?

11    A.    In July of 2004.

12    Q.    And why did you meet with Mr. Pavanelli?

13    A.    In July of 2004, I went to Lake Como to meet James

14 Pavanelli and two other individuals from Venezuela that were

15 involved with the company called Woodstrite, Manfredi and --

16 the other gentleman's name escapes me and their attorney.

17    Q.    And why did you travel to Europe to meet with them?

18    A.    There was a dispute between the principals of Woodstrite

19 and James Pavanelli regarding an agreement that the principals

20 of Woodstrite had with Pavanelli respecting the -- some notes

21 they felt Pavanelli needed to assign to them.

22        While I was there -- I mean I was there for, I think,

23 several days, and I may have met Mr. Fabbiani at that time as

24 well and, you know, done some other interviews and

25 investigations.

1   Q.   During your due diligence, did you obtain any documents

2   other than the documents we have addressed so far, the Attorney

3   General opinion, the Ministry of Finance final reports attached

4   to the Ministry's final report and the newspaper articles, of

5   course?

6   A.   I'm sure that I did.  I was doing a lot of research.

7   There were people contacting me about matters.  But nothing

8   really jumps to mind right now that I may have obtained that I

9   put a great reliance upon.

10        MR. C. COOPER:  Could we provide the witness Exhibit

11   61, please, in Binder 5?

12   BY MR. C. COOPER:

13   Q.   Mr. Alcalde, do you recognize Exhibit 61?

14   A.   Well, I think I've seen the document before, but nothing

15   jumps to mind right now that this was --

16   Q.   Okay.  You testified earlier about coming across a

17   newspaper article that referred to Atlantic Bank and Bandagro.

18   A.   Yes.

19   Q.   Did you undertake any steps to get more information

20   about Atlantic Bank or its involvement with Bandagro?

21   A.   At one point in time we hired a private investigator,

22   PICA Corporation, to look for more records and maybe to try to

23   find out who had been involved in that transaction.

24        MR. SCHWARTZ:  Your Honor --

25        THE COURT:  Is there an objection?

1      MR. SCHWARTZ:  Yes.  There is an objection as to the

2   vagueness of the temporal scope of the question.  We have a

3   witness here who was trial counsel for a period of time and

4   necessarily generated some work product.  So I think we need a

5   clarification as to when he did this --

6           THE COURT:  A date would be helpful.

7           MR. SCHWARTZ:   -- whether it was before or after the

8   litigation.

9           THE COURT:  All right.  Go ahead.

10  BY MR. C. COOPER:

11  Q.   Mr. Alcalde, do you recall when this effort was made to

12  obtain more information about Atlantic Bank?

13  A.   I am sorry, don't recall that.

14          MR. C. COOPER:  Could we give the witness Exhibit 130,

15  please?  In Binder 6.

16  BY MR. C. COOPER:

17  Q.   Mr. Alcalde, do you have Exhibit 130?

18  A.   Yes.

19  Q.   Do you recognize Exhibit 130?

20  A.   Well, the beginning of it is in -- sorry, it looks like

21  e-mails that David Richards sent to Miguel Jacir in April, on

22  or about April -- well, in April of 2004 regarding our upcoming

23  visit to Caracas.

24  Q.   Okay.

25  A.   It looks like the first one is.  And it looks like the

1  second one is -- Well, there's an April 4 e-mail at the bottom,

2  okay, that seems -- that addresses our trip to Caracas.  And

3  then it looks like an e-mail from Jacir after we returned.

4    Q.   Let's focus on the e-mail, the April 21, 2004, e-mail.

5  Through this e-mail did Mr. Jacir provide you with any

6  information?

7    A.   Yes.

8         MR. SCHWARTZ:  Objection, hearsay.

9         THE COURT:   Again, it's offered as background for

10  what's passed on to the client?

11         MR. SCHWARTZ:  Well, fair enough.  But there's a fine

12  line at this point which Mr. Cooper is treading here by loading

13  up the questions with documents that are pervaded by hearsay,

14  this being a conspicuous example.

15         THE COURT:  So we're talking specifically about the

16  e-mail from Mr. Jacir again?

17         MR. SCHWARTZ:  Well, I'm focused on the e-mail from

18  Mr. Jacir that's dated April 21, 2004.

19         THE COURT:  So this has his opinion about somebody's

20  veracity.  I will tell you that's not going to weigh into my

21  decision making.  I think at this point, as I understand

22  Mr. Cooper's questioning, he is going through with some

23  thoroughness, with what this witness passed on to the client.

24         MR. C. COOPER:  Yes, Your Honor.

25         THE COURT:  That's the whole point?

1    MR. C. COOPER:  That is.

2    THE COURT:  So there will be some things in here that

3 you can be assured, particularly the part about this other

4 witness's view of somebody lying, that will be discounted.

5    MR. SCHWARTZ:  Thank you, Your Honor.

6 BY MR. C. COOPER:

7 Q.   Mr. Alcalde, what I want to focus on is the attachment

8 that was apparently attached to this e-mail.  Do you see under

9 the e-mail header where it says Attachments?

10 A.   Yes.

11 Q.   Do you see the document that follows this e-mail?

12 A.   I am sorry, let me get to the Spanish.  So I'm looking

13 at the Spanish e-mail now.  And attached to the Spanish e-mail

14 is a photostatic copy of a document that appeared in the Notary

15 of Venezuela that Dr. Jacir is sending.

16    MR. SCHWARTZ:  My objection applies equally to this

17 portion of the exhibit just so the record is clear.

18    THE COURT:  So noted.

19    MR. SCHWARTZ:  The foundation of which is on top of

20 the hearsay issue.  It's the same weight.

21 BY MR. C. COOPER:

22 Q.   Mr. Alcalde, you've testified about trips you took,

23 documents you reviewed, opinions you assessed.  Did you provide

24 any opinions to Skye Ventures about the October 3, 2003,

25 Attorney General opinion?

1    A.   Yes.

2    Q.   When did you provide opinions to Skye about the effect

3    of the October, 2003, opinion?

4    A.   Mr. Richards and I worked very closely throughout this

5    entire period of time, and so the whole -- and I'm talking a

6    period of around eight months.  And so it was an evolving

7    process.  But before Skye Ventures purchased the notes, I took

8    all of the information that we have discussed, my reviews of

9    the law, my discussions with the Venezuelan lawyers that I have

10   identified, the research that we noted, and the newspapers and

11   all of that, and I told Mr. Richards that in my opinion, as

12   well in the opinion of the Venezuelan attorneys that we had

13   consulted, the opinion of the Attorney General of October 3,

14   2003, was final and binding under the law of Venezuela.

15           MR. C. COOPER:  If we could provide the witness with

16   Exhibit 85, please, in Binder 6?

17           THE DEPUTY CLERK:  85.

18   BY MR. C. COOPER:

19   Q.   Mr. Alcalde, this document is obviously redacted.  Do

20   you recognize through the redactions this document?

21   A.   It appears to be a memorandum that I prepared for Skye

22   Ventures analyzing the issues related to the opinion of the

23   Attorney General.

24   Q.   Through this memorandum the --

25           THE COURT:  Wait one moment.

1      MR. SCHWARTZ:  I was going to object.  It could have

2   been due to the question or to the answer, but -- or the next

3   question, so here we arrive, Your Honor.

4      THE COURT:  Let me just set the stage here.  You filed

5   a motion in limine that I held in abeyance pending his

6   testimony.  How much longer do we have with Mr. Alcalde on

7   direct?  Because I am assuming you are going to reargue the

8   motion in limine?

9      MR. SCHWARTZ:  Well, I was going to propose is

10   something slightly different which was that I stand up, record

11   the objection, reserve the right to assert it after

12   cross-examination or during cross-examination --

13      THE COURT:  That's fine.

14      MR. SCHWARTZ:  I expect to develop more of a record

15   than Mr. Cooper will to support my motion --

16      THE COURT:  I told you on Friday the motion is out

17   there.  And we would determine that after we saw the scope of

18   Mr. Alcalde's testimony, which we are about -- I will give you

19   the opportunity for some cross before we address it.

20      MR. SCHWARTZ:  Yes, I just didn't want my silence to

21   be acquiescence or abandonment of that motion.

22    BY MR. C. COOPER:

23    Q.   Mr. Alcalde, in this written memorandum, did you provide

24   Skye with your opinion about the effect of the Attorney

25   General's October 3, 2003, opinion?

1      MR. SCHWARTZ:  Again, Your Honor, this is not

2  substantive evidence --

3      THE COURT:  This is to the knowledge of the client at

4  this point.  That's all.

5      MR. SCHWARTZ:  Thank you.

6      THE WITNESS:  Yes.

7  BY MR. C. COOPER:

8  Q.   Directing your attention to the page marked SKYE6924.

9  A.   Okay.

10 Q.   What opinion did you provide to Skye Ventures about the

11 effect of the Attorney General's October 3, 2003, opinion?

12 A.   Well, my -- I mean it's set forth here.  Do you want me

13 to read it?

14 Q.   Please.

15     THE COURT:  Just the date on this is not apparent

16 unless I'm looking right at it and missing it.

17     MR. C. COOPER:  It looks like the date has been

18 redacted.

19 BY MR. C. COOPER:

20 Q.   Mr. Alcalde, do you recall when you completed this

21 memorandum?

22 A.   This memorandum, I don't know exactly when I completed

23 it.  It probably went through several drafts.

24     THE COURT:  To be honest, you probably had the

25 un-redacted version, right?  It's on that.  Perhaps you could

1  use that to refresh.  Just for the date, nothing else.  You

2  have no objection to that, I'm sure.

3        MR. SCHWARTZ:  No.  In fact I think you ordered the

4  plaintiff to have the un-redacted version in the courtroom.

5        THE COURT:  Yes.  At least here.  It didn't have to be

6  in the courtroom.  So if you want to go get it?

7        MR. SCHWARTZ:  If you want to leave it in our lunch

8  room, that's fine.  Then we can look through it --

9        THE COURT:  That's all right.  We can get back to the

10  date when the documents are retrieved.

11  BY MR. C. COOPER:

12  Q.    So, Mr. Alcalde, what opinion did you provide in this

13  written memorandum?  About the effect of the Attorney General's

14  2003 opinion?

15  A.    So if we look at the last full paragraph on SKYE6924, it

16  reads, The administrative procedure prescribed by Title 4,

17  Chapter 1 of the -- I will read it in English -- the Organic

18  Law of the Attorney General of the Republic is according to the

19  Venezuela legal experts consulted, the procedure enacted by

20  Venezuela to determine the validity of the claims against its

21  assets.  Moreover, once the claim is determined to be a legal

22  obligation of the Republic by the Attorney General, the

23  decision is final and binding upon the Republic.  As such, the

24  decision of the Attorney General of Venezuela is a final and

25  binding administrative and executive judgment on the issue of

1  the validity of the Bandagro promissory notes presented by

2  Dr. Jacir and his claim and the fact that said notes are

3  guaranteed by the Republic.

4   Q.   Now, Mr. Alcalde, this opinion you indicated is in

5  writing, is in written form.  Is this the first or only time

6  that you gave Skye Ventures that opinion?

7   A.   No.

8   Q.   When did you first give Skye Ventures your opinion that

9  the Attorney General's October 3, 2003, opinion was final and

10  binding?

11   A.   Well, as I mentioned, Mr. Richards is an attorney.

12  Mr. Richards and I were working extremely closely during this

13  period of time.  Mr. Richards went to Caracas with me.

14  Mr. Richards and I spoke often on this matter.  At some point

15  in time it probably became what I was working on the most, if

16  not sometimes the only thing that I was working on.  So he and

17  I spoke constantly about what I was learning, what research was

18  being developed.  I mean I'm sure that if I found a newspaper

19  article that said, you know, in The Wall Street Journal that

20  Venezuela was guarantying the debt, then I would have picked up

21  the phone and spoken to Mr. Richards.  It was that kind of very

22  close sort of working relationship.

23        So he and I as lawyers probably came to -- I won't

24  speak for him, but me, I came to conclusions that the opinion

25  of the Attorney General were final and binding I'm sure before

1  I was prepared to put it down in writing.  You know, attorneys,

2  once we put something in writing, it becomes something

3  different, right?  So by the time I was willing to put it in

4  writing, I felt that I had done a pretty exhaustive analysis of

5  that issue.  But that doesn't mean that I didn't come to that

6  conclusion earlier.  But that doesn't mean that I would not

7  have shared it with Mr. Richards earlier.  That does not mean

8  that Mr. Richards would not have been taking actions earlier

9  based on those discussions.

10       MR. SCHWARTZ:  Your Honor, I am going to move to

11  strike.  It's not a responsive answer to the question which

12  was:  When did you first provide the opinion orally --

13       THE COURT:  It was a long answer, but I think it was

14  responsive.  The objection is overruled.  It all had to do with

15  the timing.

16       MR. SCHWARTZ:  It would be, perhaps, helpful if we

17  knew what the date was of this document.

18       MR. C. COOPER:  The document does not bear a date.  I

19  can show it to the Court.

20       THE COURT:  Or to the witness.  If he can look at

21  that, if that would help you to determine a date.  Maybe it

22  won't.  But see if that refreshes.  Perhaps at the end if not

23  the beginning.

24       And, counsel, would there possibly be a cover letter

25  that went with this, that might have went with this?  Nothing

1    that you found?  That has been found?

2            THE WITNESS:  I am sorry, Your Honor, I just don't

3    recall the date.

4            THE COURT:  Thank you.  That's the best we can do.

5            MR. SCHWARTZ:  Actually, if I may suggest, there might

6    be something better that can be done, and that is consulting

7    the time records of Crabbe, Brown & James for the period in

8    question.  We have been produced some of those, but they have

9    been redacted.  So we don't know, but --

10           THE COURT:   I think -- Tell me if you disagree --

11   there is significance to the date, you both agree.

12           MR. C. COOPER:  Certainly.

13           THE COURT:  Are those the time records, by any chance?

14           MR. C. COOPER:  I don't have those.

15           THE COURT:  You don't have those with you.

16           MR. SCHWARTZ:  This has to be a knowable fact, that

17   law firms write down what they do --

18           THE COURT:  I am sure it is retrievable somehow.  Is

19   there any reason we can't cover this on cross and keep moving

20   forward?

21           MR. SCHWARTZ:  I have no problem with doing that as

22   long as they figure it out in the meantime.

23           THE COURT:   I think the date has to be determined.

24   You may continue.

25     BY MR. C. COOPER:

1  Q.   To the date issue, let me ask you a question,

2  Mr. Alcalde.  Did you provide your opinion to Skye Ventures

3  that the Attorney General's October 3, 2003, opinion was final

4  and binding before or after Skye Ventures purchased Bandagro

5  notes?

6  A.   Before.

7       THE COURT:  You don't recall whether that was in

8  writing or orally?  We just saw the writing.  Do you have any

9  recollection as to whether this was before that document that's

10  on the display right now?

11      THE WITNESS:  Oh, yes.  I mean as I said, Your Honor,

12  Mr. Richards and I worked very closely during this period of

13  time.  I'm confident that throughout the process -- and just to

14  frame it for you, between when I first got involved in October

15  or November of 2003 to, let's say, June of 2004, that as we've

16  seen, you know I was working on analyzing all these laws and

17  talking to all these experts.  I have met with Mr. Badell.  And

18  I'm confident during that time period, Mr. Richards and I would

19  have discussed that I was fairly confident that this was a

20  final and binding decision.  The experts that we had consulted

21  said it was a final and binding decision.

22      The memorandum in my mind didn't really have so much

23  of a legal significance with respect to whether or not I had

24  communicated to Mr. Richards that I felt it was final and

25  binding.  He wanted it -- you know, we wanted to do a

1  memorandum for him because we were analyzing a number of issues

2  besides whether it was final and binding.

3          THE COURT:  Thank you.  I appreciate that.  Thanks.

4          MR. C. COOPER:  Could we provide the witness with

5  Exhibit 151, please, in Binder 7?

6  BY MR. C. COOPER:

7  Q.   Mr. Alcalde, do you have Plaintiff's Exhibit 151?

8  A.   Yes.

9  Q.   Do you recognize this?

10  A.   Yes, I do.

11  Q.   What is Exhibit 151?

12  A.   It's a letter that I sent to Tobias Nobrega with respect

13  to seeking payment of two promissory notes, Bandagro promissory

14  notes 3/12 and 4/12.

15  Q.   Bandagro notes 3/12 and 4/12?

16  A.   Yes.

17  Q.   Those are not the notes at issue in this case.  Why were

18  you demanding payment of notes 3/12 and 4/12?

19  A.   Because those were the original notes that Skye Ventures

20  was going to obtain and in fact had obtained.

21          MR. C. COOPER:  Could we hand the witness 153, please?

22  Also in Binder 7.

23  BY MR. C. COOPER:

24  Q.   Mr. Alcalde, do you recognize Exhibit 153?

25  A.   Yes.

1    Q.    What is Exhibit 153?

2    A.    It's a letter I sent on August 11, 2004, to Minister

3    Nobrega in which I informed him that we were, on behalf of

4    Skye, we were amending the demand for payment on notes 3/12 and

5    4/12 to notes 7/12 and 8/12.

6    Q.    Between the date of the earlier letter, June 24, 2004,

7    and August 11, 2004, had you received any response to your

8    first demand letter?

9    A.    I had not.

10   Q.    And why were notes 7/12 and 8/12 substituted for notes

11   3/12 and 4/12?

12         MR. SCHWARTZ:  Objection, no foundation.

13         THE COURT:  It's his letter.  Why don't we ask for a

14   foundation first.

15   BY MR. C. COOPER:

16   Q.   Mr. Alcalde, in your letter you indicate that you're

17   amending the original demand to apply to notes 7/12 and 8/12,

18   instead of notes 3/12 and 4/12.  Why did you write that?

19   A.   Because we were substituting -- We had decided to obtain

20   notes -- or Skye Ventures had decided to obtain notes 7/12 and

21   8/12.  There was an issue with respect to notes 3/12 and 4/12

22   perhaps having a lien against them.

23         THE COURT:  So I am clear, the notes referenced in

24   151, is what you are talking about, possibly subject to liens?

25         THE WITNESS:  Yes, notes 3/12 and 4/12 could have been

1    subject to a possible lien perhaps by Woodstrite.

2    BY MR. C. COOPER:

3    Q.   To your knowledge, did Skye Ventures undertake any

4    efforts to get physical possession of the notes?

5    A.   Yes.

6         MR. C. COOPER:  If we could provide the witness with

7    Exhibit 148, please?  148, 149 and 150.

8         THE DEPUTY CLERK:  148, 149, 150.

9    BY MR. C. COOPER:

10   Q.   Mr. Alcalde, do you recognize Exhibit 148?

11   A.   Yes.

12   Q.   148 indicates that you were authorized to transport

13   certain Bandagro notes to the United States from Europe.  Did

14   you do that?

15   A.   No.  I testified earlier that I went to Lake Como, and I

16   met with James Pavanelli, and I also took care of other

17   meetings.  A Swiss attorney by the name of Schianchi had

18   possession of Skye's notes pursuant to an escrow agreement, and

19   I met with Schianchi.  But I decided that for a number of

20   reasons, perhaps it was better that I not physically transport

21   the two promissory notes back myself.  I didn't want to become

22   part of the, number one, the chain of custody.  Number two, I

23   didn't want to, you know, be carrying the two notes of such

24   high value.

25        And so given the fact that the notes were under escrow

1   with Attorney Schianchi for Skye, I made the decision that what

2   we would do then we would just transport the notes.  I would

3   have a courier transport the notes to Columbus.

4   Q.    Did that happen?

5   A.    Yes.

6   Q.    What is Exhibit 149, please?

7   A.    This is a letter from Attorney Schianchi referring to

8   the escrow agreement that I mentioned.

9   Q.    Were notes 7/12 and 8/12 transported from Europe to the

10  United States?

11  A.    Yes, they came to my office.

12  Q.    What is Exhibit 150, please?

13  A.    Exhibit 150 is my receipt of the notes when I took

14  possession of the notes.

15  Q.    Mechanically, how were they transferred from Europe to

16  the United States?

17  A.    They were physically carried by a courier who, you know,

18  had them in a bag, in a box.  And I signed for it and handed

19  them over to me.  And then we placed them in, I believe, we

20  placed them in a safety security box at, perhaps, Fifth Third

21  Bank.

22  Q.    Did you ever receive a response to either the June 24,

23  2004, or the August 11, 2004, demand letters?

24  A.    I did.  I received a letter from a law firm in Florida

25  that said they were representing the Ministry of Finance.

1    MR. C. COOPER:  Could we give the witness 154, please?

2    BY MR. C. COOPER:

3    Q.    Mr. Alcalde, you have Exhibit 154.  Do you recognize

4    this document?

5    A.    Yes, this is the letter that I received from the law

6    firm of Ruden & McClosky, which make reference to my second

7    letter, the August 11 letter.

8    Q.    You testified earlier that in addition to conducting due

9    diligence and providing Skye Ventures with a legal opinion on

10   the effect of the Attorney General's October 3, 2003, opinion,

11   you also served as a litigator on behalf of Skye Ventures in

12   this matter.  Do you recall approximately when you filed the

13   complaint in this case?

14         Let me back up.  Did you prepare a complaint in this

15   case?

16   A.    Yes, I did.

17   Q.    Do you recall approximately when it was filed?

18   A.    Sometime in August or September of 2004.

19   Q.    At the time you filed the complaint, what was your

20   understanding as to the legal effect of the Attorney General's

21   October 3, 2003, opinion?

22   A.    That it was a final and binding opinion, that it, in

23   effect, validated the authenticity of the notes and the

24   requirement of Venezuela to pay the notes.

25   Q.    And at the time you filed the complaint in this action,

1  what was your understanding as to the status of the Ministry of

2  Finance's August 8, 2003, report?

3      A.   The Minister of Finance?

4      Q.   Yes.

5      A.   It was my understanding that that was the only report

6  upon which the Attorney General of Venezuela had rendered an

7  opinion pursuant to Article 56 of the Organic Law of Venezuela.

8      Q.   Did you later receive information suggesting that the

9  Ministry of Finance had issued another report?

10     A.   That the Minister of Finance had issued another report?

11     Q.   Yes.

12     A.   With respect to the issuance of a report, I only learned

13  that after I filed the litigation.

14     Q.   After you filed the litigation, what did you learn about

15  whether or not the Ministry of Finance had issued another

16  report?

17     A.   Well, let me be clear.  Before I filed the litigation, I

18  knew that the Minister of Finance had -- was making noises or

19  making claims about not paying, okay?  After I filed the

20  litigation, I received a motion to dismiss.  Attached thereto

21  was a letter from the Minister of Finance to the Attorney

22  General of Venezuela -- sorry, I don't want to risk an

23  objection, but in which the opinion -- in which the Minister of

24  Finance sought a reconsideration by the Attorney General.

25     Q.   To your knowledge, before Skye filed suit, to your

1  knowledge had Gruppo Triad received any Ministry of Finance

2  reports that were supposedly issued after August 8, 2003,

3  regarding Bandagro?

4      MR. SCHWARTZ:  Objection, no possible foundation.

5      THE COURT:  It would be a hearsay based foundation,

6  wouldn't it?  This testimony, as I have been seeing it, has to

7  do with what was known to the plaintiff.

8      MR. C. COOPER:  Yes.

9      THE COURT:  For that basis only.  So I don't think we

10 are at that level unless this is somehow linked to what the

11 plaintiff knew.

12     MR. C. COOPER:  And that's what I'm trying to link

13 this to, Your Honor.  Before they had filed, whether they had

14 received any investigation indicating the Gruppo Triad had

15 received a different report.

16     THE COURT:  As long as it is not based on a hearsay

17 foundation, the witness can answer.

18     MR. SCHWARTZ:  It's hard to see how it wouldn't be

19 hearsay under the circumstance.

20     THE COURT:  They can try.  If it's hearsay based, then

21 I agree with you.

22   BY MR. C. COOPER:

23   Q.  Had you received any indication before filing suit that

24 the Ministry of Finance had issued any other reports and

25 notified Gruppo Triad of it?

1      MR. SCHWARTZ:  Same objection.  There is no

2   evidentiary bases for that question.

3      MR. C. COOPER:  I will withdraw the question.

4      THE COURT:  All right.  I am not rushing you, but we

5   are right up to the break.  If you have a few more questions,

6   we will continue.  If you are going to take a while, we'll take

7   a break.

8      MR. C. COOPER:  I probably got another 30 minutes.

9      THE COURT:   Then we will take a 15-minute recess at

10  this time.

11     (Recess taken from 3:00 to 3:15.)

12     THE COURT:  And, Mr. Cooper, you may proceed.

13     MR. C. COOPER:  Thank you, Your Honor.

14  BY MR. C. COOPER:

15  Q.   Mr. Alcalde, did there come a point in time where you

16  received an indication that the Attorney General of Venezuela

17  had issued another opinion after October of 2003?

18  A.   Yes.

19  Q.   Do you recall how you learned that?

20  A.   It was filed in court, in here, in the pleadings.

21     MR. C. COOPER:  Could we provide the witness with

22  Exhibit 210, please, in Binder 8?

23     COURTROOM DEPUTY CLERK:  210.

24  BY MR. C. COOPER:

25  Q.   Mr. Alcalde, do you recognize Plaintiff's Exhibit 210?

1    A.   Yes.

2    Q.   And what is this, please?

3    A.   It is the filing that was done by the Defendant,

4  Republic of Venezuela, in this case, attaching an opinion dated

5  8 December, 2003.

6    Q.   When was this filed?

7    A.   It was filed in April of 2005.

8    Q.   Before April of 2005, had you received any indication

9  from any source about a December 2003 Attorney General opinion?

10   A.   No.

11      MR. C. COOPER:  Could we look at Exhibit 204, please?

12      COURTROOM DEPUTY CLERK:  204.

13  BY MR. C. COOPER:

14   Q.   Mr. Alcalde, do you recognize Exhibit 204?

15   A.   Yes.  It's a decision of the Venezuelan Supreme Court in

16  a case filed by Woodstrite Investments Limited.

17   Q.   What is the date of this opinion?

18   A.   March 9, 2004.

19   Q.   Did you develop an understanding as to what was at issue

20  in this dispute involving Woodstrite?

21   A.   Yes.

22   Q.   What was your understanding?

23   A.   They were seeking a hearing in the Venezuelan Supreme

24  Court with respect to payment on the Bandagro notes.

25   Q.   Did you review the decision of the Supreme Court of

1  Justice dated March 9th, 2004?

2     A.   Yes.

3     Q.   And is there any reference in this decision to a

4  December 2003 Attorney General opinion?

5     A.   No.

6          MR. C. COOPER:  Would you hand the witness Exhibit

7  205, please?

8          COURTROOM DEPUTY CLERK:  205.

9  BY MR. C. COOPER:

10    Q.   Mr. Alcalde, do you recognize the document marked as

11 Plaintiff's Exhibit 205?

12    A.   Yes.  It's a copy of a newspaper article, July 2004,

13 from a newspaper in Venezuela.

14    Q.   How did you obtain a copy of this newspaper article?

15    A.   I would have been doing research on the Internet, as I

16 testified earlier, with respect to anything that was previously

17 published on Bandagro, both in English and Spanish.

18    Q.   Do you recall when you obtained a copy of this July 1st,

19 2004, article?

20    A.   I'm sure that I obtained it shortly after it came out.

21         MR. SCHWARTZ:  Your Honor, I'm just going to note that

22 we have objections, through this document, on a variety of

23 grounds set forth in the pretrial order to authentication,

24 foundation, hearsay, relevance, and as to the translation of

25 this particular document.

1       THE COURT:  Well, let me just ask Mr. Cooper.

2       So, this is not an ancient document, of course.  This is

3   much more recent than 20 years.

4       Why isn't this hearsay and without an exception?

5       MR. C. COOPER:  Well, Your Honor, we would -- I guess

6   our argument would be that, when the Attorney General gives an

7   interview in which she's asked questions about her opinion and

8   she doesn't indicate that she changed her mind at a point in

9   time when she should have --

10      THE COURT:  I'm not trying to make your case for you.

11  Would this qualify as an admission?

12      MR. C. COOPER:  I think it would.

13      THE COURT:  Why don't you address that for me,

14  Mr. Schwartz?  How do you see that?

15      MR. SCHWARTZ:  Well, first of all --

16      THE COURT:  She's still the Attorney General when the

17  statement's made?

18      MR. C. COOPER:  Yes.

19      MR. SCHWARTZ:  I believe she is, yeah.

20      THE COURT:  All right.

21      MR. SCHWARTZ:  But the problem with this document

22  concerns, in part, authenticity, foundation, and I believe

23  completeness of the document; but, also, if you were to

24  consider this -- and you may want to defer ruling on an

25  evidentiary objection to this document -- you'd need to read

1   this in light of the Attorney General's own testimony

2   concerning the interview itself, because she was deposed about

3   this.

4           THE COURT:  All right.  Then, why don't we -- we'll

5   note this, or we'll hold this for further resolution as far as

6   admissibility; but the witness can testify to it.  If I strike

7   the exhibit, then we'll strike the testimony as well.

8           MR. SCHWARTZ:  That's fine.

9     BY MR. C. COOPER:

10    Q.   And, Mr. Alcalde, after you saw the filing in April of

11   2005 attaching the December 2003 opinion, what significance, if

12   any, did this July 1, 2004, article have?

13    A.   Well, the significance of this article, in combination

14   with other articles and other information that I had developed,

15   was that it did not seem probable to me that the Attorney

16   General of Venezuela really issued an opinion in December of

17   2003.

18           MR. SCHWARTZ:  Objection.

19           THE COURT:  Yeah.  I don't see any foundation at this

20   point.  The objection's sustained.

21     BY MR. C. COOPER:

22    Q.   Mr. Alcalde, you testified previously about news

23   articles in the fall of 2003 that created -- that indicated

24   there was controversy surrounding the Attorney General's

25   opinion.  Do you recall that?

1    A.   Yes.

2    Q.   As a result of that controversy, did you undertake

3    efforts to try to find instances in which the Attorney General

4    spoke about, or addressed, the October 2003 opinion?

5    A.   Yes.

6         MR. SCHWARTZ:  Again, we have to have a limitation

7    there.  If this occurred during Mr. Alcalde's tour of duty as

8    trial counsel in this case, I don't think that's relevant.

9         MR. C. COOPER:  I can clarify.

10        THE COURT:  Go ahead.

11   BY MR. C. COOPER:

12   Q.   Mr. Alcalde, did you conduct this search during the

13   time, well, before you filed suit in this case?

14   A.   Yes.  I testified earlier that part of the investigation

15   that I did was, I saw articles that came out in the major

16   newspapers in Venezuela with respect -- that was heavily

17   criticizing the October 2003 opinion of the Attorney General.

18        I looked for articles -- I looked for every article that

19   I could find with respect to what the reaction was of the

20   Venezuelan Attorney General to what was without a doubt heavy

21   criticism in the press.

22        In addition to that, I knew that the General Assembly of

23   Venezuela had started its own investigation of the October

24   opinion, and --

25   Q.   When did you learn that the --

1    A.    I learned this while -- between the time that

2   Mr. Richards asked me to start looking at this and the time

3   that I gave him my opinion that the October opinion was final

4   and binding.  So, I -- Once I learned that the General Assembly

5   was conducting an investigation, I looked for records and

6   documents regarding that investigation.  I spoke to Miguel

7   Jacir, who actually testified during this investigation.  And,

8   as I told you, I also had met principals of Woodstrite.

9   Woodstrite -- The two principals of Woodstrite --

10         THE COURT:  If I could, let me just express a concern

11   here.

12         So, up to this point, up to the time Skye makes the

13   purchase, all of this information from Mr. Alcalde has to do

14   with what did they know, particularly surrounding the Attorney

15   General's opinion.  But we're past the purchase point.  So,

16   how -- I mean, we're getting into opinion testimony; aren't we?

17         MR. C. COOPER:  Well, Your Honor, if I may --

18         THE COURT:  Go ahead.  Sure.

19         MR. C. COOPER:  -- the Defendants in this case contend

20   that a Venezuelan Supreme Court decision issued in 2007

21   effectively allowed the Attorney General to change her opinion.

22   And it's our contention, and I think what we're trying to

23   present the evidence of, is that that opinion was essentially

24   not changed.

25         THE COURT:  Well, and -- that could very well be a

1  triable issue in this case; but, as someone who started out as

2  counsel and then -- trial counsel, is that the best person, or

3  even a proper person, to establish those claims?

4       MR. C. COOPER:  Understood, Your Honor.  I think that,

5  with respect to Mr. Alcalde, some of the documents that I am

6  going to have him look at are things like the motion to dismiss

7  that would only be known to him as a result of it being filed

8  and him being trial counsel.

9       THE COURT:  Well, I take notice of anything on the

10  Court's docket.  You don't need to have anybody authenticate or

11  testify to that.

12       MR. SCHWARTZ:  The things that have been filed in the

13  court on the docket need not be shown to Mr. Alcalde.  That

14  just doesn't serve any purpose.  They're on the Court's docket.

15       THE COURT:  Right.  In my mind, they're part of the

16  record in this case.

17       MR. SCHWARTZ:  I don't disagree.

18       THE COURT:  Right.

19       And, again, I think Mr. Alcalde knows it's not about

20  personal knowledge or qualifications.  It's about capacity, is

21  what we're talking about.

22       MR. SCHWARTZ:  And the Attorney General was deposed

23  about this subject.  That's what you should be looking at.

24       THE COURT:  Well, listen, this is a trial.  We don't

25  take anybody's word at face value, right?  The other side has a

1  right to contest it; but, certainly, the Attorney General's

2  opinion here would be important.

3       MR. SCHWARTZ:  Well, I'm talking simply as a matter of

4  fact.  Mr. Cooper took the Attorney General's opinion and asked

5  about this subject matter.  He may suggest you should find her

6  testimony not credible.  He can make that argument, but it's

7  not for Mr. Alcalde to be speculating about what did or didn't

8  happen.

9       THE COURT:  I think we understand.

10      MR. C. COOPER:  And, Your Honor, with the recognition

11  that the Court will take notice of filings in this case, Skye

12  will address that, then, in our written summation presented

13  after the court (sic) to try to knit that all together and draw

14  the links between it.

15      THE COURT:  All right.  Very good.

16      MR. C. COOPER:  And, so, with that, Your Honor, let me

17  make sure I have -- Your Honor, I do have one document that

18  was -- it's discovery responses served in this case which would

19  not have been filed.

20      If I can get a stipulation from Mr. Schwartz, I won't

21  need to go into it:  That Exhibit 219 are discovery responses

22  filed by the Defendants in this case in 2006.

23      THE COURT:  All right.  Mr. Schwartz, take a look,

24  then, and let me know if you have an objection.

25      MR. SCHWARTZ:  I'll take a look if we can find it.

1    The only objections that we have listed to this document

2  in the pretrial order, Your Honor, are the objections that are

3  stated in the document itself.  So, there is no question as to

4  the authenticity of the document.

5    THE COURT:  All right.  So, the objections haven't

6  been resolved.  Subject to those objections, then, you have no

7  concern if I admit this?

8    MR. SCHWARTZ:  Right.

9    THE COURT:  All right.  Then, that's what we'll do.

10    MR. C. COOPER:  Very good.  Thank you.

11    Then, in that case, Your Honor, I've concluded my

12  questions of Mr. Alcalde.

13    THE COURT:  All right.  Thank you.

14    Mr. Schwartz, when you're ready, you may cross-examine.

15                              - - -

16                         CROSS-EXAMINATION

17  BY MR. SCHWARTZ:

18  Q.   Good afternoon, Mr. Alcalde.

19  A.   Good day.

20  Q.   You signed the original complaint in this case, right?

21  A.   Most likely.

22  Q.   Let's take a look at it and dispel any doubt about it.

23  It's Defendant's Exhibit 606.  Should be in Binder 7.

24    So, this is our --

25    THE COURT:  You need the binders; right?

1          MR. SCHWARTZ:  Yes.

2          MR. LUCAS:  Do you want us to hand the binders to the

3     witness?  It's up to you.

4          COURTROOM DEPUTY CLERK:  No.

5          MR. LUCAS:  Okay.  Thank you very much.

6          THE COURT:  I am assuming this is one we can just show

7     to the witness.  He can identify his own signature.

8          MR. SCHWARTZ:  He should be able to do that.  This

9     should be one signature in the case not in doubt.

10          THE COURT:  Right.

11    BY MR. SCHWARTZ:

12    Q.   All right.  Do you have Defendant's Exhibit 606 in front

13    of you, Mr. Alcalde?

14          THE COURT:  If you need that.  You can also follow on

15    the screen.

16          THE WITNESS:  Yes, I do have it.

17    BY MR. SCHWARTZ:

18    Q.   All right.  Let me ask you to turn to the last page of

19    that document, please.

20    A.   (Witness complies.)

21          THE COURT:  By the way, that was in Spanish before

22    this.  This is on the Court's docket.  I think you have a

23    translation there.

24          MR. SCHWARTZ:  No.  I think the translation is

25    the -- Oh, yeah.  Look at that, actually.  We have the

1   translation.  And there are exhibits to this, of course.

2          THE COURT:  If you look at the whole document -- it's

3   on the screen right now.

4          MR. SCHWARTZ:  You don't have to go to the end of it.

5   It looks like the certificate of service, or something, is

6   there.

7   BY MR. SCHWARTZ:

8   Q.   Take a look at the fifth page of this.

9   A.   Yeah.  That looks like my signature.

10  Q.   You signed the original complaint, Docket #1 in this

11  long odyssey of a case, right?

12  A.   Yes.

13         THE COURT:  There it is.

14  BY MR. SCHWARTZ:

15  Q.   And you participated in the drafting of this complaint,

16  correct?

17  A.   Yes.

18  Q.   And the complaint names only one plaintiff, DRFP LLC,

19  D/B/A Skye Ventures, correct?

20  A.   Correct.

21  Q.   And let's take a look at Paragraph 11 of this complaint.

22  Do you have that in front of you?  It's on the third page.

23  A.   Yes.

24  Q.   And it states:  At all times relevant herein, Skye is

25  the owner, holder, and bearer of the Notes Numbers 7/12 and

1    8/12 totaling $100 million, right?

2    A.   Yes.

3    Q.   And, also, in the same paragraph, you pled that Skye

4    obtained those notes from Gruppo Triad-FCC-SPA, correct?

5    A.   Correct.

6    Q.   And Skye obtained those notes pursuant to a written

7    agreement with Gruppo Triad, correct?

8    A.   Yes.

9    Q.   When you filed this complaint, you did not attach that

10   written agreement, correct?

11   A.   I think I attached the notes.

12   Q.   Yes, you attached the notes; but you didn't attach the

13   agreement by which Skye obtained those notes from Gruppo Triad,

14   correct?

15   A.   It doesn't look like I did.

16   Q.   When you filed this complaint, Gruppo Triad had a

17   potential interest in the litigation proceeds, correct?

18   A.   I don't know.

19   Q.   Did you know then?

20   A.   I don't know that I analyzed it that way.

21   Q.   So, when you filed this complaint, did you have an

22   understanding of what percentage of the potential recovery in

23   the action Skye Ventures stood to gain?

24   A.   That Skye?  I don't know that I had -- Mr. Richards did

25   not share with me the names of all of the investors that were a

1   part of Skye or any other agreements he may have had.  I don't

2   know that I was concerned about that.

3       Q.   When you signed this complaint, did you know that Gruppo

4   Triad stood to gain tens of millions of dollars from this case

5   if the Plaintiff prevailed?

6       A.   I don't know that I know that now.

7       Q.   When you signed this complaint, did you know that Gruppo

8   Triad had, by far, the largest percentage share of any

9   potential recovery in this case?

10      A.   No.  I don't know that I know that now.

11      Q.   You were still trial counsel for the Plaintiff in this

12  case in 2006, correct?

13      A.   I was trial counsel until 2008.

14      Q.   So, in 2006, you were still the trial counsel, right?

15      A.   It sounds like it, right.

16      Q.   And, while you were trial counsel, the Defendants served

17  their first set of document requests on the Plaintiff, right?

18      A.   I don't recall, but if you say so.

19      Q.   Do you recall, as trial counsel, responding to a set of

20  document requests in this case in 2006 or at any time?

21      A.   I may have.  I don't know.

22      Q.   Let's take a look.

23           I'm going to show you a document that's an impeachment

24  exhibit designated by us as Impeachment Exhibit 2.

25           MR. SCHWARTZ:  Is there a copy for the Judge?

1          MS. RODRIGUEZ:  Yes.

2          THE COURT:  You gave us two?

3          MS. RODRIGUEZ:  Yes.

4          THE COURT:  All right.

5          MR. SCHWARTZ:  And for Skye?

6     BY MR. SCHWARTZ:

7     Q.   Take a look at this document.

8          THE COURT:  Just to make this easy, could you give us

9     the docket number on our filing system?  That will make keeping

10    track of this a lot easier.

11         MR. SCHWARTZ:  I can't, Judge, because this is a

12    discovery response.

13         THE COURT:  That's right.  It wasn't filed.  Okay.

14    You're right.  I'm mistaken.

15         Go ahead.

16    BY MR. SCHWARTZ:

17    Q.   Mr. Alcalde, take a moment and look this document over.

18    Do you recognize this as responses by Plaintiff to the

19    Defendant's first request for production of documents?

20    A.   Yes.

21         THE COURT:  While you're looking it over, we need to

22    give this a designation.

23         MR. SCHWARTZ:  All right.  We had designated it here

24    as Impeachment Exhibit 2, but we can make it the next

25    Defendant's exhibit in line.

1          THE COURT:  Well, the first exhibit was the complaint?

2          MR. SCHWARTZ:  Yes.

3          THE COURT:  Let's call this Impeachment Number 2.

4          MR. SCHWARTZ:  Yeah.

5       The complaint, actually, is already marked as an

6   exhibit, Defendant's 606.  But, the way we have this numbered,

7   it's our second impeachment exhibit.

8          THE WITNESS:  I'm going to use the first, also.

9          THE COURT:  That's fine.

10  BY MR. SCHWARTZ:

11  Q.   All right.  Mr. Alcalde, let's take a look, if we would,

12  at the 19th numbered page of this Impeachment Exhibit 2.  Do

13  you have that?

14  A.   Yes.

15  Q.   And, so, you signed these discovery responses; and they

16  were served on the 20th of November, 2006, right?

17  A.   Yes.

18  Q.   All right.  Let me ask you to take a look at the

19  second-to-last page of this document.  Actually, to put this in

20  context for you, you'll see the last five pages of this exhibit

21  consist of an index of Plaintiff's responses to Defendants'

22  request for production of documents.  Do you see that?

23  A.   Yes.

24  Q.   And this is an inventory, isn't it, of the documents

25  that you were producing in November of 2006?  Is that fair?

1    A.    Yes.  Yes.

2    Q.    And you've got columns and identification of the

3    document and the response to the request number and then the

4    Bates number, right?

5    A.    Correct.

6    Q.    All right.  Now, take a look at the fourth of five

7    pages.

8    A.    (Witness complies.)

9    Q.    Do you have that page, sir?

10    A.    Yes.

11    Q.    All right.  Look at the second-to-last entry.  Do you

12    see it says:  "Agreement dated 4-8-04 between Gruppo Triad and

13    Skye Ventures" --

14    A.    Yes.

15    Q.    -- and it lists some Bates numbers?

16    A.    Yes.

17    Q.    And it says, after the Bates numbers, "Redacted to

18    remove privileged information."  Do you see that?

19    A.    Yes.

20    Q.    And then you identify the requests to which this

21    agreement was responsive.  And those are Requests 16, 17 and 29

22    within the document request you were responding to, right?

23    A.    Yes.

24    Q.    And when you produced a copy of the agreement, the

25    written agreement between Gruppo Triad and Skye by which Skye

1   obtained the notes back in 2006, it was heavily redacted,

2   correct?

3   A.   I haven't seen the agreement since whenever this was

4   filed.  So, you'd have to show it to me.

5   Q.   I'll be happy to have Ms. Rodriguez do so.

6        MR. SCHWARTZ:  This, Your Honor, we've marked as

7   Defendant's Impeachment Exhibit 1.

8   BY MR. SCHWARTZ:

9        THE WITNESS:  Okay.  I have it.

10  BY MR. SCHWARTZ:

11  Q.   Do you recognize this as the document that you produced

12  in November 2006 to the Defendants?

13       I'll make it easy for you, Mr. Alcalde.  Look at the

14  Bates stamp numbers in the lower right-hand corner of

15  Impeachment Exhibit 1 and compare them to the Bates stamp

16  numbers in the inventory in Impeachment Exhibit 2.  Do you see

17  they match?

18  A.   Yes.

19  Q.   So, Impeachment Exhibit 1, this is the version of the

20  agreement between Gruppo Triad and Skye that you gave to the

21  Defendants in November 2006, correct?

22  A.   I presume so, yes.

23  Q.   And, looking at this heavily redacted document on the

24  second page, you'll see there's an Article 2, Purchase

25  Consideration.  Do you see that?

1    A.    Yes.

2    Q.    And, looking at this heavily redacted agreement, you

3    can't tell how much or how little Skye paid to Gruppo Triad to

4    obtain the purported notes, right?

5    A.    That's correct.

6    Q.    You obscured that information, correct?

7    A.    Either I or someone under my direction.

8    Q.    And you did so on the ground that that information

9    concerning the purchase consideration was privileged, right?

10   A.    Correct.

11   Q.    Can you conceive of any colorable basis upon which the

12   amount that a buyer paid a seller for promissory notes would be

13   privileged?

14        THE COURT:  That's asking for a legal conclusion.

15   That's the first issue.

16        MR. C. COOPER:  Your Honor, it seems like we've

17   devolving into a discovery dispute.

18        MR. SCHWARTZ:  On the contrary.

19        THE COURT:  Well, I don't want -- There may be some

20   fertile ground here, but asking for a legal opinion isn't going

21   to be the way to get to it.

22        MR. SCHWARTZ:  Fair enough.  Let me ask another

23   question.

24        THE COURT:  I think all my rulings are fair, but go

25   ahead.

1    BY MR. SCHWARTZ:

2    Q.    Regardless, you asserted privilege over the purchase

3    consideration, right?

4    A.    Yes.  I also don't think it was relevant.

5    Q.    But that --

6    A.    But, you know, had you filed a motion or your

7    predecessor filed a motion on it, I would have responded with

8    appropriate arguments.

9    Q.    By the way, you didn't say anything about relevance when

10   you indicated why you did the redactions, right?  You wrote

11   "Privileged."  Is that fair?

12   A.    Well --

13          THE COURT:  You know, let me hear from both of you on

14   this, because the witness knows the answer, or maybe he

15   doesn't.  But the real question I have -- Let's start with you,

16   Mr. Schwartz.  Why is this information relevant?

17          MR. SCHWARTZ:  You'll see --

18          THE COURT:  Just -- Let's start --

19          MR. SCHWARTZ:  Let me move to the next part of this

20   agreement.

21          THE COURT:  Well, no.  Let me get a quick answer to my

22   question.

23          Does this have to do with -- I mean, the analogy that is

24   coming to my mind is if you sold me a brand new BMW for $2,000.

25   Is that where you're going with this?

1          MR. SCHWARTZ:  That's part of it.  But, then, I sold

2     it to you for $2,000, and I got to drive it.

3          THE COURT:  All right.  Before we go any further, I

4     want to get this argument framed.

5          Mr. Cooper, do you still object to this being disclosed?

6          MR. C. COOPER:  No.  Actually, Your Honor, this

7     agreement was fully disclosed later in the case.

8          THE COURT:  All right.  I don't want to get into a

9     discovery dispute.

10         MR. SCHWARTZ:  I'm not having a discovery dispute.

11         THE COURT:  And then we'll get into -- Just go ahead

12    and ask the question.  If he knows the answer, he can give it

13    to you.

14         MR. SCHWARTZ:  That's fair enough.

15    BY MR. SCHWARTZ:

16    Q.   Let's take a look at Bates stamp page 00861 contained

17    within Impeachment Exhibit 1.  Do you see there is a section

18    entitled "The Terms"?

19    A.   Yes.

20    Q.   And that's completely obscured, right?

21    A.   Yes.

22    Q.   So, whatever the terms were were not revealed in 2006,

23    right?

24         THE COURT:  But did you eventually get all this?

25         MR. SCHWARTZ:  Yes.

1       THE COURT:  I don't want to fight a discovery dispute

2   at trial.

3       MR. SCHWARTZ:  It's not a discovery dispute, Your

4   Honor.

5       THE COURT:  Well, you say that, but that's what it

6   sounds like.  I'll give you a little bit of latitude here, but

7   that's my concern.

8       MR. SCHWARTZ:  All right.

9     BY MR. SCHWARTZ:

10    Q.   So, you couldn't tell from this Impeachment Exhibit 1,

11  the redacted agreement, how much or how little Skye paid or who

12  stood to gain from any litigation proceeds, right, from the

13  face of this document?  Is that correct?

14    A.   Well, you couldn't tell from the face of this document

15  the information that was obscured.  I don't -- I mean, your

16  characterization is your characterization.

17    Q.   All right.  Let's take a look at Defendant's Exhibit

18  521.  That's in Binder 6.  Just let me know when you have that,

19  Mr. Alcalde.

20    A.   I have it.

21    Q.   You've got it?

22    A.   Yes.

23    Q.   All right.  Let's take a look at the Purchase

24  Consideration section.  It appears on page 00894.

25    A.   Okay.

1    Q.   And it says that Skye has transferred $250,000 to Gruppo

2    or Schianchi, right?

3    A.   That's what it says.

4    Q.   And Skye will transfer, in 2004, another $200,000,

5    right?

6    A.   That's what it says in 2.2, yes.

7    Q.   That's a total of $450,000 for a hundred million dollars

8    of notes, right?

9    A.   So far.

10   Q.   And, if you do the math, that's less than half a cent on

11   the dollar of the face amount of the notes, right?

12   A.   I don't know.  I didn't calculate it.

13   Q.   Well, $450,000 as against a million.  If it was one

14   million against a hundred million, it would be one cent on the

15   dollar, right?

16   A.   Are you asking me to validate your math?

17   Q.   I'm asking you whether one million is one percent of a

18   hundred million.

19   A.   Yes.

20   Q.   All right.  So, $450,000 is less than half a cent,

21   right?

22   A.   Yes.

23   Q.   All right.  And now let's take a look at Exhibit A to

24   the fully -- the unredacted version that Mr. Cooper produced in

25   2014.  Do you see page SKYE00898?

1        THE COURT:  Is there an objection?

2        MR. C. COOPER:  Your Honor, I'm just going to object

3   to the relevance of the testimony about the agreement between

4   Skye and Gruppo Triad and note that the redacted version was

5   filed, or provided, at a time when the parties were limited to

6   jurisdictional discovery.  When that was lifted, Skye provided

7   the full agreement.  I guess my objection is one of relevance.

8        THE COURT:  Relevance.

9        This is my view:  I've heard from -- I think I

10  understand your positions.  There is some slight relevance

11  here.  The purchase price has some bearing on the triable

12  issues here.

13       MR. SCHWARTZ:  As does the waterfall distribution of

14  proceeds, which gives --

15       THE COURT:  You're winning.  So, you can proceed.

16       MR. SCHWARTZ:  Fair enough.  But I'm not going to

17  spend much more time on this.  I just want to establish the

18  parameters we're working within here.

19  BY MR. SCHWARTZ:

20  Q.   So, Mr. Alcalde, let's take a look at this nonrecourse

21  promissory note contained within Exhibit 521.  Do you have

22  that?

23  A.   Yes.

24  Q.   And there is a section on page 899 entitled

25  "Distribution of Funds."  Do you see that?

1   A.   Yes.

2   Q.   And you can see there, without going through the

3   minutiae of this waterfall, that Gruppo Triad is slated here to

4   receive $39 million of potential proceeds in Section 2.1.d,

5   right?

6   A.   That's what this document says, yes.

7   Q.   All right.  Let's turn to your interest in any potential

8   litigation proceeds.

9        You also stand to benefit financially if Skye wins this

10  case, right?

11  A.   Well, that depends.  I have an oral agreement -- I don't

12  have a written agreement -- with Crabbe, Brown and James.  I

13  don't have a written agreement with Skye Ventures.  I don't

14  have a written agreement with anyone, with the exception of a

15  small $50,000 interest that Mr. Richards gave to me sometime in

16  2003 or '04.  So, Mr. Richards has said to me that, if we're

17  successful, that he'll pay me for my work that I did during the

18  litigation; but that's the extent of it.

19  Q.   So, of the hundred million dollars in face value of

20  Notes 7/12 and 8/12, your interest is for $50,000 of the face

21  value, right?

22  A.   That's what I have a written document to, yes.

23  Q.   That's your baseline, right?

24  A.   That's not my baseline.  That's it.

25  Q.   And, then, David Richards has told you, orally, that, if

1  this case works out for Skye, he'll pay you something else,

2  right?

3  A.  Yes.

4  Q.  And, in fact, while you were preparing for your

5  deposition in this case, you had a conversation with David

6  Richards shortly before the deposition, and he reiterated that

7  promise, right?

8  A.  Yes, but I had a prior conversation with one of his

9  partners in which I made clear that I would testify in this

10  case because I'm an attorney and I feel like I have an ethical

11  duty if I'm subpoenaed or asked to testify in this case, but

12  I'm not testifying in this case because anyone has said that

13  I'm going to get paid any money.

14  Q.  Let's talk about the scope of the due diligence that you

15  conducted in 2004.  You did this work in connection with Skye's

16  possible acquisition of the purported Bandagro notes, right?

17  A.  That's correct.

18  Q.  And you learned during your due diligence there was all

19  kinds of information in the public domain, dating back to the

20  1980s, that there were fake Bandagro notes in circulation,

21  right?

22  A.  Yeah.  Well, I first learned that in the Attorney

23  General's opinion.

24  Q.  And you learned that and had it confirmed during the

25  course of your due diligence, right?

1    A.   I had it confirmed by the Ministry of Finance report and

2    the four prior investigations.  Some of the newspaper articles

3    that I read merely repeated what was said in some of those

4    things.

5    Q.   So, you knew there were fake notes in circulation?

6    A.   Yes.  So did Venezuela.

7    Q.   And you learned that Venezuela had issued public

8    statements that warned against fake Bandagro notes, right?

9    A.   Yes.  I testified to that.

10   Q.   But your investigation, you say, didn't look into

11   whether the Bandagro notes at issue in this case were fake,

12   correct?

13   A.   That's right.

14   Q.   You wanted --

15   A.   My focus was on the opinion of the Attorney General and

16   its legality.

17   Q.   And you weren't concerned about whether the notes were

18   fake, correct?

19   A.   That was the job of the Attorney General and the

20   Minister of Finance, to concern themselves with that issue.

21   Q.   I'm asking you about your job, Mr. Alcalde.

22   A.   I'm telling you what my job -- My job was to determine

23   if the opinion of the Attorney General was final and binding.

24   Q.   And you didn't care if the notes were fake, right?

25   A.   I don't believe the notes are fake.  I believe the notes

1 have been validated by the Government of Venezuela as a

2 legitimate obligation of Venezuela by a legal process.

3   Q.   And you told Mr. Lucas in your deposition on May 18th,

4 2015, that you weren't concerned whether the notes were fake,

5 correct?

6   A.   But I also -- Well, I'm not concerned by that because

7 that was taken care of by the Attorney General; but I believe

8 I've also stated that I believe that these notes have -- In

9 fact, in my opinion, since you're asking my opinion, these

10 notes are super validated.  These notes have gone through a

11 process that no other notes in Venezuela have gone to.  They've

12 gone through a process where the Attorney General of Venezuela

13 has validated these notes as legitimate obligations of the

14 Government.

15   Q.   During the time you did your investigation, you didn't

16 care, one way or the other, whether they were fake.  Isn't that

17 what you've testified to?  Do I need to pull the deposition

18 out?

19   A.   You can pull it out.  My job was to determine if the

20 opinion of the Attorney General that these notes were legal and

21 binding was a final decision.  I couldn't -- I was never going

22 to be able to find out if these notes had been issued by

23 Bandagro or not.  There is conflicting evidence in the record

24 as to whether they were issued or not.

25   Q.   In your view, whether the purported notes that Skye

1   obtained from Gruppo Triad are fake is not important to the

2   case that you filed on behalf of Skye, correct?

3   A.   It's not the issue.

4   Q.   Now, these Bandagro notes, numbers 7/12 and 8/12 that

5   are at issue in this case, they were allegedly issued in 1981,

6   right?

7   A.   Correct.

8   Q.   And you didn't investigate the circumstances surrounding

9   the alleged issuance of the notes, right?

10  A.   You mean other than what I've said, other than the fact

11  that I studied what was happening in Venezuela at that time,

12  other than the fact that I found articles that said that

13  Bandagro was issuing notes in millions of dollars, other than

14  the fact that I found an article from the *Wall Street Journal*

15  that said that Venezuela was backing the debt of Bandagro,

16  other than the fact that I studied the Minister of Finance

17  report and the Attorney General's opinion saying that these

18  notes had been issued by Bandagro?  No, I guess I didn't do

19  anything beyond that.

20  Q.   I think we're going to have to take a look at a

21  deposition transcript, Mr. Alcalde.

22  A.   Sure.

23  Q.   I'm sure we have them in the courtroom.  We'll pull out

24  Volume I of your deposition from May 18th, 2015.  It may take

25  us a moment to distribute these in the courtroom.

1    Mr. Alcalde, so, we're looking at the first volume of

2  your deposition taken on May 18th, 2015.  Please turn to page

3  28.

4    A.   (Witness complies.)

5    Q.   Do you have that?  It will continue on to 29.

6    A.   Yes.

7    Q.   Do you see, at Line 17, Mr. Lucas asked you:  Based upon

8  the due diligence that you did in this case, do you have a view

9  as to whether the notes at issue in this case are fake?

10    Do you see that question?

11    A.   Yes.

12    Q.   And do you see you answered, starting on Line 23 of page

13  28:  Well, I do not.  I did not conduct due diligence to

14  determine what happened in 1981 or '82 when these notes were

15  allegedly issued.  Okay.  That wasn't the focus of my due

16  diligence.

17    Did Mr. Lucas ask you that question, and did you provide

18  that answer?

19    A.   Yes, he did.  But I also see, down on Line 10 of page

20  28, I stated to Mr. Lucas what I just stated to you:  That I

21  believe that these notes actually have a super indicia of

22  genuineness and validity, if you'd care to read that.

23    Q.   The alleged notes at issue are identified as ICC 322,

24  Notes 7/12 and 8/12, right?

25    A.    Right.

1    Q.    And they allegedly were signed by three individuals,

2    correct?

3    A.    Right.

4    Q.    The names of those individuals are Elbano Fontana

5    Nieves -- right?

6    A.    Yes.

7    Q.    Do you recognize that name?

8    A.    Yes.

9    Q.    Pascual Puigbo Morales, do you recognize that name?

10   A.    Yes.

11   Q.    And Waldemar Cordero Vale, right?

12   A.    Yes.

13   Q.    During your investigation, you learned that all three of

14   these alleged signers had denied signing ICC 322 notes, right?

15   A.    I learned that they had denied signing them, and I

16   learned that they had also admitted to signing them.

17   Q.    Prior to Skye's acquisition of the purported notes, you

18   never attempted to contact any of the three alleged signers to

19   ask them if they signed the notes, right?

20   A.    That's right.

21   Q.    And, at any time, you've never spoken to Elbano Fontana

22   Nieves, right?

23   A.    I have not.

24   Q.    And, while they were alive, you never spoke to Pascual

25   Puigbo Morales or Waldemar Cordero Vale, correct?

1    A.    I have not.

2    Q.    And you've never spoken to a gentleman by the name of

3    Luis Ugueto, did you?

4    A.    I don't think so.

5    Q.    Do you have any idea who he is?

6    A.    I don't recall at the moment.

7    Q.    And you didn't interview anyone at Bandagro who worked

8    there in the early 1980s to investigate if the purported notes

9    were ever issued by that bank, right?

10   A.    I did not.

11   Q.    And, as you've testified, you decided you'd never be

12   able to figure out what actually happened in 1981 regarding the

13   alleged issuance of these purported notes, correct?

14   A.    Well, I might have had if I'd have had five or ten

15   million dollars to do it with, but that wasn't my task.

16   Q.    Based on the resources and the time you had available to

17   you, you determined you'd never be able to get to the bottom of

18   that, right?

19   A.    Based on the resources that I had and the task that I

20   had, it was to determine the legality and finality of the

21   Attorney General's opinion.

22   Q.    So, Skye acquired these purported notes in 2004 from

23   Gruppo Triad, right?

24   A.    Yes.

25   Q.    And the leader of Gruppo Triad was someone named James

1   Paolo Pavanelli, correct?

2       A.   Yes.

3       Q.   Before Skye obtained the notes, you spoke with

4   Pavanelli, correct?

5       A.   Yes.

6       Q.   And you asked Pavanelli how did Gruppo Triad acquire the

7   purported Bandagro promissory notes, right?

8       A.   Yes.

9       Q.   And Pavanelli was talking about having bought not just

10  these two notes for a hundred million dollars, but over a

11  billion dollars, in face amount, for these notes, right?

12      A.   Pavanelli was talking about the notes that were a part

13  of the claim or that were the claim that Dr. Jacir filed in

14  Venezuela.

15      Q.   And the aggregate face value of all those purported

16  notes exceeded one billion dollars, right?

17      A.   I thought it was one billion.

18      Q.   Okay.  And Pavanelli told you he'd paid some 200 to 300

19  million dollars in some combination of cash, jewels, and maybe

20  negotiable instruments to obtain those million dollars in

21  purported notes, right?

22      A.   Yes.

23      Q.   All right.  Let's take a look at DEF 564 and DEF 565.

24           I'll tell you in a moment what Binder they're in, Mr.

25  Cooper.  It's eight.

1    It appears I misspoke in my last question, according to

2  my colleagues.  So, just to be clear, Pavanelli told you that,

3  in order to obtain the $1 billion in aggregate face amount of

4  these purported Bandagro notes, he'd paid some 200 to 300

5  million dollars in cash, jewels, and maybe negotiable

6  instruments.  That was his claim, right?

7    A.   I thought that's what you asked me.  Yes.

8    Q.   Okay.  So did I, but apparently I misspoke.  I think you

9  understood my question anyway.

10    All right.  So, let's look at DEF 564 and 565.  Are

11  those available to you?

12         COURTROOM DEPUTY CLERK:  Volume --

13         MR. SCHWARTZ:  It's Volume #7.  Sorry.

14         THE WITNESS:  Which tab?

15  BY MR. SCHWARTZ:

16    Q.   It's 564 and 565, Mr. Alcalde.

17    A.   Okay.

18    Q.   These two are of a piece (sic).  Just let me know when

19  you've got 564.

20    A.   I have it.

21    Q.   So, 564 is a copy of an e-mail that you sent to

22  Pavanelli on or about May 26th, 2004, right?

23    A.   Yes.

24    Q.   And 565 is a copy of an e-mail from Pavanelli, to you,

25  on the same day, right?

1    A.    Yes.

2    Q.    And Pavanelli's e-mail to you, which is 565, is a

3    response to questions that you posed in 564, right?

4    A.    Yes.

5    Q.    Let's look at page 564 -- I'm sorry -- Exhibit 564, the

6    second page.  And, there, you asked Pavanelli a series of seven

7    numbered questions, right?

8    A.    Yes.

9    Q.    And Pavanelli provided some responses in 565, right?

10   A.    Yes.

11   Q.    Now, before we go through these specific questions, when

12   you first started looking into Bandagro notes, you were

13   representing Skye Ventures exclusively, right?

14   A.    Correct.

15   Q.    But, by the time you exchanged these e-mails with

16   Pavanelli in May of 2004, you were also representing Gruppo

17   Triad, right?

18   A.    There was a period of time when we were representing

19   Gruppo Triad, yes.

20   Q.    And that period of time included May 26th of 2004,

21   right?

22   A.    I told you I didn't have a lot of recollection about

23   when I represented him, but that sounds right.

24   Q.    All right.  So, at this time, you're representing both

25   the potential buyer and the potential seller of these purported

1  notes, correct?

2      A.    Yes.

3      Q.    And Pavanelli is a client of yours when you're having

4  this exchange with him, right?

5      A.    Yes.

6      Q.    All right.  So, looking at your questions, the first

7  thing you wanted to know was when did Pavanelli buy the notes,

8  right?

9      A.    Yes.

10     Q.    And Pavanelli told you, in Defendant's Exhibit 565, the

11  notes had been purchased in June 1987, right?

12     A.    Yes.

13     Q.    And then your second question to Pavanelli, naturally

14  enough, was who sold the notes to you, right?

15     A.    Yes.

16     Q.    And he told you, in Defendant's Exhibit 565, that the

17  seller was Mr. Alfredo Guillermo Agaar -- A-g-a-a-r -- a

18  Venezuelan acting for and on behalf of some undisclosed

19  Venezuelan businessmen, right?

20     A.    Yes.

21     Q.    And let's skip, now, down to your fourth question.

22         You asked Pavanelli:  Why did you only pay $250 million

23  U.S. when the notes had a face value of over one billion U.S.?

24  In other words, what was the situation with the notes that

25  caused them to sell at such a discount?

1    Right?

2  A.   Yes.

3  Q.   And that question seemed to disturb Pavanelli, right?

4       MR. C. COOPER:  Objection.

5       THE COURT:  Well, it says what it says.  I think it's

6  an improper question; but it has, I'll note, five or six

7  question marks at the end.  And that may take care of it.

8  BY MR. SCHWARTZ:

9  Q.   Let's take a look at what Pavanelli told you in his

10 answer number 4.  First he answered with a question, right?  He

11 said:  Who told you we paid 250 million, followed by five

12 question marks.

13      Right?

14 A.   Well, that's what the e-mail reads, yes.

15 Q.   And then he said:  That is false.  I never said that.

16 Exclamation point.  We paid much more.

17      Right?

18 A.   Right.

19 Q.   And, as to your question about the discount rate,

20 Pavanelli didn't respond at all, right?

21 A.   That's the answer that he gave.

22 Q.   And he didn't address the discount rate, correct?

23 A.   He said he paid much more.  So --

24 Q.   Did he provide you any explanation of why he paid

25 whatever he paid in relation to the supposed face value?

1    A.    No.

2    Q.    Now, you followed up with Pavanelli to find out how much

3    more was allegedly paid than the 250 million, right?

4    A.    I don't know.  I may have.

5    Q.    Well, didn't you testify at your deposition that you

6    probably did?

7    A.    Like I said, I don't know.  I probably did.  I don't

8    know.  Maybe I did.

9    Q.    In any event, you never got any further information

10   along those lines from Pavanelli, right?

11   A.    That's correct.

12   Q.    So, beyond having been told that the purchase price was,

13   quote, much more than 250 million, end quote, you have no idea

14   what Pavanelli claims to have paid for the notes, right?

15   A.    No.  And I stopped representing him at some point.

16   Q.    And, when you say "no," you mean you just don't know,

17   right?

18   A.    I don't know.

19   Q.    Now, turning back to Defendant's Exhibit 564, you had a

20   seventh question.  It was actually a series of questions.  You

21   asked Pavanelli some questions about whether he followed ICC

22   rules for presentment and payment as set forth on the face of

23   the notes in any prior attempt to get paid; if so, when was

24   that, what banks did he use, what was the result of his

25   efforts, and do you have any documentation with respect to

1    those prior efforts.  You asked him all those questions, right?

2    A.    I asked the questions that are in this e-mail, yes.

3    Q.    And his answer to all those questions in Defendant's

4    Exhibit 565 was one word, right?

5    A.    Yes.

6    Q.    Pavanelli didn't identify any banks, and he didn't tell

7    you the results of any of these efforts, correct?

8    A.    Not that I recall, no.

9    Q.    And he didn't identify any documentation, here or

10   elsewhere, concerning any such collection efforts, right?

11   A.    Not that I recall.

12   Q.    Now, as we've seen in --

13   A.    But, I mean, other than the collection effort through

14   Dr. Jacir.  That was the one that I was focused on.

15   Q.    That's not what you were asking about here in Question

16   7, right?  You were asking about something else, correct?

17   A.    That -- That's correct, but I want to make sure

18   that -- You asked me whether I identified any collection

19   efforts.  Well, the collection effort that is the central issue

20   of this trial is the collection effort through Dr. Jacir and

21   the administrative process in Venezuela.

22   Q.    I understand that's your stance, Mr. Alcalde, and you'll

23   look for as many opportunities as possible to say it; but, for

24   the time being, as to these questions here concerning prior

25   collection efforts, you were asking about something else,

1   right?

2   A.   Well, I don't know that.  I don't know that I -- because

3   it's possible that I was trying to find out his involvement in

4   one of the prior collection efforts in Venezuela.  I don't

5   know.  But fair enough.  You know.  I did not -- With respect

6   to prior collection efforts, prior collection efforts that I

7   can for sure testify, is the collection effort that was

8   rejected by the Minister of Finance initially.  Then we have

9   the collection effort through Dr. Jacir.  And I believe that

10   one of the prior four collection efforts that are noted in the

11   Ministry of Finance, the one, perhaps, with Triad F.F.C., may

12   have been a collection effort by Pavanelli, but I'm not

13   positive.

14   Q.   You think one of the four --

15   A.   It's possible.  I don't know.  It's possible, because

16   Pavanelli's position was that they kept getting rejected.

17        We know for a fact that he was rejected by the Minister

18   of Finance initially, and that's why Jacir wrote to the office

19   of the President.

20   Q.   And you think one of those four prior reports --

21   A.   I don't know.  Maybe.  Maybe.

22   Q.   You have to let me finish the question.

23        Do you think that one of the four prior reports

24   mentioned in the Ministry of Finance report of August 2003 had

25   something to do with Pavanelli or Gruppo Triad?

1    A.   Possible, but I don't know.

2    Q.   Now, as we've seen in Defendant's Exhibit 565, Pavanelli

3    told you that someone named "Agaar" was the seller, acting on

4    behalf of some undisclosed Venezuelan businessmen, right?

5    A.   Yes.

6    Q.   You never contacted any such person to ask about the

7    alleged sale of notes to Pavanelli, right?

8    A.   I did not.

9    Q.   You were, however, curious about the identity of the

10   undisclosed businessmen, weren't you?

11   A.   I may have been.

12   Q.   Didn't you tell Mr. Lucas on May 18th, 2015, at your

13   deposition, that you were curious about the undisclosed

14   Venezuelan businessmen?

15   A.   If I did, I may have been, yes.

16   Q.   Regardless, you never determined the identity of any

17   undisclosed Venezuelan businessmen who used some guy named

18   Agaar to sell over a hundred -- over a billion dollars of notes

19   to Pavanelli, right?

20   A.   I did not.

21   Q.   Ultimately, just like you determined you'd never be able

22   to figure out what happened in 1981, you never determined to

23   your satisfaction how Gruppo Triad got its hands on the

24   purported Bandagro notes, right?

25   A.   Other than with Pavanelli -- Other than what Pavanelli

1    said, no.

2    Q.   And you concluded you were never going to be able to

3    figure that out, right?

4    A.   I concluded that:  Probably was not going to find out,

5    and it wasn't relevant to what my task was.

6    Q.   And you concluded that you weren't going to be able to

7    figure that out even though Gruppo Triad was your client,

8    right?

9    A.   For a short period of time.

10   Q.   When Gruppo Triad was your client, you determined you'd

11   never be able to figure out how that client obtained these

12   purported promissory notes with an aggregate face amount of

13   over one billion, correct?

14   A.   Other than what Pavanelli said, no.

15   Q.   Do you still have Volume I of your deposition from May

16   18th, 2015, in front of you?

17        Let me ask you to turn to page 212 within that Volume I,

18   please.

19   A.   Yes.

20   Q.   And, specifically, at Line 20 --

21   A.   Yes.

22   Q.   Bear with me a second.

23        Do you see Mr. Lucas asked:  At the time Skye purchased

24   the purported notes, did you get to the bottom of what happened

25   with respect to the alleged transaction that Gruppo Triad said

1  they were involved in in acquiring the purported notes?

2      Do you see that question?

3  A.  Yes.

4  Q.  And, then, turning to page 213, your answer was, quote:

5  I never determined to my satisfaction how Gruppo Triad acquired

6  the notes, if that's the import of your question, because it

7  wasn't something that I was going to be able to really figure

8  out.

9      Did Mr. Lucas ask you that question, and did you provide

10  that answer in May of 2015?

11  A.  Yes.  And, in the prior page, I also told Mr. Lucas that

12  I concluded that I was going to rely on the opinion of the

13  Attorney General, as opposed to me spending 20 years doing what

14  the Attorney General of Venezuela had already done.

15  Q.  One of the things you did in due diligence, you told Mr.

16  Cooper, was to collect news articles about Bandagro, right?

17  A.  Yes.

18      THE COURT:  I think you called the witness Mr. Cooper.

19  I don't know if you meant that, but that's all right.

20      MR. SCHWARTZ:  No.  I meant that he told Mr. Cooper.

21      THE COURT:  All right.  Very good.

22  BY MR. SCHWARTZ:

23  Q.  I'll rephrase the questions, this question:

24      One of the things that you testified on during your

25  direct examination was that you collected news articles about

1   Bandagro in the course of your due diligence, right?

2    A.   Yes.

3    Q.   And you tried to gather every relevant news article

4   relating to Bandagro you could find, right?

5    A.   That I could find, yes.

6    Q.   And, in the course of that effort, you searched an

7   online news source called *Quinto Dia*, correct?

8    A.   That was one of them.

9    Q.   And however advanced the Internet was in 2004, *Quinto*

10  *Dia* articles were readily available online at that time, right?

11   A.   I was able to find articles published by *Quinto Dia*.

12   Q.   All right.  I'm going to ask you to look at Joint

13  Exhibit 30, which is in Binder 1.  It's a special binder.  At

14  least mine has a different color.

15       MR. SCHWARTZ:  Thank you, Andy.

16   BY MR. SCHWARTZ:

17   Q.   Just let me know, Mr. Alcalde, when you've got Exhibit

18  30, Joint Exhibit 30.

19   A.   Yes.

20   Q.   So, this is an article from *Quinto Dia* that was

21  published for the week of December 19 to 26, 2003.  And we've

22  included here in this exhibit both the Spanish original and the

23  English translation, and the translation comes first.  Do you

24  see that?

25   A.   Yes.

1    Q.   I'd like to direct your attention to the first page of

2  Exhibit 30, beginning with the third paragraph.

3         THE COURT:  Let me just back you up for one moment.

4         So, the online service is *Quinto Dia*; is that correct?

5         MR. SCHWARTZ:  Yes.

6         THE COURT:  And what newspaper would this be

7  taken -- Is this their publication, or it picking up another

8  newspaper article, or can you tell?

9         MR. SCHWARTZ:  Well, Mr. Alcalde might be better

10  positioned to answer that question than I am, since he did the

11  due diligence.

12         THE COURT:  All right.

13         THE WITNESS:  It was called -- The entity used the

14  name *Quinto Dia* to publish its articles.

15         THE COURT:  So, this would be an online publication?

16         THE WITNESS:  Yes.

17         THE COURT:  And you've heard of this company?

18         THE WITNESS:  Well, I learned about it.  They were

19  publishing a lot.  Yeah.

20         THE COURT:  All right.  Very good.  Thank you.

21         MR. C. COOPER:  Your Honor, we just note an objection

22  to the hearsay in this document.

23         THE COURT:  Well, I don't want to make your case,

24  Mr. Schwartz; but this is in response to what he found.  You

25  want to show what else he could have found, pretty much.  Is

1    that --

2          MR. SCHWARTZ:  What he did find and he could have

3    found.

4          THE COURT:  All right.  Mr. Cooper, you get the last

5    word.

6          MR. C. COOPER:  Sure.  So, it's still hearsay; but it

7    goes to -- It doesn't come into the substance of --

8          THE COURT:  Yes.  It would be the same as the other

9    articles were used.

10          MR. SCHWARTZ:  At least for the time being, this would

11    appear to be the flip side of the same coin we were tossing

12    most of the day.

13          THE COURT:  Very good.  Yes.  We see eye to eye.

14    BY MR. SCHWARTZ:

15    Q.    All right.  So, I'd like to direct your attention, if I

16    could now, to the third paragraph on the first page of Exhibit

17    30, Mr. Alcalde.  It starts with the words "In May 1987"?

18    A.    Yes.  I see it.

19    Q.    And, starting in that paragraph and continuing for at

20    least through the next paragraph, this *Quinto Dia* article

21    describes an incident that occurred at JFK Airport, in New York

22    City, in May 1987, that involved fake Bandagro notes, correct?

23    A.    Yes.

24    Q.    And, during the course of your due diligence, you

25    learned that there had been such an incident, correct?

1    A.    I learned that such an incident was reported, yes.

2    Q.    And what you learned had been reported was that the

3    incident involved a woman, right?

4    A.    Yes.

5    Q.    And that woman who was involved in the incident,

6    carrying the purported Bandagro notes, may have been working

7    for Pavanelli, right?  You learned that?

8    A.    I learned that that was reported, yes.

9    Q.    And you also heard that the woman was carrying some

10   substantially blank Bandagro notes and was stopped by U.S.

11   Customs, right?

12   A.    I learned whatever was reported.

13   Q.    And that's what was reported, right?

14   A.    Yeah.  Whatever is reported here, I learned it.  I read

15   this.  I downloaded this article.

16   Q.    And, during the course of your investigation, after you

17   learned about this incident at Customs in New York in May 1987,

18   you asked Pavanelli about it, right?

19        MR. C. COOPER:  Your Honor, I'm going to note an

20   objection.  The way the question is being phrased, there is a

21   lack of foundation; characterizing it as if the incident

22   occurred.

23        THE COURT:  Right now, we're still focused on what did

24   Mr. Alcalde know.  That's all we're doing at this point.

25        MR. SCHWARTZ:  The flip side of the same coin.  I'm

1    not trying to prove this happened through Mr. Alcalde.  We'll

2    do that through another witness or two.

3            THE COURT:  Go ahead.  You may answer the question.

4            MR. SCHWARTZ:  Do you remember the question?

5            THE WITNESS:  The question was, did I ask Pavanelli

6    about it?

7    BY MR. SCHWARTZ:

8    Q.    Yeah.  During your investigation, after you learned

9    about this incident or learned that it had been reported, you

10   asked Pavanelli about it, right?

11   A.    Well, I mean, has the attorney/client privilege been

12   waived by Pavanelli or his estate?  I don't know.

13   Q.    Well, since you testified about it at your deposition, I

14   think that the horse has left that barn.

15   A.    Well, I think it was -- I think we discussed the issue

16   then, but maybe if you can show me what I said at my deposition

17   --

18   Q.    Sure.  Turn, if you would, please, to page 138 within

19   the same volume you've had.

20   A.    (Witness complies.)

21   Q.    Let me catch up with you.

22   A.    Yes.  All right.  I'm looking at the page.

23   Q.    All right.  I'm trying to catch up with you.  Just hold

24   on one second, please.

25            All right.  So, take a look at Line 19 on page 138.

1   You'll see Mr. Lucas asked, quote:  So, prior to the time Skye

2   purchased the purported notes from Gruppo Triad, you heard

3   there was this Custom incident, and so you asked Pavanelli

4   about it, right?  End quote.

5         Do you see that question?

6   A.   Yes.

7   Q.   And you answered, quote:  I think so, yeah.  End quote.

8   Correct?

9   A.   Well, wait a minute.  Which page are you doing?  136?

10  Q.   I was on 138, starting on Line 19.

11  A.   Okay.

12  Q.   Continuing through 23.

13  A.   Now -- because there's questions prior to that.

14  Q.   Feel free to read as much, for context, as you think is

15  necessary.

16  A.   Okay.  So, I'm at Line 19 and Line 23 of page 138.

17  Q.   All right.  And Mr. Lucas asked you:  Prior to the time

18  Skye purchased the purported notes from Gruppo Triad, you heard

19  there was this Custom incident, and so you asked Pavanelli

20  about it, right?

21        And you answered:  I think so, yeah.  Right?

22  A.   Yes.

23        MR. C. COOPER:  Your Honor, we -- Sorry.

24  BY MR. SCHWARTZ:

25  Q.   And Pavanelli told you that this was an incident

1  involving Bandagro notes, correct?

2  A.   I -- Yes.

3  Q.   And he told you that U.S. Customs had stopped the woman

4  who was carrying Bandagro notes, right?

5  A.   Well, I don't know that I recall much more than what I

6  said here.  I said here that I didn't have much recollection of

7  it than what I said here.

8  Q.   Pavanelli told you this was all a big misunderstanding,

9  right?

10  A.   Probably, yeah.

11  Q.   Take a look at page 132, Line 17 to 19.  Isn't that what

12  you testified to last May?

13  A.   Which page?

14  Q.   Page 132, Line 17 through 19.

15  A.   Yes.

16  Q.   And, according to Pavanelli, he never did anything

17  wrong, right?

18  A.   Pavanelli -- If your question is did Pavanelli ever say

19  that he created false Bandagro notes and was trying to sell

20  those, no, he never said that.

21  Q.   Didn't you testify at Lines 23 and 24 that Pavanelli,

22  quote, never did anything wrong and he was always a victim, end

23  quote?

24  A.   Well, yes.  Isn't that what I just said?

25  Q.   Isn't what -- what you were saying, he told you?

1    A.   And isn't that what I just said?

2    Q.   If we're in agreement, we can move on.

3         When you talked to Pavanelli about this 1987 Customs

4    incident, did he tell you that the notes Customs seized had no

5    note number assigned to them?

6    A.   I don't know that he told me that.

7    Q.   Did he tell you that the date of issue for the notes was

8    blank?

9         MR. C. COOPER:  Same objection to foundation, Your

10   Honor.

11        THE COURT:  What's the basis for this?

12        THE WITNESS:  I don't know -- I don't know anything

13   about --

14        THE COURT:  No.  Wait a minute.

15        What's the basis?

16        MR. SCHWARTZ:  Well, the basis is substantial

17   documentary evidence that will be introduced in the case.  And

18   we're not at that part of the case yet, but these are facts

19   that we will prove.

20        THE COURT:  Well, through another witness.  Foundation

21   is what I'm talking about.

22        MR. SCHWARTZ:  Well, the question is whether he was

23   told these things.  That happened.  We will prove it.

24        THE COURT:  But you've asked several questions.

25        All right.  Finish this up.

1    BY MR. SCHWARTZ:

2    Q.   I'm not sure if there was an answer to the last

3    question.

4         Did Pavanelli discuss with you that the date of the

5    issue for those notes was blank?

6    A.   I don't know anything about the incident other than what

7    was reported in these articles, this article, or what Pavanelli

8    said.  I don't know anything else about it.

9    Q.   Let me ask you just one more question.  Did you ever

10   find out that the blank notes seized by Customs in 1987 are

11   identical in form to the two purported notes at issue in this

12   case?

13             MR. C. COOPER:  Same objection, Your Honor.

14             THE WITNESS:  Like I said --

15             THE COURT:  There is a lot of assumptions in that

16   question that he says he doesn't know anything about.  So, the

17   framing of the question is improper.

18             MR. SCHWARTZ:  All right.  I'll move on to this.

19   BY MR. SCHWARTZ:

20   Q.   Did Pavanelli ever tell you that, after the notes were

21   seized by Customs in 1987, he wrote a letter to Customs asking

22   that the notes be sent back to him?

23   A.   I don't know if he did or not.

24   Q.   All right.  Let me ask you to look at Defendant's

25   Exhibit 558, Binder 7, I believe.

1          MS. RODRIGUEZ:  Yes.

2          COURTROOM DEPUTY CLERK:  Number 7 binder?

3          MR. SCHWARTZ:  Yes.

4          Just a moment, please.  I'm off by one.  I'm sorry.  I

5     think it's going to be Binder 6.

6          COURTROOM DEPUTY CLERK:  This should be 6.  Yes.

7     BY MR. SCHWARTZ:

8     Q.   All right, Mr. Alcalde.  Do you have Defendant's Exhibit

9     558?

10    A.   Yes.

11    Q.   This is a printout of Gruppo Triad's website.  You can

12    see the date, at the bottom, of 5-20, 2004.  When you --

13         MR. C. COOPER:  Note an objection to foundation, Your

14    Honor.

15         THE COURT:  Well, start with that, if you would,

16    please.

17    BY MR. SCHWARTZ:

18    Q.   In the course of your due diligence in 2004, or when you

19    were representing or considering representing Gruppo Triad, did

20    you ever access its website?

21    A.   I may have.

22    Q.   All right.  Let me ask you to take a look at the certain

23    aspect of this, and we'll see if it refreshes your

24    recollection.

25         Take a look at the page LP.

1    "LP," by the way, stands for Lara Pavanelli.  Take a

2  look at LP01963, at the top of the page.

3   A.   We're talking about Exhibit 558?

4        THE COURT:  Page 2, yeah.

5        THE WITNESS:  The second page of that?  Okay.

6  BY MR. SCHWARTZ:

7   Q.   Actually, it's the third page.  Sorry.

8   A.   Okay.

9   Q.   LP019.  It's the second piece of paper, but it's the

10  third page.

11   A.   Okay.

12   Q.   LP01963.  And take a look at the discussion at the top

13  of that page and see if that refreshes your recollection as to

14  whether you accessed this Gruppo Triad website in 2004.

15   A.   I don't -- I don't recall this.  I mean, I'm not saying

16  that I didn't, but I just don't have a specific recollection of

17  this document.

18   Q.   All right.  Independent of the discussion I've shown

19  you, you have no recollection, one way or the other, of whether

20  you looked at the Gruppo Triad website?

21   A.   I may have looked at the Gruppo Triad website, but I

22  don't have a specific recollection of really what it looked

23  like or what information was on there.

24   Q.   Do you remember ever seeing any type of written

25  explanation by Gruppo Triad of the May 1987 incident at the JFK

1  Airport in New York?

2   A.   I wasn't focused on those incidents.

3   Q.   Independent of what you were focused on, do you have any

4  recollection of having seen anything written by Gruppo Triad

5  about it?

6   A.   Like I said, I -- I don't -- No, I don't have any

7  recollection of that.

8   Q.   So, regardless, you did nothing to investigate this May

9  1987 Customs incident other than talking to Pavanelli, right?

10   A.   I was investigating the Attorney General's opinion.

11   Q.   I know you like to say that, but I'm asking different

12  questions.  You didn't --

13   A.   Well --

14       THE COURT:  Wait.  Wait.  This is becoming very

15  argumentative.

16       Listen to the question.  Limit your answer to the

17  question.

18       Go ahead.

19  BY MR. SCHWARTZ:

20   Q.   You didn't do anything other than talk to Pavanelli to

21  investigate the May 1987 Customs incidence you had heard about,

22  right?

23   A.   I did not.

24   Q.   Prior to Skye's acquisition of the two purported

25  Bandagro notes, you learned that Pavanelli was a convicted

1  criminal, right?

2    A.   I learned that there were allegations that he had been

3  convicted in London, but I never saw a judgment or a conviction

4  with respect to that, but I assumed that that was probably

5  true.

6    Q.   In fact, Pavanelli, himself, admitted to you he had been

7  convicted in London for a crime involving fake Bandagro notes,

8  right?

9    A.   Yes.

10   Q.   And Pavanelli told you that he went to jail for that

11 crime, right?

12   A.   Yeah.  I think he spent some time in jail.  I think he

13 said that.

14   Q.   Did you ever come to learn from Pavanelli or any other

15 source that the allegations that led to him being convicted and

16 sentenced to jail in London included charges that he conspired

17 with Alfredo Guillermo Agaar?

18        MR. C. COOPER:  Objection.  Foundation.

19        THE COURT:  There isn't a foundation.  Do you want to

20 prepare one before you drop that question?

21        MR. SCHWARTZ:  Well, I could show the indictment and

22 the conviction to Mr. Alcalde, but --

23        THE COURT:  Do you know who this person is, the name?

24        THE WITNESS:  I think that's the person that he said

25 that was involved in -- the intermediary with purchasing the

1   notes.

2           THE COURT:  All right.

3           THE WITNESS:  Right.

4           THE COURT:  You may continue.

5   BY MR. SCHWARTZ:

6   Q.   And that -- Pavanelli claimed to have purchased the

7   notes in 1987, right, --

8   A.   Yes.

9   Q.   -- the same year as that Customs incident, correct?

10  A.   Yes.

11  Q.   Did you ever come -- Well, let me ask you this question

12  to make it simple:  You never attempted to contact any court in

13  London to get any information about Pavanelli's U.K.

14  conviction, correct?

15  A.   I did not.

16  Q.   And you did not interview anybody who was involved in

17  Pavanelli's London criminal case or conviction, correct?

18  A.   I did not.

19  Q.   You also learned at some point that Pavanelli was

20  involved in a criminal matter in Italy, correct?

21  A.   Yes, but I don't recall if that was after I filed the

22  litigation.  I mean, there was the issue with Fabbiani in that

23  report, if that's what you're referring to.

24  Q.   Well, that report, or one of those reports that Mr.

25  Cooper had you look at -- Let me rephrase that question.

1       All those Fabbiani reports that Mr. Cooper had you look

2  at you say that you saw before Skye obtained the purported

3  notes, right?

4    A.   Yes.

5    Q.   Okay.  And one of those Fabbiani reports, you'll recall,

6  was from a criminal court in Turin, right?

7    A.   Yes.

8    Q.   And you understood, did you not, that Pavanelli

9  was -- I'm sorry -- that Fabbiani was an expert who had been

10  engaged as part of the defense of Pavanelli against criminal

11  charges in Italy, right?

12    A.   Yes.

13    Q.   And the Italian court convicted Pavanelli despite

14  whatever Fabbiani had to say, right?

15    A.   I don't know that that's accurate.

16    Q.   You also discovered in your due diligence an

17  article -- and this is before Skye obtained the purported

18  notes -- you found an article stating that Pavanelli had been

19  accused of being an international swindler, correct?

20    A.   Yes.

21    Q.   And that article linked Pavanelli to the husband of

22  former vice-presidential candidate Geraldine Ferraro, right?

23    A.   Yes.

24    Q.   He had gotten himself in hot water with various criminal

25  authorities, correct?

1    A.   Who's "he"?

2    Q.   Geraldine Ferraro's husband.

3    A.   Yes.

4    Q.   And you learned there was some involvement of Pavanelli

5    in connection with him, right?

6    A.   Yes.

7        MR. C. COOPER:  Objection to the foundation.  Matter

8    of form --

9        THE WITNESS:  Well --

10       THE COURT:  Wait.  Wait.

11    Go ahead.

12       THE WITNESS:  I'm sorry.

13       MR. C. COOPER:  Maybe it's more a matter of the form

14    of the question.  If there is an implication in each instance

15    that he's establishing the truth of --

16       THE COURT:  Right.  This goes to the issue of what was

17    relayed to the client -- that's all -- and what could have been

18    known and relayed to the client, both.

19       MR. SCHWARTZ:  That's the case.  It's really just the

20    mirror image of the examination this morning.

21       THE COURT:  All right.

22       MR. SCHWARTZ:  All right.

23    BY MR. SCHWARTZ:

24    Q.   I'm going to ask you to look at Defendant's Exhibit 77.

25    It should be in Binder 2.  No.  It's in 1.  I'm sorry.

1          MR. C. COOPER:  77?

2          MR. SCHWARTZ:  Yes.  It's in Binder 1.  It appears,

3     with the creation of the joint exhibit binder, our numbers are

4     all off by one.  But we'll straighten that out by tomorrow.

5          THE COURT:  So, we're looking at the unsuccessful 1984

6     Democratic vice-presidential nominee who, through her husband,

7     is allegedly connected to a person who might have sold the

8     bonds to the Plaintiffs in this case.  That's a bit --

9          MR. SCHWARTZ:  Truth is stranger than fiction in this

10    case.

11         THE COURT:  Well, it's a bit of an attenuation, too;

12    isn't it?

13         MR. SCHWARTZ:  Well, no.  You're going to see the

14    antithesis of attenuation in a moment.

15         THE COURT:  I'll give you a little bit of latitude

16    here, but note my scepticism.

17         MR. SCHWARTZ:  All right.  Noted.

18          I need to access this Exhibit 77 before I can question

19    Mr. Alcalde about it, and I have an unwieldy binder.  So, bear

20    with me one second.

21         THE WITNESS:  You would have to put it at the end of

22    this volume.

23         MR. SCHWARTZ:  I know.  It's causing me enormous

24    trouble, and apparently you as well.  I'm working my way there

25    slowly.

1    BY MR. SCHWARTZ:

2    Q.   After all that effort with the binder, my question for

3    you, Mr. Alcalde, is whether Defendant's Exhibit 77 is the

4    article you found concerning Pavanelli being accused of being

5    an international swindler.

6    A.   I have to -- I mean, as I recall, it was an article in

7    *Vanity Fair*, but -- It's been a long time since I've read the

8    article.

9    Q.   Let me help you look at this.  If you look at page 1808

10   of this article --

11   A.   Yes.  Okay.

12   Q.   -- in the right-hand column, there is a paragraph that

13   starts with the words "In addition to giving bad advice."

14   A.   Yes, I see it.  Yes.  This is the article -- yeah.  This

15   is the article that I found.

16   Q.   All right.  So, in the middle of that paragraph that I

17   just directed your attention to is a reference to Pavanelli,

18   right?

19   A.   Yes.

20        THE COURT:  Is that the same first name?  That's the

21   person we've been talking about?

22        MR. SCHWARTZ:  That's a very good question.

23        THE COURT:  I have his name down as a different first

24   name.  Is it James?

25        MR. SCHWARTZ:  His names is James Paolo Pavanelli.

1    BY MR. SCHWARTZ:

2    Q.   And you understood, Mr. Alcalde, that from time to time

3    James Paolo Pavanelli was just known as Paolo Pavanelli, right?

4    A.   I only called him James.

5         THE COURT:   There are actually two Pavanellis there.

6    One is James, and one is Paolo.

7         MR. SCHWARTZ:   It's the same person.   You'll see ample

8    evidence in this case.

9         The Plaintiff is not going to stipulate to that?

10        MR. C. COOPER:   I'm not going to stipulate to the

11   content of -- It's an article that's describing different --

12        MR. SCHWARTZ:   All right.   We'll leave that to another

13   day.

14   BY MR. SCHWARTZ:

15   Q.   In any event, you see there is a reference to a James P.

16   Pavanelli in the same paragraph, right?

17   A.   Yes.

18   Q.   And this is the article you found, right?

19   A.   Correct.

20   Q.   And, in the same sentence as a reference -- containing

21   the reference to James P. Pavanelli, you see there is some

22   mention of an assortment of fugitives and phony Italian nobles?

23   Do you see that?

24   A.   Yes.

25   Q.   This is what you found in 2004, right?

1    A.    Okay.  This is, like, the fourth time.  Yes.

2    Q.    Okay.  Let me show you another article from the same

3    time frame.  We'll see if you found that one.

4         This is 75, but it's Defendant's Exhibit 75.  So, you've

5    only got to turn back two this time.

6         Here is a *Wall Street Journal* reprint from October 29,

7    1984.  And, to make this easy with you -- easy for you --

8    direct your attention to page 2 of this, 2 of 4; and, in the

9    last full paragraph on page 2, carrying over to page 3, there

10   is a discussion of somebody referred to as -- I'm looking for

11   the name --

12        THE COURT:  Let me just interrupt you for a minute.

13        When we had the final pretrial conference -- I'm

14   addressing this to both sides here.

15        You understand the claim for estoppel here is out.  So,

16   we walked through, in some detail, the triable issues.

17        As I understood the testimony from this witness, it

18   focused on the Attorney General's report and whether or not

19   there could be reliance on that report, and also we're going to

20   hear some testimony about what the legal effect is of that

21   report.

22        This goes to more generalized due diligence, doesn't it?

23   That's really not at play in this case.

24        MR. SCHWARTZ:  Well, this is something we began to

25   talk about during the pretrial conference, and I'm very glad to

1    have the discussion.

2              THE COURT:  Yeah.  And I remember saying that those

3    claims were out, and you asked me to dismiss them, and I did.

4              MR. SCHWARTZ:  Yeah.

5              THE COURT:  But now we're trying them again.

6              MR. SCHWARTZ:  Well, no.  You see, that's where we

7    disagree.  And I think it's something that requires

8    clarification --

9              THE COURT:  All right.

10             MR. SCHWARTZ:  -- because -- and it's a very important

11   issue.  To some extent, it's raised by the motion in limine.

12   And it, in our view, is a reflection --

13             THE COURT:  Let's go back.

14        The first question in this case is, are these notes

15   fraudulent or not.  And, then, if the answer is -- Well, if the

16   answer is "no," then we have one conclusion.  If the answer is

17   "yes," then the next argument of the Plaintiff is, but you can

18   still rely if other conditions are met.  And I know you

19   disagree with that, but their position is you can rely on the

20   Attorney General's opinion.

21        As I understand Mr. Alcalde's testimony, it has to do

22   with that opinion, by and large, not in general; but you've

23   told me that, if the notes were fraudulent, it doesn't matter

24   how much due diligence you did later; and, also, the Attorney

25   General's opinion had no effect.  You agree with that, right?

1          MR. SCHWARTZ:  Yes.

2          THE COURT:  So tell me how this becomes a triable

3     issue.

4          MR. SCHWARTZ:  Okay.  Here is the rub:  The Plaintiff

5     is asserting some ill-formed theory, in our view, that has a

6     reliance component.  We are --

7          THE COURT:  But you've prevailed on that.  That is out

8     as far as the decisions up to this point.

9          MR. SCHWARTZ:  Yes.  We agree with that; but, once

10    that's out, the question of the alleged reasonable reliance on

11    the Attorney General's opinion goes out with it.  There's no

12    place in the case for a reliance claim by the Plaintiff.

13         THE COURT:  Well, no offense, but you're asking to

14    reopen the decision I've already made.  I've already held

15    that's a triable issue.

16         MR. SCHWARTZ:  Okay.  So, if it is a triable issue,

17    which --

18         THE COURT:  No offense.  If it's a triable issue, it's

19    not up to you to decide how broad it is to be tried.  It's an

20    issue involving the Attorney General's opinion.  That's it.  It

21    doesn't open the context of everything else that you'd like to

22    bring in.

23         MR. SCHWARTZ:  Well, I hope we could advocate for a

24    broader sense of the issue in that regard because -- I have to

25    take a step back, and this is a very, very important issue as

1  far as what's going to come down the road in a long trial.

2       At the risk of repeating what I said at the pretrial

3  conference, final pretrial conference, there's only one

4  remaining cause of action in this complaint:  Default on a

5  promissory note.  Reliance is not an element of that claim.

6       THE COURT:  Exactly.  So, I'm looking at a document

7  that only goes to the issue of reliance.

8       MR. SCHWARTZ:  Okay.  But the Plaintiff is taking the

9  position in support of a theory that doesn't exist -- a cause

10  of action that doesn't exist in the case that it can prove it

11  reasonably relied on the Attorney General's opinion, and

12  provisionally --

13       THE COURT:  But I ruled on that, and I said they

14  can't.

15       MR. SCHWARTZ:  Okay.  Now, honestly, we are at a loss

16  to understand what claim that pertains to; but, passing that

17  for a moment --

18       THE COURT:  Wait a moment.  We need to stop right

19  here.

20       MR. SCHWARTZ:  Okay.

21       THE COURT:  We're not in a deposition.

22       MR. SCHWARTZ:  All right.

23       THE COURT:  And you're not arguing with me.  I've made

24  those decisions.  They're done.  You're not going to reargue

25  them.  Am I clear about that?

1          MR. SCHWARTZ:  Yes.

2          THE COURT:  All right.

3          MR. SCHWARTZ:  So, here --

4          THE COURT:  This can go to what they presented in

5    terms of how they could reasonably rely on the Attorney

6    General's opinion, but this is two steps away.  And

7    that's -- that's the ruling.

8          This is the last document.  This is in the middle of a

9    political campaign, too, by the way.  This is on the op ed

10   page.  It's not a newspaper article.  It's in the *Wall Street*

11   *Journal.*  I take note of that as well.

12         We're very far afield.  You can finish up with this

13   document and then move forward.

14         MR. SCHWARTZ:  All right.  You're not interested in

15   further argument.  I'll stop.

16         THE COURT:  No.

17         MR. SCHWARTZ:  Okay.

18         All right.  Let me just regroup for a moment.

19   BY MR. SCHWARTZ:

20   Q.   So, my question, very simply, was, for you, Mr. Alcalde,

21   is this another article that you found on the same general

22   subject as the last one we looked at?

23   A.   I don't know that I found this article, but I do note

24   that it's essentially -- If you look at Exhibit 77, the author

25   of that is James Ring.  If you look at the bottom of Exhibit

1   77, on the left-hand corner it says that James Ring is a member

2   of the editorial board of the *Wall Street Journal.* Okay?

3       If we go back to Exhibit 75, we see that this is -- the

4   byline is James Ring Adams at t*he Wall Street.* So, I don't

5   know that this article or opinion or whatever it is adds

6   anything to what I found in the prior article.

7   Q.   All right. Let's change subjects and talk about ICC 322

8   promissory notes. That's what the notes in this case are

9   designated as, right?

10  A.   Yes.

11  Q.   And the notes indicate on their face that they'll be

12  governed by the terms and conditions of the International

13  Chamber of Commerce, right?

14  A.   Yes.

15  Q.   As part of your due diligence, did you look for news

16  articles from the ICC regarding alleged ICC 322 notes?

17  A.   I may have, yes.

18  Q.   Let me show you Defendant's Exhibit 1, which undoubtedly

19  is in Binder 1. Do you have that one in front of you, Mr.

20  Alcalde?

21  A.   Yes.

22  Q.   This is a news release from the United States Council of

23  the International Chamber of Commerce dated January 5th, 1980.

24  A.   Yes.

25      MR. C. COOPER:  Note an objection to the foundation.

1      THE WITNESS:  Yeah.  I'm accepting what it says.

2      THE COURT:  We need a foundation at some point, but go

3  ahead.

4      MR. SCHWARTZ:  Yes.

5   BY MR. SCHWARTZ:

6   Q.   Did you find this article in the course of your due

7  diligence in 2004?

8   A.   I may have, but I think that this is -- If I'm reading

9  the date correctly, it looks like October 7, 2004.  So, it

10  would have been after I filed the lawsuit.

11  Q.   Well, it looks like the document was filed at some point

12  in the litigation and somebody printed it out on 10-7-04.  But

13  I'm not asking you whether you printed it out on that date.

14  I'm asking you whether you found it in doing your due

15  diligence.

16  A.   Oh, I don't recall.

17  Q.   All right.  Now we're going to switch to Defendant's

18  Exhibit 50.

19  A.   Is it the same binder?

20  Q.   Same binder.

21      COURTROOM DEPUTY CLERK:  D5?

22      MR. SCHWARTZ:  Fifty.

23      COURTROOM DEPUTY CLERK:  Oh, fifty.  I'm sorry.

24      Thank you.

25   BY MR. SCHWARTZ:

1    Q.    Do you have that one, Mr. Alcalde?

2    A.    Yes.

3    Q.    So, this is an article from the *International Financial*

4    *Law Review,* 1982, entitled "Sham Promissory Notes:  An

5    International Fraud."  Did you find this article?

6    A.    I don't know if I found it or not, but I had no doubt

7    that there were fake ICC notes in the international market

8    because the Attorney General said that in her opinion, and so

9    did the Minister of Finance.  It would not have been shocking

10    to me to find that there were fake ICC notes in the

11    international market.

12            THE COURT:  Mr. Cooper?

13            MR. C. COOPER:  At the risk of acquiescing through

14    silence, we wanted to -- we had raised an objection to

15    documents that were produced after the discovery deadline.  I

16    think this was one of them.

17            THE COURT:  All right.  So noted.

18            MR. SCHWARTZ:  I am assuming you don't need a response

19    to that at this point?

20            THE COURT:  No.

21            MR. SCHWARTZ:  Your Honor, it's five of 5:00.  I don't

22    know if you're planning on running to 5:00 or 5:30.

23            THE COURT:  Well, if this is a good place to break --

24            MR. SCHWARTZ:  It's a good place for me to break.

25            THE COURT:  All right.

1     Counsel, we will adjourn, and we'll start tomorrow at

2  9:00 a.m.  I'll see you then.  With that, we'll be in recess.

3     MR. SCHWARTZ:  Your Honor, I think we have something

4  scheduled at 8:45 tomorrow.  There was a motion regarding a

5  subpoena.

6     THE COURT:  Be seated for just a moment.

7     This is the gentleman in the Cleveland area, right?

8     MR. SCHWARTZ:  Yes.

9     THE COURT:  And that's still unresolved?  I guess the

10  question to you is whether you are going to call him or not.

11     MR. SCHWARTZ:  We may very well.  I think, as with the

12  parallel scenario we had with Ms. Reash, the most efficient

13  thing to do would be to defer this until when we start our

14  case.  The issue may turn out to be moot.

15     THE COURT:  The problem is going to be we'll need to

16  keep him on call.  We can defer it, but he can't.

17     MR. SCHWARTZ:  Unless we pick a date certain that's

18  convenient for him, ten days hence or something like that.

19     THE COURT:  All right.  Why don't we discuss his

20  schedule.  Unless you can -- With the other witness, you were

21  able to do some stipulations as far as documents.  Is that

22  possible with this witness?

23     MR. SCHWARTZ:  Well, I don't think it's going to work

24  out with the prior -- with the first one, but we've tried.

25  With this one, I think it's doubtful.  If we're going to call

1  him, I don't think we're going to stipulate.  If we dispense

2  with him, then it becomes --

3       THE COURT:  Well, he has filed a motion regarding the

4  inconvenience aspect.  We will address that again tomorrow.  I

5  have a preliminary view on that.  I'll be willing to hear from

6  both of you as far as how much inconvenience to make him come

7  from Cleveland to here for live testimony.

8       Is that going to be a contested issue on the Plaintiff's

9  side?

10      MR. C. COOPER:  It really wasn't our issue.  Sorry,

11  Your Honor.

12      THE COURT:  Right.  He raised it.

13      MR. SCHWARTZ:  I just wanted to make sure we knew it

14  was there at 8:45.

15      THE COURT:  All right.  So, I'll see you at 8:45 after

16  all.

17      With that, we'll be in recess.

18      (Proceedings were concluded at 4:57 p.m.)

19                      – – –

20

21

22

23

24

25

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF's: | | | | |
| Luis M. Alcalde | 7 | 171 | | |

1          C E R T I F I C A T E

2

3          We, Laura Samuels, Denise Errett, Lahana DuFour,

4    Shawna Evans and Darla Coulter, do hereby certify that the

5    foregoing is a true and correct transcript of the proceedings

6    before the Honorable Edmund A. Sargus, Jr., Judge, in the

7    United States District Court, Southern District of Ohio,

8    Eastern Division, on the date indicated, reported by us in

9    shorthand and transcribed by us or under our supervision.

10

11

12                        s/Laura L. Samuels,RPR
                          Laura L. Samuels, RPR
13                        Official Federal Court Reporter
                          March 16, 2016
14
                          s/Denise N. Errett, FCRR
15                        Denise N. Errett, FCRR
                          Official Federal Court Reporter
16
                          s/Lahana DuFour, RMR, CRR
17                        Lahana DuFour, RMR, CRR
                          Official Federal Court Reporter
18
                          s/Shawna J. Evans, RMR
19                        Shawna J. Evans, RMR
                          Official Federal Court Reporter
20
                          s/Darla J. Coulter, RMR, CRR
21                        Darla J. Coulter, RMR, CRR
                          Former Official Federal Court Reporter
22

23

24

25