UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRFP LLC, D/B/A SKYE      )
VENTURES,                 )
                          )
  PLAINTIFF,              )      CASE NO. 2:04-cv-0793
                          )
         vs.              )
                          )
REPUBLICA BOLIVARIANA     )
DE VENEZUELA, ET AL.,     )
                          )
  DEFENDANTS.             )
_____)


VOLUME 3
TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
WEDNESDAY, FEBRUARY 3, 2016; 9:04 A.M.
COLUMBUS, OHIO

  FOR THE PLAINTIFF:
      Cooper & Elliott, LLC
      By:  Charles H. Cooper, Jr., Esq.
           Rex H. Elliott, Esq.
           Charles B. Cooper, Esq.
           Adam P. Richards, Esq.
      2175 Riverside Drive
      Columbus, Ohio 43221


      Law Offices of John C. Camillus
      By:  John C. Camillus, Esq.
      P.O. Box 14140
      Columbus, Ohio 43214

FOR THE DEFENDANTS:
        Foley Hoag, LLP
        By:  Andrew Z. Schwartz, Esq.
             Matthew L. Baltay, Esq.
             Madeleine K. Rodriguez, Esq.
             Richard G. Baldwin, Esq.
             Thomas R. Ayres, Esq.
             Christopher E. Hart, Esq.
        155 Seaport Boulevard
        Boston, Massachusetts 02210

        Calfee, Halter & Griswold
        By:  Albert J. Lucas, Esq.
        1200 Huntington Center
        41 South High Street
        Columbus, Ohio 43215


FOR INTERESTED PARTY MIGUEL JACIR:
        Graydon Head & Ritchey
        By:  John B. Pinney, Esq.
        511 Walnut Street, Suite 1900
        Cincinnati, Ohio 45202


                         - - -


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

                    LAURA SAMUELS, RPR
              FEDERAL OFFICIAL COURT REPORTER
               85 MARCONI BOULEVARD, ROOM 121
                    COLUMBUS, OHIO 43215
                TELEPHONE NUMBER 614-719-3245

1          Wednesday Morning Session

2          February 3, 2016

3                  – – –

4          THE COURT:  Counsel, good morning.  Before we begin,

5     let me put on the record something I think you're all aware of.

6          We had an in camera matter yesterday with the issue of

7     whether or not an opinion letter written by Mr. Alcalde had

8     some additional information that was not subject to the

9     attorney/client privilege.  I had a brief hearing with counsel

10    for the plaintiffs that I ordered to be under seal.  There was

11    an error with the court reporter that did not keep that under

12    seal as far as all of you go.

13         I'm satisfied, though, the discussion we had was of a

14    very general nature so nothing of importance or improper

15    disclosure occurred.  But I also want to thank the defense

16    counsel for agreeing to seal it up right away, which now has

17    been done by the court reporter as well.

18         Are there any other matters we need to address as far as

19    that issue?

20         MR. C. COOPER:  No, Your Honor.

21         MR. SCHWARTZ:  Your Honor, let me just state on the

22    record what I understand to be the state of affairs on our side

23    of the fence with regard to this so there's no

24    misunderstanding.

25         We did receive the transcript, roughly 8:20 last night,

1    and as per usual, circulated it electronically to our team here

2    in Ohio and back in Boston, and it's a large team.  When we

3    were told this morning within the last half hour of this

4    situation, we sent a bulletin out to the entire team asking

5    that the transcript be deleted.  And in the presence of the

6    court reporter, those of us here on our phones, if we had them,

7    deleted it.

8         I can't say for sure whether any member of the team

9    anywhere else accessed the sealed portion of the transcript.  I

10   can tell you that I did review the transcript, portions of it

11   last night, and didn't even notice that the sealed part was

12   there.

13        THE COURT:  The only thing I recall discussing is what

14   ultimately was included in what was disclosed to you.  So there

15   was nothing that wasn't.  So I don't think there's any

16   potential for harm here.  But I did want to put it on the

17   record.

18        MR. SCHWARTZ:  And that's –– so anyway, the bulletin

19   went out and we will do our best to make sure that to the

20   extent anybody has noticed this, that nobody takes any

21   advantage of it.  And from the standpoint of the trial counsel,

22   Mr. Lucas and myself, we didn't access it.

23        THE COURT:  Very good.  Thank you.

24        All right.  With that, the plaintiff may call the next

25   witness.

1      MR. ELLIOTT:  Thank you, Your Honor.  The plaintiff

2  would call David Richards.

3      THE COURT:  Please come forward.

4    (Witness sworn.)

5      THE COURT:  Mr. Elliott, you may proceed.

6      MR. ELLIOTT:  Thank you very much, Your Honor.

7                        – – –

8              DAVID J. RICHARDS

9    Called as a witness on behalf of the Plaintiff, being first

10  duly sworn, testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. ELLIOTT:

13  Q.   Let's begin by having you introduce yourself to the

14  court.

15  A.   I'm David J. Richards.

16  Q.   Where do you live, Mr. Richards?

17  A.   Dublin, Ohio and Clearwater, Florida.

18  Q.   How long have you had a residence in Dublin, Ohio?

19  A.   Oh, I think it was 1988 or so.

20  Q.   All right.  Are you married?

21  A.   Yes.

22  Q.   How long have you been married?

23  A.   Over 40 years.

24  Q.   Let's turn to your professional background.  I'd like to

25  begin by having you describe your education for the Court.

1    A.    I began college as an art major, finished as an

2    accounting graduate.  Went to law school at Ohio State.  And

3    then while I was in the practice of law, I went for some

4    further school with a master's in tax program at Capital that I

5    did almost but did not quite complete.

6    Q.    When did you become licensed to practice law in the

7    state of Ohio?

8    A.    1977.

9    Q.    And did you, in fact, practice law?

10   A.    Yes.

11   Q.    How long did you practice law?

12   A.    Well, there was -- I started in '77 with Crabbe, Brown

13   and I continued with them until the later '80s.  But from the

14   mid '80s on, I practiced less and less and less until I finally

15   left.

16   Q.    You already told us that after law school you joined the

17   law firm of Crabbe, Brown and James.  How would you describe

18   the practice that you engaged in while you were with that law

19   firm?

20   A.    Well, actually joined them my first year in law school.

21   They were one of the few law firms that employed first-year law

22   students and I had to work.  So a friend was working there and

23   I got a job at Crabbe, Brown.  They were largely a litigation

24   firm at the time and the head litigator was Charlie Brown.  And

25   I became close to Charlie while I was still in school and

1    surprise to me, I became a litigator.

2         So I started as a litigator and continued as a litigator

3    until '82 or '83, something like that.  Although I may have had

4    matters that went beyond that.  But I was a full-time, you

5    know, rock and roll litigator for all of that time frame.

6    Q.   And what practice did you transition into?

7    A.   A business tax kind of practice.

8    Q.   Why did you do that?

9    A.   Well, you know, I had a lot of success as a litigator,

10   was able to track a lot of clients and the truth is, I just

11   wasn't happy doing it.  So I was looking for something else to

12   do.

13   Q.   When did you leave Crabbe, Brown and James?

14   A.   That's a hard question.  I think it was around '88 or so

15   when I formally said, we had some sort of separation agreement.

16   '88.  '87 to '89, in that time frame.

17   Q.   Why did you decide to leave the firm?

18   A.   I wanted to go in business.

19   Q.   If you could, describe for the Court what has been your

20   business since you left the Crabbe, Brown and James law firm?

21   A.   Well, my business career started in earnest in 1983

22   before I left Crabbe, Brown.  I had been doing some investing

23   outside of Crabbe, Brown, had done some real estate.  And in

24   1983, John Kennedy and I started a real estate business that

25   was small at the time but is still in business today and

1  actually at one point grew quite large.

2      So that was a continuous thing from 1983 or '4 through

3  today but, you know, it was big.  It was actually at its

4  biggest about the time of when we undertook the Bandagro

5  investment.

6      After that, we did -- I did a couple of smaller deals

7  with people I knew and then the first sizable transaction I

8  did, I was still a lawyer, there were ten of us who loaned a

9  company a million dollars.  We did it $100,000 each.  I found

10  the deal and sort of ran it and we -- the deal was successful.

11  We were repaid with a little extra.  And I thought that was

12  pretty good.  I was actually able to see this deal, figure out

13  it was a good deal, put money in with my friends.  And that's

14  sort of the template that I followed from that point forward

15  and follows through to today.

16      So after that, I did a -- we did a couple of things and

17  then around 1990, we did an investment in a medical company.

18  It was 5 million at the time and that was really, really

19  successful.  The company was taken public by Goldman Sachs.  We

20  all made -- we had a tremendous return.  It was like 20 times

21  our money.  And, you know, after that, it was sort of that was

22  the big deal that sort of helped my investor group grow and it

23  has continued to grow until today.

24  Q.   After you left the Crabbe, Brown and James law firm, did

25  you continue to do business with the law firm and its lawyers?

1   A.    Oh, yes.

2   Q.    How so?

3   A.    So what had happened was, at the time, I was one of the

4   young guys at Crabbe, Brown but I was one of the few guys that

5   really had generated a lot of client volume.  It was largely

6   litigation clients.  Those were a couple of large insurance

7   companies and some product liability companies.

8        So in fact, you know, I was, until Larry James came

9   along, I was kind of the like the young rave maker at the firm

10  and I was lapped by Larry, I think about that time.  But what I

11  did when I left Crabbe, Brown was that I wanted to -- we were

12  still all very good friends and remain today so I wanted to

13  make sure that all that work I did to get the firm the clients

14  was not for naught.  And so a couple of those last two years

15  was spent largely in easing a transition for myself as the face

16  to the client to selected other lawyers as the face of the

17  client.  And that's where I started working with Luis Al.

18        I had some really sort of high-end clients.  He

19  mentioned American Motors Corporation.  There was also Olympic

20  Paint and Stain, and Clorox.  I was that face even though

21  Charlie Brown was the head trial lawyer and the big gun, if you

22  will.  And so that wasn't like insurance work.  That was really

23  complex litigation.  So I had to think about who is the best

24  litigator in the firm to take that over and I selected Luis.

25  And so I worked with Luis over that time frame to help him get

 1   to know the client and become the guy to take over.

 2        So Luis and I became friends in that time frame about

 3   1990 and we continue to be friends until today.  As obviously

 4   with John and Larry and Jeff and some of the other guys.

 5   Q.   We'll get to Bandagro in just a moment here but if you

 6   could describe just in very general terms how your business

 7   deals typically work from the time it comes into your office to

 8   the time you make a decision as to whether to pursue it?

 9   A.    Okay.  So I would say there are three basic phases of

10   what happened.  So I've been doing this long enough

11   consistently now for 25 years, more than 25 years.  But people

12   know the kind of deals I'm interested in.  My investor groups

13   are in Florida, Texas, California, St. Louis, Pennsylvania,

14   Toronto, Canada and there's a few guys around Columbus, too.

15   So those guys all have participated in my investments and they

16   know the kind of deals that I can do, that we like to do.

17        So I get a lot of -- they're all businessmen, they see

18   deals and they -- typically what we do is smaller deals.  We do

19   deals normally in the 5- to $15 million investment range and

20   most of these guys are much wealthier, they're doing much

21   bigger deals and so they'll refer these deals to me.  So long

22   story short, I see -- I have a lot of what we call deal flow.

23        So when you're already a busy guy, we typically have

24   five to ten investments.  We have a lot of deals come across my

25   desk.  So the first thing you have to do is, on the face of

1    things, ferret them out.  So you can't diligence every deal

2    that comes across your desk or you couldn't even do that.  So

3    you try to, I call it, discovery, right.  You try to winnow

4    down the deals in discovery of something that might be of

5    interest.  And of every ten deals I see, we might say one gets

6    through discovery.  So that's sort of the first phase.

7         The second phase is what I would call sort of initial

8    diligence.  In an initial diligence the goal is to, at the

9    lowest cost possible and the least time frame possible, learn

10   as much about the deal as you can.  And that includes whether

11   you can make a deal with the company or individual that you're

12   trying to get a deal with.  So typically in that phase of the

13   deal you're dealing with calls to people you know.  Generally

14   in whatever area it is, I or somebody in my investor group will

15   know somebody who's an expert in the area we'll ask about that

16   and say, is this something that's been done before or what are

17   the parameters that investing in this kind of a deal might be.

18   And then you go to the company and you see if that's kind of

19   what they're thinking as well.

20        As well, most of the deals that come to me have risk

21   associated with them.  And the thing that I've been able to do

22   over the years is look at risk and figure, most often, which

23   risk that might scare other investors away I can overcome.  And

24   so you talk -- this is largely talking to people, right.  And

25   there may be some documents around it.  I'm not the biggest

1   document guy in the world but so mostly it's that.

2        So then at the end of this sort of initial phase where

3   you say, okay, this looks like something that we can do.  Then

4   you're going to start spending some real money and real time in

5   the deal.  And typically the beginning of that phase of the

6   deal you will try and commit the company to a deal so that

7   you're not going through all of this time and expense at the

8   end of which you can't reach an arrangement with the company.

9   Often, the company itself pays for our firm's fees during that

10  time frame.  Our firm's often just me but it might be others we

11  engage to help us in the area.  And then you go through that

12  process of deeper, intensive diligence and you try to figure

13  what's the investment thesis you had thought in initial

14  diligence is still the investment thesis, whether it's valid.

15  And then that's followed by a closing.

16        As that on the other side of the coin, as we're

17  discovering the deal, I have an investor group.  So today that

18  group's probably 80 high net worth men and women in the areas

19  that I mentioned.  And I'll be sending out an e-mail saying,

20  hey, this is an interesting deal or, hey, I've put $100,000 in

21  this deal.  I think -- I'm diligenting it.  Be alert.  I'll

22  keep them advised as we get closer and closer to a closing.

23        During that process, the guys will contact me back and

24  say, hey, I'm interested in that kind of deal or I might call

25  them.  And then finally, when there is a deal, they'll send out

1  an e-mail and say, okay, we're going to close this deal in a

2  couple of weeks.  Here's what I am putting in, and I tell them.

3   I'm typically the largest investor in my deals.  Not

4  100 percent of the time but most often.  I'm normally the first

5  investor in our deals.  We send out an e-mail.  The e-mail may

6  have a short summary attached to it.  It's not like a private

7  placement or anything like that.  These guys and gals are

8  largely my friends and so it's pretty short and easy.

9       At the end of the day, they send me money or not.  They

10 participate in that deal.  They like it or they pass.  And I

11 would say most often there's more people willing to commit than

12 the amount of money that we had decided to put in the deal.  So

13 we're typically oversubscribed and that allows me to actually

14 predict pretty closely that when I send the e-mail out and say

15 here it goes that within a couple, few days normally I get

16 responses back because people are inured to the idea that you

17 can't wait a month to respond.

18      So I'm working that side of the coin at the same time

19 with my existing investor group.  That would be the typical way

20 I do a deal.

21      Now just to be clear, we do three kinds -- typically

22 three kinds of transactions.  I do advisory transaction work.

23 Company will actually hire me to advise them in a transaction.

24 I normally have one of those going at a time.  Those have

25 ranged from, you know, very large to very small.  And those

 1    have ranged to various different industries.  So I have that

 2    going on.  And I think about putting this in frame of the

 3    context of when I did Bandagro and there was one of those going

 4    on for a national imaging company.  I was actually working with

 5    Crabbe, Brown on that -- in that advisory capacity.

 6         So, there's also we try to do secure debt deals that are

 7    odd or distressed.  So where we're trying to loan money where,

 8    there's assets there.  They might not be traditional assets but

 9    they're assets I think that, if necessary, we can cash on.  And

10    the interesting part there is rather than putting money in a CD

11    or a one percent bond fund, we're able to get 11, 12 percent

12    coupons in those deals and often an equity interest in the

13    company where the thing they need the money for is going to

14    yield some success and we ask for some participation in that

15    success if it occurs.

16         In those deals, typically the CEO or the president will

17    sign personally.  We may make his wife or his children so they

18    have assets.  So we do everything we can to make sure we're

19    actually getting the money paid back to us, but then we also

20    are trying to evaluate if this upside that they're investing

21    the money in is good.  We do those.

22         Then the other third kind of deal we do generically is

23    we do pure equity risk investments.  And those can be very

24    distressed companies, those could be D.I.P. loans in

25    bankruptcy, those sorts of things.

1    Q.   What is the advantage to investing in a distressed

2    business?

3    A.   Well, there's, as with all investments, there's

4    advantages and disadvantages.  The advantage of course is the

5    return.  If you -- typically, in a distressed business, they

6    have a need for money that they can't get.  They can't get from

7    a normal bank.  Now, that was really true in the '07, '08

8    period when the banking crisis hit.  For us, it was a great

9    time because we could loan money to people they couldn't get

10    from a bank that in 2004 a bank would have loaned them.  We

11    were able to get really good returns on what would have been

12    bankable loans in the past.

13          Normally in a distressed debt situation, you're dealing

14    with a company that's in trouble.  They really need the money.

15    And I act on behalf of my investor group.  A lot of my business

16    does come from referrals from companies I've loaned money to.

17    But I craft a hard deal.  I try to maximize the amount of

18    return that we get for them.  And if it's a coupon, we try to

19    get the highest coupon we can.  Could be as high as 20 percent,

20    25 percent.  If it's an equity kicker, we try to make that as

21    big as we can.  So the more distressed the business is, the

22    more they're willing to give you that high rate of return.

23          Now, the flip side of it, there are plenty of businesses

24    that will promise you a 30 percent return but will never be

25    able to pay you back.  So what I have to do in my diligence and

1    my judgment is to sort of sort between the two.

2    Q.    Okay.  Let's turn to the heart of this case and tell us

3    all when you first learned about an investment in Bandagro

4    notes.

5    A.    I learned about it just a little bit from a man named

6    Larry Corna.  I came to meet Larry Corna because his brother,

7    David Corna, asked me to see him.  David I knew very well.

8    David was a broker.  He had taken one of my companies public.

9    I had invested in many of the companies that he took public.

10   He was managing money for me at the time.  So he had asked me

11   to see his brother, Larry.  I had never met Larry before.  I

12   asked him what it was about and he said, he just wants to talk

13   to you about something.  Will you see him, please?

14        So I say Larry.  Larry came to my house.  We met, he was

15   telling me about this deal I could get ten times my money on.

16   He was actually holding papers but he was standing on my front

17   porch.  I got the sense, I figured out he was just trying to

18   get money.  I asked him how much money he wanted.  He said he

19   wanted $5,000; that he would give me $50,000 from this deal.

20        So I said, listen, I'll loan you $5,000.  I don't have

21   time to talk about a deal right now and I want to make sure --

22   I'll loan it to you and I'll talk to you about it later.  So

23   this meeting took 20 minutes on the doorstep of my house and I

24   loaned the guy $5,000 and he left.

25   Q.    When did that meeting occur?

1    A.    It was the end of August, 2003.

2    Q.    Did you also have contact about an investment in

3    Bandagro notes with an individual named Marvin Kantor?

4    A.    So when Larry was -- in fact, I think when David called

5    me, he had said that -- had given this thing to Larry and

6    Marvin Kantor -- the deal had come to him through Marvin

7    Kantor.  I knew Marvin pretty well.  Marvin was a really

8    successful medical imaging guy.  I invested in his companies.

9    We had either about then I think or maybe before, a little

10   after, we actually talked about doing a business called City

11   Health together.  We came very close to creating it.  We had

12   logos.

13        So he's a very smart guy, European.  Actually had a seat

14   on the New York Stock Exchange at one time.  He's about 70

15   years old.  So I asked to talk to Marvin, and I did.  I think

16   it was by phone.  And I asked him what he knew about this and

17   he said that the guy who referred the deal to him was a fellow

18   named Antonio Usuelli.  He knew Antonio Usuelli from his days

19   on the New York Stock Exchange.

20        I asked him who was this Usuelli guy and he said, well,

21   Antonio is old.  He said, he's a lovely guy.  And he told me a

22   little bit about his background.  He was the heir, the sole

23   heir to the Bornalino hat fortune which I guess were these big

24   Italian felt hats that were really big in the day and that he

25   was an attorney.  He was in the financial business.  He'd owned

1  an insurance company.  He told me enough that the guy sounded

2  pretty credible and I asked him -- so I asked either him or

3  Larry to arrange a call with Usuelli.

4    Q.   Okay.  Before we get to that discussion in the fall of

5  2003, let me go back for a moment and address the plaintiff in

6  this lawsuit.  What is DRFP, LLC doing business as Skye

7  Ventures?

8    A.   So, at the time, we created an awful lot of entities.

9  Every individual deal we do, we create a separate entity for.

10  And sometimes you create an entity and you don't do the deal

11  and it sits around with nothing in it.

12        In this particular case, I was -- I had created an

13  entity, it's actually going to be del Rio which was my mother's

14  sort of -- her name was Dolores and there was an actress named

15  Dolores del Rio.  So this was called del Rio Family

16  Partnership, DRFP, LLC.  We had other trusts and family

17  partnerships but I had an idea for a family partnership to put

18  some assets in there.

19        And so it was created.  I don't know who created it.  I

20  think it was one of the attorneys that was working for me.  And

21  it was sitting there.  At a certain point we had this entity

22  sitting there and we decided to use it for this transaction.  I

23  forget exactly when it was but at some point -- it never did

24  anything but this.

25    Q.   Okay.  And what was Skye Ventures' relationship with

1  DRFP, LLC in 2003 and 2004?

2      A.   Well, it was a d/b/a.

3      Q.   Did there come a point in time where DRFP, d/b/a Skye

4  Ventures, formally changed its name?

5      A.   Yes.

6      Q.   When did that occur?

7      A.   I don't know.  I think it was '06, '07, something like

8  that.

9      Q.   Sometime after the filing of this lawsuit?

10     A.   Yes.

11     Q.   What did DRFP, d/b/a Skye Ventures change its name to?

12     A.   Simpler, right, because just like you're asking me, it

13  was confusing, what is this DRFP?  So we just changed the name

14  of the company to Skye Ventures.

15     Q.   Okay.  Same entity, just Skye Ventures?

16     A.   Correct.

17     Q.   Is that the entity that you pursued due diligence in the

18  purchase of Bandagro notes?

19     A.   Yes.

20     Q.   Mr. Richards, let's talk a little bit about Skye's

21  investment in Bandagro notes.  Let's begin here.  Did Skye

22  Ventures purchase Bandagro notes?

23     A.   Yes.

24     Q.   Which notes did Skye Ventures purchase?

25     A.   7/12 and 8/12.

1           MR. ELLIOTT:  Adam, could we hand the witness

2    Exhibits 1 and 2?  We've seen them but I want you to take a

3    look at them.

4           THE COURTROOM DEPUTY:  1 and 2.  I have the original

5    if you want.

6           THE WITNESS:  Okay.  Yes, this looks like the notes

7    that we purchased.

8     BY MR. ELLIOTT:

9     Q.    Exhibit 1 and Exhibit 1, ICC note 7/12 and 8/12?

10    A.    Yes.

11    Q.    Who sold Bandagro notes 7/12 and 8/12 to Skye Ventures?

12    A.    Gruppo Triad.

13    Q.    When did Skye complete its purchase of notes 7/12 and

14    8/12?

15    A.    Well, in my mind we completed the purchase when we

16    received the notes.  We became the bearer of the notes.  That

17    was the final aspect of the purchase.

18    Q.    Is that in August of 2004?

19    A.    Sorry.  You're asking for a date.  I apologize.  Yes.

20    August of 2004.

21    Q.    Why did Skye Ventures decide to purchase notes 7/12 and

22    8/12?

23    A.    Well, I'm not sure exactly what you mean by why, because

24    there was a lot of aspects of how we ended up with the notes.

25    Q.    Who made the decision to purchase those notes?

1    A.    Oh, I did.

2    Q.    And prior to purchasing notes 7/12 and 8/12 in August of

3    2004, did Skye conduct any investigation or due diligence into

4    the notes themselves?

5    A.    Well, we did conduct diligence.  We hired -- we engaged

6    Crabbe, Brown to do it for us.

7    Q.    Were you also personally involved in conducting due

8    diligence?

9    A.    Yeah, somewhat, for sure.

10    Q.    Did you -- you referenced earlier an effort to arrange a

11    conversation with an Antonio Usuelli?

12    A.    Yes.

13    Q.    Did that conversation take place?

14    A.    Yes.

15    Q.    When did the conversation that you had with Antonio

16    Usuelli that first time take place?

17    A.    September of 2003 sometime.

18    Q.    And what did you learn from Mr. Usuelli about the

19    Bandagro notes?

20         MR. SCHWARTZ:  Objection on hearsay grounds, Your

21    Honor.

22         THE COURT:  The objection is hearsay.  You can

23    respond.

24         MR. ELLIOTT:  Yes, Your Honor.  It's not being offered

25    for the truth.  It's truly just background information.

1        THE COURT:  All right.  Overruled.  You may answer.

2        THE WITNESS:  Okay.  So this was in what I would call

3   the deal discovery phase.  Until then I had only had a short

4   conversation with Larry Corna who I did not know and I was

5   trying to see, well, you know, if there's some investment here

6   that will pay off at ten times, what is it?  Is there anything

7   interesting about it?  I do like deals, right.  So I found that

8   somewhat interesting.

9        And then there was this Marvin Kantor connection who I

10  have a lot of respect for.  And so I started -- I wanted to

11  find somebody who could tell me more about the deal.  And so

12  Marvin related Antonio is a very trustworthy guy, a guy who had

13  business experience.  He was a lawyer.  And he was a Swiss

14  resident at the time.  And so that's why I wanted to talk to

15  Antonio.  What did he know about this deal?

16       So I had a conversation with Antonio.  I don't think it

17  was that long of a conversation.  Time is money, if you will,

18  right?  So I think we had an amiable chat for about a half an

19  hour.  I learned a lot about Antonio's background.  He told me

20  in a little more detail the kind of things that Marvin told me

21  about his background and he was a very good speaker of English.

22  I learned that he spoke Italian and French as well.  So he was

23  a very well-educated guy.  He graduated -- his law degree is

24  from the University of Milan, I believe, but he had other

25  education.

1    He told me basically that he had invested in these

2  notes.  He was an investor at the time.  He didn't have a job.

3  And since he's become an investor in the empire, he's become a

4  member of my investor group since then; still is.

5    So he had time.  He was interested in the deal as well.

6  I thought, well, here's a fellow I can get information from.

7  And we talked a little bit about the Bandagro notes themselves.

8  And what I remember about that was saying that there was some

9  decision coming up that would be definitive and that would make

10  this a really solid deal.  And so I said -- at that point I

11  said, great.  If that ever happens, call me.  I'd like to hear

12  more.  And that was the end of it.

13  Q.  Did you learn at some point that that decision had

14  occurred?

15  A.  Yes.

16  Q.  And what decision is that that you are referring to?

17  A.  Well, the decision that it turned out to be was the

18  *dictamen* of the Attorney General.

19  Q.  Now, before we get to that, I think you mentioned that

20  you enlisted others to assist you in the due diligence of the

21  Bandagro note and the Attorney General's opinion.  Who did you

22  ask to assist you in this process?

23  A.  So there were a lot of people that assisted me through

24  the initial diligence and then additional people who assisted

25  me in the final diligence, but initially it was three people I

1    knew.  It was John Kennedy, Luis Alcalde and Bob Behal.

2              THE COURT:  Last name is what?

3              THE WITNESS:  Bob Behal, B-E-H-A-L.

4    BY MR. ELLIOTT:

5    Q.    Just a preliminary question.  As due diligence went

6    along, did you become personally aware of the information that

7    was being gathered?

8    A.    Yeah.  Yes.

9    Q.    Over what period of time did Skye Ventures conduct

10   initial due diligence into the Gruppo Triad Bandagro notes and

11   the Attorney General's October 3rd opinion?

12   A.    I would say the initial diligence period, which was

13   focused on the Attorney General's decision, was roughly mid

14   October to the end of February.

15   Q.    Okay.  Let's then walk through that initial period of

16   due diligence.  When did you learn that the Venezuelan Attorney

17   General had issued an opinion regarding Gruppo's Bandagro notes

18   on October 3rd, 2003?

19   A.    Somebody told me in October.

20   Q.    Do you recall who it was that told you?

21   A.    I think it was either Antonio or Larry Corna, or both.

22             MR. ELLIOTT:  If we could hand the witness Exhibit 3,

23   please.

24             THE WITNESS:  Do I have to keep holding the notes

25   here?

1       MR. ELLIOTT:  No.

2       THE COURTROOM DEPUTY:  Exhibit P-3.

3   BY MR. ELLIOTT:

4   Q.    Mr. Richards, I have handed you what has been marked as

5   Plaintiff's Exhibit 3.  Just for your orientation, it includes

6   both an English translation and a Spanish version of the same

7   document.

8   A.    Yes.

9   Q.    If you take a look at that, can you identify what that

10  is for the record?

11  A.    Well, it looks like, not the English version, but it

12  appears to be the one that I received in October.

13  Q.    The Spanish version?

14  A.    Yeah, the Spanish version.  Plaintiff's Exhibit 6.  It

15  appears to be.

16  Q.    Because at that point in time did you have an English

17  translation of the Attorney General opinion?

18  A.    No.

19  Q.    Now, what do you recall about your first step in the

20  initial due diligence process after you received a copy of the

21  Attorney General's opinion?

22  A.    So early on -- so for me, it's very difficult to think

23  back 13 years and get things in a precise order of when I did

24  them.  But I remember that I did a few things.  I talked -- I

25  had a conversation with Antonio Usuelli.  I had a conversation

1   with Schianchi through Bob Behal, who spoke Italian.  I had --

2   probably had a conversation with Pavanelli.  I also had a

3   conversation with John Kennedy.

4     Q.   Let's first talk in the initial due diligence phase

5   about your discussion with Mr. Usuelli about the Attorney

6   General's opinion.

7           MR. ELLIOTT:  Your Honor, this testimony is in the

8   same nature of being offered for reliance and not for the truth

9   of the matter being asserted.

10          THE COURT:  Mr. Schwartz, I'll hear from you.

11          MR. SCHWARTZ:  To that extent, I'll object on

12  relevance grounds.  I understand the Court is going to permit

13  some testimony not for the truth and simply as to what

14  Mr. Richards heard from people.

15          THE COURT:  Doesn't this inform as far as the scope

16  and the extent of due diligence as well?  So we're talking

17  about not being admitted for the truth but it goes to that

18  issue, doesn't it?

19          MR. ELLIOTT:  Yes, Your Honor.

20          THE COURT:  This is something that somebody knew as

21  opposed to a purely hearsay based kind of answer.

22          MR. SCHWARTZ:  Yes.  And I understand the Court's

23  ruling that this is not coming in for the truth.  And that will

24  be the case with these, I take it all these conversations that

25  Mr. Elliott is going through so I don't have to keep jumping up

1   and saying the same thing.  And I don't want to argue the

2   relevance issue now because we've been over that enough and I

3   understand the Court's stance.  I'm just going to note the same

4   objection and hopefully you can treat it as a continuing

5   objection and I will stay in my seat.

6           THE COURT:  I will.

7           Overruled.  You may continue.

8           MR. ELLIOTT:  Thank you, Your Honor.

9   BY MR. ELLIOTT:

10  Q.   Mr. Richards, what did you learn from Mr. Usuelli in

11  your discussion with him in the fall of 2003 about the

12  October 3rd, 2003 Attorney General opinion?

13  A.   I had learned -- I learned that the decision -- Antonio

14  said the decision was rendered, it was final and binding under

15  Venezuelan law.  It was like a Supreme Court decision.  It was

16  the end of the matter.  And so, you know, I asked him, well,

17  okay, great.  Is there, you know, I think I asked him a

18  question, is there some sort of deal there?  And he said he was

19  sure that it would take a while to get paid and that, you know,

20  Gruppo and Pavanelli would need some interim financing and so

21  maybe there was a deal there.  So I said, good.

22  Q.   All right.  You also indicated that you spoke with an

23  individual by the name of Siro Schianchi, who is that?

24  A.   That was the Swiss attorney and Notary who had

25  represented Antonio in his businesses and, as well, represented

1   Gruppo.

2   Q.    What did you learn from Mr. Schianchi in your

3   conversations with him translated by Mr. Behal in the fall of

4   2003?

5   A.    Similar, that this was a final thing.  It was the end of

6   the issue, kind of its final ruling sort of thing.

7   Q.    And when you spoke to Mr. Pavanelli, let me ask this

8   preliminary question.  In the fall of 2003, what did you know

9   about Mr. Pavanelli at that point?

10  A.    Nothing.

11  Q.    What did you know about Gruppo Triad or what did you

12  learn about Gruppo Triad in the fall of 2003?

13  A.    I don't really remember knowing much.  To be honest with

14  you, I'm not even sure I spoke with Pavanelli in October.  I

15  think I did but I don't -- you know, I had a series of

16  conversations with him until I stopped talking to him in, you

17  know, late '04 or '05.  And I can't remember exactly when they

18  first started.

19          MR. ELLIOTT:  Can I hand Exhibit 25 to the witness,

20  please?

21          THE COURTROOM DEPUTY:  P-25.

22  BY MR. ELLIOTT:

23  Q.    Mr. Richards, I've handed you what's been marked as

24  Plaintiff's Exhibit 25.  Can you identify that for the record?

25  A.    This is a letter or, yeah, it's a letter, perhaps a fax

1  because there's a fax number on it.  In fact, it looks like a

2  fax because there's a fax at the top of the page, and it's from

3  Siro Schianchi to me.  It's addressed at my home address on

4  Holyrood Court in Dublin.

5    Q.  Mr. Schianchi recites some things in his cover letter to

6  you in the substance of the cover letter indicating what to

7  you?

8        MR. SCHWARTZ:  Objection.  I didn't expect to have to

9  stand up so quickly, Your Honor.  We've now jumped forward a

10  year in time and this is a document as to which we have

11  numerous objections on grounds of, at a minimum, hearsay and

12  best evidence.  It's got various attachments to it.  So I don't

13  want to interrupt the preliminary foundational aspects of this

14  but right on the face of the document it's got hearsay and it's

15  not going to be admissible for that reason, in our view.

16        MR. ELLIOTT:  Let me try to address that by

17  withdrawing the question and asking a different one.  It was a

18  very limited purpose for this document, Your Honor.

19        THE COURT:  All right.

20    BY MR. ELLIOTT:

21    Q.  The date of this document is October of 2004.  Do you

22  see that, Mr. Richards?

23    A.  Yes.

24    Q.  And that is after you purchased the notes?

25    A.  That's correct.

1    Q.    All right.  Attached to the letter from Mr. Schianchi is

2    a document relating to the Ministry of Finance, the Attorney

3    General, on October 3rd of 2003.  It's in Spanish but do you

4    see that?

5    A.    Yes, I do.

6    Q.    Is that consistent with the document that you actually

7    received in October of 2003?

8    A.    It looks like the same one.

9         MR. SCHWARTZ:  Excuse me for a second.  I'm going to

10   make the same objection, Your Honor.  This document, as you'll

11   hear later on particularly when we get to Oscar Guzman Cova's

12   deposition, this is a highly controversial document.  I don't

13   think Mr. Elliott is meaning to open up this can of worms.

14        THE COURT:  Let me ask.  You're not using this witness

15   to authenticate the document.

16        MR. ELLIOTT:  I'm really not.

17        THE COURT:  This is going through background of due

18   diligence?

19        MR. ELLIOTT:  That's correct, Your Honor.

20        THE COURT:  So the document is not going to come in

21   through this witness.

22        MR. SCHWARTZ:  All right.  If I may just note one

23   thing about it.  This document has interspersed throughout it,

24   various purported certification pages that are a source of

25   considerable controversy in the case.  So I'm just flagging

1   that for now.

2          THE COURT:  This witness won't be addressing those

3   issues.  You may proceed.

4          MR. ELLIOTT:  Thank you.

5    BY MR. ELLIOTT:

6    Q.   Following your conversations with Mr. Usuelli and Siro

7   Schianchi, when did you first decide to make an investment in

8   Gruppo Triad's Bandagro notes?

9    A.   I think it was like the middle of November when I made

10   the first investment of I think it was 50,000.

11   Q.   50,000?

12   A.   I believe it was, yeah.

13   Q.   And what did you obtain in return for your initial

14   $50,000 investment?

15   A.   Well, so I was going to get some sort of interest in the

16   notes.  That was the purpose of it.  There was a ratio return

17   that I was going to get.  So there was an economic deal.  And

18   then I was going to receive a paper called a deed of trust that

19   is kind of like, I understood to be kind of like a UCC filing

20   in Switzerland.  So Schianchi issued this deed of trust in his

21   role as a Notary in Switzerland.  So ultimately I didn't get

22   one when I sent the 50,000.  I got a promise from Schianchi to

23   issue the deed of trust, which he did.

24   Q.   Okay.  And did you get a rate of return in connection

25   with that initial investment?

1    A.    Yeah.   I believe, you know, it was -- I'm pretty sure it

2    was ten to one.  I think I got a deed of trust for $500,000

3    that would -- in the event there was a payment on the notes, I

4    would get $500,000.  I think that was the way it was.

5    Q.   I think you mentioned earlier that you enlisted the

6    assistance of some of the Crabbe, Brown and James lawyers to

7    help you with initial due diligence.  Let's talk about those

8    lawyers for a minute.

9         First, let's talk about Mr. Alcalde.  When did

10   Mr. Alcalde begin to assist you in due diligence relating to

11   the notes in the Attorney General's opinion?

12   A.    In October.

13   Q.   And what was Mr. Alcalde's role for Skye Ventures in the

14   due diligence process?

15   A.    Well, initially I showed him when we first got -- I

16   didn't go to him directly.  I had already discussed this with

17   John and I had also had -- I think I had the meeting, the first

18   initial meeting that Behal translated before that.  But when I

19   went to Alcalde, we had the Spanish document, right, and so he

20   was -- had lived in Cuba, had lived in Venezuela.  Well, he was

21   very fluent in Spanish.  So I asked him, I said, people are

22   telling me that this is a final and binding decision.  I can

23   vest in it and get ten times my money.  What does it say?  Are

24   they telling me the truth?

25        And so he read it or skimmed it at that time and he told

1   me a couple things about the decision or about the *dictamen*.

2   He said -- I can remember a couple things really specifically

3   or vividly.  He was using the word *vinculante* with me.  And he

4   was telling me what *vinculante* meant and it had the idea that

5   it was final and could never be changed or something like that.

6       And then he showed me where the Attorney General herself

7   said in this opinion that it was a final opinion for mandatory

8   compliance.  So he was showing me that.  And I thought, huh,

9   okay, maybe they're right.  This might be worth taking a chance

10   on.

11       So, that, I'm sure at least that occurred before I made

12   the first investment.  I think I had further conversations with

13   Luis.  John and I had talked about -- John's obviously been a

14   close friend for 30 years, by then 20.  And we talked about

15   whether this was worth taking a chance on.

16       I think another Skye guy, Dave Houze, might have been

17   involved.  Dave's in the courtroom.  But I don't really think

18   so.  He came in later.  He had an office at Crabbe, Brown like

19   I did.

20       Anyway, we had this idea, kind of the sort of thing that

21   you do, I try to do.  I don't consider myself the smartest

22   person in the world but I try to insert myself around people

23   who are smart and I listen to what they say and you sort among

24   that and make a decision.  We all thought, hey, this was worth

25   like putting a little money into and then taking a deeper and

1    further look.

2    Q.    Beyond simply reading the Attorney General opinion, did

3    you ask Mr. Alcalde to do anything else during the due

4    diligence period, the initial period?

5    A.    Yes.  Oh, yes.

6    Q.    What?

7    A.    So remember, I was not paying Luis.  He was doing this

8    out of friendship and he was a really busy litigator at the

9    time.  So, those guys, they work long hours and there's a lot

10   of stress and so I was trying to get him to spend as much time

11   in it as he could because it looked like to me it had potential

12   to be something really rewarding.  At the same time, I couldn't

13   push him too hard.

14        So over the course as he -- I'd show up at his office

15   and I'd say, hey, did you read that or could we get a

16   translator, that kind of stuff.  And I was kind of nudging down

17   the road.  And eventually by early January, he was really

18   interested in it.  And he was digging in deep and getting the

19   laws and we had started talking to Jacir even though it was

20   difficult to talk to Jacir.  He was getting the idea of what

21   Jacir said.  So it was a gradual thing for Alcalde where by the

22   end of the due diligence period he had arrived at the

23   conclusion, and told me so, that in his opinion, this decision

24   was final and binding and couldn't be changed.

25   Q.    Okay.  Let's stay in the initial due diligence period

1    for a moment.  You mentioned that you enlisted the assistance

2    of Mr. Kennedy?

3      A.    Yes.

4      Q.    What did Mr. Kennedy do for you in the fall of 2003 as

5    it related to your due diligence?

6      A.    Well, you know, John and I essentially talk for --

7    probably talk to John more than I talk to my wife.  Not more

8    but I talk to John every day.  Put it that way.  So we would be

9    talking about, well, what do you think, is this a good idea?

10   So he was doing that.  And he came up with ideas about how to

11   go about things, questions to ask.  Early on he sent a fax to

12   the Ministry of Finance with a favorable article that we had

13   found or he may have found it.  He's more, even then was more

14   of an internet guy than I was.

15        And that continued when we had meetings with Luis, that

16   he would be there most often and then I think, you know, as a

17   practical matter as Luis began spending more and more time on

18   the case, he needed some cover, right, because at the firm he's

19   responsible for billing a lot of hours and all of a sudden he's

20   spending a lot of time on this.  So I think John was discussing

21   with the guys that ran the firm with him, Larry and Jeff, that

22   Luis was doing this and he thought it was a good idea.

23        MR. ELLIOTT:  Adam, could you provide the witness with

24   Plaintiff's Exhibit 115, please?

25        THE COURTROOM DEPUTY:  P-115.

1   BY MR. ELLIOTT:

2   Q.   Mr. Richards, please take a look at that.  My first

3   question for you is whether you received a copy of this

4   November 3rd, 2003 e-mail from Mr. Kennedy?

5   A.   I believe I did.  I'm on -- certainly on the -- my

6   netwalk e-mail address is on the e-mail.

7   Q.   What is this e-mail?

8   A.   This is an e-mail that John sent to the Ministry of

9   Finance and attaching an article that he had found.

10   Q.   What type of article?

11   A.   As I recall, without sitting here and rereading the

12   whole thing, I think it was an article talking about how there

13   was this ruling that required the payment of the notes in some

14   fashion and so John's asking, okay, is this -- do you have any

15   comment on this, are we doing diligence on this?  I think he

16   says, can you verify the truth of these articles?

17   Q.   To your knowledge, did Mr. Kennedy ever receive a

18   response to his e-mail?

19   A.   No.  I don't.  Not to my knowledge.  And I don't know if

20   he followed up on it, either.

21   Q.   Who is an individual named Praven Banker?

22   A.   So as part of the initial diligence, the one thing you

23   want to know -- so I'm going to buy this -- I didn't know much

24   about Venezuela at the time.  Didn't know much about Latin

25   American debt at the time.  But that's not unusual.  We learn

1   about deals as we do them.  We don't have a certain kind of

2   deal that we do.  We're opportunists.  We look for an

3   opportunity and we study the area.

4        So I had engaged or I had a partner in other deals, a

5   man named Gary post who had an investment banking firm in Los

6   Angeles.  He was also an investor and his wife Mayumi was an

7   investor in our deals.  So I had enlisted Gary's help and

8   through Gary, who is really well-connected in the bond area

9   around the country and in his history, he knew this guy who

10  specialized in defaulted Latin American debt, bank debt.

11       Little did I know that this was a thing.  There were two

12  funds that made a business of buying private defaulted bank

13  debt that had been guaranteed by their respective governments.

14  They were doing this kind of thing.  I was kind of -- so Praven

15  Banker was one of those guys and he had had some success --

16  recently had success in a Peruvian case where a private bank

17  guaranteed by the government never paid.

18       So I contacted him.  We had a conversation.  He actually

19  knew a guy who had been loaning money to Bandagro in the '80s,

20  very old fellow, and we had a conversation with him as well.

21       MR. SCHWARTZ:  I'll move to strike the hearsay aspects

22  of what this gentleman told Mr. Richards.  If the purpose,

23  again, here is just information in his head at the time --

24       MR. ELLIOTT:  That's all.

25       MR. SCHWARTZ:  -- I understand it.

1    THE COURT:  I'm treating this as part of the due

2  diligence, not as substantive evidence.

3    MR. ELLIOTT:  Yes, Your Honor.

4    THE COURT:  So you may continue.

5  BY MR. ELLIOTT:

6  Q.    You mentioned an individual by the name of Miguel Jacir.

7  Who is Dr. Jacir?

8  A.    So I hadn't quite finished my answer.  Can I finish it

9  or do I have to move on?

10  Q.    Well, let's move to Dr. Jacir.

11  A.    Fine.

12  Q.    You mentioned Dr. Jacir.  Who is he?

13  A.    Miguel Jacir is the attorney who represented Gruppo

14  Triad in the claim filed that led to this Attorney General

15  *dictamen*.

16  Q.    Did Skye have discussions with Dr. Jacir during the

17  initial due diligence period?

18  A.    Yes.  Several of them.

19  Q.    What did you know during the initial due diligence

20  period about Dr. Jacir's background?

21  A.    Well, he was supposed to be a lawyer, you know, a

22  successful lawyer of repute and somebody who was a substantial

23  man.

24  Q.    And did you understand at the time you were talking to

25  Dr. Jacir what his relationship was with respect to Bandagro

1  notes?

2    A.   That he had filed the claim, yes.

3    Q.   Did he represent somebody in that?

4    A.   Gruppo Triad.  He represented Gruppo Triad.

5    Q.   Do you recall, Mr. Richards, approximately how many

6  times -- let me back up for a second.  You don't speak Spanish,

7  do you?

8    A.   I do not.

9    Q.   So when you would have a conversation with Dr. Jacir,

10 how would that happen?

11   A.   Well, we would be on the phone, sometimes the

12 speakerphone.  John and I would normally be in the room with

13 Luis and we would be telling Luis to ask him, can you ask him

14 these questions?  Often the speakerphone didn't work and so

15 Luis would pick up the phone.  Doesn't matter.  Neither John

16 nor I spoke Spanish and would have to rely on what the Luis

17 told us.  It was the connection was poor or you couldn't hear

18 very well.

19   Q.   Do you recall approximately how many conversations Skye

20 then had with Dr. Jacir in the initial due diligence period?

21   A.   I would say three or four.

22   Q.   Okay.  What did you learn through Dr. Jacir about the

23 Gruppo Triad Bandagro notes and the Attorney General opinion?

24   A.   Well, it's been described here the process that they

25 went through to ultimately arrive at the *dictamen*.  They

1    discussed that process.  They discussed the law.  Luis had read

2    the law.  I don't know if it was January or February but he had

3    read the law, the Organic Law of Venezuela, and there was a

4    discussion about the Organic Law of Venezuela and how did it

5    come to be and what did it really mean.  And it was as though

6    he was going back and forth, you know, asking -- I don't

7    understand what they were saying but the gist was that he was

8    asking the legal issues going -- asking Jacir for documents,

9    that sort of thing.  So it was like two lawyers discussing what

10   happened.

11     Q.   Did, in those discussions, Dr. Jacir give you his view

12   of the Attorney General opinion?

13     A.   He gave it to Alcalde for sure and he said that it was

14   final and binding and couldn't be changed.

15     Q.   Now, as you continued your due diligence into the early

16   portion of 2004, was Mr. Alcalde continuing to conduct research

17   into the Attorney General opinion?

18          MR. SCHWARTZ:  Objection.  This is calling for

19   Mr. Richards' knowledge of what Mr. Alcalde was doing.

20   Mr. Alcalde has told us at great length what he was doing.

21          THE COURT:  I think I've already heard the answer to

22   this but I'll hear from you.

23          MR. ELLIOTT:  I can certainly ask him if he was aware.

24          THE COURT:  All right.  That's fine.

25

1    BY MR. ELLIOTT:

2    Q.   Let me rephrase the question, Mr. Richards.  Do you know

3    whether Mr. Alcalde continued to research the impact of the

4    Attorney General opinion in January and February of 2004?

5    A.   He did.

6    Q.   And did he provide you with the information that he was

7    gathering and the conclusions he was reaching?

8    A.   He did.

9        MR. ELLIOTT:  Could you hand the witness Exhibit 78

10   and 79, please?

11       THE COURTROOM DEPUTY:  P-78, P-79.

12       THE WITNESS:  Okay.  I have them.

13       MR. SCHWARTZ:  One second, please, Rex.

14   BY MR. ELLIOTT:

15   Q.   Mr. Richards, first turning to Plaintiff's Exhibit 78.

16   Can you identify that document, please?

17   A.   It's an e-mail from Luis Alcalde to John and I.  And I

18   see that also on the e-mail is Dave Houze and PICA.

19   Q.   And the date of the e-mail is February 14, 2004?

20   A.   Yes.

21   Q.   And Mr. Alcalde states on that first page that Dr. Jacir

22   had stated that the decision of the PG is final and cannot be

23   appealed or challenged in court.

24       My question for you is whether that is consistent with

25   the information you were getting from Mr. Alcalde at that time?

1    A.   Yes.

2         MR. SCHWARTZ:  Objection, again.  Just as necessary to

3    preserve the hearsay point here.

4         THE COURT:  Okay.  I don't think this is going to a

5    disputed fact, frankly, but I'll note the objection and I'll

6    overrule it.

7         MR. ELLIOTT:  Thank you, Your Honor.

8    BY MR. ELLIOTT:

9    Q.   Would you turn to Exhibit 79, please, Mr. Richards.

10   Plaintiff's exhibit.  And could you identify that for the

11   record?

12   A.   Yes.  It's an e-mail from Luis Alcalde to me.

13   Q.   During the time that Mr. Alcalde sent you this e-mail,

14   what was he doing for you as part of the due diligence?

15   A.   We had focused on this idea as early as November that

16   the investment thesis was is there a final and binding decision

17   that we could in some way rely on or enforce.  That was the

18   investment thesis.  And since we initially thought it was and

19   made an additional investment on that basis, the rest of the

20   time it was trying to prove out that investment thesis, to see

21   if this was a real transaction that could be of some substance

22   and size.  That's what he was doing.

23   Q.   And this e-mail is dated February 22nd, 2004.  And if

24   you look at that second paragraph it says, according to my last

25   conversation with Jacir, the administrative decision cannot be

1   appealed.  And it goes on.  Here's my question for you.

2       At any time prior to February 22nd, 2004, had you

3   received any information as part of the initial due diligence

4   process that indicated that the October 3rd, 2004 (sic)

5   Attorney General opinion was not final and binding?

6   A.   No, I didn't.

7   Q.   And as you tasked Mr. Alcalde with the job of

8   researching the opinion and what it meant, did you instruct

9   Mr. Alcalde to reach a certain opinion?

10  A.   I wanted his opinion to be as certain as possible but I

11  didn't, you know, I was agnostic to which one it was.

12  Q.   Why is that?

13  A.   Well, you know, if it's not a deal, it's not a deal.

14  You don't want to waste time on it.  You move on.

15  Q.   How did the conclusion at the end of the due diligence

16  process, whatever it may have been, regarding the finality of

17  the Attorney General's October 3rd, 2003 opinion impact your

18  decision to purchase Gruppo Triad Bandagro notes?

19       MR. SCHWARTZ:  Objection.

20       THE COURT:  Overruled.  This is this reliance issue as

21  well so the objection is overruled.

22       MR. SCHWARTZ:  May I be heard briefly?

23       THE COURT:  All right.

24       MR. SCHWARTZ:  I have difficult understanding the

25  question actually.  It's not so much --

1          THE COURT:  It's a framing issue.  All right.

2          MR. SCHWARTZ:  Yes.

3          THE COURT:  I'll give you the opportunity to reframe,

4     if you wish.

5          MR. ELLIOTT:  I'll see if I can do that, Your Honor.

6     BY MR. ELLIOTT:

7     Q.   My question for you, Mr. Richards, is you gathered a

8     great deal of information in the due diligence process about

9     the Attorney General opinion?

10    A.   I would say yes.

11    Q.   My question for you is how did the conclusion that you

12    reached at the end of that process based on all the information

13    that was gathered about the finality of that opinion or the

14    nonfinality of that opinion, how did that impact your decision

15    to invest in Bandagro notes?

16    A.   It was one of two reasons we would do it.  So it was the

17    reason.

18    Q.   Did Skye decide to invest additional funds in Gruppo

19    Triad's Bandagro notes following the initial investment that

20    you made?

21    A.   Well, what had occurred after I made the initial

22    investment is I started getting regularly pestered for money by

23    Pavanelli.  And he was a persistent man.  So I –- I relented a

24    couple of times and I think I –-

25          THE COURT:  You said he.

1      THE WITNESS:  He.  James Pavanelli, Gruppo Triad, was

2   a persistent man and so I relented a couple of times and I

3   sent -- we sent him some additional small sums of money.  I

4   think it was approximately $20,000, maybe a little more in the

5   right before Christmas and then January time frame.

6      MR. ELLIOTT:  Okay.  Could you hand the witness what's

7   been marked as Exhibit 147, please?

8      THE COURTROOM DEPUTY:  P-147.

9      THE WITNESS:  Yes.

10  BY MR. ELLIOTT:

11  Q.   Mr. Richards, could you identify the documents in

12  Plaintiff's Exhibit 147, what they are?

13  A.   These are records that we produced in the case.  The top

14  two pages are sort of financial records of payment and then

15  there are some bank statements.  There's a printout from a bank

16  and there's some bank statements.

17  Q.   What do these records relate to?

18  A.   I was asked to produce everything that we could find

19  from payments, payment records from back then.

20  Q.   Relating to your payments as it related to Gruppo Triad

21  Bandagro notes?

22  A.   Payments for the notes, yes.

23  Q.   All right.  We've talked about the initial due diligence

24  period and I think you've described in your testimony what it

25  means to move into final due diligence.  Did you do that here?

1    A.    Yes, we did.

2    Q.    When did you decide to move into final due diligence?

3    A.    Once -- so there's an event and there's a time frame.

4  So if you're asking me -- are you asking me for the time frame

5  or the event?

6    Q.    I'm asking you for the time frame right now and I'll get

7  to the event.

8    A.    So the time frame was the end of February, early March.

9    Q.    Okay.  What were the reasons, in your mind, for deciding

10  to move into final due diligence over the purchase of Bandagro

11  notes from Gruppo Triad?

12    A.    Well, Alcalde had reached the conclusion, which he told

13  me, that the decision was final and binding and couldn't be

14  changed under the Organic Law of Venezuela, which, according to

15  him, rose to the level of the constitution or something akin to

16  that, and that we had -- also we hadn't talked about the

17  jurisdictional research that Andy Douglas had done.  But we had

18  also reached the conclusion that in the event that we had to

19  bring a lawsuit, we could sue in the United States.

20        MR. SCHWARTZ:  Excuse me just one second.  I'm sorry,

21  Mr. Elliott.

22        Your Honor, with regard to the last exhibit that we

23  moved past very quickly.  I understand that this is not being

24  offered into evidence at this point.  It's a large compilation

25  of many different documents and we'll have an opportunity to be

1  heard about it at an appropriate occasion.

2         THE COURT:  It's not been offered.  I'm not ruling

3  yet.  So you're right.

4         MR. SCHWARTZ:  I just want to make sure that that's

5  clear.  Thank you.

6         I'm sorry, Mr. Elliott.

7         MR. ELLIOTT:  Okay.

8   BY MR. ELLIOTT:

9   Q.    You mentioned Andy Douglas.  Did you at some point

10  enlist Andy Douglas to assist in the due diligence as well?

11  A.    Well, I'd known Andy a long time.  Both my sons -- my

12  oldest son clerked -- was an intern at the Supreme Court when

13  he was there.  Adam was kind of like a hearing officer

14  assistant when he was running the Ohio State Employees' Union.

15  So at the time in fact I was -- the advisory transaction I was

16  working on, Andy was working on with me.  And so he had

17  initially taken the ball and kind of researched the Foreign

18  Sovereign Immunities Act and we talked about aspects of

19  jurisdiction.

20         So we hadn't -- we hadn't formed any strong opinion

21  about whether there was going to be a lawsuit or anything.  But

22  ultimately you knew that was a possibility and it was important

23  that, to me, that I didn't want to go to Venezuela and have a

24  litigation.  So if I had to litigate, it looked like we could

25  do it in Ohio.

1    Q.    All right.  When you moved into final due diligence, did

2    you travel outside the United States in connection with your

3    evaluation of the Bandagro notes and the Attorney General

4    opinion?

5    A.    Yes.

6    Q.    Where did you first travel as part of your final due

7    diligence?

8    A.    Our first trip -- my first trip was to Como, Italy in

9    the end of March and early April of 2004.

10    Q.    Did anyone accompany you on that first trip to Como,

11    Italy?

12    A.    No.

13    Q.    Why did you travel to Como, Italy in late March, early

14    April 2004?

15    A.    Well, there were several purposes.  But the primary

16    purpose was to meet the people involved, Usuelli, Schianchi and

17    Pavanelli, and see if I can make a deal with them.

18    Q.    Why was it important to meet personally with Pavanelli,

19    Schianchi and Usuelli?

20    A.    Well, you normally like to, you know, back and forth of

21    negotiation and that sort of thing, question and answer is

22    always done easier face-to-face.  Then this guy, Schianchi, he

23    was an attorney and Notary Public.  He was doing stuff for me

24    to protect my interest.  I wanted to meet him and question him

25    about that.  Then I wanted to meet Antonio to see if he was a

1  kind of guy I could rely on to be on the ground over there for

2  me if need be.

3      Q.   When did you meet with the Gruppo Triad representatives

4  in Como in early April of '04?

5      A.   Well, where?

6      Q.   When?

7      A.   When.  So I think it was -- I think I got there like the

8  31st or the 1st.  I had a day to acclimate.  So my guess is it

9  would be the 2nd or 3rd.

10     Q.   Who did you meet with on April 2nd?

11     A.   I met with -- I had a meeting with Pavanelli and then I

12  had a meeting with Pavanelli, Usuelli, Schianchi and a man

13  named Pedro Wick.

14     Q.   What do you recall about your meeting with Mr. Pavanelli

15  on April 2nd, 2004?

16     A.   Well, so I had a -- he came to my hotel to pick me up.

17  We had a meal, breakfast, together, I think.  And it was

18  social.  It was not so much about the deal.  But I was trying

19  to get a sense of the guy.  Look, you know, when you're doing

20  these deals, you're calculating, right.  You're trying to see,

21  well, can I make a deal with this guy and what kind of deal can

22  I make and that sort of thing.  So that's going on the entire

23  day.

24          So then after the meal, we drove to a local country club

25  and we had a room there that we actually talked about Bandagro

1    for maybe an hour, I don't know.  Then we had a lunch that was

2    attended by Schianchi and Usuelli appeared.  Then we went back

3    to Pavanelli's apartment and had a meeting there that everyone

4    and Pedro Wick participated in.

5    Q.    Okay.  What do you recall about your discussion about

6    Bandagro notes on April 2nd with Mr. Pavanelli?

7                MR. SCHWARTZ:  Same hearsay objection.

8                THE COURT:  Again, this is for the due diligence.

9    Objection is overruled.

10               THE WITNESS:  Well, you know, Pavanelli was anxious to

11   tell me his story and so I wasn't so much interested --

12   obviously, if the guy wants money from me, he's going to tell

13   me that the notes are real and that the Attorney General's

14   decision are final.  That's what he's going to say.  That's a

15   given.

16               But he wanted to tell me this story about how he'd been

17   persecuted by Venezuela.  They tried to prosecute him a lot of

18   times and how he was innocent and how, you know, why things

19   happened and who set him up and, you know, so he told me about

20   those things.

21               I found it interesting that he was telling me all this

22   stuff.  But, again, the investment thesis at the time was the

23   Attorney General's decision final and binding, and I was more

24   there -- we had reached the conclusion that it was.  Nothing

25   that I was going to find out in Como was going to tell me the

1    answer to that question one way or the other.  And so my

2    primary purpose there was to meet the guy and see, you know,

3    was he in need and what kind of deal I could make with the guy.

4      BY MR. ELLIOTT:

5      Q.    Who is Pedro Wick?

6      A.    Pedro Wick was a guy who was -- he had been at UBS until

7    recently, was an investment banker.  He was a younger guy.  I'd

8    say he was in his late 30s, early 40s.  He had left UBS to come

9    to work for Pavanelli.  It was after the Attorney General

10   because he had only been there for a month or two.  So it

11   seemed as if he had joined the effort in some way.

12          He said to me, he spoke very good English, and he said

13   to me when I was there that if I could contact him if I ever

14   needed anything or if I ever had any questions and that sort of

15   thing.  So he appeared to be the kind of guy that, you know, if

16   I needed something, couldn't get ahold of Pavanelli or Usuelli

17   couldn't facilitate it, I could go to him.  Other than that, he

18   didn't participate very much in the last part of the day.

19     Q.    All right.  You mentioned that Mr. Pavanelli had talked

20   to you about his efforts to collect the notes over the years

21   and being persecuted.  Did he talk to you about specific

22   proceedings he had been involved in in the past?

23     A.    Yeah.  He mentioned a few of them, yeah.

24     Q.    What did he say to you?

25     A.    Well, you know, his -- the thing he said repeatedly was

1  that he was going to cash these notes; that they had to be

2  honored and that Venezuela was preventing him and it started in

3  1991 when someone had set him up at customs or in London when

4  he was receiving notes.  The same thing happened in Italy.  The

5  same thing happened in Switzerland.  And he told me the story

6  of each of those, each of those things.

7     Q.   Did he talk to you about what had actually happened in

8  the Swiss proceeding?

9     A.   Yeah.  He had said that Venezuela set him up for

10  prosecution.  He and another guy were arrested.  They were

11  released and but there was a conviction and then they appealed

12  it and the appeal court said that the notes were real and they

13  nulled the conviction.

14     Q.   Okay.

15     A.   That's what he said.

16     Q.   And did you at some point actually get documentation

17  relating to the Swiss proceeding that confirmed what he had

18  told you?

19     A.   We did.

20     Q.   All right.

21        MR. ELLIOTT:  Could you hand the witness Exhibit 68,

22  please?

23        THE COURTROOM DEPUTY:  P-68.

24        MR. SCHWARTZ:  Just for the record, Your Honor, while

25  the exhibits are being shuffled, we will have an objection to

1    this exhibit.

2         THE COURT:  To be clear, this witness of course can't

3    in any way authenticate this.  I know it's not being offered

4    that way.  This goes to exactly what was known by him.  It's

5    not going to whether this is a true document or not.

6         MR. ELLIOTT:  Exactly.

7         THE COURT:  You may continue.

8         MR. ELLIOTT:  Thank you, Your Honor.

9    BY MR. ELLIOTT:

10   Q.   Mr. Richards, again, like many of the documents, there's

11   an English translation here along with documents in foreign

12   language.  I'd like you to first tell the Court whether or not

13   this is the Swiss information that you received from

14   Mr. Pavanelli?

15   A.   Yeah.  It looks like it for sure.

16   Q.   All right.  I'd ask you to turn to page SKYE000882.

17   It's that little bates stamp in the bottom of the page.

18   A.   Yes.

19   Q.   And you'll see under the Rules section of this document

20   that the Court indicates that the Pavanelli appeal is upheld

21   and that the prosecution against him and others for fraud and

22   receipt of stolen goods is dismissed.  My question for you is,

23   that consistent with what Mr. Pavanelli told you --

24   A.   Yeah.

25   Q.   -- in Como, Italy?

1    A.   Yes, it was.  It's what he said happened.

2         THE COURT:  What's the exhibit number again, I'm

3    sorry?

4         MR. ELLIOTT:  68, Your Honor.

5         THE COURT:  All right.

6    BY MR. ELLIOTT:

7    Q.   And this is information that you received from

8    Mr. Pavanelli during your trip to Como?

9    A.   Yes.  I believe so.  I'm not certain that I got it when

10   I was there but I know I got it.

11   Q.   Are you certain that you got it before you purchased the

12   notes?

13   A.   Yes.  That I'm sure of.

14   Q.   While you were in Como, I think you told us about your

15   meetings on April 2nd.  What do you recall about your meetings

16   on April 3rd?

17   A.   So on April 3rd I know that I drove from my hotel in

18   Como to Lago Maggiore and met with Antonio Usuelli alone for

19   three or four hours that afternoon.

20   Q.   What was the purpose of that meeting?

21   A.   Well, first off, I liked Antonio.  He was a very

22   interesting guy and I thought I could rely on Antonio to get

23   things done over there.  He spoke Italian, he knew the players

24   involved, and he had an investment in one of the notes.  So I

25   also wanted to get his impressions and thoughts sort of open,

1    you know, not with Schianchi, his attorney, Pavanelli, Pedro

2    and Wick around.  So we could have a free exchange of ideas.

3    So I did that.  And I got a really good feeling about Antonio.

4    Like I say, he's an investor today and still a good friend.

5    And I've been actually back to Switzerland to visit him.  So

6    that was the purpose of that.

7         Less clear in my mind is a meeting that I had with Bruno

8    Fabbiani.  I know that I did meet with Fabbiani at one point.

9    I know in my deposition I testified that I meet with him that

10   morning.  As I've talked to a lot of people since the

11   deposition, I'm not 100 percent sure it was that morning.

12   Q.   Okay.  But you met with Mr. Fabbiani at some point?

13   A.   Yes.

14   Q.   Before you purchased the notes?

15   A.   I think so.

16   Q.   All right.  Before we get there, on April 2nd, 2004, did

17   one of your meetings with Mr. Pavanelli and others take place

18   at Mr. Pavanelli's residence?

19   A.   Yes.

20   Q.   Did Mr. Pavanelli, during that meeting, provide you with

21   any documentation concerning Bandagro notes and the AG opinion?

22   A.   He did.

23   Q.   Do you recall approximately what the volume of that

24   documentation was?

25   A.   It was pretty significant.  It might have been, you

1    know, a foot of kind of documents at the end of the day.

2       Q.    And what did the documents consist of?

3       A.    I don't remember.

4       Q.    Why is that?

5       A.    Well, again, I'm more of a -- I was there to talk to the

6    guys.  And first off, I gave them to Alcalde when I got back.

7    But I think they were mostly in Spanish anyway.

8       Q.    Okay.  On April 2nd, 2004, in your meetings with

9    Mr. Pavanelli, did you learn information about Gruppo Triad's

10   ownership of Bandagro notes?

11      A.    Well, he claimed to own them, right, and so these were

12   the notes that went through the Attorney General's decision.

13   Schianchi had them so I was interested in were the notes there

14   and that kind of thing.

15      Q.    Did Mr. Pavanelli provide you with any information about

16   the face value of the notes that Gruppo Triad owned?

17      A.    Well, we knew that from the Attorney General's decision.

18   I think it was 1.1 billion face value.  These were zero coupon

19   promissory notes.  So they're different from notes, right.  If

20   you have a thousand dollar note it would have been something

21   you gave a thousand dollars for.  These were ten-year zero

22   coupon notes.  So when you gave the money for them, you would

23   have given the money that the note would be worth at ten years

24   at some presumed interest rate.  So it was 1.1 billion of face

25   value of the notes.

1    Q.    Did Mr. Pavanelli give you any information about what

2    Gruppo Triad had paid for the notes that he had?

3            MR. SCHWARTZ:  Same objection.  Just to preserve the

4    record, Your Honor.

5            THE COURT:  All right.  Again, this is background of

6    what he knew.

7            MR. ELLIOTT:  It is, Your Honor.

8            THE COURT:  You may continue.

9            THE WITNESS:  I answered this in my deposition.  I

10   said I think he said he paid something between 1- and

11   $200 million for them.

12   BY MR. ELLIOTT:

13   Q.    Before we get to your discussion with Mr. Fabbiani on

14   April 3rd, what do you recall learning about the Attorney

15   General's October 3rd, 2003 opinion in your meetings on

16   April 2nd and April 3rd?

17   A.    I don't think, you know, other than sort of generically

18   that there was this opinion that was final and binding, I don't

19   think that was much of a topic of discussion.  Because, again,

20   as I said to you, you know, I wasn't there to find that out

21   from Pavanelli that he thought it was final and binding or what

22   he thought.  That was not so important.

23   Q.    What do you recall about your meeting with Bruno

24   Fabbiani?

25   A.    So, again, let me be clear.  I testified in my

1   deposition that I met with him the next morning.  But I'm not

2   certain I did.  I may have just gotten a copy of his report.

3      Q.   Let's start here then.  Who is Bruno Fabbiani?

4      A.   Bruno Fabbiani is a man who is a document examiner, a

5   graphotechnic expert.  I don't know what the exact term is.

6   But his report was in the file of the AG file and she cited to

7   his opinion or to his report in her *dictamen*.  So that's who he

8   was.

9      Q.   Okay.  What did you do with Gruppo Triad's documents

10  upon returning to Columbus?

11     A.   Gave them to Luis.

12     Q.   To your knowledge, did Mr. Alcalde review the documents?

13     A.   I believe he did but I'm not sure.

14     Q.   And after returning home from Como, Italy in early April

15  of 2004, did you actually send Mr. Pavanelli a contract, a

16  proposal for the purchase of Bandagro notes?

17     A.   I did.

18     Q.   And I think you testified that one of your missions in

19  Como, Italy was to determine whether you could negotiate a deal

20  with Mr. Pavanelli?

21     A.   Probably the most important part of the trip.

22          MR. ELLIOTT:  Could you hand the witness Exhibit 145,

23  please?

24          THE COURTROOM DEPUTY:  P-145.

25

1    BY MR. ELLIOTT:

2    Q.    Can you identify Plaintiff's Exhibit 145 for the record,

3    please?

4    A.    145 is two documents.  It's an agreement to purchase the

5    notes and also a non-recourse promissory note in respect to

6    that purchase.

7    Q.    And who prepared this document, Mr. Richards?

8    A.    Regrettably, I did.

9    Q.    And if you look at the first page of the document there

10   is, and it actually goes on to the second page, there are a

11   litany of whereas clauses.  Do you see that?

12   A.    Yes.

13   Q.    Are those whereas clauses consistent with the

14   information that you had received in due diligence at that

15   point in time regarding Gruppo Triad's Bandagro notes and the

16   Attorney General opinion?

17         MR. SCHWARTZ:  I just have a clarification when you

18   say at that point in time.

19         MR. ELLIOTT:  When he sent it to Mr. Pavanelli on or

20   about April 8th.

21         MR. SCHWARTZ:  I'm not trying to be difficult here but

22   I'm not sure there's a foundation of the timing of that.

23         MR. ELLIOTT:  I'm happy to clear that up, Your Honor.

24         THE COURT:  All right.

25         MR. ELLIOTT:  If we can.

1    BY MR. ELLIOTT:

2    Q.   When did you send this document to Mr. Pavanelli?

3         MR. SCHWARTZ:  Excuse me just one more second, please,

4    Mr. Elliott.

5         Your Honor, I'm sorry to have to object here but there

6    are issues concerning various iterations of these documents.

7    As you'll hear, and Mr. Richards is well aware of this, as is

8    Mr. Elliott, here you have a signed document with an attachment

9    to it.  As I understand the point of this exercise, it's to

10   suggest that a proposal was sent.  The document is in the form

11   of something different than a proposal.  And I think to that

12   extent, the testimony is or the questioning is objectionable as

13   misleading.

14        THE COURT:  Well, I think we'll hear all this from the

15   witness.  If you have evidence to the contrary, we'll hear that

16   as well.

17        You may continue.

18        MR. ELLIOTT:  Thank you, Your Honor.

19   BY MR. ELLIOTT:

20   Q.   Mr. Richards, let's lay proper foundation.  When did you

21   send Exhibit 145 to Mr. Pavanelli?

22   A.   Well, I sent a version of one something of either this

23   document or something like it to him right after I got back.

24   Q.   So this document is dated April 8, 2004.  Does that

25   refresh your recollection of approximately when you sent this

1   to Mr. Pavanelli?

2      A.    Well, yeah.  I think it all started that date.  This

3   agreement, it says -- there's no date on the signature.  It

4   says effective April 8th.  So but I did send this document or

5   something like it on April 8.

6      Q.    Okay.  And you returned home from Como, Italy when?

7      A.    I think it was the 5th of April.

8      Q.    So just a few days before this?

9      A.    Yeah.  I wanted to get back to him with what I thought

10  our deal could be.

11     Q.    What was your -- what was the purpose for you drafting

12  this agreement and sending it to Mr. Pavanelli?

13     A.    Well, as I said earlier, and as our general practice

14  was, to bind the investee.  So normally you have a way to bind

15  the company that you're investing at a certain price and value

16  and that it's in your discretion as to whether invest.  But you

17  bind them to do the deal if you conclude to do it.

18         So it wasn't the kind of thing that I thought I could

19  get Pavanelli to go along with.  He certainly couldn't pay me

20  to do my diligence.  So we kind of made this up as the next

21  best substitute for that.

22     Q.    Okay.  At the time that you sent this to Mr. Pavanelli

23  in early April of 2004, I think you indicated that you drafted

24  this document?

25     A.    Yes.

1    Q.    The whereas clauses that are on page 1 and page 2 of the

2    document, are those consistent with what you had learned in due

3    diligence up to that point in time?

4    A.    Yes.

5    Q.    Now, Mr. Richards, if you turn to page, I think it's the

6    fifth page in, it's got the Skye bates stamp number at the

7    bottom 897, there are signature lines on that page.  Do you see

8    that?

9    A.    Yes.

10    Q.    When did you receive a signed copy back from

11    Mr. Pavanelli?

12    A.    Well, I received a signed copy of what I sent him back

13    almost immediately.

14    Q.    Okay.

15    A.    There was no red line or draft.  He just signed it and

16    sent it back.

17    Q.    You have your signature on this document as well?

18    A.    Yes, I do.

19    Q.    Do you recall when you put your signature on this

20    document?

21    A.    Well, I think this --

22        MR. SCHWARTZ:  Excuse me.  I'm sorry, Mr. Richards.

23    I'm going to object only to the extent that this document

24    includes the attachment to it for the same reason I objected

25    before.  If the question is what time did he sign page 897 and

1    that's the extent of it, I have no objection.

2              MR. ELLIOTT:  That's my question.

3              THE COURT:  As long as that's cleared up, you may do

4    that.  You may continue.

5              MR. ELLIOTT:  Thank you, Your Honor.

6              THE WITNESS:  I believe that I finally signed this

7    document or something similar to it in August of 2004.

8    BY MR. ELLIOTT:

9    Q.   And let's turn to the attachment, the non-recourse

10   promissory note, which includes a signature above

11   Mr. Pavanelli's signature line.  Do you see that?

12   A.   I'm sorry?

13   Q.   I'm referring to the non-recourse promissory note.

14   A.   Yes.  Right.

15   Q.   And on the third page of that document is a signature

16   line for Gruppo Triad?

17   A.   Yes.

18   Q.   When did you receive that signed copy back?

19   A.   So this is a document that was changed many times in the

20   sense that you can see on SKYE0899 it talks about a waterfall

21   distribution of money.  And in this particular one, the first

22   30 million went to the lawyers, the second 26 went to Skye, an

23   undefined amount would go to people that Skye engaged to help

24   them in the litigation and then under this note, $39 million

25   would then go to Gruppo Triad.

1          So my point is that this is a subordinated note and

2    Gruppo's ownership was subordinated to a certain point here.

3    That changed over time.  And so I am -- we have it changing

4    even as recently as 2009.  So this document is not signed.  So

5    I don't know exactly when it was.  I think this is the

6    waterfall or close to the waterfall when we signed -- when I

7    signed it -- when we filed the case, I believe.  Maybe a little

8    later.

9    Q.    Let me ask this.  Did you sign the non-recourse

10   promissory note that's attached as Exhibit A along with the

11   agreement?

12   A.    Yes.

13          MR. SCHWARTZ:  Excuse me for just a second.  I want to

14   be very clear about these questions, Your Honor, because this

15   is a nuance of an important issue.  If Mr. Elliott is asking

16   whether the document with the bates stamps of this particular

17   document were sent on April 8th or thereabout of 2004, I want

18   to know that's the question.  This 898 through 900 as opposed

19   to some generic question about some other document that may

20   have changed.  Should be nothing imprecise about these

21   questions.

22          MR. ELLIOTT:  That is my question.

23          MR. SCHWARTZ:  All right.  So if the question is was

24   898 through 901 sent on April 8, 2004, no objection.

25          THE COURT:  All right.

1    MR. ELLIOTT:  I think he answered the question, Your

2  Honor.

3    THE COURT:  I think he had.  My notes reflect that.

4    You may continue.

5  BY MR. ELLIOTT:

6  Q.   Just to be clear, Mr. Richards, when you received the

7  agreement back from Mr. Pavanelli signed sometime in early

8  April of 2004, why didn't you sign it then as opposed to

9  waiting until early August and signing it then?

10  A.   We weren't ready to go yet.  To be honest with you, I

11  didn't expect him to sign it and return then.

12  Q.   And you signed it, I believe your testimony was, in

13  early August?

14  A.   I think so, yes.

15  Q.   Did you sign it in connection then with your completion

16  of the purchase of notes 9 -- I'm sorry, notes 7 and 8 of 12?

17  A.   Yes.

18  Q.   How did Mr. Pavanelli's signature on the document that

19  you sent him in early April impact your due diligence, your

20  decision to continue with due diligence?

21    MR. SCHWARTZ:  Again, we have two signatures of

22  Mr. Pavanelli and I'd ask for precision in the questions.

23    THE COURT:  I thought he said in April of 2004 is what

24  I heard.

25    MR. ELLIOTT:  Right.

1    MR. SCHWARTZ:  But there's -- excuse me for just a

2    second.  Your Honor, I'm really not being difficult here.

3    These are important questions for reasons that will be apparent

4    later.

5    THE COURT:  I certainly agree.  This is a very

6    important document.  But this was an April 2004 question.

7    MR. ELLIOTT:  Let me see if I can address your issue.

8    MR. SCHWARTZ:  All right.

9    MR. ELLIOTT:  I'll withdraw the question.

10   BY MR. ELLIOTT:

11   Q.   Mr. Richards, when you received the signature page for

12   the agreement, the April 8th agreement back from Mr. Pavanelli

13   in early April 2004, how did that impact your decision to

14   continue on with final due diligence relating to the purchase

15   of Bandagro notes from Gruppo Triad?

16   A.   So you recall the three things you were interested in,

17   final and binding nature, jurisdiction, and a deal.  So we had

18   to determine could we make a deal that we could live with with

19   the owner of the notes.  And so that indicated to me that we

20   could.  I knew it for more than that reason.  By then, I had

21   known that Pavanelli was in need of money, that I was his

22   primary source of money.  I didn't make it too difficult on him

23   and he would come to me for money.  So I knew I had the control

24   in that sense.  This let me know that the specifics of this

25   deal that I could get the notes for, you know, cash and a

1   $39 million non-recourse promissory note.  I knew that.

2      Q.    Why was that important to you?

3      A.    We had to have a deal that you could finance.  So that's

4   kind of -- that's why it's important.

5           MR. ELLIOTT:  Your Honor, I'm about to move to another

6   topic.

7           THE COURT:  This is a good time for our midmorning

8   recess.  We'll be in recess for 15 minutes.

9        (A recess was taken at 10:40 a.m. until 10:59 a.m.)

10          THE COURT:  Mr. Elliott, you may continue.

11          MR. ELLIOTT:  Thank you, Your Honor.

12   BY MR. ELLIOTT:

13     Q.    Mr. Richards, before we broke for the morning, you had

14   just returned from Como, Italy.  And I want to ask, first,

15   right now, whether your final due diligence ever took you to

16   Caracas, Venezuela?

17     A.    Yes.

18     Q.    When did you personally visit Caracas, Venezuela?

19     A.    Pretty quickly after I came back from Como.  I would say

20   it was in March of 2003, the first time that I went.

21     Q.    Let me correct that just so there's no --

22     A.    In April of 2003, sorry.

23     Q.    I'll correct it again.  The testimony had been that you

24   had been there in April of '04.

25     A.    '04, I'm sorry.  That's right.

1    Q.    All right.  Just tell me how many times you went to

2    Caracas in connection with your final due diligence?

3    A.    Before August of '04?

4    Q.    Right.

5    A.    I went twice.  Once in April and once in June.

6    Q.    Let's talk about your April visit.  First, tell us

7    approximately when in April you traveled to Caracas, Venezuela?

8    A.    To be honest with you, I'm starting to lose those dates

9    in my mind.  I had them written down and now forget what they

10   were.  But I think it was like mid between 15th and 30th of

11   April.

12   Q.    Okay.  And what was the purpose of your April 2004 visit

13   to Caracas?

14   A.    Well, we wanted to meet -- the primary purpose was to

15   meet with Jacir.  That's how it started.  We had arranged that

16   in March.  Obviously if you're going to go to Caracas, we try

17   to accomplish as many other things as we could when we were

18   there.  So the other -- we tried to do other things but we

19   actually only did a couple of other things.

20        So we met with Jacir on two separate days.  We had a

21   meeting with Guzman that was also attended by Delgado.  And I

22   think I testified in my deposition that I think we met the

23   first time with Iribarren, one of the lawyers who later hooked

24   us up with his -- who opined that the opinion was final and

25   binding.  Listening to Luis' testimony, that might not have

1  occurred until June.  But it occurred in one of the two trips.

2      Q.    Who accompanied you on the first trip to Caracas?

3      A.    Luis Alcalde.

4      Q.    Why did Mr. Alcalde accompany you to Caracas in April of

5  2004?

6      A.    Well, he was the one that was trying to make this

7  determination for us, and obviously he spoke Spanish and I did

8  not.

9      Q.    How long were you in Caracas in April of 2004?

10     A.    It was a couple of days.

11     Q.    All right.  You indicated that you met with Dr. Jacir on

12  two occasions during that trip.  What do you recall about your

13  initial meeting with Dr. Jacir?

14     A.    So we met with him both at his home office and his legal

15  office.  And like Luis, I am not sure exactly what those -- the

16  sequence of those were.  When we were at his law -- for me, I

17  couldn't understand what he was saying.  I could only have Luis

18  tell me.  But I wanted to see him, see what kind of man he was,

19  that kind of thing.  And just like you'd want to meet any

20  lawyer who you were involved with.

21          So at his office I met him, one of his associates and

22  one or both of his sons who are also attorneys.  I think it was

23  relatively short at the law office.  I think that -- again, I'm

24  not sure whether that was the first or second day or the first

25  or second meeting.  I believe it was the first.

 1        And then we met -- and I think he probably wanted to

 2   meet us before he took us to his home office where we spent the

 3   better part of a day.  And there I met his wife Sandra and

 4   maybe his daughter, I'm not sure, as well.  We spent the entire

 5   day at his house.  I recall it being longer than ten or eleven

 6   hours that Luis mentioned but it was a very long day.  It was

 7   interrupted by a lunch that we had in his home that was served

 8   to us where we were able to get to know his wife Sandra a

 9   little better and then back to work.  I think it's right that

10   that started early in the day.

11        So my recollection of the sequence was meeting Jacir the

12   day we got there at his office and then starting early the next

13   morning, going the entire day from very early on

14   until 7:00, 8:00 at night.  So I was actually, my impression, I

15   don't know if you want my impressions, but it was everything

16   was conducted in Spanish.  So Jacir in his home, it was a very

17   nice home.  He had a sizable office that was like back in the

18   old days when you had had all these law books around the

19   office.  So his entire office was floor-to-ceiling shelves of

20   law books.  So it was a real law office.  It was pretty big.

21        And so I was sitting on one side of the office for the

22   most part and Luis was -- started in front of the desk and then

23   moved behind the desk.  So they were like right beside each

24   other talking for a great part of the day.  They were going and

25   going and going.  Jacir appeared, we learned that he had

1  Parkinson's, right, so he was a fairly frail guy at the time.

2  And I was just -- it was remarkable to me that the guy went as

3  long as he did because it was really intense conversation.  And

4  so periodically during, as I believe Luis related, periodically

5  he would tell me what he was saying.  I occasionally asked a

6  question that I thought was important and then the day was

7  over.

8       We went back to the Tamanaco and we had a dinner meeting

9  with Guzman that was attended by Delgado.

10  Q.   Before we get to that dinner meeting, and I assume the

11  Tamanaco was your hotel?

12  A.   Yeah.  The Intercontinental Tamanaco.

13  Q.   What do you recall learning of the meeting that you and

14  Mr. Alcalde had in Mr. Jacir's home office about Bandagro

15  notes?

16       MR. SCHWARTZ:  Excuse me just a second, Mr. Richards.

17  I'll make just a periodic hearsay preservation objection here,

18  if I may.

19       THE COURT:  It's what he knew and not the truth of

20  what's being said.

21       MR. ELLIOTT:  Yes.

22       MR. SCHWARTZ:  If we could just, if the Court would

23  permit, and with the indulgence of Mr. Elliott, we've talked a

24  bit about this during the break, if it's understood pending

25  further notice that it's not necessary each time a new player

1    appears in the conversation to object on hearsay grounds, I

2    won't have to interrupt.

3              THE COURT:  That will be noted.  Thank you.

4              MR. SCHWARTZ:  Thank you.

5      BY MR. ELLIOTT:

6      Q.   What did you learn from the discussion with Dr. Jacir

7    and Mr. Alcalde that day in his home office?

8      A.   So there were some basic things and some collateral

9    things I learned.  Early on, I had asked Luis to request that

10   Jacir set up a meeting with the Attorney General and early on I

11   asked, are we going to meet with the Attorney General?  There

12   was a discussion back and forth and then he said -- Luis said

13   that he said that they won't meet with us.

14             Then they started into sort of a very in depth -- there

15   was -- I remember early on, Luis was talking about Jacir being

16   an author in civil law.  He was, you know, a writer in the area

17   and had books published.  And so early on they -- I think it

18   was Miguel gave me one or two volumes that he had written.  It

19   was in his library and he gave them to me that were authored by

20   him on the civil law of Venezuela.  We learned a lot about his

21   background, what he had done in his life, what he was doing

22   now, about his practice.  He was obviously very successful.  He

23   had a very nice home, nice cars, nice family, all of that.

24             Then during the day I was kind of having found most of

25   what I was going to find that I could glean, that is how the

1    guy looked, how did he act, that kind of thing, I'd let pretty

2    much Luis and him go back and forth and periodically when I was

3    just sitting there, it was boring, so I would ask questions

4    occasionally.  And the issue of the final and binding nature

5    was brought up, the history of the Bandagro bank, those sorts

6    of things occurred frequently during the day.  But the primary

7    thing was the Organic Law of Venezuela, the final and binding

8    decision of the Attorney General, could it be changed, that

9    kind of thing.

10   Q.    Okay.  During the course of that day with Dr. Jacir, did

11   you receive any information that indicated that the Attorney

12   General's October 3rd, 2003 opinion could be changed?

13   A.    No, it couldn't, according to Jacir.

14   Q.    All right.  Now, you indicated that you had a dinner

15   meeting with Oscar Guzman also attended by a Mr. Delgado.

16   First tell us what your understanding of who Oscar Guzman was?

17   A.    He was the fellow who was the -- he was a high-ranking

18   officer in the Minister of Finance.  My impression that he was,

19   I think I've seen somewhere where I read, he was the third

20   ranking officer.  But he was the legal counsel who was assigned

21   the job of, you know, preparing, doing the report for Nobrega.

22   Q.    Why did you want to meet with Dr. Guzman?

23   A.    Well, it seemed a natural thing to do that you would

24   talk to the guy.  We tried to talk to the Attorney General as

25   well.  That you would talk to the guy who, you know, who

1  authored the opinion.  He was available to talk.

2    Q.    What did you learn from Dr. Guzman?

3    A.    Well, again, this was a pretty long dinner meeting.  My

4  recollection was three or four hours long.  It was outside at

5  the Tamanaco.  Lovely setting on the side of a hill looking at

6  Caracas and beautiful weather.  I occasionally interrupted

7  Luis, you know, to say what he was saying and the gist of it

8  was that, you know, the report was correct, that he stood by

9  his investigation, the notes were -- his conclusion that the

10  notes were -- had to be paid.  So that was, you know, the gist

11  of it.

12    Q.    Who is Roman Delgado?  What's your understanding of who

13  that is?

14    A.    Well, I didn't really know -- at the time, I didn't

15  really know exactly who he was.  I now know that he was the guy

16  who had -- his involvement in the investigation was he traveled

17  to Switzerland, looked at one set of the notes.  Not our set

18  but the other set involved in the Attorney General opinion.  So

19  that's my knowledge to the extent of his involvement.

20        But to me, he seemed like a guy who was kind of an

21  opportunist.  The sense that I got from him was that here we

22  had this final -- it was kind of like me, right?  We saw an

23  opportunity.  Seemed like he did as well.  And so he -- I

24  believe he mentioned some of the people he knew and was kind of

25  like he was trading in his sort of -- he could help with, you

1  know, the political effort to get the notes paid.

2      So, you know, at that time, obviously when we did the

3  deal we would look at various ways to have a liquidity, in

4  other words, the other side of the investment.  One of those

5  ways was a political way.  And so he was kind of an

6  opportunist, lobbyist, wheeler-dealer kind of guy that I just

7  got that sense from him.  I don't know that he said that too

8  much.

9  Q.   What do you mean by a political play?

10  A.   Well he knew, his grandfather was a president -- I think

11  his great-grandfather was maybe the president of the Republic

12  years back and he knew a lot of people in Venezuela and I think

13  the sense was, I don't think he made my offer but the sense was

14  that he could be of assistance on the political side of things.

15  Q.   And the next day did you again meet with Dr. Jacir?

16  A.   Again, I don't remember it was the day before or the day

17  after.  We had another meeting with him.

18  Q.   All right.  At any time during your April 2004 visit to

19  Caracas, did anybody tell you, Dr. Jacir, Dr. Guzman,

20  Mr. Delgado, that the Attorney General's October 3rd, 2003

21  opinion was not final and binding?

22  A.   No.

23  Q.   During your visit to Caracas in April of '04, did

24  anybody tell you, Dr. Jacir, Dr. Guzman, Mr. Delgado, that the

25  Attorney General had issued a second decision in December of

1    2003?

2    A.    No.

3    Q.    When you went on these trips as part of your due

4    diligence, did you periodically attempt to come back and

5    summarize in writing the status of some of the things that you

6    learned?

7    A.    At times, sure.

8          MR. ELLIOTT:  Can we show the witness Exhibit 129,

9    please?

10         THE COURTROOM DEPUTY:  P-129.

11   BY MR. ELLIOTT:

12   Q.    Mr. Richards, I've put in front of you Plaintiff's

13   Exhibit 129.  Can you take a look at that and identify that for

14   the record, please?

15   A.    This is an update that I talked about before that is

16   things seemed to be like they're becoming a deal, I would start

17   to get my larger investor group involved.  And this seemed like

18   a summary that I would have sent to them.  And I notice there

19   is some legalese at the bottom that is not normally on my

20   e-mails, but in this one it was.  It kind of says like, you

21   know, we're doing the best we can, that sort of thing.  So sort

22   of boilerplate.

23         MR. SCHWARTZ:  Just note the objection, Your Honor,

24   that now we have a document to the hearsay content.

25         THE COURT:  So this is hearsay.  What's the basis for

1    exception on the plaintiff's side?

2         MR. ELLIOTT:  I'm going to establish, Your Honor, that

3    this is a business record of Skye Ventures.

4         THE COURT:  Give me a quick response, briefly.

5         MR. SCHWARTZ:  Yes.

6         THE COURT:  Let's hear the questions first about the

7    foundation and then I'll hear from you again before we get to

8    the actual document.

9         MR. SCHWARTZ:  All right.  I just say preliminarily,

10   this is not a regularly --

11        THE COURT:  Let's get the question and answer out

12   first.

13        MR. SCHWARTZ:  All right.

14        THE COURT:  Go ahead.

15        MR. ELLIOTT:  Thank you, Your Honor.

16    BY MR. ELLIOTT:

17    Q.   Let me backtrack just a little bit, Mr. Richards.  Who

18   is the managing member of Skye Ventures?

19    A.   Me.

20    Q.   And back then when it was DRFP d/b/a Skye Ventures, who

21   was the managing member of that entity?

22    A.   I was.

23    Q.   And did you, in the course of your due diligence,

24   prepare records relating to the information you were gathering?

25    A.   I did.

1    Q.    And was the purpose of your preparing these records in

2    connection with the due diligence you were conducting on behalf

3    of Skye?

4    A.    This was the kind of record I would -- I'm not a big

5    records guy but this is the kind of record I would prepare and

6    distribute to the potential investor group.

7    Q.    In connection with the business of Skye at that time?

8    A.    Yes.

9    Q.    And did this record find its way into Skye's business

10   records?

11   A.    Probably, yes.

12   Q.    Did this record contemporaneously with your trip to

13   Caracas in April of 2004 some of the information that you

14   gathered there?

15   A.    Yes.

16        THE COURT:  So as we delve into this, I've briefly

17   skimmed this.  I'm the trier of fact in deciding the

18   admissibility of evidence.  I don't see anything in here the

19   witness hasn't already testified to.  So it's a bit duplicative

20   but I don't -- is it a business record?  It's arguable.  Is

21   there any even slight prejudice to either party in this case?

22   I don't see it.  But if I'm missing something, Mr. Schwartz,

23   you can point it out.

24        MR. SCHWARTZ:  Well, I understand the Court's point.

25   It does track the testimony.  But the testimony to date has

1  only been to show what was in the head of Mr. Richards.  The

2  point of a business record is to prove the truth of what's in

3  there.  I thought that wasn't the point.

4       THE COURT:  Again, I just don't see any difference

5  here.  I'm going to admit it but, again, indicate that I'll be

6  relying on his testimony primarily, not so much the document.

7       MR. ELLIOTT:  Thank you, Your Honor.

8  BY MR. ELLIOTT:

9  Q.   Now, you returned from Caracas sometime in April of

10 2004.  Were the Crabbe, Brown lawyers, including Luis Alcalde,

11 continuing to assist you in final due diligence?

12 A.   Yes.

13 Q.   And were you in regular contact with Mr. Alcalde during

14 this period?

15 A.   Yeah.  I was at Crabbe, Brown a lot and when I was

16 there, I would always make it a point to go talk to him and

17 sort of edge him along.  By this time, though, we were both

18 like working on it because we thought we were -- we had reached

19 the conclusion that it was final and binding.  We thought that

20 we were sort of validating that.  And we were thinking about

21 how we'd go about it.  So we were talking about all sorts of

22 things there.

23 Q.   And did Mr. Alcalde periodically update you on the

24 information that he was gathering?

25 A.   Yeah.  If something happened that he thought I would be

1  interested in, he would tell me.  Most of the time just call me

2  or tell me.

3    Q.  Okay.

4        MR. ELLIOTT:  Can you hand the witness Exhibits 82 and

5  84, please?

6        THE COURTROOM DEPUTY:  P-82 and P-83.  Did you say 82

7  or 83?  84.

8    BY MR. ELLIOTT:

9    Q.  Mr. Richards, would you identify for the record

10  Plaintiff's Exhibit 82?

11   A.  82 is an e-mail from me to Andy, Andy Douglas.

12   Q.  And just to clarify, it looks at the top of the page on

13  Exhibit 82 that it's an e-mail from you to Andy Douglas and

14  then there's detailed analysis below your signature line?

15   A.  Yes.

16   Q.  Can you tell us, is that your handwriting or somebody

17  else's?

18   A.  I don't see any handwriting.

19   Q.  I meant did you author that part of the document?

20   A.  I doubt I authored this document.  I contributed to it

21  for sure.  But I would say the primary author of this was Luis.

22   Q.  Okay.  As of May 19th of 2004, the date of the e-mail,

23  right at the top of the page it indicates, under Venezuela law,

24  the order to pay is final and nonappealable.  Is that

25  consistent with what you were learning at the time?

1          MR. SCHWARTZ:  Objection.

2          THE WITNESS:  Yes.

3          THE COURT:  One moment.  Objection?

4          MR. SCHWARTZ:  I'm objecting to this document as a

5    hearsay document as well.  If the only point of this, again,

6    consistent with the Court's prior rulings, is that this is

7    information that was made available to Mr. Richards, then --

8          THE COURT:  That's already, we've been through this.

9    We're going to get expert testimony on this very issue.  This

10   is the just reliance question right now.

11         MR. ELLIOTT:  Exactly.

12   BY MR. ELLIOTT:

13   Q.   Mr. Richards, could you turn to Plaintiff's Exhibit 84.

14         THE COURT:  By the way, I assume we're going to get

15   expert.  That's correct, right, from each side?

16         MR. SCHWARTZ:  Yes.

17         THE COURT:  All right.  Very good.  Thank you.

18   BY MR. ELLIOTT:

19   Q.   Can you identify Exhibit 84 for the record, please?

20   A.   Excuse me just one second.

21         MR. SCHWARTZ:  While we're shuffling the exhibits, the

22   next one is a little different than the prior one.  84 has some

23   more traditional factual assertions in it of a hearsay nature.

24   This is not necessarily the legal analysis that you see in 82.

25         THE COURT:  What is it exactly in 84 that catches your

1   attention?

2         MR. SCHWARTZ:  Well, this is Alcalde talking about an

3   independent expert.  The independence is debatable.  Highly

4   recommended by Jacir.  We don't know that.  And the person that

5   was the former chief of some position who then himself one step

6   removed from the hearsay apparently makes some assertions.

7         So again, if this is information in the head of

8   Mr. Richards at this time and the Court believes that's

9   relevant, that's fine.

10        THE COURT:  I'll admit it just for that purpose.  I'll

11   permit testimony on it for that purpose.

12        MR. ELLIOTT:  That's all I'm asking, Your Honor.

13   BY MR. ELLIOTT:

14   Q.   Mr. Richards, what is Plaintiff's Exhibit 84?

15   A.   Well, this is a reflection of what Luis had been -- we

16   had been working on.  This is on June 2nd.  But in May he had

17   gone about speaking with Badell and I also believe Iribarren,

18   and he was telling me here in an e-mail which because of the

19   blacked out stuff I don't know the entire context but he was

20   telling me that he'd engaged or was in the process of engaging

21   this fellow who was the sort of an AG past general prosecutor

22   of the country to render an opinion.

23   Q.   And did you, when you returned from Caracas in April

24   of '04, continue to have discussions with Mr. Pavanelli?

25   A.   I had discussions with Pavanelli throughout the course

1  of this, yes.

2      Q.   And did you continue to have discussions with Dr. Jacir

3  even after you returned from that trip to --

4      A.   Alcalde did for sure.

5      Q.   Did you receive communications, from your knowledge,

6  from Dr. Jacir about the Gruppo Triad Bandagro notes?

7      A.   Yes.  We had requested a written opinion from him when

8  we were in Caracas.

9      Q.   Mr. Richards, I'd ask you to --

10         MR. ELLIOTT:  Can you hand him what's been marked as

11  Exhibit 135?

12         THE COURTROOM DEPUTY:  P-135.

13      BY MR. ELLIOTT:

14      Q.   Mr. Richards, I'm turning your attention to Exhibit 135

15  which I believe we saw yesterday as well.  Do you recall

16  receiving this e-mail from Dr. Jacir?

17      A.   I think I'm pretty sure we received the e-mail.  I don't

18  know that there was an English translation when we received it

19  but, yeah, I see it was translated.  So, yeah, I remember we

20  got -- we did get an opinion from him.

21         MR. SCHWARTZ:  Just for the purpose of clarification

22  here.  The translation has been added as part of the litigation

23  process, Your Honor, and we've got the certified translation

24  from some date in 2016.

25         MR. ELLIOTT:  That's fair.

1    MR. SCHWARTZ:  So just the clarification of that.

2    MR. ELLIOTT:  Let me lay some foundation.

3    THE COURT:  All right.

4  BY MR. ELLIOTT:

5  Q.   As we said earlier in your testimony, Mr. Richards, many

6  of these documents have an English translation and then a

7  Spanish version.  This is one of those documents.

8       Do you recall receiving communications, this one in

9  particular, from Dr. Jacir in Spanish?

10  A.   That's what I thought I said, yes.  Sorry.

11  Q.   And what was your typical -- how did you typically go

12  about understanding what Dr. Jacir was communicating in his

13  Spanish communication?

14  A.   I would ask Luis what he said.

15  Q.   Now, you've returned from Caracas in April of '04.

16  You're continuing your final due diligence in May and into

17  June.  Did you travel to the city of Miami, Florida in the

18  United States in June?

19  A.   Yes.

20  Q.   What was the purpose of the trip to Miami?

21  A.   We wanted to meet again with Jacir and he had a home in

22  Miami as well.  And so with Jacir it was easier and he

23  preferred to meet in person.  So he told us when he was there

24  and we went to meet him.

25  Q.   Okay.  And did Mr. Alcalde accompany you on that visit?

1    A.    Yes.

2    Q.    What did you -- what do you recall about your meeting

3    with Dr. Jacir in Miami in June of '04?

4    A.    Well, I recall that we went to his condominium.  It was

5    a very nice place.  It was on the water and very sizable place.

6    It was nicely decorated.  In fact, he told a story about how

7    when he was up there looking for a condominium, this was the

8    model and he just bought the whole thing lock, stock and barrel

9    with the furniture and all the decor.

10        And then we -- one of his -- Sandra was there and one of

11   the sons, I think it was Alejandro was there.  And we went

12   through I think Alcalde had some follow-up questions and Jacir

13   had some stuff he wanted to tell Alcalde.  And so they went

14   very similar to what had happened in Caracas, they went -- we

15   were sitting in his living room.  He didn't have a law office.

16   And I was next to -- I was actually -- Alcalde was on the

17   chair, Miguel was on the couch and I was on the other side of

18   the couch listening to what they said.

19   Q.    And what do you recall learning, you, from that visit in

20   Miami?

21   A.    I think it was more of the same, you know.  They were

22   trying to validate that -- trying to probe this idea of final

23   and binding.  He might have had some questions that came up in

24   his opinion that we had recently received.  It was that sort of

25   thing.

1   Q.   Did Dr. Jacir in that meeting tell you that the Attorney

2   General had issued a second opinion in December of 2003?

3   A.   No.

4   Q.   Did Dr. Jacir tell you and Mr. Alcalde in that meeting

5   in Miami what his view was at that point as to whether or not

6   the Attorney General's October 3rd decision was final and

7   binding?

8           MR. SCHWARTZ:  Objection.

9           THE WITNESS:  It was the same.

10          MR. SCHWARTZ:  Excuse me for a second.  Objection.

11  The witness has testified he couldn't understand what Dr. Jacir

12  has said during that meeting.

13          THE COURT:  I assume it's through the aid of an

14  interpreter.

15          THE WITNESS:  Yes.

16          MR. ELLIOTT:  Yes, Your Honor.

17          MR. SCHWARTZ:  If I understand the context, the

18  conversation here, as in Caracas, is between Mr. Alcalde and

19  Dr. Jacir in Spanish with periodic updates to Mr. Richards.  So

20  we had plenty of testimony from Mr. Alcalde, who could speak

21  the language, about what he said.  If the question here is were

22  there periodic updates from Alcalde to Mr. Richards about what

23  Jacir was saying and it's just for the purpose of information

24  that he heard and not the truth.

25          THE COURT:  This is a face-to-face meeting as I

1  understand.

2          MR. ELLIOTT:  It is, Your Honor.

3          THE COURT:  I assume we're not going to spend a lot of

4  time here.  At this point the objection is overruled.

5          MR. ELLIOTT:  Thank you, Your Honor.

6  BY MR. ELLIOTT:

7  Q.    Did you answer that last question?

8  A.    Yes.  My version would be the CliffsNotes and they were

9  talking.

10  Q.    You testified earlier that you returned to Caracas for a

11  second visit at some point in June?

12  A.    Yes.

13  Q.    What was the purpose of the visit in June to Caracas?

14  A.    Well, again, more than one purpose.  We met with three

15  separate legal experts.

16  Q.    By the way, did Mr. Alcalde accompany you on this visit

17  as well?

18  A.    Yes.  Of course.  We met with three separate legal

19  experts.  We met with Gino Manfredi and Bonetti, and I think we

20  met with Jacir.  We met with Jacir again as well when we met

21  with Badell.

22  Q.    Who were the lawyers that you met with in Caracas in

23  June of 2004?

24  A.    Well, there were, like I say, three different lawyers

25  that we met with.  We met with Jacir and Badell.  We had dinner

1    with them actually as well as meeting with them.  We met with

2    Iribarren who was not only speaking for himself but had also

3    gone to his partner who was an ex Supreme Court Justice, I

4    believe, Corredor who has also filed an affidavit in this case.

5    And we met with two lawyers from Baker & McKenzie, sort of a US

6    firm that was based in Caracas that was sort of through one of

7    my contacts, guys named I think his name was Gustavo Graf and a

8    fellow named Rodriguez.  These were the two administrative law

9    lawyers that Luis referred to had given the comment about one

10   percent yesterday.

11   Q.   What was your interest in personally meeting with three

12   separate attorneys in Caracas in June of 2004?

13   A.   It was just, you know, to triple, fourple (sic),

14   quadruple-check the conclusions that Alcalde had reached.

15   Q.   Did you meet with all these lawyers together or did they

16   occur in separate meetings?

17   A.   Separately.

18   Q.   Why?

19   A.   Well, again, you didn't want -- again, we wanted

20   separate readings.  So, listen, by then, Luis had already told

21   me, this opinion is final and binding.  He believes that.  So

22   this was sort of papering the file, getting further support.

23   And so when you're doing that, you know, you want to do it kind

24   of independently here or there.  If it was in the US or

25   Columbus, we might have had different meetings on different

1   days but we tried to set them all at the same time frame but

2   they were not together.

3      Q.   Who was Dr. Ivan Badell?

4      A.   He was the ex prosecutor general of the Republic.  I

5   don't know how long it had been but he was, you know, a very

6   established guy, known guy in Venezuela.  And so he seemed to

7   be pretty well-qualified expert.

8      Q.   What did you learn from Dr. Badell?

9      A.   Opinion was final and binding, couldn't be changed.

10     Q.   Did you receive any written summaries from Dr. Badell

11  before you purchased the notes?

12     A.   I think we did.

13          MR. ELLIOTT:  Can you hand the witness Exhibit 86,

14  please?

15          THE COURTROOM DEPUTY:  P-86.

16          MR. SCHWARTZ:  Here again, Your Honor, we'll be

17  objecting to this document.  This gentleman, this is an expert

18  opinion from someone who is not an expert in the case.

19          MR. ELLIOTT:  Not being offered for the truth.

20          THE COURT:  This just goes to what's known by the

21  witness.  Not going to be offered as substantive evidence.

22     BY MR. ELLIOTT:

23     Q.   Would you identify what is Plaintiff's Exhibit 86,

24  Mr. Richards, and this is another one of those that includes a

25  Spanish version as well?

1    A.    Yes.  So I think that this is dated July —— 22 *dia*

2   *Julio*, I guess that's 22nd of July.  Again, I don't think we

3   had —— I don't think we had the English translation.  I do

4   recall receiving a formal written opinion from Badell that we

5   had asked him to write for us after our June trip.

6    Q.    Okay.  And you indicated that you also met with an

7   Enrique Iribarren?

8    A.    Yes.

9    Q.    What did you learn from your meeting with Dr. Iribarren?

10   A.    He was a much younger guy, very more dynamic, and he was

11   expert in administrative law as well.  I think he was a

12   professor at the local university, had had other good

13   qualifications.  Same conclusion.  Iribarren said, clearly,

14   this opinion is final and binding and it can't be changed.

15   Q.    And I think you had a third meeting with Baker &

16   McKenzie lawyers ——

17   A.    Yes.

18   Q.    —— in Caracas.  What did you learn from that meeting?

19   A.    So the two guys there, again they were connections of

20   mine.  They had looked into the thing.  They had reached the

21   same conclusion.  This opinion is final and binding.  And all

22   of them were willing to get involved.

23        MR. SCHWARTZ:  Your Honor, just on the hearsay nature

24   of the objection here.  I just want to emphasize one point.  I

25   understand that Your Honor's ruling is that it's relevant

1    what's in Mr. Richards' head.  At this point in time I'm not

2    challenging that ruling.  But we do have here, as with all the

3    other out-of-court encounters that are being recited,

4    Mr. Richards vouching for what other people have said.  Many

5    out-of-court declarants.

6         So there's an element to the testimony, even if it's

7    limited to what's in his head, that has a dimension of truth to

8    it.  To that extent --

9         THE COURT:  I'm not sure I get what the objection is

10   to this particular question.  But at this point the objection

11   is overruled.

12   BY MR. ELLIOTT:

13   Q.   Mr. Richards, how long were you in Caracas with

14   Mr. Alcalde in June of 2004?

15   A.   Two days.

16   Q.   And --

17   A.   I think.

18   Q.   At any point in your meetings over the course of two

19   days with Dr. Jacir or the three independent lawyers you met

20   with, did anybody tell you that the Attorney General's

21   October 3rd opinion was not final and binding?

22   A.   No.

23   Q.   At any point in time during your second trip to Caracas

24   in June of 2004 did anybody tell you, Dr. Jacir or the three

25   legal experts you met with, tell you that the Attorney General

1    had issued a second opinion in December of 2003?

2    A.    No.

3    Q.    So what was the status of your due diligence at the time

4    that you returned from Caracas in June of 2004?

5    A.    Well, one of the things that we wanted to do, remember,

6    this had the potential to be a very expensive and long

7    endeavor.  So that was the reason that we had met with three

8    separate lawyers to sort of hit the nail on the head again and

9    again to make sure that everybody who we could -- whose opinion

10   we respected said that the opinion was final and binding,

11   couldn't be changed.

12        At that point we had to select -- all three were willing

13   to go forward with us.  We had to select one of them.  We

14   viewed Badell as the most eminent, he was a former general

15   prosecutor of the country so we thought he was the most eminent

16   expert and we went with him.

17        With Iribarren, he was a younger guy and he didn't have

18   the weight, if you will, of Badell but he, his partner was

19   Corredor and that ultimately led to Corredor but we did not

20   hire him at that time.

21        Graf and Rodriguez were from Baker & McKenzie, typical

22   large law firm.  They were willing to write us an opinion and

23   represent us but they wanted a lot, a lot of money, a lot more

24   than Badell to do that.  So for -- and also they were younger.

25   They weren't like former officials of the government.  So we

1  thought that the best choice was to go with Badell at that

2  point.

3         So we decided, we had an expert, we had further

4  diligence that we had frankly already decided that was true,

5  that the decision was final and binding.  We learned nothing,

6  certainly I don't think it had entered our mind it was changed.

7  We may have asked the question.  And so we were back and we

8  were kind of ready to go.  We were actually ready to go after

9  we returned from Caracas.  We were thinking, okay, this is a

10 good deal.

11  Q.    What do you mean ready to go?

12  A.    Well, I remember returning from Caracas with Alcalde and

13 we're thinking, man, this is -- could be just a fantastic

14 opportunity.  On the one hand I have a final decision that

15 could be enforced.  On the other hand I have an owner who

16 really needs money.  So I -- it was a deal that we -- you have

17 to identify the risk points in the deal, the investment thesis.

18 The investment thesis was the opinion was final and binding.

19 The other point of that is you can get a very good deal.

20        My job for my investment group is to get the best deal

21 possible.  So I, you know, this was a situation that could be

22 really good.  That's what we thought.

23  Q.    There's some testimony over the last couple days that

24 Mr. Alcalde returned to Europe in July of 2004.  Did you go

25 with him?

1    A.    No.

2    Q.    Why did Mr. Alcalde return to Europe?

3    A.    Well --

4         MR. SCHWARTZ:  Objection.  There should be some more

5    foundation.

6         MR. ELLIOTT:  I will lay some foundation.  I'm sorry,

7    Your Honor.

8         THE COURT:  Go ahead.

9         MR. ELLIOTT:  I shouldn't try to speed things up here.

10        THE COURT:  Which is not a bad thing, you understand.

11        MR. SCHWARTZ:  I'm all in favor of speeding things up,

12   Your Honor, but not at the expense of the Rules of Evidence to

13   do that.

14        THE COURT:  I appreciate that bit of information and I

15   share the same view, just so you know.

16        MR. ELLIOTT:  Thank you, Your Honor.

17   BY MR. ELLIOTT:

18   Q.    Mr. Richards, did you, as the managing member of Skye

19   Ventures, instruct Mr. Alcalde to return to Europe in July

20   of '04?

21   A.    Remember, when we were in Caracas at the end of June, we

22   had met with Bonetti and Manfredi.  So the meeting that Alcalde

23   attended in July was sort of a continuation to what we had

24   learned there.  And it revolved around this issue they were

25   having with Gruppo Triad and I didn't need to go for that.

1    Q.    Excellent point.  Let's go back to Caracas for one

2    moment.  You met with Manfredi and Bonetti in Caracas?

3    A.    Yes.

4    Q.    In June of '04?

5    A.    Yes.

6    Q.    Who are Manfredi and Bonetti?

7    A.    There's a company called Woodstrite and they owned that.

8    We didn't know Woodstrite at the time but they were the owners

9    of Woodstrite who ultimately filed an action in Switzerland.

10    What we learned when we met with them is that they had claimed

11    an interest in the notes for what Mr. Schwartz talked about

12    with Alcalde yesterday and that they were having difficulty

13    with Pavanelli.  And they were willing to kind of work a

14    resolution of that out, which we discussed, and so to me, the

15    resolution was a good resolution.  And so I tried to have Luis

16    effectuate a meeting with the two of them and a resolution of

17    that issue.

18         We also learned that these fellows were very wealthy

19    guys.  They owned newspapers and I think hotels and they

20    traveled back and forth between Italy and Venezuela.  They had

21    very good political connections.  They mentioned that.  They

22    were -- they thought they could effectuate a political solution

23    to the problem and they were willing to try to do that but not

24    while they were having this disagreement with Pavanelli.

25         So, again, they spoke only Spanish, as did their lawyer,

1   and I was getting this back and forth with Alcalde.  I was a

2   little more actively engaged in that meeting.  There was

3   questions and answers.  So that's what I recall about that.

4      Q.   I don't want to know what happened in Italy in July

5   because you weren't there.  My question for you is did you send

6   Mr. Alcalde to Italy in July?

7      A.   Yes.

8      Q.   What was the purpose of Mr. -- of you sending

9   Mr. Alcalde to Italy in July?

10      A.   To effectuate the proposed resolution of the situation

11   that the Woodstrite guys had proposed to Gruppo.

12      Q.   Now, when Mr. Alcalde returned from Italy and this takes

13   us into the second half of July, what was the status at that

14   point of the analysis that Mr. Alcalde was doing relating to

15   the October 3rd, 2003 Attorney General opinion?

16      A.   We're talking about the redacted document?

17           MR. SCHWARTZ:  Excuse me.

18           THE COURT:  What's the objection?

19           MR. SCHWARTZ:  How would this witness know the status

20   of what Alcalde was doing other than based on what he received?

21           THE COURT:  Isn't that the point?  We're still looking

22   at what he knew and I thought you had a continuing objection

23   here.

24           MR. SCHWARTZ:  My objection was to the third party of

25   the nonparty due diligence sources.  I'll withdraw the

1   objection.

2          THE COURT:  All right.

3     BY MR. ELLIOTT:

4     Q.   What was the status of Mr. Alcalde's due diligence in

5   late July?

6     A.   I'm sorry, repeat the question.  I think you asked me

7   two different questions.  One you asked the memo and the other

8   you said the diligence.

9     Q.   What was the status of Mr. Alcalde's due diligence into

10  the Attorney General's opinion on October 3rd of 2003 by the

11  time he came back from Italy in late July?

12    A.   Nothing had occurred to change his strong and definitive

13  opinion to us that this was a final and binding opinion of the

14  Attorney General.

15    Q.   Did Mr. Alcalde at any time provide you with his own

16  legal analysis of what he had done over the many months in

17  writing?

18    A.   Yes.  I asked him to prepare one.  I thought there might

19  be some use for it in the future.  Again, if you think about

20  the other side of the investment, you put your money in, you

21  have to get your return.  I thought it might be needed if there

22  was an interim maybe sale of the notes or something like that.

23  So I was asking him to do an analysis.  There were drafts

24  changed back and forth.  I really don't think it was finished

25  until after we filed the lawsuit.

1    Q.    Did you, though, receive that legal analysis in writing?

2    A.    He would send me the drafts and say, what do you think?

3    Q.    And did you receive a final version of that?

4    A.    I don't -- I don't recall having received a final

5    version.

6    Q.    But you received drafts of that?

7    A.    Yeah.  I received drafts.

8    Q.    Now, Mr. Richards, following all of the due diligence

9    that Skye conducted from October of '03 until August of 2004,

10   what, if any, conclusions did you reach about the Gruppo Triad

11   notes and the Attorney General's opinion?

12   A.    Well, I reached the conclusion that what Luis was

13   telling me was correct and that I could rely on him to reach

14   that opinion.

15   Q.    Did you, Mr. Richards, acquire any information during

16   your final due diligence about a lawsuit filed by Venezuela in

17   Miami, Florida?

18   A.    Yes.

19   Q.    What information did you get during the course of your

20   due diligence about that lawsuit?

21   A.    Bandagro Bank had sued the Atlantic Bank over -- they

22   wanted to get back some notes that were ICC notes that they had

23   issued and the fight -- the Atlantic Bank -- it was in the

24   paper because the Atlantic Bank was undergoing some sort of

25   merger at the time and that this lawsuit, which apparently they

1    were resisting, was a problem in this merger.  So there was an

2    article to that effect that I think Luis found.

3        Q.    There's some testimony yesterday and I want to ask you

4    about it, about some maybe disputes or disagreements with

5    Mr. Pavanelli.  Did you have any disagreements with

6    Mr. Pavanelli?

7        A.    Yeah.

8        Q.    Over what?

9        A.    Even the smallest thing.  He was just a very difficult

10   guy.  He was stubborn, he was hard to negotiate with, he would

11   change his mind all the time.  By, honestly, by the fall, by

12   the time I got ownership and possession of the notes I was

13   pretty much sick of the guy.

14       Q.    Were you interested in combining or joining with Gruppo

15   Triad to collect what the Attorney General had said were final

16   and binding?

17       A.    No way on earth.

18       Q.    Why not?

19       A.    No way on earth.  He was just an impossible guy to get

20   along with.  In our deals we always try to take control.  The

21   most complaints I get about is I have too much control.  So we

22   wanted, from the very early on in this deal, we wanted our own

23   notes.  And so most of what happened between when I met with

24   Pavanelli and when we got the notes was even though it was

25   circuitous, as it always was with Pavanelli, that was the goal,

1    to own our own notes.

2    Q.   Now, I asked you some questions before the break about

3    the agreement that you had sent to Mr. Pavanelli in April of

4    2004 and I just want to return to that briefly.  It's

5    Exhibit 145.  I'd like to try to clear up a little confusion.

6         The first five pages of the document --

7    A.   It might be easier if I actually had the document as

8    opposed to just the first page on a screen, if you don't mind.

9    Q.   We'll get that for you.

10   A.   Thank you.  Yes.

11   Q.   Let me ask it this way.  There are two documents that

12   are part of this exhibit.  An agreement that's five pages and

13   then a non-recourse promissory note that is entitled Exhibit A.

14   Do you see that?

15   A.   Yes.

16   Q.   Was the non-recourse promissory note that's Exhibit A,

17   the one that is in this exhibit, was this one sent to

18   Mr. Pavanelli in early April of 2004?

19   A.   Well, as I explained, to fix a date on this I would --

20   the thing that regularly changed in this deal was the

21   waterfall.  So when this deal changed, we would -- when I was

22   doing it, I was doing it expediently.  I was sending it maybe

23   changing the page with the waterfall.  Later on in the case

24   when I started having full time lawyers work for me it was a

25   more complete document.  And I think you'll see -- you see as

1    you look in the case that they became really professionally

2    done.

3         So that's a long way of answering to say to find out

4    when this promissory note was signed, there's no date on the

5    signatures, I would look at the waterfall and I would say,

6    okay, when was the situation like this where in this particular

7    one you have a subordinated note to Gruppo Triad of

8    $39 million.  So in essence, they were going to get up to

9    $1 million of cash and this $39 million note if we cashed on

10   the case.  But, so there's three things that occurred before

11   they got a nickel.  And that was the legal fees were paid, Skye

12   was paid a certain amount, and then other parties were paid a

13   certain amount.

14        So that was important because I think I said this

15   earlier, my goal was to make the best deal I can for my

16   investors.  Every time Pavanelli asked for some additional

17   money, which he did constantly, I would shove that note farther

18   and farther back.  At this point, we could have settled the

19   case for $50 million on our notes and he wouldn't have got a

20   nickel.

21        So I'm trying to think back in my mind when that

22   situation was, what date that was.  And the honest -- honestly,

23   I think it was in 2004.  It might have been around the time we

24   got the notes.  It might have been later in 2004.  Because we

25   sent him additional money after the -- we bought the notes and

1   changed the waterfall.

2       So to further answer your question, once we had the

3   notes, the important thing was the waterfall.  We owned the

4   notes.  The waterfall also became, I'm almost certain, became

5   part of an escrow agreement.  Pavanelli wanted an escrow agent

6   to guarantee that when the notes were paid, that he would get

7   his interest from the note.  So I believe there either at this

8   time or shortly thereafter there is an escrow agreement that

9   says the waterfall at that time, which I think is pretty close

10  to what we see here.

11  Q.   Okay.  Let's stop for one second.  And if you could, for

12  the record, describe what a waterfall is?

13  A.   So a waterfall is a typical deal term and it describes

14  sort of if you think of a waterfall, how the money flows.  So

15  first it flows into one pool.  It might be a lender, first lien

16  lender.  Then it flows into a another pool, might be a second

17  lien lender.  Then it flows to equity owner.  It's that kind of

18  concept.  A waterfall.

19  Q.   And as of the dates that -- the date that you bought the

20  notes, you completed the purchase of the notes in early August

21  of 2004, what was Skye paying to Gruppo Triad for notes 7/12

22  and 8/12?

23  A.   So it was a combination of things that I was paying for

24  him.  So it was cash, it was a note, and it was the assumption

25  of an obligation -- of several obligations.  So one of the

1  obligations was to, at this time, was to file and prosecute a

2  lawsuit.  Also was my time for however long it took, which I

3  had learned by then, you know, could be a decade.  Probably

4  even Banker's case took a decade before he won.

5        So these were very significant obligations that we

6  undertook.  And when we undertook them, we thought there was

7  value to them, as did Pavanelli.

8  Q.    How much was the cash component?

9  A.    It was about $500,000 with a sort of an indication that

10 we would give him more money, up to a million, if there were

11 proper use of the proceeds, if there was good reason for them.

12 Q.    And what was the -- I think you told us about the

13 obligation which was to prosecute a lawsuit if need be?

14 A.    Yeah.

15 Q.    What was the additional debt obligation that you entered

16 into?

17 A.    It was the $39 million note.

18 Q.    So if you had collected the face value of the notes,

19 what would you be paying Gruppo Triad?

20 A.    40 cents on the dollar.

21 Q.    $40 million?

22 A.    $40 million.

23 Q.    How significant was it to you, Skye Ventures, that you

24 were able to negotiate a deal that included up to a million

25 dollars in cash and $39 million in debt on the back end?

 1      A.    Well, it was a good deal for us in a sense.  So let's

 2   assume for -- we had to make a judgment, how much would this

 3   case cost us?  Because we -- you weren't involved at the time.

 4   We may have to pay lawyers.  We certainly would have to pay the

 5   costs.  We would certainly have to travel.  So we had to

 6   estimate, what are the costs?  And we assumed that the lawyers

 7   that we had would take it on contingency because we made that

 8   agreement with Crabbe, Brown back, I believe, end of April,

 9   early May.  But there was no saying that we wouldn't have to

10   replace Crabbe, Brown with a law firm that we had to pay for,

11   which almost came to be.

12        So that if you look then, assuming that you had to pay a

13   law firm a contingent fee, assuming that you had to pay

14   Pavanelli a $39 million non-recourse note, you'd have about

15   $2 million in a deal that you would get whatever the net

16   proceeds of that 100 million were.  So then you start looking

17   at what could happen to the other --

18             THE COURT:  You said 2 million?

19             THE WITNESS:  Right.

20             THE COURT:  That includes the purchase price plus

21   expenses?

22             THE WITNESS:  Yeah.  Plus legal expenses.  So we were

23   looking at it right then as to how much we would have to

24   expend.  We thought $2 million was a good guess so long as we

25   kept the lawyers on contingency fee.  And Crabbe, Brown had

1    said in, like I say, early May they would take the case under

2    contingency fee.  Which incidentally was very important to us

3    because when a lawyer tells you something, that this is his

4    final –– this is his opinion, you say great but then you say

5    will you do this under contingency, that really must mean they

6    have conviction.  So we thought that Alcalde and all the guys

7    at Crabbe, Brown had conviction to do that.  They really

8    believe what they were saying.  That was important to us.

9         But as ultimately happened, Luis moved on in his career

10   and we were interviewing all sorts of law firms to take over.

11   But at any rate, back to the question.

12        So we had 2 million in the deal, might be more, and we

13   were getting the net proceeds after legal fees and Pavanelli's

14   promissory note of 39 million.  Well, in there, we knew that we

15   were going –– one of our possible ways to a liquidity event

16   aside from flat out selling the note was to have Venezuela

17   honor them.  That could be by politically or publicity.

18        So we had this idea early on back in March that we

19   could, if we could get enough publicity that Venezuela wasn't

20   honoring their own laws in these debts that they would make ––

21   and, look, they had this final and binding opinion that they

22   would make some settlement with us.  So that was one of the

23   strategies.

24        To the end of that strategy, we engaged one of the

25   preeminent publicity firms in the world, the man name of Mike

1    Sitrick.  Works almost exclusively for Fortune 500 companies.

2    He's a very effective guy.  He's a friend of mine.  Mike agreed

3    to do this on a contingency fee.  So he took a share of the

4    proceeds.

5         We engaged an investigation firm, Crabbe, Brown did,

6    for -- also very expensive guy.  He did it for a share of the

7    proceeds.

8         So if you look in this waterfall, the third part of the

9    waterfall is third parties to whom Skye has acquire -- was

10   given a reasonable Bandagro interest to be of assistance to

11   Skye in its efforts to assist others.  The language I put

12   there, I apologize.  Again, I'm a bad draftsman.

13        So we had engaged Alcalde or PICA.  Then we knew, I

14   think by the time we bought the notes, that Miguel Jacir and

15   Woodstrite had interest in the notes.  So there were a lot of

16   interests in the notes.  We might have ended up with 8 cents on

17   the dollar.  And if you undertake this kind of effort and you

18   expend this kind of effort and you get $8 million after 13

19   years, that's not a very good deal.

20        So what we were trying to do the whole time was minimize

21   the effect of all those other percentages in there.  One of the

22   ways we did it was we made Pavanelli agree that those interests

23   would come out of his note, his $39 million note.

24     BY MR. ELLIOTT:

25     Q.   Those interests meaning?

1    A.    Meaning Bonetti and Jacir.  That if we had to pay them,

2    that came out of his share, not ours.  So that was basically

3    sort of the inside base of the deal struggle that was going on

4    with Pavanelli and as we kind of not only bought the notes but

5    as we gave him additional money, we kept trying to push that

6    $39 million note back farther and farther and farther so that

7    the return to us was better.

8         Now, if Venezuela would have paid after we filed the

9    lawsuit, okay, that would have been a good deal.  We would have

10    put in 2, got back 10, okay that would have been a good deal.

11    So I looked at it binary.  I knew Pavanelli would be back for

12    more money and I knew I could improve the deal as he came back.

13    And we did, significantly.

14    Q.    So did the deal that you reached with Mr. Pavanelli and

15    Gruppo Triad in early August of '04, that I think you described

16    there a bit, did that then change over time up to the current

17    date?

18    A.    Yes.  I think the last time it was changed was maybe '11

19    or '12.

20    Q.    And how did your deal then change with Gruppo Triad over

21    the years?

22    A.    Well, I think this -- I'm trying to read it on the fly

23    here but I think this kind of describes the structure that the

24    deal remained in.  So the key was you have bearer notes.  So

25    ownership of bearer notes is possession of them.  So after

1    that, once I got possession of the notes then the only real

2    issue was what was the escrow agent going to do with the money

3    when they got them, right.  And so we worked -- I was most

4    concerned about that agreement.  Was the escrow agreement

5    properly reflecting the waterfall?  The escrow agent had the

6    bonds and they were going to do -- get -- receive any proceeds.

7    So after that, it was the key thing was the escrow agreement.

8        Q.   Okay.  And could I turn you to Plaintiff's Exhibit 146,

9    please?

10           MR. SCHWARTZ:  Your Honor, just as we leave 145, I

11   just want to reserve our objections to prevent the admission of

12   that document.

13           THE COURT:  Nothing's been moved to be admitted.  So

14   you don't need to reserve.  I'll note it.

15     BY MR. ELLIOTT:

16     Q.   Mr. Richards, could you identify Plaintiff's Exhibit 46?

17           MR. C. COOPER:  146.

18     BY MR. ELLIOTT:

19     Q.   Sorry, 146.

20     A.   This is an agreement modifying the bond escrow agreement

21   in 2009.  And as you can see, well I don't know if it says it

22   in here, but we had continued to provide additional funding

23   when we thought we were provided with a good reason.  And when

24   we did that, we would do -- this is a document where the

25   waterfall is being amended and it's being executed by --

1  executed by Schianchi on behalf of Gruppo.  By that time I was

2  dealing with Schianchi, I wasn't dealing with Pavanelli.

3       It talks about -- I'm trying to look where the waterfall

4  is.  Here it is.  It's on the Exhibit A where, again, I did not

5  prepare this document.  An actual lawyer prepared this document

6  for me.  So it might look better.

7       And so here you can see that we've pushed the Gruppo

8  non-recourse note back to where they wouldn't receive their

9  first penny until $110 million were paid.  That was important

10  for a lot of reasons.  And after $110 million, the proceeds

11  were split 50/50.

12  Q.   Okay.  So is this an example of what you were talking

13  about that over time as you put more money into the deal, you

14  were pushing Gruppo Triad back further and further in terms of

15  when they'd receive money?

16  A.   I was trying to get a better deal for my group if I gave

17  him money.

18  Q.   How much money did Skye Ventures pay, how much cash, how

19  much money has it invested in notes 7/12 and 8/12?

20  A.   Over the entire course of this?

21       MR. SCHWARTZ:  Objection.

22       THE COURT:  One moment.  Is there than an objection?

23       MR. SCHWARTZ:  Yes.  The question is inherently vague.

24  You have money invested over a continuum of time that rolled

25  over into different purposes.

1        THE COURT:  We can get the dates.  If we have the

2    dates is there any objection?

3        MR. SCHWARTZ:  Well, this is more complicated question

4    than may first meet the eye which is why I'm objected to it.

5    This is a question that needs much more framing in terms of

6    what money was paid to whom when.

7        THE COURT:  All right.  And we have the witness here.

8    Actually we're right up to the noon hour.  Why don't we make

9    that the first order of business when we come back.  We'll be

10   in recess for one hour.

11      (A recess was taken at 12:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Wednesday Afternoon Session

2          February 3, 2016

3          1:00 p.m.

4          -   -   -

5          THE COURT:  Mr. Elliott, you may continue.

6          MR. ELLIOTT:  Thank you very much, Your Honor.

7     BY MR. ELLIOTT:

8     Q.   Mr. Richards, before we broke, we were talking about the

9     consideration that Skye paid for the purchase of notes 7/12 and

10    8/12.  I want to direct your attention to early August of 2004

11    when you signed the agreement that Mr. Pavanelli had signed in

12    early April of 2004.  Can you, for the record, tell the Court

13    how much cash at that point Skye had paid for notes 7/12 and

14    8/12?

15    A.   As I think it was roughly 400,000, 450.

16    Q.   And I think you testified that Gruppo Triad under the

17    agreement would be entitled up to a total of a million dollars

18    had you paid Gruppo Triad more money than you had paid as early

19    as August?

20    A.   Yes.

21    Q.   How much?

22    A.   My estimate is about 900,000.

23    Q.   You also indicated that the agreement was that Skye

24    would take on the obligation and pay the expense of litigation

25    if that were to occur?

1    A.    Yes.

2    Q.    Was that part of the purchase price?

3    A.    Yes.

4    Q.    And taking into account the obligation for the

5    litigation and the expenses incurred as part of the purchase

6    price, how much is that?

7              MR. SCHWARTZ:  Objection.

8              THE COURT:  Basis?

9              MR. SCHWARTZ:  Vague and ambiguous and speculative --

10             THE COURT:  I mean he asked how much was paid.  That

11   is vague and ambiguous?

12             MR. SCHWARTZ:  No, I think he is asking a question not

13   of out-of-pocket expenses --

14             THE COURT:  The witness can explain it.  If it's not

15   clear, we will clear it up.

16             MR. SCHWARTZ:  I am only asking for the question --

17             THE COURT:  I mean this is going to the consideration

18   paid.  That's all.

19             MR. ELLIOTT:  That's all, Your Honor.

20             MR. SCHWARTZ:  Paid historically?

21             THE COURT:  I'm sorry?

22             MR. SCHWARTZ:  I am not trying to be difficult here.

23   The question was how much was paid and if it's paid

24   historically as of a point in time, I have no objection.  If

25   it's a projection into the future, it's unclear.

1        MR. ELLIOTT:  No, it's what he has paid historically

2    up to now.

3        MR. SCHWARTZ:  No objection.

4        THE COURT:  All right.

5    BY MR. ELLIOTT:

6    Q.    Can you answer that question, Mr. Richards?

7    A.    Well, the way it works is that every so often we would

8    call the group, and they may make pro rata contributions of the

9    expenses in the litigation incurred.  And I think that that

10   amount -- it's between 500 and a million, somewhere in there,

11   but I don't have that number in my head.

12       THE COURT:  Is that paid to date?

13       THE WITNESS:  To date.

14   BY MR. ELLIOTT:

15   Q.    In addition to the money that you have paid to Gruppo

16   Triad?

17   A.    Yes.

18   Q.    What's the total amount of out-of-pocket money Skye has

19   paid up to now for notes 7/12 and 8/12?

20   A.    Between 1.5 and 2 million, I would say.

21   Q.    Now when did Skye obtain physical possession of notes

22   7/12 and 8/12?

23   A.    Hold in the hand?  Is that physical possession?

24   Q.    In your hands.

25   A.    It was -- there's a date that I think Brinks delivered

1   the notes.  There's actual receipts there.  So my recollection

2   is like the 15th, 16th of August, sometime in that time frame.

3     Q.   Did Skye make a demand of Venezuela to pay notes 7/12

4   and 8/12?

5     A.   The attorneys did, yes.

6     Q.   And when that demand was made, where were notes 7/12 and

7   8/12?

8     A.   If they weren't here yet, they were either on their way

9   or Schianchi was holding on my behalf.

10    Q.   What was your agreement with Mr. Schianchi in terms of

11  his holding Skye's notes?

12          MR. SCHWARTZ:  Objection.

13          THE COURT:  His understanding was asked.  What is the

14  problem with the question?

15          MR. SCHWARTZ:  Are we talking about a written

16  agreement, an oral agreement?

17          THE COURT:  He can explain.

18          THE WITNESS:  So the agreement with Schianchi was --

19  at a certain point we agreed they were finally, finally, going

20  to send the notes.  Okay?  And we had identified notes that

21  were free and clear.  I think we have agreed that time frame

22  was kind of like the beginning of August, end of July.

23          So when that occurred, we had to spend money, we had

24  -- I think it cost $35,000 to courier the notes across.  So I

25  was, obviously, going to pay that.  So I made an agreement with

1    Schianchi that when I was going to pay that, I didn't want to

2    pay for it and then have something in the interim, get some

3    lien on the note or something, as it happened with the other

4    notes.

5            So he agreed that he would hold the notes on my

6    behalf and keep them free and clear; and that when the courier

7    came, he would give them to the courier.  So that happened.

8    BY MR. ELLIOTT:

9    Q.   And did that occur?

10   A.   Yes.

11   Q.   When Skye made its demand for Venezuela to pay notes

12   7/12 and 8/12, did Skye own the notes on that date?

13           MR. SCHWARTZ:  Objection.

14           THE COURT:  What's the basis?

15           MR. SCHWARTZ:  Calling for a legal conclusion.  The

16   bearer instrument are in someone else's hands.

17           THE COURT:  Overruled.  You're an attorney, I

18   understand.  But what was your understanding of who owned the

19   notes at that point?

20           THE WITNESS:  I did.

21           THE COURT:  All right.  You mean Skye.

22           THE WITNESS:  Skye, sorry.  I wasn't a practicing

23   attorney at that time, Your Honor.

24           THE COURT:  Understood.

25           THE WITNESS:  I was not licensed either.

1    BY MR. ELLIOTT:

2    Q.    Has Skye had notes 7/12 and 8/12 in its possession from

3    the middle of August of 2004 to the present date?

4    A.    Yes, through the escrow agents, yes.

5    Q.    Who were the escrow agents?

6    A.    Crabbe Brown and Robert Behal.

7    Q.    Now Mr. Schwartz asked Mr. Alcalde some questions

8    yesterday about a Skye Ventures website relating to the

9    Bandagro notes investment.  Did you authorize the creation of a

10   website?

11   A.    Yes.

12   Q.    What was the purpose of that?

13   A.    Well, this was at the behest -- I never -- I don't think

14   I had ever had a website before, and don't know if I have had

15   one since actually.  But the purpose was as a result of a

16   request of Mike Sitrick.  Mike was saying that, look.  If you

17   search the Internet for Bandagro, nothing comes up except for

18   what Venezuela has put out there.  So you should put something

19   out there that tells your version of the story.  And so he

20   actually helped, I think, design it and get it up.

21   Q.    Okay.  And did you post documents to the website?

22   A.    Well, there was a secondary purpose to the website, kind

23   of similar to what we now use as drop boxes.  So today we have

24   data rooms and drop boxes that are just common in every deal.

25   So when you want to look at a deal, they say, here's our

1   password.  All of the documents are in there and organized.

2   Back then those kinds of things, at least to my knowledge,

3   didn't exist.  So we put up the documents on the Skye website

4   behind a password that our investor group or anyone who we gave

5   the password to look at.

6   Q.   And were the documents gathered in the course of due

7   diligence?

8   A.   Yeah.  Yes.

9   Q.   Could you hand the witness Exhibit 30, please?

10      THE DEPUTY CLERK:  P-30.

11   BY MR. ELLIOTT:

12   Q.   Mr. Richards, in a moment I'm going to direct your

13   attention, if you have it in front of you, to the Exhibit 30.

14   Can you -- when you have had a chance to look at that, tell us

15   what this is?

16   A.   This appears to be pages from the website back in the

17   day.

18   Q.   Okay.  I'm just going to refer you to, I think, four

19   pages back.  There is a subheading -- I am sorry, maybe five or

20   six pages back.  It's document 6126, SKYE006126.  And it's

21   entitled Secure Document Index.

22   A.   Yes.

23   Q.   And I'd just like you to explain what that is?

24   A.   I think that looks to me to be a listing of the

25   documents that were on the website.  And secure indicates to me

1    that these were behind a password of some kind.

2          MR. ELLIOTT:  Could you hand the witness Exhibit 61?

3          THE DEPUTY CLERK:  P-61.

4      BY MR. ELLIOTT:

5      Q.   Mr. Richards, I turn your attention to Plaintiff's

6    Exhibit 61 and just -- and, again, this is an exhibit that has

7    multiple documents in it.  But are these -- My first question

8    is going to be:  Are these documents that you received in the

9    course of due diligence?

10     A.   Yes, I believe so.

11     Q.   And I'm going to turn you to the document that is

12   indicated SKYE001482 in that exhibit.

13     A.   Yes.

14     Q.   These documents relate to an individual by the name of

15   Alfredo Aagaard?

16          MR. SCHWARTZ:  Excuse me one second, please.  There's

17   a second tab here.

18          THE WITNESS:  I see his name there, yes.

19          MR. SCHWARTZ:  Your Honor, while I am standing, I just

20   want you to know we have objections to all these documents on

21   authentication, best evidence, hearsay and foundational

22   grounds.  I just want to point that out at this point.

23          MR. ELLIOTT:  My only issue is to establish these were

24   received by Mr. Richards in due diligence, not for the truth

25   herein.

1      THE COURT:  At this point we will continue as is.

2      MR. ELLIOTT:  Thank you, Your Honor.

3    BY MR. ELLIOTT:

4    Q.   Mr. Richards, did you receive these documents in the

5    course of due diligence?

6    A.   Yes.

7    Q.   Including the affidavit on page 1482 of the individual

8    named Alfredo Aagaard?

9    A.   Yes.

10   Q.   In the course of due diligence, did you have -- did you

11   obtain any information about an individual named Alfredo

12   Aagaard in connection with Bandagro notes?

13   A.   I know the name.  In fact I know he has filed an

14   affidavit in this case.  And I'm having a little trouble

15   remembering when I first heard his name at the moment.

16      MR. ELLIOTT:  Can you hand the witness Exhibits 139

17   and 140?

18      THE DEPUTY CLERK:  139.  And 140.

19   BY MR. ELLIOTT:

20   Q.   I first want you to look at Exhibit 139.  It looks to be

21   an e-mail from you.  But can you describe it for the record?

22   A.   It's e-mail from me to Gary Post, who was part of the

23   diligence team, and Jess Ravich, who at that time was looking

24   on joining or doing some sort of transaction with us, copied

25   David on -- David was an analyst at Ambient at the time.  And

1    I'm transmitting some documents to Gary that were received in

2    diligence.

3      Q.    Do you know what those documents are?

4            MR. SCHWARTZ:  Objection.

5            THE COURT:  Anything additional to what we haven't

6    already discussed?

7            MR. SCHWARTZ:  Yes.  He couldn't have any foundational

8    bases for knowing what these documents are.  He can say

9    somebody gave them to him, but he can't answer the fundamental

10   question of what they are.  As you will hear, if we need to

11   argue about it, there are contentions about forgery with regard

12   to these documents.  So --

13           THE COURT:  I don't think this is going to go to the

14   issue of forgery.  Right?  This witness is not being offered

15   for that.  This is what he sent.

16           MR. ELLIOTT:  That's right.

17           THE COURT:  For that limited purpose, that's all I

18   would be considering it for.

19           MR. SCHWARTZ:  All right.

20           THE WITNESS:  They are a document that appoints

21   Cordero Vale as the intervenor, and a document concerning some

22   signature of Cordero Vale where he appeared at a Notary and

23   said that he had signed the Bandagro notes.

24     BY MR. ELLIOTT:

25     Q.    Okay.

1    A.    And I was looking for a date on there for my own

2    recollection.  It looks like the early '80s.

3          THE COURT:  So should I expect some other testimony

4    about these documents?

5          MR. ELLIOTT:  I believe you will, Your Honor.

6          MR. SCHWARTZ:  We will reserve until then.

7          THE COURT:  I am wondering, is one of your witnesses

8    going to address these or not?

9          MR. SCHWARTZ:  It may be that Fontana, since he is one

10   of the people whose name is forged on here as it is, will

11   testify it's not his signature.  I expect that will happen.

12         THE COURT:  All right.  We have some people, either

13   who are experts with firsthand knowledge about signatures, who

14   will get into these documents later.

15         MR. SCHWARTZ:  I want to be careful and say, there are

16   so many forged documents that I am not undertaking to have

17   people address every one of them.

18         THE COURT:  I mean, I understand.  You don't want some

19   document coming in that's going to bite you later.  But these

20   are coming in just as far as what this witness knew and when.

21    As far as the documents themselves, he's not firsthand.  He's

22   just viewing these.  But I'm understanding from both of you we

23   will be hearing much more from people who can explain these

24   documents.

25         MR. SCHWARTZ:  Some such documents, yes, there will be

1  a handwriting expert we will offer.

2        MR. ELLIOTT:  Thank you, Your Honor.

3        THE WITNESS:  To continue, I say, incidentally, I

4  received -- or these are from the Ministry of Finance

5  investigation.

6  BY MR. ELLIOTT:

7  Q.   Mr. Richards, you concluded your due diligence and

8  signed the April agreement in early August of 2004.  Was that

9  effectively the end of your due diligence as it related to

10  notes 7/12 and 8/12 when you actually bought them?

11  A.   Yes, I would say for sure.  We made the decision.  Due

12  diligence is the effort you make to make the investment

13  decision.

14  Q.   In the course of making -- Let me go back for a second.

15  Who made the decision on Skye's behalf to purchase notes 7/12

16  and 8/12?

17  A.   I did.

18  Q.   And what did you rely on in making your decision to

19  purchase those notes?

20  A.   Luis Alcalde and Crabbe Brown's opinion that the AG's

21  decision was final and binding and could not be changed.

22  Q.   Did you, in the course of your due diligence -- and that

23  is prior to that August of '04 time frame -- did you come

24  across any information in your due diligence indicating that

25  the Attorney General had defended her October opinion?

1    A.   Yes.

2         MR. ELLIOTT:  I am going to turn the witness to

3    Exhibit 73, please.

4         THE DEPUTY CLERK:  P-73.  Let's switch.

5    BY MR. ELLIOTT:

6    Q.   Mr. Richards, there is, like many of the other exhibits,

7    English and Spanish versions of an article dated July 1 of 2004

8    in the newspaper El Nacional.  Did you receive a copy of this

9    article prior to August of 2004?

10        MR. SCHWARTZ:  Excuse me.  Just for purposes of

11   clarification, this is a compilation of different materials.

12   Are we only talking about the first two pages?

13        MR. ELLIOTT:  First two pages.

14        THE WITNESS:  Yes.

15   BY MR. ELLIOTT:

16   Q.   What information did you have relating to this article

17   before you bought the notes?

18   A.   Well, in this article it's reported that she defends her

19   decision in October of 2003 as the correct decision is what I

20   was told by Luis.

21   Q.   Because at the time you only had a Spanish version?

22   A.   Right.

23   Q.   Now when did you first learn of a second opinion

24   supposedly issued by the Attorney General on December 8 of

25   2003?

1    A.    May of, I think it was, approximately May of '05.

2    Q.    How did you learn about this second opinion dated

3    December 8 of 2003?

4    A.    Well, we had filed the complaint.  It was Luis's idea

5    that he should not attach the Attorney General's opinion for a

6    strategic reason, and he didn't.  Venezuela filed a motion to

7    dismiss.  And in that motion to dismiss, they attached two

8    opinions.  One was the October 3 opinion, and the other was a

9    request in November by the Minister of Finance to -- for her to

10   change her opinion, and her refusal to do.  That was all that

11   was attached.

12         And in their, as I recall -- it's of record -- but

13   their defense was this opinion was only advisory.  It wasn't

14   final and binding.

15         Alcalde said, ah-ha.  We've got them.  And we opposed

16   it by saying -- asking Judge Holschuh at the time to find this

17   was the opinion, but -- and they filed, and it was final and

18   binding, case over.  That's what we filed.

19         And then out of the blue came this filing that -- oh,

20   no. We didn't mean -- I'm sorry, I don't mean to editorialize,

21   but we were really stunned.  That it -- she had all along had

22   reversed her opinion no matter what had occurred in the

23   meantime.  Nobody heard about it for a year and a half.

24   Q.    Okay.  And then the first time you learned of this

25   second opinion issued in December of '03 was in 2005?

1    A.   Yes.

2    Q.   In the course of this lawsuit?

3    A.   Yeah -- yes.

4    Q.   At any point in time prior to your actually purchasing

5    notes 7/12 and 8/12, did you obtain any information in your due

6    diligence that indicated in any way that the Attorney General's

7    October 3, 2003, opinion was not final and binding?

8    A.   No.

9         MR. ELLIOTT:  If I may have one minute?

10        THE COURT:  You may.

11        MR. ELLIOTT:  Your Honor, those are all the questions

12   that I have.

13        THE COURT:  Thank you very much.

14   Mr. Schwartz, you may cross-examine.

15        MR. SCHWARTZ:  Thank you, Your Honor.

16                        - - -

17                   CROSS-EXAMINATION

18   BY MR. SCHWARTZ:

19   Q.   Good afternoon.  It's good to see you again.

20   A.   After two long days, a year and a while ago, yes, here

21   we are again.

22   Q.   I'm going to cover with you some familiar ground from

23   your deposition right here at the outset.  Specifically, I want

24   to drill down into the various agreements that you had with

25   Gruppo Triad from time to time and these various shifting

1   waterfalls so we can establish for the benefit of Judge Sargus

2   what the deal was and when.  Okay?

3      A.   We will do our best.

4      Q.   All right.  The first document I'm going to show you is

5   Defendant's Exhibit 521.  If you would give us a moment, we

6   will actually show it to you?

7      A.   I would prefer to hold it.

8      Q.   We will make sure that happens.

9           THE DEPUTY CLERK:  D-521.

10  BY MR. SCHWARTZ:

11     Q.   Now D-521 is the agreement that says it's entered into

12  on April 8 of 2004.  Right?

13     A.   Correct.

14     Q.   And at the back of it, starting on Bates page 898, is

15  the nonrecourse promissory note, which also, incidentally, says

16  it's entered into on April 8, 2004.  Right?

17     A.   That's what it says.

18     Q.   And this is the one that Mr. Elliott showed you during

19  the course of your direct examination, right?

20     A.   Okay.

21     Q.   Do you see that?

22     A.   There are -- Again, I'll take your word for it.

23     Q.   I don't want you to.  The version that he showed was

24  Plaintiff's Exhibit 145.

25           So before we shift there, take a look at the Bates

1    stamped pages on Defendant's Exhibit 521.  Do you see SKYE00893

2    -- and they run consecutively until page 901, the page that's

3    got only your signature on it.

4      A.   I see that.

5      Q.   All right.  Now let's look at Plaintiff's Exhibit 145 to

6    confirm it's the identical document.  Do we have a copy of

7    that?  You looked at it earlier.  You don't have this in front

8    of you.

9          THE COURT:  I have one, if you don't.  But you want

10   him to put these side by side is what you are asking him to do.

11         MR. SCHWARTZ:  I just want to show him the Bates

12   stamped number.

13     BY MR. SCHWARTZ:

14     Q.   Can you see the screen from where are you, Mr. Richards?

15     A.   I can see that, yes.

16     Q.   So you see Plaintiff's 145 starts on 893, and it runs

17   all the way to 901?

18     A.   Okay.

19     Q.   So we're on common ground that D-521 is identical to

20   P-145, right?

21         MR. ELLIOTT:  That's not accurate.

22         MR. SCHWARTZ:  What's not identical?  It's the same

23   Bates number.

24         MR. ELLIOTT:  I'm sorry.  I think the last page is --

25         MR. SCHWARTZ:  It's --

1    THE COURT:  I'm looking at both.  They appear to be

2  the same.

3    MR. SCHWARTZ:  It's identical.  893 to 901, right?

4    THE COURT:  That's the last page of the document.

5    MR. SCHWARTZ:  Yes.

6  BY MR. SCHWARTZ:

7    Q.   I don't want there to be any confusion.  I'm showing you

8  D-521, but you can see it's identical to P-145, right?

9    A.   Let's look -- it looks like it has the same numbers on

10  the bottom.  So it seems it has to be the same.

11    Q.   All right.  And looking within D-521, which is the only

12  one I want to look at now so we don't get confused, if you look

13  at page Bates stamped 899, that's the waterfall there with the

14  $39 million going to Gruppo Triad somewhere in the middle of

15  the waterfall, right?

16    A.   Yes.

17    Q.   And you signed on page Bates stamped 000901.  Right?

18    A.   Yes.

19    Q.   All right.  Now I'm going to direct your attention to

20  page 211 of your personal deposition from December, 2014.

21    A.   Okay.

22    Q.   Do you have that there?  I'd ask you to turn to page

23  209.

24    A.   It doesn't appear to be -- oh --

25    Q.   There should be.  If there isn't, we'll help you.

1    A.    There are two depositions here.  Which do I have --

2    Q.    I think you may have both your individual and 30(b)(6)

3    depositions in the same binder.  Start with the one that says

4    David J. Richards?

5         THE COURT:  The first one.

6         THE WITNESS:  Not David J. Richards 30(b)(6).

7    BY MR. SCHWARTZ:

8    Q.    We may look at that separately, but not right now.

9    A.    And the page number again, sorry?

10   Q.    209.  Line no. 12.  Let me know when you're there

11   because I want to do this slowly so there's no confusion.  209,

12   line 12.

13   A.    Okay I was just trying to read the --

14   Q.    I'll help you through it once you have it.  Do you have

15   it there with you?

16   A.    Yes.

17   Q.    All right.  Now having been a litigator, you probably

18   understand that deposition exhibits don't always get marked the

19   same way as trial exhibits.  But just notice on the first page

20   of D-521, this was Exhibit 12 to your deposition.  Do you see

21   that on the first page of this exhibit?

22        THE COURT:  At the bottom.

23   BY MR. SCHWARTZ:

24   Q.    Bottom of the first page.

25        THE COURT:  Let me ask a quick question.  Should I

1    assume these are two identical documents?  Are we going to get

2    into that?

3              MR. SCHWARTZ:  P-145 and D-521?

4              THE COURT:  Yes.

5              MR. SCHWARTZ:  Yes.

6              THE WITNESS:  Yes.

7      BY MR. SCHWARTZ:

8      Q.    Now take a look at page 209, line 12.  And in December,

9    2014, you'll see that I asked a question with regard to the

10   Bates stamped page 000901.  Right?

11     A.    Yes.

12     Q.    And that's the last page of Trial Exhibit D-521, right?

13     A.    Okay, yes.

14     Q.    And I said to you:  Let's look at page 000901.  There

15   you've signed the nonrecourse promissory note, right?

16              And you said:  Yep.

17              Right?

18     A.    Yes.

19     Q.    And then I said to you:  If I understand correctly,

20   you're saying that you signed this nonrecourse promissory note

21   that ends on page 901 in December of 2004 or January of 2005.

22              Do you see that question?

23     A.    I said -- I do see the question.

24     Q.    One step at a time, please.

25     A.    I do see the question.

1    Q.    And you answered:  I am saying yeah.  I signed this

2    particular version of Exhibit A, which had a changed waterfall

3    in it, probably around December or January, December of '04 or

4    January of '05.

5         Correct?

6    A.    Yes.

7    Q.    So in substance what you were saying in December of 2014

8    was that you signed D-521 in December of '04 or January of '05,

9    correct?

10   A.    I said probably.

11        I also answered before, I said, I think I signed the

12   promissory note and agreement at the same time we finally had

13   the deal.

14   Q.    We'll get to that.

15   A.    And then you asked me, looking at this waterfall, and I

16   said, boy, that kind of looks like it was a little later.  We

17   went into that.  And that was probably about December --

18   Q.    Yes.

19   A.    -- of that same year.

20   Q.    All right.

21   A.    Yes.

22   Q.    Now I want to show you one other page of this document

23   so we have this nailed down.  Take a look at --

24   A.    Well, I wouldn't say nailed down.  I said probably.

25   Looking at it today, I have no idea why I said December in the

1  deposition.

2     Q.   Please turn to page SKYE000899 within D-521.

3     A.   Would you say the number again?

4     Q.   Yes, SKYE000899 the page with the 39 --

5     A.   With the waterfall, sure.

6     Q.   With the $39 million waterfall.

7     A.   Sure.

8     Q.   Now I want to look at page 211 of your deposition, line

9  15.

10    A.   This is very small print.  So I am going to -- I

11  complained about this when they sent me the deposition.

12    Q.   All right.  I'm going to help you with this.

13    A.   So tell me the line you're looking at, please.

14    Q.   Page 211, line 15.

15         MR. LUCAS:  Mr. Richards, I have a pair of glasses.

16  Would you like those?

17         THE WITNESS:  Who said that?

18         MR. LUCAS:  I did.

19         THE COURT:  He's serious.

20         MR. LUCAS:  I was being serious.

21         THE COURT:  I know.  Do you want those?

22    BY MR. SCHWARTZ:

23    Q.   Are you on 211, line 15?

24    A.   Yes.

25    Q.   Let me read it to you.  I asked the following question:

1   What you're saying is it would have been impossible for page

2   000899 to exist until sometime in December, '04, or January,

3   '05.

4           And you answered:  Correct.  Yeah.

5           Do you see that?

6   A.   Yeah, I said the page.  I don't know why I said that,

7   what about it.  But that's the answer, correct.

8   Q.   You didn't have any hesitation.  You didn't say

9   probably.  You said correct.

10  A.   But I didn't say -- answered to the waterfall.  I

11  answered to the page.

12  Q.   And the page contains the waterfall?

13  A.   I don't know the waterfall was the thing that normally

14  changed.  So --

15  Q.   Yes.  And what you told us in December, 2014 -- and I

16  assume you were doing your best to tell the truth -- was that

17  the waterfall that appears on page 899 did not come into

18  existence until December, '04, or January, '05, four or five

19  months after you obtained the two purported notes from Gruppo

20  Triad, correct?

21  A.   Well, that particular version of the waterfall that

22  existed before, of course, yes.

23  Q.   This particular version --

24  A.   Yes.

25  Q.   -- with the $39 million you said did not come into

1  existence until December, '04, or January, '05, correct?

2  A.   This particular version of the waterfall.

3  Q.   Yes.

4  A.   We had a long discussion in the same deposition about

5  how the waterfall changed consistently.

6  Q.   Now let's take a look at something else.

7       Before we do, since which particular waterfall was in

8  effect at which time actually matters in this case now, you

9  would agree with me based on reviewing D-521 and your

10 deposition testimony from December of 2014, that the $39

11 million version of the waterfall was not in existence in August

12 of 2004 when Skye obtained the two purported notes, correct?

13 A.   I would absolutely disagree with that.

14 Q.   Well, you didn't disagree --

15 A.   This particular version of it.

16 Q.   That's what I'm asking.

17 A.   You are calling it the $39 million waterfall, but there

18 was always a $39 million waterfall.

19 Q.   Well, we'll get into that right now.  But you would

20 agree that page 899 with the $39 million waterfall in it, that

21 didn't exist until December, '04, or January, '05, right?

22 A.   When you took my deposition, I said I didn't think this

23 came in effect until December or January.  I didn't know when

24 specifically, and I said, I don't know exactly when, or why.

25 Q.   Let's look at --

1    A.   I said that.

2    Q.   -- at Defendant's 581 now.

3         THE DEPUTY CLERK:  D-581.

4         MR. SCHWARTZ:  Yes, please.

5    BY MR. SCHWARTZ:

6    Q.   All right.  This is another Bandagro notes purchase

7    agreement between you and Gruppo Triad, right?

8    A.   Yep.  It appears to be.  That's what it says.

9    Q.   Turn to the Bates stamped page 005872.  That's your

10   signature, right?

11   A.   Yes.

12   Q.   Now turn to page 5874, please.

13   A.   I'm sorry?

14   Q.   Please turn to page SKYE0005874.

15   A.   Yes.

16   Q.   Here we have a different waterfall than the $39 million

17   one, right?

18   A.   Yes.

19   Q.   And this waterfall is more favorable to Gruppo Triad,

20   right?

21   A.   Well, I will have to look at it.

22   Q.   Let's go through it line by line.  It's premised on an

23   assumed litigation recovery of $100 million, right?

24   A.   Hold on.

25   Q.   That's the top line.  Let's just take it line by line.

1   That's what payment means, $100 million in recovery, the face

2   amount of two purported notes, right?

3   A.   I don't really see where that is.

4   Q.   Are you on page --

5   A.   I'm missing it.

6   Q.   Well, let's go very slowly.  Are you on SKYE0005874?

7   A.   Two point what?

8   Q.   2.1, right smack in the middle of the page indented,

9   there's a waterfall, right?

10   A.   Well, the -- okay, yeah.  So there's actually two 2.1s

11   here.

12   Q.   Just stick with me.

13   A.   So 2.1A talks about the beginning of the waterfall, so

14   2.1, A, B, C and so on.

15   Q.   One step at a time here, Mr. Richards.  You see the

16   waterfall right in the middle of that paragraph indented?

17   A.   Well, the waterfall starts at the top of the paragraph

18   indented.  The first part of the waterfall is to the fees of

19   CBJ.

20   Q.   Please just stick with me.  There is a table, if you

21   will, in the middle of the paragraph that summarizes the text

22   above.  And you see five lines of numbers, right?  One on top

23   of the other?

24   A.   Yeah.  That's --

25   Q.   All right.

1    A.    -- in C, correct.

2    Q.    All right.  The first one says payment, $100 million,

3    right?

4    A.    Yes.

5    Q.    And that is for purposes of illustrating the operation

6    of the waterfall the presumed litigation recovery, correct?

7    A.    That's what this is, an example of how the waterfall

8    would work.

9    Q.    Exactly.  And then there's a deduct for $20 million of

10   legal fees, right?

11   A.    Yes.

12   Q.    You have to pay the lawyers, right?

13   A.    Yes.

14   Q.    Contingency fee lawyers, correct?

15   A.    Right.

16   Q.    Okay.

17   A.    Whatever that was, right at -- You can see in A, it

18   could be anything between 10 and 30 depending on -- There is a

19   separate agreement here between Crabbe Brown and Gruppo Triad

20   that's referred to that I don't see here.

21   Q.    And then the next deduct is $9,493,333 for you, right?

22   A.    Yep.

23   Q.    And then there's something called less amount deducted

24   by Venezuela $8 million, whatever that means, right?

25   A.    That's the -- I think that may refer to the 8 percent

1  fee that Jacir was due.

2  Q.   I thought as much, but it doesn't matter for purposes of

3  this discussion.  But let's assume that Gruppo Triad's lawyer

4  gets $8 million.  And then the residuum of the $100 million,

5  $62,506,667, or 62.5 percent of this illustrative example, goes

6  to Gruppo Triad, right?

7  A.   That's correct.

8  Q.   Now I'm going to direct your attention -- By the way, so

9  there's no $39 million on this waterfall?  You don't see $39

10  million?

11  A.   Again, this is a different transaction, and there's no

12  $39 million.  It also refers to other agreements.  I don't know

13  if they have a $39 million.  I doubt it, but I don't know

14  because it talks about their agreement with Crabbe Brown.

15  Q.   So now let's take a look at Plaintiff's Exhibit 152,

16  Mr. Richards.  I will have to bring that one to you.

17       THE DEPUTY CLERK:  P-152.

18  BY MR. SCHWARTZ:

19  Q.   So P-152 is a fax from your former partner Jeff Brown at

20  Crabbe Brown to Antonio Usuelli, and you'll see it's dated

21  August 4, 2004, right?

22  A.   Yes.

23  Q.   And August 4, 2004, is just about the time you completed

24  the transaction pursuant to which you obtained the two

25  purported notes from Gruppo Triad, right?

1    A.    By about that same time frame, yes.

2    Q.    And you told Mr. Elliott on direct how important it was

3    to make sure that the escrow agreement was in place so that the

4    proceeds would be distributed the right way if you ever

5    recovered any proceeds, right?

6    A.    Well, the escrow agreement.  I told him the escrow

7    agreement.  This was not one of them.  But, yes, when we had

8    the notes, the most important document was the escrow agreement

9    that would say when the cash came, what would the escrow agent

10   do with the cash.

11   Q.    Let's turn to that question and Bates stamped page

12   LP000955 of this August 4, 2004, document.  Do you have that

13   Bates stamped page LP000955?

14   A.    Yes.

15   Q.    And if you look about two thirds of the way down that

16   page, you'll see there's another numbered explanation of a

17   waterfall indented beyond all the other paragraphs.  Do you see

18   that?

19   A.    Yes.

20   Q.    All right.  And that waterfall says, first, there will

21   be legal fees, this time it says $30 million, a little more

22   than the last one we looked at, right?

23   A.    Yes.

24   Q.    Then it says, the next step in the waterfall, Skye

25   Ventures gets $9,493,333.  Right?

1    A.    Yes.

2    Q.    And then it says, $60,506,667 to Gruppo Triad --

3    A.    Yes.

4    Q.    -- right?  More than 60 percent of the recovery here,

5    right?

6    A.    That's what that document says.  It was not signed, of

7    course.  Never would have been because it was not the deal.

8            THE COURT:  I'm sorry, because it was --

9            THE WITNESS:  It was not the deal.  Crabbe Brown just

10   made a mistake.  I think it was Steve Ayers at the time.

11   BY MR. SCHWARTZ:

12   Q.    And here we have a document from August 4 of 2004 with a

13   waterfall that is substantially the same as the waterfall that

14   we saw in D-581, correct?

15   A.    I think Ayers just copied it.  He essentially made a

16   mistake.

17   Q.    Well, he didn't copy it because he changed the attorney

18   fees from $20 million to $30 million.

19   A.    Well, that's just like an attorney.  I assume he was

20   going for the most that he could get, but that was not the deal

21   at the time.  We never signed --

22   Q.    Then he --

23   A.    -- for sure --

24           THE COURT:  You don't mind if I ask a question?  Why

25   was -- What was wrong with it?  Just the attorneys' fees?

1          THE WITNESS:   No.  We had -- You can see from the

2    agreement that we had that we had modified the entire deal

3    where I was going to get ownership of the notes and complete

4    control of the lawsuit and, you know, I was going to pay the --

5    more money to him.  So that agreement that we looked at before

6    was the agreement.

7          THE COURT:  All right.  Thank you.

8          THE WITNESS:  This doesn't reflect any agreement that

9    we had at the time.

10   BY MR. SCHWARTZ:

11   Q.   On June 23, 2004, you signed an agreement that had that

12   waterfall that gave Gruppo Triad more than 60 percent of the

13   recovery, isn't that right?

14   A.   I signed this agreement, yes, that agreement, a couple

15   months earlier or a month and a half earlier.

16   Q.   Then on August 4, contemporaneously with the acquisition

17   of the two purported notes, your lawyers at Crabbe, Brown &

18   James circulated an escrow agreement with essentially the same

19   waterfall that has 60 percent or more going to Gruppo Triad,

20   correct?

21   A.   They circulated -- They sent a fax over to Gruppo Triad,

22   not to me, request that this was a draft of the escrow

23   agreement.

24   Q.   And then the waterfall with the $39 million deal in it,

25   you've testified at your deposition and confirmed today,

1   couldn't have existed until December, '04, or January, '05?

2   A.   That's not what I testified to.  I testified that I

3   thought that specific waterfall with a $39 million note was

4   made in December of that year.

5   Q.   That's after --

6   A.   But I'm not saying there wasn't a different waterfall

7   similar to that in effect in August of 2004.  There was.

8   Q.   And what happened between August, '04, and December,

9   '04, or January, '05, you gave more money to Pavanelli, right?

10   A.   Well, the reason that it changed at the end is that I

11   had given him more money.

12   Q.   And you gave him more money between August of '04 and

13   December of '04 -- I am sorry, between August, '04, on the one

14   hand, and December, '04, or January, '05, on the other?

15   A.   That's right.

16   Q.   And the waterfall changed between August of '04 and

17   December of '04 or January, '05, correct?

18   A.   It changed in some sense.

19   Q.   And it changed in your favor?

20   A.   Every time I changed it, and I was giving him money, of

21   course, I changed it in my favor.

22   Q.   And the fact of the matter is as of August 11, 2004, the

23   sum total of money that you were out of pocket including

24   $30,000 for paying for the transport of the notes was $330,000,

25   is that right?

1    A.    It sounds about right because I think it was like 450 by

2    the end of the year.

3    Q.    And it went from 330 to 450, or whatever, by the end of

4    the year; and then you modified the waterfall, right?

5    A.    More than once I would guess, but, yes, we did.

6    Q.    You took legal title to the two purported notes sometime

7    in early '04, right?

8    A.    I'm not --

9    Q.    I'm sorry, I will rephrase.  Thank you, Mr. Elliott.

10          You obtained -- You concluded this April 8 agreement

11   sometime in early August, right, of '04?

12   A.    Yes.  The end of the -- Sort of my view was that -- and,

13   again, I'm not the kind -- I was a lawyer, but my view is we

14   had a deal.  The agreement was complete when I received and had

15   possession of the notes.

16   Q.    And that happened on August 18 of 2004, right?

17   A.    Yes.

18   Q.    The agreement, just so we have this straight, says April

19   8, '04, but you didn't sign it until sometime shortly after

20   August 18, '04, right?

21   A.    The agreement says effective April 8.  It doesn't say it

22   was signed April 8.  It says effective April 8.  So in lots of

23   documents we call documents effective at some date other than

24   the actual date of signing.  So in this particular case, it

25   says effective -- the signatures say effective April 8.  The

1  agreement, of course as we have already discussed, the first

2  version of it went to Pavanelli in April of -- April 8.

3    Q.   He couldn't wait to sign it, right?

4    A.   Yes, he signed it.

5    Q.   And then --

6    A.   And he wanted money.

7    Q.   And then four months later, you signed it?

8    A.   Well, you see that in the interim, there were other

9  efforts at a deal, right?  So we signed different things in the

10  interim.

11    Q.   But you signed the one that says effective April 8

12  sometime in early August.  That's not disputed, right?

13    A.   Yes, that's what I think.  In the deposition we went

14  over this ad nauseam, and I said, that's my best estimate.  Now

15  talking about more than ten years later.  But that's what I

16  think happened.

17    Q.   If we went over it ad nauseam, which is your

18  characterization --

19    A.   I'm sorry, that's pejorative.  I apologize.  I remember

20  those two very long days.

21    Q.   Usually when people enter into deals to buy $100 million

22  in promissory notes, they can usually say when it happened,

23  right?

24    A.   Look, you have to understand.  To me these are bearer

25  notes.  The important thing was to have the notes.  When you

1  have the notes, you own them.  Documents surrounding them are

2  almost irrelevant.  And to me, other than the waterfall that

3  the escrow agent committed to, once I had the notes, the rest

4  of it wasn't -- was absolutely not relevant.

5    Q.    You got physical possession of those notes on August 18,

6  2004, right?

7    A.    You know, the date that Brinks delivered them.

8    Q.    By the way, you will probably be on the stand tomorrow.

9  See if you can find another version of the $39 million

10 waterfall different than the one you see here --

11        MR. ELLIOTT:  Objection, Your Honor.

12        THE COURT:  There is a request?

13        MR. ELLIOTT:  Objection, Your Honor.  I'm not sure

14 it's proper to send Mr. Richards off on a homework project

15 today.

16        THE COURT:  Well, I am sure you went through discovery

17 and asked him to produce all these things.

18        MR. SCHWARTZ:  Judge, we don't have it.

19        THE COURT:  He has a duty to supplement.  That's still

20 in effect.  I think we'll leave it there, right.

21        MR. SCHWARTZ:  I was going to offer an invitation to

22 see if he can find one.

23    BY MR. SCHWARTZ:

24    Q.    In the meantime, the moment you got your hands on those

25 bearer notes on August 18, 2004, you knew that you were going

1   to file this suit; is that right?

2     A.   Well, I think we concluded that we were going to have to

3   file a lawsuit before that.

4     Q.   In fact, the agreement effective as of April 8, 2004,

5   compelled you to bring an agreement -- a lawsuit, did it not?

6     A.   It says that I would, yes.

7     Q.   You agreed to do it, effective as of April 8, 2004?

8     A.   Not effective as of -- effective.  I agreed to do it.

9   And as I said, I didn't countersign anything because we weren't

10  ready to go.  When I signed it, we were ready to go.

11    Q.   Retroactively to April 8, right?

12    A.   Look, okay.  It says effective April 8.

13         THE COURT:  We've been through this several times.

14  Let's move on.

15  BY MR. SCHWARTZ:

16    Q.   Five days later, you filed the suit, right?

17    A.   Than what?

18    Q.   After you got your hands on the bonds?

19    A.   Well, you have both dates.  So I'll take it you're

20  correct.

21    Q.   You got them on August 18.  You were here when

22  Mr. Alcalde testified, right?

23    A.   Well, I don't remember that exact time frame, but it's,

24  you know -- okay.  So if you say 18th and it was -- It really

25  doesn't matter.  Right -- So you are right, approximately, for

1    sure.

2    Q.   Five days later approximately you filed a suit?

3    A.   I think we were in a rush to get, you know, get started.

4    We wanted to get moving.

5    Q.   It's not like you were buying these promissory notes to

6    clip coupons, right?

7    A.   No, it was a deal.  Right?  I was buying it certainly to

8    cash the deal at the end, but not to clip coupons.  There were

9    no coupons on the note.

10   Q.   The deal required you to bring the litigation, right?

11   A.   The deal required me to do a number of things.  You

12   know, I said that I would make an effort to get the bonds

13   cashed, whatever I could.  That could be -- That -- Certainly

14   one of the things was to put pressure on Venezuela by bringing

15   a lawsuit.  I could resell the notes to a third party.  We

16   could seek a solution inside the Venezuelan system.  There were

17   lots of things we could do to cash the notes.  But one of those

18   things was to bring a lawsuit, and we committed we would do

19   that.

20   Q.   Let's just look at D-521 quickly to clear this point up.

21   Do you have that one with you?

22   A.   581?  Or 521.

23   Q.   The first of the ones.

24   By the way, it doesn't say, just for the record, it doesn't

25   say effective on.  It says entered into on April 8, 2004?

1    A.    That's the one that I sent.  But the signatures then

2   say, effective August 8, when they were signed, because the

3   original one was April 8 when we sent it to them.

4    Q.    Help me out.  Where does it say that?

5    A.    So if you look at the signature pages, right below both

6   signatures, it says effective date August 8.  It doesn't say

7   signed date.

8    Q.    Just show me the page, please?

9         THE COURT:  It's 897, the last line on it.

10         MR. SCHWARTZ:  Okay.

11   BY MR. SCHWARTZ:

12    Q.    In any event, take a look at -- okay.  Take a look at

13   section 2.3 on Bates stamped page 894.  Do you see 2.3?

14    A.    Yes, I do.  I'm reading it.

15    Q.    And it says, "First Skye will demand payment of the

16   purchased notes."  That had already happened by the time you

17   signed D-521, right?

18    A.    Well, you'll have to help me -- I know there was a

19   demand.  Right?

20    Q.    Even before you had possession, right?

21    A.    Okay.  You're losing me a little bit here, I am sorry.

22    Q.    Alcalde sent his demand letter before the notes were in

23   Columbus, right?

24    A.    Before he had physical possession of the notes.  I

25   recall you questioning him about those dates.

1    Q.   Do you recall his answers?

2    A.   He claimed that we had legal possession of the notes.

3    Q.   I'm not trying to quibble about this.  The notes weren't

4    here, right, when you made the demand?

5    A.   We did not have physical possession of the notes.

6    Q.   Then 2.3 goes on to say, "and bring lawsuit against

7    Venezuela."  Right?

8    A.   Yes.  It says here that -- also that the fees over

9    $30,000 will be paid by Gruppo Triad, and, of course, they

10   weren't.

11        THE COURT:  You said thousand.  You meant million.

12        THE WITNESS:  The fees over $30,000 will be paid by

13   Gruppo Triad.  It says in there, but that didn't turn out to be

14   the case.

15   BY MR. SCHWARTZ:

16   Q.   You didn't read the text of the notes before you brought

17   this suit, right?

18   A.   No.

19   Q.   And as of the time I took your deposition ten years

20   later, you still hadn't read them, right?

21   A.   No.

22   Q.   What the notes said really wasn't important to you,

23   correct?

24   A.   My concern on the notes was:  Were they the same notes

25   that the Attorney General ruled on, and was there custody of

1    those same notes to the day that I got them?  That was my

2    concern.  I saw the notes.  They appeared to be the same notes.

3    I was there when Alcalde received them.  That was it.

4    Q.    And you heard Alcalde testify it wouldn't matter if they

5    were written on a napkin, right?

6    A.    Yes.

7    Q.    You share that assessment?

8    A.    If his position -- or if his legal opinion is right,

9    that the Attorney General's decision is final and binding on

10   instruments she examined, yes, of course, I share that opinion.

11   Q.    You had begun building this case months before you

12   signed the agreement effective as of April 8, 2004, right?

13   A.    I don't know what you're referring to.

14   Q.    You had commenced preparations for litigation months

15   before you signed the agreement effective as of April 8, 2004;

16   isn't that right?

17   A.    So the second that I saw that I could make a deal with

18   Pavanelli, which I knew when I got his return fax, or however I

19   got the agreement at the time, I began preparation for thinking

20   about, preparing for how would I get out of the deal.  What

21   would the other side of the deal be?  One of those ways was

22   litigation.

23          Now part of the preparation for litigation was making

24   sure we had strong legal grounds on the Attorney General

25   position decision.  And we certainly did that, and that was the

1    focus.  If you're talking about something else, I'd like you to

2    know, what you are referring to, how I prepared.  I am not

3    saying I didn't.  But you're talking about events that were a

4    long time ago.

5      Q.   Well, you had already received drafts of lengthy legal

6    memorandum, right?

7      A.   At what time?

8      Q.   Prior to the time you obtained the purported notes?

9      A.   I thought you said long before I returned.  Certainly

10   there were drafts being circulated.  We saw one a draft from

11   July.  So he was drafting a legal memorandum as to the strength

12   of the position for sure.

13     Q.   And that legal memorandum just didn't discuss whether

14   the Attorney General's October, '03, opinion was final and

15   binding, right?

16     A.   That was its focus I believe.  I'm sure there were other

17   things.  I don't recall what they were.

18     Q.   Didn't it also consider jurisdiction, comity and the

19   viability of a lawsuit in the United States?

20          THE COURT:  Aren't we getting into --

21          MR. ELLIOTT:  We are.

22          THE COURT:  That's the -- I think the point you're

23   trying to make, I will tell you, I have to assume it's correct

24   because, as you mentioned, there's a five-day interregnum here.

25   You wouldn't put a complaint like that together typically in

1    five days.  So I'm assuming there was a lot of lead up to this.

2    I don't think that you have to prove it, particularly by

3    invading the attorney/client privilege, but I will leave it to

4    you.  I'm assuming that it's all true.

5        MR. SCHWARTZ:  I want to be very careful not to

6    quarrel with the Court's ruling, but if I may be heard just

7    briefly on this question.

8        THE COURT:  Go ahead.

9        MR. SCHWARTZ:  I was very careful in phrasing

10   questions to mention only what has been expressly disclosed in

11   papers that the --

12       THE COURT:  Do you recall, Mr. Alcalde tried to give

13   you a date.  You used his billing records.  So I think it was

14   in July, if my memory is good.

15       MR. SCHWARTZ:  Yes, early July.

16       THE COURT:  A lot of that document has been redacted

17   because of the attorney/client privilege, but I know I'm going

18   to assume that a document like that would be in anticipation of

19   a lawsuit.  So --

20       MR. SCHWARTZ:  I will move on.

21       THE COURT:  -- if you need to prove any more, be my

22   guest, but that's my conclusion.

23    BY MR. SCHWARTZ:

24    Q.   Let me just cover one related aspect, and then I will

25    move on.

1    You had already lined up your Venezuelan law experts before

2    you obtained the notes, right?

3    A.   Well, I think -- I don't know what this means, lined up

4    our experts.  But we had confirmed our view of the law with

5    several Venezuelan experts.  That's true.

6    Q.   And two of those you spoke to before and several months

7    before you obtained the notes, Badell and Corredor eventually

8    submitted affidavits or opinions on your behalf in this case,

9    right?

10   A.   I didn't speak to Corredor at all ever.  His partner,

11   Enrique Iribarren, we had a meeting with.  So I didn't speak to

12   Corredor, but I did speak to Badell.

13   Q.   And he eventually became an expert that submitted

14   something for you in this case, isn't that right?

15   A.   I'm pretty sure.

16   Q.   Iribarren's colleague, Corredor, submitted some form of

17   an affidavit or opinion in this case on your behalf, correct?

18   A.   Yes.

19   Q.   These are the people you talked to or whose colleagues

20   you talked to in June of 2004, right?

21   A.   Two of the three groups we talked to, yes.

22   Q.   Now you submitted an affidavit in this case in

23   opposition to a forum non conveniens motion in 2012.  Do you

24   remember that?

25   A.   No.

1    Q.   We'll talk about that later.

2         Let's go back to the beginning.  Give me one second.

3         I want to go back to August 1 of 2003.  Prior to that

4    time, Skye didn't exist, right?

5    A.   Well, the exact date that DRFP, LLC, was in effect, I

6    don't have in my head, but that's about the time frame.

7    Q.   And as you told Mr. Elliott, since 2001 approximately

8    your business has been primarily focused on investments

9    involving distressed and high debt companies, correct?

10   A.   I did not say that.

11   Q.   Is that one of the primary focuses?

12   A.   One of the three things that we do is debt deals, some

13   of which are distressed debt.

14   Q.   And you formed special purpose entities for that

15   purpose?

16   A.   Typically, yes.

17   Q.   And Skye is one such special purpose entity?

18   A.   Yes, but in this case it just happened to be already

19   formed, and we just used a blank entity.

20   Q.   But its sole purpose now is to pursue this litigation,

21   right?

22   A.   Yes.

23   Q.   And would it sound right if I told you that you formed

24   Skye in August of 2003?

25   A.   I think I said that's about when I think it was.

1    Q.   Now at the time you formed Skye, you had not yet been

2  approached about the possibility of investing in any Bandagro

3  promissory notes, right?

4    A.   To be clear, it's not Skye that was formed.  It's the

5  entity whose name has been changed to Skye.  That was Del Rio

6  Family Partnership in August of 2003.

7    Q.   Thanks for that clarification.  I meant to include that.

8  If I say Skye at any point, you understand we are talking about

9  --

10    A.   The development of the name of that entity.

11    Q.   Just for a clarification, at the time Skye was formed,

12  you hadn't heard anything about Bandagro?

13    A.   Correct.

14    Q.   And you never heard of Gruppo Triad, right?

15    A.   No.

16    Q.   You never heard of Pavanelli?

17    A.   Of course.

18    Q.   Well, you might have.  But you never -- didn't hear of

19  him, right?

20    A.   Didn't know anything about this.

21    Q.   You didn't know anything about Usuelli or Schianchi or

22  Delgado, right?

23    A.   Same answer, didn't know anything about this.

24    Q.   And you didn't know much, if anything, about Venezuela

25  either, right?

1    A.   That's right.

2    Q.   And you had never --

3    A.   I did know that they were sort of the largest oil --

4    they had the largest oil reserves in the world, and I had

5    learned that -- and, incidentally, that was surprising because

6    you would have assumed it would be some Arab nation.  I knew

7    that.  But I didn't know anything about their political

8    situation.

9    Q.   Or their legal situation?

10   A.   Or their legal situation.

11   Q.   Or their administrative law regime?

12   A.   No reason for me to.

13   Q.   You had never done any type of sovereign debt deal?

14   A.   This was our first sovereign debt deal.

15   Q.   You testified that your business does a lot of odd

16   things, right?

17   A.   I deal in eclectic, I would call them eclectic, deals.

18   Q.   When you first heard about this one, it sounded odd to

19   you, right?

20   A.   Well, I recall hearing about this from this guy standing

21   on my doorstep who really wanted money.  He wanted a loan,

22   wanted $5,000.  And his explanation of it was certainly odd.

23   It wasn't cogent.  It was weird.  But he was saying ten to one.

24   Q.   And that was enticing?

25   A.   Well, a ten-to-one return is enticing.  Isn't it?

1   Q.   Let's fast forward one year from August, '03, to August

2   23, 2004.  As of that date, you had obtained $1 million of

3   supposed promissory notes you had never heard of a year

4   earlier, right?

5   A.   That's right.

6   Q.   And that debt originated in a country, allegedly, that

7   you also knew virtually nothing about?

8   A.   Didn't know anything about it a year earlier, yes.

9   Q.   And you bought those supposed notes from a fellow from

10  Italy you didn't know a year earlier, right?

11  A.   That's right.

12  Q.   And you brought a lawsuit against a foreign government

13  in federal court in the United States, right?

14  A.   Incidentally, if you looked at my panoply of deals over

15  the last 30 years, you would be hard pressed to find where I

16  knew of the opportunity of the people here a year earlier.  So

17  that's exactly the same as -- So I don't know what point you

18  are trying to make there.

19  Q.   And when you brought the lawsuit in this court, you did

20  so under an agreement that obligated you to pay the majority of

21  any proceeds to a Panamanian company if you succeeded?

22  A.   No, I told you that's not true.

23  Q.   On November 12 of 2002, you filed a bankruptcy petition,

24  a personal bankruptcy petition for bankruptcy, in the Southern

25  District of Ohio?

1    A.    I did.

2    Q.    And that personal bankruptcy proceeding is still

3  ongoing --

4              MR. ELLIOTT:  Your Honor --

5              THE COURT:  This is a rather sensitive area to get

6  into with an individual witness who is not here as an

7  individual.  Educate me.  Where are we going with this.

8              MR. SCHWARTZ:  Well, the personal financial

9  circumstances that Mr. Richards was experiencing at the time he

10  first began investing and the manner in which he first began

11  investing are the beginnings of the irregularities of the

12  transactions here which get progressively more irregular and

13  are probative of the triable facts in the case.

14              THE COURT:  Well --

15              MR. SCHWARTZ:  And I don't mean to dwell on this.

16              THE COURT:  It's clear that the witness and his

17  investors are trying to make money at a fairly high rate of

18  return.  Beyond that, what would this add?

19              MR. SCHWARTZ:  I'll move on, Your Honor.

20              THE COURT:  All right.

21              MR. SCHWARTZ:  I just want to -- We did get an answer

22  to the last question?

23              THE COURT REPORTER:  The question wasn't completed.

24              MR. SCHWARTZ:  I don't know exactly where we were in

25  the process.

1   Can I get the last question and answer read back?

2   (The court reporter read back the question.)

3   MR. SCHWARTZ:  I will withdraw the question, Your

4   Honor.

5   THE COURT:  Thank you.

6   BY MR. SCHWARTZ:

7   Q.   So you first learned about the opportunity to invest in

8   the purported Bandagro notes when Larry Corna walked into your

9   life, right?

10   A.   Well, I wouldn't say Corna walked into my life.  He

11   appeared on my doorstep.  I saw him at the request of his

12   brother, who was a good friend and business associate.  And I

13   for a very short period of time, I heard a rambling or

14   disassociated story about the notes.

15   Q.   From Larry?

16   A.   From Larry.

17   Q.   And just to recap how this developed, Larry's brother

18   David, whom you knew, called you up and asked you if you would

19   spend a few minutes talking to Larry, right?

20   A.   Yes.  I had a relationship with David at the time.

21   Again, David had taken a company of mine public.  And I

22   invested regularly with David.  He had made me an awful lot of

23   money, made my family an awful lot of money.  And so he asked

24   me to see his brother, and I said okay.

25   Q.   And you had no idea what was on his brother's mind,

1   right?

2   A.   He wanted to talk to me about something.

3   Q.   And within an hour, Larry Corna showed up on your

4   doorstep?

5   A.   Pretty quick.

6   Q.   And he started talking about some bond deal you should

7   be interested in, right?

8   A.   Yes.

9   Q.   And you told him you weren't going to have such a

10  conversation on the doorstep of your house?

11  A.   I said, Larry, what's this about?  You're on my

12  doorstep.  And the deal was he wanted -- You know, I don't

13  remember the exact words, but I gleaned that he was there

14  trying to get some $5,000 from me.

15  Q.   And before long, you learned that Larry Corna was Gruppo

16  Triad's mandated United States agent, correct?

17  A.   I don't know what that means.  But he was acting on

18  behalf -- I learned later on that -- So the substance of what I

19  learned we already discussed that day.  There were intervening

20  events where he talked to other people.  And then at some point

21  I learned that he was trying to raise money for Gruppo Triad on

22  these notes.

23  Q.   You didn't know that when he came to you looking for the

24  $5,000, right?

25  A.   I don't remember if he said -- I don't remember, one way

1  or the other.  I don't remember if he said Gruppo Triad.  It

2  wouldn't have meant anything to me one way or the other.  So

3  the gist I got, here's David's brother.  He would like to

4  borrow some money from me.  I loaned it to him.

5  Q.  I'm going to tread carefully, but despite being in

6  personal bankruptcy, you just gave the guy $5,000?

7  A.  We had four businesses going at the time.  I had six

8  deals going.  My business never stopped.  I did have to forfeit

9  my personal assets in a bankruptcy.  And -- but as I told you

10 in the deposition, my family had and always has had plenty of

11 assets.  At the same point, the day you filed bankruptcy, it's

12 a fresh start.  So any business you create after that is fine.

13 I had -- my wife had a business that existed before that.  We

14 had no money problems at all.

15        So yes, I gave the guy $5,000.  I have done it

16 before.  I have done it since.  Something similar to that.  I

17 have started deals like that before.

18 Q.  And Larry said, in substance, he would give you some

19 interest in this bond deal and later pay you back, right?

20 A.  I said, look.  I don't know anything about this.  Pay me

21 back.  I might talk to you about that.  I would like to know a

22 little bit more about the deal, but I want you to pay me back

23 the five grand.  This is not an investment.

24 Q.  And the five grand that you gave Larry Corna when he

25 showed up on your doorstep less than an hour's notice

1   eventually got rolled in and applied to your purchase price

2   under the agreement effective as of April 8, 2004, with Gruppo

3   Triad, right?

4     A.    Yes.  We rolled that into one of the deeds of trust.

5   The first deed of trust I got I had asked Gruppo that, listen.

6   I gave this money to Larry.  Can we put it in the deal?

7     They said, yes.  No big deal.

8     Q.    Before you gave this money to Larry Corna, you didn't

9   ask his brother, David, what this deal was about?

10    A.    I didn't.

11    Q.    Now about a week or two later, Larry Corna was back, if

12   not on your doorstep, talking to you, right?

13    A.    I don't -- The next thing I remember doing was talking

14   to Marvin Kantor.  I don't remember talking to Larry again

15   directly.

16    Q.    Well, take a look at your deposition transcript,

17   personal deposition, page 64 on line 11.  I'm not going to need

18   to read this to you.  It's not an exercise in surgical

19   precision.  But you can read lines 11 through 14.  Do you see

20   you testified at your deposition that Larry, a week or two

21   later that you had a call with him about the deal?

22    A.    Let me try to see where this is, a week or two later

23   than what?  Put it in context.

24    Q.    Take your time, please.

25    A.    Okay.  See, I gave him the $5,000.  We talked about all

1    the Cornas in town I know and including Richie, the member of

2    -- a fellow member of your field, Mark -- yeah, okay.  I see it

3    here.  And then maybe a week or so I had a phone conversation

4    with him about the deal and started -- and he started telling

5    the story about the Bandagro bond.  So I said that then.  I

6    absolutely have no recollection of that as we sit here.

7    Q.   A year or so ago you remembered that, but that doesn't

8    ring a bell now?

9    A.   I am not saying I didn't say that.  I'm not saying it

10   didn't happen.  I'm just saying -- it was 13 years or 14 years

11   ago.  I don't remember.

12   Q.   In any event, he asked for another $5,000, and you gave

13   it to him, right?

14   A.   I said that, yes.  I think I -- I would have -- Did I

15   hedge that?  Did I say I think I did it?  You tell me.  I don't

16   remember -- you know, I don't remember giving him an extra

17   five.  But if I said it, I said it.

18          MR. ELLIOTT:  On line 19 of page 64.

19          MR. SCHWARTZ:  Mr. Elliott, feel free to help him.

20          MR. ELLIOTT:  Your Honor --

21          THE WITNESS:  He might have even asked me to give him

22   another five.  That's what I said.  He might.  Again, I don't

23   know that he did or not.

24   BY MR. SCHWARTZ:

25   Q.   I am going to show you some documents that will probably

1  help you.  Let's look at Defendant's Exhibit 924.

2          MR. SCHWARTZ:  Just one moment, please, Your Honor.

3    BY MR. SCHWARTZ:

4    Q.   Mr. Richards, is it possible also, if you're

5  comfortable, to look at the screen immediately in front of you?

6  It is not required but while we are having a little difficulty

7  finding a hard copy.

8    A.   I really prefer to have a hard copy.  But if it's

9  absolutely necessary --

10   Q.   No, it's not.

11   A.   Let me try to read this while you are doing that.  If I

12 can get through this and see it.

13         MR. ELLIOTT:  Unfortunately, I think he has got to

14 have the entire document because there are important pages of

15 this document that aren't up on the screen.

16         MR. SCHWARTZ:  That's no problem.

17         THE COURT:  We will get it up.

18         MR. SCHWARTZ:  The problem is finding a physical copy

19 of the document.  I am sorry for the delay.

20         Problem solved.

21         THE COURT:  Excellent.

22   BY MR. SCHWARTZ:

23   Q.   Take a moment, Mr. Richards, and look at D-924, and I'm

24 going to ask you a few questions about it.

25   My initial question is whether this is the first

1   transactional document entered into with Mr. Corna and the

2   first agreement in a series of agreements that led to your

3   eventually obtaining the two purported notes from Gruppo Triad.

4          MR. ELLIOTT:  Your Honor, I am not trying to drag this

5   out.  I'm really not.  But I think the witness is trying to

6   read the document, and the question is being stated while he is

7   reading the document.

8          THE COURT:  Just give him a moment.  When he's ready,

9   he'll let us know.

10         Just let us know when you're ready, Mr. Richards.

11         THE WITNESS:  I'm sorry, what was the question?

12   BY MR. SCHWARTZ:

13   Q.   I want to make sure you have had a chance to read

14   through the document in light of Mr. Elliott's concerns.

15   A.   I have just read through it.

16   Q.   So this is the first transactional agreement in a series

17   of transactional agreements that eventually lead to the April

18   8, 2004, agreement that -- pursuant to what you obtained, the

19   two purported notes, right?

20   A.   I wouldn't connect -- I mean this agreement -- First

21   off, let me say this.  I don't -- I have no recollection of

22   this until you showed me this document.  Reading the document,

23   I remember now the situation where Larry gave me -- he was

24   going -- gave me a payback check that was dated 30 days later

25   or something like that, or 60 days later, I forget.  So this

1    was going to be a loan that he repaid.  And, actually, I think

2    he actually may have even given me a check.  And so, yeah, I

3    remember that part of it.

4         And then it doesn't really say when we did this.

5    Q.   Let me try to help you out.  First of all, the

6    transaction that is contemplated -- and, by the way, your wife

7    is the lender.  We'll talk about that in a moment.  But let's

8    just -- for a moment we'll call this the Richards.  The

9    Richards are giving $15,000 to Corna, right?  Some of which may

10   have already been given by the time this document is signed,

11   right?

12   A.   It says is providing, not has provided, yes.  So

13   agreeing to provide $15,000.

14   Q.   And Corna was going to go get some quantity of bonds,

15   right, using the $15,000 as on a margin loan?

16   A.   Yeah, something like that.

17   Q.   And then if he was successful in doing that, then -- and

18   the bonds got -- there was a liquidity event, to use your

19   terminology, the Richards would end up with 75 percent, and

20   Corna would get 25 percent, right?

21   A.   What he was going to do was deposit some securities at

22   Credit Suisse First Boston and then get a margin loan on the

23   securities.  I don't know what they were.  It might say it in

24   here, but I don't see it.  And then pay me back within 30 days.

25        And that he -- it also says that he had some interest

1    in the bonds, or that he was going to use the money to get the

2    interest in the bonds, and we were going to split the money

3    75/25.

4     Q.    So you were going to give him $15,000.  He was going to

5    somehow get an option to purchase $600,000 in unspecified

6    Venezuela bonds.  He was going to pay you back then for your

7    having enabled him to somehow obtain the options.  If the bonds

8    were ever purchased, he was going to give you back -- He was

9    going to give you $450,000?

10    A.    I said that he was going to go -- One of the things he

11   was going to do was go get an option to get a part of some

12   bonds.  It doesn't say specifically what bonds these were, but

13   it says Venezuela bonds.  And so, yeah, that's what it says.

14    Q.    And Corna never paid you back the $15,000, right?

15    A.    I think we rolled that into the deal, right.

16    Q.    You rolled that into the deal with Gruppo Triad in

17   August, 2004, right?

18    A.    It was pretty shortly thereafter.  I think, frankly,

19   Larry didn't have the wherewithal to pay me back.

20    Q.    And why is it that your wife is the lender here instead

21   of you?

22    A.    I don't know.

23    Q.    And if you look at the signatures on this document, it

24   looks like it has got your wife's signature on the first page

25   and your wife's signature on the second page, but the

1  signatures don't look the same?

2   A.   I think the one on the first page is hers, I asked her

3  to sign it, and it looks like I might have signed for her on

4  the back on the other page.  And I don't even know if they were

5  at the same time.  It says cancelled there, right?  I don't

6  know when that occurred either.

7   Q.   That looks like your signature also there for Gloria

8  under cancelled, right?

9   A.   Yeah, I think so.

10   Q.   Does your wife know anything about this deal?

11   A.   No, I doubt it.

12       MR. ELLIOTT:  Objection, Your Honor.

13       THE COURT:  If this were the deal at issue, I would

14  let you go on.  But where does that take us?

15       MR. SCHWARTZ:  I will withdraw the question.  It is a

16  precursor to the deal, but I will withdraw the question.

17   BY MR. SCHWARTZ:

18   Q.   All right.  By the time -- At the time of this -- Well,

19  let me do this a little differently.

20       Take a look at the lower left-hand corner of the first

21  page of D-924.

22   A.   Yes.

23   Q.   And you see a footer there.  It says, "Behal/revisions/

24  10-13-2003"?

25   A.   Yes.

1    Q.   You have already mentioned, I think, that this

2  transaction was supposed to happen by October 31, 2003, right?

3  It says that at the end the first page.

4    A.   Yeah, I don't -- The transaction, I think the bond

5  thing.  But I don't know if he was supposed to pay me back

6  before then or not.

7    Q.   In any event, by the time you or your wife entered into

8  this transaction with Larry Corna, you had never seen a

9  Bandagro promissory note, right?

10   A.   I don't think so.

11   Q.   And certainly there would have been no opinion from the

12  Venezuelan Attorney General, right?

13   A.   That's right, that I'm aware.

14   Q.   At least as of the August 21 date here as of Corna's

15  signature, right?

16   A.   Yeah.  So it might have been -- that might have been the

17  day that he was there.  Again, I would not -- You said for the

18  Bandagro, and this was the loan to Larry Corna.

19   Q.   But it eventually, as we have heard, became part of your

20  Bandagro deal, right?

21   A.   It's hard to get my money back when Larry couldn't pay

22  me.  So Pavanelli agreed.

23   Q.   Okay.  Let's move forward.  So after you talked to Larry

24  Corna, you ended up talking to Marvin Kantor, right?

25   A.   Yes.

1    Q.   And he steered you in the direction of Antonio Usuelli,

2    right?

3    A.   I don't know if he steered me, but he told me the story

4    of how he heard about the deal and who Antonio was.

5    Q.   And Marvin Kantor, he never contributed any money to

6    Gruppo Triad, right?

7    A.   I don't know.

8    Q.   And he never contributed any money to Skye Ventures for

9    this particular --

10   A.   He was not involved in this deal at all, no.

11   Q.   Now Mr. Kantor did tell you about Antonio Usuelli,

12   though, right?

13   A.   Yes.

14   Q.   And Usuelli sounded like an impressive guy to you,

15   right?

16   A.   He did.

17   Q.   And you learned that he was fluent in English, right?

18   A.   Yes.

19   Q.   And something about this deal piqued your curiosity, and

20   you wanted to talk to him, right?

21   A.   Yeah.  Like we said before, ten to one on a bond deal,

22   sounds pretty good.  Let's look into it.

23   Q.   Before long, you and Mr. Usuelli became fast friends?

24   A.   I don't know what you mean by that, but Antonio and I

25   had -- I enjoyed my conversation with him in September, about a

1  half an hour I think.  And then I became more familiar with him

2  over time, and he's now a friend and an investor in my deals.

3  Q.  The only reason that I used that term is the way you

4  characterized the relationship in your deposition, but I think

5  we're okay.

6  A.  I thought you were trying to pull one over on me there.

7  Q.  That will happen later.

8  A.  I know.  That's why I'm on guard.

9  Q.  Now do you remember that during your deposition, you

10  gave us Mr. Usuelli's address, and you testified that you'd

11  mailed him a Christmas card in -- at the end of 2014?

12  A.  I remember that I said I mailed him a Christmas card, I

13  think.  But I also -- you asked me for his address and I looked

14  at his -- and I don't know if I sent him a Christmas card in

15  2014.  I don't know that I did a date.  I might have.  So to be

16  clear.

17         But I had an address.  I said I think I have an

18  address for him.  And over my lawyer's grimacing, I clicked on

19  my phone, which you had asked me to turn it off.  We had agreed

20  to turn it off because it was ringing during the deposition.

21  And I read from my phone the address that I had on my phone for

22  Antonio, and that's what happened.

23  Q.  Have you since been communicating with him in

24  Switzerland?

25  A.  I have talked to him for sure, yes.

1    Q.   As far as you are aware, that's where he's living?

2    A.   Yes.

3    Q.   Are you aware that there was a letter of request in this

4    case issued to take his deposition in Switzerland?

5    A.   He never mentioned it to me.

6    Q.   Did he ever mention to you that his application for a

7    Swiss residence permit was denied in May of 2004?

8         MR. ELLIOTT:  I'm going to object, Your Honor, lack of

9    foundation for.

10        THE WITNESS:  I have no idea of anything about that.

11        THE COURT:  That's the answer so I will move forward.

12   BY MR. SCHWARTZ:

13   Q.   It was Usuelli who first explained to you the role of

14   James Paolo Pavanelli in Gruppo Triad in connection with the

15   purported Bandagro notes, right?

16   A.   I don't know that's true or not.  We had talked

17   generally about the deal.  I don't know if Pavanelli's name

18   came up.  And I'm talking about this is the September

19   conversation.  I do know that he said there was some decision

20   coming, should be hopefully soon.  It was -- I think I recall

21   it was a Court decision of some kind.  So that was it.  I mean

22   it was a Court decision.  I didn't know that it would be coming

23   in a month.  Days or months or years, I had no idea.

24   Q.   Take a look at your deposition, pages 102 to line 17.

25   This is not a controversial point.

1    THE COURT:  What was the reference again?

2    MR. SCHWARTZ:  102, lines 9 through 17.

3    THE COURT:  Thank you.

4    THE WITNESS:  Which is the David J. Richards --

5  BY MR. SCHWARTZ:

6  Q.   Pending further notice, we will stick with your personal

7  deposition.

8  A.   Okay.  Page 102.

9  Q.   Lines 9 through 17.  Again, this is just background, but

10 at least I understood your testimony to be, that it was Usuelli

11 who gave you the first information about this deal that

12 registered with you.  Is that a fair interpretation?

13 A.   I think I'm saying here it's possible.  Where, I am

14 sorry --

15 Q.   Lines 14 through 17.

16 A.   I'm saying there was a guy who was in charge of, the CFO

17 of Gruppo.

18 Q.   Go back a page to 101, lines 6 through 17.

19     And having reviewed that, just let me know if you will

20 confirm that your initial introduction to the substance of the

21 matter, if you will, came from your interactions with Usuelli?

22 A.   Yeah, I say now, right, he told me about Pavanelli.  But

23 I said this guy was trying to collect the notes for a long

24 time.

25 Q.   And he was suggesting to you in your early interactions

1    that you invest more money in the Bandagro notes, right?

2      A.    I don't think -- I don't recall him doing that.

3      Q.    After your initial interaction with Usuelli, you didn't

4    do anything else with Gruppo Triad for some period of time,

5    right?

6      A.    Well, I left it with them that there is this supposed

7    ruling coming out of some kind.  Whether -- I don't exactly

8    recall whether they specifically said an administrative or

9    Court ruling, but he said it was a ruling for sure.  So I said

10   to him, if that happens, give me a buzz.

11     Q.    And some time --

12     A.    I had my Larry Corna check handy so I was going to get

13   my money back.

14     Q.    Whether it was from Corna or Usuelli, that was your

15   source of your hearing of the Attorney General's opinion,

16   right?

17     A.    Again, this was a generic kind of thing, right?  So it

18   wasn't -- didn't refer to the Attorney General, I don't think.

19     Q.    At the same time approximately, you learned that

20   Venezuela's Ministry of Finance had issued a public statement

21   about Bandagro bonds, right?

22     A.    In September of 2003.

23     Q.    In October of 2003.

24     A.    I thought we were talking about my conversation with

25   Usuelli in September of '03.

1   Q.   Let's just take a half step back.

2        You talked to Usuelli in September of 2003.  Sometime

3   in October, 2003, whether it was Larry Corna or Antonio

4   Usuelli, somebody told you there was an Attorney General

5   opinion?

6   A.   That the ruling had come, yes.

7   Q.   And soon thereafter, you learned that the Venezuela's

8   Ministry of Finance had issued a public statement about

9   Bandagro bonds, right?

10  A.   I don't remember that.

11  Q.   Let's take a look at D-414.

12       THE DEPUTY CLERK:  D-414.

13  BY MR. SCHWARTZ:

14  Q.   I'm also going to show you D-418, which we can look at

15  in conjunction with 414.

16  A.   Okay.  So I think you asked Mr. Alcalde about this, and

17  I think he said he got it in February of '04.  If I recall

18  correctly, I have no recollection of seeing this.  About this

19  time frame I know that we saw an article that Kennedy forwarded

20  to the Minister of Finance.  I'm getting handed this thing so

21  --

22  Q.   Let's look at D-418.  I think that would be an easier

23  way for you to get into the subject.  Do you have that in front

24  of you?

25  A.   Do I have -- Yes, I have the notice and the e-mail from

1   Kennedy to the Ministry of Finance.

2    Q.   Set the notice aside for a second.  Let's look at D-418,

3   an e-mail from John Kennedy to somebody in Venezuela and the

4   Ministry of Finance with CC to you at -- drichards@netwalk.com,

5   right?

6    A.   Yes.

7    Q.   And that was an e-mail address that you were using in

8   the fall of 2003, correct?

9    A.   One of them, yes.

10   Q.   And you received a copy of this e-mail from Mr. Kennedy,

11  right?

12   A.   I'm on the list for sure.

13   Q.   And you have no reason to doubt that you received this,

14  right?

15   A.   I have no reason to doubt it.  We had talked about this.

16  So I'm pretty sure.  So --

17   Q.   And Kennedy wrote this e-mail to the Ministry of Finance

18  and he said, "Our law firm in the United States has been

19  retained to do due diligence on the Ministry of Finance's

20  recent public announcement (Friday, October 31, 2003) regarding

21  the legitimacy of certain bonds."

22       Do you see that?

23   A.   He goes on -- Yes, but that's not all he says, right?

24  He says, "I am reprinting" -- what I think he's referring to

25  there -- "what has been represented to us about this

1  announcement in articles on the subject from the local

2  newspapers.  Would you be kind enough to verify the truth of

3  these articles?"

4         So my recollection here he was -- these articles were

5  saying something about the bonds were going to be paid, and

6  John was trying to make sure that -- or get the reaction about

7  the articles.  That's what I thought this was about.

8  Q.    And in contrast, the Ministry of Finance had made a

9  recent public announcement to the contrary, right?

10  A.    Well, we have this other thing that is not attached to

11  this, right?  So this, I think, is -- he attaches the article,

12  and I think that's what he was referring to, I believe.  But

13  again, I'm not John Kennedy.  I just got this.

14  Q.    And Mr. Kennedy was acting on your behalf, was he not,

15  when he sent this e-mail to the Venezuelan Ministry of Finance?

16  A.    He was acting.  You know, we were looking at -- We were

17  looking at the transaction, the bonds.  So --

18  Q.    Now bearing in mind that the Ministry of Finance's

19  October 31, 2003, notice, which is included within Exhibit 414,

20  was published in Spanish, not surprisingly, did you discuss

21  with Mr. Kennedy the content of that notice at or about the

22  time he sent this e-mail on October 31 -- I am sorry, November

23  3, 2003, to the Ministry of Finance?

24  A.    No.

25  Q.    Did you ask him about it?

1    A.   I don't remember.

2    Q.   And I see here he copied Larry Corna.

3    A.   Yes.

4    Q.   And were you still working with Larry Corna in November,

5    2003?  In connection --

6    A.   I was never ever working with Larry Corna.  Larry Corna

7    was -- you know, he was trying to raise money for Pavanelli.

8    And he was hanging around then.  So John may have copied him.

9    I don't know the reason that John copied him on that.

10   Q.   Now at some point after Mr. Kennedy sent this e-mail,

11   you spoke directly to Pavanelli for the first time, right?

12   A.   I don't know it was right before or right after.  It

13   was, you know, probably about then.

14   Q.   And you -- By the time you talked to Pavanelli, you had

15   heard that the Attorney General had issued her October 3, 2003,

16   opinion, right?

17   A.   I think I both heard and received it.

18   Q.   And one of the reasons why you wanted to talk to

19   Pavanelli was to see if you might be getting paid back the

20   $15,000 you had given to Corna, right?

21   A.   I don't know.  Maybe.  I was more -- At that point we

22   were more interested in looking at a possible deal.  But, you

23   know, I might have been trying to get my 15.  I don't know if I

24   ever gave Larry, incidentally.  You think I gave him ten.  But

25   I could have given him 15.  But -- So I would say no.  We were

1   talking to Pavanelli or I was talking to Pavanelli, perhaps we,

2   to find out more about the Attorney General decision.

3     Q.   And instead of Pavanelli telling how you were going to

4   get your 10,000 or 15,000 back, he told you he wanted more

5   money, right?

6     A.   Again, I wouldn't say instead of, like I was thinking I

7   would somehow be getting money back from the guy, and he was

8   asking me for more.  That's a mischaracterization of what

9   happened, I would think.  But he did -- whether the very first

10  time I talked to him or shortly thereafter asked for money.

11    Q.   Now let's take a look at your deposition at page 103.

12    A.   Okay.  Are we done with those two?  Can I set these

13  aside?

14    Q.   Yes.

15    A.   Go ahead.  What page.

16    Q.   Look at page 103, lines 10 to 21.  Again, we don't need

17  to go through the chapter and verse.  See if that refreshes

18  your recollection of this initial conversation with Pavanelli

19  and the direction in which it headed.

20    A.   What -- I don't see this -- I must be looking at the

21  wrong lines.  I have been looking for Pavanelli.  Wait.  Here

22  it is.  I might have even talked to Pavanelli then for the

23  first time.  Is that what you are referring to?

24    Q.   And then if you look over on page 104, lines 6 through

25  12, that might refresh your recollection.

1    A.   Right above there I say, well, you know, I might get

2   some money out of this thing, right?  If there's a final

3   decision.  I'm sure I said that.

4    Q.   And it turned out Pavanelli wanted more money from you.

5   We don't have to go through this in maniacal detail here.

6    A.   I think I have said what I remember about it.

7    Q.   Sometime around November 12, 2003, you gave Pavanelli

8   $50,000, right?

9    A.   I remember for sure mid November that I made my first

10   significant investment in the deal.

11    Q.   And that $50,000 that you gave to Pavanelli on or about

12   November 12, 2003, also ended up counting as part of your

13   purchase price for notes 7/12 and 8/12 the following year,

14   right?

15    A.   Everything I gave him before then did.  So that was true

16   of all the money I gave him we rolled into the purchase.

17    Q.   Everything you gave Corna and everything that you gave

18   Pavanelli prior to August of 2004 ended up rolling into that

19   deal, right?

20    A.   I would say it wasn't everything I gave Corna,

21   everything I gave Pavanelli.  As we said, there was $10,000 or

22   $5,000 that I rolled into the deal as you know, and I cancelled

23   Larry's obligation.  And then after that, everything I gave him

24   ultimately got rolled into the purchase of the note, yes.

25    Q.   At the time you gave Pavanelli that $50,000 in mid

1  November of 2003, the Ministry of Finance had not responded, as

2  far as you were aware, to Mr. Kennedy's November 3, 2003,

3  e-mail, right?

4  A.  That's right.

5  Q.  You had not received any legal opinion from anyone about

6  the Attorney General's October 3, 2003, opinion, right?

7  A.  That's not true.  So I think I just discussed this on

8  direct that I had this discussion with Alcalde where he had

9  looked at it.  He had talked about the word "vinculante," and

10  he had said final decision for mandatory compliance.  I

11  remember that.  And I had also talked to Schianchi and Usuelli.

12  They said it was final and binding.  It couldn't be changed.

13      And so while we hadn't reached the level of certainty

14  that we reached a few months later, that it was final and

15  binding, that was the indication that I was getting.

16  Q.  In exchange for the $50,000, it was your understanding

17  you would get one of these deeds of trust?

18  A.  Yes.  Schianchi was going to issue me this lien or

19  Notorial Deed of Trust that as a Swiss Notary that he was

20  empowered to issue and file.

21  Q.  And these deeds of trust weren't in English, right?

22  A.  Gee.  Well, Schianchi didn't speak English.  So given

23  that if he did them, they weren't in English.  But -- and they

24  were these multi-page documents in a blue binder with seals, so

25  they looked very official.  But I don't think -- I know part of

1   it was in Italian.  I don't know if there was an English

2   version or not.

3      Q.   You don't know exactly what was said, right?

4      A.   No.  I went through this with Antonio and Schianchi,

5   this is how you do it.  I asked Antonio, was this the same

6   thing that he received?

7            And he said, yes.

8            So I thought it was safe.

9      Q.   You never knew exactly what protections you would have

10  under these deeds of trust, though, right?

11     A.   I assumed I had protection, sufficient protection.

12     Q.   Whatever you learned about them came from Schianchi

13  interpreted by Usuelli, right?

14     A.   Yes.

15     Q.   And it was your understanding that your $50,000 deed of

16  trust encumbered all of the many purported notes held by Gruppo

17  Triad, right?

18     A.   I am not sure if that's true or not.  It might have been

19  a specific note.  But it could have been.  Right?

20     Q.   Take a look -- Now turn to the other deposition, Skye

21  30(b)(6) deposition page 60 on lines 3 through 5, the second of

22  those depositions, lines 3 through 5?

23     A.   I am sorry, page 60, what?

24     Q.   Lines 3 through 5.  There's just an answer, quote:  I

25  said that was my best memory, that I believe my deeds of trust

1  encumbered all the notes, end quote.

2  　A.　Well, there is a colloquy before that where we talk

3  about kind of specific notes.  And I say, well, you know, my

4  sense is that's what I recall.  And that -- there were others

5  that didn't -- There were notes that weren't covered by deeds

6  of trust.  So I think that was a distinction.

7  　Q.　As you sit here today, what's your best recollection of

8  which notes were encumbered by your deed of trust?

9  　A.　Well, these things disappeared in 2004.  So I don't

10  remember.  I mean --

11  　Q.　Disappeared in the sense they were rolled into the

12  purchase price, right?

13  　A.　Yes, and they were of no longer any relevance.  So I

14  just don't remember.

15  　Q.　By December of 2003, you decided to try to bring some

16  more people into this deal, right?

17  　A.　Well, there's a process by which other people would

18  become involved in the deal.  So early on I think John Kennedy

19  and Dave Hughes were involved on the investment side.  Later

20  than that, there were others.  So I don't know exactly when

21  that was, but as we needed -- as we decided to invest more,

22  others participated.

23  　Q.　Let's take a look at D-447.

24  　　　THE DEPUTY CLERK:  D-447.

25  　　　THE WITNESS:  Okay.  I have D-447.

1    BY MR. SCHWARTZ:

2    Q.   Not the easiest document to read.

3    A.   No, it's not.

4    Q.   This is an e-mail that you sent on December 1, 2003, to

5    Larry Corna, right?

6    A.   It appears to be that, yes.

7    Q.   And if you look at the subject line, it appears that you

8    were inquiring of Mr. Corna whether what you had set forth in

9    the text of this e-mail was sufficiently accurate to send to a

10   few buddies, right?

11   A.   Honestly, I'm having -- Maybe if I could read it on the

12   screen?

13   Q.   We should be able to --

14   A.   I cannot read it.

15   Q.   We should be able to enlarge it.

16        And it says, in the subject line -- Is that easier for

17   you to see, Mr. Richards?

18   A.   Yes.  Where you're in yellow, "Larry, read carefully.

19   Is this correct?  I'm going to send to a few buddies."

20   Q.   So this reflects one of your initial efforts to put

21   together information for your investment group, right?

22   A.   Yeah.  I don't know if I ever followed through on this

23   or not, but I'm asking Larry for a read.  This is when Larry

24   had these offices over on McKitrick Road.  And so, yeah, I see

25   that I asked him and he -- I have his address in here blank

1  because I knew he had an office there for some reason.  And he

2  fills in the number of the office where it says XXX.  So it

3  looks like he responded to me by sending a fax back to me with

4  a -- with some information on it.

5  Q.   And --

6  A.   Again, I don't know if I ever did anything with this or

7  followed through on it.

8  Q.   Recognizing -- I'm sorry, recognizing that the

9  information contained here in here is in the nature of a draft

10  communication, does the content of Defendant's 447 reflect the

11  state of your knowledge concerning the purported Bandagro notes

12  as of December 1, 2003?

13  A.   I wouldn't say that.  I would say I sent this thing to

14  Larry to say if the things in here were correct.  I wouldn't

15  say it was the sum of my knowledge.  Again, I don't know if we

16  followed through with this.

17  Q.   Whether it was the sum of your knowledge in its

18  entirety, is it fair to say that document captured at least

19  some of your knowledge concerning the situation as of December

20  1, 2003?

21  A.   Okay.

22      MR. SCHWARTZ:  Your Honor, this is actually a good

23  time to perhaps take a break.

24      THE COURT:  That will be fine.  We will take a

25  15-minute recess at this time.

1     (Recess from 2:55 p.m. to 3:10 p.m.)

2          THE COURT:  Mr. Schwartz, you may continue.

3          MR. SCHWARTZ:  Thank you, Your Honor.

4     BY MR. SCHWARTZ:

5     Q.   Mr. Richards, by December, Pavanelli was again calling

6     and asking for money, right, December 2003?

7     A.   Well, he asked for money in December, yes.

8     Q.   And you responded to him just before Christmastime,

9     right?

10    A.   That's my recollection.  We discussed this at the

11    deposition, right?  Like December 23rd?

12    Q.   Your memory is excellent.

13         Let's look at Defendant's Exhibit 929.

14         THE COURT:  I'm sorry.  It's 2003 we're talking about,

15    right?

16         MR. SCHWARTZ:  Yes.

17         THE COURT:  Okay.

18         MR. SCHWARTZ:  Christmas 2003.

19         MR. BLAKE:  Your Honor, may I approach?

20         THE COURT:  You may.  Thank you.

21         Thank you very much.

22         THE WITNESS:  Thanks.

23    BY MR. SCHWARTZ:

24    Q.   Mr. Richards, this is D-929.  Do you recognize this as a

25    fax that you sent to Mr. Pavanelli on or about December 23rd of

1    2003?

2    A.   Yes.  This is my signature, at least my signature stamp.

3    And, this, I remember.  I roughly remember this.

4    Q.   And you and I know this from our discussion at your

5    deposition, but for Judge Sargus' benefit, if you look at the

6    second page, there is a header at the top of the fax legend

7    that appears to indicate this was sent on --

8         THE COURT:  I'm having a hard -- I can probably read

9    it on the screen.  I can't really read it on the paper form.

10   It's so small.

11        MR. SCHWARTZ:  I know.  It's difficult.

12        THE COURT:  So, if you could blow it up, that would be

13   helpful.

14        MR. SCHWARTZ:  The documents in this case will get

15   worse before they get better.

16        THE WITNESS:  I can see that there is a little header

17   there.  Again, it's not -- on the first page, which is much

18   easier to read; but it looks like the same page, really, shrunk

19   down.

20        I'm looking for the date here.  Maybe you can -- Oh!

21   It's at the top left, right?

22        So it's 12-23, 2004.  Right?

23   BY MR. SCHWARTZ:

24   Q.   '03.

25   A.   Oh, does it say "03" there?  It looks like "04" to me.

1    Q.    If you read this in context --

2    A.    Yeah, but I think it was '03, as we discussed, right?

3    Q.    Yeah.

4          THE COURT:  Can you take maybe the rest of the

5    document and blow it up?

6          THE WITNESS:  The first page is blown up.

7          THE COURT:  The second page, really.  I can read the

8    first page on the paper form, but it's the second page I'm

9    having a hard time with.  You can do it in halves, if you'd

10   like, whatever you prefer.

11   BY MR. SCHWARTZ:

12   Q.    The easiest way to do this is -- Mr. Richards, again,

13   you and I know this, but let's help Judge Sargus.

14         The first page is your fax to Pavanelli.  It has a date

15   of only December, right, in the box?

16   A.    Date:  December, yeah.

17   Q.    Now, if you turn to the second page, that's a fax back

18   to you from Pavanelli and Schianchi, right?

19   A.    Looks like it was signed by Schianchi.

20   Q.    And then Pavanelli at the bottom of the document?

21   A.    Oh, yeah.  Then Pavanelli at the bottom, 23rd of

22   December.

23   Q.    Pavanelli has a very distinctive signature, as we'll see

24   during the course of the trial, right?

25   A.    I think so.  That's his, yeah.

1   Q.   The easiest way to understand the date of this exchange

2   of e-mails, much easier than looking at those in indecipherable

3   headers and footers, is, if you look at Pavanelli's signature,

4   four or five lines above it, somebody wrote in handwriting

5   "Como, Italy, 23 December 2003," right?

6   A.   You're talking about Pavanelli's signature?

7   Q.   Yeah.

8   A.   It says:  "Como, Italy, 23 December," right.

9   Q.   So, this was an exchange between you and Pavanelli at or

10  about that time right before Christmas in 2003, right?

11  A.   And Schianchi, yeah.

12  Q.   Okay.  And let's look at the text of your fax to

13  Pavanelli and, specifically, the second paragraph.

14  A.   Yeah.

15  Q.   It looks like you're recapping some discussion you had

16  with him because you write:  Here is what we have decided.

17  Because you are in a difficult spot, I will send you $20,000 by

18  Western Union today/tomorrow, right?

19  A.   Yes.

20  Q.   And your understanding was, in exchange for that

21  $20,000, you were going to get another interest in one of these

22  so-called deeds of trust, right?

23  A.   The third paragraph says, for 20,000, we will receive

24  $200,000 in bonds, which Mr. Schianchi will prepare and send.

25  Q.   But translating that into what you actually were

1  contemplating at the time, you weren't expecting to get actual

2  Bandagro promissory notes or any other forms of bonds; you were

3  expecting to get some interest in some bond or bonds through

4  the so-called deeds of trust, right?

5  A.    Yeah.  That's what it says, send a deed of trust in the

6  same form as before.

7  Q.    And so you were expecting a ten X return there, right?

8  A.    Yeah.  I argued for a little more, but he was resistant.

9  Q.    I'm sorry.  What did you say?

10  A.    I was trying to get a better deal, but he was resistant.

11  It was ten X.

12  Q.    So, that additional $20,000, to recap the bidding, would

13  bring your total payments to Pavanelli from August through

14  Christmas 2003 to $85,000, right:  $15,000 to Corna in August,

15  $50,000 to Schianchi or Pavanelli in November, and now another

16  20?

17  A.    Well, to him, I'd sent 50 and this 20.  I don't

18  think -- I've said this -- Again, you keep saying 15, and I

19  keep saying 10.  So, I'm trying to watch when you -- I know

20  I've probably missed a couple, but when you say something I

21  said that I didn't say.  So, I think it was ten, but I could be

22  wrong.

23  Q.    Again, it's hardly worth quarreling about a $5,000

24  difference.  But doesn't the original document we saw, the

25  Gloria Richards Corna agreement, say it's 15?

1    A.    It says "is providing," not "has provided."  So, I think

2    there's indication in there that, instead of giving him 10,

3    looked to me like it was going to be another five.  But I don't

4    think that ever happened.

5    Q.    I don't think the case is going to turn on that.  So

6    let's keep going.

7    A.    I agree.

8    Q.    You were also holding out the possibility, in this

9    second paragraph, of sending even more money to Pavanelli,

10   right, --

11   A.    Yes, of course.

12   Q.    -- because he was asking not just for the 20 he needed

13   because he was in a difficult spot, but actually a total of a

14   hundred, correct?

15   A.    He asked for a hundred, it looks like here.

16   Q.    And at this time you were moving into the mode of trying

17   to --

18   A.    Oh, no, no.  I take that back.

19         So, what I say here is not that he asked for a hundred.

20   I say that if I give him any more money, it would put us over a

21   hundred K.  We're really getting serious here, and I'd have to

22   go to my, you know, my investor group here.

23   Q.    All right.  At this point, though, you were moving into

24   the mode of trying to stiff arm him from badgering you for

25   money all the time, right?

1    A.    Yeah.  Yeah.  You want to say, Oh, sure.

2          You know, you're kind of juggling two concepts, right?

3    You want to keep the guy there, and you want to have some

4    control over the situation, which in this case was money; but,

5    at the same time, you don't want him calling every day for more

6    money.

7          At the same time, on the flip side, you're gathering as

8    much information about the deal as you can and trying to -- so

9    that, if consanguinity exists, the two things at the end of the

10   day, you know, you know more about the deal by the time you

11   give him more money.

12   Q.    And apropos of learning more about the deal, when you

13   talked about the possibility of giving him another $80,000, in

14   the last sentence of the second paragraph you wrote:  This will

15   occur after your meeting with the banker and Mr. Guzman, so we

16   would want to be -- we'd want to be kept advised.  Right?

17   A.    Yeah.  He was saying that some banker was coming to

18   visit him that was interested in acquiring a chunk of the notes

19   based on the AG opinion.

20   Q.    Yeah.  And he was planning on meeting with that banker

21   and Oscar Guzman Cova, right?

22   A.    No, I don't think so, but -- I mean, looking back on it

23   today, I remember -- I wrote "Guzman" in the letter -- I

24   might -- I think I got that wrong.  But I doubt it was Oscar

25   Guzman Cova.

1    Q.    And, with regard to you getting it wrong, when Pavanelli

2    and Schianchi sent you the return fax, difficult to read as it

3    is, they crossed out "Delgado" in that -- "Guzman" in that

4    sentence and wrote "Delgado," right?

5    A.    Can you -- Can you like -- It's possible to blow that

6    up, I assume?

7    Q.    Yes.  We'll need to do so.  It's very hard to read.

8          One paragraph higher.

9    A.    Well, this isn't much better.  Honestly, I can't read

10    that.  Can --

11    Q.    Take a look --

12          Turn to -- Whoever's --

13          MR. SCHWARTZ:  Jim is running the projector.  Turn to

14    the -- There is -- The same page appears as Bates Stamp Page

15    5868 in the same document.  It's a little more legible.

16          THE WITNESS:  Oh, yeah.  Okay.  So, I mean --

17          MR. SCHWARTZ:  Only marginally so, but enough to see,

18    same document without some information on it.

19    BY MR. SCHWARTZ:

20    Q.    There it is.  That's Delgado, right?

21    A.    It says Delagado or Delgado, yeah.

22    Q.    So, you wrote to Pavanelli and Schianchi, and you said

23    you might give them another $80,000 after they met with Guzman.

24    And they sent a return fax and said they changed Guzman to

25    Delgado, right?

1    A.   Yes.

2    Q.   And then at the bottom of the return fax looks like you

3    sent a fax back to them, because there is a note from you

4    saying:  "James, please let me know if I can attend the

5    meeting.  David."

6         Do you see that?

7    A.   Yes.

8    Q.   So, it looks like we have actually three faxes here:

9    First you to them, then them to you, and then you asked this

10   followup question, right?

11   A.   Yeah.  Can I -- There's another I think you were asking

12   me about that, but I was looking -- There was another

13   correction there.  But, yeah, it appears I wanted to -- If

14   there was really an investment banker coming to Italy to talk

15   about purchasing an interest in the notes, I said, Hey, can I

16   be there?  I'm not sure I would have went, but I asked.

17   Q.   You, or Skye, actually made the $20,000 payment that's

18   referenced in D-929, right?

19   A.   I'm pretty sure we did, yeah.

20   Q.   Actually what happened is, you had John Kennedy give

21   $20,000 in cash to Larry Corna early on the morning of December

22   23rd to transfer to Pavanelli, right?

23   A.   Can you repeat that again, the whole question?

24   Q.   You had your long-time friend, John Kennedy, give

25   $20,000 in cash to Larry Corna early on the morning of December

1   23rd so he could transfer it, via Western Union, to Pavanelli,

2   right?

3      A.   Well, the part of that I certainly remember is, we

4   transferred cash to him a day before Christmas, like that,

5   through Western Union.

6      Q.   And John Kennedy was involved, right?

7      A.   Well, yeah, I think that's right.

8      Q.   In fact, John is the person who gave Corna the cash,

9   right?

10     A.   I don't have a specific recollection -- I'm not arguing

11  with you, but I -- you know, in my head, we sent him the 20.  I

12  remember it was Western Union.

13         How Larry got the cash I don't exactly remember.  Could

14  have been John, for sure.

15     Q.   You didn't give Corna the cash, did you?

16     A.   I don't remember giving him the cash.

17     Q.   And this $20,000 in cash that you gave Larry Corna on

18  Christmas Eve is also money that got rolled into the purchase

19  price, the eventual purchase price for Notes 7/12 and 8/12,

20  right?

21     A.   As I said, every dollar that I sent him, you know, from

22  the point of November on, got rolled into the price of the

23  purchase notes.

24     Q.   And you didn't start talking to Pavanelli about Notes

25  7/12 and 8/12 until very shortly before early August when you

1    completed the purchase agreement, right?

2    A.    Those specific notes were, you know -- they were

3    identified sometime after June of 2003 and before we actually

4    received the notes, those numbers.

5    Q.    Sometime after late June 2004, right?

6    A.    I'm sorry.  Yes -- I'm getting a little punchy here --

7    2004, yes.

8    Q.    When you were dispensing these amounts of money in 2003,

9    you had never even considered the possibility of obtaining

10   Notes 7/12 and 8/12; you hadn't even heard of those two, right?

11   A.    Well, so, my goal was to obtain -- These are bearer

12   notes.  So, my ultimate goal was to obtain them.

13        And you're right, of course.  Your specific question

14   being that I'd never identified 7/12 and 8/12 until after June

15   of 2003 is correct, but my desire --

16   Q.    2004.

17   A.    Sorry.  Yeah.

18        My desire -- My desire was, for a long time before then,

19   to actually have possession of notes.

20   Q.    Initially, though, you were just investing in the cache

21   of Gruppo Triad notes, or one or more of them, in the forms of

22   these deeds of trust, as opposed to owning any of them, right?

23   A.    That's right.

24   Q.    At some point your strategy morphed from being a deed of

25   trust investor into wanting to be the actual bearer, correct?

1    A.   Well, I wouldn't say it morphed.  You know.  It was

2    always in my mind these are bearer instruments and you would

3    want to possess them.  Right?  And how it -- So, how that

4    became the primary objective or the attainable objective was

5    developing at the time when it -- So maybe "morphed" is okay.

6    Maybe I'm arguing with you over words.  Sorry.

7    Q.   I don't -- You're not arguing.  I'm just asking for your

8    explanation, and I think you've provided it.

9    A.   Okay.

10   Q.   So, let's look at D-472.

11        THE COURT:  The exhibit number again?

12        MR. SCHWARTZ:  Your Honor, D-472.

13        THE COURT:  472.  Thank you.

14        MR. SCHWARTZ:  This will be easier to read --

15        THE COURT:  Good.  That's helpful.

16        MR. SCHWARTZ:  -- than 929.

17        THE WITNESS:  Thank goodness.  I was getting a

18   headache.

19   BY MR. SCHWARTZ:

20   Q.   So, this exhibit, Mr. Richards, is an e-mail, a series

21   of e-mails.  And, as with e-mail chains, it's often most

22   constructive to read them from bottom up.

23        So, the first one we have is from you to Mr. Pavanelli

24   with a cc to usuelli@bluewind.ch, right?

25   A.   Correct.

1    Q.   This is literally sent on Christmas Eve, right?

2    A.   Yes, six -- or eight -- p.m.  Wow!

3    Q.   And, usuelli@bluewin.ch, that's the e-mail for Antonio

4    Usuelli, right?

5    A.   Yes.

6    Q.   And you wrote to Pavanelli that you were otherwise

7    occupied yesterday, namely the 23rd.  And you went on to say:

8    "I hope everything was completed by Larry Corna to your

9    satisfaction.  One of my partners, John Kennedy, was involved."

10   Do you see that?

11   A.   Yes.

12   Q.   And what you were referring to there was Larry Corna's

13   mission of wiring, via Western Union, the $20,000 to Pavanelli,

14   right?

15   A.   I think so, yes.

16   Q.   And then Usuelli wrote back to you on Christmas, at 5:41

17   p.m., by e-mail, right?

18   A.   I said at the end:  I'd like to have some confirmation

19   that you received.

20        MR. ELLIOTT:  Your Honor, just because the document

21   has some pretty serious elements of hearsay, I assume it's

22   being offered in the same spirit as some of our stuff, which is

23   not for the truth of the matter asserted.

24        THE COURT:  Mr. Schwartz, is that your view?

25        MR. SCHWARTZ:  Not as to anything Mr. Richards is

1    saying.  That's an admission.

2        THE COURT:  Right.  But, in other words, his

3    statements would be an admission, but anything beyond that, is

4    there any claim that it's anything more than what he knew?

5        MR. SCHWARTZ:  At this point in time, it's not

6    necessary for us to argue that, Your Honor, but I do want to

7    put a marker in the ground here, when the time comes to argue

8    about exhibits, that we will be taking the position that Gruppo

9    Triad admissions are admissible against Skye on a variety of --

10       THE COURT:  Under a conspiracy theory?

11       MR. SCHWARTZ:  And a joint venture theory.

12       THE COURT:  All right.

13       MR. SCHWARTZ:  But I don't know that we need to have

14   that argument at this point.

15       THE COURT:  We'll save that.

16       MR. SCHWARTZ:  Yeah.

17       THE COURT:  But at this point it's coming in, for

18   certain, with regard to what Mr. Richards knew.  Beyond that,

19   we'll debate that later.

20       MR. SCHWARTZ:  Yes.  I think it would be most

21   constructive -- Mr. Elliott may, or not, agree; but there will

22   be a large number of documents that fall into the category of

23   admissions or adopted admissions or conspiratorial --

24       THE COURT:  You're going to pursue the agency theory,

25   is what I should be prepared for?

1          MR. SCHWARTZ:  Yes, absolutely, and various

2    manifestations of it.

3          All right.  But for now, we'll just proceed on this

4    basis, and that's fine with us.

5    BY MR. SCHWARTZ:

6    Q.   All right.  So, then Usuelli wrote back to you.  And I'm

7    going to skip over what he had to say about the Larry Corna

8    effort at Western Union and move to the next paragraph, where

9    he says:  Delgado and C. are leaving tonight and James is

10   picking them up tomorrow in Milan.  I imagine they are bearers

11   of a number of original documents, of documents to be signed to

12   further the process and of fresh information that is not

13   conveyable through the phone.

14         Right?

15   A.   I think you accurately read that.

16   Q.   Do you have any idea what he was talking about?

17   A.   No.

18   Q.   This e-mail was forwarded from usuelli@bluewin.ch,

19   namely Antonio Usuelli, also on Christmas, to Mr. Kennedy,

20   right?

21   A.   It appears that way.  That's the e-mail.

22   Q.   And that's the same Delgado who we saw referenced in the

23   handwritten portion of D-929, right?

24   A.   Well, I don't know which Delgado it is and if they're

25   the same Delgado.  So you can draw your own conclusions.  It's

1    the same name.

2    Q.   Isn't that the conclusion you drew when you received

3    this document within a day after D-929?

4    A.   I don't recall seeing this document.

5    Q.   Let's move to D-473.

6         COURTROOM DEPUTY CLERK:  D-473.

7    BY MR. SCHWARTZ:

8    Q.   Mr. Richards, D-473 is an e-mail from Pavanelli to you

9    dated December 26, 2003.  Do you see that?

10   A.   Yes.

11   Q.   Did you receive this e-mail from him the day after

12   Christmas in 2003?

13   A.   I have no reason to believe I didn't.

14   Q.   And he says in the body of this that Larry has started

15   to send the money via Western Union.  And, similar to D-472, he

16   makes reference to Delgado traveling tonight and will be here

17   mid-day on Sunday.  And then there is some discussion about

18   Chicago bankers, right?

19   A.   That's what it says.

20   Q.   Now, just before the end of 2003, you learned that all

21   of the money that you were giving to Corna to be transferred to

22   Gruppo Triad was not making its money -- not making its way to

23   Gruppo Triad, right?

24   A.   I learned there was a problem, but I don't know when I

25   learned about it.

1    Q.   Let's look at D-476.

2         COURTROOM DEPUTY CLERK:  D 476.

3         THE WITNESS:  Okay.  I see it.

4    BY MR. SCHWARTZ:

5    Q.   All right.  So, this is a document that contains part of

6    an e-mail from Paolo Pavanelli at the address

7    jppavanelli@hotmail.com, to you and others, and then a response

8    from you on December 30th, 2003, right?

9    A.   Yes.

10   Q.   And you can only see part of the Pavanelli e-mail, at

11   the bottom, to you; but you can see he's beginning to say he

12   has received only $13,050, right?

13   A.   Yes.

14   Q.   And then you provide some explanation to him, expressing

15   your disappointment and indicating that you'll find Larry Corna

16   and discuss this with him, right?

17   A.   Yes.  Well, it says what it says.

18   Q.   Excuse me one second.

19   A.   But that's the gist.

20   Q.   And you actually received the e-mail, a part of which we

21   see here at the bottom of D-476, and sent the response that

22   appears on D-476?

23   A.   So, like the previous e-mail, I don't recall either one

24   of them, but my name is on the e-mail.  And so I'm not saying I

25   didn't.  I just don't remember it.

1    Q.    You have no reason to doubt that you sent and received

2    these e-mails, right?

3    A.    I remember the dispute for sure.  I remember that.

4    Q.    All right.  Let's look at D-481.

5         THE COURT:  Just to be a purist, the testimony's loud

6    and clear.  He remembers this.  The e-mail, you're going to

7    have an admissibility problem, but the substantive testimony I

8    just heard loud and clear.  All right?

9         MR. SCHWARTZ:  All right.  There will be enough

10   documents covering this subject.

11        THE COURT:  All right.

12        MR. ELLIOTT:  Your Honor, may I just clarify one

13   thing?

14        THE COURT:  Sure.

15        MR. ELLIOTT:  On an e-mail like that, it's my

16   understanding that there is no offer to have it admitted into

17   evidence just yet.

18        THE COURT:  Not yet.

19        MR. ELLIOTT:  And, so, I would assume we can reserve

20   until later our arguments relating to hearsay.

21        THE COURT:  Right.  I'm assuming that at least part of

22   this is going to be offered as an admission exempt from the

23   hearsay rule.  That part I think is pretty obvious, but this --

24   This has to do with authentication.  But the witness remembered

25   the incident.  That was the point I was trying to make.  It's

1  not going to rest on the document.

2      MR. SCHWARTZ:  Well, while we're on the subject -- and

3  I appreciate the heads-up from the Court -- let me just ask a

4  few more questions that will lay as much of a foundation as can

5  be laid.

6      THE COURT:  Sure.

7  BY MR. SCHWARTZ:

8  Q.  So, Mr. Richards --

9      THE COURT:  Just to be clear, he remembered the

10  incident.  And that's what I think you're trying to get at with

11  the document.  Unless there is evidence to the contrary, if he

12  said he remembers the incident as it was related in the e-mail,

13  I think that solves your problem.  But you may continue on that

14  line if you wish.

15      MR. SCHWARTZ:  All right.  I'm just going to ask a

16  couple more questions, and maybe only one.

17      THE COURT:  Okay.

18  BY MR. SCHWARTZ:

19  Q.  In December 2003, you used the e-mail

20  drichards@netwalk.com, right?

21  A.  One of the ones I used, yes.

22      MR. SCHWARTZ:  All right.  We'll leave it at that for

23  now, Your Honor.  Thank you very much.

24      So, let's move to D-481.

25      COURTROOM DEPUTY CLERK:  D-481.

1    BY MR. SCHWARTZ:

2    Q.   Let's look at Defendant's 481, Mr. Richards.  This is a

3    somewhat lengthier document.  It's also an e-mail exchange.

4         The earliest e-mail in the chain is from, at least by

5    e-mail address, Susanna Usuelli.  Again that usuelli@bluewin.ch

6    address appears here on this document.  And then we have a

7    second e-mail, at the top, from that e-mail address to you.  Do

8    you see that?

9    A.   I do.

10   Q.   And, as indicated at the bottom of the document with the

11   Bates Stamp Number SKYE006212, this is a document that you've

12   produced in this case.

13   A.   I -- I don't recall the document.  I don't know that I

14   produced it; but if -- you know, I'm sure that the attorneys

15   did if you say so.

16   Q.   I don't think there will be a dispute about that.

17   A.   Okay.

18   Q.   In any event, here you have an e-mail from Mr. Usuelli

19   to Larry Corna.  It goes on at some length.  Let's take a look

20   at that.  We'll start to put this in some context, but the

21   e-mail that went directly to you at the top.

22        So, do you recognize the e-mail at 8:38 a.m. on January

23   5th from Antonio Usuelli to you?

24   A.   So, I think I told you in our deposition that I had

25   shoulder surgery at about this time.  I think it was the 3rd of

1   January or the 4th of January, something in that time frame.

2   And I think we also discussed that I don't know how active I

3   was.  There were certainly some days that I was not active.

4   Right?  And it was -- It was a torn labrum surgery, and it took

5   me a few days before I was functioning.

6       So, I assume this came in that time frame.  So, just so

7   we understand, I don't know if I read it when it was sent, and

8   I don't recall this.  I do recall the incident that James and

9   Larry were arguing about this money and Antonio was trying to

10  intervene.

11  Q.   And what the incident entailed was that you and John

12  Kennedy, you or John Kennedy, gave $20,000 to Corna, right?

13  A.   As we discussed, exactly how we discussed it before and

14  how I testified before.

15  Q.   And Pavanelli, to simplify matters, was contending that

16  Corna had improperly retained some portion of that money,

17  correct?

18  A.   That was the dispute.

19  Q.   And this exchange of e-mails here concerns that dispute

20  referred to by Usuelli in one e-mail as a mess and in another

21  as a complete and unnecessary mess, right?

22  A.   Yeah.  But, I mean, Corna was James' guy.  And I said:

23  Listen, this is not my problem.  I'll try to help you, but --

24  and I think John got involved, but that -- yeah, that's what I

25  remember.

1    Q.    Was this the first time -- Let me strike that.

2         Did you learn for the first time in the first week of

3    January, 2004, that this dispute had arisen?

4              THE COURT:  I'm sorry.  I missed the last part of the

5    question.  The dispute --

6              MR. SCHWARTZ:  -- had arisen.

7              THE COURT:  -- had arisen.  Thank you.

8              MR. SCHWARTZ:  Would you like me to reframe the

9    question?

10             THE WITNESS:  I think -- Sorry.

11   BY MR. SCHWARTZ:

12   Q.    Let me just reframe the question.

13        Did you learn for the first time during the first week

14   of January 2004 that this dispute had arisen between Pavanelli

15   on the one hand and Larry Corna on the other?

16   A.    In January sometime -- again, remember I said I was off

17   some -- I don't know how active I was and when I became active

18   again after surgery -- I learned there was this dispute.  Maybe

19   I'd read e-mails while I was recovering.

20        So, I knew there was dispute between Pavanelli and Corna

21   alleging that Corna didn't send the entire 20,000.

22   Q.    And, despite learning of that dispute in January of

23   2004, you continued working with Larry Corna for some time well

24   beyond that, correct?

25   A.    Well, I think, to put a fine point to it, you know, this

 1   drama was unnecessary, right?  I agree with that.  So, all of a

 2   sudden I'm sending the guy $20,000.  And all of a sudden there

 3   is a fuss for a month, and there's e-mails about it and calls

 4   about it.  And so I'm -- As I think I've told you, I'm a busy

 5   fellow at the time, and the last thing I need is this kind of

 6   stuff.

 7        So, I think at that point we started distancing

 8   ourselves from Larry, asking him to stop being involved and

 9   just leave us alone.  But I think, as you see, you know, he

10   kept coming back.

11   Q.   Let's look at D-482.

12   A.   To complete my answer, I did try to kind of resolve the

13   thing so it would stop, or John did.  I forget which.

14        COURTROOM DEPUTY CLERK:  D-482.

15        THE WITNESS:  Yeah.

16        Yeah.  So, this is an e-mail from me on the 6th in which

17   I say I'm really not back up to full speed, I'll need a couple

18   of more days, and that I'm not going to invest with Larry Corna

19   anymore, basically.

20   BY MR. SCHWARTZ:

21   Q.   So, the e-mail at the top of D-482 is an e-mail that you

22   sent to Antonio Usuelli on January 6, 2004, correct?

23        The e-mail at the top of D-482 is an e-mail that you

24   sent to Antonio Usuelli on Tuesday, January 6, 2004, correct?

25   A.   Yes.

1    Q.   And that was in response to the e-mail that also appears

2    on D-482, the lengthier e-mail from him to you; is that right?

3    A.   Yeah.  He's -- He was talking about making some real

4    estate investments in the U.S.  And I responded to that, and I

5    told him kinda what we had been experiencing in our real estate

6    business.  And I don't know exactly what I'm responding to

7    there at the top.

8         I told him I wasn't feeling well, I'd try to respond in

9    the next few days.  And then I told him, as to Larry Corna, as

10   your agent, Larry may be able to help you with other investors;

11   I have no position on that matter.

12   Q.   With regard to Corna, if you look at Usuelli's e-mail,

13   he makes reference, do you see, to Corna's intention of mending

14   a distasteful mess?

15   A.   Can you point me to where you're referring, because it's

16   a long, long e-mail?

17   Q.   The carryover sentence from the first page to the

18   second.

19   A.   Okay.  It seems here Larry is trying to send the rest of

20   the money a little bit at a time, slow, more to go, but at

21   least Larry is trying to correct the situation.

22   Q.   And then if you look a few lines lower, Usuelli says

23   that doubts in a long-term relationship remain; it's evident

24   that we cannot consider to have a U.S. representative that we

25   know inclined to, quote, creative accounting, end quote.  Do

1  you see that?

2  A.   Yeah.  I think he's referring to, you know, Gruppo's

3  U.S. representative.  But, yeah, I think that's what he's

4  saying:  I don't think we can use Larry, or maybe we can't use

5  Larry.

6  Q.   And, at that time, Larry was Gruppo's U.S.

7  representative, right?

8       MR. ELLIOTT:  Your Honor, I'm sorry.  We're spending

9  an awful long time on a dispute between Gruppo Triad folks.

10  I'm not sure there's any triable issue in this case relating to

11  this particular dispute.

12       THE COURT:  Well, let me ask Mr. Schwartz.

13       How do you see this as playing into triable issues?

14       MR. SCHWARTZ:  It plays into a number of ways.

15       First of all, Larry Corna was the person who brought

16  this deal to Mr. Richards.  And you'll have the opportunity to

17  meet Mr. Corna during the course of the trial.

18       As you can see from -- and this is just some of the

19  evidence -- he was prone to thievery.  And Pavanelli, himself,

20  had his own --

21       THE COURT:  I understand it's always a strategy to, of

22  course, link somebody to a thief in a case.  But tell me where

23  it takes us beyond just him opening the door to all this.

24       MR. SCHWARTZ:  Well, the continued dealings by Skye

25  Ventures for a substantial period of time with a thief of this

1   nature in the context of a series of very irregular

2   transactions that eventually turned into that so-called April

3   8th agreement is itself reflective of the fraud that Gruppo

4   Triad continued to perpetuate and brought to Columbus, Ohio.

5        Now, this fraud had a number of different dimensions to

6   it.  It started with the forgery of the documents in the first

7   place.  It started with the presentation of those documents in

8   the administrative proceeding in Venezuela and the infiltration

9   and corruption of that proceeding.  And then you have the

10  domestication of it here and the structuring of the lawsuit

11  with Skye Ventures as the nominal plaintiff at a time when

12  Gruppo Triad has the lion's share of the litigation proceeds,

13  as we've seen with this waterfall discussion earlier today.

14       Larry Corna was a key Gruppo Triad operative, in fact

15  the only effective Gruppo Triad operative here in Ohio.  His

16  machinations --

17       THE COURT:  To get to Skye, your claim is that they

18  became a participant in a fraud, is what your argument is, and

19  that that would make -- otherwise, the actions of Gruppo Triad

20  wouldn't play into a triable issue here.

21       MR. SCHWARTZ:  That's correct.

22       THE COURT:  All right.  I get that.

23  Let me hear from the Plaintiff's side.

24       MR. ELLIOTT:  Yes, Your Honor.

25       THE COURT:  I know you don't agree with that.  The

1    question is whether it's triable or not.

2          MR. ELLIOTT:  Absolutely, Your Honor.  And I would say

3    that, at this point, the AG has issued her opinion several

4    months down the road.  What we're dealing with here is a

5    dispute between Gruppo Triad and Mr. Corna that Mr. Richards

6    has testified --

7          THE COURT:  About the timing issue -- this is after

8    the opinion of the AG -- how do you respond to that,

9    Mr. Schwartz?

10          MR. SCHWARTZ:  Well, the opinion of the AG was,

11    itself, procured by --

12          THE COURT:  You're saying it's just part of the same

13    scheme and fraud?

14          MR. SCHWARTZ:  It's a continuous scheme.

15          THE COURT:  Here is how I see this right now:  I

16    haven't heard the Defendants' case, and this is going to be

17    what I would call a preliminary ruling under Evidence Rule 104.

18    I don't know what's here.  This may all be irrelevant, but you

19    also have the opportunity to try to prove that theory.  I'm

20    going to give you the opportunity, but we'll just do it a piece

21    at a time.

22          So, this is all subject to later reconsideration based

23    on what you can show or not show.

24          MR. SCHWARTZ:  Thank you, Your Honor.

25          THE COURT:  But, to be clear, there has to be some --

1   for your theory, there has to be some involvement.  It can't

2   just be somebody who makes an investment with people who turn

3   out to be, let's just say hypothetically, criminal.  You'd

4   agree with that.  There has to be more than just inadvertent

5   stumbling into something like that.  There has to be some kind

6   of active conduct.  And I assume from what you're saying you're

7   prepared to try to show that.

8            MR. SCHWARTZ:  Yes.

9            THE COURT:  All right.

10           MR. SCHWARTZ:  And there are periods -- This is a

11   continuum over a long period of time.  There are periods where

12   the fraud is more acute.  There are periods where it's in

13   gestation.  This is more of a gestation period, but this Larry

14   Corna is a key link.  He is the person who brought Gruppo Triad

15   to Columbus, Ohio.

16           THE COURT:  All right.

17           MR. SCHWARTZ:  He is the person who introduced Gruppo

18   Triad to David Richards.

19           THE COURT:  But, I mean, at this point, we're just

20   arguing about threshold issues.  And I'm going to let you

21   proceed.

22           MR. SCHWARTZ:  Thank you.  I will move along to the

23   next exhibit, though, Your Honor, which is D-931.

24           COURTROOM DEPUTY CLERK:  D-931.

25    BY MR. SCHWARTZ:

1    Q.    Mr. Richards, I'm showing you D-931.  This is a series

2    of e-mails between and among various of the participants in

3    this developing transaction.  And I think it's probably most

4    useful, with this e-mail chain, to start at the bottom, where

5    we have an e-mail from jppavanelli@hotmail.com to you and

6    Usuelli on January 17th at 4:15 a.m.  Do you see that?

7    A.    Yes.

8    Q.    And that's an e-mail that you received from Pavanelli

9    then, correct?

10    A.    Well, again, it's -- that's when it was sent to me.

11    So -- and I have no doubt to believe I didn't receive it.  I

12    just don't know when I did.  If I could read this other e-mail,

13    I could probably see.

14    Q.    If you look at the next e-mail, working your way from

15    bottom to top, then you responded to Pavanelli, correct, the

16    same day, at five o'clock p.m.?

17    A.    Yeah, I did.

18    Q.    And then Usuelli responded to you on January 7th at 1:41

19    p.m., correct?

20    A.    Yes.

21    Q.    And I'm not going to walk you through, line by line, who

22    was saying what to whom here; but this is a continuation of the

23    dialogue, if you will, concerning this Larry Corna incident,

24    correct?

25    A.    Well, it's in regard to -- I think they're trying to

1   recount the money that was sent and a figure that we all agree.

2   And I say to him that -- And this is January 7th?  Yes.

3        So I say to him that Mr. Finn, a contact who spoke with

4   my partner, sent $25,000.

5        Now, that is John Finn.  And, so, he is a -- he's one of

6   my investors.  He lives in Columbus.  He is a prominent guy in

7   town.  He is on the board of Cardinal, that kind of thing.

8   Owns a really, really large company.  And John is in my

9   investor group, and I'd learned through someone else that John

10  had invested in this Bandagro deal.

11       And so I had contacted John, and it was the same story.

12       John was actually very good friends with David.  They

13  both loved the opera.  And --

14  Q.   David Corna?

15  A.   David Corna.

16       And it was -- John told me what happened.  It was the

17  same thing.  Larry showed up on his doorstep -- Dave called

18  him.  Larry showed up at the doorstep on his house.  And, in

19  essence, John loaned him $5,000.

20       So, it was kind of funny that the same thing had

21  happened with John.  And then John had gone on to invest a

22  little bit more.

23       What then happened was that John wanted to be a part of

24  what we were doing, and not a part of what Pavanelli was doing.

25  So, that refreshed -- I almost forgot about that, but that's

1   kind of what happened then.

2        You know, Columbus is kind of a small town.  So,

3   ultimately, things get around.

4   Q.   Excuse me one second.

5        Was Mr. Finn's investment via Corna to Pavanelli

6   eventually consolidated with yours?

7   A.   I think so.  I think we ultimately included that in it.

8        Now, I don't count it in terms when we're talking about

9   the money that I put in because, when we're talking about the

10  money put in, we're looking at a bank register that you've

11  seen.  So I don't think that was included in the amount of

12  money, but it was included in the sort of what we got out of

13  the deal.

14       So I made an agreement -- I went to see John shortly

15  after that, and we talked about it.  So, by then, I think John

16  had become, either then or, you know, early February, had

17  become part of the investor group.

18  Q.   Just to hit some of the highlights here in these

19  e-mails, look at the last page of this document.  Toward the

20  end, Pavanelli says, under number 3 on the last page of the

21  document:  At this point, I really need urgently the 350,000

22  U.S. Dollars to carry on the completion -- misspelled -- of the

23  Bandagro notes.

24       Do you see that?

25  A.   Point three?

1    Q.    Yes, on the last page.

2    A.    Yes.

3    Q.    And then he points out that Larry has sent 15,850 of the

4    20,000, right?

5    A.    Yes.

6    Q.    And, turning now to page 6166 at the bottom, he told you

7    he didn't intend to carry on with Larry at all, right?

8    A.    That's what he said then.

9    Q.    And then Usuelli, on the first page of this document,

10   provided something --

11   A.    He also calls Larry a liar here -- right? -- which he

12   called me many times; he called Crabbe Brown many times.

13         So, you know, this is a bit of hyperboli.  So, I don't

14   intend to carry on with him at all; he may have said that.  I

15   don't know if he did or not, you know.  He was mercurial.

16   Q.    And then Usuelli sent you something of an accounting,

17   right, on the first page of D-931?

18   A.    Yes.  He said, Here is -- having verified with James and

19   Schianchi, here is what we've gotten so far.

20   Q.    And he asked you to confirm these figures, right?

21   A.    Yes.

22   Q.    And is that $80,050 an accurate accounting of the amount

23   of money you had invested in Gruppo Triad's purported Bandagro

24   notes as of the date January 7th, 2004?

25   A.    It sounds about right from what we discussed so far.

1    Q.   Did Pavanelli tell you why he needed the $350,000 at

2    this particular juncture?

3    A.   The sum total of this, in my recollection -- I don't

4    even remember the number, so -- if it's not in the e-mail, I

5    wouldn't remember it; but it was part of a pattern that was

6    developing, of course, that he was trying to get money from me

7    every time I talked to him.

8    Q.   All right.  We're going to move to D-935.

9         By the way, you mentioned that Pavanelli was mercurial,

10   right?

11   A.   He had a temper.

12   Q.   And he behaved irrationally, right?

13   A.   There were times when he was very rational and times,

14   especially when he was angry, that he said irrational things.

15   Q.   He was a difficult person to deal with, right?

16   A.   I think you asked me this question before, and I said,

17   at times, he was difficult; at times, he could be the most

18   charming guy in the world.  But he was a difficult character.

19   He was stubborn, for sure.

20   Q.   Let's look at D-935.

21        COURTROOM DEPUTY CLERK:  D-935.

22   BY MR. SCHWARTZ:

23   Q.   D-935 is an e-mail you sent to Pavanelli January 9th,

24   2004, right?

25   A.   Yes.

1  Q.   That's the only question I have about the document.

2       Let's look at D-487.

3  A.   In here, I also ask him not to copy correspondence to

4  Mr. Corna anymore as well.

5            COURTROOM DEPUTY CLERK:  D-487.

6  BY MR. SCHWARTZ:

7  Q.   Looking back at D-935, at this point you're trying to

8  send a message to Pavanelli that you'd prefer that Corna not be

9  included in these communications; is that correct?

10 A.   Yeah.  Look, I'm a really busy guy.  I've got a lot

11 going on.  This is one of more than one deal we're diligencing

12 at the time.  So that's a lot of work.  The last thing we want

13 to deal with in that work is these kinds of arguments that have

14 nothing to do with us.  And I didn't want to deal with Larry

15 Corna anymore.  That was what I was saying there.

16 Q.   D-487 is an e-mail from Usuelli to you and others,

17 including Corna and Pavanelli, dated January 14th, 2004.  Do

18 you see that?

19 A.   14 Gennaio, which -- Let's assume that's January.

20 Right?

21 Q.   Right.

22 A.   Yep.

23 Q.   One issue we have in the communications here is, when

24 they pass through servers in countries with different primary

25 languages, things like this happen.

1    A.    They can, especially back then, when things weren't as

2    smooth as we have come to take for granted as we do now.

3         THE COURT:  So the date on this, you both agree, is --

4         MR. SCHWARTZ:  January 14, 2004.

5         THE COURT:  -- January 14, 2004?

6         MR. SCHWARTZ:  Of 2004, yes.

7         THE COURT:  Thank you.

8    BY MR. SCHWARTZ:

9    Q.    That said, let me ask you to take a moment and read this

10   e-mail from Usuelli.  It's actually addressed to Larry Corna,

11   but you're one of the addressees.

12   A.    Okay.  Again, this is pretty small printing.

13   Q.    We can enlarge it for you on the monitor in front of

14   you.

15   A.    That's okay.  I mean, it's just a chore to read, is all

16   I'm saying.  I don't know what time it is, but I'm kind of

17   getting --

18   Q.    Are you getting tired?

19   A.    I'll live for a little while longer; but, you know, it's

20   exacerbated by trying to squint at this small print, which I'm

21   trying to do here.

22   Q.    It's not strategic.

23   A.    Yeah.  Well, if it isn't, it's working.  I mean, if it

24   were, it would be working.  Excuse me.

25        So, this is a -- Let's start out with this:  Yes.  It

1  says "Dear Larry" at the bottom.  It's Antonio.  So, that's

2  true.

3  Q.   And you received a copy of this --

4  A.   I'm on the e-mail chain.  So -- I don't really remember

5  this, but --

6  Q.   But you -- To the best of your recollection, you

7  received a copy of this on January 14, 2004, or thereabouts?

8  A.   Well, you're misstating what I said again.  It's not to

9  the best of my recollection.  I'm saying I don't have any

10  reason to believe that I didn't receive it, but I don't recall

11  it.  I do recall this dispute, though.

12  Q.   Do you see there is a reference in the second-to-last

13  paragraph to a new deed of trust being established in full to

14  Skye Ventures?

15  A.   Yes.

16  Q.   Do you recall there being some effort underway at this

17  time to cause the issuance of such a new deed of trust in that

18  amount?

19  A.   I don't.  I'm not saying it didn't happen.  I don't

20  recall this specifically, though.

21  Q.   All right.  Then let's move ahead to D-492, then.

22  A.   This could have been -- You're kind of talking about a

23  round number of a million dollars.  It could have been sort of

24  an accumulation of everything that had been sent so far into a

25  single deed of trust.  But, again, I just don't remember --

1   Q.   Your investment at this time was in the neighborhood of

2   a hundred thousand dollars, right?

3   A.   I thought we had agreed it was 80, but it could have

4   been.  I'm not saying it wasn't.

5   Q.   And you were contemplating a ten-to-one return, right?

6   A.   Yeah.  I was trying to make it higher, but that's what

7   he was going along with.

8   Q.   All right.  I'm going to show you D-492.  We'll try to

9   see if we can move through these quickly.

10          COURTROOM DEPUTY CLERK:  D-492.

11   BY MR. SCHWARTZ:

12   Q.   We're moving beyond the Larry Corna dispute.  This will

13   probably come as a relief.

14   A.   Yes, but he's still on the darn e-mail.

15   Q.   You couldn't cause them to stop that, could you?

16   A.   Okay.

17          THE COURT:  The print is bigger.  I'll note that for

18   the record.

19          THE WITNESS:  That makes it a lot better, right?

20   BY MR. SCHWARTZ:

21   Q.   All right.  So, this is an e-mail from Antonio Usuelli

22   to various people, including yourself, dated January 25, 2004,

23   right?

24   A.   Yes.

25   Q.   The subject was updating, right?

1    A.    Yes.

2    Q.    And you received this e-mail at or about that time,

3    right?

4    A.    Again, same memory.  Right?  So, when you ask me about

5    whether I remember a specific e-mail on these at least what we

6    thought were collateral issues, it's hard to say I remember

7    reading this specific e-mail; but, of course, I'm on the e-mail

8    chain.  So, there's probably little doubt that I got it.

9    Q.    I think you may find that, while in your judgment the

10   Larry Corna matters are collateral, we're getting a little

11   closer to what you would regard as the heart of the case here.

12   A.    Yeah.  Okay.

13   Q.    So, just take a moment and review this so you're

14   familiar with it.

15        MR. ELLIOTT:  While he's reviewing this, Your Honor,

16   this is again in that category of his knowledge, and not for

17   the truth of the matter, since it's not coming from

18   Mr. Richards.

19        THE COURT:  Mr. Schwartz, why don't we have an

20   understanding that, unless you tell me otherwise, that's what I

21   am assuming these documents are about?

22        MR. SCHWARTZ:  Yes.  That is fine.  I have no problem

23   with that as a provisional matter here, but we will be arguing

24   that documents like this and others of its ilk are admissible

25   admissions against Skye Ventures on account of its agency --

1          THE COURT:  On the theory of what we already talked

2     about?

3          MR. SCHWARTZ:  Yes, the same issue.

4          THE COURT:  All right.

5          MR. SCHWARTZ:  This is just another illustration of

6     the fact -- From my standpoint, I think the issue would be best

7     framed before Your Honor if all the documents are aggregated at

8     one time and you can consider them as a whole.

9          THE COURT:  All right.

10         MR. ELLIOTT:  I would point out, Your Honor, that this

11    is -- from what has been discussed, Antonio Usuelli -- I think

12    they were using his wife's e-mail address at the time.  There

13    is no evidence that he was -- He was an investor like Skye.

14    There's no evidence that he was at Gruppo Triad.

15         THE COURT:  Let me see if I can clarify this.

16         So, in other words, the only basis for admissibility,

17    you're arguing, would be that this was all part of a scheme and

18    there's an agency relationship and the statement of one could

19    be used against the others as an exception to the hearsay rule?

20    Is that your position?

21         MR. SCHWARTZ:  This one may contain a declaration of

22    interest as well, but --

23         THE COURT:  But, in general, that's your position?

24         MR. SCHWARTZ:  Yes.  I don't want to rule out other --

25         THE COURT:  Just to remind both of you, that requires

1    some additional proof of facts.  It's coming in at this point

2    on a conditional basis.  If those facts are proven, then they

3    would all be admissible.  If I don't find that kind of

4    relationship, they'll all be inadmissible.

5              MR. ELLIOTT:  Thank you, Your Honor.

6              MR. SCHWARTZ:  Or admissible only for the limited

7    purpose.

8              THE COURT:  For limited purposes, right, and also for

9    the purpose of knowledge.  That's where we start.

10             MR. SCHWARTZ:  Thank you, Your Honor.

11   BY MR. SCHWARTZ:

12   Q.    All right.  Mr. Richards, have you had a chance to look

13   through this?

14   A.    I've skimmed over it, yes.

15   Q.    All right.  This one I want to pay a little more

16   attention to the chapter and verse of.  So let's look at the

17   second paragraph.

18             There, Mr. Usuelli is reporting to Mr. Kennedy and you

19   and Pavanelli and Larry Corna that, just before Christmas,

20   Jacir -- namely, Miguel Jacir -- presented to the Supreme

21   Court, of which he has been a President, a request technically

22   named, quote, imparo, end quote, by which he requests on behalf

23   of Gruppo Triad that the Court receiving the reports of the

24   Legal Department of the Ministry of Finance and the decision of

25   the Attorney General, orders to the Minister of Finance to

1    issue the order of payment giving a term for complying.

2        Do you see that?

3    A.    Well, he is saying that he has seen messages from other

4    e-mails or other stuff that he'd seen, and he is summarizing

5    what he thinks those messages say.

6        Now, you have to remember Antonio doesn't speak Spanish.

7    So -- He speaks Italian, English, and French.  So, if he were

8    seeing Jacir's stuff, he might not have it right.  He probably

9    wouldn't have any way to have it right but guess.  So, that's

10   what's being discussed in that first paragraph:  That he's

11   seeing something from Jacir.  Right?  And Jacir, as we know,

12   speaks only Spanish.  Okay?

13       Now, Antonio does write, which you read, for sure; but

14   it seems that he's missed it on a lot of different points.  So,

15   I don't know how accurately he's getting it.  In fact, it's

16   inaccurate for sure, right?  We know that some of the stuff

17   he's saying in there is just wrong.

18   Q.    Well, with that I cannot concur.  But in any event he's

19   telling you, whatever you may think today of the accuracy of

20   what he's telling you, that Jacir had made a request called an

21   imparo in the Supreme Court having something to do with the

22   report of the Ministry of Finance and the decision of the

23   Attorney General, and that's the report of August 2003 and the

24   decision of October 2003, right?

25   A.    Not to quibble with you again, but he's saying that he

1   thinks Jacir is saying this.  That's what he's saying.

2        So, with that caveat, he says what he says here.  Right?

3   I don't disagree with your reading of that paragraph, for sure.

4   Q.   And then he goes on to tell you, here on January 25,

5   2004, that a decision of the Supreme Court is expected by the

6   end of February, right?

7   A.   Again, same sort of qualification:  That's

8   what -- That's what he's saying in this e-mail.

9   Q.   And then he goes on to say that -- he describes the

10  composition of the Court, right?

11  A.   Yes.  He says the Court counts five members, three of

12  which are on Jacir's side and two of which are undecided.  I

13  don't know how in the world he'd know that, but -- So, I kind

14  of -- If I read this, which I don't remember, I would have

15  taken this with a grain of salt for sure.

16       THE COURT:  I'm sorry.  I missed the last part of that

17  answer.

18       THE WITNESS:  I said, if I read this, which I don't

19  recall whether I did or not, I would have taken this kind of a

20  statement with a grain of salt for sure.

21       THE COURT:  Thank you.

22  BY MR. SCHWARTZ:

23  Q.   And, then, in the last sentence of that paragraph,

24  Usuelli wrote, quote:  Moreover, comma, some sort of

25  compensation, comma, after the decision is published will be

1   arranged by Jacir, end quote.  Do you see that?

2      A.   I do see he says that.  What the heck that refers to I

3   have no idea.

4      Q.   Really?

5         MR. ELLIOTT:  Your Honor, we seem to just be reading a

6   document now.

7         THE COURT:  Yes.  All right.  Well, ask a question.

8   We'll move forward.

9   BY MR. SCHWARTZ:

10     Q.   And, then, in the last -- next-to-last paragraph, the

11  last one that starts on page 5974, there's some reference to

12  Pavanelli describing the necessity for liquidity in order to

13  make the above steps possible and smoother.  Do you see that?

14     A.   He needs money for authentication, interest,

15  transmission of a large number of documents to be presented by

16  Jacir, which is -- Yeah.  He says that James needs money to pay

17  for these authentications and transmissions of a large number

18  of documents, some of these referring to Fabbiani and others.

19     Q.   Actually what he said is:  James has already described

20  the necessity for a certain liquidity in order to make the

21  above steps possible and smoother, right, before the semicolon?

22     A.   Again, I think you're reading it correctly.

23     Q.   And the above steps include, the immediately above step,

24  some sort of compensation being arranged by Jacir after some

25  decision is published, right?

1    A.    Again, I don't know that's what he's referring to.  And

2    I don't know whose -- what they're talking -- You know,

3    remember, Antonio is reading Spanish here.  So, it doesn't make

4    a lot of sense to me.  Maybe Jacir was going to get some more

5    money.  I don't know, but --

6    Q.    And then, on the last page, there is an update as to the

7    efforts of Delgado, right?

8    A.    Yeah.

9    Q.    Now, turning back to the second page of this document

10   where Usuelli is talking about Jacir trying to obtain an order

11   of payment from the Ministry of Finance, do you see that again?

12   A.    No.

13   Q.    Let's turn to that just-before-Christmas paragraph.

14   A.    Okay.  All the way to the top.  All right.  Sure.

15   Q.    And it culminates in a description of Jacir's effort to

16   obtain an order of payment giving a term for complying.  Do you

17   see that?

18   A.    I think he's trying to get -- What he's saying here,

19   again, as he's trying to -- So, the language is what the

20   language is.  I don't recall seeing this before.

21         If you're asking me what do I think it means -- Is that

22   what you're asking me:  How do I take this?

23   Q.    Actually, I'm just asking you to take stock of the

24   language before I ask the question.  I just want to make sure

25   you're focused on the right part of the document.

1    A.    Okay.  Okay.  He's trying to get -- He's trying to

2  achieve the Supreme Court to get an order to force the Ministry

3  of Finance to pay.

4    Q.    And, in the roughly 12 years since you've been involved

5  with this deal, you've never seen any such order, have you?

6    A.    I don't think this existed.  Right?  So, I don't think

7  this even is true in this paragraph.  I think he might be

8  referring to the Woodstrite case.  So --

9    Q.    And the Woodstrite case, you know, involved an effort on

10  the part of Woodstrite to cause the Venezuelan Supreme Court to

11  compel the Ministry of Finance to issue an order of payment,

12  right?

13    A.    I know that now for sure, and it was about this time.

14  Again, I think that's -- he's got this totally wrong -- that's

15  where he's referring to.

16    Q.    Regardless of whether he's got it right or wrong, as far

17  as you're aware, the Venezuelan Supreme Court has never issued

18  any order compelling the Ministry of Finance to issue a payment

19  order, right?

20    A.    They ordered -- They dismissed the case for lack of

21  standing is what I was told.  So --

22    Q.    That's what someone told you, right?

23    A.    That's what Alcalde told me.

24    Q.    That's a subject we'll -- I'll leave it like that.

25        Let's move to D-495.

1    COURTROOM DEPUTY CLERK:  D-495.

2    BY MR. SCHWARTZ:

3    Q.   Mr. Richards, moving along, in January 2004, we now have

4    a January 28th, 2004, e-mail from Mr. Pavanelli to you.  Do you

5    recognize this document?

6    A.   Yes.  Well, I recognize it as an e-mail that was sent to

7    me.  I don't remember it; but, yeah.  It's -- I recognize what

8    it is.  It's an e-mail.

9    Q.   And here's Pavanelli telling you that Delgado will be in

10   Lugano tomorrow to discuss the closing of the deal.  And then

11   he goes on from there, right?

12   A.   Yes.  He talks about this deal that's going to happen.

13   Q.   And it appears from this document that Delgado was close

14   to concluding some deal for Pavanelli, or at least Pavanelli

15   was telling you that, correct?

16   A.   Well, it was -- you know, in context of what was

17   happening before, this Mr. Delgado had arranged for some

18   bankers to visit.  And so I think that's -- this is a

19   continuation of that, perhaps.

20   Q.   Do you know what the contours of that deal were at this

21   time?

22   A.   No.  I didn't even know if it existed or not.  Right?

23   So --

24   Q.   Let's turn to D-503.

25        COURTROOM DEPUTY CLERK:  D-503.

1    BY MR. SCHWARTZ:

2    Q.   So, D-503 consists of two different e-mails, Mr.

3    Richards.  The first one is from you to Pavanelli and Usuelli

4    on January 31, 2004.  Let's take a look at that first.  Do you

5    recognize that one?

6    A.   Well, I recognize it as an e-mail.

7    Q.   You recognize it as an e-mail you sent Pavanelli and

8    Usuelli on January 31, 2004?

9    A.   Do I recognize that's what it is?  Yes.  It's an e-mail

10   that's directed to Pavanelli and Usuelli from me.

11   Q.   Hold on just one second.

12      (Whereupon, there was a brief interruption.)

13   BY MR. SCHWARTZ:

14   Q.   And, not to bring up a sore subject, but, in the last

15   paragraph of this e-mail, you tell Pavanelli and Usuelli that

16   you'll be working with Larry Corna in the coming week, right?

17   A.   Well, I say that he -- my partner worked with Larry and

18   believes he might -- he will be in a position to send funds

19   next week.

20   Q.   And the next sentence?

21   A.   And I don't know what that refers to.

22      And I said, I will work with Larry Corna this coming

23   week to determine what the status is.

24      And I think we're still talking about this thousand

25   dollars.  So, again, it's coming back.  It just won't go away.

1  And I tell him I had to be in New York for three days as

2  well.  And in this -- in the context of this e-mail, I tell

3  him, look, I've been very busy in other things.  I had

4  requested basic documents.  I think those were about the -- I'm

5  not really sure, but I think those are about this financing

6  deal.  And I say that I didn't get any.  And then I said, well,

7  I could look and, you know, it seems like -- it's starting to

8  look like this -- us -- the main thing here -- right? -- was it

9  was starting to look to us like this was a final and binding

10  order; and, if true, if we concluded that, the notes would have

11  more value than this ten-to-one thing I was paying for.  And I

12  thought that, hey, maybe there's a chance that we could place

13  some notes in the U.S. for him.  And I offered to take a look

14  at that.  That didn't happen, but I offered.

15  Q.  And the e-mail on the first page of this Exhibit 503 is

16  from Usuelli to you and Kennedy and others, right?

17  A.  Yes, 2-1, 2004.

18  Q.  It also cc's someone named Brian Good.  Do you see that?

19  A.  Yes.

20  Q.  What was his role in the deal?

21  A.  Well, Brian Good -- Geez!  I'm trying to remember what

22  even the guy looked like.  I think he, again, was a guy that,

23  for awhile, Pavanelli was using to help him do some things,

24  maybe look for investors.  I don't know.

25  And, so, I don't know if I'd ever heard the name Brian

1    Good before this, but I did hear it again after.

2     Q.    Did you have dealings with Brian Good in connection with

3    this Bandagro transaction?

4     A.    I did have a couple.  I know he had some documents.  I

5    sent him to meet with Crabbe Brown with those documents.  I may

6    have briefly interacted with him.  I'm trying -- I'm, you know,

7    searching my brain, did I do anything with -- but, like so many

8    things that weren't related to -- you know, I really wasn't

9    focused on -- We were focused on this idea of, let's find out

10    if this is a final and binding opinion.  And, so, some of these

11    things that were happening on the side I just don't have that

12    good a recollection of.

13     Q.    And there is also a further update in this document on

14    February 1st, 2004, on whatever deal Delgado was working on,

15    right?

16     A.    I was just reading that.

17           And, so, he says again there that Jacir is following

18    closely this claim that was introduced in the Supreme Court and

19    that the sale of a hundred fifty million of face value seems to

20    make progress.  And then he describes what he thought was

21    progress.  I don't know where he got the information.  And he

22    says the deal looks credible.

23           My suggestion is, if you could possibly wait until the

24    end of the week before entering a more committing negotiation

25    with your broker.

1          Well, I didn't have a broker.  I said to James I could

2     look into it perhaps, or to Pavanelli, there.

3          So, yeah.  I mean, it is what it is.  I'm sort of

4     remembering as I'm reading this.  So, excuse me if I'm

5     rambling.

6          Oh, yeah.  He's saying he doesn't want to give up a big

7     multiple bonds if he's getting ready to close a deal.  So --

8     Q.   All right.  Unless there is anything else that jogs your

9     memory in this document, I don't have any further questions for

10    you about it.  But I am going to turn to D-508.

11          COURTROOM DEPUTY CLERK:  D-508.

12    BY MR. SCHWARTZ:

13    Q.   I'm showing you D-508, Mr. Richards.  This is an easier

14    one to read, not too much text.  It's an e-mail from you to

15    Mr. Pavanelli, with a cc to Antonio Usuelli, dated February

16    16th, 2004.  You sent this e-mail, correct?

17    A.   It appears so, yeah.  It's dated -- This is from one of

18    the businesses I was renting at the time, OFS Financial

19    Services.  We had offices on Broad Street.  So, that's my

20    signature block.

21    Q.   You indicated in the second paragraph that you're

22    sending another $50,000 to Pavanelli, right?

23    A.   I say it will be sent tomorrow.  I was going to send it.

24    Whether I did or not, I think I may have; but, here, I'm saying

25    I will send it.

1    Q.   Didn't you send $50,000 to Pavanelli at or about this

2    time?

3    A.   I think so.  But, you know, we have that log of

4    everything that we actually sent from Commerce Bank.  So, I

5    think that's on there.  I don't know if it was that next day or

6    if it was a few days delayed or whatever, but I think probably

7    I did send him 50,000.

8    Q.   And that was the last payment you made to Pavanelli

9    before you met him for the first time in Lake Como in early

10   April of 2004, right?

11   A.   I don't think that's right.  I think there was one other

12   one at the end of February, to my recollection; but, again, I

13   could be wrong.  It would be on that log that we all have.

14   Q.   And in the meantime you reported that, even though a

15   month and a half had passed, you still had not resolved the

16   Larry Corna issue, right?

17   A.   Yeah.  And I didn't say I was going to do it either.  So

18   --

19   Q.   Nobody ever resolved that issue, right?

20   A.   He was a difficult guy to deal with, and fine sometimes.

21   But I say here that -- Do you wish me to speak with

22   Illamarrendi while I'm in New York?  And then I asked James,

23   Are you getting these e-mails, indicating to me that I'd been

24   trying to contact him and he hadn't been responding.

25        So, that's the rest of the e-mail.  I was trying to set

1    up a call with Schianchi.  I told him I had to have the call, I

2    think, before I sent the money.  So, that's kind of a mishmash

3    of things being dealt with in this e-mail.

4    Q.   And this $50,000 wire would have been rolled into the

5    purchase price for Notes 7/12 and 8/12 when that transaction

6    eventually proceeded in August of 2004, right?

7    A.   Yes, as with all money I'd sent him in the interim.

8    Q.   Let's take a look now at D-510.

9        MR. SCHWARTZ:  But, before we do that, Your Honor,

10   we were told that you'll be teaching your class this afternoon.

11       THE COURT:  You have a few more minutes, though.  I am

12   assuming we have a long time, still, with Mr. Richards?

13       MR. SCHWARTZ:  Yes.

14       THE COURT:  All right.

15       MR. SCHWARTZ:  Should I show him one more document?

16       THE COURT:  Sure.  You can keep going.

17       MR. SCHWARTZ:  All right.

18       THE WITNESS:  Last one?

19       THE COURT:  No, not the last one.

20       MR. SCHWARTZ:  I have a few others.

21       THE WITNESS:  I guess.

22       MR. SCHWARTZ:  But, actually, after this one wouldn't

23   be a bad time to stop if it's convenient.

24       THE COURT:  All right.

25       COURTROOM DEPUTY CLERK:  D-510.

1    BY MR. SCHWARTZ:

2    Q.   Mr. Richards, here we have an e-mail from Pavanelli to

3    you dated February 20th, 2004, right, --

4    A.   Yes.

5    Q.   -- cc'ing some other familiar players now in the case:

6    Mr. Usuelli and Mr. Schianchi, right?

7    A.   Yes.

8    Q.   And the subject is "apology," right?

9    A.   Yes.

10   Q.   And you received this e-mail, right?

11   A.   Again, same thing.  There is no reason to believe I

12   didn't.  This was part of a pattern where, you know, he'd have

13   this screaming -- I would say "screaming match," but there was

14   only one person screaming -- and then he would apologize.  So,

15   this was not unusual.  And, so, this e-mail is that he

16   didn't -- you know, he might have done it by phone.

17   Q.   And, among the things that Pavanelli was screaming

18   about, figuratively, in this e-mail was that, on top of it,

19   last Wednesday night he had to come up with $15,000 to pay

20   Delgado's hotel, plus three airline tickets, right?

21   A.   Yes.  He says that.  He says -- He says some other

22   things there, of course; that he has bills to pay and Schianchi

23   is asking for money and he has to pay Fabbiani and he has to

24   pay Delgado.  So, he's saying that he has all of these bills.

25   Q.   And then he expresses his long-standing frustration over

1    eight months with Larry Corna, right?  See that?

2      A.    He first says:  I can't keep borrowing money from

3    friends while I'm waiting for you to send money.

4            So, maybe it wasn't the 17th that I sent him the fifty.

5    Maybe he was still waiting on it.  Sounds like it was -- he

6    was.  Maybe the call with Schianchi didn't go forward.

7            Yes.  Then he also comments about, Take this how you'd

8    like, but I have had frustration with Larry Corna.

9      Q.    And he goes on to say, in a prophetic comment apropos of

10   Corna:  Yes.  I want that bastard in jail, but not yet.  Right?

11     A.    He wanted to get his thousand dollars first.

12     Q.    Corna did eventually end up in an Ohio penitentiary,

13   right?

14           MR. ELLIOTT:  Objection, Your Honor.  This is years

15   and years after this whole --

16           THE COURT:  What's the connection?

17           MR. SCHWARTZ:  The connection here in this instance

18   is --

19           THE COURT:  In other words, this person -- The witness

20   would have to have a crystal ball to have seen this coming,

21   right?

22           MR. SCHWARTZ:  No.  But I'll withdraw the question.

23           THE COURT:  All right.  I was talking specifically

24   about the prison time, not about the activities.

25           All right.

1    MR. SCHWARTZ:  I'm going to withdraw the question.

2    THE COURT:  All right.

3   BY MR. SCHWARTZ:

4   Q.    Then he goes on to say that Jacir has a hearing -- It

5   says "earring," but I assume it's a hearing -- on February 25,

6   2004, with the Finance Subcommission for the final decision,

7   which he say will be in our favor at 99 percent.  Do you see

8   that?

9   A.    Yep.  He says that.

10   Q.    And that's a reference to the then pending Mixed Special

11   Commission Legislative Committee review that was ongoing in

12   Venezuela at the time, right?

13   A.    That's not what he said.  So, I don't know what he's

14   referring to.  There's -- I think there are also Finance

15   Subcommissions and Central Banking Subcommissions.  So, I don't

16   know that's what he was referring to, but I later learned that

17   there was such a kind of proceeding that you referred to going

18   on.  So, perhaps.

19   Q.    You went ahead with the note purchase agreement without

20   waiting for the outcome of that proceeding, right?

21   A.    Which proceeding?

22   Q.    The Mixed Special Commission proceeding.

23   A.    If that's what it was, we knew that there was --

24   Congress was looking into this.  Right?

25        And, you know, my impression was it had to do with not

1    only the order to pay but the size of it, and it was a

2    political problem.

3    Q.   Let's just stick with that subject for a second.

4         So, as of the time that you required Notes 7/12 and

5    8/12, you were aware that that Legislative Mixed Special

6    Commission proceeding was still pending, correct?

7    A.   Again, not to quibble with you, but you say things in

8    your question, that I was aware of XXXXX.  So, I was aware

9    there was this proceeding.  Right?  I told you what I was aware

10   of.  And I was aware that that was going on.

11        I did not -- I don't -- I'm pretty sure I knew that

12   before we bought the notes.  I think I'm comfortable saying

13   that.  And I'm pretty sure that I'm comfortable saying that we

14   didn't know there was a result to that.

15   Q.   And then we have, in the next-to-last full paragraph,

16   another update on the activities of Carlos Delgado Morean,

17   right?

18        MR. ELLIOTT:  I'm just going to object, Your Honor.

19   We don't -- If there's a foundation that this witness knows who

20   that is --

21        THE COURT:  All right.  Why don't you clear that up.

22   I don't think he's been asked yet, has he?

23   BY MR. SCHWARTZ:

24   Q.   Well, you came to learn that the Delgado frequently

25   referred to by Pavanelli and Usuelli and others was Carlos

1  Delgado Morean, right?

2   A.   Well, if you're asking me what I knew when this e-mail

3  came, I don't think I knew that for sure.

4       So, ultimately do I know that -- do I know a guy named

5  Roman Delgado?  Yes, I do.  Is it the same guy?  I don't know.

6       You're telling me it is.  I'm not arguing with you.  I'm

7  just saying I don't know.  I don't remember this e-mail, but

8  this is part of this ongoing saga about a banking deal going to

9  happen.

10  Q.   With some guy named Delgado?

11  A.   With a guy named Delgado bringing bankers to do it, he

12 acting as a sort of intermediary, is the sense I got.

13  Q.   Okay.  Thank you.

14  A.   In here, he talks about Banco Santander.

15  Q.   And no deal ever happened with Banco Santander and

16 Pavanelli as far as you know, right?

17  A.   No.  It never happened.

18       MR. SCHWARTZ:  Your Honor, if you're planning on

19 stopping anytime soon, this is a good time.

20       THE COURT:  All right.

21       We will be in recess until nine o'clock tomorrow

22 morning.

23       (Proceedings were concluded at 4:30 p.m.)

24                        - - -

25

- - -

WITNESS INDEX

- - -

WITNESSES                DIRECT CROSS REDIRECT RECROSS

PLAINTIFF's:

David Richards          5    125

1          C E R T I F I C A T E

2

3          We, Laura Samuels, Denise Errett, Lahana DuFour,

4    Shawna Evans and Darla Coulter, do hereby certify that the

5    foregoing is a true and correct transcript of the proceedings

6    before the Honorable Edmund A. Sargus, Jr., Judge, in the

7    United States District Court, Southern District of Ohio,

8    Eastern Division, on the date indicated, reported by us in

9    shorthand and transcribed by us or under our supervision.

10

11

12                         s/Laura L. Samuels,RPR
                           Laura L. Samuels, RPR
13                         Official Federal Court Reporter
                           March 16, 2016
14
                           s/Denise N. Errett, FCRR
15                         Denise N. Errett, FCRR
                           Official Federal Court Reporter
16
                           s/Lahana DuFour, RMR, CRR
17                         Lahana DuFour, RMR, CRR
                           Official Federal Court Reporter
18
                           s/Shawna J. Evans, RMR
19                         Shawna J. Evans, RMR
                           Official Federal Court Reporter
20
                           s/Darla J. Coulter, RMR, CRR
21                         Darla J. Coulter, RMR, CRR
                           Former Official Federal Court Reporter

22

23

24

25