UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRFP LLC, D/B/A SKYE    )
VENTURES,               )
                        )
  PLAINTIFF,            )        CASE NO. 2:04-cv-0793
                        )
        vs.             )
                        )
REPUBLICA BOLIVARIANA   )
DE VENEZUELA, ET AL.,   )
                        )
  DEFENDANTS.           )
_____)


VOLUME 4
TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
THURSDAY, FEBRUARY 4, 2016; 9:20 A.M.
COLUMBUS, OHIO


  FOR THE PLAINTIFF:
        Cooper & Elliott, LLC
        By:  Charles H. Cooper, Jr., Esq.
             Rex H. Elliott, Esq.
             Charles B. Cooper, Esq.
             Adam P. Richards, Esq.
        2175 Riverside Drive
        Columbus, Ohio 43221


        Law Offices of John C. Camillus
        By:  John C. Camillus, Esq.
        P.O. Box 14140
        Columbus, Ohio 43214

FOR THE DEFENDANTS:
        Foley Hoag, LLP
        By:  Andrew Z. Schwartz, Esq.
             Matthew L. Baltay, Esq.
             Madeleine K. Rodriguez, Esq.
             Richard G. Baldwin, Esq.
             Thomas R. Ayres, Esq.
             Christopher E. Hart, Esq.
        155 Seaport Boulevard
        Boston, Massachusetts 02210

        Calfee, Halter & Griswold
        By:  Albert J. Lucas, Esq.
        1200 Huntington Center
        41 South High Street
        Columbus, Ohio 43215


FOR INTERESTED PARTY MIGUEL JACIR:
        Graydon Head & Ritchey
        By:  John B. Pinney, Esq.
        511 Walnut Street, Suite 1900
        Cincinnati, Ohio 45202



                        - - -


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

                        LAURA SAMUELS, RPR
                FEDERAL OFFICIAL COURT REPORTER
                85 MARCONI BOULEVARD, ROOM 121
                    COLUMBUS, OHIO 43215
                TELEPHONE NUMBER 614-719-3245

1        Thursday Morning Session

2        February 4, 2016

3                   - - -

4        THE COURT:  Counsel, good morning to all of you.  We

5    had a little bit of an issue that's been resolved with some

6    court reporting matters.  We're ready to begin.

7        Mr. Schwartz, you may continue with the

8    cross-examination of Mr. Richards.

9        MR. SCHWARTZ:  Thank you very much, Your Honor.

10                  - - -

11              DAVID RICHARDS

12    resuming the stand for further cross-examination, having been

13    previously duly sworn, continued his testimony as follows:

14              CROSS-EXAMINATION (Cont'd.)

15    BY MR. SCHWARTZ:

16    Q.   Good morning, Mr. Richards.

17    A.   Good morning.

18    Q.   Preliminary question.  Since the time you left the

19    witness stand yesterday, have you discussed your testimony with

20    anyone?

21    A.   You mean the substance of my testimony or whether I was

22    doing okay or not?

23    Q.   Any aspect of it, sir.

24    A.   I think -- no, not really.

25    Q.   You'll recall that we spent some time at the beginning

1  of your cross-examination yesterday talking about the waterfall

2  that was in effect the day this lawsuit was filed.  Do you

3  remember that?

4      A.   I don't recall that we -- we talked about the evolution

5  of the waterfall but I don't recall that we talked about what

6  it was specifically the day the lawsuit was filed.

7      Q.   You don't recall we spent time looking at Defendant's

8  Exhibits 521 and 581 and there was a $39 million non-recourse

9  promissory note in 521 and then a different form of

10  non-recourse note in 581 which had you only getting

11  $10 million?

12          THE COURT:  I don't think we need to go over all this.

13  I remember what we went over.

14          MR. SCHWARTZ:  I just want to make sure the witness

15  does.

16          THE COURT:  Well, I'm the one that's going to be

17  deciding the case.  Let's go forward, if we can.

18          MR. SCHWARTZ:  Okay.

19  BY MR. SCHWARTZ:

20      Q.   I've done a little additional homework on the subject,

21  Mr. Richards, and I want to review something with you here.  So

22  let me ask that we put before you your deposition transcript

23  from your rule 30(b)(6) deposition on December 23rd of 2014.

24      A.   Okay.

25      Q.   You have that with you?

1    A.    I have the deposition.

2    Q.    All right.  Let me ask you, please, to turn to page 76

3    of the 30(b)(6) deposition transcript.

4    A.    I'm sorry, 76?

5    Q.    Yes.

6    A.    Okay.  Yeah.

7    Q.    On line 18 do you see I asked you a question.  So when

8    you entered into this transaction, how did you quantify the

9    risk and how did you quantify the reward?

10         Do you see that question?

11   A.    Yes.

12   Q.    And then you gave a rather lengthy answer that began on

13   the bottom of page 76, continued through the entirety of page

14   77, continued through the entirety of page 78, and concluded on

15   line 2 of page 79, right?

16   A.    I see that it's a very long answer for sure.  I said a

17   lot of stuff in there.

18   Q.    All right.  If you feel it's necessary at any point

19   during this exchange, you can look at any or all of that.  But

20   I'm going to direct your attention right now to page 78, line

21   8.  Are you fixated on that, Mr. Richards?

22   A.    Yes.

23   Q.    Do you see that on line 8 on page 78 you said, quote,

24   and on the reward side we were going to get a return on our

25   funding.  As of the time we filed the lawsuit, I believe our --

1    the waterfall would have put us at, after the attorneys were

2    paid, the next $10 million.

3         Do you see that?

4    A.   You're talking about line 13 there?

5    Q.   I'm talking about lines 8 through 12.

6    A.   Oh.

7    Q.   Have I read those correctly?

8    A.   Again -- yeah.  I say, I believe our waterfall would

9    have put us at the next 10.

10   Q.   Now let's look at lines 13 through 15.  Do you see that

11   you testified on December 23rd, 2014, quote, so the potential

12   at that point was that we would have put all of the cash, all

13   of the 15 years of effort, all the risk for just the

14   $10 million return.

15        Do you see that's what you said on December 23rd, 2014?

16   A.   I said that.  I think it should be put in context, but I

17   said it.

18   Q.   Let me ask you now to look at line 22 on the same page,

19   78.  Do you see starting on line 22 you testified, quote, so

20   the deal as structured when we -- it was certain when we filed

21   the litigation is we would receive something short of

22   $10 million that in return for not only the cash and my time

23   but the commitment to put all the effort into the lawsuit,

24   that's how I looked at it.  Continuing on to page 79.

25        Is that what you said December 23rd, 2014?

1  A.   This is in respect to the waterfall that we had at the

2  deposition and we were discussing from December that I would be

3  netting $10 million after paying all of the lawyers, all of the

4  fees, all of the promissory note, all of that thing.  So that's

5  my recollection.  And I believe if we look -- if you gave me --

6  if we looked at the whole deposition, that's what we were

7  discussing at that time.

8  Q.   So you said three times on page 78 continuing on to line

9  2 of page 79 that what you stood to gain the day you filed the

10  lawsuit was $10 million or less, correct?

11  A.   Again, in the context of the December waterfall that I

12  think we were discussing at the time which I said to you was I

13  was paying A, lawyers 30 million, promissory note Gruppo Triad

14  39 million, Jacir, 8 percent.  There was a risk.  We went over

15  Sitrick, what he would get, what the investigator was getting.

16  Net of that 100 million, 10 million -- about 10 million, more

17  or less, would be left for me.  We were saying that that was

18  not a great deal for me and it was also in the context of me

19  telling you in this deposition that my goal from that point

20  forward was to improve the waterfall.

21  Q.   Mr. Richards, the lawsuit was filed in August, not

22  December of 2004, correct?

23  A.   That's right.

24  Q.   These questions or rather these answers specifically

25  addressed the waterfall the day the lawsuit was filed, correct?

1   Three times in one page and two lines of this transcript, isn't

2   that correct?

3      A.   If you look at it, you're saying the waterfall contained

4   in Exhibit 12, that's what you're referring to.

5      Q.   Mr. Richards?

6      A.   In this question, it says it right here.  And that's the

7   waterfall we were discussing, the waterfall contained in

8   Exhibit 12.

9      Q.   All right.  I'm going to have to show you one more page

10  of the transcript.  Take a look now at page 80, the next page.

11  And I'm going to direct your attention to my question beginning

12  on page 4, I'm sorry, line 4.  Do you see I addressed you with

13  the following question:  And let's look at the waterfall that's

14  contained within Exhibit 13 -- that was deposition

15  Exhibit 13 -- that's on page 005874.

16          Do you see that question?

17     A.   I'm sorry.  I think I might have lost my place here.

18  You were talking about page --

19     Q.   Page 80.

20     A.   Page 80.  All right.

21     Q.   Line 4.  Are you there?

22          THE COURT:  Exhibit 13.  What does that correspond to

23  in this case?

24          MR. SCHWARTZ:  I'm going to point out in a moment it's

25  Defendant's Exhibit 581, Your Honor.

1        THE COURT:  Thank you.

2        THE WITNESS:  Okay.  You say let's look at, this is a

3   different section and you're saying let's look at Exhibit 11.

4   We were looking at Exhibit 12 before, right?

5   BY MR. SCHWARTZ:

6   Q.   Mr. Richards, stick with my questions.  Line 4.  It's a

7   short question.  Quote, and let's look at the waterfall that's

8   contained within Exhibit 13 that's on page 005874.

9        Do you see that was the question?

10  A.   Yes.

11  Q.   All right.

12  A.   I see that's the question.

13  Q.   Now, that was a reference to deposition Exhibit 13.

14  A.   Right.

15  Q.   I'd like you now to look at Defendant's trial

16  Exhibit 581.  We looked at it yesterday.  We can look at it

17  right now.  Is a hard copy available to you?

18  A.   No.  I don't have one in front of me.

19  Q.   D-581.

20       THE COURTROOM DEPUTY:  D-581.

21  BY MR. SCHWARTZ:

22  Q.   Let's start just by looking at the first page of D-581.

23  A.   Okay.

24       THE COURT:  Give me just one second to find that, if

25  you would, Mr. Schwartz.

1    MR. SCHWARTZ:  We have extra copies, Your Honor.

2    THE COURT:  I know you gave it to me.

3    MR. SCHWARTZ:  We'll give you another one.

4    THE COURT:  It's here somewhere.  Just a moment.

5    I've got it.

6   BY MR. SCHWARTZ:

7   Q.   All right.  Let's look, Mr. Richards, do you have D-581?

8   A.   Yes.

9   Q.   Let's look at the first page of D-581.

10  A.   Okay.

11  Q.   Do you see in the lower right-hand corner it was

12  deposition Exhibit 13?

13  A.   Yes.

14  Q.   And that's the deposition exhibit I was asking you about

15  on lines 4 and 5 on page 80, right?

16  A.   That's right.  I think I was confused because you

17  switched there from 12 to 13.  You'd been asking me a bunch of

18  questions about the waterfall in 13 and so I might have

19  misunderstood -- I misunderstood, I think, looking at this

20  answer.

21  Q.   Well let's see what the question and the answer were.

22  On lines 4 and 5 I asked you about Exhibit 13 and then I

23  directed you to page 005874, right?

24  A.   You did.

25  Q.   All right.  Now I'm going to do the same exact thing.

1    Please look at page 005874 within D-581.  Let me know when you

2    have that page in front of you.

3    A.    I've got it.

4    Q.    Okay.  Now we're going to proceed to line 7 on page 80

5    of the 30(b)(6) deposition.

6    A.    Page what?

7    Q.    Same page 80, three lines lower.

8    A.    Gotcha.

9    Q.    After I said, let's look at the waterfall that's

10   contained within Exhibit 13 that's on page 005874, and you

11   said, yes, I asked another question.  Quote, and if you look at

12   that waterfall, is that the one that was in effect when you

13   agreed to purchase 7/12 and 8/12 in late July or early August?

14        Do you see that question?

15   A.    Yes.  Could I ask you to see Exhibit 12?

16   Q.    Not right now.

17   A.    Because I say the exact -- you ask me the exact same

18   question about Exhibit 12 that you -- three outlines earlier,

19   as you did about Exhibit 13.

20        THE COURT:  We'll have to save that for redirect.

21        You may continue.

22        THE WITNESS:  Okay.  I'm sorry.

23   BY MR. SCHWARTZ:

24   Q.    Now I'm going to repeat the question because I don't

25   want there to be any possible understanding or interruption.

1    So I said, let's look at the waterfall on page 005874.  Right?

2    Just like we're doing now.

3    A.    Yes.

4    Q.    And I asked you on December 23rd, 2014, quote, and if

5    you look at that waterfall, is that the one that was in effect

6    when you agreed to purchase 7/12 and 8/12 in late July or early

7    August?

8         Do you see that?

9    A.    Yes, I do.

10   Q.    And your answer was, quote, I believe so, yes.  Right?

11   A.    Yes.

12   Q.    Let's move on to another subject.  We'll mark D-538.

13   I'll show you D-538.  It's previously been marked.

14         THE COURTROOM DEPUTY:  D-538.

15   BY MR. SCHWARTZ:

16   Q.    Mr. Richards, do you have D-538 with you?

17   A.    I do.

18   Q.    This document's got a number of parts to it so I'm going

19   to take you through it slowly at the beginning.  I'd like you

20   to look at the bates stamp page JACIR01-005.

21   A.    Yes.

22   Q.    And toward the bottom of that page do you see there's an

23   e-mail from you to Antonio Usuelli, James Pavanelli and Siro

24   Schianchi dated May 5th, 2004?

25   A.    So I can't read it on this, but on the screen I can see

1   that it is.

2       Q.   And I want you to look at the subject --

3           THE COURT:  My copy is unreadable, too.  The date on

4   this is?

5           MR. SCHWARTZ:  5 May, 2004.  Fairly legible up there

6   on the --

7           THE COURT:  All right.  I can read it.

8       BY MR. SCHWARTZ:

9       Q.   And I want you to look, first of all, at the subject

10  line.  And you can see it starts with the words -- the letters

11  capital FW for forwarding, right?

12      A.   I don't see -- subject FW, yeah.  Okay.

13      Q.   So you were forwarding something to Usuelli and

14  Pavanelli and Schianchi, right?

15      A.   I don't remember that but --

16      Q.   Take a look at the bates stamp page that's immediately

17  following 005, it's JACIR01-006.  Do you have that page?

18      A.   Yes.

19      Q.   So here's a letter in Spanish from Miguel Jacir to

20  Pavanelli, right?

21      A.   Yes.

22      Q.   And when you sent the e-mail that appears on page 01-005

23  you said, this is an extremely serious blow.  We need to

24  discuss tomorrow.  Right?

25      A.   That's what it says.

1    Q.   What you were doing when you communicated that to

2    Usuelli, Pavanelli and Schianchi was forwarding this letter

3    from Jacir, right?

4    A.   That's what it appears.  Again, I don't recall it.

5    Q.   All right.  Let's now look at a different part of this

6    document.  There's a translation that appears on the bates

7    stamp page JACIR01-006?

8    A.   01-006.  I have that, yeah.

9    Q.   That's a translation of -- actually it's the same bates

10   number and that's the translation of the last page of this

11   exhibit.  I'll represent that to you.

12   A.   Okay.

13   Q.   So here's the English translation of the letter from

14   Jacir to Pavanelli that you forwarded.  Why don't you take a

15   moment and look at it.

16   A.   I've read it.

17   Q.   So basically what was going on in this letter was Jacir

18   was resigning from representing Pavanelli, right?

19   A.   Yes.

20   Q.   And he said, among other things, he's irrevocably

21   resigning as representative of Triad FFC-S.P.A. because I

22   consider that you have not valued the work I have done for your

23   company, which I have served loyally and honorably without

24   receiving one single cent in fees and which I have invested my

25   own money.  Right?

1    A.    Yes.  You've read the first part of that correctly.

2    Q.    And when you got a copy of this resignation letter from

3    Jacir to Pavanelli, you regarded that as an extremely serious

4    blow, right?

5    A.    We wanted Jacir to be around.  He was a really

6    accomplished guy.  It was a blow if he was not part of it.  I

7    don't recall saying that, but I would -- don't doubt I would

8    have said it.  I valued Jacir's input.

9    Q.    There's no doubt he did say it, right?

10   A.    Whether he said it and it went away the next day, again,

11   I don't remember this.

12   Q.    There's no doubt that you sent this e-mail to Usuelli

13   and Pavanelli and Schianchi, is there?  You're not denying

14   that?

15   A.    Again, I'm not arguing with you.  I'm saying I don't

16   remember it.

17   Q.    This is an e-mail sent from drichards@netwalk.com,

18   right?  That's what it looks like on page 005?

19   A.    That was one of my e-mail addresses at the time for

20   sure.

21   Q.    On May 5th, 2004, you were deep in the throes of dealing

22   with Pavanelli and his various acquaintances, right?

23   A.    At that point we were -- had made the decision to

24   proceed with the lawsuit, that the Attorney General's decision

25   was final and binding, and I was trying to get a final deal.

1    Q.   Taking that into account and that this is an e-mail

2   address you used at the time, it's more probable than not that

3   you sent this e-mail to Usuelli, Pavanelli and Schianchi on

4   May 5th, 2004 as indicated on this exhibit, correct?

5    A.   So you're asking me to judge more probable than not.  I

6   said I'm not arguing with you about that.  That was an e-mail

7   address I used at the time.  I just don't remember it.

8    Q.   How did you get a copy of this Spanish resignation

9   letter?

10    A.   I have no idea.

11        THE COURT:  If we could clear up.  Remembering the

12   e-mail is one issue.  Remembering the subject matter is

13   another.  I don't believe we addressed both.

14   BY MR. SCHWARTZ:

15    Q.   And you do remember this subject matter of Jacir

16   resigning, right?

17    A.   I really don't.

18    Q.   Fair enough.

19    A.   My guess would be it went away.  This is Pavanelli 101

20   where he'd have these blowups and they'd get resolved or

21   sometimes not.

22    Q.   So Pavanelli then responded to your e-mail the next day,

23   correct?

24    A.   There is an e-mail here from Pavanelli to me, Usuelli

25   and some other e-mail addresses that I really don't recognize.

1    Q.   Well, among the other e-mail addresses included in the

2    CC line on Pavanelli's e-mail is cromandelchal@hotmail.com?

3    A.   Yes.

4    Q.   That's Carlos Roman Delgado's e-mail address, correct?

5    A.   Again, I don't know that one way or the other.  I don't

6    recall ever seeing this e-mail address for Roman Delgado.  I'm

7    not denying it.  I just don't know.

8    Q.   And Pavanelli, he added his own subject line when he

9    sent his response, right?

10   A.   Yeah.

11   Q.   He called it bullshit from Jacir and Bonetti, right?

12   A.   Yes.

13   Q.   Let's see what he had to say under that polite

14   salutation.  First of all, in the first paragraph you look at

15   the third line he says, Bonetti had promise to get the payment

16   order from the Ministry of Finance in exchange for a uge amount

17   of notes on or before October 4.  Do you see that?

18        THE COURT:  One moment.  There's an objection.

19        MR. ELLIOTT:  Thank you, Your Honor.

20        I think Mr. Richards has indicated he doesn't recall

21   this e-mail.  Certainly if he recalls the subject matter,

22   that's a different story.

23        THE COURT:  He doesn't have any -- you have no

24   foundation for this.  You can ask him about the subject matter

25   and ask him whether he remembers this e-mail.  If he doesn't

1   remember anything then we're back to the subject matter only.

2          MR. SCHWARTZ:  I'm going to address the subject matter

3   of the e-mail and we'll see where it leads.

4          THE COURT:  But right now reading to him a document

5   that he says he hasn't seen.

6          MR. SCHWARTZ:  May I be heard a bit further on this?

7          THE COURT:  Briefly.

8          MR. SCHWARTZ:  We have here an exchange of e-mails at

9   a time when Mr. Richards was actively engaged with the people

10  who are on it from an e-mail address that he acknowledges to be

11  one he used at the time.  When you have a witness, as has been

12  the case to some extent in the course of this

13  cross-examination, who looks at e-mails of that nature and

14  says, well, I can't be sure if I got them or not, it was a long

15  time ago --

16         THE COURT:  But this is substantive matters right now.

17  First of all, we're talking about whether he had knowledge of

18  this.  He says he's never seen it.  You can later argue about

19  what he should have known, inferences and so on, but if he

20  hasn't seen it, he can't be crossed with it.  Unless you've got

21  some other basis.  And I don't hear one at this point.

22         MR. SCHWARTZ:  I think it also will present,

23  ultimately, a credibility issue.  But I think I can ask him

24  about the subject matter in here and ask him if he remembers

25  it.

1          THE COURT:  You can do that.

2          MR. SCHWARTZ:  But the only way to lay the groundwork

3     for the question is to indicate what it says, I think.

4          THE COURT:  I don't think you can ask him to read it

5     line for line.

6          MR. SCHWARTZ:  All right.  I'll adjust.

7     BY MR. SCHWARTZ:

8     Q.   Do you have a recollection that after you forwarded

9     Jacir's resignation letter to Pavanelli there was some

10    discussion with Pavanelli concerning Bonetti having promised to

11    get a payment order from the Ministry of Finance in exchange

12    for a huge amount of notes on or before October 4th of 2003?

13    A.   No.

14    Q.   Do you recall any interaction with Pavanelli or any

15    member of his entourage concerning some arrangement under which

16    Bonetti had promised to get a payment order from the Ministry

17    of Finance at any time?

18    A.   So I -- the -- his entourage, I don't know what you mean

19    by his statement.  It sounds like something I've not said.  So

20    I don't know that Pavanelli had an entourage.  I don't think he

21    did.

22         So just to clarify my answer to your question, I'm not

23    consenting to your introduction about characterizing Pavanelli

24    and his entourage.  So I know he had an attorney and we had an

25    investor, Usuelli.

1    So and to that end, I did not know that.  Ultimately I

2  knew there was an agreement between Woodstrite and Gruppo that

3  provided something specific, but I don't recall discussing this

4  matter with Pavanelli.

5    Q.   All right.  In light of your challenging the premise of

6  the question, let me rephrase it.  At any time in or after May

7  of 2004, were you privy to any kind of discussion, whether it

8  was oral or in writing, that involved the issue of Bonetti

9  promising to get to Pavanelli or Gruppo Triad a payment order

10  from the Ministry of Finance?

11    A.   Again, we became aware after this or before it, I don't

12  know exactly when, that there was an agreement that Alcalde

13  described between Woodstrite, Bonetti and Manfredi on the one

14  hand, and Gruppo on the other.  The way Luis Alcalde

15  characterized it was they were commissioned to use their

16  contacts, their knowledge of the people in Venezuela to get an

17  investigation started.

18    I assume that's what the contract read.  I don't know.

19    Q.   That was the arrangement under which Manfredi and

20  Bonetti, occasionally known as Woodstrite, were going to get

21  $250 million in face amount of the purported notes for lobbying

22  the congressmen to cause the investigation to be initiated; is

23  that right?

24    A.   I recall that it was 22, 25 percent.  So that's –– they

25  had an interest in the success, yes.

1    Q.    25 percent of over a billion, right?

2    A.    Of whatever was recovered.

3    Q.    But the amount of notes that Pavanelli was seeking to

4    have investigated was over a billion dollars in face amount,

5    right?

6    A.    That was the face value of the promissory notes, the

7    zero coupon promissory notes.

8    Q.    Rough math, 25 --

9        MR. ELLIOTT:  Your Honor, I think we've covered this

10   over and over again.

11       THE COURT:  I think with respect to this particular

12   e-mail I'll overrule the objection.  You may continue.

13       MR. SCHWARTZ:  Can I finish this question?

14       THE COURT:  I overruled the question.  You may go

15   forward.

16   BY MR. SCHWARTZ:

17   Q.    So without prolonging this, 25.11 percent of a billion

18   is, give or take, 250 million, right?

19   A.    Yes.  Your math is correct.

20   Q.    At any time do you recall any time before you obtained

21   the purported notes, let's put it that way, do you recall any

22   interaction with Pavanelli, Manfredi, Bonetti, Usuelli, Carlos

23   Delgado Morean or others concerning the failure to obtain a

24   payment order from the Ministry of Finance?

25   A.    Well, I think I've described my only interaction with

1    Manfredi and Bonetti which was in the end of June of 2004.  So

2    I would refer you back to that.  And we discussed the subject,

3    of course, and that that was also the purpose of -- the primary

4    purpose, I think, of Alcalde's trip to Switzerland to discuss

5    that further with the parties.  I was not present there.

6    Q.   Let's move a little further along with this document.

7    Another subject here that is introduced in the same paragraph

8    in the May 6, 2004 e-mail is Jacir being about to introduce a

9    claim to the Administrative Court and claiming that to do that,

10   he needed to have possession of the notes.

11        Do you have any recollection of having engaged in any

12   kind of communication, oral, written or otherwise, with anyone

13   concerning the possibility of Jacir bringing a claim in the

14   Administrative Court in or after May of 2004?

15             THE COURT:  There's an objection?

16             MR. ELLIOTT:  I'm sorry, Your Honor.  I think

17   Mr. Schwartz misspoke.  The document indicates that the claim

18   was being presented by Mr. Bonetti, not Mr. Jacir.  So he's

19   mischaracterizing the exhibit.

20             THE COURT:  Do you agree with that?

21             MR. SCHWARTZ:  Reluctantly, yes.

22             THE COURT:  All right.  Go ahead and rephrase the

23   question.

24             MR. SCHWARTZ:  Thank you, Mr. Elliott.

25        Let me rephrase the question because I think your

1  counsel's objection is well taken, even though the sentence is

2  a little ambiguous.

3  BY MR. SCHWARTZ:

4  Q.   Do you have any recollection in May of 2004 or

5  thereafter, and the time frame here is important, of there

6  being any discussion of any type, oral or written, concerning

7  Bonetti being about to introduce a claim to an Administrative

8  Court in Venezuela?

9  A.   No.  I don't recall anything like that.

10 Q.   Now, you'll recall we've talked with Mr. Alcalde, whose

11 testimony you observed, and to some is extent with you about

12 this Woodstrite action in the Venezuelan Supreme Court, right?

13 A.   Yes.

14 Q.   That action was over by May 6 of 2004, right?

15 A.   I think that's right.  You would probably have documents

16 with dates on it.

17 Q.   While you and Mr. Alcalde have characterized the

18 decision of the Venezuelan Supreme Court as being on some

19 standing grounds, in fact what really happened was the Court

20 said that Woodstrite had brought the proceeding in the wrong

21 court, right?

22 A.   Again, I told you what I was told and that it was

23 dismissed on some procedural ground.  I don't read Spanish.

24 Q.   Fair enough.  So after you learned that Woodstrite's

25 action in the Venezuelan Supreme Court had been dismissed on a

1  procedural ground, did you learn that Woodstrite was

2  contemplating bringing another case in the Venezuelan court

3  system to address the procedural defect in its initial claim?

4  A.   I thought I already answered that no.  So that answer is

5  no.  Or certainly not that I recall.

6  Q.   Now, toward the end of this paragraph, and again, I'm

7  not going to read it to you verbatim in light of the Court's

8  rulings, there's some discussion here about Jacir in May 2004

9  surfacing the possibility of getting some payment on some of

10  the purported notes but also needing $200 million of the notes

11  in Caracas to do so.

12       In or after May of 2004, is that a subject to which you

13  became privy?

14  A.   You know, this is very typical of Pavanelli, nobody can

15  have my notes.  I told him no.  And that was consistent.  I

16  recall Pavanelli saying that kind of thing.  He said it to me

17  many times.  But this idea that Jacir was requesting notes, I

18  don't have any knowledge of that.  I mean, I don't know if it's

19  true or false and I don't remember it.

20  Q.   Let's move to the next paragraph here.  And again --

21       THE COURT:  To be precise, we're testing his memory

22  because he doesn't remember this e-mail.  You're going to have

23  to stay away from the e-mail.

24       MR. SCHWARTZ:  All right.

25

1    BY MR. SCHWARTZ:

2    Q.   I'm going to move to the next subject in this line of

3    questions.

4         At any point in or after May of 2004, did you come to

5    learn in any manner that Pavanelli was accusing Woodstrite of

6    attempted fraud and any other civil or criminal charge?

7    A.   Did I remember they argued?  Pavanelli would say, often

8    when he was angry, irrational things.  That was a

9    characteristic of Pavanelli.  Specifically what you're talking

10   about, I have no knowledge.

11   Q.   Let me try to condense the question.  Did you ever get

12   any exposure or visibility of Pavanelli alleging that Manfredi,

13   Bonetti or Woodstrite had engaged in a crime or fraud?

14   A.   Again, it wouldn't surprise me if Pavanelli alleged

15   that.  He alleged it of Crabbe, Brown, he alleged it of me, he

16   alleged it of Jacir at times when he was angry, but I don't

17   have any specific recollection of that.

18   Q.   I'm going to ask you a question about the e-mail itself

19   similar to the question I asked you about the e-mail below just

20   so the record is clear on this.  Do you think it's more

21   probable than not that you received the e-mail from Pavanelli

22   from May 6, 2004 addressed to you at drichards@netwalk.com that

23   appears at the top of the page of JACIR01-005?

24        THE COURT:  There's an objection.

25        MR. ELLIOTT:  Your Honor, if he doesn't remember the

1    e-mail, I'm not sure how he can remember whether it's more

2    probable than not.

3         THE COURT:  Again, I've told you before, I look at

4    practical solutions here, if there is one.  Jacir is going to

5    testify.  This is his e-mail or actually he started this with

6    his e-mail, then we get to this e-mail.  The witness has said

7    that's his e-mail address.  You're going to be able to ask

8    Jacir if he sent it, I assume.

9         MR. SCHWARTZ:  It's actually not from Jacir.  It's

10   printed out by Jacir.  It's from Pavanelli.

11        THE COURT:  It's from his file.

12        MR. SCHWARTZ:  It is from Jacir's file.

13        THE COURT:  Yes.

14        MR. SCHWARTZ:  Understood.

15        Actually, Your Honor, you suggest a few questions about

16   the document I'm going to pursue.

17   BY MR. SCHWARTZ:

18   Q.    So, Mr. Richards, as Judge Sargus has just pointed out,

19   the document we're looking at bears the Jacir bates stamp

20   numbers, right?

21   A.    Okay.

22   Q.    And I'm going to represent to you, and you'll have no

23   argument from anyone because there's a stipulation to this

24   effect, that documents with Jacir numbers have been produced by

25   Jacir's US counsel in this litigation.

1    A.   All right.

2    Q.   You can take that as a given.

3    A.   Okay.  I'll assume that for purposes of your question.

4    Q.   So you appear to have been copied on the e-mail from

5    Pavanelli, at least as it appears at the top of page

6    JACIR01-005, right?

7    A.   As I think we discussed that that's my e-mail address up

8    there.

9    Q.   And I'm not trying to make this unnecessarily agonizing.

10   But the same is true of the one that appears you sent at the

11   bottom.  It's got your e-mail address, right and your phone

12   number?

13   A.   Which?

14   Q.   The one at the bottom of JACIR01-005.

15   A.   That is my e-mail address, as we discussed.

16   Q.   It's also your phone and fax number below your name,

17   right?

18   A.   Yes.  That's still my phone number.

19   Q.   Do you have a copy of the e-mail that appears at the

20   bottom of page JACIR01-005 or the one that appears at the top

21   of the page?

22   A.   The one that's on the screen?

23   Q.   No.  I mean in your files, Skye Ventures' files?

24   A.   I've produced everything I had.  I think we went through

25   this at length in my deposition.

1    Q.    Indeed.  But you didn't produce this document, right?

2    A.    Right.  I didn't produce any e-mails from 2004 or 2003.

3    Q.    And the reason you didn't produce e-mails is that you

4    didn't retain them, right?

5    A.    I had nothing that old.  Nothing from any deal, this

6    deal or any deal.

7    Q.    May of 2004 was just three months before this lawsuit

8    was commenced, right?

9    A.    Yes.

10    Q.    And you were already readying a litigation offensive at

11    that time, right?

12    A.    That was one of the possible avenues, maybe probable

13    avenues of recovery at that time.

14    Q.    Let's move to another document.  This will be D-576.

15          THE COURTROOM DEPUTY:  D-576.

16    BY MR. SCHWARTZ:

17    Q.    Before we look at this document, Mr. Richards, as of

18    early June 2004, you weren't satisfied with the information you

19    were getting from Pavanelli as of that time, right?

20    A.    As of what date?

21    Q.    Early June 2004.

22    A.    We had made our decision.  We had all the information we

23    needed for the key investment thesis, that is was the Attorney

24    General decision final and binding.

25    Q.    But as the information coming from Pavanelli himself,

1 you weren't yet satisfied with what he was telling you, right?

2 A. Well, I was satisfied but others were asking for some

3 additional information.

4 Q. Who were the others?

5 A. So at this time in June there's a firm called Libra

6 that's run by a fellow named Jess Ravich, ex Drexel guy, big

7 bond guy.  And we had started the process of exploring another

8 one of our possible liquidity events and that is having Libra

9 take our position at some sort of profit and carry the lawsuit

10 forward.

11  So Libra had a team of young analysts on the deal and

12 they were requesting some of these detailed information.  And

13 so rather than -- while we were discussing with them, look,

14 this stuff doesn't matter, your investment thesis has to be the

15 same as ours, it's an investment that's not based on some of

16 these details, it's based on whether the Attorney General's

17 decision is final and binding.  And I think they ultimately

18 arrived at that same conclusion.  But in the meantime, we had

19 these young guys just, you know, working for Jess and they

20 weren't partners and trying to paper their file and get as much

21 information they can and asking.  So rather than fighting with

22 them about what's relevant and not relevant, we just sent the

23 request to Pavanelli.

24 Q. Ultimately, Libra declined to invest in this

25 opportunity, right?

1    A.    In the fall, Libra actually considered it a good

2    investment.  So in the fall they got through diligence, they

3    thought it was a good deal.  They took it to the partners and

4    the partners passed for a couple of reasons.  One, they didn't

5    like the fact that I had so much control over the deal and

6    second, they thought the ten-year sort of the time frame was

7    just too long, the potential time frame.  That was why they

8    passed.  But they passed in the fall, right?  I think.

9    Q.    Have you completed your answer?

10    A.    Yeah.

11         MR. SCHWARTZ:  I'm going to move to strike the answer

12    as unresponsive to the question and fraught with hearsay.

13         THE COURT:  The implication was that there was some

14    reason they hadn't invested.  I think he explained that.  So

15    I'm going to overrule the objection.

16    BY MR. SCHWARTZ:

17    Q.    So you were satisfied with the information you had from

18    Pavanelli as of early June 2004; is that right?

19    A.    Again, I don't want to -- I know you don't want to hear

20    me keep saying this but we weren't basing our investment on

21    information from Pavanelli.  We were basing our investment

22    decision on, is the Attorney General decision final and

23    binding?  For right or wrong, we had reached that conclusion.

24    We didn't care about other information from Pavanelli.  We were

25    trying to make a deal with Pavanelli.  That's what was going

1   on.

2   Q.   I think I understand what you're saying.  Let's take a

3   look now at D-576.

4   A.   Yes.

5   Q.   Initially just to touch on the foundation here.  This

6   document bears the Skye bates stamp numbers 006469 through

7   6471, right?

8   A.   Yeah.

9   Q.   You understand that means Skye Ventures produced the

10  document in this litigation, right?

11  A.   I -- I'll take your word for that.

12  Q.   And looking at the form of the document, the first page

13  is a fax communication sheet from Pavanelli to you, right?

14  A.   Yes.

15  Q.   And you received this fax from Pavanelli, correct?

16  A.   I don't remember this specific fax but, again, I'm

17  not -- I remember kind of the context of within which it

18  occurred and so I don't -- I'm looking at it as I'm answering

19  it.

20  Q.   Mr. Richards, didn't you submit an affidavit within a

21  few weeks of today in which you discussed this document?

22  A.   I don't recall that I did.  I'm not saying I didn't, I

23  just don't recall it.

24           MR. SCHWARTZ:  Excuse me for one second.

25           MR. LUCAS:  May I approach the court reporter, Your

1  Honor?

2       THE COURT:  You may.

3       MR. SCHWARTZ:  Your Honor, we didn't really think this

4  would be necessary so we're creating exhibits on the fly here.

5  This will be Defendant's Impeachment Exhibit 12.  Once we get

6  copies we'll distribute them.

7       THE COURT:  What are you numbering this exhibit to be?

8       MR. SCHWARTZ:  Defendant's Impeachment 12.

9       THE COURTROOM DEPUTY:  D Impeachment 12.

10       THE COURT:  You may not have this but if you do, it

11  would be helpful to me if we know the ECF number.  It's not on

12  here but maybe you have that handy, maybe you don't.

13       MR. SCHWARTZ:  We'll figure that out.  The ECF number.

14       THE COURT:  There it is.  I've got it.

15       MR. SCHWARTZ:  656, it appears.

16       THE COURTROOM DEPUTY:  658.

17       THE COURT:  658-6.  I note for the record that means

18  that at this point there had been 658 documents filed in this

19  case and that was almost a month ago.

20       With that observation, you may continue.

21       MR. SCHWARTZ:  All right.  I'm now the only one

22  without the exhibit but I'll work with what's up on the screen.

23   BY MR. SCHWARTZ:

24   Q.   So, Mr. Richards, you used to be a rock and roll

25  litigator, right?

1    A.   I don't know if that's the correct phrase but I had

2    success.

3         THE COURT:  I remember you using that phrase.

4         THE WITNESS:  I was rocking and rolling.  Sorry.  Let

5    me take that back.  I thought I was a good litigator but it was

6    back, you know, early '80s, of course.

7    BY MR. SCHWARTZ:

8    Q.   Back in the early '80s there was this process called

9    discovery in litigation, right?

10   A.   Sure.

11   Q.   Parties would ask for documents to be exchanged, et

12   cetera?

13   A.   Yeah.

14   Q.   And if one side had misgivings with the way the other

15   dealt with document issues, it could go to the Court and seek

16   relief in various ways, right?

17   A.   Yeah.

18   Q.   So you must know that sometime within the last two

19   months, Venezuela filed a motion in limine in this case

20   concerning the alleged spoliation of documents by Skye, right?

21   A.   I can shortcut you.  Looking through this affidavit I

22   now remember this.

23   Q.   So when you say you now remember this, are you saying

24   you now remember D-576?

25   A.   I remember this was an example in the affidavit of

1   records that we had retained.  I think this probably came from

2   my files at Crabbe, Brown, files that had been merged by that

3   time.

4   Q.   That's not quite what it was in the context of the

5   motion.  But anyway, let's just look at paragraph 6 of this

6   affidavit very quickly.  I'm sorry, paragraph 12.

7       So here's a paragraph from an affidavit you signed under

8   oath or a declaration, right?

9   A.   Yeah.

10  Q.   And in paragraph 12, without parsing this too closely,

11  you were talking about the document that's D-576, right?

12  A.   Yep.

13  Q.   With that behind us, you'll now acknowledge that D-576

14  consists of a fax cover sheet, then a fax from Pavanelli to

15  you, right?

16  A.   Yes.

17  Q.   And then there's handwritten notations on various parts

18  of the faxed letter, and that's your handwriting, right?

19  A.   Yes.

20      MR. SCHWARTZ:  I should note, Your Honor, for the

21  record, lest there than any doubt, we're not going to be

22  introducing this for the truth of any matters but for other

23  purposes.

24  BY MR. SCHWARTZ:

25  Q.   Let's take a look at the actual letter that Pavanelli

1    faxed to you with a date of June 15th, 2004.  All right?

2    A.    Yes.

3    Q.    First of all, to confirm the date of the fax because

4    there's some -- may have been a problem with the fax machine on

5    the first page.  Look at the second page on the top and you'll

6    see there's an 06 for June, a 15 for the date and then an 04

7    for the year, right?

8    A.    Yes.

9    Q.    And then it actually says under your name where you're

10   addressed, June 15, 2004, right?

11   A.    Yes.

12   Q.    So this is a letter Pavanelli sent to you on that date,

13   right?

14   A.    Yes.  It appears that way.

15   Q.    He says at the beginning, following your your request

16   for informations over some questions, these are my answears:

17          Do you see that?  First sentence.

18   A.    Yes.

19   Q.    And then there's three categories of information through

20   this letter and numbered questions that follow -- numbered

21   answers that follow, right?

22   A.    Yes.

23   Q.    So, trying to interpret this document is a little bit

24   like playing the game show Jeopardy because we've got the

25   answers but we don't have the questions, right?

1    A.    Okay.

2    Q.    And by the way, what you said in your affidavit that

3    we've just looked at, Defendant's Impeachment Exhibit 12, is

4    that you didn't send any written questions to Pavanelli.  You

5    must have been talking to him on the phone and then this is how

6    he responded, right?  That's your testimony?

7    A.    I don't think that's what I said there.  These are

8    questions, I believe, from Libra.  And so I think my

9    handwritten notes are from a phone conversation that Pavanelli

10   and Libra and others were participating.

11   Q.    Let's just go one step at a time.  Pavanelli addressed

12   this letter to you, right, not to Libra?

13   A.    He faxed -- apparently it looks like he faxed it to me.

14   Q.    But it's addressed to Mr. David Richards, Skye Venture,

15   right?

16   A.    Yes.  He faxed it to me.  And I would have, no doubt,

17   faxed it to Libra if these were their questions.

18   Q.    Well, you haven't produced any fax from you to Libra in

19   this case, have you, of this document?

20   A.    Again, I don't have everything in front of me that we

21   produced.  If you say we haven't, I'm not arguing with you.

22   Q.    If you have it, your counsel can show it to you on

23   redirect.  In the meantime, you also don't have any document at

24   all that contains in writing the questions to which Pavanelli

25   apparently was responding, right?

1    A.    There was obviously such a document.  I believe Libra

2    would have it.  I don't, obviously.

3    Q.    Did you ever have it?

4    A.    I might have just forwarded Libra's questions to him.

5    Q.    But you had it at one point in June of 2004?

6    A.    Possibly.

7    Q.    But you didn't retain it, correct?

8    A.    If our attorneys have not given it to you, I don't know

9    what to say about that.  I obviously don't have it.  I've given

10   them everything I have.

11   Q.    If they have it, they can show it to you on redirect.

12   A.    Okay.

13   Q.    So in the meantime, we're going to have to try to define

14   the questions in light of the answers.  So the first category

15   is original issue of Bandagro notes, right?

16   A.    First of, yeah, three categories.

17   Q.    You're saying this was of concern to Libra, not you,

18   right?

19   A.    These were their questions.  Again, they were

20   investigating taking on the notes.

21   Q.    You didn't care.  You had no interest in the original

22   issue of the Bandagro notes, right?

23   A.    We had already reached our conclusion that the Attorney

24   General's decision was final and binding.  Our investment

25   thesis was satisfied.  This was in relationship to an exit

1    event or liquidity event that we were trying to make happen.

2    Q.    As far as you were concerned, whether the bonds were

3    originally issued or not was not material to your investment

4    thesis, correct?

5    A.    That was decided.  That was part of the Attorney

6    General's decision was final and binding.

7    Q.    So now let's look at answer number 1.  Pavanelli said, I

8    dont have any documents.  And then answer 2 he said, I dont

9    think that A-N-O-N-E can be located.  Right?

10   A.    Yep.

11   Q.    And then let's skip down to answer number 6.  He wrote,

12   I dont know.  Do you see that?

13   A.    Yes.

14   Q.    What was the question to which he was responding?

15   A.    I have no idea.

16   Q.    Look at number 8.  He wrote, as above.  What was the

17   question to which he was responding?

18   A.    I don't know.

19   Q.    Let's move to category number 2:  Issues from 1981 the

20   time Mr. Pavanelli buys.  Do you see that?

21   A.    I'm sorry, I was reading.  I lost track of that question

22   halfway through it.

23   Q.    The second category.

24   A.    Yes.

25   Q.    Issues from 1981 the time Mr. Pavanelli buys.

1    A.    Yes.

2    Q.    That's a little confusing because Mr. Pavanelli never

3    claimed to buy in 1981, right?

4    A.    To the time probably.

5    Q.    So your interpretation of this is that Libra, in doing

6    its own due diligence, was interested in understanding the

7    chain of title of the purported Bandagro notes through and

8    including the time Pavanelli got his hands on them?

9    A.    Like I said, I don't want you to characterize Libra,

10   right.  Libra was Jess Ravich.  Very, you know, a big bond guy.

11   He would have made the decision.  These were young analysts who

12   were just gathering information.  Everything -- they were

13   asking all the questions they could think of.  I don't know how

14   much interest, if any, that it was.  We do know they asked --

15   they had this category in this e-mail.

16   Q.    I'm just trying to understand the category.  Looks like

17   they were asking you and you were communicating with Pavanelli

18   about chain of title issues, right?  You understand what that

19   means, right?

20   A.    Well, they're saying issues from 1981 the time

21   Mr. Pavanelli buys.  And it was known that he bought in '86

22   or '87.  So I think it's missing in the categories it was the

23   issue, the time from when they were issued to Pavanelli buys

24   and then Mr. Pavanelli's purchase.  They're two separate

25   categories.  Wouldn't make any sense any other way to me.

1    Q.    I know.  I'm not disagreeing.  So it looks like they

2   were interested in understanding what happened from the alleged

3   issuance of the notes in 1981 until Pavanelli entered the

4   scene, right?

5        MR. ELLIOTT:  Your Honor, maybe I'm splitting a hair

6   here but I think it's perfectly fine for the witness to talk

7   about what he understood it to mean.  But the questions are

8   coming out for him to interpret what Libra meant.  And I think

9   that's too different.

10       THE COURT:  Well, the information, certainly, no doubt

11  about that.  But why Libra didn't invest, I'm not going to find

12  a lot of usable facts there.  As far as what the letter says,

13  that's a different matter.

14       MR. SCHWARTZ:  I'm not at all -- let me make very

15  clear, we're not acquiescing for a second in the proposition

16  that this has anything to do with Libra.  There's nothing on

17  the face that would suggest that.

18       THE COURT:  I only mention that because I think we're

19  getting bogged down with Libra as opposed to what's in the

20  letter.

21       MR. SCHWARTZ:  I'm just trying to understand what's in

22  the letter.  I'm not interested in Libra right now.

23   BY MR. SCHWARTZ:

24   Q.    Whether there's a semantic difference or not, I think

25  we're on the same wavelength here as to what the second

1    category appears to comprise, Mr. Richards.

2         So the first item under there also seems to be missing a

3    word.  Pavanelli has written, I was involved with Cordero in

4    any way, I only saw Cordero Vale for the first time in a Court

5    of Justice in London back in 1988 for the first time in my

6    life.

7         Do you see that sentence?

8    A.    That's what it says.

9    Q.    Do you agree with me that Pavanelli left out the word

10   not between was and involved in the first three words?

11   A.    I think that's another word that's missing there.

12   Q.    And Cordero, also referred to as Cordero Vale, the

13   person he's referring there to is the Waldemar Cordero Vale,

14   one of the alleged signers of the notes, right?

15   A.    You're asking me is Cordero Vale one of the people who

16   signed the notes or alleged to have signed the notes?

17   Q.    No.  Believe me, I'm not asking you that.  I'm asking

18   you whether you understand that the person that he's referring

19   to there is one of the three people who is alleged to have

20   signed the notes?

21   A.    Yes.

22   Q.    And for whatever reason, Pavanelli is disavowing any

23   involvement with him except at some proceeding in a court of

24   justice in London, right?

25   A.    That's what's written on this page.

1    Q.    And when you received this fax from Pavanelli, did you

2    understand that reference to a court of justice in London back

3    in 1988 being a reference to the criminal proceeding that

4    resulted in Pavanelli being convicted of conspiracy involving

5    fake Bandagro notes?

6    A.    Well, we knew, generally speaking, that there was this

7    case in London and that he was acquitted of possession of false

8    instruments and convicted of conspiracy, generically.  So I

9    think we knew that at the time.  I don't know how much more or

10   less we knew than that.

11   Q.    And that conspiracy charge concerned fake Bandagro

12   notes, right?

13   A.    I'm telling you what I remember we knew at the time.  We

14   didn't have records or anything like that at this time, I'm

15   pretty sure.

16   Q.    There's no crime of generic conspiracy, right?

17   A.    I don't know what the laws of London or England were.

18   Q.    All right.  Let's turn to the second page of the letter.

19   Again, under the second category here the answer to number 3 is

20   no.  Right?

21   A.    Correct.

22   Q.    Do you know what the question was?

23   A.    I don't know.

24   Q.    Let's look at the third category of this document.  It

25   starts with the heading, Mr. Pavanelli's purchase of the Notes.

1   That one's unambiguous, right?

2     A.   Yes.

3     Q.   Okay.  Let's go through some of his answers here in some

4   detail.  So the first item he says, during June of 1987, I

5   don't recal the exact date.  I should get the purchase/sale

6   agreement but its deposited with a fiduciary deed with Austrian

7   bank safe box.  I cannot gettit just like that, it would

8   require time and money.

9        When you got this written communication from Pavanelli

10  in mid June 2004, did that sound like a plausible explanation?

11    A.   Again, this was -- I was not looking for an explanation.

12  I was relaying information to somebody else who was asking

13  these questions.  So I don't know if I viewed it in that way.

14  I don't even recall having any thought about that.

15    Q.   And look at item 3.  Pavanelli wrote, the price cannot

16  be disclosed for no reason what so ever and its not necessary.

17       Do you see that?

18    A.   Yes.  That's what he says.

19    Q.   And then in number 4 he says, the notes have been sold

20  by Mr. Alfredo Guillermo Agaard.

21       Skipping down lower he says, I dnt know were he lives or

22  were he is.

23       A little further:  I figure out he could be in Australia

24  or Caracas.  Right?

25    A.   I think you read that correctly.

1    Q.    He reiterates, apparently, something he told you before

2    in number 5 when he says, the funds came from some of mine

3    private german investors and some from Gruppo.  Had he told you

4    that before?

5    A.    He -- he told me something similar to that, yes.

6    Q.    And let's look at number 6.  He told you we have a,

7    quote, Purchase & sale agreement, quote, this document cannot

8    be produce, at the time we did the transaction under a banking

9    law, therefor we are bound by the, quote -- all capital

10   letters -- BANKING SECRECY LAW, end quote, we cannot disclose

11   this document, if we did so, we would brake, B-R-A-K-E, the

12   law.

13         Have I read that correctly?

14   A.    Yeah.  I have no idea what he's talking about and don't

15   recall it, but you certainly read it correctly.

16   Q.    Now when you got this June 15th, 2004 fax from

17   Pavanelli, you couldn't possibly have believed what was in that

18   item number 6, could you?

19   A.    I don't recall receiving this.  My primary function

20   would have been passing it on to somebody else and so I don't

21   recall reflecting on any of this stuff.

22   Q.    Wait a second.  I thought we went through this with the

23   affidavit.  You do recall receiving this.

24   A.    I recall that this was received.  It's obviously mine

25   but it's as to what's inside of it I don't recall reflecting on

1    it or what's in there.  That is my handwriting on the thing so

2    I obviously received it.

3      Q.   And you don't recall being given so bizarre an

4    explanation as this that the purchase and sale agreement

5    couldn't be produced because it was subject to some banking

6    secrecy law which would result in the law being broken if it

7    was shared with you?

8      A.   Again, I don't recall him saying that.  I don't recall

9    if he actually turned that stuff over.  I just don't recall it.

10     Q.   All right.  Let's look at number 7 under the category

11   Mr. Pavanelli's purchase of the notes.  He writes there, none,

12   at the time the banking rules and regulations did oblige to to

13   keep record of funds and its origin.

14         Have I read that correctly?

15     A.   I think so.

16     Q.   It looks like there, again, Pavanelli forgot to put the

17   word not in, right?

18     A.   Perhaps.

19     Q.   It wouldn't make any sense otherwise, right?

20         He says none.  It looks like somebody was asking for

21   something, right, of which he had none.  Is that fair?

22     A.   Well, I don't know.  Again, I have to see the question

23   and know it in context.  But I'm just not arguing with you.

24   Just doesn't -- you want to put a word in there, you can put a

25   word in there.

1    Q.    I didn't receive this in 2004, Mr. Richards, you did.

2    And you obviously paid some attention to it because you put

3    handwritten notes on it, right?

4        MR. ELLIOTT:  Your Honor, can we -- it just seems like

5    we're arguing over the witness' answer at this point.

6        THE COURT:  We are.  And perhaps the handwritten notes

7    would help.  It's more of a subject matter here.

8    BY MR. SCHWARTZ:

9    Q.    Let's move to number 8 and then we'll go to the

10   handwritten notes.  Maybe number 8 is more familiar with you.

11       He says, I told you many times, from some german clients

12   of Gruppo and some from Gruppo directly.

13       What was the question he was answering there?

14   A.    I don't know.

15   Q.    Had he told you anything previously about German clients

16   of Gruppo?

17   A.    I don't recall that at the moment.  He may have.

18   Q.    Let's look at the handwritten notes.  These are all

19   yours, right?

20   A.    Yes.

21   Q.    I'm not going to ask you about all of them but I'll ask

22   you about some of them.  So let's go back to the first

23   category.  Original issue of Bandagro notes.

24       Under item number 2 or after item number 2 you seem to

25   have put a caret in there and then created a box and you wrote

1    something in the box, right?

2    A.    Yes.

3    Q.    The last line you wrote there is, tried to check with

4    bank in Milan, no record.  Right?

5    A.    Yes.  That's what it says.

6    Q.    Did you try to check for something with the bank in

7    Milan and find that there was no record of it?

8    A.    So these notes were made during a conversation that I

9    generally have a generic recollection of between Libra and

10   Pavanelli where Libra was asking questions of Pavanelli.  You

11   can see from these notes that -- and the conversation was a

12   long one.  It was a couple of hours.  They were very thorough.

13   Typical.  It's not as bad as being cross-examined by you but

14   these analysts are very thorough and they go through detailed

15   things.

16          So you can see from my notes that I'm not very good at

17   doing this thing because I'm writing stuff down but I'm also

18   trying to focus on what's going back and forth.  So as to this

19   point, as with a couple of other of these, I look at what I was

20   trying to write about.  And I just -- I can't remember exactly

21   what discussed.

22          So if I'm referring to whether I checked with the Bank

23   of Milan or he checked with the Bank of Milan or somebody else

24   checked with the Bank of Milan and what the records were, I

25   don't remember.  But I did write that down.

1    Q.    So tell me about the call.  Who arranged it?

2    A.    I don't remember.  The call occurred, it was part of

3    this diligence process that Libra was going through and they

4    wanted to speak with Pavanelli.  So I arranged -- we arranged

5    for that.  They had some questions.  I'm pretty sure these were

6    the subjects that they wanted to discuss.  And we got on the

7    phone.

8    Jess wasn't there.  We were having separate

9    conversations with Jess and his partner, the decision-makers at

10    the firm.  These were three -- I think there were three

11    analysts from Libra on this phone call.

12    Q.    Those were the young kids, right, the analysts?

13    A.    Younger than Jess.  Jess was a really sort of veteran in

14    the industry.  And if you're a guy like Jess, you turn it over

15    to young guys and you say work it up, and they do and they

16    bring it back to you and ultimately you might make a decision

17    or you make a decision and take it to your investment

18    committee.

19    Q.    And the young guys' job is to ask the questions, right?

20    A.    Gather information, right.  So this was part of that.

21    And they -- I think we -- I don't recall the specifics of the

22    conversation.  We went through this kind of stuff and maybe

23    more.  Maybe additional things.  If I were my normal self in

24    the conversation I'd be telling the young guys, look, you just

25    have to focus on the AG decision.  It's really all that's

1    important here.  And they were like young guys and they were,

2    you know, going forward to gather the information.

3        Q.    Wanted to find out what really had happened, right?

4        A.    They wanted the information.  I don't know.  They were

5    trying to find every detail they could find.  That's in their

6    DNA.  That's what they do, right?

7        Q.    They try to make prudent investment decisions, right?

8        A.    Yeah.  They were trying to figure out their own

9    investment thesis at the time.

10       Q.    Their investment thesis general doesn't involve --

11   doesn't involve building a lawsuit against a foreign sovereign

12   government?

13            THE COURT:  This is what we said you weren't going to

14   get into.  You're comparing this witness' due diligence with

15   Libra's due diligence and that I'm not going to permit.

16   BY MR. SCHWARTZ:

17       Q.    So how many people were on the call?

18       A.    Well, it looks like I was on the call, right.  The Libra

19   people were on the call and Pavanelli was on the call.  So who

20   else was on the call, I don't know.

21       Q.    Was Usuelli on the call?

22       A.    I don't know.

23       Q.    You say the call lasted several hours?

24       A.    At least a couple, I would guess.

25       Q.    To the best of your recollection, was it one of the

1   Libra analysts who indicated that he or she had tried to check

2   with the bank in Milan but couldn't find any records?

3       A.   No.  I don't know.  Again, I wouldn't guess that but I

4   don't know.

5       Q.   All right.  Let's look down the right-hand column.

6   There's another reference here to a trial in London.  That's

7   the same Pavanelli criminal trial that resulted in the

8   conviction for conspiracy; is that right?

9       A.   Yes.  That's the paragraph.

10      Q.   Did anybody ask Pavanelli during this phone call to

11  explain what had happened to him in that criminal proceeding?

12      A.   I think so.

13      Q.   What did he say?

14      A.   Well, I don't exactly remember what he said but I'm sure

15  it was consistent with what he always said.  He was set up by

16  Venezuela.  The guys who -- they picked him up.  No one would

17  have known what he was doing, so he was set up.  He was only

18  convicted of conspiracy and that kind of stuff.  So he had a

19  consistent story there.

20      Q.   All right.  Let's look at your handwritten notes on the

21  second page.  At the top there you wrote, bag with diamond.  10

22  plus million.  6 million currency.  What's that all about?

23      A.   I don't remember.

24      Q.   Did Pavanelli tell you that part of the alleged

25  consideration for his acquisition of the over billion dollars

1  in the purported notes was a bag with diamonds?

2   A.   I think I told you what he had said, right.  So, what I

3  recall him saying.  And he might have -- I think Luis mentioned

4  this, that there were cash, jewels and notes that he gave it

5  for.  So he might have said that in the call.  I don't remember

6  the call though.

7   Q.   Your understanding --

8   A.   I don't remember the specifics of the call.

9   Q.   Your understanding of the deal was he actually took a

10  bag of diamonds and just handed it to someone?

11   A.   I didn't have an understanding there.  There was a

12  closing in a bank in London.

13       MR. SCHWARTZ:  Move to strike the last part of the

14  answer to the extent it's based on any kind of hearsay.  If

15  that's his understanding, that's fine.

16       THE COURT:  I didn't catch that from the answer.

17  Explain that.

18       MR. SCHWARTZ:  He made some assertion that there was a

19  closing in London which he wouldn't have any possible

20  foundation for testifying about because he sure wasn't there.

21       THE COURT:  Aren't we still looking into what he knew?

22       MR. SCHWARTZ:  If it's limited to what he was told,

23  that's fine.

24       THE COURT:  Then we're in agreement.

25

1    BY MR. SCHWARTZ:

2    Q.    So you're a sophisticated investor, right, Mr. Richards?

3    A.    Well, you might have people that give you different

4    opinions about that but I kind of, I mean, certainly now I

5    really know what I'm doing.  I'm 65 years old and I've done it

6    for a long time.

7    Q.    In 2004 you regarded yourself as a sophisticated

8    investor?

9    A.    Probably not quite as good as I am now but I thought I

10    was then.  And my investor group thought I was pretty good.

11    Q.    And you developed a following that comprises this

12    investor group, right?

13    A.    I have consistent investor groups that's grown since

14    1989.

15    Q.    And those investors count on you to make prudent

16    investment decisions, right?

17    A.    Well, what they really count on me for is to -- you can

18    argue about prudence one way or the other but they count on me

19    to look at risk and decide whether it's overcome-able.  So in

20    all the deals we look at, there's some risk and they rely on me

21    to look at deals where we can overcome the risk.  So like here,

22    for example, the risk was we looked at whether the Attorney

23    General's decision was final and binding.  We concluded it was.

24    And I decided.

25        That's the kind of decision they would typically rely on

1    me for.  I would create an investment thesis that was focused

2    on the key risk, try not to get distracted by side items.  I

3    was good at focusing on that and making a judgment about that.

4    I've almost always been right.

5    Q.   And there was a risk, was there not, as of the time you

6    received D-576 that Pavanelli was making this whole story up,

7    wasn't there?

8    A.   That was not a risk in the investment thesis, right,

9    that, as I just said, there's all these deals that have --

10   they're complex, they're big companies.  You have to figure out

11   what's the key risk here and try not to get distracted by other

12   stuff that's not part of the key risk, the investment thesis.

13   Here, the investment thesis was, is the Attorney General's

14   decision final and binding?  If that's your investment thesis

15   and you believe that the answer to that question is yes, that

16   simplifies your consideration or your what you care about other

17   collateral items.

18        So, again, I would say by this time when Libra was

19   looking into this, we had already made the investment thesis,

20   we made the decision that it was an investment we wanted to

21   make and the rest of the time frame we were trying to get a

22   deal right that we were comfortable with.

23   Q.   So you didn't want to be distracted by whether the notes

24   were forged in the first instance, right?

25   A.   I didn't want to be -- remember, if your answer to the

1   question, is the Attorney General's opinion is final and

2   binding, it's irrelevant what anyone thought about how the

3   notes -- there were opinions.  Somebody said yes, somebody said

4   no.  Doesn't matter if the Attorney General's decision is final

5   and binding.

6        So, again, that's -- I don't know how else to answer the

7   question.  I didn't want to get involved in he said this or she

8   said that or they said that.  We had a final and binding

9   decision from the highest legal official in Venezuela.  That's

10  what we focused on.

11   Q.   And just to be clear about this, it was not material to

12  your investment thesis whether the notes were forgeries,

13  correct?

14   A.   Once you conclude that the Attorney General's decision

15  is final and binding, they're not.  That's the answer to the

16  question.

17   Q.   All right.  We'll move on to another document.  D-579.

18        THE COURTROOM DEPUTY:  D-579.

19  BY MR. SCHWARTZ:

20   Q.   Mr. Richards, I'm showing you D-579.  It's an e-mail

21  from Pavanelli to you from June 18th, 2004.  It's got a

22  SKYE006083 bates number.  So, from that, you can tell this was

23  produced by your lawyers in the case.

24        This is dated just three days after D-576.  Do you

25  recall receiving this e-mail from Pavanelli in June of 2004?

1    A.    No.

2    Q.    Taking into account that it's an e-mail that on its face

3    indicates it was sent at a time where you were in the throes of

4    developing and implementing your investment thesis and that

5    your lawyers produced it in the case and it's got your e-mail

6    address on it, do you think it's more likely than not that this

7    is an e-mail that you received?

8    A.    So just to correct the preamble to your question, we

9    were not developing our investment thesis in the middle of June

10   of 2004.  We had had -- our investment thesis was, from the

11   beginning, was this decision final and binding, and we'd

12   already reached the conclusion that it was.

13   Q.    When did you reach that conclusion?  When was the

14   investment thesis finalized?

15   A.    Well, again, when -- so we went through this discussion

16   about discovery, initial diligence and then final diligence,

17   right?  So at the end of initial diligence you're pretty

18   certain that you're right.  And then when you go through final

19   diligence you're trying to make sure you're right before you

20   close.  So I would say that we had reached the conclusion that

21   the decision was final and binding, not we, that Alcalde had,

22   and gave me that firm opinion, no less firm than he gave it in

23   this courtroom, say around the end of February, early March of

24   2004.  And that's when we started focusing on the real

25   expensive part about diligence.  We were traveling all over the

1   world, you're trying to cut the deal with the guys, that sort

2   of thing.

3        So I would say, to put it in context, we had reached

4   that conclusion end of February, early March kind of time

5   frame.

6   Q.   All right.  I'll rephrase my question.  Given that this

7   document bears a Skye Ventures bates stamp number, it indicates

8   that it was sent to the e-mail address you used in June 2004.

9   In June 2004 you were in the midst of some phase of your due

10  diligence process, as you describe it.  Taking all that into

11  account, do you think it's more likely than not that you

12  received D-579?

13  A.   Again, I still disagree with your preamble but I do

14  remember that post the Libra call, there was a further exchange

15  of documents.  I don't remember the specific e-mail, but it's

16  not, what I've read of it here, I don't -- it's not

17  inconsistent with what I remember was going on at the time.

18  Libra was --

19  Q.   I'll ask you some specific questions about some of the

20  subjects and maybe we'll see if that --

21  A.   So Libra was continuing to move forward.  And they were

22  asking for other stuff.

23  Q.   We'll see if this jogs your memory if we talk about some

24  of the subjects, as Judge Sargus has suggested.

25       In the middle of June 2004 or at any other time, do you

1    recall Pavanelli telling you he needed money to pay an Italian

2    criminal lawyer by the name of Cajelli, C-A-J-E-L-L-I?

3        A.    Well, do I recall this occurring in the middle of June

4    of 2004?

5        Q.    Or at any time?

6        A.    Listen, Pavanelli was always asking me for money.

7    Always making up a reason.  That was sort of the control, the

8    practical control I ever had over the deal.  So I could pretty

9    much -- and he would come up with -- he always wanted money,

10   right?  So the fact that in here, this e-mail, there's a

11   request for money is nothing unusual.  I think, though, you're

12   referring to this Cajelli fellow and I do remember the name

13   Cajelli or Cajelli or however you say it.  I remember it more

14   in connection with stuff that occurred in '05 and '06 and I

15   think we actually contacted the guy and part -- the lawyers did

16   at least.

17            But I don't remember hearing the name Cajelli in June.

18   Not saying I didn't.  So this e-mail says I did.  I don't want

19   to argue with you about that.

20            MR. ELLIOTT:  Your Honor, just belated but

21   Mr. Schwartz, in his question, indicated that he characterized

22   Professor Cajelli as a criminal lawyer and I don't see that in

23   the document anywhere.  So I don't think there's foundation for

24   that.

25            THE COURT:  Well, if you can establish that but it's

1    not in the document.  Would you agree?

2         MR. SCHWARTZ:  Yes.  But I've been directed and I've

3    accepted, by the Court's rulings, that I need to stay away from

4    the e-mail verbatim and try to jog --

5         THE COURT:  This is different.  This came from Skye,

6    right?  I'm not suggesting that I changed my ruling but the

7    other ruling was something that came from Jacir.  In any event,

8    the more narrow issue is the word criminal lawyer or the phrase

9    criminal lawyer is not in that first paragraph.

10        MR. SCHWARTZ:  I understand.  I think I have a

11   good-faith basis for asking the question.  If I can't just read

12   the e-mail to him, and I'm not complaining about this, I'm just

13   trying to frame questions.

14        THE COURT:  You haven't asked to do that.  But go

15   ahead.

16        MR. SCHWARTZ:  I haven't --

17        THE COURT:  This is something from Skye.  The other

18   document we were hung up on didn't come from Skye.

19   BY MR. SCHWARTZ:

20   Q.   Did you ever come to learn that there was a criminal

21   lawyer named Cajelli who was involved with Pavanelli in some

22   way?

23   A.   I remember, I think we discussed this in my deposition,

24   I became aware that what I thought was a bankruptcy case was

25   going on that had accusations against Pavanelli but it was

1    later that the name Cajelli came into focus.  So obviously I

2    didn't send him money for something about Professor Cajelli.

3        I was aware there was this -- I probably was aware there

4    was this thing I thought was a bankruptcy going on.  I'm still

5    not satisfied I actually know what was going on.

6    Q.   Have you ever come to learn that Pavanelli was convicted

7    in Turin, Italy for crimes involving fake Bandagro notes?

8    A.   I don't think that's true.  I've been told it was

9    something different.

10   Q.   You don't have personal knowledge one way or the other.

11   I don't need to belabor this with you.

12       THE COURT:  Just to be clear from this exchange,

13   there's no evidence whatsoever is the question and there's an

14   answer that you didn't know.  At this point that's out.

15       MR. SCHWARTZ:  I'm happy to move on.

16       THE WITNESS:  Long after the lawsuit -- sorry.

17       THE COURT:  Go ahead.  You may ask the next question.

18   BY MR. SCHWARTZ:

19   Q.   So let's take a look at item 3 on this e-mail from the

20   Skye production.  In here Pavanelli wrote, I'm ready to send

21   100 million dollar -- 100 M. notes to Alcalde but we need

22   money.

23       Do you see that?

24   A.   I do.

25   Q.   Do you have a recollection of Pavanelli holding some

1   notes hostage at this time and trying to extract money from

2   you?

3   A.    You remember that in June was the time frame when this

4   failed deal for Crabbe, Brown to file a lawsuit where they

5   would have some input into and part of that was they had to

6   send notes.  He had to give physical possession of the notes to

7   Crabbe, Brown.  And that's -- which never occurred, of course.

8   So I think that's what he's referring to.

9   Q.    Okay.  Let me direct your attention now to paragraph 5.

10  So here Pavanelli wrote, I will try to get documents from the

11  London case, but these documents will not be free to gives

12  copies around, you have to take a very carefull attitude, if we

13  are waking, quote, the sleeping dog, end quote, it could be a

14  boomerang against me, remember this, and it is not the moment

15  to get more trable.  Presumably trouble.

16        Do you recall Pavanelli saying anything to you, orally

17  or in writing, in or about June 2004?

18  A.    So I was going to say yes until you said about this

19  date.  So, generically, of course we discussed these two cases,

20  as I said.  The Swiss case and the London case.  He had his

21  what he said about those cases.  He provided me with the Swiss

22  case where he was accused and then acquitted and that the Court

23  said the notes were fine.  Then I had -- I know I might have

24  asked him, where's the records to the London case, and he said

25  he couldn't get them.  And that was true.  We later tried to

1   get them and couldn't get them.

2   Q.   And what was your understanding of the sleeping dog he

3   was afraid about waking?

4   A.   I had -- I don't know what he's talking about there.

5   Q.   Let me ask you to look down at item number 7 here.

6   Pavanelli wrote, some funds are need it to take care of very

7   sensitive matter to avoid further problems, you help and

8   understand is now required.

9        Do you see that?

10  A.   Yes.

11  Q.   What was your understanding of what he was addressing

12  there?

13  A.   I, again, I don't specifically recall receiving this

14  e-mail, but looking at it now, I have no idea what he's

15  referring to.

16  Q.   So this may strike you as a silly question but it's not

17  intended to be one.  Pavanelli was not very good at spelling,

18  right, at least in English?

19  A.   Well, you know, we think people are good or bad.  We're

20  all good today because we have spell check.  He's obviously has

21  misspellings in his -- particularly you'll notice when he's

22  really angry the number of misspellings go up.  You know, I've

23  also received plenty of e-mails from him with no misspellings.

24  Q.   And one word that he seemed to have a recurring problem

25  spelling correctly is further, right?

1    A.   I don't know that.

2    Q.   Let's take a look at SKYE006083 also known as D-579.

3    Take a look at the first paragraph right there in the middle.

4    Do you see the word further is spelled F-U-R-T-H-U-R on the

5    third line?

6    A.   Further, yeah.

7    Q.   And then take a look at the last item number 7, do you

8    see further is spelled F-U-R-T-H-U-R?

9    A.   I actually thought it was the right spelling but I guess

10   it's not.  It's E-R.

11   Q.   You see that there?  And then take a look back at D-576,

12   the document with the answers without the questions.  I'm

13   sorry, not that one.  My mistake.

14        Take a look back at D-538.

15   A.   D-538?

16   Q.   Yes.  This was the e-mail with the profane subject line.

17   A.   Okay.  I have it.

18   Q.   And if you look down the last line of Pavanelli's --

19   second to last line, last comment he made there before making

20   another profane comment is, I have no furthur comment to make.

21   F-U-R-T-H-U-R.  You see that, right above your e-mail.

22   A.   Yes.  F-U-R-T-H-E-U-R?

23   Q.   No.

24   A.   That's my eyes looking at this print here.

25   Q.   Take a look at D-538 on page JACIR01-005.

1    MR. LUCAS:  Mr. Richards, it may be easier --

2    THE WITNESS:  I see that.

3  BY MR. SCHWARTZ:

4  Q.    You see another spelling of further.  It's typed

5  F-U-R-T-H-U-R?

6  A.    Yeah.  I assume that is a misspelling.

7  Q.    So go back now, please, to D-579.

8  A.    Okay.

9  Q.    The June 18th document.  So just to be clear, after you

10  received this e-mail, the sleeping dog e-mail, you were still

11  undeterred, correct?

12  A.    From what?

13  Q.    From proceeding with your investment thesis?

14  A.    Again, this had had nothing to do with my investment

15  thesis.

16    MR. SCHWARTZ:  Your Honor, this might be a good time

17  to take a break.

18    THE COURT:  All right.  We'll be in recess for ten

19  minutes.

20    (A recess was taken at 10:51 a.m. until 11:09 a.m.)

21    THE COURT:  Mr. Schwartz, you may continue.

22    MR. SCHWARTZ:  Thank you, Your Honor.

23  BY MR. SCHWARTZ:

24  Q.  Mr. Richards, we're going to show you D-558.

25    THE COURTROOM DEPUTY:  D-558.

1    BY MR. SCHWARTZ:

2    Q.    This is a capture of the Gruppo Triad website with a

3    5/20/2004 date in the lower right-hand corner on the first

4    page.  In the course of your dealings with Gruppo Triad and

5    Pavanelli in 2003 and 2004, did you ever take a look at the

6    Gruppo Triad website?

7    A.    So this is a document that I definitely have seen before

8    but I'm not sure if I saw it in connection with the litigation

9    or whether I actually saw the website beforehand.  I think I

10   might have seen their website.

11   Q.    Let's take a look at page 2 with the bates stamp

12   LP01962.  I'll direct your attention to the last paragraph such

13   as it is at the bottom of this particular exhibit.  Starting

14   here on page LP1962 and we can hover here for a moment and

15   continuing on to page LP1963, you'll see that the Gruppo Triad

16   website provides an explanation of certain events.

17        Let's start at the bottom of LP1962 and you can see that

18   the Gruppo Triad website starts to talk about something that

19   occurred in London in 1998.  Do you see that?

20   A.    Yes.

21   Q.    And then under item number 1 there's a reference to

22   $150 million in face amount of notes having been seized by

23   Scotland Yard.  Do you see that?

24   A.    Yeah.  I'm trying to read the whole paragraph so that I

25   understand what you're asking me about.

1    Q.   All right.  Do you want to read all the way to the

2    bottom of the discussion on the next page?  That would be fine

3    with me.  Take your time and read it.

4    A.   This gets difficult to read because it's black behind

5    the print.

6    Q.   Take a look up on the big screen or on your monitor.

7    It's pretty clear there.

8    A.   Okay.  Yeah.  I can see it to the bottom of that page

9    and then it goes on from there which I'm having a little

10   trouble reading.

11   Q.   We'll enlarge it for you on the next page.  Probably

12   better that you read the whole thing before I start firing

13   questions at you.

14   A.   Yeah.  This contains some stuff I've never -- the

15   general story about this, I recall.  But there's stuff in here

16   that's, you know, I don't remember.

17   Q.   Is what you're reading here on the Gruppo Triad website

18   generally consistent with the spin that Pavanelli put on what

19   occurred to him in this criminal proceeding in the UK?

20   A.   Some of it is and some of it is I don't recall him ever

21   saying.

22   Q.   I'm not going to take you through every line of this but

23   I do have some specific questions.  In the course of your

24   dealings with Pavanelli, did you ever discuss with him that

25   this conviction in London was associated with some Customs

1   incident that occurred in the United States back in 1987, the

2   same year he supposedly obtained the notes?

3   A.    Never mentioned Customs incident in the United States

4   that I recall.  He was open about this London case and that he

5   was going to go back and clear his name when he could and that

6   he was convicted of a conspiracy but acquitted of the false

7   instruments charge.  That was kind of what he had said on more

8   than one occasion.  I do remember him saying that.

9        This -- I don't remember some of this.

10  Q.    Independent of whether the United States Customs was

11  involved at all, did he discuss with you that the criminal

12  proceeding in London arose out of some incident where some

13  woman was seized carrying blank notes?

14  A.    I don't remember that.  I remember him being arrested.

15  I don't remember the -- I don't remember that.

16  Q.    Do you recall learning that, from Pavanelli or any other

17  source, that he was sentenced to four years in jail and served

18  some prison time on account of this conviction?

19  A.    I don't -- the four-year term, no, I don't remember

20  that.  But I remember he was in jail for some period of time.

21  I understood it to be short and then he was out.

22  Q.    Let's take a look at actually the text of the last line

23  of this paragraph in the website.  It says -- starts by saying,

24  James Pavanelli arranges for his own release from prison.  Do

25  you see that?

1    A.    This is on 1963?

2    Q.    Yes, it's on 1963.  The last line of this subject.

3    A.    Yeah.  Where it's highlighted, I see it, yes.

4    Q.    The last sentence, I should say.

5    A.    I see that, yes.

6    Q.    And my question following up on that is did you ever

7    have any discussion with Pavanelli or anybody else about

8    Pavanelli arranging for his own release from prison?

9    A.    No.  I don't recall him saying that.

10   Q.    To put it slightly differently, did you ever have any

11   discussion with Pavanelli or anybody else about Pavanelli

12   escaping from prison?

13        MR. ELLIOTT:  Objection, Your Honor.  There's no

14   foundation for that.

15        THE COURT:  At this point the witness said he didn't

16   know.  You can ask him if he read it on the website.  If the

17   answer still is he didn't know, you'll have to use some other

18   method of proof.

19        MR. SCHWARTZ:  May I be heard briefly?

20        THE COURT:  Just briefly.

21        MR. SCHWARTZ:  The only reason I've asked the question

22   in a somewhat blunter form is that a witness might not

23   interpret the words arranging for his own release from prison

24   as connoting an escape.

25        THE COURT:  If he knows something about it, you can

1    inquire.  If he doesn't, then we'll move on.

2     BY MR. SCHWARTZ:

3     Q.   So simply, Mr. Richards, did you ever receive any

4    information from Pavanelli or anybody else that Pavanelli had

5    escaped from prison in the UK?

6     A.   Again, we're -- okay.  So this -- the answer is no.

7    That I -- again, it would be something that was --

8          THE COURT:  So now I understand your position.  You

9    weren't relying on this.  I get that.

10         But the answer is no, so there's no foundation to go

11   forward.

12         MR. SCHWARTZ:  Agreed.

13    BY MR. SCHWARTZ:

14    Q.   The last question here.  The next clause talks about the

15   case against Pavanelli having been left in some suspended

16   state.  Was it your understanding when you were dealing with

17   Pavanelli in 2004 that this UK case was -- from 1988 or 1989

18   was still open?

19    A.   He said he was going to go back and clear his name.

20   Maybe that implies that it was open.

21    Q.   Okay.  You can put aside D-558.

22         I'll ask you to turn to D-590.

23         THE COURTROOM DEPUTY:  D-590.

24    BY MR. SCHWARTZ:

25    Q.   Mr. Richards, D-590 is a document that was produced by

1    Crabbe, Brown and James in this litigation.  It's an e-mail

2    from Pavanelli to quite a few people, including you,

3    drichards@netwalk.com.  Do you see that?

4    A.    Yes, I do.

5    Q.    And it's dated Saturday, July 3rd, 2004, correct?

6    A.    Yes.

7    Q.    And the other addressees include Usuelli, Alcalde and

8    whoever has the e-mail address cromandelchal@hotmail.com,

9    right?

10   A.    Yes.

11   Q.    And surely you recall receiving this e-mail, right?

12   A.    I recall the events surrounding this and but, again, if

13   you're asking me if I recall receiving a specific e-mail 13

14   years ago, the answer is no, I don't.

15   Q.    And the title of this e-mail is urgent message to all,

16   right?

17   A.    That's what it says.

18   Q.    And then in the first paragraph, as I discussed with

19   Mr. Alcalde with you in the courtroom, there's an invitation

20   list of various people who are to come to Como, correct?

21   A.    Yes.

22   Q.    And then a statement that no one else is acceptable,

23   right?

24   A.    Yes.

25   Q.    And then if you move down a few paragraphs, there's a

1    paragraph that starts with Mr. Luis Alcalde.  Do you see that?

2    A.    Yes.

3    Q.    And the next sentence reads, quote, Mr. David Richards

4    has nothing to do aswell, Infact I gave him instruction not to

5    talk with Mr. Bonetti, Mr. Richards went against my will and my

6    instruction, this is a very serious problem, and has generated

7    this mess.  I may have to take some sanctions about the

8    creation of this problem.

9        Do you see that?

10    A.    I see that's what it says.  It's rather amusing, but

11    it's what it says.

12    Q.    What is it that you find amusing?

13    A.    That he told me not to do something, not to talk to

14    Bonetti, like I would have to listen to what he said.

15    Q.    What is it that you had done that drew his ire?

16    A.    Listen, this is -- first off, I don't know what draws

17    the guy's ire.  Like I told you in the deposition, the guy, by

18    this time, was impossible and it could be anything, right?  So

19    you know that I did go talk to Bonetti, or Luis and I went and

20    talked to Bonetti and Manfredi.

21        So he's saying that he gave me instructions not to talk

22    to Bonetti which is not -- I doubt it's true and it wouldn't

23    have mattered what he told me what to do.  So but if -- this is

24    very vintage Pavanelli at this time.  Kind of why Crabbe, Brown

25    quit.  The guy was just impossible.

1    Q.    And did you understand that whatever misgivings

2    Pavanelli had with you in early July 2004 that had something to

3    do with your interactions with Bonetti in Caracas back in

4    June 2004?

5    A.    It wasn't in July.  It was on this particular day

6    because no doubt it was different the next day when he calmed

7    down.  So I assume -- I don't know what he -- again, I don't

8    know what he's talking about here.  But that's the -- the only

9    action I ever had with Bonetti that I recall is when I met

10   with -- Luis and I met with him at the end of June.

11   Q.    And remind us, what did you discuss with Bonetti at the

12   end of June that appears to have caused such consternation with

13   Pavanelli?

14   A.    I don't know.  I don't know what caused such

15   consternation.

16   Q.    What did you talk to Bonetti about?

17   A.    I went through this in direct, what we talked to him

18   about.  And so the thing that I'm thinking about right now is

19   that we learned about this issue between Pavanelli and Bonetti

20   about their entitlement to some interest in the notes if they

21   were paid.

22   Q.    The 25.11 percent, right?

23   A.    Yeah.  Well, again, I don't recall that specific

24   percentage.  I think you're probably right.  But the -- so

25   among the things that we learned when we were -- that Luis

1   learned and related to me, again, it was all in Spanish, was

2   that.  That there was this dispute.  And there was a proposal

3   or resolution of this dispute which seemed reasonable to me and

4   so I -- actually we were sort of the force behind causing this

5   meeting to take place.

6   Q.   Incidentally you accept, do you not, that Woodstrite has

7   a 25.11 percent lien on this litigation; is that right?

8   A.   I don't know.  I mean, there was a -- in the AG decision

9   there was a recognition of interest.  So if that's the law of

10  the decision, I recognize it.  So I would -- whether the

11  Attorney General says it's 25 percent, 25 percent of what,

12  under what conditions, I don't know.  But if they have a

13  legitimate legal interest, yes, I would accept that.

14  Q.   Have you had any negotiations with Bonetti, Manfredi,

15  Woodstrite or their counsel since you filed this lawsuit?

16  A.   Well, they don't talk English, so I haven't.  Their

17  attorney had conversations with Luis, I believe, in connection

18  with their intervention but I don't know what those were.

19  Their attempted intervention in the case.

20  Q.   Have you reached any form of agreement, oral, written,

21  handshake, formal or otherwise, with Bonetti, Manfredi or

22  Woodstrite concerning that 25.11 percent lien?

23  A.   No.

24  Q.   All right.  Let's keep going with D-590.  In the next

25  paragraph Pavanelli says, furthurmore -- you'll notice again

1   misspelling further -- insofar we have not received from any of

2   the group concern the famous, quote, dictame, end quote, dated

3   October 3, 2003.

4       And then he goes on to say something about a Mr. Santana

5   having a copy of, quote, the document, which appear to be

6   false, or not quite right, according to Bonetti.

7       Do you see that?

8   A.   I see that he says that, yes, in this e-mail or letter.

9   Q.   Do you have any understanding of what he was referring

10  to there?

11  A.   Again, this is just another example of him being

12  impossible, wrong, saying stuff that's just not true.  That's

13  the way he was by this time.

14  Q.   And none of that --

15  A.   Obviously he had the *dictamen* so, you know, that's

16  nonsense.

17  Q.   And none of that stopped you from proceeding to do

18  business with Pavanelli, correct?

19  A.   I wasn't doing business with Pavanelli.  I was trying to

20  get a deal and escape Pavanelli as best I could.  So the

21  strategy was to get the notes in my hand and then push him out

22  of the deal.  That was my strategy.  And I executed that

23  strategy successfully.

24  Q.   We'll talk about that later.

25      In any event, despite this admonition that neither you

1   nor Alcalde should travel to Como, you dispatched Alcalde to go

2   there just the same, right?

3      A.   That is not true.  I don't know what he's talking about

4   here.  We were setting up the meeting.  So this is crazy.  He's

5   just ranting here.  I don't know why, but he is.

6      Q.   All right.  We'll change subjects here.  I want to show

7   you D-527.  We'll need to get you the hard copy so just hang on

8   one second, please.

9           THE COURTROOM DEPUTY:  D-527.

10   BY MR. SCHWARTZ:

11      Q.   Like a bad penny, Mr. Richards, Larry Corna re-emerges

12   here on April 16, 2004, an e-mail you sent to him.  Do you see

13   this?

14      A.   Okay.  So, again, when you have these comments I note

15   that you like to say about like a bad penny.  I'm not agreeing

16   with that if I answer your question.

17      Q.   Let me rephrase the question.  Is D-527 an e-mail that

18   you sent to Larry Corna on April 16th of 2004?

19      A.   It appears so, yes.

20      Q.   And I want to focus not so much on your dealings with

21   Larry Corna, which we've covered sufficiently, at least for the

22   time being, but the last -- second paragraph of this e-mail.

23           You wrote to Larry Corna, quote, as you know, I have

24   been appoint the exclusive US rep for Gruppo re funding

25   matters.  Since you have decided to not work with me, anything

1  you are doing with James needs to be finished up, end quote.

2       Do you see that?

3   A.   Yes.

4   Q.   So when were you appointed the exclusive United States

5   representative for Gruppo Triad in funding matters?

6   A.   I think I was the exclusive guy for him in the US from

7   November on.  Appointed might be -- appoint might be -- I don't

8   know exactly the right word, but I was the only guy giving him

9   money that I knew of.

10  Q.   Are you saying November of 2003 you became the exclusive

11  US rep for Gruppo Triad?

12  A.   I said -- I just said that I wouldn't categorize as

13  being the exclusive US rep.  I misspoke here.  I was the only

14  guy giving him money.  And at this point I'm trying to get rid

15  of Larry Corna, right?  So, you know, there you have it.

16  Q.   So you're saying you misspoke in this e-mail to Larry

17  Corna when you said you had been appointed the US -- the

18  exclusive US rep for Gruppo Triad?

19  A.   Well, appoint, I don't know.  That might be the wrong

20  word.  But I was the only guy giving him money.  If there is an

21  appointment, I don't recall it.  If there's a document.  There

22  may be.  But I was the only guy giving him money.  And, again,

23  the purpose of this was to try to get rid of Larry Corna.

24  Q.   So you were trying to elbow Larry Corna out of the

25  picture here, right?

1    A.    Listen, I was trying -- Larry was this -- so you have to

2   understand something.  In this time frame this is April of

3   the -- the middle of April.  We were trying to make a deal with

4   Pavanelli at this point.  He had agreed to a certain kind of

5   deal.  And this is when -- the April 8th time frame.  Larry was

6   a distraction.  So we were trying to, I don't know if elbow him

7   out was the right way because he kept coming back.  But we just

8   didn't want him involved.

9    Q.    So what you told him here just wasn't true, right?

10   A.    Well, you know, you could argue with the language,

11   right?  So the language was inartful, I would say.  I would say

12   I was the exclusive guy giving him money.  Was I the US rep at

13   that time?  I might have proposed to him that I would go raise

14   money to him.  I just, you know, I don't remember.

15   Q.    Let's look at D-553.

16        THE COURTROOM DEPUTY:  D-553.

17   BY MR. SCHWARTZ:

18   Q.    Mr. Richards, now we're in April 2004.  We have an

19   e-mail from you from your netwalk.com account to Larry Corna

20   dated May 18, 2004.  Do you see that?

21   A.    Yes.

22   Q.    This is an e-mail you sent Mr. Corna on that day,

23   correct?

24   A.    Yes.

25   Q.    And you attached various types of documents, right?

1    A.    Yes.

2    Q.    And one of them has the file name Bandagro notes one

3    page intro.pdf and there's another file name fax for purchase

4    of notes.pdf, and a third file name invitation to bid for

5    Bandagro notes.pdf, right?

6    A.    Yes.

7    Q.    So let's look at the next page of the document.  The one

8    with the bates stamp at the bottom 3166.

9    A.    Okay.

10    Q.    This is one of the files you attached to the e-mail,

11    right?

12    A.    Yes.

13    Q.    If you look at the first paragraph of this document that

14    you had in circulation in May 2004, you wrote that Skye

15    Ventures is currently offering for sale, interests in certain

16    Venezuelan promissory notes, issued by Bandagro, right?

17    A.    Yes.

18    Q.    And then you went on to say those notes were currently

19    owned by Gruppo Triad, right?

20    A.    Yes.

21    Q.    And then in the bold paragraph two below that you

22    identified the notes that you were offering for sale, right?

23    A.    I think I was reading in the wrong place there.  Where

24    exactly are we right now?  Oh, in the Gruppo Triad attachment.

25    Q.    Third paragraph.

1    A.   Yeah.

2    Q.   The bates stamp page ending in 03166.  Are we on the

3    same page?

4    A.   Yes.

5    Q.   And there's the bold language in the third paragraph,

6    right?

7    A.   Yes.

8    Q.   And there, you identified the notes that you were trying

9    to sell?

10   A.   Yes.

11   Q.   And those purported notes were identified as Series 322,

12   Caroni, numbers 2/6 to 5/6, each in denomination of 25 million,

13   right?

14   A.   Yes.

15   Q.   And those happen to be two of the purported notes that

16   were inspected by Carlos Delgado Morean for the Ministry of

17   Finance in Switzerland, right?

18   A.   I'll take your word for it.  I don't know whether they

19   were but I'll take your word for it.

20   Q.   Then you provide a little history in the next paragraph

21   including a reference to the existence of counterfeit Bandagro

22   notes, right?

23   A.   I list the rationale for the fact that the bonds had not

24   previously been honored.  There were a number of reasons there.

25   That was one of them.

1    Q.    And then in the paragraph beneath that one you note in

2    the last sentence in the last clause characterizing the

3    Attorney General opinion that that ruling had failed to dictate

4    a precise date by which the notes must be paid.  Right?

5    A.    I'm sorry?

6    Q.    Second to last paragraph on the page.

7    A.    Yes.

8    Q.    Last clause.  You're referring to the October 2003

9    Attorney General opinion and you go on to say that that ruling

10   failed to dictate a precise date by which the notes must be

11   paid.  Right?

12   A.    Yes.  I said that, among other things.

13   Q.    That's another way of saying there was no payment order,

14   right?

15   A.    I beg your pardon?

16   Q.    That's another way of saying there had been no payment

17   order, right?

18   A.    There was an order to pay them, to process payment, by

19   the Attorney General so that's not another way of saying it.

20   There was no date that payment had to be made by.

21   Q.    And the Ministry of Finance had not issued a payment

22   order, correct?

23   A.    I don't know if such a thing even existed.  So if there

24   was such a thing, I had not seen it.

25   Q.    In fact, you've never seen a payment order from the

1   Ministry of Finance on any of these purported Gruppo Triad

2   notes, correct?

3      A.   What I've seen is the Attorney General ordering them to

4   be paid.  So, yes.

5      Q.   Let's look at the next paragraph.  Here again you make

6   an assertion in the first sentence that Gruppo Triad FFC has

7   retained Skye Ventures as its exclusive representative in North

8   America to assist Gruppo in raising sufficient funds to cover

9   all outstanding and potential costs necessary to enact the

10  final stages of its efforts, expected to culminate in

11  Venezuela's payment of these notes.  Right?

12     A.   Yes.

13     Q.   Then you went on to say that could take 6 to 36 months,

14  right?

15     A.   I said Gruppo believes.

16     Q.   Now, you prepared this Bandagro promissory note sheet

17  here with the expectation that this or something like it would

18  be distributed to potential investors, right?

19     A.   So, as looking at this, I recall for a short period of

20  time that this, in fact, did exist.  Like one of the -- after

21  we got back from Switzerland or from Como, one of the things

22  that we were thinking about doing, again, given our belief that

23  the Attorney General decision was final and binding, well heck,

24  if that's right and other people would -- other people might

25  reach the same conclusion, maybe the way to attack this deal is

1   to simply sell some notes and take an advisory fee.  So that

2   was one of the ways that we were thinking about doing it.

3        So here you have sort of a draft of something that we

4   might have used to do it.  I don't know if we ever sent this to

5   anybody or not, and this effort to sell notes for them was

6   abandoned shortly after this, I think.

7   Q.   This one-page Bandagro promissory note sheet, this

8   wasn't prepared for the purpose of elbowing Larry Corna out of

9   the picture, right?

10  A.   No, it wasn't.

11  Q.   This was meant for potential investors who hadn't yet

12  had exposure to Gruppo Triad or Bandagro or these purported

13  notes, correct?

14  A.   Well, again, I don't remember what it was intended for.

15  But the clear intent here would have been to use this or

16  something like this in the event that we had someone who was

17  interested purchasing the bonds.

18  Q.   Now, when you said, Gruppo Triad FFC has retained Skye

19  Ventures as its exclusive representative in North America, had

20  Pavanelli or Schianchi or anybody else executed some form of

21  written agreement appointing you to that role?

22  A.   I don't remember if there was a written agreement or

23  not.

24  Q.   Well, your counsel can show that to you on redirect if

25  it exists or they choose.  Let's look at the next page.

1    A.    Like I said, this effort was abandoned shortly after

2  this and later on, we resumed that with respect to a single

3  note.

4    Q.    Let me ask you this question.  As of May 18th, 2004, was

5  it true that Gruppo Triad FFC had retained Skye Ventures as its

6  exclusive representative in North America?

7    A.    I think our discussion was that if I could sell a note

8  for him, he wanted money, right, so that I could go do that and

9  I might have said, well don't let anybody else do it.  And in

10  this particular instance I recall working for a short period of

11  time on this with this fellow who was involved in the initial

12  diligence, Gary Post.

13    Q.    I'm not asking you to speculate on what might have

14  happened.  I'm asking you whether this is true.

15    A.    Well, if I said it, they'd asked me to do it, it's true.

16    Q.    But when you said it in the previous exhibit, D-527, you

17  testified it really wasn't true?

18    A.    Well, I said I was confused.  This reminds me that I

19  was -- we were doing this.  Again, it was a short period of

20  time.  It was one of the ways we were trying to achieve a

21  liquidity event and it looks like it happened.

22    Q.    Did it become true sometime --

23    A.    Incidentally, I said I did it.  I didn't say -- I wasn't

24  sure that was the right language.  Well, you're right, it was.

25    Q.    Did something happen between April 16th, 2004, the date

1    of D-527, and May 18th, 2004, the date of D-553, that resulted

2    in you having been retained as Gruppo Triad's exclusive North

3    American representative?

4    A.    I don't know.

5    Q.    Let's look at the next page of D-553.  This is some

6    confidential fax that's got your stamped signature on it.  It's

7    obviously a form meant to be sent to a recipient or recipients

8    to be filled in.  Is that a fair description of that page?

9    A.    It could have been, yeah.  I don't know if it was the

10   final version or if it was ever sent.  But that appears to be

11   the purpose.

12   Q.    Well it's obviously not the final version but it's not

13   sent to anybody, right?

14   A.    Correct.  I don't know that it ever was.

15   Q.    All right.  In this, let's call it draft, in the second

16   sentence you wrote, we own about 1 Billion Dollars of these

17   notes, correct?

18   A.    Yeah.  The royal we I guess, if that's what you're

19   referring to.

20   Q.    Well, I'm asking who you were referring to.

21   A.    Yeah.  We.  Again, inartful.  And I don't know if this

22   was the final draft.  We own 1 billion.  I obviously didn't own

23   1 billion-dollar notes but Gruppo did.

24   Q.    You didn't own any, right?

25   A.    That's right.  We must have been referring to the --

1  this would have been referring to the investor we have control

2  of or we own.  It's not correct.

3  Q.    So the royal --

4  A.    Again, I don't know if this was ever sent out to

5  anybody.

6  Q.    When this was drafted and your stamped signature was put

7  on it, the royal we you had in mind was you and Gruppo Triad,

8  right?

9  A.    Probably Gruppo Triad.  And my, as I say in there that

10  we're the -- I say in the attachment that the owner/seller is

11  Gruppo Triad and that I was the agent assisting.  So that's, I

12  think, pretty clearly what it would have been referring to.

13  And, again, I don't know whether this was ever sent to anybody.

14  Q.    Let's turn to the next page, 3168 at the bottom.  You

15  have that one?

16  A.    There's no stamp on this.

17  Q.    There should be a bates stamp in the lower right-hand

18  corner.

19  A.    This one there's not.

20  Q.    Kind of a double entendre, the lower right-hand corner

21  03168.

22  A.    Yeah.  This one doesn't have that but it looks like the

23  same document.

24  Q.    That's puzzling.  Maybe we should take a look at this

25  exhibit.

1          THE COURT:  Actually, mine doesn't have it either.

2          MR. SCHWARTZ:  All right.  That's doubly puzzling.

3     Hold on just a second, please.

4          THE COURT:  I don't think any of this series has

5     numbering in the lower right-hand number.  You do have it

6     identified as Exhibit 75.  I'm sorry, Exhibit 553.

7          MR. SCHWARTZ:  Yes.  And the version I'm looking at

8     starts at 03165 and looks a lot like the one that's up on the

9     screen here but it may be that there's some confusion.  Just

10    bear with us.

11         THE COURT:  The only difference is the bates numbers

12    are not on the bottom.

13         MR. SCHWARTZ:  Why don't we continue with that

14    understanding and we'll straighten this out as need be later.

15     BY MR. SCHWARTZ:

16     Q.   I'm asking you now to turn to the fourth page of this

17    exhibit, Mr. Richards.

18     A.   They're not numbered.  If you could put it up on the

19    screen, I can see which one you're referring to.

20     Q.   It's the second to last page of the document.

21     A.   It says terms for purchase at the top?

22     Q.   Yes.

23     A.   Yeah.  Sure.  Got it.

24     Q.   And there again, under terms and conditions, the seller

25    is identified as Gruppo Triad (through Skye Ventures its

1    exclusive North American representative).  Right?

2    A.   Yes.  That's what it says.

3    Q.   I'm sorry.  What did you say?

4    A.   Yes.  That's what it says.

5    Q.   Okay.  You can put 553 aside.

6    A.   Okay.

7    Q.   We'll proceed to D-847.

8         THE COURTROOM DEPUTY:  D-847.

9    BY MR. SCHWARTZ:

10   Q.   Mr. Richards, let's take a look at D-847.  As you'll see

11   it, there are certain similarities to D-553.

12   A.   Yes.

13   Q.   But it's not identical.  So first we have a form of the

14   confidential fax.  This one actually has an addressee, correct?

15   A.   Yes.

16   Q.   And that's your stamped signature there, faint as it may

17   be, on this document, right?

18   A.   Yes.

19   Q.   Who is Mohamid El-Erian?

20   A.   I don't remember.

21   Q.   Suzanne Richards, any relation?

22   A.   I don't think so, no.

23   Q.   So you sent this confidential fax to Mr. El-Erian,

24   correct?

25   A.   It was -- certainly looks like it was sent to him.

1  There's no fax logos on the top or bottom but obviously this

2  document existed.

3  Q.   And if you look at the text of the first paragraph like

4  we saw in the preceding exhibit it has an assertion by you,

5  quote, we own about 1 Billion Dollars of these notes, period

6  end quote.  Right?

7  A.   Yes.  But, again, we say that later in the document the

8  seller is Gruppo Triad.

9  Q.   So you were representing to Mohamid El-Erian that you,

10  Skye Ventures, owned about $1 billion of the notes, right?

11  A.   I think we already went over this and my answer is the

12  same.  In this same document we say the seller is Gruppo Triad

13  through Skye Ventures, its exclusive North American

14  representative.  So I think that's what I was saying.

15  Q.   Attached to the fax cover sheet is a one-page overview

16  of Bandagro promissory notes, right?

17  A.   Yes.

18  Q.   And this is a little different than what we saw in

19  D-553.  So let's take a look at this sheet that appears to have

20  evolved at some point.  So I'm looking at the page, at least

21  mine has a bates stamp, CORNA07249, the second page of the

22  document.  Does yours?

23  A.   Yes.

24  Q.   And then there's a series of indented bullet points

25  starting about a third of the way down the document.  Do you

1   see that?

2     A.    Yes.

3     Q.    Point number 2 says, during that investigation,

4   referring to the Guzman Cova investigation, duly appointed

5   Venezuelan Officials visited Switzerland to examine the notes

6   and officially authenticated the Gruppo Triad Bandagro notes as

7   genuine.

8         Do you see that?

9     A.    Yes.

10    Q.    Is that your understanding of what happened?

11    A.    I think so, right?

12    Q.    And the person who -- who were the duly-appointed

13  Venezuelan officials, plural, who performed that function?

14    A.    The two officials were Hepsie Hurtado who authenticated

15  the notes in this particular case and Roman Delgado who

16  authenticated the notes in Switzerland.

17    Q.    And that's your understanding that these two people went

18  there and --

19    A.    It is today.

20    Q.    Okay.

21    A.    I just generically referred to them as officials back

22  then.  I don't know if I knew who they were then.  Probably did

23  not.

24    Q.    I'm sorry?

25    A.    Probably did not.

1    Q.   And in this document, if you turn to the next page,

2    there's a description here of, in the last paragraph, Gruppo

3    Triad's plans going forward, right?

4    A.   Yes.

5    Q.   And you wrote here in the second sentence that plans

6    included analysis of, preparation of and potential filing of

7    lawsuits in Switzerland, Venezuela and the United States.

8    Right?

9    A.   Yes.

10   Q.   And you indicated further that Gruppo is in the process

11   of retaining an investment banker and a public relations firm,

12   right?

13   A.   Yes.

14   Q.   And when you said that, you really meant you were in the

15   process of hiring a public relations firm, right?

16   A.   Oh, no.  They were doing the same stuff.  I certainly

17   wasn't thinking about an action in Venezuela or even in

18   Switzerland.

19   Q.   I'm asking you about the action of hiring a public

20   relations firm.  That was your initiative, right?

21   A.   I hired a public relations firm but I believe Gruppo was

22   trying to hire one, too.

23   Q.   Gruppo had no money, right?

24   A.   And, again, in my particular case, this top PR firm did

25   it on the basis of an interest in the notes.  So money probably

1  was not required.

2     Q.    To the best of your knowledge, did Gruppo Triad ever

3  engage a public relations firm?

4     A.    I don't think they did.

5     Q.    The only party who engaged the public relations firm was

6  you, right?

7     A.    Yeah.  I had the lawsuit and I retained Sitrick.

8     Q.    Let's move to D-603.

9        THE COURTROOM DEPUTY:  D-603.

10  BY MR. SCHWARTZ:

11     Q.    Mr. Richards, we're looking at D-603.

12     A.    Yes.

13     Q.    Do you recognize this document?

14     A.    It appears to be -- this looks like it might be an

15  update from myself, although my signature is not on here, to my

16  investor group.

17     Q.    And to try to put this one in some type of chronological

18  frame of reference, let's look at the second page of the

19  document.  And the end of the first paragraph.  Do you see the

20  last sentence says, our lawsuit will be filed Friday August 20?

21     A.    Yes.

22     Q.    So it's safe to assume this document was created prior

23  to that date?

24     A.    Yes.

25     Q.    Now let's look back at the first page.  We have a

1    picture of you displaying one of the notes proudly, right?

2    A.   Boy, I look young there.

3    Q.   Huh?

4    A.   Boy, I look young there.

5    Q.   And then lower down, Mr. Alcalde is pouring over them

6    carefully, right?

7    A.   He's looking at them.

8    Q.   You didn't have those notes in your hands until

9    August 18th of 2004, right?

10   A.   I think that's the date.

11   Q.   So if you take the information on the second page

12   together with the pictures on the first, it seems reasonably

13   likely, this document was created on August 18th or 19th,

14   right?

15   A.   I'm not going to argue with you over a day or two either

16   way.  That's the time frame.

17   Q.   The first thing you say -- I want to point your

18   attention to you make reference in the first paragraph to Jacir

19   being a former Supreme Court Justice, right?  See that in the

20   middle of that paragraph?

21   A.   Yes.

22   Q.   That's not quite true, is it?

23   A.   Ended up I have that wrong.  He was a Magistrate at the

24   Supreme Court.

25   Q.   Looking in the next paragraph right next to -- about

1  halfway up the picture of you with the note there's a sentence

2  that says, those of you who have followed this closely know

3  that the man who runs Gruppo Triad can be a difficult and

4  unreasonable man.  It's now unnecessary to be concerned about

5  the process of obtaining reimbursement through Swiss legal

6  channels or the risk that any issues between Skye and Gruppo

7  could delay or reduce payment.

8      Do you see that?

9  A.  Hold on a second.  You're yellowing it there.

10  Q.  That may make it easier for you.

11  A.  Yes.  I do say that.

12  Q.  This is a reflection of the culmination of one part of

13  your game plan and namely resting physical control of at least

14  two of the purported notes from Pavanelli, right?

15  A.  Well, our plan, of course, the first part of the plan of

16  this side of the plan, that is the deal side, or one of the

17  parts was to actually possess the bearer instruments.  So we

18  had accomplished that.

19  Q.  Let's look at the next page again.  And you have a

20  section in the middle there, efforts to raise $25 million to be

21  resumed.

22  A.  Yes.  We had abandoned that and we, as I think we've

23  discussed, we, after this lawsuit was filed, we got an

24  actual -- wasn't at this time but shortly after, we got another

25  note that we were trying to place on behalf of Gruppo Triad.

1    Q.   Let me ask you to look at the sentence, the third

2    sentence of this section.  It reads, quote, before we start

3    these efforts, Skye will be in the possession of a copy of the

4    Attorney General's opinion from a third party source.  You see

5    that?

6    A.   Yes.

7    Q.   What's that all about?

8    A.   So I think what we were trying to do -- I don't remember

9    exactly.  I can assume or guess, but --

10   Q.   Generally not a good idea in a trial.

11   A.   Again, this relates to stuff that was going to occur in

12   the future.

13       THE COURT:  Just to be clear, don't guess.

14       THE WITNESS:  All right.  This hadn't occurred yet.

15   So we're talking about stuff that might occur in the future.

16   BY MR. SCHWARTZ:

17   Q.   I'm a little puzzled by this.  I thought long before

18   August 18th or 19th of 2004 that you and Alcalde had received a

19   copy of the Attorney General's opinion and studied it intently

20   in consultation with experts in two countries and concluded

21   that it was final and binding?

22   A.   Of course.  I think you heard Luis testify to that.

23   Q.   So why is it that you were discussing here on

24   August 18th or 19th saying that before you start these -- renew

25   these financing efforts, you will be in the possession of a

1    copy of the Attorney General's opinion from a third-party

2    source.  What does that mean?

3        A.    I don't know.  They may have been trying to get a

4    version directly from the Attorney General.  I don't know.

5        Q.    Was that important?

6        A.    I can't imagine it was, but we were going to do it and

7    our counsel, I think, was attempting to have direct discussions

8    with the Attorney General.

9        Q.    Who's the third-party source?

10       A.    I don't know.  Maybe it was the Attorney General.  I

11   don't know.  Again, this refers to something that was going to

12   occur with respect to an effort after the lawsuit.

13       Q.    Exactly.  I'm trying to find out why was it necessary

14   for something else to occur?

15       A.    Necessary for what?

16       Q.    For you resuming your financing efforts.

17       A.    It doesn't say it was necessary.  It said we will do

18   this.

19       Q.    It said, before you start these efforts.

20       A.    Yeah.  It says that in the future we will do this before

21   we start these efforts to place this extra note.  It had

22   nothing to do with the lawsuit.

23       Q.    Why did you need to have another copy of the Attorney

24   General's opinion before you could start financing?

25       A.    I don't know.  I've said that.

1    Q.    All right.  Let's take a look at the next section.  It

2    reads, financial public relations firm engaged.

3    A.    Yes.

4    Q.    This was another part of your strategy, right?

5    A.    Engaging a -- to be clear, part of the strategy of one

6    of the four or five ways we could be paid was -- so to put this

7    in context, right, one of the things that I was pretty good at

8    doing in deals, generally, and this was kind of along the veins

9    is we would typically -- you might put X dollars in a risk deal

10   and then there would be an interim transaction where you would

11   attempt, as soon as possible, to get X dollars back out and

12   then you would ride the risk of the venture on the remaining

13   deal having had your capital returned.

14        I've done that many times and that's a good strategy in

15   a risky deal.  If you can get your capital back and preserve

16   some of the upside, that's a good thing to do.  And I may have

17   talked to my group or members of my group about that strategy

18   here.

19        So there were several ways that that could be

20   accomplished.  One of them was selling a bond for Gruppo and

21   getting all of our money back in that process.  Second was an

22   early settlement.  So if you believe in the investment thesis

23   that we had, that is the Attorney General's decision was final

24   and binding, and recall that in our opinion in July she

25   reaffirmed her opinion.

1        I know you might disagree with that but we felt like,

2   look, we have a certain amount in the notes.  We could settle

3   this for far less than face value, make it attractive to

4   Venezuela and it would still be a very good deal for us.  So

5   why don't we try to put some pressure on them to face up to

6   their own laws?  Again, if our thesis is right that the

7   Attorney General's decision is final and binding and they know

8   that and now that they know they're up against a firm in the US

9   that has the wherewithal to complete it, that might lead to an

10  early resolution and a really good result for the investment

11  group.

12       So that was part of my strategy.  This was preached to

13  me by Sitrick who had similar experiences in the past of doing

14  things like this.  So it was definitely one part of our

15  strategy.

16  Q.   So let's see how you describe that strategy here on this

17  communication.  First you said, we feel that our chances of an

18  early settlement of our litigation will be enhanced if

19  Venezuela's failure to make payment on its legitimate financial

20  obligations is publicized in the financial press.  Right?

21  A.   Yes.  That's what we thought.

22  Q.   Then you went on to say, since Venezuela regularly

23  accesses US capital markets for billions of dollars, negative

24  publicity will likely make placement of debt more difficult and

25  interest rates higher, costing Venezuela millions and millions

1  of dollars and making placement of the debt more difficult.

2  Right?

3   A.   The point here was that with a large, very large

4  sovereign debt, I think at the time it was in the nature of

5  something between 25 billion and 30 billion, a point of

6  interest difference because there was more risk would more than

7  settle this case.  So it would be easier for them to face up to

8  this obligation than delay it for 13 years.

9   Q.   So in other words, you thought that if you filed this

10  litigation and hired a high-powered public relations firm to

11  publicize it, you could create a risk of interference with a

12  foreign sovereign government's access to financial markets?

13       MR. ELLIOTT:  Objection.

14       THE COURT:  I'm going to sustain the objection.  I

15  think where we're going here is somewhat obvious.  People

16  oftentimes use different techniques as long as they're legal to

17  try to settle lawsuits.  That should be no surprise, right?

18       More importantly, we're right up to twelve o'clock.  At

19  this point we're going to take a lunch break and see you back

20  here at 1:10.

21       MR. SCHWARTZ:  Thank you, Your Honor.

22   (A recess was taken at 12:02 p.m.)

1    Thursday Afternoon Session

2    February 4, 2016

3    1:10 p.m.

4    - - -

5    THE COURT:  Mr. Schwartz, you may continue.

6    MR. SCHWARTZ:  Thank you very much, Your Honor.

7    BY MR. SCHWARTZ:

8    Q.   Mr. Richards, do you still have D-603 in the vicinity?

9    A.   I do.

10    Q.   Before we leave -- thank you.  Before we leave this

11    document, I just want to confirm this is a document you

12    created, correct?

13    A.   So -- I was looking at it.  I read it fully in the

14    break, which you were asking me about specific questions.  So I

15    would say definitely this is something that I prepared.

16    Whether this was the final one or the results of at least one

17    sent, I'm not sure.  You know, I say that, finally, we become

18    the owner and possessor of the notes.  So in terms of the time

19    frame, it was after this August 18 date that you were talking

20    about.

21        But then later on I say, Skye -- I say in one section

22    Skye will file a lawsuit, and then Skye has filed a lawsuit.  I

23    think probably some of that, you know, might have been fleshed

24    before this thing became final.  But this was the news to the

25    investor group, that, hey, we finally have these notes.  We are

1   the clear owner of these notes.  We don't have a deal with

2   Pavanelli's BS anymore.  Let's go.

3       Q.   And without getting too specific about exactly when it

4   was created, it looks to you like something that was created

5   approximately toward the end of August, 2004; is that fair?

6       A.   Yes, we have the notes, right.  We didn't get the notes

7   until, I think we said, August 17 or August 18, something like

8   that.

9       Q.   All right.  I'm going to show you now D-608.  I'm not

10  going to ask a lot of questions about this document.

11          THE DEPUTY CLERK:  D-608.

12  BY MR. SCHWARTZ:

13      Q.   I'm going to help you navigate your way through this one

14  because the way in which it came out of the computer is a

15  little bit choppy.  So let's just look at the last page of the

16  document, please.  So I would ask you to turn to the last page

17  with the Bates stamp ending in 346.

18      A.   Okay, I was kind of trying to read it here.

19      Q.   You should feel free to read it to whatever extent you

20  think is necessary, but I'm not going to have questions about

21  the substance of this right now.

22      A.   Okay.

23      Q.   I'm going to try to establish what it is.

24      A.   Okay.

25      Q.   If you look at the last page, there's your name and

1   contact information.  Right?

2    A.    That's -- Yeah, that's my -- That's one of the

3   businesses I was running at the time.

4    Q.    And then turning back to the page with the Bates stamp

5   344, are you there?

6    A.    Yes.

7    Q.    And then about 20 percent of the way down the page,

8   there's your name and e-mail address, and then the word

9   "draft," right?

10   A.    Yes.

11   Q.    And there's a headline of sorts, "Skye Ventures has

12   retained Mike Sitrick, quote, Wizard of Spin, as public

13   relations counsel," right?

14   A.    Yeah.  There was a book out about him at the time, and

15  it was called that.  That was the quotation, "The Wizard of

16  Spin."

17   Q.    And then there's --

18   A.    But it says -- you're right.  I'm sorry.  To answer your

19  question, it says, yes, it says "draft," and it does have my

20  e-mail address there.

21   Q.    And there's a couple of pages of biographical

22  information on Mr. Sitrick, right?

23   A.    Hold on a second.  Just let me see if that's true.  It

24  certainly starts out that way.  There are some quotes from

25  Sitrick here.  It sounds very much like Mike.

1    Q.    And, again, I am not going to ask you about them, but

2  feel free to read them.

3    A.    Mike has said that Venezuela -- if Venezuela does not

4  pay a valid obligation that their own Attorney General says

5  must be paid, when that failure to pay is made well known in

6  the correct way, he does not believe it will be possible for

7  Venezuela to access the markets in any reasonable way.

8          So, yeah, I mean this sounds like I'm talking about

9  Sitrick here or -- it's a draft of what we might say about

10  Sitrick.

11    Q.    Again, I'm not particularly interested at the moment in

12  the text.

13          If you look at the first page carrying over to the

14  second page, this is where it gets a little choppy in terms of

15  presentation.  You will see there appears to be an e-mail

16  exchange between you and Larry Corna on September 3, 2004,

17  right?

18    A.    Can you refer me to that date, September 4?

19    Q.    September 3, and I may have misspoken, but if you look

20  at -- there's also a September 4, I will show you that in a

21  second -- but if you look at the absolute bottom of the first

22  page of the document there is a sent:  Friday, September 3,

23  2004, 8:32 in the morning.  And I appreciate your attention to

24  the detail here, but as you will see, I'm not going to be

25  grilling you on any aspect --

1    A.    Well, this is weird because the top date is March 28 --

2    oh, 2015.

3    Q.    That's why I'm trying to help you.

4    A.    I got you.  I got confused.

5    Q.    Don't even bother with that yet.

6    A.    Okay.

7    Q.    You see that there is an e-mail from Corna to you that

8    carries over onto the second page.  And then your name is

9    there.  It appears there was some communication between you and

10   Mr. Corna to which this Sitrick biographical information is

11   attached.

12   A.    Yes, I see.  So it's -- I thought I knew the question

13   you were asking.  You are saying this is an e-mail from -- It

14   starts -- But this is an e-mail on September 3 from Larry to

15   me.

16   Q.    And then you can see in the middle of the first page, it

17   looks like you wrote, "Larry, I will talk to you next week

18   sometime," and it says September 4, 12:07 a.m.

19   A.    Yes.

20   Q.    Then disregard everything above that because that was

21   the way the document was produced in the litigation.  All I am

22   trying to establish here with you is that you had some exchange

23   with Mr. Corna by e-mail in the September 3rd to 4th time

24   frame, and this is Sitrick biographical information that was

25   appended to one or more of those e-mails; is that fair?

1  A.    Yeah, I think that was kind of the time frame that we

2  were finally engaging Sitrick, and we did ultimately announce

3  that.  Why I would send it to Larry, I don't recall; but it

4  looks like he's back around for some reason.

5  Q.    That's all we need to talk about with this document

6  right now.

7        Let's move to D-631.

8        THE DEPUTY CLERK:  D-631.

9  BY MR. SCHWARTZ:

10  Q.    Here's an easier document to read.  It's one page,

11  Mr. Richards.  It has your electronic signature in the lower

12  right-hand corner.  Also apparently signed, it appears

13  electronically, by Mr. Post.  Do you recognize this as your

14  document with your electronic signature on it?

15  A.    Yes.

16  Q.    And this document starts out by saying, Ambient Advisors

17  -- That's Mr. Post's group, right?

18  A.    Yes.

19  Q.    -- and Skye Ventures are pleased to introduce ourselves

20  to the distressed debt community with a highly interesting

21  project.  Do you see that?

22  A.    Yes.

23  Q.    And then looking at the first sentence of the next

24  paragraph, it says, "We are acting as a principal, agent and

25  advisor with respect to 1.075 billion face value of notes

1    issued by a Venezuelan agricultural bank with the full faith

2    and credit of the Venezuelan government."  Do you see that?

3    A.    You read that correctly.

4    Q.    This is some type of document, an announcement, an

5    introduction -- however you characterize it -- that you and

6    Mr. Post prepared to be distributed to potential investors.  Is

7    that correct?

8    A.    This was done for a specific purpose.  And so it was

9    done -- Gary and I attended a distressed debt conference, I

10   think it was, November of 2004.  And we were taking -- We had

11   this right to sell this $50 million note, that you know is

12   9/12, and so in this context we were distributing this to the

13   group of distressed debt investors, a lot of them Gary knew, at

14   this conference.  That's the context in which this was written.

15   Q.    Where was the conference?

16   A.    I forget.  I think some place out west.

17   Q.    When you said, "We are acting as a principal, agent and

18   advisor with respect to 1.075 billion face value of notes," you

19   were referring to the purported Gruppo Triad notes, right?

20   A.    Well, so you are -- We were principal in the sense that

21   we owned notes.  We were agents in the sense we were trying to

22   sell the $50 million note.  And we were advisors, I guess, on

23   how to sell it.

24   Q.    And you didn't limit this reference to $50 million,

25   right?  You said you were principal, agent and advisor with

1    respect to the entire collection of Gruppo Triad purported

2    notes totalling 1.075 billion, right?

3    A.    Again, if you look at it, we say that we own 100, we are

4    offering 50, and the owner -- there's an owner of over 900.  So

5    we clarified that sentence of what we meant, I think, to just

6    what I said.

7    Q.    I say what you are saying now.  You go on to say at the

8    end of the paragraph and say that you are the agent for the

9    owner of the remaining 900 million.  That's Gruppo Triad,

10    correct?

11    A.    We are offering the 50 million as the agent of that

12    owner, right?  We are selling it for him.  We didn't claim that

13    we owned the $50 million note.  We were an agent.  We knew that

14    we owned 100 million of the notes, which we did.

15        Again, this was November of 2004, you know, after the

16    lawsuit was filed just before Venezuela answered.

17    Q.    All right.  You could put that one aside.

18    A.    And, again --I just wanted to say that, again, this was

19    part of this effort to figure out some way where we could have

20    an interim liquidity event and take a part of the risk without

21    having capital at any longer at risk.  So that's what we were

22    trying to do there.

23    Q.    I have one more document to show you in this series,

24    D-649.

25    A.    This, incidentally, so you know -- oh, I think we talked

1  about this in my deposition.  This was part of a larger

2  document.  So we had it at the deposition where it was kind of

3  a glossy piece that had been printed up -- You might remember

4  -- and it has Andy Douglas's picture in there.  This was part

5  of it.

6  Q.  Thank you for the clarification.  I don't recall, but we

7  will be moving into evidence later in the case various portions

8  of your two depositions and will see if what you just said has

9  any impact on that.  But thank you for pointing that out.

10      All right.  Let's look at D-649.  Do you have that?

11  A.  I do.

12  Q.  We will start this at the top instead of the bottom.

13  And this is an e-mail from you to Mr. Sitrick and Mr. Post,

14  correct?

15  A.  Yeah, to Sitrick, Post, Vogel, Knight and Mullens.

16  Q.  All right.  I'm just going to direct your attention to

17  the bottom of the first page of this document.  Do you see

18  there's a line that says, "Questions likely to be posed by a

19  journalist"?

20  A.  I see that, yes.

21  Q.  And then the balance of this document appears to be a

22  series of such questions and your proposed answers, correct?

23  A.  I don't know that to be true.  It looks like -- I'm just

24  starting at the top here, right?  It starts that -- It starts

25  with a comment about that Venezuela -- kind of like the notices

1   that we have talked about already that I think Vogel had found.

2   And then we tell him what we knew at the time that, yes, there

3   were frauds that were recognized by the Attorney General, but

4   that's why we didn't buy them absent of the Attorney General

5   making the ruling that she did.  And so --

6   Q.   Again, I am happy to have you read as much as you want,

7   but I'm only interested in what's on the second page.  And if

8   your counsel thinks it's advantageous to talk about the first

9   page, they can redirect you to it.  I don't mind you're

10  familiarizing yourself with this, but I don't have questions on

11  the first page.

12  A.   Well, why don't you ask your question, and I will see if

13  I need to go back and get the context of it.

14  Q.   That's perfectly fine.

15       At the bottom of the first page there's a heading that

16  says, "Questions likely to be posed by journalists."  Do you

17  see that?

18  A.   Yes.

19  Q.   It appears to me -- and you can tell me if I have this

20  correct -- there are a series of questions posed by someone and

21  a series of answers or proposed answers provided by someone

22  else.  And I don't want to put words in your mouth, but I'm

23  inferring someone is asking the questions, and you're providing

24  the answers.  Is that correct?

25  A.   Well, normally what would occur is that, you know, if

1    you are going to prepare to talk to reporters, these people,

2    all of whom work for Sitrick, I'm pretty sure -- I know Vogel

3    did.  I am almost certain Knight did.  I'm pretty sure that

4    Kelly Mullens did, worked for Sitrick.  Normally, the way it

5    would work is they would come up with the sort of approach and

6    then questions and answers.  Now normally they would have the

7    questions they expected and what they expected answers to be.

8           So here you can see I'm sending this back to them, and

9    I might have -- I might have either put these answers in,

10   modified answers that were already there.  This is a little

11   closer in time.  It's, you know, March of 2005.  The lawsuit

12   was underway at that point.  So it's a little closer in time.

13   But I still really don't specifically remember this e-mail.

14   Q.   When you sent this e-mail back, whether you modified

15   someone's answers or created them yourself in the first

16   instance, these answers reflected your positions as of the time

17   of this e-mail, right?

18   A.   I'd have to know which positions you are referring to

19   and say, yes, that's right, or, no, that's wrong, or there

20   might have been further drafts of this.  So I can't make that

21   blanket statement without reading each of these positions.

22          My position at the time was the Attorney General's

23   position -- opinion was final and binding.  So I think that was

24   our position.  Right?

25   Q.   I understand --

1    A.   So if there was anything inconsistent with that, I would

2    say, no, it wasn't my opinion at the time.

3    Q.   All right.  I'm not really trying to trip you up here.

4    Let's turn to the second page.

5    A.   Okay.

6    Q.   I'm going to count down questions from the top.  I get

7    to the sixth question, and it starts with, "Who were the

8    original buyers?"  Do you see that?

9    A.   Yeah.

10   Q.   So the question here was, "Who were the original buyers

11   of the Bandagro notes (that is the types of buyers)"?  Right?

12   Do you see that question?

13   A.   I do.

14   Q.   And the answer that appears on this page of D-649,

15   "Don't know, don't care."  Do you see that?

16   A.   Yes.

17   Q.   Was that your position at the time you sent this e-mail?

18   A.   Well, between the time that notes were issued in '81 and

19   when they went to Pavanelli, we didn't know who were the

20   original purchasers, and we didn't care.

21   Q.   Let's look --

22   A.   That was something, you know, we never really tried to

23   find out, and it didn't matter.

24   Q.   Let's look at the last question on this page.  It says,

25   "How much did Skye pay for the notes (that is how many pennies

1    on the dollars)?"  Do you see that?

2    A.    Yes.

3    Q.    And then the answer on the following page is, "This is

4    private information.  However, in cash notes and assumption of

5    obligation, Skye paid more than 50 cents on the dollar."  Do

6    you see that?

7    A.    Yes.

8    Q.    That wasn't true, correct?

9    A.    Well, sure it was.

10   Q.    What obligation did Skye assume?

11   A.    The -- So we assumed the obligation to get the lawyers,

12   30 cents on the dollar, engage Sitrick, five or ten cents on

13   the dollar, for exactly what was bought, pay cash, get my time

14   for however long it took.  We valued that at more than 50 cents

15   on the dollar.

16   Q.    Your deal with Sitrick provides that Sitrick only gets

17   paid if you win?

18   A.    Correct.

19   Q.    Your deal with Pavanelli, however many times it morphed

20   over time, it provides that you only had to pay Gruppo Triad if

21   you win, right?

22   A.    Correct.

23   Q.    That's why you called that promissory note a nonrecourse

24   promissory note, right?

25   A.    Yes.

1    Q.    You don't owe Pavanelli and you don't owe Sitrick and

2    you don't owe the lawyers a penny if you lose, right?

3    A.    That's right.  I point out that in the Weltover Bond

4    case, also that Dart paid a few cents on the dollar.  So it

5    wouldn't be unusual to pay a few cents on the dollar.

6          Now did we ever -- Was this the final thing?  No.  I

7    don't know.  So our position was consistently with the press

8    and even in this case, that it didn't matter what we paid.

9    These are bearer notes, and they're valid.  And if we paid a

10   dollar ten, ten or nothing for them, they were valid or not.

11   Q.    All right.  Let's change subjects again.  When did you

12   first get a copy of the Attorney General's October 3, 2003,

13   opinion?

14   A.    I believe it was in October of 2003.

15   Q.    Who did you get that copy from?

16   A.    I don't recall, as I said.

17   Q.    All right.  Let's take a look at the interrogatory

18   answers that you signed very early in the case.  These are

19   D-701.

20          THE DEPUTY CLERK:  D-701.

21   BY MR. SCHWARTZ:

22   Q.    At least on the copy of the document that I have,

23   Mr. Richards, there were some very faint numbers in the center

24   of the bottom of each page.  I think the one up on the screen

25   also has it.  As long as you can see those numbers, and they're

1    actually on your copy, you can turn to page 9.

2    A.   Okay.

3    Q.   And if you'll look at the second-to-the-last paragraph

4    on this page -- well, you can read the questions and the

5    objections and any other part of this that you want, there is a

6    fairly simple foundational matter here -- if you look at the

7    second-to-the-last paragraph, you will see that these

8    interrogatory answers state, "In mid to late October of 2003,

9    David Richards was given a copy of the October 3, 2003, opinion

10   by either Larry Corna or Siro Schianchi."  Right?

11   A.   Yep.

12   Q.   And you signed these interrogatory answers?

13   A.   I think that's right.

14   Q.   And I'm not suggesting that was inconsistent with your

15   answer a moment ago.  I just wanted to refresh your

16   recollection.

17   A.   Okay.

18   Q.   So does D-701 refresh your recollection as to when and

19   from whom you received a copy of the October 3, 2003, opinion?

20   A.   Yeah, I was -- I said kind of a date range, and it was

21   either Larry Corna or Siro Schianchi.  And I still think that.

22   I don't have a strong recollection, but that's what I think.

23   That's the best of my recollection.

24   Q.   We have talked now for a moment about Corna, Siro

25   Schianchi, Gruppo Triad's Swiss lawyer -- and you pointed out a

1    Notary as well?

2       A.    Yes.   It's possible I got it from them both.

3       Q.    We're going to take a look back here at a document that

4    we looked at before, D-590.   It wasn't that long ago that we

5    had looked at it so you may have it in the pile.

6       A.    I have got quite a stack here.

7       Q.    Would you like us to sort through it for you?

8    This is the July 3 e-mail from Pavanelli in anticipation of

9    the Como --

10      A.    I see that.

11      Q.    And I just want to focus on something we did look at

12   before, but I want to look at again with you.   So if you look

13   in the body of the first page of this document, at the

14   paragraph that begins with the misspelled "Furthurmore," do you

15   see that?

16      A.    Yes.

17      Q.    And as we've seen before, Pavanelli wrote, "Insofar we

18   have not received from any of the group concern the famous

19   dictame dated October 3, 2003, nine months has gone by and we

20   are still waiting for such document."   Right?

21      A.    Yeah, we discussed this.

22      Q.    There will be some other questions on this.   I know we

23   did.   I wanted to remind you of this.

24            And there was some discussion here about Santana,

25   Umberto Santana, identified above as the false copy of the

1    document according to Pavanelli or something that's not right.

2    That's what he said?

3    A.   As we discussed earlier, which I said was likely

4    nonsense.

5    Q.   All right.  Now I want you to look back at a document we

6    also looked at a moment ago, D-603.  It was the last document

7    we looked at before lunch and the first document we looked at

8    after lunch.  I'm looking for my own copy.

9    A.   This is the draft or potential communication to my

10   investor group.

11   Q.   Yes.

12   A.   Yes, I got it.

13   Q.   And we looked at this before so I'm not going to dwell

14   on it extensively here, but this is the document on the second

15   page where you said before you resume your efforts to raise $25

16   million, you will be in possession of a copy of the Attorney

17   General's opinion from a third party source.  Right?

18   A.   That's what it says there.  We talked about that.

19   Q.   Right.  And we have also established D-603 was created

20   sometime in late August of 2004, right?

21   A.   It appears that it was after I received the notes and

22   owned them.  And, again, it says, we are filing a lawsuit or we

23   have filed a lawsuit.  So it's -- You know, the beginning is

24   after we received and owned the notes.  As to whether it was

25   the end of August or -- I don't know if you really care about

1  the specific date.

2     Q.   I don't.

3     A.   Okay.  All right.

4     Q.   As long as we are in general agreement.

5     A.   Yes, generally, that's true.

6     Q.   At that time the Attorney General's October 3, 2003,

7  opinion was not publicly available, correct?

8     A.   I don't know.  I mean it was in the press all over the

9  place.  It was a big uproar.  She was defending her opinion to

10  reporters.  I don't know that to be true.  I think it was in

11  the press.  I think it was publicly available.

12     Q.   I'm not talking about whether there had been any type of

13  leaks to the press or you could read a newspaper article about

14  it.  I'm talking about the actual opinion itself was not

15  publicly available?

16     A.   Well, I think that's untrue.  Jacir went and got it and

17  filed it in a Notary.  I don't think that's true.

18     Q.   You couldn't go to a website and find the Attorney

19  General's opinion, correct?

20     A.   I don't know that.

21     Q.   You couldn't use LexisNexis to access the Attorney

22  General's opinion, correct?

23     A.   I don't know yes or no to that question.  I don't know

24  if anybody tried to do that or anybody -- We had it directly

25  from the Attorney General.

1    Q.   That's what you understood.

2    A.   Correct.

3    Q.   That came from sources as to whom and which you don't

4    have firsthand knowledge, correct?

5    A.   I didn't go to the Attorney General's place myself and

6    get the opinion, no.

7    Q.   And -- not being -- Well, I'll do it this way.  You

8    don't know whether you could have walked into the AG's office

9    from the street and asked for a copy, right?  You personally?

10   A.   Me personally, I don't know if I would be able to do

11   that.

12   Q.   And if the opinion had been publicly available, you

13   wouldn't really need to have obtained it from a so-called

14   third-party source, right?

15   A.   Well, again, I say here, you know -- You're taking this,

16   again, out of context -- I say in other places something that

17   sort of talks more about this opinion.  But I think here we're

18   talking about some third-party source.  Maybe it was herself.

19   I don't know.  I have told you I don't know what we were

20   referring to there.  But this was in regard to the placement

21   efforts that were going to take place after the lawsuit was

22   filed.

23   Q.   And you've told us and Mr. Alcalde told us you had some

24   version of it that you were able to read as early as October of

25   2003, right?

1    A.    End of October of -- I saw something that appeared to be

2    this.  I didn't, you know, read it page for page.  But I saw

3    something that was the dictamen toward the end of -- October of

4    2003.

5    Q.    And here we are many months later in August, 2004, you

6    have either -- just either about to file a lawsuit or you just

7    filed it; and for some reason the one -- the copy you got the

8    preceding year is not good enough, right?

9    A.    The real one, you'd think you could get one that was

10   really nice and had it in color and all of that.  And so in

11   terms of showing it to these investors who might purchase the

12   note in the fall, maybe Gary had asked for it.  But I think

13   what we are looking for is like one of these colorful --

14   Q.    Colorful --

15   A.    Looked better than a lousy copy, if you will, even with

16   the stamps on it and not colored.  It would look better to me.

17   Q.    Now you testified yesterday when -- that when the

18   complaint was filed on August 23, '04, you made a strategic

19   decision not to attach a copy of the Attorney General's

20   decision to the complaint, right?

21   A.    I didn't.

22   Q.    Alcalde did, correct?

23        MR. ELLIOTT:  Your Honor, now we're approaching into

24   areas of attorney/client privilege and work product.  What

25   Mr. Alcalde discussed with Mr. Richards about what would be

1  attached --

2      THE COURT:  Well, let's see if we can kind of winnow

3  this down.  The conversations are out.  The facts about receipt

4  are certainly in play.  So if you can limit it to that second

5  issue, I think we can make this problem solvable.

6      MR. ELLIOTT:  Thank you, Your Honor.

7      MR. SCHWARTZ:  I think I can fashion a practical

8  solution.  I'm not looking to invade the attorney/client

9  privilege.  Let me put people at ease.

10      THE COURT:  Right.

11      MR. SCHWARTZ:  I'm looking at the transcript of

12  yesterday's testimony.  And Mr. Richards testified -- This was

13  the rough transcript, but I believe it's consistent with what

14  happened -- he said -- this is page 123, line 17 -- "Well, we

15  had filed the complaint.  It was Luis' idea that he should not

16  attach the Attorney General's opinion --"

17      MR. C. COOPER:  Your Honor, one moment.  Is this

18  proper to be reciting testimony from yesterday?

19      THE COURT:  Not with the witness here.  You're making

20  an argument to me based on that.

21      But as I understand it -- I am not sure where this is

22  going, but I'm going to leave this to you for now -- you are

23  trying to establish when the witness actually had a physical

24  copy of the Attorney General's opinion.  Is that where you're

25  going?

1          MR. SCHWARTZ:  Well, their --

2          THE COURT:  Just in general, where are you headed with

3     this?

4          MR. SCHWARTZ:  There are very serious issues in the

5     case as to the legitimacy of the means by which various

6     versions of the Attorney General opinion were obtained.

7          THE COURT:  I get that.  And then avoid the

8     attorney/client issue, and that's certainly an area that you

9     can pursue.

10    BY MR. SCHWARTZ:

11    Q.   I will do it this way.

12    As far as you are aware, when the complaint was filed on

13    August 23, 2004, a copy of the Attorney General's opinion was

14    not attached, right?

15    A.   That's what I recall -- and you're the lawyer so you

16    would know the pleadings better than I -- but that's what I

17    recall.

18    Q.   All right.  Let's mark D-613.

19         THE COURT:  Well, let me, just for my edification --

20    I'm the trier of fact after all -- so you each have used a copy

21    of the Attorney General's opinion.  At this point should I

22    assume it's going to be disputed as to which one?  Are they the

23    same, I guess is the first question?  And if not, I assume

24    we're going to hear some testimony on this.

25         MR. SCHWARTZ:  Would you like me to elaborate?

1          THE COURT:  Just briefly.  If I need to be worried

2   about authenticity, I want to flag that in my mind.

3          MR. SCHWARTZ:  There is most certainly an issue of

4   authenticity concerning the version or a version of the

5   Attorney General that the plaintiff displayed either with

6   Mr. Alcalde or Mr. Richards.  I can't recall which.  The days

7   are flowing together.  But I remember standing up in an

8   agitated manner and saying, we have an issue with the

9   authenticity of this.  You might not expect that as to the

10  document --

11         THE COURT:  But there are competing versions is what

12  your position is?  Mr. Cooper.

13         MR. C. COOPER:  I'm not aware of competing versions of

14  the report.  What I believe what Mr. Schwartz is referring to

15  is, perhaps, certifications.  But the content of the Attorney

16  General's -- I don't believe there is a dispute about the

17  versions.

18         THE COURT:  Is that true, about the content?

19         MR. SCHWARTZ:  This is not about the content.

20         THE COURT:  So it's about what you're calling the

21  certification.  Enlighten me what you mean by that exactly.

22         MR. C. COOPER:  So there are -- Apparently, in

23  Venezuela to get a document certified, they, on the back of

24  each page, they put a stamp and a signature.  And I believe

25  Mr. Schwartz is contending there are some certifications on the

1  back of some copies that are different than copies that have

2  other certifications.

3      MR. SCHWARTZ:  This is part of a much larger issue.

4  Mr. Cooper is right, by the way.

5      THE COURT:  We'll start with that, that the -- in

6  terms of the physical content of the document, it's the back of

7  the page certification that's first disputed.

8      MR. SCHWARTZ:  A witness has testified that a

9  certification that the plaintiff is relying on is fraudulent.

10      THE COURT:  All right.  So the document is not in

11  dispute.  The certification, you're saying, your contention is

12  it's fraudulent?

13      MR. SCHWARTZ:  At least that certification, yes.

14      THE COURT:  All right.

15      MR. SCHWARTZ:  That's what the person who signed it

16  has testified.

17      THE COURT:  All right.  Then, again, what we started

18  with was just the attorney/client privilege.  That is a subject

19  you may inquire.

20      MR. SCHWARTZ:  I think I'm beyond the privilege

21  because I just asked what the complaint looked like.  It

22  doesn't matter what the thinking was behind it really.  And the

23  testimony from yesterday will stand regardless.

24      All okay.  I am going to move on from there.

25      THE COURT:  All right.

1    MR. SCHWARTZ:  There is more to this issue, but I

2  don't think we need to get into it right this second.

3  BY MR. SCHWARTZ:

4  Q.   Okay.  So, Mr. Richards, I'm going to show you D-613.

5    THE DEPUTY CLERK:  D-613.

6    MR. SCHWARTZ:  And, Your Honor, with the next, apropos

7  to what we just discussed, on account of the issue regarding

8  authenticity of certifications, the next series of exhibits I'm

9  showing you I'm most definitely not introducing for the truth

10  of anything asserted in there, starting with D-613.

11  BY MR. SCHWARTZ:

12  Q.   So, Mr. Richards, do you have D-613?

13  A.   Yes.

14  Q.   All right.  First of all, you'll recognize that this is

15  an e-mail that was produced by your counsel in the case as

16  reflected in the Skye Bates numbers, right?

17  A.   Yes.

18  Q.   And this one has got a translation because it was

19  originally sent in Italian.

20  A.   Okay, yeah.

21  Q.   But I'm going to have you focus on the English

22  translation.

23  A.   All right.

24  Q.   So this is an e-mail that Siro Schianchi sent you on

25  October 6, 2004, right?

1    A.    That's what the title says.

2    Q.    And cc'd Usuelli, right?

3    A.    Yes.

4    Q.    And you received this e-mail, correct?

5    A.    I don't recall it, but, again, it's like the standard:

6    I'm not denying I received it, but I don't recall it.  And

7    since it was in Italian, no, I certainly didn't read it.

8    Q.    We'll see other documents in a second in English.  But

9    let's stick with the translation of this Italian document from

10   Schianchi.

11         So to put this in chronological context, October 6,

12   2004, is five or six weeks after the lawsuit was filed, right?

13   A.    It sounds about right.

14   Q.    And Schianchi starts by saying, "I can hereby confirm

15   the following to you."  Right?

16   A.    So this is a translation.  Was this translation done

17   back then or done in the case?

18   Q.    Well, the translation you're looking at was done during

19   the case.

20   A.    Okay.

21   Q.    If you obtained a translation of it contemporaneously

22   with its transmittal, I don't know.

23   A.    Okay.

24   Q.    But I do know that you have a translation here, and I'd

25   like to ask you about it.

1      So Schianchi starts by saying, "I can hereby confirm

2   the following to you."  Right?

3   A.   Yes.

4   Q.   And then we have four bullets?

5   A.   Yes.

6   Q.   The first states, on October 9, 2003, Pavanelli asked

7   the Ministry of Finance for a certified copy of the Attorney

8   General's October 3 opinion, right?

9   A.   That's what the translation of this e-mail, which I

10   don't -- you know, couldn't have read at the time says, yes.

11   Q.   By the way, the translation is not disputed.  So I

12   wouldn't --

13   A.   But I mean I couldn't read the e-mail back then.  I

14   don't know if I ever read it.  So that's my point.

15          THE COURT:  Wait a minute.  Is there an objection?

16          MR. ELLIOTT:  Your Honor, if he doesn't remember -- He

17   saw it in Italian, doesn't remember the contents.  I assume

18   where we are going with this is whether he recalls

19   independently these subject matters, as opposed to reading the

20   e-mail.

21          THE COURT:  Well, this was also produced by Skye,

22   though.  Does that change anything?

23          MR. SCHWARTZ:  I am going to make this much easier for

24   everybody.  I think I can accommodate the objection and find a

25   different way to accomplish the same purpose here.  Can we

1   stipulate that the Italian version of this e-mail of October 6,

2   2004, was sent by Schianchi and received by Richards?  If we

3   can, I can dispense with this document for now.

4           THE COURT:  Mr. Elliott?

5           MR. ELLIOTT:  Yes, Your Honor.  My issue is not so

6   much with the documents since it's one of our exhibits as well.

7   My only issue was trying to read the document to Mr. Richards

8   who never saw it before.

9           MR. SCHWARTZ:  I appreciate that.

10          THE COURT:  I think we have got the problem solved.

11          MR. SCHWARTZ:  Again, we are not admitting this for

12  any purpose for having to do with the truth.  But the fact it

13  was sent and received is stipulated, I don't need to ask any

14  further questions about this, at least not at the moment.

15          THE COURT:  All right.

16  BY MR. SCHWARTZ:

17  Q.   So let's go to D-618.  We're going to have a similar

18  issue here.  This is going to be a document that presents

19  exactly the same issue.

20          THE DEPUTY CLERK:  D-618.

21  BY MR. SCHWARTZ:

22  Q.   All right.  So, Mr. Richards, here we have another

23  e-mail in Italian from Schianchi to you.  This is dated the

24  next day, October 7, 2004.  Do you recall receiving this?

25  A.   No.

1    Q.   All right.

2         MR. SCHWARTZ:  Can we have the same stipulation on

3    this one, Mr. Elliott, and dispense with further questioning of

4    it?  Regarding it, I should say?

5         MR. ELLIOTT:  I'm sorry, what are you asking?

6         MR. SCHWARTZ:  I am proposing that rather than work

7    with that English translation of an Italian document that may

8    not have been translated at the time the witness received it,

9    we stipulate with this document, like the predecessor, it was

10   sent and received.  That's it.

11        MR. ELLIOTT:  I have no problem with that.

12        THE COURT:  Very good.  Thank you.

13        MR. SCHWARTZ:  Again, not for the truth.  Okay.

14   BY MR. SCHWARTZ:

15   Q.   All right.  I now arrive at a document in English,

16   D-621.

17        THE DEPUTY CLERK:  D-621.

18   BY MR. SCHWARTZ:

19   Q.   Okay, Mr. Richards.  Here we have a letter from

20   Schianchi to you dated October 12, 2004, within the same week,

21   give or take, as the last two exhibits.  This one has a Skye

22   Bates stamp so it was produced by your counsel.  It's written

23   in English, which will make it easier for us to talk about.  Do

24   you recognize this as a copy of a letter you received from

25   Schianchi on or about October 12, 2004?

1    A.    I would say that I have no recollection of this, but

2   this is certainly a fax or -- it looks like a fax probably to

3   me addressed -- sent by Siro Schianchi.  Again, I don't

4   remember it, but it certainly looks like that's what it is.

5    Q.    Now you will see here, Schianchi includes four bullet

6   points, right?

7    A.    Yes.

8    Q.    First he says -- just like in the translation I started

9   to read you of the Italian document -- on October 9, 2003,

10  Pavanelli -- I'm skipping some words -- requested from the

11  Ministry of Finance an original copy of the dictamen issued on

12  October 3, 2003, by the Attorney General.  Right?

13   A.    That's what it says.

14   Q.    And then in the next bullet -- I'll paraphrase just a

15  bit -- he says, on October 15, 2003, Oscar Guzman Cova at the

16  Ministry of Finance certified page by page a copy of the

17  Attorney General's opinion.  Do you see that?

18   A.    Yes, that's -- I think that's what it said.  I wasn't

19  following you word for word.  I am assuming you're reading it

20  correctly.

21   Q.    Well, paraphrasing it a little bit.  But, in essence,

22  he's saying -- asserting, I should say, on October 15, 2003,

23  Guzman Cova certified a copy of Marisol Plaza's opinion, right?

24   A.    That's what he says.

25   Q.    And Schianchi is very specific here in giving you the

1  date that Pavanelli supposedly made this request and Guzman

2  supposedly took this action, right?

3     A.   He has dates in there, yes.

4     Q.   Then he has got another bullet.  And he says, the above

5  said copy has been given to me by hand by Mr. Roman Delgado in

6  representation of the Ministry of Finance of the Venezuelan

7  Republic as in conformity of the previous communications sent

8  to me from the Venezuelan Embassy in Bern, Switzerland.  Do you

9  see that?

10    A.   I see that.  I think you read that correctly.

11    Q.   And he, unlike the prior two bullets, he doesn't tell

12 you when Delgado supposedly did this, right?

13    A.   That's right.  There's no date in that bullet point.

14    Q.   Then the last bullet, he says he's holding this as a

15 fiduciary, right?

16    A.   That's what he says.

17    Q.   Now --

18    A.   He refers, incidentally in the -- I don't know if you

19 read the whole thing, and I'm trying to understand this in my

20 own head as I'm reading this -- in this letter the text reads

21 that as in conformity of the previous communications sent to me

22 from the Venezuelan Embassy in Bern, Switzerland.

23       So it sounds as if he had received something before

24 that, and this thing that Roman Delgado gave to him was the

25 same.  That's kind of how I read that.

1     Q.    You can hold that interpretation for yourself.  I don't

2   mean any disrespect --

3     A.    It could be wrong.  That is what it means to me.  That

4   is what it looks like to me.  I'm looking at this the first

5   time in forever.

6     Q.    So he starts this letter to you by saying, upon your

7   request, he's confirming the following.  Do you see that?

8     A.    Yes.

9     Q.    Had you made a request of Schianchi in or about October,

10  2004, that he confirmed that he was in possession of a

11  certified copy of the opinion of the Attorney General?

12    A.    Perhaps.  I don't recall doing so.  Or I don't recall

13  whether I did it on my own or if I did at the request of

14  Mr. Alcalde.  But, again, I just don't recall.

15    Q.    So you have no recollection of an effort being made

16  after the litigation was filed, after this litigation was filed

17  by you or on your behalf, to obtain a copy of the Attorney

18  General's opinion certified by the Ministry of Finance?

19    A.    I might not have been asking for a copy here.  I might

20  have asked him what happened, if I did ask him anything.

21  Again, I just don't recall.

22    Q.    Okay.

23    A.    And it might have been that the lawyers were asking for

24  some clarification.  I just simply don't recall.

25    Q.    All right.  Let's move to D-624.

1          MR. SCHWARTZ:  Again, Your Honor, not being offered

2     for the truth by any stretch of the imagination.

3          THE DEPUTY CLERK:  D-624.

4          THE WITNESS:  Yes.

5          MR. SCHWARTZ:  Hold on for one second.

6          THE WITNESS:  I have it.

7     BY MR. SCHWARTZ:

8     Q.   All right.  So here we have the first document that Skye

9     Ventures produced in this litigation, SKYE00001, now

10    Defendant's Exhibit 624.  It's a cover letter from Schianchi,

11    it's dated October 20, 2004, and it addressed to Mr. Gerace of

12    Skye Ventures?

13    A.   Gerace, yes.

14    Q.   Do you recognize this document?

15    A.   Well, it's a -- it could be a letter.  I don't see a fax

16    at the top.  It looks like it's another letter from Schianchi.

17    Again, it could be a letter, could be a fax.  So that's what it

18    appears to be.  I don't recall this document.

19    Q.   Turn to the second page of this document, please.

20    A.   Okay.

21    Q.   Do you see this includes a declaration from Schianchi?

22    A.   Yes.

23    Q.   And we don't have to go over this word by word, but, in

24    essence, it's the same four bullet points that are in

25    Defendant's Exhibit 621, right?

1    A.    It appears to be.

2    Q.    He just took the letter, D-621, and he turned it into a

3   declaration for some reason, right?

4    A.    Kind of looking at the first word and last word in each

5   of the bullet points, it looks like the same.

6    Q.    Now let me ask you this question.  Look at the third

7   bullet.  Schianchi asserts that at some point, unspecified, a

8   copy, supposedly certified by Guzman Cova, had been given to

9   Schianchi by hand by Roman Delgado in representation of the

10  Ministry of Finance, right?

11   A.    Yes.

12   Q.    To the best of your knowledge, at any point on or after

13  October 15, 2003, was Roman Delgado employed by or performing

14  any official functions for the Venezuelan Ministry of Finance?

15   A.    I don't know.

16   Q.    You can put D-624 away.

17        THE COURT:  For my future benefit, each of these pages

18  has its seal on it.  Is that what we were talking about a

19  moment ago?  I think you had mentioned it was on the back of

20  the page that we're interested in.

21        MR. SCHWARTZ:  You will see in Guzman Cova's

22  deposition that he testifies that these certifications are

23  fraudulent.

24        THE COURT:  What I am asking is just a very practical

25  question, on the front of each page or on the back?  There are

1   stamps on each page, on the face of each page.

2        MR. SCHWARTZ:  It's the back.

3        THE COURT:  But we -- In other words, it's not copied

4   here?

5        MR. SCHWARTZ:  You raise a good question here because

6   of the un-authenticity -- and I don't want to have an argument

7   with Mr. Cooper about this now -- I don't want to make

8   representations about fronts and backs.  It's not atypical in

9   some circumstances for the stamps to go on the back.

10        THE COURT:  I am just trying to tee up what I should

11   be looking for.  I'm not going to -- I need testimony to

12   resolve this.  But these stamps are not what I am looking for?

13        MR. SCHWARTZ:  I think the issue here is that -- and

14   this is part of a much larger issue -- but the issue with

15   regard to the specific document is Guzman Cova at his

16   deposition said that this certification is fraudulent.  The

17   text is inconsistent with reality, as he understood it.  And

18   this could turn into a long discussion.  It's best taken up, I

19   suggest, in the context of his deposition, but Mr. Cooper may

20   have a different view.

21        MR. C. COOPER:  I was going to answer your direct

22   question.  The round things are the seals, and the stamp is the

23   language on the back.  And you're correct, Your Honor, the

24   language on the stamp that is on the back of each page it

25   appears is sequential.

1      THE COURT:  Right now we don't have that in the copy

2 that I have in front of me.

3      MR. C. COOPER:  Yes.

4      THE COURT:  Very good.  Thank you.

5      MR. SCHWARTZ:  We are foreshadowing an issue which

6 will require some discussion later.

7      MR. C. COOPER:  Your Honor, I guess I should complete

8 my response to you.  To my knowledge, in this case the defense

9 has not produced two-sided copies of any documents.  The

10 production has always been sequential pages even for documents

11 that are in fact two-sided.

12      THE COURT:  All right.  This is why I'm confused.

13 This is just all a practical question.  Don't read anything

14 into this.  These were two-sided document at the time they were

15 issued.  So the stamps could be on the back but the second page

16 of two pages.

17      MR. C. COOPER:  Yes, that's what I wanted to make sure

18 that the Court was clear.

19      THE COURT:  There are blank backsides.

20      MR. SCHWARTZ:  With this particular document, I don't

21 want to be making any particular representations because it's a

22 controversial subject --

23      THE COURT:  Right.  I'm just -- There is going to be a

24 dispute about whether the seals are valid, and I'm just asking:

25 Where are they?  That's all I'm asking for right now.  And

1    they're all over the documents on the front and back is what

2    you're telling me.

3           MR. C. COOPER:  The seals, Your Honor, I don't think

4    there's going to be much of a dispute.  The stamp language it

5    certifies is the point of contention.

6           THE COURT:  All right.

7           MR. C. COOPER:  But you're right.  You won't see it on

8    the back of the page.  You'll see, as the next page, which just

9    has the language, "This hereby certifies," and then goes on

10   with the text.

11          MR. SCHWARTZ:  Whatever might have happened at the

12   source of the certification is not necessarily the way the

13   document got carried through the places it was later sent.  And

14   there will be chain-of-custody type issues.

15          THE COURT:  All right.

16          MR. SCHWARTZ:  There will be other issues in this case

17   like this where the seals and certifications need to be

18   examined very closely.

19          THE COURT:  All right.

20     BY MR. SCHWARTZ:

21     Q.   But that won't be the case on D-482.  So let's take a

22   look at that one, Mr. Richards.  This is a document we looked

23   at yesterday, but I'm going to show a segment of it we didn't

24   look at.

25          THE DEPUTY CLERK:  D-482.

1          THE WITNESS:  This is the Pavanelli/Corna $1,000

2     dispute.

3       BY MR. SCHWARTZ:

4       Q.   Well, if it is, that comes up in many documents, but

5     that's not really what I have in mind here.

6       A.   Okay.

7       Q.   I think it was more like a $5,000 dispute.  But either

8     way, I have no intention of asking you about that right now.

9            You have D-482?

10      A.   I do.

11      Q.   So just to put this in context, this is an e-mail from

12    Usuelli to you from January 6, 2004, and then your response at

13    the top, correct?

14      A.   Yes, I think that's what we discussed yesterday.

15      Q.   All right.

16      A.   Again, remembering I forget if I said I actually saw it

17    then or if I was recovering from my shoulder surgery then.

18      Q.   It's on Skye Ventures Bates stamp.  You don't have any

19    reason to doubt that this is a document that your lawyers

20    produced representing an e-mail exchange between you and

21    Usuelli --

22      A.   No, that's not what I'm saying.  I'm saying I don't know

23    when I saw it.

24      Q.   That's okay.

25            Let's look at the last page of the document.  I want

1  to focus on the part we didn't look at yesterday.  So there's a

2  heading no. 3, Legal Opinion, right?

3  A.   Yep.

4  Q.   And then you'll see a break after some paragraphs and a

5  sentence that begins, "My question is what might produce a

6  lawsuit in the United States -- or the U.S."  Do you see that?

7  A.   Yes.

8  Q.   And then Usuelli raises some questions about what might

9  happen in a U.S. court in the next paragraph.  And the third

10  paragraph says, "I was considering that a U.S. entity could

11  start it with a single note and I could file in Switzerland on

12  another one."  Do you see that?

13  A.   Yes, I see that's in the middle.  He says that, yes.

14  Q.   And the next paragraph he says, "This would not

15  prejudice Gruppo Triad's negotiations since the lawsuits are

16  brought by third unrelated, paren, formally, end paren,

17  parties."  Do you see that?

18  A.   Yes.

19  Q.   Did you understand that in January, 2004, Usuelli was

20  proposing or suggesting that there be some effort underway to

21  have some formally unrelated party, unrelated to Gruppo Triad,

22  bring a lawsuit in the United States?

23  A.   Well, I don't know if I would characterize it exactly as

24  you say.  You can see he is kind of rambling through all sorts

25  of things here.  But what you read is accurately his words,

1   yes.

2      Q.   That's all I have for D-482.

3           I would like you to look now at Joint Exhibit 35,

4   J-35.  We may need to give you that one.  There is going to be

5   one that's difficult to read.  The print is clear, but it's

6   tiny.  We may want to enlarge portions of this for you on the

7   screen.

8           THE DEPUTY CLERK:  Joint J-35.

9           MR. SCHWARTZ:  Actually, since yesterday we took

10  precautions here.  Let me just explain what has happened here.

11  So this is Joint 35.  The copy that I've handed or had handed

12  to Mr. Richards includes an enlargement of the text at the back

13  of this document so it will be easier to read because

14  otherwise, it's going to cause eye strain.  So I don't -- Do we

15  have another copy for plaintiff's counsel with the enlargement?

16

17          MR. ELLIOTT:  We can see it.  Thank you.

18      BY MR. SCHWARTZ:

19      Q.   I will represent to you, Mr. Richards, and to co-counsel

20  and the Court that what we tried to do here was take the minute

21  text of J-35 and just enlarge it by 20 percent, or something

22  like that, so you can read it without too much trouble.  And

23  feel free to check the original against the enlargement any

24  time you would like, but I'm going to direct you to the larger

25  one so it's easier for you to read.  Is that all making sense?

1    A.    Yes.

2    Q.    All right.  So before we start looking at the larger

3    one, though, I want to establish this document was produced by

4    Skye Ventures.  Do you see that?

5    A.    Yes.

6    Q.    It's an exchange of e-mail between Pavanelli and you

7    from February 5, 2004, right?

8    A.    Yes.

9    Q.    All right.  Now let's turn to the version you can

10   actually read.

11   A.    Okay.

12   Q.    So first there's some discussion in Pavanelli's e-mail

13   to you -- I'm working from back to front -- of some meeting

14   with Delgado people in the second paragraph.  Do you see that?

15   A.    I was trying to quickly glance through the response to

16   put it into context, if you don't mind.

17   Q.    Take your time.  Why don't you read as much of this as

18   you would want.

19   A.    Okay.  I read the exchange.

20   Q.    Let's start with Pavanelli's e-mail to you.

21   A.    Yes.

22   Q.    In the third paragraph he makes reference to some

23   meeting the following day with Delgado people, right?

24   A.    I think this is the investment bankers we were talking

25   about before maybe.

1    Q.   Do you have any further information about what that

2    meeting was about?

3    A.   No.

4    Q.   Then he says to you, "I have sent you via Mr. Good, all

5    necessary documents and now you should not have any more

6    excuses not to provide sending funds as per our understanding."

7    Do you see that?

8    A.   Yes.

9    Q.   That's a reference to Brian Good?

10   A.   Again, I don't remember the specific e-mail, but this is

11   about the time frame that I met with Brian Good.

12   Q.   And Larry Corna brought Brian Good into this deal,

13   right?

14   A.   I didn't know that.  I thought that -- I didn't know

15   they were related.

16   Q.   What documents had Pavanelli sent you via Brian Good?

17   A.   I don't remember.  The meeting with Brian Good I think,

18   if I'm remembering correctly, occurred at Crabbe Brown.  And I

19   don't think I attended.  But I might have.  I just -- But he

20   was bringing some assortment of documents that ended up, you

21   know, at Crabbe Brown in their hands.  I don't remember what

22   they were.

23   Q.   Brian Good at that time was an Ohio resident, right?

24   A.   He was -- I don't know the answer.  At some point he

25   was.  He had a house in Arlington somewhere, I think.

1    Q.   He wasn't one of the people like Pavanelli and Schianchi

2    and Usuelli and Pedro Wick who came from Italy or Switzerland,

3    right?  He was a local guy?

4    A.   Yeah, yeah, he was a U.S. guy for sure.

5    Q.   But you don't recall what necessary documents he brought

6    you from Pavanelli?

7    A.   No, or whether I would have called them necessary.  He

8    is saying necessary for him to get more money.  So as I said,

9    whatever the documents were, ended up in Crabbe Brown's hands

10   either directly or as part of a meeting they had with him.

11   Q.   Then after the obligatory reference to the Larry Corna

12   affair, a paragraph we can skip -- actually two paragraphs --

13   there is a paragraph that starts, "My attorney, Dr. Jacir is

14   having an extremely important meeting with the President of the

15   financial subcommission of the Venezuelan Parliament for the

16   final decision" -- and he switches to all cap letters -- "I

17   must funds available before that time."  Do you see that?

18   A.   Yes, I do see that's in the e-mail.

19   Q.   Was it your understanding at that time that Pavanelli

20   was trying to make sure that funds would be available to be

21   dispensed in connection with this extremely important meeting

22   that Jacir was having?

23   A.   Again, I don't have that understanding.  I don't recall

24   what my understanding was at the time.  But my reading of this,

25   it just seems to be this constant asking for more money.

1    Q.    And then Pavanelli makes some insult at the end about

2    you having only provided crumbs, which he misspelled as

3    "crambs."  Right?

4    A.    Yeah.

5    Q.    And then you sent the response that appears on the first

6    page of this exhibit, J-35, right?

7    A.    Again, I don't recall this e-mail, but I sent -- It's

8    from me to him, Usuelli, Good and John.

9    Q.    And you can see in the third paragraph, you do see that

10   you met with Brian Good, right?

11   A.    The third paragraph.  We met with Brian Good.  It might

12   have been referring to our team.

13   Q.    Does that refresh your recollection in any way about any

14   interaction with Brian Good?

15   A.    I think, you know, I would have said this even if I

16   wasn't present, you know.  But, again, it doesn't refresh my

17   recollection.

18   Q.    Then in the third-to-last paragraph there's another

19   reference to whatever efforts Delgado was mounting at this time

20   to try to monetize the note, correct?

21   A.    I beg your pardon?

22   Q.    In the third-to-last paragraph --

23   A.    Third to last, okay.

24   Q.    -- there's some reference to an offer -- you suggesting

25   there will be some offer only if Delgado is unsuccessful,

1   right?

2   A.   I don't see -- the third.

3   Q.   It says, "In the past we" -- meaning you -- "have

4   discussed my offer to begin the process of placing 50 million

5   of these bonds with a U.S. buyer."  Right?

6   A.   Yeah.

7   Q.   And then you proposed to undertake that effort on a best

8   effort basis and complete it within a certain amount of time,

9   right?

10  A.   I say that I have offered -- I say that, yes, in

11  connection with the other things that I am saying in that

12  paragraph.

13  Q.   And in essence, without parsing this too carefully,

14  you're saying you'll do that if Delgado is unsuccessful, right?

15  A.   If the deal coming up is successful, what does he need

16  me for?  Basically, let's see what happens with this deal.

17  Q.   And then in the second-to-last paragraph, you have made

18  a request for -- for your deed of trust that apparently hadn't

19  been sent, right?

20  A.   Yes.

21  Q.   All right.  That's it for J-35 for now.

22  A.   I also -- okay.

23  Q.   Something you wanted to add?

24  A.   Well, I'm just saying I was kind of giving him the stiff

25  arm here saying, if you can't wait, then you can't wait.  It's

1   up to you.  So --

2     You know, it's coming, to correct what I just said here, I'm

3   starting to think I did attend that meeting.  I'm concerned I

4   have a vague recollection of sitting in a room with Alcalde and

5   Brown with Good.  So I'm starting to see his face now.  So I

6   couldn't remember what he looked like.  So it's possible that I

7   met with him.

8     Q.   On how many occasions did you meet with Brian Good in

9   connection with your dealings with Pavanelli?

10    A.   Well, I was having trouble remembering that time.  And

11  I'm still not sure it occurred.  But I think I met with him at

12  least once.

13    Q.   Generally speaking, what was his role?

14    A.   Just he was bringing stuff, he was bringing documents,

15  at that point.

16    Q.   Did you understand that like Corna, he was a

17  representative of Pavanelli?

18    A.   I didn't -- you know, my -- He was bringing documents

19  for Pavanelli.  I didn't know whether he was a representative

20  or not, but he was doing it for Pavanelli.

21    Q.   He wasn't working for you, right?

22    A.   No, he wasn't working for me.

23    Q.   Now yesterday Mr. Elliott asked you were you interested

24  in combining or joining with Gruppo Triad to collect what the

25  Attorney General had said were final and binding.  Do you

1   remember that question?

2    A.   No, but I'm not saying it didn't happen.

3    Q.   And do you remember telling him, quote, no way on earth,

4   end quote?

5    A.   Well, certainly toward the end, that's the truth.  So in

6   context, you know, I didn't know the guy.  If you are asking me

7   in January, I didn't know the guy very well.  But by the time

8   we finally decided to go ahead and ultimately really file the

9   lawsuit, yes, there was no way in hell.

10    Q.   When did you come to the conclusion there was no way on

11   earth or in hell that you ever wanted to combine or join forces

12   with Gruppo Triad?

13    A.   In the context of the lawsuit, you know, it was -- he

14   was getting just -- He was a difficult guy to begin with, as I

15   said, stubborn and difficult, always asking for money.  Just

16   not the kind of guy to be around all the time.  And it just got

17   worse and worse and worse.  And it wore me down, and it wore

18   Crabbe Brown down, too.  And I'm hard to wear down.  By the

19   time Crabbe Brown fired him, they said, we're not going to deal

20   with this guy anymore in July, certainly, you know, I was there

21   with them with the same conclusion.  As to how long before

22   that, I don't know.

23         Obviously, we had this deal that we had agreed to

24   where we were going to file a lawsuit in June, and he was going

25   to have some part in it.  But, you know, that deal had failed.

1    So I wasn't wild about that.  And I actually, like I told you

2    in the deposition, I didn't think it would ever happen.

3        Q.    You didn't think what would ever happen?

4        A.    That Crabbe Brown would ultimately represent the guy and

5    file a lawsuit for him.

6        Q.    All right.  We're going to turn now to D-581, that we

7    have looked at before, but we are going to look at it in a

8    different light.  You may have a copy up there, at least we

9    expect you do.  This is the June 23, 2004, agreement.

10       A.    I don't think I have it in this file here for sure.

11       Q.    Let me ask Mr. Baldwin to check on that, please.

12       A.    Should I keep this whole pile here?

13       Q.    We can probably relieve you of some of that.

14             MR. SCHWARTZ:  Sorry, Your Honor.  I think it was at

15   one point in front of him.  We may have other copies.

16             THE COURT:  I have got my copy.

17             MR. SCHWARTZ:  I think, Mr. Baldwin, I have other

18   copies here.  Here's another one.  Have you got it?  Just make

19   sure I haven't written on it.

20             THE DEPUTY CLERK:  D-581.

21    BY MR. SCHWARTZ:

22       Q.    Before you take a look at that, can you confirm that one

23   isn't written on by us, Mr. Richards?  It looks pristine to

24   you?

25       A.    Well, there is a note here that says Richards is really

1   a nice guy, but I'm going to get him.  I don't know if you

2   wrote that or not.

3      Q.   No, that was Mr. Lucas.

4      A.   No, there's no writing on it.

5      I apologize for that.  I'm getting a little punchy.

6      Q.   Trust me, it wasn't taken personally.

7      So D-581 is the June 21, 2004, agreement, correct?

8      A.   Yes.

9      Q.   Just to put this into context with this line of

10  questioning, first, we have an agreement of three pages and

11  then signatures by Pavanelli and you on the next -- on the

12  third page and the fourth page, right?

13     A.   Yes.

14     Q.   And then comes the nonrecourse promissory note we have

15  spent a little time talking about already?

16     A.   Yes.

17     Q.   And that's also signed on June 23, 2004, by both

18  Pavanelli and you, right?

19     A.   Yes.

20     Q.   And this agreement was actually signed on the date it

21  says it's signed on, right?

22     A.   It seems it says that.  It says date, not like the other

23  one effective date.  And then there's a fax on top that's of

24  the same date.  So it seems that way, yes.

25     Q.   And this is the first of the agreements you actually

1    entered into with Gruppo Triad, right?

2    A.    Well, I don't know if there were other agreements before

3    this or not.  You know, this was an arc back and forth.  But

4    certainly this agreement was in effect -- went into effect on

5    6-23.

6    Q.    Can you think of any agreement you went into, a written

7    agreement you entered into, with Gruppo Triad prior to June 23

8    of 2004?

9    A.    Well, we talked about the April 8 agreement that he

10   signed that I don't think I did.  Right?  I don't think I

11   countersigned at that time.

12   Q.    That wasn't in effect, right?

13   A.    That is -- Well, you know, even if it were, at this

14   point it would no longer be in effect because there was a new

15   deal, right?  So --

16   Q.    Let's forget about April 8 until we get to August.

17   A.    And, yeah, so I don't think so.

18   Q.    Okay.

19   A.    I don't recall seeing any between in that interim

20   period.

21   Q.    Okay.  So let's walk through some of the salient

22   features of this particular agreement.  So just for background

23   purpose, you have various whereas recital clauses, right?

24   A.    Right.

25   Q.    And the third to the last of them on the first page is

1   "Gruppo is managing the final authorization procedures within

2   the judicial, legislative and monetary branchs of the

3   Venezuelan government."  Right?

4     A.   Which whereas?  I'm sorry.

5     Q.   Third to last.  Or sixth from the top.

6     A.   Yes, it says that he's attempting to have them honored.

7     Q.   And then if you turn to the next page --

8     A.   In Venezuela, yeah.

9     Q.   Excuse me.  There's an Article 1 that says, "Skye will

10  purchase 100 million face value of Bandagro notes."  Right?

11    A.   Yes.

12    Q.   And 1.2 talks about the nonrecourse promissory note,

13  right?

14    A.   Yes.

15    Q.   Then we have Article 2, Future Actions, right?

16    A.   Yes.

17    Q.   That's what I would like to focus on.

18    A.   Okay.

19    Q.   2.1 says, "Skye will file lawsuit against Venezuela."

20  Right?

21    A.   Future actions after the purchase, yes, in the future.

22    Q.   And then it goes on to say, "The law firm engaged by

23  Gruppo Triad, Crabbe, Brown & James, will file the lawsuit

24  under the terms, fees and conditions agreed to by Gruppo, all

25  of which will remain in full force and effect."  Right?

1    A.    Yes.  Yes, they were transferring those terms to this

2    agreement, whatever terms he had agreed -- I think what had

3    happened was they had agreed to represent him a little before

4    this, and we were trying to incorporate whatever those terms

5    were into this agreement.

6    Q.    Had you seen the Gruppo Triad/CBJ engagement agreement

7    by the time you signed this June 23, 2004, agreement?

8    A.    I don't know.

9    Q.    Let's look at 2.2.  It says, "Skye and Gruppo will

10   consult on the lawsuit and will jointly instruct CBJ as to the

11   conduct of the lawsuit."  Right?

12   A.    Yep, that's what it says.

13   Q.    Then we have two provisions contemplating Skye making a

14   demand for payment of the notes and Gruppo immediately

15   transferring notes 3/12 and 4/12 to CBJ, right?

16   A.    Yep.

17   Q.    And then 2.5, "Immediate upon receipt of the notes, Skye

18   will file the lawsuit through CBJ, and CBJ will operate under

19   the existing agreement with Gruppo of which Skye will become a

20   beneficiary and party."  Right?

21   A.    That's what it says.

22   Q.    Then we have Article 3, Custody of Notes.  I would like

23   you to look at 3.3.  It says, "In the event the lawsuit is not

24   successful, CBJ will return the notes to Gruppo and the

25   obligations of Skye under the NRPN, the nonrecourse promissory

1    note, will be cancelled."  Right?

2    A.    Yep.  If we failed, we failed.  I will give him his

3    notes back.  He wanted them back.  Still will.

4    Q.    Under the terms of this agreement, if the contemplated

5    lawsuit didn't work, the purchase and sale will be rescinded?

6            MR. ELLIOTT:  Your Honor, if I can, I want to note an

7    objection.  This is an agreement that relates to two notes that

8    are not even at issue in this case.  And the testimony has been

9    pretty clear that this agreement wasn't in effect as to the

10   notes that are at issue.

11           THE COURT:  What is your response?

12           MR. SCHWARTZ:  I have several responses.  First of

13   all, this is the template and the precursor of the April 8

14   agreement that was entered into in August.  The two notes here

15   are the subject of the demand letter that was later modified to

16   become the demand letter for the two notes at issue here.  And

17   --

18           THE COURT:  But just to be clear, this involves notes

19   that are not subject to this lawsuit but were the subject of

20   the demand letter.  We are going to move through this.  And I

21   assume we are going to get to the agreement that involves the

22   actual basis for this lawsuit.

23           MR. SCHWARTZ:  Yes.

24           THE COURT:  If it's preliminary, I will let you move

25   through this quickly.

1          MR. SCHWARTZ:  Thank you.

2      BY MR. SCHWARTZ:

3      Q.   I only want to focus on one other aspect of this

4   document because we have looked enough at this waterfall

5   already.  And if you will turn to the Bates stamped page

6   005874, there's a section called distribution of funds, right?

7      A.   Yes.

8      Q.   If you look at section 2.1, it says, "In the event the

9   Bandagro notes are paid," then I'm going to skip to section

10  2.1B.

11     A.   Okay.

12     Q.   It acknowledges that you had deeds of trust at this time

13  in an amount of $9,493,333, right?

14     A.   That's what it says.

15     Q.   And what this provision here says in the next sentence

16  is that "If for some reason unrelated to the resolution of the

17  contemplated lawsuit those deeds of trust are paid, then Gruppo

18  Triad's obligations to Skye under this agreement would be

19  reduced correspondingly."  Right?

20     A.   That's what this says.

21     Q.   All right.  That's all I have on this particular

22  agreement.

23          Now let's move to the agreement that's got the date on

24  it of April 8, 2004.  This is D-521.

25          THE DEPUTY CLERK:  D-521.

1    BY MR. SCHWARTZ:

2    Q.   Now, again, I'm not going to spend any material amount

3    of time, if I spend any, on the waterfall, which we have

4    covered more than adequately.  But I do want to look at some of

5    the other features of this agreement, nor am I going to spend

6    time talking to you about when it was executed.  We have been

7    over that enough times.

8         So let's take a look under the section Purchase, which

9    is Article 1.

10    A.   Yes.

11    Q.   And 1.3, says that "Gruppo cooperate with Skye, and will

12    provide Skye with all needed documents, reports, interviews,

13    other materials or witnesses in Gruppo's possession, influence

14    or" -- it looks like it meant to say control -- "as requested

15    by Skye."  Right?

16    A.   Every time I wanted something from Pavanelli, he would

17    try to charge me money.  So I tried to obligate him to get me

18    this stuff without charging me -- attempting to charge me for

19    it.

20    Q.   The idea here was since you were stepping into Gruppo

21    Triad's shoes as the plaintiff here, you expected to need

22    cooperation from Gruppo Triad to support the lawsuit, right?

23         THE COURT:  Wait a minute.  There's an objection.

24         MR. ELLIOTT:  Thank you, Your Honor.  I'm going to

25    object.  This document does not say anywhere that he's stepping

1    into Gruppo Triad's shoes.

2         THE COURT:  Rephrase the question.

3    BY MR. SCHWARTZ:

4    Q.   Since you were going to be bringing a lawsuit on a

5    purported promissory note that was being provided by Gruppo

6    Triad under an agreement that required you to pay certain

7    litigation proceeds to Gruppo Triad if you succeeded, this

8    provision contemplated that Gruppo Triad would cooperate with

9    and provide support to Skye in the prosecution of the

10   litigation, right?

11   A.   One would assume that if someone had an interest, like a

12   promissory note in the litigation that they might be paid on,

13   that this kind of provision would be unnecessary.  The reason

14   this provision was here so that he was obligated to do it and

15   didn't try to charge me money, and I could point back to it if

16   we ever needed anything, that he would give it to me.

17   Q.   And then I'd like you to look at 4.4 of this agreement.

18   A.   Yes.

19   Q.   You may need to do a little consultation of the

20   definitions first.  So let me help you with that.  We need to

21   go back to the first page and look at the definition of the

22   Bandagro notes or the notes in the fourth whereas clause.  Let

23   me know if you're there.

24   A.   What page, I am sorry?

25   Q.   First page, fourth recital.  And just to move things

1    along here, do you see that that recital defines the Bandagro

2    notes or the notes broadly to include all the purported Gruppo

3    Triad notes?

4    A.    That's what it looks like.

5    Q.    Before I go to 4.4, I want to emphasize something here.

6    So this agreement doesn't say what notes Gruppo Triad was going

7    to provide to you, right?

8    A.    I'd have to look through the whole thing if it refers to

9    7/12 and 8/12 anywhere.

10   Q.    I think you can search it high and low to see that, but

11   if you'd like to take a moment to check it?

12   A.    In the interest of time, I'm willing to take your word

13   that it doesn't refer to specifically 7/12 or 8/12.

14   Q.    All right.  So now let's go to 4.4.

15   A.    If my recollection is correct, that this was the April

16   agreement where we modified waterfall continuously -- Remember,

17   this agreement is from December of '04 or January of '05.  We

18   agreed to that -- or you didn't agree to it, but we established

19   that in a deposition.  Again, if this is the same agreement

20   from April of '04 where we kept repeatedly substituting the

21   waterfall as I gave him more money, naturally, it wouldn't have

22   7/12 or 8/12.  So I'm taking your word for it that it doesn't.

23   Q.    All right.  Now let's go to 4.4?

24   A.    Okay.

25   Q.    So even though this agreement doesn't specify which

1   notes somehow amounting to $100 million in face amount are

2   going to be provided to you, it then proceeds to provide in

3   4.4, "If there is any kind of liquidity event with regard to

4   any of the notes, there is some distribution of proceeds

5   formula."  Right?

6   A.   Yes.  So we wanted, of course if there was some payment,

7   we wanted to participate.

8   Q.   I think that's all I have for you on this one.

9        MR. SCHWARTZ:  Your Honor, might this be a good time

10   to take the break?

11        THE COURT:  We will take a 15-minute recess at this

12   time.

13     (Recess from 2:50 p.m. to 3:05 p.m.)

14        THE COURT:  Mr. Schwartz, you may continue.

15        MR. SCHWARTZ:  Thank you, Your Honor.

16   BY MR. SCHWARTZ:

17   Q.   Mr. Richards, I'm going to show you J-44, another in the

18   series of agreements.

19        COURTROOM DEPUTY CLERK:  J-44.

20   BY MR. SCHWARTZ:

21   Q.   We're now into 2005, Mr. Richards.  Here, we have a June

22   16, 2005, agreement and instructions to escrow agent.  Do you

23   recognize this document?

24   A.   Yes, it looks familiar.

25   Q.   This is one in the evolving series of agreements

1    concerning the lawsuit and the proceeds from the lawsuit or,

2    let's put it this way, the potential proceeds from the lawsuit;

3    is that right?

4    A.    I like it better the way you said it the first time, but

5    this is part of what I had described as my effort -- I'm

6    sorry -- this is part of what I described as my effort to

7    gradually push Pavanelli back in the waterfall and ultimately

8    out.

9    Q.    So, a few new players entered the stage with this

10   particular agreement.  If you look at the waterfall provision

11   at the bottom, there's seven numbered points.  Do you see that?

12   A.    Yes.

13   Q.    And here we have Ray -- I'm sorry -- Jay Ramsey and Ray

14   Henehan working their up the waterfall, $500,000 a piece.  Who

15   are they?

16   A.    So, Ray Henehan and Jay Ramsey are two investors, two

17   outside of me, who had invested money with Gruppo Triad, kind

18   of like John Finn had done.  And somehow I got connected with

19   Ray Henehan and Jay Ramsey.  Ray was an attorney, and Jay owned

20   a business.  And they asked -- Somehow -- Somehow they got into

21   this waterfall because they wanted to be part of our effort in

22   the lawsuit, as opposed to having a 500,000 deed of trust with

23   Gruppo Triad.  And, from my perspective, I agreed to that and

24   then sort of indicated, as we indicated here, made Pavanelli

25   agree to it.

1    Q.    So, Pavanelli's $39 million became 38 million?  Is that

2    the idea?

3    A.    I'm not sure that's the -- I don't think that's the

4    exact reason, but I think -- and I don't specifically recall

5    how we reduced his promissory note, or even that we did, but

6    that's what it says there.

7    Q.    Well, it used to be 39, right?

8    A.    Well, if you look at the waterfalls, it was -- in

9    December of '04 and/or January of '05, that time frame, it was

10   39 thousand (sic).  So, in the new waterfall in June of '05,

11   it's reduced to 38 million.

12   Q.    And then right above that comes a million for Ramsey and

13   Henehan, right?

14   A.    Five hundred thousand each, yeah.  So, it could be

15   consanguineous.  Maybe it was.  Right?

16   Q.    Let's look at sixth.  It says the remaining amount,

17   after various steps in the waterfall, if any, shall be

18   distributed as determined by Skye in its sole discretion, but

19   will include an interest payment by Skye to Gruppo determined

20   by Skye in its sole discretion.  Do you see that?

21        MR. ELLIOTT:  Your Honor, may I just object to this

22   particular document on relevance grounds?  This happens long

23   after the transaction.

24        THE COURT:  Right.  This is -- Now we're into 2005, of

25   course, right?

1            MR. SCHWARTZ:  Yes.

2            THE COURT:  And, so, tell me how you see a relevance

3    in this, and I'll consider the objection.

4            MR. SCHWARTZ:  At the risk of --

5            THE COURT:  I mean, this would implicate the proceeds

6    of any recovery in this lawsuit.  I get that, but this is after

7    the lawsuit's been filed, the notes have been purchased.  Where

8    does this take us?

9            MR. SCHWARTZ:  Well, the short answer is it's a joint

10   exhibit.  So it's already --

11           THE COURT:  Well, that's always the hundred-dollar

12   question:  Does that mean it's automatically admissible?

13           MR. SCHWARTZ:  Yes, I think so.

14           MR. ELLIOTT:  It is certainly not an exhibit that we

15   have elected to use.  We didn't have an objection to it, but we

16   didn't intend to use it.

17           THE COURT:  More fundamentally, I have to decide the

18   facts in this case.  Tell me where it takes the facts.

19           MR. SCHWARTZ:  There were a handful of these

20   agreements, and there is about two or three more, but I want to

21   show you -- This one is not the most important of them.

22           THE COURT:  Well, the numbers change, and --

23           MR. SCHWARTZ:  There's more changes than that.  There

24   are other provisions reflecting the ongoing nature of the joint

25   venture or partnership between Skye and Gruppo Triad that are

1    material.  There are acknowledgments and warranties and

2    representations that come in that are different.  And there are

3    other issues that --

4         THE COURT:  Well, just to be blunt, what would you ask

5    me to use this for as far as a triable issue or as an inference

6    to be drawn, whatever?

7         MR. SCHWARTZ:  There will be credibility issues that

8    arise out of these agreements as well.  And it's hard to

9    telegraph that kind of thing, but they are there.

10        THE COURT:  Well, it's got to be a material issue in

11    the case, or else we're looking at extrinsic evidence that

12    wouldn't really play in.  It can't just be a credibility

13    matter.

14        MR. SCHWARTZ:  Well, I would think the credibility of

15    Mr. Richards is an issue in the case.  And credibility always

16    has characteristics that pervade any particular document or

17    fact.  And there are elements --

18        THE COURT:  The issue under Rule 608 is whether this

19    is a matter that's triable in the case or whether it's purely

20    collateral.

21        Now, if it's just a matter of -- You know, you could ask

22    him his age and you can cross him with his birth certificate.

23    That may go to credibility, but it's not going to be

24    admissible, right?

25        MR. SCHWARTZ:  Well, our theory of the case includes

1   --

2        THE COURT:  I mean, if it links to a theory, if it

3   links to something triable, I'll hear you; but not just an

4   abstract to show him to be a liar with documents that don't

5   connect to the case.

6        MR. SCHWARTZ:  All right.  Our theory of the case

7   includes that all of these agreements and the entire

8   architecture of the lawsuit was concealed from you and from us

9   for more than a decade.

10        THE COURT:  And let me just ask you this:  Why

11   wouldn't what happened at the time of the filing be -- Why do

12   you need things after that date?

13        MR. SCHWARTZ:  Because things were said to the Court

14   in public filings that we will argue to you were highly

15   misleading and reflect --

16        THE COURT:  But to be blunt, again, I'm the trier of

17   fact.  I'm just going to tell you what's on my mind.  I'm not

18   going to resolve this.  But you've established that, at the

19   time the lawsuit was filed, there's a waterfall.  It's pretty

20   clear about who gets what and who is a party and who isn't.

21   Beyond that, what do these new documents add?

22        MR. SCHWARTZ:  It's clear in retrospect now.  What the

23   new documents add are foundation that will show you that the

24   pattern that started with the complaint and the redaction of

25   that agreement in its entirety continued for a long time

 1  thereafter.  And I can approach this from the back end, and it

 2  might be clearer.  So, maybe I should do that.

 3          THE COURT:  I'll give you an opportunity.  Go ahead.

 4          MR. SCHWARTZ:  All right.  I'm going to do this in

 5  reverse, and then --

 6          THE COURT:  All right.

 7          MR. SCHWARTZ:  -- we'll see if my argument works.

 8      All right.  We're going to need to mark a new

 9  impeachment exhibit.

10      Mr. Lucas, always a source of good ideas, has whispered

11  --

12          MR. LUCAS:  I do speak, though, Your Honor.  I just

13  wanted to tell you that.  I will eventually.

14          THE COURT:  You're ordering a copy of the transcript

15  after this, I understand?

16          MR. LUCAS:  I'm sorry?

17          THE COURT:  You're ordering a copy of the transcript,

18  of this, this last comment from Mr. Schwartz?

19          MR. LUCAS:  Just to hang in my bathroom, Your Honor.

20          THE COURT:  All right.  Very good.

21          MR. SCHWARTZ:  Mr. Lucas points out that the Plaintiff

22  did endeavor to adduce evidence concerning the extent of its

23  contributions to Gruppo Triad during the pendency of the

24  lawsuit.  So, on some level, putting the agreement structure

25  before the Court to understand those assertions is relevant.

1          THE COURT:  Well, it would be easier if you didn't do

2     it line by line.  I mean, I get the testimony.  There's more

3     money being put in over time.  The waterfall changes.  And, if

4     you think there is something more significant than that, I'll

5     give you an opportunity.  But I don't think it takes a

6     line-by-line analysis.

7          MR. SCHWARTZ:  Okay.  So maybe what I'll do is reverse

8     course a different way and just show him the agreements one by

9     one, authenticate them, no questions about the context.

10          THE COURT:  All right.

11          MR. SCHWARTZ:  All right.  And then we'll --

12          THE COURT:  Again, I don't see anything particularly

13     prejudicial at this point, but I think there is an efficiency

14     issue.

15          MR. SCHWARTZ:  I think that's a good suggestion.

16          It may be that Counsel can stipulate that these are a

17     series of agreements and reserve rights as to relevance to the

18     extent it's not a joint exhibit.

19          THE COURT:  Mr. Elliott, would you be willing to

20     concede that?

21          MR. ELLIOTT:  Your Honor, I'm happy to locate the

22     documents and stipulate that they are what they are, with the

23     reservation of relevance.

24          THE COURT:  All right.

25          MR. SCHWARTZ:  That seems like a good solution.

1          THE COURT:  That would work for me.

2          MR. ELLIOTT:  Do you want to do that --

3          MR. SCHWARTZ:  Should we take five minutes, or --

4          THE COURT:  Well, are these essentially each

5     reiteration of the waterfall agreements?

6          MR. SCHWARTZ:  Yes, but the agreements mutate into

7     different forms from time to time.  But that's the essence of

8     it.

9          THE COURT:  So, with that representation, would that

10    give enough for you to be confident you could agree on these?

11         MR. ELLIOTT:  I'm sure that --

12         MR. SCHWARTZ:  Why don't we give Rex the numbers and

13    the documents?

14         MR. ELLIOTT:  At the conclusion of the day, I can take

15    a look at those.  If that's what they are --

16         THE COURT:  All right.

17         MR. ELLIOTT:  -- you know, obviously, while we don't

18    think they're relevant -- and that's part of the reason they

19    were redacted before, is because we didn't think it was

20    appropriate to disclose to Venezuela what our investors and

21    others were getting after the deal, but I'm happy to look at

22    that when the testimony is done.

23         THE COURT:  All right.  We'll just leave it at that.

24    All right.

25         MR. SCHWARTZ:  Fine.  I think that's a good idea.

1          So, let's still go with the impeachment exhibit.

2          What number are we up to?  Thirteen.

3            COURTROOM DEPUTY CLERK:  Impeachment 13.

4      BY MR. SCHWARTZ:

5      Q.   Mr. Richards, do you have in front of you Impeachment

6      Exhibit 13?

7      A.   I do.

8      Q.   All right.  Let me see if Mr. Doyle has that loaded so

9      we can put up it on the screen for Mr. Elliott.

10          Mr. Richards, I'm showing you an affidavit that you

11     signed in 2012.  Do you recognize this document?

12     A.   I don't really remember it, to be honest with you.

13     Q.   Take a look at page 7, please.  Is that your signature

14     on page 7?

15     A.   Yes.

16     Q.   Do you recall that, in 2012, there was a dispute about

17     whether this Court was a convenient forum for this litigation?

18     A.   I don't.

19     Q.   Do you recall signing this affidavit?

20     A.   I don't.

21     Q.   Why don't you --

22     A.   I'm not saying I didn't do it.  I just don't remember.

23     Q.   Why don't you take a look and see if it refreshes your

24     recollection.

25     A.   I just kind of read through it.  And, again, I'm just

1   searching my memory for why this was filed, or why this was,

2   you know, prepared for me.  And so I just -- I just don't

3   remember this.

4       Q.   It looks utterly unfamiliar?

5       A.   Yeah.  I just don't remember doing this.  I'm looking at

6   some of the stuff in there, and it's certainly stuff that looks

7   like it were true.  But, again, I don't remember this.  This

8   was three years ago, or four years ago.

9       Q.   Let's look at Paragraph 24.

10      A.   Yes.

11      Q.   In this affidavit from 2012, you swore, in Paragraph 24,

12  that the claim that Skye is a front for foreign interests is

13  absurd, the only interest that Skye represents in this lawsuit

14  is its own, right?

15      A.   Yes.

16      Q.   And this affidavit was filed, as you can see from the

17  ribbon at the top, on April 20th of 2012, right?

18      A.   Yes.

19      Q.   And that was after the last iteration of the waterfall

20  that morphed over time from 2004 all the way to 2010, right?

21      A.   Well, I'll take your word for it if that's what you're

22  saying.  I don't recall exactly when the last waterfall was

23  redone, but I think it was before this.

24      Q.   And, as of the time you signed this affidavit and it was

25  filed, there were many other interests that stood to benefit

1    from any potential recovery in this case, correct?

2    A.   Well, as I recall the waterfall at the time, the

3    beneficiaries were basically me, my attorneys, and, you know,

4    the people I'd assigned interest in it to help me.

5    Q.   And, as of the time you filed this affidavit, Gruppo

6    Triad still had a residual interest in the potential litigation

7    proceeds, correct?

8    A.   By then, they were way back, yes, you know, unlikely to

9    ever receive anything in this case.

10   Q.   However far back Gruppo Triad was in this waterfall on

11   account of your diluting it over time, it still had a residual

12   interest as of April 20th, 2012, correct?

13   A.   There was that -- that distant interest where they had

14   been pushed back to, yes.

15   Q.   And that distant interest is a Panamanian corporation,

16   correct?

17   A.   It was Gruppo Triad.  Right?  I don't -- I don't know if

18   it was Italian, Swiss, or Panamanian.

19   Q.   And, under the last iteration of the waterfall that was

20   in place at the time you signed this affidavit, your good

21   friend, Antonio Usuelli, had a place in the waterfall, correct?

22   A.   I think he would get part of the Gruppo note if it was

23   ever paid.

24   Q.   And, as far as you're aware, Usuelli is a resident of

25   Switzerland, right?

1    A.    Yes, he is a resident of Switzerland.

2    Q.    And, under the last iteration of the waterfall, Siro

3    Schianchi stood to gain under some potential recovery scenario,

4    right?

5    A.    Again, I think they were part of Gruppo Triad's note.

6    In other words, the part of the note that they had been pushed

7    back was also partially assigned to Schianchi and Usuelli.  I

8    really don't know if there was anything left for Gruppo at that

9    point and it was just those two or it was the three of them.

10   Q.    And, Schianchi, he's a Swiss resident, right?

11   A.    I think so, yes.

12   Q.    And, then, there were various and sundry residents of

13   the United States, like Ramsey and Henehan and DiBenedetto,

14   whose names appear in the waterfall, right?

15   A.    Yes.  I don't know about DiBenedetto appearing in the

16   waterfall, but I know Ramsey and Henehan appeared in the one we

17   just looked at.

18   Q.    And, at the time this affidavit was filed in April 2012,

19   none of these waterfall agreements had been produced in this

20   case, correct?

21   A.    I don't know.

22   Q.    And, at the time this affidavit was filled out, the

23   purchase agreement that had been redacted when it was first

24   produced in 2006 still remained heavily redacted, correct?

25   A.    I don't know.

1   Q.   So, at the time you filed this affidavit, there was no

2   information available to Venezuela or the Court to test your

3   assertion in Paragraph 24, right?

4   A.   Well, again, I don't know what was available to -- You

5   guys had been litigating for ten years by then, or almost ten

6   years.  So, I don't know what was available to you.

7   Q.   And, in fact, Skye has been a front for a foreign

8   interest from the day you filed this case; isn't that true?

9   A.   I would repeat what I say in this, in this thing.  It's

10  absurd.  No.  I'm not a front for anybody.  I'm representing my

11  own interest in this case.

12  Q.   Then there's Miguel Jacir, right?  He has an

13  eight-percent interest in any potential recovery.  And that

14  comes off the top, doesn't it?

15  A.   I -- I don't know if it comes off the top.  Miguel had

16  claimed he had a lien in Venezuela.  And I think we provided

17  that, you know, if that were a lien, that he would get his

18  eight percent.  I don't know exactly what the various

19  waterfalls said at the various times, but I think we made it

20  clear that we had intended to honor his eight-percent fee if it

21  ever came that I settled the case.

22  Q.   And that eight percent, whether it's specifically

23  attributed to him as it is on occasion, or just left as eight

24  percent without explanation, it's always been your expectation

25  that if you recovered anything in this case, you'd pay Jacir

1   that amount, right?  You knew that from before you filed the

2   case?

3     A.   No, I wouldn't say that.  But, you know, listen, he did

4   a really good job.  He was entitled to a fee.  You try to

5   respect attorneys' fees, and I would have tried to have done

6   that if it were able.  And at some point I think we put that in

7   writing:  That if I were -- if I was successful in the lawsuit,

8   that he would get some of the proceeds.

9     Q.   And you knew as of April 20th, 2012, that Jacir was

10   going to get paid out of any potential litigation proceeds,

11   right?

12     A.   Again, I don't know that.  I know we made an agreement

13   with him -- and I think it was shortly before -- I think it was

14   in the last year or so -- that we specifically would do it.

15   But, again, I -- if he'd asked me, I'd have told him, Yes,

16   we'll honor your fee; you earned it.

17     Q.   Do you have your deposition transcript available?

18     A.   Yeah.

19     Q.   I'm looking now at your 30(b)(6), and I'm looking on

20   page 13, and I'm looking on Line 7.  What I'm looking at is an

21   answer, quote:  "We knew that before we purchased the notes."

22        Next sentence:  "Jacir had a claim for eight percent

23   recovery on the notes that allegedly he had filed some sort of

24   lien on them in Venezuela."

25     A.   Yes.  His representation was that, you know, if

1  Venezuela paid anything, this would just be deducted.

2     Q.   And he's Venezuelan, right?

3     A.   He's Venezuelan.

4     Q.   Then there's Manfredi and Bonetti, also known as

5  Woodstrite, right?

6     A.   Yes.

7     Q.   They're also Venezuelan, aren't they?

8     A.   Yes.

9     Q.   And you've acknowledged that they have a 25.11-percent

10 lien?

11    A.   I've acknowledged that's the correct number.  I think I

12 said I hadn't seen their agreements.  I don't know how valid

13 their lien is.  I don't know what the circumstance is under

14 which it's precisely earned.  I think we identified this as a

15 risk that there would be a lien on the proceeds.

16         MR. SCHWARTZ:  All right.  Your Honor, with regard to

17 the agreements, including the final one that lays out the last

18 waterfall, we'll discuss with Mr. Elliott if we can work out a

19 stipulation.

20         THE COURT:  When did you receive those?

21         MR. SCHWARTZ:  Magistrate Judge Kemp entered an order,

22 the date of which was sometime in 2014, as I recall, in the

23 fall of 2014, November.  So, as I -- I'm doing this from

24 memory, but I think it's important.  So, if I misspeak, I'll

25 try to correct it, but here is my understanding:  I believe

1    that, for the first time, the unredacted version of the

2    so-called April 8th agreement was disclosed in approximately

3    September of 2014.

4              THE COURT:  2014?

5              MR. SCHWARTZ:  Yes.

6              THE COURT:  All right.

7              MR. SCHWARTZ:  More than ten years into the case.

8              THE COURT:  I just want to be clear about this.  You

9    haven't had a chance to do your redirect.  So I'm not going to

10   make any conclusions.  I see two issues here.  I'm always

11   concerned when there's a misrepresentation made to the Court.

12   On the other hand, this could have been the subject of a motion

13   a year and a half ago.  When you didn't have the information --

14   I understand -- there's not much you can do.  But this didn't

15   just come up as we're preparing for trial, it doesn't sound

16   like.

17             MR. SCHWARTZ:  It was the subject of several motions,

18   and Magistrate Judge Kemp --

19             THE COURT:  That's to compel.

20             MR. SCHWARTZ:  Yes.

21             THE COURT:  Not to act upon what you found.

22             MR. SCHWARTZ:  Well, now, as I say, it's a credibility

23   issue.

24             THE COURT:  Well, I'll take it for that purpose.

25             MR. SCHWARTZ:  All right.  The record in front of

1  Magistrate Judge Kemp is clear on the fight over this, which we

2  won.

3         THE COURT:  All right.

4         MR. SCHWARTZ:  Okay.  Let me just move to the next

5  subject.

6         MR. LUCAS:  Your Honor, would you like us to supply

7  you with the exact date of that order?

8         THE COURT:  No.  That's okay.  I can find that.  Thank

9  you.

10  BY MR. SCHWARTZ:

11  Q.   Mr. Richards, in the course of your investigation -- Let

12  me rephrase that.  In the course of your exploration of this

13  investment thesis, you traveled to Caracas in April of 2004, as

14  you've testified, right?

15  A.   Yes.

16  Q.   And that's when you met with Oscar Guzman Cova, who had

17  written the Ministry of Finance's August 2003 report, right?

18  A.   Alcalde and I, yes.

19  Q.   And that's also when you met, for the first time, with

20  Carlos Delgado Morean, right?

21  A.   Yes.

22  Q.   And whether you knew it then, you certainly know now

23  that he is the person who was dispatched by Guzman Cova to go

24  to Switzerland and inspect certain Gruppo Triad notes, right?

25  A.   Yes.  He was one of two people who inspected the notes.

1    Q.   The only one who went to Switzerland, right?

2    A.   One went to Miami -- Hepsie Hurtado -- who inspected our

3    notes.  And he also went to Switzerland to inspect other notes.

4    Q.   And, during that meeting, if you didn't know before, you

5    learned that Guzman Cova had either been fired or resigned

6    under stress from his position at the Ministry of Finance,

7    right?

8    A.   Yes.  I think we learned it at that meeting, or maybe

9    before.  I don't know.

10   Q.   Guzman does not speak English, correct?

11   A.   That's right.

12   Q.   But Delgado does, right?

13   A.   Yes.

14   Q.   He was educated in the United States, correct?

15   A.   I don't know that.

16   Q.   When you had this meeting in April of 2004 with Guzman

17   and Delgado which you've described to some extent, you knew

18   that, like Guzman, Delgado was no longer associated with the

19   Ministry of Finance, right?

20   A.   I didn't know that.

21   Q.   You know that now, don't you?

22   A.   I assume the answer is that he's not.

23   Q.   All Guzman did -- I'm sorry.  All that Delgado did for

24   the Ministry of Finance was go to Switzerland and look at these

25   notes, right?

1    A.   So, as far as I know and as to when I knew that that's

2    all he did, I think that's what he did.  I didn't see his name

3    referred to in either the AG or had his name mentioned in any

4    other connection with the case.

5    Q.   And he did that in March of 2003, right?

6    A.   Whenever that investigation was going on.

7    Q.   That's apparent on the face of Guzman Cova's report,

8    isn't it?

9    A.   I'll take your word for it, if that's true.  I

10   don't -- I mean, I didn't read the report.  It's in Spanish.

11   So --

12   Q.   When you spent time with Delgado in April 2004 in

13   Caracas, that took about five hours, right?

14   A.   It was a long time.  I would recall four hours, three or

15   four hours; but it could be five.

16   Q.   And you spent about an hour, you and Alcalde, with

17   Delgado, and then the balance of that time with both Delgado

18   and Guzman Cova, correct?

19   A.   My recollection as I sit here today is that that was all

20   together at the dinner.  If you want to refresh my memory with

21   something, I'm happy to look at it.

22   Q.   Well, perhaps we'll do that.

23        You summarized your impressions of Delgado in an e-mail

24   that I think Mr. Elliott showed you.  Do you remember seeing

25   that yesterday?

1    A.    Vaguely, yes.

2    Q.    Let's take a look.

3    A.    If I can see it again -- Let's take a look at it, and

4    I'll tell you if I remember seeing it.

5    Q.    All right.

6          MR. SCHWARTZ:  It's Plaintiff 129, from my memory.  My

7    recollection -- I don't know why the number sticks in my

8    head -- is Plaintiff's 129.

9          THE COURT:  Good retention of numbers, if I do say so.

10         THE WITNESS:  That's pretty good.

11         MR. SCHWARTZ:  Shot in the dark.

12         THE WITNESS:  Is it possible to see the whole document

13   --

14         MR. SCHWARTZ:  Sure.

15         THE WITNESS:  -- so I could read it?

16         If you want to only ask me about one section, I'm happy

17   to look at that section.  I think we went over this yesterday.

18         MR. SCHWARTZ:  I'm looking at it on the screen without

19   the actual document.  So --

20         THE WITNESS:  Okay.  All right.

21     BY MR. SCHWARTZ:

22    Q.    Look in the middle.  There's a paragraph:  "We met with

23   Roman Delgado."

24    A.    Yes.

25         MR. SCHWARTZ:  Start one above that, please,

1  Mr. Doyle.

2     Here we go.

3  BY MR. SCHWARTZ:

4  Q.   These are the relevant excerpts.

5  A.   Okay.

6  Q.   Take a look and see if it refreshes your recollection

7  here.

8  A.   Yeah.  Yeah, for about five hours, four of which were

9  Guzman.

10  Q.   And the impression you had of Delgado was he is the

11  fellow who helps with the political aspects of the effort to

12  have the notes honored, right?

13  A.   Yeah.  I tried to characterize it in terms that people

14  here in my investor group would understand, sort of a lobbyist

15  kind -- we have lobbyists.  Sort of a lobbyist/wheeler dealer

16  is guys who help to get things done.  That was what I was

17  trying to convey there.

18  Q.   And you actually learned about Delgado's involvement in

19  this matter as early as December 2003, right?

20  A.   Well, a guy named Delgado was associated with some

21  bankers who he's bringing to Gruppo Triad.  That's what I

22  learned:  That he had -- was introducing some investment

23  bankers to Gruppo Triad.  I didn't know if it was this guy

24  or -- I didn't know -- The name "Delgado," at the time, was

25  meaningless to me.

1    Q.    And you came to learn, through 2004, that Delgado was

2    trying to place some of Gruppo Triad's notes with some

3    investment banker, correct?

4    A.    That's what -- I thought that's what I just said.

5    Q.    And then we saw in the Christmas Day 2003 communication

6    from Usuelli that he told you Delgado was the bearer of fresh

7    information not conveyable through the phone, right?

8    A.    I don't remember that, but I kind of remember there was

9    something like that in the context of a whole paragraph, yes.

10   Q.    And, not long before you went to Como, Italy -- We saw a

11   communication earlier today where you said you would only ramp

12   up your efforts if Delgado was not successful, right?

13   A.    Right.  If there was money going to be raised already,

14   then why would -- This was in the context of me saying, Hey,

15   you know, I might be able to place some notes for you at a

16   high, like, 20- to 25-cent sort of ratio; do you want me to

17   explore that?  But, of course, it's unnecessary if this deal --

18   this Delgado investment banker deal goes through and there is

19   already money there.

20   Q.    So you were in favor of Delgado brokering this deal that

21   would have resulted in a liquidity event for whatever amount of

22   investment you'd made as of that time, right?

23   A.    Well, I was -- I wouldn't say I was in favor of it.  I

24   was following it, of course.  And if -- You know, it's kind of

25   like, if this really is a very good opportunity and somebody

1   else comes in and takes it, that would be a regret.  If on the

2   other hand somebody comes in and takes you out, even if it's a

3   small amount at that time, relatively thin, okay, that could be

4   good, too.

5       So it was sort of a ying and a yang kind of thing.

6   Q.   And the ying and the yang involved some phone calls with

7   Delgado in the spring and summer of 2004, correct?

8   A.   No.  The ying and the yang I was referring to is the

9   ying of the deal getting done with these bankers that were

10  supposedly going to Italy -- and I don't recall if we were

11  getting paid off at the time, but I think we would have gotten

12  paid off -- or the yang of me doing the deal and achieving

13  success.  So, that's the ying and the yang I was referring to.

14      So, when we're seeing another person coming in to do a

15  deal that you're looking at, well, okay, that -- you know,

16  normally that's not the greatest thing for a company that's

17  trying to do a deal with a company.

18  Q.   And, however that worked out or didn't, you had phone

19  calls with Delgado through the spring and summer of 2004,

20  right?

21  A.   Boy, I don't recall talking to Delgado in that time

22  frame.  I mean, if you having something to refresh my memory --

23  Q.   Well, at a minimum, you were here to see the examination

24  of Mr. Alcalde.  And we had his time records that documented

25  numerous interactions with Delgado in that time frame, right?

1    A.    Yeah.  I don't recall you saying time records on this

2    particular topic.  But I think -- you know, I don't deny it.

3    If they're there, they're there.  Right?

4    Q.    In the lead-up to that meeting in Como that you

5    dispatched Alcalde to, you saw that Delgado was included on the

6    invite list and/or copied on e-mail communication, right?

7    A.    I think I remember that, yes.

8    Q.    Now, you also know that, somehow, Delgado got involved

9    with some effort to intervene to enforce some of the purported

10   notes in this action, right?

11   A.    Oh, in this particular case?

12   Q.    This particular case.

13   A.    Maybe he was associated with Venospa in some way, shape,

14   or form.  I don't know what.

15   Q.    Venospa, right, V-e-n-o-s-p-a?

16   A.    Venospa.

17         Maybe he was associated with them.  It was, like, 2009

18   or '10, or something like that.

19   Q.    I think your memory is right.  And he came to Columbus,

20   Ohio, to talk about joining in this lawsuit, didn't he, Carlos

21   Delgado Morean?

22         THE COURT:  Could you spell that again?  I'm sorry.

23   V-e-n --

24         MR. SCHWARTZ:  It's Carlos Delgado Morean.

25         THE COURT:  No, the company.

 1              MR. SCHWARTZ:  Oh, Venospa.

 2              THE COURT:  Yes.

 3              MR. SCHWARTZ:  I'm sorry.  V-e-n-o-s-p-a.  And I think

 4    it's LLC.

 5              THE COURT:  Thank you.

 6              THE WITNESS:  I don't remember him coming to talk --

 7    to Columbus, Ohio, to talk about intervening in the lawsuit.

 8              MR. SCHWARTZ:  Well, let's check the deposition on

 9    that.

10              MR. ELLIOTT:  I'm sorry, Your Honor, but now we're

11    talking about a third party trying to intervene in a lawsuit

12    that has no interest in this case whatsoever.

13              THE COURT:  Well, as I understand the thread here,

14    this is a person who was involved in the investigation leading

15    to the Attorney General's report, as well?

16              MR. SCHWARTZ:  It's much worse than that.

17              THE COURT:  All right.  Then, that's the flavor I'm

18    getting here.

19              MR. SCHWARTZ:  Yes.

20              THE COURT:  The lawsuit, independently, wouldn't be

21    relevant, but the background that ties into it, you're claiming

22    does make it -- I'll hear it.

23              MR. SCHWARTZ:  Yes, and there is much more --

24              THE COURT:  Continue.

25              MR. SCHWARTZ:  -- not all within the competence of

1  this witness, but within the competence of others.

2      THE COURT:  Just to be clear on that ruling, the

3  connection also has to be with regard to the Plaintiff.  And

4  you're doing that at this time.  An independent activity

5  unbeknownst to Skye I don't think would play in much here.  To

6  the extent it involves knowledge here, I'll at least consider

7  it.

8      MR. SCHWARTZ:  My colleagues don't think I am

9  aggressive enough when we have these discussions.  And I'm

10  always urged to articulate our theory of the case and explain

11  how this all fits into the master plan.  And I know the Court

12  doesn't want that.  So I have to restrain my colleagues, but I

13  could explain this.

14      THE COURT:  Well, right now, the objection is

15  overruled.  So you're free to move forward.

16      MR. SCHWARTZ:  All right.  Thank you.

17  BY MR. SCHWARTZ:

18  Q.   Okay.  Let's look at your individual deposition on page

19  286.

20  A.   Okay.  Page 286?

21  Q.   Yes, on Line 3.

22  A.   Last page, huh?  Okay.

23  Q.   So, on page 286, the second-to-last page, actually, I

24  asked you:  "How many further interactions did you have with

25  Delgado?"

1      And do you see that, without my reading this to you,

2  that you explained, in the second sentence, that Delgado came

3  to Columbus to talk about joining in our lawsuit and you saw

4  him there -- here?

5   A.   I'm just trying to look at this in context here.  Just

6  give me one second.

7   Q.   By all means.

8   A.   So it says:  "How many further interactions did you have

9  with Delgado?"

10      And I'm going to look -- I was looking back, just to see

11  what you were referring to, which interactions.  So I'll assume

12  it was that dinner in April of '04.  And so fast forward to

13  2009, or I think -- No.  I say here that I had met with him.

14  He was somewhat involved in that settlement initiative that

15  Mr. Chavez's sisters came.

16      And then I saw him some -- Delgado, I think, tried to

17  get involved with some guys that owned another note and tried

18  to come to Columbus to talk about joining our lawsuit.  And I

19  saw him then.  And I saw him one other time in Cincinnati with

20  his attorney, Pierce, there.

21   Q.   Well, does that refresh your recollection that you met

22  with Delgado here in Columbus to discuss the possibility of his

23  joining in this lawsuit?

24   A.   I think he came here.  He asked me to meet with him, and

25  I did.  So -- I don't remember where we met; but, obviously,

1  I'm saying we did here.  So --

2     Q.   And, then, at your deposition, at least, you had a

3  recollection of having met with Mr. Delgado and his attorney,

4  Mr. Cunningham, in Cincinnati, correct?

5     A.   Yep.

6     Q.   And Venospa wanted to assert a claim on four purported

7  Bandagro notes it claimed to own, correct?

8     A.   I don't remember that detail, but I know they wanted to

9  assert a claim and get involved in our case.

10    Q.   You only met Pavanelli once, right?

11    A.   Yes.

12    Q.   And that was in April 2004, in Como, when you traveled

13  there on March 31st?

14    A.   That's right.

15    Q.   And that was part of your exploration of the notes,

16  right?

17    A.   That was primarily part of my trying to get a deal with

18  him.  That was the main purpose there.  Again, as I said, there

19  was nothing that he could say, really, that would affect the

20  legal opinion that Alcalde was doing, the finality of the

21  Attorney General opinion.

22    Q.   I know you like to say that.

23    A.   No.  It's not I like to say that.

24         THE COURT:  We've been over this -- all right? -- from

25  both ends.  Let's just move forward.  Okay?

1       THE WITNESS:  You characterized what I saw him for,

2   and I was just trying to correct it.

3       THE COURT:  And I've heard this.  I mean, I get this

4   part.

5       Go ahead.

6   BY MR. SCHWARTZ:

7   Q.   So, you met Mr. Usuelli that trip, and Mr. Schianchi

8   that trip, for the first time, right?

9   A.   Yes.

10  Q.   And Pavanelli met you at -- What was the name of the

11  hotel?

12  A.   It's a hotel called Villa D'Este.

13  Q.   Villa D'Este -- right? -- which you characterized as the

14  best hotel in the world, right?

15  A.   I think we had a long colloquy about this; but, yeah, it

16  was a great hotel.  It was recommended to me, and it was a

17  really nice place.  It's on Lake Como.

18  Q.   And Pavanelli was ordering everyone around like he was

19  royalty, right?

20  A.   He had a presence about him, for sure.

21  Q.   And that must have seemed incongruous -- right? -- that

22  the guy who was begging you for cash and besieging you through

23  Larry Corna was living such a lavish lifestyle, right?

24  A.   I didn't say he was living a lavish lifestyle.  I said

25  he had a presence when he was sitting with me in Villa D'Este

1  at a breakfast that I was buying.

2  Q.  You formed the impression, when you met Pavanelli, that

3  he might be on a downhill slide, though, right?

4  A.  Well, I had that impression because he -- you know, and

5  he kind of admitted to it, in a sense, that he was worn out;

6  he'd been trying to cash these notes forever, and he was

7  obviously out of money.  He was asking me for, you know, money

8  consistently.

9      So, yeah, he was kind of -- he was in need of money.

10  Right?

11  Q.  And you thought you could take advantage of that, right?

12  A.  Well, listen, my job is -- I don't know take advantage

13  of it, because there is always two sides to a deal.

14      My thought was that it would operate to my advantage, to

15  my investor group's -- my and my investor group's advantage

16  because, like this and any deal, the greater need the company

17  or the entity has, the better deal you can structure for your

18  group.

19  Q.  And Pavanelli gave you a large stack of documents that

20  you stuffed in your suitcase when you came home, right?

21  A.  During the trip, he gave me documents that I brought

22  back, yes.  We've talked about that.

23  Q.  This was after you'd already concluded your investment

24  thesis, right?

25  A.  We'd reached our conclusion.  Like, it was post initial

1  diligence.  And then we were into this final diligence.  Make a

2  decision.  This was part of that, yes.

3     Q.   You took all the documents, though, and gave them to

4  your lawyers, right?

5     A.   Right.

6     Q.   You wanted them to review them, didn't you?

7          THE COURT:  I'm sorry.  I missed that question.

8  BY MR. SCHWARTZ:

9     Q.   You wanted your lawyers to review those documents,

10  right?

11    A.   I gave them the documents.  I don't remember -- As we

12  discussed in the deposition, I didn't read the documents.  I

13  don't remember what was precisely in there.  So, they may have

14  already had some of the documents.  I gave my lawyers the

15  documents.

16    Q.   So, this diligence process didn't really end after you

17  got the first informal opinion from Alcalde on the so-called

18  final and binding issue, right?

19    A.   As I said, we reached our conclusion at the end of

20  February, early March.  And then we went about just verifying

21  everything.  Right?

22         So we didn't go into the process of spending all the

23  time and money for travel and all of that until we'd reached

24  the conclusion.

25    Q.   You didn't need to go to Como if you'd already formed

1  this investment thesis, though, did you?

2  A.   Again, I wanted -- I had to -- I wanted to make a deal

3  with the guy.  And those things are done, better done, face to

4  face.

5  Q.   Mr. Richards, we're here today.  Skye is suing for

6  nonpayment of two purported promissory notes, right?

7  A.   We're here over collecting on the promissory notes.  I

8  don't know exactly -- I'm careful as to when you characterize

9  it.  But we're here in a lawsuit over 7/12 and 8/12 yes.

10  Q.   It turns out you have a third purported Bandagro note,

11  don't you?

12  A.   As I said earlier, we obtained 9/12 after we filed the

13  lawsuit.

14  Q.   And, just like 7/12 and 8/12, 9/12 has a supposed face

15  value of $50 million, right?

16       MR. ELLIOTT:  Your Honor --

17       THE COURT:  Is there an objection?

18       MR. ELLIOTT:  Yes, Your Honor.  This is not relevant

19  to this case whatsoever.

20       MR. SCHWARTZ:  It's highly relevant.

21       THE COURT:  Tell me how it ties in.

22       MR. SCHWARTZ:  Here, we have Mr. Richards/Skye

23  Ventures in possession of a third instrument, identical to the

24  other two, for $50 million, which he has been sitting on for

25  years on end, letting it collect dust.  That in and of itself

1   goes to the validity of the instruments and to the purpose of

2   the lawsuit and the structure of the case.

3        Think about this:  Here's a plaintiff with 7 of 12 and 8

4   of 12, all these architectural arrangements that are a moving

5   target, with a case for a hundred million dollars, at the same

6   time sitting with another note in the same amount in its back

7   pocket, doing absolutely nothing about it.

8        We asked Mr. Richards at his deposition:  Why aren't you

9   doing anything about this if this is a valid instrument?

10       In substance, his answer was:  I don't know.

11       Then he submits an errata sheet.  And you know we have

12   that errata motion still pending.

13       The errata sheet attempts to concoct an explanation for

14   an answer that obviously was known to be harmful to the case.

15   That explanation is itself --

16       THE COURT:  Just to cut to the quick, so you're -- I'm

17   the trier of fact.  I have to think the way a jury would.  This

18   is a time where I can draw inferences or not.

19       You would argue that the inference would be, you've got

20   three notes; one of them you're not sure of; that somehow the

21   inference could be there is a lot of doubt about the other two?

22       MR. SCHWARTZ:  Absolutely.

23       THE COURT:  All right.  Now, how do you come back to

24   that?

25       MR. ELLIOTT:  Your Honor, this is a note that was

1  bought after this lawsuit was filed; and Mr. Richards and Skye

2  Ventures made a decision, for whatever reason, not to include

3  that note within this lawsuit.  I just don't see the relevance

4  to that at all, and it's going to lead us down a long path

5  here.

6       THE COURT:  Well, your path would be to explain why

7  not.  That would complicate the trial somewhat; but, as far as

8  an inference that we just talked about, Mr. Schwartz and I, do

9  you disagree with that?

10      MR. ELLIOTT:  I do, Your Honor, because, again, I

11 don't think it has -- it's a subsequent event to the filing of

12 this lawsuit.

13      Certainly, if Mr. Richards had acquired Note 9/12 in --

14      THE COURT:  Before that?

15      MR. ELLIOTT:  Yeah.

16      THE COURT:  When was it acquired?

17      MR. ELLIOTT:  After the lawsuit was filed.

18      MR. SCHWARTZ:  It's not that simple, because --

19      THE COURT:  Nothing seems to be in this case, but go

20 ahead.

21      MR. SCHWARTZ:  Well, that's unfortunately so.  And I

22 hate to be --

23      THE COURT:  What do you contend is the date of

24 purchase?

25      MR. SCHWARTZ:  Well, it's like so many of these other

1    agreements.  First Mr. Richards, you'll hear, if you allow the

2    questioning, first he's trying to sell it for Gruppo Triad.

3    It's relevant to that to show the partnership.

4         THE COURT:  In the preceding circulars and so on?

5         MR. SCHWARTZ:  Yes.  He said that already, and he

6    mentioned it.  Then it morphs into something he owns subject to

7    Gruppo Triad restrictions.  Then the Gruppo Triad restrictions

8    are lifted.

9         So, nothing sits still in this case.  But think about

10   that:  An identical $50 million instrument.

11        THE COURT:  I get it.

12        Mr. Elliott?

13        MR. ELLIOTT:  Your Honor, just so the record is clear,

14   the effort on note 9/12 was to place the note that Gruppo Triad

15   had owned.  It was -- It was an effort by Skye to place that

16   note in the United States.

17        THE COURT:  Place it as in getting investors?

18        MR. ELLIOTT:  Exactly, Your Honor.

19        THE COURT:  So this would have been more -- Your

20   contention is it would be linked to the circulars seeking

21   people to invest?

22        MR. ELLIOTT:  Yes, Your Honor.

23        MR. SCHWARTZ:  That's relevant in itself.

24        THE COURT:  Well, I'm not being at all sloppy here,

25   but this is not to a jury.

1    I'll hear it.  I'm not sure whether I'd put any weight

2  on it, but I'll hear it.  And I'll also hear, if appropriate,

3  from the Plaintiff's side about anything I should know as to

4  why a suit wasn't filed on the third note.

5        MR. SCHWARTZ:  I'll try to be as efficient as

6  possible.

7        THE COURT:  All right.

8  BY MR. SCHWARTZ:

9  Q.    You got note 9/12 from Pavanelli just like 7/12 and

10  8/12, right?

11  A.    Later.

12  Q.    But it came from Pavanelli, right?

13  A.    Yes.

14  Q.    And it was part of the 2003 --

15  A.    It came from Gruppo Triad.  Right?  So --

16  Q.    Clarification accepted.

17        It was part of the 2000 Ministry of Finance

18  investigation into the over $1 billion of Gruppo Triad notes,

19  right?

20  A.    That's right.

21  Q.    It was inspected by Carlos Delgado Morean in

22  Switzerland.  Do you know that?

23  A.    I think that's right.

24  Q.    And Skye obtained possession --

25  A.    I think Miami was 1 through 8, if I'm not mistaken.

1    Q.   So, Skye obtained possession of 9/12 on December 1,

2   2004, right?

3    A.   On when?

4    Q.   December 1, 2004.

5    A.   Yeah, about three or four months after we filed the

6   suit.

7    Q.   Exactly.  You anticipated my next question.

8         So, let's now turn to D-658.

9         COURTROOM DEPUTY CLERK:  D-658.

10   BY MR. SCHWARTZ:

11   Q.   Mr. Richards, I'm showing you D-658.  It's an agreement,

12   from June 18, 2005, between Skye Ventures, Gruppo Triad, and

13   something called Skye Ventures II.  Do you see that?

14   A.   Yes.

15   Q.   Just so we have the facts straight here, let's look at

16   Section 1.1.

17        Do you see that says:  "Skye acquired the status of

18   bearer and owner of note 9/12 in 2004 subject to certain

19   contractual restrictions in favor of Gruppo Triad"?

20   A.   I was trying to read the whereases beforehand.

21   Q.   Of course, do so if you think that's necessary.

22   A.   I don't really remember this.  I didn't review this in

23   connection with preparation.  So this is the first time I've

24   seen this in -- probably since the deposition.

25   Q.   So, before you start looking at it, let's just do some

1   housekeeping here.  If you look at the last page of Exhibit

2   D-658, you can see this is executed by you several times and by

3   Pavanelli and by Schianchi, right?

4       A.   Say that again.  I'm sorry.  I apologize.

5       Q.   If you look at the last page of D-658, it's executed by

6   you twice, once for Skye Ventures, one for Skye Ventures II?

7       A.   Yes.

8       Q.   And also by Pavanelli and Schianchi for Gruppo Triad,

9   right?

10      A.   That's right.

11      Q.   Now take as much time as you need to familiarize

12  yourself with this.

13      A.   Okay.

14      Q.   You needn't do it out loud.  Just review whatever you'd

15  like, and let me know when you're ready.

16      A.   Okay.  I'm seeing -- read Article I.

17      Q.   All right.  Let's look at 1.1.  So it says:  "Skye

18  acquired the status of bearer and owner of note 9/12 in 2004

19  subject to certain contractual restrictions in favor of Gruppo

20  Triad," right?

21      A.   December of 2004, yes.

22      Q.   All right.  It doesn't say that, but I'll agree with you

23  that's what you've put in the interrogatory answers.

24      A.   Yes.

25      Q.   And then 1.2 very simply says the contractual

1  restrictions are being lifted under this agreement, right?

2  A.   Yes.

3  Q.   So, as of this June 18, 2005, agreement, Skye was the

4  bearer and owner of note 9/12, with no contractual restrictions

5  whatsoever, right?

6       MR. ELLIOTT:  Your Honor, may I just make a clarifying

7  point here?  The agreement, itself -- and Mr. Schwartz knows

8  this but has not gone over it -- is with a separate entity

9  called Skye II.  And he is using "Skye" in connection with

10 that.

11      So, I didn't want the Court to be confused that we're

12 talking about the entity that bought note 7/12 and 8/12.

13      THE COURT:  Let's do some questioning about the entity

14 just so I'm clear on how the Plaintiff connects to this

15 particular party.

16      MR. SCHWARTZ:  All right.  I think, actually, that --

17 Although Mr. Elliott is correct in one respect, he's incorrect

18 in another.  But I'll clear that up.

19 BY MR. SCHWARTZ:

20 Q.   Mr. Richards, take a look at the first line of the

21 agreement, the one that says "This agreement is entered into on

22 June 18, 2005."  Do you see that?

23 A.   Yes.

24 Q.   So there is an entity, Skye Ventures II, mentioned

25 there, right?

1    A.    Yes.

2    Q.    And then Gruppo Triad, right?

3    A.    Yes.

4    Q.    And Skye Ventures?

5    A.    Yes.

6    Q.    Right?  That's the Plaintiff in this case, right?

7    A.    Correct.

8    Q.    And then Skye Ventures, the Plaintiff in this case, is

9    described in the parentheses as, quote, Skye, end quote, right?

10   A.    Yes.

11   Q.    Okay.  So, now, looking down at the 1.1, it says Skye,

12   the defined term Skye, acquired the status of bearer and owner

13   of 9/12 in 2004, right?

14   A.    Yes, that's what it says.

15   Q.    And then 1.2 says any and all contractual restrictions

16   on Skye's ownership are removed and satisfied by execution of

17   this agreement, right?

18   A.    Yes.

19   Q.    So, as of June 18, 2005, Skye Ventures, the Plaintiff in

20   this case, was the bearer and owner of note 9/12, without any

21   contractual restrictions, right?

22   A.    In June of '05, yes.  That's when that occurred.

23   Q.    Now, going back in time a bit, you had tried to sell

24   note 9/12 for awhile, right?

25   A.    Well, we obtained -- The idea was that we got 9/12 with

1  the goal of placing it in a U.S. institution.  We talked about

2  doing that earlier, and we were unsuccessful.

3  Q.  And then, in fact, one of the companies you tried to

4  sell it to was Libra, right?

5  A.  I think, Libra, that was going to -- One of the

6  objections Libra had was that I had too much control of the

7  deal.  And so I think maybe Gary was -- Gary Post, who was the

8  good friend of Jess Ravage, was saying, well, maybe he would

9  take this note if he had the sole possession of the note.

10  Q.  So, he wasn't interested, right?

11  A.  Well, he was interested, but they just said no.  They

12  put a lot of time and effort into it.  But, at the end, they

13  said no.

14  Q.  You also tried to market investments in note 9/12,

15  right?

16  A.  Well, like I said, I was trying to find an investor.  I

17  would have thought it would be a single investor in the note,

18  somebody would either -- we were looking to fund.  So somebody

19  would either buy or not buy.  I wasn't doing as in my own group

20  where we have a bunch of guys who put a share in.

21  Q.  Well, just like you couldn't find a buyer, you couldn't

22  find an investor, right?

23  A.  Well, same thing.  Right.

24  Q.  And, then, we talked about this at your Rule 30(b)(6)

25  deposition in December 2014, right?  Do you remember that?  You

1   brought it up yourself.

2     A.   I do remember talking about it.

3     Q.   And I asked you why hadn't you done anything with this

4   note to try to enforce it, right?

5     A.   I don't recall that, but you probably did.  I recall we

6   talked a lot about it.

7     Q.   And, in substance, you said you didn't know, right?

8          MR. ELLIOTT:  Can you refer --

9          THE COURT:  Let's get a page and line number.

10          MR. SCHWARTZ:  Sure.  It's 134 -- It's the Skye Rule

11   30(b)(6).  One thirty four, Line 9, is where it starts.

12          THE WITNESS:  It's the 30(b)(6)?

13          MR. SCHWARTZ:  It is.

14          THE WITNESS:  Tell me the page again, please.

15          MR. SCHWARTZ:  Page 134, Line 9.

16   BY MR. SCHWARTZ:

17     Q.   Why don't you read from 134, Line 9, to 135, Line 4?

18     A.   "So why wouldn't you have brought this?"

19          And I said:  "Well, I think it would have been a

20   different answer at different times."

21     Q.   You can read this to yourself.  I'm going to ask you

22   some specific questions after you do.

23     A.   Oh, I'm sorry.  Okay.  So I'm reading this colloquy

24   here, starting on page 134?

25     Q.   I've noticed you like to read the surrounding testimony.

1    So, the episode runs from 134, Line 9 -- looks like we just

2    came out of a break -- and it goes to the answer on 135, Line

3    4.

4    A.   Yes, I see that.

5    Q.   And if you'd look at Lines 14 and 15 on 134, you'll see

6    that you said at the end of that answer:  "And I don't know why

7    we didn't pursue it, we just never did."  Right?

8    A.   Oh!  I saw that, "No.  Just that we didn't."

9    Q.   You're ahead of me.  I'm back at Line 14 and 15 on the

10   preceding page.

11   A.   "I don't know why we didn't pursue it, we just never

12   did."

13   Q.   And then I followed up, at the end of this excerpt on

14   page 135, Line 2, and I asked you:  "And you have no

15   explanation for why you didn't?"

16       And your answer was:  "No.  Just that we didn't."

17   Right?

18   A.   That's what I said that day.

19   Q.   Now, more than 50 days after your deposition, you

20   submitted an errata sheet, right?

21   A.   I remember -- I remember asking you for some extra time

22   to read the deposition because I was very busy at the time, and

23   you gave it to me.  You gave me 60 days.  And I remember toward

24   the end of that reading the deposition and changing some things

25   that I thought were better said or inaccurate.

1    Q.   And one of the answers you've tried to change

2    substantively was this particular answer that we just, or,

3    these particular answers that we just reviewed, right?

4    A.   I was anxious to change it as you were asking me here,

5    but can you show me the errata sheet so I can see what I said

6    back then?

7    Q.   Sure, absolutely.

8         All right.  This is our Impeachment Exhibit #14.  Bear

9    with us one second, please.

10      (Whereupon, there was a brief interruption.)

11           COURTROOM DEPUTY CLERK:  Impeachment 14.

12           THE WITNESS:  Yes.  Where are we in the errata sheet?

13           Okay.  It should be the back, then, of the errata sheet?

14   BY MR. SCHWARTZ:

15   Q.   Well, no.  It's the second page.  And there is a lot of

16   changes here.  I understand.  But, on the second page, you

17   started with the -- Looks like you've made the changes on the

18   30(b)(6) first.  In any event, the second page of the errata

19   sheet, last change, carrying over, it appears, onto the third

20   page, it's a long change.

21   A.   Okay.  Yeah, I remember that.

22   Q.   So, instead of just saying, "No.  Just that we didn't,"

23   you added a lengthy explanation, right?

24   A.   Yeah.  I tried to -- I thought about it after the

25   deposition when I was reading it.  I tried to think back and

1   explain what was going on at the time.

2        And, as I said here, you know, the reliance might have

3   been perceived to be in a different position if for the first

4   time we heard that Venezuela was saying that, you know, there

5   was a new Attorney General position.  So, if our case was

6   reliance on seven and eight, it would have created sort of new

7   issues in the case.  And Alcalde didn't want that.  So, that's

8   why I changed the answer:  Because I remembered that.

9   Q.   So your new answer was that you had learned about the

10  December 2003 Attorney General by the time Skye finished

11  purchasing 9/12; is that right?

12  A.   That's what I wrote there.  That's what I thought.  I

13  was trying to be more thorough.  I could -- I could enlarge on

14  that, but that's what I wrote in the errata sheet.

15  Q.   I just want to understand the factual basis of the

16  change.  We've seen already that Skye was the owner and the

17  holder of note 9/12 by December 31, 2004, at the latest, right?

18  A.   Well, I had received it from Pavanelli in December,

19  right, as we discussed.

20  Q.   Well --

21  A.   I would claim that I was the owner and holder at that

22  time.  Pavanelli might have claimed something different,

23  necessitating this later agreement.

24  Q.   All right.  We have just looked, though, at D-658.  Do

25  you have that?

1    A.    Yeah.

2    Q.    So turn again to 1.1.

3    A.    I'm sorry.  D what?  658?

4    Q.    Yes.

5    A.    Yes.

6    Q.    And 1.1, we saw just a moment ago, states that Skye

7    acquired the status of bearer and owner of note 9/12 in 2004,

8    right?

9    A.    Yes.

10   Q.    And your position is that you first learned of the

11   December 2003 Attorney General opinion sometime in 2005, right?

12   A.    Yes.  That's what I recall.

13   Q.    So, if you were the owner and the holder of 9/12

14   sometime in 2004, what difference would it have made when you

15   learned of the Attorney General's second opinion?

16   A.    Well, remember, as I told you before, sometimes I put

17   these things in here 'cause Pavanelli's claiming something

18   different.  So I'm giving him some money in June of 2005, and I

19   put in there -- say:  Look, here it is; agree with this and

20   quit saying something different.

21          So that could have been the reason that is in there.

22          Second, in December of 2004, we were still endeavoring

23   to sell the notes.  And that might have been these

24   restrictions, that the reason we had it, we were trying to sell

25   it for him.  Those restrictions were removed by this agreement

1    here in June of '05, as I recall.

2      Q.    Was there any restriction in your deal with Gruppo Triad

3    that would have prevented you from commencing a lawsuit on

4    9/12?

5      A.    I would imagine there was, yes.

6      Q.    On what basis?

7      A.    Well, remember, he -- the reason he sent us the note was

8    for us to go out to meet with financial institutions in the

9    United States and see if they would buy the note.  I'm sure

10   there was some agreements surrounding that.  So, consist -- To

11   take the note and sue on it would be inconsistent with that

12   even if we decided it was a good idea.

13     Q.    Do you have any written agreement that imposes some

14   contractual restrictions on your ability to bring a lawsuit on

15   9/12?

16     A.    Well, there obviously were because they're referred to

17   in here.

18     Q.    Where is it?

19     A.    I don't know.

20     Q.    All right.  Regardless of when you learned of the

21   December 2003 opinion and regardless of when that was in

22   relation to your getting unrestricted control of 9/12, your

23   legal position in this case is that the December 2003 opinion

24   should be disregarded, right?

25     A.    That's -- we relied -- Our position is that it's final

1    and binding and that we relied on it.

2        Q.   And your position must be that note 9/12 is real, right?

3        A.   My opinion is that the Attorney General's decision, if

4    this note -- any note that was included in that is real because

5    in a final, binding, and legal way she said these are valid and

6    real.

7        Q.   But --

8        A.   I don't know if she used the word "real," but valid and

9    actual instruments.

10       Q.   But you've done nothing whatsoever to try to enforce

11   this purported $50 million bearer note, right?

12            MR. ELLIOTT:  Your Honor --

13            THE WITNESS:  Again, he is --

14            MR. ELLIOTT:  -- he's explained why he didn't do that.

15            THE COURT:  I think we're pretty exhausted on this

16   topic right now.  I get the point.

17            MR. SCHWARTZ:  All right.

18        One moment, please.

19        I have a couple of documents concerning number 9/12 that

20   approach it from a slightly different direction.  Let's mark

21   display, to Mr. Richards, D-536.

22            COURTROOM DEPUTY CLERK:  D-536.

23       BY MR. SCHWARTZ:

24       Q.   Mr. Richards, I'm showing you D-536.

25       A.   Yes.

1    Q.   You'll see it consists of an e-mail on Thursday, April

2    29, 2004, from you, addressed to all.  Now, do you see that?

3    A.   I do see that.

4    Q.   And you start by saying:  "First many of you" -- so I

5    assume you're writing to an investor group -- "have not seen a

6    Bandagro Promissory Note," right?

7    A.   If this went to an investor group, there would be a, you

8    know, an e-mail on this.  There would be a chain, I would

9    think.  So I don't know where this went.  I have no idea how

10   Larry got it.

11   Q.   You actually raise an interesting point.

12        So, as you can tell from the form in which this document

13   is produced, this was produced in this litigation by Mr. Corna

14   as a nonparty.  That's reflected by what's at the top of the

15   document.

16   A.   I see on the bottom there it says "CORNA."

17   Q.   Yes.  And Mr. Corna's mode of document production is

18   illustrative of the time when this was done, because, if you

19   look at the top of the page, you'll see it says "lcorna," and

20   it's sent on March 24, 2015, deep into the discovery in this

21   case.  Do you see that?

22   A.   March 24th, 2015?

23   Q.   Last year.

24   A.   Okay.

25   Q.   That's part of discovery in the case.

1    A.   All right.

2    Q.   Trust me on that.

3    A.   Okay.

4    Q.   So, Mr. Corna had a copy of this document.  And he

5    produced it as a nonparty.  Okay?

6    A.   All right.

7    Q.   You, as it turns out, didn't produce it.

8    A.   Okay.

9    Q.   So, when you say if it was an e-mail to investors or if

10   it was intended for investors, or however you phrased it, there

11   would be some kind of distribution, maybe if we had your copy

12   that would be true.  Do you understand what I'm saying?

13   A.   Well, this isn't my copy.  Otherwise, I'm saying, it

14   would be on here.  Right?  So, I don't know -- It does say to

15   all.  So --

16   Q.   And it appears, somehow, Mr. Corna got it, right?

17   A.   Somehow, he got it.

18   Q.   All right.  And, however we obtained it in the

19   litigation, you don't have any doubt that you authored this

20   e-mail, right?

21   A.   Well, I could read the whole thing to see if I have any

22   doubt.

23   Q.   Why don't you do that?

24   A.   I can -- yes.

25        Okay.  I see that.  My signature block is at the bottom.

1  So it look like it's certainly from me.

2  Q.   All right.  So, the first thing you said is:  "First

3  many of you have not seen a Bandagro Promissory Note and I am

4  attaching one for you."

5       And there it is, #9/12, attached, in color.  Right?

6  A.   Yep.

7  Q.   That's the one that's sitting somewhere here in

8  Columbus, right?

9  A.   I don't know.

10  Q.   You don't even know where it is?

11  A.   I don't know if this is the one.

12  Q.   Oh!

13  A.   This one says "9/12."

14  Q.   Where is it now, 9/12?

15  A.   It's with the escrow agent.

16  Q.   And I want you to look at the second paragraph of this

17  April 29th, 2004, e-mail.

18  A.   Yes.

19  Q.   You wrote:  We are interested to determine, as fully as

20  possible, if our payment on the Bandagro Notes is only a matter

21  of timing -- that is, when the notes will be paid -- not a

22  matter of if the notes will be paid.

23       Do you see that?

24  A.   Yes.

25  Q.   And this was on April 29, 2004, right?

1    A.    Yes.

2    Q.    And then you went on to say that you have three law

3    firms, from Switzerland, Venezuela, and the United States,

4    preparing written opinions on two specific issues.  The first

5    was, is the opinion of the Attorney General of Venezuela a

6    final non appealable order, right?

7    A.    Yes.

8    Q.    So, as of April 29th, 2004, it turns out you had not

9    completed your investment thesis, had you?

10   A.    Again, I would repeat exactly what I said before, which

11   I think is consistent with this.  At the end of March and the

12   beginning of April, Alcalde had given me the opinion that was

13   firm that the Attorney General's decision was final and

14   binding.  To complete final diligence, where we would go to our

15   investor group at some level, we were getting written opinions

16   from other lawyers to back that up.  So, we were -- At this

17   time, we were in final diligence.

18   Q.    Well, first of all --

19   A.    So, if that's -- I'm sorry.  Go ahead.

20   Q.    -- a small detail here.  When you say "other lawyers,"

21   you didn't get any other lawyers from the United States to

22   prepare a written opinion, except for Crabbe, Brown and James,

23   right?

24   A.    We have three law firms -- from Switzerland, Venezuela

25   and the United States -- preparing written opinions, is what I

1   said.

2    Q.   One of those three was in the United States, right?

3    A.   Yes.  One from Switzerland, one was Venezuela, and one

4   from the United States.

5    Q.   One plus one is three?

6    A.   One plus one plus one.

7    Q.   One plus one plus one is three.  That's what I meant to

8   say.

9        Anyway, much more seriously, when you wrote that

10   sentence:  We are interested to determine, as fully as

11   possible, if our payment is only a matter of timing -- that is,

12   when -- or matter of if the notes will be paid, you were

13   telling your investor group, including Mr. Corna, that that was

14   still an open question, right?

15   A.   No.  I was saying, we're trying -- this is -- Again, we

16   had reached the determination at the end of February or March.

17   And so we -- we were saying we were -- the process of trying to

18   determine the final diligence of whether the Attorney General's

19   is final and binding, you will tell your investors we're trying

20   to determine if this -- if it really is a final and binding

21   order, then it's a matter of when you're going to get paid, not

22   if.  If it isn't a final and binding order, then you would move

23   on.

24   Q.   Well, I'm having some difficulty following that.  Look

25   at Question #1 after you said you had the three law firms

1    preparing opinions.  I'll read the entirety of it to you.

2        "Is the opinion of the Attorney General of Venezuela a

3    final non appealable order on the issue of whether Gruppo

4    Triad's promissory notes are obligations of the Venezuelan

5    government which must be paid?"

6        Did I read that correctly?

7    A.    Exactly.  That's what the three law firms -- We had the

8    three law firms, in final diligence, working on written

9    opinions on that issue.

10   Q.    Can you see anywhere, either on the lines or between the

11   lines of this e-mail, where you were telling anybody that you'd

12   already reached the conclusion that the Attorney General's

13   opinion was final and binding?

14   A.    Well, in this particular document, if it did go to the

15   investor group, it would be more -- you know, you would be

16   saying, I will send this to you at the end of final diligence.

17       So, I don't -- I don't really understand the question.

18       And then it was -- we had not yet reached an agreement

19   on a contingency fee in the case, which was also key.

20   Q.    Let's look at D-629.

21       COURTROOM DEPUTY CLERK:  D-629.

22       THE WITNESS:  Yes.

23   BY MR. SCHWARTZ:

24   Q.    Mr. Richards, I'm showing you D-629.

25   A.    Yep.

1    Q.    It's a summary memorandum.  And I want you to look,

2    first, at the second page of it.

3    A.    Yes.

4    Q.    And it -- This has been produced by your lawyers, Skye

5    Ventures.

6    A.    Yes.

7    Q.    And you'll notice, on the second page, the authors are

8    identified, or the preparers of the summary.  One is Mr. Post,

9    right, --

10    A.    Yes.

11    Q.    -- from Beverly Hills?

12    A.    Yes.

13    Q.    And then we have Skye Ventures, right?

14    A.    Yes.

15    Q.    And look how you describe yourself here:  David J.

16    Richards, Skye Ventures, Columbus, Ohio, Consulting Director of

17    Corporate Finance for Gruppo Triad FFC, S.P.A.  Do you see

18    that?

19    A.    Yes.

20    Q.    When were you appointed as Consulting Director of

21    Corporate Finance for Gruppo Triad FFC, S.P.A.?

22    A.    I don't know.  I don't recall.  This is the first time I

23    can recall seeing this particular term.

24    Q.    Were you ever appointed Consulting Director of Corporate

25    Finance for Gruppo Triad FFC, S.P.A.?

1    A.    I may have been for this limited purpose of trying to

2    sell 9/12.

3         MR. ELLIOTT:  Can we lay some foundation with this

4    document, Your Honor?

5         THE COURT:  Let's back up on this document, if we

6    could.  There's a date on it and so forth.  Just cover the

7    essentials.

8         MR. SCHWARTZ:  Certainly.

9    BY MR. SCHWARTZ:

10   Q.    You recognize, preliminarily, it's a document that was

11   produced by your lawyers in this case on behalf of Skye

12   Ventures, right?

13   A.    That's right.

14   Q.    And, if you look at the bottom of the first page, it

15   says:  "The date of this Summary Investment Memorandum is

16   November 4, 2004," correct?

17   A.    Yeah, November of '04.  We discussed this before.  This

18   was the thing that I mentioned that was attached to the letter.

19   Q.    Yes.  In fact, you told us there was some communication

20   you sent to investors, or prospective investors, that had a

21   picture of Andy Douglas, right?

22   A.    Yes.

23   Q.    There he is, on page 3.

24   A.    There he is, that's right.

25   Q.    So, this is the document you described before, right?

1    A.   It was a glossy one.  So I'm assuming this is a copy of

2    the -- sort of the glossy brochure.

3    Q.   And, if you look at page 4, "PRINCIPAL TERMS OF THE

4    OFFERING," on the left-hand column, there is something called

5    "Note IDs," right?

6         MR. ELLIOTT:  Your Honor, again, here we are, well

7    after 7/12 and 8/12 were purchased.  This relates to 9/12, the

8    effort to place it into the market.

9         THE COURT:  Go ahead, Mr. Lucas.  Do you want to

10   consult?

11        MR. LUCAS:  Thank you, Your Honor.

12        MR. SCHWARTZ:  Your Honor, this document, first of

13   all, is not well after Skye obtained the notes.

14        THE COURT:  Well, we've already talked about the third

15   note and the absence of a lawsuit on that note.  I think we've

16   covered that.

17        This may have some information regarding the state of

18   the witness' knowledge at this point and, presumably, a few

19   months earlier.  That part is relevant.  The deal itself, not

20   so much, I would think.

21        MR. SCHWARTZ:  Agreed, but the designation of Mr.

22   Richards as Consulting Director --

23        THE COURT:  Right.  That part, I don't --

24        MR. ELLIOTT:  Although, as it relates to note 9/12, I

25   mean --

1      THE COURT:  Right.  And I get that.  But, I mean,

2  still, this is a matter where inferences may be at play and so

3  on.  So, I'll hear it.  I'm not sure what I'm going to do with

4  it at this point, but I'll hear it.

5      MR. SCHWARTZ:  Right.  And I'm not going to spend a

6  lot of time on this.

7  BY MR. SCHWARTZ:

8  Q.   So, take a look at the -- By the way, you have no doubt

9  this is a non-glossy version of the glossy offering memorandum

10  that you prepared, right?

11  A.   Yeah.  It's a long time ago, but you told me it is.  So,

12  I'll take you at your word.

13  Q.   All right.  So take a look, now, at the second page.  At

14  the end of the -- There is a paragraph -- There is a little

15  picture of some scale on some note there and then another

16  paragraph that's not disrupted by any photograph.  Do you see

17  that one?  It starts "October 3, 2003."

18  A.   Yes, I see that.

19  Q.   And in the last sentence, here, you were telling these

20  offerees, whoever they may be, quote:  "Under Venezuelan law

21  this is a final decision from which there is no recourse, but

22  the Minister of Finance has not processed payment of the Notes

23  as required by the decision."  Right?  That's what you wrote?

24  A.   Obviously.  We were in a lawsuit.

25  Q.   And then -- I don't want to dwell on this extensively;

1   but, right next to the picture of Andy Douglas, there is a

2   sentence that starts "To put continued pressure on Venezuela."

3   Do you see that?

4      A.   Yes.

5      Q.   And you explained that you had retained Sitrick; is that

6   right?

7      A.   That's right.

8      Q.   And I was about to say -- and I'm not sure if we've gone

9   over this; but, if you look at the fourth page, the note that's

10  identified as the subject of the offering is number 9/12,

11  right?

12     A.   That's right.

13     Q.   And, then, if you look at page 5, under "KEY INVESTMENT

14  CONSIDERATIONS," --

15     A.   Yes.

16     Q.   -- point 2, you wrote:  "Gruppo and Skye Have a Strong

17  Legal Case and a Lawsuit has been filed in the United States."

18  Right?

19     A.   Two things, yes.  And both are true.  You know, we felt

20  Gruppo and Skye have a strong legal case, and also a lawsuit

21  has been filed in the United States.

22     Q.   And then --

23     A.   It goes on to say "Skye has filed a lawsuit."  So,

24  they're two separate things.

25          MR. ELLIOTT:  I'd point out again, Your Honor, again,

1   we're dealing with note 9/12, which at this point is not even

2   owned by Skye.

3          THE COURT:  Understood.

4          MR. SCHWARTZ:  Well, but the "strong legal case" is

5   about 7/12 and 8/12 here, the allegedly strong legal case.

6          THE COURT:  That's describing this case.  So don't

7   think I'm not somewhat aware of this case.

8          THE WITNESS:  No.  I would say that, independently,

9   they have a strong legal case based on the AG decision.  I was

10  not referring to 7/12 and 8/12 here.  I say a lawsuit has been

11  filed in the United States and Skye has filed a lawsuit.

12         So, let me read the rest of this paragraph.

13         MR. SCHWARTZ:  Please.

14         THE WITNESS:  Okay.  I see it.

15  BY MR. SCHWARTZ:

16  Q.   All right.  And, then, if you'll look at page 6, point

17  7, there you wrote:  There Are Good Legal Precedents Supporting

18  (sic) Gruppo's Success in Litigation, right?

19  A.   Yes.

20  Q.   And you go on to elaborate.

21  A.   Wait.  Wait.  Wait.  Hold on.  Sorry.  I just -- I did

22  what my lawyers tell me not to do.  And that is, just don't

23  agree with you without reading it.  So can you point to me

24  where you are?

25  Q.   Sure.  Page 6, point 7, the last one on the page.

1   A.   Yes.

2   Q.   It says:  There Are Good Legal Precedents Supporting

3   (sic) Gruppo's Success in Litigation.  Right?

4   A.   Yeah.  And, again, I think I would be referring to

5   potential litigation for 9/12 here.

6   Q.   And it says:  "Gruppo and its advisors have researched

7   similar actions," et cetera, right?

8   A.   Yep.

9   Q.   Take a look at the last page of this document.

10  A.   Okay.

11  Q.   It looks like some website address.  There is a website

12  established, bandagronotes.com?

13  A.   Yes.

14  Q.   And a listing of examples of documents that are

15  available, right?

16  A.   Yep.

17  Q.   And, then, the second-to-last bullet is "Opinion of US

18  Counsel regarding favorable outcome of U.S. litigation."  Do

19  you see that?

20  A.   Yes.

21  Q.   To whom did you make available that opinion of U.S.

22  Counsel?

23  A.   I don't know.

24  Q.   Who would know?

25  A.   I said the documents were available.  I don't know if I

1  made it available to anyone.

2      We didn't get much traction with this, incidentally.

3  So, it's not -- you know.  I don't recall dealing with anybody.

4  It was a flop.  We didn't have anyone interested in this --

5   Q.   All right.

6   A.   -- at this convention.

7      MR. SCHWARTZ:  Your Honor, I know it's only 4:35.  I

8  don't know the Court's --

9      THE COURT:  Well, I'd like to keep going.  I mean,

10 guys, do we want to finish this within the time frame of four

11 to six weeks you'd mentioned?  I assume you're not finished

12 with the witness?

13     MR. SCHWARTZ:  I'm not.  I don't have all that much

14 more.

15     THE COURT:  Why don't we try to finish up today if we

16 could?

17     MR. SCHWARTZ:  All right.

18     I was going to say it might be more efficient to do it

19 otherwise, but we can press on.  I don't know how much Mr.

20 Elliott is going to have.

21     THE COURT:  I am assuming there will be a lot.  And

22 you'll also have, of course, recross.

23     MR. SCHWARTZ:  Yeah.  I don't -- I may not be able to

24 finish by 5:00.  So -- I can keep going, though.

25     THE COURT:  All right.

1          MR. SCHWARTZ:  May I have just a moment, please?

2          THE COURT:  You may.

3     BY MR. SCHWARTZ:

4     Q.   Mr. Richards, you had the opportunity to observe Mr.

5     Alcalde's testimony, right?

6     A.   Yes.

7     Q.   Did you observe the entirety of it?

8     A.   I think I saw most of it.

9     Q.   Before Skye obtained the two purported notes in August

10    2004, did Mr. Alcalde keep you informed about what he was

11    learning during his efforts?

12    A.   We had many, many discussions, of course.

13    Q.   Was there anything that Mr. Alcalde testified to that

14    you had not learned prior to the acquisition of the purported

15    Bandagro notes?

16    A.   I don't know.  I don't remember, but --

17    Q.   Before you acquired the purported notes, did you learn,

18    through Mr. Alcalde, that there was all kinds of information in

19    the public domain, dating back to the 1980s, that there were

20    fake Bandagro notes in circulation?

21    A.   Again, like he said in his testimony, there was mention

22    of this.  The AG was aware of it.  And he may have mentioned it

23    to me in that context:  That there were, you know -- she

24    recognized in her decision that there were counterfeit notes

25    and that decision here had to be made as to whether these notes

1    were issued.

2        Q.   Before Skye acquired the two purported Bandagro notes

3    from Gruppo Triad, did you learn, through Mr. Alcalde, that the

4    Venezuelan newspapers were reporting about Pavanelli's

5    connection to a 1987 Customs incident at JFK Airport in New

6    York?

7        A.   No, not that I recall.

8        Q.   Before Skye acquired the two purported Bandagro notes

9    from Gruppo Triad, did you learn, through Mr. Alcalde, that

10   Pavanelli had admitted that he had been convicted, in London,

11   for a crime involving fake Bandagro notes?

12       A.   Say that again.  Before I purchased the notes, did I

13   learn that there was this London case?

14            Yes.  I think I've testified to that.

15       Q.   And that there had been a conviction for a crime

16   involving fake Bandagro notes?

17       A.   I think there was -- What I'd learned was, there was a

18   conviction for conspiracy, in some regard, of handling

19   instruments, but that he had been acquitted of actually holding

20   counterfeit notes.  I might have been wrong, but that's what

21   I -- that's what was told to me.

22       Q.   Did you understand that the conspiracy conviction

23   involved fake Bandagro notes?

24            MR. ELLIOTT:  Objection, Your Honor.  He's now

25   testified about what he knew of the issue, and there's no

1  foundation for that.

2      THE COURT:  Well, I wasn't clear about the answer, to

3  be honest.  So I'm going to permit the question to be answered.

4      THE WITNESS:  So, it was related to me that there were

5  three or four charges against him, three involving possessing

6  counterfeit instruments and one of which was conspiracy; that

7  he was acquitted of the three charges involving counterfeit

8  instruments, and that he was convicted of a conspiracy charge

9  of some type; and whether that was related to -- It was picked

10  up -- I think he was -- As I remember, he was picked up in --

11  This had something to do with the notes being delivered to him.

12  And so it was a conspiracy in that regard.  But my memory of

13  that, that last part, is kind of foggy.

14  BY MR. SCHWARTZ:

15  Q.   So, you don't know what the subject of the conspiracy

16  was?

17  A.   No, I don't.

18  Q.   And you didn't know then, is the more important

19  question?

20  A.   I didn't.

21      THE COURT:  I don't want to ask any questions here,

22  but I'm still a little confused with the answer and the

23  question.  I will ask, if you don't mind.

24      So, the conspiracy, you were aware of?

25      THE WITNESS:  Yes.

1      THE COURT:  And what we would call the substantive

2  matter involving the notes, your information was he was

3  acquitted?

4      THE WITNESS:  That's what he said.

5      THE COURT:  And the conspiracy case, what did he know

6  about that?

7      THE WITNESS:  It was a conspiracy having to do with

8  how he took the notes in, or something.

9      THE COURT:  But, again, Bandagro notes?

10     THE WITNESS:  Correct.

11     THE COURT:  All right.  That's what I needed to clear

12 up.  Thank you.

13     MR. SCHWARTZ:  All right.  We're going to have to look

14 at the deposition, just briefly, on this, because --

15     THE COURT:  You did hear that last answer?

16     MR. SCHWARTZ:  I think what I heard the last answer to

17 be --

18     THE COURT:  I thought that cleared it up, but I'll

19 leave it to you.

20     MR. SCHWARTZ:  Well, if I heard correctly -- and I was

21 grabbing the deposition, so I may have missed it, and my

22 apologies for that -- I thought what I heard, consistent with

23 what I heard before, is that there was substantive counts

24 involving false instruments on which Mr. Richards understood

25 there were acquittals and a conspiracy charge on which there

1  was a conviction, but he's not sure of the circumstances of the

2  conspiracy.

3          THE COURT:  He did say they involved Bandagro notes,

4  though.

5          MR. SCHWARTZ:  He did say that.

6          THE COURT:  Yes.

7          MR. SCHWARTZ:  All right.  Then, that clears that up.

8   BY MR. SCHWARTZ:

9   Q.    With regard to that conspiracy charge, did you

10  understand that the charge involved not just Bandagro notes,

11  but fake Bandagro notes?

12  A.    I don't remember the details of that today as I'm

13  sitting here.

14  Q.    All right.  Let's talk about what happened on

15  December -- in December 2014 when we went over this subject.

16  A.    Okay.

17  Q.    This is personal deposition, page 120.

18  A.    One twenty what?

19  Q.    Page 120, Line 11.  And then we're going to have an

20  errata discussion after that.

21  A.    Okay.

22  Q.    So, 120, Line 11, question:  "At some point did you

23  learn that Pavanelli had been convicted in the United Kingdom

24  in 1989 for conspiracy to use fake Bandagro notes?"

25          Answer:  "Yes."

1        Line 15:  When did you learn that?

2        Answer:  "I don't remember.  It was in 2004 and it was

3   either at or after my Como meeting with Pavanelli."

4        So, did I ask those questions, and did you --

5   A.   That's what it says there.

6   Q.   -- provide those answers?

7   A.   That's right.

8   Q.   Okay.  But you changed the answer.  So we need to look

9   at the errata again.

10  A.   Okay.  I was going to say I don't remember the "fake"

11  part, but I'm not saying --

12  Q.   Do you still have the errata in front of you?

13  A.   Yeah, I do.

14  Q.   Hold on.

15       MR. SCHWARTZ:  We'll have to separately mark this,

16  Your Honor, because it's now clear to me that we had two errata

17  sheets.  And the first one we marked was just for the 30(b)(6).

18       THE COURT:  So this is the errata of the errata sheet?

19       MR. SCHWARTZ:  No.  You need two errata sheets to

20  accommodate all these changes.  But this is -- There was one

21  for the 30(b)(6), which we used previously.  Now we have to

22  mark this one separately.

23       COURTROOM DEPUTY CLERK:  Impeachment 15.

24  BY MR. SCHWARTZ:

25  Q.   All right.  So, it's page 120, Line 14.  The answer was

1   a flat-out "Yes," correct, Mr. Richards?

2     A.   Yes.

3     Q.   And then you made a change.  And the reason you offered

4   for the change was that you misunderstood the question.

5     A.   I think you've -- I think what I felt was, you slipped

6   that sort of "false" in the question by it, and I tried to

7   clarify that, what I thought I knew.

8     Q.   You didn't -- but you didn't put "Reason for change:

9   Lawyer slipped word in," right?

10    A.   Well, "Misunderstood question."  I was trying not to be

11  pejorative in any way, shape, or form.

12    Q.   So, you misunderstood the question.  And then you

13  provided this embellishment, right?

14    A.   Yeah.  I provided this answer, which I think I've said

15  today.  And I think that's accurate.

16    Q.   And what is it that happened in the roughly 50 days

17  between December 22nd of 2014 and the time you submitted the

18  errata that occasioned this change?

19    A.   I think I noticed that you had put "fake" in the

20  question, and I didn't recall responding to that particular

21  aspect of the question, and I wanted to clarify.

22         If you got me, you got me.  But that's what I was trying

23  to clarify.

24    Q.   Did Alcalde tell you during the course of due diligence,

25  such as it was, that the London conviction involved fake

1  Bandagro notes?

2     A.   No, not that I recall.  Again, no particular reason I

3  would have recalled it, because my conversations with Alcalde

4  were largely around the issue that we were trying to determine.

5     Q.   Well, you heard Alcalde testify that he conducted a

6  factual investigation into other matters, right?

7     A.   Yes.  I mean, he became aware of other matters, for

8  sure.  He read -- I think I heard him say he read everything he

9  could read.

10     Q.   Did he tell you that Venezuela had issued a public

11  statement after the October 3, 2003, Attorney General opinion

12  stating that the Bandagro Caroni Code ICC-322 Promissory Notes

13  were fraudulent?

14     A.   I don't recall.

15     Q.   Did Alcalde convey to you, before you obtained the

16  purported notes, that he knew that Tobias Nobrega, the Minister

17  of Finance at the time, was backing away from the Attorney

18  General's October 3, 2003, opinion?

19     A.   I don't remember that.  Of course, there were things

20  that we've discussed here that -- where that stuff was kind of

21  into the Spanish press.  I don't know if he ever brought that

22  up to me or not.  We knew, of course, it wasn't -- he wasn't

23  paying.

24     Q.   Now, you testified yesterday that Delgado was someone

25  you perceived as an opportunist, just like you, right?

1    A.   I don't remember saying "just like me," but he -- we are

2    opportunistic in our fund, for sure.  I wouldn't say Delgado

3    was just like me, of course.

4    Q.   All right.  I'm looking at the transcript from

5    yesterday's testimony.  This is in response, I believe, to a

6    question from your own counsel.  I'm sure you don't have the

7    transcript, but here is what it says:

8         Question -- This is on page 74 to 75 of your testimony

9    yesterday -- "Who's Roman Delgado?  What's your understanding

10   of who that is?"

11        And then it goes on for awhile.  And eventually --

12        MR. ELLIOTT:  Your Honor, we don't have a copy of this

13   transcript.  I'm not sure --

14        THE COURT:  In the modern technology day of day-after,

15   I'm not sure this is a traditional way of impeaching; but, at a

16   minimum, we could display it.

17        MR. SCHWARTZ:  All right.

18        MR. LUCAS:  Can we do that?

19        THE COURT:  Yes.

20        MR. SCHWARTZ:  We can do it with the ELMO.

21        THE COURT:  Just pull the ELMO up.  And Mr. Quisumbing

22   can do that.

23        MR. LUCAS:  While they're doing that, does anybody

24   know why it's called an ELMO?

25        THE COURT:  It used to be the manufacturer.  It's sort

1   of like xerox.

2           MR. LUCAS:  Oh!  Is that what it is?

3           THE COURT:  Yeah.  I'm way out of date when I used

4   that word.

5           If you'd just pull that straight up, and then just put

6   it right on there, and it should display.

7           You probably need to put it on automatic focus.

8           MR. BALDWIN:  Your Honor is probably far, far more

9   familiar with this than I am.  So I hope I don't break it.

10          MR. SCHWARTZ:  Now it's an eye test.  It's page -- Jim

11  may have it here.  It's page 74, Line 12, running to 75, Line

12  8.

13  BY MR. SCHWARTZ:

14  Q.   All right.  So, Mr. Richards, it's a long answer.  I was

15  focused on Lines 20 to 22, but you can read the entirety of

16  this.

17  A.   I see it.  I remember that.

18  Q.   All right.  So, without getting hung up on the

19  particular words, you've characterized yourself as an

20  opportunist, right?

21  A.   What I said is, he -- he is kind of like me in this

22  case.  He saw an opportunity.

23          That's what I said there.  That's what I just read,

24  which I think he did.  He saw an opportunity.

25          We are an opportunistic fund.  We look for

1  opportunities.

2    Q.    Before Skye obtained the notes, did Alcalde tell you

3  that he was suspicious of Delgado?

4    A.    Well, it was more, later, when Alcalde -- Delgado was

5  arranging all these meetings with ambassadors and officials and

6  the lawyers for Venezuela.  And he was suspicious because

7  Delgado had all these connections.  So that was why he was

8  suspicious.

9    Q.    Did he ever tell you that he was leery -- Let me

10  rephrase the question.  Before Skye obtained the two purported

11  notes, did Alcalde tell you he was suspicious and leery of

12  Delgado?

13    A.    I think he said that yesterday.

14    Q.    Who did?

15    A.    Alcalde.  Or not yesterday.  I was here all day

16  yesterday.

17        The day before.  I think he said he was leery of

18  Delgado.

19    Q.    Exactly.

20    A.    He may have said the same thing to me.

21    Q.    I'm asking.  Did he?

22    A.    I don't remember.  I remember this discussion where he

23  thought he was somebody from the Venezuelan secret police

24  trying to trap him, and he was suspicious in that sense.  And,

25  you know, it was because Delgado could usher right into the law

1    offices of Esther Bigott, who was representing Venezuela at the

2    time, or the Minister of the Vatican, or -- So, that's why he

3    was suspicious.

4      Q.    You've gotta keep your time frames together and try not

5    to conflate Alcalde's testimony from what I'm asking you right

6    now.

7      A.    Okay.

8      Q.    Esther Bigott, I don't need to know about.  That's after

9    the litigation.

10         Here is what I want to find out:  Before you obtained

11   the notes, did Alcalde tell you that he thought Delgado was

12   trying to entrap him, or you, in some sort of criminal offense?

13     A.    I don't remember that, before the notes.  If he did it,

14   I don't remember it.  And, if he did say it, I don't remember a

15   time frame.

16     Q.    And I want to just go back to the prior question with a

17   clear time focus to it.

18         Before you obtained the two purported notes, did Alcalde

19   tell you that he was either suspicious or leery of Delgado?

20     A.    I thought I just answered that.  I don't remember.

21     Q.    I just want to make sure we --

22     A.    He may have.  I just don't remember.

23     Q.    Before Skye obtained the notes, did Alcalde ever tell

24   you that he didn't trust Delgado?

25     A.    I don't remember.

1    Q.    Did he tell you that he put no weight on what Pavanelli

2   said?

3    A.    Well, I think -- He said that yesterday, and -- or --

4   sorry -- the day before; that, in the context of what he was

5   trying to decide, he didn't put much weight on what anybody

6   said, including Pavanelli.

7    Q.    Did he communicate the Pavanelli component of that to

8   you before you obtained the two purported notes?

9    A.    I think he said that he would -- didn't have to tell me

10   anything like that; that would be up to me.

11    Q.    Did Pavanelli ever supply you with any court documents

12   regarding his London criminal case?

13    A.    Just the Swiss case.

14    Q.    Did Pavanelli ever give you any court documents

15   regarding his Italian criminal case?

16          THE COURT:  I'm sorry.  I missed that.

17          MR. SCHWARTZ:  Italian criminal case.

18          THE COURT:  Italian.  All right.

19          THE WITNESS:  There was an Italian case in '91, or the

20   '90s, of some kind, where he was detained and then released

21   again and given the notes back.  And I think he gave us those.

22   BY MR. SCHWARTZ:

23    Q.    He gave you those documents?

24    A.    At some point, I think.

25    Q.    Before you obtained the purported notes?

1    A.    I don't know.

2         MR. SCHWARTZ:  May I have just a moment, Your Honor?

3    I may be able to get this done in a couple of minutes.

4         THE COURT:  All right.

5       (Whereupon, there was a brief interruption.)

6    BY MR. SCHWARTZ:

7    Q.    Mr. Richards, you thought Pavanelli was a guy you could

8    trust for the most part, right?

9    A.    Did I say that?

10   Q.    I'm asking.

11   A.    I don't recall saying that, put it that way.  And the

12   question, I guess, would be when.

13   Q.    You thought he was an honorable guy, right?

14   A.    Again I would ask you, when did I think that?  You

15   obviously have something there.  I'd appreciate seeing it.

16   Q.    Let's take a look at your deposition, 30(b)(6).

17   A.    Yep.

18   Q.    Page 243.

19   A.    Yes, I'm there.

20   Q.    All right.  Page 243, Line 6.  You can read the prior

21   colloquy, if that is necessary, to frame the question; but it

22   should be apparent what the context is.

23         "Did you think you could trust him?"

24         Line 7, answer:  "Never -- tried not to -- I never made

25   that determination."

1    And then --

2  A.   This is in a context -- I'm just reading the part before

3  where you're saying, did you get stuff in writing from him,

4  right?  And why was it necessary to get that stuff in writing?

5  Because you couldn't trust him?

6    And that's -- So, in that context, you're asking me, why

7  did you get stuff in writing; can't you trust him.

8    And I would say I never tried to make the determination.

9  You got the stuff -- We got the stuff in writing.  I think

10 that's kind of what's going on there.

11 Q.   I understand what you're trying to do here, but let's

12 just look at the questions and answers.

13   The question was, on Line 6:  "Do you think you could

14 trust him?"

15   Then there was some colloquy.

16   The question was read back on Line 17.

17   And you answered, on Line 18:  "I did think I could

18 trust the guy for the most part."

19   Right?  Am I reading that correctly?

20 A.   Yeah.  I -- That's -- You are, but in the context -- I

21 think you have to read the context of why you were saying this.

22 But, yeah.  It's at the end of this discussion about whether we

23 put things in writing and that kind of thing.  But, certainly,

24 those are my -- that's my answer.

25 Q.   And on page 244, Line 5, question:  "Did you ever reach

1    a point where you determined that you could not trust him?"

2        Answer, Line 7:  "No."

3    A.    And I say, "Remember, I stopped dealing with the guy

4    way, way back when," right after we filed the lawsuit, or not

5    too long after we filed the lawsuit.

6    Q.    And, then, look at the top of page 244.  It's part of an

7    answer that was a continuation of one of the questions we had

8    looked at before.  You wrote, or spoke, on Line 1:  "I thought

9    he was an honorable guy," right?

10    A.    I think, when I left Como, for sure, the impression was

11    that here is a guy who admitted, you know, these two cases.  He

12    seemed like he was consistently trying to get the notes.  He,

13    you know -- heck -- he filed the request with the issuer of the

14    notes.

15        So, yeah, it seemed like an honorable guy.

16    Q.    As of the time you concluded the purchase of notes 7/12

17    and 8/12, did you still think he was an honorable guy then?

18    A.    I don't remember my thoughts at that time, but I was

19    definitely trying to separate myself from him then.  And you

20    can see, from that letter I wrote to my investors, finally, we

21    don't have to deal with this guy in this case anymore.

22    Q.    And then, finally, on page 244, Line 18 through 20, you

23    said:  "So I'm trying to think if he ever told me anything that

24    wasn't true and I don't recall anything specific," right?

25    A.    Yes.  You asked me did -- oh -- in retrospect, do you

1   think it was a mistake to trust him.  And I say, "I can't think

2   of anything he told me that wasn't true."  So --

3   Q.   Let's look at page 277.  I might be on the wrong page.

4   Bear with me one second.

5        I'm on the wrong volume.  That would explain why I'm not

6   looking directly at what I'm reading.

7        Bear with me one second.

8        So, I'm in the 30(b)(6) at 277.  Are you there?

9   A.   Yes.

10  Q.   It's taken me awhile to get there.

11  A.   All right.

12  Q.   Line 23.

13  A.   Yes.

14  Q.   "Everything that Pavanelli told me that we checked out

15  turned out to be accurate."  Was that true?

16  A.   From that -- I think this was -- Sorry.  Tell me

17  which -- what line you are.  I was reading, sort of, the

18  context.

19  Q.   I'm sorry it's taken me so long to get there.  It's Line

20  23, the question on Line 20:  "In making the decision that you

21  did for Skye to purchase notes 7/12 and 8/12, did you rely on

22  Pavanelli's story?"

23        And embedded within the answer that follows you said:

24  "Everything that Pavanelli told me that we checked out turned

25  out to be accurate."

1        Is that true?

2    A.    So, again, since I read the page before, I am saying to

3    you:  Look, what I've said in this trial a million times, and

4    people are sick of hearing me say it, I was concerned that the

5    Attorney General's decision was final and binding.  That was

6    the main thing.  And I said this again and again and again.

7    And then you asked me, here, did it affect me in any way.  And

8    I said, yeah, probably, in some way, it did.  So --

9    Q.    And, finally, on page 278, Line 16, question:  "Is there

10   anything Pavanelli told you prior to the time you purchased the

11   purported notes 7 of 12 and 8 of 12 in early August 2004 that

12   you did not believe?"

13        And, after some preliminary commentary, you concluded:

14   "I don't think there was anything that I viewed as really

15   important that I didn't believe."

16        Is that true?

17   A.    Well, look, this is the end of two very long days.  It's

18   the very end.  And I say, I can't think of anything.  So that's

19   what I said.

20   Q.    That was the end of two long days at the deposition, or

21   you're saying two long days here?

22   A.    I'm trying to think back as to whether I was more tired

23   then or more tired now, but they're both long days.

24        MR. SCHWARTZ:  I have no further questions.

25        THE COURT:  We're actually after five o'clock.  So we

1    will resume, in the morning, with the redirect examination of

2    Mr. Richards.

3            We'll be in recess.

4               MR. C. COOPER:  Your Honor, --

5               THE COURT:  Mr. Richards, you may step down.

6            Please be seated, Counsel.

7            Mr. Cooper?

8               MR. C. COOPER:  I just wanted to alert the Court to

9    this scheduling issue.

10           Back -- I think it would be maybe in the settlement

11   conference, and then again at the pretrial conference, when we

12   mapped out the case, I think we indicated we have two witnesses

13   for this week.  Defense Counsel indicated that, with cross, it

14   would take the entire week.

15           As a result of that, the parties scheduled the

16   translator to arrive this weekend.  And the Venezuelan

17   witnesses that we have, our last two witnesses, are flying in

18   this weekend as well.

19           We don't want any downtime, obviously.  But the next two

20   witnesses will require that translator.

21               THE COURT:  All right.

22           How long do you expect your redirect to take of Mr.

23   Richards?

24               MR. ELLIOTT:  Hard to tell, Your Honor, but probably

25   an hour.

1        THE COURT:  All right.  And I'm going to guess recross

2   will take at least that long.  That gives us half a day.

3        Is there anyone else you can fill in?

4        MR. C. COOPER:  We don't have any other witnesses,

5   Judge.  We have two final witnesses.

6        We could -- I don't know if the Court wants to hear, for

7   lack of a better word, presentation of deposition designations

8   to draw the Court's attention to things that we find

9   significant --

10       THE COURT:  Well, we can -- I know, when you're

11  bringing in people from Venezuela, this can be hard.  But we're

12  trying to avoid this, so we can stay on schedule.

13       We'll use -- Plan on we'll do something tomorrow

14  afternoon.  It won't be a dead time.

15       All right.  With that, we'll be in recess.

16       (Proceedings were concluded at 5:05 p.m.)

17                         – – –

18

19

20

21

22

23

24

25

- - -

WITNESS INDEX

- - -

WITNESSES          DIRECT CROSS REDIRECT RECROSS

PLAINTIFF's:

David Richards              3

1                       C E R T I F I C A T E

2

3           We, Laura Samuels, Denise Errett, Lahana DuFour,

4   Shawna Evans and Darla Coulter, do hereby certify that the

5   foregoing is a true and correct transcript of the proceedings

6   before the Honorable Edmund A. Sargus, Jr., Judge, in the

7   United States District Court, Southern District of Ohio,

8   Eastern Division, on the date indicated, reported by us in

9   shorthand and transcribed by us or under our supervision.

10

11

12                       s/Laura L. Samuels,RPR
                        Laura L. Samuels, RPR
13                      Official Federal Court Reporter
                        March 16, 2016
14
                        s/Denise N. Errett, FCRR
15                      Denise N. Errett, FCRR
                        Official Federal Court Reporter
16
                        s/Lahana DuFour, RMR, CRR
17                      Lahana DuFour, RMR, CRR
                        Official Federal Court Reporter
18
                        s/Shawna J. Evans, RMR
19                      Shawna J. Evans, RMR
                        Official Federal Court Reporter
20
                        s/Darla J. Coulter, RMR, CRR
21                      Darla J. Coulter, RMR, CRR
                        Former Official Federal Court Reporter
22

23

24

25