UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DRFP LLC, D/B/A SKYE        )
VENTURES,                   )
                            )
  PLAINTIFF,                )        CASE NO. 2:04-cv-0793
                            )
          vs.               )
                            )
REPUBLICA BOLIVARIANA       )
DE VENEZUELA, ET AL.,       )
                            )
  DEFENDANTS.               )
_____)


VOLUME 5
TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
FRIDAY, FEBRUARY 5, 2016; 9:00 A.M.
COLUMBUS, OHIO

  FOR THE PLAINTIFF:
        Cooper & Elliott, LLC
        By:  Charles H. Cooper, Jr., Esq.
             Rex H. Elliott, Esq.
             Charles B. Cooper, Esq.
             Adam P. Richards, Esq.
        2175 Riverside Drive
        Columbus, Ohio 43221


        Law Offices of John C. Camillus
        By:  John C. Camillus, Esq.
        P.O. Box 14140
        Columbus, Ohio 43214

FOR THE DEFENDANTS:
        Foley Hoag, LLP
        By:  Andrew Z. Schwartz, Esq.
             Matthew L. Baltay, Esq.
             Madeleine K. Rodriguez, Esq.
             Richard G. Baldwin, Esq.
             Thomas R. Ayres, Esq.
             Christopher E. Hart, Esq.
        155 Seaport Boulevard
        Boston, Massachusetts 02210

        Calfee, Halter & Griswold
        By:  Albert J. Lucas, Esq.
        1200 Huntington Center
        41 South High Street
        Columbus, Ohio 43215


FOR INTERESTED PARTY MIGUEL JACIR:
        Graydon Head & Ritchey
        By:  John B. Pinney, Esq.
        511 Walnut Street, Suite 1900
        Cincinnati, Ohio 45202


                        -  -  -


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

                    LAURA SAMUELS, RPR
              FEDERAL OFFICIAL COURT REPORTER
              85 MARCONI BOULEVARD, ROOM 121
                   COLUMBUS, OHIO 43215
               TELEPHONE NUMBER 614-719-3245

1        Friday Morning Session

2        February 5, 2016

3              – – –

4        THE COURT:  Counsel, good morning to all of you.

5        Mr. Richards is about to begin redirect examination.

6   He'll come forward.

7        Mr. Richards, hang on just one moment.  I'm sorry.

8   There is a preliminary matter.  Mr. Schwartz.

9        MR. SCHWARTZ:  Just a couple of housekeeping measures,

10  Your Honor.

11       During the course of the cross-examination of Mr.

12  Richards yesterday, we had some colloquy about bypassing

13  walking through the chapter and verse of a series of agreements

14  with the understanding --

15       THE COURT:  This is the waterfall provision that

16  you're talking about?

17       MR. SCHWARTZ:  More than the waterfall.  That's part

18  of it, but there is -- The body of the agreements also shift

19  over time, and there are various representations in them.  And

20  I have provided to Mr. Elliott a list of the agreements that we

21  would like to see admitted under that arrangement, subject to

22  whatever relevance objections the Plaintiff may have.  We just

23  gave him the list this morning.  So he hasn't had a chance to

24  go through the documents yet.  We're making copies.  We're

25  almost done.  So, at some point during the course of the day,

1    we should be able to iron that out.

2          THE COURT:  Very good.

3          MR. ELLIOTT:  Your Honor, we actually have had a

4    chance to look through the exhibits that Mr. Schwartz is

5    referring to, and we've got no objection to authenticity.  We

6    reserve rights on relevancy and things of that nature.

7          THE COURT:  Very good.

8          MR. ELLIOTT:  But they are authentic.

9          THE COURT:  Thank you.

10          MR. SCHWARTZ:  We'll submit the list to the Court at

11    some point during the course of the day.

12          If I had it in my hands, I could do it right now.

13          Thank you.

14          So, here they are.  It's D-637, D-658, D-673, D-686,

15    D-687, D-729, D-730, D-736, D-824, D-825, and J-38.

16          THE COURT:  Are these all, in a general sense,

17    agreements, or essentially renegotiated terms?

18          MR. SCHWARTZ:  Yes.  They're a series of agreements

19    between Skye Ventures and Gruppo Triad, and I think one of them

20    also is the CBJ/Gruppo Triad engagement agreement that's

21    incorporated in some respect by one of the other agreements

22    between Skye and Gruppo Triad.

23          THE COURT:  Okay.  Very good.

24          MR. SCHWARTZ:  All right.  So only one other

25    housekeeping measure from our standpoint.  And I'm not looking

1  to argue this.

2       I've mentioned this to Mr. Elliott before.  But there

3  were a handful of exhibits, either with Mr. Alcalde and Mr.

4  Richards -- I think only three documents -- where we had copies

5  of e-mail communications that included David Richards' e-mail

6  address but which had not been produced by Skye.  And there was

7  some colloquy with the Court about how those needed to be

8  treated as compared to e-mails that came from Skye's files.

9       As the Court knows, we have pending still a spoliation

10  motion.  And, as one component of that, particularly in light

11  of the Court's rulings, we will ask the Court to deem any of

12  those documents -- So far, only three are material -- that have

13  a David Richards' e-mail address on it but were produced by

14  someone else as authentic on the ground that Richards didn't

15  preserve the e-mails, but other people, obviously, have e-mails

16  with his e-mail address on it.  And we'd ask the Court, in

17  essence, to draw an inference of authenticity in light of the

18  spoliation and the acknowledgment by the witness that that's

19  his e-mail address and the e-mails were sent or received at a

20  time when he was otherwise engaged in the activities that are

21  the subject matter of the suit.

22       THE COURT:  All right.  Very good.  Thank you.

23       MR. SCHWARTZ:  Thank you.

24       MR. ELLIOTT:  And, Your Honor, I have two preliminary

25  matters as well this morning.  The first is kind of a

1  housekeeping issue.

2      As the Court is aware, we have marked the original notes

3  as Exhibits 1 and 2.  And they are in fact, obviously, the

4  original notes, and they've been identified as true and

5  authentic, et cetera.

6      In the exhibit notebooks and the exhibits that we've

7  provided to the Court, we've made a copy of that note, but it's

8  not exactly the copy as the original exists.  And what we would

9  like to do is just substitute a copy exactly as the original

10  note exists for the purposes of the record later on if needed.

11      THE COURT:  There is no objection to that, is there?

12      MR. SCHWARTZ:  The only objection I have to what Mr.

13  Elliott has said is that there's some authenticity of these

14  notes, which, of course, is disputed.

15      THE COURT:  That's the reason we're here, right?

16  Yeah.  I don't want to have us holding bearer bonds in the

17  court.  So that's fine.

18      MR. SCHWARTZ:  We won't have a problem with the copies

19  once we see them and confirm they look right.

20      MR. ELLIOTT:  Thank you, Your Honor.

21      And then the second and final matter is, there was some

22  discussion yesterday about Note 9/12, and maybe even a

23  suggestion that certain documents related to 9/12 had not been

24  produced by Skye, and I think it falls into this so-called

25  spoliation category.  And I wanted to just note for the record

1  that, on May 22 of 2015, Magistrate Judge Kemp issued an order

2  on a motion to compel that we were to produce records relating

3  to Note 9/12.

4      Magistrate Kemp ruled that we were not required to

5  produce documents related to Note 9/12 because there had been

6  no attempt by Venezuela, whatsoever, in the motion to show how

7  that could be relevant to the case, not arguing that they can't

8  show it in trial, but that was Judge Kemp's ruling.

9      Venezuela objected to that ruling to Your Honor, but did

10 not object as it related to the ruling on discovery related to

11 Note 9/12.  So I just wanted to note for the record that the

12 discovery record as it stood was that we didn't have an

13 obligation to produce documents relating to Note 9/12.

14         THE COURT:  That's helpful.  Thank you.

15         MR. ELLIOTT:  Thank you, Your Honor.

16         MR. SCHWARTZ:  Your Honor, I'm going to take an

17 opportunity to review the rulings that Mr. Elliott's referring

18 to more closely.  And, if we have anything further to say about

19 that, I'll let you know.

20         THE COURT:  All right.

21         MR. ELLIOTT:  We're ready to go, Your Honor.

22         THE COURT:  All right.

23      Mr. Richards will, then, come forward.

24      Mr. Elliott, you may proceed.

25         MR. ELLIOTT:  Thank you, Your Honor.

1                         – – –

2                    DAVID J. RICHARDS

3    resuming the stand for further redirect examination, having

4    been previously duly sworn, continued his testimony as follows:

5                 REDIRECT EXAMINATION (Cont'd.)

6    BY MR. ELLIOTT:

7    Q.   Mr. Richards, did you learn before Skye acquired Notes

8    7/12 and 8/12 that there may be counterfeit Bandagro notes in

9    existence?

10   A.   Yes.  I think that was in the AG opinion.

11   Q.   And, based on the due diligence that Skye conducted that

12   you were aware of over the course of nearly a year, did you

13   obtain any information to indicate that Notes 7/12 and 8/12

14   were counterfeit?

15   A.   No.

16   Q.   When Skye purchased Notes 7/12 and 8/12, did you believe

17   that those Bandagro notes were valid?

18   A.   I think I've hit the nail on the head many times during

19   this trial that we believe that was conclusively established by

20   the Attorney General's decision, and we believed that was final

21   and binding.

22   Q.   Okay.  Let's try to clear up some testimony yesterday as

23   it related to Note 9/12.

24        Did Skye at some point assist Gruppo Triad in attempting

25   to place a Bandagro note in the United States market?

1   A.   Subsequent to filing the case, we undertook that effort

2   in -- beginning in the fall of 2004.

3   Q.   All right.  And which of Gruppo Triad's Bandagro notes

4   did Skye attempt to place in the U.S. beginning in the fall of

5   2004?

6   A.   I would say that Skye and Ambient -- Gary Post --

7   attempted to place them.  He was kind of the guy in the bond

8   industry, but the note that we were trying to place was 9/12.

9   Q.   Okay.  And this occurred after you purchased 7/12 and

10  8/12?

11  A.   Yes.

12  Q.   Did Skye own Note 9/12 by December of 2004?

13  A.   We had possession of the note.  It's a bearer note.  So,

14  I'm not -- Well, I was a lawyer a long time ago; but, in my

15  estimation, if you had possession of a bearer note you were,

16  by -- you were the owner.

17  Q.   Were there conditions to your ownership of Note 9/12 in

18  December of 2004?

19  A.   Yes.

20  Q.   What were they?

21  A.   The purpose -- I don't recall the specifics, but the

22  sole purpose for me owning the note, having it in my

23  possession, was to place it for Gruppo Triad; but, of course,

24  had it been placed, we would have received, you know, kind of

25  our money back kind of thing.

1    Q.   All right.  How long did Skye have the right to attempt

2    to place Note 9/12 in the U.S. market?

3    A.   I think it was, you know, roughly November to June,

4    maybe, November of 2004 to June of 2005.

5    Q.   There was some testimony or -- I'm sorry -- some

6    questioning from Mr. Schwartz about why Skye did not sue, or

7    add, Note 9/12 to the complaint in this case.  Can you explain

8    why you didn't include 9/12 in this case?

9    A.   Well, thinking about it, it was kind of the reason that

10   we discussed yesterday.  So, by then, Venezuela had come up

11   with this opinion that was back-dated, or we allege was

12   back-dated, until December of 2003.  It was totally shocking to

13   us.  And, by the time I had acquired the ownership of the note,

14   that had occurred.

15        So 9/12 would have been in a little different position

16   than 7 and 8, because, when we purchased 7 and 8, of course, we

17   were believing that we could settle the case pretty quickly.

18   The Attorney General's decision was extant.  She'd just said in

19   the press that she backs the decision.

20        Now, that was different from 9/12.  And so it would have

21   been a different lawsuit.  Right?  And, you know, do you really

22   want to start another lawsuit?  Here we are, 13 years later,

23   over a different note.

24        Now, at the same time, we'd had settlement hopes and

25   actual -- we had plenty discussions, settlement discussions, in

1    the case.  And we always felt like, in that context, we could

2    put in 9/12 and improve the return to my investor group.  So I

3    think those were kind of the reasons.

4            MR. ELLIOTT:  Okay.  I'm going to ask to provide the

5    witness with Exhibit 142, please, Plaintiff's Exhibit 142.

6            COURTROOM DEPUTY CLERK:  Thank you.

7            P-142.

8            MR. SCHWARTZ:  Your Honor, before this exercise

9    begins, this appears to be an exhibit that's in the nature of a

10   settlement communication.  And so we've got an immediate Rule

11   408 issue, never mind other issues that are presented by this

12   document.  So, I don't think this is a proper subject of

13   inquiry in the course of this trial.  And I think I'd like to

14   have some understanding of where Mr. Elliott is going with this

15   before he starts.

16           THE COURT:  Mr. Elliott?

17           MR. ELLIOTT:  Yes, Your Honor, and I'm fine with that.

18           This is not being used, by any stretch, to establish

19   liability in this case or any of the issues that Rule 408

20   precludes.

21           What this document is being used to establish, in some

22   part, is the explanation for why Note 9/12 was not either

23   wrapped into this lawsuit or put into another lawsuit.  It's

24   designed to address the suggestion Mr. Schwartz made yesterday

25   that, you know, if 9/12 and these notes were valid and it was

1   worth $50 million, then you should have put it in this lawsuit

2   or sued on a -- sued in a separate lawsuit.  So, that's the

3   purpose of this.

4        THE COURT:  All right.  I'm looking at evidence Rule

5   408.  And this is not being used to prove the validity or an

6   amount of a disputed issue.  So, the objection is overruled.

7   You may proceed.

8        MR. ELLIOTT:  Thank you, Your Honor.

9   BY MR. ELLIOTT:

10  Q.   Mr. Richards, you've been given Plaintiff's Exhibit 142.

11  Can you tell the Court what that document is?

12  A.   This are some documents that were generated in relation

13  to one or two of the sort of what I would have viewed as

14  serious settlement initiative that involved people meeting with

15  us on behalf of Venezuela.

16  Q.   Okay.  And, this communication, was this a communication

17  that you were involved with personally?

18  A.   Yes.

19  Q.   And did this communication also involve Note 9/12?

20  A.   Yes.

21       MR. SCHWARTZ:  Object.  Excuse me.  Is the question

22  whether this document mentions 9/12?

23       MR. ELLIOTT:  I said is it related to Note 9/12.

24       MR. SCHWARTZ:  I'm going to object to that question.

25  He's asking whether the agreement says something.  It speaks

1    for itself.  If the question is whether something else

2    mentioned 9/12, that should be clarified.

3            THE COURT:  Let's hear from the witness.  That may be

4    a valid point, but I don't know yet.  Maybe you can clear it

5    up.

6            MR. ELLIOTT:  Thank you.

7            THE WITNESS:  In the settlement initiatives, we made

8    it clear that if we're going to settle the case, we would like

9    to settle all three notes.  Right?  We felt stronger about 7

10   and 8, because it was in the lawsuit; but we would attempt to

11   include 9/12 in these settlement negotiations with these

12   ladies.

13   BY MR. ELLIOTT:

14   Q.   Okay.

15   A.   So, when this occurred, we actually had like other

16   things.  We had the people checked out as to who they were.

17   And, so, once we knew who they were, that they were actually

18   who they said they were -- these ladies were associated with

19   Chavez -- we proceeded along that line, and we proceeded with

20   those discussions.

21   Q.   Okay.  Is this an indication, then, of the settlement

22   discussions you testified about earlier along the way in the

23   course of this lawsuit?

24   A.   Yes.  Yes.

25   Q.   Thank you, Mr. Richards.

1        Did your efforts to place 9/12, Note 9/12, for Gruppo in

2   the U.S. market have anything to do with Notes 7/12 or 8/12?

3   A.   They were two separate matters.

4        MR. ELLIOTT:  Could you put Exhibit 621, D-621, on the

5   screen, please?

6   BY MR. ELLIOTT:

7   Q.   Mr. Richards, can you see that on the screen in front of

8   you?  I'm happy to --

9   A.   I can see it on the screen here.

10  Q.   Okay.  This is a copy of a -- Are you ready?

11       MR. SCHWARTZ:  Not quite.  Thank you.

12       Ready.

13  BY MR. ELLIOTT:

14  Q.   This is Defense Exhibit 621.  You were shown this

15  exhibit yesterday, and I want to ask you a few questions about

16  it.

17  A.   Okay.

18  Q.   The exhibit is a letter from Mr. Schianchi to yourself?

19  A.   It's from -- yes, from Mr. Schianchi to me.

20  Q.   In October of 2004?

21  A.   Yes.

22  Q.   All right.  Mr. Schianchi, in his letter, indicates that

23  he is providing a copy of the Attorney General opinion as part

24  of his letter.  Is that the first time that you received a copy

25  of the Attorney General's opinion in October of 2004?

1    A.   Oh, no.

2    Q.   When did you first receive the Attorney General's

3    opinion?

4    A.   I've testified I believe I received it in mid to the end

5    of October of 2003.

6    Q.   Okay.  And I'd like you to, if you could --

7    A.   I thought it was from Schianchi at the time.

8    Q.   Yes.

9        MR. ELLIOTT:  If you could pull up, Ben, Defense

10   Exhibit 447, which is another exhibit you were shown yesterday.

11       Can you enlarge the bullet points?

12   BY MR. ELLIOTT:

13   Q.   Mr. Richards, this is an e-mail Mr. Schwartz showed you

14   yesterday dated December 1st of 2003, an e-mail that you were

15   sending to Mr. Corna.  Do you see that?

16   A.   Yes.

17   Q.   And I'd like you to look down at the paragraph that's

18   enlarged, which indicates that additional information, events,

19   have occurred over the past several months that makes it appear

20   that there is a possibility the bonds will be honored.  The

21   following is a list of materials related to the bonds that are

22   attached with pdf's.

23       Do you see that?

24   A.   Yes.

25   Q.   And is one of the items attached to the pdf the opinion

1    of the Attorney General of October --

2    A.    Yes.

3    Q.    -- 3, 2003, that you had received?

4    A.    Yes.

5    Q.    You also indicate that you attach an announcement of the

6    Venezuelan Minister of Finance of the intent to issue the

7    bonds, correct?

8    A.    Yes.

9    Q.    So, by this point in time, December 1st of 2003, did you

10   have a copy of the Attorney General's opinion?

11   A.    Yes.

12          THE COURT:  What was that date, again?  I'm sorry.

13          MR. ELLIOTT:  December 1, 2003, Your Honor.

14       Ben, could you pull up Defendant's Exhibit 133?

15          COURTROOM DEPUTY CLERK:  D-133.

16          THE WITNESS:  Okay.  I have it.

17   BY MR. ELLIOTT:

18   Q.    Mr. Richards, this is an e-mail from Mr. Alcalde to

19   yourself.  Do you see that?

20   A.    Yes.

21   Q.    Dated May 17 of 2004?

22   A.    Yes.

23   Q.    What is the subject matter of the attachments?

24   A.    He is -- The comment of the Attorney General is

25   attached.

1    Q.    Do you see the attachment there?

2    A.    Yes.

3    Q.    So you would, also, obviously, have had a copy of this

4    opinion by then?

5    A.    Well, sure.

6         MR. SCHWARTZ:  It's Plaintiff's 133?

7         MR. ELLIOTT:  Yes, it is.

8         MR. SCHWARTZ:  The date is May 17th.

9         MR. ELLIOTT:  May 17, 2004.

10        MR. SCHWARTZ:  Thank you.

11   BY MR. ELLIOTT:

12   Q.   Mr. Richards, there was some suggestion yesterday that

13   there has been an effort to conceal Gruppo's involvement or

14   right to receive proceeds if Notes 7/12 and 8/12 are paid.  I

15   want to ask you some questions about that.

16   A.    Okay.

17        MR. ELLIOTT:  Ben, do you have, or, Adam, do you have

18   Impeachment Exhibit -- I'm sorry.  It's the redacted version?

19        This is an impeachment exhibit, Your Honor.  I'm trying

20   to get the number of it right now.

21   BY MR. ELLIOTT:

22   Q.    This is Defendant's Impeachment Exhibit 1.  Can we

23   provide a copy to the witness?

24        COURTROOM DEPUTY CLERK:  Impeachment Exhibit D-1.

25        THE WITNESS:  Yes.

1    BY MR. ELLIOTT:

2    Q.   Mr. Richards, I'm providing you with Impeachment Exhibit

3    1, Defendant's Impeachment Exhibit 1, which is a redacted

4    agreement between you and Gruppo Triad.  I think this is the

5    agreement that you've testified that you signed in early

6    August.

7    A.   Yes.

8    Q.   Of 2003, correct?

9    A.   Yep.

10   Q.   Now, this agreement was produced in redacted form during

11   jurisdictional discovery a long time ago, and I want to ask you

12   some questions about this.

13   A.   Okay.

14   Q.   The agreement is between whom?

15   A.   Gruppo Triad and Skye.

16   Q.   Now, I'd like you to turn to page 2 under the issue, or

17   the subsection, Article 2, Purchase Consideration.  And the

18   purchase consideration states that the consideration for the

19   notes will consist of a promissory note, cash, the agreement of

20   Skye to incur expenses and the agreement of Skye to do certain

21   things, all of which are enumerated below.  Do you see that?

22   A.   I do.

23   Q.   And then the specific items that are redacted, correct?

24   A.   Yes.

25   Q.   Now, the purchase consideration includes a promissory

1  note, true?

2    A.    With Gruppo Triad, yes, of course.

3    Q.    Is that the nonrecourse promissory note that we've been

4  talking about?

5    A.    Yes.

6    Q.    And is this agreement between anybody other than Skye

7  and Gruppo Triad?

8    A.    No.

9    Q.    Mr. Schwartz asked you some questions about Defense

10  Exhibit 469.  And I don't think we need to pull it up, but his

11  question related to a statement in that document that in effect

12  Skye didn't care who originally bought the notes.  Do you

13  recall that testimony?

14    A.    I –– Vaguely, yes.  I do.

15    Q.    Did you care who originally bought the notes?

16    A.    It was not –– It was not relevant to what we were doing.

17        MR. ELLIOTT:  Could you pull up Joint Exhibit 35?

18  BY MR. ELLIOTT:

19    Q.    There was some testimony, Mr. Richards, about Mr. –– I'm

20  sorry –– Dr. Jacir attending a hearing, an upcoming hearing.

21  Do you recall that testimony?

22    A.    I kind of do, yes.

23    Q.    Do you remember what that related to?

24    A.    I –– I think, if I remember what was discussed

25  yesterday, there was –– this was from an e-mail roughly in the

1    February time frame, if I'm recalling correctly.  So, you know,

2    if I'm thinking about it today, I believe it was what Jacir had

3    told us; that there was congressional hearings going on about

4    the Attorney General's decision.

5    Q.   Okay.

6         MR. ELLIOTT:  Could you pull up D-581, please?

7    BY MR. ELLIOTT:

8    Q.   Mr. Richards, D-581 is a copy of the June 23, 2004,

9    agreement that you gave testimony about yesterday.  And my

10   first question for you on this is, what was the -- what was the

11   basis for this agreement?  What were the circumstances leading

12   to this agreement?

13   A.   So, this is part of this constant back-and-forth with

14   Pavanelli about -- and, honestly, we were trying to get a

15   transaction closed.  Right?  It had gone on a long time.  This

16   was a long diligence stretch.  And, so, at this point, he had

17   insisted that, you know, he be involved in a lawsuit if it were

18   filed.

19        So this was a short-lived attempt for him to be involved

20   with Crabbe, Brown and Jones -- Crabbe, Brown and James.  It

21   was over -- probably one of the shorter representations in

22   history.  It was over in a few weeks.

23   Q.   Was this agreement in effect when you bought Notes 7/12

24   and 8/12?

25   A.   No.  No.  They had abandoned that in July.

1    Q.   And this agreement Mr. Schwartz cross-examined you about

2    has a provision that indicates that if you don't prevail, that

3    you would return the notes.  Do you recall that testimony?

4    A.   Yes.

5    Q.   Is that same provision included in the agreement that

6    you signed in August for Notes 7/12 and 8/12?

7    A.   I don't believe so, but I'd have to see it.  I can't

8    remember.

9    Q.   Well, sitting here today, are you aware of any third

10   party that has the right to have you return those notes at any

11   point in time?

12   A.   No.

13   Q.   Is there anybody other than Skye Ventures that is the

14   owner of Notes 7/12 and 8/12?

15   A.   I'm the owner.  I'm the bearer and the owner of these

16   notes.

17   Q.   All right.  Mr. Schwartz asked you some questions about

18   an affidavit that you filed with the Court in 2012, and more

19   specifically, paragraph 24, which indicates that the only

20   interest that Skye represents in this lawsuit is its own.  And

21   I want to ask you some questions.

22        First of all, reading your affidavit on the witness

23   stand yesterday, to the best of your knowledge is that

24   statement accurate?

25   A.   Yes.

1    Q.    Why is it that you believe that statement in your

2    affidavit is accurate?

3    A.    Well, I think we even might have discussed this when you

4    prepared, and I signed, the affidavit.  So, it's -- you know, I

5    have nobody who I care about other than myself and my investor

6    group here.  I have -- Nobody can tell me what to do.  I had

7    created a waterfall where I could have, if there was a -- What

8    we hoped for was an early initiative to resolve the case.

9        I could have offered Venezuela a 60-percent discount in

10    the note, taken the early part of the money, just applied it to

11    Crabbe, Brown and myself and both -- nobody else had any right

12    -- would have had any right to get money under that.

13        So, you know, the whole time, as the owner of the note,

14    I was representing myself.  Nobody -- I didn't really care

15    about anyone else.

16        Now, it's kind -- I think we discussed this when we were

17    doing it.  It's kind of like, you know, I own a house.  I'm

18    selling it.  Sure, the bank has a note on it; and, if I sell

19    it, they'll get paid.  Just like, here, we always said that

20    Pavanelli, or Gruppo, had a promissory note here.  We never

21    were hiding that.  They would have gotten paid.  But I was

22    representing myself.  That's the way I viewed that.  Skye was

23    representing Skye.

24    Q.    Okay.  Of any of the parties that you've testified about

25    that have a potential claim or right to the proceeds on Notes

1  7/12 and 8/12, do any of those parties have an ownership

2  interest in those notes?

3   A.   No.

4   Q.   Have any of those parties that have a potential claim or

5  right to the proceeds of Notes 7/12 and 8/12, have any of them

6  participated in instructing you to do things in the course of

7  this litigation?

8   A.   Of course not.

9   Q.   Is Skye Ventures representing anyone's interest in this

10  case other than its own ownership in Notes 7/12 and 8/12?

11   A.   No.

12   Q.   You testified yesterday that -- I think Mr. Schwartz

13  asked you some questions about, when you met with Oscar Guzman

14  in April of 2004, that he was no longer with the Ministry of

15  Finance.  Do you recall those questions?

16   A.   Yes, I think so.

17   Q.   My question for you is -- Well, first of all, let's

18  establish some foundation and background.

19       Oscar Guzman is one of the individuals you met with in

20  Caracas in April of 2004?

21   A.   Correct.

22   Q.   And, when you met with Dr. Guzman, did it matter to you

23  at that time in April of 2004 when you were looking at him face

24  to face whether or not he was still employed with the Ministry

25  of Finance?

1   A.   It didn't matter.

2   Q.   Why not?

3   A.   Well, the -- the investigation was concluded.  The case

4   had gone to the Attorney General.  She had ruled.  That was

5   long before then.

6   Q.   And why did you, then, meet with Dr. Guzman in April of

7   2004?

8   A.   Well, I think part of what we wanted to accomplish was,

9   you know, as much Luis Alcalde as me, is they wanted to see

10  that there was such a guy and see what he said and see that he

11  stood behind his investigation.  And I think that was the gist

12  of the conversation, all of which seemed, you know, based on

13  what Luis told me, was positive.

14       MR. ELLIOTT:  Can you put up Defense Exhibit 629?

15  Could you go to, I think, the next page?

16       Yes.  Thank you.  Back.  There you go.

17  BY MR. ELLIOTT:

18  Q.   Mr. Schwartz asked you some questions about this

19  document yesterday, and I don't recall one of the foundation

20  questions being asked, and I want to ask you that question.

21       Did you prepare this document?

22  A.   Gary Post prepared the document.  As you can see,

23  normally, in this business, the guy at the top is the lead guy.

24  Right?  So, he was doing that.

25       Now, certainly, we contributed to it.  But he -- he

1    prepared it.

2    Q.    Okay.  And, under your name, Skye Ventures, there is a

3    reference to Consulting Director of Corporate Finance for

4    Gruppo Triad.  Did you instruct Mr. Post to put that

5    designation below your name?

6    A.    Well, first off, when I saw -- I'll admit, when I saw

7    that yesterday, I was pretty surprised.

8         I don't recall -- I have no recollection of that at all.

9    So I -- I -- I just don't remember that being there.  And I

10   don't remember the circumstances under which it was there.

11   Q.    Were you ever appointed Consulting Director of Corporate

12   Finance for Gruppo Triad?

13   A.    Again, I don't recall.

14   Q.    Did you ever hold yourself out as Consulting Director of

15   Corporate Finance for Gruppo Triad?

16   A.    In this document, it says that.

17        Now, this document was never -- ended up never to be

18   distributed to anyone.  But we -- Gary didn't get any interest

19   at this convention that he was attending.

20        It turned out that this kind of deal was not really in

21   the wheelhouse of distressed debt deals.  Since there was

22   already a litigation -- You know, there's a lot of entities out

23   there that are litigation funder entit- -- they're private

24   equity funds that just fund litigation.  There was already a

25   litigation.

1    So, probably it would have been better to take it to,

2  sort of, that milieu.  It didn't work here.  No one was

3  interested.

4    Q.    Okay.  But you weren't responsible for that designation

5  in this document?

6    A.    Again, I just don't recall it.  I'm very surprised that

7  it's there, and I don't recall it.

8    Q.    You didn't prepare it?

9    A.    Gary prepared it.

10        MR. SCHWARTZ:  Objection.  Asked and answered.

11        MR. ELLIOTT:  I'll move on.

12        THE COURT:  I need to interrupt you for just a moment.

13        I have a little bit of a crisis in an MDL case that I

14  need to resolve in a deposition with about 20 lawyers

15  attending.  So, I apologize, but let's take a 10-minute recess

16  at this time.

17        MR. ELLIOTT:  Thank you, Your Honor.

18      (A recess was taken from 9:30 until 9:45 a.m.)

19        THE COURT:  Mr. Elliott, sorry for the interruption.

20        You may proceed.

21        MR. ELLIOTT:  Thank you very much, Your Honor.

22    BY MR. ELLIOTT:

23    Q.    Just to follow up on one of my earlier questions to make

24  sure I'm precise here, does anyone who was discussed here

25  yesterday with Mr. Schwartz and you who may have an interest in

1   the proceeds of Notes 7/12 or 8/12 -- Dr. Jacir, Gruppo,

2   Venospa, Woodstrite, anybody that was mentioned here in this

3   courtroom yesterday -- do any of those people, other than Skye

4   Ventures, have an ownership interest in those notes?

5   A.   No, nobody.

6   Q.   There was some discussion here yesterday about some sort

7   of a joint venture in the lawsuit with Gruppo, and I want to

8   ask you some questions about that.

9        During the course of this lawsuit, have you taken

10  direction from anybody at Gruppo Triad about this lawsuit?

11  A.   No, of course not.

12  Q.   Have you consulted with anybody from Gruppo Triad about

13  this lawsuit during its existence?

14  A.   In terms of -- I think Alcalde would occasionally, and

15  Schianchi, would ask each other what's going on in the lawsuit.

16  But they certainly didn't consult with me in the sense of

17  telling me what to do or how to make decisions or anything like

18  that.

19  Q.   Has Gruppo made any decisions on your behalf in this

20  lawsuit?

21  A.   No.

22  Q.   And, based on the current status of the waterfall, how

23  much of the face value of Notes 7/12 and 8/12 would Gruppo

24  Triad be entitled to receive today if you got paid the face

25  value?

1    A.    Nothing.

2          MR. SCHWARTZ:  Objection.

3          THE COURT:  Overruled.  We've been through the

4    exhibits and the waterfall.  So this just ties into that.

5          So you may answer.

6          THE WITNESS:  Nothing.

7    BY MR. ELLIOTT:

8    Q.    I want to ask you some questions about Mr. Pavanelli and

9    your communications with him during the due diligence process.

10          How much of your due diligence, before you bought Notes

11    7/12 and 8/12, focused on whether Mr. Pavanelli was an

12    honorable guy?

13    A.    Again -- I think I answered this yesterday -- the focus

14    of the due diligence, of course, was whether the Attorney

15    General decision was final and binding.  And, in that respect,

16    the question of what kind of guy Pavanelli was was not really a

17    relevant inquiry.  He could have been an angel; and, if the

18    notes were not found authentic by the Attorney General, we

19    wouldn't have bought them.  And, likewise, it didn't much

20    matter what kind of guy he was if the Attorney General declared

21    they were final and binding and I had -- the notes were

22    authentic and valid, and I had possessed the note.  We wouldn't

23    look at it as a relevant issue.

24    Q.    All right.  You testified yesterday that Mr. Pavanelli

25    was repeatedly asking you for money.  Do you recall that

1  testimony?

2   A.   Yes.

3   Q.   During the due diligence period and prior to the time in

4  August of 2004 when you signed the agreement to purchase the

5  Notes 7/12 and 8/12, what did Mr. Pavanelli tell you about why

6  he needed money?

7   A.   Well, he told me --

8        MR. SCHWARTZ:  Objection, just for the hearsay basis

9  of this.  If it's information in his head, again, as we've been

10  through --

11        THE COURT:  Right.  It's not -- There is no exception;

12  but, if we're looking at what he understood at the time, it

13  will come in just for that limited purpose.

14        MR. ELLIOTT:  Yes, Your Honor.

15        THE WITNESS:  He said, and I observed, that he

16  had -- he had been on this attempt to collect on these notes

17  since 1991, when they originally were to mature, and had

18  consistently tried to collect on them over the years.  He spent

19  money.  And, essentially, it looked to me he -- he was -- In

20  fact, at the end, he went to the issuer themselves, finally.

21  After there was a change of administration and Chavez took

22  over, he went to the issuer themselves and said, Are these

23  notes valid?  All of that took time and money.

24        And, by the time I was there, to me, it looked like he

25  was at the end of his rope.  He was about broke.

1    BY MR. ELLIOTT:

2    Q.    Okay.  Antonio Usuelli you encountered in the fall of

3    2003.  And you were asked some questions about him yesterday by

4    Mr. Schwartz.

5    A.    Yes.

6    Q.    Was Mr. Usuelli, to your knowledge, ever employed with

7    Gruppo Triad?

8    A.    No.

9    Q.    What was your understanding of Mr. Usuelli's

10   relationship with Gruppo?

11   A.    Like, he was an investor at the time, and he had

12   invested in the notes.

13   Q.    You were asked some questions by Mr. Schwartz about

14   e-mails, including your e-mail address in 2003 and 2004.  And I

15   want to ask you some questions about that.

16   A.    Okay.

17   Q.    E-mails that you authored or received in 2003 and 2004,

18   where did those e-mails go?

19   A.    Well, a lot of them went to Crabbe Brown.

20   Q.    Okay.  And, in the course of this lawsuit, have you seen

21   e-mails that you either received or sent in 2003 and 2004?

22   A.    I have.  You've shown them to me.

23   Q.    And are you aware of any documents as you sit here today

24   relating to your due diligence or Notes 7/12 or 8/12 that were

25   destroyed by Skye?

1    A.    No.

2    Q.    Are you aware of any documents relating to Notes 7 and

3    8/12 that Skye had in its possession at one time that have not

4    been made available to Venezuela from some source?

5    A.    Well, again, we collected documents.  Alcalde was the

6    depository of them, including some of the stuff that are my

7    e-mails that were produced.  And, so, everything that we

8    thought was important, we kept at Crabbe Brown.

9         MR. ELLIOTT:  Could you show up D-576?

10        COURTROOM DEPUTY CLERK:  D-576.

11        THE WITNESS:  Yes.

12   BY MR. ELLIOTT:

13   Q.    And I guess, before we get to this document, very

14   quickly, let me close the loop.  Sitting here today, are you

15   aware of any document relating to Notes 7/12 or 8/12 that Skye

16   had in its possession at one point that Skye destroyed?

17   A.    No.

18   Q.    D-576 is --

19        MR. ELLIOTT:  Could you go to page 2, Ben, please?

20   BY MR. ELLIOTT:

21   Q.    Do you remember being asked about this document

22   yesterday?

23   A.    I do.

24   Q.    Have you ever seen a written document that had the

25   questions on it that correspond to these answers?

1    A.   Not that I recall.

2    Q.   Do you know whether the questions were posed in a phone

3    call?

4    A.   I don't.

5    Q.   Let's talk about Mr. Corna.  Did Larry Corna at any time

6    represent Skye Ventures?

7    A.   No.

8    Q.   Did Larry Corna ever at any time have any affiliation

9    with Skye Ventures?

10        MR. SCHWARTZ:  Objection to the form.

11        THE COURT:  It's leading.

12        All right.  It's redirect.  Just rephrase, if you would.

13        MR. ELLIOTT:  Thank you, Your Honor.

14   BY MR. ELLIOTT:

15   Q.   Did Larry Corna ever have any employment, ownership, or

16   other agency relationship with Skye Ventures?

17   A.   No.

18   Q.   Mr. Schwartz asked you some questions about a dispute

19   that was occurring between Mr. Pavanelli and Mr. Corna.  Do you

20   recall those questions?

21   A.   Yes.

22   Q.   Why did you become involved in that dispute?

23   A.   Well, look, I just wanted this stuff to stop.  I think I

24   told you that it was a sideshow.  They were all upset over what

25   ultimately was a thousand dollars.  Larry was claiming that he

1  was entitled to commission.  Pavanelli was accusing him of

2  being a thief.  It was just unnecessary, you know.  So I was

3  just trying to get it over with and reach some accommodation so

4  it would stop -- you know, they were both coming to me at that

5  point, or at least Pavanelli was.

6  Q.    Did this dispute between Mr. Corna and Mr. Pavanelli

7  begin before or after the Venezuelan Attorney General issued

8  her October 3, 2003, opinion?

9  A.    Well, this decision was at the end of December of 2003.

10  So it was after.

11  Q.    The Attorney General opinion of October of 2003?

12  A.    This dispute between the two of them started around

13  Christmas of 2003.

14  Q.    To your knowledge, did Mr. Corna have any role in the

15  investigation conducted in 2003 by the Ministry of Finance?

16  A.    No.

17  Q.    To your knowledge, did Mr. Corna have any involvement in

18  the Attorney General's review of that investigation?

19  A.    No.

20  Q.    To your knowledge, did Mr. Corna have any involvement in

21  the Attorney General's October 3, 2003, opinion?

22  A.    No.

23        MR. ELLIOTT:  Could you put up D-924, please?

24        THE WITNESS:  I know what it is.  I remember this from

25  yesterday.

1    BY MR. ELLIOTT:

2    Q.   Mr. Richards, you do recall being asked questions by

3    Mr. Schwartz on this document?

4    A.   Yes.

5         MR. ELLIOTT:  And could you flip it to page 2?

6    BY MR. ELLIOTT:

7    Q.   There is some handwriting in the top right corner of the

8    document.  Whose is that?

9    A.   That's mine.

10   Q.   The "Cancelled"?

11   A.   Yeah.

12   Q.   What does that mean?

13   A.   Note -- The obligation was canceled.  The whole -- The

14   deal was canceled.

15   Q.   Did Larry Corna have any involvement, at all, in Skye's

16   decision to purchase Notes 7/12 and 8/12?

17   A.   No.

18   Q.   Let's talk about Mr. Delgado.  What, to be clear, did

19   you know about Mr. Delgado during the time that Skye was

20   performing its due diligence.

21   A.   That he was the person who inspected notes in

22   Switzerland.

23   Q.   Do you know whether he inspected the two notes that Skye

24   eventually purchased, 7/12 and 8/12?

25   A.   No.  My -- Our notes -- and this was important to us, I

1    thought, we thought, jurisdictionally –– our notes were in

2    America; and they were inspected by a woman named Hepsie

3    Hurtado, who was actually, I think, a Ministry of Finance

4    employee at the time.

5    Q.   To your knowledge, other than looking at notes in

6    Switzerland, did Mr. Delgado have any other role in the

7    Ministry of Finance investigation?

8    A.   Not that I know of.

9         THE COURT:  One moment.

10        MR. SCHWARTZ:  No foundation for that.

11        THE COURT:  This is on what he knew.

12        MR. ELLIOTT:  Yes, Your Honor.

13        THE COURT:  On that basis, it will be admissible.

14   BY MR. ELLIOTT:

15   Q.   And, Mr. Richards, during the course of the due

16   diligence process and before you bought Notes 7/12 and 8/12, to

17   your knowledge, did Mr. Delgado have any role in the Attorney

18   General's opinion issued on October 3, 2003?

19   A.   No.

20        THE COURT:  I'm sorry.  That's one of those hanging

21   chad kind of questions.  It was a "did he know," as opposed

22   to –– Could you elaborate on it just a little bit for my

23   benefit?

24        THE WITNESS:  I thought he said "to my knowledge."

25        MR. ELLIOTT:  Let me back up.

1          MR. SCHWARTZ:  That's how I understood it in a similar

2     question.

3          MR. ELLIOTT:  Let me back up, though, and make sure

4     there's not a hanging chad here.

5          THE COURT:  Sure.  All right.

6          MR. ELLIOTT:  It's a fair point.

7      BY MR. ELLIOTT:

8      Q.   Mr. Richards, during the course of your due diligence

9     and prior to purchasing Notes 7/12 and 8/12, did you learn any

10    information to suggest that Mr. Delgado had any role in the

11    Attorney General's October 3, 2003, opinion?

12     A.   No.

13          MR. ELLIOTT:  Could you put up Plaintiff's Exhibit

14    145, please?

15      BY MR. ELLIOTT:

16     Q.   Mr. Richards, I've put up the agreement with Gruppo for

17    which you have testified you signed in August of 2004.  Do you

18    see that?

19     A.   Yes.

20          MR. SCHWARTZ:  Excuse me just a second.  I'm just

21    going to make the same objection I made the first time this was

22    displayed.  The document, including the attachment, is

23    something of a Frankenstein combination of things in several

24    pieces.  You've got the December waterfall, Your Honor,

25    attached to the April agreement executed in August.

1        THE COURT:  I'll keep that in mind, but there has been

2    testimony on that.  So --

3        MR. ELLIOTT:  That's exactly where I'm going, Your

4    Honor, just to make sure the record is clear.

5     BY MR. ELLIOTT:

6     Q.   Let's begin, Mr. Richards, first with the non-recourse

7    note attached as Exhibit A.

8     A.   Yes.

9     Q.   Is that the version of the non-recourse promissory note

10   that existed in August of 2004?

11    A.   Again, I want to be clear on this so that I am accurate.

12   All right?

13        This specific agreement that we were talking about

14   contains the December waterfall, right?  So, in my deposition,

15   we discussed that this version of the agreement was from

16   December.  But I do believe that it was in basically the same

17   form and format as the agreement that existed in August of --

18        MR. SCHWARTZ:  I move to strike that, Your Honor.

19   We've been over this many, many times.  There is no such

20   document.  There has been ample opportunity for the Plaintiff

21   to produce it.  This is the third or fourth time over the same

22   subject matter.

23        THE COURT:  All right.

24        MR. ELLIOTT:  That's exactly where I'm going right

25   now, Your Honor.

1          THE COURT:  All right.

2          MR. SCHWARTZ:  It will necessitate a fifth rerun on

3     recross.

4          THE COURT:  Well, this is on redirect.  I assume it

5     has something to do with the cross.  So I'm going to let you

6     proceed.

7          MR. ELLIOTT:  Thank you, Your Honor.

8       BY MR. ELLIOTT:

9       Q.   Mr. Richards, was the waterfall periodically updated?

10      A.   Yes.

11      Q.   And is this, then, the December version of that

12    waterfall?

13      A.   In there is the version that I believe was from -- I

14    said in my deposition and still believe it was from December

15    '04, January '05.

16      Q.   Okay.  And were you modifying these agreements along the

17    way?

18      A.   Yes.

19      Q.   And --

20      A.   We tried to modify it every time that there was a

21    monetary event to Gruppo.  And we tried to modify the

22    waterfall, primarily, but sometimes other parts of the

23    agreement, in our favor.

24      Q.   That, then, would have been a modification of the August

25    version?

1    A.   Yes.

2         MR. SCHWARTZ:  Objection.

3         THE WITNESS:  Yes.

4         MR. SCHWARTZ:  Objection.  It assumes facts not in

5    evidence.  There is no August version.

6         THE COURT:  Well, this is the witness' knowledge.  You

7    can cross him on why there is nothing in writing.  You can go

8    through all that, but he can testify to the facts.  So the

9    objection is overruled.

10   BY MR. ELLIOTT:

11   Q.   Mr. Richards, I would like to turn you to the page that

12   has Bates stamp SKYE000895.  And, if you look at Section 2.5,

13   it says Skye will execute the promissory note for $39 million

14   as per Exhibit A.

15   A.   Yes.

16   Q.   When was the $39 million waterfall put into the

17   non-recourse note?

18   A.   I believe August.  Again, --

19        MR. SCHWARTZ:  Objection.

20        THE WITNESS:  -- as I've said --

21        THE COURT:  Just a moment.  I'll note a continuing

22   objection on the same basis, but you can go ahead and answer.

23        THE WITNESS:  So, as I've said, the waterfall was an

24   evolving thing, that it changed over time.  There is a written

25   document as to what it was in June, and there is a written

1  document as to what it was in December.

2       So, in between then, there were a lot of events,

3  including July, when that changed.

4       So, unfortunately, we don't have the actual agreement

5  from August.  But there was an agreement in August, and the

6  waterfall was something between the two.  I believe it was very

7  close to this.

8       And, so, yes.  My answer is, to the best of my

9  recollection, yes.

10  BY MR. ELLIOTT:

11  Q.   All right.  Why was it that the waterfall changed

12  from -- I think the number was around $62 million in June to

13  $39 million in August.

14  A.   Again, I'd given the guy more funding.  And I was

15  improving the deal for my group.  I was trying to set up a

16  situation where I could offer an attractive settlement to

17  Venezuela and where I could get them down to what we thought

18  was sort of a standard offer in these kinds of deals, like 40

19  cents on the dollar.  That's kind of what, like -- Even the Ken

20  Dart case at the time, Argentina offered 42 cents.

21       We're trying to get a position where we could,

22  ourselves, execute a favorable settlement in that range.  And

23  we thought that, with the AG decision being in effect and her

24  validating it, that there was a good chance that could happen.

25  So, that was the goal.

1          So, I think that's what happened in August.  It

2     certainly happened before December.

3      Q.   Okay.

4          MR. ELLIOTT:  Could you pull up –– I think it's

5     Exhibit, Plaintiff's Exhibit, 25, which is the Kennedy e-mail.

6      BY MR. ELLIOTT:

7      Q.   I'm going to hand you what's been marked as Plaintiff's

8     Exhibit 115.

9          COURTROOM DEPUTY CLERK:  P–115.

10         THE WITNESS:  Okay.  Yep.

11     BY MR. ELLIOTT:

12     Q.   I believe you were cross–examined about this e-mail.  Do

13     you recall that?

14     A.   I do.

15     Q.   It's an e-mail that you saw at the time it was sent?

16     A.   Yes.

17     Q.   And you discussed it with Mr. Kennedy?

18     A.   Yes, I think we did.

19     Q.   Now, the e-mail includes an English translation; but, in

20     the body of Mr. Kennedy's e-mail, it indicates that the

21     Minister of Finance had made a recent public pronouncement.

22     And then, in parens, there is a Friday, October 31, 2003, date.

23     A.   Yes.

24     Q.   There's also an article that's reprinted below that.

25     What's the date of the article that's reprinted below that?

1    A.    It's that same date:  October 31st.

2    Q.    All right.  Are you aware of -- Strike that.

3         During your due diligence period and before you bought

4    Notes 7/12 and 8/12, were you aware of any public pronouncement

5    where the Ministry of Finance had, in essence, indicated that

6    the notes were not valid?

7    A.    Not at this time.

8    Q.    Mr. Schwartz asked you, yesterday, about a document

9    involving a dispute between Dr. Jacir and Mr. Pavanelli.  Do

10   you recall that testimony?

11   A.    He did.  I do.

12   Q.    And did that dispute, like the Corna dispute, arise

13   before or after the Attorney General's October 3, 2003,

14   opinion?

15   A.    After.

16   Q.    And what happened with that dispute?  Was it resolved?

17   A.    I'm sure it was.  Like I said in my testimony, this was

18   not an uncommon thing with Pavanelli.

19         MR. ELLIOTT:  Your Honor, if I may have a minute?

20         THE COURT:  You may.

21      (Whereupon, there was a brief interruption.)

22         MR. ELLIOTT:  One final question, Mr. Richards.

23   BY MR. ELLIOTT:

24   Q.    Did any of the entities that were discussed in the

25   courtroom yesterday that have a right to the proceeds --

1   Gruppo, Venospa, Dr. Jacir, Woodstrite, Crabbe, Brown and

2   James -- anybody else that has a right to those proceeds, are

3   any of those third-party owners of Skye Ventures?

4      A.   Leaving open the question of whether they do have rights

5   to the proceeds, the answer is no.

6      Q.   Who is the owner of Skye Ventures?

7      A.   Me and my wife.  She owns a teeny part, one or two

8   percent.

9         MR. ELLIOTT:  Thank you.

10        Your Honor, those are all the questions I have.

11        THE COURT:  Thank you.

12        Mr. Schwartz, you may have recross.

13        MR. SCHWARTZ:  Thank you.

14                            - - -

15                    RECROSS-EXAMINATION

16   BY MR. SCHWARTZ:

17      Q.   Good morning, Mr. Richards.  How are you?

18      A.   Good morning.  It seems like just yesterday.

19      Q.   It was.  Between then and now, or between then and the

20   time you began your redirect, had you discussed your testimony

21   with anyone?

22      A.   No.

23      Q.   So, Mr. Elliott asked you to look at Defendant's Exhibit

24   447.  I don't know if you're using a hard copy over there, or

25   just looking at the screen on your monitor.

1    A.    I'm looking at the screen, but I remember he asked me

2    that about the attachments.

3    Q.    Yes.  And there aren't any, right?

4    A.    I don't know.  I didn't look at it from that sense.

5    Q.    Well, it's a one-page document.  Maybe we ought to give

6    you the hard copy of D-447.  Do you think it's up here?  Should

7    be in the folders available to you.

8         MR. SCHWARTZ:  This is Defendant's 447.

9         COURTROOM DEPUTY CLERK:  447?

10         MR. SCHWARTZ:  Yes.

11         COURTROOM DEPUTY CLERK:  Only one sheet?

12         MR. SCHWARTZ:  Yes.  Thank you.

13    BY MR. SCHWARTZ:

14    Q.    Mr. Richards, take a look at the hard copy of D-447.

15    It's a one-page document, right?

16    A.    Right.

17    Q.    There are no attachments, by definition, right?

18    A.    The purpose of this was not to send these attachments to

19    Larry Corna.  It was to ask him to review the text.  The letter

20    refers to attachments that we were going to include.

21    Q.    Exactly.  And this was just a form of draft

22    communication that you sent to Mr. Corna, right?

23    A.    Yes.  I was going to send this to a few buddies.  And I

24    said:  Please look at the facts to -- please look at this and

25    see if you see anything wrong about it.

1    Q.   When you sent this to Mr. Corna, you didn't attach any

2    pdf's, right?

3    A.   I don't think so, no.  It doesn't appear they're on the

4    thing.

5    Q.   So, there is nothing on the face of D-447 to suggest you

6    had anything in your possession at this time, right?

7    A.   Well, yeah.  It says I'm going -- these are the things

8    I'm going to include with this e-mail.  So, obviously, I would

9    have had them.

10   Q.   Well, regardless, you didn't attach it to Corna at this

11   time, right?

12   A.   No.

13   Q.   All right.  Let's look now at P-133.  This is the

14   Monday, May 17, 2004, e-mail that Mr. Elliott also showed you

15   just a moment ago.  Do you remember this one?

16   A.   Yes.

17   Q.   And in this e-mail, although the attachment is not

18   there, it does have the appearance of Mr. Alcalde forwarding

19   you at least an e-mail from Mr. Jacir, right?

20   A.   He's forwarding me the document, it looks like to me.

21       MR. BALTAY:  Note an objection.  Mr. Schwartz may have

22   misspoken.  He said the attachment is not there.  On the

23   exhibit, the attachment is there.

24       MR. SCHWARTZ:  I'm sorry.

25       THE COURT:  It's a fact question.  Let the witness

1   answer.

2       MR. SCHWARTZ:  That's fine.  Thank you for the

3   clarification.

4     BY MR. SCHWARTZ:

5     Q.   So, on this one, May 17, 2004, what's happening here is,

6   Mr. Alcalde is forwarding to you what he has received from

7   Mr. Jacir several days earlier; and the full copy would reflect

8   that some version of the Attorney General opinion was included,

9   right?

10    A.   That's what it looks like, sure.

11    Q.   All right.  Now let's look at D-552.

12        COURTROOM DEPUTY CLERK:  D-552.

13    BY MR. SCHWARTZ:

14    Q.   So I'm showing you D-552 for the first time, Mr.

15  Richards.  And you'll see that this is an e-mail exchange

16  between you and Mr. Corna.  Just preliminarily, let's establish

17  what occurred here.

18        Corna wrote to you, looking at the bottom e-mail, on May

19  18, 2004.  Do you see that?

20    A.   Yes, I see this.

21    Q.   And then you responded to him on Tuesday, May 18th,

22  2004, one day after the e-mail from Mr. Alcalde, which is

23  Plaintiff's 133, right?

24    A.   It looks like he sent the e-mail to me on May 18th, and

25  I responded to him on May 18th.

1    Q.    The same day, right?

2    A.    The same day, yes.

3    Q.    And, then, seemingly also the same day, 20 minutes

4    later, Mr. Corna responded to you and said, "Call my cell,"

5    right?

6    A.    Yes.

7    Q.    So -- and this is an exchange of e-mails that you had

8    with Larry Corna on May 18, 2004, correct?

9    A.    I don't recall them.  But, again, my e-mail is there.

10   So I have no reason to dispute it.

11   Q.    All right.  And you were still dealing with Larry Corna

12   as late as May 18th, 2004, right?

13   A.    Larry kept coming back with this or that.

14   Q.    Well, this reflects a little bit more than Larry Corna

15   pestering you, doesn't it?

16   A.    Well, Larry Corna pestering me is what is -- Maybe I

17   said that, but -- And he did pester me at times, pestered

18   Crabbe Brown at times, but he also at times would give me a

19   name of a person:  You should talk to this guy about a Bandagro

20   investment or something.  So, who am I to say no, right?

21   Q.    But, in this particular instance, you made a request of

22   Larry Corna; did you not?

23   A.    Yes.

24   Q.    You asked him to get you a certified copy of the AG

25   report and the Guzman report, right?

1    A.    I didn't ask him to get it.  I said I wanted it.  I

2    assumed he had it.  So I'm asking him to give it -- to get it

3    for me.

4    Q.    So, for some reason, whatever you had received the day

5    before from Mr. Alcalde via Miguel Jacir wasn't sufficient,

6    right?

7    A.    Oh, I wouldn't -- I wouldn't put that into it.  Maybe I

8    hadn't seen Alcalde's e-mail yet.  You know, I get hundreds of

9    e-mails a day.

10    Q.    In any event, the contemporaneous documentation shows

11    you received some version of the Attorney General opinion on

12    May 17th, and you asked Corna to see if he could get you a

13    certified copy on the 18th, right?

14    A.    This is in respect to, if you look at the bottom

15    e-mail -- I'm trying to look at it and see what this was in

16    regard to.

17          So, he says to me:  Look, there is a person at the U.S.

18    Embassy in Caracas who works on the Foreign Trade Desk in

19    Venezuela -- Oh, no.  There is another person who works in the

20    Foreign Trade Desk for Venezuela in D.C. who referred us to him

21    to quickly obtain document authentication stamps.

22          So, I mean, I'm reading this for -- I don't recall ever

23    having seen this.  But I'm reading it, so trying to familiarize

24    myself; and, so, maybe we were trying to get an additional

25    document stamp on it or something.

1    Q.    And you wanted a certified copy, right?  There is

2    nothing complex about the request you made to Corna, is there?

3    A.    Yeah.  I wanted a -- I wanted a certified copy.  I

4    wanted him to send it to me.

5    Q.    All right.  Let's move forward to D-590.  You'll

6    remember this e-mail -- we've seen it many times, now, between

7    your testimony and Mr. Alcalde's -- this is the July 3, 2004,

8    pre-Como meeting -- from Pavanelli to various people, including

9    you, right?

10   A.    Yes.

11   Q.    We've been over this before.  We don't have to go

12   through it in great detail here, but you'll recall that, for

13   some reason, Pavanelli, in the "Furthermore" paragraph in the

14   middle of the first page, was maintaining that he had not

15   received the dictame dated October 3, 2003, right?

16   A.    We discussed that yesterday, yes.

17   Q.    And he stated that nine months had gone by and he was

18   waiting for the document, and he had some concern about whether

19   the copy Santana had was false, right?

20   A.    Again, yes.  We discussed this yesterday.

21   Q.    The following month, you filed the complaint in this

22   case, right?

23   A.    Crabbe Brown did, yes.

24   Q.    And Alcalde did, right?

25   A.    Yes.

1    Q.   For some strategic reason –– We don't have to get into

2    what it is –– as you testified, he opted not to include any

3    version of the Attorney General's opinion when he filed the

4    complaint, right?

5    A.   Yes.  There was a strategic reason for that.

6    Q.   And, then, after the complaint was filed –– Let's look

7    at D-621.  Mr. Elliott had you look at this document on your

8    redirect as well.  We looked at it on your cross.

9         Remember this document?  It's an October 12th, 2004,

10   letter from Mr. Schianchi to you in English, right?

11   A.   Yes.

12   Q.   And Schianchi said that he was confirming certain

13   alleged information upon your request, right?

14   A.   Yes.  I don't recall ––

15        THE COURT:  What's the exhibit number again?  I'm

16   sorry.

17        MR. SCHWARTZ:  D-621.

18        THE WITNESS:  As I said, I don't recall the request

19   specifically or how responsive this was to it, but certainly

20   that's what he says.  This is pursuant to my ––

21   BY MR. SCHWARTZ:

22   Q.   Well, when Mr. Elliott showed you this document on your

23   redirect, you didn't say you had any problem remembering it,

24   did you?

25   A.   I didn't say I don't have –– I said I don't have a

1    recollection of what my specific request to him before this

2    was.  He's saying "pursuant to your request."

3    Q.    Well, this is a little bit like the document where

4    Pavanelli was responding to some questions.  We don't have any

5    form of written request, but --

6    A.    It might not have been a written request, of course.

7    Q.    I understand that.  But you certainly have some very

8    specific representations, at least two of the four, from

9    Schianchi, to you, about how, somehow, he supposedly had

10   obtained a certified copy of the Attorney General opinion,

11   right?

12   A.    He's describing that in that letter to me, yes.

13   Q.    And he's describing it prefaced by the comment "Upon

14   your request," right?

15   A.    Yes.

16   Q.    So, as of October 12th, 2004, after this lawsuit was

17   filed, you were still seeking information concerning a

18   certified copy of the Attorney General's opinion, correct?

19   A.    This may well have been a copy from Alcalde to say get

20   this detail from Schianchi.  It might have been related to the

21   fact that he had these communications with the Venezuelan

22   embassy prior to meeting with Delgado.  I don't remember what

23   the request was.

24   Q.    Now, Mr. Elliott asked you some questions about your

25   relationship with Larry Corna.  Let's take a look at D-515.

1    COURTROOM DEPUTY CLERK:  D-515.

2    THE WITNESS:  Yes.

3  BY MR. SCHWARTZ:

4  Q.   So, D-515 is an e-mail from you to Mr. Corna, correct?

5  A.   It's an e-mail from Larry Corna to

6  bandagroemails@gmail.com.

7  Q.   All right.  As with some of the other documents, or at

8  least one of the other ones we've seen, I'm going to ask you to

9  disregard what appears at the top of this document, because

10  that reflects how Mr. Corna responded to a nonparty subpoena

11  and gathered documents in the case, which will become apparent

12  when he testifies.  But, for the time being, I'm looking at the

13  e-mail from 2004 that starts in the middle of the first page of

14  this exhibit and continues onto the second page.  Do you

15  see --

16  A.   Yes.  So the attachment to this e-mail that Larry

17  forwarded to someone -- I don't know who that is -- has an

18  attachment that says, on Sunday, March 7, Dave Richards wrote.

19  And, so, I don't know how something like that gets in there,

20  but that's my e-mail address.

21  Q.   It gets in there because, on March 7, 2004, at 12:21

22  p.m., you sent Corna an e-mail.  Do you see that?

23  A.   I mean, if I sent him an e-mail, there would be a

24  typical "From, To, Date."  So, this is different from that.

25  So, again, what I'm just saying is, I don't know that that is

1   what it is, but it -- you know, again -- I think I told you

2   when you asked -- when you asked me about this originally that

3   I didn't recall it.

4      Q.   Actually, I didn't ask you about this previously.

5      A.   Oh.

6      Q.   But I have asked about any number of

7   drichards@netwalk.com e-mails.  And, as you've testified, you

8   didn't retain all of those, right?

9      A.   I retained those that we thought were important, for

10  sure.

11     Q.   Well, let's look at this one.

12          MR. SCHWARTZ:  And, Your Honor, just briefly I'll say

13  this is going to fall in the category of those we addressed

14  preliminarily where we have someone else's version but not Mr.

15  Richards'.

16  BY MR. SCHWARTZ:

17     Q.   This says that you had spoken at length with Pavanelli.

18  And, if you looked at the third sentence, he confirmed that the

19  press article appeared which stated that the External Debt

20  Commission had determined to honor the Bandagro debt.  Let's

21  stop right there.

22          If Pavanelli had actually said that to you, that would

23  have been false, right?

24     A.   I don't know.  There might have been -- There is press

25  articles that said all kinds of stuff that turned out to be

1    true or false.

2        So, again, I don't know that -- I still don't know that

3    this really is an e-mail from me because of the way the header

4    reads.  And I don't know that there was or wasn't such a press

5    article.  There were hundreds of press articles.

6    Q.   All right.  Let me just focus you on the underlying

7    information.

8        As of March 7, 2004 -- in fact, as of today -- no

9    External Debt Commission has ever determined to honor the

10   Bandagro debt, right?

11   A.   Even here he says, he confirmed that an order would be

12   the real document, not a newspaper article.

13       So I don't think anybody is saying that this is true

14   until you have an order.

15   Q.   And that was your understanding as of March 7, 2004:

16   That there would need to be some form of payment order,

17   correct?

18   A.   Again, I don't remember this e-mail.  So we would say

19   that our position would be that the Attorney General ordered

20   the Minister of Finance to process payment in this case.  So,

21   what you call it, that's what we thought it was.

22   Q.   But that happened, in your view, in October of 2003,

23   right?

24   A.   Yes.

25   Q.   And, according to this e-mail, you were reporting that,

1   as of March 7, 2004, more than five months later, someone

2   was -- Pavanelli was telling you that an order that had not yet

3   been issued would be the real determinant, right?

4      A.   I'm saying that's what Pavanelli said --

5      Q.   And --

6      A.   -- again, if this is my e-mail.

7      Q.   And look at the next paragraph.  You say the same thing

8   at least twice more, if not three times, right?

9      A.   I'm saying what he said, yeah.

10     Q.   Yes.  You're reporting to Corna that Pavanelli said that

11  there'd need to be an order, right?

12     A.   Again, I don't know if characterizing that I reported

13  this to Corna is correct.  Corna got a copy of it somehow.  I

14  don't know -- If this is an e-mail, which it might be -- I'm

15  not denying it -- there would be an e-mail "From, To, Date" on

16  the top.  So -- But, yes, with that qualification, I'm

17  reporting what I -- what Pavanelli told me.

18     Q.   Look at the next page.  You go on to report:  With an

19  order of payment in addition to the Attorney General's opinion

20  that Gruppo's notes should be paid, there should be reduced

21  risk, including reduced time risk, right?

22     A.   Hold on.  I was just reading the part before that.

23          Yeah.  The more -- Yeah.  The more -- Of course, the

24  more agencies that said something, the lower the risk.  If

25  ultimately Chavez said to pay it, the risk would probably be

1    close to zero.

2    Q.    But the order of payment that you're referring to was an

3    order of payment from the Ministry of Finance, right?

4    A.    No.    I think it's something called the External Debt

5    Commission, is what he was saying.    I'm not saying that.

6    Q.    Let's look at the two sentences later.    You see a

7    sentence that starts "Even if this is true."    I guess I need to

8    preface that with the prior sentence to make it a little more

9    comprehensible.

10          So the next sentence says that one thing that did occur,

11    supposedly, is that an official admitted to the fact that some

12    but not all of the Bandagro notes were legitimate.    Do you see

13    that?

14    A.    Yes.

15    Q.    Then you went on to say:    Even if this is true, Skye's

16    agreement with Gruppo is that we will be paid if any of the

17    notes are paid, and we are not limited to the note that is

18    encumbered by our deed of trust.

19          Do you see that?

20    A.    Yes.

21    Q.    First of all, does that refresh your recollection that

22    whatever deed or deeds of trust you received from Schianchi

23    applied to a specific purported note and not all of them?

24    A.    Well, I -- This is what I said in -- It does not -- No,

25    it doesn't refresh my recollection, but that's what I said

1   here, for sure.

2   Q.   And what agreement were you referring to that provided

3   that if Gruppo was paid on any notes Skye would get repaid?

4   A.   I don't know.  Maybe a verbal agreement.

5   Q.   "Verbal" meaning oral?

6   A.   Oral, yeah.

7   Q.   And then there is a sentence two later, two sentences

8   later, quote:  Further, until we confirm the specifics of a

9   ruling or even its existence, I wouldn't spend any of the

10  money.  End quote.  Do you see that?

11  A.   Yes.  I do.

12  Q.   Now, so you knew as of March 7, 2004, that until

13  something else happened beyond the Attorney General's October

14  2003 opinion things were very much in doubt, right?

15  A.   There was -- So, what I say here is that, until

16  you -- we confirm the specifics of a ruling, or even its

17  existence, quote, I wouldn't spend the money, which is

18  shorthand for you don't spend money on something that you don't

19  know has occurred yet.

20       So, it's -- it's not I wouldn't spend the money.  It's

21  you have to validate that it's true.

22  Q.   And this e-mail was sent on March 7, 2004.  That's just

23  about the time you've testified that you finalized your

24  investment thesis, right?

25  A.   Yes.  But, again, I'm trying to point out -- maybe I

1   wasn't clear -- that these are two unrelated things.

2     Q.   All right.

3         MR. SCHWARTZ:  Your Honor, I'm done with this

4   document.  I just want to note, when the time comes to be

5   moving its admission, we will not be doing so for the truth of

6   anything in it.

7         THE COURT:  All right.

8         MR. SCHWARTZ:  Let me show you one other document,

9   D-474.

10        COURTROOM DEPUTY CLERK:  D-474.

11    BY MR. SCHWARTZ:

12    Q.   D-474 is an e-mail chain.  You'll see, Mr. Richards,

13   that the first e-mail is from Usuelli.  This one has been

14   produced by Skye, incidentally.  The first one is from Usuelli.

15   And then you have a response from John Kennedy.  And he cc's

16   you at netwalk.com, right?

17    A.   Yes.

18    Q.   And you can see, even when these documents are produced

19   by Skye, sometimes you don't have the complete header on an

20   e-mail, right?

21    A.   Well, it says "From, To" on the top.  And, yeah, I see

22   that.  It has the -- It has the e-mail address and update.

23    Q.   Right.  So you don't have the full Usuelli e-mail

24   reprinted, just the who sent it, what time, maybe the subject,

25   and then all the text, right?

1    A.    That's right.  Looks unusual to me, but you're correct.

2    Q.    All right.  So let's look at the Usuelli update.  This

3    is back at the end of December '03.  And the first paragraph

4    just basically is an account of where Pavanelli is and an

5    indication that he's asked Usuelli to tell you certain things,

6    right?

7    A.    He asked me -- He's going to give me a summary of the

8    contents, yes.

9    Q.    It's the second paragraph I would like to direct your

10   attention to at this point.  Do you see that Usuelli says:

11   Please notice that this information is along general lines

12   since matters are at a positive but delicate point, and

13   discretion is necessary to prevent any involuntary leakage that

14   might jeopardize the current activity aimed at submitting by

15   mid-January, when public offices reopen in Venezuela, a number

16   of requests and documents such as to speedily conclude the

17   whole matter with the final order of payment or swap?

18         Do you see that?

19   A.    I see that.

20   Q.    So Usuelli was telling you, at the end of 2003, two

21   months after the Attorney General's October 2003 opinion, that

22   some effort was going to be made in January '04 to obtain a

23   final order of payment, right?

24   A.    Yeah.  So, again, I'd caution you not to -- These are

25   two -- This is a layman -- right? -- exchanging words.  English

1    is not his native language.  So, when you look at some of the

2    wording in this paragraph, you can see that it's -- you know,

3    he speaks a little differently than we do.  And so --

4        Q.    Haven't you testified that he was a very erudite fellow?

5        A.    Erudite, yes.  He was -- spoke English, French, some

6    German, Italian.  Yeah.  So he was well-educated.  Yes, I said

7    that.  But, again, you can see by his vernacular here that he

8    doesn't talk exactly like we do.

9        Q.    Well, he says "Final order of payment."  That --

10       A.    Well, I wasn't referring to that, but I wanted you to

11   keep that in mind.

12            So he says here that their public offices in Venezuela

13   reopen.  A number of requests and documents to attempt to

14   speedily conclude the whole matter with the final order of

15   payment or debt swap, which was the thing that was referred to

16   in that article from October 31st.  So, obviously, he was

17   referring to the Minister of Finance here.

18       Q.    All right.  Let's look at the next paragraph.  And then

19   there's one in a series of periodic updates on the efforts of

20   Delgado to monetize the purported notes, right?

21       A.    I don't -- You're referring to -- Oh, okay.  This

22   is -- I thought this was the one that went on for five or six

23   pages.

24            I'm trying to look for the name "Delgado" that you're

25   referring to here.

1    Q.    Right after the "Final order of payment," there is a

2    paragraph that begins "As announced."  Do you see that?

3    A.    Let me just read this paragraph before, which -- I'm

4    trying to refresh my memory here.

5         MR. ELLIOTT:  Your Honor, as he's reading this, I

6    asked about Mr. Delgado's role in the Ministry of Finance and

7    Attorney General's opinion.  I didn't go down the path of his

8    relationship, that I think we were -- went over in great detail

9    on cross yesterday.  I think we're getting a little outside the

10   scope of my redirect.

11        THE COURT:  All right.  Because there's no additional

12   chance on the Plaintiff's side to get a little bit tighter here

13   with the scope, it's got to come back to something that was

14   asked on redirect.

15        MR. SCHWARTZ:  There was inquiry about Delgado.  And I

16   understand that --

17        THE COURT:  There was some questions about Delgado.

18   You can clean that up.  As long as that's what we're doing, I'm

19   fine.

20        MR. SCHWARTZ:  That's where I am, and that's the last

21   question I have about this document.

22    BY MR. SCHWARTZ:

23    Q.    And all I'm asking, Mr. Richards, is, if you'd have

24   recognized here, there is another in a series of updates

25   concerning Delgado's attempts to monetize the purported

1    promissory notes, right?

2      A.    Yes.  I would say, as I read this below, the part you

3    quoted me, it puts that issue of the final thing, the final

4    payment order, in context.  But, as I get down there, it does

5    mention the name "Delgado" and talks about this financing that

6    you talked about in your cross yesterday.

7      Q.    All right.  That's all I have for you on this document.

8           Mr. Elliott asked you some questions about your 2012

9    affidavit, which is Defendant's Impeachment Exhibit 13.  Do you

10   still have that there?

11     A.    I don't, but I recall it.

12     Q.    Well, let's make sure you do have it.

13          THE COURT:  If I could pass along a comment about

14   this, it seems to me -- We're going to be questioning him.  I

15   understand you have a right to do that, but this really is a

16   legal issue; wouldn't you agree?

17          In other words, as I understood the testimony, Mr.

18   Richards is analogizing this to a homeowner bringing a lawsuit

19   with a bank as a mortgagee, but the bank not named as a

20   plaintiff.  You disagree with that.

21          I think that's the way this stands.  The question is

22   which position is the better legal position, not so much the

23   factual position.

24          MR. SCHWARTZ:  I'm actually not going to direct his

25   attention to the paragraph that we spoke about before.

1          THE COURT:  All right.  Just so you understand that I

2     see that as an issue here.  You may want to address that in

3     your briefing.  But I think it's really more of a legal issue

4     than a factual one because the facts really aren't in dispute.

5          MR. ELLIOTT:  The only thing -- I really don't know

6     what we're going to be talking about.  The only paragraph I

7     asked him about on redirect was that paragraph.

8          THE COURT:  The ownership, yeah.

9          MR. ELLIOTT:  And now we're hearing he's going to do

10    something else.

11         THE COURT:  Well, let's see what that is.  And we'll

12    address that question by question.

13         MR. SCHWARTZ:  Okay.  And Mr. Elliott brought up the

14    affidavit.  There's other aspects of it the Court may be

15    interested in hearing about.  I don't think this is the

16    occasion to debate the proper interpretation of --

17         THE COURT:  No.  My point simply is, you do have a

18    dispute about the effect, but it's in my view more of a legal

19    dispute that a witness is not going to be able to resolve.

20         MR. SCHWARTZ:  Yes.  I think when you see -- We've now

21    agreed to submit all of the agreements and waterfalls to you,

22    and you'll have in front of you the final waterfall that

23    existed at the time --

24         THE COURT:  I'm just framing the issue.  I just don't

25    think this witness can be a whole lot more helpful on this

1    factually speaking.

2         MR. SCHWARTZ:  I agree.  And that's why I have no

3    intention of asking him anything further about that particular

4    paragraph.  But, to ask him about several others, he's going to

5    need to have the affidavit in front of him.

6         COURTROOM DEPUTY CLERK:  Impeachment D–13.

7         THE WITNESS:  Yes.

8    BY MR. SCHWARTZ:

9    Q.   You now have this, Mr. Richards?

10   A.   I do.

11   Q.   So, Mr. Elliott asked you some questions about Note

12   Number 9/12, right?

13   A.   I recall that.

14   Q.   And now I'm going to direct your attention to Paragraph

15   25 of your 2012 affidavit, which is Impeachment Exhibit 13.  In

16   Paragraph 25, you said Skye is the sole owner of the notes and

17   Notes 7/12 and 8/12 are the only Bandagro notes Skye owns?

18   A.   Yes.

19   Q.   And you went on to say:  "Contrary to Defendants'

20   assertion, Bandagro Note 9/12 is currently owned by a separate

21   entity that is not a party to this lawsuit."  Right?

22   A.   We went through this in my deposition.  It was my belief

23   --

24        THE COURT:  Well, you know, you understand I didn't

25   attend the deposition.

1          THE WITNESS:  I'm sorry.

2          THE COURT:  So I need you to tell me.

3          THE WITNESS:  Okay.  Yes, that's in there.

4          THE COURT:  All right.

5     BY MR. SCHWARTZ:

6     Q.   And the assertion in the second sentence of Paragraph 25

7     was false when you made it in 2012, correct?

8     A.   There was some confusion about whether Skye I –– Skye or

9     Skye II owned the note at this time that we discussed in my

10    deposition.  And I think I concluded that I was confused and,

11    by that time, Skye had owned the note.

12    Q.   Put another way, the assertion in Paragraph 25 of your

13    affidavit is false, right?

14    A.   I admitted I made a mistake.  I admitted that to you in

15    the deposition.  But, again, we weren't trying to –– We had

16    possession of it.  We showed it to Venezuela in '04 when they

17    came and inspected the notes.  So, there was no dispute that I

18    had it.  As to the specific entity that owned it, I was

19    confused.

20    Q.   Let's look at Paragraph 20.  You wrote there in the

21    first sentence:  "Skye did not travel abroad to purchase an

22    interest in the notes."  Do you see that?

23    A.   That's right.

24    Q.   In fact, before you purchased the notes, you traveled to

25    Italy, correct?

1    A.    Of course.

2    Q.    And, when you were there, Pavanelli gave you a large

3    number of documents, right?

4    A.    Of course.

5    Q.    And you traveled to Caracas, correct?

6    A.    Yes.

7    Q.    And Alcalde traveled to Italy.  And he traveled to

8    Caracas on several occasions, as well, right?

9    A.    Yes.  I mean, in this -- we say that in this paragraph,

10   right?

11   Q.    You show me where.

12   A.    It says:  "Further, the purchase agreement states that

13   Gruppo and Pavanelli have provided documents on the Bandagro

14   notes to Skye..."

15   Q.    Complete the sentence.

16   A.    "... through its representatives in the United States."

17   Q.    Yes.  And the impression you were trying to create there

18   was that the documents had been provided in the United States,

19   right?

20   A.    What we were trying to say here and what we specifically

21   said, that we did not travel abroad to purchase the notes,

22   because the agreement itself said that the purchase was in

23   Columbus, Ohio.  So, that's where we took possession of the

24   notes; and that's where we viewed the purchase took place.

25   Q.    Didn't you travel to Como in early April of 2004 to

1    negotiate the purchase of the notes?

2    A.   We did -- I did not say I didn't.  What we say is the

3    purchase agreement states that they provided documents to us

4    through their representatives in the United States, which, in

5    fact, occurred through Brian Good and Larry Corna.  We didn't

6    say that no other documents were provided.  We were reciting

7    here what did the purchase agreement say.  That is accurate.

8    Q.   So, the purpose of this affidavit was to try to

9    establish that this case should stay in the United States,

10   right?

11   A.   The purpose here was to describe where the purchase took

12   place.  The purchase took place in Columbus, Ohio.

13   Q.   And that's -- that was written into the agreement,

14   right?

15   A.   Yes.

16   Q.   Okay.  And, in reliance on the language that the lawyers

17   put in the agreement, you took the position in this factual

18   affidavit that you didn't travel abroad to purchase an interest

19   in the notes, right?

20   A.   I didn't --

21        MR. ELLIOTT:  Your Honor, we're way beyond --

22        THE COURT:  Yeah.  You've got the scope issue, and

23   this is a matter we already decided in this case.  This goes to

24   the question of venue.

25        Do you want me to change venue at this point?  I assume

1  you're not asking me to do that.

2      MR. SCHWARTZ:  No.  I'm comfortably ensconced here in

3  Columbus.

4      THE COURT:  Good.  You've gotten used to Columbus?

5  I'm glad to hear that.

6      MR. SCHWARTZ:  But I don't think this is, actually, a

7  joking matter.  This is not --

8      THE COURT:  I'm not joking about it.

9      MR. SCHWARTZ:  I know.

10     THE COURT:  My point simply is we can't relitigate a

11 matter that's already long gone.

12     MR. SCHWARTZ:  But the credibility of the witness

13 remains an issue.  And the assertions in this affidavit are

14 ones you can assess in that light.  But I'll move on.

15   BY MR. SCHWARTZ:

16   Q.   Now, Mr. Elliott asked you some questions in connection

17 with Note 9/12 and the reasons why it's been sitting, gathering

18 dust, since 2005.

19     MR. ELLIOTT:  Your Honor, I'm just going to object.

20     THE COURT:  We're going to end up with the witness

21 clarifying the question again.  Let's just go right to the

22 question.

23   BY MR. SCHWARTZ:

24   Q.   All right.  You were asked some questions about Note

25 9/12 and the reasons why, despite owning it free and clear

1    since June of 2005, you've done nothing with it, right?

2    A.   I'm sorry?  Yes.  Look, I'm a little irritated.  You sit

3    here and are essentially trying to say I'm lying in these

4    affidavits.

5         THE COURT:  Mr. Richards --

6         THE WITNESS:  Your firm said --

7         THE COURT:  Mr. Richards -- Mr. Richards --

8         THE WITNESS:  I'm sorry.

9         THE COURT:  We're getting editorial comments back and

10    forth.  Let's get right to a specific question.

11    BY MR. SCHWARTZ:

12    Q.   You've testified that the reason you didn't institute

13    any attempt to collect on Note 9/12 was because you thought you

14    would roll it into some settlement negotiations with Venezuela,

15    right?

16    A.   I'm sorry.  Could you repeat the question?

17    Q.   Yes.  You told Mr. Elliott, on redirect, that the reason

18    why you didn't attempt to enforce Note 9/12 was you thought

19    you'd be able to roll it into some settlement negotiation with

20    Venezuela, right?

21    A.   I said I think that was one of the reasons.

22    Q.   That was the only reason you --

23    A.   No.  The other -- I testified about the other reason,

24    about there being a different legality -- legal position with

25    respect to the notes.  There would have to be another lawsuit,

1  another 13 years.  That was also a reason, potentially.

2  Q.   We talked about that yesterday.  Let's focus on --

3  A.   You said that was the only reason.

4  Q.   I'm sorry.  I misspoke.  You're absolutely right in that

5  regard.

6  A.   There may have been others, incidentally.  I just can't

7  think of them at the moment.  It's ten years ago.

8  Q.   Let's just talk about the rationale that you provided in

9  connection with the possibility of a settlement.  All right?

10  A.   Yeah.

11  Q.   And you told Mr. Elliott that you thought you might be

12  able to roll 9/12 into some settlement and that's why you

13  didn't bring a suit on it, right?

14  A.   That's what I thought, yes.

15  Q.   And then -- You were shown a document concerning some

16  visit here by the two women you describe as the sisters, right?

17  A.   That was one of the settlement initiatives, yes.

18  Q.   And those sisters traveled to Columbus in what year?

19  A.   I think it was '05 or '06, from my memory.

20  Q.   And whatever settlement negotiations occurred at that

21  time collapsed, right?

22  A.   Yeah.  They didn't -- They went a long way, allegedly,

23  to Chavez's office, himself.  And they didn't go through.

24  Q.   And that was nine or ten years ago?

25  A.   '05 or '06, right, for sure.

1    Q.    And, since that time, you still haven't done anything

2    with 9/12, right?

3    A.    That's correct.  I still possess it, but I haven't done

4    anything with it.

5    Q.    Now, as to 7/12 and 8/12, you were asked a series of

6    questions on redirect about who owns the notes and whether you

7    have any obligation to return them to anyone if the litigation

8    does not succeed.  Do you remember those questions?

9    A.    I do.

10    Q.    And didn't you testify yesterday that, just like what's

11    provided in the June 23, 2004, agreement, if the litigation

12    isn't successful, you'd be happy to give the notes back to

13    Gruppo Triad?

14    A.    Well, it was probably an editorial comment on my part

15    that I'm cautioned against doing.  So, if we fail in this case,

16    I'm probably done with these notes.  So I don't care who has

17    them, I think, after 13 years, if we lose.

18    Q.    Let's talk about D-629, and let's look at the second

19    page, please.

20         Now, you'd testified yesterday that this document, in

21    which you were identified as the Consulting Director of

22    Corporate Finance, was attached to D-631, right?  Want to take

23    a look at D-631?  I'm sure you haven't memorized these things.

24    A.    Yeah.  It's the letter, the letter that -- If I said

25    "attached," I might have misspoken a little bit.  But they were

1  meant to go together.

2      Q.   Let's look at D-631.

3      A.   Okay.

4      Q.   Your memory is excellent.  Here is the cover memo.  And

5  as you indicated yesterday, 631 accompanied 629, right?

6      A.   Yes.

7      Q.   And both 631 and 629 were prepared to be distributed at

8  some distressed debt conference, right?

9      A.   They were to be used and distributed if anybody was

10  interested at the distressed debt conference.

11      Q.   And you actually distributed them at that conference,

12  right?

13      A.   I wasn't there.  Like I said, Gary was there.  So, my

14  recollection is that nobody bit, so he didn't give it to

15  anybody. But he could have.  I wasn't there.

16      Q.   Didn't you suggest yesterday that the reason nobody bit

17  was that they had an opportunity to review the glossy brochure

18  that had been prepared and accompanied this cover letter, and

19  Mr. Post traveled somewhere to go to some conference with these

20  materials?

21      A.   Well, if I suggested that, it was a suggestion I didn't

22  intend.

23          What happened is, this is a milieu in which Gary

24  travels.  He is a distressed debt Drexel junk bond guy.  And so

25  he knew these people.  So the intent was that he would go talk

1    to the people he knew and use this if there was a purpose.

2         I don't know if he did or didn't give it to anyone.

3    Q.    You think that you and he -- And you signed this

4    document, right?

5    A.    Well, it's my signature stamp, for sure.  And it says

6    "SKYE VENTURES, LLC Ambient."  I don't know exactly what that

7    means.  But that is -- that's my signature stamp, yeah.

8    Q.    And you authorized your signature to be put on this

9    document?

10   A.    Of course.

11   Q.    And you did so with the intention that the cover letter

12   and the underlying glossy brochure would be distributed, right?

13   A.    If there were interest, yes, for sure.  There wasn't.

14   Q.    And that includes the brochure that has you being

15   identified as holding a position with Gruppo Triad, right?

16   A.    If they're -- was interest, for sure.

17   Q.    Are you suggesting now that Mr. Post went to this

18   distressed debt conference with these glossy brochures and

19   didn't distribute any of them after all the effort that went

20   into preparing them?

21   A.    I think that's what happened, actually.

22         MR. ELLIOTT:  Your Honor --

23         THE WITNESS:  -- or almost none or them, or one or

24   two, if any; but it was generally a complete bust.  He was in

25   the wrong place.

1    BY MR. SCHWARTZ:

2    Q.   Now, you testified that you had no information to

3    suggest that Notes 7/12 and 8/12 were counterfeit.  Is that

4    right?

5    A.   I had no information, because the information I had was

6    the Attorney General's decision that said it was valid.  So

7    that was the information I had and we relied on.

8    Q.   And that's the full extent of the support you have for

9    your assertion that there was no information they were

10   counterfeit, right?

11   A.   Yes.  That was -- Our view was, again, right or wrong --

12   We have had the correct investment thesis or not, but that was

13   our thesis.

14   Q.   And any other information suggesting that they were

15   counterfeit you just excluded from consideration based on some

16   legal theory, right?

17   A.   I -- Again, I didn't personally gather most of the

18   stuff.  And the stuff that I got I would have given to Alcalde.

19   So, the idea of there was stuff that said there was counterfeit

20   bonds and there were legitimate bonds or these were counterfeit

21   or these were legitimate, as Alcalde said in his testimony, we

22   didn't reinvestigate that.

23   Q.   You made no effort to figure out, independently, on your

24   own, whether the notes were counterfeit, right?

25   A.   Of course not.  If I was going to do that, I would have

1   never done the investment.  I would have never went down that

2   path.

3    Q.   Now, let's clear one thing up here by looking at D-135.

4        COURTROOM DEPUTY CLERK:  D-135.

5        MR. ELLIOTT:  Your Honor, I'm very sure that I didn't

6   ask anything about this.

7        THE COURT:  So let's talk about this.

8        First -- There could be several issues here, but the

9   first one is the scope of your examination.

10       On recross, at least at this juncture, there is no

11  opportunity for any followup questions by the Plaintiff.  How

12  does this bear with regard to what was asked on redirect?

13       MR. SCHWARTZ:  It bears on the subject we were talking

14  about just a moment ago:  Determination of whether the notes

15  are counterfeit.

16       THE COURT:  Well, that's the nature of the trial.  I

17  asked specifically about the redirect.

18       MR. SCHWARTZ:  Well, the witness was asked on

19  redirect:  Did you have any information suggesting or

20  indicating that the notes were counterfeit?

21       THE COURT:  And if he says he hasn't seen this, where

22  does that take us?

23       MR. SCHWARTZ:  To the next question.

24       THE COURT:  Well, what I'm going to do -- I may give

25  an opportunity for redirect, and you'll get an opportunity for

1    recross.  We'll take this a question at a time.

2           MR. SCHWARTZ:  All right.

3     BY MR. SCHWARTZ:

4     Q.    I'm showing you Exhibit 23, the certified copy of a

5     Certificate of Conviction of Paolo James Pavanelli.  Do you see

6     that?

7     A.    Yes.

8     Q.    And it indicates on the first page he was tried and

9     convicted on indictment of conspiracy to use false instruments.

10    Do you see that?

11    A.    I've never seen this before.  Do you want me to read the

12    whole thing before we start talking about it?

13           THE COURT:  Let's just start with that.  He hasn't

14    seen it.

15           You may continue if there's anything else you want to

16    ask about this.

17    BY MR. SCHWARTZ:

18    Q.    Now, you testified that you made an effort to obtain

19    documents from the Pavanelli London criminal case, right?

20           MR. ELLIOTT:  I'm sorry, Your Honor.  If he hasn't

21    seen it --

22           THE COURT:  We'll take it down for now.

23           MR. ELLIOTT:  Thank you, Your Honor.

24           MR. SCHWARTZ:  You testified that --

25           THE WITNESS:  Are we done with this?

1          MR. SCHWARTZ:  Not necessarily.

2          THE WITNESS:  All right.

3     BY MR. SCHWARTZ:

4     Q.    You testified that you made an effort to try to find

5     documents from Pavanelli's London criminal case, right?

6     A.    I don't think that was during the diligence period.  But

7     I think at one point Alcalde did try to find documents and had

8     PICA involved, and they weren't able to get any -- they weren't

9     able to find anything.

10    Q.    When did that occur?

11    A.    During the case, maybe.  Again, I just don't remember.

12    Q.    During the due diligence period, did you make any effort

13    to obtain documents concerning Pavanelli's London criminal

14    conviction?

15    A.    Me, personally, no.

16    Q.    To the best of your knowledge, did anybody acting on

17    behalf of Skye Ventures make any attempt to obtain any

18    documents during due diligence concerning Pavanelli's London

19    criminal conviction?

20    A.    Like I just said, I believe that Alcalde, through PICA,

21    made an effort.  I don't know when it was.  I believe it was

22    during the case, but it might have been during diligence.

23    Q.    You just don't know, one way or the other?

24    A.    That's right.  I don't know.

25          MR. ELLIOTT:  Just to preserve the objection, too,

1  Your Honor, for the record, the information that he's being

2  asked about is not admissible under Rule 404, as well.  But, as

3  I understand, I think we're done with the questioning.

4          THE COURT:  I'm sorry.  You said 404?

5          MR. ELLIOTT:  Yes, Your Honor.  Four oh four relates

6  to character evidence, crimes, or other acts.

7          THE COURT:  Well, I don't think it's -- Correct me if

8  I'm wrong, Mr. Schwartz.  Are you offering this under 404(a) or

9  (b)?  I wouldn't think that would be the basis here.

10         I think this would go to what could have been found with

11 reasonable investigation.  Would that be your argument?

12         MR. SCHWARTZ:  That's part of it, but that's by no

13 means all of it.  There will be an effort to introduce these

14 documents as evidence of a common scheme running from at least

15 1987 onward.

16         THE COURT:  Well, I'm not prepared to make a ruling

17 today on that issue.

18         MR. SCHWARTZ:  Oh, no.  I'm not asking for one.

19         THE COURT:  These are rulings that really are

20 conditioned upon what other facts are in this case.  This is

21 under 104.  But, at this point, this witness hasn't seen it.

22 That doesn't end the matter, though.  The question is what

23 could have been discovered through reasonable investigation.

24         Now, that he can't authenticate this, that would be a

25 different matter.  But you can question him on this, but I am

1  going to give -- This is beyond the scope, by the way; but my

2  assumption is we're going to get into this anyway.  So I'm

3  going to give Mr. Elliott an additional round of examination.

4  You'll have the last word.

5       MR. SCHWARTZ:  All right.

6       THE COURT:  You may continue.

7       MR. SCHWARTZ:  I'm not asking any further questions

8  about this at this time.

9       THE COURT:  All right.

10      One thing that would be helpful -- I'm speaking now as

11 the trier of fact -- is how difficult this would have been to

12 obtain or how easy it would have been to obtain.  I don't want

13 to hear that from you.  You're not a witness.

14      Is there anyone who can testify to that?

15      MR. SCHWARTZ:  Well --

16      THE COURT:  In other words, if this is something

17 hidden in, you know, some crypt below the Parliament, that's

18 one thing.  If it's something you could simply do with a

19 records check, that's another matter.

20      MR. SCHWARTZ:  All right.  I don't want to be

21 testifying.  These are the kind of things lawyers do in the

22 course of preparing a case.

23      THE COURT:  All right.

24      MR. SCHWARTZ:  So, we'll try to consider the best --

25 easiest way to address the Court's question.  I think it's a

1   fair question.

2          THE COURT:  All right.

3          MR. LUCAS:  Can I just address that very quickly, Your

4   Honor?

5          I think it's pretty clear that Mr. Richards and

6   Mr. Pavanelli were talking.  Mr. Pavanelli had given court

7   documents to Mr. Richards in other cases.

8          You know, the question is, how easy is it to get.  Mr.

9   Richards could have, and so testified he did, ask Mr. Pavanelli

10  for it.  I think that kind of speaks for itself.

11         THE COURT:  All right.  Very good.  Thank you.

12  BY MR. SCHWARTZ:

13  Q.   You were asked some questions regarding Defendant's

14  Impeachment Exhibit 1, the redacted version of the April 8th

15  version of the purchase agreement.  Let's take a look at that.

16         Are you aware that the unredacted version of this, the

17  version that had all the information, was not produced in this

18  litigation until 2014?

19  A.   I think we took the position, as I recall, that, while

20  it was -- we certainly didn't -- we disclosed that there was a

21  promissory note to Gruppo Triad, the amount of money that we

22  paid for the bonds was irrelevant; that we were the possessor

23  of the bonds; and the question was not what we paid for them,

24  but whether they were authentic or not.  So, that's what I

25  believe occurred.  So, here, we didn't disclose what the

1    waterfall was or who was going to get paid for it, even though

2    we did disclose there was a promissory note to Gruppo Triad.

3    Q.    And my question remains the same.  Are you aware that

4    the unredacted version, the version that would have all the

5    information, was produced for the first time in 2014?

6    A.    No.

7    Q.    Now, just a point of clarification.  You testified that

8    Crabbe Brown had only represented Gruppo Triad for a few weeks?

9    Is that what you said?

10   A.    I think that started in June -- My recollection is it

11   started in June and ended in July.

12   Q.    If Mr. Alcalde testified that it started in April and

13   ended in July, would you stand corrected?

14   A.    I don't think that's the truth, but -- I think he would

15   have been wrong about it, but he was representing me.

16   Q.    All right.  Hold on just one second.

17          And you know that, under the June 23rd, 2004, agreement

18   that you'd entered into with Gruppo Triad, that Skye Ventures

19   became a beneficiary of the engagement agreement between Gruppo

20   Triad and CBJ, right?

21   A.    Sounds like something that's written down somewhere.  I

22   don't remember that.

23   Q.    All right.  Let's cover both of these points.

24          All right.  The first thing we're going to do is look at

25   J-38.  I think we can just do this on the screen.

1      Mr. Richards, here is J-38.  It's a letter from Crabbe,

2  Brown and James to Pavanelli.

3      Why don't we just scroll through the pages so you can

4  see what it is.

5  A.   Okay.

6      MR. SCHWARTZ:  Get to the last page, please.

7  BY MR. SCHWARTZ:

8  Q.   You see it's signed by Alcalde and Schianchi and

9  Pavanelli?

10  A.   Undated signatures.  It looks like it was May 28th that

11  they started representing them.

12      So -- Okay.  Early June.  May 28th.  Who am I -- I'm not

13  going to argue with you over a couple of weeks.

14  Q.   Let's look at the first page of the document.

15      All right.  You see it's dated April 23, 2004?

16  A.   Yes.

17  Q.   Are you saying that the work for Gruppo Triad didn't

18  begin until May?  Is that your testimony?

19  A.   Well, if you look at this, they reached agreement on

20  this letter that was originally sent to Pavanelli on May 28th.

21  That's what it says.  That's when they signed it.

22  Q.   And you had offices at CBJ at this time, right?

23  A.   I had an office on one of their floors, yeah.

24  Q.   All right.  We'll take a look at another document here

25  in just a moment.

1          Let's look at D-800.  You were here when Mr. Alcalde

2    testified and we went through the various CBJ time entries that

3    lawyers keep, right?

4     A.    Yeah.

5     Q.    Okay.  Let's look at D-800 and the page within it that

6    has the trial exhibit number at the bottom 09736.

7     A.    Yes.

8          MR. ELLIOTT:  Your Honor, could we have some

9    foundation for whether this witness has ever seen this document

10   before?

11         THE COURT:  First of all, we've heard testimony from

12   Mr. Alcalde.  So I am familiar with the billing records.  The

13   billing records have very specific dates of services on them.

14   It's very easy to track when the services were performed, when

15   the services ended.

16         If he knows, we can go further; but, if he doesn't know,

17   then I think we're at an impasse.

18         MR. SCHWARTZ:  See if this refreshes his recollection,

19   because -- I don't think this is controversial.

20    BY MR. SCHWARTZ:

21    Q.    Take a look at the first time entry.

22         THE COURT:  Again, this is a bill to Gruppo Triad, as

23   I understand?

24         MR. SCHWARTZ:  Well, it's a little different than

25   that.  If you look at the -- It is and it isn't.

1          Take a look at -- Let's go back, please, to page, trial

2     exhibit page, 09735.

3     BY MR. SCHWARTZ:

4     Q.    So this is a pre-bill statement, Mr. Richards, as Mr.

5     Alcalde clarified.  And the client is Gruppo Triad S.P.A., in

6     care of Skye Ventures, to Bentgrass Drive, Sarasota, Florida.

7          Did you have a home or office there at that time?

8     A.    Did I have a home in Bentgrass on -- in Sarasota,

9     Florida?  When was this?  2004?

10         I think I did, yes.

11    Q.    So now let's take a look just at the first time entry.

12    I don't think we really need to spend a lot of time on this.

13         So, the first time entry you'll see here, Mr. Richards,

14    actually precedes the date of the engagement letter by roughly

15    eight days, right?

16    A.    The -- Again, I'd said the date of the engagement letter

17    was in May.  But I understand what you're saying:  That the top

18    date of the letter was '4.  So, just to refresh the way it is

19    in my mind, there was a letter sent to Pavanelli, regarding his

20    representation, at the end of April.  He signed it in May -- at

21    the end of May.

22         This date is April 15th.  These are all things you've

23    shown me here.

24         So, yes, that's the -- that's the consecutive.

25    Q.    And look at what Mr. Alcalde did the first day he began

1  working for Gruppo Triad.  He had a discussion with somebody

2  named Schiavoni.  Maybe that's Schianchi.  He talked to Jacir

3  about going to Caracas.  And then he talked to you, right?

4  A.   So, your predecessor -- the prelude to your comment was,

5  this was the date he was working for Gruppo Triad.

6      My understanding of his testimony about this document

7  which is not my document, was that the fact that Gruppo Triad

8  was on the top there was not a meaningful thing to him, because

9  he was working for me at the time, which he was.

10     So, again, it's not my record.  I don't know.

11     Certainly he said he did this on 4-15, well before these

12  other documents are dated.

13  Q.   And you know that it was at the end of July 31st -- at

14  the end of July, after the failed Como trip, that CBJ fired

15  Gruppo Triad, right?

16  A.   Yeah.

17  Q.   I can show you the letter.

18  A.   It was after the Como trip that it came to -- this

19  difficulty they were having came to a culmination.

20  Q.   And it was at the end of July -- specifically, I think,

21  July 30th -- that that CBJ termination letter was sent, right?

22  A.   I don't recall the date of the letter, but I know it was

23  all over but the shouting in Como.  So --

24  Q.   I just want to ask one followup question regarding the

25  London conviction.

1    Judge Sargus asked and there was some colloquy with Mr.

2   Lucas about how difficult it would be to obtain a copy of that

3   conviction document.  Did you ever specifically ask Pavanelli

4   to provide it to you?

5   A.   I might have.

6   Q.   What did he say?

7   A.   I don't remember.

8   Q.   Did you ask anybody else for a copy of it?

9   A.   I might have.  I don't remember.  But, again, we were,

10  not to -- I know -- we were not trying to redo the

11  investigation.  And, obviously, Venezuela knew of the

12  conviction when they made the ruling.  So -- I think that's the

13  way we looked at it.

14       MR. SCHWARTZ:  All right.  One second, please, Your

15  Honor.

16    (Whereupon, there was a brief pause in the proceedings.)

17  BY MR. SCHWARTZ:

18  Q.   Now, Mr. Richards, we've been over this, and you've

19  covered it now with Mr. Elliott this morning, but I'm going to

20  touch one more time on the waterfall issue.

21       So, the waterfall that's attached, or included, within

22  the June 23rd agreement has the $10 million -- slightly less

23  than $10 million amount going to Skye Ventures, right?

24  A.   I remember it as the 30-10-60 sort of waterfall.

25  Q.   Thirty for the lawyers, ten for you, sixty for Gruppo

1   Triad?

2      A.   In that order prioritized.

3      Q.   And you confirmed this morning, again, that the version

4   of the waterfall included within D-521, the April 8th, 2004,

5   agreement, is the version that existed in December, right?

6      A.   I -- As I testified in my deposition, I believe that's

7   the version from December '04 or January of '05.

8      Q.   And the only money you paid to Gruppo Triad between June

9   23rd, in 2004, and late July or early August 2004 was the

10   roughly $30,000 you paid to transport the two purported notes

11   from Italy or Switzerland to Columbus, right?

12      A.   I'm pretty sure that's not correct.  I think I sent them

13   some money between that time frame and the end of the year.

14   But I don't recall the times and specific amounts.

15      Q.   So you don't know, one way or the other, correct?

16      A.   I'm just telling you my best recollection is there was

17   money sent.

18      Q.   You don't have any other version of the $39 million

19   waterfall available to you other than the one that's embedded

20   in D-521, this form of April 8th agreement with the December

21   waterfall in it, right?

22      A.   That's right.

23      Q.   Now, looking at D-521, your testimony is that the form

24   of the document was created in April 2004, right?

25      A.   Yes.

1   Q.   But it was not --

2   A.   That's the first one.

3   Q.   But it was not signed, at least by you, until August

4   2004, right?

5   A.   I think what I said was I don't think I signed it

6   or -- What I think the question was was the document -- I

7   signed -- I signed this document that we have in December.

8   That's when I signed this one.  The document that Pavanelli

9   sent back in April I didn't sign.  I think that's what I

10  specifically testified.  And I think I said that, in August.

11  I'm using my best recollection.

12  Q.   And take a look at Section 2.5 of D-521.

13       So, this says --

14  A.   Yes.

15  Q.   -- Skye will execute the promissory note for $39 million

16  as per Exhibit A, right?

17  A.   Yes.

18  Q.   But we know from your testimony there was no $39 million

19  promissory note in contemplation as of April 8th, 2004, right?

20  A.   I don't think so, no; or it might have been

21  contemplated, but it wasn't executed.  I just don't remember.

22  Q.   And, in fact, on June 23, 2004, you had what you called

23  the 30-10-60 waterfall, right?

24  A.   That was in existence at the time, yes.

25  Q.   So, this April 8th, 2004, document that is D-521, this

1   couldn't have been prepared in April.

2     A.    It could have been.  It could have been abandoned.  So,

3   you know, we didn't follow through on this agreement.  We could

4   have contemplated a 39-million-dollar promissory note then, but

5   not executed it.  And then, in this continual back-and-forth

6   with Pavanelli, we arrived at this situation where they hired

7   Crabbe Brown.

8         So, it's true that at the time Crabbe Brown took them

9   over, I had about $10 million of deeds in trust.  That doesn't

10  mean that back in April we hadn't contemplated paying with a

11  non-recourse promissory note.  In fact, I was trying to get

12  him -- I told him that he should give me the note without

13  consideration.  He wouldn't do that, but --

14    Q.    That raises an interesting question.  How much did you

15  pay for 9/12?

16    A.    We added to the pot.  We viewed it more as just our

17  original investment.  So --

18    Q.    What does that mean?

19    A.    So, he had asked for money.  We gave him money.  And we

20  insisted that he transfer the note to us in June of '06 as part

21  of everything.

22    Q.    June of '05?

23    A.    Or June of '05, yeah.  Sorry.

24    Q.    How much did you pay for 9/12?

25    A.    Again, I -- I viewed it as giving Pavanelli money and

1    trying to get everything I could:  Concessions.  We got 9/12.

2    We got other things, too.

3        Q.    How much money did you pay for 9/12?

4        A.    I don't remember.

5        Q.    Now, are you trying to suggest that you drafted an

6    agreement in April; you put the 39-million-dollar waterfall in

7    it; then you did one and signed it in June, and you had the

8    30-10-60; then you abandoned June, and you went back to the 39?

9        A.    I'm saying that that certainly is not outside the realm

10   of possibility.

11       Q.    But wasn't the idea that, as you kept feeding money to

12   Pavanelli, you would dilute his interest in the waterfall?

13       A.    Yes.

14       Q.    So when you're saying that, April 8th, you had the 39

15   and then -- What?  He gave you the money back, so when you got

16   to the June agreement, it was more favorable to him?

17       A.    Again, this was an uncompleted negotiation.  Maybe --

18   I'm saying maybe I suggested an agreement.  I'm not saying that

19   I did, but I'm saying it's possible.  You said, is it

20   impossible.  And I said, no, it's not impossible.

21       Q.    But certainly Pavanelli didn't pay you any money back

22   between April 8th and June 23rd, 2004, right?

23       A.    Well, no.  He would always -- wanted more money.

24       Q.    And the progression of the waterfall, consistent with

25   your strategic vision, was always to make it more favorable to

1    you as you gave more money to Pavanelli, right?

2    A.    Yes.

3    Q.    So, if that's the case, there's no way in the world it

4    could have started at 39, reduced to what you'd call the

5    30-10-60 formula, and then gone back up to 39.  That's

6    impossible, isn't it?

7    A.    You never dealt with this guy.  He was impossible.  So

8    things went back and forth with the guy.  He changed his mind.

9    So -- What I testified to is, that was the agreement in

10   December for sure.

11   Q.    Money didn't go back and forth.  Money only went in one

12   direction.  Right?

13   A.    Yeah.  That's true.

14        MR. SCHWARTZ:  One moment, please, Your Honor.

15     (Whereupon, there was a brief interruption.)

16   BY MR. SCHWARTZ:

17   Q.    So you were asked some questions by Mr. Elliott

18   concerning whether you discovered if Corna or Delgado were

19   involved in any way in connection with the Ministry of Finance

20   investigation, right?

21   A.    I recall that.

22   Q.    You never made any effort to find out if they did

23   participate in any way in that, did you?

24   A.    We never learned that -- The question was, they never

25   learned -- we never learned if they were.  And --

1    Q.    That's because you never looked, right?

2    A.    We didn't redo the Attorney General's investigation.  We

3    never became aware that -- I think it would be absurd if Larry

4    Corna participated in that investigation.

5    Q.    However absurd it may be, you made no effort to

6    determine if either --

7         THE COURT:  Wait.  Let's strike that comment.  All

8    right?  You're describing the testimony as absurd.  We know

9    that's improper.  Rephrase the question.

10         MR. SCHWARTZ:  I'm sorry, Your Honor.  I thought he

11    said it would be absurd.

12         THE COURT:  Go ahead.

13         MR. SCHWARTZ:  I didn't mean to say the testimony was

14    absurd.  I'll rephrase, though.

15         THE COURT:  Okay.

16    BY MR. SCHWARTZ:

17    Q.    Regardless of how you would assess the likelihood of

18    Larry Corna being involved in anything, you never made any

19    effort in your due diligence to find out if either Larry Corna

20    or Carlos Delgado Morean had any involvement in the Ministry of

21    Finance investigation other than learning that Delgado had

22    inspected the notes in Switzerland, right?

23    A.    Delgado read the entire report, and that's the only

24    thing that came up.

25    Q.    And, setting aside the report, which I know Alcalde has

1  testified he read, independent of that, as far as you're aware,

2  neither you, nor Alcalde, made any effort to investigate

3  whether Delgado or Corna had any involvement in the Ministry of

4  Finance investigation, right?

5    A.   Yeah.  I don't -- I think that's accurate.  It wouldn't

6  have occurred to me.

7         MR. SCHWARTZ:  Just one moment, please, Your Honor.

8  We're just looking for one exhibit.

9     (Whereupon, there was a brief interruption.)

10  BY MR. SCHWARTZ:

11    Q.   Mr. Richards, I'd like to direct your attention to

12  D-576.  Mr. Elliott asked you some questions about this.  We

13  can just put it up quickly.  You'll remember this one.

14         This is the document with Pavanelli's answers to --

15    A.   Yeah.  I remember that.

16    Q.   -- certain questions, right?

17    A.   Yes.

18    Q.   And you were asked some questions about whether you were

19  aware of any documents that Skye no longer has and whether any

20  of those are unavailable from other sources, right?

21    A.   I -- I don't --

22    Q.   I could ask that question better.

23         You were asked some questions concerning destruction of

24  documents by Skye Ventures, right?

25    A.   Yeah, I think so.  Sure.

1    Q.    And Mr. Elliott asked you whether you were aware of any

2    documents that Skye had either lost or discarded or destroyed

3    that are not available somewhere else, right?

4    A.    I think he asked destroyed, do we destroy any documents,

5    or -- That's, as I recall, what he asked me.

6    Q.    And the point of the question, not to put words in

7    opposing counsel's mouth, was, even if you no longer had the

8    documents, somebody else might still have them, right?

9    A.    Of course.  I --

10    Q.    For example, we've seen documents that Larry Corna, of

11    all people, managed to retain that were e-mail exchanges with

12    you that he managed to have but, for whatever reason, you don't

13    have, right?

14    A.    Yes.

15    Q.    Now, with regard to this D-576 document, you've

16    testified that this entire exchange of information here between

17    you and Pavanelli was done at the behest of the analysts at

18    Libra, right?

19    A.    Yeah.  Yes.

20    Q.    And, once you received this information from Pavanelli,

21    you must have passed it along to Libra, right?

22    A.    I probably would have passed it along to Gary Post, who

23    was dealing directly with Libra.

24    Q.    All right.  You don't have any document in this case

25    reflecting your transmitting this information to Gary Post or

1    anyone else, do you?

2      A.   If I did that, I obviously -- If I had it, I've given it

3    to my attorneys.  And, if they decided to produce it, they did.

4      Q.   You're not aware of -- You haven't seen, in the course

5    of this entire case, going back to 2004, have you, any document

6    having been produced showing what you did with D-576 after you

7    received it from Pavanelli, have you?

8      A.   I'm sorry.  Maybe I'm missing your question.

9      Q.   Have you ever seen any document showing what, if

10   anything, you did after you received D-576 from Pavanelli?

11     A.   What I did with the stuff that he sent me here?

12     Q.   Yes.  Pavanelli sent you a fax, which is D-576, right?

13   Your testimony is that you were gathering this information not

14   for yourself but for Libra, right?

15     A.   Or for Gary Post, who was working with Libra.

16     Q.   And whether it was Post or Libra or both of them, after

17   you got this fax from Pavanelli, you must have sent this

18   information along to Post or Libra, right?

19     A.   I probably did, yeah.

20        MR. ELLIOTT:  Your Honor, the testimony has been that

21   the notes that were made on this were made on a phone call with

22   the Libra analysts at the time.  So --

23        THE COURT:  Was this document used in redirect?

24        MR. ELLIOTT:  It was, Your Honor.

25        THE COURT:  All right.

1    MR. ELLIOTT:  For purposes of asking the question,

2    there are some answers in typewritten.  Whether he'd seen a

3    document with questions on it and his answer was no, my only

4    point is that, the question that he's now guessing about what,

5    the testimony earlier in the case was that this document

6    was during a phone conversation.

7    THE COURT:  I'll let the witness clear it up.

8    MR. SCHWARTZ:  All right.  I think what Mr. Elliott

9    just said is in part true, but it's a combined document.  It's

10   written, and there is handwritten notes.  So I'll try to make

11   it clearer, if I can, for the witness.

12   THE COURT:  All right.

13   BY MR. SCHWARTZ:

14   Q.   So the fax Pavanelli sent to you, you've testified, was

15   not really because you were interested in this subject matter,

16   but because Libra was, right?

17   A.   I -- I think that's close to what I said.  But what I

18   think I said is a part of this exchange we had about the Libra

19   analysts wanting a bunch of detailed information, and I think

20   that's how this came around.  We kept -- I assume that we

21   produced this document, we kept this.  And so -- And this is my

22   handwriting.

23   Q.   The flow of information was as follows.  Let me know if

24   I have this right.  Libra wanted information, right?

25   A.   Yes, that's true.

1    Q.    For whatever reason, Pavanelli sent the information not

2    to Libra, but to you, in D-576, right?

3    A.    Yes.  Probably the request came to me either in written

4    form or verbal form.

5    Q.    And you don't have anything from Libra reflecting

6    questions that Libra had to be asked of Pavanelli, right?

7    A.    Well, I do.  These are the questions they were asking

8    right here.

9    Q.    These are the answers.

10    A.    No.  They're the questions.

11          Oh!  Yeah, you're right, exactly.  Sorry.  Yeah.

12    Q.    So you don't have any document reflecting Libra's or

13    Post's questions, right?

14    A.    Correct.

15    Q.    And --

16    A.    If there were questions, right?

17          So, looking at this again -- If you look at it again, it

18    has -- it has three topics and some numbers in there.

19          You're saying it indicates there were questions of those

20    numbers.  Maybe there were, maybe there weren't.  Maybe this is

21    a list of things that Pavanelli was answering.

22          But, again, I'm looking at it sideways here and kind of

23    forgetting what we testified.

24          So, let's assume there were questions.  And do I have

25    those questions?  If my attorneys have them and produced them

1  to you or didn't produce them to you, I don't know.

2    Q.   Well, I'm going to represent to you they haven't, and

3  they can correct me if I'm wrong.

4    A.   Okay.

5    Q.   And there is no document, of which you're aware,

6  reflecting any transmittal of this Pavanelli fax by you to

7  anybody else, correct?

8    A.   That's right.  I don't -- If we haven't produced it -- I

9  don't say there is no document.  I don't know of any.  And, if

10  I had one, I would have given it to put it in the Crabbe Brown

11  file long, long ago.

12   Q.   Now, you've tried to minimize the significance -- Well,

13  let me approach this differently.

14        You characterized the dispute between Corna and

15  Pavanelli over the Christmas Eve Western Union money transfers

16  as a sideshow, right?

17   A.   That's what it was.  That's what it was in my view, yes.

18   Q.   It was your money, right, your cash?

19   A.   It was my money that I was going to send to Gruppo, for

20  which I expected to receive something, which I received.  So it

21  wasn't my issue.  It was more -- As it worked out, I think they

22  agreed that Larry was entitled to something, and I got what I

23  had paid for.  I believe that was the resolution.

24   Q.   Now, you were also asked some questions about

25  Plaintiff's Exhibit 115, Mr. Kennedy's e-mail to the Ministry

1   of Finance?

2   A.   Yes.  I was asked about my recollection of that.

3   Q.   And I just want to clarify one thing.

4        Prior to the time you obtained Notes 7/12 and 8/12, you

5   were aware that the Ministry of Finance had issued a public

6   statement on October 31st, 2003, indicating that it was not

7   going to pay anything on Gruppo Triad's purported notes, right?

8   A.   I don't think I was aware of that, no.

9   Q.   And you heard Alcalde testify that he was aware, right?

10  A.   You said on Gruppo Triad's notes.  I think what Alcalde

11  said was he was aware that the Ministry of Finance had put this

12  announcement out.  It was the same as an earlier one they'd put

13  out.  There was no specific reference to Gruppo Triad or its

14  notes.

15       This was -- This was a notice that was on their website

16  both before and after the Attorney General's decision.  That's

17  what I think he testified to.

18  Q.   And it was republished on Friday, October 31, 2003,

19  right?

20  A.   I don't recall that date, but I'll take your word for

21  it.

22  Q.   Well, you can --

23  A.   I think Alcalde testified he saw it for the first time

24  in February.

25  Q.   Well, it would appear from this e-mail that Mr. Kennedy

1    sent, on which you were copied, that at least Mr. Kennedy was

2    aware of it as of November 3, 2003.

3    A.   I don't take that from that at all.

4    Q.   Well, you don't deny that you received Mr. Kennedy's

5    e-mail on November 3, 2003, do you?

6    A.   So, the confusion, I think, is I believe Mr. Kennedy is

7    referring to something in the body of the article of October

8    31st in which it says the Ministry of Finance was going to swap

9    the bonds.  That's what I think he was referring to.

10   Q.   Let's look at his first sentence.  He writes to someone

11   named Melendez at the Ministry of Finance.  And he says -- It's

12   on Monday, October 3, 2003, right?

13   A.   Yes.

14   Q.   Eleven o'clock at night, right?

15   A.   Yes.

16   Q.   And he says:  "Dear sir:  Our law firm in the United

17   States has been retained to do due diligence on the Minister of

18   Finance's recent public announcement (Friday Oct 31 2003)

19   regarding the legitimacy of certain bonds."  Right?

20   A.   You're reading accurately, yes.

21   Q.   And you received a copy of this, right?

22   A.   I did.

23   Q.   Do you have any doubt that Mr. Kennedy was aware, by

24   November 3, 2003, that the Ministry of Finance had issued this

25   public announcement?

1    A.   Mr. Kennedy doesn't read Spanish.  Mr. Kennedy read this

2    article.  So, my view is, of the thing, is that he's referring

3    to something that occurred on Friday, October 31, 2003.  And I

4    think it's this article in which it says that the Minister of

5    Finance is going to do a bond swap.  That's what I read it as.

6    You disagree with me.  Okay.

7    Q.   I'll talk to Mr. Kennedy in a couple of weeks.

8    A.   Yeah.  That's probably the best thing.

9         MR. SCHWARTZ:  Just one second, please.

10   BY MR. SCHWARTZ:

11   Q.   You were asked about Antonio Usuelli's involvement with

12   Gruppo Triad, right?

13   A.   I was asked if I knew if he was an employee of Gruppo

14   Triad, and I said I didn't think that was the case.  I thought

15   he was an investor.  That's what I was asked.

16   Q.   Your initial contact to these purported financial

17   instruments came from Mr. Corna, right?  We know that?

18   A.   I don't know what you want to call contact, but I first

19   heard about this -- and I said in a very, like, disjointed

20   general way -- from Mr. Corna.

21   Q.   But, soon thereafter, you were in contact with

22   Mr. Usuelli, right?

23   A.   Yes.  I spoke to Marvin Kantor about this fella named

24   Usuelli, and I met Usuelli on the phone.

25   Q.   Once you wanted to get serious about your initial due

1    diligence, you started dealing with Mr. Usuelli, not Larry

2    Corna, right?

3    A.    I would say before that, because I wasn't serious, based

4    on what I, you know -- It wasn't that I got serious about it

5    and then I went to talk to Usuelli.  It was the concept of

6    talking to Kantor and Usuelli to see if there was really

7    anything interesting there at all.

8    Q.    But, pretty quickly, Mr. Usuelli became one of your

9    primary sources of information, right?

10   A.    I talked to him before the Attorney General's decision,

11   and then I began talking to him about it shortly after, yes.

12   Q.    And, when you started getting your deeds of trust, it

13   was Usuelli who explained to you how those instruments worked,

14   right?

15   A.    Yes.  I believe -- you know, I might have had another

16   source as well.  But, certainly, he -- he is a lawyer, and

17   Uschianchi (sic) helped me understand that.

18   Q.    And, unlike Schianchi, Usuelli spoke English.  So it was

19   easy to communicate with him, right?

20   A.    Yeah.  I didn't have to go down to Bob Behal's office

21   and impose upon him to speak to Schianchi.  It was easier.

22   Q.    And when you went to Como in early April of 2004 to

23   negotiate the deal, among the people you met with was Usuelli,

24   right?

25   A.    Correct.

1    Q.    And, over the period of time from Larry Corna showing up

2    on your doorstep in August 2003 and your getting the two

3    purported promissory notes in August 2004, you exchanged

4    numerous emails with Mr. Usuelli about those purported notes,

5    right?

6    A.    Well, I exchanged numerous e-mails with Usuelli about

7    this matter, for sure.

8    Q.    And we've looked at some of those e-mails during the

9    course of the last couple of days, right?

10   A.    Yes.

11   Q.    And we've seen that Usuelli provided you with periodic

12   updates on various matters concerning Pavanelli, right?

13   A.    I recall two of them.  There may have been more.

14   Q.    And they're updates on matters concerning Gruppo Triad's

15   efforts to find some way to reach a liquidity event with regard

16   to the purported notes, right?

17   A.    I said I recall two of them.  I should say you showed me

18   two of them, and they are -- they say what they say they say,

19   of course.

20   Q.    And Usuelli kept you apprised of Delgado's efforts as

21   well, right?

22   A.    In those two communications, he mentioned that Delgado

23   was bringing their -- a man named "Delgado" was bringing an

24   investment banking firm, who was interested in purchasing the

25   notes, and that that might close.

1    Q.    And those two e-mails weren't the only interactions you

2    had with Usuelli between August of 2003 and August of 2004,

3    right?

4    A.    No.

5         MR. SCHWARTZ:  One second, please.  Let's mark D-673.

6    This one may be among the ones that we've reached agreement as

7    to authenticity over, but let's look at this one.

8         COURTROOM DEPUTY CLERK:  D-673.

9         MR. ELLIOTT:  Your Honor, I will note that -- Again, I

10   don't know where he's going with this, but this is not a

11   document that I redirected Mr. Richards on.  And it's not going

12   to be my opportunity to stand up and start asking him questions

13   about unrelated areas.

14        THE COURT:  I don't recall this document being used in

15   the redirect.  Where are we going with this, and why would this

16   be within the scope of recross?

17        MR. SCHWARTZ:  It was not used on redirect.  This

18   document shows the extent of Usuelli's involvement.  There was

19   an attempt on redirect to limit the extent of his -- role of

20   the Gruppo Triad and --

21        THE COURT:  If it goes to that narrow issue, I'll

22   permit it.

23        MR. SCHWARTZ:  That's it.

24   BY MR. SCHWARTZ:

25   Q.    So, I'm showing you D-673, Mr. Richards.

1    A.    I'm sorry?  Defendant's 673?  Yes.

2    Q.    Yes.  Do you have that?

3    A.    I do.

4    Q.    What's this?

5    A.    This is -- We had gone -- okay.  It's called Escrow

6    Agreement Amendment.  That's what it is.

7    Q.    What's the function of this document?

8    A.    I think it's designed to modify the escrow agreement.

9    Or the function of the escrow agreement was to, as I think we

10   discussed a number of times -- Well, one of the purposes of it

11   was to describe how -- when the escrow agreement -- when the

12   escrow agent received the proceeds from the Bandagro notes

13   payment, how he would distribute them.

14   Q.    Do you see that Mr. Usuelli is a party to this December

15   20th, 2005, agreement?

16   A.    I don't.  Maybe you could point me to it.

17   Q.    First paragraph.

18   A.    First paragraph?  "Whereas," do you mean?

19   Q.    No, no, even prior to that:  This escrow agreement is

20   entered into effective the 20 day of December 2005 by and

21   between Skye Ventures, Antonio Usuelli, Gruppo Triad and

22   Crabbe, Brown and James, right?

23   A.    It says that, yes.  He doesn't sign it, but it says

24   that.  But, again, ultimately, he became -- sorry.  No

25   question.

1    Q.   And take a look, if you would, very briefly, at D-730.

2    A.   I don't need this document any longer, 673?

3    Q.   I don't think you'll need 673.

4         COURTROOM DEPUTY CLERK:  D-730.

5         MR. SCHWARTZ:  And I'm not going to have many

6    questions about D-730, either.

7         This is another one of the series of agreements, Your

8    Honor, where there has been now a stipulation as to

9    authenticity.

10   BY MR. SCHWARTZ:

11   Q.   So, I'm just going to direct your attention to the Bates

12   stamp page SKYE004479.

13   A.   Say the number again.  D what?

14   Q.   It's D-730, and the page is SKYE004479.

15   A.   4479.  Okay.  Yes.

16   Q.   And this is the last of the various agreements that you

17   entered into with Gruppo Triad that completed the series of

18   transactions that concerned various rights to distribution from

19   any litigation proceeds, right?

20   A.   This reflects, I think, the -- Let me just check.  I

21   told you that I didn't quite remember exactly when the last

22   amendment was, but this has a date of January 10, and it is a

23   modification to the waterfall.  So I -- I'll take your word for

24   it that this was the last time that it was done.  I don't

25   dispute it, but --

1    Q.   And take a look, now, at page 004479.

2    A.   4479, yes.

3    Q.   You'll see that this document was dated November 9,

4    2009, by the Gruppo Triad signatories, even though it bears an

5    effective day of the 1st of January of 2010, right?

6    A.   Yes.

7    Q.   And, for some reason, even though Pavanelli was still

8    alive at this time, he's not signing this for Gruppo Triad,

9    right?

10   A.   Well, I think I told you I stopped dealing with

11   Pavanelli at some point.  This is obviously -- and I began

12   dealing with Schianchi.  And this probably was at that point.

13   Schianchi was executing documents for Gruppo.

14   Q.   All right.  My point is simply Pavanelli is not a

15   signatory here on page 4479, right?

16   A.   That's accurate.

17   Q.   And the people that signed for Gruppo Triad are

18   Schianchi, right, --

19   A.   Hold on.  Yes.

20   Q.   Twice, right?

21   A.   Yep.

22   Q.   And --

23   A.   Once as General Counsel of Gruppo, an authorized agent.

24   The other is individually.

25   Q.   And then you'll see that the person who authorized this

1  signature was Usuelli, right?  I shouldn't say "authorized."

2  Attested to his signature, or witnessed it, was Usuelli?

3     A.   Yes, Usuelli.  It looks like his -- I cannot say that I

4  noticed that when I looked at it earlier.  It looks like "A.

5  Usuelli," yeah.

6     Q.   If you take a look at page 4480, it's even clearer

7  print.

8     A.   Yeah.  Okay.

9     Q.   It says signature of Siro Schianchi.  It looks like

10 witnessed by Antonio Usuelli on November 9, 2009, right?

11    A.   Yes.

12    Q.   That's all I have for you on D-730.

13         MR. SCHWARTZ:  Bear with me, Your Honor.  I may not

14 have anything else here.

15         (Whereupon, there was a brief interruption.)

16         MR. SCHWARTZ:  Those are all our questions, Your

17 Honor, on recross.

18         THE COURT:  Thank you.

19         I left open the possibility of redirect.  Are you

20 satisfied?

21         MR. ELLIOTT:  Yes, I am, Your Honor.

22         THE COURT:  All right.

23         Mr. Richards, thank you.  You may step down.

24         THE WITNESS:  I apologize for my brief outburst.  It's

25 not like me.

1      THE COURT:  No, not necessary, but thank you.  Step

2  down.

3      Counsel, before we break for lunch, I understand that

4  we're going to have a bit of a gap here in witnesses, until

5  Monday morning, with interpreter issues?

6      MR. C. COOPER:  Unfortunately, Your Honor.  We tried

7  to avoid that, but --

8      THE COURT:  I would like to make use of the afternoon.

9  You had mentioned that we could perhaps address some deposition

10  designations.  What do you propose?

11      MR. C. COOPER:  Your Honor, whatever would be most

12  useful to the Court as the trier of fact.  Our thought might be

13  to identify certain designations that bear on issues that the

14  Court has heard about so far.

15      THE COURT:  All right.  And we'll be doing that

16  primarily, or exclusively, with the Plaintiff's witnesses at

17  this point?

18      MR. C. COOPER:  I believe so.

19      THE COURT:  And, Mr. Schwartz, I'll give you an

20  opportunity, when you're in your case in chief, or now, if you

21  would like, when we come back this afternoon; but it would be

22  helpful.

23      There are going to be a number of depositions.  And

24  having you cue me into some of the parts of the testimony you

25  think bear on what I just heard would be helpful.

1        So, we'll be in recess.  Why don't we take a little bit

2   longer lunch hour since we have a break here.

3        I'll see you back here at 1:30.

4      (A recess was taken at 12:00 p.m.)

1    Friday Afternoon Session,

2    February 5, 2016.

3    1:30 p.m.

4              - - -

5         THE COURT:  So, Mr. Cooper, you had mentioned we would

6    take up some issues of depositions.  What would you propose?

7         MR. C. COOPER:  Yes, Your Honor.  With the Court's

8    permission, I guess what the plaintiffs would propose is that

9    we begin by simply entering into the record some admissions

10   that were request for admission and one interrogatory response

11   followed by some deposition designations.  There are certainly

12   -- They are not all the plaintiff's designations, but what we

13   tried to do is identify the issues that I believe the Court has

14   heard something about and identified designations that we

15   believe go to those issues --

16        THE COURT:  All right.

17        MR. C. COOPER:  -- to create some additional

18   framework --

19        THE COURT:  That would be helpful.  Thank you.

20        MR. C. COOPER:  I have copies of how we kind of

21   aggregated testimony and also the admissions.  If the Court

22   would find it helpful --

23        THE COURT:  All right.

24        MR. C. COOPER:  -- we will certainly be happy to do

25   that or put it on the screen or whatever the Court would

1  prefer.

2        THE COURT:  You can do both, but the paper copy would

3  probably be a little bit better.  Thank you.

4        MR. C. COOPER:  I don't know if the Court would like

5  the plaintiff to describe how they believe -- what they believe

6  the significance is for the Court's benefit or the Court ---

7        THE COURT:  Well, let me ask Mr. Schwartz, if we did

8  that, I would want to give you a chance to respond.  Do you

9  feel you're prepared to do that?

10        MR. SCHWARTZ:  I'm not sure.  I'm going to have to see

11  what Mr. Cooper has in mind --

12        THE COURT:  What would be helpful to me is if you

13  would tell me how this ties into the case.  I, obviously, want

14  to hear from Mr. Schwartz as well.  Let's start with that.  And

15  if you think you need additional time, we'll discuss a

16  different procedure.

17        MR. SCHWARTZ:  That's fine.

18        THE COURT:  All right.

19        MR. C. COOPER:  So, Your Honor, with respect to the

20  first admission that we have identified, the Court has heard a

21  little bit of testimony and will hear some more about the

22  Ministry of Finance backing away from its August 8, 2003,

23  report and the conclusions it reached in there.

24        And I believe there has been a little bit of

25  testimony, and there will certainly be some more with the very

1  next witness next week, about the Ministry of Finance issuing

2  what is dated as a November 17, 2003, report that then becomes,

3  supposedly, the genesis for the Attorney General issuing a

4  December, 2003, opinion.

5      The November 17, 2003, Ministry report authored by a

6  Mr. Guzman's replacement, Ms. Ludmila Soto, identifies the

7  reasons why the Ministry says it is changing its opinion.  The

8  reason articulated, the primary reason, is a 1998 judicial --

9  or graphotechnical report, they call it an expertise, that was

10  conducted in Switzerland, again in 1998.  This first admission

11  goes to the issue of whether or not notes that were the subject

12  of that 1998 graphotechnical inspection or expertise in

13  Switzerland were Skye's notes because --

14      THE COURT:  So this is -- Where does that come from,

15  that language?

16      MR. C. COOPER:  I'm sorry, that's purely my language,

17  Your Honor.

18      THE COURT:  So, in other words, this would be, the

19  request for admissions, Request For Admission No. 2, and then

20  we have the response to it.

21      MR. C. COOPER:  Yes.

22      THE COURT:  And the response, of course, is from the

23  defendant?

24      MR. C. COOPER:  It is.  And we have identified these

25  requests, the responses to the request for admissions, as a

1  plaintiff's exhibit.

2          THE COURT:  Thank you.

3          MR. C. COOPER:  Adam, what exhibit number are the

4  responses?

5          MR. RICHARDS:  The judge has it right now.  It's 222.

6          MR. C. COOPER:  So Plaintiff's Exhibit 222 are the

7  defendant's amended and restated responses and objections to

8  plaintiff's requests for admissions.  And those amended and

9  restated responses and objections were served February 12,

10  2015.

11          THE COURT:  So tell me if this is what you're

12  submitting this for.  As far as I read this, the two notes at

13  issue in this case from the request for admission and response

14  does not appear to be anything that the 1998 inspection would

15  have covered?

16          MR. C. COOPER:  Exactly, Your Honor.

17          THE COURT:  All right.

18          MR. SCHWARTZ:  Your Honor, this I am prepared to

19  address.

20          THE COURT:  And do you -- Well, we can take -- Are you

21  completed with what you see as a relevance of the first part?

22  We can take these one at a time.

23          MR. C. COOPER:  With respect to this first one, yes.

24          THE COURT:  Let me hear then from Mr. Schwartz.

25          MR. SCHWARTZ:  All right.  So with regard to the 1998

1    inspection that is the subject of this Request For Admission

2    No. 2 and the rationale for its admission, Mr. Cooper made

3    reference to the Ministry of Finance report from November 17 of

4    2003, prepared by Ludmila Soto and has taken a position as to

5    the grounds upon which that report relied in finding --

6            THE COURT:  In fact, let me stop you for a second.  I

7    know we are going to get into a big debate about the 2003

8    report.  But the 1998 report, I'm not as familiar with.  Right

9    now we're just excluding these notes from that report.  Would

10   that be -- Do you disagree or agree?

11           MR. SCHWARTZ:  It's a little more complex but not much

12   more than that.

13           THE COURT:  All right.

14           MR. SCHWARTZ:  There's various reports and opinions.

15   Mr. Cooper will correct me if I am mistaken, but there's no

16   question that the Ministry of Finance issued a second report on

17   November 17, 2003.  I don't believe that's a disputed fact.

18           THE COURT:  All right.  And that's not referenced

19   directly in this first request for admission and response.  But

20   what I think this is doing -- Tell me if you disagree just so

21   I'm clear on this -- that as far as the two notes go, the 1998

22   report is not going to be particularly helpful?  At least as

23   far as these two notes.  There may be some other things in it.

24           MR. SCHWARTZ:  Here's why this is being introduced,

25   and I don't think this is going to be highly controversial.

1   What happened in 1998 was there was someone who had notes 7/12

2   and 8/12, the same designation as the notes at issue in this

3   case.  Those were inspected -- and you'll have testimony from

4   one of our witnesses about this -- those were inspected in

5   Switzerland and deemed to be counterfeit.  It's a different set

6   of 7/12 and 8/12.

7           When the November 17 --

8           THE COURT:  That is consistent with what Mr. Cooper

9   told me so far.

10          MR. SCHWARTZ:  I don't think this is disputed.

11          THE COURT:  All right.

12          MR. SCHWARTZ:  What is disputed, however, is the

13  characterization of the November 17, 2000, report and the

14  extent to which it places reliance on this particular fact.

15  And you will read the November 17 --

16          THE COURT:  We'll be getting into that in some detail

17  --

18          MR. SCHWARTZ:  Yes.

19          THE COURT:  -- I'm assuming.

20          MR. SCHWARTZ:  Correct.

21          THE COURT:  So we'll just leave it right now with the

22  1998 report, not including any reference to the notes in our

23  case.

24          MR. C. COOPER:  Thank you, Your Honor.

25          THE COURT:  All right.  Then let's go to no. 2.

1    MR. C. COOPER:  No. 2, there seems to be a contention

2  at times as to whether the Ministry of Finance investigation

3  was to determine the existence of, the literal existence, of

4  Bandagro promissory notes or the validity.  And so we provided

5  this request for admission and response confirming that the

6  Ministry of Finance conducted an investigation to determine the

7  validity of the claim presented by Mr. Jacir.

8    THE COURT:  All right.  And that's not disputed?

9    MR. SCHWARTZ:  Actually, it is disputed, and this may

10  be to some extent semantic, but I need to address it.

11   These admissions were made in the form in which they were

12  made before Oscar Guzman Cova, who wrote the August, 2003,

13  Ministry of Finance report, was deposed.  And you'll have a

14  chance to read substantial portions of his deposition because

15  both sides are designating from it, and it is one of the more

16  important depositions in the case.

17    So what the defendants admitted was that the Ministry

18  of Finance conducted an investigation into the validity of

19  documents purporting to be promissory notes.  But as you'll see

20  from Guzman Cova's testimony, and particularly the conclusions

21  of his report, he does not profess to have made a determination

22  of the validity of the notes.  He's very clear about this --

23    THE COURT:  And to be clear, this says that they

24  conducted an investigation.  It doesn't say what the result

25  was.

1      MR. SCHWARTZ:  Yes, and I want to be very clear

2  because he clarified this and pointed the parties' attention to

3  -- He's a nonparty.  He has been gone from the Ministry of

4  Finance since 2003.  He was deposed late in 2015, twelve years

5  later, for many days or three or four days.  And he was at

6  great pains to emphasize the limitations on the extent of his

7  work and his conclusions.  And you can read his conclusions and

8  make your own assessment of --

9      THE COURT:  I'm just staying with the literal

10  language.  This is very narrow.  The admission just says they

11  conducted an investigation.  It doesn't mention anything about

12  the result.  And you don't disagree there was an investigation

13  conducted?

14      MR. SCHWARTZ:  There was an investigation for sure.

15      THE COURT:  We'll just leave it at that.

16    Then we will get to no. 3.

17      MR. C. COOPER:  Your Honor, just so that our position

18  is clear, we're highlighting the entire phrase "conducted an

19  investigation into the validity."

20      THE COURT:  Well -- and that's the purpose of the

21  investigation.  That's not a disputed fact here, is it?

22      MR. SCHWARTZ:  Well --

23      THE COURT:  We get -- The conclusions are going to --

24  That's where, it seems to me, we're going to have -- but not --

25      MR. SCHWARTZ:  What's important to bear in mind is

1    this process took place under a law, this Organic Law, that was

2    very new at the time.  And you'll see that the people involved

3    with it in the Ministry of Finance were feeling their way

4    through it.  And Guzman Cova, who wrote the report, had a very

5    clear sense of what he thought the mission was; and necessarily

6    elements of validity were part of this investigation, but the

7    conclusions will speak for themselves.

8         THE COURT:  Right.  So, again, the limited purpose

9    that this covers is not disputed.  So I'll take that as an

10   admission that binds both sides.  All right.

11        And then we get to the third.

12        MR. C. COOPER:  The third, Your Honor, is -- You have

13   heard some testimony, I am sure you will hear more -- about the

14   dissemination or publication of the Attorney General's October

15   3, 2003, decision.  And through this admission and response, we

16   want to point the Court to the fact that the defendants have

17   admitted that the October, 2003 -- and I'll explain this in a

18   second -- November, 2003, opinions was published in one or more

19   Venezuelan newspapers.

20        The November, 2003, opinion that was referred to,

21   there is actually an opinion by Marisol Plaza, the Attorney

22   General.  So the sequence of events was she issues her opinion

23   on October 3, 2003.  On November 17, 2003, the Ministry of

24   Finance, through Ludmila Soto and the minister, submit a new

25   report asking for the Attorney General to change her mind, in

1   essence.  The very next day the Attorney General issues a

2   November opinion, which the parties dispute the impact of, but

3   that's the November opinion that's being referred to in this

4   request for admission.

5          THE COURT:  But this goes to publication in

6   newspapers.  That's what's highlighted, and that's the issue

7   here, right?

8          MR. C. COOPER:  Yes, Your Honor.

9          THE COURT:  And that's an admission?

10         MR. SCHWARTZ:  Well, this needs to be put in context,

11  if I may.

12         So I have a number of things to say about this

13  particular request for admission and response.  First of all,

14  there are objections to the request for admission as to the

15  nature of the request and the fact that --

16         THE COURT:  Let's be clear.  I'm looking at the --

17  Actually, Mr. Cooper, what you are asking me to look at is just

18  the highlighted parts of this, right?

19         MR. C. COOPER:  Yes, Your Honor.

20         THE COURT:  So the objection goes to what exactly does

21  this document represent?  The highlighted parts do not.  So if

22  I stay with just the highlighted part, this is strictly --

23  we're not saying what the document is or isn't, but that it was

24  published.

25         MR. SCHWARTZ:  Yes, but published here is ambiguous in

1    this context, and here's what I mean about this.

2         THE COURT:  Well, these are the words that Venezuela

3    used, right?  This is your client's answer?

4         MR. SCHWARTZ:  I understand that, but this was the

5    request, and there was objection to the verbiage.  But let me

6    try to get to the substance of and not get detained by the

7    preamble here.

8         So we have got two different documents that Mr. Cooper

9    is referring to here, and I want to make sure the Court is

10   clear on what they are because there is for sure an October 3,

11   2003, opinion that you have been hearing about all week.

12   What's described here as a November 3, 2003, opinion is nothing

13   of the sort.  That may be the defined term that's used, but it

14   really was just correspondence between the Attorney General and

15   the Ministry of Finance.

16        THE COURT:  The October 3.

17        MR. SCHWARTZ:  No, November.

18        MR. C. COOPER:  You said November --

19        THE COURT:  Just read the question together.  In

20   October and/or November, 2003.  This refers to the date of

21   publication, I'm assuming.  Then it goes on, the October 3,

22   2003, decision.

23        MR. SCHWARTZ:  Now I'm lost.

24        THE COURT:  On the Request For Admission No. 15.

25        MR. SCHWARTZ:  Yes.  I am looking right at the

1    language.

2         THE COURT:  I take that to mean that either October or

3    November of 2003, the October 3, 2003, was published.

4         MR. SCHWARTZ:  And the answer, I'm trying to, frankly,

5    make sense of the answer that's highlighted here in light of

6    the question because there's a mismatch between the two.  Jut

7    look at the --

8         THE COURT:  Well, the answer indicates two reports

9    were published.  The question only referred to one.

10        MR. SCHWARTZ:  That's why I am confused, frankly.

11   So --

12        THE COURT:  Let's see if we can -- I don't want to be

13   confused.  You don't want to be confused.  So we first have a

14   document produced by the Attorney General.  We're calling that

15   the October 3, 2003 --

16        MR. SCHWARTZ:  Opinion.  There is no question about

17   that.

18        THE COURT:  All right.  And then, subsequently, the

19   Ministry of Finance has -- I'm going to call that a report

20   also?

21        MR. SCHWARTZ:  We tend -- I think the parties are in

22   agreement that we talk about what the Attorney General did as

23   opinions and what the Ministry of Finance did, when it did it,

24   as reports.

25        THE COURT:  All right.  So the reports from the

1  Ministry of Finance that followed the opinion were dated in

2  October -- The exact date again was the 17th, did I hear?

3       MR. SCHWARTZ:  Let me give you the sequence.  I think

4  it will be easiest.

5       So you have August 8, 2003, is the first Ministry of

6  Finance report.  That's the Oscar Guzman Cova report.  Then you

7  have the October 3, 2003, Marisol Plaza Attorney General

8  opinion.  Next there's a November 17 -- If I'm not mistaken --

9  2003 Ministry of Finance report written by Ludmila Soto.

10       THE COURT:  All right.

11       MR. SCHWARTZ:  Then, although it's not the subject of

12  this particular request for admission, you have the December,

13  2003 -- Hang on just one second.  There's a December, 2003,

14  Attorney General opinion.  And Mr. Cooper would -- has focused

15  on the fact there's some intervening correspondence in November

16  between the Attorney General and Ministry of Finance.

17       THE COURT:  Those dates are helpful.  So let's go

18  back.  So the question refers only to the October 3 opinion.

19       MR. SCHWARTZ:  I'm sorry?

20       THE COURT:  The question refers only to the October 3,

21  2003, opinion.

22       MR. SCHWARTZ:  Yes.

23       THE COURT:  And then when we get to the answer --

24       MR. SCHWARTZ:  Which is baffling to me, even though it

25  comes from our side --

1          THE COURT:  Let me ask:  Do you mean by that that the

2   October 3 opinion and the November 17 report were both

3   published?  Is that what that answer is saying?

4          MR. SCHWARTZ:  I hope not, but I'm really –– I'm at a

5   loss myself, and I'm sorry for this to understand it.  If this

6   is accurately typed, I don't understand it.

7          THE COURT:  Let's go back because I want to get this

8   straight.  The October 3 opinion –– Let's just stay with

9   that –– this answer would indicate that it was published.  It

10  is admitted that it was published in one or more Venezuelan

11  newspapers.  Are we agreed on that?

12         MR. SCHWARTZ:  But not by the Attorney General.

13  Newspapers covered –– The more –– Technically, the more

14  accurate admission would be that the Attorney General's October

15  3, 2003, opinion was reported on by the Venezuelan press.  That

16  I would admit.

17         THE COURT:  And where would that take us?

18         MR. C. COOPER:  I don't know, Your Honor.  I believe

19  what the defense has been trying to do is to portray the

20  October opinion as some quiet, secret, interagency opinion.

21  And one of the reasons we asked for this admission was to

22  address that, and they acknowledged that the opinion was

23  published in one or more Venezuelan newspapers.

24         THE COURT:  Well, a blunt question, the opinion is

25  quite lengthy.  So would it have just been more of a report

1   about it?  In other words, would you be satisfied that the

2   newspapers reported that on October 3, an Attorney General's

3   opinion was issued?

4           MR. C. COOPER:  Well --

5           THE COURT:  And I assume it was issued, and then the

6   papers reported finding that certain notes were valid.  It was

7   more than just an article.

8           MR. C. COOPER:  I think that's the key, Your Honor,

9   kind of the conclusions reached by the Attorney General and how

10  that was --

11          THE COURT:  All right.  That's a --

12          MR. SCHWARTZ:  That's what we intended to admit --

13          THE COURT:  All right.

14          MR. SCHWARTZ:  -- in-artfully, I have to concede.

15          THE COURT:  So I'm taking some notes here.

16    So the parties agree that the Attorney General's opinion of

17  October 3, 2003, was reported in newspapers that also indicated

18  the report found certain notes to be authentic and payable.

19          MR. SCHWARTZ:  Your Honor, can you just, please,

20  repeat the -- that language, please?  I just want to make sure

21  --

22          THE COURT:  The Attorney's General opinion of October

23  3, 2003, was reported in newspapers that also included the

24  report -- included that the report found certain notes -- Let

25  me be clear -- Bandagro notes to be authentic and payable.

1          MR. SCHWARTZ:  I need -- The authentic and payable I'm

2    going to need to confirm because I don't want to admit more

3    than what actually happened.

4          THE COURT:  Well, the --

5          MR. SCHWARTZ:  I -- Could we --

6          THE COURT:  I don't want to get hung up on those

7    words, but we know what the report said --

8          MR. SCHWARTZ:  How about the substance of it was

9    reported.

10          THE COURT:  To be valid.  How about we say to be

11    valid?

12          MR. SCHWARTZ:  You know, the words in the report are

13    admissible.  And that's a term of art that we heard --

14          THE COURT:  Let's stay with admissible, and then we

15    can decide what that means under Venezuelan law.

16          MR. C. COOPER:  I guess without sounding like I'm

17    complaining, I feel like we're drifting away from what, to me,

18    was a clear admission.  And we also recognize that in the

19    Internet age, it's certainly possible to attach copies of an

20    entire report or decision.  And I believe there were articles

21    -- I don't know if they were introduced -- that actually

22    captured maybe text or pages from the opinion.  So I think the

23    Court understands what I'm trying to do.

24          THE COURT:  That would be easier.  What if we just

25    referred to specific articles without trying to describe them

1    as far as the substance.

2            MR. C. COOPER:  The problem that that poses for us,

3    and the reason for the request was, we couldn't -- we -- they

4    would know better than we would all the articles that were

5    generated as a result of the controversy and the decision.  So

6    it was difficult for us --

7            THE COURT:  Let's go back.  You would agree, though --

8    In other words, the articles said what they said.  And what

9    they -- These are articles I've seen, of course, right, we're

10   talking about?

11           MR. C. COOPER:  Some of them, certainly, Your Honor.

12           THE COURT:  They reported, let's just say, consistent

13   with the report of October 3.  And just leave it with that.

14           MR. SCHWARTZ:  The substance of it would work for me.

15   We're not denying that it was reported.  But I would like to

16   get -- to avoid getting into a characterization exercise of

17   what was in the newspapers.

18           THE COURT:  How about we say in that sentence, the

19   newspaper articles also indicated a determination made in the

20   report by the Attorney General.

21           MR. SCHWARTZ:  That would work for us.

22           MR. C. COOPER:  This is with respect to the October,

23   3, 2003 --

24           THE COURT:  October 3.

25           MR. C. COOPER:  Because before we leave this, I think

1  I do need to address the November, 2003, opinion.

2        THE COURT:  All right.  So we're clear on the 2003.

3        MR. SCHWARTZ:  Now talk to me about the next report.

4        MR. C. COOPER:  So Mr. Schwartz just characterized the

5  Attorney General's November, 2003, communication which

6  responded to the November 17 Ludmila Soto report.

7        THE COURT:  Actually, I don't have any notes on that.

8  So we have the October 3 Attorney General's opinion.  Then the

9  next thing I have is the November 17 report from the Finance

10  Ministry.  But there's something in between?

11        MR. C. COOPER:  Yes.  So we have the August 8, 2003,

12  Ministry of Finance final report, the October 3, 2003, Attorney

13  General opinion.  Then we have the November 17, 2003, Ministry

14  of Finance report authored by Ludmila Soto.  And then the very

15  next day is a November 18, 2003, opinion by the Attorney

16  General that responds to the November 17, 2003, report of the

17  Ministry of Finance.

18        THE COURT:  All right.  And was that meant to be

19  referenced in this request and admission?

20        MR. C. COOPER:  Your Honor, I believe it is.  And the

21  reason I believe it is not a mistake in referring to the

22  November, 2003, opinion, first of all, the request was

23  addressing solely the Attorney General's opinions.  It doesn't

24  refer to the Ministry of Finance.  And the reason I believe

25  that the defendants were truthfully addressing the October,

1  2003, Attorney General opinion and the November 18, 2003,

2  opinion is because in one of their early pleadings, ECF 18-1 --

3  It's actually, Plaintiff's Exhibit 207 -- they characterize the

4  November 18, 2003, document as an Attorney General opinion.

5      THE COURT:  Well, to be precise, in the request,

6  reference is only made to the Attorney General.

7      MR. C. COOPER:  That's correct, Your Honor.

8      THE COURT:  And what you wanted -- What you believe

9  the admission says is that -- Well, it only mentions the

10  October 3.  It doesn't mention the November 18.  But to be

11  blunt, we've seen testimony on it.  We have seen articles about

12  that, right?

13      MR. C. COOPER:  And I guess -- So what the response

14  says is that defendants admit that the October, 2003, and

15  November, 2003, opinions were published in one or more

16  Venezuelan newspapers --

17      THE COURT:  You take that to mean November 18.

18      MR. C. COOPER:  Exactly, Your Honor.  So if we can get

19  the same characterization Your Honor described for the October

20  opinion that the substance was reported --

21      THE COURT:  And, again, Mr. Schwartz, I know you know

22  this, but this is just whether or not it was reported in the

23  papers.  That's all we're saying.  There's no other conclusion

24  being reached here.

25      MR. SCHWARTZ:  All right.

1        THE COURT:  We have agreed the October report was --

2        MR. SCHWARTZ:  I'm fine with the October 1.

3        THE COURT:  The November one --

4        MR. SCHWARTZ:  I can't understand, for the life of me,

5   why the admission was cast this way.  You might say I should

6   know, but I'm telling you I don't.

7        THE COURT:  But you know this case well, so does

8   Mr. Cooper.  Was the second opinion of November 18 publicized?

9        MR. SCHWARTZ:  First of all, it's not an opinion.

10       THE COURT:  Well, whatever we want to call it.  There

11  was something issued on that day, you don't disagree, by the

12  Attorney General.

13       MR. SCHWARTZ:  There was correspondence between the

14  Attorney General and the Ministry of Finance on that day and on

15  November 20.  And those have to be taken together.

16       THE COURT:  But the only thing we're dealing with, did

17  it make the newspapers?

18       MR. SCHWARTZ:  I don't know.  I'll have to find out.

19  Can I check into it?

20       THE COURT:  Well, I'm giving you some leeway here

21  because this is an admission.  The only reason I'm giving you

22  some leeway is because it's a little ambiguous.  And,

23  Mr. Cooper, you check, too.  If there are newspaper articles

24  about this, I don't want to fight over the obvious.

25       MR. SCHWARTZ:  I'm not going to fight about it.

 1          THE COURT:  Okay.

 2          MR. SCHWARTZ:  I just don't know the answer because

 3     the question really asked about October 3, 2003.  Why the

 4     answer says what it does --

 5          THE COURT:  All right.

 6          MR. SCHWARTZ:  -- I don't know.

 7          THE COURT:  I'll let you check it out -- you, too,

 8     Mr. Cooper -- again, only because there is an ambiguity.

 9          Mr. Lucas?

10          MR. LUCAS:  Your Honor, I'm pretty familiar with the

11     newspaper articles.  I'm not aware of any that talk about the

12     November 18 --

13          THE COURT:  And that would be both --

14          MR. LUCAS:  -- opinion.

15          THE COURT:  And there is kind of a back and forth

16     here, right?  There's the November 18 AG opinion in response to

17     the November 17 report.

18          MR. LUCAS:  And, again, Your Honor, we wouldn't

19     characterize it as an opinion --

20          THE COURT:  Whatever, okay.

21          MR. LUCAS:  But there was no newspaper --

22          THE COURT:  A document --

23          MR. LUCAS:  -- that I'm aware of --

24          THE COURT:  -- let's just call it a document.

25          MR. SCHWARTZ:  We'll check it.

1          THE COURT:  Go back and double check.

2          MR. SCHWARTZ:  I don't have as much confidence on this

3    as Mr. Lucas here, so I'm going to be careful, and I'm going to

4    check.  We'll find out.

5          THE COURT:  Isn't the fundamental point here, there's

6    no dispute that the opinion of October 3 made the paper.

7          MR. SCHWARTZ:  Yes.  No question, admitted.

8          THE COURT:  And within a month, it was made clear that

9    there was a dispute with the Ministry of Finance.  Isn't that

10   also something we've pretty much beaten into the ground?

11         MR. SCHWARTZ:  By October 31, the Ministry of Finance

12   was making clear it's intention.

13         THE COURT:  So we have two agencies -- We have two

14   departments disagreeing, and it has made the paper.

15         Is there anything else you need from the plaintiffs'

16   side on this admission?

17         MR. C. COOPER:  There is, Your Honor, because the

18   November 18 Attorney General opinion book-ends it, it closes

19   it, by saying, I'm sticking with my --

20         THE COURT:  Okay.

21         MR. C. COOPER:  -- October, 2003, opinion.  And that's

22   the significance to us.  And I know they don't want to

23   characterize it, and I don't want to beat it up, but --

24         THE COURT:  Well, again, this isn't asking me to make

25   any kind of conclusion about what the effect of the letter is.

1    It's just whether or not it was publicized.

2         MR. SCHWARTZ:  You'll see the Attorney General's

3    testimony as to what happened between November 17 and December

4    8.  There's more correspondence than Mr. Cooper is addressing

5    here.  But we're going to check --

6         THE COURT:  All right.

7         MR. SCHWARTZ:  -- and I take it as my obligation to

8    check on the story with the November 17 and the -- what's being

9    characterized here as the November 18 --

10        THE COURT:  All right.

11        MR. SCHWARTZ:  -- opinion, which is just a letter.

12   But we'll look into it.

13        THE COURT:  All right.

14        MR. SCHWARTZ:  And we'll report back to you.

15        THE COURT:  So the October 3 matter we have a

16   resolution of.  The events in November, we'll address again and

17   decide exactly what this admission means.

18        MR. C. COOPER:  Thank you, Your Honor.

19        MR. SCHWARTZ:  All right.  I will tell the preliminary

20   returns from Boston, as we have been checking here in realtime,

21   is that the November 18 Attorney General correspondence was not

22   published by anybody.  But we'll check it and be very cautious

23   in getting back to you.

24        THE COURT:  All right.  Then we'll get to the fourth.

25        MR. C. COOPER:  Yes, Your Honor.  The fourth one, the

1    Court will be hearing testimony about, from plaintiff's

2    perspective, why -- or what influenced the Ministry of Finance

3    to begin, as defense counsel characterized it, backing away

4    from the August 8, 2003, report that had been upheld by the

5    October 3, 2003, Attorney General opinion.

6              As the Court has heard, one of these signers of the

7    notes is Waldemar Cordero Vale -- Mr. Cordero, as we have

8    referred to him.  And this request goes to that issue and

9    indicates that after Mr. Cordero, one of the signers of Skye's

10   notes, learned of the October 3, 2003, decision, he contacted

11   his cousin, who was the vice president of the nation, about

12   that decision.  I don't believe that's in dispute.

13             THE COURT:  And this -- all right.  And the admission

14   -- So will we be receiving testimony from this person?

15             MR. C. COOPER:  He died a week before trial, Your

16   Honor.

17             THE COURT:  All right.  Was he deposed before that?

18             MR. C. COOPER:  There was a preservation deposition

19   conducted before discovery opened up where there was some

20   limited information obtained.

21             THE COURT:  All right.  But this seems, again, a

22   pretty narrow:  Did he say this or didn't he?

23             MR. SCHWARTZ:  This admission is admitted.  I just

24   have to give you a little context, while we're talking about

25   this, very little context.  I believe this --

1          THE COURT:  His name is on the note.  That's to get

2   him in context.

3          MR. SCHWARTZ:  He's one of the alleged signers,

4   Waldemar Cordero Vale.  He was the intervenor of the bank.  He

5   has steadfastly denied for decades having signed the notes, and

6   we will be moving his deposition testimony.

7          The only thing I want to say about this is, because

8   the admission is admitted, the actual communication that's

9   referenced in this admission is a trial exhibit, I believe.

10  And what you will see and what is significant to put this in

11  context is that this communication from Waldemar Cordero Vale

12  to his cousin, Jose Vicente Rangel Vale, happened after the

13  December, '03, Attorney General opinion.  So it's true that it

14  happened after October 3, 2003, but it also happened after

15  December 8, 2003.

16         MR. C. COOPER:  Not quite, Your Honor.  And I don't

17  think we need to bog into it.  The letter, which we denied the

18  authenticity of, and I don't think they will be able to

19  authenticate it, is dated December 1, 2003.

20         MR. SCHWARTZ:  We'll stand by my --

21         MR. C. COOPER:  I don't think we need to discuss it.

22         THE COURT:  The admission doesn't have a date, so we

23  will leave that for testimony.  But the other part of the

24  admission is now established.

25         MR. SCHWARTZ:  I mis-spoke about the day in December.

1    I'm sorry about that.  But the communication is a trial

2    exhibit.  So we should be fine.

3         THE COURT:  All right.  And then we'll get to no. 5.

4         MR. C. COOPER:  No. 5, Your Honor, is from an

5    interrogatory response and not from a request for admission.

6    The Court has heard testimony, a little bit already, about when

7    Skye became aware of the December, 2003, the purported

8    December, 2003, Attorney General opinion.  You heard

9    Mr. Alcalde testify and Mr. Richards, I believe, when they

10   learned of it.  This kind of fills in a gap as to when Gruppo

11   -- whether Gruppo Triad or its agent were provided with a copy.

12   And in this, Venezuela acknowledges that it did not send the

13   December, 2003, Attorney General opinion to Gruppo Triad or to

14   its attorney, Mr. Jacir.

15        THE COURT:  All right.  So we will be at some point

16   addressing what exactly this report was.  I understand the

17   defendant is saying it was an internal opinion, but the answer

18   is still no.  That's not disputed?

19        MR. SCHWARTZ:  That's correct.  There is evidence,

20   incidentally, that the Gruppo Triad's Swiss lawyer learned

21   about this --

22        THE COURT:  Okay.  But this is whether the defendant

23   provided it, and the answer is still no.

24        MR. SCHWARTZ:  Correct.

25        THE COURT:  Okay.  All right.  I think that covers the

1    four admissions and one interrogatory issue.

2          MR. SCHWARTZ:  We have some homework, and we will look

3    into and report back early next week on that one document.

4          THE COURT:  Thank you.

5          MR. C. COOPER:  Your Honor, next we turn to some

6    deposition designations, and I don't know the Court's

7    preference, I have got them, again, identified.  With respect

8    to one topic, I tried to aggregate some of the deposition

9    testimony even from, perhaps, different sources just so it's

10   topical.

11         THE COURT:  All right.

12         MR. C. COOPER:  And I ran out of time.  With one of

13   them I actually excerpted the actual transcript.  The others I

14   have cited to the pages of the transcript.  I don't know if

15   it's the Court's preference --

16         THE COURT:  It would be helpful to me -- I don't want

17   to blind-side the defendant.  How many pages are we talking

18   about?

19         MR. C. COOPER:  For the first one there I've

20   excerpted, it's four pages and a copy of a --

21         THE COURT:  Why don't we -- You don't have any problem

22   exchanging it, I'm sure.  Why don't we take about a ten-minute

23   break.  I will get the depositions out.  I will also take a

24   look at that.  And, Mr. Schwartz, if you need more time after

25   the ten minutes, you can tell me, but let's at least take a

1  shot at this.

2       MR. SCHWARTZ:  It's only four pages.  I can probably

3  handle it in ten minutes.

4       THE COURT:  I assume it's referring to deposition

5  testimony.

6       MR. SCHWARZ:  Oh, I see.

7       MR. C. COOPER:  And, Your Honor, that's the first

8  topic.

9    I then have a couple of other topics that have probably an

10  equal number of pages --

11       THE COURT:  Would it make sense to exchange those all

12  right now?  Maybe give you 20 minutes or so to digest then.

13  And we'll see where that takes us.

14       MR. C. COOPER:  Great.

15       MR. SCHWARTZ:  All right.  Can we do that in the

16  courtroom?

17       THE COURT:  You can do if you would like.  We're going

18  to take a recess for the duration, though.  So we will be

19  recess for 20 minutes.

20    (Recess from 2:30 p.m. to 2:50 p.m.)

21       THE COURT:  All right.  Just to set the stage,

22  Mr. Cooper -- and I want to be clear with Mr. Schwartz -- that

23  in the defendants' case-in-chief, I am going to give the same

24  opportunity because what we have here is live witnesses mixed

25  in with deposition testimony.  And I want to get the facts

1   straight.  You each believe in your cases.  You don't want me

2   confused, and this would be helpful.

3       So what I propose we do, we go through a witness at a

4   time.  You'll tell me, Mr. Cooper, what you think is the

5   significance.  I'm not going to make any findings at this

6   point.  I want to hear from Mr. Schwartz about what I should

7   consider to the contrary, not so much argument but what other

8   facts you think would enlighten me in terms of what these

9   issues are.  And we can do this periodically.  It is going to

10  be a long bench trial.  And it is, again, the mixing of live

11  witnesses with deposition testimony.  That will help me as you

12  alert me to what parts of the deposition you think I should

13  consider in light of what I have just heard.

14      Mr. Schwartz, any problem with that procedure?

15      MR. SCHWARTZ:  Well, I do have a problem with the

16  procedure to the extent it's going to be keyed off the type of

17  submission that has been just handed to the Court, and I talked

18  to Mr. Cooper and Mr. Elliott about this during the break.  I

19  know we find ourself unexpectedly here with extra time, and

20  it's the Court's desire, and I think the parties have tried to

21  use time as efficiently as possible, but back when we had the

22  pretrial conference, we had discussed deferring submitting line

23  by line deposition designations and having some process where

24  there was some reasonable notice of what was going to be

25  submitted when.

1    And I'm not accusing anybody of an ambush or anything

2  like that.  I know that the plaintiffs had open time so they

3  have put together these little collections of argumentative

4  headings and some supporting testimony.  But I can tell you

5  that we have vehement objections --

6    THE COURT:  Let's talk about procedures because,

7  again, I am going to read all the depositions.  You can be sure

8  of that.  But knowing what exactly ties into the live witness's

9  testimony, what if we did some sort of written submission, and

10  you'd have an opportunity to do a written response?  Would that

11  be more helpful?

12    MR. SCHWARTZ:  Yes, with some measure of notice so the

13  Court would get a balanced presentation --

14    THE COURT:  What I'm suggesting to you, in your

15  case-in-chief, I want you to do the same thing.  So you will be

16  the one doing the proffering, and they'll be the one saying why

17  I should think otherwise.

18    MR. SCHWARTZ:  I think that's fine, and I would hope

19  they would have more than the 15 minutes than I have had to

20  react to this.

21    THE COURT:  No, we can start it now actually.  What I

22  am thinking is maybe at the end of each week, you, on each

23  side, if the next week is split between the plaintiff and the

24  defense case-in-chief, next Friday you tell me from what I have

25  heard during the week preceding how I should link in -- not

1   argument, just sort of testimony and just a brief description

2   of why you think it would enlighten me -- as far as live

3   testimony that I have heard.

4        MR. SCHWARTZ:  That actually sounds like a very good

5   suggestion, and if I might propose a modification, perhaps the

6   best thing to do would be on the Monday following the Friday,

7   we would submit something, whichever side had presented

8   evidence during the week, so that we'd have the weekend to

9   reflect on what just happened.

10       THE COURT:  Why don't we do this.  And because we are

11  changing this procedure as we go, I might give you time to

12  supplement this, this is fine, but get it to Mr. Schwartz by --

13  Tomorrow?  And then we don't have to pick Monday.  Maybe

14  Tuesday, do you want to do a written response?

15       MR. SCHWARTZ:  Yes.

16       THE COURT:  All right.  Again, I don't want -- Don't

17  throw any legal arguments in it at this point.  You're going to

18  get an opportunity do that at the end.  But this is, again,

19  along the lines of how I should be piecing the testimony

20  together between deponents and live witnesses.

21       MR. SCHWARTZ:  And I would suggest that this not be

22  accompanied by sort of a headline, argumentative-type brief

23  writing presentations, and we just give you the testimony from

24  the people.

25       MR. C. COOPER:  If I may, Your Honor --

1      THE COURT:  Well, I find it actually kind of useful.

2  What typically is going to happen -- and I'm just

3  hypothetically, forget this case -- the plaintiff -- the

4  proponent will give me bullet points.  And typically, the other

5  side is going to say it's more complicated than that.  You need

6  to read more pages.  Tell me what those pages are, and I'll go

7  look at them.

8      Go ahead.

9      MR. C. COOPER:  And that's what we're striving to do.

10 Rather than give paragraphs of pros about linking things

11 together, we simply wanted to get bullet point headings as to

12 what we think the significance was.

13     MR. SCHWARTZ:  Now to the extent -- This may be true

14 of many cases, and it's certainly true of this case -- when we

15 present deposition testimony, we will necessarily need to

16 present some of the deposition exhibits without which you

17 wouldn't be able to make sense of the testimony.  So I would

18 assume we would attach the relevant deposition exhibits --

19     THE COURT:  But what I'd -- We'll deal with that at

20 the end when we're getting ready to close out the record.  So

21 any of the deposition exhibits that you want to offer as

22 evidence, substantive evidence, in the case, we'll have to

23 address any objections at that point.

24     MR. SCHWARTZ:  I'm just thinking out loud, though.

25 There will be instances where some of the testimony from a

1  particular witness will be of no value other than in the

2  context of a particular document that's the subject of the

3  deposition testimony.  But I think we can use our judgment to

4  try not to overburden you with exhibits, focus on the

5  testimony, add the exhibits only when absolutely necessary to

6  make sense out of the testimony.

7       THE COURT:  All right.

8       MR. SCHWARTZ:  But I think the best idea would be that

9  there's some amount of notice -- We're all, I think, at least

10  on our side, I assume on the plaintiff's side, able to respond

11  very rapidly, not in 15 minutes but in day or so, to any of

12  these things.  But this, again, is coming too quickly --

13       THE COURT:  Well, let's get a schedule set up.  We

14  will deal with the other weeks to come.  But what I would

15  suggest, starting next week, again on Friday, I'll get two

16  submissions from each of you because I'm assuming half the week

17  will be with the plaintiff's witnesses and half the

18  defendants'.  And then by the end of the weekend, let me know

19  what you think -- Let's make it -- I don't want to kill anybody

20  on your team.  We want a week of the testimony linked to

21  deposition testimony.  So what is an appropriate day to file

22  these?

23       MR. LUCAS:  Your Honor, you're not in session next

24  Friday.

25       THE COURT:  Right.  That's right.  So through

1    Thursday.  And that would -- Then Monday is the holiday.  So be

2    ready to go on Tuesday.

3            MR. SCHWARTZ:  Whatever makes sense for the Court.  I

4    think we're all more or less in 24/7 mode now.  So there's no

5    weekends, so to speak.

6            THE COURT:  Well, for this week, why -- Given this --

7    Would you like to, given this, supplement this?

8            MR. C. COOPER:  If I could, Your Honor.

9            THE COURT:  I won't read -- I mean I've read it, but I

10   won't digest it and read the deposition testimony until I get

11   your document.  What do you think, maybe by Monday morning?

12           MR. C. COOPER:  That would be terrific, Your Honor.

13           THE COURT:  All right.  And then what's a reasonable

14   time for you to respond?

15           MR. SCHWARTZ:  Wednesday morning?

16           THE COURT:  All right.  And then let's do the same

17   thing after that.  We'll wrap up on Thursday next week.  By

18   Saturday morning, you may be both submitting, depending on how

19   far we get in the testimony of the defendant.  And then the

20   following Tuesday, respond -- So what we'll have is every time

21   somebody files one in the affirmative way, the other side will

22   get a few days to respond to it.

23           MR. SCHWARTZ:  And just mechanically, how would you

24   like us submit them to the Court?

25           THE COURT:  Just as a memorandum.

1        MR. SCHWARTZ:  As like an ECF filing?

2        THE COURT:  Yes, yes.

3        MR. SCHWARTZ:  Okay.  I think that's very workable.  I

4   think we've worked with, either the first day of the next week

5   and then the Wednesday, and I think that's a workable schedule.

6        MR. C. COOPER:  Your Honor, would you like to see the

7   excerpted testimony in the document itself or just references

8   to the transcript?

9        THE COURT:  We have all of the transcripts.  I think

10   the -- Reference to a line and page wouldn't hurt, but you

11   don't have to reprint the testimony.

12        MR. C. COOPER:  All right.  And submit it to the

13   Court.  Not by filing it through the clerk's office, but an

14   e-mail --

15        THE COURT:  Just put it on -- I don't think there's

16   anything that shouldn't be on the CM/ECF system.

17        MR. C. COOPER:  Okay.

18        THE COURT:  That would be the easy way.

19        MR. SCHWARTZ:  I think that's workable.

20        THE COURT:  All right.  Well, I think that takes care

21   of today then, is that right?

22        MR. C. COOPER:  It does, Your Honor.

23        THE COURT:  Well, have a nice long weekend, and we'll

24   see you Monday morning.  We'll start again at nine.

25        (Court was adjourned at 3:00 p.m.)

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| PLAINTIFF's: | | | | |
| David J. Richards | | 8 | 43 | |

1              C E R T I F I C A T E

2

3          We, Laura Samuels, Denise Errett, Lahana DuFour,

4    Shawna Evans and Darla Coulter, do hereby certify that the

5    foregoing is a true and correct transcript of the proceedings

6    before the Honorable Edmund A. Sargus, Jr., Judge, in the

7    United States District Court, Southern District of Ohio,

8    Eastern Division, on the date indicated, reported by us in

9    shorthand and transcribed by us or under our supervision.

10

11

12                          s/Laura L. Samuels,RPR
                            Laura L. Samuels, RPR
13                          Official Federal Court Reporter
                            March 16, 2016
14
                            s/Denise N. Errett, FCRR
15                          Denise N. Errett, FCRR
                            Official Federal Court Reporter
16
                            s/Lahana DuFour, RMR, CRR
17                          Lahana DuFour, RMR, CRR
                            Official Federal Court Reporter
18
                            s/Shawna J. Evans, RMR
19                          Shawna J. Evans, RMR
                            Official Federal Court Reporter
20
                            s/Darla J. Coulter, RMR, CRR
21                          Darla J. Coulter, RMR, CRR
                            Former Official Federal Court Reporter
22

23

24

25