UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DRFP L.L.C., d/b/a SKYE VENTURES,

               Plaintiff,                  Case No. 2:04–cv–0793

      v.                            CHIEF JUDGE EDMUND A. SARGUS, JR.
                                      Magistrate Judge Terence P. Kemp

REPÚBLICA BOLIVARIANA
DE VENEZUELA, *et. al.*,

               Defendants.

## OPINION & ORDER

This case comes before the Court on a claim for recovery on promissory notes. Plaintiff contends that Defendants have defaulted on valid debt obligations. For the reasons stated below, the Court finds that the notes are fraudulent. The Court also finds that Plaintiff's alternative arguments raised in favor of enforceability of the notes are without merit.

### I. Executive Summary

In this case, Plaintiff DRFP L.L.C. d/b/a Skye Ventures, brings suit to recover on a pair of paper promissory notes, each with a face value of $50 million. Plaintiff asserts that a Venezuelan bank issued the notes in 1981. After the notes were issued, the bank was liquidated and the government of Venezuela took over the lion's share of its debt obligations. As a result, Plaintiff brings suit against Defendants the Republic of Venezuela, and its Ministry of Finance. Defendants maintain that the notes are fraudulent and no legal theory proffered by the Plaintiff can cure that defect. In 2003, the Ministry of Finance performed an investigation into the validity of purported notes issued by the bank. As a result of the investigation and a subsequently issued report, the Attorney General of Venezuela issued a legal opinion finding in

favor of paying out monetary claims on the notes. The opinion was later disavowed, but Plaintiff maintains that it had "binding" preclusive effect under both United States and Venezuelan law.

For all the reasons set forth hereafter, the Court draws the following findings of fact and conclusions of law. First, the notes are fraudulent, although the facts do not demonstrate that the plaintiff was involved in the fraud. The bank in question never issued the debt and received no consideration for it. That being the case, Plaintiff has a heavy burden to bear in convincing the Court that a party that did not issue notes and did not receive consideration for them should nevertheless be responsible for the debt. Plaintiff makes several alternative arguments as to why that should be the case and the Court addresses each in turn. Second, the Attorney General's opinion does not cure the fraud. It may have been "binding," but it was reevaluated and disavowed. Nothing in Venezuelan law precluded a reevaluation or holds the Defendants to paying out on the fraudulent debt. Third, the Attorney General's opinion did not ratify the fraudulent debt, creating a legal obligation to pay. Fourth, Plaintiff did not reasonably rely on the Attorney General's opinion in a manner in which Defendants are estopped from nonpayment. Fifth, Plaintiff knew or had reason to know that the debt was unpaid and disavowed when it purchased the notes, and therefore, does not qualify as a holder in due course.

Based on the foregoing, Plaintiff's claim is denied and the Court enters judgment in favor of the Defendants.

## II. Background

### A. Factual Background

Prior to the resolution of this case, the Court issued Orders providing detailed accounts of the factual background. *See e.g. DRFP, LLC, v. República Bolivariana de Venezuela*, 945 F. Supp. 2d 890 (S.D. Ohio 2013); *DRFP L.L.C. v. República Bolivariana de Venezuela*, No. 2:04-

2

cv-0793, 2015 WL 9302841 (S.D. Ohio Dec. 18, 2015). The following brief summary of the case's pre-trial history provides context for the post-trial facts and legal conclusions below.

This lawsuit is an action to recover on a pair of paper promissory notes with face values of $50 million each to the bearer, the legitimacy of which are in dispute. Plaintiff DRFP L.L.C. d/b/a Skye Ventures ("Plaintiff" or "Skye"), is a Columbus based limited liability company formed as an investment vehicle in August 2003. Plaintiff maintains that, in December 1981, Banco Desarrollo Agropecuario SA ("Bandagro"), a Venezuelan financial institution established pursuant to the laws of the Republic, issued a series of bearer promissory notes, including the two notes at issue in this case (the "Notes"). (Sec. Am. Compl. ¶¶ 6–7; ECF No. 301). According to Plaintiff, Bandagro issued the bearer promissory notes for the purpose of funding economic development programs in Venezuela and traded the Bandagro notes on the international financial market. (Id. at ¶¶ 9–10).

The Notes state that they are guaranteed by the Venezuelan government and have a face value of $50,000,000.00 (US) each. Trial Exs. P-1; P-2. The Notes further provide that they are governed by the regulations of the International Chamber of Commerce as well as the United States Council of the International Chamber of Commerce Brochure 322. Id. It is undisputed that, since the date of issuance on the Notes, Bandagro ceased operations and is currently defunct.

Plaintiff asserts that, before May 2002, certain holders of the Bandagro notes requested payment. (Sec. Am. Compl. at ¶ 18). Such requests prompted the Venezuelan Minister of Finance to investigate the legitimacy of the Bandagro notes. (Id. at ¶¶ 18–21).

According to Plaintiff, as part of the investigation, a visual inspection of the Notes at issue in this case was performed in the United States. (Id. at ¶ 21). Plaintiff maintains that

3

following a four-month investigation, the Ministry of Finance's Office of Legal Counsel issued a report concluding that the holders of the Notes had legitimate rights to payment. (*Id.* at ¶ 22). Plaintiff asserts that based on these findings, Venezuelan Attorney General Marisol Plaza issued an opinion on October 3, 2003, stating that the Notes were valid and that Venezuela was obligated to pay them. (*Id.* at ¶ 25). Plaintiff contends that on approximately October 17, 2003, the Minister of Finance distributed copies of the Attorney General's opinion to the holder of the Notes. (*Id.* at ¶ 26).

Plaintiff asserts that it acquired the Notes from Gruppo Triad–FCC SPA ("Gruppo Triad"), a Panamanian corporation. (*Id.* at ¶ 14). Plaintiff maintains that, prior to purchasing the Notes, it received a copy of the Attorney General's October 3, 2003 opinion. (*Id.* at ¶ 26). Plaintiff contends that, in purchasing the Notes, it relied on the Attorney General's October 3, 2003 opinion. (*Id.* ¶ 29). Plaintiff further contends that on August 11, 2004, it demanded—from Columbus, Ohio—that Defendants make payment on the Notes by depositing funds in a Columbus, Ohio financial institution. (*Id.* at ¶ 32). Defendants have refused to pay on the Notes. (*See id.* at ¶ 33).

Defendants maintain that the Notes in question are part of a series of well-known forgeries. Specifically challenged is the conduct of James Paolo Pavanelli ("Pavanelli"), the CEO and President of Gruppo Triad. Defendants submit that even before Plaintiff acquired the Notes, Pavenelli had already been convicted twice—in England and Italy—for trading in false Bandagro notes. Moreover, Defendants stress that, since 1981, Venezuelan government officials have conducted numerous investigations into the validity of Bandagro notes. According to Defendants, these investigations have revealed that the Bandagro notes are forgeries. Additionally, Defendants provide that Venezuela had issued several alerts warning the public

4

that such notes are invalid. Defendants submit that the individuals who purportedly signed the Notes have testified that they never signed such documents. Finally, Defendants posit that multiple investigations independent from Venezuela have also determined that the Bandagro notes are forgeries.

Defendants further challenge Plaintiff's reliance on the October 2003 opinion of the Attorney General. Defendants emphasize that the Attorney General withdrew this opinion shortly after finding that government officials had overlooked evidence. Defendants also contend that in December 2003, following further investigation by both the Attorney General and Ministry of Finance, the Attorney General issued a new opinion finding the Notes invalid. Moreover, Defendants stress that in July 2007, the Venezuelan Supreme Court issued an interpretative opinion finding that the Attorney General's October 2003 opinion was consultive in nature, as opposed to binding, and did not create private individual rights.

**B. Procedural History**

Plaintiff originally filed this cause of action on August 23, 2004, bringing a single cause of action for default on the Notes. (*See* Compl., ECF No. 1). On January 31, 2005, Defendants moved for dismissal based on a lack of subject matter jurisdiction in light of sovereign immunity under FSIA; lack of personal jurisdiction; preclusion under the act of state doctrine; *forum non conveniens;* and failure to state a claim. (*See* ECF Nos. 13, 14). On June 7, 2007, Defendants filed a supplement to their original Motion to Dismiss urging that the Court to first consider the issues of sovereign immunity and *forum non conveniens.* (ECF No. 106).

On February 13, 2009, the Court, through United States District Judge John D. Holschuh, now deceased, issued an Opinion and Order denying Defendants' Motion to Dismiss on the grounds of subject matter jurisdiction and *forum non conveniens.* The Court held that it

5

possessed subject matter jurisdiction pursuant to FSIA's commercial activity exception. Additionally, the Court concluded that Venezuela was not an available forum because the Venezuelan Supreme Court's 2007 decision "would not permit litigation of one of the essential issues of Plaintiff's complaint." (Opinion & Order 20, ECF No. 144).

Plaintiff filed an Amended Complaint on March 2, 2009. (ECF No. 147). Within the Amended Complaint, Plaintiff reasserted a cause of action for default on the Notes. Plaintiff also pled four additional counts for estoppel/detrimental reliance; breach of contract; promissory estoppel; and negligence.

Defendants appealed the Court's February 13, 2009 Opinion and Order.[1] The United States Court of Appeals for the Sixth Circuit issued its Opinion on September 23, 2010. *DRFP L.L.C. v. República Bolivariana de Venezuela*, 622 F.3d 513 (2010). The Sixth Circuit affirmed this Court's holding as to subject matter jurisdiction, concluding that the Notes gave Plaintiff a right to designate the United States as a place of payment, thus creating a direct effect in the United States within the meaning of FSIA. *Id.* at 518. The Sixth Circuit, however, reversed the Court's decision as to *forum non conveniens*. *Id.* at 520. The Sixth Circuit held that the Venezuela Supreme Court decision did not render Venezuela "unavailable and inadequate as a matter of law" and remanded for a "full consideration of the question whether the doctrine of *forum non conveniens* applies." *Id.*

In August of 2009, Venezuela sought leave to take depositions to preserve the testimony of Cordero, Puigbó and Fontana (ECF No. 185). Skye objected, because merits discovery had not yet begun (ECF No. 187). Limited jurisdictional discovery had been conducted in 2006, but

---

[1] Defendants appealed the Court's denial of foreign sovereign immunity as a matter of right pursuant to 28 U.S.C. § 1291. Upon Defendants' Motion, the Court also certified the issue of *forum non conveniens* for interlocutory appeal. (Opinion & Order, ECF No. 155). Finally, the Court stayed proceedings during the pendency of the interlocutory appeal. (Opinion & Order, ECF No. 198).

was then stayed while the parties briefed jurisdictional issues. The Court permitted the preservation testimony (ECF No. 200). Skye objected to the ruling (ECF No. 202), but the depositions proceeded in February 2010 (*See* ECF Nos. 254-257).

Following remand, the parties submitted supplemental briefing regarding the issue of *forum non conveniens*. On October 23, 2012, the Court again denied Defendants' request for dismissal on the grounds of *forum non conveniens*. The Court, after considering the factors outlined in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947), found that Defendants failed to carry their burden of overcoming the strong presumption in favor of Plaintiff s forum choice. (Opinion & Order 20–21, ECF No. 263).

Defendants filed three motions shortly after the Court's October 23, 2012 Opinion and Order. First, Defendants moved for transfer of this case to the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1404(a) and 1406(a) (ECF No. 274). Second, Defendants moved for dismissal on a variety of grounds pursuant to Federal Rule of Civil Procedure 12 (ECF No. 275). Finally, Defendants requested certification to file an interlocutory appeal from this Court's October 23, 2012 Opinion and Order addressing *forum non conveniens* (ECF No. 276). On May 14, 2013, the Court denied the Motion to Transfer, denied, in part, the Motion to Dismiss; and denied the Motion for Certification (Opinion & Order, ECF No. 298). Pursuant to the Court's Order, Plaintiff filed a Second Amended Complaint on May 21, 2013 (ECF No. 301).

The parties cross-moved for summary judgment. Defendants moved for summary judgment based on the statute of limitations (ECF No. 359), and on the basis that Plaintiff is not a holder in due course of the Notes (ECF No. 413). Plaintiff moved for summary judgment to enforce payment on the Notes on the basis of equitable estoppel (ECF No. 409). On December

7

18, 2015, the Court denied all three motions (Opinion & Order, ECF No. 642).  The Court held that the statute of limitations had not run on the claim, that Defendants were not equitably estopped from non-payment on the Notes, and that the issue of holder in due course was not ripe for review.

This matter came before the Court on February 1, 2016, for a bench trial, which continued through March 4, 2016.  Having taken the matter under advisement, the Court now issues the following findings of fact and conclusions of law.

### III. Findings of Fact

**A. Bandagro & the Notes**

#### 1. History of Bandagro

Before its liquidation, the now-defunct Bandagro supplied medium to large-scale funding to agricultural projects.  Tr. Trans. Vol. 15 at 11:1-4.  During its existence, Bandagro struggled with its financial viability, specifically with debt balances that were higher than bank assets. Eventually, Bandagro found itself placed into intervention due to poor economic conditions, with the dissolution of the Board of Directors and the appointment of an intervenor who retained control over the bank's operations.  Tr. Trans. Vol. 15 at 13:3-13.

Elbano Fontana Nieves ("Fontana"), an Agronomist and University professor, was the General Manager of Bandagro from 1976-1978.  As the General Manager, he held supervisory control over all of Bandagro's operations, but was not directly involved in financial matters for the bank.  When the Bandagro Board of Directors turned over in 1978, Fontana briefly resumed his professorship.  He then returned to Bandagro from 1980-March 1983 as the General Manager, at the request of Waldemar Cordero Vale ("Cordero"), then-President of the Bandagro Board of Directors.  Tr. Trans. Vol. 15 at 11:5-12:5, 12:15-13:2.

8

During his employment at Bandagro, Fontana became familiar with a company called International Development Company Limited ("INDECO"). Fontana also came to know that, prior to his arrival at Bandagro, a transaction had been initiated in which the bank was to receive a $500 million loan from INDECO through the Atlantic National Bank of Florida. *Id.* at 14:10-17, 15:15-24. By the time Fontana became General Manager, he believed the "transaction failed completely. It was never entered into... ." *Id.* at 16:9-10.

Starting in January 1981, Bandagro's Board of Directors was dissolved, and Cordero became Bandagro's intervenor, which made him essentially a liquidator. *Id.* at 13:3-8. A Bandagro Liquidation Board (the "Liquidation Board") was created. Fontana continued in roughly the same position he held prior to the dissolution—he functioned as a consultant, coordinating meetings for the Liquidation Board, etc. *Id.* at 13:14-14:1. In the period of 1981-1982, Fontana, Cordero, and Pascual Puigbó Morales ("Puigbó"), traveled to Europe in search of money for the beleaguered bank. Fontana testified that the trips did not result in any loan transactions. Tr. Trans. Vol. 16 at 34:21-35:21.

At the time Bandagro was going through liquidation, those who worked on the process noticed that the records were poorly kept. Tr. Trans. Vol. 15 at 101:13-23 (member of Bandagro's liquidation board in 1992 found the bank's historical records unreliable). The Venezuelan Comptroller General similarly found in a 1986 Comptroller General Report that "records allow significant differences between the control accounts for the general ledger and the auxiliary books, which means that the figures in the financial statements lack reliability." P-165 at VZ015284. Fontana shed light on employee actions that likely contributed to the issue, describing having taken Bandagro records pertaining to loans with him when he resigned from his position in early 1983. Tr. Trans. Vol. 16 at 23:24-24:6, 25:11-16. In 2006, Fontana

9

destroyed those records. *Id.* at 25:21-26:20, 27:11-18. Fontana explained, however, that the records were copies of "loans to agriculturers," rather than loans from foreign banks to Bandagro. *Id.* at 24:3-26:3. Additionally contributing to a loss of Bandagro records, in 1988 a fire damaged "floors one to five of the Bandagro Tower Building located on the Esquina de Jesuitas, Caracas…." P-169 at VZ015365. This particular building in Caracas is where Bandagro "handled international operations, finance with the national private bank and more than 50% of the commitments assumed by the Institution." P-164 at VZ015270.

### 2. The Notes at Face Value

Skye's Notes cite Bandagro as the issuer and contain a 10-year maturation date, coming due on December 8, 1991. P-1, P-2.[2] Each note is identified as part of the series ICC-322. The first Note is identified as Note No. 7/12 and the second Note is identified as Note No. 8/12. The Notes contain certain typographical errors. For example, they are issued "for valie received." The Notes also contain a discrepancy between the English text and the Spanish translation, the latter of which indicate that a letter numbered 733 from the Venezuelan Minister of Finance, dated November 5, 1981 (the "733 Letter") should be attached, whereas the English text is silent. P-1, P-2; Tr. Trans. Vol. 2 at 161:10-162:6.

The Notes contain signatures on behalf of the borrower and represent that "all engagement of BANDAGRO have the explicit backing of the National Government of the Republic of Venezuela according to" the 733 Letter. This backing is contained within a Guarantee Collateral clause, purportedly signed by Cordero. The three signers and their Bandagro titles are: General Manager Fontana, Legal and Administrative Advisor Puigbó, and Receiver of the Bank Cordero. P-1, P-2. Before the Notes matured Defendant the Venezuelan

---

[2] Plaintiff's exhibits are referred to as P-1, P-2 etc.; Defendants' exhibits are referred to as D-1, D-2 etc.; and Joint Exhibits are referred to as JX-1, JX-2 etc.

Ministry of Finance (the "MNF")[3], a division of Defendant the República Bolivariana de Venezuela (collectively, "Venezuela"), took over the bank.

In 1988 or 1989, the Division of Organized Crime in Venezuela contacted Fontana through the Technical Body of Judicial Police.[4] The Judicial Police relayed to Fontana that the government of the United Kingdom had invited him to testify regarding certain notes. *Id.* at 26:20-27:7. Fontana was shown notes that are either the same or similar to the Notes at issue in this case by the Venezuelan police. He denied signing the Notes, a position he has maintained ever since. *Id.* at 26:20-31:7. Additionally, Fontana denies having seen Puigbó or Cordero sign the Notes. *Id.* at 29:15-22, 30:11-14.[5] Cordero and Puigbó have also denied signing the Notes or authorizing anyone to sign the Notes on their behalves. Deposition of Waldemar de Jesus Cordero Vale, February 25, 2010, at 44:22-47:6, 47:11-53:20; Deposition of Pascal Puigbó Morales, February 23, 2010, at 26:24-28:19, 28:22-29:2, 31:11-33:11, 34:1-37:8.[6]

At trial, Venezuela offered the testimony of a handwriting expert, Mr. David Richard Browne ("Browne"). Browne has over forty years of experience in forensic handwriting and document examination. Tr. Trans. Vol. 20 at 75:13-21, 94:25-95:2 (recognizing Browne as an expert). In evaluating the signatures on the Notes, Browne obtained and studied genuine examples of Cordero, Fontana, and Puigbó's signatures, to go into "really fine detail, and [] build up a picture of the way that [a] person writes their signature." *Id.* at 85:3-4. Browne then compared the genuine signature examples with the signatures on the Notes and other documents, focusing on specific characteristics of the handwriting. *Id.* at 85:5-14, 104:16-107:16. Browne

---

[3] "Ministerio de Hacienda."
[4] Cuerpo Tecnico de Policia Judicial.
[5] Fontana denied having signed P-1 or having seen either Puigbó or Cordero sign P-1, and Venezuela represented at trial that his answers to the same questions regarding the signatures on P-2 are identical denials. *Id.* at 30:15-31:8.
[6] Skye objects to the admission of the deposition testimony of both Cordero and Puigbó. The Court admits the referenced testimony, but notes that the weight of the evidence, even in the absence of this admission, favors Venezuela's contention that the signatures on the Notes are forged.

also compared the stamps used by the three purported signers. He compared undisputed documents in which the stamps were used to the stamps used on the Notes at issue. *Id.* at 124:18-22.

Using the American Society for Testing and Materials ("ASTM") standards,[7] Browne opined that the Notes are fake documents. *Id.* at 137:25-138:5. Specifically, material differences between the genuine and questioned signatures led Browne to determine that:

- definite evidence exists that Puigbó's signatures on the Notes are forged, *id.* at 116:5-17;

- there is a strong probability that Fontana's signatures on the Notes are forged, *id.* at 107:25-108:12; and

- it is probable that Cordero's signatures on the Notes are forged, *id.* at 121:4-16.

Additionally, Browne concluded that the stamps on the Notes bear indications of forgery. *Id.* at 127:16–128:4, 130:18–131:13, 134:20–135:17. Specifically, the stamp exemplar for the Interventor, Cordero, has (a) two rings, (b) the letters "S.A." after "Agropecuario" on the right, and (c) the word "INTERVENTOR" on the bottom; whereas the stamp attributed to Cordero on the purported notes has (a) three rings, (b) two dots after "Agropecuario" on the right, and (c) the "I" of the "INTERVENTOR" on the bottom has a noticeable blemish. *Id.* at 133:7–22, 134:2–16; *compare* D-184 *with* P-001.

Examples of genuine Cordero and Interventor stamps have (a) two rings, (b) either "S.A." or a blank space (with no dots) after "Agropecuario," and (c) no blemish on the "I" of "INTERVENTOR." *See* D-058; D-061; D-066; D-121; D-184; D-887; D-892; D-894; D-895; D-896. Cordero's genuine "Interventor" stamps appear on legitimate, short-term promissory notes that Bandagro issued to actual lenders in early 1982. *See, e.g.*, D-61. In contrast, the

---

[7] The ASTM standard involves a 5-level scale of opinion in handwriting work. *Id.* at 91:25-92:21.

12

three-ring stamps, with two dots after "Agropecuario", and the smudged "I" in "INTERVENTOR," appear on the Notes. P-1; P-2; P-6A at FS0884–88, 892–946, 950–55, 959–70, 974–79, 983–84, 987–91, 995–97, 1002–1007.

The same inconsistencies appear on stamps for Fontana. The genuine stamp exemplar for Fontana has (a) two rings and (b) "S.A." after "Agropecuario" on the right, whereas the stamp attributed to Fontana on the purported notes has (a) three rings and (b) two dots after "Agropecuario" on the right. Tr. Trans. Vol. 20 at 127:6–15; *compare* D-885 *with* P-1. Examples of genuine Fontana stamps have (a) two rings and (b) "S.A." after "Agropecuario." *See* D-019; D-021; D-059; D-063; D-875; D-878; D-880; D-883; D-884; D-885; D-888; D-889; D-891; D-897. In contrast, the three-ring Fontana stamps with two dots appear on the Notes. P-1, P-2, P-6A at FS0884–88, 892–946, 950–55, 959–70, 974–79, 983–84, 987–91, 995–97, 1002–1007.

Finally, the pattern also appears on stamps for Puigbó. The genuine stamp exemplar for Puigbó has (a) two rings and (b) "S.A." after "Agropecuario" on the right, whereas the stamp attributed to Puigbó on the purported notes has (a) three rings and (b) two dots after "Agropecuario." Tr. Trans. Vol. 20 at 130:12-17; *compare* P-001 *with* D-881. Examples of genuine Puigbó stamps have (a) two rings and (b) "S.A." after "AGROECUARIO" on the right. *See* D-886; D-877. Again, in contrast, the three-ring Puigbó stamps with two dots after "Agropecuario" appear on the Notes. P-1; P-2; P-6A at FS0884–88, 892–946, 950–55, 959–70, 974–79, 983–84, 987–91, 995–97, 1002–1007.

### 3. Issuance of ICC notes by Bandagro

In 1980, the United States Council of the International Chamber of Commerce issued a public warning in response to an "increasing number of reports" that promissory notes titled

"ICC-290" and "ICC-322" were being used in "suspicious transactions." D-1. The ICC disavowed the notes, stating: "The ICC is by no means a financial institution. The ICC does not secure or guarantee loans, and does not issue 'promissory notes' of any kind." *Id.*

In 1980, a man named Milton Linn ("Linn") approached Bandagro, claiming he could broker a loan to the bank. J-1 at JX-003. Linn stated that he was acting on behalf of INDECO. He claimed that Atlantic National Bank in Florida had agreed to act as escrow agent for the loan. *Id.* Relying on Linn's representation, Bandagro pursued the loan. In April 1980, the then-manager of Bandagro, Sergio Matamoros ("Matamoros") issued a letter of instruction to Linn and signed 55 promissory notes titled "ICC-290." JX-1 at JX-003; *see also* P-177 at SKYE000927-28. The notes were not to be completed or validated until Bandagro received its promised loan funds. *Id.* The funds, however, never arrived. *See* Tr. Trans. Vol. 15 at 16:6-10; Tr. Trans. Vol. 16 at 28:13-15. When the funds never materialized, Bandagro revoked the transaction. *See* Tr. Trans. Vol. 16 at 29:19-30:4.

As General Manager, Fontana was authorized by Cordero Vale, the Bandagro interventor, to retrieve the notes that were issued in connection with the failed transaction. Fontana traveled to the Atlantic National Bank of Florida, and showed his authorization, but returned from the trip without them because he was told that no such notes existed.[8] *Id.* at 16:13-25. Fontana proceeded to meet with Venezuela's General Counsel in Miami for the purposes of obtaining "a universal declaration of annulment on those notes." *Id.* at 18:23-19:12. As a result of advice he received from counsel, Fontana believed there was no legal record of the notes at issue. *Id.* at 19:5-9. Ultimately, on May 20, 1981, Bandagro filed suit in Florida seeking return of the incomplete promissory notes. JX-1. The Florida court ruled that the notes were "void and non-

---

[8] Skye objected to the admission of this sentence on the basis of hearsay. The Court ruled it is admitted for the purpose of Fontana's knowledge then and now. Tr. Trans. Vol. 15 at 17:4-18:11.

negotiable." JX-1 at JX-003.

### 4. Documentation of the Notes

In the early 1980s, facing an economic liquidity problem with plummeting global oil prices, the MNF began work on large-scale debt restructuring. To that end, in January 1983, the MNF hired economist Gustavo Galdo ("Galdo"), tasking him with cataloging the nation's debt. Tr. Trans. Vol. 16 at 139:3-140:3. As part of the cataloging process, all Venezuelan banks known to hold foreign currency debt were contacted and asked to submit accounting forms to the MNF. *Id*. at 140:12-19, 147:3-16. Thus, the foreign currency debt details from the various Venezuelan financial institutions were gathered with this form for debt reporting. Tr. Trans. Vol. 16 at 142:14-143:5, 149:18-151:10 (discussing D-68, D-69).

Galdo's team also canvassed the international financial community, including institutional lenders, banks, fund managers, and investment companies worldwide. Tr. Trans. Vol. 17 at 5:1-6:14, 7:5-19. The team did not limit the inquiry to financial institutions known to hold Venezuelan debt; rather, "they created a net all over the world, and they divided the world into regions," in searching for debt to catalogue. *Id*. at 5:12-15, 6:10-14. The process was well-publicized internationally "in every paper in every financial center as this gathering of information went on, and it went on for a couple months." *Id*. at 15-18. Galdo personally "was called to several meetings to explain the needs of the country and to explain why we were doing this gathering of information... ." *Id*. at 6:23-7:1. Galdo's team then entered the data received from Venezuelan borrowers and from international lenders into a computer program for the purposes of reconciling the data. *Id*. at 8:8-21; *see* D-72.

For the Venezuelan government to take over the debt and obligations of a decentralized financial institution with its own charter and management, a favorable opinion must be issued

15

from the Venezuelan Central Bank on credit operations.  Congressional approval is also required.

Tr. Trans. Vol. 16 at 145:4-14; Tr. Trans. Vol. 19 at 23:17-24.  A creditor, therefore, had every

incentive to include its foreign debt in the cataloging.  Tr. Trans. Vol. 17 at 22:10-14.  Several

hundred creditors participated.  *See* D-70 at TrEx-00782-96.  Bandagro was one of the banks that

submitted forms chronicling its external debt.  Its submissions did not include any debt

obligations maturing in 1991, such as the Notes.  Tr. Trans. Vol. 16. at 155:10-156:4, Tr. Trans.

Vol. 17 at 16:14-17:3, 21:13-22:5; D-68; D-69; D-72.  Instead, the cataloging process revealed

that Bandagro had $627 million in foreign currency debt outstanding as of 1983.  *Id.* at 16:6-12

(discussing D-70 at TrEx-00834).  The debt was largely short term, with the latest maturity date

in 1987.  *Id.* at 16:17-20.  In other words, as of 1983, Bandagro had no debt maturing past 1987;

thus none maturing in 1991.  *Id.* at 21:8-12.  Before the maturation date on the Notes, the

government of Venezuela assumed nearly all of Bandagro's debt obligations.  Tr. Trans. Vol. 17

at 19:7-11, 20:19-21:3; P-39.  The bank is no longer in existence.

In April 1992, economist Jesus Eduardo Rodriguez Nuñez ("Rodriguez"), with extensive

public and private finance experience,[9] was appointed the President of the Liquidation Board.

Tr. Trans. Vol. 14 at 160:8-17, 167:16-18.  In the course of his management duties as President

of the Liquidation Board, Rodriguez became suspicious of certain documents in Bandagro's

files,[10] which referred to the issuance of $200 million in Bandagro Caroni I.C.C. 322 series

promissory notes executed by Nieves, Morales, and Cordero.  Rodriguez's doubts were due to

irregularities between the documents and liquidation reports he reviewed, which contained no

record of the referenced promissory notes.  *Id.* at 169:12-170:5; D-151; D-152.  Rodriguez

investigated the references and documents, and concluded that the documents were not authentic

---

[9] Rodriguez has worked for the International Monetary Fund, the World Bank, an investment bank entitled the Venezuelan Central Fund, and the Organization of the Petroleum Exporting Countries.

[10] The documents are letters purportedly sent by the prior President of the Liquidation Board.

16

and that the promissory notes referenced therein never existed. Tr. Trans. Vol. 14 at 170:17-25, 174:2-10, 175:23-176:12. Rodriquez considered the following indicia of forgery on the documents: the absence of archive numbers included as a matter of course on all such documents as well as inconsistencies between the signature block and the proper business title held by the purported signor. *Id.* at 172:14-173:24, 174:11-22. The Liquidation Board then reported that the documents and notes were forged to the Venezuelan police. *Id.* at 177:5-11.

## B. Gruppo Triad's Collection Efforts

Venezuelan attorney Miguel Jacir Hernandez ("Jacir") has been practicing for 49 years, specializing in civil law, civil procedure, mercantile law, and labor law. Tr. Trans. Vol. 7 at 68:7-16. Jacir is currently a partner in a private law practice after serving as a co-judge on the Venezuelan Supreme Court of Justice[11] from 1982 – 1994. *Id.* at 68:3-6, 68:17-22, 69:2-13. On March 8, 2000, Jacir issued a solicited opinion letter to a Panamanian entity Gruppo Triad, a collection of companies controlled and managed by President and CEO, James Paolo Pavanelli. *Id.* at 77:10-19; P-99. The opinion letter addressed the validity of bearer promissory notes issued on December 7, 1981 by Bandagro. P-99.

Following his March 8 opinion letter, Jacir traveled to Mexico to meet with Pavanelli regarding the promissory notes. Tr. Trans. Vol. 7 at 82:21-83:3. On November 27, 2000, Pavanelli granted Jacir's private practice a power of attorney to act on behalf Gruppo Triad with respect to collection efforts on the notes. P-92. Thereafter, on August 18, 2001, Pavanelli and Jacir executed a retainer agreement in Mexico for Jacir to pursue collection of the notes on behalf of Gruppo Triad in exchange for an 8% interest on any cash recovery to Gruppo Triad resulting therefrom. The agreement specifies that the notes in question are Bandagro promissory notes, type ICC 290, Caroní code, and type ICC 322, Caroní code, with a total face value of

---

[11] Venezuela's highest court.

$1,495,350,000 (the "Gruppo Triad Bandagro Notes"). P-93. Jacir doggedly pursued collection on the Gruppo Triad Bandagro Notes over a number of years. In doing so, his inquiries reached multiple branches of the Venezuelan government – Congress, the President and the MNF. P-15; JX-22, JX-17.

On May 9, 2002, Jacir wrote to both the President and the MNF requesting payment on behalf of Gruppo Triad. P-13. On September 16, 2002, the Minister of Finance, Tobias Nóbrega ("Nóbrega"), wrote to Jacir's partner, stating that "investigations carried out in 1998 through intelligence work and an audit procedure to determine whether the **'PROMISSORY NOTES,'** identified by **Caroni Code ICC-290** and **ICC-322**, correspond to commitments that were validly accepted by the Venezuelan State" resulted in a determination that **"such 'PROMISSORY NOTES' were never issued by the Banco de Desarrollo Agropecuario (BANDAGRO)… ."** JX-18.

Nevertheless, Jacir wrote to the Congressman and Chairman of the Subcommittee for Oversight and Spending of the National Assembly, Luis Velázquez Alvaray ("Alvaray"), on February 6, 2003, seeking assistance with the collection of Gruppo Triad's claim on its Notes. P-15. On February 14, 2003, Alvaray sent a letter to Nóbrega, urging an investigation into the Gruppo Triad Bandagro Notes and a determination of whether payment was due. JX-22. Jacir wrote again to the MNF on April 3, 2003 seeking payment. P-22.

### 1. The August 2003 MNF Report

#### a. Inspection of the Gruppo Triad Bandagro Notes

Jacir's inquiries were eventually successful such that in 2003, the MNF initiated an investigation into the claim for payment on the Gruppo Triad Bandagro Notes. The investigation was assigned to legal counsel Oscar Guzman Cova ("Guzman"), who issued a report on August

8, 2003 (the "August 2003 MNF Report"), which supported Gruppo Triad's claim for payment. P-6; P-17.

Guzman recruited the assistance of MNF attorney Hepsie Hurtado ("Hurtado") with the investigation into the Gruppo Triad Bandagro Notes. Tr. Trans. Vol. 8 at 10:8-15; *see* JX-25. At the time of the investigation, some of the Gruppo Triad Bandagro Notes were located in Switzerland, while others—including the Notes at issue in this case—were located at HSBC Bank in Miami. Tr. Trans. Vol. 7 at 96:3-11. Guzman sent Hurtado to Miami to examine the Gruppo Triad Bandagro Notes. Tr. Trans. Vol. 8 at 10:18-11:1. On March 7, 2003, Guzman requested that the Venezuelan Consul in Miami assist Hurtado. JX-25. Hurtado, Jacir, and the Venezuelan Consul met and examined the Gruppo Triad Bandagro Notes. Tr. Trans. Vol. 8, 11:1-25. After the examination, Hurtado submitted an inspection report to the MNF which was subsequently attached to the August 2003 MNF Report. P-6 at VZ-15643, Attachment F. Hurtado's report states that the Gruppo Triad Bandagro Notes "do not have any alteration, they are written on special bank security paper and the authenticity is verified." *Id.* at FS0881.

In early 2003, Guzman also appointed Carlos Delgado Morean ("Delgado")[12] to assist in investigating the Gruppo Triad Bandagro Notes. *Id.* at 47:25-48:2. Guzman delegated two tasks to Delgado—first, to provide advice in his capacity as a financial professional to Hurtado; and second, to examine the Gruppo Triad Bandagro Notes in Switzerland. *Id.* at 50:22-51:1; 51:13-19; 163:13-22. Before appointing Delgado, Guzman first sought and obtained approval from Nóbrega. *Id.* at 167:18-168:1. Guzman did not discuss Delgado's prospective appointment with anyone outside the MNF. *Id.* at 166:19-23. Delgado's only involvement in the MNF's 2003 investigation was to go to Switzerland to examine the notes held there. *Id.* at 279:7-1. Delgado

---

[12] Carlos Delgado Morean was also known as "Carlos Roman Delgado," Deposition of Oscar Guzman Cova, November 6-7, 9, 11, 2015, ("Guzman Dep.") at 260:19-23, and "Carlos Delgado Chalbaud Morean," *Id.* at 51:15-16.

left the MNF soon after his inspection of the notes in Switzerland and "after he left, he no longer visited the ministry." *Id.* at 279:4-12.

Delgado was working for Gruppo Triad at the same time as he was assisting the MNF investigation of the Gruppo Triad Bandagro Notes. D-575. On May 26, 2004, Delgado wrote Jacir an e-mail regarding legal proceedings with respect to collection on the Gruppo Triad Bandagro Notes stating "this is a team effort, and everyone has performed their tasks." D-563. On June 9, 2004, Delgado wrote an e-mail to Jacir,[13] stating that "for the last three years [Jacir] and I have worked hard and at the same time effectively in the process of legitimizing and winning recognition for TRIAD's rights, so that they will be given legal effect." D-575. [14] Guzman did not know about Delgado's conflict of interest, but he also did not make any attempt to assess whether Delgado had any connection to the Gruppo Triad Bandagro Notes before he made the appointment. Guzman Dep. at 173:10-175:23.

### b. Gathering Documents and Background Information

The MNF's inspection into the background and validity of the Gruppo Triad Bandagro Notes uncovered a multitude of documentation which it considered prior to issuing its report. As part of her investigation into the authenticity of the Gruppo Triad Bandagro Notes, Hurtado obtained from a government office a document dated June 5, 1987, in which the signers of the Notes purportedly acknowledged in the presence of a notary that they had issued the Gruppo Triad Bandagro Notes. Guzman Dep. at 61:24-64:4; P-6A at FS1042. Another document dated October 29, 1987, purports to be an affidavit signed by Fontana attesting once again to the veracity of signatures on the Gruppo Triad Bandagro Notes, as well as to the veracity of the June

---

[13] The document contains no sent or received information on its face, however, it was obtained from Jacir's files during discovery. D-575.

[14] Skye objects to the admission of D-563 and D-575 on the basis of hearsay. The Court finds the exhibits admissible for the limited purpose of establishing that Delgado was "'doing something' on behalf of [Gruppo Triad]." *Hilborn v. Chaw Khong Tech., Co., Ltd.*, No. 03-cv-71726, 2008 WL 4225783, at *6 (E.D. Mich. Sept. 10, 2008).

5, 1987 notarized acknowledgment by all three signers. P-53. The investigators also obtained a 1991 judicial inspection which confirmed that the MNF's records contained correspondence from an MNF official, verifying the Bandagro ICC promissory notes issued in 1981 did exist. *See* P-6A at FS1018-1031.

In 1998, however, the MNF had obtained written declarations from Cordero and Fontana in which they denied signing the Notes. Tr. Trans. Vol. 16 at 81:20-82:10; JX-9; JX-10. Fontana, to this day, denies signing the October 29, 1987 affidavit. Moreover, the cedula number—a unique identification number contained on Venezuelan identity cards—listed next to his name on the document is incorrect. Tr. Trans. Vol. 15 at 49:23-51:18; *See* P-53. Additionally, in 1998 the MNF ordered an analysis of certain Bandagro ICC notes located in Geneva, Switzerland. Marta Gomis ("Judge Gomis"), then head of the MNF's Department of Inspection and Auditing, accompanied the inspection team and witnessed the analysis. Tr. Trans. Vol. 15 at 139:15-23, 142:13-24; Vol. 16 at 68:3-6, 82:15-83:14. The 1998 analysis concluded that the signatures on the notes were forgeries, as well as that the stamps representing Bandagro seals on the face of the notes were inauthentic. D-916. Gomis also investigated the 733 Letter, uncovering three different versions. Tr. Trans. Vol. 16 at 69:9-18, 70:13-72:25; *see also* D-38; D-39; D-40. In the course of her investigation, Judge Gomis concluded that none of the 733 Letter's various versions had legal effect. Tr. Trans. Vol. 16 at 74:24.

Nevertheless, the MNF concluded that the claimants of the Gruppo Triad Bandagro Notes "have the legitimate right to be processed to make such Promissory Notes effective pursuant to the standards and procedures ruling this activity." P-6 at VZ15683. On August 12, 2003, Nóbrega sent the August 2003 MNF Report to the Venezuelan Attorney General,[15] Marisol Plaza Irigoyen ("Plaza"), for review. P-5; Deposition of Marisol Plaza Irigoyen, August 6-8, 2015,

---

[15] La Procuraduría General de la República.

21

("Plaza Dep.") at 67:11-25.

### 2. The October 2003 Attorney General Report & Related Venezuelan Law

In 1998, Hugo Chavez ("President Chavez") mounted a successful presidential campaign in Venezuela, taking office in 1999. Following the change in administration, in December 1999, the Constitution of Venezuela was amended by referendum, making several notable changes to the prior Constitution of 1961. Tr. Trans. Vol. 6 at 25:8-9, 25:14-18. The 1999 Constitution remained in place through the relevant time period—2003 and 2004. *Id.* at 25:9-11. The 1999 changes provided for the appointment of the Venezuelan Attorney General by the President but with authorization of the National Assembly. *Id.* at 26:1-4. The new constitutional framework also addressed the function of the Attorney General in specific respects. *Id.* at 26:13-16.

Since at least 1965, the Venezuelan Attorney General's role has been governed in part[16] by the Organic Law of the Attorney General. *See id.* at 28:4-8 (The Organic Law of the Attorney General was probably enacted in the early 20th century, with the 1965 codification applicable through 1999); P-7 at SKYE43. The 1999 constitutional regime change, however, also gave authority to the President to enact what are called Organic Laws. *Id.* at 28:9-14; P-7. Thus, President Chavez amended the Organic Law of the Attorney General in 2001, which remained in place until a later amendment in 2008. *Id.* at 28:14-18; Tr. Trans. Vol. 19 at 40:14-18; P-7. A Memorandum Introduction to the 2001 Organic Law of the Attorney General (the "OLAG") detailing the rationale for the amendments reads, in relevant part:

> Firstly, the new instrument implicitly contains the institutional reaction against the limitations and deficiencies of the legal instrument that has regulated it since 1965. The latter, established under a pattern of reduced interpretation from the assignment which the 1961 Constitution attributed to the Office of the Attorney General, limited considerably its activity and led, for the most part, to a

---

[16] Other laws are also applicable to the Office of the Attorney General; the OLAG, while specific, is not exclusive in its governance. *See e.g.* Tr. Trans. Vol. 19 at 39:12-18 (the Attorney General is also subject to the provisions of the Organic Law of Administrative Procedure).

22

weakening of its authority, in terms of its activity of the representation and defense of the asset interests of the Republic, as much as what concerns its judicial criteria.

\*\*\*

The reduced importance that has been conferred upon the function of this institution has been gradually added to the reduced version of the constitutional purpose of the Office of the Attorney General, as a result of an underestimation of its character and constitutional breadth, and the ignorance of its role as a body which guarantees the existence and permanence of the Venezuelan State.

\*\*\*

In addition to introducing a logical distinction and distribution of the norm which regulates the activity of the Office of the Attorney General, when the Republic does or does not take part in a trial, and which constitutes a guarantee of precision and legal security, the new legal instrument introduces the new feature of making imperative the criteria issued by the Office of the Attorney General of the Republic, when this is consulted in relation to the legality or illegality of the law requested from the Republic by individuals.

In addition to constituting an important innovation, it is a legal mandate destined to confer relevance and efficiency upon this Institution's criteria, and in this manner avoids the practice that has been generated by the tradition of making this consultation a formal act, without greater positive consequences for the individual or the State.

P-7 at SKYE43, SKYE46.

Title 4, Chapter 1 of the OLAG, specifically, Articles 54-60, governs the presentation of a claim against the Republic of Venezuela before the filing of a lawsuit. Tr. Trans. Vol. 6 at 33:18-21. Articles 54-60 provide for a prior administrative proceeding known as the "administrative pretrial" or administrative proceeding. Tr. Trans. Vol. 19 at 41:12-15; JX-16 at JX-160. The administrative pretrial must be exhausted before a private citizen files a lawsuit against the government for monetary damages. Tr. Trans. Vol. 6 at 34:22-35:7. This mandatory proceeding affords the Attorney General's office the opportunity to evaluate the merits of the claim as well as to negotiate a pre-litigation settlement, should it see fit. *Id*. at 35:8-17. Articles

23

54-60 state:

# TITLE IV
## ON ADMINISTRATIVE PROCEDURE PRIOR TO ACTIONS AGAINST THE REPUBLIC AND ON THE ACTIVITIES OF THE OFFICE OF THE ATTORNEY GENERAL OF THE REPUBLIC IN COURT CASES

## CHAPTER I
### ON ADMINISTRATIVE PROCEDURE PRIOR TO ACTIONS AGAINST THE REPUBLIC

**Article 54.** Whoever intends to file a lawsuit of an economic nature against the Republic must so state in advance and in writing to the body to which the matter corresponds and specifically set forth his or her claims in the case. Upon the filing of said document, the interested party must be given a receipt, which must acknowledge the receipt thereof.

**Article 55.** The respective body, within twenty (20) business days following the submission of the document containing the claim, must proceed to form a file on the matter submitted to it for consideration. The file, as applicable, must contain the instruments evidencing the obligation, the date on which the obligation arose, certification of the debt, a mediation certificate signed by the requesting party and the representative of the body, as well as the legal opinion with respect to whether the claim is or is not valid, and any other document considered indispensable.

**Article 56.** On the working day following the conclusion of the administrative file's preparation, the respective body must send it to the Office of the Attorney General of the Republic, with the pages duly numbered, in an original or certified copy, so that the Office of the Attorney General of the Republic, in a term of not more than thirty (30) business days, may formulate and send to the respective body or entity its legal opinion on whether the claim is valid. In such case, the opinion of the Office of the Attorney General of the Republic is binding.

The opinion of the Office of the Attorney General of the Republic is not required on claims whose amount is less than or equal to five hundred Tax Units (500 T.U.) that have been found to be valid by the highest authority of the respective body.

**Article 57.** The respective body must notify the interested party of its decision within five (5) working days following receipt of the opinion of the Office of the Attorney General of the Republic.

**Article 58.** Within ten (10) working days following the notification, the interested party must respond to the appropriate body on whether it accepts the decision notified. In case of disagreement, that interested party is entitled to take the case to the courts.

24

**Article 59.** Failure by the Administration to provide a timely response, within the timeframes contemplated in this Decree Law, entitles the interested party to take the case to the courts.

**Article 60.** Judicial officials must find any actions or third party interventions brought against the Republic to be inadmissible unless fulfillment of the formalities of the preliminary administrative procedure referred to in this Chapter has been demonstrated.

JX-16 at JX-160-61.

On October 3, 2003, the Venezuelan Attorney General issued an opinion favoring the claims for payment on the Gruppo Triad Bandagro Notes (the "October 2003 AG Opinion"). P-6. The October 2003 AG Opinion references the October 2003 MNF Report extensively and includes a significant number of attachments. One of the attachments is a grapho-technical report by Bruno Fabbiani ("Fabbiani"), an Italian document expert who had issued opinions regarding handwriting analysis and signatures with respect to the Gruppo Triad Bandagro Notes.[17] P-6 at VZ15644; Tr. Trans. Vol. 1 at 100:17-22. Fabbiani originally prepared the 1993 report for Pavanelli and the MNF took it into consideration when issuing the October 2003 MNF Report.[18]

Plaza issued the October 2003 AG Opinion in order to "fulfill the administrative proceedings according to the organic law of the attorney general office of the Republic." Plaza Dep. at 136:24-137:3. During the time period in which Plaza was Attorney General, between 2000 and 2006, there were many administrative proceedings pursuant to Articles 54-60 of the OLAG as "hundreds and hundreds of these claims were being made." *Id.* at 46:1-10, 49:2-21,

---

[17] Venezuela moved *in limine* to prevent Fabbiani from testifying, because he had not disclosed any relevant rebuttal opinions; he had not properly reviewed the report he was meant to rebut; he had not written the rebuttal report himself; and he otherwise did not employ a reliable methodology. *See* ECF No. 650 at 6–10. The Court took Defendants' motion *in limine* regarding Fabbiani under advisement at the final pretrial conference. Tr. Trans. Jan. 29, 2016, at 21:14–22:7. Skye mooted the issue by not calling Fabbiani as a witness at trial.

[18] The 1993 document (contained within P-6B) was admitted only for the purpose of showing what Skye knew in its information gathering before purchasing the Notes. *See* Tr. Trans. Vols. 23 at 34:21-38:20.

277:25-279:2.

On November 18, 2003, Plaza sent a certified copy of the October 2003 AG Opinion to Alvaray. The same day, the MNF received a letter sent by Jacir to Nóbrega. Jacir referenced the August 2003 MNF Report and stated that he had "received information to the effect that the Attorney General [of] the Republic confirmed the opinion of the Ministry on October 3 of this year." P-117. As a result, Jacir requested that "the order issued by the Attorney General of the Republic be complied with and an official letter sent to the Public Credit Bureau or to the relevant office so that [Gruppo Triad] can be paid the sum claimed." *Id.*

### 3. The November 2003 MNF Report & December 2003 AG Report

By all accounts, public controversy erupted once the October 2003 AG Opinion was published and reported in the news. Plaza received criticism in the media implying that she had committed a crime in approving the claim. *Id.* at 235:25-236:16. On November 17, 2003, Nóbrega sent Plaza a letter asking her to issue a new opinion. In his letter, Nóbrega indicated that he had asked a new legal advisor to prepare a new report, which reached a different conclusion on the validity of the Gruppo Triad Bandagro Notes. Plaza Dep. at 198:3-10; D-428.[19] Plaza responded the next day, stating that her office was unable to issue a new opinion and that, because the new MNF report cited to criminal actions, follow-up would be best left to the public prosecutor. D-436; Plaza Dep. at 194:8-195:5. Plaza then called Nóbrega to explain that the August 2003 MNF Report was still valid. Plaza Dep. at 195:1-6.

On November 20, 2003, Nóbrega sent Plaza another letter, attaching the new report he referenced in his first letter, (the "November 2003 MNF Report"), and stating that it "revokes the opinion dated August 8, 2003." D-438. The 1998 investigative analysis into the Gruppo Triad

---

[19] The parties stipulated to the admissibility of D-428 for the purposes of what was sent and received between Nóbrega and Plaza, rather than for the truth of what is asserted therein. Tr. Trans. Vol. 23 at 8-9.

26

Bandagro Notes was the primary justification the MNF gave when rescinding its original report and issuing a new one. The MNF stated that it had the 1998 report from Switzerland, but contended the 1998 analysis had not been thoroughly considered during the 2003 investigation. *See* D-429. Plaza understood that Guzman's previous opinion had been specifically revoked by Nóbrega. Plaza Dep. at 254:13-18. Therefore, Plaza's "office was able to issue a new opinion." *Id.* at 258:4-9.

Plaza issued her second opinion on December 8, 2003 (the "December 2003 AG Opinion"). D-452A; Plaza Dep. at 233:2-8, 265:1-5, 266:7-13. Based on the November 2003 MNF Report, the December 2003 AG Opinion revoked the October 2003 AG Opinion and declared that the claim on the purported Gruppo Triad Bandagro Notes was not viable. D-452A at TrEx-05550.

Jacir's files, exchanged during discovery in this litigation, contain copies of newspaper articles from late 2003 through early 2004. *Quinto Dia* was, at the time, a well-known Venezuelan weekly newspaper. Tr. Trans. **Vol. 12** at 19:1-5. One of the articles in Jacir's files, published in the January 23-30, 2004 edition of *Quinto Dia*, specifically references a November 17, 2003 report from the MNF related to the Gruppo Triad Bandagro Notes. *Id.* at 7:18-22. Jacir's files also contained a *Quinto Dia* article from December 19-26, 2003, reporting that a Venezuelan woman was detained by United States Customs after arriving at John F. Kennedy airport ("JFK") in New York City on a flight from Caracas. The woman was carrying $4.2 million in purported Bandagro promissory notes, which, after investigations conducted by Venezuela in conjunction with North American authorities, were determined to be fraudulent. *Id.* at 16:7-23; *see also* JX-30. Jacir also read in the newspapers in late December 2003 or early 2004 that Cordero had denied signing the Gruppo Triad Bandagro Notes. *Id.* at 19:16-24.

27

## C. David Richards & Skye

David Richards ("Richards") is an investment professional who formed Skye in August 2003 as a conduit entity for financial deals he pursues in the regular course of his investment business. Tr. Trans. Vol. 3 at 18:19-22. In or around August 2003, Richards met with the brother of a friend and business associate who told Richards about an investment opportunity in Venezuelan bank notes, which, if successful, would bring a higher-than-industry-average rate of return. *Id.* at 16:14-24.

### 1. Skye's Due Dilligence on the Notes

Richards began gathering information on the deal—which included contacting Swiss attorney and businessman, Antonio Usuelli ("Usuelli"), who, along with Swiss attorney and notary Siro Schianchi ("Schianchi"), represented and/or negotiated on behalf of the entity Richards came to know was in possession of the bank notes. *Id.* at 21:15-17; 25:24-26:1. Shortly after learning of the investment opportunity and conducting his own preliminary background inquiries, Richards learned that the Venezuelan Attorney General had issued an opinion regarding the validity of the bank notes. *Id.* at 24:21.

From roughly mid-October to November 2003, Richards focused his diligence on the opinion. During this initial due diligence phase, Usuelli informed Richards that the October 2003 AG Opinion was final and binding under Venezuelan law and that "was the end of the matter." *Id.* at 27:13-16, 30:6-8. Richards asked Gruppo Triad representatives about a possible transaction. Usuelli responded that it may take a while for Venezuela to pay and that Pavanelli would likely need some interim funding, so a deal may be possible. *Id.* at 27:13-21.

In the course of looking into the potential investment, Richards engaged the law firm of Crabbe, Brown & James, LLP ("CBJ"), where he was previously employed, to conduct due

diligence on the potential deal. Louis Alcalde ("Alcalde") was the principle CBJ attorney conducting the diligence, with assistance from John Kennedy ("Kennedy"). *Id*. at 23:23-24:1. Richards gave Alcalde a copy of the October 2003 Attorney General Report, favoring claims for payment by holders of the bank notes, and put Alcalde in touch with Jacir. Tr. Trans. Vol. 1 at 13:19-23. For some period of time, Alcalde recorded time using a single client matter number for both Skye and Gruppo Triad, as well as submitted billing records naming the client Gruppo Triad care of Skye Ventures II, LLC. *See* D-799. At Richards' request, Alcalde's due diligence focused on the effect of the October 2003 Attorney General Report, specifically whether it had a binding precedential nature under Venezuelan law. *Id*. at 32:13-33:10; Tr. Trans. Vol. 1 at 15:19-22. Alcalde was not asked to and did not focus his diligence on whether Bandagro had in fact issued the Notes. Tr. Trans. Vol. 1 at 189:19-24.

In October 2003, Richards asked Alcalde for his impression of the October 2003 AG Opinion and was told that the opinion itself indicated it was a final opinion that required mandatory compliance. Tr. Trans. Vol. 3 at 32:13-33:10. Skye also learned that the Venezuelan media was reporting about the Bandagro notes and, according to the media, the validated Gruppo Triad notes might be delivered to the MNF and exchanged for Eurobonds maturing in 2013. Tr. Trans. Vol. 12 at 101:12-103:5; Tr. Trans. Vol. 3 at 31:6-32:4.Tr. Trans. Vol. 3 at 31:6-32:4; D-418. To that end, on November 3, 2003, Kennedy attempted to e-mail the MNF to verify the truth of certain newspaper articles from South American media on the legitimacy of the bonds, given the MNF's October 31, 2003 Public Notice. Tr. Trans. Vol. 12 at 97:9-16; D-418.

In the course of performing diligence on the Notes, Alcalde noted that the October 2003 AG Opinion included a discussion of evidence in the MNF files indicating that the signers of the Gruppo Triad Bandagro Notes had denied signing them. Tr. Trans. Vol. 1 at 101:1-8. On the

other hand, Alcalde discovered that the 2003 AG Opinion referenced the June 5, 1987 document in which the signers purportedly admit to signing the notes, as well as Fabbiani's investigation "in which he opined that the signatures on the notes were the signatures of the three principals of Bandagro." *Id.* at 101:9-18. At some point while performing his diligence on the Notes, Alcalde received the October 2003 MNF Report. *Id.* at 119:11-23. Between the October 2003 MNF Report and AG Opinion, Alcalde noted that the MNF and the Attorney General "recognize and list four prior investigations in which the Ministry of Finance, for a variety of other reasons, had rejected claims and had alleged that some [Bandagro] notes were counterfeit." *Id.* at 98:15-19. Alcalde placed great weight on the fact that, despite recognizing the existence of fake Bandagro notes, the August 2003 MNF Report and the October 2003 AG Opinion still found the Gruppo Triad Bandagro Notes valid. *Id.* at 98:20-25.

In mid-November 2003, Richards made an initial investment of $50,000 in exchange for Schianchi promising a deed of trust for proceeds from recovery on the Gruppo Triad Bandagro Notes. Eventually, Richards received the deed, in the amount of $500,000. Tr. Trans. Vol. 3 at 31:6-32:4. During the initial diligence phase, Richards and Alcalde contacted Jacir several times. *Id.* at 38:12-17. Richards learned that Jacir had filed Gruppo Triad's claim resulting in the October 2003 AG Opinion. *Id.* at 38:21-39:4. Alcalde understood Richards was evaluating "whether or not this opinion of the Attorney General of Venezuela was final and binding and whether or not he wanted to invest in the notes that were the subject of the opinion." Tr. Trans. Vol. 1 at 15:19-22.

Specifically, Alcalde questioned Jacir about the preclusive effect of the October 2003 AG Opinion and reported back to Richards that the opinion was "final and binding and cannot be challenged or appealed in Court." P-78. Jacir sent Alcalde a copy of the OLAG along with its

30

legislative history, the Venezuelan constitution, and other Venezuelan laws, all of which Alcalde reviewed. Tr. Trans. Vol. 1 at 26:18-23, 29:1-12. Alcalde reported to Richards that according to the October 2003 AG Opinion, the government of Venezuela had previously found other Bandagro notes to be fake, but had still concluded that Gruppo Triad's notes were legitimate obligations. Tr. Trans. Vol. 3 at 42:9-22; P-79.

By early 2004, Richards had developed an "investment thesis" that the October 2003 AG Opinion was a final and binding decision that could be enforced. *Id.* at 42:15-17. Alcalde and Richards had also reached the conclusion that, in the event a lawsuit was necessary to enforce payment on the Gruppo Triad Bandagro Notes, it could be brought in the United States. *Id.* at 46:17-19. At the same time, Richards continued to participate in diligence efforts and came to know that Delgado was involved with recovery efforts on behalf of Gruppo Triad. On March 7, 2004, Richards relayed via e-mail to a business associate that Pavanelli "rebuffed an offer from DelGado at .45 on the dollar, telling him not to waste his time." D-515.

In April 2004, Richards and Alcalde traveled to Venezuela to meet with attorneys, including Jacir, and officials who had some involvement in the Venezuelan government's investigation into the notes pertaining to the October 2003 Attorney General Report. Alcalde and Richards spent both April 16 and 17 with Jacir. Tr. Trans. Vol. 2 at 50:14-19; Tr. Trans. Vol. 3 at 70:11-14. The April 17 meeting included Guzman in substantial part. Tr. Trans. Vol. 2 at 51:22-24; Tr. Trans. Vol. 3 at 71:8-9. Delgado also attended a lengthy portion of the April 17 meeting. Tr. Trans. Vol. 2 at 50:21-24; Tr. Trans. Vol. 3 at 68:20-21, 71:8-9; P-129.

By this time, Richards knew that during the MNF's 2003 investigation Delgado had traveled to Switzerland to inspect some of the Gruppo Triad Bandagro Notes. *Id.* at 74:14-19. Richards believed Delgado was an "opportunist" who had indicated his relationships could help

31

with political efforts to get the notes paid. *Id.* at 74:20-75:1.

By that time, Alcalde was aware, through newspapers reports that had been uncovered through due diligence, that the MNF terminated Guzman after the issuance of the August 2003 MNF Report. Tr. Trans. Vol. 2 at 53:13-18. At the meeting, Alcalde asked Guzman about his termination. *Id.*

Alcalde further spoke over the phone or met with Delgado on June 23, 25, 29, and July 2 and 7. Tr. Trans. Vol. 2 at 58:16-59:4; D-800. Alcalde was "suspicious" and "leery" of Delgado. Tr. Trans. Vol. 2 at 60:1-7. Richards believed Delgado was a "lobbyist/wheeler dealer" who "help[ed] with the political aspects of the effort to have the notes honored." P-129.[20] During the due diligence process, Richards became aware that Delgado inspected other Gruppo Triad Bandagro Notes in Switzerland on behalf of the MNF. Tr. Trans. Vol. 5 at 34:18-22. It was "important" to Richards that Delgado had not performed the inspection on the Notes, which were instead inspected by Hurtado, a MNF employee. *Id.* at 34:25-35:4. Nevertheless, Skye[21] also purchased Note 9/12 from Gruppo Triad, one of the Bandagro promissory notes inspected by Delgado during the MNF investigation. Tr. Trans. Vol. 4 at 195:19-22; D-658. Skye has never filed suit seeking payment on the note. *Id.* at 198:13-18; *see also id.* at 202:7-19 (Richards testified suing on Note 9/12 was inconsistent with contractual obligations to Gruppo Triad). Skye also solicited investments in other notes on behalf of Gruppo Triad. D-629.

---

[20] Venezuela initially objected to the admission of P-129 at trial on hearsay grounds. Tr. Trans. Vol. 3 at 78:24-79:3. The Court ruled that the document is admissible as a business record under Federal Rule of Evidence 803(6). *Id.* at 78:19-20. In doing so, the Court emphasized that it would not rely primarily upon the exhibit with respect to the facts surrounding Richards' trip to Venezuela to evaluate the potential investment in the Gruppo Triad Bandagro Notes, but rather on Richards' testimony. *Id.* at 79:4-6. At the close of trial when both parties moved to admit exhibits, however, Venezuela no longer recorded an objection to P-129 and the exhibit was subsequently re-admitted. "Plaintiff's Exhibits for Admission with Venezuela's Objections as of 3/3/2016 – Subject to Amendment, Modification, or Supplementation," submitted to the Court March 3, 2016; Tr. Trans. Vol. 23 at 3:4-9 (referencing submissions and admitting Plaintiff's exhibits offered to which there are no objections).

[21] Note 9/12 was purchased from Gruppo Triad by Skye in conjunction with another Richards corporate entity, entitled "Skye II." Tr. Trans. Vol. 4 at 194:20-195:7. By June 18, 2005, Plaintiff Skye was the bearer and owner of Note 9/12. *Id.* at 19-21.

Pavanelli repeatedly requested money from Richards in ongoing efforts to collect on the Gruppo Triad Bandagro Notes. *See* Tr. Trans. Vol. 4 at 75:19-23, 82:7-9. On February 5, 2004, Pavanelli wrote an e-mail to Richards which states that Jacir was about to have "an extreemely [sic] important meeting with the President of the financial subcommission of the Venezuelan Parlament [sic] for the final decision" and that he "MUST [have] FUNDS AVAILABLE BEFORE THAT TIME." JX-35. On February 16, 2004, Richards sent Pavanelli and Usuelli an email stating that he would send another $50,000 to Pavanelli. D-508. On February 22, 2004, Alcalde sent Richards an email stating that the 2003 Attorney General Report "could not be appealed" and as a result, Jacir was "working on the politics of the situation." P-79.

On April 2, 2004, Richards and others met with Pavanelli in Lake Como, Italy, to discuss the Gruppo Triad Bandagro Notes. Tr. Trans. Vol. 3 at 55:16-19. During that trip, Pavanelli said that he had paid between $100-200 million for the Gruppo Triad Bandagro Notes, which held a face value of $1.1 billion. *Id.* at 56:24-25, 57:9-11.[22] Prior to Skye obtaining the Notes, Alcalde asked Pavanelli how Gruppo Triad acquired the Notes. Tr. Trans. Vol. 1 at 194:3-8. In May 2004, Alcalde asked Pavanelli why the latter only paid $250 million for the Gruppo Triad Bandagro Notes, when they had a face value over $1 billion. Tr. Trans. Vol. 1 at 197:21-25; D-564. Pavanelli responded that he paid "much more" than $250 million. D-565.[23] Alcalde did not receive any further information from Pavanelli regarding the purchase price. Tr. Trans. Vol. 1 at 199:9-11.

During the April 2004 meetings in Caracas, Richards and Alcalde asked Jacir to provide a written opinion regarding the finality of the October 2003 AG Opinion. Tr. Trans. Vol. 3 at

---

[22] The Court admitted this hearsay testimony not for the truth of the matter asserted. Rather, it was admitted solely for the purpose of Richards' knowledge at the time, which is relevant towards Skye's due diligence prior to purchasing the Notes. *Id.* at 57:5-6.
[23] D-565 was also not admitted for the truth of the matter asserted, but for Skye's knowledge prior to purchasing the Notes.

83:7-8. On May 23, 2004, Jacir sent an e-mail to Richards and Alcalde with written answers to several questions regarding the October 2003 AG Opinion and the validity of the Gruppo Triad Bandagro Notes. *Id.* at 83:14-20; D-560. In the email, Jacir described his involvement in a hearing before a Venezuelan National Assembly subcommittee. Tr. Trans. Vol. 2 at 34:21-35:7; D-560. Jacir wrote that the hearing was an investigation into irregularities on the part of certain government officials from former administrations. The purpose was to learn whether or not fraud was committed against Venezuela with respect to the Gruppo Triad Bandagro Notes. The e-mail also advises that Venezuela "has been in default" since the date of the 2003 Attorney General Report. D-560.

Alcalde also sought opinions from Venezuelan lawyers about the effect of the October 2003 AG Opinion. Jacir put Alcalde in touch with a former Attorney General, Ivan Badell ("Badell"), with whom Alcalde met in June 2004. Tr. Trans. Vol. 1 at 65:21-24. Badell's credentials also include serving as a professor, specifically the Criminal Procedure Law Chair at Santa Maria University in Caracas, judge, and a member of the Ministry of Justice's National Legislation, Coding, and Jurisprudence Committee. *See* ECF No. 20-1. Alcalde also consulted with prominent Venezuelan attorneys Duque Corredor ("Corredor") and Enrique Irribarren. *Id.* at 69:10-17. Corredor served as legal counsel to the President, formerly was a Supreme Court justice, a professor of civil and administrative law, and a professor of constitutional law. *See* ECF No. 20-2. Richards and Alcalde met with each of the Venezuelan attorneys separately during a return trip to Caracas in June 2004. Tr. Trans. Vol. 3 at 87:10-19, 88:15-89:2. Each attorney told Alcalde and Richards that the October 2003 AG Opinion was final and binding and could not be changed. *Id.* at 89:3-9, 90:6-14; Tr. Trans. Vol. 1 at 69:18-70:17.

On August 5, 2004, Pavanelli sent Jeffrey Brown ("Brown"), an attorney with CBJ who

34

worked on the sale of the Notes, an e-mail which stated that Pavanelli no longer wanted Richards or Skye involved. As a result, Pavanelli wrote, arrangements would have to be made to "use another firm or company to be upfront in the lawsuit." D-599; Tr. Trans. Vol. 13 at 144:20-23. [24]

At some point during the diligence, negotiation, and execution process, but no later than May 2004, Skye became aware that an agreement existed between Gruppo Triad and Woodstride Investments Limited ("Woodstride"), a company incorporated and domiciled in the British Virgin Islands. Tr. Trans. Vol. 2 at 70:16-24. As a result of this deal, Woodstride representatives were claiming a 25.11% interest on certain of the Gruppo Triad Bandagro Notes. *See* J-39; Tr. Trans. Vol. 2 at 72:12-18 (Alcalde had read the October 2003 AG Report by May 2004, which contained the information that various interests on the Gruppo Triad Bandagro Notes had been assigned to Woodstride). In July 2004, Alcalde met with Woodstride representatives and Pavanelli at Lake Como, Italy. Specifically, Alcalde understood that the meeting took place because "there was a dispute between the principals of Woodstride and James Pavanelli regarding an agreement that the principals of Woodstride had with Pavanelli respecting the – some notes they felt Pavanelli needed to assign to them." Tr. Trans. Vol. 1 at 13-21.

Alcalde also learned that Woodstride representatives were connected to Alvaray. Tr. Trans. Vol. 2 at 79:3-6. The representatives "lobbied Alvaray to get him to send a letter to investigate the notes." *Id*. at 79:11-14. Woodstride eventually filed a lawsuit against Venezuela for payment on the Gruppo Triad Bandagro Notes in the Constitutional Chamber of the Supreme Court of Venezuela, pursuant to its claimed interest. The Constitutional Chamber issued an opinion against Woodstride's collection efforts on March 9, 2004. D-524.

In the course of its due diligence, Skye also uncovered the following:

---

[24] Skye objects to the admission of D-599 on the basis of hearsay. The document was admitted, not for the truth of the matter asserted, but rather for the purposes of demonstrating what legal counsel for Skye knew at the time.

- In 1981, the *Wall Street Journal* reported that the Venezuelan government had intervened in the bank and would assume all of Bandagro's credit obligations. The same story reported that the intervention occurred because the bank's debts of $2.5 billion exceeded its capital of $23 million. P-74A.

- In January 1981, the Venezuelan Minister of Finance met with foreign banks and confirmed the government's decision to support Bandagro's commitments to foreign and domestic investors. P-39.

- On September 30, 1998, the Venezuelan Ministry of the Treasury published an "Open Letter to the Public" which disavowed the validity of promissory notes purportedly issued by Bandagro in the CARONI Code, ICC-290 and ICC-322 series. The Letter is signed by the Minister of the Treasury. D-282.

  - The Letter was subsequently published in two newspapers – *El Universal* and *El Nacional* on October 7, 1998. J-14; *see* Tr. Trans. Vol. 1 at 188:1-9 (Alcalde knew there were fake Bandagro notes in circulation and Venezuela had issued public statements warning against them).

- On February 23, 2001, the MNF issued a Public Notice confirming that promissory notes CARONI Code, ICC-290 and ICC-322 were never issued by Bandagro. The Public Notice specifically references and ratifies the September 30, 1998 Ministry of the Treasury Letter. JX-14; *see* Tr. Trans. Vol. 1 at 188:1-9.

- On October 31, 2003, Nóbrega re-released the February 23, 2001 MNF Public Notice stating the Bandagro promissory notes were forged and international financial institutions should refrain from negotiating them. D-414; D-418; Tr. Trans. Vol. 2 at 16:5-17:9.

- On November 30, 2003, *El Universal* reported that the MNF had rejected the conclusions in the October 2003 AG Report. Nóbrega was reported to have removed Guzman from the MNF's Office of Legal Counsel. The article further reports that Nóbrega denied that the October 2003 AG Report is final and that the MNF was preparing a new report arguing against any payment to Gruppo Triad. D-446.

- A December 19-26, 2003 *Quinto Dia* article was published regarding the May 1987 incident at JFK airport in which a woman was detained with fraudulent Bandagro promissory notes. Tr. Trans. Vol. 1 at 208:12-15. Alcalde also learned that the woman was reported to have been working for Pavanelli. *Id*. at 208:5-8. Prior to Skye's purchase of the Notes, Alcalde asked Pavanelli about the incident. *Id*. at 210:16-22.

- A December 19-26, 2003 *Quinto Dia* article reported that an investigation into the seized fraudulent notes resulted in Pavanelli's prosecution and sentencing to six years in prison in England. JX-30 at JX-332. Details about the prosecution and conviction were published by Gruppo Triad on its website. D-558 at TrEx-06188-89.

- Pavanelli was indicted, tried, and acquitted of fraud, but convicted of conspiracy to use false Bandagro notes in 1989 in London. Tr. Trans. Vol. 4 at 219:8-221:10; *see also* Tr. Trans. Vol. 1 at 216:24-217:13.

- The Venezuelan legislature convened a Special Mixed Commission to investigate "the entire matter of the Attorney General issuing an opinion about these Bandagro notes that are at issue here and the circumstances behind that." Tr. Trans. Vol. 2 at 187:18-188:16.

- On March 9, 2004, the Constitutional Chamber of the Supreme Court of Venezuela denied Woodstride's claim against the MNF for payment of 25% credit interest on 25 Gruppo Triad Bandagro Notes due to a lack of standing, maintaining that the claim was

37

an administrative one for payment from Venezuela rather than a claim for protection of a constitutional right. D-524.

- On July 1, 2004, *La Nacion* published an article stating that Plaza defended the 2003 Attorney General Report, despite the MNF having classified the Gruppo Triad Bandagro Notes as forgeries for the previous eight years. P-73.

- Venezuela had not made any payment to Gruppo Triad in the ten months between the October 2003 AG Opinion and the time Skye obtained the Notes and filed this suit in August 2004. D-560 at TrEx-06201 (May 23, 2004 email from Jacir responding to Skye's inquiry about why payment had not been made); D-629 at Tr-Ex-06672 (November 4, 2004 memo from Richards stating "the Minister of Finance has not processed payment of the Notes").

Richards' trip to Lake Como, Italy, to meet with Pavanelli and others regarding the Gruppo Triad Bandagro Notes took place from late March into early April 2004. Tr. Trans. Vol. 3 at 48:8-10. During the trip, Richards met with Pavanelli, Usuelli, and Schianchi. *Id.* at 48:11-12. At that time, Pavanelli told Richards that Venezuela had "persecuted" him by trying to "prosecute him a lot of times," despite his innocence.[25] *Id.* at 50:16-18. Specifically, Pavanelli spoke of legal problems in 1991 in London in relation to the Gruppo Triad Bandagro Notes located in Italy and in Switzerland. *Id.* at 52:1-6. Richards met with Fabbiani, before purchasing the Notes. *Id.* at 55:12-15.

While performing diligence, Alcalde also learned that "in addition to the four investigations that had rejected the prior claims, that the government of Venezuela, specifically the Ministry of Finance, had issued by public announcements, sometimes posted on their website

---

[25] This hearsay testimony was not admitted for the truth of the matter asserted, but rather towards what Skye knew or uncovered in the course of its diligence before purchasing the Notes. *Id.* at 50:8-9.

and also, perhaps, issued them to international banks, about the fact that there were counterfeit Bandagro notes in the international markets." Tr. Trans. Vol. 1 at 131:8-14. Alcalde was not concerned about the public announcements, however, because he believed the Attorney General's office "had taken note of all of this and issued an opinion deciding that these notes were different and that these notes were valid and had to be paid." *Id*. at 131:16-20.

After compiling and analyzing his own research and soliciting legal opinions from the Venezuelan attorneys, Alcalde concluded that the October 2003 Attorney General Report was "final and binding" under Venezuelan law. Tr. Trans. Vol. 1 at 147:7-14. Alcalde provided his conclusion to Richards. *Id*; Tr. Trans. Vol. 3 at 46:2-8. Richards based his decision to purchase the Notes on the investment thesis that the October 2003 AG Opinion was final and binding. Tr. Trans. Vol. 4 at 28:23-24, 30:20-23. As an investment professional, Richards understood that all deals involve some measure of risk. Skye's investors relied on Richards to evaluate whether that risk could have been overcome. *Id*. at 50:19-24. To evaluate the risk involved in purchasing the Notes, Richards testified that he did not look at Pavanelli's history, but rather at whether the October 2003 AG Opinion was final and binding. *Id*. at 30:20-23. Richards concluded that it was. *Id*. at 50:19-24.

Skye learned of the December 2003 Attorney General Report sometime in 2005. Tr. Trans. Vol. 4 at 10-12.

## 2. Skye's Purchase of the Notes

In early April 2004, immediately following the Lake Como trip, Richards sent Pavanelli a purchase agreement between Gruppo Triad and Skye. Tr. Trans. Vol. 3 at 58:14-17. From that point on, the agreement was consistently edited—mostly by Richards—resulting in several versions at various points in time. *Id*. at 144:24-145:4. The first version of the agreement was

39

dated effective April 8, 2004 (the "April 8 Agreement"). *Id.* at 60:20-23; P-145. Upon retuning from Lake Como, Richards quickly received a signed copy of the agreement from Pavanelli, while Richards delayed signing. Eventually, he signed that same version or one similar to it in August 2004. *Id.* at 62:10-13, 63:6-7.

On June 23, 2004, Richards and Pavanelli signed an agreement providing that Skye would "purchase 100,000,000 Million [sic] Face Value of Bandagro Notes," identified as notes 3/12 and 4/12. D-581 at TrEx-06301 (§§ 1.1, 2.4). The agreement provided for Skye to bring a lawsuit against Venezuela in collaboration with Gruppo Triad to have the notes honored. The agreement also provided for Skye and Gruppo Triad to jointly instruct CBJ as to the conduct of the lawsuit. *Id.* §§ 2.1, 2.2. Under the agreement, Skye also became a party to the pre-existing engagement letter between CBJ and Gruppo Triad. *Id.* § 2.5. The notes to be purchased by Skye would be held by CBJ. *Id.* § 3.1. If the suit were unsuccessful, CBJ would return the notes to Gruppo Triad. *Id.* § 3.3. If the suit were successful, funds would be distributed according to the waterfall in the non-recourse promissory note attached to the agreement. *Id.* §3.2. Attorneys would be paid first, followed by Skye's deeds of trust, which totaled around $9.5 million. *Id.* § 2.1. The remaining proceeds would be provided to Gruppo Triad. Richards testified that the June 23, 2004 agreement was abandoned in early July 2004 due to Pavanelli's irrational behavior, including Pavanelli's refusing to send the notes as required by the agreement. Tr. Trans. Vol. 5 at 20:23-25. At that point, Richards testified, he had grown weary of Pavanelli and decided that there was "no way on earth" Skye would join with Gruppo Triad in further efforts to collect on the Gruppo Triad Bandagro Notes. Tr. Trans. Vol. 3 at 99:14-100:1.

In July 2004, Alcalde traveled to Lake Como intending to pick up and bring back the Notes to the United States for Skye. Tr. Trans. Vol. 2 at 73:11-15; D-593. Alcalde returned

from the trip without the Notes, and CBJ sent a letter terminating its representation of Gruppo Triad to Pavanelli on July 30, 2004. Tr. Trans. Vol. 2 at 76:7-8; D-595. CBJ continued to represent Skye for some time thereafter. Initially, the Notes came into Skye's possession through Schianchi, who had agreed to act as Skye's agent. Tr. Trans. Vol. 3 at 114:3-9. The Notes were subsequently delivered by courier to Columbus, Ohio and have been in Skye's possession since on or about August 16, 2004. Tr. Trans. Vol. 3 at 113:25-114:2.

The April 8 agreement, which Richards signed in August 2004, directed Skye to demand payment on the Notes and bring a lawsuit against Venezuela. Skye was responsible for all legal fees and legal expenses reasonably necessary for the action, estimated to be around $30 million. Gruppo Triad was to pay any legal costs over that amount. The agreement acknowledged that Skye had already paid Gruppo Triad $250,000 and stated that Skye would pay an additional $200,000. The distribution of funds recovered on the Notes was laid out in a "waterfall." That is to say, any recovery on the Notes would be distributed up to a certain amount to one designee, up to the next increment to another designee, and so on. The April 8 agreement included a waterfall distribution as follows:

- First, legal fees up to $30 million to Skye;

- Second, $26 million to Skye;

- Third, to "those parties to whom Skye has assigned a reasonable Bandagro Interest to be of assistance to Skye in its effort to assist. (Others)."

- Fourth, $39 million to Gruppo Triad;

- Fifth, the remaining amount, equal to accrued interest, to be divided between Skye, Others and Gruppo Triad on a prorated basis;

41

- All funds distributed to Gruppo Triad will be reduced by any deduction made by Venezuela, for example, any legal fees deducted etc.

P-145.

The agreement includes a provision permitting modification by writing signed by both parties. *Id.* The parties utilized the modification provision several times from 2004 onward, at the behest of Richards, who, as Skye continued to contribute additional funding either to Gruppo Triad or to the litigation on the Notes, wanted to ensure a favorably profitable position for Skye and its investors. Tr. Trans. Vol. 3 at 101:16-18. As a result, the modifications of the purchase agreement focused on the waterfall distribution. In March of 2009, for example, a modification was executed which included the following distribution:

- First, to Skye for all amounts received up to $110 million;

- Second, all amounts received between $110 million and $188 million split 50% to Skye and 50% to Gruppo Triad "or any interested parties to whom Gruppo has assigned an interest in its share of the recovery;"

- Third, all amounts received above $188 million distributed to Skye, but may include an interest payment by Skye to Gruppo Triad, to be determined by Skye in its sole discretion;

- Fourth, all of Gruppo Triad's previous agreements with third parties for priority distributions from Gruppo Triad's share remain in effect, with an additional assignment of $12.5 million to Useulli. Should recovery on the Notes be insufficient to pay out the obligations of Gruppo Triad to Useulli, Gruppo Triad will make up any difference with such third parties from its own share of proceeds from other notes;

- All funds distributed to Gruppo Triad will be reduced by any deduction made by Venezuela, for example, any legal fees deducted, etc.

P-146.   By August 11, 2004, Richards had paid $330,000 to Gruppo Triad—which included the $30,000 cost of transporting the notes to Ohio—and had paid $450,000 by the end of 2004.  Tr. Trans. Vol. 3 at 142:22-143:2.  To date, Richards estimates Skye has paid Gruppo Triad around $900,000 and spent between an additional $500,000 to $1 million on legal fees and expenses.  Tr. Trans. Vol. 3 at 111:16-22, 113:10-11.  Still, Richards testified that he intends to give the Notes back to Gruppo Triad if this litigation is unsuccessful.  Tr. Trans. Vol. 4 at 149:22-150:3.

### D. The Supreme Court of Venezuela Addresses the AG Opinions

The Constitutional Chamber of the Supreme Court of Venezuela addressed the October 2003 and December 2003 AG Opinions in 2007.  *See* D-710.   Under the Organic Law of the Supreme Court of Justice, the various chambers of the Supreme Court have jurisdiction to issue decisions on requests for interpretation of Venezuelan law.  Certain chambers have jurisdiction[26] over certain areas of law—the Criminal Chamber has jurisdiction over interpretations of the criminal code, for example.  Tr. Trans. Vol. 6 at 98:1-8.

On January 17, 2007, Plaza, acting in her capacity as an individual citizen, "filed a request for the constitutional interpretation of Article 247 of the Constitution of Venezuela," as well as Articles 56 and 57 of the OLAG, in the Constitutional Division of the Venezuelan Supreme Court.  D-710 at TrEx-07824-25.  Plaza's brief specified that her request was related to the Gruppo Triad Bandagro Notes and the October 2003 and November 2003 AG Opinions.  *Id.* at TrEx-07826-27.  Plaza took the position that the November 2003 AG Opinion was issued

---

[26] This concept is translated as "competence" in the trial exhibits, but the meaning equates with what the U.S. legal system calls "jurisdiction."

within the purveyance of the OLAG Articles 56-57 and that it was therefore an administrative proceeding with binding effect under Venezuelan law. *See* Tr. Trans. Vol. 6 at 94:12-17.

On March 13, 2007, an associate of Pavanelli's, Jose Nicholas Tovar, who worked for some time on behalf of Gruppo Triad in its efforts to collect on the Gruppo Triad Bandagro Notes (*see* Tr. Trans. Vol. 7 at 97:24-98:3), submitted a brief to the Constitutional Division on behalf of Gruppo Triad, "objecting to the admissibility of the request for interpretation filed." D-710 at TrEx-07824. The then-Attorney General of Venezuela, Gladys Gutiérrez Alvarado ("Gutiérrez"), also filed a brief on April 11, 2007, requesting interpretation of Article 247. *Id.* at TrEx-07829-30. Gutiérrez took the position that the October and November 2003 AG Opinions were made outside of administrative proceedings and therefore produced no binding effects. Tr. Trans. Vol. 6 at 94:18-22.

Plaza and Gutiérrez's petitions were originally pending as separate cases, but on June 5, 2007, Jacir submitted a brief which objected to the admissibility of Plaza and Gutiérrez's requests and asked for joinder of the two files. The Supreme Court denied hearing Jacir's petition, finding that he lacked standing because no authorization attesting to his interest in the case had been filed, but granted the joinder *sua sponte*. *Id.* at TrEx-07835. The Constitutional Chamber of the Court also found that it had jurisdiction to render a decision on the interpretation of Article 247 of the Venezuelan Constitution. *Id.* at TrEx-07834-35. The Court further noted that the OLAG Articles 56 and 57 are so closely connected with Article 247, indeed, "[they are] only in elaboration of the constitutional rule," that the Constitutional Chamber also had jurisdiction to analyze the petitions with respect thereto. *Id.* at TrEx-07835.

In her brief, Plaza set forth that after she issued the October 2003 AG Opinion, but before the MNF issued any administrative order or decision, the MNF was able to confirm the falsity of

44

documents upon which the claim was based and, accordingly, issued a new report. *Id.* at TrEx-07826. Plaza noted that she then issued the December 2003 AG Opinion, revoking the October 2003 AG Opinion and ratifying the November 2003 MNF Report, which declared the claim for payment on the Gruppo Triad Bandagro Notes not viable. *Id.* at TrEx-07827.

Gutiérrez maintained that the October 2003 AG Opinion did not fall within the framework of an administrative proceeding under the OLAG Articles 54-60, but was rather an "administrative inquiry," without any binding force of law. *Id.* at TrEx-07831.

Article 247 of the Venezuelan Constitution reads:

Article 247. The Attorney General's Office provides counsel on, defends and represents, in and out of court, the financial interests of the Republic, and shall be consulted for the approval of all contracts in the national public interest. The organic law shall determine its organization, jurisdiction, and function. The Attorney General's Office is a constitutional body under the Centralized National Government.

*Id.* at TrEx-07840.

In issuing its opinion, the Supreme Court found:

In any event, the Court reiterates that even when a legal text establishes in a specific case the *"binding"* nature of the opinion of an advisory body— which is not common—the opinion expressed therein does not assume the character of an administrative act capable of creating rights in favor of private individuals because that opinion is produced within the framework of an inter-organic relationship and it aimed solely at helping to form the decision of the decision-making body, and not at supplanting it. It is so decided.

*Id.* at TrEx-07845.

The Supreme Court explained that while Article 247 of the Constitution deals with "contracts in the national public interest," the OLAG Articles 56 and 57 deal with the Office of the Attorney General's "participation in the context of an 'Administrative Proceeding prior to actions against the government.'" *Id.* The Court further noted that actions of the Attorney

General under Articles 56 and 57 "would only be 'binding' in nature if that opinion were part of a special administrative proceeding governed by the referenced Executive Decree." *Id.* The Court then determined that the October 2003 MNF Report and the October 2003 AG Opinion were not issued within the framework of Articles 56 and 57 meaning that "the opinion contained therein does not assume the character of an administrative act capable of creating rights in favor of private individuals because that opinion is reached within the framework of an inter-organic relationship—as an act in preparation for a potential act of greater complexity… ." *Id.* The Court pointed out that:

> [The] isolated and merely **consultative** (not constitutive) nature of the [October 2003 AG Opinion], which is **incapable of creating subjective rights** on the part of private individuals, is evidenced by the indisputable fact that, as occurred in the case at hand, both the Legal Counsel to the Ministry of Finance and the Office of the Attorney General, after having obtained new evidence—that emerged in the context of that inter-organic relationship—issued opinions vacating their respective prior opinions. This legal possibility is coherent and consistent if one considers that, as has been explained, we are not faced with a proceeding capable of creating subjective rights, but rather an instance of authentic internal consultation, which, benefiting from new evidence, may change direction.

*Id.*

As a result, the Court concluded that the October 2003 AG Opinion did not have binding effect such that it created a private right of action for Gruppo Triad to recover on the Notes. *Id.*

## IV. Conclusions of Law – Fraud

### A. Skye's Burden on the Validity of the Notes

Skye brings this action to recover on the Notes. Venezuela maintains that the Notes are actually fraudulent and that their subsequent conveyance by Gruppo Triad to Skye was also a fraudulent transfer.

"Generally, the holder of a negotiable instrument *** establishes a *prima facie* case for payment on a note where the note is placed in evidence and the makers' signature(s) is (are)

admitted." *Green Tree Servicing, L.L.C. v. Roberts*, No. CA-2013-03-039, 2013 WL 6498071, at *3 (Ohio Ct. App. Dec. 9, 2013) (quoting *Dryden v. Dryden*, 621 N.E.2d 1216, 1219 (Ohio Ct. App. 1993)). Thus, Skye has the burden to prove the validity of the signatures on the Notes by a preponderance of the evidence. *Id*; Ohio Rev. Code § 1303.36(A). Skye also has the burden to prove "entitlement to enforce the instrument," which it may satisfy by proving it is the holder of the Notes. Ohio Rev. Code § 1303.36(B); *id.* § 1303.31(A). If Skye proves the validity of the signatures on the Notes and that it holds the Notes, the burden then shifts to Venezuela to prove "a defense or claim in recoupment." *Id.* § 1303.36(B).

Venezuela's defense in this case is that the Notes are fraudulent. The Sixth Circuit has held that fraud "is an affirmative defense, to be established by clear and convincing proof rather than by mere preponderance of the evidence." *Fid. & Cas. Co. of New York v. Genova*, 90 F.2d 874, 876 (6th Cir. 1937). Still, "Ohio courts have recognized that direct proof of fraud may be impossible." *U.S. v. Toler*, 666 F. Supp. 2d 872, 891 (S.D. Ohio 2009) (citing *United States v. Leggett*, 292 F.2d 423, 426 (6th Cir. 1961); *Stein v. Brown*, 480 N.E.2d 1121 (Ohio 1985)). "As a result, Ohio courts have held that inferences can be drawn from the circumstances surrounding the transaction to prove actual fraud." *Id* (citing *U.S. v. Berman*, 884 F.2d 916, 922 (6th Cir. 1989; *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 524 N.E.2d 915 (Ohio Ct. App. 1987)).

### i. Skye as a Holder of the Notes

Venezuela does not contest that Skye is in actual possession of the Notes. Skye has had physical possession of the Notes since on or about August 16, 2004. Tr. Trans. Vol. 3 at 113:25-114:2. While Venezuela disputes that Skye is a holder of the Notes in due course, it does not dispute that Skye is an actual physical holder of the Notes. Skye has placed the Notes into

evidence and the documents have been admitted.  P-1; P-2.  Thus, the Court now turns to an analysis of whether a sufficient number of badges of fraud exist—first on the Notes, and second on their transfer from Gruppo Triad to Skye.

### ii. The Signatures on the Notes

With respect to negotiable instruments under Ohio law, "it is initially presumed that all signatures are valid."  *Dryden*, 621 N.E.2d at 1219; *accord* Ohio Rev. Code § 1303.36. "However, if the party denying the signature's validity introduces evidence sufficient to overcome the rebuttable presumption of validity, then the case will be decided upon all of the evidence introduced at trial with the burden of proof being upon the party claiming under the signature to establish its effectiveness by a preponderance of the evidence."  *Id.* (quoting *Bates & Springer, Inc. v. Stallworth*, 382 N.E.2d 1179 (Ohio Ct. App. 1978)).  Here, the parties submit competing evidence as to whether the alleged signers disavow signing the Notes.

Venezuela asserts that each of the three alleged signers has denied signing the Notes.  At trial, Fontana testified that he did not recognize the Notes' various terms or markings, he did not sign them, and he did not observe Cordero or Puigbó signing them.  Tr. Trans. Vol. 15 at 26:20-31:7, *see* P-1; P-2.  Cordero and Puigbó denied signing the Notes in deposition testimony taken in February 2010.  Cordero Dep. at 44:22-47:6, 47:11-53:20; Puigbó Dep. at 26:24-28:19, 28:22-29:2, 31:11-33:11, 34:1-37:8.  Skye has filed a Motion asking the Court, as factfinder, to weigh the preservation testimony of Cordero and Puigbó with recognition that Skye did not have ample opportunity to develop cross-examination of the two witnesses at the time their testimony was preserved (ECF No. 823).  Both witnesses died before trial.

Civil Rule 32(a)(1)(B) permits the use of deposition testimony of a deceased witness at

trial "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying. . . ." Skye argues that it did not have a *meaningful* opportunity to cross-examine the testimony of Cordero or Puigbó, as required by Evid. R. 804(b)(1), which permits deposition testimony to be admitted from unavailable declarants where it is offered against a party that had opportunity to develop it by cross-examination. *See Complaint of Paducah Towing Co., Inc.*, 692 F.2d 412, 418 (6th Cir. 1982). At the time the depositions were conducted, discovery on the merits had not commenced, and, therefore, Skye did not have an opportunity to cross-examine the witnesses regarding evidence that came into its possession at later dates.

As the Sixth Circuit stated in *Complaint of Paducah*, "[i]f a meaningful opportunity to develop the former testimony was not afforded, then the testimony may properly be assumed to be less reliable." *Id*. The Court admits the testimony but weighs it accordingly. The preservation deposition testimony bolsters Fontana's testimony that he did not sign the Notes and did not witness Cordero or Puigbó signing the Notes, but it is not, by itself, dispositive of the issue of the validity of signatures. In other words, while the preservation testimony corroborates Fontana, striking the testimony leaves only Fontana as the sole witness with firsthand knowledge of the validity of the signatures on the Notes. Thus, whether admitting the deposition testimony or excluding it, the net effect of the testimonial evidence favors Venezuela. In addition to the testimonial evidence, Venezuela also submits various documents to demonstrate the signatures on the Notes are invalid. For example, the written declarations from Cordero and Fontana obtained by the MNF in 1998, in which they denied signing the Notes, Tr. Vol. 16 at 81:20-82:10; JX-9, JX-10, as well as the 1998 analysis of Bandagro ICC notes in Geneva, Switzerland, which, as Gomis testified, concluded that the signatures on the notes were forgeries. Tr. Vol. 15

at 139:15-23, 142:13-24; Vol. 16 at 68:3-6, 82:15-83:14; D-916.

Venezuela additionally submits the testimony of its handwriting expert, Browne. Skye argues that Browne's methodology is inherently subjective and empirically unreliable. Skye points to Browne's own testimony that handwriting analysis is not scientific, Tr. Trans. Vol. 21 at 44:9-12; it is not capable of empirical testing, *id.* at 44:16-17; all persons vary their signatures from one time to the next, *id.* at 41:11-19; no data can establish the frequency with which stylistic details recur in a person's signature, *id.* at 44:18-20; and it is impossible for Browne to determine his own error rate, *id.* at 45:2-4. Each of these critiques focuses on handwriting evidence in general, rather than on Browne's credentials or his specific methodology. The Sixth Circuit, however, has squarely ruled that handwriting analysis falls into the "technical, or other specialized knowledge" component of Federal Rule of Evidence 702. *U.S. v. Jones*, 107 F.3d 1147, 1157-59 (6th Cir. 1997). Specifically, "expert handwriting analysis is a field of expertise under the Federal Rules of Evidence." *Id.* at 1160.

Browne testified that the ASTM standards include "five basic levels of opinion in handwriting work." Tr. Trans. Vol. 20 at 91:25-92:1. He then explained the levels in detail:

> At the bottom of the pile, as it were, is basically it's an inconclusive finding. It's not possible to arrive at any decision because the evidence on one side is it a forgery is balanced out precisely by the evidence on the other side, well, is it forged or is it genuine. We don't know. We can't tell. It's the least helpful of the opinions, the layers of opinion.
>
> The next level above that is that there are indications of forgery, and to achieve that you have to have over 50 percent found evidence of forgery to get even there.
>
> The third layer is probable forgery or probably forged. The words mean basically the same. And that's -- that's quite serious because you have to have fairly strong evidence of forgery to get to that level. We're talking 75, 80 percent.
>
> The next layer after that is strong probability of forgery, and that's almost certainly a forgery. There's just a little bit that you're not happy with or it's just not

> possible to go that extra layer to the top layer which is certainty forgery, and there's no doubt then we're looking at absolute, it's a forgery.

*Id*. at 92:3-21. Browne obtained and studied genuine examples of Cordero, Fontana and Puigbó's signatures. *Id*. at 85:3-4. He then compared the genuine signature examples[27] with the signatures on the Notes and other documents focusing on specific characteristics of the handwriting. *Id*. at 85:5-14, 104:16-107:16.

As in *Jones*, Browne's specific testimony in this case "outlined the procedure that he uses when comparing a questioned signature with a known one. He then focused on enlargements of the signatures at issue in this case and described to the [finder of fact], in some detail, how he reached his ultimate conclusions." *Id*; Tr. Trans. Vol. 20 at 85:3-14, 104:16-107:16. "His testimony enabled the [factfinder] to observe firsthand the parts of the various signatures on which he focused." *Jones*, 107 at 1160. As a result, the Court credits Browne's expert testimony as well as his conclusions that: there is definite evidence that Puigbó's signatures on the Notes are forgeries; there is a strong probability that the Fontana' signatures on the Notes are forgeries; and it is probable that Cordero's signatures on the Notes are forgeries. Tr. Trans. Vol. 20 at 116:5-17, 107:25-108:12, 121:4-16, 137:25-138:25.

In response, Skye submits that documents obtained by Hurtado in the course of the 1998 MNF investigation into the validity of the Gruppo Triad Bandagro Notes constitute evidence that the signatures are not forgeries. Specifically, Hurtado obtained the June 5, 1987 notarized attestation by Fontana, Puigbó, and Cordero that the signatures on the Notes are valid, as well as the October 29, 1987 Fontana affidavit acknowledging the June 5 document. P-6A at FS1042,

---

[27] Skye argues that the signatures Venezuela provided to Browne were insufficient in number and without guarantees of their authenticity. Browne testified that he relied on Venezuela to provide him with exemplars. Tr. Trans. Vol. 21 at 41:25-42:7. Again, this critique does not touch on Browne's qualifications or methodology but rather on the accuracy of information provided to him in reaching his opinions.

FS1018-1031; P-53.[28]  The investigators also obtained a 1991 judicial inspection that confirmed the MNF's records contained correspondence from an MNF official verifying the existence of Bandagro promissory notes issued in 1981.  *See* P-6A at FS1018-1031.

While a "general denial" by the alleged signer has been held "insufficient to raise the issue of the genuineness of [his or] her signature," *Dryden*, 621 N.E.2d at 1220, here Venezuela has identified multiple occasions of specific denials.  *See e.g. Mortgage Lenders Network USA, Inc. v. Adkins*, No. 3:04 CV 7767, 2007 WL 963212, at *5 (N.D. Ohio Mar. 28, 2007) (deposition testimony sufficient to create a genuine issue of material fact on validity of signatures where alleged signer denied signing each of the appraisals at issue and "detailed the way in which the signatures on the appraisals differ from her *bona fide* signature").  Fontana denied signing the Notes on multiple separate occasions—in 1998, and again during trial, for example.  Tr. Trans. Vol. 16 at 81:20-82:10; JX-9; JX-10; Tr. Trans. Vol. 15 at 26:20-31:7.  He also denies signing the June 5, 1987 and the October 29, 1987 documents, pointing out that the identification number listed next to his name is incorrect.  Tr. Trans. Vol. 15 at 49:23-51:18; *See* P-53.  These denials, coupled with Browne's testimony make a strong case against the validity of the signatures.  The Court finds that the weight of the evidence that the signatures on the Notes are forged is stronger than the evidence in favor of their veracity.

**B. Actual Fraud of the Notes**

Under Ohio law, indicia or badges of fraud include: the relationship between the parties, inadequate consideration, insolvency or indebtedness of the debtor, secrecy or concealment of the transaction; and the debtor's retention of an interest, benefit, or control in the transferred

---

[28] The investigation also included the 1993 report prepared by Fabbiani that determined that the signatures on the Notes were valid. However, the Court only admitted the 1993 report for the purpose of showing what information Skye obtained prior to purchasing the Notes. *See* Tr. Trans. Vols. 23 at 34:21-38:20. Therefore, the Court does not consider the report as substantive evidence towards the validity of the Notes.

property. *See Toler*, 666 F. Supp. 2d at 891; *Berman*, 884 F.2d at 922; *Leggett*, 292 F.2d at 427;
*Wagner v. Galipo*, 646 N.E.2d 844, 849 (Ohio Ct. App. 1994); *DiMazzio*, 524 N.E.2d at 918.

"'If the party alleging fraud is able to demonstrate a sufficient number of badges, the burden of proof then shifts to defendant to prove that the transfer was not fraudulent.'" *Langaa v. Pauer*, No. , 2005 WL 3150251, at *4 (Ohio Ct. App. Nov. 25, 2005) (quoting *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App. 3d 644, 650 (Ohio 1993)).

### i. Lack of Consideration

Venezuela argues that Skye has submitted insufficient evidence of the origins of the Notes, including to whom they were purportedly issued or for what consideration.

Consideration, in the context of negotiable instruments, "means any consideration sufficient to support a simple contract." Ohio Rev. Code § 1303.33(B). "The drawer or maker of an instrument has a defense if the instrument is issued without consideration." *Id*; *accord Hootman v. Fryman*, No. 97CA006846, 1998 WL 318467, at *3 (Ohio Ct. App. June 17, 1998). "However, '[t]he law presumes the existence of a consideration for a promissory note; and this presumption continues until it is shown that there was none; *and the burden of showing this is on the party attacking the note for want of consideration*." *Taylor v. Uhl*, No. 13CA010441, 2014 WL 3440603, at *3 (Ohio Ct. App. July 14, 2014) (emphasis in original) (quoting *Harvest Land Co-Op, Inc. v. Hora*, No. 25068, 2012 WL 6554728, at *2 (Ohio Ct. App. Dec. 14, 2012)). Consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Brads v. First Baptist Church of Germantown, Ohio*, 89 Ohio App. 3d 328, 336 (Ohio 1993) (citing *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163 (Ohio 1990)). A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered or undertaken by the

promisee.  *Id.*  Absent a showing of fraud, consideration is not deemed legally insufficient merely because it is inadequate.  *Id* (citing *Mooney v. Green*, 4 Ohio App. 3d 175 (Ohio 1982)). "It is axiomatic that courts are not required to inquire into the adequacy of the consideration; the existence of some benefit or detriment to the promisor or promise is sufficient.  *Gallon v. Scouten*, No. L-06-1168, 2007 WL 1720774, at *3 (Ohio Ct. App. June 15, 2007).

Skye asserts that the Bandagro records were in such poor shape that the lack of documentation regarding the Notes, including what consideration was exchanged for them, is not indicative of fraud.  Skye points to trial testimony in which a member of Bandagro's liquidation board described the bank's records as "a necessary mess."  Tr. Trans. Vol. 15 at 124:14-19. Moreover, Gomis testified that some of Bandagro's records "are difficult to locate, of course." *Id.* at 125:17-126:2.  Skye also highlights that the 1988 fire destroyed important records of foreign debts.  Skye further asserts that the three signers had the power to issue the Notes,[29] all three traveled to Europe in 1981-1982 in search of money for the struggling bank, and the Notes bear a strong resemblance to the 1980 notes which Venezuela admits were printed and signed by Bandagro in the hopes of completing the INDECO transaction.

Venezuela counters that the debt cataloging process undertaken by the MNF in 1983 and spearheaded by Galdo, was thorough and extensive.  As Galdo testified, it began with gathering all foreign currency debt details from the various Venezuelan financial institutions, including Bandagro, with a comprehensive form for debt reporting.  Tr. Trans. Vol. 16 at 142:14-143:5, 149:18-151:10 (discussing D-68, D-69).  The debt cataloging process was conducted with wide latitude around the world, and received international publicity for a number of months.  Tr. Trans. Vol. 17 at 5:12-15, 6:10-14, 6:23-7:1.  Bandagro's debts were also cataloged, but neither

---

[29] Skye asserts that Cordero had the power to issue the Notes and gave Puigbó and Fontana the power of attorney for Bandagro.

54

the Notes, nor any other debt maturing in 1991 were found through the cataloging process. Tr. Trans. Vol. 16. at 155:10-156:4, Tr. Trans. Vol. 17 at 16:14-17:3, 21:13-22:5; D-68; D-69; D-72. Skye's explanations for lack of record evidence on the Notes thus falter when the Court considers that the cataloging: (1) took place before the 1988 fire; (2) was completed in close temporal proximity to the supposed 1981 issuance date on the Notes; and (3) did not just rely on Bandagro's records but also on the international financial community, which had strong incentive to have its debt catalogued and recognized. Tr. Trans. Vol. 17 at 5:9-6:14, 7:5-19, 22:10-14.

Similarly, the fact that Cordero, Puigbó, and Fontana traveled to Europe in 1981-1982 is not sufficient evidence to support that the Notes were issued for consideration because Fontana testified that the trips did not result in any loan transactions. Tr. Trans. Vol. 16 at 34:21-35:21. The printing of the 1980 Bandagro ICC notes is also not compelling evidence to overcome the lack of showing of any consideration paid. The Atlantic National Bank transaction was never completed, precisely for the reason that no funds arrived to exchange in consideration for the notes. *See* Tr. Trans. Vol. 15 at 16:6-10; Tr. Trans. Vol. 16 at 28:13-15. A Florida court has even ruled that the 1980 notes were "void and non-negotiable." JX-1 at JX-003.

Finally, the words "for value received" on the face of a note can provide contradictory evidence to testimony that nothing of value was received in exchange for the promissory note. *Taylor*, 2014 WL 3440603, at *4. But, the Court is also not persuaded that consideration was given due to the printing of the words "For valie received" on the Notes. First, Skye has not been able to identify to whom the Notes were ever originally issued, and therefore, cannot give salient details regarding what consideration may have been exchanged by whom. Second, the 1980 ICC notes that were admittedly printed by Bandagro, which Skye asserts are demonstrably

55

similar to the Notes at issue in this case, did not recite that they were issued "For valie received." *See* P-177 at SKYE000928; D-16 at TrEx-00121.

As a result, the Court finds by clear and convincing evidence a lack of consideration in exchange for the Notes. *See Sech v. Tollis Const. Co., Inc.*, No. 85570, 2005 WL 1303199, at *2 (Ohio Ct. App. June 2, 2005) (upholding a finding that no consideration was issued for a note).

### ii. Insolvency or Indebtedness of Bandgaro

Generally insolvency or indebtedness of the debtor at the time of a conveyance is evidence towards fraudulent intent on the part of the debtor. *See e.g In re Stanley*, 384 B.R. 788, 804 (Bankr. S.D. Ohio 2008); *Langaa*, 2005 WL 3150251, at *3; *Mathias v. Rosser*, Nos. 01AP-768, 01AP-770, 2002 WL 1066937, at *4 (Ohio Ct. App. May 30, 2002). But, Ohio case law does not limit the applicability of badges of fraud to transactions based on the party asserting the fraud nor on whether actual fraud or fraudulent intent is asserted. *See Toler*, 666 F. Supp. 2d at 892 (applying insolvency of the transferee as an indicator of actual fraud).

"'A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation.'" *Langaa*, 2005 WL 3150251, at *3 (quoting O.R.C. 1336.02(A)(1)). Here, Fontana testified that Bandagro struggled with financial viability, due to debt balances that were higher than bank assets. Tr. Trans. Vol. 15 at 13:3-13. Additionally, in January 1981, the year the Notes were purportedly issued, Bandagro's Board of Directors was dissolved and Cordero was appointed interventor for the purpose of guiding the bank through liquidation. *Id*. at 13:3-8; Tr. Trans. Vol. 14 at 166:12-19. The *Wall Street Journal* also reported in 1981 that the Bandagro intervention occurred because the bank's debts exceeded its capital. P-74A.

While the evidence may not be as compelling as, for example, a Bandagro balance sheet

56

would be, it weighs in favor of the insolvency of Bandagro at the time the purported Notes were issued. On the other hand, there is no outweighing evidence that Bandagro's assets were greater than its debts. The Court finds that the evidence of the insolvency of Bandagro in 1981 is an additional badge that the Notes are fraudulent.

### iii. Secrecy or Concealment of the Transaction

To the extent that an absence of any records of the Notes in either Bandagro's files or Galdo's debt cataloging efforts constitutes evidence of secrecy or concealment, the Court finds that it too weighs in favor of actual fraud.

Here, Venezuela has proven by clear and convincing evidence, numerous badges of fraud. Thus, the burden shifted to Skye to rebut this evidence or otherwise demonstrate why the Notes should still be paid. *Langaa*, 2005 WL 3150251, at *4 (quoting *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App. 3d 644, 650 (Ohio 1993)); *see also Toler*, 666 F. Supp. 2d at 892 ("Ohio courts have found as few as three badges to be clear and convincing evidence of actual fraudulent intent."). Skye fails to factually rebut the evidence that the Notes are invalid. It makes several legal arguments, addressed *infra* IV, that the Skye is nevertheless entitled to payment.

### C. Fraud in the Transfer from Gruppo Triad to Skye

#### i. Relationship Between the Parties (Conspiracy theory)

Venezuela maintains that Gruppo Triad and Skye were members of a conspiracy to defraud the former by collecting on the Notes. Venezuela seeks to admit various documents containing statements of Pavanelli, Usuelli, Schianchi, Delgado, Jacir, and witness Lawrence Corna (the "Conspirator Exhibits").[30] Skye has asserted hearsay objections to these documents. Venezuela argues that the statements which it seeks to offer for the truth of the matter asserted

---

[30] A complete list of the documents is filed on the docket at ECF No. 818, Ex. A.

are not hearsay under Federal Rule of Evidence 801(d)(2)(E), because they are the statements of Skye's co-conspirators, made during and in furtherance of the conspiracy.[31] Venezuela also maintains that the transfer of the Notes between Gruppo Triad and Skye is a fraudulent conveyance. To that end, the Court will evaluate Venezuela's conspiracy theory under federal law for the purposes of the admission of the Conspirator Exhibits, as well as under Ohio law towards the relationship between Gruppo Triad and Skye pertaining to fraudulent conveyance.

### a. Conspiracy under FRE 801(d)(2)(E)

"Under Federal Rule of Evidence 801(d)(2)(E), for co-conspirator hearsay statements to be admissible, the [proponent] must show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy." *U.S. v. Benson*, 591 F.3d 491, 501-502 (6th Cir. 2010) (citing *Bourjaily v. U.S.*, 483 U.S. 171, 175 (1987)). Moreover, "proof of the [alleged co-conspirator's] knowledge and participation in the conspiracy must be supported by independent, corroborating evidence other than co-conspirator hearsay." *Id.* at 502 (citing *U.S. v. Clark*, 18 F.3d 1337 (6th Cir. 1994)).

"'A conspiracy requires: (1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the [alleged co-conspirators] whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *U.S. v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *U.S. v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)). The party asserting the conspiracy must prove that the alleged

---

[31] Venezuela also maintains that many of the Conspirator Exhibits are also admissible under other provisions of FRE 801, 803, and/or 804, or are admissible for purposes other than proving the truth of the matter asserted. Where the Court has relied on an exhibit to which it previously withheld ruling on the admissibility, it has so noted and ruled upon in this Opinion and Order.

co-conspirator "was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *Id.* at 421. Additionally, "mere association with conspirators is not enough to establish participation in a conspiracy." *U.S. v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990). Instead, the Sixth Circuit "requires firm evidence of at least tacit coordination among conspirators in affirming conspiracy convictions." *Id.*

Venezuela asserts that Skye was conspiring with Pavanelli toward the common goal of profiting from the Gruppo Triad Bandagro Notes. Venezuela points towards the evidence that Pavanelli was previously associated with fraudulent Bandagro notes as proof of the conspiracy. *See* Tr. Trans. Vol. 12 at 16:7-23; Tr. Trans. Vol. 1 at 208:5-8; JX-30; D-558. Specifically, Richards was told prior to Skye's purchase of the Notes that Pavanelli was convicted of conspiracy to use false Bandagro notes in 1989 in London. Tr. Trans. Vol. 4 at 219:8-221:10; *see also* Tr. Trans. Vol. 1 at 216:24-217:13. Venezuela also submits that the connections between Gruppo Triad, Woodstride, and Alvaray infer that the conspiracy existed. *See* Tr. Trans. Vol. 2 at 79:3-6, 79:11-14; P-15; JX-22. Finally, Venezuela submits that Delgado's conflict of interest in assisting both the MNF investigation into the Gruppo Triad Bandagro Notes and Gruppo Triad supports the conspiracy theory. Tr. Trans. Vol. 8 at 159:1-5; D-563; D-575.

Venezuela points to common efforts to collect on the Notes as evidence of Skye's participation in the conspiracy. Much of the evidence Venezuela cites on this point, however, includes the co-conspirator hearsay which alone may not support a finding of a conspiracy for purposes of 801(d)(2)(E). *Benson*, 591 F.3d at 502. Venezuela argues that Skye's agreement to serve as a plaintiff in this lawsuit as well as the interest which Gruppo Triad retained in the Notes demonstrate Skye's participation in the conspiracy. *See* P-145; P-146. Venezuela maintains that

59

the fact that Alcalde was recording time using a single client matter number for both Skye and Gruppo Triad, as well as submitting billing records naming the client Gruppo Triad care of Skye Ventures II, LLC, support its assertion that Skye was a nominal plaintiff in a front for Gruppo Triad to collect on the notes. *See* D-799. Venezuela also asserts that agreements between Gruppo Triad and Skye related to other Gruppo Triad Bandagro Notes not at issue in this case demonstrate Skye's participation in the concerted activities. For example, Skye solicited investments in other notes on behalf of Gruppo Triad. D-629.

With respect to Skye's notice of the conspiracy before joining, Venezuela points to Pavanelli's request for funding from Skye to support Jacir's collection efforts on the Gruppo Triad Bandagro Notes in February 2004. JX-35. Venezuela proffers additional co-conspirator hearsay evidence on this point, which alone cannot meet the requirements of 801(d)(2)(E).

The Court finds that Venezuela has not satisfied its burden to prove Skye "was aware of the object of the conspiracy and that [Skye] voluntarily associated [itself] with it to further its objectives." *Gibbs*, 182 F.3d at 421. Assuming, without finding, that a preponderance of the evidence supports the existence of a conspiracy by Pavanelli and others to collect on Bandagro notes, Venezuela has failed to submit "firm evidence of at least tacit coordination" by Skye. *Pearce*, 912 F.2d at 162. The filing of this lawsuit by Skye, the retention of an interest in the Notes by Gruppo Triad, and the efforts by Skye to solicit investments in other notes, coupled with the billing practices of Alcalde do not constitute a preponderance of evidence that Skye knew of a conspiracy and knowingly participated in it. Each of these actions had credible business justifications which have not been discredited. While potentially risky business decisions, they do not add up to the level of knowledge of or participation in a conspiracy. As a

result, the Conspirator Exhibits are inadmissible where offered for the truth of the matter asserted.

### b. Conspiracy under Ohio law

Under Ohio law a conspiracy to commit fraud entails: "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)). Thus, a claim of civil conspiracy requires proof of the following elements: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Id.* at 538 (quoting *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio 1993)).

The first of the three elements, "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Id.* (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio 1996)). Courts have recognized that, in this context, "the existence of an express agreement … will frequently be provable only through circumstantial evidence." *Id.* (citing *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982) (noting "conspirators seldom make records of their illegal agreements"). "With respect to the level of agreement that must be established," the showing required is that "the alleged co-conspirator shared in the general conspiratorial objective." *Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

The Sixth Circuit has provided the following guidance on measuring "whether the [accused] *agreed to join in* the wrongful conduct." *Id* (emphasis in original).

> Courts and commentators have frequently blurred the distinction between the two theories of concerted liability. Most commonly, courts have relied on evidence of assistance to the main tortfeasor to infer an agreement, and then attached the label "civil conspiracy" to the resultant amalgam. Sometimes, although not always, the inference has been factually justified; many tort defendants have both conspired with and substantially assisted each other.... There is a qualitative difference between proving an agreement to participate in a tortious line of conduct, and proving knowing action that substantially aids tortious conduct. *In some situations, the trier of fact cannot reasonably infer an agreement from substantial assistance or encouragement.*

*Id* (emphasis in original).

It should be noted that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). This rule also applies to either in-house counsel or outside counsel of a corporation. *Id.* at 340. Thus, no conspiracy exists if the conduct challenged is a single act by Gruppo Triad acting through its officers and employees within the scope of employment, or outside counsel.

The Court finds that the evidence does not show the existence of a conspiracy between Gruppo Triad and Skye under Ohio law. The evidence does not support that Skye "shared in the general conspiratorial objective," to collect on Bandagro notes. *Aetna Cas. and Sur. Co.*, 219 F.3d at 534. Rather, the evidence generally shows Gruppo Triad's efforts to collect on Bandagro notes, but does not support agreement by Skye to join in wrongful conduct. Instead, the Court finds that the relationship between Gruppo Triad and Skye was arms-length and does not give rise to a badge of fraud.

## ii. Lack of Consideration

Richards testified that to date Skye has paid Gruppo Triad approximately $900,000 on the

$100 million Notes.  Tr. Trans. Vol. 3 at 111:16-22.  Venezuela asserts that the price of less than

two cents on the dollar of the face value of the Notes is indicative of the falsity of the Notes.  *See*

*Russell v. Universal Acceptance Corp.*, 210 A.2d 834, 837 (D.C. App. 1965).

Neither party, however, submitted evidence regarding what price is typically paid for

distressed foreign debt.  No financial or economic experts opined on the reasonableness of the

price paid.  As a result the Court can only weight Venezuela's assertion that the price paid is

presumptively unreasonable against Skye's assertion otherwise.  Richards testified at length

during trial as to Skye's motivation for making the particular deal:

> Q. How significant was it to you, Skye Ventures, that you were able to negotiate a
> deal that included up to a million dollars in cash and $39 million in debt on the
> back end?
>
> A. Well, it was a good deal for us in a sense. So let's assume for -- we had to
> make a judgment, how much would this case cost us? Because we -- you weren't
> involved at the time.
>
> We may have to pay lawyers. We certainly would have to pay the costs. We
> would certainly have to travel. So we had to estimate, what are the costs? And we
> assumed that the lawyers that we had would take it on contingency because we
> made that agreement with Crabbe, Brown back, I believe, end of April, early
> May. But there was no saying that we wouldn't have to replace Crabbe, Brown
> with a law firm that we had to pay for, which almost came to be.
>
> So that if you look then, assuming that you had to pay a law firm a contingent fee,
> assuming that you had to pay Pavanelli a $39 million non-recourse note, you'd
> have about $2 million in a deal that you would get whatever the net proceeds of
> that 100 million were. So then you start looking at what could happen to the other
> --
>
> THE COURT: You said 2 million?
>
> THE WITNESS: Right.
>
> THE COURT: That includes the purchase price plus expenses?

THE WITNESS: Yeah. Plus legal expenses. So we were looking at it right then as to how much we would have to expend. We thought $2 million was a good guess so long as we kept the lawyers on contingency fee.

Tr. Trans. Vol. 3 at 103:23-104:25.

So we had 2 million in the deal, might be more, and we were getting the net proceeds after legal fees and Pavanelli's promissory note of 39 million. Well, in there, we knew that we were going -- one of our possible ways to a liquidity event aside from flat out selling the note was to have Venezuela honor them. That could be by politically or publicity.

So we had this idea early on back in March that we could, if we could get enough publicity that Venezuela wasn't honoring their own laws in these debts that they would make -- and, look, they had this final and binding opinion that they would make some settlement with us. So that was one of the strategies.

To the end of that strategy, we engaged one of the preeminent publicity firms in the world, the man name of Mike Sitrick. Works almost exclusively for Fortune 500 companies. He's a very effective guy. He's a friend of mine. Mike agreed to do this on a contingency fee. So he took a share of the proceeds.

We engaged an investigation firm, Crabbe, Brown did, for -- also very expensive guy. He did it for a share of the proceeds.

So if you look in this waterfall, the third part of the waterfall is third parties to whom Skye has acquire -- was given a reasonable Bandagro interest to be of assistance to Skye in its efforts to assist others. The language I put there, I apologize. Again, I'm a bad draftsman.

So we had engaged Alcalde or PICA. Then we knew, I think by the time we bought the notes, that Miguel Jacir and Woodstrite had interest in the notes. So there were a lot of interests in the notes. We might have ended up with 8 cents on the dollar. And if you undertake this kind of effort and you expend this kind of effort and you get $8 million after 13 years, that's not a very good deal.

So what we were trying to do the whole time was minimize the effect of all those other percentages in there.

*Id.* at 105:12-106:19.

In the absence of contravening testimony that the purchase price was unreasonable with

respect to market rates for distressed debt, the Court finds that the consideration paid is not a

badge of fraud.

### iii. Insolvency or Indebtedness of Gruppo Triad

While the Court heard testimony and reviewed documentary evidence regarding Pavanelli's need for funding, Tr. Trans. Vol. 3 at 27:13-21, no balance sheets or documentation regarding the solvency of Gruppo Triad were submitted. In the absence of direct evidence as to the solvency of Gruppo Triad, the Court does not find that Pavanelli's repeated requests for interim funding until efforts to collect on the Notes were successful, *see* Tr. Trans. Vol. 4 at 75:19-23, 82:7-9; JX-35; D-508, constitute a badge of fraud.

### iv. Secrecy or Concealment of the Transaction

#### a. Motion for Spoliation

Venezuela filed a Motion in Limine for sanctions against Skye for Knowing Spoliation of Relevant Documents (ECF No. 651). The Court held ruling on the motion in abeyance, until further relevant testimony could be heard at trial. A party seeking spoliation sanctions must show: "First, the party with control over the evidence must have had an obligation to preserve it at the time it was destroyed. Second, the accused party must have destroyed the evidence with a culpable state of mind. And third, the destroyed evidence must be relevant to the other side's claim or defense." *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 383-84 (6th Cir. 2013). The duty to preserve "may arise when a party should have known that the evidence may be relevant to future litigation." *Id.* at 384.

Venezuela asserts that Skye did not preserve email and other documents relevant to the claim and defenses in this case. Specifically, Richards explained that he did not preserve emails from the 2003-2004 time period during which Skye was conducting due diligence on the Notes and, in fact, had no emails predating 2009. Deposition of David J. Richards, December 22, 2014

65

("Richards Dep."), at 59:23-60:11; 30(b)(6) Deposition of Skye, December 23, 2014, at 171:4-12 (steps were not taken to secure information and data from the SkyeVentures.com domain while the case was pending). Venezuela also asserts that Skye failed to preserve a fax received from Pavanelli answering a series of numbered questions concerning Pavanelli's acquisition of the Notes as well as financial records concerning money Skye paid to or invested in Gruppo Triad. Richards Dep. at 66:11-69:12. Finally, Venezuela asserts that Skye had control over CBJ and Gruppo Triad, which both improperly failed to preserve relevant evidence.

Venezuela's motion fails for a number of reasons. At the outset, Venezuela has not been able to "identify with any degree of precision the alleged missing documents" or records that were destroyed. *See Busch v. Dyno Nobel*, 40 F. App's 947, 963 (6th Cir. 2002). The only specific document identified by Venezuela—a fax from Pavanelli—is mere speculation. Venezuela has failed to submit evidence that such a document ever existed. *Terry v. United States Enrichment Corp.*, 2011 U.S. Dist. LEXIS 71849, at *26 (S.D. Ohio July 5, 2011) (M.J. King) (denying request for spoliation sanctions where "[o]ther than his own rank speculation, Plaintiff has offered no basis upon which to conclude that Defendants engaged in the improper destruction of evidence"); *Miller v. Experian Info. Solutions, Inc.*, No. 3:313-cv-90, 2014 WL 5513477, at *2 (S.D. Ohio Oct. 31, 2014) (M.J. Newman) (finding that producing party could not be sanctioned for failure to produce documents the plaintiff had no evidence even existed).

Additionally, the Court does not find that Skye had control over CBJ and Gruppo Triad, such that the former could be culpable for any alleged spoliation by the latter. Moreover, Venezuela has not shown that any records were destroyed with the requisite culpable state of mind. "To prove a culpable state of mind, a party must demonstrate that the alleged spoliator destroyed the evidence knowingly or negligently. A culpable state of mind, the Sixth Circuit has

explained, depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction." *Pollard v. City of Columbus*, No. C2-11-CV-0286, 2013 WL 5334028, at *4 (S.D. Ohio Sept. 23, 2013).

As a result, the Court finds Venezuela has failed to demonstrate that all three requirements for spoliation have been met in this case, and its Motion in Limine for sanctions against Skye for Knowing Spoliation of Relevant Documents (ECF No. 651) is **DENIED**.

### b. Concealment of the nature of the transaction

Venezuela also contends that Skye became a nominal plaintiff for Gruppo Triad's interest in the litigation and that it hid the nature of its relationship with Gruppo Triad for over a decade. Specifically, Venezuela asserts that the April 8, 2004 Agreement was not signed in August 2004, thus the June 23, 2004 agreement still had operative effect when the Notes were transferred. First, Richards is not precise on specifically which version of the agreement was sent to Pavanelli and which version he signed in August 2004. Tr. Trans. Vol. 3 at 62:19-63:7 (Richards signed the April 8 Agreement "or something similar to it in August of 2004"). Second, Venezuela argues, if, as Richards testified Pavanelli was willing to sign the April 8, 2004 Agreement, providing Gruppo Triad with $39 million in the recovery waterfall, remainder to Skye after attorney's fees, *id.* at 62:10-13, then Skye had no incentive to sign an agreement in June which only entitled it to $9.5 million with the remainder, after attorney's fees to be paid to Gruppo Triad. Moreover, Venezuela asserts, Skye attempted to obscure the details of the transaction in the following ways:

- When Skye initially produced the "effective April 8" agreement, it heavily redacted the agreement to obscure the consideration to be paid to Gruppo Triad. D-IMP-1 at SKYE000856.

67

- Skye also redacted the non-recourse promissory note to remove the title that identifies it as a non-recourse promissory note.  *Compare* D-IMP-02 at SKYE000860 *with* D-522 at TrEx-06043.  Skye initially claimed to have redacted this information on privilege grounds.  D-IMP-2 at 25; Tr. Trans. Vol. 1 at 178:11–180:10.

- Skye did not produce the unredacted version of the "effective April 8" agreement until August 2014, ten years after bringing this action.

- Skye did not produce its prior and subsequent agreements with Gruppo Triad—including the ones in effect currently—until being compelled to do so in November 2014.  ECF No. 403.

- Skye also unsuccessfully attempted to avoid its obligation to produce Gruppo Triad documents by amending the agreement during this litigation to eliminate Gruppo Triad's obligation to cooperate with Skye, but in November 2014 it was compelled to produce the documents anyway.  ECF No. 405 at 3–4.

Venezuela's arguments are not compelling on this point.  The fact that Richards cannot remember the precise dates and terms of multiple drafts and subsequently executed agreements does not indicate that the agreements hold meanings that are different from the faces of the documents.  The June 23 agreement states that it applies to Gruppo Triad Bandagro Notes 3/12 and 4/12 and there is insufficient evidence to support a finding that the agreement was, in fact, applicable to the Notes at issue in this case.  Additionally, the April 8 Agreement and the June 23 Agreement have more differences than just the monetary terms.  The latter allowed for joint control over a lawsuit to collect on notes, whereas the former does not provide for collaboration between Skye and Gruppo Triad in seeking to recover on the Notes at issue in this case.  *Compare* P-145 *and* D-581.  There may be legitimate business reasons for the differences in

monetary allocation—for example, Gruppo Triad's retention of control over the litigation on notes 3/12 and 4/12 necessitated greater potential recovery in its eyes.

The Court is also unpersuaded that Skye attempted to obscure the transaction during the course of this litigation in a manner that might give rise to an inference of secrecy and concealment constituting a badge of fraud. Discovery in this case was long and arduous; both parties filed motions to compel certain documents or testimony. Moreover, any secrecy or concealment on the April 8 Agreement was not material to the transaction for the Notes at issue in this case. *See In re Immobilaire, IV, Ltd.*, 314 B.R. 139, 161 (Bankr. S.D. Ohio 2004) (in evaluating allegations of fraud under Ohio law, even assuming concealment, evidence failed to establish that any such actions were material to the transaction).

The Court finds that Venezuela has not satisfied its burden by clear and convincing evidence to demonstrate secrecy or concealment in the transaction.

### v. Gruppo Triad's Retention of a Benefit, Interest or Control

Venezuela argues that the transaction between Gruppo Triad and Skye was a straw man designed to obscure the fact that Gruppo Triad retained control and interest in the Notes. For the reasons stated above, namely, the lack of evidence that the June 23, 2004 agreement pertained to the Notes at issue in this case, the Court does not find that Gruppo Triad retained joint interest and control over the litigation by virtue of the purchase agreement.

Venezuela points to the following additional evidence to satisfy its burden. First, Skye's initial complaint does not mention Gruppo Triad's interest in the case (ECF No. 1). Gruppo Triad is mentioned once as the entity from which Skye "obtained" the Notes, but any residual interest retained by Gruppo Triad is not mentioned. *Id.* ¶ 11. Thereafter, Skye did not produce the operative April 8 Agreement until August 2014, about ten years into this action. Second,

Richards testified that he intends to give the Notes back to Gruppo Triad if this litigation is unsuccessful.  Tr. Trans. Vol. 4 at 149:22-150:3.  Third, Venezuela argues, Skye submitted a misleading affidavit from Richards regarding the April 8 Agreement.  D-IMP-13 ¶ 20.  In the affidavit, Richards stated: "The claim that Skye is a front for foreign interests is absurd.  The only interest that Skye represents in this lawsuit is its own."  *Id.* ¶ 24.  This, Venezuela claims, ignores the various foreign interests in recovery on the Notes—Gruppo Triad, Usuelli, and Schianchi.  D-729.

In contrast, Richards testified at trial that Skye is the whole and sole owner of the Notes and that the statements from his affidavit are accurate:

> Q. Is there anybody other than Skye Ventures that is the owner of Notes 7/12 and 8/12?
>
> A. I'm the owner. I'm the bearer and the owner of these notes.
>
> Q. All right. Mr. Schwartz asked you some questions about an affidavit that you filed with the Court in 2012, and more specifically, paragraph 24, which indicates that the only interest that Skye represents in this lawsuit is its own. And I want to ask you some questions.
>
> First of all, reading your affidavit on the witness stand yesterday, to the best of your knowledge is that statement accurate?
>
> A. Yes.
>
> Q. Why is it that you believe that statement in your affidavit is accurate?
>
> A. Well, I think we even might have discussed this when you prepared, and I signed, the affidavit. So, it's -- you know, I have nobody who I care about other than myself and my investor group here. I have -- Nobody can tell me what to do. I had created a waterfall where I could have, if there was a – What we hoped for was an early initiative to resolve the case.
>
> I could have offered Venezuela a 60-percent discount in the note, taken the early part of the money, just applied it to Crabbe, Brown and myself and both -- nobody else had any right
> -- would have had any right to get money under that.

So, you know, the whole time, as the owner of the note, I was representing myself. Nobody -- I didn't really care about anyone else.

Now, it's kind -- I think we discussed this when we were doing it. It's kind of like, you know, I own a house. I'm selling it. Sure, the bank has a note on it; and, if I sell it, they'll get paid. Just like, here, we always said that Pavanelli, or Gruppo, had a promissory note here. We never were hiding that. They would have gotten paid. But I was representing myself. That's the way I viewed that. Skye was representing Skye.

Q. Okay. Of any of the parties that you've testified about that have a potential claim or right to the proceeds on Notes 7/12 and 8/12, do any of those parties have an ownership interest in those notes?

A. No.

Q. Have any of those parties that have a potential claim or right to the proceeds of Notes 7/12 and 8/12, have any of them participated in instructing you to do things in the course of this litigation?

A. Of course not.

Q. Is Skye Ventures representing anyone's interest in this case other than its own ownership in Notes 7/12 and 8/12?

A. No.

Tr. Trans. Vol. 5 at 21:13-23:11.

The Court credits Richards' testimony on this matter. While Skye was less than forthcoming regarding Gruppo Triad's interest in recovery on the Notes, its conduct does not give rise to the inference that Gruppo Triad exerted control over and retained the benefit of the Notes. Rather, Richards testified that the waterfall distribution clause has been amended several times from 2004 onwards to further subordinate Gruppo Triad's interest on the Notes. Tr. Trans. Vol. 3 at 101:16-18. In later iterations of the waterfall, for example, Gruppo Triad would not have received any amounts recovered on the Notes unless more than face value was recuperated. *See* P-146. A subordinated interest in the outcome of the recovery of the Notes (which is inherently tied to the outcome of this litigation) does not rise to the level of retention of interest,

71

benefit, or control to indicate fraud. *Cf. Toler*, 666 F. Supp. 2d at 892 (badge of fraud satisfied as to transfer of land where the "use of the land did not change because of the transfers" and transferor "continued to use the land just as they had prior to the transfers). Moreover, the Court notes that even if the concealment of Gruppo Triad's retention of a recovery interest in the Notes were a badge of fraud, it would not affect the outcome of the Court's overall determination. *See William D. Mundinger Trust U/A 10/13/00 v. Zellers*, 473 B.R. 222, 235 (N.D. Ohio 2012) ("Ohio courts have held that merely demonstrating one or two badges of fraud is insufficient to show fraud per se"); *Crocker v. Hood*, 113 Ohio App. 3d 476 (Ohio 1996).

Finally, the Court finds unavailing Venezuela's argument that Skye's decision not to file suit on Note 9/12 supports an inference of falsity. Tr. Trans. Vol. 4 at 198:13-18. The issue is not relevant to this lawsuit and, in any event, Richards testified that bringing suit on Note 9/12 was inconsistent with its contractual obligations to Gruppo Triad. *Id.* at 202:7-19.

Here, Venezuela has failed to meet its burden of demonstrating fraud in the transfer of the Notes from Gruppo Triad to Skye. For the reasons mentioned above, the Court finds that the requisite badges of fraud do not exist.

## D. Bar to Jurisdiction under FSIA

Generally, a foreign sovereign is immune from suit in the United States. *Republic of Iraq v. Beaty*, 556 U.S. 848, 851 (2009). "But the statute embodying that principle—the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602 *et seq.*—recognizes a number of exceptions; if any of these is applicable, the state is subject to suit, and federal district courts have jurisdiction to adjudicate the claim." *Id.* (citing § 1330(a); *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489 (1983). The applicability of the FSIA is a question of subject matter jurisdiction. *Id.* The FSIA provides, in part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
>
> ***
>
> (2) in which the action is based … upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

In this case, the Sixth Circuit upheld this Court's ruling against Venezuela's motion to dismiss, finding that the commercial activity exception to Venezuela's immunity applied to the facts. *DRFP L.L.C. v. República Bolivariana de Venezuela*, 622 F.3d 513, 516 (6th Cir. 2010). It is undisputed that Venezuela is a foreign sovereign that would normally be entitled to FSIA immunity. The parties do not dispute that, if the Notes are valid, the activities involving the Notes can be characterized as "commercial activity" within the meaning of 28 U.S.C. § 1605(a)(2). Venezuela argues, however, that if the Notes are deemed to be fraudulent, it did not actually engage in any commercial activity that eliminates their immunity from jurisdiction. As a result, Venezuela argues, since the Court answers the question of whether the Notes are fraudulent in the affirmative, it should dismiss this case without further inquiry.

Bolstering Venezuela's argument is the Supreme Court's opinion in *Steel Co. v. Citizens for a Better Env't*, which discussed the concept of assuming jurisdiction for the purposes of deciding the merits of a case. 523 U.S. 83, 93-95 (1998). As the Court enumerated:

> This is essentially the position embraced by several Courts of Appeals, which find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. The Ninth Circuit has denominated this practice—which it characterizes as "assuming" jurisdiction for the purpose of deciding the merits—the "doctrine of hypothetical jurisdiction." See, *e.g., United States v. Troescher*, 99 F.3d 933, 934, n. 1 (1996).

> We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868).

523 U.S. 83, 93-95 (1998) (internal citations omitted).

But Venezuela's argument only paints half the applicable picture. "A 'commercial activity' has the jurisdictional nexus with the United States necessary to invoke the 28 U.S.C. § 1605(a)(2) exception when either: (1) the foreign state carries on the commercial activity in the United States; (2) the foreign state, in connection with the foreign state's commercial activity elsewhere, performs an act in the United States; or (3) the foreign state, in connection with the foreign state's commercial activity elsewhere, performs an act outside the territory of the United States which causes a direct effect in the United States." *Riedel v. Bancam, S.A.*, 792 F.2d 587, 591-92 (6th Cir. 1986).

As Skye argues, there are multiple ways to establish the validity of the Notes. The first, which the Court addressed above, is through direct and corroborative evidence that Bandagro issued the Notes. The Court has found that Skye did not satisfy its evidentiary burden on that point. Another is to prove that the October 2003 AG Opinion is final and binding upon Venezuela, and cannot be changed. Yet another is by showing that Venezuela is bound by the October 2003 AG Opinion under the U.S. legal principles of acknowledgment, ratification or estoppel. Still another is by showing that Venezuela cannot maintain defenses against validity because Skye is a holder in due course of the Notes. Put more plainly, if Venezuela misled investors in the United States into purchasing invalid Bandagro notes, it carried out commercial activities with a direct effect in the United States within the meaning of 28 U.S.C. § 1605(a)(2).

Once vested with jurisdiction to decide whether Venezuela is legally obligated to make payment on the Notes, the Court is not stripped of this power by virtue of whether Venezuela is legally obligated to make payment under a question of law, fact, or a mixed question of law and fact. As this Court has already stated, "if the October, 2003 opinion of the Attorney General is valid and binding, that opinion will be conclusive on the issue of whether Venezuela engaged in commercial activity." (Opinion & Order 4, Sept. 13, 2006, ECF No. 62). The October 2003 AG Opinion "purports to conclude that the notes at issue were properly issued by a Venezuelan bank and properly guaranteed by an authorized representative of the government of Venezuela." (*Id*). "If those facts are true," this Court stated, "it would follow conclusively that Venezuela engaged in commercial activity in connection with the issuance of the notes." (*Id*. at 5).

## V. Conclusions of Law – Applicable Venezuelan and U.S. Law

Skye argues that, irrespective of the validity of the Notes, both Venezuelan law and U.S. law prevent Venezuela from refusing to honor the 2003 Attorney General Report. Specifically, Skye argues that the OLAG and the U.S. legal principles of acknowledgment, ratification, estoppel, and holder in due course apply to bar Venezuela's refusal to pay. The Court will address each *ad seriatum*:

### A. Venezuelan Law

Both parties called qualified scholars on Venezuelan law to testify regarding the validity of the Notes under Venezuelan law.[32]

Skye called Jacir as a fact witness, whose credentials have already been discussed. *Infra*I.B. In his capacity as an advocate for Gruppo Triad, Jacir's fact testimony shed some light

---

[32] Expert opinion on a question of law is generally inadmissible. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994). But, "[w]hen the law of a foreign nation is at issue, evidence may be presented regarding that issue." *Ohic Ins. Co. v. Employers Reinsurance Corp*. 694 F. Supp. 2d 794, 801 (S.D. Ohio 2010). Fed. R. Civ. P. 44.1 permits the Court to consider "any relevant material or source" even if not otherwise "admissible under the Federal Rules of Evidence."

on what legal processes the parties believed were being followed at the time of the MNF Reports and the AG Opinions, the reasonable reliance on the AG Opinions, and the Venezuelan Supreme Court 2003 and 2007 decisions related to the Gruppo Triad Bandagro Notes.

Skye additionally called Professor Rafael Chavero ("Chavero"), a lawyer and professor of law. Chavero has been a lawyer since 1994, and holds a specialization in administrative law from the Central University of Venezuela[33] in 1997.[34] Tr. Trans. Vol. 6 at 7:16-23. He then received an L.L.M. from Duke University. *Id*. at 7:24-25. Chavero also completed the Program on Negotiation and Mediation at Harvard University in 2006. *Id*. at 9:18-22. After a rigorous selection process in the year 2000, he has been a Professor of Law at the Central University of Venezuela for 15 years, where he is also currently pursuing his Ph.D. *Id*. at 9:12-17, 10:10-17. Chavero's focus at the Central University of Venezuela is Administrative Law, but he has also taught Constitutional Law at another university. *Id*. at 10:18-11:6. Chavero's Administrative Law curriculum has included a course related to procedural claims against public entities e.g. how to collect money from the state government. *Id*. at 11:13-16.

Venezuela called Professor Carlos Mouriño ("Mouriño") to testify regarding Venezuelan law. Mouriño obtained his law degree as well as a specialization in administrative law from Catholic University Andres Bello in Venezuela. Tr. Trans. Vol. 19 at 4:25-5:3. Mouriño has also completed certain continuing legal education at Georgetown University. *Id*. at 6:5-8. He has been a Professor of Law for more than 20 years at his alma mater, teaching Constitutional Law, Administrative Law, and the Practice of Administrative Law. *Id*. at 14-24. Mouriño's curriculum on Constitutional Law includes the history of constitutional law, the various Organic Laws of the Venezuelan constitution, as well as the powers established within the different

---

[33] Universidad Central de Venezuela.
[34] Chavero explained that the specialization is akin to an L.L.M. in the United States.

branches of government. *Id.* at 7:20-8:16. His Administrative Law curriculum includes administrative activities, organization and functionality of the administration and public services, general theory of administrative laws (or, administrative acts), and general theory of the administrative process. *Id.* at 9:1-7. Mouriño has chaired the Department of Administrative Law Practice and received multiple accreditations as a professor. *Id.* at 10:12-21. He also maintains a private administrative and constitutional law practice at a law firm. *Id.* at 11:14-19. Mouriño additionally has a background in government service, which includes serving as a Magistrate Judge in the Administrative Chamber of the Venezuelan Supreme Court in the year 2000. *Id.* at 15:3-6.

The Court credits the testimony of Jacir, Chavero and Mouriño on Venezuelan law, as highly qualified practitioners and professors. The Court finds no reason to question the credibility of these witnesses, takes into account their differences in opinion, and draws the following legal conclusions.

Skye argues that, under Venezuelan law, the October 2003 AG Opinion has preclusive binding effect on the validity of the Notes. Specifically, Skye asserts that the 2003 MNF Report and the 2003 AG Opinion were properly carried out within the purview of Articles 54-60 of the OLAG and that such a process is preclusive. Venezuela asserts that neither is the case. The Court addresses each argument below.

### i. Administrative Proceeding under the OLAG

According to Skye, Jacir made multiple inquiries, including a demand letter on April 3, 2003, that satisfied Article 54. *See* P-22. The letter was sent to the MNF, which was the appropriate body from which to demand payment. *See* P-22; Tr. Trans. Vol. 6 at 401:1-5; Tr. Trans. Vol. 20 at 36:14-25. Nóbrega then issued an "Order to Open an Administrative

77

Proceeding," and Guzman issued an "Order for Opening an Investigation," *see* P-6A at FS0877, both of which mirror the language used in the OLAG header governing Articles 54-60. JX-15 at JX-139 ("On Administrative Procedure"). Guzman also believed the investigation to be commenced under Article 51 of the Venezuelan constitution. Guzman Dep. at 329:13-20, 499:2-11.

The August 2003 MNF Report calls the investigation an "administrative proceeding." P-6 at VZ015641/FS0772. It expressly states that the MNF is following the provisions of the OLAG. *Id*. at VZ015682. It identifies itself as "a legal opinion with respect to whether [Gruppo Triad's] claim is or is not valid," required by the OLAG Article 55. *Id*. at JX11-9. Additionally, Venezuelan legal scholars Jacir and Chavero testified that Gruppo Triad's claim through Jacir was adjudicated in an administrative proceeding. Tr. Trans. Vol. 7 at 40:24-41:7; Tr. Trans. Vol. 10 at 96:23-97:8.

Venezuela responds that the procedural requirements for an administrative proceeding under the OLAG Articles 54-60 were not followed. According to Mouriño, the key requirements of Article 54 are: (1) sending the claim to the appropriate agency, here the MNF; (2) in advance of a lawsuit; (3) in writing; (4) specifically setting forth the claims; (4) and receiving a receipt. Mouriño testified that these requirements are not just "mere formalities," but rather "administrative acts." Tr. Trans. Vol. 19 at 50:8, 50:9-15. Venezuela asserts that the 2003 process was initiated by Luis Velázquez Alvaray, a member of Congress, who grounded his request not in an inquiry under Article 54 but instead in "Article 223 of the Constitution." *Id*. at 83:10-84:4; *see* JX-22. Jacir's letter to Alvaray seeking intervention, Venezuela contends, cannot constitute an Article 54 demand, because it was never sent to or filed with the MNF. *See* P-15. None of the letters sent by Gruppo Triad's lawyers fulfill the Article 54 requirements,

Mouriño concluded. Tr. Trans. Vol. 19 at 95:25-107:4.

Venezuela also asserts that Article 55 was not complied with because no mediation or mediation certificate ever existed. *Id.* at 44:21-45:9. Venezuela further asserts that the October 2003 MNF Report was not a "decision" issued within the meaning of Article 57 because the OLAG would require such a decision to be issued by the Minister of Finance himself. *Id.* at 46:12-18. Moreover, Articles 72 and 73 of the OLAG require that a decision under Article 57 be communicated to the claimant and published in the official gazette. P-10A. Neither occurred here.

Skye responds that Jacir submitted multiple written claims for payment, which satisfy Article 54, even if the correspondence with Alvaray is excluded. *E.g.*, P-102; P-13; P-22; *see also* Tr. Trans. Vol. 6 at 43:21-44:5, 40:8-13, 36:25-37:3 (Chavero testified that these letters were "more than enough" to initiate a claim under Article 54). Article 55 itself makes clear that the case file from the applicable agency, in this case the MNF, must contain certain enumerated items, including a conciliation certificate, "if applicable." P-8. This, Skye posits, means that not every case will include each item.

Finally, Skye asserts, Article 56 states that the October 2003 AG Opinion is final and binding when it is sent to the MNF, while Article 57 requires the MNF notify the claimant of its decision. This requirement was satisfied, Skye claims, when the MNF and the Attorney General provided the October 2003 AG Opinion to Jacir's office. Jacir testified that he regularly checked with the MNF on the status of the August 2003 MNF Report. Tr. Trans. Vol. 8 at 29:19-30:3. His office obtained a copy on November 14, 2003. Tr. Trans. Vol. 6 at 31:2-39:19; P-26. Jacir also testified that he checked daily to see if the Attorney General had issued an opinion regarding the August 2003 MNF Report, therefore, learning of the October 2003 AG Opinion as soon as it

was issued. Tr. Trans. Vol. 8 at 39:21-40:7. He received a copy within a day or two, Tr. Trans. Vol. 8 at 40:16-20, from the MNF, Tr. Trans. Vol. 10 at 66:17-20; Tr. Trans. Vol. 13 at 63:17-20. Moreover, the October 2003 AG Opinion states that "in accordance with the administrative file that has been remitted to it, the legal requirements have been satisfied in order for [the Attorney General] to proceed to issue the Opinion requested." P-3 at SKYE05622-23. It further states that the office was issuing "its legal opinion in accordance with the provisions of Article 56 of the Organic Law governing its duties." *Id.* at SKYE05613.

### ii. Binding Effect Under Venezuelan Law

Venezuela asserts that the October 2003 AG Opinion was not final and binding under Venezuelan law because the Attorney General subsequently disavowed the conclusions.

On November 17, 2003, Nóbrega sent Plaza a letter indicating that he had asked a new legal advisor to prepare a new report, which reached a different conclusion on the validity of the Gruppo Triad Bandagro Notes, and asked her, as Attorney General, to issue a new opinion. Plaza Dep. at 198:3-10; D-428. Plaza responded the next day, stating that her office was unable to issue a new opinion, subsequently calling Nóbrega to explain that the August 2003 MNF Report was still valid. D-436; Plaza Dep. at 194:8-195:5, 195:1-6.

On November 20, 2003, Nóbrega sent Plaza the November 2003 MNF Report, revoking the August 2003 MNF Report. D-438. Plaza understood that the previous opinion had been specifically revoked by Nóbrega. Plaza Dep. at 254:13-18. Therefore, Plaza was able to issue a new opinion. *Id.* at 258:4-9. She then issued the December 2003 AG Opinion. D-452A; Plaza Dep. at 233:2-8, 265:1-5, 266:7-13. Based on the November 2003 MNF Report, the December 2003 AG Opinion revoked the October 2003 AG Opinion and declared that the claim on the purported Gruppo Triad Bandagro Notes was not viable. D-452A at TrEx-05550.

Skye asserts that the December 2003 AG Opinion was issued years later and backdated to appear as though the Office of the Attorney General had changed its legal opinion on the validity of the Notes within a few weeks. Various news articles were published concerning Bandagro notes in December 2003 and January 2004 mentioning the October 2003 AG Opinion, Skye maintains, but not the December 2003 AG Opinion. *See* JX-30; D-494. Plaza herself did not mention a new opinion until years later and Venezuela has failed to produce any announcements or press releases indicating that the Attorney General issued a new opinion in December 2003. Likewise, Plaza sent Alvaray a certified copy of the October 2003 AG Opinion on November 18, 2003. Venezuela submits no documentation that Plaza ever sent Alvaray the December 2003 AG Opinion. Indeed, Skye claims it never heard of nor received the latter until after it purchased the Notes. Even the National Assembly's special mixed commission (which Jacir testified in front of) issued a report on March 1, 2005, which did not mention the December 2003 AG Opinion. JX-43. Finally, Skye argues that no new information was uncovered by the MNF such that a reversal of the August 2003 MNF Report was warranted. When it issued the August 2003 Report, the MNF knew each of the following:

- The 1998 grapho-technical inspection performed in Switzerland at which Gomis was present declared those notes void. P-6.

- The 1998 report also stated that Cordero, Fontana, and Puigbó did not sign those notes. *Id*.

- Public Opinion notices issued in 1998 and 2001 by the MNF called into question the validity of Bandagro notes. *Id*.

- Multiple different versions of the 733 Letter existed. *See* JX-7 at JX-29.

Fatal to Skye's argument is the fact that, whether the December 2003 AG Opinion was

81

issued at the time or later is not relevant to the Attorney General's ability under Venezuelan law to change a previous legal opinion. Skye also argues that the November 2003 MNF Report and the December 2003 AG Opinion were procured as a result of political posturing, rather than new information or evidence. The Court has examined the evidence and finds no supporting evidence establishing fraud in the inducement, issuance, nor any other bad faith that would potentially invalidate the later Report and Opinion. Certainly, the question of the timing of the December 2003 AG Opinion is relevant to Skye's due diligence on the Notes. *Infra* IV.E. But, the Court finds that the December 2003 AG Opinion and the conclusions contained therein are proper representations of the legal opinion of the Attorney General, irrespective of when precisely it was published.

Skye further argues that the December 2003 AG Opinion could not invalidate the October 2003 AG Opinion, which has final and binding preclusive effect on the validity of the Notes under the OLAG. Venezuela responds that an opinion issued by the Attorney General does not have binding preclusive effect under Venezuelan law, and, moreover, nothing in Venezuelan law precludes the Attorney General from issuing new opinions with the same force of law as previous opinions.

Here, the Court is persuaded that the October 2003 AG Opinion was not final and binding with preclusive effect under Venezuelan law. The Supreme Court of Venezuela has addressed the identical issue involving Bandagro notes. One of the holdings in the opinion was that the October 2003 AG Opinion was not issued within a pretrial administrative procedure and, therefore, it is impossible for that Opinion to produce the effects contemplated in Article 56 of the OLAG. The Supreme Court explained "it being clearly evidenced in the file containing this action for interpretation, that the opinion in the case connected with it is an isolated judgment,

82

disconnected from any administrative proceeding." D-710 at TrEx-07846. The court then held:

> [T]he aforementioned total and absolute omission of the administrative proceeding prior to the issuing of the opinion makes it impossible for that opinion to produce the effects contemplated in Article 56 of the Executive Decree on the Organic statute of the Office of the Attorney General; and it is so decided.

*Id.* The Sixth Circuit has interpreted the Venezuelan Supreme Court's opinion as holding that "Attorney General opinions of the kind issued in 2003 and relied upon by Skye are not final and binding determinations of the rights of private claimants, but are 'merely consultative' opinions 'incapable of creating subjective rights on the part of private individuals'." *DRFP, L.L.C.*, 622 F.3d at 519.

Skye argues that Venezuela engineered the 2007 Supreme Court decision to conclusively establish that the October 2003 AG Opinion was not issued in a pretrial administrative proceeding. The Court, Skye contends, should not credit the 2007 decision for several reasons. First, the Venezuelan Supreme Court has no power to resolve the factual questions at issue. Instead, it merely addressed advisory opinions regarding its interpretation of the law based on the assumed facts. Tr. Trans. Vol. 21 at 157:5-16, 158:10-13. In other words, for the Supreme Court to come to the conclusions in its opinion, it had to assume the factual determinations that Venezuela did not conduct a pretrial administrative proceeding. It had no authority to actually make the determination for itself. Tr. Tans. Vol. 6 at 87:8-12.

Second, Skye asserts that the Supreme Court's 2007 decision was issued by a corrupt judiciary that lacks independence. In support of its assertion, Skye quotes from the United States Department of State Annual Reports for 2004-2007. P-246; P-247; P-248; P-249. The 2004 report reads: "[t]he civilian judiciary is an independent branch of power according to the Constitution; however, it was subject to political influence, highly inefficient, and sometimes corrupt." P-246. The 2005 report reads: "[w]hile the law provides for an independent judiciary,

it was increasingly less so. The judiciary also was highly inefficient, sometimes corrupt, and subject to political influence, particularly from the attorney general's office, which in turn was pressured by the executive branch." P-247. In 2007, the year of the relevant Supreme Court decision, the State Department reported: "[w]hile the constitution provides for an independent judiciary, judicial independence was increasingly compromised." P-249.

While the Court finds there is reason to question the independence of the Venezuelan judiciary, without specific facts, it cannot conclude that the system in its entirety is corrupt, or that the 2007 Supreme Court decision was politically motivated. Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007) (citing *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). As Skye points out, foreign judgments may be disregarded on a number of grounds, enabling U.S. courts to use the comity doctrine to refuse to recognize or enforce them. *See Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594-96 (5th Cir. 1003). Here, however, the Court does not find it necessary to perform a comity balancing test because it is not enforcing a foreign judgment in Venezuela's favor. It is simply crediting the interpretation of foreign law of the Venezuelan Supreme Court and the legal scholar proffered by the government of Venezuela over Skye's legal scholars.

Having decided to credit the Venezuelan Supreme Court's decision, the Court credits its determination that it had jurisdiction to decide the petition for constitutional interpretation. D-710 at TrEx-07834-35 (citing Venezuelan decisional law to determine that the court had competence to hear the request for interpretation). The Court also credits the Supreme Court's

84

ability to determine whether a pretrial administrative proceeding took place such that the October 2003 AG Opinion would be final and binding under Venezuelan law. The Court is not persuaded that the Supreme Court took up certain questions of fact versus interpretations of constitutional law that were outside the bounds of its judicial power.

Further, Skye relies almost exclusively on its interpretation of the word "binding" as used in Article 56. To claim that the word "binding" means never subject to change or amendment is more than what the word means. A decision from the Attorney General is binding under Article 56. No language contained therein prevents a reevaluation by the Attorney General, even if the opinion, subject to revision only by the Attorney General, may very well be binding on other governmental agencies.

For the reasons stated above, the Court finds that the October 2003 AG Opinion did not have binding preclusive effect under Venezuelan law necessitating payment on the fraudulent Notes. Moreover, the Attorney General is not expressly prohibited from reexamining and reversing a previous opinion.

## B. Acknowledgment

Skye contends that Venezuela is bound to honor the Notes because the October 2003 AG Opinion constitutes acknowledgement of the debt. At summary judgment, the Court found that the statute of limitations had been extended by Venezuela's acknowledgment of the debt. Opinion & Order, ECF No. 642. Under an Ohio statute, "[a] payment ... made upon any demand founded on a contract, or an acknowledgment thereof, or a promise to pay it ... signed by the party to be charged," will remove the bar of the statute of limitations. O.R.C. § 2305.08. Skye now asserts that when an alleged debtor acknowledges owing a debt, that acknowledgement binds the debtor to payment, unless the debtor can show that the individual

who acknowledged the debt on its behalf did not have authority to do so. Here, the Venezuelan Minister of Finance and the Attorney General had actual and apparent authority to acknowledge the debt and bind Venezuela to that acknowledgment.

Venezuela responds that Skye has improperly raised the theory of acknowledgment, which it did not plead or set forth in the proposed pretrial order. *See* ECF Nos. 301, 667. This failure to raise acknowledgment at an earlier stage results in a waiver. *See Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1188 (6th Cir. 1981) (failure to include claim in pretrial order is a failure to raise the issue at trial). The Court agrees. In an abundance of caution, however, the Court will consider the argument on the merits.

Venezuela also asserts that the acknowledgment doctrine solely applies to extend the statute of limitations, not to bind the debtor to an admission of liability. In *Turner v. Chrisman*, the Ohio Supreme Court stated that "[t]he running of the statute of limitations does not discharge the debt. It only suspends the remedy on the presumption that the debt is paid. By an acknowledgment of the debt ... that presumption is removed and the remedy is restored." 20 Ohio 332, 336 (1851). Thus, Venezuela posits, acknowledgement restores the availability of the remedy, allowing suit on an otherwise time-barred claim. It does not constitute a new debt or establish conclusive liability on the part of the alleged debtor.

The Court finds Venezuela's argument well taken. In *State ex rel. Board of County Commissioners v. Rhodes*, an Ohio court enumerated that the acknowledgment only resets the statute of limitations, but does not "create liability." 177 N.E.2d 557, 567 (Ohio Ct. Com. Pl. 1960). In that case, the Ohio Attorney General promised a local Board of County Commissioner that the state would reimburse it for the county's overpayments to the state for support of inmates. *Id.* at 558-59. The court rejected the plaintiff's argument that the acknowledgement

amounted to a new contract, giving rise to a new legal liability, instead finding that it simply extended the statute of limitations. *Id.*

Likewise, other legal authority has rejected Skye's argument, given that acknowledgement of a debt needs neither mutual assent nor consideration. 4 Samuel Willison & Richard Lord, A TREATISE ON THE LAW OF CONTRACTS § 8:12 at 292 (4th Ed. 2000) ("an express promise made by the debtor that merely repeated the obligation of the debt added nothing to the obligation except perhaps to start again the running of the statute of limitations"); *see* Restatement (Second) Contracts § 82 (Am. Law Inst. 1981) ("A promise to pay all or part of an antecedent … indebtedness owed by the promisor is binding if the indebtedness is still enforceable or would be except for the effect of the statute of limitations."). An acknowledgement does not constitute a new, enforceable promise to pay. *Fed. Deposit Ins. Corp. v. Galloway*, 856 F.2d 112, 117 (10th Cir. 1988) ("Acknowledgment or part payment of debt does not constitute a new agreement. It only suspends the running of the statute of limitations against the party making such acknowledgment or partial payment.").

Skye points to two cases in support of its legal theory of acknowledgement. The first is *Themis Capital, LLC v. Democratic Republic of Congo*, in which the plaintiff-investors brought a breach of contract action against the Democratic Republic of Congo and the Central Bank of the Democratic Republic of Congo (collectively, the "DRC"). 35 F. Supp. 3d 457 (S.D.N.Y. 2014), *aff'd in part*, 626 F. App'x 346 (2d Cir. 2015). The plaintiffs were successors-in-interest to portions of debt that the DRC restructured in 1980, which had been in default since 1990. The restructuring agreement was signed by the Governor of the DRC's Central Bank and its State Commissioner of Finances, both of whom had actual authority to enter into the debt restructuring agreements. *Id.* at 461-62. The same two officers also signed a series of debt acknowledgment

letters in the form of tolling agreements with the lenders. *Id.* at 477. The DRC conceded that each element of a breach of contract action was met, but contested the statute of limitations and the validity of the tolling agreements. *Id.* at 472. The DRC claimed that the letters were not binding because the Governor of the Bank and the State Commissioner lacked authority to bind the DRC. The court disagreed, holding that the officials had actual authority to bind the DRC because they are "national-level officials charged with safeguarding the DRC's monetary and fiscal health." *Id.* at 479-80.

*Themis Capital* is distinguishable from this case. Specifically, the court only decided the issue of whether the statute of limitations had run, it did not attach legal liability for debt that was allegedly fraudulent to the DRC on the basis of acknowledgement. While *Themis Capital* could start for the proposition that the Venezuelan Attorney General and the Minister of Finance had actual authority to bind Venezuela with their correspondence on Bandagro's debt, it does not stand for the proposition that acknowledgment of a debt binds a debtor to payment on the merits. The Court has already agreed with Skye on the former point—the Minister of Finance and the Attorney General both had actual authority to correspond on behalf of Venezuela with respect to the debt. That is why the Court found that the statute of limitations on the Notes had not run. But, having authority to correspond on behalf of Venezuela for the purpose of reviving the statute of limitations does not equate to that correspondence representing a final and binding commitment to payment on the Notes. While Venezuela does argue that neither official had authority to legally bind Venezuela to payment, the Court's opinion on the binding finality of the October 2003 AG Opinion does not rest on that point. Even assuming, without holding, that the officials had authority to bind Venezuela to payment on the fraudulent Notes, the Court finds that the officials would also have authority to reverse their decisions. The latter Report and Opinion,

for this purpose, cancel out the former.

The second case is *GP Hemisphere Assocs., L.L.C. v. Republic of Nicaragua*, in which the plaintiffs sued the Republic of Nicaragua ("Nicaragua") regarding various credit agreements entered into in the 1980s. No. 99 CIV. 10302 (WHP), 2000 WL 1457025, at *1-2 (S.D.N.Y. Sept. 28, 2000). Nicaragua defaulted on the debt and the lenders filed suit to enforce payment. The case resulted in a settlement agreement, in which Nicaragua agreed to pay certain amounts and not to assert a statute of limitations defense in any subsequent action brought within ten years. *Id.* Within the ten year tolling period, the lenders again filed suit for nonpayment. *Id.* at *2. Nicaragua's defense was that the tolling period in the settlement agreement was unenforceable because it exceeded New York's six-year limitations period. *Id.* at *3. The court disagreed, finding that the acknowledgment of the debt in the settlement agreement restarted the statute of limitations. *Id.* at *3-4. This Court does not read the holding as broadly as Skye, which asserts that the court's statement that "the Settlement Agreement constitutes an acknowledgement of the debt by Nicaragua," also touches on the merits of legal liability. *Id.* at *3. The settlement agreement is interpreted by the court as an extension of the statute of limitations, but not, as Skye asserts, as a binding admission of the debt's merit, which was never contested. Thus, neither case offers dispositive support to Skye's argument.

For the abovementioned reasons, the Court finds Venezuela is not bound to payment on the fraudulent Notes due to acknowledgment of the debt.

## C. Ratification

Skye argues that a party becomes liable for debt that it ratifies, even if the underlying debt is one for which the party would not be liable but for the ratification. Venezuela ratified the Notes with the October 2003 AG Opinion, and even if the debt is based on a forgery, the

ratification requires judgment in favor of Skye.

The UCC states that "[a]n unauthorized signature may be ratified for all purposes of this chapter." Ohio Rev. Code § 1303.43(A). "Ratification is a retroactive adoption of the unauthorized signature by the person whose name is signed and may be found from conduct as well as from express statements." *Id.* at Official Comment, No. 3. Skye proffers that, while ratification often arises in the context of an actual agency relationship, where a principal ratifies the conduct of his or her actual agent, no agency relationship is necessary for an unauthorized signature to ratify a debt. "'Unauthorized signature' means a signature means a signature made without actual, implied, or apparent authority. The term includes a forgery." *Id.* at § 1301.201. The official comment explains: "[a]lthough the forger is not an agent, ratification is governed by the rules and principles applicable to ratification of unauthorized acts of an agent." *Id.* at § 1303.43(A), Official Comment, No. 3; *see also Paterson v. Equity Trust Co.*, No. 11CA009993, 2012 WL 690642, at *7 (Ohio Ct. App. Mar. 5, 2012) (rejecting argument that defendant did not ratify transaction because it was accomplished through forgery).

"Ratification is effectuated where the principal, with full knowledge of the fact, conducts himself in a way which manifests his intention to approve an earlier act performed by his agent which did not bind him." *Chase Bank of Ohio v. Mentor Food Mart*, No. 90-L-14-055, 1991 WL 117011, at *5 (Ohio Ct. App. June 28, 1991) (citing *Meyer v. Klensch*, 114 Ohio App. 4 (Ohio 1961); *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 274 (Ohio 1976)). "The consequences of ratification are the same as if the original act had been authorized." *Id.* Intention to affirm the transaction may be proven: (1) expressly, through a party's statements; or (2) impliedly, through a party's conduct. Ohio Rev. Code § 1303.43(A), Official Comment, No. 3.

90

Express ratification means a manifestation of an intent to be bound, while implied ratification means behavior inconsistent with an attempt to repudiate the obligation. *See Barclay Petroleum, Inc. v. Ohio State Dep't of Natural Resources*, No. 00AP-592, 2001 WL 242567, at *5 (Ohio Ct. App. Mar. 13, 2001) ("Ratification can be found in conduct of the principal ... which either expressly manifests its intention to be bound by the acts of its agent or is inconsistent with an intention to repudiate the transaction entered by the agent."). For example, ratification by a corporation's board of directors may be made expressly "by a resolution or vote of the board of directors expressly ratifying previous acts either of corporate officers or agents," or it may be made impliedly "where the directors have actual knowledge of the facts and (1) accept and retain the benefits of the contract, (2) acquiesce in it, or (3) fail to repudiate the contract within a reasonable period of time." *Campbell v. Hospitality Motor Inns, Inc.*, 24 Ohio St.3d 54, 57 (Ohio 1986).

Skye asserts that Venezuela had full knowledge of the facts. The October 2003 MNF Report chronicles Venezuela's investigation into the Notes, including an analysis of both validity and invalidity of the alleged debt. Venezuela knew about the 1998 grapho-technical inspection in Switzerland, the conflicting documents with respect to the signers denying the validity of their signatures, and everything else the MNF uncovered. Skye further asserts that Venezuela expressly affirmed the obligation. The October 2003 AG Opinion reads:

> Accordingly, from the examination and evaluation of all the evidence submitted in the administrative proceeding and from the evidence that has been reproduced for it, containing instruments both of a public as well as of an administrative nature, susceptible of being deemed both as of a public nature (due to their having been authenticated under legal formalities by officials with standing to attest to them: Judges and Notaries), as well as of an administrative nature (in having been produced and gathered by different public officials in the exercise of their duties), it is evident that the Nation has a valid obligation, rooted in the Promissory Notes that are the subject of the present claim.

P-3 at SKYE05630-31.  Skye argues that this language expressly affirmed the debt.  The Attorney General pronounced the claim "procedencia," which means "the claim is according to the law and the merits of the case were considered and in this case the claimant has the right to collect their money."  *Id.* at SKYE05634; Tr. Trans. Vol. 5 at 61:20-24, 72:12-17; Tr. Trans. Vol. 1 at 33:5-15, 34:1-6.  Skye also asserts that, at a minimum, through the language quoted above, Venezuela impliedly affirmed the obligation by adoption or acquiescence.

Venezuela makes several arguments in response: (1) ratification is inapplicable because the underlying transaction never occurred; (2) ratification is unavailable due to lack of actual authority; (3) the Attorney General lacked the full knowledge necessary to ratify the face notes; and (4) fraudulently-obtained ratifications are ineffective.  The Court finds arguments (1) and (3) persuasive.

"To have ratification, there must be an antecedent contract that was previously voidable, but not avoided."  *Somervell v. Baxter Healthcare Corp.*, 159 F.3d 637, at *2 (D.C. Cir. 1998) (quoting *Wamsley v. Champlin Refining and Chemicals, Inc.*, 11 F.3d 534, 538 (5th Cir. 1993); *overruled on other grounds, Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998)).  "Promises that are void cannot be ratified.  The reason for this is simple: Void promises are not legally binding and thus, are not contracts."  *Wamsley*, 11 F.3d at 539.  The Fifth Circuit has explained that "[w]ithout an antecedent contract to ratify, there can be no ratification."  *Id.*

The Court is persuaded that Ohio courts also adopt the reasoning of the D.C. and Fifth Circuits.  In *In re Estate Popp*, an individual fraudulently held himself out as the executor of an estate and drained the decedent's bank account.  94 Ohio App. 3d 640,

92

644-45 (Ohio Ct. App. 1994). The administrator of the estate subsequently brought civil litigation against the bank, and the court denied ratification. The court stated that while forged signatures may be ratified, forged instruments may not be, because a "forged instrument is not merely voidable, but absolutely void, and there can be no ratification of forgery, or a mistake by its acceptance that will make a forged instrument valid." *Id.* at 648.

Here, the Court has concluded that the Notes are forged, therefore, there can be no ratification. The purported Notes were never signed, issued, or sold by Bandagro. As Venezuela highlights, the cases that Skye cites to in support of the proposition that a forged signature can be ratified all involve signatures, rather than instruments that are fraudulent on their face. A non-existent transaction, on the other hand, can never be ratified because ratification cannot create a contract where one never existed. *See Wamsley*, 11 F.3d at 539; *In re Estate Popp*, 94 Ohio App. 3d at 648.

Skye also has not proven that the Attorney General had full knowledge necessary to ratify the Notes with the October 2003 AG Opinion. "To establish ratification under Ohio law, one must show action by the principal, taken with full knowledge of the facts, which manifests his intention to adopt the unauthorized transaction." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 822 (6th Cir. 1981); *see also Integrated Payment Sys., Inc. v. A & M 87th Inc.*, Nos. 91454, 91473, 2009 WL 1623168, at *6 (Ohio Ct. App. June 11, 2009) ("it is well settled that full knowledge of the unauthorized act and of all material matters related to it is essential to a valid ratification"). A fact is material for these purposes, if a reasonable person would attach importance to it in determining whether to ratify. Restatement (Third) Agency, § 4.06, Comment C; Restatement (Second) Torts, § 538(2)(a).

93

Here, Plaza did not have knowledge of all of the material facts because she did not know when she issued the October 2003 AG Opinion that the Notes were fraudulent. *See, e.g. LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 461 (5th Cir. 2011) ("one seeking to prove ratification has the burden to provide knowledge of the fraud and a voluntary, intentional choice to ratify the contract in light of that knowledge"). Here, the facts belie the assertion that Plaza knew the Notes were fraudulent when issuing the October 2003 AG Opinion. When informed about MNF's new determination that the Notes were not valid, Plaza responded that she was unable to change her opinion until she received the November 2003 AG Report. At that point, with the evidence in hand that the MNF had more completely examined its investigation and concluded that the Notes were invalid, Plaza issued the December 2003 AG Opinion. There is no evidence in the record to indicate that she knew or believed that the Notes were fraudulent prior to issuing the October 2003 AG Opinion. As a result, there was no ratification of the debt such that the fraudulent Notes have become payable.

**D. Estoppel**

Skye argues that, under Ohio law, Venezuela is estopped from nonpayment on the Notes. At the outset, the parties disagree on whether Venezuela should be treated as a government actor or a private party for the purposes of Ohio's equitable estoppel law. Skye asserts that the Foreign Sovereign Immunities Act ("FSIA") provides that once the Court has jurisdiction over a case involving a foreign sovereign, "[a]s to any claim … the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Venezuela argues that the FSIA does not alter substantive state laws with respect to causes of action and that equitable estoppel is not a rule of liability. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) ("where state law

94

provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances"). Therefore, Venezuela concludes, the Court should treat it as a government actor for the purposes of equitable estoppel. "In Ohio, as well as other jurisdictions, it is well-settled that, as a general rule, the principle of estoppel does not apply against a state or its agencies in the exercise of governmental function." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 199 (Ohio 2006) (internal quotations omitted); *see also Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010) ("A party attempting to estop the government bears a very heavy burden.").

Skye argues that, even if the Ohio estoppel analysis for government actors is applied, immunity from equitable estoppel is only available to governments "in the exercise of a governmental function." *Id.* at 199. Here, Skye asserts, Venezuela was engaged in a "proprietary function" rather than a governmental function. This Court has already considered this question, in its Opinion and Order on Venezuela's Motion to Dismiss (ECF No. 298), stating:

> Plaintiff attempts to estop Defendants from arguing that the Notes are invalid based on the Venezuelan Attorney General's October 2003 opinion that concluded Venezuela was obligated to make payments on the Notes. This type of administrative determination is clearly a governmental function within the meaning of Ohio law.

(ECF No. 298, pp. 24-26). The Court declines to revisit the question again today, but in an abundance of caution, it has also considered the equitable estoppel analysis applicable to private actors under Ohio law, in light of all of the evidence presented at trial.

"To invoke the doctrine of equitable estoppel, a party must demonstrate (1) a factual misrepresentation; (2) that is misleading; (3) that induced actual reliance, which was both reasonable and in good faith; and (4) that caused detriment to the relying party." *Mark-It Place*

*Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App. 3d 65, 90 (Ohio Ct. App. 2004); *Jefferson-Pilot Life Ins., Co. v. Kearney*, No. 1:02CV479, 2006 WL 212072, at *6-9 (S.D. Ohio Jan. 26, 2006). "[T]he primary focus is on the *conduct* of the party against whom the estoppel is asserted and the *reasonable reliance* of the party asserting it." (Emphasis *sic.*) *Kosa v. Pruchinsky*, 82 Ohio App. 3d 649, 652 (Ohio Ct. App. 1992).

This Court has already held that the August 2003 MNF Report and the October 2003 AG Opinion were, at the least, unintentionally misleading, satisfying the first and second elements. (ECF No. 642 at pp. 25-28). The Court declines to revisit that ruling now.

The Court next turns to whether Skye reasonable relied on the October 2003 AG Opinion in purchasing the Notes. Venezuela argues that any reliance was not reasonable. Skye asserts that Venezuela did not publicly release the November 2003 MNF Report and that the December 2003 AG Opinion was procured later and backdated. As a result, Skye contends that it was not aware of their existence—and could not have discovered it through reasonable diligence—before purchasing the Notes.

Fatal to Skye's argument is the plethora of evidence indicating that the Notes were invalid which it did discover in conducting its due diligence. The Court has made detailed findings of fact chronicling the pieces of information Skye learned during its due diligence phase before it purchased the Notes. *Supra* I.C.1. Skye knew about the conflict of interest with respect to Delgado. Tr. Trans. Vol. 2 at 50:21-24, 60:1-7; Tr. Trans. Vol. 3 at 68:20-21, 71:8-9, 74:14-75:1. Skye knew about Guzman's termination by the MNF. Tr. Trans. Vol. 2 at 53:13-18. Skye knew about Woodstride's claim to the Notes and about its connections with Luis Velázquez Alvaray, an important member of the Venezuelan Congress. Tr. Trans. Vol. 2 at 79:3-6. Skye knew about the public notices published by the MNF disavowing the Gruppo Triad Bandagro

Notes. D-282; JX-14; D-414; D-418; *See* Tr. Trans. Vol. 1 at 188:1-9; Tr. Trans. Vol.2 at 16:5-17:9. Skye knew that Pavanelli had previously been linked to fraudulent Bandagro notes, even tried and convicted in other countries. Tr. Trans. Vol. 1 at 208:5-15; JX-30 at JX-332; Tr. Trans. Vol. 4 at 219:8-221:10. Skye knew that in 2004 the Venezuelan legislature convened a Special Mixed Commission to investigate the Bandagro notes.

The Court has weighed the evidence and finds that any reliance on the part of Skye on the October 2003 AG Opinion in purchasing the Notes was not reasonable. Even Skye's legal counsel Alcalde believed that the question of validity of the Notes was a tremendously close call. Tr. Trans. Vol. 1 at 98:23-25 ("Because if [the MNF and Attorney General's office] were looking for a reason to deny these notes, they certainly had them."). Given the evidence that Skye either knew or should have discovered through diligence, it was not reasonable to rely upon the later-reversed opinion of the Attorney General that the Notes were valid.

Venezuela also argues that equitable estoppel can never be used to perpetuate a fraud. Under Ohio law, equitable estoppel "is available only in defense of a legal or equitable right or claim made in good faith and should not be used to uphold crime, fraud or injustice." *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 502 (Ohio 2006) (quoting *Ohio State Bd. Of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (Ohio 1990)). The Court finds Venezuela's argument well taken. Here, evidence establishes that the Notes are fraudulent and, as a result, equitable estoppel cannot be applied to uphold the fraud by compelling Venezuela to make payment. *See also Stern v. Shainker*, No. 2009 WL 1636173, at *3 (Ohio Ct. App. June 11, 2009) ("Equitable estoppel is therefore a shield not a sword. It does not furnish a basis for damages claims, but a defense against the claim of the stopped party.").

## E. Holder in Due Course

Skye argues that it is entitled to payment on the Notes because it is a holder in due course. Skye has the burden of proving that it is eligible to be a holder in due course. *Aetna Life & Cas. Co. v. Huntington Nat'l Bank*, 934 F.2d 695, 700 (6th Cir. 1991).

> There are five requirements which, under R.C. 1303 .31 (UCC 3-302), one must meet in order to establish holder in due course status: viz., (1) one must be a 'holder' as defined in R.C. 1301.01(T) (UCC 1-201); (2) one must be in possession of an 'instrument,' as explained in R.C. 1303.01(A)(5) (UCC 3-102(A)(5); (3) 'value,' as set forth in R.C. 1303.32 (UCC 3-303), must have been given for the instrument; (4) the instrument must have been taken in 'good faith,' as defined at R.C. 1301.01(S) (UCC 1-201); and (5) the purchaser must take the instrument without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person, as detailed at R.C. 1303.33 (UCC 3-304). All five of these requirements must be met to qualify as a holder in due course. A transferee who otherwise qualifies as a holder in due course, but who takes an instrument with notice of a defense to it on the part of any person is therefore not a holder in due course. Likewise, one who does not take an instrument in good faith is not a holder in due course.

*Fairbanks Capital Corp. v. Summerall*, No. 02AP-864, 2003 WL 1700487, at *2 (Ohio Ct. App. Mar. 31, 2003). Further, "[a] transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated." *Chase Bank of Ohio v. Nealco Leasing, Inc.*, 92 Ohio App. 3d 555, 567 (Ohio 1993); *see also* O.R.C. 1303.33(A)(1).

Venezuela asserts that, under the Ohio Uniform Commercial Code, a party that acquires a negotiable instrument containing a forged indorsement is not a holder in due course. "Read together, R.C. 1303.21(b), 1303.43(A), and 1301.01(QQ) preclude a person who accepts a check under a thief's forged indorsement from becoming a holder." *Romano's Carryout, Inc. v. P.F. Chang's China Bistro, Inc.*, 196 Ohio App. 3d 648, 653 (Ohio Ct. App. 2011). Specifically,

since a forger lacks the status of a holder, "he cannot effectively indorse the instrument, and his transferee cannot acquire that status." *Morris v. Ohio Cas. Ins. Co.*, 517 N.E.2d 904 n. 7 (Ohio 1988). As a result, "[i]f any endorsement in the chain of title is forged, none of the transferees who accept the check after the forged endorsement qualify as holders." *Romano's Carryout, Inc.*, 196 Ohio App. 3d at 654 (citing *Morris*, 517 N.E.2d at 904 n. 7; *Golden Years Nursing Home (No. 2), Inc. v. Gabbard*, 94 Ohio App. 3d 430, 434 (Ohio Ct. App. 1994). Again, the Court finds Venezuela's argument well taken. Because the Notes are forgeries, no transferee in the chain of title, including Gruppo Triad or Skye, qualifies as a holder in due course.

Alternatively, Venezuela argues, Skye does not satisfy the requirements for holder in due course because it was aware that the Notes were both overdue and dishonored when it acquired them. Skye acquired physical possession of the Notes and brought suit on them within a few weeks.[35] Tr. Trans. Vol. 3 at 113:25-114; Compl. ¶ 1. But, "[w]hile the proximity of the date of the assignment and the institution of suit on the note may be cause for further inquiry, absent more it is not sufficient evidence that the assignee had notice of default at the time of assignment." *Countrywide Home Loans Servicing, L.L.P. v. Heck*, No. OT-10-011, 2011 WL 281148, at *3 (Ohio Ct. App. Jan. 14, 2011).

"Even though [Skye] took the note after it was due, it is essential to point out that this does not necessarily mean that [it] took the note with 'notice' that it was overdue. The holder or purchaser of an instrument that is, in fact, overdue may still be a holder in due course if he takes it without notice that it is overdue." *Fid. Title Serv. v. Ball Homes, Inc.*, 25 Ohio App. 3d 52, 55-56 (Ohio 1985). "[A] person takes with notice of a fact when 'he has actual knowledge of it; or

---

[35] Even if Skye's assertion that it acquired constructive possession of the Notes earlier is correct, the time between acquisition and suit was, at most, a month or two.

from all the facts and circumstances known to him at the time in question he has reason to know that it exists." *Id.* at 56.

Here, Skye has actual knowledge or reason to know that the Notes were both overdue and dishonored. Skye's own purchase agreement drafts state that the Notes are currently in default. D-521 at TrEx-06029; D-581 at TrEx-06300. Additionally, the MNF issued several public notices, all warning that documents purporting to be ICC 290 and ICC 322 promissory notes were fake. D-282; JX-14; D-414; D-418; *See* Tr. Trans. Vol. 1 at 188:1-9; Tr. Trans. Vol.2 at 16:5-17:9. Alcalde testified that Venezuela was not going to pay on the purported notes, even after the October 2003 AG Opinion:

> Q. And in fact you learned early in your due diligence that Venezuela was not going to honor the October 3, 2003, opinion, correct?
>
> A. I learned that Venezuela was not going to pay voluntarily.
>
> Q. And you also learned during your due diligence that after the October 3, 2003, opinion, Venezuela had issued one or more public statements that Bandagro Caroni Code ICC-290 and ICC-322 promissory notes were fraudulent, right?
>
> A. One, I don't know about more than one. But for sure one.

Tr. Trans. Vol. 2 at 15:16–16:1.

Skye asserts that it still qualifies as a holder in due course because when an inquiry is made and the obligation is affirmed, the duty to inquire is discharged and the purchaser can take the note as a holder in due course. But, as Venezuela responds, Skye cites cases that were decided before Ohio's adoption of O.R.C. § 1303.32(A)(1)(c), which codified the common law rule that a purchaser cannot become a holder in due course with notice of an overdue or dishonored note. *See Preble v. Portage County*, 19 F. Cas. 1266, 1267 (C.C.W.D. Wis. 1878); *Cincinnati v. Emerson*, 48 N.E. 667 (Ohio 1897). Even assuming, without finding, the October

2003 AG Opinion could overcome notice that the Notes were overdue and dishonored, the facts in this case do not support that it did so, as the Court discusses *supra* IV.A.

For the afore-mentioned reasons, Skye does not qualify as a holder in due course such that the Notes are payable despite their fraudulent issuance.

## VI. CONCLUSION

Based on the foregoing, Defendants' Motion in Limine for sanctions against Skye for Knowing Spoliation of Relevant Documents (ECF No. 651) is **DENIED**. The Court also **DIRECTS** the Clerk to **ENTER JUDGMENT** in favor of Venezuela as to Skye's claim for payment on the Notes. This case is dismissed.

**IT IS SO ORDERED.**

7-22-2016
_____
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**