# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: August 24, 2017

Mr. Charles Horne Cooper Jr.
Cooper & Elliott
2175 Riverside Drive
Columbus, OH 43221

Re: Case No. 16-3960, *DRFP LLC v. Republica Bolivariana, et al*
Originating Case No. : 2:04-cv-00793

Dear Counsel,

The Court issued the enclosed (Order/Opinion) today in this case.

Sincerely yours,

s/Roy G. Ford
Case Manager
Direct Dial No. 513-564-7016

cc: Mr. Thomas R. Ayres II
   Mr. Richard Grant Baldwin
   Mr. Matthew Baltay
   Mr. John C. Camillus
   Mr. Charles Benjamin Cooper
   Mr. Rex H. Elliott
   Mr. Albert J. Lucas
   Mr. Richard W. Nagel
   Ms. Madeleine Rodriguez
   Mr. Andrew Z. Schwartz

Enclosure

Mandate to issue

<u>**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**</u>
File Name:  17a0497n.06

Case No. 16-3960

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

```
┌─────────────────────────────┐
│           FILED             │
│        Aug 24, 2017         │
│    DEBORAH S. HUNT, Clerk   │
└─────────────────────────────┘
```

| | | |
|---|---|---|
| DRFP L.L.C., dba Skye Ventures, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| REPÚBLICA BOLIVARIANA DE | ) | OHIO |
| VENEZUELA; THE VENEZUELAN | ) | |
| MINISTRY OF FINANCE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:  COOK, KETHLEDGE, and DONALD, Circuit Judges.

COOK, Circuit Judge.  Plaintiff-Appellant DRFP L.L.C., dba Skye Ventures ("Skye"), seeks to recover on two promissory notes (the "Notes"), claiming that the República Bolivariana de Venezuela and the Venezuelan Ministry of Finance (collectively, "Venezuela") defaulted on valid debt obligations.  At a bench trial, Skye asserted its right to enforce the instruments by attempting to prove that a Venezuelan financial institution issued the Notes and that Venezuela guaranteed them.  It also argued several alternative theories of recovery to show that, regardless of the Notes' origin, Venezuela obligated itself to honor the instruments when its Attorney General issued an opinion endorsing their validity.  The district court rejected these tactics, first finding that the Notes were fraudulent, and second concluding that Skye's alternative theories of recovery were meritless.  Without contesting the fraud finding, Skye appeals the district court's

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

rejection of two of its alternative theories of recovery. We AFFIRM the district court's judgment against Skye.

## I.

In August 2004, Skye purchased the Notes from Gruppo Triad-FCC SPA ("Gruppo Triad"), a Panamanian corporation, for approximately 2 million United States dollars (USD). The Notes have a face value of 50 million USD each and state that they are guaranteed by the Venezuelan government. Both also specify that they are governed by International Chamber of Commerce regulations, and contain the series denomination "ICC-322." The Notes' language reflects that the instruments were due to mature in 1991.

Less than a month after acquiring the Notes, Skye sued Venezuela to recover for default on the debt. In its amended complaint, Skye alleged that, in 1981, Banco Desarollo Agropecuario SA ("Bandrago"), a Venezuelan financial institution, issued a series of promissory notes (the "Bandrago notes") to fund economic development programs in Venezuela. The Bandrago notes purportedly included the two Notes at issue in this case. Skye claimed that Bandrago traded the Bandrago notes on the international financial market just a few years before going defunct. Skye also alleged that, before 2002, Bandrago notes holders, including Gruppo Triad, requested payment from Venezuela, which prompted the Venezuelan Minister of Finance to investigate the Bandrago notes' legitimacy. On the basis of this investigation, former Venezuelan Attorney General Mariol Plaza issued an opinion in October 2003 ("October 2003 AG Opinion"), concluding that the Bandrago notes were valid and that Venezuela was obligated to pay the note holders. Skye asserted that it relied on that opinion in making its investment decision.

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

In response, Venezuela refused to honor its purported obligations under the Notes, maintaining that they are forged instruments. Venezuela also challenged Skye's reliance on the October 2003 AG Opinion, contending that its conclusions about the Bandrago notes' validity created no private individual rights of enforcement. And it stressed that the Attorney General withdrew this opinion in December 2003 ("December 2003 AG Opinion") after discovering irregularities in her original investigation plus evidence suggesting that the Bandrago notes were counterfeited.

The parties litigated these and other issues over the next 11 years, including one interlocutory appeal to this court. *DRFP L.L.C. v. Republica Bolivariana de Venez.* ("*DRFP I*"), 622 F.3d 513 (6th Cir. 2010). In February 2016, the parties' dispute resulted in a 23-day bench trial addressing the viability of Skye's claim.

*The District Court's Finding of Fraud.* At the conclusion of the trial, the district court granted judgment in favor of Venezuela, first finding that the Notes are fake. As the court recognized, the instruments themselves betrayed fraudulent origins, containing typographical errors and discrepancies between the English text and Spanish translation. Further damaging Skye's case, the three purported signatories (Bandrago's General Manager, Legal and Administrative Advisor, and Receiver) all disclaimed signing the instruments, with a handwriting expert bolstering their denials.

The Bandrago notes' checkered history also belied the Notes' legitimacy. In the early 1990s, for example, an economist overseeing Bandrago's liquidation became suspicious of certain documents in Bandrago's files that referred to the issuance of millions of dollars in ICC-322 series promissory notes. He investigated the irregularities and concluded that the ICC-322 series promissory notes never existed. By 1998, the Venezuelan Ministry of the Treasury

- 3 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

published an "Open Letter to the Public" that disavowed the validity of Bandrago notes in the ICC-322 series. Then, in February 2001, the Venezuelan Ministry of Finance issued a Public Notice confirming the findings. What's more, prior to Skye's acquisition of the instruments, Gruppo Triad's President and CEO James Paolo Pavanelli had already been convicted twice—in England and Italy—for trading in false Bandrago notes.

*The District Court's Rejection of Skye's Alternative Theories of Recovery.* Notably, Skye was aware of much of this information at the time the company decided to purchase the Notes. Nevertheless, Skye's "investment thesis" was that the October 2003 AG Opinion, which concluded that the Notes were valid, "was a final and binding decision that could be enforced." Relying on that opinion, Skye asserted several other legal theories in an effort to enforce the instruments against Venezuela. Of relevance, Skye contended that the October 2003 AG Opinion (1) is legally binding under Venezuelan law and thus creates a private right to enforce payment on the Notes against the sovereign; and (2) constitutes a material misrepresentation of Venezuela's obligation to honor the instruments, thereby estopping Venezuela from asserting the Notes' invalidity and refusing payment. After concluding that it had jurisdiction to address the merits of these other legal theories, the district court rejected them.

Mounting no challenge to the district court's fraud finding, Skye appeals only the court's conclusions that the October 2003 AG Opinion was not legally binding under Venezuelan law and that Venezuela is not estopped from refusing payment on the Notes.

## II.

Before reaching Skye's arguments, we must resolve a jurisdictional issue. Venezuela contends that, because the district court concluded that the Notes were forged, it lacked jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA" or the "Act") to address

- 4 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

Skye's alternative theories of recovery. We review de novo "questions of subject matter jurisdiction, including issues of sovereign immunity." *DRFP I*, 622 F.3d at 515.

The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States[.]'" *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017) (quoting 28 U.S.C. § 1604). One of those exceptions, the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), permits "actions based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). A burden-shifting framework governs claims of immunity under the FSIA, with the party claiming immunity bearing the initial burden of proof that it satisfies the Act's definition of a foreign state, and the non-movant bearing the burden of production to show that an exception applies. *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (citation omitted). The party asserting immunity, however, "retains the burden of persuasion throughout this process." *Id.* (citation omitted).

Earlier in this litigation, Venezuela moved to dismiss Skye's complaint, citing, in part, sovereign immunity under the FSIA. But the district court denied the motion, and this court affirmed. Agreeing with the district court, we concluded that the commercial activity exception abrogated Venezuela's immunity under the FSIA. *See DRFP I*, 622 F.3d at 518. Noting no dispute between the parties that "the activities involving the two promissory notes can be characterized" as "commercial," we held that the exception applied because Venezuela's refusal to pay Skye caused a direct effect in the United States—that is, "money that was supposed to have been delivered to Skye at its office in Columbus was not forthcoming." *Id.* at 516, 518.

- 5 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

Venezuela again asserted sovereign immunity at trial after Skye attempted to prove Venezuela's obligation to honor the Notes through its alternative legal theories, most of which relied on the purportedly binding legal effect of the October 2003 AG Opinion. The district court, however, rejected Venezuela's renewed immunity attempt and addressed the merits of Skye's theories. Now Venezuela rearticulates its immunity claim on appeal as an alternative means for this court to preserve the district court's judgment against Skye. Though we acknowledge that Venezuela's argument has some intuitive appeal, we ultimately find it unpersuasive.

*Commercial Activity under the FSIA.* The "'commercial activity' exception of the FSIA withdraws immunity in cases involving essentially private commercial activities of foreign sovereigns that have an impact within the United States." *O'Bryan*, 556 F.3d at 374 (quoting *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994)). Under the pertinent provision, the Act precludes sovereign immunity when an "action is based . . . upon an act outside the territory of the United States *in connection with a commercial activity* of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added).

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). As the Supreme Court has observed, however, this definition "leaves the critical term 'commercial' largely undefined." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). The Court thus added to the understanding of the term in *Weltover*, holding that "when a foreign government acts, not as a

- 6 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614. The key inquiry is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (citation omitted).

Critical for our purposes, *Weltover* confirmed that a foreign state's issuance of bonds or assumption of debt constitutes a "commercial activity" under the FSIA. *Id.* at 615–16. This is so because there is "nothing distinctive" about the state's assumption of debt other than its purpose that makes the act different from private commercial activity. *Id.*; *see also Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Ger.*, 615 F.3d 97, 107 (2d Cir. 2010) (concluding that West Germany's "affirmative assumption of liability" of certain bonds constituted a commercial activity under the FSIA).

*Venezuela's Immunity Claim.* Venezuela doesn't quarrel with this general concept. Instead, it asserts that, because the district court concluded that the Notes were counterfeited, Bandrago never actually issued them, and, therefore, the sovereign could not have engaged in any commercial activity for purposes of the FSIA. It also suggests that we premised our previous observation (at the motion to dismiss stage) that "the activities involving the [Notes] can be characterized" as commercial on the assumption that Bandrago actually issued the Notes. *See DRFP I*, 622 F.3d at 515–16. Now that this assumption no longer holds, Venezuela maintains it is immune from suit.

Whether a foreign sovereign has engaged in a "commercial activity" depends in large part on the way in which a court defines the allegedly unlawful act at issue in the lawsuit. And, unfortunately, the case law in this area lacks clarity. *See* Joan E. Donoghue, *Taking the*

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

*"Sovereign" Out of the Foreign Sovereign Immunities Act: A Functional Approach to the Commercial Activity Exception*, 17 Yale J. Int'l L. 489, 499–517 (1992) (observing that the immunity of a foreign state under the commercial activity exception varies inconsistently across FSIA case law, depending in large part on a court's identification of the relevant activity for purposes of applying the commercial activity exception). We must nevertheless reject Venezuela's renewed push for immunity because it rests on a faulty assumption that the "commercial activity" underlying Skye's claim is Bandrago's purported issuance of the Notes. As the district court observed, that understanding "only paints half the applicable picture." The underlying "commercial activity" at issue is Venezuela's purported *assumption* of debt and its *refusal to honor* that debt. Jurisdiction thus depends not simply on whether Bandrago actually issued the Notes—it turns on whether the Notes are obligations binding on Venezuela.

And, as Skye has argued throughout the litigation, there are multiple ways to establish Venezuela's obligation to pay on the instruments at issue. As the district court explained, the first and most obvious is by showing "direct and corroborative evidence that Bandrago issued the Notes," which Skye failed to do. Another is to prove that the October 2003 AG Opinion bound Venezuela to honor the Notes' terms under Venezuelan law. Yet another is to show Skye's reasonable reliance on misrepresentations in the October 2003 AG Opinion through the common-law estoppel doctrine. The district court thus retained jurisdiction to address Skye's alternative theories of recovery because a country's assumption of debt and refusal to honor it is, in general, a commercial activity. *See Weltover*, 504 U.S. at 615–16. Put another way, if Venezuela assumed debt by binding itself to pay the Notes under Venezuelan law or by misleading United States investors into purchasing invalid Bandrago notes, then it carried out actions in connection with a commercial activity under § 1605(a)(2).

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

Venezuela counters that Skye's alternative theories of recovery rely on a sovereign act—that is, the issuance of an Attorney General opinion—which is the type of conduct no private party could perform in the marketplace. Since this particular act is not "commercial" in nature, Venezuela claims that the commercial activity exception cannot apply. But again, Venezuela misconstrues the relevant inquiry. The commercial activity exception applies when an "action is based . . . upon an act outside the territory of the United States *in connection with* a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." § 1605(a)(2) (emphasis added). By its plain terms, "the FSIA does not require that every act by the foreign state be commercial for [this] clause of the commercial activity exception to apply. Rather, its activities must merely be made 'in connection with' a commercial activity." *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 725 (9th Cir. 1997) (citations omitted). In *Weltover*, for example, holders of Argentinian bonds sued Argentina for default after the president issued a decree rescheduling payment and offering bondholders substitute instruments. 504 U.S. at 609–10. The Supreme Court concluded that the bondholders' claim fell within the commercial activity exception. *Id.* at 615–16. In that case, "[a] presidential decree [was] clearly not commercial activity. But the issuance of both the bonds was, and the decree was an act made 'in connection with' that activity. The third clause of the commercial activity exception[, § 1605(a)(2),] applied.'" *Adler*, 107 F.3d at 725–26.

Similarly, in *Mortimer*, the Second Circuit considered a claim to enforce several hundred bearer bonds against the Federal Republic of Germany ("FRG"). 615 F.3d at 99. The plaintiff had alleged that the FRG assumed liability to pay on the bonds when its predecessor state, West Germany, enacted a law pledging to honor the instruments if properly validated through certain procedures. *See id.* at 106. The FRG asserted immunity under the FSIA, arguing in part that its

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

alleged assumption of liability was sovereign in character because it was accomplished through the passing of legislation. The court, however, rejected that contention. *See id.* at 107. Noting that "[p]rivate parties can and often do assume liability for bonds in trade or commerce," the court reasoned that West Germany's method of assuming liability—passing a law—did not defeat the essentially commercial character of the act. *See id.* at 107–08; *see also Odhiambo v. Republic of Kenya*, 764 F.3d 31, 38 (D.C. Cir. 2014) (holding that Kenya's alleged refusal to pay plaintiff under a state-run rewards-offer program to enlist public cooperation in enforcing Kenya's tax laws was a breach of a financial obligation and therefore a "presumptively commercial activity of the Kenyan government"). Likewise, here, Venezuela acted in connection with commercial activity by allegedly binding itself as guarantor of the Notes, notwithstanding its use of an Attorney General opinion to (purportedly) do so.

In short, Venezuela fails to satisfy its burden of persuasion to show immunity under the FSIA. *See O'Bryan*, 556 F.3d at 376. The district court thus acted appropriately in addressing Skye's alternative theories of recovery. We turn to those next.

## III.

In addition to asserting the Notes' legitimacy, Skye maintained at trial that the October 2003 AG Opinion binds Venezuela under its own law to pay on the Notes. The district court rejected this argument. To do so, it "credit[ed] the interpretation of foreign law of the Venezuelan Supreme Court and the legal scholar proffered by the government of Venezuela over Skye's legal scholars." On appeal, Skye contests the district court's reliance on the Venezuelan Supreme Court opinion, arguing that the district court erred by failing to conduct a "comity analysis," and further maintaining that such analysis would have shown that the opinion "should be disregarded, not credited."

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

We review the district court's interpretation of foreign law de novo. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 790 (6th Cir. 2007) (citing *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738 (6th Cir. 1999)). Having done so, we disagree with Skye, concluding that its argument both misrepresents the district court's reasoning and misconstrues comity principles.

*Attorney General Opinions under Venezuelan Law.* In 1999, Hugo Chavez assumed the Venezuelan presidency. Following the change in administration, the Constitution of Venezuela was amended by referendum, making several significant alterations to the prior Constitution of 1961. The 1999 Constitution, the version in place through the time relevant to this dispute, provided for the President's appointment of the Venezuelan Attorney General with the authorization of the National Assembly. It also permitted the President to amend the Organic Law of the Attorney General ("OLAG"), a set of laws that have governed the role of the Venezuelan Attorney General since 1965.

In 2001, President Chavez exercised his authority under the new Constitution to amend the OLAG, adding provisions that set forth administrative procedures a party must follow before filing a lawsuit against Venezuela. As the district court explained:

> Articles 54-60 provide for a prior administrative proceeding known as the "administrative pretrial" or administrative proceeding. The administrative pretrial must be exhausted before a private citizen files a lawsuit against the government for monetary damages. This mandatory proceeding affords the Attorney General's office the opportunity to evaluate the merits of the claim as well as to negotiate a pre-litigation settlement, should it see fit.

Central to Skye's theory of recovery is whether Attorney General Plaza issued her October 2003 AG Opinion pursuant to OLAG Articles 54 through 60—that is, in the context of a special administrative proceeding. Because, if so, Article 56 provides that that opinion

- 11 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

constitutes a "binding" legal act, obligating Venezuela to abide by its endorsement of the Notes and pay Skye.

But in 2007, the Constitutional Chamber of the Venezuelan Supreme Court issued an "interpretative" opinion holding the October 2003 AG Opinion was not binding under Venezuelan law. In doing so, it distinguished between opinions the Venezuelan Attorney General issues in her consultative capacity and those she issues in the context of a "special administrative proceeding." As the court explained, the Attorney General issues the former class of opinions under Article 247 of Venezuela's 1999 Constitution, and they are *advisory only*, therefore creating no private rights with preclusive effect, even if they contain language suggesting as much. The Attorney General promulgates the latter class of opinions under her authority set forth in OLAG Articles 54 through 60. Those opinions bind the Venezuelan government. To achieve such "binding" status, however, there must be strict compliance with the rules governing special administrative proceedings.

Addressing the October 2003 AG Opinion specifically, the Venezuelan high court observed that it "[was] reached within the framework of an inter-organic relationship . . . aimed solely at assisting the decision-making body to make a decision." The court also observed "an absolute omission of [a formal] administrative proceeding." In other words, it reasoned that since not all of the procedures under Articles 54 through 60 were followed when the opinion issued, no administrative proceeding took place. The Venezuelan Supreme Court thus held that the October 2003 AG Opinion had no binding, preclusive effect under Venezuelan law. In *DRFP I*, we summarized the Venezuelan Supreme Court's holding as follows:

> We read the Supreme Court's opinion as limited, as we have said, to the holding that certain Attorney General opinions, including those issued in 2003 in this dispute, are not binding on private parties and are subject to change. Neither the first Attorney General opinion [the October 2003 AG Opinion] (that the

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

> [Bandrago] notes are valid) nor the second [the December 2003 AG Opinion] (that the notes are invalid) is settled law in Venezuela binding the parties to this litigation.

622 F.3d at 519.

*Skye's "Comity Analysis" Argument.* As noted, Skye faults the district court for crediting the Venezuelan Supreme Court's interpretation of Venezuelan law. In Skye's view, the district court improperly allowed the Venezuelan Supreme Court decision to "control the outcome of this case" without conducting a proper comity analysis.

Skye's argument mischaracterizes the district court's reasoning. As even a quick glance through its opinion and order reveals, the district court thoughtfully analyzed Venezuelan constitutional and administrative law in addressing Skye's theory of recovery. It did not simply adopt the reasoning of the 2007 Venezuelan Supreme Court opinion to reject Skye's argument. Indeed, in addition to crediting the decision, the district court relied on its own reading of the relevant Venezuelan provisions and the testimony of Venezuela's legal expert.

Skye also misconstrues comity principles. The "comity analysis" Skye would have had the district court employ comes from cases addressing the enforceability of foreign judgments in U.S. courts. Those cases stand for the proposition that, before enforcing a foreign judgment, a U.S. court must assure itself that there was no prejudice by the foreign court issuing the judgment, and that the party against whom judgment is sought had notice and a fair opportunity to be heard. *See Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895); *MacArthur v. San Juan Cty.*, 497 F.3d 1057, 1067 (10th Cir. 2007); *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594–96 (5th Cir. 2003); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141–42 (2d Cir. 2000); *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1148–50 (5th Cir. 1990). Pointing to these cases, Skye asserts that it had neither notice nor an

opportunity to be heard prior to the Venezuelan Supreme Court's decision, which it characterizes as "clandestine." And it argues at length that the Venezuelan judiciary lacks independence, suffers from widespread corruption, and is, as a result, biased.

Certainly, a court should conduct Skye's proffered "comity analysis" when a party asks it to enforce a foreign judgment. *See Hilton*, 159 U.S. at 202–03. But that is not what either party asked the district court to do below. Skye instead petitioned the court to consider the potentially preclusive effect of the October 2003 AG Opinion because one of its alternative theories of recovery depended on it. And that theory required the district court to interpret a complicated issue of Venezuelan law, on the basis of novel and largely untested provisions in the OLAG. To that end, the court considered a range of evidence and sources—including, but not limited to, the 2007 Venezuelan Supreme Court opinion. The Federal Rules afford it such discretion. Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

Nor was it improper for the district court to "credit" the Venezuelan Supreme Court's opinion after reviewing and evaluating the foreign law sources. In fact, the weight of authority suggests the district court would have erred if it had refused to do so. As one of Skye's own experts acknowledged, "the decisions of the Constitutional Chamber of the Supreme Court of Justice of Venezuela are the highest and most final statements of Venezuelan law." And when tasked with resolving an issue of foreign law, courts ordinarily defer to that country's interpretation of its own law. *See, e.g.*, *Hilton*, 159 U.S. at 194 ("We receive the construction given by the courts of the nation as the true sense of the law, and feel ourselves no more at liberty to depart from that construction than to depart from the words of the statute.") (citation

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

omitted); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 92 (2d Cir. 2002) ("Where a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas."); *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 714 (5th Cir. 1999) ("Recognizing the difficulty of interpreting foreign law, courts may defer to foreign government interpretations."); *Shaw v. Goebel Brewing Co.*, 202 F. 408, 412 (6th Cir. 1913) (noting that the court was "constrained" in its interpretation of a British law by the decisions of Great Britain's courts); 73 Am. Juris. 2d Statutes *Construction by foreign courts as aid in interpretation of foreign statutes* § 80 (2017) ("[T]he construction of a statute of a foreign country should be governed by the decisions of the courts of that country.").

Attempting to revive its "comity analysis" argument, Skye suggests that the 2007 Venezuelan Supreme Court decision "functions as a 'judgment.'" In particular, Skye argues that, because the 2007 decision addresses facts specific to this case—that is, the preclusive effect of the October 2003 AG Opinion—that opinion constitutes an enforceable judgment against Skye. But we previously rejected reading the 2007 Venezuelan Supreme Court Opinion so broadly. In addition to addressing sovereign immunity, we also reviewed Venezuela's motion to dismiss on the basis of *forum non conveniens* in *DRFP I*. Defending against that motion, Skye posited that the 2007 Venezuelan Supreme Court opinion effectively decided the issue of the Notes' validity against Skye, and as a result, Venezuela was not an adequate alternative forum to litigate its claim to recovery on the Notes. *DRFP I*, 622 F.3d at 519. We disagreed, concluding that Skye "has read too much into the Venezuelan Supreme Court opinion." *Id.* Although that ruling might "weaken Skye's case," we noted that it "[said] nothing that has the effect of denying Skye

- 15 -

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

the right to litigate the subject matter of the lawsuit in Venezuela." *Id.* at 519–20. In other words, *DRFP I* focused on the claim at the heart of this case—Venezuela's purported default under the Notes—to reject Skye's contention that the 2007 Venezuelan Supreme Court opinion constituted a judgment against Skye. We follow that lead. *See United States v. Haynes*, 468 F.3d 422, 426 (6th Cir. 2006) ("Determinations by a Court of Appeals become the law of the case and are binding on both the district court on remand and the Court of Appeals on subsequent appeal.").

Accordingly, the district court committed no error in declining to conduct Skye's proposed comity analysis before crediting the Venezuelan Supreme Court's interpretation of Venezuelan law.[1]

## IV.

Skye also argued at trial that the district court should estop Venezuela from refusing payment on the Notes. Specifically, Skye contended that it relied on the October 2003 AG Opinion, which misrepresented the sovereign's obligations, before it purchased the Notes. Applying Ohio law,[2] the district court rejected this argument for three independent reasons, concluding that: (1) equitable estoppel is unavailable against government actors like Venezuela

---

[1] After concluding that the October 2003 AG Opinion was not a binding administrative act, the district court also suggested, in the alternative, that nothing in Venezuelan law bars the Attorney General from revoking any of her previously issued opinions—even those she issues under OLAG Articles 54 through 60. Skye faults the district court for this reasoning, citing an expert's affidavit that explains the limited circumstances in which an Attorney General can revoke Article 56 opinions, and which opines that none of those circumstances applies here. We need not resolve this disputed issue of Venezuelan law. The district court determined that the October 2003 AG Opinion was *not* an Article 56 opinion, and Skye's only argument contesting that conclusion—that the district court should have conducted a "comity analysis" before crediting the 2007 Venezuelan Supreme Court decision—we reject here.

[2] Both parties agree that Ohio law governs application of Skye's estoppel theory. We assume that to be true without deciding the issue.

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

that are performing a government function, like the issuance of the Attorney General's opinion; (2) even assuming the availability of equitable estoppel, "any reliance on the part of Skye on the October 2003 AG Opinion in purchasing the Notes was not reasonable"; and (3) Skye may not invoke equitable estoppel because doing so would perpetuate a fraud. On appeal, the parties spill much ink debating whether the district court was right on the first and second points. We need not delve into those arguments, however, because we agree with the district court on the third.

We review a district court's interpretation of state law de novo. *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 660 (6th Cir. 2005) (citation omitted). In Ohio, "equitable estoppel is not an independent cause of action, but rather [] a device by which courts bind parties to presentments made upon which an opposing party relies to his . . . detriment for the formation of a contract." *Smith v. Safe Auto Ins. Co.*, 901 N.E.2d 298, 304 (Ohio Ct. App. 2008) (second alteration in original) (citations and internal quotation marks omitted). "To invoke the doctrine of equitable estoppel, a party must demonstrate (1) a factual misrepresentation; (2) that is misleading; (3) that induced actual reliance, which was both reasonable and in good faith; and (4) that caused detriment to the relying party." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 804 N.E.2d 979, 998 (Ohio Ct. App. 2004) (citations omitted). There are limits, however, to benefitting from this doctrine. Ohio law permits equitable estoppel only "in defense of a legal or equitable right or claim made in good faith." *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 278–79 (Ohio 2006) (quoting *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (Ohio 1990)). The doctrine "should not be used to uphold a crime, fraud, or injustice." *Id.* (quoting *Frantz*, 555 N.E.2d at 633).

As the district court held, ample evidence established that the Notes are fake, and, as noted, Skye voices no challenge to that finding on appeal. Skye instead protests the district

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

court's conclusion that "equitable estoppel cannot be applied to uphold the fraud by compelling Venezuela to make payment." In Skye's view, Ohio law permits applying the doctrine, even in the case of fraud, where the party refusing to fulfill a purported obligation is the less "innocent" party. Since, as Skye reasons, Venezuela is to blame for erroneously endorsing the Bandrago notes, it cannot later "recant[] to escape its monetary obligations." And Skye cites one Ohio case from 1878, *Workman v. Wright*, 33 Ohio St. 405 (1878), to support its claim that "estoppel can be used in forgery cases."

No, *Workman* actually rejected the petitioner's request to apply estoppel against a government actor who had previously promised to make payment on a forged note. *See id.* at 408–10. And Skye cites no other authority that suggests we should apply the doctrine. The Notes are, at this point, undisputedly fraudulent. Despite Venezuela's missteps investigating and temporarily endorsing the Bandrago notes, its negligence or incompetence do not justify sanctioning fraud. 42 Ohio Juris. 3d *Estoppel & Waiver* § 22 (2017) ("[E]quitable estoppel . . . can never be used to uphold a crime, fraud, injustice or wrong of any kind."); *cf. Frantz*, 555 N.E.2d at 633 (affirming a state board's revocation of a pharmacist's and pharmacy's licenses due to Medicaid fraud and rejecting an estoppel argument based on the board's continued renewal of the licenses for several years despite learning of the fraudulent activity). We therefore uphold the district court's rejection of Skye's equitable estoppel theory.

## V.

We note that this litigation by Skye against Venezuela now spans more than a dozen years. It includes extensive motion practice, a 23-day trial, and two appeals to this court. And it all stemmed from Skye's plan to invest with a known criminal (who had already been convicted for trading in false Bandrago notes) by buying counterfeited notes at less than two percent of

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

their face value in a calculated effort to pull off a "gotcha" against a foreign sovereign. As the district court found, Skye knew about or should have known about "the plethora of evidence indicating that the Notes were invalid" prior to purchasing the Notes. This evidence included the typographical errors and mistranslations apparent on the face of the documents—inconsistent with legitimate multi-million dollar financial instruments—and the numerous public warnings issued by the Venezuelan Ministry of Finance advising against the purchase of Bandrago notes in the ICC-322 series. And in this appeal, as explained above, Skye has advanced arguments untethered to valid analysis of either Ohio or Venezuelan law.

We accordingly invite Venezuela to apply to this court for reasonable attorneys fees and costs associated with this appeal under Federal Rule of Appellate Procedure 38.

## VI.

For these reasons, we AFFIRM the district court's judgment against Skye.

Case No. 16-3960, *DRFP L.L.C. v. República Bolivariana de Venezuela, et al.*

KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment. In my view Venezuela is immune from jurisdiction in this case under the Foreign Sovereign Immunities Act. The question under the Act is whether Venezuela engaged in some "commercial activity" that had a "direct effect" in the United States. 28 U.S.C. § 1605(a)(2). In the last appeal the activity that deprived Venezuela of immunity was its putative issuance of the Notes, since the case then came to us at the pleading stage and we were thus required to assume that Skye's allegations were true. But now we know they were false. In this appeal, however, Skye argues that the relevant "commercial activity" was a Ministry of Finance investigation and an inter-agency legal opinion with respect to the Notes. But both of those actions were the exercise of "powers peculiar to sovereigns" rather than "powers that can also be exercised by private citizens." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted). And neither of those actions had the "direct effect" in the United States—as opposed to the highly attenuated effect that Skye claims to have felt here—necessary for Venezuela to lose immunity under the Act. 28 U.S.C. § 1605(a)(2). Hence I would dismiss this appeal on jurisdictional grounds.

That said, however, I wholeheartedly join part V of the majority opinion, in which the court invites Venezuela to seek fees and costs under Rule 38. Skye chose to buy (for pennies on the dollar) notes that were obviously fraudulent, and then for twelve years took a flier on enforcing them in federal court. The consequences for the defendants and the court system alike have included a 23-day bench trial and two notably burdensome appeals, the last of which was utterly without merit. A motion under Rule 38 will allow us to consider whether Skye and its attorneys should now share some of those consequences.